William B. Ingram, #10807   wingram@strongandhanni.com
Spencer W. Young, #16993   syoung@strongandhanni.com
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUMMIT MOUNTAIN HOLDING GROUP, L.L.C., a Utah Limited Liability Company,<br><br>        Plaintiff,<br><br>v.<br><br>SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware Limited Liability Company; GRAND CANYON DEVELOPMENT HOLDINGS 3 LLC, an Arizona Limited Liability Company; and DOES 1 through 10,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>Judge _____ |

COMES NOW Summit Mountain Holding Group, L.L.C., a Utah limited liability company ("Plaintiff"), by and through its undersigned counsel, the law firm of Strong & Hanni, to complain and allege of Defendant Summit Village Development Lender 1, LLC, a Delaware limited liability company (the "Lender"), Defendant Grand Canyon Development Holdings 3 LLC, an Arizona

1

limited liability company (the "Additional Lender"), and Defendant Does 1 through 10 (hereafter collectively, "Defendants") as follows:

### PARTIES

1.      Plaintiff is a duly organized Utah limited liability company in good standing.

2.      The natural persons who are the ultimate beneficial owners of Plaintiff are citizens of the States of Utah, Texas, Michigan, and Connecticut.

3.      Plaintiff acted as guarantor for certain obligations of SMHG Village Development LLC, a Delaware limited liability company (the "Borrower"), pursuant to a Borrower's Equity Requirement Guaranty Agreement dated as of June 28, 2016, by Plaintiff in favor of the Lender, as modified by that certain Amended and Restated Guaranty Agreement, dated as of October 31, 2017 (the "Equity Requirement Guaranty").

4.      A true and correct copy of the Equity Requirement Guaranty is attached hereto as **Exhibit 1**.

5.      The Lender is a Delaware limited liability company.

6.      The Additional Lender is an Arizona limited liability company, and may be a third-party beneficiary of the Equity Requirement Guaranty.

7.      Upon information and belief, all the natural persons who are the ultimate beneficial owners of the Lender and the Additional Lender are subjects of a foreign nation, specifically Hong Kong and/or China.

8.      Does 1 through 10 are persons, natural and unnatural, in the corporate structure of the Lender and the Additional Lender who are believed to have participated in the fraudulent acts alleged herein, including possibly Tang, Shing, and Zou (*see* paragraphs 68 through 87, *infra*).

Plaintiff will definitively name such persons and describe their role by amending this pleading after further investigation and discovery.

## JURISDICTION

9.      Because this is a dispute between citizens of one or more States and the subjects of one or more foreign states, this Court has subject matter jurisdiction pursuant to Title 28, Sections 1332(a)(2) and (3) of the United States Code.

10.      Because Defendants' actions were directed at a Utah limited liability company and Defendants purposefully availed themselves of the privileges of conducting business in Utah with respect to a property located in Utah, this Court has personal jurisdiction over all of the Defendants consistent with due process and the Constitution of the United States.

11.      Because the entire property that is at the center of this dispute is located within the State of Utah, venue is proper in this Court pursuant to Title 28, Section 1391(b)(2) of the United States Code.

## GENERAL ALLEGATIONS

12.      In April 2013, a group of investors and entrepreneurs formed Plaintiff to purchase the Powder Mountain ski resort, which sits east of Eden, Utah.

13.      The goal of those investors and entrepreneurs was to develop the resort into a place where leaders in various fields from around the world could gather and create a community conducive to the development of new and innovative ideas.

14.      In furtherance of that goal, those investors and entrepreneurs planned to responsibly develop real estate around the resort while maintaining its natural beauty.

15.     The planned development was a mixed use project called Summit Powder Mountain, which would feature hotel condominiums and single-family homes, as well as shops, restaurants, event venues, and other points of attraction (the "Development").

16.     The Development was to be located near the top of the Powder Mountain ski resort, and the construction was to take place in stages.

17.     The initial stage was the construction of infrastructure to support the Development, including a four-mile stretch of road, as well as conduits for water, sewer, and electricity.

18.     The next stage was the construction of the "core" of the Development—namely, the hotel condominiums, shops, restaurants, and event venues at the center of the Development.

19.     This second stage was called Summit Village.

20.     Finally, the third stage of the Development was the construction of single-family homes around Summit Village.

21.     Among the individuals who acquired new single-family home sites in the new Development were Reed Hastings (co-founder and CEO of Netflix), Ann Veneman (former Secretary General of UNICEF), Beth Comstock (Chief Marketing Officer at General Electric), Miguel McKelvey (co-founder of WeWork), Blake Mycoskie (founder of TOMS), Gayle Troberman (former Chief Creative Officer at Microsoft), Sir Richard Branson (founder of Virgin Group), and Sophia Bush (actress/director).

22.     In other words, the Development had all the wind at its back, with expectation of great success to be what the investors and entrepreneurs behind it had imagined it could be.

**The EB-5 Program**

23.     United States immigration law, more specifically Title 8, Section 1153(b)(5) of the United States Code, allocates a certain number of total employment-based visas each year to those who are investing capital in the United States to create jobs for its citizens and lawful permanent residents (the "EB-5 Program").

24.     The regulations promulgated under the EB-5 Program require that capital invested pursuant thereto be always "at risk." 8 C.F.R. § 204.6(j)(2); *accord Spencer Enters., Inc. v. U.S.*, 229 F.Supp.2d 1025, 1042 (E.D.Cal. 2001) (finding decision of Administrative Appeals Office not to be arbitrary and capricious where EB-5 investor failed to show her capital was always at risk).

25.     The EB-5 Program is a popular means for foreign nationals abroad to obtain lawful permanent residence (i.e., green cards) in the United States, including foreign nationals of Hong Kong and mainland China.

**The Loan Agreement and Equity Requirement Guaranty**

26.     In mid-2016, the total costs of the second phase of the Development were estimated to be $207,192,584.00.

27.     In order to fund Summit Village, the Borrower entered into an arrangement with the Lender, wherein the Lender planned to use the EB-5 Program to raise capital to fund a loan to the Borrower of $120,000,000.

28.     To memorialize their agreement, the Borrower and the Lender executed that certain Loan Agreement, dated as of June 28, 2016 (the "Original Loan Agreement").

29.     A true and correct copy of the Original Loan Agreement is attached as **Exhibit 2**.

30.     The Loan Agreement was thereafter modified by:

5

a.      the First Amendment to Loan Agreement and Other Loan Documents, dated as of September 23, 2016, between the Borrower and the Lender (a true and correct copy of which is attached hereto as **Exhibit 3**);

b.      the Second Amendment to Loan Agreement and Other Loan Documents, dated as of October 31, 2017, between the Borrower and the Lender (a true and correct copy of which is attached hereto as **Exhibit 4**);

c.      the Third Amendment to Loan Agreement and Other Loan Documents, dated as of March 2, 2018, between the Borrower, the Lender, and the Additional Lender (a true and correct copy of which is attached hereto as **Exhibit 5**);

d.      the Fourth Amendment to Loan Agreement and Other Loan Documents, dated as of May 24, 2018, between the Borrower, the Lender, and the Additional Lender (a true and correct copy of which is attached hereto as **Exhibit 6**); and

e.      the Fifth Amendment to Loan Agreement and Other Loan Documents, dated as of January 31, 2019, between the Borrower, the Lender, and the Additional Lender (a true and correct copy of which is attached hereto as **Exhibit 7**).

31.     The Original Loan Agreement, as modified by the amendments described above in paragraph 30, is simply referred to hereafter as the "Loan Agreement."

32.     Contemporaneous with the Borrower's and the Lender's execution of the Original Loan Agreement, Plaintiff also executed the original Equity Requirement Guaranty.

33.     Contemporaneous with the Borrower's and Lender's execution of the amendment described in paragraph 30.b, Plaintiff executed the amended and restated Equity Requirement Guaranty.

34.     The purpose of the Equity Requirement Guaranty has always been to mitigate risk to the Lender by ensuring that a certain "loan to value" ratio would always be maintained through the completion of Summit Village. The Equity Requirement Guaranty was never intended to guaranty the payment obligations of the Borrower.

35.     In fact, had the parties wanted the Equity Requirement Guaranty to be a guaranty of the Borrower's payment obligations, they could have drafted it as such. The parties chose, however, to limit the guarantied obligations to the Borrower's Equity Requirement solely to ensure that a certain "loan to value" ratio would always be maintained, and specifically did not include repayment obligations in the scope of the Equity Requirement Guaranty.

36.     The Equity Requirement Guaranty has not been modified since October 31, 2017.

### The Obligations Guarantied

37.     Plaintiff did not guaranty the payment or performance of every obligation of the Borrower under the Loan Agreement, but only certain obligations specified in Section 1 of the Guaranty.

38.     One such guaranty is the "punctual payment of … Borrower's Equity Requirement, ___***as and when required under the Loan Agreement***___."

> SECTION 1.  **Guaranty**.  Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of (a) Borrower's Equity Requirement, as and when required under the Loan Agreement, (b) all operating expense and debt service shortfalls of the Project that are not Approved Costs funded by Advances under the Loan to the extent the non-

Ex. 1, at 1 (emphasis added).

39.     "Borrower's Equity Requirement," in turn, is defined with reference to Section 5.17 of the Loan Agreement.

> "**Borrower's Equity Requirement**" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

Ex. 2, at 4.

40.     The amount specified as "Borrower's Equity Requirement" ($87,192,584.00) is the exact difference between the estimated costs of Summit Village ($207,192,584.00) and the amount of the loan set forth in the Loan Agreement ($120,000,000.00).

41.     Furthermore, the Loan Agreement provides that the loan from the Lender would be made in tranches, called "Advances" under the Loan Agreement, and required the Borrower with each "Advance" to submit a "Draw Package," which contained information to mitigate the risk to the Lender, which were subject to Lender approval before the Lender would make the "Advance" that was requested in the "Draw Package." *See generally* Ex. 2, at 23-29 §§ 2.3.2 through 2.4.10.

42.     And in fact, the Loan Agreement expressly conditioned Lender's obligation to give *any* "Advance" on the availability of funds from EB-5 investors.

43.     More specifically, Section 2.1 provided that "[n]otwithstanding any provision to the contrary in this Loan Agreement, Lender *shall have no obligation to make any Advance* to the extent that *EB-5 Capital then deposited in the Lenders' Deposit Account is not sufficient to fund the requested Advance*."

> prepayments of the Loan made by Borrower pursuant to the terms of this Loan Agreement. Notwithstanding any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.
>
> 2.2     *Reserved.*

Ex. 2, at 20 (emphasis added).

44.     Accordingly, Plaintiff and the Borrower always understood and maintained that it was the Borrower's obligation only to contribute "equity" to Summit Village *in proportion* to the amount of aggregate Advances provided by the Lender—specifically, that for every dollar loaned as an "Advance" under the Loan Agreement, the Borrower was obligated to contribute $0.7266 to the costs of Summit Village ($87,192,584.00 divided by $120,000,000.00).

45.     The language of myriad other provisions in the Loan Agreement confirms that this was the correct understanding of the "Borrower's Equity Requirement."

46.     Section 5.17.1 of the Loan Agreement (with reference to which "Borrower's Equity Requirement" is defined; *see* paragraph 39, *supra*) provides as follows:

> 5.17.1. Anything contained in this Loan Agreement to the contrary notwithstanding, the Loan shall at all times be "in balance" on (a)an individual Budget line item basis, and (b)an aggregate Budget amount basis. The Loan shall be deemed to be "in balance" on an individual Budget line item basis only at such time (and *from **time to time***) as the *unexpended amount* for *each Budget line item*, without including the contingency (except to the extent reallocated to such line item in accordance with <u>Section 2.4.5(d)</u>), is *sufficient to pay* <u>all outstanding amounts for the completed work done</u> and to pay for <u>any work to be done to complete such Budget line item</u>. The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and *from **time to time***) as the aggregate of the unexpended amounts for *all individual Budget line items* (including the contingency) is *sufficient to pay* <u>all outstanding amounts for the completed work done</u> and to pay for <u>any work to be done to complete the Project</u>. Without limiting the generality of the foregoing, the Liquid Funds Amount must remain, in combination with the undrawn Loan proceeds (*i.e.*, ***as of any date***, the <u>remainder of $120,000,000.00 *less the sum* of total Advances then made</u>), sufficient to pay for all Approved Costs anticipated to be incurred in the succeeding (prospective) twelve (12) month period in accordance with the Budget, the Plans and Specifications and the Schedule.

Ex. 2, at 47-48 (emphasis added) (some underlined and italicized text in the original).

47.     "Budget," in turn, is defined with reference to Exhibit B of the Loan Agreement, with the possibility that the amounts set forth in Exhibit B could increase in accord with Sections 2.3.1, 2.4.5, or 5.1:

> "**Budget**" means the budget of the Improvement Costs as set forth in <u>Exhibit B</u>, as the Budget may be revised by Borrower from time to time and, to the extent required, approved by Lender from time to time in accordance with <u>Sections 2.3.1</u>, <u>2.4.5</u> or <u>5.1</u>.

Ex. 2, at 4.

48.     Exhibit B to the Loan Agreement, in turn, sets forth in detail the estimated costs for Summit Village, totaling $207,192,584.00. *Id.*, at B-1.

49.     "Approved Costs," is then defined with respect to the "Budget" attached as Exhibit B to the Loan Agreement:

> "**Approved Costs**" means any Improvement Costs, whether incurred by or on behalf of Borrower, for the development of the Project, to the extent specified in the Budget approved by Lender.

Ex. 2, at 3.

50.     Finally, "Liquid Funds Amount" refers to the amount of money that the Borrower contributed to Summit Village, whether through "equity contributions," a "Senior Loan," or one or more "Subordinated Loans."

> "**Liquid Funds Amount**" means the amount of funding obtained from Borrower's equity contributions, from a Senior Loan, or from Subordinated Loans, in each case that is available for contribution to the Project in the form of cash in a Borrower bank account that is part of the Collateral.

Ex. 2, at 12.

51.     In other words, under Section 5.17, the "Loan" was only "in balance" when, at any given point in time, the remainder of the $120 million not yet advanced, plus the total amount the

Borrower had contributed to Summit Village, was enough to pay for all the costs that are specified in Exhibit B but have not yet been paid, and that were expected to be incurred in the succeeding 12 months.

52.     That this was to be paid over time in proportion to the sum of all "Advances" which the Lender had loaned to that point in time is confirmed by myriad other provisions in the Loan Agreement:

a.     Section 2.4.1 of the Original Loan Agreement (the pertinent sentence was removed with the modification described in paragraph 30.e, *supra*) states that no Advance can be used to return equity to Borrower's members contributed up to that point, "***unless and until*** Borrower's Equity Requirement has been *satisfied **in full**.*"

> Except for the First Disbursements, in no event shall an Advance be made in order to return or reimburse any equity funded by Borrower's members or any other Person (whether in the form of cash equity or direct payment of Improvement Costs) unless and until Borrower's Equity Requirement has been satisfied in full, and then such Advance may only be made to reimburse the excess of Borrower's actual equity contributions over the Borrower Equity Requirement.

Ex. 2, at 25, § 2.4.1. In other words, Section 2.4.1 of the Original Loan Agreement clearly contemplated that Advances would be made *before* the Borrower's Equity Requirement had been satisfied *in full*.

b.     Section 2.4.5(a) of the Loan Agreement states that following each Advance requested by the Borrower, "the Loan shall be 'in balance' as required by Section 5.17."

> 2.4.5.  *Loan in Balance*.
>
> (a)     Following the requested Advance, the Loan shall be "in balance" as required by Section 5.17 hereof.

Ex. 2, at 27. This provision would make no sense if Borrower's Equity Requirement were not proportional to the aggregate sum of all Advances made by the Lender.

        c.        Section 3.3.2 of the Loan Agreement states that the Borrower was required to provide to the Lender upon request evidence that funds it received from a condominium unit sold to a buyer were applied either to "pay Approved Costs or otherwise to satisfy the requirements of Section 5.17 of this Agreement for the Loan to be 'in balance.'"

> 3.3    *Release of Units*.  Lender shall from time to time upon the request of Borrower received not less than five (5) Business Days prior to any release contemplated by this <u>Section 3.3</u>, release individual Units from the Lien of the Deed of Trust and from any other Liens held by Lender, provided that:  (a) no Event of Default exists on the date of the proposed release; (b) contemporaneous with any such release, there shall be a sale of such Unit pursuant to an Approved Contract; and (c) Lender shall have received all of the following with respect to the Unit to be sold:
>
> > 3.3.1.  an Approved Contract certified by Borrower to be a true and complete statement of the terms of sale with respect thereto;
> >
> > 3.3.2.  evidence that Borrower has received the Release Price and that Borrower has applied or has reserved such funds to pay Approved Costs or otherwise to satisfy the requirements of Section 5.17 of this Agreement for the Loan to be "in balance";

Ex. 2, at 35. Again, this provision would make no sense if Borrower's Equity Requirement were not proportional to the aggregate sum of all Advances made by the Lender.

        d.        Section 5.27 of the Loan Agreement provides that the Borrower's members would "maintain a *minimum aggregate capital contribution* to the Project *of not less than Borrower's Equity Requirement*, ***as and when required to pay Approved Costs***."

> 5.27    *Capital Contributions*.  Borrower's members shall contribute and thereafter maintain a minimum aggregate capital contribution to the Project of not less than Borrower's Equity Requirement, as and when required to pay Approved Costs and otherwise in accordance with the requirements of this Agreement.

Ex. 2, at 51. That such maintenance provision is expressly conditioned only "as and when required to pay Approved Costs" affirms that Borrower's Equity Requirement was only in proportion to the aggregate sum of all Advances made by the Lender.

### The Borrower's Performance of Guaranteed Obligations

53.     Between June 28, 2016 (the date of the Original Loan Agreement) and March 8, 2019, the Borrower submitted a total of 16 "Draw Packages" to the Lender to receive "Advances" totaling $45,365,201.55.

54.     The Lender, however, failed to deliver the full requested amount on 10 such "Draw Packages," and only ever provided "Advances" totaling $42,000,000.00.

55.     The Borrower, in turn, contributed more than its proportional equity requirement to Summit Village, including:

      a.      The land, valued at $29,000,000.00 (*see* Ex. 2, at B-1);

      b.      Sales proceeds totaling $3,615,003.00; and

      c.      Other equity contributions, totaling $3,315,224.00.

56.     In other words, although the Borrower was only required by the Loan Agreement to contribute $30,517,404.40 ($0.7266 for every $1 the Lender loaned), the Borrower in actuality contributed $35,930,227—a contribution that was $5,412,822.60 in excess of what was required.

57.     Nevertheless, the Lender never loaned any more funds to the Borrower to complete Summit Village, and because the Borrower was relying on those funds to complete Summit Village the Borrower was never able to do so.

58.     The maturity date for the loan was June 28, 2021, five years after the Original Loan Agreement was signed.

59.     However, because the Lender had failed to provide Advances totaling $120 million as originally anticipated, the Borrower did not have the proceeds necessary to repay the $42 million in Advances the Lender had loaned to the Borrower.

60.     On July 6, 2021, the Lender and the Additional Lender sent Plaintiff a letter entitled "Notice of Default Under Amended and Restated Guaranty" (the "Notice").

61.     A true and correct copy of the Notice is attached as **Exhibit 8**.

62.     In the Notice, the Lender and the Additional Lender claimed Plaintiff as guarantor of "Borrower's Equity Requirement" was required to contribute an additional $51,262,357.00 (the difference of $87,192,584.00 and $35,930,227.00) to Summit Village, even though the Lender and the Additional Lender had completely and utterly failed to loan the sum total of $120,000,000.00 in "Advances" under the Loan Agreement.

63.     The Lender and the Additional Lender provided no basis or argument for their claim that the Borrower was ever required to contribute an amount disproportionate to the aggregate sum of "Advances" under the Loan Agreement. *See generally* Ex. 8.

64.     In fact, under the implied interpretation of the Lender and the Additional Lender—namely, that the Borrower's Equity Requirement was due in full on day one—the Borrower would have been in default on June 28, 2016, and the Lender and the Additional Lender fail to explain in their Notice or elsewhere their choice to wait five years to give notice of that default to Plaintiff as guarantor of the Borrower's Equity Requirement.

65.     Indeed, the parties' course of dealing throughout their relationship has reaffirmed, time and again—from presentations to business models to a host of other communications between the parties—the mutual understanding that the Borrower's Equity Requirement was proportionate

14

to the aggregate sum of "Advances" made under the Loan Agreement—an understanding that is consistent with the interpretation of the Loan Agreement set forth above.

66.     The Equity Requirement Guaranty provides that payment is "due no later than thirty (30) days following the giving of a written demand therefor from Lender to" Plaintiff, which from the date of the Notice means that any payment Plaintiff owes would be due on or before August 5, 2021. Ex. 1, at 1-2.

67.     Plaintiff brings this lawsuit to adjudge the respective rights among Plaintiff and the Lender and the Additional Lender—specifically that the Borrower was only required to contribute its "Borrower's Equity Requirement" proportionally to the aggregate sum of the "Advances" made by Lender under the Loan Agreement, for the reasons set forth above, that Borrower performed in full that obligation, and that Plaintiff accordingly has no obligation under the Equity Requirement Guaranty.

### Defendants' Fraudulent Misrepresentations

68.     Before Plaintiff or the Borrower were ever introduced to the Lender, the Additional Lender, or any of their respective representatives, the Borrower entered into a binding term sheet with American Immigration Group, LLC, a Florida limited liability company ("AIG"), to provide the funding for Summit Village through the EB-5 Program.

69.     That term sheet, as amended, was dated May 26, 2015, yet by early 2016, AIG had failed to raise the funds required for Summit Village.

70.     Certain representatives of the Lender and/or one or more Defendants—to wit, Tang Tang, a Taiwanese U.S. citizen ("Tang"), Alex Shing, a Taiwanese U.S. citizen ("Shing"), and a Chinese national named Henry Zou ("Zou")—induced Plaintiff and the Borrower to repudiate their

relationship with AIG specifically because the Lender and/or one or more Defendants could secure the requisite funding for Summit Village instead.

71.     During negotiations for the Loan Agreement, Tang, Shing, and Zou continued to make such representations, telling various representatives of Plaintiff and the Borrower that while the Lender did not yet have the full $120 million for the loan raised, the Lender would have those funds raised by the end of 2018.

72.     Tang and Shing also told Plaintiff and the Borrower that if they could arrange for the American basketball player Kobe Bryant (who was very popular in China at the time) to meet with Zou and Defendants' prospective investors in Hong Kong and China, the full $120 million could be raised in a matter of weeks and would be allocated to the Lender for Summit Village.

73.     Relying on that representation to secure funds for Summit Village, Plaintiff and the Borrower _did_, in fact, arrange for Kobe Bryant to meet with those prospective investors, including a man named Joseph Tsai, the member of a high-net worth family in Taiwan ("Tsai").

74.     As a result of Plaintiff's and the Borrower's efforts, Defendants did in fact secure a total of at least $120 million in commitments from investors.

75.     However, instead of allocating those funds to the Summit Village loan pursuant to the Loan Agreement as represented, one or more Defendants allocated those funds to one or more projects owned and funded by one or more Defendants, instead of to the Lender for "Advances" to the Borrower under the Loan Agreement.

76.     In fact, funds raised from Tsai and his family were devoted to those projects instead of to Summit Village.

77.     Tsai is also now a major investor in the private equity fund formed by one or more Defendants, to which fund one or more Defendants caused the funds raised as a result of the above-described efforts by Plaintiff and the Borrower to be diverted, instead of allocating them to the Lender for Summit Village as they had represented.

78.     As a corporate parent of the Borrower, Plaintiff stood to benefit immensely from the Borrower's development of Summit Village, and construction of the Development as a whole.

79.     However, because Defendants allocated funds Plaintiff and the Borrower helped to raise instead to other projects instead of Summit Village, Plaintiff has been deprived of the benefit it otherwise would have reaped from the activities described in paragraph 78.

80.     More particularly, had Defendants instead allocated those funds to Summit Village through "Advances" under the Loan Agreement, Plaintiff would have reaped the benefit of at least $25 million in additional sales per year for the last two years from the Development.

81.     However, because Defendants instead allocated those funds elsewhere, contrary to what they represented to Plaintiff and the Borrower, Plaintiff has been damaged to date by at least $50 million, and will continue to be damaged from sales in the Development that otherwise would have been made.

82.     Plaintiff has attempted to mitigate those damages by arranging for financing to fund the missing "core" of the Development using land that is not part of the Borrower's collateral to the Lender, including one or more term sheets for preferred equity financing in potentially in excess of one hundred fifty million dollars ($150,000,000) with well-capitalized real estate fund(s), but the Lender's assertion of Plaintiff's liability pursuant to the Equity Requirement Guaranty has interfered with those efforts.

83.     Furthermore, because one or more Defendants induced the Borrower to repudiate its binding term sheet with AIG, AIG threatened to sue the Borrower, Plaintiff, and others for that repudiation.

84.     Plaintiff and the Borrower settled with AIG, agreeing to pay AIG certain sums of money based on the anticipated "Advances" from the Lender.

85.     Indeed, the Loan Agreement expressly conditions the receipt of any "Advances" on execution of the settlement agreement with AIG, and required that the Borrower indemnify the Lender against any claims that might be brought by AIG. *See* Ex. 2, at 20 § 2.3.1(a), 47 § 5.14(e).

86.     But for the inducements of one or more Defendants to repudiate that term sheet on the promise of full funding from the Lender, Plaintiff and the Borrower would not have had to pay those sums to AIG, because they would have never had to settle any claims with AIG.

87.     To date, Plaintiff has paid a sum total of $745,538.36 and the Borrower has paid a sum total of $620,448.08 to AIG pursuant to that settlement agreement, and continues to make such payments to AIG as a result of the inducements by one or more Defendants.

## FIRST CAUSE OF ACTION:
### Declaratory Relief
### (Title 28, Section 2201 of the United States Code)

88.     Plaintiff incorporates the allegations in paragraphs 1 through 87 above, as well as paragraphs 96 through 99 below, hereinto as though fully set forth hereunder.

89.     Pursuant to the Notice, an actual controversy has arisen concerning the respective obligations of the Borrower, the Lender, and the Additional Lender regarding "Borrower's Equity Requirement" under the Loan Agreement—and specifically Plaintiff's obligation to guaranty the Borrower's performance of the "Borrower's Equity Requirement."

90.     That controversy is definite and concrete, touching the legal relations of those with adverse legal interests—namely, Plaintiff, the Lender, and the Additional Lender.

91.     That controversy is real and substantial, insofar as it contains a concrete set of facts which are in no way hypothetical, amounting to a present and unresolved legal issue.

92.     Absent an adjudication from this Court concerning those respective rights, Plaintiff is unable to ascertain what its obligations as guarantor are under the Equity Requirement Guaranty.

93.     An adjudication from this Court will inform Plaintiff of its obligations as guarantor under the Equity Requirement Guaranty—specifically whether Plaintiff has any obligation, in light of the facts set forth above, to pay the sum of money demanded in the Notice, or any sum of money, to the Lender or the Additional Lender—and resolve the controversy that has arisen between Plaintiff, the Lender, and the Additional Lender, as reflected in the Notice.

94.     Plaintiff is entitled to a declaration from this Court of the respective obligations of the Borrower, the Lender, and the Additional Lender regarding "Borrower's Equity Requirement," as well as any other obligations of the Borrower for which Plaintiff has acted as guarantor under the Equity Requirement Guaranty, pursuant to Title 28, Section 2201 of the United States Code.

### SECOND CAUSE OF ACTION:
**Declaratory Relief**
**(Sections 78B-6-401 through –412 of the Utah Code)**

95.     Plaintiff incorporates the allegations in paragraphs 1 through 94 above hereinto as though fully set forth hereunder.

96.     The facts set forth herein give rise to a justiciable controversy presented to the Court for resolution—specifically whether Plaintiff has any obligation, in light of those facts, to pay the

sum of money demanded in the Notice, or any sum of money, to either the Lender or the Additional Lender.

97.     The legal interests of Plaintiff, on the one hand, and the Lender and the Additional Lender, on the other, are adverse, insofar as the Lender and the Additional Lender are demanding payment from Plaintiff that Plaintiff does not believe it owes.

98.     Plaintiff has a legally protectable interest in the money payment of which has been demanded in the Notice.

99.     Because the controversy is based on a set of actual and concrete facts, which have matured into a live controversy reflected in the Notice, this controversy is ripe for determination by the Court.

100.     Plaintiff is entitled to a declaration from this Court of the respective obligations of the Borrower, the Lender, and the Additional Lender regarding "Borrower's Equity Requirement," as well as any other obligations of the Borrower for which Plaintiff has acted as guarantor under the Equity Requirement Guaranty, pursuant to Sections 78B-6-401 through -412 of the Utah Code.

### THIRD CAUSE OF ACTION:
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against the Lender and the Additional Lender)**

101.     Plaintiff incorporates the allegations in paragraphs 1 through 87 above hereinto as though fully set forth hereunder.

102.     A valid and enforceable contract exists between Plaintiff and the Lender (and to the extent it is an intended beneficiary thereof, the Additional Lender), in the Equity Requirement Guaranty.

103.     The Equity Requirement Guaranty is, by its terms, governed by New York law.

104.    Under New York law, the implied covenant of good faith and fair dealing inheres to every contract as a matter of law.

105.    The Equity Requirement Guaranty makes reference to Section 5.17 of the Loan Agreement and therefore incorporates the same by reference thereinto.

106.    Section 5.17 of the Loan Agreement purports to give the Lender discretion to decide if the amount the Borrower has contributed to Summit Village is "deficient," and to demand that the Borrower cure the deficiency through additional contributions. Ex. 2, at 48 §§ 5.17.2, 5.17.3.

107.    By exercising that purported discretion to claim a deficiency in the Borrower Equity Requirement and thereafter demanding Plaintiff pay the same, but only after inducing Plaintiff and the Borrower to repudiate the term sheet with AIG and then to secure Kobe Bryant's attendance at an event to help Defendants secure funds for other projects (as alleged above), the Lender and the Additional Lender breached the covenant of good faith and fair dealing in the Equity Requirement Guaranty.

108.    In addition, if the Lender or the Additional Lender had discretion to allocate funds to other projects instead of to Summit Village, then by exercising that discretion to thus allocate funds Plaintiff and the Borrower helped to secure for Summit Village instead to such other projects, the Lender or the Additional Lender breached the implied covenant of good faith and fair dealing inherent in the Equity Requirement Guaranty.

109.    Plaintiff has been damaged by the Lender and the Additional Lender's breach in an amount to be determined at trial, but in no event less than the $50 million in sales that went unmade in the Development because of the Lender's and the Additional Lender's breach, plus the sums of money paid and to be paid to AIG.

21

110.    Additionally, in the event Plaintiff is held to be required to pay the amount which the Lender and the Additional Lender have demanded in the Notice, Plaintiff has suffered damages in the amount of $51,262,357.00, which amount it would not have had to pay had the Lender and the Additional Lender not breached the Equity Requirement Guaranty's implied covenant of good faith and fair dealing by allocating funds to other projects instead of Summit Village.

### FOURTH CAUSE OF ACTION:
**Fraud Under the Common Law of the State of Utah**
**(Against All Defendants)**

111.    Plaintiff incorporates the allegations in paragraphs 1 through 87 above hereinto as if fully set forth hereunder.

112.    To induce the Borrower to repudiate its term sheet with AIG, representatives of one or more Defendants, namely Tang, Shing, and Zou, represented that Defendants could secure the requisite funding for Summit Village.

113.    During negotiations of the Loan Agreement, at least two representatives of one or more Defendants, namely Tang and Shing, represented to both Plaintiff and the Borrower that if they could secure Kobe Bryant's attendance at an event attended by prospective investors, the Lender could secure the $120 million needed to fund the Advances under the Loan Agreement in a matter of weeks, and would devote all such funds to Summit Village.

114.    During negotiations of the Loan Agreement, at least three representatives of one or more Defendants, namely Tang, Shing and Zou, also represented to both Plaintiff and the Borrower that even if they could not secure the attendance of Kobe Bryant at such event, the Lender could still secure the $120 million needed to fund the Advances by the end of 2018.

115.    By the end of 2018, however, the funds had not been secured for the Lender as one or more Defendants represented they would be on the multiple occasions described in paragraphs 112 through 114 above.

116.    The representations described in paragraphs 112 through 114 were representations of presently existing material fact, insofar as they concerned the ability of the Lender to secure the requisite funding based upon prospective investors already known to Defendants.

117.    In reliance on the representation described in paragraph 112, the Borrower repudiated its term sheet with AIG, and both Plaintiff and the Borrower entered into a settlement agreement with AIG and agreed to pay certain sums to AIG.

118.    In reliance on the representation described in paragraph 113, Plaintiff secured the attendance of Kobe Bryant at such an event, and the Lender did secure the $120 million needed to fund the Advances for Summit Village.

119.    In reliance on the representation described in paragraph 114, the Borrower executed the Loan Agreement and Plaintiff executed the Equity Requirement Guaranty; neither would have executed either such document had they known the representation was false.

120.    Plaintiff had no reason to believe the representations described in paragraphs 112 through 114 were false at the time they was made, and acted reasonably by relying on them.

121.    Instead, Defendants made the representations described in paragraphs 112 through 114 specifically to induce Plaintiff to unwittingly help Defendants fund other projects.

122.    Upon information and belief, one or more Defendants both owning and funding the other projects may constitute a violation of the EB-5 Program and United States immigration law,

since the funds under such an arrangement may not be "at risk," and if so, may in turn constitute a pattern of racketeering activity.

123.   Upon information and belief, representatives of one or more Defendants, including Tang, Shing, and Zou, made the representation described in paragraph 112 having no intention to secure the funds for Summit Village as promised, or recklessly without regard for whether those funds would actually be devoted to Summit Village.

124.   Upon information and belief, representatives of one or more Defendants, including Tang and Shing, made the representation described in paragraph 113 having no intention to devote the $120 million the Lender secured through Plaintiff's efforts to Summit Village, or recklessly without regard for whether such funds would actually be devoted to Summit Village.

125.   Upon information and belief, representatives of one or more Defendants, including Tang and Zou, made the representation described in paragraph 114 either knowing it was false, or recklessly without sufficient knowledge of the Lender's ability to secure such funds.

126.   Because of Defendants' fraudulent misrepresentations as described above, Plaintiff has been damaged in an amount to be proved at trial, but in no event less than the $50 million of sales which otherwise would have been made from the Development had the Lender used the funds so secured for Summit Village, as represented, plus the sums of money paid and to be paid to AIG.

127.   Additionally, in the event Plaintiff is held to be required to pay the amount which the Lender and the Additional Lender have demanded in the Notice, Plaintiff has suffered damages in the amount of $51,262,357.00, which amount it would not have had to pay had Defendants not falsely represented they would allocate the funds secured with Plaintiff's help to Summit Village, because neither Plaintiff nor the Borrower would have signed the Equity Requirement Guaranty

or the Loan Agreement had they known Defendants would not allocate funds so secured to Summit Village as represented.

128.     Upon information and belief, representatives of one or more Defendants engaged in the above-described conduct with a knowing and reckless indifference toward, and disregard of, the rights of others, including Plaintiff, the Borrower, and AIG—specifically because Defendants knew Plaintiff was crowd-sourced and that neither Plaintiff nor the Borrower had a capital partner that could provide the requisite funding of Summit Village in the event the Lender and Additional Lender did not provide such funds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the Court enter judgment in its favor and afford Plaintiff the following relief:

A.     A declaratory judgment adjudicating the respective obligations of the Borrower, the Lender, and the Additional Lender regarding "Borrower's Equity Requirement" and the obligation of Plaintiff to guaranty the same;

B.     Damages for the breach of the Equity Requirement Guaranty's implied covenant of good faith and fair dealing by the Lender and the Additional Lender;

C.     Damages for Defendants' fraud against Plaintiff;

D.     Exemplary and punitive damages for Defendants' fraud against Plaintiff;

E.     Plaintiff's attorney fees and costs as permitted by contract or statute; and

F.     Such other and further relief as the Court finds equitable or just in the premises.

DATED this 4th day of August, 2021.

STRONG & HANNI

*/s/ Spencer W. Young*
H. Burt Ringwood
William B. Ingram
Spencer W. Young
*Attorneys for Plaintiff*