SNELL & WILMER L.L.P.

Matthew L. Lalli (6105)
Jeremy J. Stewart (12247)
Aline Marie H. Longstaff (16089)

15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1531
Telephone: (801) 257-1900
mlalli@swlaw.com
jjstewart@swlaw.com
alongstaff@swlaw.com

KASOWITZ BENSON TORRES LLP

Uri A. Itkin (*pro hac vice* pending)
Jordan D. Beltz (*pro hac vice* pending)
Andrew W. Breland (*pro hac vice* pending)

1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
uitkin@kasowitz.com
jbeltz@kasowitz.com
abreland@kasowitz.com

*Attorneys for Summit Village Development Lender 1 LLC
and Grand Canyon Development Holdings 3 LLC*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUMMIT MOUNTAIN HOLDING GROUP, L.L.C., a Utah Limited Liability Company, | |
| Plaintiff, Counterclaim-Defendant, | Case No. 1:21-cv-00110-BSJ |
| vs. | Honorable Bruce S. Jenkins |
| SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware Limited Liability Company, | |
| Defendant, Counterclaim-Plaintiff | |
| and | |
| GRAND CANYON DEVELOPMENT HOLDINGS 3 LLC, an Arizona Limited Liability Company; and DOES 1 through 10, | |
| Defendants. | |

## ANSWER AND COUNTERCLAIM

Defendants Summit Village Development Lender 1, LLC ("SVDL") and Grand Canyon Development Holdings 3 LLC ("GCDH," and together with SVDL, the "Lenders" or "Defendants"), for their answer to the complaint (the "Complaint") filed on August 4, 2021 by plaintiff Summit Mountain Holding Group, L.L.C. ("Plaintiff"), hereby respond as follows:

## PRELIMINARY STATEMENT

This action stems from Plaintiff's efforts to avoid the absolute and unconditional guaranty that Plaintiff signed in connection with the construction loan that Plaintiff's subsidiary, SMHG Village Development LLC (the "Borrower"), took out from the Lenders.  As explained in more detail in the Lenders' counterclaim, the Borrower borrowed $42 million from the Lenders to help fund the development of a ski resort known as Powder Mountain, in Weber and Cache Counties, Utah.  In connection with the loan, the Borrower promised to contribute at least $87 million of capital to ensure the completion of the project.  Because the Borrower is a LLC, Plaintiff backstopped its capital contribution obligation.

While the Lenders extended $42 million of the $45 million in financing requested by the Borrower, the parties had expressly contemplated the possibility that the Lenders would not be able to provide any more funds.  In that case, because the Lenders still expected the Borrower to complete the project, the Borrower had to secure additional funding from other lenders or investors, which could be senior to the Lenders' loan.  And that is where the Borrower's troubles began.  The Lenders routinely kept the Borrower informed about the limited amount of funds available for the loan and told the Borrower that they had no more funds to lend right before making their last advance in January 2020.  But the Borrower failed to obtain additional funding.

The Borrower began defaulting on payments due on the loan in February 2020.  The Lenders sent Plaintiff and the Borrower pre-default letters in September 2020, demanding a $51

million capital contribution to satisfy the capital contribution requirement.  In November 2020, the Lenders agreed to the Borrower's request to discuss restructuring the loan.  During the parties' discussions, neither Plaintiff nor the Borrower ever complained about the Lenders' actions, let alone accused them of fraud or any other misconduct.  In fact, to induce the Lenders into having restructuring discussions in the first place, Plaintiff and the Borrower repeatedly assured the Lenders in writing that the Lenders had complied with all of their obligations.  In other words, the Borrower and Plaintiff contractually agreed that they had no claims against the Lenders *after* the Lenders informed them that the amount of the loan would be only $42 million and *after* the Lenders asked Plaintiff and the Borrower to make the $51 million contribution.

The loan came due in June 2021, but the Borrower failed to repay it.  After the Borrower defaulted, the Lenders sent a default notice to Plaintiff and the Borrower, seeking, among other things, payment of the capital contribution that Plaintiff and the Borrower failed to make.  In response, Plaintiff filed this action.

As the Lenders will show, Plaintiff's Complaint is meritless.  Not only is Plaintiff now asserting the very claims that it contractually agreed that it did not have and would not assert against the Lenders, but its claims rely on blatant mischaracterizations of the loan documents and what actually happened.  For example, Plaintiff claims that the Lenders used Plaintiff and the late Kobe Bryant to raise money for the loan but then allocated the money elsewhere.  In reality, as unambiguous documentary evidence will confirm, it was Greg Mauro, Plaintiff's chairman and co-owner, who used Mr. Bryant to raise money for *Mauro's* own venture, Learn Capital LLC. The Lenders look forward to dispelling this and other myths in the Complaint and proving that the Complaint is nothing more than a desperate ploy to renege on Plaintiff's unequivocal guaranty obligations.

## DEFENDANTS' RESPONSES TO THE COMPLAINT

1.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint.

2.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint.

3.      Defendants admit that Plaintiff entered into a Guaranty Agreement, dated June 28, 2016 with SVDL, which was amended on October 31, 2017.  Defendants deny the remainder of the allegations in paragraph 3.

4.      Defendants admit the allegations in paragraph 4 of the Complaint.

5.      Defendants admit the allegations in paragraph 5 of the Complaint.

6.      Defendants admit that GCDH is an Arizona limited liability company and deny the rest of the allegations in paragraph 6 of the Complaint.

7.      Defendants deny the allegations in paragraph 7 of the Complaint.

8.      Defendants deny the allegations in paragraph 8 of the Complaint.

9.      The allegations in Paragraph 9 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

10.      The allegations in Paragraph 10 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

11.      The allegations in Paragraph 11 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

12.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint.

13.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint.

14.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint.

15.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint.

16.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint.

17.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint.

18.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint.

19.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint.

20.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint.

21.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint.

22.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint.

23.     The allegations in Paragraph 23 of the Complaint call for legal conclusions to

which no response is required.  To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

24.     The allegations in Paragraph 24 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

25.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Complaint.

26.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint.

27.     Defendants deny the allegations in paragraph 27 of the Complaint.

28.     Defendants admit that the Loan Agreement is dated June 28, 2016.  Defendants deny the remainder of the allegations in paragraph 28.

29.     Defendants admit the allegations in paragraph 29.

30.     Defendants admit that the Loan Agreement was amended on September 23, 2016, October 31, 2017, March 2, 2018, May 24, 2018, and January 31, 2019.  Defendants deny the remainder of the allegations in paragraph 30.

31.     Defendants admit the allegations in paragraph 31.

32.     Defendants admit that the Loan Agreement and Guaranty are dated June 28, 2016. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 32 of the Complaint.

33.     Defendants admit that the Second Amendment and Amended Guaranty are dated October 31, 2017, and that the Amended Guaranty is also dated October 31, 2017.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the remainder of the

allegations in paragraph 33 of the Complaint.

34.     Defendants deny the allegations in paragraph 34 of the Complaint.

35.     Defendants deny the allegations in paragraph 35 of the Complaint.

36.     Defendants deny knowledge or information sufficient to form a belief as to the meaning of the word "modified" as used in paragraph 36 and therefore can neither admit nor deny the allegations in paragraph 36 of the Complaint.

37.     Defendants deny the allegations in paragraph 37 of the Complaint, and state that the documents referred to therein speak for themselves.

38.     Defendants deny the allegations in paragraph 38 of the Complaint, and state that the documents referred to therein speak for themselves.

39.     Defendants deny the allegations in paragraph 39 of the Complaint, and state that the documents referred to therein speak for themselves.

40.     Defendants deny the allegations in paragraph 40 of the Complaint, and state that the documents referred to therein speak for themselves.

41.     Defendants deny the allegations in paragraph 41 of the Complaint, and state that the documents referred to therein speak for themselves.

42.     Defendants deny the allegations in paragraph 42 of the Complaint, and state that the documents referred to therein speak for themselves.

43.     Defendants deny the allegations in paragraph 43 of the Complaint, and state that the documents referred to therein speak for themselves.

44.     Defendants deny the allegations in paragraph 44 of the Complaint.

45.     Defendants deny the allegations in paragraph 45 of the Complaint.

46.     Defendants deny the allegations in paragraph 46 of the Complaint, and state that

the documents referred to therein speak for themselves.

47.     Defendants deny the allegations in paragraph 47 of the Complaint, and state that the documents referred to therein speak for themselves.

48.     Defendants deny the allegations in paragraph 48 of the Complaint, and state that the documents referred to therein speak for themselves.

49.     Defendants deny the allegations in paragraph 49 of the Complaint, and state that the documents referred to therein speak for themselves.

50.     Defendants deny the allegations in paragraph 50 of the Complaint, and state that the documents referred to therein speak for themselves.

51.     Defendants deny the allegations in paragraph 51 of the Complaint, and state that the documents referred to therein speak for themselves.

52.     Defendants deny the allegations in paragraph 52 of the Complaint, and state that the documents referred to therein speak for themselves.

53.     Defendants deny the allegations in paragraph 53 of the Complaint, and state that the documents referred to therein speak for themselves.

54.     Defendants admit that they advanced $42 million in financing to the Borrower and otherwise deny the allegations in paragraph 54 of the Complaint.

55.     Defendants deny the allegations in paragraph 55 of the Complaint.

56.     Defendants deny the allegations in paragraph 56 of the Complaint.

57.     Defendants deny the allegations in paragraph 57 of the Complaint.

58.     Defendants admit the allegations in paragraph 58 of the Complaint.

59.     Defendants deny the allegations in paragraph 59 of the Complaint.

60.     Defendants admit the allegations in paragraph 60 of the Complaint.

61.     Defendants admit the allegations in paragraph 61 of the Complaint.

62.     Defendants deny the allegations in paragraph 62 of the Complaint.

63.     Defendants deny the allegations in paragraph 63 of the Complaint.

64.     Defendants deny the allegations in paragraph 64 of the Complaint.

65.     Defendants deny the allegations in paragraph 65 of the Complaint.

66.     Defendants deny the allegations in paragraph 66 of the Complaint.

67.     Defendants deny the allegations in paragraph 67 of the Complaint.

68.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68 of the Complaint.

69.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 69 of the Complaint.

70.     Defendants deny the allegations in paragraph 70 of the Complaint.

71.     Defendants deny the allegations in paragraph 71 of the Complaint.

72.     Defendants deny the allegations in paragraph 72 of the Complaint.

73.     Defendants deny the allegations in paragraph 73 of the Complaint.

74.     Defendants deny the allegations in paragraph 74 of the Complaint.

75.     Defendants deny the allegations in paragraph 75 of the Complaint.

76.     Defendants deny the allegations in paragraph 76 of the Complaint.

77.     Defendants deny the allegations in paragraph 77 of the Complaint.

78.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 of the Complaint.

79.     Defendants deny the allegations in paragraph 79 of the Complaint.

80.     Defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 80 of the Complaint.

81.     Defendants deny the allegations in paragraph 81 of the Complaint.

82.     Defendants deny the allegations in paragraph 82 of the Complaint.

83.     Defendants deny the allegations in paragraph 83 of the Complaint.

84.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 of the Complaint.

85.     Defendants deny the allegations in paragraph 85 of the Complaint, and state that the documents referred to therein speak for themselves.

86.     Defendants deny the allegations in paragraph 86 of the Complaint.

87.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 of the Complaint.

88.     Defendants incorporate by this reference their responses to the allegations in paragraphs 1-87 of the Complaint as if set forth in full herein.

89.     The allegations in Paragraph 89 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in paragraph 89 of the Complaint, and state that the documents referred to therein speak for themselves.

90.     The allegations in Paragraph 90 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in paragraph 90 of the Complaint, and state that the documents referred to therein speak for themselves.

91.     The allegations in Paragraph 91 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those

allegations, and state that the documents referred to therein speak for themselves.

92.     The allegations in Paragraph 92 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

93.     The allegations in Paragraph 93 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

94.     The allegations in Paragraph 94 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

95.     Defendants incorporate by this reference their responses to the allegations in paragraphs 1-94 of the Complaint as if set forth in full herein.

96.     The allegations in Paragraph 96 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

97.     The allegations in Paragraph 97 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

98.     The allegations in Paragraph 98 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

99.     The allegations in Paragraph 99 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those

allegations.

100.    The allegations in Paragraph 100 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

101.    Defendants incorporate by this reference their responses to the allegations in paragraphs 1-100 of the Complaint as if set forth in full herein.

102.    The allegations in Paragraph 102 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

103.    The allegations in Paragraph 103 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

104.    The allegations in Paragraph 104 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

105.    Defendants deny the allegations in paragraph 105 of the Complaint, and state that the documents referred to therein speak for themselves.

106.    Defendants deny the allegations in paragraph 106 of the Complaint, and state that the documents referred to therein speak for themselves.

107.    The allegations in Paragraph 107 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

108.    The allegations in Paragraph 108 of the Complaint call for legal conclusions to

which no response is required.  To the extent that a response is required, Defendants deny those allegations.

109.    The allegations in Paragraph 109 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

110.    The allegations in Paragraph 110 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

111.    Defendants incorporate by this reference their responses to the allegations in paragraphs 1-110 of the Complaint as if set forth in full herein.

112.    Defendants deny the allegations in paragraph 112 of the Complaint.

113.    Defendants deny the allegations in paragraph 113 of the Complaint.

114.    Defendants deny the allegations in paragraph 114 of the Complaint.

115.    Defendants deny the allegations in paragraph 115 of the Complaint.

116.    The allegations in Paragraph 116 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

117.    Defendants deny the allegations in paragraph 117 of the Complaint.

118.    Defendants deny the allegations in paragraph 118 of the Complaint.

119.    Defendants deny the allegations in paragraph 119 of the Complaint.

120.    Defendants deny the allegations in paragraph 120 of the Complaint.

121.    Defendants deny the allegations in paragraph 121 of the Complaint.

122.    The allegations in Paragraph 122 of the Complaint call for legal conclusions to

which no response is required.  To the extent that a response is required, Defendants deny those allegations.

123.    Defendants deny the allegations in paragraph 123 of the Complaint.

124.    Defendants deny the allegations in paragraph 124 of the Complaint.

125.    Defendants deny the allegations in paragraph 125 of the Complaint.

126.    The allegations in Paragraph 126 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

127.    The allegations in Paragraph 127 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

128.    The allegations in Paragraph 128 of the Complaint call for legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny those allegations.

## GENERAL DENIAL

Defendants deny each and every allegation in the Complaint not specifically admitted above.

## AFFIRMATIVE DEFENSES

Defendants set forth below their affirmative defenses.  In doing so, Defendants incorporate the allegations in their counterclaim as if fully set forth herein.  By setting forth these affirmative defenses, Defendants do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff.  Moreover, nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter

is relevant to Plaintiff's allegations.  Defendants have not knowingly or intentionally waived any applicable defenses, and hereby reserves the right, to the extent permitted by applicable law, to assert and rely upon other defenses and affirmative defenses that become available or apparent as this matter proceeds.  Defendants reserve the right to amend or seek to amend their answers and/or his affirmative defenses as additional facts concerning their defenses become known to them.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted, including without limitation failing to plead the circumstances allegedly constituting fraud with particularity as required under Federal Rule of Civil Procedure 9(b).

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own breach of contract, unclean hands, and other culpable conduct.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of consent, assumption of the risk, ratification, and accord and satisfaction.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, based on the doctrine of estoppel.  As explained in Defendants' counterclaim, Plaintiff repeatedly (including most recently on November 2, 2022 and on January 27, 2021) and expressly represented to Defendants in writing that Defendants had complied with all of their obligations and that Plaintiff had no claims or defenses against them related to the Loan Documents and Guaranty.  By these representations, Plaintiff is estopped from contesting its obligations under the Loan Documents and the Guaranty,

including via the claims in the Complaint.

### FIFTH AFFIRMATIVE DEFENSE

Defendants affirmatively assert that Plaintiff's claims are barred, in whole or in part, based on two separate and independent types of waiver. First, Plaintiff repeatedly (including most recently on January 27, 2021) and expressly represented to Defendants in writing that Defendants had complied with all of their obligations and that Plaintiff had no claims or defenses against them related to the Loan Documents and Guaranty. By these representations, Plaintiff knowingly, intentionally, and distinctly relinquished all of its rights related to any offset, claim, or defense pertaining to the Loan Documents and Guaranty.

Second, in Section 2 of the Guaranty, Plaintiff expressly waived the defenses it has restyled as claims in the Complaint. *See, e.g.*, *Hotel 71 Mezz Lender LLC v. Mitchell*, 63 A.D.3d 447, 448 (N.Y. App. Div. 2009) ("Both the guaranty and the subsequent forbearance agreement, in which the guaranty was reaffirmed, contain express waivers of any and all defenses to enforcement of the guaranty. The language of the waivers is sufficiently specific to bar [defendant's] asserted defenses of . . . breach of the covenant of good faith and fair dealing, and fraudulent inducement.").

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, statute of limitations, and statute of repose, including specifically Utah Code §§ 78B-2-305(3), 78B-2-307(1), and 78B-2-307(3).

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, based on the doctrine of avoidable consequences and Plaintiff's failure to mitigate damages, if any.

### RESERVATION OF AFFIRMATIVE AND OTHER DEFENSES

Lenders may have additional defenses that are not currently known to Lenders but that may be discovered during the course of this case, and Lenders reserve the right to plead and raise such additional defenses as such become known to Lenders.

### PRAYER FOR RELIEF

Wherefore, having fully answered the Complaint, Defendants request that the same be dismissed with prejudice; that Plaintiff take nothing thereby; that Defendants be awarded their reasonable attorney fees and costs incurred in connection with this action as allowed by law (including under Utah Code § 78B-5-825(1)); and that Defendants be awarded such other and additional relief as may be deemed just, equitable, or proper.

\*   \*   \*

### COUNTERCLAIM

Counterclaimant Summit Village Development Lender 1 LLC (the "Lender"), for its counterclaim against counterclaim defendant Summit Mountain Holding Group LLC (the "Guarantor"), alleges as follows:

### PRELIMINARY STATEMENT

1.      This claim arises from the Guarantor's failure to perform its absolute, unconditional, and irrevocable obligations under a guaranty agreement with the Lender.  The Guarantor's subsidiary, SMHG Village Development LLC (the "Borrower"), borrowed $42 million from the Lender to help fund the development of a ski resort, known as Powder Mountain, in Weber and Cache Counties, Utah and promised to contribute at least $87 million of capital to ensure the completion of the development.  The Guarantor agreed to backstop this obligation because the Borrower is a special-purpose entity.  Even though the Lender performed

17

all of its obligations and advanced virtually all of the funds the Borrower requested, the Borrower failed to make its full capital contribution and has failed to repay a penny of the loan when the loan matured in June 2021 (after interest and other amounts due, the unpaid amount has grown to over $50 million).  Now, the project remains incomplete, and the Lender is forced to pursue the Guarantor for the capital contribution that the Borrower promised but failed to make.

2.      In 2016, the Lender negotiated and entered into a construction loan agreement (the "Loan Agreement") with the Borrower and a related guaranty agreement (the "Guaranty") with the Guarantor to develop a highly desirable part of Powder Mountain.  The aim was to build a mixed-use commercial, hospitality/hotel, and residential hub for the entire mountain.  The Borrower and the Guarantor aimed to transform a section of the pre-existing ski resort, which they marketed under the name "Summit Village," into "a utopian club for the millennial elite" (the "Project").

3.      At the outset, the parties estimated that the Project would cost approximately $207 million to develop and complete.  The Borrower and the Guarantor agreed to contribute at least $87 million of that amount (called the "Borrower's Equity Requirement") — the amount would be provided by the Borrower and backstopped by the Guarantor — with the rest funded through debt or equity.  The Loan Agreement provides that the Lender would lend up to $120 million.  However, because the Lender's capital came from potential EB-5 investors whom the Lender had to attract, the parties explicitly provided for the possibility that the Lender would be unable to find enough investors and therefore unable to lend the full $120 million.  In that scenario, because the Lender needed the Borrower to complete the project for purposes of the EB-5 program, the Borrower had to fill the gap with additional equity or debt, which could be senior to the Lender's loan.

4.      Critically, the Loan Agreement entitles the Lender to require the Borrower and the Guarantor to deposit additional funds (called the "Deficiency Deposit") if the loan was not "in balance."  In simple terms, the loan could be out of "balance" in one of two ways: either (i) when the cost of the work completed combined with the cost of work left to be completed exceeded the budget or (ii) when the amount of equity and debt readily available to fund the project was less than the budget.  In both cases, the Lender had sole discretion to require a Deficiency Deposit, which the Borrower had to deposit into a Lender-controlled account that formed part of the Lender's collateral (the "Borrower Deposit Account").

5.      During the course of the loan, the Borrower contributed about $35 million of its Borrower's Equity Requirement and asked the Lender to advance about $45 million in financing. The Lender funded over $42 million of the requested amount, as the other $3 million was for duplicate draw amounts and costs not authorized under the Loan Agreement.  Neither the Borrower, nor the Guarantor ever challenged the Lender's decision not to fund that $3 million.

6.      During the course of the loan, the Lender also kept the Borrower and the Guarantor apprised of the existing number of EB-5 investors and available capital those investors contributed to fund the loan.  Neither the Borrower, nor the Guarantor ever contested the fact that the amount of the loan would be less than $120 million.

7.      In January 2020, weeks before the Lender made its last advance, the Lender informed the Borrower that it had no more funds to lend.  The Lender was amenable to having the Borrower obtain other funding, which would be more senior to the Lender's loan.  But the Borrower failed to do so.  In September 2020, because there were not enough funds to complete the Project and the loan was out of balance, the Lender asked the Borrower to make a $51 million Deficiency Deposit (which reflects the shortfall from the minimum Borrower's Equity

Requirement).  The Borrower failed to do that too.

8.      In November 2020, the parties entered into a pre-negotiation agreement (the "PNA") to facilitate their discussions potentially to restructure the loan to accommodate the Borrower's liquidity crunch.  In the PNA, the Guarantor and the Borrower explicitly agreed that the Lender had complied with all of its obligations under the loan documents, including the Loan Agreement and the Guaranty, and represented that they had no claims against the Lender.  The Guarantor and the Borrower reaffirmed these representations in January 2021, when the Lender agreed to the Borrower's request to sell a lot on the land allocated for the Project.

9.      The parties' restructuring discussions were not successful.  The loan matured and was due to be repaid in full in June 2021.  The Borrower did not repay a penny then and has not repaid a penny to this day.  Now, the full outstanding amount due under the loan, together with interest and all others amounts due, exceeds $50 million.

10.     The Project is far from complete.  Under the Loan Agreement, the Project has a number of major residential, commercial, and infrastructure components, including an 80-unit residential complex, a 52,167 square-foot commercial space, two other lodges, and roads, sewers, and other improvements.  To date, none of the residential complex or commercial space has been constructed.  As a result, the value of the Lender's collateral is far less than expected and is insufficient to repay the loan.  And because the Borrower and the Guarantor have failed to fund the Borrower's Equity Requirement, the Lender cannot look to the cash collateral for full repayment of money it is owed.

11.     The Lender's claims in this case are simple.  It wants its loan repaid.  To this end, the Lender seeks to enforce the Guarantor's absolute and unconditional agreement to pay the full amount of the Borrower's Equity Requirement.  The Guarantor explicitly waived all defenses to

fulfilling this obligation, and indeed, none exist.  The Guarantor and the Borrower repeatedly confirmed this fact on numerous occasions, including in November 2020 and January 2021, *after* the Lender informed them that it would only fund $42 million of the loan and *after* the Lender demanded that they fund the Deficiency Deposit to satisfy the Borrower's Equity Requirement.

12.     Accordingly, as explained in detail below, the Lender is entitled to a judgment requiring the Guarantor to pay the full amount of the Borrower's Equity Requirement and all other amounts due under the Guaranty; awarding Lender its costs and expenses, including its attorneys' fees incurred in enforcing the Guaranty and opposing the Guarantor's meritless strike suit; and for such other relief as the Court may deem just and proper.

## PARTIES

13.     Plaintiff Summit Village Development Lender 1 LLC (the "Lender") is a Delaware limited liability company.

14.     The Lender is the collateral agent for itself and for Grand Canyon Development Holdings 3 LLC, an Arizona limited liability company ("GCDH"), and is entitled to enforce the terms of the Loan on behalf of both itself and GCDH pursuant to a Syndication and Co-Lender Agreement between the Lender and GCDH.

15.     All of the individuals who are members or ultimate beneficial owners of the Lender and non-party GCDH are citizens of China.

16.     Counterclaim defendant Summit Mountain Holding Group LLC is a Utah limited liability company.

17.     On information and belief, all individuals who are members or ultimate beneficial owners of the Guarantor are citizens of Utah, Texas, Michigan, and Connecticut.

18.     On information and belief, the Guarantor and the Borrower are affiliates of a

high-end property developer which currently is constructing a luxury ski resort in Weber County, Utah.  The Guarantor and the Borrower are owned and controlled by some or all of the same board and management teams.

## JURISDICTION AND VENUE

19.     There is federal jurisdiction over this case under 28 U.S.C. § 1332, based on diversity of citizenship and because the dispute concerns over $50 million, far above $75,000, exclusive of interest and costs.

20.     Although the parties had contractually agreed to have their disputes over the Guaranty heard in the state and federal courts in New York, the Guarantor has sued the Lender in this Court, and the real property at issue is located in this District.

## FACTS

### I.      The Purpose Of The Loan Was To Fund The Costs Of Developing The Project

21.     The Borrower took out the loan (the "Loan") from the Lender pursuant to the Loan Agreement, dated June 28, 2016, to develop and construct the Project.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

22.     The Project has major residential, commercial, and infrastructure components, which are defined in Section 1.1 of the Loan Agreement:

> "Project" means Borrower's development of an 80-unit and 214-key townhome, condominium, and hotel condominium complex east of the City in Weber County, Utah, near the summit of Powder Mountain consisting of approximately 52,167 square feet of commercial space, the JV Neighborhood Developments (including the development, construction and operation of (a) an 11,000 sf lodge and event space in the Horizon Neighborhood, and (b) a 15,675 sf lodge and event space in Spring Park), a 6,500 sf Sky Lodge, which is capable of being relocated throughout the Master Project, several remote event spaces, which are capable of being relocated throughout the Master Project, and the development, construction and operation of roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for the Master Project, all as reflected in the Plans and Specifications, as the same may be amended from time

to time with Lender's prior written consent.

23.     The Loan was specifically designed to pay for the construction and development

costs associated the Project which were agreed to by the parties:

> WHEREAS, Borrower has requested and applied to Lender for a secured loan (the "Loan") consisting of EB-5 Capital, not to exceed the Loan Amount, the proceeds of which will be used by Borrower for payment or reimbursement of Approved Costs in connection with the Project or for such other purposes as are permitted under this Loan Agreement;

24.     The agreed-to costs are referred to as the Approved Costs and are defined in

Section 1.1 of the Loan Agreement as costs specified by the parties and approved by the Lender:

> "Approved Costs" means any Improvement Costs, whether incurred by or on behalf of Borrower, for the development of the Project, to the extent specified in the Budget approved by Lender.

25.     That the Approved Costs entail construction and development is reflected in the

definition of "Improvement Costs" in Section 1.1 of the Loan Agreement:

> "Improvement Costs" means all Hard Costs and Soft Costs incurred by or on behalf of Borrower related to the construction of the Improvements, including any site-wide impact fees, labor training costs, or similar costs required under the Entitlements, provided, however, for the avoidance of doubt in no event shall Improvement Costs include EB-5 Financing Costs or amounts owed or payable, or Distributions, to any direct or indirect owner of Borrower or any Affiliate of Borrower, except for the purpose of repaying bridge financing that was used for Improvement Costs and was incurred prior to the Borrower's receipt of the Loan.

26.     At the outset, the parties specified the Approved Costs and agreed upon a budget

in Section 1.1 of the Loan Agreement:

> "Budget" means the budget of the Improvement Costs as set forth in Exhibit B, as the Budget may be revised by Borrower from time to time and, to the extent required, approved by Lender from time to time in accordance with Sections 2.3.1, 2.4.5 or 5.1.

27.     As reflected in Exhibit B to the Loan Agreement, the parties budgeted for over

$207,192,584 in Hard Costs and Soft Costs for construction and development, as well as for

interest.  This amount could be revised by the parties over the term of the Loan in accordance

with the definition of "Budget."

## II.   The Parties Agreed From The Start That The Amount Of The Loan Was Uncertain

28.     The Loan was funded with EB-5 capital.  This means that the amount of loan proceeds to be disbursed was uncertain from the start.  This is because the availability of EB-5 capital depends on the number of willing EB-5 investors, and that number was undetermined.

29.     The parties made this clear in the Loan Agreement.  Specifically, the definition of the Loan in Section 2.1 of the Loan Agreement provides that the Loan could be up to $120 million but would be no greater than the amount of the EB-5 capital that the Lender actually obtained:

> *The Loan.* Lender agrees to lend the Loan to Borrower, and Borrower agrees to borrow the Loan from Lender, subject to the terms and conditions set forth herein and in the Note. The Loan is to be disbursed in incremental Advances (as provided in this Loan Agreement), and the aggregate amount of advances will not exceed the principal amount of One-Hundred Twenty Million Dollars ($120,000,000.00), provided that the amount of Loan shall not be greater than (a) sixty percent (60%) of the Appraised Value, or (b) the aggregate amount of EB-5 Capital deposited in the Lender's Deposit Account (as applicable, the "Loan Amount"). The Loan shall be evidenced by the Note. Borrower agrees to cause the Loan proceeds to be applied (i) for the payment or reimbursement of Approved Costs, or (ii) for the repayment of the Bridge Loan, and for no other purposes, except as may be otherwise approved by Lender in its sole and absolute discretion (including as evidenced by its approval of the relevant change(s) to the Budget and any applicable Draw Package). The Loan is not a revolving loan and amounts repaid may not be re-borrowed without Lender's consent, except with respect to any EB-5 Capital deposited by any replacement investors pursuant to the MDRA following any mandatory prepayments of the Loan made by Borrower pursuant to the terms of this Loan Agreement. Notwithstanding any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.

30.     Furthermore, Section 3.4 of the Loan Agreement provides that if the Loan was less than $120 million, the Borrower could obtain more funding, either in the form of equity or debt, to make up for any shortfall, and that funding would be more senior to the Loan:

> *Senior Loans.* Borrower shall have the right to obtain debt financing or obtain

equity contributions secured by the Mortgaged Property senior in right to the Loan (such senior loans or equity, collectively, the "Senior Loans," each of which is a "Senior Loan") if Lender notifies Borrower in writing that the aggregate amount of the Advances is reasonably expected by Lender to be less than $120,000,000 ….

31.     On top of additional senior funding, the Borrower also could obtain more junior

funding under Section 3.2 of the Loan Agreement:

*Subordinated Loans*. Borrower shall have the right to obtain and borrow loans secured by the Mortgaged Property or otherwise evidenced by one or more Subordinated Notes and other Subordinated Loan Documents (such subordinated loans and any replacement loans obtained to refinance such subordinated loans, in whole or in part, other than the Loan, the "Subordinated Loans"); provided that (a) after giving effect to the proposed Subordinated Loan, the Maximum Permitted Financing Amount shall not be exceeded (or such higher amount as may be approved by Lender in its sole discretion); (b) the proceeds of any Subordinated Loan will only be used to (i) pay or reimburse Approved Costs, (ii) repay or refinance any Subordinated Loan that paid or reimbursed Approved Costs, or (iii) make agreed Deficiency Deposits into the Borrower's Deposit Account; (c) such Subordinated Loans shall be subordinated in their liens, and other rights to the Loan Documents in accordance with an Intercreditor Agreement, which any holder of a Subordinated Loan shall be required to enter into; and (d) such Subordinated Loans shall mature no earlier than the Maturity Date. The form and substance of all Subordinated Loan Documents shall otherwise be in form acceptable to Lender.

32.     In other words, the Borrower knew and agreed from the start that the amount of

the Loan was uncertain and agreed to look for other funding if the Loan was less than $120

million.

### III.     The Borrower And The Guarantor Had To Contribute At Least $87 Million

33.     The Borrower had to contribute at least $87 million of capital to the Project, and

possibly more, and, as shown further below, the Guarantor agreed to backstop this obligation.

34.     The Borrower's capital contribution is referred to as the Borrower's Equity

Requirement and is defined in Section 1.1 of the Loan Agreement as a minimum of $87 million

or such greater amount as required by the costs of the Project:

"Borrower's Equity Requirement" means Borrower's obligation to contribute to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater

amount as is required to cause the loan to be 'in balance' pursuant to Section 5.17 of this Agreement.

35.     As reflected in Section 5.27 of the Loan Agreement, the Borrower's Equity Requirement had to be funded at the start of the Loan and maintained by the Borrower's members to pay for the Approved Costs:

> Borrower's members shall contribute and thereafter maintain a minimum aggregate capital contribution to the Project of not less than Borrower's Equity Requirement, as and when required to pay Approved Costs and otherwise in accordance with the requirements of this Agreement.

36.     Under Section 1.1 of the Loan Agreement, the Borrower was required to keep the Borrower's Equity Contribution in cash, in a Lender-controlled bank account that was assigned to the Lender as part of the Loan collateral:

> "Liquid Funds Amount" means the amount of funding obtained from Borrower's equity contributions, from a Senior Loan, or from Subordinated Loans, in each case that is available for contribution to the Project in the form of cash in a Borrower bank account that is part of the Collateral.

37.     Section 6.10 of the Loan Agreement makes clear that the full amount of the Borrower's Equity Requirement had to be maintained through the life of the Project, even after the construction and development was substantially completed and the Borrower was permitted to make distributions:

> If no Default or Event of Default has occurred and is continuing, after Substantial Completion of the Project, Borrower may make Distributions that do not cause Borrower's aggregate capital contribution to the Project to fall below Borrower's Equity Requirement, provided such Distributions do not exceed Excess Cash Flow.

## IV.     The Lender Could Require The Borrower Or The Guarantor To Pay A Deficiency Deposit If The Borrower's Equity Requirement Fell Below The Minimum Amount

38.     The parties also agreed that Lender would have the right to ask the Borrower to infuse additional capital.  The Lender had the sole discretion to exercise this right.

39.     Specifically, Section 5.17 of the Loan Agreement provides that the Loan had to be

"in balance" during its term.  There are two separate mechanisms to keep the Loan "in balance":

40.     First, as reflected in Section 5.17.1 of the Loan Agreement, the Loan was "in balance" when the sum of (a) the amount of money spent on work that was completed plus (b) the amount of money needed to pay for work yet to be completed was equal to or less than the Budget:

> 5.17.1. Anything contained in this Loan Agreement to the contrary notwithstanding, the Loan shall at all times be "in balance" on (a)an individual Budget line item basis, and (b) an aggregate Budget amount basis. The Loan shall be deemed to be "in balance" on an individual Budget line item basis only at such time (and from time to time) as the unexpended amount for each Budget line item, without including the contingency (except to the extent reallocated to such line item in accordance with Section 2.4.5(d)), is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete such Budget line item. The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project.

41.     Second, as reflected in Section 5.17.4 of the Loan Agreement, the Loan was also "in balance" when there were sufficient funds to complete the Project within the Budget and Schedule, among other things.  The available funds could be equity or debt financing, and other sources, including guarantees.  The Lender, in its sole discretion, determined whether the amount of available funds was sufficient.  So long as that amount was available to the Borrower, including through the Guarantor's guarantees, and so long as there was no Event of Default under the Loan Agreement, this requirement was satisfied:

> 5.17.4. For the purposes of ensuring that the Loan is "in balance" as required by subsection 5.17.1, Borrower and/or Guarantor (if Guarantor is unconditionally obligated in writing to contribute the same to the Project) shall provide reasonable evidence satisfactory to Lender in its sole discretion of financing, Purchaser Deposits and/or equity commitments, sources of financing including, but not limited to, available proceeds of public financing incentives such as tax increment financing, transient room tax revenues, resort tax revenues, or guarantees confirming in sufficient detail the specified amount and terns of the funds that will be available on a timely basis in order to complete the construction of the

Improvements on the Mortgaged Property in accordance with the Budget, the Plans and Specifications and the Schedule ("Commitment Financing Amount"). So long as (i) the Commitment Financing Amount remains available to be drawn by Borrower as and when needed to fund costs of the Improvements, and (ii) no Event of Default has occurred and is continuing, Borrower shall not be required to make a Deficiency Deposit under Section 5.17.4 with respect to the Commitment Financing Amount.

42.     But if either of the "in balance" requirements was not satisfied, the Lender could require the Borrower to deposit the amount of the deficiency into a Lender-controlled account (defined in Section 1.1 as the "Borrower Deposit Account") to be used as additional collateral for the Loan.

43.     In other words, under Section 5.17.3 of the Loan Agreement, the Borrower had to make a Deficiency Deposit if the Lender determined that the available funds were not sufficient to complete the Project:

5.17.3. Borrower agrees that if Lender in its reasonable good faith judgment determines that the Loan is not "in balance", then regardless of how such condition may have been brought about, Borrower shall, within ten (10) Business Days after request by Lender, either deposit from its own funds (or from funds contributed by any of Borrower's direct or indirect constituent members) or from the proceeds of a Subordinated Loan or a Senior Loan (to the extent permitted under Section 3.2 or Section 3.4 of this Loan Agreement) the amount of such deficiency (the "Deficiency Deposit") into the Borrower Deposit Account, which Deficiency Deposit shall first be disbursed before any further Advance shall be made and shall, until fully disbursed, constitute additional collateral security for the Loan. Disbursements of the Deficiency Deposit will be made from time to time for the payment of deficient line item amounts prior to any further Advance of proceeds of the Loan for such amounts and will be made subject to the terms of this Loan Agreement regarding Advances of the Loan.

44.     As explained further below, the Guarantor agreed to backstop this obligation, and it is this obligation that gave rise to this dispute.

## V.     The Lender's Collateral Includes The Borrower's Equity Requirement And Deficiency Deposits

45.     In Section 1.1 of the Loan Agreement, the parties agreed that the Lender's collateral would include the Mortgaged Property and the UCC Collateral under the Deed of

Trust:

> "Collateral" means the Mortgaged Property and the "UCC Collateral" under the Deed of Trust, the "Documents" under the Assignment of Documents (as such quoted terms are defined in those documents), and any other collateral for the Loan now or hereafter granted by Borrower to Lender.

46.     Section 1.1 of the Loan Agreement further defines the Mortgaged Property as all

real and personal property for which the Borrower granted a security interest to the Lender under

the Deed of Trust:

> "Mortgaged Property" means the Land, Improvements, fixtures and all personal property in which Borrower grants to Lender a security interest under the Deed of Trust, in each case only to the extent now or hereafter located on or within the Project.

47.     As noted, the Loan Agreement provides that the Borrower's Equity Requirement

and the Deficiency Deposits had to be deposited into the Borrower's deposit accounts that were

controlled by the Lender.  In turn, Section 1.01 of the Deed of Trust (as amended and restated

most recently in January 2019), a true and correct copy of which is enclosed herewith as Exhibit

B, provides that the Mortgaged Property includes the Borrower's deposit accounts, including all

deposits therein:

> (l) Borrower Deposit Account(s). Any and all rights in any Borrower Deposit Account (the "Cash Collateral") and (i) all instruments or items now or hereafter submitted as deposits or additions to the Cash Collateral, (ii) all revenues, income, interest, dividends, issues and profits now or hereafter earned from the Cash Collateral, (iii) all accessions to, substitutions for, replacements or reissues of, products of and proceeds of the Cash Collateral and the revenues, income, interest, dividends, issues and profits thereof, and (iv) all books and records used in connection with or pertaining to the Cash Collateral, including files, correspondence, printouts, tapes, records of transactions, payments and other proceeds received, the revenues, income, issues and profits therefrom and all credits and other dealings with respect to such Cash Collateral.

48.     Under Section 5.03 of the Deed of Trust, the Lender has the right to foreclose on

the Mortgage Property, either judicially or non-judicially, and use the proceeds to repay the Loan

and to recoup its fees and expenses in enforcing its rights under the Deed of Trust, including

attorneys' fees.

**VI.    The Guarantor Guaranteed The Borrower's Equity Requirement And Other Obligations**

49.     The Guarantor signed the Guaranty at the same time the Borrower entered into the Loan Agreement.  A true and correct copy of the Guaranty, as amended and restated on October 31, 2017, is attached hereto as Exhibit C.

50.     In Section 1(a) of the Guaranty, the Guarantor "absolutely, unconditionally and irrevocably guarantee[d] to Lender the punctual payment" of the "Borrower's Equity Requirement, as and when required under the Loan Agreement."

51.     In Section 1, the Guarantor also agreed "to pay any and all expenses (including reasonable counsel fees and expenses) incurred by Lender in enforcing any rights under this Guaranty."  The Guarantor agreed that if "the amounts due hereunder are not paid to Lender as aforesaid within such thirty (30) days following written demand, then the same shall bear interest at the Default Rate (as defined in the Note) from the date of the initial demand until the date such amounts due hereunder have been paid in full."

52.     In Section 1(c) of the Guaranty, the Guarantor also guaranteed the payment of "all brokerage commission, finder's fees or similar amounts claimed by any Person in connection with the Project, except to the extent arising from any claims of any Person engaged or purportedly engaged by or on behalf of Lender."

53.     Section 2 of the Guaranty, provides that the "Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection . . . .  The liability of Guarantor under this Guaranty shall be absolute and unconditional irrespective of . . . any . . . circumstance which might . . . constitute a defense available to, or a discharge of, Borrower or a guarantor or a Person giving an acknowledgment of debt, unless due to Lender's

gross negligence or willful misconduct."

**VII.  The Lender Disbursed The Loan As Required And Complied With All Of Its Obligations, But The Borrower Defaulted In 2020**

54.     As noted, the parties signed the Loan Agreement in June 2016.  The Lender began advancing funds almost immediately, and made 17 advances to the Borrower between July 2016 and January 2020.  The aggregate amount of the Lender's advances was $42,000,000.

55.     During the course of the Loan, the Borrower contributed $35,930,227 toward the Borrower's Equity Requirement.  This amount principally consisted of the Borrower's contribution of the underlying land where the Project was going to be built.  To date, neither the Borrower nor the Guarantor has made any more capital contributions toward the Borrower's Equity Requirement.

56.     As noted, the Lender's purpose in making the Loan was to enable its investors to participate in the EB-5 program.  The EB-5 program was created by Congress in 1990 to facilitate commercial investment in the United States in return for providing lawful visas to foreign investors.  The program requires an investment of $500,000 or more that creates a certain amount of jobs in the United States.  Participation in the program, and the availability of capital, is based on the number of potential investors.

57.     The Lender informed the Borrower from the start that there was a limited number of potential EB-5 investors and, therefore, a limited amount of EB-5 capital.  Between 2016 and 2020, the Lender worked closely and amicably with the Borrower with respect to the Project.  Throughout that time period, the Lender kept the Borrower apprised of the number of willing EB-5 investors it could rely on for capital and that it was unlikely to have EB-5 capital beyond the $42 million.

58.     In early January 2020, several weeks before making the last advance, the Lender

informed the Borrower in writing that no funds would in fact be available for any future requests for advances. The parties then proceeded to discuss potential alternatives, and the Borrower suggested that it might have to turn to other forms of financing. But the Borrower failed to secure any additional funding for the Project.

59. In September 2020, the Lender sent the Borrower and the Guarantor two pre-default notices. True and correct copies of these notices are attached hereto as Exhibits D and E. In the notices, the Lender advised the Borrower and the Guarantor of their failure to deposit a Deficiency Deposit in the amount of $51,262,357 into the Borrower Deposit Account to satisfy the Loan imbalance, their failure to complete the construction on the agreed-to schedule, their failure to provide certain audited financials, and their failure to pay accrued interest on the Loan and certain EB-5-related expenses ("EB-5 Financing Costs").

60. The Borrower was required to reimburse the EB-5 Financing Costs to the Lender pursuant to certain reimbursement finder and manager reimbursement agreements included under the definition of Loan Documents in the Loan Agreement:

> "Loan Documents" means this Loan Agreement, the Note, the Deed of Trust, the Assignment of Documents, the Environmental Indemnity, the Early Release Guaranty, the Shortfall Guaranty, the Recourse Indemnity, Finder Reimbursement Agreement, the Manager Reimbursement Agreement, the AIG Agreement, the Operating Capital Loan Documents, and appropriate deposit account control agreements, along with any and all other documents which Borrower has executed and delivered, or may hereafter execute and deliver, to evidence, secure or guaranty the Obligations or any portion thereof.

61. The Borrower had paid the EB-5 Financing Costs between October 2016 and February 2020, but stopped making the payments due in February 2020.

62. The unpaid EB-5 Financing Costs total over $11,088,773.11.

63. The accrued interest on the Loan as of November 2021 was over $1,645,140.43.

64. Neither the Borrower nor the Guarantor made any of the payments or complied

with any of the obligations identified in the Lender's pre-default notices.

**VIII.  The Borrower And The Guarantor Agreed That They Had No Claims Against The Lender Or Defenses To The Performance Of Their Obligations**

65.     Soon after the Lender sent the pre-default notices, the Borrower and the Guarantor reached out to the Lender in an effort to restructure the Loan.  Consequently, on November 2, 2020, the parties executed a pre-negotiation agreement (the "PNA") to facilitate their discussions.  A true and correct copy of the PNA is attached as Exhibit F.

66.     In the PNA, the Borrower and the Guarantor each explicitly acknowledged and agreed that there was no default by the Lender under the Loan and that they had no claims against the Lender.

67.     Specifically, in Section 5 of the PNA, the Borrower and the Guarantor "each . . . acknowledge[d] and agree[d] that there are no defaults by Lenders or its members, managers, or any servicer or service provider, or its predecessors-in-interest, if any (collectively, the 'Lender Parties'), under or in connection with the Loan or any of the Loan Documents."

68.     In Section 6 of the PNA, the Borrower and the Guarantor "represent[ed] that after conducting a thorough investigation and diligent inquiry that they [were] presently unaware of any claims they might hold against the Lender Parties, including, but not limited to, setoff, estoppel, waiver, cancellation of instruments, rescission or excuse of performance under or in connection with the Loan or any of the Loan Documents, and no claims against any other party that could be asserted by any of the Borrower Parties to reduce or eliminate all or any part of Co-Borrowers' or Guarantors' obligations under the Loan Documents."

69.     These representations and assurances were in addition to, and consistent with, similar representations and assurances made by the Borrower and the Guarantor in connection with the parties' five amendments of the Loan Agreement, in September 23, 2016, October 31,

2017, March 2, 2018, May 24, 2018, and January 31, 2019 (the "Amendments").  True and

correct copies of the Amendments are attached hereto as Exhibits G to K.

70.     In each of the Amendments, the Borrower and the Guarantor "represent[ed],

warrant[ed] and covenant[ed] that as of the date hereof . . . there are no offsets, counterclaims or

defenses which may be asserted with respect to this Amendment, the Loan Agreement or any of

the other Loan Documents, . . . nor is there any basis whatsoever for any such offset,

counterclaim or defense as of the date hereof."

71.     In addition, in each of the Amendments, the Guarantor expressly ratified and

confirmed the Guaranty, and further confirmed that the Guaranty "remain[s] in full force and

effect" and, "as of the date hereof, Guarantor has no defense to the enforcement of its obligations

and liabilities under . . . the Shortfall Guaranty . . . or any claim or counterclaim against Lender."

72.     The Borrower and the Guarantor made the same representations and assurances in

January, 2021, when they entered into a Release of Horizon Lot 108 Agreement (the "Lot 108

Release Agreement") with Lender.  A true and correct copy of the Lot 108 Release Agreement is

attached hereto as Exhibit L.

73.     In the Lot 108 Release Agreement, the Borrower and the Guarantor again

"represent[ed], warrant[ed], and covenant[ed]" that as of the date of that agreement, there were

"no offsets, counterclaims, or defenses" with respect to their obligations under the Loan

Agreement and the Guaranty:

> (i) this [Release] Agreement, the Loan Agreement and the other Loan Documents
> are valid, binding and enforceable in accordance with their respective terms and
> conditions, (ii) there are no offsets, counterclaims or defenses which may be
> asserted with respect to this [Release] Agreement, the Loan Agreement or any of
> the other Loan Documents, or which may in any manner affect the collection or
> collectability of the principal, interest and other sums evidenced and secured by this
> Agreement, the Loan Agreement or any of the other Loan Documents, nor is there
> any basis whatsoever for any such offset, counterclaim or defense as of the date

hereof, and (iii) Borrower and Guarantor (and the undersigned representative(s) of Borrower and Guarantor) have full power, authority and legal right to execute this [Release] Agreement and to keep and observe all of the terms of this [Release] Agreement, the Loan Agreement and the other Loan Documents on Borrower's and Guarantor's part to be observed and performed[.]

74.    In accordance with the Lot 108 Release Agreement, the Lender released Lot 108 from the Deed of Trust and conveyed it to the Borrower.

75.    In sum, the Borrower and the Guarantor explicitly agreed on numerous occasions — including after the Lender informed that it would not lend more than $42 million and asked them to make the $51 million Deficiency Deposit — that the Lender had performed all of its obligations and that neither the Borrower nor the Guarantor have any defenses to their failure to comply with their contractual obligations, including the failure to fund the Deficiency Deposit.

## IX.    The Borrower Failed To Repay The Loan When It Matured, And The Project Remains Unfinished

76.    The Loan matured on June 28, 2021.

77.    The Borrower has failed to repay any of the $42 million Loan amount.

78.    On July 6, 2021, the Lender served a notice of default (the "Default Notice").  A true and correct copy of the Default Notice is attached hereto as Exhibit M.

79.    The Default Notice described various violations, including the Borrower's and the Guarantor's failure to fund the Deficiency Deposit in the amount of $51,262,357.00, which had to be deposited into the Borrower Deposit Account to satisfy the loan imbalance, the Borrower's failure to pay the EB-5 Financing Costs, which total over $11,088,773.11, and accrued interest, which was over $1,645,140.43 in November 2021, as well as the Borrower's failure to complete the construction and make certain disclosures.

80.    The Guarantor failed to fund the Borrower's Equity Requirement, which serves as collateral securing the payments enumerated in the Default Notice.

81.     In the meantime, major components of the Project remain unfinished.  The unfinished components include the 80-unit residential and hotel complex, the 50,000 square feet of commercial space, one of two lodge and event spaces on the mountain (only one has been built), remote event spaces, and myriad infrastructure-related improvements.  As it currently stands, the value of the Project itself, including the land and any improvements, will not be sufficient to repay the unpaid principal, interest, and other amounts due on the Loan.

82.     Rather than comply with its obligations, the Guarantor filed suit against the Lender, accusing the Lender of fraud and other improprieties, in an effort to avoid its unambiguous, absolute, and irrevocable obligations under the Guaranty.

83.     The Guarantor's claims are contrary to the written representations and assurances that the Guarantor explicitly made to the Lender throughout the course of the Loan and after the Lender informed the Borrower and the Guarantor that the amount of the Loan would be $42 million and the Guarantor had to fund the $51 million Deficiency Deposit.

84.     Because the Guarantor has no intention of complying with its obligations under the Guaranty, the Lender has no choice but to bring this counterclaim.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Guaranty)

85.     The Lender incorporates all of the foregoing allegations as if fully set forth herein.

86.     The Guaranty is a valid and binding contract.

87.     The Lender has fully performed its obligations under the Guaranty.

88.     The Guarantor has breached its obligations under the Guaranty as set forth above and summarized as follows.

36

89.     The Borrower failed to fund the full amount of the Borrower's Equity Requirement, failed to fund the Deficiency Deposit for over $51,262,357, failed to pay EB-5 Financing Costs, which total over $11,088,773.11, and accrued interest, which as of November 2021 was over $1,645,140.43, and failed to repay the $42,000,000 of principal of the Loan, as well as all interest, penalties, and expenses.

90.     Under the Guaranty, the Guarantor agreed to backstop the full amount of the Borrower's Equity Requirement.  As the Borrower funded only $35,930,227 of the Borrower's Equity Requirement, the Guarantor is obligated to deposit at least $51,262,357, and potentially as much as $129,262,357, which constitutes the entire shortfall between the available Project funds and the Budget, into the Borrower's deposit account controlled by the Lender.

91.     The Borrower's deposit account and all deposits therein are part of the Lender's collateral, which the Lender can foreclose on and use to repay the Loan and all of the Borrower's obligations under the Loan Agreement, including to pay EB-5 Financing Costs that remain outstanding.

92.     The Guarantor has failed to deposit the full amount of the Borrower's Equity Requirement in the Borrower's deposit account and is therefore in breach of the Guaranty.

93.     By reason of the foregoing, the Lender has suffered damages in an amount no less than $51,262,357, and all applicable interest, costs, fees, and expenses, including attorneys' fees.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (Loan Agreement Amendments, PNA, and Lot 108 Release Agreement)

94.     The Lender incorporates all of the foregoing allegations as if fully set forth herein.

95.     The Amendments, PNA, and Lot 108 Release Agreement are valid and binding

contracts.

96.     The Lender has fully performed its obligations under the Amendments, PNA, and Lot 108 Release Agreement.

97.     The Guarantor has breached its obligations under the Amendments, PNA, and Lot 108 Release Agreement as set forth above and summarized as follows.

98.     In the Amendments, the PNA, and the Lot 108 Release Agreement, the Guarantor represented and agreed that the Loan Agreement and the Guaranty were valid, binding, and enforceable agreements, and that the Guarantor had no offsets, claims, or defenses with respect to the Loan Agreement or the Guaranty.

99.     The Guarantor breached these agreements and representations when it filed suit against Lender, disputing its obligation to fund the Borrower's Equity Requirement under the Loan Agreement and the Guaranty.

100.    By reason of the foregoing, the Lender has suffered damages in an amount to be determined at trial, with all applicable interest, costs, fees, and expenses, including attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, the Lender respectfully requests that the Court enter judgment against the Guarantor, awarding the Lender:

(i)      Damages in an amount to be determined at trial, but no less than $51,262,357;

(ii)     Costs, interest, expenses, and attorneys' fees; and

(iii)    Such other and further relief as the Court deems just and proper.

Dated:  Salt Lake City, Utah
              December 6, 2021

                                                    Respectfully submitted,

                                                    SNELL & WILMER L.L.P.

                                                    By:  */s/Matthew L. Lalli*

                                                          Matthew L. Lalli
                                                          Jeremy J. Stewart
                                                          Aline Marie H. Longstaff

                                                    15 West South Temple, Suite 1200
                                                    Salt Lake City, Utah 84101-1531
                                                    (801) 257-1900

                                                    - and -

                                                    KASOWITZ BENSON TORRES LLP

                                                          Uri A. Itkin (*pro hac vice* pending)
                                                          Jordan D. Beltz (*pro hac vice* pending)
                                                          Andrew W. Breland (*pro hac vice* pending)

                                                    1633 Broadway
                                                    New York, New York 10019
                                                    (212) 506-1700

                                                    *Attorneys for Summit Village Development
                                                    Lender 1 LLC and Grand Canyon Development
                                                    Holdings 3 LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of December, 2021, I caused the foregoing to be served on the following by submitting a copy for electronic filing:

H. Burt Ringwood
STRONG & HANNI
9350 South 150 East, Suite 820
Sandy, Utah 84070

William B. Ingram
Spencer W. Young
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, Utah 84106

/s/ Debbie Withers