Matthew L. Lalli (6105)
Jeremy J. Stewart (12247)
Aline Marie H. Longstaff (16089)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1531
Telephone: (801) 257-1900
Email: mlalli@swlaw.com
jjstewart@swlaw.com
alongstaff@swlaw.com

*Attorneys for Defendants Summit Village
Development Lender 1, LLC
and Grand Canyon Development
Holdings 3 LLC*

Jordan D. Beltz (*pro hac vice*)
Andrew W. Breland (*pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Email: jbeltz@kasowitz.com
abreland@kasowitz.com

Uri A. Itkin (*pro hac vice*)
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, New York 10036
Telephone: (212) 827-1027
Email: uitkin@akingump.com

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SUMMIT MOUNTAIN HOLDING GROUP, L.L.C., a Utah Limited Liability Company**, Plaintiff, vs. **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware Limited Liability Company; GRAND CANYON DEVELOPMENT HOLDINGS 3 LLC, an Arizona Limited Liability Company; and DOES 1 through 10**, Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** Case No. 1:21-cv-00110-BSJ Honorable Bruce S. Jenkins |

Pursuant to Fed. R. Civ. P. 56 and DUCivR 56-1, Defendants Summit Village Development Lender 1, LLC and Grand Canyon Development Holdings 3 LLC (together, "Defendants") respectfully submit this Motion for Summary Judgment granting their counterclaim against Plaintiff Summit Mountain Holding Group, L.L.C.'s ("Plaintiff") on the guaranty and dismissing Plaintiff's claims against them.

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION AND RELIEF SOUGHT ...................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................... 2

    A.    The Inception of the Deal ............................................................... 3

    B.    The Loan Agreement and Shortfall Guaranty ................................ 5

    C.    The Waiver and Release Agreement ............................................ 10

    D.    The Loan Agreement Amendments .............................................. 11

    E.    The Loan Disbursements and The Borrower's Default ................. 12

    F.    Procedural History ........................................................................ 14

ARGUMENT ..................................................................................................................... 14

    I.    Defendants Are Entitled To Summary Judgment On Their Counterclaims And Plaintiff's Contract Claims ......................... 15

        A.    The Shortfall Guaranty Plainly Requires Plaintiff To Backstop The Borrower's Equity Requirement ........................... 16

        B.    Plaintiff's Theories Have No Basis In The Plain Language Of The Agreements .................................................................... 18

        C.    Plaintiff's Declaratory Judgment And Good Faith And Fair Dealing Claims Fail In The Face Of The Plain Contract Language ...................... 20

    II.    Defendants Also Are Entitled To Summary Judgment On Plaintiff's Fraud Claim ...................................................................................... 21

        A.    Plaintiff Explicitly Released Its Fraud Claim By Agreement ................. 22

        B.    Plaintiff's Fraud Claim Is Also Barred By Equitable Estoppel ............... 23

        C.    Plaintiff's Fraud Claim Also Is Belied By The Language Of The Agreements .............................................................................. 23

D.      Plaintiff's Fraud Claim Also Is Belied By Sworn Testimony .................. 25

CONCLUSION................................................................................................................... 28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*757 3rd Ave. Assocs., LLC v. Patel*,
    117 A.D.3d 451 (N.Y. App. Div. 2014) ...................................................................23

*Baraliu v. Vinya Capital, L.P.*,
    2009 WL 959578 (S.D.N.Y. Mar. 31, 2009) ...........................................................27

*BBM3, LLC v. Vosotas*,
    2022 WL 36158 (N.Y. Sup. Ct. Jan. 04, 2022), *reconsideration denied*, 2022
    WL 3565305 (N.Y. Sup. Ct. 2022) ........................................................................15

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
    76 A.D.3d 310 (N.Y. App. Div. 2010), *aff'd*, 17 N.Y.3d 269 (2011) ....................22

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
    720 F.3d 84 (2d Cir. 2013).......................................................................................20

*Gold Standard, Inc. v. Getty Oil Co.*,
    915 P.2d 1060 (Utah 1996)................................................................................24, 26

*Gutman v. Gutman*,
    51 A.D.2d 535 (N.Y. App. Div. 1976) ...................................................................19

*Higby Crane Serv., LLC v. Nat'l Helium, LLC*,
    751 F.3d 1157 (10th Cir. 2014) ..............................................................................14

*Hindsight Sols., LLC v. Citigroup Inc.*,
    53 F. Supp. 3d 747 (S.D.N.Y. 2014).......................................................................27

*Hoffmann v. Horn*,
    157 A.D.3d 871 (N.Y. App. Div. 2018) .................................................................22

*Hotel 71 Mezz Lender LLC v. Mitchell*,
    63 A.D.3d 447 (N.Y. App. Div. 2009) ...................................................................27

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
    655 F.3d 136 (2d Cir. 2011).....................................................................................22

*N.Y. State Mortg. Loan Enforcement & Admin. Corp. v. Coney Island Site Five
    Houses, Inc.*,
    109 A.D.2d 311 (N.Y. App. Div. 1985) ............................................................25, 26

*Red Tulip, LLC v. Neiva,*
    44 A.D.3d 204 (N.Y. App. Div. 2007) ...................................................................27

*Turnberry Residential Ltd. Partner, L.P. v. Wilmington Tr. FSB,*
    99 A.D.3d 176 (N.Y. App. Div. 2012) ...................................................................15

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.,*
    1 N.Y.3d 470 (N.Y. 2004) .....................................................................15, 16, 18

*W.&S. Life Ins. Co. v. U.S. Bank N.A.,*
    209 A.D.3d 6 (N.Y. App. Div. 2022) .....................................................................19

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)......................................................................19

Fed. R. Civ. P. 56(a) ...................................................................................................14

v

## INTRODUCTION AND RELIEF SOUGHT

This case concerns an absolute, unconditional, and irrevocable guaranty (the "Shortfall Guaranty") that Plaintiff signed.  The Shortfall Guaranty was a vital part of the loan because the borrower ("Borrower") is a special purpose entity owned by Plaintiff, which Plaintiff could decide to capitalize (or not capitalize).  The Borrower had to fund at least $87 million (or more), and the parties understood and agreed since day one that Plaintiff guaranteed any shortfall in the borrower's payment obligations.  The plain language of the Shortfall Guaranty and the undisputed facts of Plaintiff's breach require judgment for Defendants on all claims here.

The Shortfall Guaranty was central from the outset.  The parties described it in plain English in their initial term sheet and in marketing materials sent to potential EB-5 investors:

> In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of Sponsor Equity, the Sponsor [i.e., the Plaintiff] will contribute or cause to contribute the equivalent amount in cash contribution to makeup for such shortfall.

The relevant contract provisions are beyond dispute.  The contracts define Borrower's funding obligation that Plaintiff guaranteed as the Borrower's Equity Requirement.  Borrower had to pay $87,192,584 or more, but explicitly "not less":

> "Borrower's Equity Requirement" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

Plaintiff's guaranty of the Borrower's Equity Requirement in the Shortfall Guaranty is also clear:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of [] Borrower's Equity Requirement, as and when required under the Loan Agreement[.]

1

The relevant facts are also beyond dispute. It is undisputed that the Borrower funded less than $36 million of its equity requirement — far less than the $87,192,584 minimum. It is also undisputed that Defendants lent $42,000,000 to the Borrower, and the Borrower failed to repay any of that amount when the loan matured in June 2021. Upon the Borrower's failure to repay the loan, Defendants sought to get their money back from Plaintiff under the Shortfall Guaranty. Plaintiff refused and filed this suit instead. By this motion, Defendants seek summary judgment because it is clear that Plaintiff must make Defendants whole under the Shortfall Guaranty.

*First*, this motion seeks summary judgment on Defendants' counterclaims to enforce the Shortfall Guaranty and other contracts (as well as dismissal of Plaintiff's related declaratory judgment and implied covenant claims). Plaintiff guaranteed the Borrower's Equity Requirement of at least $87,192,584 (or more) if the Borrower failed to fund that amount. Since it is undisputed that the Borrower funded much less than that amount, Plaintiff must pay the rest under the Shortfall Guaranty.

*Second*, this motion seeks summary dismissal of Plaintiff's fraud claim. The fraud claim is barred by the plain language of the release agreement that Plaintiff signed before Defendants agreed to sign the loan documents. Nor can the fraud claim hold up in any event, as the other agreements that Plaintiff signed and the sworn testimony of Plaintiff's principal refute Plaintiff's allegations as a matter of law.

The Court should grant this motion so Defendants can finally get their money back.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**

As shown below, the Shortfall Guaranty in this case is clear. But it is helpful to understand the context in which it was signed.

### A.    The Inception of the Deal

1.      Plaintiff, led at all times by its principal, Greg Mauro ("Mauro"), dreamt of building the next Aspen on Powder Mountain.  App. Ex. 1 [Mauro Dep. Tr.] at 11:21-13:12; 21:6-22:21.  Mauro had no real estate development expertise and was looking for financing that was easier to secure than traditional debt.  App. Ex. 1 [Mauro Dep. Tr.] at 181:17-19.  So, he decided to turn to the EB-5 program.  App. Ex. 1 [Mauro Dep. Tr.] at 31:25-34:8.  Under a decades-old Congressional law, this program enabled foreign citizens to obtain a green card by investing $500,000 or more in America.  App. Ex. 1 [Mauro Dep. Tr.] at 41:10-20.

2.      In 2014, long before Mauro met Defendants, Plaintiff signed an exclusive deal with an EB-5 agent called American Immigration Group ("AIG").  App. Ex. 1 [Mauro Dep. Tr.] at 63:20-65:1; 65:25-66:19; App. Ex. 2 [AIG Term Sheet] at SMHG000010.  But AIG was unable to raise a penny for Plaintiff.  App. Ex. 1 [Mauro Dep. Tr.] at 71:19-72:4.

3.      Mauro had heard that parties had successfully raised financing through EB-5, and Mauro wanted to meet someone familiar with that financing model.  App. Ex. 1 [Mauro Dep. Tr.] at 44:18-45:5.  So, in August 2015, just a few days after reaffirming Plaintiff's exclusive deal with AIG, Mauro secretly violated that agreement and paid several thousand dollars to be introduced to Defendants' representative, Tang Tang, at a conference.  App. Ex. 1 [Mauro Dep. Tr.] at 45:9-21; 67:23-68:22.

4.      Notwithstanding Plaintiff's exclusive deal with AIG, Mauro asked Mr. Tang to help him raise EB-5 financing for Plaintiff.  App. Ex. 1 [Mauro Dep. Tr.] at 70:1-10.  Mauro wanted Mr. Tang to connect him with immigration agents in China and help him create a

structure and prepare materials that could be attractive to potential EB-5 investors.  App. Ex. 1 [Mauro Dep. Tr.] at 87:14-88:10.

5.      Mr. Tang agreed.  In September 2015, Plaintiff signed a term sheet ("Letter of Intent" or "LOI") with Mr. Tang and a Chinese immigration agent, describing the terms of the financing for the project at issue in this case.  App. Ex. 1 [Mauro Dep. Tr.] at 117:15-118:14; Ex. 3 [LOI] at SMHG001585-1600.

6.      The Shortfall Guaranty was explicitly included in the Letter of Intent.  App. Ex. 3 [LOI] at SMHG001587.  Plaintiff agreed to capitalize the borrower with the land for the project, as well as the proceeds of various other "anticipated" financing sources.  App. Ex. 3 [LOI] at SMHG001587.  The parties called these anticipated funding sources "sponsor equity."  But because the funding sources were "anticipated" — not certain — the parties agreed in the Letter of Intent that Plaintiff would cover any shortfall in the funding of building costs:

> In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of Sponsor Equity, the Sponsor will contribute or cause to contribute the equivalent amount in cash contribution to makeup for such shortfall.

App. Ex. 3 [LOI] at SMHG001587.

7.      Mr. Tang also helped Plaintiff prepare the marketing materials that the immigration agent would send to potential Chinese EB-5 investors.  The marketing materials also included the same shortfall guaranty language as the Letter of Intent.  App. Ex. 4 [PPM] at LENDERS_0066426.

8.      With Mr. Tang's help, Plaintiff incorporated one of the Defendants, Summit Village Development Lender 1, LLC ("Summit Lender").  Plaintiff agreed that Mr. Tang, through KT Capital Group LLC and its affiliate KT Summit Development Manager LLC

(together, "KT"), would manage the EB-5 regulatory compliance for Summit Lender. App. Ex. 5 [Class A Management Agreement] at LENDERS_0003247. It also agreed that an independent manager in Hong Kong, Celona Asset Management ("Celona"), would manage the Summit Lender's day-to-day activities. App. Ex. 3 [LOI] at SMHG001588; App. Ex. 6 [Class B Management Agreement] at LENDERS_0003296.

9.      Since the outset, the parties understood and agreed that the ultimate amount of the loan was uncertain. To this end, the LOI describes the loan amount on an "up to" basis, and provides that the immigration agents would seek to recruit potential investors "on a best-effort-basis." App. Ex. 3 [LOI] at SMHG001590-1591.

10.      The parties' EB-5 marketing materials reflect the same understanding:

> [I]f the Company does not raise the full US$150.0 million in this Offering, . . . then the Company will be unable to advance the full US$150.0 million contemplated under the Loan Agreement.

App. Ex. 4 [PPM] at LENDERS_0066443.

**B.      The Loan Agreement and Shortfall Guaranty**

11.      In the Spring of 2016, Plaintiff began working on the loan documents with Summit Lender. Initially, Plaintiff contemplated capitalizing Borrower with about $4.5 million of cash to be used for the development, in addition to the land and other expected sources of equity Plaintiff promised. The parties exchanged various drafts of this language when they negotiated the loan agreement ("Loan Agreement"). As reflected in a redline sent by Mr. Tang to Plaintiff, the language provided that Borrower would fund the $4.5 million of cash proportionally to the amount of loan proceeds funded by the lenders:

"**Borrower's Cash Equity Requirement**" means ~~an initial cash equity contribution of $1,000,000.00 on or before the Loan Closing Date, then prior to the Advance that would cause the principal balance of the Loan to exceed $7,500,000.00, $15,000,000.00, $22,500,000.00 and $30,000,000.00, Borrower shall make additional cash equity contributions in the amounts of $1,000,000.00, $1,000,000.00, $1,000,000.00 and $500,000.00, respectively~~, with respect to each Advance, a pro rata contribution of cash to the Project (at a ratio of 10:1 Loan to equity) until Borrower's cash equity requirement of Four Million Four Hundred Ninety-Eight Thousand Six Hundred Twenty-Five and 00/100 Dollars ($4,498,625) is fully funded.

App. Ex. 7 [Redline of Loan Agreement] at SMHG013585.

12.    Ultimately, however, Plaintiff decided not to have Borrower fund the $4.5 million in cash.  As a result, the parties struck this language in its entirety from the Loan Agreement.

~~"**Borrower's Cash Equity Requirement**" means, with respect to each Advance, a pro rata contribution of cash to the Project (at a ratio of 10:1 Loan to equity) until Borrower's cash equity requirement of Four Million Four Hundred Ninety-Eight Thousand Six Hundred Twenty-Five and 00/100 Dollars ($4,498,625) is fully funded.~~

"**Borrower's Equity Requirement**" means, collectively, ~~the Borrower's Cash Equity Requirement and~~ Borrower's obligation to contribute additional equity to the Project in connection with sales of Units, receipt of public incentives available to the Project and/or other sources in order to make an aggregate contribution of equity to the Project of not less than ~~Ninety-Two~~Eighty-Seven Million One Hundred Ninety-Two  Thousand Five Hundred ~~Twenty-Four Thousand Sixty Three~~Eighty-Four Dollars ($~~92,524,063.00~~87,192,584 ).

*See* App. Ex. 8 [June 14, 2016 Redline] at LENDERS_0118369.

13.    As a result, the executed Loan Agreement states, simply, that the borrower would be responsible for funding "not less than" $87 million, and potentially more as needed:

"Borrower's Equity Requirement" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

App. Ex. 9 [Loan Agreement] at SMHG081995.

14.    As clear from this language, the Borrower's Equity Requirement definition that both parties agreed to does not contain any of the pro rata language that the parties *contemplated but ultimately struck* with respect to the borrower's $4.5 million in cash.

15.    The parties removed the pro rata concept from the Borrower's Equity Requirement, but they still understood and agreed that the loan amount could be less than $120 million, depending on how much money was raised from EB-5 investors:

> The Loan is to be disbursed in incremental Advances (as provided in this Loan Agreement), and the aggregate amount of Advances will not exceed the principal amount of One-Hundred Twenty Million Dollars ($120,000,000.00), provided that the amount of Loan shall not be greater than (a) sixty percent (60%) of the Appraised Value, or (b) the aggregate amount of EB-5 Capital deposited in the Lender's Deposit Account ( as applicable, the "Loan Amount").  . . .  Notwithstanding any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.

App. Ex. 9 [Loan Agreement] at SMHG082010-2011.

16.    The parties included various covenants and provisions to ensure that the development would move forward regardless of how much Summit Lender could lend.  For example, the Loan Agreement required Borrower to continue construction, required Borrower's members to capitalize Borrower with the Borrower's Equity Requirement, and entitled Borrower to obtain other loans.  App. Ex. 9 [Loan Agreement] at SMHG082031 (§ 5.1), SMHG082042 (§ 5.27), SMHG082026 (§ 3.2), SMHG082027 (§ 3.4).

17.    The parties also included a mechanism for Defendants to make capital calls on the Borrower to ensure the payment of the Borrower's Equity Requirement.  The mechanism, called "Deposits to Balance Loan," is in Section 5.17 of the Loan Agreement.  It is based on the

Borrower's obligation to keep the loan "in balance."  The "in balance" requirement consists of several elements.

18.    Section 5.17.1 provides that Borrower was responsible for funding any cost overruns and, significantly, ensuring that there were enough funds to complete the $207 million project:

> Anything contained in this Loan Agreement to the contrary notwithstanding,  the Loan shall at all times be "in balance" on (a) an individual Budget line item basis, and (b) an aggregate Budget amount basis.
>
> [. . .]
>
> The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project.

App. Ex. 9 [Loan Agreement] at SMHG082038.

19.    Section 5.17.2 describes the process for Summit Lender's determination of the potential cost overruns.  App. Ex. 9 [Loan Agreement] at SMHG082039.

20.    Section 5.17.3 describes the capital call process.  It provides that if Summit Lender determined that the loan was out of balance, Summit Lender had the right to make a capital call on Borrower for a Deficiency Deposit.  Borrower could pay the Deficiency Deposit from its own funds, from funds contributed by its members, or from funds Borrower raised from other loans:

> Borrower agrees that if Lender in its reasonable good faith judgment determines that the Loan is not "in balance", then regardless of how such condition may have been brought about, Borrower shall, within ten (10) Business Days after request by Lender, either deposit from its own funds (or from funds contributed by any of Borrower's direct or indirect constituent members) or from the proceeds of a Subordinated Loan or a Senior Loan (to the extent permitted under Section 3.2 or

Section 3.4 of this Loan Agreement) the amount of such deficiency (the "Deficiency Deposit").

App. Ex. 9 [Loan Agreement] at SMHG082039.

21.    Section 5.17.4, in turn, describes another relevant component of the "in balance" requirement. It provides an accommodation for the Borrower to avoid funding the entire Borrower's Equity Requirement on day one of the loan. The accommodation only works, however, so long as Summit Lender is satisfied that the Borrower and Plaintiff had available funds to complete the entire $207 million project, and — notably — there was no default under the loan:

> For the purposes of ensuring that the Loan is "in balance" as required by subsection 5.17.1, Borrower and/or Guarantor (if Guarantor is unconditionally obligated in writing to contribute the same to the Project) shall provide reasonable evidence satisfactory to Lender in its sole discretion of financing, Purchaser Deposits and/or equity commitments, sources of financing including, but not limited to, available proceeds of public financing incentives such as tax increment financing, transient room tax revenues, resort tax revenues, or guarantees confirming in sufficient detail the specified amount and terns of the funds that will be available on a timely basis in order to complete the construction of the Improvements on the Mortgaged Property in accordance with the Budget, the Plans and Specifications and the Schedule ("Commitment Financing Amount"). So long as (i) the Commitment Financing Amount remains available to be drawn by Borrower as and when needed to fund costs of the Improvements, and (ii) no Event of Default has occurred and is continuing, Borrower shall not be required to make a Deficiency Deposit under Section 5.17.4 with respect to the Commitment Financing Amount.

App. Ex. 9 [Loan Agreement] at SMHG082039-2040.

22.    Significantly, the other financing sources included "guarantees." App. Ex. 9 [Loan Agreement] at SMHG082039-2040. So, as long as the loan was not in default, the Borrower could rely on Plaintiff's wherewithal under the Shortfall Guaranty to avoid funding the entire Borrower's Equity Requirement. *Id*.

23.     The parties signed the Loan Agreement on June 28, 2016.  Under the Loan Agreement, the loan matured and had to be repaid five years later.  App. Ex. 9 [Loan Agreement] at SMHG082001 (definition of "Initial Maturity Date").  Borrower's failure to repay the loan on the Maturity Date was an Event of Default under the Loan Agreement.  *Id.* at SMHG082048.

24.     Plaintiff signed the Shortfall Guaranty on the same day the parties signed the Loan Agreement.  App. Ex. 10 [Shortfall Guaranty] at SMHG081979.  As noted above, the Guaranty unambiguously obligated Plaintiff to backstop the Borrower's Equity Requirement:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of [] Borrower's Equity Requirement, as and when required under the Loan Agreement[.]

*Id.*

25.     In other words, if Summit Lender determined that the loan was out of balance and made a capital call on Borrower but Borrower could not pay it, Plaintiff had to pay it pursuant to the Shortfall Guaranty.  App. Ex. 10 [Shortfall Guaranty] at SMHG081979.

**C.      The Waiver and Release Agreement**

26.     A few days before signing the Loan Agreement, the parties also entered into another relevant agreement.  On June 20, 2016, Plaintiff and Summit Lender entered into a Waiver and Release Agreement.  App. Ex. 11 [Waiver and Release] at SMHG082135.  Under that agreement, Plaintiff explicitly waived any and all claims against Summit Lender, as well as their employees and representatives, related to the loan, the project, or other events, including AIG:

> In consideration of Lender's willingness to execute the AIG Waiver, SMHG and Development, on behalf of the SMHG Parties, hereby waive, release and forever discharge and hold harmless Lender, KT, Cottonwood, Goldstone and Henry, each of their owners, general or limited partners, directors, shareholders, employees,

officers, successors, executors, assigns, affiliated parent and subsidiary companies, agents and contractors, or any other individuals or entities claiming by or through any of them (collectively, the "EB-5 Lender Released Parties"), from and against any and all manner of claims, liabilities, demands, actions, causes of action, debts, accounts, bonds, covenants, agreements, liens, judgments and/or suits, whether known or unknown, suspected or unsuspected, which the SMHG Parties had, have, may have, may have had, or may in the future have against the EB-5 Lender Released Parties, or any of them, which arise out of, are connected with, or relate in any way to the AIG LOI, the KT LOI, the AIG Fee, the Project, the Loan and/or the Loan Agreement (but excluding any claims under this Agreement) (the "Released Claims").

*Id*. at SMHG082136.

27.     Defendants had to enter into this agreement to protect themselves because AIG went after Plaintiff for violating the exclusivity provision in AIG's term sheet.  App. Ex. 11 [Waiver and Release] at SMHG082135-2136.

**D.     The Loan Agreement Amendments**

28.     The parties amended the Loan Agreement five times — in September 2016, October 2017, March 2018, May 2018, and January 2019.  App. Exs. 12 - 16 [Five Amendments].  In connection with the second amendment, the parties amended the Shortfall Guaranty.  App. Ex. 17 [Amended Shortfall Guaranty] at SMHG002864; App. Ex. 13 [Second Amendment] at LENDERS_0001554.  In connection with the third amendment, the parties added Grand Canyon Development Holdings 3 LLC ("Grand Canyon Lender") as another lender under the Loan Agreement.  App. Ex. 14 [Third Amendment] at LENDERS_0015772-5723. None of the amendments affected any of the relevant provisions discussed above.

29.     In the amendments, Borrower represented that it had no defenses to its obligations under the Loan Agreement, and Plaintiff confirmed that it "has no defense to the enforcement of

its obligations and liabilities under . . . the Shortfall Guaranty" and has no "claim or counterclaim

against Lender." *See e.g.*, App. Ex. 14 [Third Amendment] at LENDERS_0015776.

30.    After the loan documents were signed in June 2016, Borrower contributed

approximately 4.52 acres of Powder Mountain where the development was supposed to take

place.  App. Ex. 18 [Amended and Restated PPM] at LENDERS_0003578 and 0003592.  That

contribution satisfied $29,000,000 of the Borrower's Equity Requirement.  App. Ex. 18

[Amended and Restated PPM] at LENDERS_0003578; App. Ex. 23 [Pre-Notice of Default] at

SMHG102408.

### E.    The Loan Disbursements and The Borrower's Default

31.    Beginning in June 2016, Defendants collectively made seventeen loan

disbursements to Borrower, totaling $42,000,000.  App. Ex. 19 [Email re Loan Draws] at

LENDERS_0010996.

32.    In the course of the loan, Defendants made considerable accommodations to

Borrower and Plaintiff.  During the loan's lifetime, Plaintiff funded over $15 million of the

Borrower's Equity Requirements because loan proceeds were not coming in as fast as Mauro

wanted.  App. Ex. 1 [Mauro Dep. Tr.] at 25:16-26:2, 288:8-290:3.  When the loan proceeds were

received, Plaintiff wanted to use some of those proceeds to *reimburse* itself, rather than

contribute all of the proceeds to the development.  *Id*.  Defendants agreed to Plaintiff's request

even though the Loan Agreement explicitly prohibited using loan proceeds for reimbursement.

App. Ex. 9 [Loan Agreement] at SMHG082016.

33.    Defendants stopped their disbursements in January 2020, when Weber County,

where the project is located, lost its designation as a Targeted Employment Area ("TEA") under

the EB-5 program.  App. Ex. 19 [Email re Loan Draws] at LENDERS_0010996; App. Ex. 20 [Emails re TEA Status] at LENDERS_0086093.  Due to the loss of the TEA designation, the minimum EB-5 investment amount doubled.  App. Ex. 20 [Emails re TEA Status] at LENDERS_0086093.  As a result, it became virtually impossible for the project to attract additional EB-5 investors.  *Id.*

34.     In the first quarter of 2020, Borrower stopped making payments required under the Loan Agreement.  App. Ex. 21 [Letter from Mulreed to Lender].  It also did not come up with any other loans (senior or junior to Defendants' loan), as permitted under the Loan Agreement.  App. Ex. 1 [Mauro Dep. Tr.] at 216:9-23.

35.     In September 2020, after months of efforts to work out the loan default, Defendants sent Plaintiff and Borrower pre-default notices.  App. Exs. 22, 23 [Pre-Default Notices].  The notices advised that the loan was out of balance and asked Borrower to pay at least $51,262,357 of the Borrower's Equity Requirement.  App. Ex. 23 [Pre-Default re In Balance Requirement] at SMHG102405.

36.     In November 2020, Plaintiff and Borrower entered into a Pre-Negotiation Agreement with Defendants (the "PNA").  App. Ex. 24 [PNA].  In the PNA, Plaintiff and Borrower represented, among other things, that they were unaware of any claim against Defendants:

> The Borrower Parties represent that after conducting a thorough investigation and diligent inquiry that they are presently unaware of any claims they might hold against the Lender Parties, including, but not limited to, setoff, estoppel, waiver, cancellation of instruments, rescission or excuse of performance under or in connection with the Loan or any of the Loan Documents, and no claims against any other party that could be asserted by any of the Borrower Parties to reduce or eliminate all or any part of Co-Borrowers' or Guarantors' obligations under the Loan Documents.

*Id*. at SMHG161870.

  37. In exchange for signing the PNA, Defendants continued their efforts to work out the Borrower's defaults.  App. Ex. 24 [PNA].

  38. The loan matured on June 28, 2021.  App. Ex. 25 [Notice of Default] at SMHG166022.  Borrower failed to repay the loan by that date or within the ten-day grace period. *Id*.; App. Ex. 9 [Loan Agreement] at SMHG 082048 (§ 7.1).  That is an Event of Default under the Loan Agreement.  App. Ex. 9 [Loan Agreement] at SMHG 082048 (§ 7.1).

  39. On July 6, 2021, Defendants declared an Event of Default under the Shortfall Guaranty.  App. Ex. 25 [Notice of Default] at SMHG166021-6023.

  **F. Procedural History**

  40. In August 2021, several weeks later, Plaintiff filed the instant suit.  Despite its representations in the Loan Agreement amendments and the PNA, it asserted various claims to avoid the Shortfall Guaranty.  *See generally* Complaint [ECF No. 2].  Defendants answered and filed their counterclaim for Plaintiff's breach of the Shortfall Guaranty in December 2021.  *See* Answer and Counterclaims [ECF No. 35].

  41. The parties completed discovery on April 14, 2023.  This motion timely follows in accordance with the Court's scheduling order.  *See* Third Scheduling Order [ECF No. 105].

**<u>ARGUMENT</u>**

  Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact" requiring trial.  Fed. R. Civ. P. 56(a).  In a contract dispute such as this, summary judgment "should be granted if the contractual language is unambiguous."  *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014).

14

**I.    Defendants Are Entitled To Summary Judgment On Their Counterclaims And Plaintiff's Contract Claims**

By their counterclaim, Defendants seek relief for Plaintiff's failure to fulfill its obligations under the Shortfall Guaranty to pay over $51 million of the Borrower's Equity Requirement that was not funded by the Borrower.  Because the relevant terms of the Shortfall Guaranty are unambiguous, summary judgment should be granted in Defendants' favor on their counterclaim and on Plaintiff's declaratory judgment and implied covenant claims.

The Shortfall Guaranty is governed by New York law.  App. Ex. 10 [Shortfall Guaranty] at SMHG081983 (§ 15).  In New York, contracts —particularly those in the real estate context — are enforced as written.  *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) ("When interpreting contracts, we have repeatedly applied the familiar and eminently sensible proposition of law that, when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms.  We have also emphasized this rule's special import in the context of real property transactions, where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length.") (cleaned up and citations and quotations omitted).

New York courts strictly interpret real estate guarantees and routinely grant summary judgment in lenders' favor.  *See e.g.*, *BBM3, LLC v. Vosotas*, 2022 WL 36158, at *3 (N.Y. Sup. Ct. Jan. 04, 2022) (entering summary judgment for Lender on shortfall guaranty), *reconsideration denied*, 2022 WL 3565305 (N.Y. Sup. Ct. 2022); *see also Turnberry Residential Ltd. Partner, L.P. v. Wilmington Tr. FSB*, 99 A.D.3d 176 (N.Y. App. Div. 2012) (affirming grant of summary judgment to lender of real estate construction loan).  This case is no different.

### A.    The Shortfall Guaranty Plainly Requires Plaintiff To Backstop The Borrower's Equity Requirement

Defendants' Shortfall Guaranty counterclaim is simple.  The Borrower was required to fund at least $87,192,584 under the Borrower's Equity Requirement.  Plaintiff guaranteed the Borrower's obligations in the event of a shortfall.  It is undisputed that the Borrower paid just $36 million of the required amount before it defaulted on the loan.  Accordingly, Plaintiff must pay the rest under the Shortfall Guaranty.

The relevant provisions are crystal clear.  The Borrower's Equity Requirement definition plainly requires the Borrower to fund "not less" than $87,192,584, or more as required under Section 5.17 to keep the loan in balance:

> "Borrower's Equity Requirement" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

App. Ex. 9 [Loan Agreement] at SMHG081995.  And Plaintiff plainly guaranteed any shortfall of the Borrower's Equity Requirement in the Shortfall Guaranty:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of [] Borrower's Equity Requirement, as and when required under the Loan Agreement[.]

App. Ex. 10 [Shortfall Guaranty] at SMHG081979.  These provisions are plain and unambiguous and should be "enforced according to [their] terms." *Vermont Teddy Bear Co.*, 1 N.Y.3d at 475.

The meaning of these provisions is punctuated by the parties' plain language description of Plaintiff's shortfall obligations in the initial term sheet, as well as their EB-5 marketing materials, prepared before and after Plaintiff signed the Shortfall Guaranty:

> In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of Sponsor Equity, the Sponsor [*i.e.*, the Plaintiff] will contribute or cause to contribute the equivalent amount in cash contribution to makeup for such shortfall.

App. Ex. 3 [LOI] at SMHG001587; *see* App. Ex. 4 [PPM] at LENDERS_0066426 (therein defined as "Developer Equity" rather than "Sponsor Equity"); App. Ex. 18 [Amended and Restated PPM] at LENDERS_0003636 (same). There can thus be no meaningful dispute about the scope of Plaintiff's obligations under the Shortfall Guaranty.

There can also be no meaningful dispute over the relevant facts. During the loan's lifetime, the Borrower failed to fund the entirety of the Borrower's Equity Requirement. The Borrower funded less than $36 million (consisting of land, valued at the time at approximately $29 million, and less than $7 million in cash). App. Ex. 23 [Pre-Notice of Default] at SMHG102408. When the loan matured, and the Borrower defaulted on payment, neither the Borrower nor Plaintiff funded the rest of the Borrower's Equity Requirement. App. Ex. 23 [Pre-Default re In Balance] at SMHG102405. As a result, *at least* $51 million of the Borrower's Equity Requirement remains unpaid. *Id.*

As shown above, Plaintiff explicitly agreed to pay that shortfall under the Shortfall Guaranty. Accordingly, Defendants are entitled to summary judgment on their counterclaim against Plaintiff for at least $51 million under the Shortfall Guaranty so that Defendants can get their investors' money back. Plaintiff is also responsible for default interest on that amount and Defendants' attorneys' fees, as provided in the Shortfall Guaranty. App. Ex. 9 [Loan Agreement] at SMHG081995 [definition of claim]; App. Ex. 10 [Shortfall Guaranty] at SMHG081979 (§ 1).

**B.    Plaintiff's Theories Have No Basis In The Plain Language Of The Agreements**

Throughout this litigation, Plaintiff has asserted a jumble of theories to confuse and obfuscate the plain language of the Shortfall Guaranty.  None of these theories have merit.

Plaintiff claims that the Borrower's Equity Requirement *could* be less than $87,192,584. According to Plaintiff, this is because the parties agreed that the Borrower's equity contributions were supposed to be made "in proportion" to the loan disbursements.  *See* Complaint [ECF No. 2] ¶ 44.  These theories fly in the face of the Borrower's Equity Requirement definition and improperly try to add terms or disregard explicit language in the Loan Agreement.  *See Vermont Teddy Bear Co.*, 1 N.Y.3d at 475 ("courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.").

*First*, nothing about the Borrower's Equity Requirement is "proportional."  There is simply no such language in the definition.  Rather, the definition clearly provides that the amount of the Borrower's Equity Requirement is "*not less* than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), *or such greater amount* as is required to cause the loan to be 'in balance' pursuant to Section 5.17 of this Agreement."  App. Ex. 9 [Loan Agreement] at SMHG081995 (emphasis added).  In other words, the Borrower's Equity Requirement *could be more* than $87,192,584, but it *could not be less*.

Moreover, the parties *deliberately omitted* the proportionality concept during their negotiations of the Loan Agreement.  As discussed above, the parties initially contemplated including a separate provision for $4.5 million that the Borrower would contribute in cash.  App. Ex. 8 [June 14, 2016 Redline] at LENDERS_0118369 (striking "pro rata contribution of cash to

the Project").  As reflected by a redline exchanged by the parties, that provision contemplated

precisely the type of proportional, pro rata treatment that Plaintiff tries to add now.  Specifically,

that provision contemplated that the Borrower would fund the $4.5 million "pro rata" to the loan

disbursements.  *Id*.; *see also* Black's Law Dictionary (11th ed. 2019) (defining "pro rata" as

"Proportionately").  Ultimately, however, Plaintiff decided against funding the $4.5 million, and

*the parties removed that provision from the Loan Agreement*.  App. Ex. 8 [June 14, 2016

Redline] at LENDERS_0118369; App. Ex. 9 [Loan Agreement] at SMHG081995.

  The fact that the parties knew how to provide for proportionality but deliberately omitted

that language in the final Borrower's Equity Requirement definition is dispositive.  Plaintiff

cannot add that term now through litigation.  *See W.&S. Life Ins. Co. v. U.S. Bank N.A.*, 209

A.D.3d 6, 14 (N.Y. App. Div. 2022) ("If it is apparent that the parties intended to omit the

language at issue, [courts] are precluded from implying those terms from the general language of

the agreement"); *Gutman v. Gutman*, 51 A.D.2d 535, 536 (N.Y. App. Div. 1976) ("This court

cannot read into the agreement a provision which the parties chose not to insert").

  *Second*, Plaintiff has repeatedly argued that the Borrower's Equity Requirement could

still be *less* than $87 million because the loan had been "in balance" under Section 5.17 before

the Borrower defaulted.  This is also wrong.  The "in balance" provision merely *defers* the

Borrower's obligation to fund the Borrower's Equity Requirement; it does not *reduce* it.

  As explained above, Section 5.17.4 provides that so long as the Borrower's Commitment

Financing Amount (the funds required to complete the project) remains available and "no Event

of Default has occurred and is continuing," the Borrower does not have to make a Deficiency

Deposit payment with respect to the Commitment Financing Amount.  App. Ex. 9 [Loan

Agreement] at SMHG082039-40.  The quoted Event of Default language is crucial.  It explicitly and unambiguously provides that any deferral given by Section 5.17.4 expires upon an Event of Default.

Plaintiff cannot dispute that an Event of Default occurred when the Borrower failed to repay the loan at maturity.  As such, the Borrower had to make a Deficiency Payment for the *entire* Commitment Financing Amount — at least $87 million (and, really, much more to complete the $207 million project).

In sum, none of Plaintiff's theories help it avoid the plain language of the agreements.

### C. Plaintiff's Declaratory Judgment And Good Faith And Fair Dealing Claims Fail In The Face Of The Plain Contract Language

By its declaratory judgment claims, Plaintiff seeks a ruling that it is not obligated to cover the shortfall in the Borrower's Equity Requirement.  Complaint [ECF No. 2] ¶¶ 88-100.  Since, as shown above, the language of the Shortfall Guaranty and the Borrower's Equity Requirement are clearly to the contrary, these claims should be dismissed as a matter of law.

Plaintiff's good faith and fair dealing claim also should be dismissed.  Plaintiff claims that Defendants exercised "discretion to claim a deficiency in the Borrower Equity Requirement and thereafter demand[ed] Plaintiff pay the same . . . ."  Complaint [ECF No. 2] ¶¶ 107-08.  But as shown above, there is nothing discretionary about Section 5.17.4.  It plainly requires the Borrower to make a Deficiency Deposit for the Commitment Financing Amount in the Event of Default.

Thus, summary judgment also should be granted on Plaintiff's good faith and fair dealing claim.  *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013)

(the implied covenant of good faith and fair dealing "cannot be used . . . to imply an obligation inconsistent with other terms of a contractual relationship.").[1]

## II.    Defendants Also Are Entitled To Summary Judgment On Plaintiff's Fraud Claim

Plaintiff's fraud claim also should be dismissed as a matter of law.  It is explicitly barred by the Waiver and Release Agreement that Plaintiff signed.  It also fails in the face of the plain language of the parties' other agreements and Mauro's sworn testimony.

As a threshold matter, Plaintiff voluntarily withdrew the fraud claim against Grand Canyon Lender, since Grand Canyon Lender did not become a lender until March 2018.  ECF No. 30 at 40:11-25; *see also* ECF No. 28 at 2.  Plaintiff bases its fraud claim against Summit Lender on alleged representations, made during "negotiations of the Loan Agreement," that Defendants would be able to raise $120 million in EB-5 proceeds.  Complaint [ECF No. 2] ¶¶ 113-14.  Plaintiff claims that based on these representations, it "repudiated its term sheet with AIG, and both Plaintiff and the Borrower entered into a settlement agreement with AIG and agreed to pay certain sums to AIG."  *Id.* ¶ 117.  Plaintiff also claims that it signed the Shortfall Guaranty based on these representations.  *Id.* ¶ 119.  These claims are legally and factually baseless.

---

[1]    Defendants also are entitled to summary judgment on their second counterclaim.  Their second counterclaim seeks damages for Plaintiff's violation of its covenants and representations that it had no defenses to the Shortfall Guaranty and no claims against Defendants.  Answer and Counterclaims [ECF No. 35]  ¶¶ 94-100.  By virtue of these representations, Plaintiff induced Defendants into continuing to provide financing (including inducing Grand Canyon Lender to become party to the Loan Agreement).  And by this suit, Plaintiff brazenly violated those covenants and representations when it could no longer exploit its relationship with Defendants.  Thus, Defendants are entitled to summary judgment on this counterclaim as well.

### A.    Plaintiff Explicitly Released Its Fraud Claim By Agreement

As explained above, the Waiver and Release Agreement explicitly bars Plaintiff from

asserting claims against Summit Lender related to AIG, the loan, or the project.  Specifically, the

Agreement releases:

> **any and all manner of claims**, liabilities, demands, actions, causes of action, debts,
> accounts, bonds, covenants, agreements, liens, judgments and/or suits, **whether
> known or unknown, suspected or unsuspected, which the SMHG Parties had,
> have, may have, may have had, or may in the future have** against the EB-5
> Lender Released Parties, or any of them, **which arise out of, are connected with,
> or relate in any way to the AIG LOI**, the KT LOI, **the AIG Fee, the Project, the
> Loan and/or the Loan Agreement** (but excluding any claims under this
> Agreement) (the "Released Claims").

App. Ex. 11 [Waiver and Release] at SMHG082136 (emphasis added).  Under New York law

(which governs, *id.* at SMHG082137), this broad release is a complete bar to Plaintiff's fraud

claim.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011)

("[A] valid release constitutes a complete bar to an action on a claim which is the subject of the

release.") (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 76 A.D.3d

310, 318 (N.Y. App. Div. 2010), *aff'd*, 17 N.Y.3d 269 (2011)).

This is especially true because the scope of the release — AIG, the project, the loan, and

the Loan Agreement — specifically covers each of the bases for Plaintiff's fraud claim.  *See*

*Centro Empresarial*, 76 A.D.3d at 318 ("[A] claim for fraud within the scope of a release can be

released even if it is unknown to the releasor, and notwithstanding that the releasee did not make

full disclosure of its wrongdoing before the release was granted"); *accord Hoffmann v. Horn*,

157 A.D.3d 871, 873 (N.Y. App. Div. 2018) ("A valid general release without any limiting

language will apply not only to known claims, but also unknown claims between the parties that

may have existed prior to the release").  Accordingly, the Waiver and Release Agreement requires dismissal of Plaintiff's fraud claim.

### B.    Plaintiff's Fraud Claim Is Also Barred By Equitable Estoppel

Plaintiff decided to claim fraud over six years after signing the Shortfall Guaranty and *after* receiving $42 million.  In the interim, Plaintiff repeatedly assured Defendants that it had no defenses to the enforcement of its obligations under the Shortfall Guaranty and had no claims against Defendants.  Plaintiff made these assurances in the five Loan Agreement amendments between 2016 and 2019, including to induce Grand Canyon Lender to become a party to the Loan Agreement.  App. Exs. 12 – 16 [Amendments].  It also made these assurances in the PNA to induce Defendants to negotiate a potential work-out of the loan.  App. Ex. 24 [PNA] at SMHG161870.

Equity does not permit Plaintiff to claim fraud after reassuring Defendants for years to the contrary so that Plaintiff could reap the benefits of unwitting investors' $42 million.  *See 757 3rd Ave. Assocs., LLC v. Patel*, 117 A.D.3d 451 (N.Y. App. Div. 2014) ("[t]he purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted.").

### C.    Plaintiff's Fraud Claim Also Is Belied By The Language Of The Agreements

Plaintiff's fraud claim also fails in the face of the parties' agreements.  Given the documents that Plaintiff and its principals signed, Plaintiff cannot credibly assert that it believed Defendants would raise the full $120 million for the loan.

*First*, the term sheet (Letter of Intent) that Plaintiff signed in September 2015, long before it signed the Shortfall Guaranty, made clear that the loan would be raised by an independent immigration agent, not Defendants, and that the loan could be less than $120 million. App. Ex. 3 [LOI] at SMHG001590-91 (the fundraising would be "up to" a maximum amount and merely on a "best-efforts-basis").

*Second*, the initial and amended marketing materials that Plaintiff prepared before and after it signed the Shortfall Guaranty reflected the same understanding:

> [I]f the Company does not raise the full US$150.0 million in this Offering, . . . then the Company will be unable to advance the full US$150.0 million contemplated under the Loan Agreement.

App. Ex. 4 [PPM] at LENDERS_0066443.

*Third*, the Loan Agreement provides that the loan "will not exceed" $120 million, and that Summit Lender was obligated to disburse only the proceeds that were raised:

> Notwithstanding any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.

App. Ex. 9 [Loan Agreement] at SMHG082011. The Loan Agreement also contemplated other options for Plaintiff to fund the development of the Project to the extent there was less than $120 million of available EB-5 capital, including both senior and subordinate loans. *Id*. at SMHG082026-27.

In other words, Plaintiff repeatedly and explicitly recognized that the fundraising would be done by *third parties* and Defendants would only disburse proceeds that were raised, not a penny more. Plaintiff cannot reasonably claim that it expected *Defendants* to raise *the full $120 million* in the face of these provisions. *See Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060,

1067 (Utah 1996) (plaintiff could not reasonably rely on oral promise that was contradicted by written correspondence following the meeting); *accord N.Y. State Mortg. Loan Enforcement & Admin. Corp. v. Coney Island Site Five Houses, Inc.*, 109 A.D.2d 311, 318 (N.Y. App. Div. 1985) (a party cannot claim justifiable reliance in the face of a conflict between the alleged misrepresentations and the written terms of the agreements).

### D.    Plaintiff's Fraud Claim Also Is Belied By Sworn Testimony

The sworn testimony of Plaintiff's principal, Mauro, is the final nail in the coffin of Plaintiff's fraud claim.  Mauro admitted that Plaintiff did not actually repudiate the deal with AIG because of Defendants.  Mauro also effectively admitted that there were no actionable misrepresentations made by Defendant's representatives.

With respect to AIG, Mauro testified that he signed an exclusive EB-5 fundraising deal with AIG in December 2014, long before he met Defendants.  App. Ex. 1 [Mauro Dep. Tr.] at 58:15-24.  He also testified that he reaffirmed that deal — including the *exclusivity* provision — on July 29, 2015.  App. Ex. 1 [Mauro Dep. Tr.] at 64:1-67:2; 68:23-69:11.  Plaintiff's agreement with AIG indeed provided that Plaintiff could not approach anyone else about raising EB-5 capital.  App. Ex. 2 [AIG Term Sheet] at SMHG000010.

But Mauro admitted that on August 4, 2015, just *six* days after he reaffirmed Plaintiff's deal with AIG, he paid several thousand dollars to meet Summit Lender's representative, Mr. Tang, at a conference *to discuss raising EB-5 capital*.  App. Ex. 1 [Mauro Dep. Tr.] at 45:9-21.  In other words, Mauro admitted that he violated his agreement with AIG *before even meeting Defendants' representatives*.  App. Ex. 1 [Mauro Dep. Tr.] 68:23-69:11.  In fact, Mauro admitted that AIG had raised "zero dollars" for Plaintiff, and *that* was the reason why he approached Mr.

Tang.  App. Ex. 1 [Mauro Dep. Tr.] 72:2-13.  These admissions flatly contradict Plaintiff's

allegations that Defendants somehow induced Plaintiff to breach its agreement with AIG.

Later in his deposition, Mauro also dispelled any doubt over Plaintiff's fraud theory.

Mauro testified that the *only* purported misrepresentation made to him by any of Defendants'

representatives concerned the meaning of the Shortfall Guaranty.  App. Ex. 1 [Mauro Dep. Tr.]

256:1-260:1.  But the documents Mauro signed before Plaintiff executed the Shortfall Guaranty

conclusively refute Plaintiff's purported reliance on this misrepresentation.

As noted above, the parties' September 2015 Letter of Intent — signed nine months

before the Shortfall Guaranty — explicitly provides that Plaintiff would be responsible for

covering any shortfall in cash.  App. Ex. 3 [LOI] at SMHG001587.  Mauro *signed* that Letter of

Intent.  App. Ex. 3 [LOI] at SMHG001598.  The parties also included the same language in the

initial and amended marketing materials.  App. Ex. 4 [PPM] at LENDERS_0066426; App. Ex.

18 [Amended and Restated PPM] at LENDERS_0003636.

Accordingly, Plaintiff cannot now claim that it was somehow misled about the true

meaning of the Shortfall Guaranty.  *See Gold Standard*, 915 P.2d at (plaintiff could not

reasonably rely on oral promise that was contradicted by written correspondence following the

meeting); *Coney Island Site Five House*, 109 A.D.2d at 318 (a party cannot claim justifiable

reliance in the face of a conflict between the alleged misrepresentations and the written terms of

the agreements).

This is especially true in light of Plaintiff's concession that the alleged misrepresentations

arose "during negotiations of the Loan Agreement."  Complaint [ECF No. 2] ¶¶ 113-14.  Both

the Loan Agreement and the Shortfall Guaranty contain plain and unambiguous merger clauses.

26

App. Ex. 9 [Loan Agreement] at SMHG082059 (§ 9.23); App. Ex. 10 [Shortfall Guaranty] at SMHG081982 (§ 11).  It is settled law that Plaintiff, a sophisticated party represented by sophisticated counsel, cannot rely on statements made during negotiations in the presence of such merger clauses.  *See Hindsight Sols., LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 773 (S.D.N.Y. 2014) (discussing the application of a merger clause); *Hotel 71 Mezz Lender LLC v. Mitchell*, 63 A.D.3d 447, 448 (N.Y. App. Div. 2009) (dismissing claims waived by language in loan agreement); *see also Red Tulip, LLC v. Neiva*, 44 A.D.3d 204, 209 (N.Y. App. Div. 2007) (applying "broadly worded waiver language" to "preclude the assertion of defenses to a guaranty").

Put simply, Plaintiff cannot use its purported misunderstanding of the Shortfall Guaranty as an excuse to avoid repaying Defendants' $42 million.  Insofar as Plaintiff now claims that it signed the Shortfall Guaranty believing it meant something else, Plaintiff has no one but itself to blame.  Plaintiff is a highly sophisticated party, and it was represented by sophisticated counsel.  To the extent Plaintiff had a different understanding, it was incumbent on Plaintiff to put that understanding in writing.  *See Baraliu v. Vinya Capital, L.P.*, 2009 WL 959578, at *8 (S.D.N.Y. Mar. 31, 2009) (in cases like this one, "involving sophisticated parties and high-stakes transactions — a party lacking information cannot reasonably rely on oral representations from a negotiator on the other side of a proposed transaction, and must be expected to demand documented confirmation or otherwise perform basic due diligence") (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997)).

Plaintiff did not do so, but it instead repeatedly assured Defendants that it had no defenses, offsets, or claims against them.  Plaintiff must live with the result.

## CONCLUSION

For the foregoing reasons, the Court should grant judgment to Defendants on their counterclaims and should dismiss Plaintiff's claims against Defendants.  Defendants ask that the Court schedule a hearing to determine the amount of damages, interest, and attorneys' fees due to Defendants.

DATED:   May 5, 2023                    **SNELL & WILMER L.L.P.**

                                        */s/ Aline Marie H. Longstaff*
                                        Matthew L. Lalli
                                        Jeremy J. Stewart
                                        Aline Marie H. Longstaff

                                        **AKIN GUMP STRAUSS HAUER & FELD LLP**

                                        Uri A. Itkin

                                        **KASOWITZ BENSON TORRES LLP**

                                        Jordan D. Beltz
                                        Andrew W. Breland

                                        *Attorneys for Defendants Summit Village*
                                        *Development Lender 1, LLC and Grand Canyon*
                                        *Development Holdings 3 LLC*

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 5th day of May, 2023, a true and correct copy of the foregoing

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed via the Court's ECF

system, which effectuated service upon all counsel of record, including the following:

> William B. Ingram
> Spencer W. Young
> STRONG & HANNI
> 102 South 200 East, Ste. 800
> Salt Lake City, Utah 84111
> wingram@strongandhanni.com
> syoung@strongandhanni.com
>
> *Attorneys for Plaintiff*

/s/ Mary Batchelor
Legal Administrative Assistant
Snell & Wilmer L.L.P.

4867-6669-5010