William B. Ingram, #10803    wingram@strongandhanni.com
Spencer W. Young, #16993    syoung@strongandhanni.com
Connor J. Keller, #18440    ckeller@strongandhanni.com
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUMMIT MOUNTAIN HOLDING GROUP, L.L.C., a Utah Limited Liability Company,<br><br>    Plaintiff,<br><br>v.<br><br>SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware Limited Liability Company; GRAND CANYON DEVELOPMENT HOLDINGS 3 LLC, an Arizona Limited Liability Company; and DOES 1 through 10,<br><br>    Defendants. | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 1:21-CV-00110-BSJ<br><br>Judge Bruce S. Jenkins |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule DUCivR 56-1, Plaintiff Summit Mountain Holding Group, L.L.C. ("Plaintiff"), by and through its undersigned counsel, Strong & Hanni law firm, respectfully moves for summary judgment on (1) its declaratory relief claims, (2) the related claim brought by Defendants Summit Village Development Lender 1, LLC (the "Lender") and Grand Canyon Development Holdings 3 LLC (the "Additional Lender")

1

(together, the "Lenders") that Plaintiff breached its Amended and Restated Guaranty Agreement, dated October 31, 2017 (the "Equity Requirement Guaranty"), given in favor of the Lender; and (3) Plaintiff's claim that the Lenders breached the implied covenant of good faith and fair dealing. Because there is no genuine dispute of any material fact and Plaintiff is entitled to judgment as a matter of law on these claims, the Court should grant this motion.

## INTRODUCTION AND RELIEF REQUESTED

Plaintiff pled four claims in this case: two claims for declaratory relief that Plaintiff does not owe what the Lenders claim Plaintiff owes under the Equity Requirement Guaranty;[1] one claim that the Lenders breached the implied covenant of good faith and fair dealing inherent in the Equity Requirement Guaranty;[2] and a claim that the Lenders and others fraudulently induced Plaintiff to sign the Equity Requirement Guaranty with representations about their abilities to raise funds their intent to allocate those funds to the Village EB-5 project at Powder Mountain, and that the Equity Requirement Guaranty would only be used to keep the loan "in balance" with respect to loan funds actually drawn for each budget line item, and in the aggregate.[3] The Lenders, for their part, pled two claims: one for breach of the Equity Requirement Guaranty;[4] and a separate claim that Plaintiff breached other agreements between the parties by filing this action.[5]

By this motion, Plaintiff seeks summary judgment in its favor on its claims for declaratory relief, its claim for breach of the implied covenant of good faith and fair dealing, and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty. Because the Equity Requirement

---

[1] Compl. (ECF No. 2), ¶¶ 26-67, 88-100.
[2] *Id.* ¶¶ 101-110.
[3] *See id.* ¶¶ 68-87, 111-128.
[4] Answer & Countercl. (ECF No. 35), ¶¶ 85-93.
[5] *Id.* ¶¶ 94-100.

Guaranty is ambiguous as to "when" contributions of the Borrower's Equity Requirement is required, because there is no genuine dispute the parties understood that the Borrower's Equity Requirement would be contributed on a pro-rata basis over time in proportion to the total EB-5 funds the Lenders actually disbursed (thus keeping the loan "in balance"), or that the Lenders waited nearly two-and-a-half years (half the loan term) *after* they knew the EB-5 market had dried up in China to give SMHG Village Development, LLC (the "Borrower") notice they weren't going to be able to raise the full $120 million in funding, Plaintiff is entitled to judgment as a matter of law on its claims for declaratory relief and for breach of the implied covenant of good faith and fair dealing, and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty.

## BACKGROUND

Over a decade ago, skiing aficionado and Plaintiff's principal, Greg Mauro, skied Powder Mountain for the first time and believed it to be the best ski resort in the world. Mr. Mauro wanted to prevent Powder Mountain from being acquired by a large corporation that would seek to overdevelop and overcrowd it, so he assembled a group of individuals interested in future homeownership at Powder Mountain into a founding member offering whereby they contributed capital in exchange for credits toward the purchase of land at the ski resort. Together, they bought Powder Mountain in April of 2013 and sought to responsibly develop the ski resort, maintaining its natural beauty and inherently great skiing experience.

Ski resort developments typically have, at their center, a "village." This "village" serves as the core of the development, providing hotel condominiums, shops, restaurants, and event venues. Single-family and other types of homes are then built around the village. Mr. Mauro and his group of future homeowners wanted to develop a Village at Powder Mountain. However, because they

also sought to preserve Powder Mountain from exploitation, they had only their own personal funds, plus seller financing and a Weber County Assessment Bond, to develop the first phase of Powder Mountain. They could not rely on institutional capital to fund the development, since that would require control and a corporate playbook of overdevelopment and overcrowding.

That led Mr. Mauro to an immigration program known as the EB-5 program. This allowed wealthy foreign nationals to invest between $500,000 and $1 million in United States projects, and if those funds were put at risk and created ten jobs, the foreign national would receive immigration status as a lawful permanent resident (i.e., a "green card"), and a pathway to American citizenship. Mr. Mauro's attraction to the EB-5 program was because of its requirement that the capital be put "at risk," which meant that foreign nationals could not insist on guaranties from parent entities or principals in the way a bank would. This meant the risk of developing Powder Mountain's Village would be isolated to the Borrower and would not bleed over to or "cross-collateralize" Plaintiff's assets if something were to go wrong.

Plaintiff began its pursuits of EB-5 capital with a company called American Immigration Group, LLC ("AIG"). After nine months, however, AIG failed to raise any EB-5 capital for Powder Mountain, and the necessary legal documents had not even been prepared. So, Mr. Mauro looked for another company to work with, and in his pursuit met a Canadian citizen named Tang Tang on August 3, 2015, at an EB-5 convention. Mr. Tang told Mr. Mauro that his team could raise the full $120 million the Borrower needed to develop the Village at Powder Mountain, and would allocate those funds to the project.

█████████████ a Letter of Intent ████████████████████████████ ("KT Capital"), on ████████████ (the "LOI"). The Lender was formed the next day ████████

4

███████ The Lender's only business was receiving investments of foreign nationals to loan to the Borrower in a way that would satisfy the requirements of the EB-5 program for its foreign national-investors.

Negotiations ensued, with Mr. Tang ████████████████████████ During the negotiations, Mr. Tang suggested that Plaintiff secure the attendance of late NBA basketball player Kobe Bryant at an event in Shanghai to raise money that Mr. Tang represented would be loaned for development of the Village at Powder Mountain. The parties also exchanged materials during negotiations, including a Private Placement Memorandum that was to be provided to investors and was dated September 18, 2015 (the "Original PPM"). Those materials show the Borrower's Equity Requirement being contributed over time and in proportion to the EB-5 loan proceeds advanced by the Lender, thus preserving the loan's debt-to-equity "balance." The parties even exchanged e-mails confirming they understood that contributions of the Borrower's Equity Requirement would be proportional to the amount of EB-5 loan proceeds the Lender actually lent to the Borrower. In fact, the Original PPM, as well as an Amended and Restated Private Placement Memorandum dated August 24, 2016 (the "A&R PPM"), both show that ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████ Indeed, the Original PPM provides just ████████████████████ ████████████████████████████████ and the A&R PPM does not ████████████ ██████████████

On June 28, 2016, the parties closed the transaction. The Borrower and the Lender entered into a Loan Agreement (the "Loan Agreement"). Plaintiff signed the original Equity Requirement Guaranty, wherein it guarantied prompt contribution of "Borrower's Equity Requirement, as and when required under the Loan Agreement." The loan term was five years, during which time the parties amended the Loan Agreement five times. The third amendment to the Loan Agreement, on March 2, 2018, added the Additional Lender to the Loan Agreement.

The Lenders' process of raising EB-5 funds and loaning them to the Borrower was slower than expected, and while the Lenders could notify the Borrower that they were not going to be able to raise the full $120 million, which in turn would have given the Borrower the right to seek other financing secured by a lien senior in right to the Lenders' lien, the Lenders delayed providing that notice until January 6, 2020, nearly four years into the loan term and nearly two-and-a-half years after the Lenders knew ███████████████████████ (and thus, they wouldn't be able to raise any new EB-5 funds for the Borrower).

At the outset of this litigation, the Lenders filed a motion to dismiss Plaintiff's claims (ECF No. 16) and argued that the Equity Requirement Guaranty and Loan Agreement were _un_ambiguous as to "when" contributions of the Borrower's Equity Requirement is required. ECF No. 24, at 2 (arguing the Loan Agreement is "plain and unambiguous"). The Court rejected that argument and found the Equity Requirement Guaranty and Loan Agreement to be ambiguous as to "when" contribution of the Borrower's Equity Requirement is required. ECF No. 28; *accord* ECF No. 20, at 10-12 (explaining why the documents are ambiguous, and why that necessitated denial of the motion).

Discovery has revealed parol evidence that indisputably shows the parties' understood that contribution of the Borrower's Equity Requirement would be over time, in proportion to the total EB-5 funds the Lender loaned to the Borrower, to maintain the debt-to-equity balance of the loan. Those undisputed facts warrant summary judgment in Plaintiff's favor on its first and second causes of action for declaratory relief, and on the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty. Indeed, the parol evidence shows that the loan's debt-to-equity ratio was "in balance" throughout the course of the loan, and the Lenders never referred to Plaintiff's Equity Requirement Guaranty or sought contributions under it while deeming the loan to be "in balance" over the course of 17 draw packages submitted by the Borrower.

Moreover, because the Lenders inexplicably delayed their notification of the Borrower that they would not be able to raise the full $120 million for two-and-a-half years after ███████████ ███████████████████████ Plaintiff is entitled to summary judgment in its favor on Plaintiff's third cause of action for breach of the implied covenant of good faith and fair dealing. This breach also provides a separate reason Plaintiff is entitled to judgment in its favor on its declaratory relief claims and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty, pursuant to the First Breach Rule.

Each of these bases for summary judgment is explained in more detail below.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In accord with Rule 56(c)(1) and DUCivR 56-1(b)(3), Plaintiff provides the Court with the following statement of facts material to this motion, as to which there is no genuine dispute:

**The Parties' Agreements**

1.      The Borrower and the Lender entered into the Loan Agreement on June 28, 2016.[6] The Loan Agreement was subsequently amended five times, on September 23, 2016, October 31, 2017, March 2, 2018, May 24, 2018, and January 31, 2019.[7]

2.      Plaintiff signed the operative version of the Equity Requirement Guaranty with the second amendment to the Loan Agreement on October 31, 2017.[8]

3.      Both the Loan Agreement and Equity Requirement Guaranty are governed by New York law.[9]

4.      In Section 1(a) of the Loan Agreement, Plaintiff guarantied "punctual payment of … Borrower's Equity Requirement, as and when required under the Loan Agreement."[10]

5.      The Loan Agreement, for its part, defines "Borrower's Equity Requirement" with respect to Section 5.17 of the Loan Agreement:[11]

> "**Borrower's Equity Requirement**" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to <u>Section 5.17</u> of this Agreement.

---

[6] App. of Evid., Ex. 1; *accord* App. of Evid., Ex. 8, Answer to RFA No. 1 (admitting Ex. 1 is a true and correct copy of the Loan Agreement).

[7] App. of Evid., Exs. 2-6; *accord* App. of Evid., Ex. 8, Answers to RFA Nos. 2-6 (admitting Exs. 2-6 are true and correct copies of the first through fifth amendments to the Loan Agreement).

[8] App. of Evid., Ex. 7; *accord* App. of Evid., Ex. 8, Answer to RFA No. 8 (admitting Ex. 7 is a true and correct copy of the Equity Requirement Guaranty); *see also* App. of Evid.. Ex. 3 (second amendment to the Loan Agreement, dated October 31, 2017).

[9] *Id.*, at SMHG002943-002944 § 9.17; App. of Evid., Ex. 7, at SMHG002868 § 15.

[10] *Id.*, at SMHG002864 § 1(a).

[11] App. of Evid., Ex. 1, at SMHG002881. The Borrower's Equity Requirement of $87,192,584.00 is the exact difference between the total expected budget of $207,192,584.00 and $120,000,000.00 in EB-5 loan proceeds. *See id.*, at SMHG002951 (showing the project's total budget).

6.    However, the subpart of Section of 5.17 that defines when the loan is "in balance" simply ensures that the project stays in budget as the loan proceeds are advanced and Borrower's Equity Requirement is contributed,[12] and provides that this "in balance" requirement would have to be met "at such time (and from time to time)" in the course of the loan term, but does not say when:

> 5.17.1. Anything contained in this Loan Agreement to the contrary notwithstanding, the Loan shall at all times be "in balance" on (a)an individual Budget line item basis, and (b)an aggregate Budget amount basis. The Loan shall be deemed to be "in balance" on an individual Budget line item basis only at such time (and from time to time) as the unexpended amount for each Budget line item, without including the contingency (except to the extent reallocated to such line item in accordance with Section 2.4.5(d)), is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete such Budget line item. The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project. Without limiting the generality of the foregoing, the Liquid Funds Amount must remain, in combination with the undrawn Loan proceeds (*i.e.,* as of any date, the remainder of $120,000,000.00 less the sum of total Advances then made), sufficient to pay for all Approved Costs anticipated to be incurred in the succeeding (prospective) twelve (12) month period in accordance with the Budget, the Plans and Specifications and the Schedule.

7.    Section 2.4.5(a) of the Loan Agreement provides some clue, in that it requires the loan to be "in balance" after each advance (individually and in the aggregate), but does not state how much the Borrower was required to contribute or—more importantly—when the contributions were required:[13]

---

[12] *Id.*, at SMHG002924-002925 § 5.17.1; Consolidated Depo. of Tang Tang, KT Capital, and KT Summit Development Manager, LLC (Feb. 24, 2023) ("Tang Depo."), App. of Evid., Ex. 9, at 123:6-125:16; Consolidated Depo. of Jeffrey Cheung and Lenders (Apr. 5, 2023) ("Cheung Depo."), App. of Evid., Ex. 10, at 41:10-42:22.

[13] *Id.*, at SMHG002904 § 2.4.5(a).

> 2.4.5.  *Loan in Balance.*
>
> (a)    Following the requested Advance, the Loan shall be "in balance" as required by Section 5.17 hereof.

8.      Section 3.3.2 of the Loan Agreement provides another clue, in that it requires that the Borrower provide the Lender with evidence that the Loan was "in balance" after the Borrower sold a condominium unit within the Village, but still does not identify how much was required to be contributed or when:[14]

> 3.3    *Release of Units*.  Lender shall from time to time upon the request of Borrower received not less than five (5) Business Days prior to any release contemplated by this Section 3.3, release individual Units from the Lien of the Deed of Trust and from any other Liens held by Lender, provided that:  (a) no Event of Default exists on the date of the proposed release; (b) contemporaneous with any such release, there shall be a sale of such Unit pursuant to an Approved Contract; and (c) Lender shall have received all of the following with respect to the Unit to be sold:
>
> 3.3.1.  an Approved Contract certified by Borrower to be a true and complete statement of the terms of sale with respect thereto;
>
> 3.3.2.  evidence that Borrower has received the Release Price and that Borrower has applied or has reserved such funds to pay Approved Costs or otherwise to satisfy the requirements of Section 5.17 of this Agreement for the Loan to be "in balance";

9.      The Loan Agreement—and thus the Guaranty, inasmuch as it incorporates the Loan Agreement by reference—is ambiguous as to the question of "when" contribution of the Borrower's Equity Requirement is required. ECF No. 28 (denying Lenders' motion to dismiss); *accord* ECF No. 20, at 10-12 (explaining that Lenders' motion should be denied because the Loan Agreement is ambiguous).

---

[14] *Id.*, at SMHG002912 § 3.3.2.

### The Lenders' Managers and Agents

10.      Mr. Tang acted as the Lenders' ███████████████████████████

████████████████████.[15]

11.      Mr. Tang was employed by KT Capital,[16] which owned and managed ██████████

Development Manager, LLC ("KT Summit").[17] ████████████████████████████████

████████████████████.[18]

12.      As the Lender's Class A Manager, ██████████████████████████████

████████████████.[19]

13.      However, the Lender is principally managed by Celona Asset Management (USA)

Ltd. ("Celona"), which was appointed as ████████████████████████████████[20]

14.      As the Lender's ██████████████████████████████████████████

████████████████████████████████████████████[21]

15.      ██████████████████████████████████████[22]

---

[15] Tang Depo., App. of Evid., Ex. 9, at 119:19-120:2; Cheung Depo., App. of Evid., Ex. 10, at 19:12-20:5.

[16] Tang Depo., App. of Evid., Ex. 9, at 15:21-25, 22:11-16.

[17] *Id.*, at 16:1-18.

[18] *Id.*, at 83:20-84:1; *accord* App. of Evid., Ex. 11 (agreement dated September 20, 2015 appointing KT Summit as the Lender's Class A Manager).

[19] *Id.*, at LENDERS_0003247 § 2.1; *accord* Tang Depo., App. of Evid., Ex. 9, at 84:2-6.

[20] App. of Evid., Ex. 12 ████████████████████████████████████████

██████████; *accord* App. of Evid., Ex. 13 ██████████████████████████████, at LENDERS_ 0002636-LENDERS_0002638 § 5.1.1 ██████████████████████████████.

[21] Cheung Depo., App. of Evid., Ex. 10, at 22:16-24:2.

[22] *Id.*, at 8:15-19.

**The Parties' Negotiations and Course of Dealing**

16. The parties have always understood the Borrower's Equity Requirement would be contributed from sources that include the following:



17. Indeed, the LOI

---

[23] App. of Evid., Ex. 14, at LENDERS_0005100; App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980; App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003636.

[24] App. of Evid., Ex. 14, at LENDERS_0005100; App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980-LENDERS_0003981; App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003637.

[25] App. of Evid., Ex. 14, at LENDERS_0005100; App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980; App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003636-LENDERS_0003637.

[26] App. of Evid., Ex. 14, at LENDERS_0005100.



██        ████████████████████████████ in the Original PPM:[27]

19.     The Original PPM █████████████████████████████████

████████████████████████████████████████████████████

███████████████████[28]

---

[27] App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980-LENDERS_0003981.
[28] *Id.*, at LENDERS_0003970.



20.    In March of 2016, Plaintiff's representative, Tom Jolley, and Mr. Tang exchanged

e-mails in which they both ███████████████████████████████████████████████

███████████████████████████████████████

     a.    In an e-mail on March 7, 2016, ██████████████████████████████

████████████████████████████████████████████████"[29] and

     b.    In an e-mail on March 15, 2016, ██████████████████████████

███████████████████████████████████████████████████████████

█████████"[30]

21.    Like the Original PPM, the A&R PPM ████████████████████████████

█████████████████████████████████[31]

[29] App. of Evid., Ex. 17, at SMHG015200; *accord* Tang Depo., App. of Evid., Ex. 9, at 94:9-23 (authenticating Exhibit 17).
[30] App. of Evid., Ex. 18, at LENDERS_0008641.
[31] App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003636-LENDERS_0003637.



22.     Those sources were the following:

     a.



23.     Just like the Original PPM, the A&R PPM also

---

15

████████████████████████████████████████████████████████████

████████████████



24.  ████████████████████████████████████████

████████████████ [37] ████████████████████████████████

████████████ . [38]

25.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [39]

---

[36] *Id.*, at LENDERS_0003627.

[37] Expert Witness Rept. of Matt H. Connors (Dec. 21, 2022), App. of Evid., Ex. 19, at 12 (stating that the Lender "████████████████████████████████████████████").

[38] *Id.*

[39] *Id.*, at 7-12 (explaining his analysis of the Development Model and PPM, and concluding those documents ████████████████████████████████████████ ).

26.    Moreover, both the Original PPM and the A&R PPM ███████████████

███████████████████ ██████████████████████████████

██████████████████████████████████████████████

██████████████████████[41]

27.    In fact, James Yuan, an employee of Cottonwood Management, LLC,[42] the servicer of the loan ("Cottonwood"),[43] sent an e-mail to Celona's Chief Operating Officer,[44] a man named Jeffrey Cheung, on November 11, 2017, confirming he ████████████████████

███████████████████████████████████████████████

██████████████████████

28.    Moreover, from July 28, 2016, through January 31, 2020, the ████████████

████████████████████,[46] ███████████████████████████

████████████████████████████████████████████████

████████.[47]

29.    Although the Borrower included spreadsheets titled "████████████ with many of the ████████████████████████[48] none of those spreadsheets made any mention

[40] Tang Depo., App. of Evid., Ex. 9, at 65:2-5, 164:2-10.
[41] 15 U.S.C.A. § 77l (West 2023); *see also* Lee, Sharon M., *The Development of China's Securities Regulatory Framework and the Insider Trading Provisions of the New Securities Law*, 14 N.Y. Int'l L. Rev. 1, 24 (Summer 2001) (explaining China's heightened penalties for securities fraud).
[42] Depo. of Alex Shing and Cottonwood (Mar. 17, 2023), App. of Evid., Ex. 20, at 33:21-34:14.
[43] *See generally* App. of Evid., Ex. 21 (Cottonwood's agreement with the Lender confirming the scope of its agency as servicer of the loan).
[44] Cheung Depo., App. of Evid., Ex. 10, at 7:16-20, 8:15-19.
[45] App. of Evid., Ex. 22, at LENDERS_0104123 (emphasis added).
[46] App. of Evid., Ex. 23; *accord* Cheung Depo., at 76:20-78:12.
[47] *Id.*, at 81:16-21.
[48] App. of Evid., Ex. 24 (e-mail from Plaintiff's general counsel, Shaun Mulreed, attaching Equity Prove-Up spreadsheet to e-mail delivering Request for Advance #4); App. of Evid., Ex. 25 (same

of the Equity Requirement Guaranty,[49] and the Lenders have no documents showing that they ever considered the Equity Requirement Guaranty when determining the loan to be "in balance" under Section 2.4.5(a) or otherwise.

30.    Indeed, the [50] In each instance, they never asked Plaintiff to make any contributions pursuant to the Equity Requirement Guaranty because it was a moot point—the debt-to-equity ratio was "in balance," and no cure was necessary from the project itself or via the Equity Requirement Guaranty.

### The Importance of a TEA Designation

31.    As explained in the Original PPM and the A&R PPM, the  the effect of which was [51]

---

with respect to Request for Advance #5); App. of Evid., Ex. 26 (same with respect to Request for Advance #6); App. of Evid., Ex. 27 (same with respect to Request for Advance #7); App. of Evid., Ex. 28 (same with respect to Request for Advance #9); App. of Evid., Ex. 29 (same with respect to Request for Advance #11); App of Evid., Ex. 30 (same with respect to Request for Advance #12); App. of Evid., Ex. 31 (same with respect to Request for Advance #13); App. of Evid., Ex. 32 (same with respect to Request for Advance #14); App. of Evid., Ex. 33 (same with respect to Request for Advance #15); App. of Evid., Ex. 34 (same with respect to Request for Advance #16); App. of Evid., Ex. 35 (same with respect to Request for Advance #17).

[49] App. of Evid., Ex. 36 (print-out of spreadsheet attached to Exhibit 24 showing *no* reference to the Equity Requirement Guaranty); App. of Evid., Ex. 37 (same with respect to Exhibit 25); App. of Evid., Ex. 38 (same with respect to Exhibit 26); App. of Evid., Ex. 39 (same with respect to Exhibit 27); App. of Evid., Ex. 40 (same with respect to Exhibit 28); App. of Evid., Ex. 41 (same with respect to Exhibit 29); App. of Evid., Ex. 42 (same with respect to Exhibit 30); App. of Evid., Ex. 43 (same with respect to Exhibit 31); App. of Evid., Ex. 44 (same with respect to Exhibit 32); App. of Evid., Ex. 45 (same with respect to Exhibit 33); App. of Evid., Ex. 46 (same with respect to Exhibit 34); App. of Evid., Ex. 47 (same with respect to Exhibit 35).

[50] Cheung Depo., App. of Evid., Ex. 10, at 81:16-21.

[51] App. of Evid., Ex. 15, at LENDERS_0003947, LENDERS_0004008; App. of Evid., Ex. 16, at LENDERS_0003602, LENDERS_0003664.

32.    ██████████████████████████████████████████████[52]

33.    However, whether the Village remained in a TEA was ████████████████

████████,[53] and as Mr. Tang confirmed in his deposition, ████████████████████

██████████████████████████████████████████████████████████

████████████████████████████[54]

34.    Indeed, both the Original PPM and the A&R PPM █████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████[55]

**The Lenders' Bad Faith**

35.    Plaintiff gave the Equity Requirement Guaranty as "an Affiliate of Borrower" that

expected to "derive material financial benefit from the Loan,"[56] and ensure that the loan remained

"in balance."

36.    While the Loan Agreement allows the Lender to loan less than the full $120 million

to the Borrower if the Lender fails to raise the full $120 million,[57] the Loan Agreement ensures the

Village could still be constructed by giving the Borrower the right to obtain other financing secured

---

[52] Tang Depo., App. of Evid., Ex. 9, at 194:23-195:7.
[53] Cheung Depo., App. of Evid., Ex. 10, at 25:11-27:2.
[54] Tang Depo., App. of Evid., Ex. 9, at 194:5-195:11.
[55] App. of Evid., Ex. 15, at LENDERS_0004008; App. of Evid., Ex. 16, at LENDERS_0003664.
[56] App. of Evid., Ex. 7, at SMHG002864 (last recital to the Equity Requirement Guaranty).
[57] App. of Evid., Ex. 1, at SMHG02897 § 2.1 (providing that Lender has "no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance").

by a lien senior in right to the Lender's loan, once the Lender notified the Borrower that it expected to be unable to raise the full $120 million in EB-5 funding:[58]

> 3.4    *Senior Loans*. Borrower shall have the right to obtain debt financing or obtain equity contributions secured by the Mortgaged Property senior in right to the Loan (such senior loans or equity, collectively, the "**Senior Loans**," each of which is a "**Senior Loan**") if Lender notifies Borrower in writing that the aggregate amount of the Advances is reasonably expected by Lender to be less than $120,000,000; provided that (a) after giving effect to the proposed Senior Loans, the aggregate of the Loan Amount plus the amount of all Senior Loans does not exceed $120,000,000 (or such higher amount as may be approved by Lender in its sole discretion); (b) the proceeds of any Senior Loans will only be used to (i) pay or reimburse Approved Costs, or (ii) repay or refinance any Senior Loan securing a loan that paid or reimbursed Approved Costs; (c) such Senior Loans shall mature no earlier than the Maturity Date; and (d) no Event of Default exists at the time Borrower proposes to borrow a Senior Loan. If Borrower has the right under this Section 3.4 to obtain a Senior Loan, Lender agrees to enter into an Intercreditor Agreement with the proposed holder of such Senior Loan, and Borrower will not execute any documents evidencing or securing any Senior Loan unless and until Lender executes such Intercreditor Agreement. Borrower shall provide Lender with copies of all documents evidencing and/or guaranteeing any Senior Loan, all of which shall be subject to Lender's reasonable approval.

37.    By September 25, 2017—15 months into the loan term— ████████████████████

████████████████████[59]

████████████████████[60]

38.    By April 16, 2018, the Lenders knew that ████████████████████

████████████████████.[61]

39.    Indeed, the Lender was told back in August 2016—just over a month into the loan term—that the ████████████████████

---

[58] *Id.*, at SMHG002913 § 3.4.

[59] Tang Depo., App. of Evid., Ex. 9, at 184:12-185:3; *accord* Statement of Undisputed Material Facts, *supra*, ¶¶ 11-12 ████████████████████ ).

[60] App. of Evid., Ex. 48, at LENDERS_0088551.

[61] App. of Evid., Ex. 49, at LENDERS_0012387-LENDERS_0012388; *accord* Tang Depo., App. of Evid., Ex. 9, at 186:21-187:18, 188:14-22.


███████████████ [62]

40.     Finally, by January 3, 2019, the Lenders ████████████████████████

████████████ [63]

41.     Yet the earliest the Lenders purport to provide any notice to the Borrower that they did not expect to raise the full $120 million in EB-5 capital was ██████████,[64] and even that notice said only that ███████████████████████,"[65] and ████████████

████████████████.[66]

42.     Nevertheless, the Borrower undertook efforts to raise financing to allow it to finish construction of the Village,[67] but because the Lenders claimed Plaintiff owed them more than $51 million under the Equity Requirement Guaranty, the Borrower's efforts were ultimately futile.[68]

43.     As part of the final advance request, the Borrower submitted an Equity Prove-Up spreadsheet to the Lenders and the Lenders subsequently ██████████████████

---

[62] App. of Evid., Ex. 50, at SMHG102346.
[63] App. of Evid., Ex. 51, at SMHG094580 (letter from the State of Utah designating the Village as within a TEA through January 3, 2019); *accord* Tang Depo., App. of Evid., Ex. 9, at 190:1-192:1.
[64] App. of Evid., Ex. 52, at LENDERS_0086095; *accord* Lenders' Supp'l Resps. and Obj. to Pl.'s Second Set of Disc. Reqs. (Apr. 14, 2023), App. of Evid., Ex. 53, at 3 ██████████████████████
███████████████████.
[65] App. of Evid., Ex. 52, at LENDERS_0086095.
[66] *See generally id.*
[67] Decl. of Greg Mauro, App. of Evid., Ex. 56, ¶¶ 11.
[68] *Id.* ¶ 12.

████████████████████████████████████

███ [69]

44.    Despite these facts, and despite the fact that nothing had changed about the Village development in the interceding months with respect to any debt or equity, the budget, or anything else,[70] the Lenders delivered a notice to Plaintiff on July 6, 2021, claiming that the loan was *not* in balance and that the Borrower had only contributed $35,930,227.00, and purporting to obligate Plaintiff to pay over $51 million under the Equity Requirement Guaranty.[71]

45.    Indeed, as the Lender's own loan servicer put it, any attempt to enforce the Equity Requirement Guaranty against Plaintiff, in light of the transaction's history and the ambiguities in the Loan Agreement ████████████████████ [72]

46.    The Lenders' actions described in paragraphs 35 through 45 above not only caused the Borrower to be unable to develop the Village,[73] but have deprived Plaintiff of several business opportunities and substantial revenue—to wit:

a.    While Plaintiff likely would have been selling real estate at a clip of between ████████ per year and ████████ per year, it has only been selling real estate at a pace of between ████████ per year and ████████ per year;[74]

---

[69] App. of Evid., Ex. 23, at LENDERS_0010996; *accord* Cheung Depo., App. of Evid., Ex. 10, at 81:16-21; App. of Evid., Ex. 35; *accord* App. of Evid., Ex. 47 (print-out of SMHG136432 attached to Exhibit 35).
[70] Mauro Decl., App. of Evid., Ex. 56, ¶ 13.
[71] App. of Evid., Ex. 54, at SMHG002981 (claiming the "Loan is out of balance pursuant to Section 5.17 of the Loan Agreement," and purporting to obligate Plaintiff to pay $51,262,357.00); *see also id.*, at SMHG002984 (listing Borrower's equity contributions).
[72] App. of Evid., Ex. 55, at LENDERS_0101627.
[73] Mauro Decl., App. of Evid., Ex. 56, ¶ 14.
[74] *Id.*, ¶¶ 15-16.

    b.    While the Borrower had opportunities to develop hotels including a ███ Hotel project, an opportunity that would have furthered an important business relationship for Plaintiff, that opportunity was foiled by the Lenders;[75] and

    c.    While both Plaintiff and the Borrower had ████████████ ████████████████████████████████ as advertised in the Original PPM and the A&R PPM,[76] that opportunity was lost because the Borrower never had the capital to develop the Village.[77]

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that the Court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit," *Doe v. University of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020), and a "dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

## ARGUMENT & ANALYSIS

There are two reasons Plaintiff is entitled to summary judgment in its favor on its claims for declaratory relief and for breach of the implied covenant of good faith and fair dealing, and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty. First, there is no genuine dispute that the parties always understood the Borrower's Equity Requirement would be

---

[75] *Id.*, ¶¶ 17-18.
[76] App. of Evid., Ex. 15, at LENDERS_0003955-LENDERS_0003956; App. of Evid., Ex. 16, at LENDERS_0003609-LENDERS_0003610.
[77] *Id.*, ¶ 19.

contributed over time in proportion to the total EB-5 loan proceeds actually advanced by the Lenders. Second, there is no genuine dispute that the Lenders breached the implied covenant of good faith and fair dealing by depriving the Borrower of its ability to seek financing senior in right to the Lenders' loan for two-and-a-half years after the Lender knew the EB-5 market had dried up in China.

Each of these reasons will be examined in turn.

I.    **The Parties Always Understood the Borrower's Equity Requirement Would Be Contributed in Proportion to the Total EB-5 Loan Proceeds Advanced by the Lenders.**

Because the parol evidence is clear that the parties always understood that the Borrower's Equity Requirement would be contributed over time in proportion to the EB-5 loan proceeds the Lenders actually disbursed, Plaintiff is entitled to judgment as a matter of law on its claims for declaratory relief and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty.

Guaranties are interpreted just like any other contract under New York law,[78] and are thus subject to the Parol Evidence Rule.[79] When determining whether or not a guaranty is ambiguous, New York courts look only to the four corners of the document.[80] If a court finds that the guaranty is ambiguous, it will consider parol evidence to decide what the parties intended.[81]

---

[78] *G-3 Purves Street, LLC v. Thomson Purves, LLC*, 953 N.Y.S.2d 109, 112 (App. Div. 2012).
[79] *United Orient Bank v. Lee*, 637 N.Y.S.2d 96 (App. Div. 1996) (citing *Namad v. Salomon Inc.*, 74 N.Y.2d 751, 752 (App. Div. 1989)).
[80] *Hoeg Corp., v. Peebles Corp.*, 153 A.D.3d 607, 608 (N.Y. App. Div. 2017) ("[A] court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities."); *see also Brad H. v. City of New York*, 928 N.Y.S.2d 221, 224 (2011); *Consedine v. Porteville Cent. School Dist.*, 12 N.Y.3d 286, 293 (2009); *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008).
[81] *Legum v. Russo*, 20 N.Y.S.3d 124, 126 (App. Div. 2015); *Schron v. Troutman Sanders LLP*, 963 N.Y.S.2d 613, 616 (App. Div. 2013).

In this case, the Equity Requirement Guaranty is clearly ambiguous. In Section 1(a) of the Equity Requirement Guaranty, Plaintiff guarantied the "punctual payment of … Borrower's Equity Requirement, as and when required under the Loan Agreement."[82] The Loan Agreement, however, never specifies "when" contribution of the Borrower's Equity Requirement is required.

The Loan Agreement defines the "Borrower's Equity Requirement" by referring to Section 5.17's requirement that the Loan be "in balance,"[83] but says nothing at all about *when* contribution of the Borrower's Equity Requirement is required:[84]

> "**Borrower's Equity Requirement**" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to <u>Section 5.17</u> of this Agreement.

Section 5.17.1 defines what it means for the Loan to be "in balance," but says nothing about *when* the Borrower's Equity Requirement must be contributed to *keep* the loan "in balance"[85]—only that the loan must be "in balance … at such time (and from time to time)" ████████████ ██████████████████████████████████████[86] Sections 2.4.5(a) and 3.3.2 of the Loan Agreement provide some clue as to *when* contribution of the Borrower's Equity Requirement is required to be contributed, in that they require the loan to be "in balance" *after* each advance (both individually in the aggregate) and *after* a unit within the Village was sold,[87] but neither of those sections provides any information about the *amount* of the Borrower's Equity Requirement that must be contributed at such times.

---

[82] App. of Evid., Ex. 7, at SMHG002864 § 1.
[83] App. of Evid., Ex. 1, at SMHG002881 § 1.1.
[84] *See generally id.*
[85] *Id.*, at SMHG002924-SMHG002925 § 5.17.1.
[86] Tang Depo., App. of Evid., Ex. 9, at 123:6-125:16; Cheung Depo., App. of Evid., Ex. 10, at 41:10-42:22.
[87] App. of Evid., Ex. 1, at SMHG002904 § 2.4.5(a); *id.*, at SMHG002912 § 3.3.2.

Because the Loan Agreement fails to unambiguously express the parties' intentions about *when* the Borrower is required to contribute the Borrower's Equity Requirement, the Equity Requirement Guaranty is rendered ambiguous insofar as it relies upon the Loan Agreement to specify *when* that contribution is required from Plaintiff. Under New York law, that ambiguity means that the Court may consider parol evidence to understand *when* the parties intended that the Borrower would contribute the Borrower's Equity Requirement.

On this point, the evidence is incontrovertible. Both the Original PPM and A&R PPM state that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

Moreover, Mr. Tang and Plaintiff's employee, Tom Jolley, exchanged e-mails in March of 2016—three months before the Loan Agreement and Equity Requirement Guaranty were signed— confirming ███████████████████████████████████████████████████ ██████████████████████████████████████████ Indeed, Plaintiff's expert, Matt Connors, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ the Original PPM and the A&R PPM. Consistent with all the parties' discussions on this point, Mr. Connors ████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

This parol evidence, of course, explains the requirements in Sections 2.4.5(a) and 3.3.2 of the Loan Agreement that the loan be "in balance" after each advance and after the sale of units in the Village. Because everyone understood the Borrower's Equity Requirement was required to be contributed "pro-rata" with the total EB-5 loan, it makes sense for the loan to be "in balance" after each advance of EB-5 loan proceeds—the Borrower needed to show it had contributed its pro-rata share of equity. It also makes sense for the loan to be "in balance" after the sale of real estate units since the parties clearly understood the Borrower's Equity Requirement ████████████████████

████████████████████████████████████████████

In addition, the parol evidence makes sense of Section 5.28 of the Loan Agreement, which requires the Borrower to contribute one of the "JV Development Neighborhoods"—sales proceeds of which were one of the sources from which contributions of the Borrower's Equity Requirement would come—as additional collateral when the total amount of the loan reached thresholds of $15 million, $25 million, $35 million, and $45 million. In other words, Section 5.28 requires a pro-rata contribution of collateral from whence sales proceeds would come, as the Lenders disburse EB-5 loan proceeds.

If the Lenders were confused about the parties' negotiations, Mr. Yuan, an employee of the Lender's loan servicer, Cottonwood, cleared things up. As he stated in his November 11, 2017 e-mail to Mr. Cheung, Celona's Chief Operating Officer, he ██████████████████████

████████████████████████████████████████████

████████████████████████████████████"[88] Mr. Cheung responded by █████████████████

████████████████████████████████████████████████████████████████

████████████"[89] Nowhere did ████████████████████████████████████████████

████████████████████████████████████████████ Because "the court may

consider the construction placed on the contract by the parties to help ascertain the meaning,"[90]

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████"[91]

      That, in turn, means that the Borrower has satisfied its Borrower's Equity Requirement and

Plaintiff has no obligation to the Lenders under the Equity Requirement Guaranty. Under the Loan

Agreement, the total EB-5 disbursements were expected to be $120 million, and the Borrower was

expected to contribute a Borrower's Equity Requirement that totaled $87,192,584.00. The Lenders

only disbursed $42 million in EB-5 funds, however. The Borrower was thus obligated to make an

equity contribution of only $30,517,404.40.[92] As the Lenders concede in their July 6, 2021 notice,

the Borrower contributed equity totaling $35,930,227.00,[93] far exceeding what it was obligated to

---

[88] App. of Evid., Ex. 22, at LENDERS_0104123 (emphasis added).

[89] *Id.* at LENDERS_0104122.

[90] *Abramson v. Hasson*, 125 N.Y.S.3d 730, 770 (App. Div. 2020) (stating that "[w]here a contract is ambiguous, the court may consider the construction placed on the contract by the parties to help ascertain the meaning").

[91] App. of Evid., Ex. 22, at LENDERS_0104123 (emphasis added).

[92] ($87,192,584 ÷ $120,000,000) x $42,000,000 = $30,517,404.40.

[93] App. of Evid., Ex. 54, at SMHG002984 (conceding the Borrower's land contribution for a total of $29 million, JV Development Neighborhood sales proceeds totaling $3,615,003, and other cash equity totaling $3,315,224).

contribute.[94] In other words, the loan consistently remained in debt-to-equity "balance." Therefore, Plaintiff has no obligation to contribute anything under the Equity Requirement Guaranty.

While the Lenders will certainly argue for some other, alternative construction of the Loan Agreement, any construction the Lenders will advance will seek to minimize the "risk" the Lenders took on this transaction. This presents an issue, since the EB-5 program requires that the Lenders' capital be truly "at risk" so that the Lenders' foreign national-investors could get their green cards. Title 8, Section 204.6(j)(2) of the Code of Federal Regulations requires that these investors present immigration authorities with "evidence that the [investor] has placed the required amount of capital *at risk* for the purpose of generating a return,"[95] and it has long been the position of the Department of Justice, which oversees immigration matters including the EB-5 program,[96] that capital that "is guaranteed to be returned, regardless of the success or failure of the business," is not capital which qualifies foreign national-investors to receive visas under the EB-5 program.[97] Yet that is exactly what the Lenders seek to transform the Equity Requirement Guaranty into—an absolute guaranty that the Lenders' investors will get their money back, even though the Village was not successfully developed. Such a construction of the Loan Agreement and the Equity Requirement Guaranty is contrary to the public policy of the EB-5 program that is at the very heart of this transaction, and—unsurprisingly—does not hold water in the face of the parol evidence set forth above, which clearly shows the parties always understood the Borrower's Equity Requirement would be contributed in proportion to the EB-5 funding actually advanced. That is all Plaintiff guarantied, and as reflected

---

[94] This, of course, is in addition to the collateral Defendants received as described in Section 5.28 of the Loan Agreement.

[95] 8 C.F.R. § 204.6(j)(2) (West 2023) (emphasis added).

[96] *See* 8 U.S.C.A. § 1103.

[97] *In re Izummi*, 22 I. & N. Dec. 169, 184 (Jul. 13, 1998).

in ███████████ and discussed above, the Borrower's Equity Requirement has been satisfied in full. Plaintiff thus has no obligation to the Lenders under the Equity Requirement Guaranty.

While the Loan Agreement—and thus the Equity Requirement Guaranty—are ambiguous as to *when* contribution of the Borrower's Equity Requirement is required, the parol evidence makes things quite clear, and confirms what Plaintiff has asserted all along—that the Borrower was only required to contribute equity to the Village in proportion to the total amount of EB-5 proceeds the Lenders actually loaned to the Borrower. By the Lenders' own admission, the Borrower not only met the Borrower's Equity Requirement, but exceeded it by over $5 million, in addition to providing additional collateral under Section 5.28 of the Loan Agreement. Accordingly, Plaintiff is entitled, as a matter of law, to judgment in its favor on its claims for declaratory relief and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty.

## II.    The Lenders Acted in Bad Faith By Concealing Their Inability to Raise the Full $120 Million in EB-5 Funds for Two-and-a-Half Years.

Because no one disputes that the Lenders delayed giving the Borrower the right to pursue financing secured by rights senior to the Lenders for nearly two-and-a-half years (half of the loan term) after the Lender knew ██████████████████████ Plaintiff is entitled to judgment as a matter of law that the Lenders breached the implied covenant of good faith and fair dealing inherent in the Equity Requirement Guaranty. This breach provides another reason Plaintiff is also entitled to judgment as a matter of law, under the First Breach Rule, on its claims for declaratory relief and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty.

Under New York law, "[i]mplicit in every contract is an implied covenant of good faith and fair dealing."[98] This implied covenant "is a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not expressly prohibit such conduct."[99] "Historically, New York courts have held that the covenant of good faith and fair dealing applies to cases where a contract contemplates the use of discretion."[100] "[E]ven an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement."[101]

Additionally, New York recognizes the First Breach Rule: "Under New York law, when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party."[102] This applies to guaranties, just like every other contract,[103] and a breach of the implied covenant can trigger application of the First Breach Rule just like any other breach.[104]

In this case, even if the Lenders somehow convince the Court that the Equity Requirement Guaranty and Loan Agreement are not ambiguous or that they had discretion to call the Borrower's Equity Requirement due whenever they pleased, the Lenders' own material breach of the Equity

---

[98] *25 Bay Terrace Associates, L.O. v. Public Services Mut. Ins. Co.*, 148 N.Y.S.3d 484, 489 (App. Div. 2021).

[99] *Id.*, at 490.

[100] *Southern Telecom Inc. v. ThreeSixty Brands Group, LLC*, 520 F.Supp.3d 497, 505 (S.D.N.Y. 2021).

[101] *Legend Autorama, Ltd. v. Audi of America, Inc.*, 100 A.D.3d 714, 716 (N.Y. App. Div. 2012).

[102] *Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F.Supp.3d 637, 641 (S.D.N.Y. 2017).

[103] *See Parlux Fragrances, LLC v. S. Carter Enterprises, LLC*, 164 N.Y.S.3d 108, 122 (App. Div. 2022).

[104] *Rebecca Broadway Ltd. Partnership v. Hotton*, 37 N.Y.S.3d 72, 79 (App. Div. 2016).

Requirement Guaranty's implied covenant of good faith and fair dealing precludes them as a matter of law from now seeking to enforce that guaranty against Plaintiff.

In September 2017, Mr. Tang ██████████████████████████████████████ ████████████████████████"[105] Mr. Tang conceded in his deposition that this ████████████ ██████████████████████████████████████████[106] The Lenders also knew in April of 2018 that ████████████████████████████████████████ ████████████ and in January 2019 that the ████████████████████████████████ ██████████████████████████████████.

Despite all of this, the Lenders inexplicably delayed notifying the Borrower under Section 3.4 of the Loan Agreement that they were not going to be able to raise the full $120 million, which would have allowed the Borrower to pursue other financing secured by a lien senior in right to the Lenders' lien. The Lenders purport to have provided the notice on January 6, 2020, a full two-and-a-half years *after* ████████████████████████████████ and over three-and-a-half years into the loan term. But even that purported "notice" is unclear. It ████████████████████████ ████████████████████ and says only that it is ████████████████████████████████ ████████████████ not that the Lenders ████████████████████████.

Either way, the Lenders have no excuse for this nearly two-and-a-half-year delay, the effect of which was to deprive Plaintiff of the "material benefit" it expected to receive from the loan as the Borrower's affiliate entity. Indeed, the Lenders' delay deprived the Borrower of capital that it needed to develop the Village, which in turn wreaked havoc on Plaintiff's business. Plaintiff owns

---

[105] App. of Evid., Ex. 48, at LENDERS_0088551.
[106] Tang Depo., App. of Evid., Ex. 9, at 184:12-185:3; *accord* App. of Evid., Ex. 48.

the land surrounding the Village, and should have been selling real estate at a clip of between ███

███ and ████████ per year. Instead, because the Lenders' breach deprived the Borrower of

the capital it needed to develop the Village, Plaintiff is selling at a fraction of what it should be. In

addition, Plaintiff's affiliate, SMHG Phase I LLC, is now threatened with a lawsuit claiming fraud

because the Village was never developed.[107]

     Moreover, the Lenders' breach of the Equity Requirement Guaranty's implied covenant of

good faith and fair dealing accrued on January 6, 2020, a full year-and-a-half *before* the date upon

which the Lenders sent their notice claiming Plaintiff owed the Lenders over $51 million. In other

words, there is no genuine dispute that the Lenders' breach of the implied covenant preceded any

supposed breach of the Equity Requirement Guaranty by Plaintiff. The First Breach Rule therefore

precludes any right the Lenders may have otherwise had to recover from Plaintiff under the Equity

Requirement Guaranty, as a matter of law.

## <u>CONCLUSION</u>

     Despite the requirements of the EB-5 program that their investors' capital be "at risk" and

subject to loss, the Lenders seek to transform the Equity Requirement Guaranty into a guaranty of

absolute payment that defies the requirements of the EB-5 program at the heart of this transaction

and flies in the face of the parol evidence amassed in discovery.

     As shown above, there can be no genuine dispute from that parol evidence that the parties

all understood the Borrower's Equity Requirement would be contributed on a pro-rata basis over

time in proportion to the total EB-5 proceeds the Lenders actually loaned to the Borrower. In light

---

[107] *See* Mot. for Leave to Amend Pleadings and to Bring Claims Against Certain Third Parties (ECF No. 73), *SMHG Phase I LLC v. Eisenberg, et al.*, Case No. 1:22-CV-00035 (D.Utah, filed April 6, 2023).

of that evidence, there is no genuine dispute that the Borrower satisfied its Equity Requirement in full, and then some, which means Plaintiff has no obligation to pay the Lenders anything under the Equity Requirement Guaranty.

Indeed, the very purpose of the Equity Requirement Guaranty was to ensure that the loan remained "in balance" with respect to the total debt and total equity actually contributed to the Village. The loan consistently remained in debt-to-equity "balance" as validated by the Lender and independent third parties such as Fuclrum, LLC (which reviewed every draw package), from its first advance in June 2016 through its last advance in January 2020. Therefore Plaintiff has no obligation to contribute anything under the Equity Requirement Guaranty because there was no debt-to-equity imbalance to cure.

But even if the Lenders could somehow controvert those facts, or persuade the Court that the Loan Agreement and Equity Requirement Guaranty were not ambiguous, or gave them some sort of discretion, the Lenders cannot avoid the undisputed fact that they inexplicably waited nearly two-and-a-half years after learning the ███████████████████████ to notify the Borrower that they would not be able to raise the full $120 million. This delay deprived Plaintiff of the fruit it expected to receive under the Equity Requirement Guaranty as the Borrower's grandparent entity and the owner of much of the land surrounding the Village.

Therefore, even if the Lenders somehow avoid the incontrovertible parol evidence Plaintiff described above, their own first breach of the implied covenant of good faith and fair dealing that inheres to the Equity Requirement Guaranty precludes any attempts by the Lender to now enforce the Equity Requirement Guaranty against Plaintiff, as a matter of law.

For all of these reasons and the reasons set forth above, the Court should grant this motion and enter summary judgment in Plaintiff's favor on its declaratory relief claims, the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty, and Plaintiff's claim that the Lenders' breached the implied covenant of good faith and fair dealing.

DATED this 5th day of May, 2023.

STRONG & HANNI

_/s/ Spencer W. Young_____
William B. Ingram
Spencer W. Young
Connor J. Keller
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 5th day of May, 2023, a true and correct copy of the foregoing PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, with any exhibits and attachments, was served upon the following by the method respectively indicated below:

Matthew L. Lalli                        ( )    U.S. Mail, Postage Prepaid
    mlalli@swlaw.com                ( )    Hand Delivery
Jeremy J. Stewart                       ( )    Overnight Mail
    jjstewart@swlaw.com             ( )    Facsimile
Aline Marie H. Longstaff                (X)    Electronic Filing
    alongstaff@swlaw.com            ( )    E-mail
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, UT 84101-1531
Telephone: (801) 257-1900

*Attorney for Defendants*

Jordan D. Beltz                         ( )    U.S. Mail, Postage Prepaid
    jbeltz@kasowitz.com             ( )    Hand Delivery
Andrew W. Breland                       ( )    Overnight Mail
    abreland@kasowitz.com           ( )    Facsimile
KASOWITZ BENSON TORRES LLP              (X)    Electronic Filing
1633 Broadway                           ( )    E-mail
New York, NY 10019
Telephone: (212) 506-1700

*Attorneys for Defendants*

Uri A. Itkin                            ( )    U.S. Mail, Postage Prepaid
    uitkin@akingump.com             ( )    Hand Delivery
AKIN GUMP STRAUSS HAUR & FELD LLP       ( )    Overnight Mail
One Bryant Park                         ( )    Facsimile
New York, NY 10036                      (X)    Electronic Filing
Telephone: (212) 872-1000               ( )    E-mail

*Attorneys for Defendants*

/s/ Kaylee Haines
Kaylee Haines
*Legal Assistant*