**LOAN AGREEMENT**

**By and Between**

**SMHG VILLAGE DEVELOPMENT LLC,**

**a Delaware limited liability company**

**and**

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC,**

**a Delaware limited liability company**

**Dated:  June 28, 2016**

94392406

CONFIDENTIAL INFORMATION                                                                                    SMHG002872

Table of Contents

                                                                    Page

ARTICLE 1 Definitions and Accounting Terms .................................................................1
    1.1    Definitions ..........................................................................................1
    1.2    Accounting Terms ..............................................................................19

ARTICLE 2 The Loan ........................................................................................................19
    2.1    The Loan ............................................................................................19
    2.2    Reserved ............................................................................................20
    2.3    Loan Closing Date and First Disbursements .....................................20
    2.4    Advances of Loan Proceeds ...............................................................24
    2.5    Improvement Conditions ...................................................................29
    2.6    Final Advance and Release of Retainage ..........................................30
    2.7    Prepayments.......................................................................................31
    2.8    Sales Deposits; Unit Release Prices ..................................................32
    2.9    Defeasance .........................................................................................32

ARTICLE 3 The Collateral .................................................................................................34
    3.1    Generally............................................................................................34
    3.2    Subordinated Loans ...........................................................................35
    3.3    Release of Units .................................................................................35
    3.4    Senior Loans ......................................................................................36

ARTICLE 4 Representations and Warranties of Borrower ................................................36
    4.1    Capacity .............................................................................................36
    4.2    Validity of Loan Documents ..............................................................36
    4.3    No Governmental Approvals Required ..............................................37
    4.4    Tax Liability ......................................................................................37
    4.5    Financial Statements ..........................................................................37
    4.6    Pending Litigation .............................................................................37
    4.7    Bankruptcy.........................................................................................38
    4.8    Compliance with Zoning Ordinances and Similar Laws....................38
    4.9    Entitlements .......................................................................................38
    4.10    Environmental and Geological Issues ..............................................38
    4.11    No Other Liens ..................................................................................38
    4.12    No ERISA Plan..................................................................................38
    4.13    Material Contracts; Consents.............................................................38
    4.14    Full Disclosure ..................................................................................38
    4.15    Governmental Regulation ..................................................................39
    4.16    No Condemnation ..............................................................................39
    4.17    Defaults Under Loan Documents ......................................................39
    4.18    Separate Tax Parcel ...........................................................................39

CONFIDENTIAL INFORMATION

SMHG002873

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 4.19 | Budget and Schedule | 39 |
| 4.20 | Other Defaults | 39 |
| 4.21 | No Violations of Law | 39 |
| 4.22 | Commissions and Fees | 39 |
| 4.23 | Employees | 39 |
| 4.24 | Subordinated Loans | 39 |
| 4.25 | Affirmation of Certain Representations and Warranties | 39 |

ARTICLE 5 Affirmative Covenants and Agreements ......................................................40

| | | |
|---|---|---|
| 5.1 | Construction | 40 |
| 5.2 | Compliance with Laws | 40 |
| 5.3 | Inspections; Cooperation | 40 |
| 5.4 | Contracts | 42 |
| 5.5 | Payment and Performance of Contractual Obligations | 42 |
| 5.6 | Correction of Construction Defects | 42 |
| 5.7 | Insurance | 43 |
| 5.8 | Adjustment of Condemnation and Insurance Claims | 44 |
| 5.9 | Utilization of Net Proceeds | 45 |
| 5.10 | Application of Loan Proceeds | 45 |
| 5.11 | Taxes | 46 |
| 5.12 | Adverse Environmental Conditions | 46 |
| 5.13 | Notification by Borrower | 46 |
| 5.14 | Indemnification by Borrower | 46 |
| 5.15 | Fees and Expenses | 47 |
| 5.16 | Federal Tax ID Number | 47 |
| 5.17 | Deposits to Balance Loan | 47 |
| 5.18 | Terrorism and Anti-Money Laundering | 49 |
| 5.19 | Deed of Trust Recording Taxes | 49 |
| 5.20 | Management | 49 |
| 5.21 | Delivery of Financial Statements | 50 |
| 5.22 | Right to Contest | 50 |
| 5.23 | Appraisal Updates; LTV Covenant | 50 |
| 5.24 | Estoppel Certificates | 51 |
| 5.25 | Facilitation of I-829 Petitions and Payment of Fees | 51 |
| 5.26 | Leases | 51 |
| 5.27 | Capital Contributions | 51 |
| 5.28 | JV Neighborhood Developments | 51 |
| 5.29 | Condominium | 52 |
| 5.30 | Unit Sales | 52 |

ARTICLE 6 Negative Covenants ...................................................................................53

| | | |
|---|---|---|
| 6.1 | Conditional Sales; Management Agreements; Franchise Agreements | 53 |
| 6.2 | Changes to Plans and Specifications and Construction Contract | 54 |

CONFIDENTIAL INFORMATION

SMHG002874

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 6.3 | Insurance Policies and Bonds | 54 |
| 6.4 | Restrictions on Indebtedness | 54 |
| 6.5 | Restrictions on Liens and Transfers | 54 |
| 6.6 | Change in Nature of Business; New Line of Business | 55 |
| 6.7 | Special Purpose Entities | 55 |
| 6.8 | Transactions with Affiliates | 56 |
| 6.9 | Zoning Changes | 56 |
| 6.10 | Restricted Payments | 56 |

ARTICLE 7 Events of Default ........................................................................... 57

| | | |
|---|---|---|
| 7.1 | Payment Default | 57 |
| 7.2 | Deposits; Other Monetary Obligations | 57 |
| 7.3 | Other Obligations | 57 |
| 7.4 | Accuracy of Information; Representations and Warranties | 57 |
| 7.5 | Progress of Construction | 57 |
| 7.6 | Bankruptcy | 58 |
| 7.7 | Appointment of Receiver, Trustee, Liquidator | 58 |
| 7.8 | Dissolution | 58 |
| 7.9 | Change of Control | 58 |
| 7.10 | Judgment | 58 |
| 7.11 | Invalidity of or Default Under the Loan Documents | 58 |
| 7.12 | Fraud | 58 |
| 7.13 | Senior Loan | 58 |
| 7.14 | Bridge Loan Documents | 58 |
| 7.15 | Attachment | 58 |
| 7.16 | Other Defaults | 58 |
| 7.17 | Lapse or Impairment of Insurance | 58 |

ARTICLE 8 Remedies ..................................................................................... 59

| | | |
|---|---|---|
| 8.1 | Lender's Rights to Pay and Perform | 59 |
| 8.2 | Remedies on Event of Default | 59 |
| 8.3 | No Release or Waiver; Remedies Cumulative and Concurrent | 60 |
| 8.4 | Lapse or Impairment of Insurance | 61 |

ARTICLE 9 Miscellaneous ............................................................................... 61

| | | |
|---|---|---|
| 9.1 | Effect of Agreement on Note and Loan Documents | 61 |
| 9.2 | Further Assurances; Authorization to File Documents | 61 |
| 9.3 | No Warranty by Lender | 62 |
| 9.4 | Exculpation | 62 |
| 9.5 | No Partnership | 62 |
| 9.6 | Disclaimer by Lender | 62 |
| 9.7 | Compliance with Immigration Laws | 63 |

CONFIDENTIAL INFORMATION                                        SMHG002875

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 9.8 | Severability / Usury Savings | 63 |
| 9.9 | Notices, Approvals and Other Communications | 64 |
| 9.10 | Permitted Successors and Assigns | 65 |
| 9.11 | Update of W-9 | 65 |
| 9.12 | Reserved | 66 |
| 9.13 | Modification; Waiver | 66 |
| 9.14 | Third Parties; Benefit | 66 |
| 9.15 | Rules of Construction | 66 |
| 9.16 | Counterparts | 66 |
| 9.17 | Governing Law | 66 |
| 9.18 | Time of Essence | 67 |
| 9.19 | Class B Manager Acting on Behalf of Lender | 67 |
| 9.20 | Extension of Time for Repayment | 67 |
| 9.21 | WAIVER OF JURY TRIAL | 67 |
| 9.22 | USA Patriot Act Notice | 68 |
| 9.23 | Entire Agreement | 68 |

CONFIDENTIAL INFORMATION                                                    SMHG002876

**<u>List of Exhibits</u>**

Exhibit A – Legal Description of the Land

Exhibit A-1 - Legal Descriptions of the JV Neighborhood Parcels

Exhibit B – Budget

Exhibit C – Schedule

Exhibit D – Disclosure Schedule

Exhibit E – Reserved

Exhibit F – Form of Request for Advance

Exhibit G – Form of Engineer Certificate

Exhibit H – Form of Architect Certificate

Exhibit I – Form of Lease Estoppel Certificate

Exhibit J – Form of Subordination, Non-Disturbance and Attornment Agreement

Exhibit K – Release Price Schedule

Exhibit L – Master Schedule

CONFIDENTIAL INFORMATION    SMHG002877

# LOAN AGREEMENT

This Loan Agreement is made this 28th day of June, 2016 (this "**Loan Agreement**") by and between SMHG VILLAGE DEVELOPMENT LLC, a Delaware limited liability company ("**Borrower**"), and SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware limited liability company ("**Lender**").

## RECITALS

WHEREAS, Borrower is the owner of a 4.515 acre lot located in Weber County, Utah, as more particularly described on <u>Exhibit A</u> (together with each JV Neighborhood Development upon Borrower's acquisition of fee simple title to the same, the "**Land**"), upon which Borrower plans to develop the Project;

WHEREAS, Borrower intends to acquire each JV Neighborhood Development in Weber County, Utah that is more particularly described on <u>Exhibit A-1</u> (collectively, and as such legal descriptions may be updated and confirmed prior to Borrower's acquisition thereof, the "**JV Neighborhood Development Land**"), at such times and on such terms as are required under this Agreement;

WHEREAS, Borrower has requested and applied to Lender for a secured loan (the "**Loan**") consisting of EB-5 Capital, not to exceed the Loan Amount, the proceeds of which will be used by Borrower for payment or reimbursement of Approved Costs in connection with the Project or for such other purposes as are permitted under this Loan Agreement;

WHEREAS, Lender has agreed to extend the Loan to Borrower upon the terms, covenants, and conditions set forth herein, and Borrower has agreed to accept the Loan; and

WHEREAS, the parties intend to execute and deliver other Loan Documents to memorialize parts of their agreement in connection with the transaction contemplated by this Loan Agreement.

NOW, THEREFORE, in consideration of the mutual promises hereinafter contained and of other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS AND ACCOUNTING TERMS

1.1     *Definitions*.  For purposes of this Loan Agreement (including the Recitals), the following terms shall have the following meanings:

"**Advance**" means (a) a disbursement by Lender of Loan proceeds to Borrower, (b) a disbursement by Lender of Loan proceeds to the holder of the Bridge Loan in order to satisfy the Bridge Loan and all other obligations of Borrower under the Bridge Loan Documents in full, or (c) if elected by Lender in its sole and absolute discretion, and with the prior written consent of both Borrower and Lender, another recipient, from Lender's Deposit Account or the Borrower Deposit Account,  in each case in accordance with this Loan Agreement.

94392406

1

CONFIDENTIAL INFORMATION                                                                    SMHG002878

"**Affiliate**" means, with respect to any entity, another Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such entity.

"**AIG Fee**" means, collectively, all fees required to be deposited by Borrower into escrow pursuant to Section 3 of the AIG Agreement described in subsection (a) of the definition of AIG Agreement.

"**AIG Agreement**" means, collectively, (a) that certain Waiver and Release Agreement, dated effective as of June 20, 2016, by and among Lender, Borrower and American Immigration Group, LLC, (b) that certain Waiver and Release Agreement dated effective as of June 20, 2016, by and among Lender, Borrower and Guarantor, and (c) that certain Agreement, dated as of June 20, 2016, by and among Borrower, Guarantor and American Immigration Group, LLC.

"**Anti-Money Laundering Laws**" means the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"**Appraisal**" means an appraisal of the "as completed" value of the Mortgaged Property by an Appraiser.

"**Appraisal Update**" is defined in <u>Section 5.23</u>.

"**Appraised Value**" means the combined appraised value of the completed and/or stabilized components of the Project (or any proposed Replacement Collateral), including the net proceeds expected to be generated by the sale of Units, if any, as determined pursuant to an Appraisal that shall (i) comply with the appraisal standards set forth in FIRREA, (ii) be prepared in accordance with the Uniform Standards of Professional Appraisal Practice as promulgated by The Appraisal Foundation and the Standards of Professional Appraisal Practice and Code of Ethics of the Appraisal Institute, and (iii) otherwise use an as-completed valuation methodology acceptable to Lender.

"**Appraiser**" means HVS Consulting and Valuation Services or any other third-party MAI-certified appraiser reasonably acceptable to Lender and which may be selected by Borrower.

"**Approved Bank**" means any bank designated by Borrower and approved by Lender.

"**Approved Contract**" means a bona fide executed arms-length agreement for the sale to and purchase of a Unit by a Person who is not an Affiliate of or otherwise related to Borrower or

CONFIDENTIAL INFORMATION                                    SMHG002879

any Affiliate of Borrower, which shall be substantially and materially in the form contract approved by Lender in writing. Each Approved Contract shall (i) specify a gross sale price which shall result in Net Sale Proceeds which are not less than the Release Price for the Unit in question, (ii) require a non-refundable cash deposit on signing equal to at least ten percent (10%) of the gross sale price (or, as to any agreements executed after the date of this Loan Agreement, a non-refundable cash deposit on signing equal to fifteen percent (15%) of the gross sale price, if Lender directs that the required deposit amount be so increased in its sole and absolute discretion) (each, a "**Purchaser Deposit**"), and (iii) require full payment of the gross sale price in cash to Borrower at the closing of the sale of such Unit. Each Approved Contract shall (a) prohibit any purchaser from assigning its rights thereunder to any Person other than an immediate family member or a trust or other entity created for the sole benefit of purchaser and/or such purchaser's immediate family members and (b) not contain any contingencies other than financing contingencies and standard closing conditions (except as expressly provided in the form approved by Lender in writing).

"**Approved Costs**" means any Improvement Costs, whether incurred by or on behalf of Borrower, for the development of the Project, to the extent specified in the Budget approved by Lender.

"**Architect**" means, collectively, each architect for any portion of the Project selected by Borrower and approved by Lender in its reasonable discretion, and their respective successors and assigns in interest as approved by Lender in its reasonable discretion.

"**Architect Certificate**" means a certificate from an Architect in the form attached hereto as Exhibit H.

"**Architect Consent and Agreement**" means, for each Architect, the consent from such Architect to the collateral assignment in favor of Lender of the Architect Contract to which it is a party, in the form attached as an exhibit to the Assignment of Documents.

"**Architect Contract**" means, individually and collectively, as the context may require, those contracts between Borrower, as owner, and each Architect, for architect services, and each other service contract for architect services entered into between Borrower and an Architect, as each may be amended, modified and/or supplemented from time to time with Lender's reasonable consent.

"**Assignment of Documents**" means a collateral assignment to Lender of each Construction Contract, each Architect Contract, each Engineer Contract, the Development Management Agreement, all Plans and Specifications for each component of the Project, all Approved Contracts, all Purchaser Deposits, each Leasing Agent Agreement, all Entitlements and other applicable permits, documents or agreements relating to the development and construction of the Project or any portion thereof, as the same may be amended, modified, renewed or restated from time to time.

"**Borrower**" is defined in the Preamble.

"**Borrower Closing Conditions Precedent**" is defined in Section 2.3.2.

CONFIDENTIAL INFORMATION                                                        SMHG002880

"**Borrower Deposit Account**" means an interest-bearing escrow account established by Borrower with an Approved Bank, to be under the dominion and control of Lender, pursuant to a deposit account control agreement in form and substance reasonably satisfactory to Lender.

"**Borrower's Equity Requirement**" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

"**Bridge Loan**" means, collectively, (a) that certain unsecured loan in the principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) made by Grandway USRE III Master, LLC to Borrower, and (b) that certain unsecured loan in the principal amount of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) made by HG Capital Partners Co., Ltd. to Borrower, in each case pursuant to the Bridge Loan Documents.

"**Bridge Loan Documents**" means (a) that certain unsecured promissory note, dated as of June 24, 2016, in the principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) made by Grandway USRE III Master, LLC to Borrower, and (b) that certain unsecured promissory note, dated as of June 24, 2016, in the principal amount of Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) made by HG Capital Partners Co., Ltd. to Borrower, as the same may be amended, modified, renewed or restated from time to time.

"**Budget**" means the budget of the Improvement Costs as set forth in Exhibit B, as the Budget may be revised by Borrower from time to time and, to the extent required, approved by Lender from time to time in accordance with Sections 2.3.1, 2.4.5 or 5.1.

"**Business Day**" means any day that is not a Saturday, Sunday or banking holiday in the State of New York, the State of Utah, or any other state in which the depository bank holding a relevant account is doing business with respect to the Project.

"**Casualty**" means any act or occurrence of any kind or nature that results in damage, loss or destruction to the Improvements.

"**City**" means the City of Eden, Utah.

"**Claim**" means any liability, suit, action, claim, demand, loss, penalty, fine or judgment of any kind or nature whatsoever, including fees, costs and expenses of attorneys, consultants, contractors and experts related thereto.

"**Class A Management Agreement**" means the Management Agreement between Lender and Class A Manager dated as of September 20, 2015.

"**Class A Manager**" means the Person identified from time to time by Lender to Borrower as Lender's Class A Manager under Lender's Amended and Restated Operating Agreement dated as of September 20, 2015, as thereafter amended, restated or otherwise modified. KT Summit Development Manager, LLC, a Washington limited liability company, is

94392406

4

the Class A Manager as of the "Effective Date" of such Amended and Restated Operating Agreement (as such quoted term is defined therein) pursuant to the Class A Management Agreement.

"**Class B Management Agreement**" means the Management Agreement between Lender and Class B Manager dated as of September 20, 2015.

"**Class B Manager**" means the Person identified from time to time by Lender to Borrower as Lender's Class B Manager under Lender's Amended and Restated Operating Agreement dated as of September 20, 2015, as thereafter amended, restated or otherwise modified. Celona Asset Management (USA) Limited is the Class B Manager as of the "Effective Date" of such Amended and Restated Operating Agreement (as such quoted term is defined therein) pursuant to the Class B Management Agreement.

"**Closing Conditions**" is defined in <u>Section 2.3.1</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the regulations promulgated and the rulings issued thereunder.

"**Collateral**" means the Mortgaged Property and the "UCC Collateral" under the Deed of Trust, the "Documents" under the Assignment of Documents (as such quoted terms are defined in those documents), and any other collateral for the Loan now or hereafter granted by Borrower to Lender.

"**Commitment Financing Amount**" is defined in <u>Section 5.17.4</u>.

"**Condemnation**" means any taking of title to, use of, or any other interest in the Mortgaged Property or any portion thereof under the exercise of the power of condemnation or eminent domain, whether temporarily or permanently, by any Governmental Authority or by any other Person acting under or for the benefit of a Governmental Authority.

"**Condemnation Awards**" means any and all judgments, awards of damages (including severance and consequential damages), payments, proceeds, settlements, amounts paid for a taking in lieu of Condemnation, or other compensation heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, or in connection with, any Condemnation or threatened Condemnation.

"**Condominium**" means each condominium to be created pursuant to the Condominium Documents.

"**Condominium Documents**" shall mean all documents necessary to meet the requirements of Utah state law for the creation of a condominium with respect to any condominium component of the Project.

"**Condominium Unit**" means an individual ownership unit in a Condominium, as created by and described in the Condominium Documents, together with all rights attached to such Condominium Unit and all common elements of such Condominium.

94392406                                          5

"**Construction Advance**" means any Advance to pay or reimburse (a) Approved Costs that are Hard Costs or (b) Approved Costs that if not paid would otherwise give rise to a Lien pursuant to Title 38, Chapter 1 of the Code of Utah.

"**Construction Consultant**" means a Person appointed or designated by Lender from time to time to inspect the progress of the construction of the Improvements and the conformity of such construction with the Budget, Schedule and the Plans and Specifications, and to perform such other acts and duties for such other purposes as Lender may from time to time reasonably deem appropriate or as may be required by the terms of this Loan Agreement.

"**Construction Contract**" means, for each component of the Project, (a) a construction contract to be entered into between Borrower, as owner, and General Contractor, as contractor, and (b) any other agreement(s) executed by and between Borrower and a contractor or vendor with respect to construction, development and/or design of any Improvements as to such component of the Project, and in each case as the same may have been amended, modified and/or supplemented with Lender's approval in accordance with this Loan Agreement.

"**Control**" means with respect to any Person, possession, directly or indirectly, of (a) 25% or more of the ownership interests in such Person or (b) the power to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or by contract and "Controlling" or "Controlled" have meanings correlative thereto.

"**Deed of Trust**" means, collectively, (a) that certain deed of trust granted by Borrower for the benefit of Lender dated as of the Loan Closing Date and securing the Obligations, and (b) any deed of trust granted by Borrower for the benefit of Lender after the Loan Closing Date with respect to any JV Neighborhood Development, as each may be amended, modified, renewed or restated from time to time.

"**Defeasance Disqualifying Event of Default**" means (i) any misrepresentation in any Loan Document resulting in a Material Adverse Effect or (ii) any Event of Default arising from Borrower and/or any Affiliate of Borrower causing or permitting a transfer of the Project or any interest in Borrower in violation of this Loan Agreement or any change of Control of Borrower not consented to by Lender and for which consent is required under this Loan Agreement.

"**Default**" means an event that with the passage of time or notice or both would become an Event of Default.

"**Deficiency Deposit**" is defined in <u>Section 5.17.3</u>.

"**Deposit Account Control Agreement**" means a deposit account control agreement or account control agreement among Borrower, an Approved Bank, and Lender, in form reasonably acceptable to Borrower and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time with Lender's approval.

"**Development Agreement**" means, collectively, (a) that certain zoning development agreement by and between Summit Mountain Holding Group, L.L.C., a Utah limited liability company and Weber County a public body, corporate and politic dated January 2015, and (b) that certain development agreement by and between Summit Mountain Holding Group, L.L.C.

CONFIDENTIAL INFORMATION                                                                 SMHG002883

and the Redevelopment Agency of Weber County, a public body, corporate and politic, dated August 15, 2015.

"**Development Management Agreement**" means the Development Management Agreement to be executed after the date of this Loan Agreement between Borrower and Development Manager, as amended from time to time, and each other service contract for development services entered into between Borrower and a Development Manager, as each may be amended, modified and/or supplemented from time to time with Lender's reasonable consent.

"**Development Manager**" means SMHG Village Development Manager, LLC a Delaware limited liability company, and it successors and assigns as approved in writing by Lender, or any other development manager for any portion of the Project selected by Borrower and approved by Lender in its reasonable discretion, and their respective successors and assigns in interest as approved by Lender in its reasonable discretion.

"**Development Manager Consent**" means, collectively, each consent from a Development Manager to the collateral assignment in favor of Lender of the Development Management Agreement to which it is a party, in the form attached as an exhibit to the Assignment of Documents.

"**Disclosure Schedule**" means the schedule attached hereto as <u>Exhibit D</u>.

"**Distribution**" means any payment by Borrower of a dividend or any other cash distribution to its members.

"**Draw Package**" is defined in <u>Section 2.4.2</u>.

"**Early Release Guaranty**" means the Early Release Guaranty dated as of September 18, 2015, made by Guarantor for the benefit of Lender, as the same may be amended, modified, renewed or restated from time to time.

"**EB-5 Capital**" means the capital obtained from the Members.

"**EB-5 Financing Costs**" means (x) interest owed or payable under the Loan Documents, (y) amounts owed or payable under the Finder Reimbursement Agreement or the Manager Reimbursement Agreement.

"**EB-5 Investor**" means a foreign investor who has entered into a subscription agreement with Lender with the intention to become a Member.

"**Economist**" means Michael K. Evans, PhD, of Evans, Carroll & Associates or another qualified economist approved by Lender.

"**Eligible Assignees**" means, prior to any Event of Default, any successor or assign of Lender approved by Borrower in its sole discretion and, thereafter, any successor or assign following notice by Lender to Borrower of such succession or assignment, provided, however, that in no event may the Lender be a Non-U.S. Person.

CONFIDENTIAL INFORMATION                                          SMHG002884

"**Engineer**" means NV5 Engineering and its successors reasonably approved by Lender, or any other engineer for any portion of the Project selected by Borrower and approved by Lender in its reasonable discretion, and their respective successors and assigns in interest as approved by Lender in its reasonable discretion.

"**Engineer Certificate**" means, collectively, a certificate from each Engineer in the form attached hereto as <u>Exhibit G</u>.

"**Engineer Consent and Agreement**" means, collectively, a consent from each Engineer to the collateral assignment in favor of Lender of Engineer Contract to which it is a party, in the form attached as an exhibit to the Assignment of Documents.

"**Engineer Contract**" means, individually or collectively, as the context may require, those contracts between Borrower, as owner, and each Engineer, for engineering services, as amended from time to time in accordance with this Loan Agreement.

"**Entitlements**" means all permits, certificates, franchises, licenses, approvals, agreements, letters, and other evidence of rights and obligations between Borrower, any Borrower Affiliate, Development Manager or Guarantor, on the one hand, and, on the other hand, any Governmental Authority or any other Person necessary or required under applicable Law for the construction and occupancy of the Improvements or any portion thereof.

"**Environmental Indemnity**" means the Environmental Indemnity dated as of the Loan Closing Date, made by Borrower for the benefit of Lender, as the same may be amended, modified, renewed or restated from time to time, and any other Environmental Indemnity Agreement delivered to Lender pursuant to <u>Section 2.9</u>, in a form acceptable to Lender, as the same may be amended, modified, renewed or restated from time to time.

"**Event of Default**" is defined in <u>Article 7</u>.

"**Excess Cash Flow**" means the amount by which the Borrower's Net Operating Income for the applicable period exceeds all unpaid fees and amounts, whether or not then payable, which have accrued during the same period for which Borrower's Net Operating Income has been calculated (i) under the Loan, (ii) pursuant to the Manager Reimbursement Agreement, and (iii) pursuant to the Finder Reimbursement Agreement.

"**Financial Statements**" means balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, all prepared in accordance with GAAP and submitted to Lender prior to the date hereof and from time to time in accordance with the terms of the Loan Documents.

"**Finder Reimbursement Agreement**" means that certain reimbursement agreement dated as of September 18, 2015, by and between Lender and Borrower regarding Borrower's obligation to pay to Lender, or to reimburse Lender for, certain fees due from Lender to the Regional Center in connection with one or more MDRAs for services provided in connection with the introduction to Lender of EB-5 Investors.

CONFIDENTIAL INFORMATION                                SMHG002885

"**FIRREA**" means Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Disbursements**" means, collectively, the initial Advances of the Loan up to the aggregate amount of Ten Million and 00/100 Dollars ($10,000,000.00).

"**First Disbursement Conditions**" has the meaning provided in Section 2.3.2.

"**Force Majeure**" means any of the following events which delay the date of Substantial Completion:  (a) acts of God (including a tornado, flood, earthquake or hurricane); (b) fires, accidents or other casualties; (c) strikes, lockouts or other labor disturbances or disputes; (d) acts of war, riots, insurrections, civil commotions, acts of terrorism or similar acts; (e) Laws enacted after the date hereof; (f) orders or judgments of Governmental Authorities; (g) embargoes, shortages or unavailability of materials, supplies, labor, equipment and systems; or (h) any other cause or condition (other than lack of funds or Laws enacted on or prior to the date hereof) beyond the reasonable control of Borrower to the extent that events or conditions described in clause (h) of this definition have a direct and negative impact on the Project.

"**Force Majeure Extension**" is defined in Section 7.5.

"**Franchise Agreement**" means any agreement between Borrower or any Affiliate of Borrower and a franchisor relating to the operation of a hotel facility within the Project, including without limitation, all branding, naming and other intellectual property rights with respect to such hotel facility and the ability of the hotel operator to operate the facility utilizing such rights and any common systems, reservation services and other shared systems and services made available by the franchisor to the franchisee under each such agreement.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**General Contractor**" means, collectively, each Person named in a Construction Contract as the general contractor and its successors and in each case acceptable to Lender in its sole discretion that will construct substantially all of the Improvements, in accordance with the Plans and Specifications, under a Construction Contract with a maximum price guaranty on construction costs.

"**General Contractor Consent and Agreement**" means a consent from a General Contractor to the collateral assignment of the Construction Contract to which it is a party to Lender, in the form attached as an exhibit to the Assignment of Documents.

"**Governmental Authority**" means any governmental entity, including any court, department, commission, board, bureau, agency, administration, service or district of any governmental entity.

CONFIDENTIAL INFORMATION                                    SMHG002886

"**Gross Revenue**" means for any period, the amount of all income generated from the Project (excluding insurance proceeds, condemnation awards and other nonrecurring items of income or extraordinary gains).

"**Guarantor**" means Summit Mountain Holding Group, L.L.C., a Utah limited liability company, or any substitute "Guarantor" approved by Lender in its sole and absolute discretion.

"**Hard Costs**" means all costs and expenses for work, labor and materials required to construct and complete the Improvements, all as set forth in the Budget.

"**I-526 Petition**" means a Form I-526 Petition by Alien Entrepreneur filed by an EB-5 Investor with the USCIS under the Immigrant Investor Program.

"**I-526 Petition Approval**" means the final approval of an I-526 Petition by the USCIS under the Immigrant Investor Program.

"**I-829 Petition**" means a Form I-829 Petition by Entrepreneur to Remove Conditions filed by an EB-5 Investor with the USCIS under the Immigrant Investor Program.

"**Immigrant Investor Program**" means the EB-5 investor visa program under 8 U.S.C. § 115 3(B)(5)(A)(D).

"**Improvement Conditions**" is defined in <u>Section 2.5</u>.

"**Improvement Costs**" means all Hard Costs and Soft Costs incurred by or on behalf of Borrower related to the construction of the Improvements, including any site-wide impact fees, labor training costs, or similar costs required under the Entitlements, provided, however, for the avoidance of doubt in no event shall Improvement Costs include EB-5 Financing Costs or amounts owed or payable, or Distributions, to any direct or indirect owner of Borrower or any Affiliate of Borrower, except for the purpose of repaying bridge financing that was used for Improvement Costs and was incurred prior to the Borrower's receipt of the Loan.

"**Improvements**" means any or all grading; any environmental remediation and related systems; infrastructure, landscaping, utilities (including domestic and reclaimed water mains, sewer mains, storm drainage, electrical power and other utility lines or connections), water tanks, streets, roads, curbs, gutters, and other street improvements, including lighting; parks and other public improvements, including parkway landscape and irrigation, entry monuments and other offsite improvements, other site work, and all other horizontal and vertical improvements now or hereafter constructed as part of the Project or any portion thereof, whether or not the same have been delivered or affixed to the Project.

"**Indemnified Parties**" is defined in <u>Section 5.14</u>.

"**Initial Maturity Date**" means the fifth (5th) anniversary of the Loan Closing Date.

"**Insurance Proceeds**" means the insurance claims under and the proceeds of any and all policies of insurance covering the Mortgaged Property, including all returned and unearned premiums with respect to any insurance relating to the Mortgaged Property.

CONFIDENTIAL INFORMATION                                                    SMHG002887

"**Intercreditor Agreement**" means an intercreditor agreement between or among Lender, the holder of a Senior Loan and/or a lender providing a Subordinated Loan, in the form provided and approved by Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time with Lender's approval.

"**Jobs Cushion**" means, in respect of any amount of Loan proceeds, the extent to which the number of jobs to be created by the Project, which estimate shall be as set forth in the Qualified Economist Report provided that construction of the Improvement is consistent with the Project Business Plan, exceeds the number of jobs required to be created under the Immigrant Investor Program for such number of Members whose capital contributions are, in aggregate, not less than such amount of Loan proceeds, such excess being a percentage of such jobs required to be created.

"**JV Neighborhood Developments**" means, collectively, the multi-stage development, construction and operation of four (4) distinct neighborhoods, which in the aggregate represent approximately eleven (11) acres of land and sixty-six (66) residential units. The individual components of the JV Neighborhood Developments include (a) a 6.25 acre subdivision site to be known as "Horizon Neighborhood," consisting of twenty-seven (27) residential units ("**Horizon Neighborhood**"), (b) a 4.05 acre subdivision site to be known as "Spring Park," consisting of eighteen (18) residential units, (c) a 0.72 acre subdivision site to be known as "Village Nest West," consisting of ten (10) residential units, and (d) a 0.42 acre subdivision site to be known as "Copper Crest West," consisting of eleven (11) residential units, located on the JV Neighborhood Development Land; and "**JV Neighborhood Development**" means any one of them.

"**KT Capital**" means KT Capital Group, LLC, a Washington limited liability company.

"**Land**" is defined in the Recitals.

"**Law**" or "**Laws**" means all federal, state and local laws, statutes, rules, ordinances, regulations, codes, licenses, authorizations, injunctions, determinations, orders or decrees of any court or other Governmental Authority having jurisdiction as may be in effect from time to time.

"**Lease**" means a fully executed lease(s), occupancy agreement(s), license agreement(s) or other rental or occupancy arrangement(s) by or binding upon Borrower, as lessor, for space in the Project or any portion thereof.

"**Leasing Agent**" means, with respect to any portion of the Project, each leasing agent selected by Borrower and reasonably approved in writing by Lender following the date of this Loan Agreement.

"**Leasing Agent Agreement**" means, with respect to any portion of the Project, the leasing agreement executed between Borrower, as owner, and a Leasing Agent, as broker, as approved by Lender, as amended from time to time with Lender's written approval.

"**Leasing Agent Consent and Agreement**" means, collectively, each consent from a Leasing Agent to the collateral assignment in favor of Lender of the Leasing Agent Agreement to which it is a party, in the form attached as an exhibit to the Assignment of Documents.

CONFIDENTIAL INFORMATION     SMHG002888

"**Lender**" is defined in the Preamble.

"**Lender's Deposit Account**" means an interest-bearing account established by Lender at a bank reasonably approved by Borrower.

"**Lender's Estimate of the Cost of Construction**" is defined in Section 5.17.2.

"**Lender's Offering**" is defined in Section 5.14.

"**Lender's Title Policy**" means an ALTA Loan Policy or Policies (2006) with endorsements, issued by the Title Company in favor of Lender in accordance with Lender's written instructions, insuring that fee simple title to the Mortgaged Property (other than personal property) is vested in Borrower and the lien of the Deed of Trust is a valid first Lien on the Mortgaged Property, together with any endorsements to the same issued after the initial issuance of such policy.

"**Lien**" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, assignment, security interest or any other encumbrance or charge affecting Borrower, the Collateral, any portion of the Project or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar Liens and encumbrances.

"**Liquid Funds Amount**" means the amount of funding obtained from Borrower's equity contributions, from a Senior Loan, or from Subordinated Loans, in each case that is available for contribution to the Project in the form of cash in a Borrower bank account that is part of the Collateral.

"**Loan**" is defined in the Recitals.

"**Loan Agreement**" is defined in the Preamble.

"**Loan Amount**" is defined in Section 2.1.

"**Loan Closing Date**" is defined in Section 2.3.

"**Loan Documents**" means this Loan Agreement, the Note, the Deed of Trust, the Assignment of Documents, the Environmental Indemnity, the Early Release Guaranty, the Shortfall Guaranty, the Recourse Indemnity, Finder Reimbursement Agreement, the Manager Reimbursement Agreement, the AIG Agreement, the Operating Capital Loan Documents, and appropriate deposit account control agreements, along with any and all other documents which Borrower has executed and delivered, or may hereafter execute and deliver, to evidence, secure or guaranty the Obligations or any portion thereof.

"**Loan to Value Ratio**" means, as of the applicable date of determination, the ratio (expressed as a percentage) in which (1) the numerator is equal to the sum of (a) the Loan Amount, plus (b) the committed principal amount of any Subordinated Loans and any Senior Loans, and (2) the denominator is equal to the Appraised Value of the Collateral, including any

CONFIDENTIAL INFORMATION                                SMHG002889

Replacement Collateral or Reconveyance Collateral, then remaining subject to the lien of the Loan Documents.

"**Manager Reimbursement Agreement**" means the reimbursement agreement dated as of September 20, 2015, by and between Lender and Borrower regarding Borrower's obligation to pay to Lender, or to reimburse Lender for, certain fees due from Lender to the Class B Manager pursuant to the Class B Management Agreement, as the same may be amended, modified, renewed or restated from time to time.

"**Master Project**" means the Summit Powder Mountain resort mixed-use development that includes the Project and, without limitation, the construction of roads, bridges, utilities and other infrastructure, attached and detached single-family residential dwellings, the Units, multi-family, hotels, commercial and other ancillary improvements to support the access, use and operation of the Master Project as an integrated mountain resort.

"**Master Schedule**" means, with respect to the Master Project, the development, construction and completion schedule attached hereto as <u>Exhibit L</u>.

"**Material Adverse Effect**" means a material adverse effect on (a) the Project, or otherwise on the business, operations, financial condition, assets or liabilities of Borrower, (b) the ability of Borrower or Guarantor to perform its obligations under any of the Loan Documents to which it is a party, including, as applicable, the timely payment of the principal of or interest on the Loan or other amounts payable in connection therewith, or any of their respective obligations under the Development Agreement, (c) the validity or enforceability of any of the Loan Documents or the Development Agreement (not as a result of Lender's gross negligence or willful misconduct), or (d) the rights and remedies of Lender under any of the Loan Documents (not as a result of Lender's gross negligence or willful misconduct).

"**Material Construction Agreement**" means any contract, subcontract, sub-subcontract, bill of sale, statement, receipted voucher or other agreement that either (a) (i) relates to the construction of the Improvements, including any such item pursuant to which Borrower has any claim of title to any materials, fixtures or other articles delivered or to be delivered to the Land and incorporated or to be incorporated into the Improvements, and (ii) is, together with all other such items with the named counterparty, in an aggregate amount of $100,000.00 or more; or (b) is designated as a Material Construction Agreement by the Construction Consultant.

"**Material Subcontracts**" means any subcontract entered into by any General Contractor (a) that covers, in whole or in part, a scope of work that has been designated by the Construction Consultant as material, or (b) that is projected to cover Hard Costs in excess of $100,000.00 in the aggregate.

"**Maturity Date**" means the earlier of (a) the Initial Maturity Date, as the same may be extended pursuant to Section 3(d) of the Note or (b) the date on which Lender exercises its right to accelerate the Loan upon the occurrence of an Event of Default.

"**Maximum LTV Percentage**" means a Loan to Value Ratio no greater than sixty percent (60%).

CONFIDENTIAL INFORMATION                                                     SMHG002890

"**Maximum Permitted Financing Amount**" means, as of the applicable date of calculation, the maximum principal amount of a proposed Subordinated Loan which, when added to the aggregate principal amount of (i) the Loan Amount, (ii) the amount of any Senior Loans, and (iii) the aggregate principal amount of outstanding Subordinated Loans, would not cause the Loan to Value Ratio to exceed the Maximum LTV Percentage.

"**MDRA**" means one or more master distribution and referral agreements, each one to be entered into between the Regional Center and a broker or "finder" for the provision of services by such broker or "finder" related to the introduction to Lender of EB-5 Investors.

"**Member**" means a Class B member of Lender as defined under Lender's constitutive documents.

"**Mortgaged Property**" means the Land, Improvements, fixtures and all personal property in which Borrower grants to Lender a security interest under the Deed of Trust, in each case only to the extent now or hereafter located on or within the Project. The Mortgaged Property shall include each JV Neighborhood Development at such time as Borrower grants a lien on the same for the benefit of Lender.

"**Net Operating Income**" means, for any period, the Gross Revenue, reduced by the amount of all expenses which are directly related to the ownership, operation or maintenance of the Project and which are incurred or accrued during such period. For purposes of the foregoing, the term "**expenses**" shall (i) include (A) a property management fee (regardless of whether such amount is actually paid) equal to the greater of three percent (3.0%) of Gross Revenue or the actual property management fee, (B) a capital replacement reserve (regardless of whether such amount is actually paid) equal to the greater of the amount required by Lender or the actual reserve, and (C) a pro-rata portion of expenses anticipated to be incurred (such as Taxes or insurance) which relate to the period in question but are not payable within such period, and (ii) exclude any interest expense related to any indebtedness secured by any liens against the Project, capitalized expenditures, depreciation and amortization, extraordinary losses and income taxes.

"**Net Proceeds**" when used with respect to any Condemnation Awards or Insurance Proceeds, means the gross proceeds from any Condemnation or Casualty of the Mortgaged Property, less any reasonable expenses in collecting such proceeds incurred by Borrower or Lender.

"**Net Sale Proceeds**" means, with respect to any Unit, the net amount payable to Borrower upon the sale of any Unit after credit for the Purchaser Deposit and deduction for commissions and reasonable and customary costs of closing, such commissions and reasonable and customary costs not to exceed eight percent (8.0%).

"**Non-Refundable Purchaser Deposit**" means any non-refundable portion of a Purchaser Deposit, and "**Non-Refundable Purchaser Deposits**" means all such deposits in the aggregate.

"**Non-U.S. Person**" means any Person that is not a "United States Person" as defined in Section 7701(a)(30) of the Code.

CONFIDENTIAL INFORMATION                                                    SMHG002891

"**Note**" means the Promissory Note dated as of the Loan Closing Date from Borrower to Lender evidencing the Loan, as the same may be amended, modified, renewed or restated from time to time.

"**Obligations**" means all debts, obligations and liabilities of Borrower to Lender arising pursuant to, or on account of, the provisions of this Loan Agreement, the Note or any of the other Loan Documents, including the obligations: (a) to pay all principal, interest, late charges, and other amounts due at any time under this Loan Agreement and the Note; (b) to pay all expenses, indemnification payments, fees and other amounts due at any time under the Deed of Trust or any of the other Loan Documents, together with interest thereon as provided in the Deed of Trust or such other Loan Documents; (c) to complete the construction of the Improvements, free and clear of Liens and otherwise in accordance with the Plans and Specifications, applicable Laws and the provisions of this Loan Agreement and the other Loan Documents; and (d) to perform, observe and comply with all of the terms, covenants and conditions, expressed or implied, that Borrower is required to perform, observe or comply with pursuant to the terms of the Deed of Trust or any of the other Loan Documents.

"**OFAC**" means the United States Department of the Treasury, Office of Foreign Assets Control.

"**OFAC Prohibited Person**" means a country, territory, individual or person (a) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws or (b) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Project directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such lists or in such laws.

"**Offsite Materials**" is defined in <u>Section 2.4.7</u>.

"**Offsite Supplier**" is defined in <u>Section 2.4.7(b)</u>.

"**Operating Capital Loan Documents**" means, collectively, that certain Operating Capital Loan Agreement between Lender and Borrower dated as of the date hereof and the Promissory Note issued in respect of such Operating Capital Loan Agreement, as each may be amended, modified, renewed or restated from time to time.

"**Organizational Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization; and, in each case, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or

CONFIDENTIAL INFORMATION                                        SMHG002892

organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Units**" means real estate units offered for sale by Borrower other than Condominium Units.

"**Patriot Act**" is defined in <u>Section 9.22</u>.

"**Permitted Adjacent Land Exceptions**" means, with respect to the JV Neighborhood Developments, those exceptions to title that are approved by Lender in writing in its sole discretion.

"**Permitted Encumbrances**" means (a) Liens permitted or created by the Loan Documents; (b) those matters and exceptions shown in the pro forma Lender's Title Policy approved by Lender in its written instructions; (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent; (d) Liens created pursuant to issued Governmental Authority CDA bonds, or any subsequent issued Governmental Authority CDA bonds or any transient room tax allowed by Governmental Authorities, in each case as approved in writing by Lender prior to the issuance of any such bonds or imposition of any such taxes (it being understood that Lender's execution of this Loan Agreement constitutes its approval of any bond issued prior to the date of this Loan Agreement); (e) Liens being contested in accordance with, and as expressly permitted by, the terms of Section 4.4; (f) Liens incidental to construction or maintenance of the Mortgaged Property, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that (x) are inchoate Liens not recorded or otherwise filed against the Mortgaged Property (or any portion thereof) and are not overdue for a period of more than thirty (30) days, or (y) are insured over or bonded for in the amount of such Lien plus a reasonable sum to pay all costs in connection therewith, but only so long as such insurance or bonding discharges such lien of record; (g) the Condominium Documents, provided Lender has approved the same it its sole discretion; (h) at such time as Borrower acquires any JV Neighborhood Development and grants a Deed of Trust for the benefit of Lender encumbering the same, the Permitted JV Neighborhood Development Exceptions with respect to such JV Neighborhood Development; (i) Liens securing any Subordinated Loans or any Senior Loans permitted under this Loan Agreement; and (j) such other matters, including Leases, as Lender may hereafter approve (or with respect to Leases, if such approval is not required under <u>Section 5.26</u>).

"**Person**" means an individual, a corporation, a partnership, a joint venture, a limited liability company, a trust, an unincorporated association, any Governmental Authority or any other entity.

"**Plans and Specifications**" means, with respect to any portion of the Project, the set of plans and specifications prepared in connection with the construction of the Improvements, as approved by Lender and the Construction Consultant and as the same may from time to time be amended with the prior approval of Lender and the Construction Consultant, in each case as contemplated by <u>Section 6.2</u>.

CONFIDENTIAL INFORMATION                                                    SMHG002893

"**PPM**" means that certain Confidential Private Placement Memorandum of Lender dated September 18, 2015, as amended from time to time, relating to the Project.

"**Project**" means Borrower's development of an 80-unit and 214-key townhome, condominium, and hotel condominium complex east of the City in Weber County, Utah, near the summit of Powder Mountain consisting of approximately 52,167 square feet of commercial space, the JV Neighborhood Developments (including the development, construction and operation of (a) an 11,000 sf lodge and event space in the Horizon Neighborhood, and (b) a 15,675 sf lodge and event space in Spring Park), a 6,500 sf Sky Lodge, which is capable of being relocated throughout the Master Project, several remote event spaces, which are capable of being relocated throughout the Master Project, and the development, construction and operation of roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for the Master Project, all as reflected in the Plans and Specifications, as the same may be amended from time to time with Lender's prior written consent.

"**Project Business Plan**" means the Project Business Plan for the Project dated August 1, 2015 and filed with USCIS, as amended from time to time with Lender's prior written consent.

"**Property Manager**" means a property manager retained for the Project or any portion thereof, in accordance with this Loan Agreement.

"**Property Management Agreement**" means a property management and leasing agreement between Borrower, as owner, and Property Manager, as manager, with respect to the Project or any portion thereof, entered into and as amended from time to time in accordance with this Loan Agreement.

"**Property Manager Consent and Agreement**" means a consent from a Property Manager (i) providing for termination by Lender of the relevant Property Management Agreement if an Event of Default has occurred and is then continuing, and (ii) prohibiting the amendment, modification or termination of such Property Management Agreement without Lender's prior written consent.

"**Public Securities**" means United States government bonds or publicly traded securities.

"**Purchaser Deposits**" is defined in the definition of Approved Contract.

"**Qualified Economist Report**" means a report from the Economist estimating the number of jobs to be created by the Project, using the 2007 RIMS II model or, to the extent that model is no longer in use, an alternate model that meets USCIS requirements for approval of I-526 and I-829 Petitions of the EB-5 Investors, which report has been approved by the Regional Center.

"**Reconveyance Account**" is defined in Section 2.9.3.

"**Reconveyance Collateral**" is defined in Section 2.9.1.

CONFIDENTIAL INFORMATION                                            SMHG002894

"**Recourse Indemnity**" means the Recourse Indemnity dated as of the Loan Closing Date made by Guarantor for the benefit of Lender, as the same may be amended, modified, renewed or restated from time to time.

"**Regional Center**" means Mountain States Center for Foreign Investment, LLC, a Utah limited liability company, or any replacement regional center designated as a "regional center" by the USCIS.

"**Register**" is defined in Section 9.10.3.

"**Release Price**" means the amount to be paid to obtain the release of a Unit from the Lien of the Deed of Trust which, for each such Unit, shall be equal to the greater of (x) the Net Sale Proceeds for such Unit, and (y) the amount set forth in the Release Price Schedule for the respective Unit (or, if no Release Price is specified on the Release Price Schedule for a Unit, the amount approved by Lender in its sole discretion).  For purposes of calculating the Release Price, any closing credits or sales price concessions will be treated as a gross price reduction rather than a closing expense.

"**Release Price Schedule**" is the schedule of Release Prices attached to this Loan Agreement as Exhibit K.

"**Retainage Amount**" is defined in Section 2.4.2(a).

"**Schedule**" means the schedule for commencement and completion of the Improvements in accordance with the Plans and Specifications as set forth in Exhibit C, as the Schedule may be revised by Borrower and, to the extent required, approved by Lender pursuant to Sections 2.4.2 or 5.1.

"**Senior Loans**" is defined in Section 3.4.

"**Shortfall Guaranty**" means that certain guaranty agreement, dated as of the date hereof, executed by Guarantor in favor of Lender, as the same may be amended, modified, renewed or restated from time to time.

"**Soft Costs**" means all costs and expenses required to construct and complete the Improvements other than Hard Costs, including architectural and engineering fees, consultant fees, professional fees, real estate taxes, insurance and bonding costs, interest and fees incurred in connection with the Loan (but not including EB-5 Financing Costs), marketing fees and expenses, brokerage, sale or leasing commissions, any site-wide impact fees, labor training costs, or other similar costs required under the Entitlements, and any other items identified as "Soft Costs" on the Budget for the Improvements.

"**Subordinated Loans**" is defined in Section 3.2.

"**Substantial Completion**" means, with respect to any portion of the Project, the earliest date on which all of the following have occurred:  (a) the Architect has executed and delivered a certificate of substantial completion to Lender with respect to such portion of the Project in the form of AIA Document G704 (April, 1978 edition) or any successor or replacement certificates,

CONFIDENTIAL INFORMATION                                             SMHG002895

(b) Lender shall be reasonably satisfied that substantially all of the furniture, fixtures, fittings, equipment and articles of personal property called for by the Plans and Specifications, or, if not encompassed by the Plans and Specifications, reasonably necessary for the operation and maintenance of the applicable portion of the Mortgaged Property for its intended purposes, have been installed and are operational, (c) the City has issued a temporary certificate of occupancy with respect to such portion of the Project allowing occupancy of the same (subject only to such conditions as Lender approves), (d) Borrower and General Contractor have each certified to Lender in writing that such portion of the Project has been substantially completed in compliance with the Plans and Specifications and in a good and workmanlike manner, free and clear of any liens or encumbrances (other than Permitted Encumbrances), and (e) such portion of the Project can otherwise be legally used and occupied for its intended purpose in compliance with all Laws.

"**Substantial Completion Date**" means, with respect to each component of the Project, the date set forth in the Schedule with respect to such component of the Project, as may be amended, as the same may be extended in accordance with Section 5.1 of this Loan Agreement; provided that such date shall at all times be consistent with the requirement to create at least ten (10) jobs in respect of each Member prior to the submission of his/her I-829 Petition.

"**Survey**" means, collectively, that certain ALTA/ACSM Land Title Survey of the Land prepared by NV5 dated June 6, 2014, together with each other ALTA/ACSM Land Title Survey of any portion of the Land prepared with respect to any individual component of the Project.

"**Taxes**" means all taxes, levies, imports, duties, deductions, withholdings, assessments, bond assessments, transient room taxes, fees or other charges, whether general or special, ordinary or extraordinary, or foreseen or unforeseen, which at any time may be assessed, levied, confirmed or imposed on the Mortgaged Property by any Governmental Authority or any community facilities or other private district.

"**TI Allowance**" is defined in Section 2.4.9.

"**Title Company**" means First American Title Insurance Company, or another nationally recognized title insurance company reasonably acceptable to Lender.

"**Units**" means Condominium Units and Other Units, each of which is a "**Unit.**"

"**USCIS**" means the United States Citizenship and Immigration Services.

1.2     *Accounting Terms*.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP, and all financial data submitted pursuant to this Loan Agreement shall be prepared in accordance with GAAP, unless Lender agrees to another manner of preparation.

ARTICLE 2
THE LOAN

2.1     *The Loan.*  Lender agrees to lend the Loan to Borrower, and Borrower agrees to borrow the Loan from Lender, subject to the terms and conditions set forth herein and in the Note.  The Loan is to be disbursed in incremental Advances (as provided in this Loan

94392406

19

Agreement), and the aggregate amount of Advances will not exceed the principal amount of One-Hundred Twenty Million Dollars ($120,000,000.00), provided that the amount of Loan shall not be greater than (a) sixty percent (60%) of the Appraised Value, or (b) the aggregate amount of EB-5 Capital deposited in the Lender's Deposit Account (as applicable, the "**Loan Amount**"). The Loan shall be evidenced by the Note.  Borrower agrees to cause the Loan proceeds to be applied (i) for the payment or reimbursement of Approved Costs, or (ii) for the repayment of the Bridge Loan, and for no other purposes, except as may be otherwise approved by Lender in its sole and absolute discretion (including as evidenced by its approval of the relevant change(s) to the Budget and any applicable Draw Package).  The Loan is not a revolving loan and amounts repaid may not be re-borrowed without Lender's consent, except with respect to any EB-5 Capital deposited by any replacement investors pursuant to the MDRA following any mandatory prepayments of the Loan made by Borrower pursuant to the terms of this Loan Agreement. Notwithstanding any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.

2.2    *Reserved.*

2.3    *Loan Closing Date and First Disbursements*.  The date of this Loan Agreement is the "**Loan Closing Date**".  Borrower shall request the First Disbursements, and Lender shall make the First Disbursements to Borrower, in accordance with wire instructions previously given by Borrower to Lender, when all the First Disbursement Conditions have been satisfied or waived.  Subject to <u>Section 2.4.1</u>, the First Disbursements shall be used to pay for or reimburse Approved Costs reflected on the Budget.

2.3.1.    *Closing Conditions Precedent*.  Lender's obligation to close the Loan on the Loan Closing Date is subject to no Event of Default having occurred and being then continuing, and Lender's receipt of the following (duly executed by all relevant parties and recorded, if and as applicable), in form and substance acceptable to Lender (such receipt of each item, a "**Closing Condition**" and together, the "**Closing Conditions**"):

(a)    the Note, the Deed of Trust, the Assignment of Documents, the Environmental Indemnity, the Early Release Guaranty, the Finder Reimbursement Agreement, the Manager Reimbursement Agreement, the Recourse Indemnity, the Completion Guaranty, the AIG Agreement, the Operating Capital Loan Documents and any other Loan Documents in existence on the Loan Closing Date;

(b)    a Certificate/Incumbency Certificate executed by a secretary or an assistant secretary of Borrower, attaching:

(A)    a certified copy of Borrower's certificate of formation;

(B)    a copy of Borrower's operating agreement;

(C)    good standing certificates of Borrower from the Secretary of State for each of the States of Delaware and Utah; and

CONFIDENTIAL INFORMATION    SMHG002897

(D)    resolutions or other actions authorizing the execution, delivery and performance by Borrower of the Loan Documents;

(c)    a Certificate/Incumbency Certificate executed by a secretary or an assistant secretary of Guarantor, attaching:

(A)    a certified copy of Guarantor's certificate of formation;

(B)    a copy of Guarantor's operating agreement;

(C)    good standing certificates of Guarantor from the Secretary of State for the State of Utah; and

(D)    resolutions or other actions authorizing the execution, delivery and performance by Guarantor of the Loan Documents;

(d)    legal opinions from Borrower's counsel and local counsel, in the form approved by Lender;

(e)    evidence satisfactory to Lender confirming the Property is not in a one hundred year flood plain;

(f)    copies of all reports scheduled in Section 4.10 of the Disclosure Schedule;

(g)    the Lender's Title Policy;

(h)    a copy of the Survey, and if required by the Title Company to issue the Lender's Title Policy free of any survey exceptions, such updates to the Survey as the Title Company requires to issue the Lender's Title Policy free of any survey exceptions;

(i)    a probable maximum loss (PML) report for the Project and certificates of insurance evidencing the insurance coverage that Borrower is required to maintain on the Loan Closing Date pursuant to Section 5.7;

(j)    evidence of payment of Lender's expenses to the extent required to be paid on the Loan Closing Date in accordance with the terms of this Loan Agreement, including the expense of examination of title, the cost of the Lender's Title Policy, the reasonable fees and expenses of Lender's counsel, and the fee for recording of the Deed of Trust;

(k)    each Construction Contract with the General Contractor in place for any part or the Project;

(l)    each Architect Contract in place for any part of the Project along with the related Architect Certificate;

CONFIDENTIAL INFORMATION    SMHG002898

(m)    each Engineer Contract in place for any part of the Project along with the related Engineer Certificate;

(n)    the Budget and Schedule;

(o)    the Plans and Specifications in place for the Project or any portion thereof;

(p)    copies of such financial statements of each General Contractor as Lender may reasonably require, including balance sheets and profit and loss statements;

(q)    a signed IRS Form W-9 from Borrower indicating that Borrower is not subject to backup withholding;

(r)    an Appraisal, last updated as of a date not earlier than June 24, 2016;

(s)    copies of all existing Entitlements;

(t)    if applicable, copies of all leases of any space within the Project, copies of Borrower's standard forms of office and retail leases, estoppel certificates substantially in the form of Exhibit I from all tenants, and subordination, non-disturbance and attornment agreements  substantially in the form of Exhibit J, from all tenants;

(u)    if applicable, a copy of each Franchise Agreement in place for any portion of the Project;

(v)    if applicable, a copy of each Management Agreement in place for any portion of the Project;

(w)    certificates of insurance evidencing the insurance coverage that Borrower is required to maintain on the Loan Closing Date pursuant to Section 5.7;

(x)    the Qualified Economist Report acceptable to Lender in its sole discretion evidencing a Jobs Cushion of not less than twenty-five percent (25%) in respect of the Loan Amount, with respect to which Lender confirms its receipt by its execution of this Loan Agreement;

(y)    evidence that the Bridge Loan has been made available to Borrower and copies of the executed Bridge Loan Documents; and

(z)    any other due diligence information (including copies of documents) reasonably requested by Lender with respect to the Project, any portion of the Project, or the Master Project.

CONFIDENTIAL INFORMATION                                                                    SMHG002899

If Lender elects to execute this Loan Agreement without receipt of all of the Closing Conditions, any item not received and approved by Lender (or waived in writing) shall be a condition to Lender's obligation to fund any of the First Disbursements and any additional Advance after the First Disbursements.

2.3.2. *First Disbursement Conditions Precedent.* Lender's obligation to make any First Disbursement is subject to no Event of Default having occurred and being then continuing, and Lender's receipt of the following (duly executed by all relevant parties and recorded, if and as applicable), in form and substance acceptable to Lender (such receipt of each item, a "**First Disbursement Condition**" and together, the "**First Disbursement Conditions**"):

(a)    If requested by Lender, a Certificate executed by a secretary or an assistant secretary of Borrower confirming there have been no changes to Borrower's organizational documents since the Loan Closing Date;

(b)    If requested by Lender, a Certificate executed by a secretary or an assistant secretary of Guarantor confirming there have been no changes to Guarantor's organizational documents since the Loan Closing Date;

(c)    a legal opinion from Arnstein & Lehr LLP that Lender falls within an exemption from the definition of an "investment company" in the Investment Company Act of 1940 and the regulations thereunder;

(d)    a legal opinion from Arnstein & Lehr LLP that Lender falls within an exemption from registration requirements of the Securities Act of 1933, as amended, and the regulations thereunder;

(e)    evidence of payment of Lender's expenses to the extent required to be paid on the date of any First Disbursement in accordance with the terms of this Loan Agreement, including the expense of examination of title and the reasonable fees and expenses of Lender's counsel;

(f)    a Draw Package in respect of each First Disbursement;

(g)    a report from the Construction Consultant in the form described in Section 2.4.3 approving the Draw Package in respect of each First Disbursement;

(h)    copies of all existing Entitlements not previously delivered to Lender;

(i)    if required by Lender based on the current stage of the Project in order to obtain the title insurance coverage required by Lender, such updates to the Survey, modifications to the Lender's Title Policy, and title endorsements not previously provided to the Lender's Title Policy as Lender requests;

(j)    upon confirmation of the scope of collateral covered by the same, Lender's receipt of any amendments to or partial releases of that certain UCC-1

CONFIDENTIAL INFORMATION                                            SMHG002900

financing statement filed on April 26, 2013 by Peak Mountain Fund, LLC against Guarantor with the Utah Division of Corporations;

(k)    a report from the Construction Consultant certifying that the Budget, Schedule, and any available Plans and Specifications have been reviewed and approved by the Construction Consultant;

(l)    if required pursuant to Section 5.17 to keep the Loan "in balance," evidence of the Commitment Financing Amount pursuant to Section 5.17.5;

(m)    evidence satisfactory to Lender that the Project may be developed "as of right" under all applicable Laws, building codes, and zoning ordinances and requirements;

(n)    with respect to any Advance other than the first Advance, Lender's receipt and approval of the Release Price Schedule to be attached as Exhibit K; and

(o)    any other due diligence information (including copies of documents) reasonably requested by Lender with respect to the Project, any portion thereof, or the Master Project.

If Lender elects to make any First Disbursement without receipt of all of the First Disbursement Conditions, any item not received and approved by Lender (or waived in writing) shall be a condition to Lender's obligation to fund the next Advance (including any First Disbursement or any other Advance).

2.3.3.    *Closing Conditions Precedent for Borrower*.    Borrower's obligation to borrow the Loan is subject to Borrower's receipt of the following (duly executed and delivered by Lender, if applicable), in form and substance reasonably satisfactory to Borrower unless waived by Borrower (the "**Borrower Closing Conditions Precedent**"):

(a)    a signed IRS Form W-9 from Lender indicating that Lender is not subject to backup withholding;

(b)    the Finder Reimbursement Agreement, of which Borrower hereby affirms receipt; and

(c)    the Manager Reimbursement Agreement, of which Borrower hereby affirms receipt.

2.4    *Advances of Loan Proceeds*.

2.4.1.    *Generally*.    So long as no Event of Default has occurred and is then continuing, Lender shall make the First Disbursements and shall make other Advances to Borrower from time to time thereafter first, to repay the Bridge Loan and any other amounts outstanding under the Bridge Loan in full (only to the extent the same funded Approved Costs), then to pay or reimburse Approved Costs, subject to the provisions of

CONFIDENTIAL INFORMATION                                                    SMHG002901

this Section 2.4 and Sections 2.5 and 2.6. Advances will be made to Borrower upon Borrower's request by submission of a Draw Package to Lender in accordance with Section 2.4.2 provided the Improvement Conditions have been satisfied in accordance with Section 2.5 or waived in writing; provided, however, until the Bridge Loan and all other obligations under the Bridge Loan Documents have been paid in full, Borrower authorizes Lender, without the requirement of any Draw Package or other written request from Borrower, to make Advances directly to the holder of the Bridge Loan Documents until the obligations thereunder are unconditionally satisfied in full. No more than one Advance shall be made in any calendar month unless otherwise agreed by Lender. Except for the First Disbursements, in no event shall an Advance be made in order to return or reimburse any equity funded by Borrower's members or any other Person (whether in the form of cash equity or direct payment of Improvement Costs) unless and until Borrower's Equity Requirement has been satisfied in full, and then such Advance may only be made to reimburse the excess of Borrower's actual equity contributions over the Borrower Equity Requirement.

2.4.2. *Draw Package.* Lender shall have received in full the following to the extent applicable (collectively, a "**Draw Package**") at least ten (10) Business Days prior to the date each requested Advance is to be made (except Material Subcontracts shall have been received at least thirty (30) days prior to the date of any Advance in respect of payments thereunder), and Lender shall, in respect of each requested Advance, so long as no Event of Default has occurred and is then continuing, make such Advance on the date requested provided the applicable Draw Package is complete and has been approved by Lender in accordance with this Section 2.4 and, if applicable, all conditions of Sections 2.5 and 2.6 have been satisfied:

(a)    a request for an Advance in the form attached hereto as Exhibit F itemizing the purposes for which the Advance will be used, confirming that the amounts set forth in the request are consistent with the Budget and, with respect to any Construction Advance, providing for the withholding of a retainage in the amount required under this Loan Agreement or the applicable Construction Contract, if greater (each such amount withheld, a "**Retainage Amount**"), until the final disbursement pursuant to Section 2.6;

(b)    with respect to any Construction Advance, a draw request certification from each applicable General Contractor covering the requested disbursement in the form of AIA Form G702 and G703 or an equivalent form acceptable to Lender (with each applicable General Contractor's sworn statement and application for payment attached thereto), and copies of invoices, bills of sale, statements, receipted vouchers or other reasonably acceptable supporting documents for each item in excess of $25,000.00 (and, if required by the Title Company in order to continue Lien coverage, any such items less than $25,000.00);

(c)    with respect to any Construction Advance, a cumulative log of all lien waivers provided to date, copies of conditional partial Lien waivers or releases of Lien for all lienable work done and materials delivered in the full

CONFIDENTIAL INFORMATION                                    SMHG002902

amount requested in the Draw Package, conditioned only upon receipt of the payment requested in the Draw Package, along with copies of unconditional partial Lien waivers or releases of Lien for all lienable work done and materials delivered in the amount obtained by adding (i) the cost of all lienable work performed prior to the Loan Closing Date that was not paid for or reimbursed by the First Disbursements, and (ii) the full amount of all prior Construction Advances, except, in all cases, for any Retainage Amounts not yet released and any amounts then being disputed by Borrower in accordance with the terms of this Loan Agreement;

(d)    with respect to any Construction Advance, a copy of the then current change order log and pending change order log;

(e)    a list of Approved Costs (not otherwise addressed in the draw request certification delivered pursuant to Section 2.4.2(b)), to be paid or reimbursed from the requested Advance, and copies of invoices (or other reasonably acceptable documents) for each item of any such Approved Costs in excess of $25,000.00 (and, if required by the Title Company in order to continue Lien coverage, any such items less than $25,000.00);

(f)    to the extent not previously delivered to Lender, copies of all Material Subcontracts or other subcontracts for Hard Costs as required by the Title Company in order to continue Lien coverage under which work and materials have been provided as of the date of the applicable Draw Package;

(g)    to the extent not previously delivered to Lender, copies of all Entitlements for construction of the Improvements;

(h)    if requested by Lender, an amendment to the Assignment of Documents reflecting any specific documents or agreements not previously itemized in Part II of Exhibit B to the Assignment of Documents;

(i)    an updated Schedule, if applicable;

(j)    any additional documentation reasonably requested by Lender or the Construction Consultant;

(k)    evidence of insurance as required under Section 5.7;

(l)    to the extent not previously satisfied or waived in writing, any Closing Conditions or First Disbursement Conditions; and

(m)    any other due diligence information (including copies of documents) reasonably requested by Lender.

2.4.3.    *Construction Consultant's Report*.    Lender shall have received a report from the Construction Consultant approving the subject Draw Package, unless delivery of such report has been waived by Lender.  Such report shall affirm that the Loan is "in

CONFIDENTIAL INFORMATION                                                    SMHG002903

balance" and that all work completed at the time of the submission of the Draw Package has been performed in a good and workmanlike manner, constructed in substantial conformance with the Plans and Specifications and that, subject to any Force Majeure Extensions, the Improvements have been or, to Construction Consultant's knowledge, can be substantially completed in accordance with the Budget and Schedule.

2.4.4.  *Title Insurance*.  Lender shall have received a Standard Construction Datedown Endorsement to the Lender's Title Policy extending the coverage to include the date of the requested Advance insuring over all mechanics' and materialmen's liens arising (or which may arise) out of work under construction or completed.

2.4.5.  *Loan in Balance*.

(a)  Following the requested Advance, the Loan shall be "in balance" as required by Section 5.17 hereof.

(b)  From time to time, as applicable, Borrower or Lender may determine that modifications are necessary to the Budget because of actual or anticipated changes in the Approved Costs reflected in the Budget, including modifications due to changes in design or construction plans and timing.  If, after due consultation and consideration of the views of Borrower and Lender and supporting documentation, Borrower and Lender do not agree on the changes, Lender's determination shall control, absent manifest error.

(c)  Cost savings from any Budget line item, other than for interest on the Loan, contingency or fees due to Affiliates of Borrower, demonstrated to the satisfaction of Lender, shall be available for costs in any other Budget line item in accordance with Section 5.1.

(d)  A portion of the funds allocated to the contingency line item in the Budget shall be available for Approved Costs in the Budget in the same proportion as the then percent of completion of the construction of the Improvements, or shall be reallocated and may thereafter be advanced for Approved Costs in the Budget in any other manner as approved by Lender in its sole and absolute discretion.

2.4.6.  *Hard Costs*.  Advances for Hard Costs shall be limited to the amounts actually payable to each General Contractor under the applicable Construction Contract for each item or element of Hard Costs (including the provisions therein for the withholding and payment of retainage).  Unless otherwise agreed by Lender, retainage under the Construction Contract will be no less than ten percent (10%).  Advances for the payment of retainage to the General Contractor are subject to the provisions of Section 2.6 hereof.

2.4.7.  *Offsite Materials*.  If an Advance is requested for the cost of materials that are stored off the Project site ("**Offsite Materials**"), the Construction Consultant shall verify that the Offsite Materials comply with the Plans and Specifications, are of suitable quality for ultimate incorporation into the Improvements and are free from any apparent

CONFIDENTIAL INFORMATION                                              SMHG002904

defect (with Borrower agreeing to pay for all reasonable travel expenses of the Construction Consultant to view and inspect the Offsite Materials), and Borrower shall provide Lender and the Construction Consultant with:

>        (a)        a detailed list of the Offsite Materials for which the Advance is requested showing identity, evidence of Borrower's current ownership (or future ownership if contingent only upon payment to be made from the Advance) of all Offsite Materials (to the extent not previously provided), location and cost and evidence that Borrower has paid for the Offsite Materials or will cause payment to be made from the Advance;

>        (b)        if the Offsite Materials are stored at the facilities of the supplier of Offsite Materials ("**Offsite Supplier**"), a written statement from the Offsite Supplier that the Offsite Materials have been segregated from other materials in the Offsite Supplier's storage facility and have been marked with the name of Borrower.        Such statement shall also include the Offsite Supplier's acknowledgment of Lender's security interest in the Offsite Materials;

>        (c)        if the Offsite Materials are stored in a place other than the facilities of the Offsite Supplier, a written statement from the bailee or other custodian acknowledging Lender's security interest in the Offsite Materials; and

>        (d)        in all events, certificates of Insurance showing the Offsite Materials are insured as required by this Loan Agreement and showing Lender as the loss payee.

2.4.8.  *Soft Costs*.  Advances for Soft Costs shall be limited to amounts then due under the applicable contract or agreement or otherwise then due and payable, on the basis of invoices, statements or other evidence thereof reasonably acceptable to Lender. Advances for fees payable under the Development Management Agreement or the Leasing Agent Agreement or any other agreement with any Affiliate of Borrower or Guarantor shall be limited to the lesser of (a) the amounts then due thereunder and payable (as set forth in the Budget), or (b) an amount equal to the percentage of work then in place with respect to the Project, as determined by Lender's Construction Consultant.  If an Event of Default shall occur with respect to Borrower's failure to pay any amounts due under Section 5.15 of this Loan Agreement, Lender is irrevocably authorized to disburse funds from Lender's Deposit Account or the Borrower Deposit Account to pay such amounts payable to Lender, which shall exclude EB-5 Financing Costs.  Any disbursement to Lender pursuant to the foregoing sentence shall be deemed a cure of the applicable Event of Default arising from failure to pay the amounts due but shall not waive any other obligations of Borrower under the Loan Documents, including the obligation to keep the Loan "in balance."

2.4.9.  *Tenant Improvement Allowance*.  If a Construction Advance is requested for the payment of a tenant improvement allowance pursuant to a lease of all or any part of the Mortgaged Property whereby such tenant improvements have been performed and completed under a construction contract to which Borrower is not a party or to which

CONFIDENTIAL INFORMATION                                                        SMHG002905

Borrower is not bound  (with respect to a particular lease, each such amount, a "**TI
Allowance**"), then, notwithstanding anything to the contrary in this Loan Agreement,
Borrower shall provide Lender and the Construction Consultant with:

> (a)      a request for Advance required under <u>Section 2.4.2</u>, providing for
> the withholding of a retainage in an amount equal to the greater of ten percent
> (10%) or the amount required under the applicable lease and/or the relevant
> construction contract until the final disbursement pursuant to the relevant
> construction contract (it being understood that in no event will Lender be
> obligated to fund more than is then currently owed to the contractor under the
> applicable contract);

> (b)      the Construction Consultant's report verifying that the relevant
> tenant improvements have been performed in a good and workmanlike manner
> and constructed in substantial conformance with the Plans and Specifications and
> the applicable lease;

> (c)      a draw request certification from the relevant contractor covering
> the requested disbursement in the form of AIA Form G702 and G703 or an
> equivalent form acceptable to Lender (with such contractor's sworn statement and
> application for payment attached thereto), copies of invoices, bills of sale,
> statements, receipted vouchers or other reasonably acceptable supporting
> documents for each item;

> (d)      evidence of payment of all invoices and bills for which prior
> Construction Advances were made for TI Allowances, along with Lien waivers
> from subcontractors for all prior fundings of the TI Allowance and from the
> contractor for the current request (conditional upon receipt of payment); and

> (e)      with respect to an advance for the final portion of a TI Allowance
> under a particular lease, an estoppel certificate in form approved by Lender, from
> the tenant certifying that all Borrower's obligations with respect to tenant
> improvement allowances under such lease have been fully performed and satisfied
> and that no default then exists under the lease.

2.4.10. *AIG Fee*.  With and as a condition to each Advance, and at such other
times as are designated in the AIG Agreement described in subsection (a) of the
definition of AIG Agreement, Borrower shall fund into an escrow account the portion of
the AIG Fee then due to be funded by Borrower into escrow pursuant to the terms and
conditions of the AIG Agreement described in subsection (a) of the definition of AIG
Agreement. The escrow shall be subject to, and may only be released in accordance with,
the AIG Agreement described in subsection (a) of the definition of the AIG Agreement.

2.5      *Improvement Conditions*.  Lender shall not be obligated to make any Advance for
Hard Costs unless Lender has received each of the following (duly executed by all relevant
parties and recorded, if and as applicable), in form and substance reasonably satisfactory to
Lender (such receipt of each item, an "**Improvement Condition**" and together, "**Improvement**

CONFIDENTIAL INFORMATION                                                           SMHG002906

**Conditions"**), it being understood that Borrower shall not be required to provide to Lender any items previously delivered to Lender absent any subsequent updates to the same:

2.5.1.  each Construction Contract in place, along with the applicable General Contractor Consent and Agreement;

2.5.2.  each Engineer Contract in place, along with the applicable Engineer Consent and Agreement and the Engineer Certificate;

2.5.3.  the Architect Contract in place, along with the applicable Architect Consent and Agreement and the Architect Certificate;

2.5.4.  each Development Management Agreement in place, along with the applicable Development Manager Consent;

2.5.5.  each Leasing Agent Agreement in place, along with the applicable Leasing Agent Consent and Agreement;

2.5.6.  a copy of each General Contractor's standard form of subcontract, which form will not prohibit an assignment of the subcontract to Lender or require the subcontractor's consent thereto and shall be used for all of such General Contractor's subcontracts; and

2.5.7.  such additional documents and information relating to the design and construction of the Improvements, as may be reasonably required by Lender.

2.6     *Final Advance and Release of Retainage.*  With respect to any Construction Contract, Advances for the payment of final construction costs and release of retainage to the General Contractor shall not be made until Lender has received and Lender has approved, in addition to any applicable deliverables required pursuant to Sections 2.3.3, 2.4 and 2.5, all of the following (to the extent not a previously satisfied Improvement Condition):

2.6.1.  evidence of Substantial Completion of the applicable portion of the Project, or with respect to any tenant improvements under a particular lease, a certificate of occupancy for such premises;

2.6.2.  final, unconditional lien waivers from the General Contractor and each applicable subcontractor;

2.6.3.  no Event of Default shall exist;

2.6.4.  executed AIA Form G706 (Contractor's Affidavit of Payments of Debts and Claims) and AIA Form G706A (Contractor's Affidavit of Release of Liens);

2.6.5.  an ALTA as-built survey or other satisfactory evidence showing the Improvements (a) do not materially encroach on any easement or private right-of-way or upon any public right-of-way; (b) have been constructed within the boundaries of the

94392406

30

Land, and (c) have been constructed within the setback lines as required by applicable zoning and other applicable land use ordinances;

2.6.6. as-built plans and specifications for the Improvements;

2.6.7. estoppel certificates and subordination, non-disturbance and attornment agreements from tenants under such Leases as Lender requires;

2.6.8. a warranty book or letter confirming receipt of a warranty book, together with all guaranties and maintenance agreements; and

2.6.9. a notice of completion duly recorded in the official records of Weber County, Utah.

If the Loan has been fully advanced prior to Substantial Completion of any portion of the Project, Borrower shall still provide to Lender on a monthly basis all deliverables required pursuant to Sections 2.4 and 2.5 as if an Advance was being requested, and upon achieving Substantial Completion, Borrower shall provide to Lender all of the items listed in this Section 2.6.

2.7    *Prepayments.*

2.7.1. If at any time a Member is informed of the denial of his or her I-526 Petition, Borrower shall, upon Lender's prior written approval, prepay the Loan, without penalty or premium, in the amount of such Member's capital contribution previously disbursed to Borrower hereunder within ninety (90) days after receipt of notice from Lender of such I-526 Petition denial unless Lender has replaced such Member with a substitute Member within sixty (60) days after receipt of such Member's liquidation request; provided that the Borrower shall not be required to make any prepayment to the extent the Member's interest is liquidated (including, without limitation, following denial of any Member's I-526 Petition) if such liquidation is due to the voluntary abandonment by such Member of his or her I-526 Petition or due to the denial of such Member's I-526 Petition if the denial is the result of such Member's fraud, misrepresentation or failure to provide USCIS any information that is in such Member's possession or control or capacity to produce. If Borrower fails to prepay the Loan in accordance with this Section 2.7.1, the same shall constitute an Event of Default and Lender shall have the right to prepay the Loan on behalf of Borrower, without penalty or premium, in such amounts as required by this Section from the proceeds in Lender's Deposit Account or Borrower Deposit Account, to the extent available, and such prepayment shall not constitute a waiver of any of Lender's rights or remedies hereunder, including without limitation, any Loan balancing provision or requirement hereunder.If at any time a Member receives an adjudication of his or her I-829 Petition, Borrower may make a prepayment of the Loan, without penalty or premium, in the amount of such Member's capital contribution; provided, however, that such prepayment shall have no material adverse effect on the I-829 Petition of any Member.

CONFIDENTIAL INFORMATION                                                  SMHG002908

2.7.3.  Provided no Defeasance Disqualifying Event of Default has occurred, Borrower shall have the right to defease the Loan pursuant to Section 2.9 of this Loan Agreement.

2.7.4.  Reserved.

2.7.5.  Except as provided in Sections 2.7.1, 2.7.2, 2.7.3, or 5.9, Borrower may not prepay the Loan in whole or in part prior to the Initial Maturity Date or any extensions thereof made in accordance with the Loan Documents.

2.8    *Sales Deposits; Unit Release Prices*.  Non-Refundable Purchaser Deposits and Release Prices shall be used (a) first, to pay Approved Costs reflected on the Budget, (b) next, for any other purposes that are expressly permitted under the Loan Documents or otherwise approved by Lender in writing.

2.9    *Defeasance*.

2.9.1.  Provided there is no continuing Defeasance Disqualifying Event of Default, after the full advance of the Loan Amount (or prior to full advance of the Loan Amount only if a defeasance under this Section 2.9 would not, in Lender's sole and absolute discretion, have any material adverse effect on Lender or the I-829 Petition of any Member or otherwise cause any adverse immigration consequences to any Member), Borrower may at its option, upon sixty (60) days prior written notice to Lender, cause an Affiliate of Borrower to provide partially and/or fully as Collateral for Borrower's Obligations under this Loan Agreement ("**Reconveyance Collateral**"):

(a)    a first lien on real estate collateral reasonably acceptable to Lender (including as to the identity of ownership and management of such real estate collateral) and having an Appraised Value, which, when combined with the Appraised Value of any remaining Collateral which is not Reconveyance Collateral pursuant to this Section 2.9, is at least 1.67 times the Loan Amount on the Reconveyance Date (provided, however, if the Reconveyance Collateral after giving effect to this Section 2.9.1(a) is comprised solely of real estate collateral, the Appraised Value shall be such that the Reconveyance Collateral equals or exceeds the Loan Amount); or

(b)    a first lien on either (i) cash, cash equivalents or Public Securities, or (ii) a combination of cash, cash equivalents, Public Securities and real estate collateral, in each case, reasonably acceptable to Lender, and in each case, the value of which (or, in the case of real estate collateral, the Appraised Value of which), when combined with the Appraised Value of any remaining Collateral which is not Reconveyance Collateral pursuant to this Section 2.9, results in an aggregate value of not less than 1.67 times the Loan Amount (and with the portion of the Reconveyance Collateral comprised of real estate collateral having a value of not less than an amount equal to the Loan Amount) on the Reconveyance Date and which would not result in any Material Adverse Effect.

CONFIDENTIAL INFORMATION                                    SMHG002909

2.9.2.   Notwithstanding any provision to the contrary, the Reconveyance Collateral may not be paid for with any Advances of the Loan, nor may the same be provided or paid for by Borrower, but rather shall be paid or provided only from Affiliate(s) of Borrower that provide(s) such Reconveyance Collateral as an accommodation for Borrower, and Borrower shall provide Lender with evidence reasonably satisfactory to Lender that this condition has been satisfied.

2.9.3.   With respect to any Reconveyance Collateral comprised of cash, cash equivalents or Public Securities, such Collateral shall be deposited into an account with an Approved Bank ("**Reconveyance Account**") that is under the dominion and control of Lender pursuant to a Deposit Account Control Agreement.  Lender will be granted a perfected security interest in any real estate collateral, through a mortgage, deed of trust, security agreement and UCC financing statement, pledge agreement or such other method as is necessary to attach and perfect the security interest of Lender in the Reconveyance Collateral, and any such real estate collateral will be added to the real property which is the subject of the Environmental Indemnity, all pursuant to documentation reasonably acceptable to Lender, including from each party providing any Reconveyance Collateral. Borrower shall at its sole cost and expense provide an authority and enforceability opinion as to such new Loan Documents reasonably acceptable to Lender.  In addition, with respect to any Reconveyance Collateral comprised of real estate, Borrower shall provide to Lender at Borrower's sole cost and expense a current ALTA updated survey and an ALTA 2006 loan policy of title insurance for the Appraised Value of the Reconveyance Collateral containing such available endorsements and subject only to such exceptions and encumbrances, in each case, as may be acceptable to Lender.  Upon the grant of the security interest the Reconveyance Collateral and satisfaction of Borrower's other requirements under this Section, Lender shall release all liens on the Collateral (other than the Reconveyance Collateral and such portion of the Collateral which is necessary to remain Collateral for Borrower to satisfy the criteria of Sections 2.9.1(a) or 2.9.1(b) above), including via partial/full reconveyance of the Deed of Trust and in the event Reconveyance Collateral would fully satisfy the criteria of Section 2.9.1(a) or Section 2.9(b) above.  Reconveyance Collateral (in addition to any other remaining Collateral which is not Reconveyance Collateral) shall secure all Obligations of Borrower under this Loan Agreement.  All reasonable costs and expenses of Lender and Class B Manager (including without limitation attorneys' fees) that are incurred in connection with considering, agreeing to and implementing any reconveyance hereunder, and any required amendments to the Loan Documents, shall promptly be reimbursed by Borrower and Borrower shall indemnify Lender and Class B Manager in accordance with Section 5.14 and Section 5.15 for all Claims directly or indirectly arising out of or resulting from the same.

2.9.4.   Upon complete satisfaction of the conditions and requirements set forth in this Section 2.9:

(a)      Borrower shall no longer have a right to extend the Initial Maturity Date;

CONFIDENTIAL INFORMATION                                                                SMHG002910

(b)    Borrower shall be required to maintain the Reconveyance Collateral which is real property and all improvements thereon in accordance with all applicable Laws, not lease or enter into any contract relating to the same without Lender's prior written consent, comply with its covenants in Sections 5.2, 5.4.2, 5.7, 5.8, 5.9, 5.10, 5.11, 5.12, 5.13, 5.14, 5.15, 5.16, 5.18, 5.19, 5.20, 5.21, 5.22, 5.23, 5.24, 5.25, 5.26, 5.27, 6.1, 6. 3, 6. 4, 6.5, 6.6, 6.7, 6.8, 6.9, 6.10, 9.7 and 9.10, and make its representations in Sections 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.10, 4.11, 4.13, 4.14, 4.16, 4.18, 4.21, 4.22 and 4.24 as of the date of the contribution of such Reconveyance Collateral with respect to any real property and improvements which are included in the Reconveyance Collateral, but not with respect to the Mortgaged Property to the extent substituted with Reconveyance Collateral (and Borrower shall have been released from its representations, warranties and covenants with respect to such Mortgaged Property except as otherwise expressly required by the terms of this Loan Agreement); and

(c)    contemporaneously with the deposit of the Reconveyance Collateral into the Reconveyance Account in accordance with this Section, Lender and Borrower shall negotiate in good faith and execute an amendment to this Loan Agreement and the other Loan Documents that will, among other things, (A) reflect the fact that Lender has no further obligation to make Advances under this Loan Agreement, (B) reflect the fact that Borrower will have no further obligations to Lender under any representations, warranties, covenants or agreements with respect to the Mortgaged Property to the extent substituted with Reconveyance Collateral, and Borrower will not be bound by any restrictions on indebtedness or on the transfer of a direct or indirect interest in Borrower, and (C) reflect the fact that if an Event of Default occurs and upon maturity of the Loan, Lender shall have the right to exercise its remedies against the Reconveyance Account and to apply funds therein to satisfy all outstanding Obligations.

2.9.5.    Lender and Regional Center shall each have the right to request from Borrower such materials as are requested and/or reasonably necessary for it to respond to any "Request for Evidence," or other requests, issued by the USCIS in connection with any I-829 Petition by Entrepreneur to Remove Conditions related to the Project. Upon receipt of such request, Borrower shall, and shall cause Affiliates of Borrower to, provide to Lender or Regional Center, as applicable, not less than 48 hours before any relevant deadlines issued by the USCIS such materials that are in its possession or may be obtained with commercially reasonable effort within the applicable time frame.

ARTICLE 3
THE COLLATERAL

3.1    *Generally.*  The Loan shall be secured by:

3.1.1. a first Lien (to be evidenced by the Deed of Trust) on the Mortgaged Property;

CONFIDENTIAL INFORMATION                                    SMHG002911

3.1.2.  a security interest in the "UCC Collateral" assigned under the Deed of Trust;

3.1.3.  a security interest in the "Documents" assigned under the Assignment of Documents; and

3.1.4.  any other collateral now or hereafter granted by Borrower to Lender under the Loan Documents.

3.2     *Subordinated Loans*.  Borrower shall have the right to obtain and borrow loans secured by the Mortgaged Property or otherwise evidenced by one or more Subordinated Notes and other Subordinated Loan Documents (such subordinated loans and any replacement loans obtained to refinance such subordinated loans, in whole or in part, other than the Loan, the "**Subordinated Loans**"); provided that (a) after giving effect to the proposed Subordinated Loan, the Maximum Permitted Financing Amount shall not be exceeded (or such higher amount as may be approved by Lender in its sole discretion); (b) the proceeds of any Subordinated Loan will only be used to (i) pay or reimburse Approved Costs, (ii) repay or refinance any Subordinated Loan that paid or reimbursed Approved Costs, or (iii) make agreed Deficiency Deposits into the Borrower's Deposit Account; (c) such Subordinated Loans shall be subordinated in their liens, and other rights to the Loan Documents in accordance with an Intercreditor Agreement, which any holder of a Subordinated Loan shall be required to enter into; and (d) such Subordinated Loans shall mature no earlier than the Maturity Date. The form and substance of all Subordinated Loan Documents shall otherwise be in form acceptable to Lender.

3.3     *Release of Units*.  Lender shall from time to time upon the request of Borrower received not less than five (5) Business Days prior to any release contemplated by this Section 3.3, release individual Units from the Lien of the Deed of Trust and from any other Liens held by Lender, provided that:  (a) no Event of Default exists on the date of the proposed release; (b) contemporaneous with any such release, there shall be a sale of such Unit pursuant to an Approved Contract; and (c) Lender shall have received all of the following with respect to the Unit to be sold:

3.3.1.  an Approved Contract certified by Borrower to be a true and complete statement of the terms of sale with respect thereto;

3.3.2.  evidence that Borrower has received the Release Price and that Borrower has applied or has reserved such funds to pay Approved Costs or otherwise to satisfy the requirements of Section 5.17 of this Agreement for the Loan to be "in balance";

3.3.3.  the out-of-pocket costs and expenses of Lender (including reasonable legal fees and costs and escrow and recording and filing costs) in connection with each such release (it being acknowledged that Lender intends to accomplish each release of a residential Unit through an escrow with the title company closing such transaction);

3.3.4.  Lender's confirmation of compliance with Section 5.23 of this Agreement following the proposed release; and

CONFIDENTIAL INFORMATION                                          SMHG002912

3.3.5.   such other documents, opinions, assurances or certificates relating to such sale (including back-up for closing costs and proof of payment thereof) as Lender may reasonably request.   If Lender does not require satisfaction of all of the conditions described above before releasing one or more Units, that alone shall not be a waiver of such conditions and Lender reserves the right to require their satisfaction in full before releasing any further Units from the Lien of the Deed of Trust.

3.4     *Senior Loans*.   Borrower shall have the right to obtain debt financing or obtain equity contributions secured by the Mortgaged Property senior in right to the Loan (such senior loans or equity, collectively, the "**Senior Loans**," each of which is a "**Senior Loan**") if Lender notifies Borrower in writing that the aggregate amount of the Advances is reasonably expected by Lender to be less than $120,000,000; provided that (a) after giving effect to the proposed Senior Loans, the aggregate of the Loan Amount plus the amount of all Senior Loans does not exceed $120,000,000 (or such higher amount as may be approved by Lender in its sole discretion); (b) the proceeds of any Senior Loans will only be used to (i) pay or reimburse Approved Costs, or (ii) repay or refinance any Senior Loan securing a loan that paid or reimbursed Approved Costs; (c) such Senior Loans shall mature no earlier than the Maturity Date; and (d) no Event of Default exists at the time Borrower proposes to borrow a Senior Loan. If Borrower has the right under this Section 3.4 to obtain a Senior Loan, Lender agrees to enter into an Intercreditor Agreement with the proposed holder of such Senior Loan, and Borrower will not execute any documents evidencing or securing any Senior Loan unless and until Lender executes such Intercreditor Agreement.   Borrower shall provide Lender with copies of all documents evidencing and/or guaranteeing any Senior Loan, all of which shall be subject to Lender's reasonable approval.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower hereby represents and warrants to Lender as follows:

4.1     *Capacity*.   Borrower is a limited liability company duly organized and existing in good standing under the Laws of the State of Delaware, duly qualified to do business in Utah and in any other state in which the nature of its business requires it to be so qualified, and lawfully empowered and possessing the capacity to enter into and carry out the terms and provisions of the Loan Documents binding upon Borrower.   All Organizational Documents that have been submitted to Lender by Borrower or that have been filed in public records are current and true and complete in all material respects.

4.2     *Validity of Loan Documents*.   The Loan Documents are in all material respects valid and binding upon Borrower, as applicable, according to their terms, subject to all Laws, including equitable principles, insolvency Laws, and other Laws applying to creditors generally. The execution and delivery by Borrower, and the performance by Borrower, of all its Obligations under the Loan Documents, have been duly authorized by all necessary limited liability company or organizational action and do not and will not:

CONFIDENTIAL INFORMATION                                                      SMHG002913

4.2.1.  require any consent or approval not previously obtained of any other Person holding any interest in or entitled to receive any interest issued or to be issued by Borrower;

4.2.2.  violate any provision of the Organizational Documents of Borrower or any other material agreements to which Borrower is bound;

4.2.3.  result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, or other encumbrance of any nature (other than under those contemplated in the Loan Documents) upon or with respect to any Collateral;

4.2.4.  violate any applicable Laws; or

4.2.5.  result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any Collateral is bound or affected.

4.3  *No Governmental Approvals Required*.  No authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any Governmental Authority is or will be required to authorize, or is otherwise required in connection with, the validity of the Loan Documents, and the creation of the Deed of Trust or the other Liens, security interests, or other charges or encumbrances in favor of Lender described in the Loan Documents, except that filing or recording with Governmental Authorities may be required to perfect such Liens, security interests, or other charges or encumbrances.

4.4  *Tax Liability*.  Borrower has timely filed (or has obtained effective extensions for filing) all federal, state, and local tax returns required to be filed and has paid all Taxes which have become due pursuant to such returns or any tax assessments received by Borrower, including interest and penalties, if any, except Taxes that are being contested in good faith by appropriate proceedings and for which Borrower has set aside adequate reserves.

4.5  *Financial Statements*.  (a)All Financial Statements of Borrower fairly present the financial positions of Borrower at the respective dates of such Financial Statements, and the Financial Statements of Borrower have been prepared in accordance with GAAP.  To Borrower's actual knowledge, after due inquiry, all contingent liabilities of Borrower have been disclosed in the Financial Statements to the extent required to be disclosed under GAAP; and (b)since the respective dates of the Financial Statements, there have been no changes in the financial condition of Borrower that would give rise to a Material Adverse Effect.

4.6  *Pending Litigation*.  Except as described in Section 4.6 of the Disclosure Schedule, there are no actions, suits or proceedings pending, or to Borrower's actual knowledge, after due inquiry, threatened in writing against Borrower, or the Project, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien created thereof, at Law or in equity, or before or by any Governmental Authority, except in each case actions, suits, and proceedings that are being defended by insurance carriers or which, if adversely determined, would not result in a Material Adverse Effect.

CONFIDENTIAL INFORMATION                                                    SMHG002914

4.7     *Bankruptcy.*  There are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief Laws filed by Borrower or pending against Borrower.

4.8     *Compliance with Zoning Ordinances and Similar Laws.*  Except as described in Section 4.8 of the Disclosure Schedule, the Land and existing improvements thereon comply in all material respects with all applicable Laws and all permits and approvals issued thereunder, including applicable subdivision Laws, licenses and permits, aviation regulations and determinations, building codes, zoning ordinances and requirements, flood disaster, environmental protection and equal employment regulations and appropriate supervising boards of fire underwriters and similar agencies.

4.9     *Entitlements.*  Borrower possesses all Entitlements (to the extent available) and is not in violation of the existing Entitlements and the Plans and Specifications submitted to Lender and Construction Consultant for approval comply with such Entitlements.  To the extent not currently issued, Borrower has no reason to believe that any of the Entitlements will not be issued in a timely manner by a date sufficient for the completion of construction and occupancy of the Improvements in compliance with the Schedule.  All applicable fees have been paid and bonds or other security have been posted in connection with the existing Entitlements to the extent the same were required to have been paid or posted on or before the Loan Closing Date.

4.10    *Environmental and Geological Issues.*  Except as described in reports scheduled in Section 4.10 of the Disclosure Schedule, (a) all environmental impact reports as required by any Governmental Authority having jurisdiction over the Project have been duly prepared and certified in all material respects, (b) there are no environmental violations or liabilities or geological conditions relating to the Project that may individually or in the aggregate adversely affect the Project, and (c) any environmental violations or liabilities or geological conditions disclosed in the reports identified on the Disclosure Schedule could not reasonably be expected to give rise to a Material Adverse Effect.

4.11    *No Other Liens.*  Except as described in Section 4.11 of the Disclosure Schedule, any unpaid amounts under any contract for the supplying of labor, materials, or services for the design or construction of the Improvements, or the surveying thereof, are included in the Budget.

4.12    *No ERISA Plan.*  Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974, as amended.

4.13    *Material Contracts; Consents.*  Any contract (or series of contracts) to which Borrower is a party or by which Borrower is bound related to the Project involving an aggregate value in excess of $1,000,000.00, or between Borrower and an Affiliate of Borrower related to the Project, are described in Section 4.13 of the Disclosure Schedule.  All necessary third party consents to Borrower's assignment to Lender of each of the agreements, licenses, permits and plans described in Exhibit B to the Assignment of Documents have been obtained.

4.14    *Full Disclosure.*  All information in the Financial Statements, certificates, or other documents of or prepared by Borrower and delivered to Lender or Lender's advisors prior to the Loan Closing Date in obtaining the Loan are correct and complete in all material respects.  There

CONFIDENTIAL INFORMATION                                                          SMHG002915

are no omissions therefrom that result in such information being incomplete, incorrect or misleading in any materially adverse respect and all documents other than originals delivered by Borrower to Lender in obtaining the Loan are true and correct photocopies. All information in the Financial Statements, when furnished to Lender pursuant to Section 5.21, will be correct and complete in all material respects.

4.15    *Governmental Regulation*. Borrower is not an "investment company" or a company "controlled" by an "investment company," or otherwise required to register as an "investment company," within the meaning of the Investment Company Act of 1940 and the regulations issued thereunder, each as amended. Borrower is not subject to any federal or state Laws which limit its ability to incur indebtedness.

4.16    *No Condemnation*. No condemnation or eminent domain proceedings are pending, or to Borrower's knowledge, after due inquiry, threatened against the Land.

4.17    *Defaults Under Loan Documents*. No Default or Event of Default has occurred.

4.18    *Separate Tax Parcel*. The Mortgaged Property is comprised of one or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of such Mortgaged Property; provided, that the Village Nest West development parcel will be platted as a separate tax parcel as approved by Weber County. In addition, no other parcel not a part of such Mortgaged Property constitutes a portion of such Mortgaged Property's tax lots.

4.19    *Budget and Schedule*. The Budget is a reasonable estimate of the costs to complete the construction of the Improvements and the Schedule is a reasonable estimation of the timetable to complete the construction of such Improvements.

4.20    *Other Defaults*. Borrower is not in default under, or in violation of, any order, writ, judgment, injunction, decree, determination, award, indenture or credit agreement or any other agreement, lease or indemnity to which Borrower is a party or is bound or any Collateral is bound or affected that could have a Material Adverse Effect.

4.21    *No Violations of Law*. Borrower has not received any written notices of any violation of Laws and, to the best of Borrower's knowledge, there are no violations or claims of violations of any Laws.

4.22    *Commissions and Fees*. Borrower has not agreed with any Person to accept any commission or fee in connection with the identification or recruitment of Members for Lender. This provision shall survive the repayment of the Loan and shall continue in full force and effect so long as the possibility of such liabilities, claims or losses exists.

4.23    *Employees*. Borrower has no employees.

4.24    *Subordinated Loans*. No Subordinated Loans exist as of the Loan Closing Date.

4.25    *Affirmation of Certain Representations and Warranties*. Each request for a disbursement of Loan proceeds under this Loan Agreement shall constitute an affirmation that the foregoing representations and warranties of Borrower are true in all material respects and

CONFIDENTIAL INFORMATION                                                                    SMHG002916

correct as of the date of such request in all material respects and will be true in all material respects as of the date such disbursement is made.

## ARTICLE 5
### AFFIRMATIVE COVENANTS AND AGREEMENTS

5.1     *Construction.*   Borrower shall cause (a) all construction of the Improvements to be commenced, continued and prosecuted in a good and workmanlike manner and shall cause the Project to achieve Substantial Completion substantially in accordance with the Schedule, Plans and Specifications, Budget and each Construction Contract on or before the Substantial Completion Date, as such date may be extended by the aggregate number of days of all Force Majeure Extensions and Financing Delays permitted by Section 7.5, (b) the Architect, Engineer or the applicable General Contractor to deliver to Lender within ten (10) Business Days of each calendar month end, commencing with the month in which the next Advance of the Loan to Borrower occurs, a written monthly status report regarding the status of all construction of Improvements, containing a copy of the then current Schedule and Budget and indicating any material deviations from the Schedule, Plans and Specifications, Budget or Construction Contract, as applicable to the Architect, Engineer or General Contractor, and (c) all construction of the Master Project to be commenced, continued and diligently prosecuted in a good and workmanlike manner and shall cause the Master Project to achieve completion substantially in accordance with the Master Schedule.  All changes to the Schedule and the Master Schedule must be approved by Lender.  Changes to the Budget may be made pursuant to the recommendation of Borrower with the consent of Lender.  All changes to any Plans and Specifications shall be subject to the provisions of Section 6.2.

5.2     *Compliance with Laws.*  The Improvements shall be constructed in all material respects in accordance with all applicable Laws.  Borrower will obtain all Entitlements necessary and as required to ensure completion of construction of the Improvements and the commencement of sale, operation, leasing or financing of the Improvements substantially in accordance with the Schedule, will pay all required fees and post all bonds or other security as may be required for the issuance of such permits or approvals, will promptly and timely respond to written notices from any Governmental Authority relating to any material requirement of such Governmental Authority regarding the development or construction of the Project and promptly comply with such material requirements that are not being contested by Borrower in accordance with Section 5.22, and in any event will comply with such material requirements within the deadline set forth in the final determination from such Governmental Authority.  Promptly upon demand by Lender, Borrower will deliver to Lender any departmental searches made by Governmental Authorities.  Following the issuance thereof, Borrower shall cause all material and necessary Entitlements to remain in full force and effect.  Construction of the Improvements shall occur wholly within all applicable building restriction lines and set-backs, however established, and shall not encroach upon any easement or right-of-way or upon the land of others and shall be in strict compliance with all applicable use or other restrictions, agreements, declarations, covenants, and zoning and subdivision ordinances and requirements.

5.3     *Inspections; Cooperation.*

CONFIDENTIAL INFORMATION                                                          SMHG002917

5.3.1.  Borrower shall permit representatives of Lender and the Construction Consultant to enter upon the Land at reasonable times and, except in the case of any emergency condition or while an Event of Default exists, upon reasonable notice, to inspect the Improvements and any and all materials to be used in connection with the construction of the Improvements, to examine all detailed plans and shop drawings and similar materials as well as all records and books of account maintained by or on behalf of Borrower relating thereto and to discuss the affairs, finances and accounts pertaining to the Loan and the Improvements with representatives of Borrower.  Borrower shall at all times cooperate, and use commercially reasonable efforts to cause each General Contractor and each and every one of its subcontractors, sub-subcontractors and material suppliers to cooperate, with the representatives of Lender and the Construction Consultant in connection with or in aid of the performance of Lender's functions and the exercise of any other rights granted to Lender under this Loan Agreement.

5.3.2.  In furtherance of Lender's rights hereunder, Lender may, at its option, require a monthly inspection of the Improvements by the Construction Consultant during construction of the Improvements.  Without limitation of the provisions of this Section 5.3.2, Borrower shall provide the Construction Consultant with copies of any testing and property condition reports prepared for or received by Borrower with respect to the Improvements promptly upon Borrower's receipt thereof.

5.3.3.  It is expressly understood and agreed that Lender is under no duty to supervise or to inspect the work of construction, and that any such inspection by or on behalf of Lender is for the sole purpose of protecting the interests of Lender with respect to the Collateral.  Failure to inspect the work shall not constitute a waiver of any of Lender's rights hereunder.  Inspection not followed by notice of Default shall not constitute a waiver of any Default then existing; nor shall it constitute an acknowledgment that there has been or will be compliance with the Plans and Specifications or applicable Law or that the construction is free from defective materials or workmanship.  It is further understood and agreed that any consents or approvals of Lender hereunder are for the sole purpose of protecting the interests of Lender under the Loan Documents.

5.3.4.  Borrower acknowledges that (a) the Construction Consultant has been retained by Lender to act as a consultant and only as a consultant to Lender in connection with the construction of the Improvements, (b) the Construction Consultant shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing which is binding upon Lender and any such purported decision, approval, consent, act or thing by the Construction Consultant on behalf of Lender shall be void and of no force or effect, (c) notwithstanding the recommendations of the Construction Consultant, Lender reserves the right to make any and all decisions required to be made by Lender under this Loan Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Loan Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Loan Agreement, without in any instance being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information,

CONFIDENTIAL INFORMATION                                                    SMHG002918

certificate or report provided or not provided, by the Construction Consultant to Lender with respect thereto, (d) Lender reserves the right in its reasonable discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant, and (e) Lender reserves the right in its reasonable discretion to replace the Construction Consultant with another inspecting professional at any time and without prior notice to or approval by Borrower.  Borrower shall have no right to receive copies of any written reports by the Construction Consultant, but in the event Lender does make such information or portions thereof available to Borrower, Borrower shall rely thereon at its own risk.

5.4     *Contracts.*

5.4.1.  Borrower shall furnish to Lender, promptly on demand, each Material Construction Agreement.  Borrower shall furnish to Lender, promptly on demand, a written statement, in such form and detail as Lender may require, setting forth the names and addresses of all contractors, subcontractors, sub-subcontractors and suppliers furnishing labor or materials for the construction of the Improvements and showing all amounts paid for labor and materials and all items of labor and materials furnished or to be furnished for which payment has not been made and the amounts to be paid therefor.

5.4.2.  Except as otherwise expressly permitted in this Loan Agreement with respect to Senior Loans (in which case Borrower shall preserve the priority of Lender's Lien on the Mortgaged Property in accordance with the priority agreed in the applicable Intercreditor Agreement), Borrower shall, while any portion of the Loan is outstanding, take such action as is necessary to preserve the first priority of Lender's Lien on the Mortgaged Property subject to Permitted Encumbrances.

5.5     *Payment and Performance of Contractual Obligations.*  Borrower shall perform in a timely manner all of its material obligations under the Construction Contracts, Architect Contract or Engineer Contract, and all other contracts and agreements related to the construction or operation of the Improvements.  Borrower will pay when due all bills for services or labor performed and materials supplied in connection with the construction of the Improvements. Within thirty (30) days after the filing of any mechanic's Lien or other Lien or encumbrance against the Mortgaged Property, Borrower will promptly discharge the same by payment or filing a bond or as otherwise permitted by Law.  So long as Lender's Lien on the Mortgaged Property has been protected by the filing of a bond or otherwise in a manner reasonably satisfactory to Lender, Borrower shall have the right to contest any claim, Lien or encumbrance, provided that Borrower does so diligently and without prejudice to Lender or delay in completing construction of the Improvements.

5.6     *Correction of Construction Defects.*  As promptly as commercially reasonable following any demand by Lender, Borrower shall correct or cause the correction of any structural defects in the Improvements, any work that fails to comply with the requirements of Section 5.2 and any material departures or deviations from the Plans and Specifications not approved by Lender.

CONFIDENTIAL INFORMATION                                                    SMHG002919

5.7  *Insurance*.  Borrower shall maintain, the following insurance at the sole cost and expense of Borrower:

5.7.1.  Insurance against loss under a policy or policies covering such risks as are presently included in "special cause of loss form" (also known as "all risk" or "open perils") coverage, with no exclusion for any loss caused by fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, smoke, vandalism, malicious mischief or acts of terrorism.  Such insurance shall name Lender as a mortgagee and loss payee with respect to the Mortgaged Property.  Unless otherwise agreed in writing by Lender, such insurance with respect to the Mortgaged Property shall be for the full insurable value of the Mortgaged Property, with a deductible amount, if any, reasonably satisfactory to Lender.  No policy of such insurance shall be written such that the proceeds thereof will produce less than the minimum coverage required by this Section 5.7.1 by reason of co-insurance provisions or otherwise.  The term "full insurable value" means one hundred percent (100%) of the actual replacement cost of the Mortgaged Property (excluding foundation and excavation costs and costs of underground flues, pipes, drains and other uninsurable items).

5.7.2.  Commercial general liability insurance on an "occurrence" based form against claims for "personal injury" liability and liability for death, bodily injury and property damage to the Mortgaged Property in an amount not less than $5,000,000.00 per occurrence.  Such insurance shall name Lender as an additional insured.

5.7.3.  If applicable, workers' compensation insurance for any and all employees of Borrower in such amount as is required by regulation or statute and including employer's liability insurance, if required by Lender, with limits equal to $1,000,000.00 per accident for bodily injury by accident, $1,000,000.00 policy limit by disease, and $1,000,000.00 per employee for bodily injury by disease.  Borrower shall provide a waiver of subrogation for any and all employment-related claims for the benefit of Lender.

5.7.4.  During any period of construction of the Improvements, Borrower shall maintain, or cause others to maintain, builder's fully completed value risk insurance in non-reporting form against all risks of physical loss, including collapse during construction, covering the total value of work performed and equipment, supplies and materials furnished for the Project (including on-site and off-site stored materials), with delayed delivery coverage, coverage for debris removal, and coverage for theft of building materials, fixtures, machinery and equipment not otherwise covered.

5.7.5.  If any of the Improvements or the use of the Mortgaged Property shall at any time constitute a legal nonconforming structure or use, Borrower shall obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement, which shall include coverage for (a) loss of value (in an amount not less than one hundred percent (100%) of the full replacement cost of the Improvements), (b) demolition and debris removal costs (in an amount not less than fifteen percent (15%) of the policy limit or insured value), and (c) increased costs of construction (in an amount not less than fifteen percent (15%) of the policy limit or insured value).

CONFIDENTIAL INFORMATION                                                    SMHG002920

5.7.6.   Such other and further insurance as may be required from time to time by Lender.

5.7.7.   Upon completion of construction of the Project, rent interruption insurance in an amount approved by Lender, but in any event insuring a period of twelve (12) months of interruption.

In addition to the foregoing, Borrower shall cause each General Contractor to provide and maintain commercial general liability insurance and workers' compensation insurance for all employees of the General Contractor meeting, respectively, the requirements of Sections 5.7.2 and 5.7.3.   Each General Contractor shall provide a waiver of subrogation for any and all employment-related claims for the benefit of Lender and Borrower.

Each policy of insurance shall be issued by one or more insurance companies each of which must have an A.M. Best Company financial and performance rating of A-VII or better and are qualified or authorized by the Laws of Utah to assume the risks covered by such policy, and to the extent, and only to the extent, that such insurance policy pertains to the Mortgaged Property (a) with respect to the insurance described under the preceding Sections 5.7.1 and 5.7.4, shall have attached thereto a mortgagee clause in favor of and approved by Lender and entitling Lender without contribution to collect any and all proceeds payable under such insurance, either as sole payee or as joint payee with Borrower, (b) shall provide that such policy shall not be canceled or modified without at least thirty (30) days prior written notice to Lender, and (c) shall provide that any loss otherwise payable thereunder shall be payable notwithstanding any act or negligence of Borrower which might, absent such agreement, result in a forfeiture of all or a part of such insurance payment.   Borrower shall promptly pay all premiums when due on such insurance or cause others to pay such premiums according to the payment terms specified in the policy.   Borrower will deliver to Lender acceptable evidence of insurance, such as ACORD certificate of insurance forms or other evidence reasonably satisfactory to Lender, reflecting that all required insurance is current and in force, and upon Lender's request, Borrower will provide complete copies of all policies only if a policy summary with all specifications and details is not to Lender's satisfaction, Lender will indicate such dissatisfaction in writing and allow Borrower thirty (30) days to provide policy copies.   Borrower will promptly give notice to Lender of any cancellation of, or change in, any insurance policy required pursuant to this Section 5.7.   Lender shall not, because of accepting, rejecting, approving or obtaining insurance, incur any liability for (1) the existence, nonexistence, form or legal sufficiency thereof, (2)the solvency of any insurer, or (3) the payment of losses.   Borrower may satisfy any insurance requirement hereunder by providing one or more "blanket" insurance policies, subject to Lender's approval in each instance as to limits, coverages, forms, deductibles, inception and expiration dates, and cancellation provisions.

5.8     *Adjustment of Condemnation and Insurance Claims*.   Borrower shall give prompt notice to Lender of any Casualty or any Condemnation or threatened Condemnation.   Except as provided below, Lender is authorized, at its sole and absolute option, to commence, appear in and prosecute, in its own or Borrower's name, any action or proceeding relating to any Condemnation or Casualty of the Mortgaged Property, to make proof of loss for and to settle or compromise any Claim in connection therewith and to receive all Condemnation Awards and Insurance Proceeds (and may deduct therefrom all payments of its expenses in collecting the

CONFIDENTIAL INFORMATION                                                      SMHG002921

same).  Notwithstanding anything to the contrary in this Loan Agreement, if prior to the receipt by Lender of any Condemnation Award or Insurance Proceeds, the Mortgaged Property shall have been sold pursuant to the provisions of the Deed of Trust, Lender shall have the right to receive such funds (a) to the extent of any deficiency found to be due upon such sale with interest thereon (whether or not a deficiency judgment on the Deed of Trust shall have been sought or recovered or denied) and (b) to the extent necessary to reimburse Lender for its expenses in collecting the same.  If any Condemnation Awards or Insurance Proceeds are paid to Borrower, Borrower shall receive the same in trust for Lender and within ten (10) days after Borrower's receipt of any Condemnation Awards or Insurance Proceeds, Borrower shall deliver such awards or proceeds to Lender in the form in which they were received, together with any endorsements or documents that may be necessary to effectively negotiate or transfer the same to Lender.  Borrower agrees to execute and deliver from time to time, upon the request of Lender, such further instruments or documents as may be reasonably requested by Lender to confirm the grant and assignment to Lender of any Condemnation Awards or Insurance Proceeds.

    5.9    *Utilization of Net Proceeds*.  All Net Proceeds must be utilized either for payment of the Obligations or for the restoration of the Mortgaged Property.  For a Casualty which results in Insurance Proceeds in excess of $500,000.00, Lender's prior approval shall be obtained for the use of the Net Proceeds for the restoration of the Mortgaged Property.  For a Casualty which results in Insurance Proceeds not in excess of $500,000.00, upon request from Borrower within thirty (30) days of the Casualty, the Net Proceeds shall be utilized for the restoration of the Mortgaged Property, but only if:  (a) no material Default and no Event of Default shall exist and be continuing, and only if (b) in the reasonable judgment of Lender, there has been no material adverse change in (1) Borrower's ability to complete construction of the Improvements in accordance with the Schedule, Budget and Plans and Specifications or the availability of material Entitlements, or (2) the financial viability of the operation of the Improvements, (c) in the reasonable judgment of Lender, the Net Proceeds, together with other funds deposited into the Borrower Deposit Account for that purpose, are sufficient to pay the cost of the restoration pursuant to a budget and plans and specifications approved by Lender, and (d) in the reasonable judgment of Lender, the restoration can be substantially completed prior to the Maturity Date.  In the event that Net Proceeds are to be used for the restoration of the Mortgaged Property, all Insurance Proceeds (net of any amounts necessary to reimburse Lender for its actual and reasonable costs of collecting the same) shall be deposited into the Borrower Deposit Account and disbursed in accordance with the disbursement provisions of this Loan Agreement as provided in Sections 2.4, 2.5 and 2.6.  If all of the foregoing conditions are satisfied, then Borrower shall be entitled to receive from such Borrower Deposit Account the amount of any reasonable expenses incurred by Borrower to collect the Insurance Proceeds.  If Net Proceeds are utilized for payment of the Obligations, they shall be applied without payment of any penalty or premium.

    5.10    *Application of Loan Proceeds*.  Except as provided in Section 2.7, proceeds of the Loan will be used by Borrower solely for the payment or reimbursement of Approved Costs.  No Advances will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U or G of the Board of Governors of the Federal Reserve System (12 C.F.R.  Part 221 and 207), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U or G.  Borrower is

CONFIDENTIAL INFORMATION                                                                      SMHG002922

not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock.

5.11   *Taxes*.   Borrower shall pay and discharge all Taxes prior to the date on which penalties are attached thereto unless and to the extent only that such Taxes are contested in accordance with <u>Section 5.22</u>.

5.12   *Adverse Environmental Conditions*.   If a material release of hazardous materials is discovered or occurs upon the Mortgaged Property, Lender (a) shall have the right to visually inspect such Land and (b) shall be entitled to require Borrower to meet all federal, state and local laws, regulations and policies pertaining to remediation with respect to the affected portion of such Land.

5.13   *Notification by Borrower*.   Borrower will promptly give notice to Lender of any claim of a material default by Borrower, or any claim by Borrower of a material default by any other party, under any Construction Contract, the Engineer Contract, the Architect Contract, or any other contract.   Borrower shall also promptly give notice to Lender of any material defects in Improvements discovered by Borrower and Borrower shall diligently assert any claims relating thereto under any applicable contract or warranty.   Lender reserves the right to require that Borrower affirm in writing that none of the foregoing events has occurred, which affirmation shall be delivered to Lender together with the annual Financial Statements referred to in <u>Section 5.21</u>.

5.14   *Indemnification by Borrower*.   Borrower agrees to indemnify Lender, Class A Manager, Class B Manager, Construction Consultant and their Affiliates, members, managers, directors, employees, agents and advisors (together, the "**Indemnified Parties**") and to hold the Indemnified Parties harmless from and against, and to defend the Indemnified Parties by counsel reasonably approved by Lender against, any and all Claims directly or indirectly arising out of or resulting from any transaction, act, omission, event or circumstance in any way connected with the making of the Loan by Lender or the construction of the Project, including any Claim arising out of or resulting from (a) construction of any Improvements, including any defective workmanship or materials; (b) any failure by Borrower to comply with the requirements of any Laws or to comply with any agreement, in each case, that applies or pertains to the Improvements, including any agreement with a broker or "finder" in connection with the Loan or other financing of the Project; (c) any other Default or Event of Default hereunder or under the other Loan Documents; (d) any assertion or allegation that Lender is liable for any act or omission of Borrower or any other Person in connection with the ownership, development, financing, leasing, operation or sale of the Project; provided, however, that Borrower shall not be obligated to indemnify the Indemnified Parties with respect to any Claim to the extent arising from the gross negligence or willful misconduct of any of the Indemnified Parties.   Borrower further agrees to indemnify and hold the Indemnified Parties harmless from and against any Claim solely to the extent arising out of or resulting from (1) any untrue statement or alleged untrue statement of a material fact contained in the PPM and/or the Project Business Plan (or any amendment or supplement thereto approved by or on behalf of Borrower, including, without limitation, by its immigration or securities counsel) (the offering of membership interests in Lender described in the PPM, being herein collectively referred to as the "**Lender's Offering**") or the omission or alleged omission therefrom of a material fact necessary in order to make the

CONFIDENTIAL INFORMATION   SMHG002923

statements therein, in the light of the circumstances under which they were made, not misleading, including, without limitation, distributions to the members thereof, or any other information specific to Lender and (2) the actions or omissions by Borrower within the United States of America in connection with Lender's Offering; or (e) the AIG Agreement or the escrow established pursuant thereto.    The agreements and indemnifications contained in this Section 5.14 shall apply to Claims arising both before and after the repayment of the Loan and shall survive the repayment of the Loan, any foreclosure or deed, assignment or conveyance in lieu thereof and any other action by Lender to enforce the rights and remedies of Lender hereunder or under the other Loan Documents but shall not apply to Claims made by Lender. This <u>Section 5.14</u> shall not apply with respect to any Claims in respect of the Indemnified Parties' taxes.

5.15    *Fees and Expenses*.    Borrower shall pay all fees, charges, costs and expenses required to satisfy the conditions of the Loan Documents.    Without limitation of the foregoing, Borrower will pay, when due, and if delinquent and paid by Lender Borrower will reimburse Lender on demand for (together with interest on the delinquent amount from date of demand until paid at the rate of interest then applicable to the Loan under the terms of the Note), all reasonable fees and expenses of the Construction Consultant, Title Company, environmental engineers, appraisers, surveyors and Lender's counsel in connection with the closing (to be paid on or before the Loan Closing Date), administration, modification or any "workout" of the Loan, or the enforcement of Lender's rights and remedies under any of the Loan Documents. Lender's payment of any of the above fees and expenses following Borrower's delinquency shall constitute Advances secured by the Deed of Trust and other security documents fully as if made to Borrower regardless of the disposition thereof by the party or parties to whom such Advance is made, accruing interest thereon from the date incurred until paid in full at the rate of interest then applicable to the Loan under the terms of the Note.

5.16    *Federal Tax ID Number*.    Borrower's Internal Revenue Taxpayer ID Number is 81-1408024, and Borrower shall use such number as its exclusive Internal Revenue Taxpayer ID Number until all Obligations have been satisfied in full.

5.17    *Deposits to Balance Loan*.

5.17.1. Anything    contained    in    this    Loan    Agreement    to    the    contrary notwithstanding, the Loan shall at all times be "in balance" on (a)an individual Budget line item basis, and (b)an aggregate Budget amount basis.    The Loan shall be deemed to be "in balance" on an individual Budget line item basis only at such time (and from time to time) as the unexpended amount for each Budget line item, without including the contingency (except to the extent reallocated to such line item in accordance with <u>Section 2.4.5(d)</u>), is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete such Budget line item.    The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project.    Without limiting the generality of the foregoing, the Liquid Funds Amount must remain, in combination with the undrawn Loan proceeds (*i.e.,* as of any

CONFIDENTIAL INFORMATION                                                SMHG002924

date, the remainder of $120,000,000.00 less the sum of total Advances then made), sufficient to pay for all Approved Costs anticipated to be incurred in the succeeding (prospective) twelve (12) month period in accordance with the Budget, the Plans and Specifications and the Schedule.

5.17.2. Lender shall have the right, from time to time (but no more often than once per month), to make a reasonable estimate of the cost of construction of the Project (the "**Lender's Estimate of the Cost of Construction**"). The Lender's Estimate of the Cost of Construction will take into account, in respect of the Improvements, in addition to the Budget, each Construction Contract, outstanding bulletins and addenda, contracts, subcontracts and purchase orders and other considerations which Lender in its reasonable good faith judgment deems relevant or likely to have an impact upon the cost of construction of the Improvements, including current costs for and availability of materials and supplies, the provisions of subcontracts and purchase orders, the ability of each General Contractor to perform under its Construction Contract, and the ability of parties to perform under and in accordance with the terms of the subcontracts and purchase orders.  If there is a contract in place with an unaffiliated contractor which has not defaulted under its contract, then Lender shall use the contract price as the Lender's estimated cost for completing its work unless the Construction Consultant has determined that such work is not reasonably likely to be completed for such amount.  If there is an "identity of interest" between Borrower and any of Borrower's Affiliates, contractors or subcontractors, any contract or subcontract between parties having such "identity of interest" shall be regarded solely as an estimate for the purpose of this Section 5.17.2. There shall be deemed to be an "identity of interest" if Borrower shall act as a contractor or subcontractor in its own name or through a separate Person in which it or any entity related to it has a substantial interest or Control.

5.17.3. Borrower agrees that if Lender in its reasonable good faith judgment determines that the Loan is not "in balance", then regardless of how such condition may have been brought about, Borrower shall, within ten (10) Business Days after request by Lender, either deposit from its own funds (or from funds contributed by any of Borrower's direct or indirect constituent members) or from the proceeds of a Subordinated Loan or a Senior Loan (to the extent permitted under Section 3.2 or Section 3.4 of this Loan Agreement) the amount of such deficiency (the "**Deficiency Deposit**") into the Borrower Deposit Account, which Deficiency Deposit shall first be disbursed before any further Advance shall be made and shall, until fully disbursed, constitute additional collateral security for the Loan.  Disbursements of the Deficiency Deposit will be made from time to time for the payment of deficient line item amounts prior to any further Advance of proceeds of the Loan for such amounts and will be made subject to the terms of this Loan Agreement regarding Advances of the Loan.

5.17.4. For the purposes of ensuring that the Loan is "in balance" as required by subsection 5.17.1, Borrower and/or Guarantor (if Guarantor is unconditionally obligated in writing to contribute the same to the Project) shall provide reasonable evidence satisfactory to Lender in its sole discretion of financing, Purchaser Deposits and/or equity commitments, sources of financing including, but not limited to, available proceeds of public financing incentives such as tax increment financing, transient room tax revenues,

resort tax revenues, or guarantees confirming in sufficient detail the specified amount and terms of the funds that will be available on a timely basis in order to complete the construction of the Improvements on the Mortgaged Property in accordance with the Budget, the Plans and Specifications and the Schedule ("**Commitment Financing Amount**"). So long as (i) the Commitment Financing Amount remains available to be drawn by Borrower as and when needed to fund costs of the Improvements, and (ii) no Event of Default has occurred and is continuing, Borrower shall not be required to make a Deficiency Deposit under Section 5.17.4 with respect to the Commitment Financing Amount.

5.18    *Terrorism and Anti-Money Laundering*.    Borrower warrants and agrees as follows:

5.18.1. As of the date hereof and throughout the term of the Loan: (a) Borrower; (b) any Person Controlling or Controlled by Borrower; (c) if Borrower is a privately held entity, any Person having a beneficial interest in Borrower; or (d) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

5.18.2. To comply with applicable Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

5.18.3. Borrower agrees promptly to notify Lender should Borrower become aware of any change in the information set forth in this Section 5.18.

5.19    *Deed of Trust Recording Taxes*.    Borrower agrees that any taxes and fees due for the recording of the Deed of Trust shall be promptly and in a timely manner paid by Borrower. Borrower shall unconditionally indemnify, defend and hold Lender harmless from and against any and all claims arising out of any failure by Borrower to timely pay any such recording tax.

5.20    *Management*.    Borrower shall at all times provide for the competent and responsible management and operation of the Project. Without limiting the foregoing, in no event later than thirty (30) days prior to the Substantial Completion Date, Borrower shall submit to Lender, for Lender's approval, (A) one or more proposed Property Management Agreements with a proposed Property Manager(s) (which Property Manager(s) shall not be affiliated with Borrower and otherwise acceptable to Lender in its reasonable discretion) who will manage the day-to-day operation, management and leasing of the Project, and (B) the proposed Property Manager Consent and Agreement(s). Borrower shall not execute any Property Management Agreement without Lender's prior written consent. The Property Management Agreement(s) shall be terminable by Lender, at its option, upon the occurrence of an Event of Default hereunder. At all times from and after Substantial Completion, Borrower shall operate the Project and maintain the Project as a first-class mixed use development similar to other mixed

CONFIDENTIAL INFORMATION

use resort developments of similar size and quality.  Borrower shall (i) cause the Project to be operated and leased pursuant to and in accordance with the Property Management Agreement(s), (ii) within three (3) Business Days after receipt, deliver to Lender a copy of each material financial statement, business plan, capital expenditures plan, notice, report and estimate prepared and delivered under the Property Management Agreement(s) and not otherwise delivered to Lender, and (iii) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the respective parties to the Property Management Agreement(s) unless waived in the ordinary course of business.

5.21    *Delivery of Financial Statements.*  Borrower will furnish or cause to be furnished to Lender annual audited Financial Statements for Borrower within one hundred twenty (120) days after each fiscal year end.  Borrower will furnish or cause to be furnished to Lender quarterly statements (cash flow, balance sheet and profit and loss only) for Borrower within sixty (60) days after the end of each calendar quarter, together with a certificate by Borrower certifying to Lender whether Borrower has any actual knowledge after due inquiry that a material Default or an Event of Default has occurred and is then continuing.  Within thirty (30) days after the end of each calendar quarter when Borrower is seeking to sell any Units in the Project, Borrower shall provide to Lender (a) a real estate sales report setting forth, among other information, a list of each for-sale real estate product under contract and its contract date, proposed closing date, square footage, sales price, and proposed Release Price, and (b) a sales report for all for-sale real estate projects within the Master Project (exclusive of those in the Project), setting forth, among other information, a list of each for-sale real estate product under contract and its contract date, proposed or actual closing date (as applicable), square footage, sales price, and proposed or actual release price, in each case certified by Borrower and in form and substance reasonably satisfactory to Lender.  Within twenty (20) days of execution, Borrower shall provide to Lender a copy of each contract of sale (or prior to execution thereof, if Lender's approval of any such contract is required, as applicable under this Loan Agreement).

5.22    *Right to Contest.*  Notwithstanding anything herein to the contrary, Borrower may contest, by appropriate proceedings conducted in good faith and with due diligence, any Tax, Law, insurance requirement, permit or Lien on, or with respect to, the Project or any interest therein, provided that no Event of Default has occurred and is continuing and, as a result of such contest or proceeding, (a) no Mortgaged Property or interest therein is in danger of being sold, forfeited or lost, and the priority of the Lien of Lender is not at risk, (b) in the case of any Law or permit, Lender is not in danger of any criminal or material civil penalty or any other liability for failure to comply therewith, (c) in the case of any insurance requirement, no insurance policy or coverage is in danger of being invalidated, forfeited or lost for failure to comply therewith, and (d) in the case of any Lien, such proceedings suspend the foreclosure of such Lien or any other collection thereof from the Mortgaged Property and all interests therein; and provided further that Borrower establishes any reserve or other appropriate provision required with respect to such contest as required under GAAP.  It is agreed that the failure to comply with any such Tax Law, insurance requirement, permit or Lien being contested pursuant to this Section 5.22 during such contest shall not constitute an Event of Default, provided that Borrower is in compliance with this Section 5.22.

5.23    *Appraisal Updates; LTV Covenant.*  Commencing on the first anniversary of the Loan Closing Date and on each anniversary thereafter (or more frequently as requested by

Lender, but not more often than once every six (6) months), and at any time (a) upon the occurrence of an Event of Default, (b) as required by applicable Law, or (c) if requested by Lender in connection with any event that Lender reasonably determines may materially impact the Appraisal Value of the Project, Borrower shall (i) obtain, and provide to Lender, an Appraisal Update as of such date, at Borrower's cost, or (ii) at Lender's option, reimburse Lender for the cost of an Appraisal Update by an appraiser approved by Lender and Borrower as of such date, with Lender being unconditionally authorized to use funds from Lender's Deposit Account or the Borrower Deposit Account to make such reimbursement (each update to a prior Appraisal pursuant to this <u>Section 5.23</u> or any update to a prior Appraisal pursuant to <u>Section 3.2</u>, an "**Appraisal Update**"). At all times, the Loan to Value Ratio for the Project shall not exceed the Maximum LTV Percentage.

     5.24    *Estoppel Certificates*. Within fifteen (15) Business Days after any request by Lender or an Eligible Assignee, Borrower shall certify to Lender, or to such Eligible Assignee, the then unpaid balance of the Loan and whether Borrower claims any right of defense or setoff to the payment or performance of any of the Obligations, and if Borrower claims any such right of defense or setoff, Borrower shall give a detailed description of such claimed right.

     5.25    *Facilitation of I-829 Petitions and Payment of Fees*. Borrower shall, at its own cost and expense, cooperate and use best efforts to provide job creation reports and timely information and assistance to Lender, the Members, and the Regional Center, as reasonably requested by Lender for preparing and submitting the I-829 Petition of each Member

     5.26    *Leases*. Borrower will not enter into, amend or modify, or consent to the assignment of any of tenant's rights under, any Lease without the prior consent of Lender, and Borrower will not terminate any Lease or any guarantee of the obligations of any tenant under any Lease without the prior consent of Lender; provided, however, Borrower may terminate any Lease without Lender's prior consent when an event of default has occurred and is continuing under any such Lease. Borrower shall observe and perform all of Borrower's covenants and obligations under each of the Leases and will not suffer or permit any breach or default to occur under any one or more of the Leases. Borrower will promptly notify the Lender of any default under a Lease by any party thereto (other than routine notices of late payments that do not rise to the level of calling a default under a Lease), and Borrower shall not waive any default under any Lease without Lender's prior consent.

     5.27    *Capital Contributions*. Borrower's members shall contribute and thereafter maintain a minimum aggregate capital contribution to the Project of not less than Borrower's Equity Requirement, as and when required to pay Approved Costs and otherwise in accordance with the requirements of this Agreement.

     5.28    *JV Neighborhood Developments*. Prior to the aggregate Advances under this Agreement exceeding $15,000,000.00, Borrower must acquire marketable fee simple title and satisfy the requirements of this <u>Section 5.28</u> with respect to Horizon Neighborhood. Subject to <u>Section 2.9</u>, thereafter, prior to any Advance that would cause the aggregate Advances under this Agreement to exceed $25,000,000.00, $35,000,000.00 and $45,000,000.00, respectively, Borrower shall, in each case, acquire marketable fee simple title and satisfy the requirements of this <u>Section 5.28</u> with respect to another JV Neighborhood Development such that all of the JV

CONFIDENTIAL INFORMATION                                SMHG002928

Neighborhood Developments shall be subject to a Deed of Trust prior to any Advance that would cause the aggregate Advances under this Agreement to exceed $45,000,000.00. With respect to each JV Neighborhood Development, contemporaneously with Borrower's acquisition of marketable fee simple title, Borrower shall (a) modify the Deed of Trust to add the applicable JV Neighborhood Development to the Mortgaged Property granted for the benefit of Lender under the Deed of Trust, subject only to the Permitted JV Neighborhood Development Exceptions (or, at Lender's election, grant a new Deed of Trust for the benefit of Lender, in substantially the same form as the Deed of Trust granted by Borrower as of the date hereof), (b) deliver to Lender an endorsement to Lender's loan policy of insurance (or if the same is not available for any reason, a new loan policy of title insurance) with respect to the Mortgaged Property, insuring the Deed of Trust as a first lien on the applicable JV Neighborhood Development, subject only the Permitted JV Neighborhood Development Exceptions, (c) pay all costs and expenses incurred by Lender in connection with Borrower's acquisition of the applicable JV Neighborhood Development (including without limitation, title premiums and reasonable attorneys' fees), and (d) provide such additional items as Lender reasonably requests, including without limitation, authority documents and an opinion of counsel, an Appraisal and environmental reports with respect to the applicable JV Neighborhood Development and evidence of insurance with the respect to applicable JV Neighborhood Development.

5.29    *Condominium.*    Borrower shall comply with its obligations under the Condominium Documents and each of the Approved Contracts.

5.30    *Unit Sales.*

5.30.1.    Borrower agrees any sale of a Unit shall be pursuant to an Approved Contract. Borrower may sell Units in the ordinary course of business to bona fide third-party buyers without Lender's prior consent if the sales agreement falls within the definition of an Approved Contract. Each Approved Contract shall be assigned to Lender as additional collateral for the Loan. All Purchaser Deposits under each Approved Contract shall immediately be deposited and held by an escrow agent approved by Lender in a blocked account at a United States domestic, commercial bank acceptable to Lender, subject to an escrow agreement approved by Lender in writing. If a buyer under an Approved Contract fails to close and forfeits his, her or its Purchaser Deposit, then all of such Purchaser Deposit shall be applied in accordance with Section 2.8 of this Loan Agreement);

5.30.2.    Borrower agrees that the program for the sale of Units shall be implemented in compliance with all Laws and the Condominium Documents. Borrower shall satisfy and comply with, prior to the time required, all disclosure, filing, approval and other requirements and Laws to be complied with in connection with the Condominium Documents or the offering or selling of the Units. Without limiting the foregoing, Borrower agrees that the offering and selling of Units shall comply with all applicable Federal and state securities Laws;

5.30.3.    Borrower shall not, without the prior written consent of Lender, modify, amend or supplement in any material respect or terminate any Approved Contract (it being understood that (i) termination by reason of a proposed purchaser's

CONFIDENTIAL INFORMATION                                        SMHG002929

default and (ii) customary extensions of closing dates and financing contingency periods shall not require such consent of Lender);

     5.30.4.    Lender may consider any sale to be unsatisfactory if the sale fails to meet any of the requirements of this Loan Agreement.  In such event, or if any Event of Default has occurred, Lender may require Borrower to submit all future sales agreements for Lender's approval prior to execution, together in each instance with all accompanying financial statements and other information that Borrower may have pertaining to the prospective buyer;

     5.30.5.    Borrower shall deliver to Lender upon request copies, certified as being true, correct and complete, of all agreements related to the sale and purchase of Units (including all Approved Contracts) not theretofore delivered to Lender.  Within ten (10) days of Lender's request, Borrower shall deliver to Lender a sales report showing all currently pending sales (separated into new sales entered into during the month being reported on and previous sales contracted for in preceding months), all closings which took place during the month being reported on, and all sales previously reported that for any reason will not close.  Borrower shall also promptly deliver to Lender such other sales information and documents as Agent from time to time may reasonably request, including operating statements, all new sales agreements, and notice of or information regarding any claimed breach or disavowal of buyer's or seller's obligations under any one or more sales agreements;

     5.30.6.    Borrower shall at all times maintain adequate marketing capability and shall timely perform all obligations required to be performed by it under each Approved Contract; and

     5.30.7.    All fees and expenses incurred by Lender (including, without limitation, reasonable attorneys' fees and disbursements, escrow, closing and recording costs) in respect of the matters contemplated in this <u>Section 5.30</u> shall be paid by Borrower.

## ARTICLE 6
### NEGATIVE COVENANTS

     6.1    *Conditional Sales; Management Agreements; Franchise Agreements*.  Borrower shall not incorporate into the Improvements on the Mortgaged Property any property acquired under a conditional sales contract or lease or as to which the vendor retains title or a security interest, without the prior consent of Lender.  Borrower will not appoint a property manager for the Mortgaged Property without Lender's prior written reasonable approval.  Borrower will not execute any Franchise Agreement without Lender's prior written approval (which may be subject to, among other things, a collateral assignment of such Franchise Agreement to Lender, with consent of the franchisor, and a so-called comfort letter from the franchisor, each in form and substance acceptable to Lender).

CONFIDENTIAL INFORMATION        SMHG002930

6.2     *Changes to Plans and Specifications and Construction Contract.*  Borrower shall
not make or permit any changes to the Plans and Specifications or any Construction Contract,
including any such changes that alter, diminish or add to the work to be performed, materially
alter the selection of materials, or change the design of the Improvements without the prior
consent of Lender and under such reasonable conditions as Lender may establish.
Notwithstanding the foregoing, Lender's prior consent shall not be required as to any change
order which (a) individually does not cause the fixed or guaranteed maximum price of any
Construction Contract to be increased or decreased by more than $50,000.00 and, when added to
all previous change orders, does not cause such price to be increased or decreased by more than
$500,000.00 in the aggregate, (b) does not result in a material change to the design of the
Improvements or to the selection of materials, (c) has been approved in writing by the Engineer
or Architect and any Governmental Authority or other party whose approval is required, and (d)
does not result in the Loan becoming out of balance.  Upon request from Lender or the
Construction Consultant, not more than once every calendar quarter, Borrower will promptly
provide Lender and the Construction Consultant with copies of the most recent Plans and
Specifications.

6.3     *Insurance Policies and Bonds.*  Borrower shall not do or permit to be done
anything that would materially and adversely affect the coverage or indemnities provided for
pursuant to the provisions of any insurance policy, performance bond, labor and material
payment bond or any other bond given in connection with the construction of the Improvements.

6.4     *Restrictions on Indebtedness.*  Borrower will not create, incur, assume, guarantee
or be or remain liable, contingently or otherwise, with respect to any indebtedness for borrowed
money or the deferred purchase price for property other than:

      6.4.1.  customary accounts payable, based on applicable market standards, to
trade creditors incurred for services or goods purchased in the ordinary course of business
or in connection with the Project that are paid within thirty (30) days of when invoiced;

      6.4.2.  indebtedness to Lender under any of the Loan Documents;

      6.4.3.  indebtedness under Permitted Encumbrances; and

      6.4.4.  endorsements for collection, deposit or negotiation and warranties of
products or services, in each case, incurred in the ordinary course of business.

6.5     *Restrictions on Liens and Transfers.*  Except as expressly permitted in this Loan
Agreement, Borrower will not (a) create or incur or suffer to be created or incurred or to exist
any Lien or encumbrance (including, unless approved by Lender, any Lease) upon any of the
Mortgaged Property of any character whether now owned or hereafter acquired, or upon the
income or profits from the Mortgaged Property, other than Permitted Encumbrances; (b) sell,
lease, assign, or otherwise transfer any of the Mortgaged Property, any interest in the Mortgaged
Property, any direct or indirect interest in Borrower, or any interest in the income or profits of the
Mortgaged Property, except for sales of Units that comply with the terms and conditions of
this Loan Agreement and as may be otherwise expressly approved by Lender in writing; (c)
acquire, or agree or have an option to acquire, any Mortgaged Property upon conditional sale or

CONFIDENTIAL INFORMATION                                                      SMHG002931

other title retention or purchase money security agreement, device or arrangement; or (d) sell, assign, pledge or otherwise transfer any receivables for the Mortgaged Property with or without recourse. Borrower will not become a party or agree to or effect any disposition of assets, other than the sale of inventory and the disposition of obsolete assets, in each case in the ordinary course of its business.

6.6     *Change in Nature of Business; New Line of Business*. Except in connection with the development or operation of the Project, Borrower will not engage in any line of business substantially different from the lines of business conducted by Borrower on the date hereof or engage or enter into any new line of business without the prior consent of Lender.

6.7     *Special Purpose Entities*. Except as permitted by the terms of this Loan Agreement, Borrower, after the date of this Loan Agreement, will not do any of the following:

6.7.1.   engage in any business or activity other than the acquisition, development, ownership, operation, leasing, managing, maintenance, financing and refinancing of the Project, and entering into the Loan, agreements expressly permitted under this Loan Agreement, and activities incidental thereto;

6.7.2.   acquire or own any material assets other than (a) the Mortgaged Property, and (b) such incidental personal property as may be necessary for the operation of the Project;

6.7.3.   dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent;

6.7.4.   (a) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State where the Project is located, if applicable, or (b) without the prior consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's partnership agreement, articles or certificate of incorporation, articles of organization or similar organizational documents, as the case may be, in any manner that could adversely affect Lender or cause an Event of Default under this Loan Agreement;

6.7.5.   own any subsidiary or make any investment in, any Person without the consent of Lender;

6.7.6.   commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person;

6.7.7.   except as expressly permitted in this Loan Agreement, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan, except for trade payables in the ordinary course of its business of owning and operating the Project;

CONFIDENTIAL INFORMATION                                        SMHG002932

6.7.8.  fail to pay its debts and liabilities from its assets as the same shall become due, provided, that, in each such case there exists sufficient cash flow from the Project to do so;

6.7.9.  fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from those of the members, general partners, principals and Affiliates of Borrower, the Affiliates of a member, general partner or principal of Borrower, and any other Person;

6.7.10. fail to correct any known misunderstandings regarding the separate identity of Borrower or any member, general partner, principal or Affiliate thereof or any other Person;

6.7.11. make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower, or any member, general partner, principal or Affiliate thereof, or acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower, or any member, general partner, or Affiliate thereof;

6.7.12. fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name in order not (a) to mislead others as to the identity with which such other party is transacting business, or (b) to suggest that Borrower is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, or any member, general partner, principal or Affiliate thereof);

6.7.13. fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided there exists sufficient cash flow from the Project to do so);

6.7.14. pledge its assets for the benefit of any other person or entity, other than with respect to the Loan; or

6.7.15. fail to hold its assets in its own name.

6.8    *Transactions with Affiliates.*  Without Lender's prior consent, Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with, between or among any of its Affiliates related to the development of the Project, including any management contract, if such transaction is on terms that are less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate of Borrower.

6.9    *Zoning Changes.*  Borrower shall not seek, make or consent to any change in the Entitlements, zoning, conditions of use, or any other applicable land use permit, approval or regulation pertaining to the Land without Lender's prior written consent.

6.10    *Restricted Payments.*  Except as expressly permitted in this Loan Agreement with respect to the First Disbursements, no Distributions shall be made by Borrower except as

CONFIDENTIAL INFORMATION                                            SMHG002933

follows: Prior to Substantial Completion, Borrower shall make no Distributions. If no Default or Event of Default has occurred and is continuing, after Substantial Completion of the Project, Borrower may make Distributions that do not cause Borrower's aggregate capital contribution to the Project to fall below Borrower's Equity Requirement, provided such Distributions do not exceed                                    Excess                                    Cash                                    Flow.

EVENTS OF DEFAULT

The occurrence or happening, from time to time, of any one or more of the following shall constitute an "**Event of Default**" under this Loan Agreement:

7.1     *Payment Default*.   Borrower fails to pay any Obligation under the Loan Documents within five (5) Business Days after the same shall become due as to any payment of interest or principal and as to any other payment due Lender, within ten (10) Business Days after the same shall become due, in each case whether on the scheduled due date or upon acceleration, including any payments due under the Note or under Sections 2.7 or 5.5 of this Loan Agreement.

7.2     *Deposits; Other Monetary Obligations*.   Borrower (a) fails to deposit funds in the Borrower Deposit Account in the amount requested by Lender pursuant to the provisions of Section 5.9 or Section 5.17, (b) fails to deliver to Lender any Insurance Proceeds or Condemnation Awards within five (5) days after Borrower's receipt thereof to the extent required by Section 5.8 or Section 5.9, (c) fails to pay Taxes pursuant to Section 5.11 of this Loan Agreement, (d) fails to pay recording taxes and fees pursuant to Section 5.19, or (e) makes any Distribution or payment that is not permitted pursuant to Section 6.10.

7.3     *Other Obligations*.   Borrower fails to promptly perform or comply with any of its other Obligations set forth in the Loan Documents and such failure continues uncured for the cure period set forth in this Loan Agreement (not including the cure period set forth in this Section 7.3), or if no such cure period is provided, then for a period of thirty (30) days after notice of such failure from Lender to Borrower, Borrower shall have an opportunity to cure; provided that if (a)such failure, by its nature, is not capable of being cured within such period and (b)within such period Borrower commences to cure such failure and thereafter diligently prosecutes the cure thereof, then Borrower shall have an additional period of 60 days (for a total cure period of 90 days) in which to cure the failure.

7.4     *Accuracy of Information; Representations and Warranties*.   Any representation or warranty contained in this Loan Agreement or in any other Loan Document or other document or certificate delivered to Lender in connection with the Loan, proves at any time to be incorrect or inaccurate in any material respect when made on the Loan Closing Date or, as applicable, when reaffirmed on a request for an Advance.

7.5     *Progress of Construction*.   Construction of the Improvements is discontinued for a period of more than thirty (30) consecutive days (each such extension, a "**Financing Delay")** or the occurrence of one or more Force Majeure events or conditions (each such extension, a "**Force Majeure Extension**"), provided, however, that (a)the aggregate extension for all Force Majeure events or conditions may not exceed sixty (60) days, and (b)Borrower has promptly given notice to Lender of each Financing Delay and Force Majeure Extension.

CONFIDENTIAL INFORMATION                                                                SMHG002934

7.6     *Bankruptcy*.  Borrower or Guarantor files a bankruptcy petition or makes a general assignment for the benefit of creditors, or an involuntary bankruptcy petition is filed against Borrower or Guarantor and such involuntary bankruptcy petition continues undismissed for a period of thirty (30) days after the filing thereof.

7.7     *Appointment of Receiver, Trustee, Liquidator*.  Borrower or Guarantor applies for or consents in writing to the appointment of a receiver, trustee or liquidator of or for itself, the Mortgaged Property, or all or substantially all of the assets of Borrower or Guarantor, or an order, judgment or decree is entered by any court of competent jurisdiction on the application of a creditor appointing a receiver, trustee or liquidator of Borrower, Guarantor, the Mortgaged Property, or all or substantially all of the assets of Borrower or Guarantor.

7.8     *Dissolution*.  Borrower or Guarantor is liquidated, dissolved, or fails to maintain its status as a going concern.

7.9     *Change of Control*.  Without the prior consent of Lender, Borrower is no longer Controlled by Gregory Mauro and Elliott Bisnow.

7.10    *Judgment*.  If a judgment or judgments for the payment of money in excess of $100,000.00 in the aggregate is rendered against Borrower or in excess of $200,000.00 in the aggregate against Guarantor and the same shall remain unsatisfied and in effect, without stay of execution, for a period of sixty (60) days.

7.11    *Invalidity of or Default Under the Loan Documents*.  If Borrower shall assert in writing that its Obligations under any Loan Document are not in full force and effect or a default beyond expiration of all applicable cure periods occurs under one or more of the other Loan Documents.

7.12    *Fraud*.  Borrower (or an Affiliate of Borrower) or Guarantor has committed any fraud or act of bad faith.

7.13    *Senior Loan*.  If any event of default (after expiration of any applicable notice and cure periods) occurs under any Senior Loan.

7.14    *Bridge Loan Documents*.  If any event of default (after expiration of any applicable notice and cure periods) occurs under any of the Bridge Loan Documents.

7.15    *Attachment*.  Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the Collateral and is not released, vacated or fully bonded within thirty (30) days after its issue or levy.

7.16    *Other Defaults*.  If any default occurs under Sections 5.1, 5.2.4, 5.5, 5.7, 5.8, 5.10, 5.11, 5.13, 5.17, 5.18, 5.19, 5.21, 5.23, 5.26, 5.27, 5.28,  6.1, 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8, 6.9, 6.10 or 9.10.1 of this Loan Agreement.

7.17    *Lapse or Impairment of Insurance*.  If any insurance required under Section 5.7 of this Loan Agreement shall cease to be in effect for any reason, or if any default shall occur under Section 6.3 of this Loan Agreement with respect to coverage or indemnities provided under any

CONFIDENTIAL INFORMATION                                      SMHG002935

insurance policies, and, subject to Section 8.4, Borrower fails to cure the default within ten (10) days.

## ARTICLE 8
### REMEDIES

8.1    *Lender's Rights to Pay and Perform.*  If, after any required notice, Borrower fails to promptly pay or perform any of the obligations owing or due to any third party in connection with construction of Improvements within any applicable grace or cure periods, Lender, upon an additional notice to Borrower, and without waiving or releasing any such obligation or default, may (but shall be under no obligation to) make such payment or perform such act for the account and at the expense of Borrower, unless Borrower has notified Lender that the obligation in question is in dispute, and if the party to whom such obligation is owed has Lien rights, Borrower shall have provided to Lender title insurance or such other protection reasonably satisfactory to Lender to assure the priority of Lender's Lien on the Mortgaged Property (other than personal property).  Lender may enter upon the Mortgaged Property for that purpose and take all action thereon as reasonably necessary or appropriate.   The execution of this Loan Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization from and after the Loan Closing Date to advance the proceeds of the Loan or disburse funds from Lender's Deposit Account or the Borrower Deposit Account to make payment permitted by this Section 8.1 and no further direction or authorization from Borrower shall be necessary.

8.2    *Remedies on Event of Default.*  If any Event of Default occurs and is continuing, Lender shall have the right to exercise any remedy set forth in Sections 8.2.1 to 8.2.6, in addition to any other rights or remedies available to Lender under the Deed of Trust or any of the other Loan Documents or under applicable Law:

8.2.1.   Lender may terminate its obligation to disburse any further principal of the Loan by notice to Borrower.

8.2.2.   Lender may accelerate all of the Obligations whereupon such Obligations shall become immediately due and payable, without notice of default, acceleration or intention to accelerate, presentment or demand for payment, protest or notice of nonpayment or dishonor, or notices or demands of any kind or character (all of which are hereby waived by Borrower).

8.2.3.   Lender may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for the Collateral.

8.2.4.   Lender may foreclose the Deed of Trust either judicially or to the extent permitted by Law, by power of sale, which power is hereby granted, and exercise all other available remedies with respect to the Collateral.

8.2.5.   Lender may enter into possession of the Mortgaged Property and perform any and all work and labor necessary to complete construction of the Improvements on the Mortgaged Property (in accordance with the Plans and Specifications if available, otherwise Lender may cause the Plans and Specifications to be completed) and to employ watchmen to protect the Improvements on the Mortgaged Property.  All sums expended

CONFIDENTIAL INFORMATION                                                     SMHG002936

by Lender for such purposes shall be deemed to have been advanced to Borrower under the Note and shall be secured by the Deed of Trust and the other Loan Documents. For this purpose, Borrower hereby appoints Lender its true and lawful attorney-in-fact with full power of substitution, which power is coupled with an interest, but without any fiduciary duty, to complete the work in the name of Borrower, and hereby empowers said attorney or attorneys, in the name of Borrower or Lender:

>    (a)    to use funds which may remain unadvanced hereunder for the purpose of completing the Improvements on the Mortgaged Property, in the manner called for in the Plans and Specifications;

>    (b)    to pay, settle or compromise all existing bills and claims which are or may be liens against the Mortgaged Property, or may be necessary or desirable for the completion of the work or the clearance of title to the Mortgaged Property;

>    (c)    to the extent permitted by Law, to execute all applications and certificates which may be required in the name of Borrower;

>    (d)    to file for record, at Borrower's cost and expense and, to the extent permitted by Law, in Borrower's name, any notices of completion, notices of cessation of labor, or any other notices that Lender in its sole and absolute discretion may consider necessary or desirable to protect its security; and

>    (e)    to the extent permitted by Law, to do any and every act with respect to the construction of the Improvements on the Mortgaged Property which Borrower may do in its own behalf.

8.2.6.  Lender may foreclose upon the "Documents" under the Assignment of Documents and exercise all other remedies available thereunder and under any other Loan Document.

8.2.7.  If the Bridge Loan remains outstanding, Lender may make an Advance to the holder of the Bridge Loan Documents in order to satisfy the Bridge Loan and all other obligations outstanding under the Bridge Loan Documents in full.

8.3    *No Release or Waiver; Remedies Cumulative and Concurrent.*  Borrower shall not be relieved of any Obligation by reason of the failure of Lender to comply with any request of Borrower or of any other Person to take action to foreclose the Deed of Trust or otherwise to enforce any provision of the Loan Documents, or by reason of the release, regardless of consideration, of all or any part of the Collateral. No delay or omission of Lender to exercise any right, power or remedy accruing upon the happening of an Event of Default shall impair any such right, power or remedy or shall be construed to be a waiver of any such Event of Default or any acquiescence therein. No delay or omission on the part of Lender to exercise any option for acceleration of the maturity of the Obligations, or for foreclosure of the Deed of Trust or the exercise of any right or remedy under any of the other Loan Documents or applicable Law following any Event of Default, or any other option granted to Lender hereunder in any one or more instances, or the acceptance by Lender of any partial payment on account of the Obligations shall constitute a waiver of any such Event of Default and each such option shall

CONFIDENTIAL INFORMATION                                            SMHG002937

remain continuously in full force and effect. No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other remedies provided for in the Loan Documents, and each and every such remedy shall be cumulative to the fullest extent permitted by applicable Law, and shall be in addition to every other remedy given hereunder, or under the Loan Documents, or now or hereafter existing at Law or in equity. To the fullest extent permitted by applicable Law, every right, power and remedy given by the Loan Documents to Lender shall be concurrent and may be pursued separately, successively or together against Borrower or the Collateral, and every right, power and remedy given by the Loan Documents may be exercised from time to time as often as may be deemed expedient by Lender.

8.4  *Lapse or Impairment of Insurance*. If any insurance required under <u>Section 5.7</u> of this Loan Agreement shall cease to be in effect for any reason, whether or not an Event of Default has occurred, then Lender in its sole discretion, subject to all applicable Laws, upon notice to Borrower, may procure a new policy and advance funds to pay the premiums for it. Borrower shall repay Lender immediately on demand for any advance for such premiums, which shall be considered to be an additional loan to Borrower bearing interest at the rate of interest provided for in the Note, and secured by the Loan Documents. If Borrower thereafter cures the applicable Event of Default, Lender shall, at the cost of Borrower, use commercially reasonable efforts to eliminate any overlap in coverage.

## ARTICLE 9
### Miscellaneous

9.1  *Effect of Agreement on Note and Loan Documents*. The Note and the other Loan Documents to be executed, acknowledged, and delivered pursuant to this Loan Agreement shall be subject to all the conditions, stipulations, agreements, and covenants contained in this Loan Agreement to the same extent as if this Loan Agreement were fully set forth and made part of the Note and the other Loan Documents.

9.2  *Further Assurances; Authorization to File Documents*. At any time, and from time to time, upon request by Lender, Borrower shall, at Borrower's expense, (a) correct (including by amendment) any defect or error which may be discovered in the form or content of any of the Loan Documents and (b)make, execute, deliver and record, or cause to be made, executed, delivered and recorded, any and all further instruments, certificates and other documents as may, in the reasonable opinion of Lender, be necessary in order to complete, perfect or continue and preserve the Liens of the Deed of Trust and the other Loan Documents. Upon any failure by Borrower to do so, Lender, with prior notice to Borrower, if practicable and unless there is an Event of Default, may make, execute and record any and all such instruments, certificates and other documents for and in the name of Borrower, all at the sole expense of Borrower, and Borrower hereby appoints Lender as the agent and attorney-in-fact of Borrower to do so, this appointment being coupled with an interest and being irrevocable. Without limitation of the foregoing, Borrower irrevocably authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements necessary to establish or maintain the validity, perfection and priority of the security interests granted in the Deed of Trust and the other Loan Documents, and Borrower ratifies any such filings made by Lender.

CONFIDENTIAL INFORMATION                                              SMHG002938

9.3    *No Warranty by Lender*.  By accepting or approving anything required to be observed, performed or fulfilled by Borrower or to be given to Lender pursuant to this Loan Agreement, including any certificate, receipt, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and any such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Lender.

9.4    *Exculpation*.  It is expressly understood and agreed that Lender is under no duty to supervise or to inspect the work of construction, and that any such inspection by or on behalf of Lender is for the sole purpose of protecting the interests of Lender with respect to the Collateral.  Failure to inspect the work shall not constitute a waiver of any of Lender's rights hereunder.  Inspection not followed by notice of an Event of Default shall not constitute a waiver of any Event of Default then existing; nor shall it constitute an acknowledgment that there has been or will be compliance with the Plans and Specifications or applicable Laws or that the construction is free from defective materials or workmanship.  It is further understood and agreed that any consents or approvals of Lender hereunder are for the sole purpose of protecting the interests of Lender under the Loan Documents.

9.5    *No Partnership*.  None of the covenants or other provisions contained in this Loan Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the rights to exercise the remedies referred to in the Loan Documents.  The relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor.  No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower.  Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Collateral or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents:  (a) Lender is not, and shall not be construed as, a partner, joint venturer, alter ego, manager, Controlling person or other business associate or participant of any kind of Borrower or its members or Affiliates and Lender does not intend to ever assume such status; (b) Lender shall in no event be liable for any debts, expenses or losses incurred or sustained by Borrower; and (c) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower or its members or other Affiliates.  Lender and Borrower disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Lender and Borrower, or to create any equity in the Project in Lender, or any sharing of liabilities, profits, losses, costs or expenses.

9.6    *Disclaimer by Lender*.  This Loan Agreement and the other Loan Documents are made for the sole benefit of Borrower and Lender, and no other Person shall have any benefits, rights or remedies under or by reason of the Loan Documents, or by reason of any actions taken by Lender pursuant to the Loan Documents.  Lender shall not be liable to any contractor, subcontractor, supplier, architect, engineer, tenant or other party for labor or services performed or materials supplied in connection with the construction of the Improvements.  Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Mortgaged Property or any other Collateral.

CONFIDENTIAL INFORMATION    SMHG002939

9.7    *Compliance with Immigration Laws.*  The terms of this Loan Agreement and the other Loan Documents are meant to comply in all respects with the Immigrant Investor Program and with any and all approvals that have been obtained for the Project in connection with such Program.

9.8    *Severability / Usury Savings.*

9.8.1.  In the event any one or more of the provisions of this Loan Agreement or any of the other Loan Documents shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any other respect, or in the event any one or more of the provisions of any of the Loan Documents operates or would prospectively operate to invalidate this Loan Agreement or any of the other Loan Documents, then and in either of those events, such provision or provisions only shall be deemed null and void and shall not affect the validity of the remaining Obligations, and the remaining provisions of the Loan Documents shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby and the parties shall correct (including amending or replacing) the Loan Document(s) in a manner to effect as closely as possible the original intent of such invalidated provisions.

9.8.2.  It is the intention of the parties hereto to conform strictly to applicable usury Laws.  Accordingly, all agreements between Borrower, on one hand, and Lender, on the other hand, with respect to the Loan are hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to Lender or charged by Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by applicable Law.  If the Loan would be usurious under applicable Law (including the Laws of the State of Utah and the Laws of the United States of America), then, notwithstanding anything to the contrary in the Loan Documents:  (a) the aggregate of all consideration which constitutes interest under applicable Law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable Law, and any excess shall be credited on the Note by the holder thereof (or, if the Note has been paid in full, refunded to Borrower); and (b) if maturity is accelerated by reason of an election by Lender, or in the event of any prepayment, then any consideration which constitutes interest may never include more than the maximum amount allowed by applicable Law.  In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable Law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform throughout the term hereof.  If such amortization, proration, allocation and spreading is not permitted under applicable Law, then such excess interest shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note has been paid in full, refunded to Borrower).  The terms and provisions of this <u>Section 9.8.2</u> shall control and supersede every other provision of the Loan Documents.  The Loan Documents are contracts made under and shall be construed in accordance with and governed by the Laws of the State of Utah, except that if at any time the Laws of the United States of America permit Lender to contract for, take, reserve, charge or receive a higher rate of

CONFIDENTIAL INFORMATION                                                      SMHG002940

interest than is allowed by the Laws of the State of Utah (whether such federal Laws directly so provide or refer to the Law of any state), then to the extent permitted by Law such federal Laws shall to such extent govern as to the rate of interest which Lender may contract for, take, reserve, charge or receive under the Loan Documents.

9.9    *Notices, Approvals and Other Communications.*  All notices, requests, consents, approvals, demands, instructions, certifications, or other communications required hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed) or, by facsimile or electronic mail.  Any notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile and electronic mail, upon receipt; provided that service of a notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt.  This Section 9.9 shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Loan Agreement or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason.

The address, fax number and electronic mail address of Borrower are:

> SMHG Village Development LLC
> c/o Summit Mountain Holding Group, L.L.C
> 3923 N. Wolf Creek Drive
> Eden, Utah 84310

The address, fax number and electronic mail address of Lender are:

> Summit Village Development Lender 1, LLC
> c/o Celona Asset Management (USA) Limited
> 2207-09, Tower Two, Lippo Centre
> 89 Queensway, Admiralty, Hong Kong
> Facsimile Number: (852) 2530-8100
> Electronic Mail Address:  boffice@celonacapital.com

With a copy to:

> Dentons US LLP
> One Metropolitan Square, Suite 3000
> St. Louis, Missouri  63102
> Attn: Jennifer A. Marler
> Facsimile Number:  (314) 259-5959
> Electronic Mail Address:  jennifer.marler@dentons.com

In no event, to be effective, may a notice of Default be sent by Lender solely by electronic mail.

CONFIDENTIAL INFORMATION                                                    SMHG002941

9.10   *Permitted Successors and Assigns.*   Each and every one of the covenants, terms, provisions and conditions of this Loan Agreement and the other Loan Documents shall apply to, bind and inure to the benefit of Borrower and its successors, and shall apply to, bind and inure to the benefit of Lender and the Eligible Assignees of Lender, and all Persons claiming under or through any of them.

9.10.1. Borrower agrees not to transfer, assign, pledge or hypothecate any right or interest in any payment or advance due pursuant to this Loan Agreement, or any of the other benefits of this Loan Agreement, to any Person without the prior consent of Lender, not to be unreasonably withheld or delayed.  Any such transfer, assignment, pledge or hypothecation made or attempted by Borrower without the prior consent of Lender shall be void and of no effect.  No consent by Lender to any such assignment shall be deemed to be a waiver of the requirement of prior consent by Lender with respect to each and every further assignment and as a condition precedent to the effectiveness of such assignment.

9.10.2. Lender agrees not to transfer, assign, pledge or hypothecate any right or interest in any payment or advance due pursuant to this Loan Agreement, or any of the other benefits of this Loan Agreement, to any Person other than an Eligible Assignee.  Any such transfer, assignment, pledge or hypothecation made or attempted by Lender shall be void and of no effect.  No consent by Borrower to any such assignment or transfer shall be deemed to be a waiver of the requirement of prior consent by Borrower with respect to each and every further assignment or transfer and as a condition precedent to the effectiveness of such assignment or transfer.

9.10.3. Lender's assignment to an Eligible Assignee shall be contingent on Lender's execution and delivery to Borrower of notice, reasonably acceptable to Borrower, which shall contain the name and address of the Eligible Assignee and the interest being assigned to such Eligible Assignee.  Borrower shall maintain a register for the recordation of the names and addresses of the lenders, and the commitments of, and principal amounts (and related interest amounts) of the Loan owing to, each lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error.  The Register shall be available for inspection by any lender, at any reasonably time and from time to time upon reasonable prior notice.

9.10.4. Notwithstanding Section 9.10.2, Lender may from time to time grant participations to one or more Persons in a portion of the Loan without the prior consent of Borrower; provided, however, that (a) Lender's obligations under this Loan Agreement shall remain unchanged, (b) Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Loan Agreement, and (c) the participation interest shall not afford such participant any rights or privileges granted to Lender by Borrower under the Loan Documents.

9.11   *Update of W-9.*   If the IRS Form W-9 previously provided by Lender expires or becomes obsolete, Lender shall deliver to Borrower a new signed IRS Form W-9 (or successor form) indicating that Lender is not subject to backup withholding.

CONFIDENTIAL INFORMATION                                                          SMHG002942

9.12    *Reserved*.

9.13    *Modification; Waiver*.  None of the terms or provisions of this Loan Agreement may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against whom enforcement of the change, waiver, modification, discharge or termination is asserted.  None of the terms or provisions of this Loan Agreement or the other Loan Documents shall be deemed to have been abrogated or waived by reason of any failure or failures to enforce the same.

9.14    *Third Parties; Benefit*.  All conditions to the obligation of Lender to make Advances hereunder are imposed solely and exclusively for the benefit of Lender and its assigns and no other Persons shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make Advances in the absence of strict compliance with any or all thereof and no other Person shall, under any circumstances, be deemed to be the beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender at any time in the sole and absolute exercise of its discretion.  The terms and provisions of this Loan Agreement are for the benefit of the parties hereto and, except as herein specifically provided, no other Person shall have any right or cause of action on account thereof.

9.15    *Rules of Construction*.  The words "hereof," "herein," "hereunder," "hereto," and other words of similar meaning refer to this Loan Agreement in its entirety.  The word "including" or words of similar meaning shall mean "including without limitation".  The words "agree" and "agreements" mean and include "covenant" and "covenants."  The word "approval" or "consent" of a party to this Loan Agreement or the Construction Consultant and other words of similar meaning mean an approval or consent not to be unreasonably withheld or delayed unless specifically provided to the contrary.  The captions and headings contained in this Loan Agreement are included herein for convenience of reference only and are not in any way intended to define, limit or enlarge the terms hereof.  All references (a)made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, (b)made in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well, (c)to Loan Documents are to the same as extended, amended, restated, supplemented or otherwise modified from time to time unless expressly indicated otherwise, (d) to Land, Loan, Obligations, Collateral, Improvements, or Mortgaged Property shall mean all or any portion of each of the foregoing, and (e)to Articles, Sections and Schedules are to the respective Articles, Sections and Schedules contained in this Loan Agreement unless expressly indicated otherwise.

9.16    *Counterparts*.  This Loan Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes; provided, however, that all such counterparts shall together constitute one and the same instrument.

9.17    *Governing Law*.  THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND UNDER THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO NEW YORK'S

CONFIDENTIAL INFORMATION                                      SMHG002943

PRINCIPLES OF CONFLICTS OF LAW).  BORROWER AND LENDER EACH HEREBY
IRREVOCABLY (A)SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW
YORK STATE OR FEDERAL COURT, OR IN ANY STATE OF FEDERAL COURT
SITTING IN WEBER COUNTY, UTAH, AS ELECTED BY LENDER, OVER ANY SUIT,
ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN
AGREEMENT OR THE OTHER LOAN DOCUMENTS, (B)WAIVE ANY OBJECTION
WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY ACTION
OR PROCEEDING BROUGHT IN ANY SUCH COURT,(C) WAIVE ANY CLAIM THAT
SUCH PROCEEDINGS OR ACTIONS HAVE BEEN BROUGHT IN AN INCONVENIENT
FORUM AND (D) WAIVE THE RIGHT TO OBJECT, WITH RESPECT TO SUCH ACTION
OR PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION.  LENDER
AND BORROWER EACH HEREBY AGREE AND CONSENT THAT, IN ADDITION TO
ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE
LAW, ALL SERVICE OF PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING IN
ANY STATE OF UTAH OR FEDERAL COURT SITTING IN WEBER COUNTY MAY BE
MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED,
DIRECTED TO LENDER OR BORROWER, AS APPLICABLE AT THE ADDRESS FOR
NOTICES PROVIDED HEREIN, AND SERVICE SO MADE SHALL BE COMPLETE
SEVEN (7) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

    9.18    *Time of Essence*.  Time shall be of the essence for each and every provision of
this Loan Agreement of which time is an element.

    9.19    *Class B Manager Acting on Behalf of Lender*.  Lender may take certain actions
hereunder only through the Class B Manager, or its designee, unless and until the Class B
Manager is replaced (and a successor manager shall be appointed by the Members) pursuant to
Lender's operating agreement and the Class B Management Agreement and Borrower is hereby
authorized to deal with such manager or its designee which Borrower reasonably believes is
acting on behalf of Lender, and shall comply with requests from such manager or its designee
which Borrower reasonably believes is acting on behalf of Lender, as if such manager or its
designee was directly an authorized representative of Lender.

    9.20    *Extension of Time for Repayment*.  Lender or any holder of the Note may extend
the time of payment of the principal evidenced and secured by the Note, and any extension so
granted shall be deemed to be made in pursuance of this Loan Agreement and not in
modification thereof.

    9.21    *WAIVER OF JURY TRIAL*.  BORROWER AND LENDER WAIVE TRIAL BY
JURY IN RESPECT OF ANY DISPUTE AND ANY ACTION ON SUCH DISPUTE
RELATING TO THIS LOAN AGREEMENT, THE NOTE, THE OTHER LOAN
DOCUMENTS, THE LOAN OR ANY ACTS OR OMISSIONS OF LENDER OR
BORROWER IN CONNECTION THEREWITH.  THIS WAIVER IS KNOWINGLY,
WILLINGLY AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND
BORROWER AND LENDER HEREBY REPRESENT THAT NO REPRESENTATIONS OF
FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE
THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS
EFFECT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES

CONFIDENTIAL INFORMATION                                                                SMHG002944

ENTERING INTO THE LOAN DOCUMENTS. BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. BORROWER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS LOAN AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

9.22    *USA Patriot Act Notice*.  Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender to identify Borrower in accordance with the Patriot Act.

9.23    *Entire Agreement*.  The Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the Loan, and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect to the matters addressed in the Loan Documents.  In particular, and without limitation, the terms of any commitment by Lender to make the Loan are merged into the Loan Documents.  Except as incorporated in writing into the Loan Documents, there are no representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Loan Documents.

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL INFORMATION                                                    SMHG002945

IN WITNESS WHEREOF the parties hereto have caused this instrument to be signed in their respective names by authorized persons as of the date first written above.

**LENDER:**

SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware limited liability company

By:   Celona Asset Management (USA) Limited, its Class B Manager

By: _____
Name: Max Huang
Title: Authorized Signatory

94392406

[Signature Page to Loan Agreement]

SMHG002946

BORROWER:

SMHG VILLAGE DEVELOPMENT LLC,
a Delaware limited liability company

By:    SMHG Investments LLC,
       a Delaware limited liability company
       Its: Sole Member

       By:   _____
           Name:  **Jeff Werbe**low
           Title:
                Chief Operations Officer

[Signature Page to Loan Agreement]

CONFIDENTIAL INFORMATION           SMHG002947

**Exhibit A**

**Legal Description of the Land**

DEVELOPMENT PARCEL D3, SUMMIT EDEN PHASE 1C AMENDMENT 2, AMENDING LOTS 87, 88, 89A, 89B, 90, 91, 92, 93, 94A, 94B, 95R, PARCELS F AND M, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE WEBER COUNTY RECORDER.

DEVELOPMENT PARCELS D4R AND D6, SUMMIT EDEN PHASE 1D, AMENDMENT 1 SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE WEBER COUNTY RECORDER.

TOGETHER WITH AND SUBJECT TO THE EASEMENTS ESTABLISHED BY:

THE TERMS OF THE MASTER DECLARATION OF COVENANTS, CONDITIONS, EASEMENTS AND RESTRICTIONS FOR SUMMIT EDEN, RECORDED JANUARY 27, 2014, AS ENTRY NUMBER 2672941, AND AS AMENDED BY ENTRY NUMBERS 2704954, 2712001, AND 2776705;

THAT CERTAIN EASEMENT AGREEMENT GIVEN BY SUMMIT MOUNTAIN HOLDING GROUP, L.L.C, SUMMIT EDEN RESORT LLC, AND SMHG INVESTMENTS LLC, RECORDED APRIL 26, 2013 AS ENTRY NUMBER 2631963.

Tax ID Nos. (For Reference Purposes Only):  **23-137-0001; 23-138-0001; 23-138-0003**

94392406

A-1

SMHG002948

## Exhibit A-1

### Legal Description of each JV Neighborhood Development

**Cooper Crest West**

ALL OF LOT 51R, 52R, 53, 54, 55 AND 56, SUMMIT EDEN PHASE 1C, ACCORDING TO
THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE
WEBER COUNTY RECORDER.

**Horizon**

ALL OF LOTS 19, 20, 22R AND 23R, SUMMIT EDEN PHASE 1A, ACCORDING TO THE
OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE WEBER
COUNTY RECORDER.

**Spring Park**

ALL OF LOT 76R, SUMMIT EDEN PHASE 1C, ACCORDING TO THE OFFICIAL PLAT
THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE WEBER COUNTY
RECORDER.

**Village Nest West**

PROPOSED PARCEL D8, SUMMIT EDEN PHASE 1C, DESCRIBED AS FOLLOWS:

ALL OF PARCEL E (OPEN SPACE), SUMMIT EDEN PHASE 1C, ACCORDING TO THE
OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE WEBER
COUNTY RECORDER.

Tax ID No. (For Reference Purposes Only): **23-130-0066**

ALSO:

THAT PORTION OF PARCEL 23-012-0148 DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT BEING THE NORTHEAST CORNER OF PARCEL E, SUMMIT
EDEN PHASE 1C SUBDIVISION, ENTRY NO. 2672945, BOOK 75, PAGE 35-40, AS
RECORDED IN THE OFFICE OF THE WEBER COUNTY RECORDER, SAID POINT
BEING SOUTH 00°45'10" EAST 519.19 FEET AND EAST 3576.84 FEET, FROM THE
NORTHWEST CORNER OF SECTION 8, TOWNSHIP 7 NORTH, RANGE 1 EAST, SALT
LAKE BASE AND MERIDIAN (BASIS OF BEARING IS NORTH 89°55'51" WEST ALONG
THE LINE BETWEEN THE NORTHEAST CORNER OF SECTION 1, TOWNSHIP 7
NORTH, RANGE 1 EAST, SALT LAKE BASE AND MERIDIAN AND THE SET WEBER
COUNTY MONUMENT ON THE INTERSECTION OF THE WEBER/CACHE COUNTY
LINE AND THE SECTION LINE.); TO A POINT ON THE SOUTHERLY RIGHT OF WAY
LINE OF SUMMIT PASS; THENCE ALONG SAID SOUTHWERLY RIGHT OF WAY LINE

CONFIDENTIAL INFORMATION                                    SMHG002949

THE FOLLOWING FOUR (4) COURSES: 1) SOUTH 83°44'18" EAST 6.13 FEET, 2) EASTERLY ALONG A 783.00 FOOT RADIUS TANGENT CURVE TO THE LEFT, (CHORD BEARS SOUTH 88°46'32" EAST A DISTANCE OF 137.50 FEET), THROUGH A CENTRAL ANGLE OF 10°04'29", A DISTANCE OF 137.68 FEET, 3) NORTH 86°11'14" EAST 193.22 FEET, 4) EASTERLY ALONG A 217.00 FOOT RADIUS TANGENT CURVE TO THE RIGHT, (CHORD BEARS SOUTH 88°44'05" EAST A DISTANCE OF 38.42 FEET), THROUGH A CENTRAL ANGLE OF 10°09'23", A DISTANCE OF 38.47 FEET, TO THE NORTHWEST CORNER OF PARCEL F OF ABOVE SAID SUMMIT EDEN PHASE 1C SUBDIVISION, THENCE SOUTH 05°39'44" WEST, 64.51 FEET, ALONG THE WESTERLY LINE OF PARCEL F, TO A POINT ON SAID NORTHERLY RIGHT OF WAY LINE OF COPPER CREST ROAD THE FOLLOWING THREE (3) COURSES: 1) WESTERLY ALONG A 143 FOOT RADIUS NON-TANGENT CURVE TO THE LEFT, (CHORD BEARS SOUTH 89°51'48" WEST A DISTANCE OF 28.90 FEET), THROUGH A CENTRAL ANGLE OF 11°35'53", A DISTANCE OF 28.95 FEET, 2) SOUTH 84°03'51" WEST 138.80 FEET, 3) EASTERLY ALONG A 482.00 FOOT RADIUS TANGENT CURVE TO THE RIGHT, (CHORD BEARS NORTH 83°43'36" WEST A DISTANCE OF 203.87 FEET), THROUGH A CENTRAL ANGLE OF 24°25'07", A DISTANCE OF 205.42 FEET, THENCE NORTH 01°26'03 EAST, 47.96 FEET TO THE POINT OF BEGINNING.

CONTAINING 24,214 SQUARE FEET OR 0.56 ACRES.

Tax ID No. (For Reference Purposes Only): A portion only of **23-012-0148**

CONFIDENTIAL INFORMATION                                                    SMHG002950

**Exhibit B**

**Budget**

### Development Budget

| | |
|---|---|
| **Land Cost** | 29,000,000 |

**Hard Costs**

| | |
|---|---|
| General Conditions | 4,715,920 |
| Concrete | 4,271,220 |
| Masonry | 1,238,316 |
| Metals | 4,304,483 |
| Woods | 4,482,919 |
| Thermal & Moisture Protection | 4,819,113 |
| Doors & Windows | 3,414,572 |
| Finishes | 8,270,800 |
| Specialties | 758,789 |
| Equipment | 948,486 |
| Furnishings | 284,546 |
| Conveying Systems | 821,400 |
| Mechanical | 8,441,188 |
| Electrical | 4,746,878 |
| Permits, Insurances, Contingency, Fee | 8,412,912 |
| Site Work | 7,977,282 |
| Ski Lifts | 8,900,000 |
| Roads/Water/Sewer | 18,059,606 |
| Lodges & Event Space (Direct Cost) | 13,808,884 |
| Hard Cost Contingency | 5,338,441 |
| **Total Hard Costs** | 114,015,754 |

**Soft Costs**

| | |
|---|---|
| Management Fee and Overhead | 6,210,000 |
| Permits, Fees, and Assessments | 1,163,010 |
| Legal | 3,000,000 |
| Marketing | 6,300,000 |
| Insurance | 1,427,331 |
| Developer Fee | 4,649,769 |
| Soft Cost Contingency | 5,338,441 |
| Architect and Engineering | 9,515,162 |
| Pre-Opening Expenses & Cmrcl. FF&E | 1,100,000 |
| **Total Soft Costs** | 38,703,712 |

| | |
|---|---|
| **Interest** | 25,473,118 |
| **Total** | 207,192,584 |

CONFIDENTIAL INFORMATION                                                    SMHG002951

## Exhibit C

## Schedule





CONFIDENTIAL INFORMATION

SMHG002952



94392406

CONFIDENTIAL INFORMATION

SMHG002953

Exhibit D

**Disclosure Schedule**

This Disclosure Schedule is being furnished in connection with the execution and delivery of the Loan Agreement dated June 28, 2016 (the "**Loan Agreement**") between SMHG Village Development LLC ("**Borrower**") and Summit Village Development Lender 1, LLC ("**Lender**").  Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Loan Agreement.

The sections and subsections of this Disclosure Schedule are arranged in sections corresponding to the numbered and lettered sections of the Loan Agreement.  The headings inserted in the sections and subsections of this Disclosure Schedule are for convenience of reference only and shall to no extent have the effect of amending, expanding or changing the express terms of the sections or subsections as set forth in the Loan Agreement.

Any reference in a particular section or subsection of this Disclosure Schedule shall only be deemed to be an exception to (or, as applicable, a disclosure for purposes of) the representations and warranties (or covenants, as applicable) of the Borrower that are contained in the corresponding section or subsection of the Loan Agreement.  A disclosure set forth in one section or subsection of this Disclosure Schedules need not be set forth in any other section or subsection so long as the relevance of such disclosure to such other section or subsection of this Disclosure Schedule is reasonably apparent on the face of the information disclosed therein.

CONFIDENTIAL INFORMATION                                                     SMHG002954

**Schedule 4.6**

**Pending Litigation**

1. To Borrower's knowledge there is no pending litigation against the Project.

2. Summit Mountain Holding Group L.L.C., is involved in an eminent domain action with Wolf Creek Water and Sewer Improvement District. This litigation involves land owned by Summit in the Eden Valley for sewer lagoons and has nothing to do with the Project. We expect to settle the matter within the next few months. To put this in perspective the litigation value is less than $25,000.

**Schedule 4.8**

**Zoning Ordinances and Similar Laws**

1. The Project was rezoned in Weber County to the newer Ogden Valley Destination and Recreation Resort Zone ("DRR-1 Zone") pursuant to a Weber County Zoning Development Agreement dated January 13, 2015.

2. A copy of the DRR1-Zone Application and recorded Development Agreement were provided in the due diligence materials provided to Lender.

**Schedule 4.10**

**Environmental and Geological Issues**

1. To Borrowers knowledge there are no environmental or geological issues concerning the Project.

2. A Phase 1 Environmental Site Assessment dated June 3, 2014 prepared by AEI Consultants was provided to Lender as part of the due diligence materials.

CONFIDENTIAL INFORMATION                                      SMHG002955

## Schedule 4.11

### Other Liens

1. The Project is encumbered by Summit Mountain Assessment Area and Weber County levying assessment thereon pursuant to SAA Bonds ($17.6m). All bond documents have been provided to Lender as part of the due diligence materials. Moreover, the Summit Mountain Assessment Area is listed on the title reports provided to Lender as part of the due diligence materials.

## Schedule 4.13

### Material Contracts

1. Skytrac Services Passenger Ropeway Supply and Installation Agreement dated March, 2016 between Summit Mountain Holding Group, L.L.C. in the amount of $1,924,658.00

2. Skytrac Services Passenger Ropeway Supply and Installation Agreement dated May 23rd, 2016 between Summit Mountain Holding Group, L.L.C. in the amount of $2,216,000.00

## Schedule 4.21

### Violations of Law

1. To Borrowers knowledge, there are no violations of law against the Project.

## Schedule 6.4.4

### Other Indebtedness

1. The Borrower does not have other indebtedness.

CONFIDENTIAL INFORMATION    SMHG002956

**Exhibit E**

**Reserved**

94392406

E-1

CONFIDENTIAL INFORMATION    SMHG002957

**Exhibit F**

**Form of Request for Advance**

_____, 20__

Summit Village Development Lender 1, LLC
c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Centre
89 Queensway, Admiralty, Hong Kong
Attn: _____

RE:    **Advance for the Project located in the City of Eden, Weber County, Utah**

Ladies and Gentlemen:

Reference is made to that certain Loan Agreement dated as of June 28, 2016 (the "**Loan Agreement**") between SMHG Village Development LLC, a Delaware limited liability company ("**Borrower**") and Summit Village Development Lender 1, LLC ("**Lender**"). Capitalized terms used but not otherwise defined in this Request for Advance have the meanings given to such terms in the Loan Agreement.

This Request for Advance (i) constitutes Borrower's request to borrow an Advance in the amount and in the manner set forth below and (ii) is otherwise subject to the terms of the Loan Agreement. The information relating to the proposed Advance is as follows:

1.    the amount of the proposed Advance is $_____;

2.    the date of the proposed Advance is _____, 20__; and

3.    the purpose of the proposed Advance is to pay or reimburse Borrower for the [Improvement Costs] [prepayments pursuant to Sections 2.7 or 3.2 of the Loan Agreement ("**Prepayments**")] [or other Approved Costs] described in Schedule 1.

Attached to this Request for Advance is the balance of the applicable Draw Package.

In connection with this Request for Advance, Borrower hereby confirms that:

1.    the amounts set forth in this Request for Advance are consistent with the Budget; and

2.    to the extent this Request for Advance is for a Construction Advance, this Request for Advance provides for the withholding of retainage in the amount required under the Construction Contract.

CONFIDENTIAL INFORMATION                                   SMHG002958

The undersigned requests that the requested Advance be deposited into Borrower's Deposit Account pursuant to the wiring instructions attached as <u>Schedule 2</u>. The person(s) signing this Request for Advance on behalf of Borrower represents and warrants to you that such person(s) are authorized officer(s) of Borrower.

*[Signature Page Follows]*

94392406

F-2

SMHG002959

**IN WITNESS WHEREOF**, Borrower has duly executed this Request for Advance as of the day and year first above written.

BORROWER:

**SMHG VILLAGE DEVELOPMENT LLC,**
a Delaware limited liability company

By:  SMHG Investments LLC,
      a Delaware limited liability company
      Its:  Sole Member

By: _____
      Name:
      Title:

**ACKNOWLEDGED:**

SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC,
a Delaware limited liability company

By:  Celona Asset Management (USA) Limited,
      its Class B Manager

By: _____
      Name:
      Title:

CONFIDENTIAL INFORMATION                                                      SMHG002960

## Schedule 1

**Description of [Improvement Costs] [Prepayments] [other Approved Costs]**

F-4

CONFIDENTIAL INFORMATION                                                    SMHG002961

## Schedule 2

**Wiring Instructions**

_____

_____

_____

ABA #: _____

Account #: _____

Beneficiary: _____

Ref: _____

CONFIDENTIAL INFORMATION                                         SMHG002962

## Exhibit G

### Form of Engineer Certificate

### Engineer Certificate

DATE:                  _____, 2016

TO:          Summit Village Development Lender 1, LLC
             c/o Celona Asset Management (USA) Limited
             2207-09, Tower Two, Lippo Centre
             89 Queensway, Admiralty, Hong Kong

FROM:        SMHG Village Development LLC
             [_____]
             [_____]

RE:          Engineering services related to any horizontal and vertical improvements
constructed as part of the Project (the "**Improvements**")

_____

   This Engineer's Certificate is being provided pursuant to Section 2.5.3 of that certain Loan Agreement between SMHG Village Development LLC, a Delaware limited liability company ("**Borrower**"), and Summit Village Development Lender 1, LLC, a Delaware limited liability company ("**Lender**"), dated as of June 28, 2016 ("**Loan Agreement**"). Capitalized terms used but not otherwise defined in this Engineer's Certificate have the meanings given to such terms in the Loan Agreement.

   As Engineer for the design and construction of the Improvements, I observed the Improvements construction from _____, 20__ to _____, 20__ [a date subsequent to the date thereby which payment or reimbursement of Improvement Costs is adequate] and hereby certify that, to the best of my knowledge, information, and belief, the work to be paid for pursuant to the current request for Advance has been substantially completed in accordance with the Plans and Specifications for the Improvements. My certification is subject to the following qualifications: (i) an evaluation of the Improvements upon substantial completion thereof; (ii) the results of subsequent tests and inspections; and (iii) the correction of minor deviations from the Plans and Specifications for the Improvements upon substantial completion.

   My opinions and statements provided in this certificate are limited to my on-site inspections. I have not made exhaustive or continuous on-site inspections to check the quality or quantity of the Improvements. I neither retained nor exercised control over or charge of, nor am I responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the construction of the Improvements.

94393429                              G-1

I shall not be responsible for the contractor's schedules or failure to carry out the work in accordance with the Plans and Specifications. I neither have nor have had control over or charge of acts or omissions of any contractor, subcontractor or their agents or employees, or of any other person performing portions of the construction.

_____,
a _____

By: _____
Name: _____
Title: _____

94393429                                        G-2

CONFIDENTIAL INFORMATION                                        SMHG002964

**Exhibit H**

**Form of Architect Certificate**

**Architect Certificate**

DATE:    _____, 2016

TO:      Summit Village Development Lender 1, LLC
         c/o Celona Asset Management (USA) Limited
         2207-09, Tower Two, Lippo Centre
         89 Queensway, Admiralty, Hong Kong

FROM:    SMHG Village Development LLC
         [_____]
         [_____]

RE:      Architectural services related to any horizontal and vertical improvements constructed as part of the Project (the "**Improvements**")

---

This Architect's Certificate is being provided pursuant to Section 2.5.3 of that certain Loan Agreement between SMHG Village Development LLC, a Delaware limited liability company ("**Borrower**"), and Summit Village Development Lender 1, LLC, a Delaware limited liability company ("**Lender**"), dated as of June 28, 2016 ("**Loan Agreement**").  Capitalized terms used but not otherwise defined in this Architect's Certificate have the meanings given to such terms in the Loan Agreement or, if not defined in the Loan Agreement, in the Architect Contract (as defined in the Loan Agreement).

As Architect for the design and construction of the Improvements, I observed the Improvements from _____, 20__ to _____, 20__ [a date subsequent to the date thereby which payment or reimbursement of Improvement Costs is adequate] and hereby certify that, to the best of my knowledge, information, and belief, (a) the work to be paid for pursuant to the current request for Advance has been substantially completed in accordance with the Plans and Specifications for the Improvements, (b) relative to the Standard of Care, I am not aware of any respect in which the Project, as constructed to date, materially violates any existing applicable zoning, building, environmental protection or similar statutes, ordinances, laws or regulations in effect at the time services are rendered, and (c) the Drawings and Specifications and other Construction Documents comply with all existing codes and governmental regulations applicable to the Project in effect at the time services are rendered.  My certification is subject to the following qualifications:  (i) an evaluation of the Improvements upon substantial completion thereof; (ii) the results of subsequent tests and inspections; and (iii) the correction of minor deviations from the Plans and Specifications for the Improvements upon substantial completion.

CONFIDENTIAL INFORMATION                                    SMHG002965

My opinions and statements provided in this certificate are limited to my on-site observations.  I have not made exhaustive or continuous on-site inspections to check the quality or quantity of the Improvements.  I neither retained nor exercised control over or charge of, nor am I responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the construction of the Improvements.

I shall not be responsible for the contractor's schedules or failure to carry out the work in accordance with the Plans and Specifications, I neither have nor have had control over or charge of acts or omissions of any contractor, subcontractor or their agents or employees, or of any other person performing portions of the construction.

_____,
a _____

By:     _____
Name:  _____
Title:   _____

CONFIDENTIAL INFORMATION     SMHG002966

**Exhibit I**

**Form of Lease Estoppel Certificate**

**LEASE ESTOPPEL CERTIFICATE**

To:     Summit Village Development Lender 1, LLC ("Lender")
c/o Celona Assset Management (USA) Limited
2207-09 Tower Two, Lippo Centre
89 Queensway, Admiralty, Hong Kong
Attn: Back Office Services Group

Re:     Property
Address:         _____

Lease Date:     _____

Landlord:       _____

Tenant:         _____

Leased
Premises:       Approximately _____ square feet located at the Property, known as _____.

The undersigned Tenant under the above-referenced lease ("Lease") certifies to Lender that the copy of the Lease attached hereto as Exhibit A is correct and complete and has not been canceled, modified, assigned, extended or amended, except as indicated in that attached copy.

The undersigned Tenant further certifies to Lender as of the date hereof, except as otherwise indicated in the attached copy of the Lease or as described in Exhibit B to this certificate, the following:

1.     Rent, including without limitation, common area maintenance charges, has been paid to the first day of the current month and all additional rent has been paid and collected in a current manner. There is no prepaid rent.  No security deposit is required by, or is being held in connection with, the Lease.

2.     Tenant has accepted possession of the Leased Premises and has commenced to pay rent. Base Rent is currently payable in the amount of $_____ monthly.

3.     The Lease term expires on _____.  We have no option(s) to renew or extend the term of the Lease.

4.     All work to be performed for us under the Lease has been performed as required and has been accepted by us.

94393429                                I-1

5.      The Lease is in full force and effect on the date hereof and represents the legal, valid and binding obligation of Tenant.   Neither we nor to our knowledge, the Landlord, is in default thereunder. We have no claims against the Landlord or offsets against the payment of rent.

6.      We have not received any notice of prior sale, transfer or assignment, hypothecation or pledge of the Lease or of the rents received therein except to Lender.

7.      We have not assigned or sublet the said Lease nor does the undersigned hold the Leased Premises under assignment or sublease.

8.      We have no other interest in any other part of the building of which the Leased Premises form a part or to any personal property appurtenant or used in connection with such other parts of the building.

9.      We have no right or option pursuant to the Lease or otherwise to purchase all or any part of the Leased Premises or the building of which the Leased Premises are a part.

10.      There are no other agreements, written or oral, between us and the Landlord with respect to the Lease, the Leased Premises or the building in which the Leased Premises are located.

11.      The statements contained herein may be relied upon by the Landlord under the said Lease and the Lender and their respective successors and assigns.

12.      [Intentionally Omitted].

13.      All notices to Lender shall be in writing and addressed to it at the address specified above or such other address as Lender may by notice designate.

14.      The individual signing this certification on behalf of Tenant is authorized and empowered in all respects to do so.

Dated this _____ day of _____, 20[__].

Tenant:

_____

By:_____
Name (Print):_____
Title:_____

CONFIDENTIAL INFORMATION                                    SMHG002968

EXHIBIT A to Lease Estoppel Certificate

** PLEASE ATTACH COMPLETE COPY OF LEASE **

CONFIDENTIAL INFORMATION                                      SMHG002969

EXHIBIT B to Lease Estoppel Certificate

** DESCRIBE ALL EXCEPTIONS TO THE FOREGOING CERTIFICATION **

94393429

I-4

**Exhibit J**

**Form of Subordination, Non-Disturbance and Attornment Agreement**

*Space Above Line Reserved for Recorder's Use*

| | | |
|---|---|---|
| 1. | **Title of Document**: | Lease Subordination, Non-Disturbance and Attornment Agreement |
| 2. | **Date of Document**: | _____, 20__ |
| 3. | **Grantor(s)**: | _____ |
| 4. | **Beneficiary(s)**: | Summit Village Development Lender 1, LLC |

5. **Statutory Mailing Address(es)**:

**Grantor:**

[_____]
[_____]
[_____]

**Beneficiary:**

c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Centre
89 Queensway, Admiralty, Hong Kong
Attn: Back Office Services Group

6. **Legal description**:   See *Exhibit A* annexed to the document.

94392406

J-1

CONFIDENTIAL INFORMATION                                                                SMHG002971

# LEASE SUBORDINATION,
## NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS LEASE SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "*Agreement*"), dated as of the _____ day of _____, 20[  ], by and between **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**, a Delaware limited liability company ("*Lender*"), having a mailing address of [   ], and _____, a _____ ("*Tenant*"), having a mailing address of [ ].  The following recitals are a material part and form the basis of this Agreement:

A.    Tenant is the tenant under that certain lease dated _____, ____, together with all amendments and modifications thereto (collectively, the "*Lease*"), a copy of which Lease has been previously delivered to Lender, for certain premises situated in the City of Eden, State of Utah, and more particularly described in the Lease ("*Premises*"); and

B.    Lender has made or is about to make a certain loan (the "*Loan*") or otherwise extend credit to SMHG Village Development LLC, a Delaware limited liability company ("*Borrower*"), which Loan is or will be secured by a Construction Deed of Trust, Security Agreement and Fixture Filing (as subsequently amended, modified, renewed and restated, the "*Deed of Trust*") covering the property described on *Exhibit A* hereto which includes the Premises, which Deed of Trust has been or will be recorded in the official records of Weber County, State of Utah; and

C.    To induce Lender to make the aforesaid Loan or extension of credit to Borrower, Tenant has agreed to subordinate the Lease to the Deed of Trust, to attorn to Lender and other persons herein described, and to otherwise agree as set forth herein, subject to Lender's agreement not to disturb the Lease or Tenant's possession of the Premises upon the terms set forth herein;

NOW, THEREFORE, for and in consideration of the premises, and for $1.00 paid to and received by Tenant, and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Tenant and Lender hereby covenant and agree as follows:

1.    **Lease Subordination**.  The Lease and the leasehold estate created by the Lease and all of Tenant's rights under the Lease are and shall remain subject to the Deed of Trust and the lien of the Deed of Trust and to all rights of Lender under the Deed of Trust, including to all renewals, amendments, modifications and extensions of the Deed of Trust.

2.    **Acknowledgment by Tenant**.  Tenant acknowledges and agrees that (a) Tenant has notice that the Lease and the rent and other sums due under the Lease have been or are to be assigned by Borrower to Lender as security for the Loan.  If Lender notifies Tenant in writing of a default under the Deed of Trust and requests that Tenant pay its rent and other sums due under the Lease to Lender, Tenant shall pay such sums directly to Lender or as Lender may otherwise request; and (b) this Agreement satisfies any condition or requirement in the Lease relating to the granting of a non-disturbance agreement.

3.    **Foreclosure and Sale; Attornment**.  Tenant covenants and agrees to make full and complete attornment, without the necessity of any other or further attornment than in this paragraph contained (and this paragraph shall be considered a self-operative attornment), to Lender, its successors and assigns, or to the purchaser or grantee of the Premises at foreclosure or sale under the Deed of Trust or by deed in lieu thereof (Lender and all such other persons are each referred to herein as a "*Successor Owner*"), as the case may be, and upon such Successor Owner's

CONFIDENTIAL INFORMATION    SMHG002972

election. Such attornment shall be for the balance of the term of the Lease, including any extensions thereof, if extended, and shall be upon the same terms, covenants and conditions as provided in the Lease so as to establish direct privity of estate and contract between Tenant and such Successor Owner, with the same force and effect as though the Lease was made directly between Tenant and such Successor Owner, whether or not Tenant is then in possession of the Premises under the Lease; *provided*, *however*, that neither Lender nor any other Successor Owner shall be: (i) liable for any act or omission of any prior lessor (including Borrower) in connection with the Lease; (ii) subject to any offsets or defenses which Tenant might have against any prior lessor (including Borrower); (iii) bound by any rent or additional rent which Tenant might have paid to any prior lessor (including Borrower) more than one (1) month in advance of the due dates thereof for any period after the occurrence of the event that gave rise to attornment by Tenant, except to the extent that such sums are actually delivered by the prior lessor (including Borrower) to Lender; (iv) liable for the return of any security deposit, cleaning deposit or other sum that Tenant may have paid in advance to any prior lessor (including Borrower), unless such Successor Owner actually receives such amounts; (v) liable for any representation, warranty or indemnity given by any prior landlord (including Borrower); (vi) liable for indirect or consequential damages; (vii) liable for payment of any allowance or other cash reimbursement obligation due from Landlord to Tenant with respect to any tenant improvements; or (viii) bound by any amendment, modification assignment or termination of the Lease or by any waiver or forbearance on the part of any prior lessor (including Borrower) made or given without the written consent of Lender or such other Successor Owner; and, *further provided*, that Lender and any other Successor Owner shall be discharged from all responsibility under the Lease which accrues or arises after Lender or such other Successor Owner disposes of its interest in the Premises.

4. **Nondisturbance Agreement**. Subject to Tenant's attornment upon the terms set forth above, Lender agrees, for itself and any other Successor Owner, that provided Tenant shall not be in default under the Lease (beyond any applicable notice and cure period provided in the Lease), the Lease and Tenant's right of possession and enjoyment of the Premises shall be and remain undisturbed and unaffected by any foreclosure or other proceedings involving the Deed of Trust, subject to the terms and conditions of the Lease, and shall continue in full force and effect as a direct lease between the Successor Owner and Tenant.

5. **Tenant Covenants**. Tenant agrees that, so long as the Deed of Trust shall remain outstanding, Tenant shall not, without the prior written consent of Lender: (a) prepay any of the rents, additional rents or other sums due under the Lease more than one (1) month in advance of the due dates thereof; (b) voluntarily surrender the Premises or terminate the Lease without cause or shorten the term thereof; (c) voluntarily subordinate the Lease to any lien or encumbrance; or (d) assign the Lease or sublet of the Premises or any portion thereof pursuant to the provisions of the Lease.

6. **Subordination and Release of Purchase Options and Rights of First Refusal**. Tenant represents and warrants that, except as set forth in the Lease, Tenant has no right or option of any nature to purchase the Premises, any part thereof, or any interest in Borrower, or any rights of first refusal to lease or purchase the Premises or any part thereof. To the extent Tenant has or acquires any such options or rights without Lender's prior written consent, such options or rights are acknowledged to be subject and subordinate to the Deed of Trust and are waived and released as to Lender and any Successor Owner.

7. **Insurance Proceeds and Condemnation Awards**. Notwithstanding anything to the contrary in the Lease, all all-risk property insurance proceeds arising out of policies insuring the property

CONFIDENTIAL INFORMATION                                                          SMHG002973

encumbered by the Deed of Trust, all proceeds of any other insurance policies maintained by or for the benefit of Borrower, and all condemnation awards shall be paid to Lender and shall be applied in accordance with the documents evidencing the Loan.

8.    **Lender's Right to Cure Defaults**.  In the event Tenant shall send any notice pursuant to or in connection with the Lease, Tenant shall simultaneously send a copy of said notice to Lender in accordance with Section 9(d) below.  Tenant agrees that Lender shall have thirty (30) days after its actual receipt of any notice of default of the lessor under the Lease to cure such default, during which period Tenant shall not exercise any remedies available to it under the Lease (including, without limitation, any right of termination).  Notwithstanding the foregoing, it is expressly agreed that, although Lender shall have the right under this Agreement to cure lessor's defaults under the Lease, nothing herein shall be construed as requiring or obligating Lender to cure lessor's defaults.

9.    **Miscellaneous**.

(a)    This Agreement shall run with the land and shall inure to the benefit of Lender and any other Successor Owner, and their respective successors and assigns, and be binding upon Tenant, its successors, assigns, heirs and legal representatives.  This Agreement may be modified only by a writing signed by both of the parties hereto, and shall be governed by and construed in accordance with the laws of the state where the Premises are located.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but together shall constitute one and the same instrument.  If any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, that invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement.

(b)    At any time, and from time to time, Lender may elect by written notice to Tenant to subordinate the Deed of Trust to the Lease, in which event, neither a foreclosure of the lien of the Deed of Trust, entry by Lender, nor any other action by Lender with respect to the Deed of Trust will affect the continued existence of the Lease or the rights and obligations of the Tenant thereunder.  This election may be changed from time to time so that at all times, the Lease will be subordinate to the Deed of Trust, subject to the terms of this Agreement, or the Deed of Trust subordinate to the Lease, as elected by Lender.

(c)    Neither Lender nor any other Successor Owner shall be subject to any provision of the Lease that is inconsistent with this Agreement.

(d)    All notices or other communications under this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable overnight carrier that provides a receipt, and shall be deemed given when addressed to the parties at their addresses listed in the first paragraph above (or such other addresses and the parties may provide to the other party in writing), on the second business day after being deposited in the mail, if sent by registered or certified mail, or on the next business day after being deposited with an overnight courier.

(e)    The individuals executing this Agreement hereby represent and warrant that they are empowered and duly authorized to so execute this Agreement on behalf of the parties they represent.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL INFORMATION                                    SMHG002974

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

*Tenant:*

_____

By_____
Title:_____


STATE OF UTAH          )
                       ) ss.
COUNTY OF _____   )

On this _____ day of _____, 2016, before me, the undersigned, a notary public, in personally appeared _____, known to me to be the _____ of _____, a _____, the managing member of _____, the limited liability company that executed the foregoing instrument, and that acknowledged the said instrument to be the free and voluntary act and deed of said limited liability company, for the purposes therein mentioned, and on oath stated that he/she was authorized to execute said instrument.

I certify that I know or have satisfactory evidence that the person appearing before me and making this acknowledgment is the person whose true signature appears on this document.

WITNESS my hand and official seal hereto affixed the day and year in the certificate above written.

_____
Signature

_____
Print Name

94392406

J-5

CONTINUATION OF SIGNATURE PAGE-SNDA

*Lender*:

SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware limited liability company

By:_____
Printed Name:_____
Title:_____

STATE OF UTAH                    )
                                 ) ss.
COUNTY OF _____           )

On this _____ day of _____, 2016, before me, the undersigned, a notary public, in personally appeared _____, known to me to be the _____ of _____, a _____, the managing member of _____, the limited liability company that executed the foregoing instrument, and that acknowledged the said instrument to be the free and voluntary act and deed of said limited liability company, for the purposes therein mentioned, and on oath stated that he/she was authorized to execute said instrument.

I certify that I know or have satisfactory evidence that the person appearing before me and making this acknowledgment is the person whose true signature appears on this document.

WITNESS my hand and official seal hereto affixed the day and year in the certificate above written.

_____
Signature

_____
Print Name

94392406

J-6

CONFIDENTIAL INFORMATION                                    SMHG002976

## EXHIBIT A

*Legal Description of the Deed of Trust Property*

CONFIDENTIAL INFORMATION    SMHG002977

**Exhibit K**

**(To Be Provided By Borrower and Approved for Attachment by Lender After Closing)**

CONFIDENTIAL INFORMATION                                    SMHG002978

**Exhibit L**

**Master Schedule**



94392406

CONFIDENTIAL INFORMATION

SMHG002979