William B. Ingram, #10803   wingram@strongandhanni.com
Spencer W. Young, #16993   syoung@strongandhanni.com
Connor J. Keller, #18440   ckeller@strongandhanni.com
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUMMIT MOUNTAIN HOLDING GROUP, L.L.C., a Utah Limited Liability Company,<br><br>　　　Plaintiff,<br><br>v.<br><br>SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware Limited Liability Company,<br><br>　　　Defendants. | **PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 1:21-CV-00110-DBB-JCB<br><br>Judge David B. Barlow<br><br>Magistrate Judge Jared C. Bennett |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule DUCivR 56-1, Plaintiff Summit Mountain Holding Group, L.L.C. ("Plaintiff"), by and through its undersigned counsel, Strong & Hanni law firm, respectfully moves for summary judgment on (1) its declaratory relief claims, (2) the related claim brought by Defendant Summit Village Development Lender 1,

LLC (the "Lender"),[1] that Plaintiff breached its Amended and Restated Guaranty Agreement, dated October 31, 2017 (the "Equity Requirement Guaranty"), given in favor of the Lender; and (3) Plaintiff's claim that the Lender breached the implied covenant of good faith and fair dealing. Because there is no genuine dispute of any material fact and Plaintiff is entitled to judgment as a matter of law on these claims, the Court should grant this motion.

## INTRODUCTION AND RELIEF REQUESTED

Plaintiff pled four claims in this case: two claims for declaratory relief that Plaintiff does not owe what the Lender claims Plaintiff owes under the Equity Requirement Guaranty;[2] one claim that the Lender breached the implied covenant of good faith and fair dealing inherent in the Equity Requirement Guaranty;[3] and a claim that the Lenders and others fraudulently induced Plaintiff to sign the Equity Requirement Guaranty with representations about their abilities to raise funds and their intent to allocate those funds to the Village EB-5 project at Powder Mountain, and that the Equity Requirement Guaranty would only be used to keep the loan "in balance" with respect to loan funds actually drawn for each budget line item, and in the aggregate.[4] The Lenders, for their part, pled two claims: one for breach of the Equity Requirement Guaranty;[5] and a separate claim that Plaintiff breached other agreements between the parties by filing this action.[6]

---

[1] Grand Canyon Development Holdings 3 LLC (the "Additional Lender") was a Defendant in this matter, but was recently dismissed to avoid issues with diversity jurisdiction. The Lender, together with the Additional Lender, are sometimes referred to as the "Lenders."
[2] Compl. (ECF No. 2), ¶¶ 26-67, 88-100.
[3] *Id.* ¶¶ 101-110.
[4] *See id.* ¶¶ 68-87, 111-128.
[5] Answer & Countercl. (ECF No. 35), ¶¶ 85-93.
[6] *Id.* ¶¶ 94-100.

By this motion, Plaintiff seeks summary judgment in its favor on its claims for declaratory relief, its claim for breach of the implied covenant of good faith and fair dealing, and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty. Because the Equity Requirement Guaranty is ambiguous as to "when" contributions of the Borrower's Equity Requirement were required, because there is no genuine dispute the parties understood that the Borrower's Equity Requirement would be contributed on a pro-rata basis over time in proportion to the total EB-5 funds the Lender actually disbursed (thus keeping the loan "in balance"), or that the Lender waited nearly two-and-a-half years (half the loan term) *after* they knew the EB-5 market had dried up in China to give SMHG Village Development, LLC (the "Borrower") notice they weren't going to be able to raise the full $120 million in funding, Plaintiff is entitled to judgment as a matter of law on its claims for declaratory relief and for breach of the implied covenant of good faith and fair dealing, and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty.

## **BACKGROUND**

Over a decade ago, skiing aficionado and Plaintiff's principal, Greg Mauro, skied Powder Mountain for the first time and believed it to be the best ski resort in the world. Mr. Mauro wanted to prevent Powder Mountain from being acquired by a large corporation that would seek to overdevelop and overcrowd it, so he assembled a group of individuals interested in future homeownership at Powder Mountain into a founding member offering whereby they contributed capital in exchange for credits toward the purchase of land at the ski resort. Together, they bought Powder Mountain in April of 2013 and sought to responsibly develop the ski resort, maintaining its natural beauty and inherently great skiing experience.

Ski resort developments typically have, at their center, a "village." This "village" serves as the core of the development, providing hotel condominiums, shops, restaurants, and event venues. Single-family and other types of homes are then built around the village. Mr. Mauro and his group of future homeowners wanted to develop a Village at Powder Mountain. However, because they also sought to preserve Powder Mountain from exploitation, they had only their own personal funds, plus seller financing and a Weber County Assessment Bond, to develop the first phase of Powder Mountain. They could not rely on institutional capital to fund the development, since that would require control and a corporate playbook of overdevelopment and overcrowding.

That led Mr. Mauro to an immigration program known as the EB-5 program. This allowed wealthy foreign nationals to invest between $500,000 and $1 million in United States projects, and if those funds were put at risk and created ten jobs, the foreign national would receive immigration status as a lawful permanent resident (i.e., a "green card"), and a pathway to American citizenship. Mr. Mauro's attraction to the EB-5 program was because of its requirement that the capital be put "at risk," which meant that foreign nationals could not insist on guaranties from parent entities or principals in the way a bank would. This meant the risk of developing Powder Mountain's Village would be isolated to the Borrower and would not bleed over to or "cross-collateralize" Plaintiff's assets if something were to go wrong.

Plaintiff began its pursuits of EB-5 capital with a company called American Immigration Group, LLC ("AIG"). After nine months, however, AIG failed to raise any EB-5 capital for Powder Mountain, and the necessary legal documents had not even been prepared. So, Mr. Mauro looked for another company to work with, and in his pursuit met a Canadian citizen named Tang Tang on August 3, 2015, at an EB-5 convention. Mr. Tang told Mr. Mauro that his team could raise the full

4

$120 million the Borrower needed to develop the Village at Powder Mountain, and would allocate those funds to the project.

Plaintiff signed a Letter of Intent with Mr. Tang's employer, KT Capital Group, LLC ("KT Capital"), on September 2, 2015 (the "LOI"). The Lender was formed the next day ███████████ ██████ The Lender's only business was receiving investments of foreign nationals to loan to the Borrower in a way that would satisfy the requirements of the EB-5 program for its foreign national-investors.

Negotiations ensued, with Mr. Tang acting as the Lender's principal negotiator. During the negotiations, Mr. Tang suggested that Plaintiff secure the attendance of late NBA basketball player Kobe Bryant at an event in Shanghai to raise money that Mr. Tang represented would be loaned for development of the Village at Powder Mountain. The parties also exchanged materials during negotiations, including a Private Placement Memorandum that was to be provided to investors and was dated September 18, 2015 (the "Original PPM"). Those materials show the Borrower's Equity Requirement being contributed over time and in proportion to the EB-5 loan proceeds advanced by the Lender, thus preserving the loan's debt-to-equity "balance." The parties even exchanged e-mails confirming they understood that contributions of the Borrower's Equity Requirement would be proportional to the amount of EB-5 loan proceeds the Lender actually lent to the Borrower. In fact, the Original PPM, as well as an Amended and Restated Private Placement Memorandum dated August 24, 2016 (the "A&R PPM"). ████████████████████████████████ ███████████████████████████████████████████████████ contributed land, sales deposits, and bond proceeds from future Tax Increment Financing—███████████ ████████████████████████████████████████ which required the full $120

██████████████████████ Indeed, the Original PPM provides just $4.5 million in actual cash proceeds contributed by the Borrower pro-rata over four years, and the A&R PPM ███████████████████████ ███████████████████

On June 28, 2016, the parties closed the transaction. The Borrower and the Lender entered into a Loan Agreement (the "Loan Agreement"). Plaintiff signed the original Equity Requirement Guaranty, wherein it guarantied prompt contribution of "Borrower's Equity Requirement, as and when required under the Loan Agreement." The loan term was five years, during which time the parties amended the Loan Agreement five times. The third amendment to the Loan Agreement, on March 2, 2018, added the Additional Lender to the Loan Agreement.

The Lender's process of raising EB-5 funds and loaning them to the Borrower was slower than expected, and while the Lender could notify the Borrower that they were not going to be able to raise the full $120 million, which in turn would have given the Borrower the right to seek other financing secured by a lien senior in right to the Lender's lien, the Lender delayed providing that notice until January 6, 2020, nearly four years into the loan term and nearly two-and-a-half years after the Lender knew the EB-5 market in China had dried up (and thus, they wouldn't be able to raise any new EB-5 funds for the Borrower).

At the outset of this litigation, the Lenders filed a motion to dismiss Plaintiff's claims (ECF No. 16) and argued that the Equity Requirement Guaranty and Loan Agreement were _un_ambiguous as to "when" contributions of the Borrower's Equity Requirement were required.[7] The Court rejected that argument and found that the Equity Requirement Guaranty and Loan Agreement were

---

[7] ECF No. 24, at 2 (arguing the Loan Agreement is "plain and unambiguous").

ambiguous as to "when" contribution of the Borrower's Equity Requirement is required.[8] It denied the Lenders' motion accordingly, and allowed the parties to conduct discovery of parol evidence.[9]

Discovery in turn has uncovered parol evidence which indisputably shows that the parties understood contribution of the Borrower's Equity Requirement would be over time, in proportion to the total EB-5 funds the Lender loaned to the Borrower to maintain the debt-to-equity balance of the loan. Those undisputed facts warrant summary judgment in Plaintiff's favor on its first and second causes of action for declaratory relief, and on the Lender's claim that Plaintiff breached the Equity Requirement Guaranty.

Moreover, because the Lender inexplicably delayed their notification of the Borrower that they would not be able to raise the full $120 million for two-and-a-half years after they knew EB-5 funds had dried up in China, Plaintiff is entitled to summary judgment in its favor on Plaintiff's third cause of action for breach of the implied covenant of good faith and fair dealing. This breach also provides a separate reason Plaintiff is entitled to judgment in its favor on its declaratory relief claims and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty, since the Lender cannot show it acted with the "reasonable, good faith judgment" its proffered construction of the Loan Agreement required it to exercise,[10] and pursuant to the First Breach Rule.

Each of these bases for summary judgment is explained in more detail below.

---

[8] Trans. of Hg. (ECF No. 30), at 47:7-21 (the Court asking Lenders' counsel, "When are the funds due?"), 48:23-49:22 (same); *accord id.*, at 21:6-23:5 (Plaintiff's counsel explaining the Lenders' counsel failed to answer the question of when contribution of the Borrower's Equity Requirement was required), ECF No. 20, at 10-12 (explaining why the documents are ambiguous, and why that necessitated denial of the motion).

[9] ECF No. 28; *accord Travelers Prop. Cas. Co. of Am. v. Fed. Recovery Servs., Inc.*, 156 F.Supp.3d 1330, 1334-35 (D.Utah 2016) (ruling that "[h]aving lost its earlier motion, Defendants [sic] cannot seek to relitigate the same issue" because of the law of the case doctrine).

[10] *See* Loan Agmt., Pl.'s App. of Evid., Ex. 1, at SMHG002925 § 5.17.3.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In accord with Rule 56(c)(1) and DUCivR 56-1(b)(3), Plaintiff provides the Court with the following statement of facts material to this motion, as to which there is no genuine dispute:

### The Parties' Agreements

1.      The Borrower and the Lender entered into the Loan Agreement on June 28, 2016.[11] The Loan Agreement was subsequently amended five times, on September 23, 2016, October 31, 2017, March 2, 2018, May 24, 2018, and January 31, 2019.[12]

2.      Plaintiff signed the operative version of the Equity Requirement Guaranty with the second amendment to the Loan Agreement on October 31, 2017.[13]

3.      Both the Loan Agreement and Equity Requirement Guaranty are governed by New York law.[14]

4.      In Section 1(a) of the Loan Agreement, Plaintiff guaranteed "punctual payment of … Borrower's Equity Requirement, as and when required under the Loan Agreement."[15]

5.      The Loan Agreement, for its part, defines "Borrower's Equity Requirement" with respect to Section 5.17 of the Loan Agreement:[16]

---

[11] App. of Evid., Ex. 1; *accord* App. of Evid., Ex. 8, Answer to RFA No. 1 (admitting Ex. 1 is a true and correct copy of the Loan Agreement).

[12] App. of Evid., Exs. 2-6; *accord* App. of Evid., Ex. 8, Answers to RFA Nos. 2-6 (admitting Exs. 2-6 are true and correct copies of the first through fifth amendments to the Loan Agreement).

[13] App. of Evid., Ex. 7; *accord* App. of Evid., Ex. 8, Answer to RFA No. 8 (admitting Ex. 7 is a true and correct copy of the Equity Requirement Guaranty); *see also* App. of Evid.. Ex. 3 (second amendment to the Loan Agreement, dated October 31, 2017).

[14] App. of Evid., Ex. 1, at SMHG002943-002944 § 9.17; App. of Evid., Ex. 7, at SMHG002868 § 15.

[15] *Id.*, at SMHG002864 § 1(a).

[16] App. of Evid., Ex. 1, at SMHG002881. The Borrower's Equity Requirement of $87,192,584.00 is the exact difference between the total expected budget of $207,192,584.00 and $120,000,000.00 in EB-5 loan proceeds. *See id.*, at SMHG002951 (showing the project's total budget).

> "**Borrower's Equity Requirement**" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

6.      However, the subpart of Section 5.17 that defines when the loan is "in balance" simply ensures that the project stays in budget as the loan proceeds are advanced and Borrower's Equity Requirement is contributed,[17] and provides that this "in balance" requirement would have to be met "at such time (and from time to time)" in the course of the loan term, but does not say when:

> 5.17.1. Anything contained in this Loan Agreement to the contrary notwithstanding, the Loan shall at all times be "in balance" on (a)an individual Budget line item basis, and (b)an aggregate Budget amount basis. The Loan shall be deemed to be "in balance" on an individual Budget line item basis only at such time (and from time to time) as the unexpended amount for each Budget line item, without including the contingency (except to the extent reallocated to such line item in accordance with Section 2.4.5(d)), is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete such Budget line item. The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project. Without limiting the generality of the foregoing, the Liquid Funds Amount must remain, in combination with the undrawn Loan proceeds (*i.e.*, as of any date, the remainder of $120,000,000.00 less the sum of total Advances then made), sufficient to pay for all Approved Costs anticipated to be incurred in the succeeding (prospective) twelve (12) month period in accordance with the Budget, the Plans and Specifications and the Schedule.

7.      Section 2.4.5(a) of the Loan Agreement provides some clue, in that it requires the loan to be "in balance" after each advance (individually and in the aggregate), but does not state how much the Borrower was required to contribute or—more importantly—when the contributions were required:[18]

---

[17] *Id.*, at SMHG002924-002925 § 5.17.1; Consolidated Depo. of Tang Tang, KT Capital, and KT Summit Development Manager, LLC (Feb. 24, 2023) ("Tang Depo."), App. of Evid., Ex. 9, at 123:6-125:16; Consolidated Depo. of Jeffrey Cheung and Lenders (Apr. 5, 2023) ("Cheung Depo."), App. of Evid., Ex. 10, at 41:10-42:22.

[18] *Id.*, at SMHG002904 § 2.4.5(a).

> 2.4.5.  *Loan in Balance*.
>
>     (a)    Following the requested Advance, the Loan shall be "in balance" as required by <u>Section 5.17</u> hereof.

8.    Section 3.3.2 of the Loan Agreement provides another clue, in that it requires that the Borrower provide the Lender with evidence that the Loan was "in balance" after the Borrower sold a condominium unit within the Village, but still does not identify how much was required to be contributed or when:[19]

> 3.3    *Release of Units*.  Lender shall from time to time upon the request of Borrower received not less than five (5) Business Days prior to any release contemplated by this <u>Section 3.3</u>, release individual Units from the Lien of the Deed of Trust and from any other Liens held by Lender, provided that:  (a) no Event of Default exists on the date of the proposed release; (b) contemporaneous with any such release, there shall be a sale of such Unit pursuant to an Approved Contract; and (c) Lender shall have received all of the following with respect to the Unit to be sold:
>
>     3.3.1.  an Approved Contract certified by Borrower to be a true and complete statement of the terms of sale with respect thereto;
>
>     3.3.2.  evidence that Borrower has received the Release Price and that Borrower has applied or has reserved such funds to pay Approved Costs or otherwise to satisfy the requirements of Section 5.17 of this Agreement for the Loan to be "in balance";

9.    Section 5.28 also provides a clue, in that it requires the Borrower to contribute four single-family "JV Neighborhood Developments" to the Lender's collateral package as aggregate EB-5 loan proceeds reached thresholds of $15 million, $25 million, $35 million, and $45 million,[20] but it still does not answer the question of what amounts of the Borrower's Equity Requirement was required to be contributed, or when:

> 5.28    *JV Neighborhood Developments*.  Prior to the aggregate Advances under this Agreement exceeding $15,000,000.00, Borrower must acquire marketable fee simple title and satisfy the requirements of this <u>Section 5.28</u> with respect to Horizon Neighborhood.  Subject to <u>Section 2.9</u>, thereafter, prior to any Advance that would cause the aggregate Advances under this Agreement to exceed $25,000,000.00, $35,000,000.00 and $45,000,000.00, respectively, Borrower shall, in each case, acquire marketable fee simple title and satisfy the requirements of this <u>Section 5.28</u> with respect to another JV Neighborhood Development such that all of the JV

---

[19] *Id.*, at SMHG002912 § 3.3.2.
[20] *Id.*, at SMHG002929 § 5.28.

Neighborhood Developments shall be subject to a Deed of Trust prior to any Advance that would cause the aggregate Advances under this Agreement to exceed $45,000,000.00. With respect to each JV Neighborhood Development, contemporaneously with Borrower's acquisition of marketable fee simple title, Borrower shall (a) modify the Deed of Trust to add the applicable JV Neighborhood Development to the Mortgaged Property granted for the benefit of Lender under the Deed of Trust, subject only to the Permitted JV Neighborhood Development Exceptions (or, at Lender's election, grant a new Deed of Trust for the benefit of Lender, in substantially the same form as the Deed of Trust granted by Borrower as of the date hereof), (b) deliver to Lender an endorsement to Lender's loan policy of insurance (or if the same is not available for any reason, a new loan policy of title insurance) with respect to the Mortgaged Property, insuring the Deed of Trust as a first lien on the applicable JV Neighborhood Development, subject only the Permitted JV Neighborhood Development Exceptions, (c) pay all costs and expenses incurred by Lender in connection with Borrower's acquisition of the applicable JV Neighborhood Development (including without limitation, title premiums and reasonable attorneys' fees), and (d) provide such additional items as Lender reasonably requests, including without limitation, authority documents and an opinion of counsel, an Appraisal and environmental reports with respect to the applicable JV Neighborhood Development and evidence of insurance with the respect to applicable JV Neighborhood Development.

10.     The Loan Agreement—and thus the Guaranty, inasmuch as it incorporates the Loan Agreement by reference—is ambiguous as to the question of "when" contribution of the Borrower's Equity Requirement is required. ECF No. 28 (denying Lenders' motion to dismiss); *accord* ECF No. 20, at 10-12 (explaining that Lenders' motion should be denied because the Loan Agreement is ambiguous).

## The Lenders' Managers and Agents

11.     Mr. Tang acted as the Lenders' principal negotiator of the Loan Agreement and the Equity Requirement Guaranty.[21]

---

[21] Tang Depo., App. of Evid., Ex. 9, at 119:19-120:2; Cheung Depo., App. of Evid., Ex. 10, at 19:12-20:5.

12. Mr. Tang was employed by KT Capital,[22] which owned and managed ███████

Development Manager, LLC ("KT Summit").[23] ██████████████████████████

████████████████████.[24]

13. As the Lender's Class A Manager, KT Summit's duties include liaising with EB-5 fundraisers in China.[25]

14. However, the Lender is principally managed by Celona Asset Management (USA) Ltd. ("Celona"), which was appointed as the Lender's Class B Manager on September 20, 2015.[26]

15. ████████████████████████████████████████

████████████████████████████████.[27]

### The Parties' Negotiations and Course of Dealing

16. The parties have always understood the Borrower's Equity Requirement would be contributed from sources that include the following:

a. The Borrower's contribution of a 4.5-acre piece of land to the project, upon which the Village would be built, and for which the Borrower was given credit toward the Borrower's Equity Requirement of $29 million;[28]

---

[22] Tang Depo., App. of Evid., Ex. 9, at 15:21-25, 22:11-16.
[23] *Id.*, at 16:1-18.
[24] *Id.*, at 83:20-84:1; *accord* App. of Evid., Ex. 11 (agreement dated September 20, 2015 appointing KT Summit as the Lender's Class A Manager).
[25] *Id.*, at LENDERS_0003247 § 2.1; *accord* Tang Depo., App. of Evid., Ex. 9, at 84:2-6.
[26] App. of Evid., Ex. 12 ███████████████████████████████████
███████████ *accord* App. of Evid., Ex. 13 ███████████████ at LENDERS_ 0002636-LENDERS_0002638 § 5.1.1 ████████████
[27] Cheung Depo., App. of Evid., Ex. 10, at 22:16-24:2.
[28] App. of Evid., Ex. 14, at LENDERS_0005100; App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980; App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003636.

      b.     Non-refundable sales deposits for real estate sold within the Village;[29] and

      c.     Proceeds from Tax Increment Financing (TIF) bonds that would be issued by Weber County based on the increased tax base the County would receive from the new taxable real estate within the project.[30]

17.     Indeed, the LOI signed by Plaintiff and KT Capital on September 2, 2015, includes those three sources:[31]

> Capital Stack:    The Development Costs are anticipated to be funded as follows:
>
> | EB-5 Senior Secured Mortgage Loan | $150,000,000 |
> | Weber County Special Assessment Bonds | $18,600,000 |
> | Sponsor Equity | $92,524,063 |
> | Total | $261,124,063 |
>
> Sponsor Equity comprises the following: (i) in-kind contribution of the Property at an independently appraised value of $29.0 million; (ii) an estimated cash contribution by the Sponsor of $16,679,300 in tax increment financing ("TIF") proceeds; (iii) an estimated cash contribution by the Sponsor of $4,498,625; and (iv) allocation of an estimated $42,346,138 constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units.

18.     Those three sources were also included in the Original PPM:[32]

---

[29] App. of Evid., Ex. 14, at LENDERS_0005100; App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980-LENDERS_0003981; App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003637.

[30] App. of Evid., Ex. 14, at LENDERS_0005100; App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980; App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003636-LENDERS_0003637.

[31] App. of Evid., Ex. 14, at LENDERS_0005100.

[32] App. of Evid., Ex. 15, at LENDERS_0003940, LENDERS_0003980-LENDERS_0003981.

The Summit Village Costs will be funded by:

(1)    the Loan from the Company; and

(2)    Owner equity, which includes: (i) US$29.0 million of an in-kind contribution of the Property, (ii) US$16,679,300 of anticipated TIF financing, (iii) US$4,498,625 of equity and cash contribution and (iv) US$42,346,138 from non-refundable deposits from the purchase of townhome and condominium units in Summit Village.

19.    The Original PPM even provided pro forma cash flow statements that showed those sources materializing over time as the EB-5 loan proceeds were advanced to the Borrower, and as development costs were expended:[33]

| | Inception | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Annual Development Costs\*** | | | | | | | | | | | | |
| Hard Costs | 0 | 9,651,938 | 64,346,256 | 86,867,445 | | | Potential add'l development based on prevailing market | | | | | 160,865,639 |
| Soft Costs & Contingency | 11,125,000 | 14,002,420 | 7,677,346 | 10,584,912 | | | Potential add'l development based on prevailing market | | | | | 43,389,678 |
| Land | 29,000,000 | 0 | 0 | 0 | | | Potential add'l development based on prevailing market | | | | | 29,000,000 |
| Interest Expense | 0 | 940,986 | 2,993,201 | 6,684,559 | 8,625,000 | 8,625,000 | Potential add'l development based on prevailing market | | | | | 27,868,747 |
| Total | 40,125,000 | 24,595,344 | 75,016,803 | 104,136,916 | 8,625,000 | 8,625,000 | | | | | | 261,124,063 |
| | | | | | | | | | | | | |
| **Development Funding** | | | | | | | | | | | | |
| Profits from Homesite Construction | | | | 3,927,925 | 0 | 570,700 | Potential add'l development based on prevailing market | | | | | 4,498,625 |
| Land Contribution | 29,000,000 | 0 | 0 | 0 | | | Potential add'l development based on prevailing market | | | | | 29,000,000 |
| EB-5 Facility | 11,125,000 | 10,479,965 | 60,901,424 | 67,493,611 | | | Potential add'l development based on prevailing market | | | | | 150,000,000 |
| Assessment Bonds | 0 | 0 | 0 | 18,600,000 | | | Potential add'l development based on prevailing market | | | | | 18,600,000 |
| Total Net Sales Deposits | 0 | 14,115,379 | 14,115,379 | 14,115,379 | | | Potential add'l development based on prevailing market | | | | | 42,346,138 |
| TIF | 0 | 0 | 0 | 0 | 8,625,000 | 8,054,300 | Potential add'l development based on prevailing market | | | | | 16,679,300 |
| Total | 40,125,000 | 24,595,344 | 75,016,803 | 104,136,916 | 8,625,000 | 8,625,000 | | | | | | 261,124,063 |

20.    In March of 2016, Plaintiff's representative, Tom Jolley, and Mr. Tang exchanged e-mails in which they both confirmed the parties' understanding that the funding of the Borrower's Equity Requirement would be "pro-rata" with the EB-5 funds the Lender disbursed:

a.    In an e-mail on March 7, 2016, Mr. Tang noted the parties' agreement "that the developer equity … would be funded pro-rata with the EB-5 disbursements;"[34] and

---

[33] *Id.*, at LENDERS_0003970.
[34] App. of Evid., Ex. 17, at SMHG015200; *accord* Tang Depo., App. of Evid., Ex. 9, at 94:9-23 (authenticating Exhibit 17).

      b.     In an e-mail on March 15, 2016, Mr. Jolley confirmed Mr. Tang "negotiated with Greg [Mauro] a pro-rata funding of developer's equity with the disbursements of EB-5 proceeds."[35]

21.    Like the Original PPM, the A&R PPM describes the sources from which the parties understood the Borrower's Equity Requirement would be contributed:[36]

> The Total Development Cost is estimated to be approximately US$307 million, which is comprised of the Summit Village Costs and the Residential Component Cost (both terms defined below). The cost to develop Summit Village, the Event Spaces, the JV Neighborhood Developments and the Infrastructure Component is estimated to be approximately US$207 million ("**Summit Village Costs**"). The Developer intends to use the proceeds of the Loan to fund up to US$120 million of the Summit Village Costs. The remaining $87 million of the Summit Village Costs are expected to be funded by (i) an in-kind contribution of the Summit Village Property, which is reflected in the capital stack at value of $29.0 million but which has been independently appraised at an "as complete" a value of US$46.8 million, (ii) US$16.7 million in tax increment financing proceeds, (iii) approximately US$28.8 million of proceeds from the sale of underlying homesites in the JV Development Neighborhoods, (iv) an estimated US$12.6 million constituting non-refundable deposits by purchasers of townhome, condominium and hotel condominium units.
> […]

22.    Those sources were the following:

      a.     An "in-kind contribution" of the 4.5-acre parcel on which the Village would be built, for which the Borrower was given equity credit of $29 million;[37]

      b.     $16.7 million in Tax Increment Financing (TIF) proceeds;[38]

      c.     $28.8 million in sales proceeds from lots in the single-family neighborhoods that surround the Village (defined as "JV Development Neighborhoods");[39] and

---

[35] App. of Evid., Ex. 18, at LENDERS_0008641.
[36] App. of Evid., Ex. 16, at LENDERS_0003594, LENDERS_0003636-LENDERS_0003637.
[37] Note 36, *supra*.
[38] *Id.*
[39] *Id.*

d.      $12.6 million in non-refundable sales deposits, deposited by the purchasers

of townhome, condominium, and hotel condominium units in the Village.[40]

23.      Just like the Original PPM, the A&R PPM also included pro forma cash flows that

showed the sources of the Borrower's Equity Requirement materializing over time as the Lender

advanced the full $120 million in EB-5 loan proceeds to the Borrower and as development costs

were expended:[41]



24.      These pro forma cash flows were taken directly from a business model that Plaintiff

shared with the Lenders,[42] a business model that forensic accountant Matt H. Connors, ASA, CPA/

ABV, CFE, reviewed.[43]

---

[40] *Id.*
[41] *Id.*, at LENDERS_0003627.
[42] Expert Witness Rept. of Matt H. Connors (Dec. 21, 2022), App. of Evid., Ex. 19, at 12 (stating that the Lender "appear[s] to have received critical portions of the Development Model").
[43] *Id.*

25.    Mr. Connors concluded from his review that the model reflects an understanding that the Borrower would contribute the Borrower's Equity Requirement over time in proportion to the EB-5 loan proceeds the Lender actually advanced.[44]

26.    Moreover, both the Original PPM and the A&R PPM were used to solicit investors in China to invest in the Lender,[45] making any misstatement therein—including any misstatement with respect to when contribution of the Borrower's Equity Requirement would be required— subject to the penalties of securities laws.[46]

27.    In fact, James Yuan, an employee of Cottonwood Management, LLC,[47] the servicer of the loan ("Cottonwood"),[48] sent an e-mail to Celona's Chief Operating Officer,[49] a man named Jeffrey Cheung, on November 11, 2017, confirming he "discussed this matter with the Borrower and … *agreed* that *any equity* should be committed on a *pro rata* basis with EB-5 disbursements in proportion to the 'sources of funding.'"[50]

---

[44] *Id.*, at 7-12 (explaining his analysis of the Development Model and PPM, and concluding those documents "confirm the expectation that the Borrower's Equity Requirement would be paid over time as the Lender advanced the full $120,000,000 loan").

[45] Tang Depo., App. of Evid., Ex. 9, at 65:2-5, 164:2-10.

[46] 15 U.S.C.A. § 77l (West 2023); *see also* Lee, Sharon M., *The Development of China's Securities Regulatory Framework and the Insider Trading Provisions of the New Securities Law*, 14 N.Y. Int'l L. Rev. 1, 24 (Summer 2001) (explaining China's heightened penalties for securities fraud).

[47] Depo. of Alex Shing and Cottonwood (Mar. 17, 2023), App. of Evid., Ex. 20, at 33:21-34:14.

[48] *See generally* App. of Evid., Ex. 21 (Cottonwood's agreement with the Lender confirming the scope of its agency as servicer of the loan).

[49] Cheung Depo., App. of Evid., Ex. 10, at 7:16-20, 8:15-19.

[50] App. of Evid., Ex. 22, at LENDERS_0104123 (emphasis added).

28.    While the Lender previously claimed this e-mail from Mr. Yuan merely reflected

an "accommodation," the Lender has produced zero evidence that this understanding of what Mr.

Yuan describes as an "agree[ment]" was ever communicated to the Borrower.[51]

29.    Moreover, from July 28, 2016, through January 31, 2020, the Lender funded a total

of 17 advances requested by the Borrower,[52] deeming the loan to be "in balance" on an individual

line item as well as an aggregate basis for each advance as required by Section 2.4.5(a) of the Loan

Agreement.[53]

30.    Although the Borrower included spreadsheets titled "Equity Prove-Up" with many

of the Requests for Advances it sent to the Lenders,[54] none of those spreadsheets made any mention

of the Equity Requirement Guaranty,[55] and the Lenders have no documents showing that they ever

---

[51] *See* 1 WILLISTON ON CONTRACTS § 4:1 (4th ed.) ("In the formation of contracts, … it was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties"); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 18, cmt. a (2021) (explaining that mutual assent is only operative to the extent manifested).

[52] App. of Evid., Ex. 23; *accord* Cheung Depo., at 76:20-78:12.

[53] *Id.*, at 81:16-21.

[54] App. of Evid., Ex. 24 (e-mail from Plaintiff's general counsel, Shaun Mulreed, attaching Equity Prove-Up spreadsheet to e-mail delivering Request for Advance #4); App. of Evid., Ex. 25 (same with respect to Request for Advance #5); App. of Evid., Ex. 26 (same with respect to Request for Advance #6); App. of Evid., Ex. 27 (same with respect to Request for Advance #7); App. of Evid., Ex. 28 (same with respect to Request for Advance #9); App. of Evid., Ex. 29 (same with respect to Request for Advance #11); App of Evid., Ex. 30 (same with respect to Request for Advance #12); App. of Evid., Ex. 31 (same with respect to Request for Advance #13); App. of Evid., Ex. 32 (same with respect to Request for Advance #14); App. of Evid., Ex. 33 (same with respect to Request for Advance #15); App. of Evid., Ex. 34 (same with respect to Request for Advance #16); App. of Evid., Ex. 35 (same with respect to Request for Advance #17).

[55] App. of Evid., Ex. 36 (print-out of spreadsheet attached to Exhibit 24 showing *no* reference to the Equity Requirement Guaranty); App. of Evid., Ex. 37 (same with respect to Exhibit 25); App. of Evid., Ex. 38 (same with respect to Exhibit 26); App. of Evid., Ex. 39 (same with respect to Exhibit 27); App. of Evid., Ex. 40 (same with respect to Exhibit 28); App. of Evid., Ex. 41 (same with respect to Exhibit 29); App. of Evid., Ex. 42 (same with respect to Exhibit 30); App. of Evid., Ex. 43 (same with respect to Exhibit 31); App. of Evid., Ex. 44 (same with respect to Exhibit 32);

considered the Equity Requirement Guaranty when determining the loan to be "in balance" under Section 2.4.5(a) or otherwise.

31.    Indeed, the Lenders determined the loan to be "in balance," individually and in the aggregate, with every one of the 17 advances they loaned to the Borrower,[56] without ever asking Plaintiff to make any contributions pursuant to the Equity Requirement Guaranty.

32.    In fact, while the Lender has previously made much of its supposed "discretion" in Sections 5.17.3 and 5.17.4 of the Loan Agreement to determine when the loan was "in balance,"[57] the Lender ignores the fact that Section 5.17 was concerned with making sure the project stayed in budget,[58] which is why Section 5.17.2 required the Lender to develop an estimate of construction costs before the Lender could claim the loan was not "in balance."[59]

33.    The Lender ignores this concession because it has no evidence it ever developed this required estimate of construction costs, and thus no evidence it could invoke its "discretion" under Sections 5.17.3 or 5.17.4.

### The Importance of a TEA Designation

34.    As explained in the Original PPM and the A&R PPM, ███████████ ███████████████████████████ the effect of which was ██████████ ███████████████████████████████████[60]



---

App. of Evid., Ex. 45 (same with respect to Exhibit 33); App. of Evid., Ex. 46 (same with respect to Exhibit 34); App. of Evid., Ex. 47 (same with respect to Exhibit 35).
[56] Cheung Depo., App. of Evid., Ex. 10, at 81:16-21.
[57] *See generally* Lenders' Mot. for Summ. J. (ECF No. 123).
[58] Note 17, *supra*.
[59] App. of Evid., Ex. 1, at SMHG002925 § 5.17.2.
[60] App. of Evid., Ex. 15, at LENDERS_0003947, LENDERS_0004008; App. of Evid., Ex. 16, at LENDERS_0003602, LENDERS_0003664.

35. ███████████████████████████████████████████[61]

36.    However, whether the Village remained in a TEA was beyond the control of any of the parties,[62] and as Mr. Tang confirmed in his deposition, the Village's continuing designation as a TEA was such a fundamental assumption on which the transaction was based that without it the transaction would have made little sense.[63]

37.    Indeed, both the Original PPM and the A&R PPM ██████████████████



████████████████████████████████████████████████[64]

## The Lenders' Bad Faith

38.    Plaintiff gave the Equity Requirement Guaranty as "an Affiliate of Borrower" that expected to "derive material financial benefit from the Loan."[65]

39.    While the Loan Agreement allows the Lender to loan less than the full $120 million to the Borrower if the Lender fails to raise the full $120 million,[66] the Loan Agreement ensures the Village could still be constructed by giving the Borrower the right to obtain other financing secured by a lien senior in right to the Lender's loan, once the Lender notified the Borrower that it expected to be unable to raise the full $120 million in EB-5 funding:[67]

---

[61] Tang Depo., App. of Evid., Ex. 9, at 194:23-195:7.
[62] Cheung Depo., App. of Evid., Ex. 10, at 25:11-27:2.
[63] Tang Depo., App. of Evid., Ex. 9, at 194:5-195:11.
[64] App. of Evid., Ex. 15, at LENDERS_0004008; App. of Evid., Ex. 16, at LENDERS_0003664.
[65] App. of Evid., Ex. 7, at SMHG002864 (last recital to the Equity Requirement Guaranty).
[66] App. of Evid., Ex. 1, at SMHG02897 § 2.1 (providing that Lender has "no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance").
[67] *Id.*, at SMHG002913 § 3.4.

3.4    *Senior Loans*.  Borrower shall have the right to obtain debt financing or obtain equity contributions secured by the Mortgaged Property senior in right to the Loan (such senior loans or equity, collectively, the "**Senior Loans**," each of which is a "**Senior Loan**") if Lender notifies Borrower in writing that the aggregate amount of the Advances is reasonably expected by Lender to be less than $120,000,000; provided that (a) after giving effect to the proposed Senior Loans, the aggregate of the Loan Amount plus the amount of all Senior Loans does not exceed $120,000,000 (or such higher amount as may be approved by Lender in its sole discretion); (b) the proceeds of any Senior Loans will only be used to (i) pay or reimburse Approved Costs, or (ii) repay or refinance any Senior Loan securing a loan that paid or reimbursed Approved Costs; (c) such Senior Loans shall mature no earlier than the Maturity Date; and (d) no Event of Default exists at the time Borrower proposes to borrow a Senior Loan. If Borrower has the right under this Section 3.4 to obtain a Senior Loan, Lender agrees to enter into an Intercreditor Agreement with the proposed holder of such Senior Loan, and Borrower will not execute any documents evidencing or securing any Senior Loan unless and until Lender executes such Intercreditor Agreement.  Borrower shall provide Lender with copies of all documents evidencing and/or guaranteeing any Senior Loan, all of which shall be subject to Lender's reasonable approval.

40.    By September 25, 2017—15 months into the loan term—the Lender knew that the EB-5 market in China had dried up;[68] that's when Mr. Tang e-mailed David Finkelstein, the CEO of AIG, and said that "[e]veryone is doing very little EB-5 in China these days."[69]

41.    By April 16, 2018, the Lenders knew that delays in EB-5 fundraising were causing delays in the Borrower's ability to construct the Village.[70]

42.    Indeed, the Lender was told back in August 2016—just over a month into the loan term—that the Lender's failure to provide the EB-5 capital the Borrower needed was going to have a "critical impact on the project," and that the Borrower could not "scale back" its need for funding "any further."[71]

---

[68] Tang Depo., App. of Evid., Ex. 9, at 184:12-185:3; *accord* Statement of Undisputed Material Facts, *supra*, ¶¶ 12-13 (KT Summit's knowledge was within the course and scope of its agency as the Lender's Class A Manager).
[69] App. of Evid., Ex. 48, at LENDERS_0088551.
[70] App. of Evid., Ex. 49, at LENDERS_0012387-LENDERS_0012388; *accord* Tang Depo., App. of Evid., Ex. 9, at 186:21-187:18, 188:14-22.
[71] App. of Evid., Ex. 50, at SMHG102346.

43.     Finally, by January 3, 2019, the Lenders knew that the Village's TEA designation had lapsed.[72]

44.     Yet the earliest the Lenders purport to provide any notice to the Borrower that they did not expect to raise the full $120 million in EB-5 capital was January 6, 2020,[73] and even that notice said only that raising more EB-5 capital was "highly unlikely,"[74] and made no reference to Section 3.4 of the Loan Agreement.[75]

45.     Nevertheless, the Borrower undertook efforts to raise financing to allow it to finish construction of the Village,[76] but because the Lenders claimed Plaintiff owed them more than $51 million under the Equity Requirement Guaranty, the Borrower's efforts were ultimately futile.[77]

46.     Despite these facts, despite the fact that the Borrower submitted an Equity Prove-Up spreadsheet and the Lenders deemed the Loan to have been "in balance" (individually and in the aggregate) when they funded the last advance on January 31, 2020,[78] and despite the fact that nothing had changed about the Village development with respect to any debt or equity, the budget, or anything else,[79] the Lenders delivered a notice to Plaintiff on July 6, 2021, claiming that the

---

[72] App. of Evid., Ex. 51, at SMHG094580 (letter from the State of Utah designating the Village as within a TEA through January 3, 2019); *accord* Tang Depo., App. of Evid., Ex. 9, at 190:1-192:1.
[73] App. of Evid., Ex. 52, at LENDERS_0086095; *accord* Lenders' Supp'l Resps. and Obj. to Pl.'s Second Set of Disc. Reqs. (Apr. 14, 2023), App. of Evid., Ex. 53, at 3 (identifying Exhibit 52 and the later e-mails in the same thread as the only notice the Lenders gave under Section 3.4 of the Loan Agreement).
[74] App. of Evid., Ex. 52, at LENDERS_0086095.
[75] *See generally id.*
[76] Decl. of Greg Mauro, App. of Evid., Ex. 56, ¶ 11.
[77] *Id.* ¶ 12.
[78] Cheung Depo., App. of Evid., Ex. 10, at 81:16-21.
[79] Mauro Decl., App. of Evid., Ex. 56, ¶ 13.

loan was *not* in balance and that the Borrower had only contributed $35,930,227.00, and purporting to obligate Plaintiff to pay over $51 million under the Equity Requirement Guaranty.[80]

47.    Indeed, as the Lender's own loan servicer put it, any attempt to enforce the Equity Requirement Guaranty against Plaintiff, in light of the transaction's history and the ambiguities in the Loan Agreement "would be very out of the blue."[81]

48.    Because of this bad faith, even if the Court were to adopt the Lender's construction of the Loan Agreement, the Lender cannot show it exercised the "reasonable, good faith judgment" that construction required of it.[82]

49.    The Lenders' actions described in paragraphs 37 through 46 above not only caused the Borrower to be unable to develop the Village,[83] but have deprived Plaintiff of several business opportunities and substantial revenue—to wit:

   a.    While Plaintiff likely would have been selling real estate at a clip of between $30 million per year and $50 million per year, it has only been selling real estate at a pace of between $7 million per year and $10 million per year;[84]

   b.    While the Borrower had opportunities to develop hotels including a Selina Hotel project, an opportunity that would have furthered an important business relationship for Plaintiff, that opportunity was foiled by the Lenders;[85] and

---

[80] App. of Evid., Ex. 54, at SMHG002981 (claiming the "Loan is out of balance pursuant to Section 5.17 of the Loan Agreement," and purporting to obligate Plaintiff to pay $51,262,357.00); *see also id.*, at SMHG002984 (listing Borrower's equity contributions).
[81] App. of Evid., Ex. 55, at LENDERS_0101627.
[82] App. of Evid., Ex. 1, at SMHG002925 § 5.17.3.
[83] Mauro Decl., App. of Evid., Ex. 56, ¶ 14.
[84] *Id.*, ¶ 15-16.
[85] *Id.*, ¶ 17-18.

       c.    While both Plaintiff and the Borrower had an opportunity to work with one of the world's preeminent real estate developers, East-West Partners, as advertised in the Original PPM and the A&R PPM,[86] that opportunity was lost because the Borrower never had the capital to develop the Village.[87]

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that the Court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit," *Doe v. University of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020), and a "dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

## ARGUMENT & ANALYSIS

There are two reasons Plaintiff is entitled to summary judgment in its favor on its claims for declaratory relief and for breach of the implied covenant of good faith and fair dealing, and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty. First, there is no genuine dispute that the parties always understood the Borrower's Equity Requirement would be contributed over time in proportion to the total EB-5 loan proceeds actually advanced by the Lenders. Second, there is no genuine dispute that the Lender breached the implied covenant of good faith and fair dealing by depriving the Borrower of its ability to seek financing senior in right

---

[86] App. of Evid., Ex. 15, at LENDERS_0003955-LENDERS_0003956; App. of Evid., Ex. 16, at LENDERS_0003609-LENDERS_0003610.
[87] *Id.*, ¶ 19.

to the Lender's loan for two-and-a-half years after the Lender knew the EB-5 market had dried up in China.

Each of these reasons will be examined in turn.

**I.   The Parties Always Understood the Borrower's Equity Requirement Would Be Contributed in Proportion to the Total EB-5 Loan Proceeds Advanced by the Lenders.**

Because the parol evidence is clear that the parties always understood that the Borrower's Equity Requirement would be contributed over time in proportion to the EB-5 loan proceeds the Lender actually disbursed, Plaintiff is entitled to judgment as a matter of law on its claims for declaratory relief and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty.

Guaranties are interpreted just like any other contract under New York law,[88] and are thus subject to the Parol Evidence Rule.[89] When determining whether or not a guaranty is ambiguous, New York courts look only to the four corners of the document.[90] If a court finds that the guaranty is ambiguous, it will consider parol evidence to decide what the parties intended.[91]

In this case, the Equity Requirement Guaranty is clearly ambiguous. In Section 1(a) of the Equity Requirement Guaranty, Plaintiff guarantied the "punctual payment of … Borrower's Equity

---

[88] *G-3 Purves Street, LLC v. Thomson Purves, LLC*, 953 N.Y.S.2d 109, 112 (App. Div. 2012).

[89] *United Orient Bank v. Lee*, 637 N.Y.S.2d 96 (App. Div. 1996) (citing *Namad v. Salomon Inc.*, 74 N.Y.2d 751, 752 (App. Div. 1989)).

[90] *Hoeg Corp., v. Peebles Corp.*, 153 A.D.3d 607, 608 (N.Y. App. Div. 2017) ("[A] court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities."); *see also Brad H. v. City of New York*, 928 N.Y.S.2d 221, 224 (2011); *Consedine v. Porteville Cent. School Dist.*, 12 N.Y.3d 286, 293 (2009); *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008).

[91] *Legum v. Russo*, 20 N.Y.S.3d 124, 126 (App. Div. 2015); *Schron v. Troutman Sanders LLP*, 963 N.Y.S.2d 613, 616 (App. Div. 2013).

Requirement, as and when required under the Loan Agreement."[92] The Loan Agreement, however, never specifies "when" contribution of the Borrower's Equity Requirement is required.

The Loan Agreement defines the "Borrower's Equity Requirement" by referring to Section 5.17's requirement that the Loan be "in balance,"[93] but says nothing at all about *when* contribution of the Borrower's Equity Requirement is required:[94]

> "**Borrower's Equity Requirement**" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

Section 5.17.1 defines what it means for the Loan to be "in balance," but says nothing about *when* the Borrower's Equity Requirement must be contributed to *keep* the loan "in balance"[95]— only that the loan must be "in balance … at such time (and from time to time)" ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄.[96] Sections 2.4.5(a) and 3.3.2 of the Loan Agreement provide some clue as to *when* contribution of the Borrower's Equity Requirement is required to be contributed, in that they require the loan to be "in balance" *after* each advance (both individually in the aggregate) and *after* a unit within the Village was sold,[97] but neither of those sections provides any information about the *amount* of the Borrower's Equity Requirement that must be contributed at such times.[98]

---

[92] App. of Evid., Ex. 7, at SMHG002864 § 1.

[93] App. of Evid., Ex. 1, at SMHG002881 § 1.1.

[94] *See generally id.*

[95] *Id.*, at SMHG002924-SMHG002925 § 5.17.1.

[96] Tang Depo., App. of Evid., Ex. 9, at 123:6-125:16; Cheung Depo., App. of Evid., Ex. 10, at 41:10-42:22.

[97] App. of Evid., Ex. 1, at SMHG002904 § 2.4.5(a); *id.*, at SMHG002912 § 3.3.2.

[98] In all its proffered constructions of the Loan Agreement, the Lender has failed to account for the requirements of Sections 2.4.5(a) and 3.3.2 that the loan be "in balance" at certain times. This, in turn, is fatal for the Lender's case, because New York law makes clear that courts cannot adopt a construction of an agreement that renders any provision without force and effect. *Corhill Corp. v.*

While the Lender has previously claimed that it had unfettered discretion to "declare" that the loan was not "in balance" under Sections 5.17.3 and 5.17.4, this ignores the concession by their principal negotiator that Section 5.17 is about making sure the project stays within budget, which is why Section 5.17.2 (which the Lender has ignored) required the Lender to generate an estimate of construction costs before it could claim the loan was not "in balance" pursuant to Sections 5.17.3 and 5.17.4. But the Lender ignores Section 5.17.2 because it has not produced a shred of evidence in this case that it ever generated the estimate of construction costs that was a prerequisite to any exercise of purported discretion by the Lender under Sections 5.17.3 and 5.17.4. Because of that failure, these Sections are simply not in play.[99]

Therefore, because the Loan Agreement fails to unambiguously express the parties' intent about *when* the Borrower is required to contribute the Borrower's Equity Requirement, the Equity Requirement Guaranty is rendered ambiguous insofar as it relies upon the Loan Agreement to

---

*S.D. Plants, Inc.*, 176 N.E.2d 37 (N.Y. 1961) ("[i]t is a cardinal rule of [contract] construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect"); *Bisimwa v. St. John Fisher College*, 194 A.D.3d 1467 (N.Y. App. Div. 2021) (explaining that when "construing an agreement, the language should not be read in isolation …; rather, [the entire agreement] must be read as a whole to give effect and meaning to every term"); *K.G. v. J.G.*, 149 N.Y.S.2d 830 (2021) (noting "the court should not adopt an interpretation of one provision which operates to leave other provisions without force and effect").

[99] Even if they were, it would not matter. While the Lender has claimed that the word "guarantees" in Section 5.17.4 is an allusion to the Equity Requirement Guaranty, this ignores the words "such as" in that same sentence, which make clear that the "guarantees" the Loan Agreement is referring to are types of "public financing incentives," along with "tax increment financing" and "transient room tax revenues." This was confirmed by the Lender's principal negotiator in an e-mail on June 24, 2016, in which he confirmed the loan was "in balance when we close," but refused to provide clarification of what everyone understood about Section 5.17.4, specifically that it was to give the Borrower "credit for all those sources of equity," i.e., sales deposits and tax increment financing, or TIF, bond proceeds. E-mail from Tang, Pl.'s App. of Evid., Ex. 57, at LENDERS_0095994. This refusal was because the Lender wanted to keep the loan documents to a form consistent with another deal, called "Stockbridge." *Id.* Any attempt by the Lender to reinvent the meaning of this section after the fact flies in the face of what its own negotiator says it meant.

specify *when* that contribution is required from Plaintiff. Under New York law, that ambiguity means that the Court may consider parol evidence to understand *when* the parties intended that the Borrower would contribute the Borrower's Equity Requirement.

On this point, the evidence is incontrovertible. Both the Original PPM and A&R PPM ▮▮



—sales deposits, sales proceeds, and proceeds from a TIF bond. ▮▮

Moreover, Mr. Tang and Plaintiff's employee, Tom Jolley, exchanged e-mails in March of 2016—three months before the Loan Agreement and Equity Requirement Guaranty were signed— confirming their understanding that the Borrower's Equity Requirement would be contributed "pro-rata" as the Lender disbursed the EB-5 loan to the Borrower. Indeed, Plaintiff's expert, Matt Connors, reviewed a complex development model Plaintiff and the Borrower shared with the Lender during the parties' negotiations of the Loan Agreement and the Equity Requirement Guaranty. The Lender incorporated parts of this model into the Original PPM and the A&R PPM. Consistent with all the parties' discussions on this point, Mr. Connors concluded from his review that the model showed the parties understood that the Borrower's Equity Requirement would be contributed over time as the EB-5 loan was disbursed and the Village was constructed.

This parol evidence, of course, explains the requirements in Sections 2.4.5(a) and 3.3.2 of the Loan Agreement that the loan be "in balance" after each advance and after the sale of units in

the Village. Because everyone understood the Borrower's Equity Requirement was required to be contributed "pro-rata" with the total EB-5 loan, it makes sense for the loan to be "in balance" after each advance of EB-5 loan proceeds—the Borrower needed to show it had contributed its pro-rata share of equity. It also makes sense for the loan to be "in balance" after the sale of real estate units since the parties clearly understood the Borrower's Equity Requirement would be contributed in part from sales proceeds of real estate units in the Village and some surrounding neighborhoods.

In addition, the parol evidence makes sense of Section 5.28 of the Loan Agreement, which requires the Borrower to contribute one of the "JV Neighborhood Developments"—sales proceeds of which were one of the sources from which contributions of the Borrower's Equity Requirement would come—as additional collateral when the total amount of the loan reached thresholds of $15 million, $25 million, $35 million, and $45 million. In other words, Section 5.28 requires a pro-rata contribution of collateral from whence sales proceeds would come, as the Lender disbursed EB-5 loan proceeds. Indeed, it was Plaintiff (directly or through a subsidiary) which held title to each of those JV Neighborhood Developments, and thus guarantied that the sales proceeds from those JV Neighborhood Developments would be contributed to the project "as and when required under the Loan Agreement."

If the Lenders were confused about the parties' negotiations, Mr. Yuan, an employee of the Lender's loan servicer, Cottonwood, cleared things up. As he stated in his November 11, 2017 e-mail to Mr. Cheung, Celona's Chief Operating Officer, he "discussed this matter with the Borrower and … _agreed_ that _any equity_ should be committed on a _pro-rata_ basis with EB-5 disbursements in proportion to the 'sources of funding.'"[100] Mr. Cheung responded by confirming the Borrower

---

[100] App. of Evid., Ex. 22, at LENDERS_0104123 (emphasis added).

had been given a good deal with Mr. Yuan's agreement, stating that "the Borrower is already better off than usual."[101] Nowhere did Mr. Cheung chastise Mr. Yuan or try to repudiate the agreement Mr. Yuan reached with the Borrower to resolve the Lender's confusion. Because "the court may consider the construction placed on the contract by the parties to help ascertain the meaning,"[102] the agreement that Mr. Yuan reached with the Borrower about the Loan Agreement's construction is dispositive: the parties quite clearly "agreed that any equity should be committed on a pro-rata basis with EB-5 disbursements."[103]

That, in turn, means that the Borrower has satisfied its Borrower's Equity Requirement and Plaintiff has no obligation to the Lenders under the Equity Requirement Guaranty. Under the Loan Agreement, the total EB-5 disbursements were expected to be $120 million, and the Borrower was expected to contribute a Borrower's Equity Requirement that totaled $87,192,584.00. The Lenders only disbursed $42 million in EB-5 funds, however. The Borrower was thus obligated to make an equity contribution of only $30,517,404.40.[104] As the Lenders concede in their July 6, 2021 notice, the Borrower contributed equity totaling $35,930,227.00,[105] far exceeding what it was obligated to contribute.[106] In other words, the loan consistently remained in debt-to-equity "balance."

---

[101] *Id.* at LENDERS_0104122.

[102] *Abramson v. Hasson*, 125 N.Y.S.3d 730, 770 (App. Div. 2020) (stating that "[w]here a contract is ambiguous, the court may consider the construction placed on the contract by the parties to help ascertain the meaning").

[103] App. of Evid., Ex. 22, at LENDERS_0104123 (emphasis added).

[104] ($87,192,584 ÷ $120,000,000) x $42,000,000 = $30,517,404.40.

[105] App. of Evid., Ex. 54, at SMHG002984 (conceding the Borrower's land contribution for a total of $29 million, JV Development Neighborhood sales proceeds totaling $3,615,003, and other cash equity totaling $3,315,224).

[106] This, of course, is in addition to the collateral Defendants received as described in Section 5.28 of the Loan Agreement.

Therefore, Plaintiff has no obligation to contribute anything under the Equity Requirement
Guaranty.

While the Lender will certainly argue for some other, alternative construction of the Loan
Agreement, any construction the Lenders will advance will seek to minimize the "risk" the Lenders
took on this transaction. This presents an issue, since the EB-5 program requires that the Lenders'
capital be truly "at risk" so that the Lenders' foreign national-investors could get their green cards.
Title 8, Section 204.6(j)(2) of the Code of Federal Regulations requires that these investors present
immigration authorities with "evidence that the [investor] has placed the required amount of capital
_at risk_ for the purpose of generating a return,"[107] and it has long been the position of the
Department of Justice, which oversees immigration matters including the EB-5 program,[108] that
capital that "is guaranteed to be returned, regardless of the success or failure of the business," is
not capital which qualifies foreign national-investors to receive visas under the EB-5 program.[109]
Yet that is exactly what the Lender seeks to transform the Equity Requirement Guaranty into—an
absolute guaranty that the Lenders' investors will get their money back, even though the Village
was not successfully developed. Such a construction of the Loan Agreement and the Equity
Requirement Guaranty is contrary to the public policy of the EB-5 program that is at the very heart
of this transaction, and—unsurprisingly—does not hold water in the face of the parol evidence set
forth above, which clearly shows the parties always understood the Borrower's Equity
Requirement would be contributed in proportion to the EB-5 funding actually advanced. That is
all Plaintiff guarantied, and as reflected in Mr. Yuan's e-mail and discussed above, the Borrower's

---

[107] 8 C.F.R. § 204.6(j)(2) (West 2023) (emphasis added).
[108] _See_ 8 U.S.C.A. § 1103.
[109] _In re Izummi_, 22 I. & N. Dec. 169, 184 (Jul. 13, 1998).

Equity Requirement has been satisfied in full. Plaintiff thus has no obligation to the Lenders under the Equity Requirement Guaranty.

While the Loan Agreement—and thus the Equity Requirement Guaranty—are ambiguous as to *when* contribution of the Borrower's Equity Requirement is required, the parol evidence makes things quite clear, and confirms what Plaintiff has asserted all along—that the Borrower was only required to contribute equity to the Village in proportion to the total amount of EB-5 proceeds the Lenders actually loaned to the Borrower. By the Lenders' own admission, the Borrower not only met the Borrower's Equity Requirement, but exceeded it by over $5 million, in addition to providing additional collateral under Section 5.28 of the Loan Agreement. Accordingly, Plaintiff is entitled, as a matter of law, to judgment in its favor on its claims for declaratory relief and the Lenders' claim that Plaintiff breached the Equity Requirement Guaranty.

## II.    The Lenders Acted in Bad Faith By Concealing Their Inability to Raise the Full $120 Million in EB-5 Funds for Two-and-a-Half Years.

Because no one disputes that the Lenders delayed giving the Borrower the right to pursue financing secured by rights senior to the Lenders for nearly two-and-a-half years (half of the loan term) after the Lender knew the EB-5 market had dried up in China, Plaintiff is entitled to judgment as a matter of law that the Lender breached the implied covenant of good faith and fair dealing inherent in the Equity Requirement Guaranty. This breach provides another reason Plaintiff is also entitled to judgment as a matter of law, under the First Breach Rule, on its claims for declaratory relief and the Lender's claim that Plaintiff breached the Equity Requirement Guaranty. Indeed, the Lender's own bad faith means the Lender cannot possibly show that it exercised anything close to

the "reasonable, good faith judgment" required of it under its own proffered construction of the Loan Agreement.[110]

Under New York law, "[i]mplicit in every contract is an implied covenant of good faith and fair dealing."[111] This implied covenant "is a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not expressly prohibit such conduct."[112] "Historically, New York courts have held that the covenant of good faith and fair dealing applies to cases where a contract contemplates the use of discretion."[113] "[E]ven an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement."[114]

Additionally, New York recognizes the First Breach Rule: "Under New York law, when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party."[115] This applies to guaranties, just like every other contract,[116] and a breach of the implied covenant can trigger application of the First Breach Rule just like any other breach.[117]

---

[110] App. of Evid., Ex. 1, at SMHG002925 § 5.17.3.

[111] *25 Bay Terrace Associates, L.O. v. Public Services Mut. Ins. Co.*, 148 N.Y.S.3d 484, 489 (App. Div. 2021).

[112] *Id.*, at 490.

[113] *Southern Telecom Inc. v. ThreeSixty Brands Group, LLC*, 520 F.Supp.3d 497, 505 (S.D.N.Y. 2021).

[114] *Legend Autorama, Ltd. v. Audi of America, Inc.*, 100 A.D.3d 714, 716 (N.Y. App. Div. 2012).

[115] *Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F.Supp.3d 637, 641 (S.D.N.Y. 2017).

[116] *See Parlux Fragrances, LLC v. S. Carter Enterprises, LLC*, 164 N.Y.S.3d 108, 122 (App. Div. 2022).

[117] *Rebecca Broadway Ltd. Partnership v. Hotton*, 37 N.Y.S.3d 72, 79 (App. Div. 2016).

In this case, even if the Lenders somehow convince the Court that the Equity Requirement Guaranty and Loan Agreement are not ambiguous or that they had discretion to call the Borrower's Equity Requirement due whenever they pleased, the Lenders' own material breach of the Equity Requirement Guaranty's implied covenant of good faith and fair dealing precludes them as a matter of law from now seeking to enforce that guaranty against Plaintiff.

In September 2017, Mr. Tang advised Mr. Finkelstein of AIG that everyone "is doing very little EB-5 in China these days."[118] Mr. Tang conceded in his deposition that this meant the Lenders knew in September 2017 that the EB-5 market had dried up in China.[119] The Lender also knew in April of 2018 that their incredibly slow pace in raising EB-5 capital was delaying the construction of the Village, and in January 2019 that the Village's TEA designation—a fundamental assumption on which the transaction was based—had expired.

Despite all of this, the Lender inexplicably delayed notifying the Borrower under Section 3.4 of the Loan Agreement that they were not going to be able to raise the full $120 million, which would have allowed the Borrower to pursue other financing secured by a lien senior in right to the Lenders' lien. The Lender purports to have provided the notice on January 6, 2020, nearly two-and-a-half years *after* they knew the EB-5 market had dried up in China and over three-and-a-half years into the loan term. But even that purported "notice" is unclear. It does not reference Section 3.4 of the Loan Agreement and says only that it is "highly unlikely" the Lender will be able to raise the full $120 million, not that the Lenders will be unable to do so.

---

[118] App. of Evid., Ex. 48, at LENDERS_0088551.
[119] Tang Depo., App. of Evid., Ex. 9, at 184:12-185:3; *accord* App. of Evid., Ex. 48.

Either way, the Lender has no excuse for this nearly two-and-a-half-year delay, the effect of which was to deprive Plaintiff of the "material benefit" it expected to receive from the loan as the Borrower's affiliate entity. Indeed, the Lender's delay deprived the Borrower of capital that it needed to develop the Village, which in turn wreaked havoc on Plaintiff's business. Plaintiff owns the land surrounding the Village, and should have been selling real estate at a clip of between ███ and ███████ per year. Instead, because the Lender's breach deprived the Borrower of the capital it needed to develop the Village, Plaintiff is selling at a fraction of what it should be. In addition, Plaintiff's affiliate, SMHG Phase I LLC, has now been sued for fraud because the Village was never developed.[120]

Moreover, the Lender's breach of the Equity Requirement Guaranty's implied covenant of good faith and fair dealing was complete on January 6, 2020, a full year-and-a-half *before* the date upon which the Lenders sent their notice claiming Plaintiff owed the Lenders over $51 million. In other words, there is no genuine dispute that the Lender's breach of the implied covenant preceded any supposed breach of the Equity Requirement Guaranty by Plaintiff. The First Breach Rule therefore precludes any right the Lender may have otherwise had to recover from Plaintiff under the Equity Requirement Guaranty, as a matter of law.

## **<u>CONCLUSION</u>**

Despite the requirements of the EB-5 program that their investors' capital be "at risk" and subject to loss, the Lender seeks to transform the Equity Requirement Guaranty into a guaranty of

---

[120] *See* Second Am. Answer to Compl., Reliance on Jury Demand, Countercl., and Third-Party Compl. (ECF No. 90), *SMHG Phase I LLC v. Eisenberg, et al.*, Case No. 1:22-CV-00035 (D.Utah, filed August 23, 2023).

absolute payment that defies the requirements of the EB-5 program at the heart of this transaction and flies in the fact of the parol evidence amassed in discovery.

As shown above, there can be no genuine dispute from that parol evidence that the parties all understood the Borrower's Equity Requirement would be contributed on a pro-rata basis over time in proportion to the total EB-5 proceeds the Lenders actually loaned to the Borrower. In light of that evidence, there is no genuine dispute that the Borrower satisfied its Equity Requirement in full, and then some, which means Plaintiff has no obligation to pay the Lender anything under the Equity Requirement Guaranty. Indeed, the very purpose of the Equity Requirement Guaranty was to ensure that the loan remained "in balance" with respect to the total debt and total equity actually contributed to the Village.

But even if the Lender could somehow controvert those facts, or persuade the Court that the Loan Agreement and Equity Requirement Guaranty were not ambiguous, or gave them some sort of discretion, the Lender cannot avoid the undisputed fact that they inexplicably waited nearly two-and-a-half years after learning the EB-5 market had dried up in China to notify the Borrower that they would not be able to raise the full $120 million. This delay deprived Plaintiff of the fruit it expected to receive under the Equity Requirement Guaranty as the Borrower's grandparent entity and the owner of much of the land surrounding the Village, which means not only that the Lender cannot enforce the Equity Requirement Guaranty against Plaintiff under the first breach rule, but that the Lender cannot show anything close to the "reasonable, good faith judgment" its proffered construction of the Loan Agreement requires it to show.

For all of these reasons and the reasons set forth above, the Court should grant this motion and enter summary judgment in Plaintiff's favor on its declaratory relief claims, the Lender's claim

36

that Plaintiff breached the Equity Requirement Guaranty, and Plaintiff's claim that the Lenders'

breached the implied covenant of good faith and fair dealing.

      DATED this 21st day of February, 2024.

                STRONG & HANNI


                */s/ Spencer W. Young*
                William B. Ingram
                Spencer W. Young
                Connor J. Keller
                *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 21st day of February, 2024, a true and correct copy of the foregoing PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT, with any exhibits and attachments, was served upon the following by the method respectively indicated below:

| | | |
|---|---|---|
| Matthew L. Lalli | ( ) | U.S. Mail, Postage Prepaid |
|    mlalli@swlaw.com | ( ) | Hand Delivery |
| Jeremy J. Stewart | ( ) | Overnight Mail |
|    jjstewart@swlaw.com | ( ) | Facsimile |
| Aline Marie H. Longstaff | (X) | Electronic Filing |
|    alongstaff@swlaw.com | ( ) | E-mail |
| SNELL & WILMER L.L.P. | | |
| 15 West South Temple, Suite 1200 | | |
| Salt Lake City, UT 84101-1531 | | |
| Telephone: (801) 257-1900 | | |

*Attorney for Defendants*

| | | |
|---|---|---|
| Jordan D. Beltz | ( ) | U.S. Mail, Postage Prepaid |
|    jbeltz@kasowitz.com | ( ) | Hand Delivery |
| Andrew W. Breland | ( ) | Overnight Mail |
|    abreland@kasowitz.com | ( ) | Facsimile |
| KASOWITZ BENSON TORRES LLP | (X) | Electronic Filing |
| 1633 Broadway | ( ) | E-mail |
| New York, NY 10019 | | |
| Telephone: (212) 506-1700 | | |

*Attorneys for Defendants*

| | | |
|---|---|---|
| Uri A. Itkin | ( ) | U.S. Mail, Postage Prepaid |
|    uitkin@akingump.com | ( ) | Hand Delivery |
| AKIN GUMP STRAUSS HAUR & FELD LLP | ( ) | Overnight Mail |
| One Bryant Park | ( ) | Facsimile |
| New York, NY 10036 | (X) | Electronic Filing |
| Telephone: (212) 872-1000 | ( ) | E-mail |

*Attorneys for Defendants*

_/s/ Kaylee Haines_
Kaylee Haines
_Legal Assistant_