SERVICING AGREEMENT

Between

COTTONWOOD MANAGEMENT, LLC,

as Servicer

and

CELONA ASSET MANAGEMENT (USA) LIMITED,

as Client

Dated as of July 1, 2016

709631688.3



EXHIBIT 6
WIT: SHING
DATE: 3-17-23
Jeanine Curcione, CSR, RPR

## SERVICING AGREEMENT

This SERVICING AGREEMENT (this "**Agreement**") is made as of July 1, 2016, between COTTONWOOD MANAGEMENT, LLC, a Delaware limited liability company (the "**Servicer**"), and CELONA ASSET MANAGEMENT (USA) LIMITED, a limited company incorporated under the laws of the Hong Kong Special Administrative Region of the People's Republic of China having its registered office at 2207-09 Tower Two, Lippo Centre, 89 Queensway, Admiralty, Hong Kong (the "**Client**"). The Servicer and the Client may each be referred to herein as a "**Party**" and collectively as the "**Parties**",

WHEREAS, Summit Village Development Lender 1, LLC, a Delaware limited liability company (the "**Lender**"), has appointed the Client and the Client has accepted the appointment as the class B manager of the Lender pursuant to a management agreement dated September 20, 2015 (as amended, supplemented and modified, the "**Management Agreement**") whereby, subject to the provisions therein, the Client is granted full power and authority for and on behalf of the Lender to do or cause to be done, inter alia, any and all things in connection with the servicing and administration of the Loan (as defined below);

WHEREAS, the Lender is about to make a loan to SMGH Village Development, LLC, a Delaware limited liability company (the "**Borrower**"), in the amount of up to $150 million (the "**Loan**") with respect to the development of a mixed use retail, residential and hotel project located near the summit of Powder Mountain located in Utah (the "**Project**");

WHEREAS, the Loan will be evidenced among other documents by a loan agreement (the "**Loan Agreement**"), a promissory note (together with the Loan Agreement and all other documents evidencing, securing and guarantying the Loan, the "**Loan Documents**");

WHEREAS, the Servicer is in the business of asset servicing and administering specified mortgage and mezzanine loans and investments in real estate under the direction of its clients; and

WHEREAS, the Servicer and the Client desire that the Servicer service the Loan subject to the terms hereof and the Loan Documents.

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Client and the Servicer agree as follows:

-1-

LENDERS_0125498

# ARTICLE I

## SERVICING

Section 1.1    <u>Appointment of the Servicer</u>.  The Servicer is hereby appointed to service and administer the Loan and shall diligently perform its obligations hereunder in accordance with (i) this Agreement, and to the extent applicable, the Loan Documents; (ii) applicable law; and (iii) commercially reasonable directions given from time to time by the Client.  If there is any conflict between the terms of this Agreement and the Loan Documents, the terms of the Loan Documents shall govern. Any capitalized term not otherwise defined herein shall have the meaning as specified in the Loan Documents.

Section 1.2    <u>Custody and Administration of Documents</u>.  The Client will deliver to the Servicer electronic copies of the Loan Documents, together with such other documents, including Project related documents (the "**Project Documents**") as the Servicer may reasonably request in order to perform its duties under this Agreement.  The Client or its duly appointed custodian (the Client in such capacity or its appointee, the "**Custodian**") shall be responsible for maintaining originals of the Loan Documents.  The Servicer may from time to time request from the Custodian the release to the Servicer of any such original documents held by the Custodian to the extent needed in connection with its duties hereunder and the Servicer shall return to the Custodian any such original documents when the Servicer's need therefor no longer exists, upon the Client's written request, or upon the expiration or termination of this Agreement, whichever first occurs. The Servicer shall maintain physical or imaged copies of all instruments or documents generated by or coming into the possession of the Servicer in connection with the performance of its duties hereunder.   All documents and records reasonably required to enable the Servicer to perform its duties and service the Loan, including Loan Documents and records received from the Client, the previous servicer or manager or any Custodian (the "**Servicing File**") shall remain at all times the property of the Lender, provided that the Servicer shall be entitled to retain copies thereof in accordance with its internal policies.

Section 1.3    <u>Duties of the Servicer</u>. Upon the Client's request, the Servicer shall perform any or all of the following duties regularly or from time to time in order to service and administer the Loan:

a)  Prepare and deliver a "hello" letter to the Borrower and any guarantors (individually and collectively, the "**Guarantor**").

b)  Review, organize and input required information from the Loan Documents into the Servicer's servicing system, and administer and maintain electronically copies of all documents and records comprising the Servicing File.

c)  Work with Lender's employees, consultants, or authorized representatives to monitor any and all deposit accounts in each of which the Lender has a security interest under the

-2-

LENDERS_0125499

Loan Documents (the "**Bank Accounts**") and review any deposit account control agreement required thereunder prior to acceptance by the Lender.

d) Prepare and make available to the Borrower payment billing statements, administer collection of all required monetary payments and review cash management account activity. The Client shall provide the Servicer with information about account activity conducted by the Lender and/or the Client outside the knowledge of the Servicer reasonably necessary for the Servicer to service and administer the Loan.

e) Provide insurance due diligence, monitoring of insurance covenant compliance, and at the Client's direction, enforcement of insurance coverage to ensure such compliance as required by the Loan Documents. If the Borrower fails to obtain or maintain the required insurance under the Loan Documents with respect to the Loan collateral, the Servicer will immediately so notify the Client and upon receipt of written approval from the Client to obtain such insurance and at the Lender's sole cost and expense, will obtain as soon as reasonably available such insurance with respect thereto. In the event the Servicer advances funds to obtain insurance on behalf of the Borrower, such advance will only be made after the Servicer has obtained the funds required to make such advance from the Client and the Servicer has obtained consent of the Lender in accordance with the terms of the Loan Documents. The Servicer will monitor any casualty losses or condemnation proceedings and, at the Client's direction, administer any proceeds related thereto in accordance with the Loan Documents.

f) File financial statement continuations (UCC-3's) in a timely fashion following receipt of recorded copies of UCC-1's and other relevant and necessary documents, if any, provided to the Servicer by the Client and file termination statements upon the Client's written request and receipt of necessary documents. The Servicer will be entitled to a fee from the Client as set forth on Exhibit A per continuation statement (or termination statement) filing (inclusive of filing fees). The Servicer will have no obligation to review any original filing with respect to accuracy, completeness, or perfection of the security interests therein. The Servicer will request such fees from the Borrower to the extent the Borrower is responsible for payment of such fees under the Loan Documents in which case the Servicer will pass through the fees collected to the Client.

g) Coordinate collateral releases amongst the Borrower, Lender, and other lenders (if any).

h) Make commercially reasonable efforts to collect from the Borrower (and make available to the Client (and any participants or syndicate members, if applicable)) property operating statements, rent rolls, financial statements and other reports which are required to be delivered by the Borrower pursuant to the Loan Documents and notify the Client if the Borrower fails to so comply.

i) Make commercially reasonable efforts to collect from the Guarantor (and make available to the Client (and any participants or syndicate members, if applicable)) Guarantor financial statements and other information required to be delivered by the Guarantor pursuant to the Loan Documents and notify the Client if the Guarantor fails to so comply.

-3-

j) Prepare and file all required 1098, 1099-A and 1099-C IRS forms with respect to the Loan on behalf of the Lender to the extent the Client has provided all relevant information necessary (not in the Servicer's possession) to complete such forms, provided that the Borrower will be responsible for filing 1099-MISC IRS forms for vendors even if vendors are paid by the Servicer via a draw on the Lender's funds.

k) Provide notices to the appropriate parties, as required, in accordance with the Loan Documents.

l) Prepare and deliver payoff quotes and collect and process payoff funds.

m) Maintain reasonable Loan records setting forth, among other things, the status of the Loan, the amount and application of any funds received on account of the Loan, the amount of any advances made in collection of, or other realization upon the Loan, in accordance with the terms of the Loan Documents.

n) Perform construction draw loan review and disbursement activities in accordance with the Loan Documents.

o) Provide for Lender's review and approval a plan for monitoring the Borrower's compliance with the representations, warranties, affirmative and negative covenants to be set forth in the Loan Agreement within ninety (90) days of the execution thereof, and prepare an update on the Borrower's compliance with the same thirty (30) days after the first disbursement of the Loan and thereafter by the same day of every month, until the full and final repayment of the Loan by the Borrower.

Section 1.4    Power and Authority. (a)    Except as otherwise provided herein, the Servicer is hereby granted and shall have full power and authority for and on behalf of the Lender, as required by and pursuant to the terms of the Loan Documents, to do or cause to be done any and all things in connection with the servicing and administration of the Loan as may be necessary or desirable to conform to the terms of this Agreement and the Loan Documents. All actions taken hereunder by the Servicer shall be performed in accordance with the terms of this Agreement and the Loan Documents. If the Servicer takes any action hereunder (or if the Client's consent is required, upon receipt of the Client's consent to any action), such action shall be taken with respect to the Loan by the Servicer, in its own name, as servicer for the Client and its participants, if any, successors and/or permitted assigns. In the event that the Client receives a request for consent from the Servicer and the Client does not consent or object within ten (10) Business Days of receipt of such request, the Client shall be deemed to not have consented to such matter. Subject to the terms of this Agreement, if the Servicer participates on behalf of the Lender in any legal proceedings involving the Loan, the Servicer is authorized and empowered to execute and deliver in its name as servicer for the Lender any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding. The Client agrees to cooperate with the Servicer by executing and delivering to the Servicer from time to time such documents or instruments reasonably necessary or appropriate to enable the Servicer to carry out its obligations hereunder, including appropriate powers of attorney evidencing the Servicer's authority and power under this Section. For purposes of this Agreement, if not already defined in the Loan Agreement which definition shall control,

-4-

"Business Day" means any day that is not a Saturday or Sunday, and that is not a legal holiday in any other city that serves as the principal place of business for the Servicer or any successor thereto or a day that banking institutions or savings associations in California, USA are closed for business.

(b)    In the performance of its obligations hereunder, the Servicer shall take any reasonable action directed by the Client which relates to the Servicer's obligations under this Agreement, provided that the Servicer shall not be obligated to take, or to refrain from taking, any action which the Client requests that the Servicer take or refrain from taking to the extent that the Servicer determines in its reasonable judgment that such action or inaction may (i) cause a violation of applicable laws, regulations, codes, ordinances, court orders or restrictive covenants with respect to the Loan, any Loan obligor or Loan collateral, (ii) cause a violation of any provision of the Loan Documents, (iii) expose the Servicer or its affiliates, shareholders, officers, directors, employees or agents to any claim, suit or liability, or (iv) materially expand the scope of the Servicer's responsibilities under this Agreement.

(c)    Notwithstanding anything to the contrary herein, the Servicer shall not be under any obligation to appear in, prosecute or defend any legal, equitable or administrative action or to defend a claim which is not incidental to its duties under this Agreement and which in its reasonable judgment may involve it in any material expense or liability; provided that the Servicer may, with the prior written consent of the Client, undertake any such action that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the Parties or the interests of the Lender hereunder.   Upon receipt of such consent of the Client, the reasonable and necessary out-of-pocket legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities for which the Client will be liable, the Servicer shall be entitled to be reimbursed therefor from the Client upon written demand.

Section 1.5    Legal Compliance.  The Servicer shall perform all of its obligations under this Agreement in compliance with all applicable laws, rules and regulations, including, but not limited to, laws, rules and regulations governing debt collection practices and procedures.

Section 1.6    Non-Performance of the Loan and REO Property.  The Loan or an REO Property shall be considered a specially serviced asset for purposes of this Agreement when mutually agreed upon by the Client and the Servicer. At such time, the additional compensation (the "**Special Servicing Fee**") and the additional duties of the Servicer with respect to such specially serviced asset will also be mutually agreed upon.   "**REO Property**" means the collateral acquired by the Lender securing the Loan as a result of foreclosure or deed in lieu of foreclosure or other proceeding or agreement.

Section 1.7    Advances.  To the extent that the Servicer is requested by the Client or the Lender is required under the Loan Documents to make an Advance, the Servicer shall make such Advance only after the funds required for such purpose are available to the Servicer and all approvals and other conditions precedent have been met.   Notwithstanding anything to the contrary herein or in any Loan Documents or Project Documents, the Servicer shall have no obligation to use its own funds to make any Advances pursuant to this Agreement or with respect to the Project or the Loan.

-5-

# ARTICLE II

## SERVICER FEES AND EXPENSES

Section 2.1    Servicer Fees and Expenses.    The Servicer shall be entitled to such servicing fees with respect to the Loan ("**Servicing Fees**") as more particularly described on Exhibit A.

Section 2.2    Servicing Expenses.    The Client shall be responsible for the reasonable expenses incurred by the Servicer as follows in connection with its servicing activities and obligations hereunder ("**Servicing Expenses**"):

(a)    any cost or expense necessary in order to prevent or cure any violation by the Borrower of applicable laws, regulations, codes, ordinances, rules, orders, judgments, decrees, injunctions or restrictive covenants;

(b)    any cost or expense incurred to obtain any insurance proceeds and condemnation proceeds in respect of REO Property;

(c)    costs and expenses for the collection, enforcement or foreclosure of the Loan and the collection of deficiency judgments against the Borrower and the Guarantor (including the fees and expenses of any trustee under a deed of trust, foreclosure title searches and other lien searches);

(d)    third party costs and expenses necessary to be incurred relative to the opening or operation of cash management and lock-box arrangements or accounts as required by the Loan Documents (it being understood that such costs and expenses will not be commonly incurred, but will only be incurred when they are required in order to complete or fulfill the arrangements and the Lender has given prior written approval);

(e)    costs and expenses approved in writing by the Client relative to the maintenance, leasing, operation, management and sale of any REO Property;

(f)    customary expenses for liquidation, restructuring, modification or loan workouts, such as sales brokerage expense and other costs of conveyance; and

(g)    other costs and expenses approved in writing by the Client relative to the performance by the Servicer under this Agreement,

provided that the Servicer shall not be entitled to any reimbursement from the Client for the use of the Servicer's facilities or equipment or the Servicer's salaries and overhead.

Section 2.3    Additional Services and Expenses.    To the extent not specifically covered herein, additional services requested and approved in writing by the Client ("**Additional Services**") shall be billed by the Servicer to the Client at the Servicer's then applicable hourly rates unless the Parties have mutually agreed on an alternative fee arrangement (the "**Additional Services Fees**", and together with Servicing Fees and Special Servicing Fees, the "**Fees**").  The Client will pay directly for reasonable costs and expenses associated with the Additional

-6-

Services and approved by the Client including but not limited to (a) third-party consultant fees, property inspections (including travel, hotel and meals), market study reports, legal reviews, environmental assessment and database services, and (b) non-customary duplicating, postage, courier or other delivery expenses incurred by the Servicer under this Agreement (collectively, "**Additional Expenses**" and together with Servicing Expenses, "**Expenses**"), provided that the Servicer shall not be entitled to any reimbursement from the Client for the use of the Servicer's facilities or equipment or the Servicer's salaries and overhead.  The Servicer shall be entitled to Additional Services Fees for services performed in response to any request by the Client for such Additional Services, or any request by court or governmental agency order, subpoena, civil investigative demand or similar process, to disclose information or documents or provide testimony in connection with any litigation or investigation related to or arising out of this Agreement or the Loan and shall be entitled to reimbursement of out-of-pocket expenses actually incurred in connection with such Additional Services.

Section 2.4    Payment.  The Servicer shall invoice the Client monthly for all Fees and Expenses.  Payment of earned and invoiced amounts shall be made by the Client within thirty (30) days of receipt of such invoice.

## ARTICLE III

## ACCOUNTING AND INSPECTION RIGHTS

Section 3.1    Books and Records; Inspection Rights.  The Servicer shall keep accurate books and records pertaining to the Loan.  At any time and from time to time, as mutually agreed upon by the Client and the Servicer, during regular business hours and upon five (5) Business Days prior Notice, the Servicer shall permit the Client, or its respective agents, at the sole cost and expense of the Client, (a) to visit the offices of the Servicer for purposes of examining or making copies or abstracts of such books and records, and (b) to discuss matters relating to assets or the servicing and administration thereof or the performance by the Servicer hereunder with respect thereto with any officers or employees having knowledge of any such matters.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of the Servicer.    The Servicer hereby represents and warrants to the Client the following:

(a)    The Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and in each jurisdiction in which the nature of its business make such qualification necessary, except where the failure to be so qualified does not materially affect the Servicer's business operations.  The Servicer has all requisite corporate power and authority to own and operate its properties, carry out its business

-7-

as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement.

(b)    The Servicer's execution and delivery of, performance under, and compliance with this Agreement, have been duly authorized by all necessary corporate action on the part of the Servicer and will not violate the Servicer's governing documents, or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Servicer is a party or by which it or its properties may be bound or affected.

(c)    This Agreement constitutes the valid, legal and binding obligation of the Servicer, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

Section 4.2    Representations and Warranties of the Client. The Client hereby represents and warrants to the Servicer the following:

(a)    The Client is a limited company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and is duly qualified to transact business and is in good standing in each jurisdiction in which the nature of its business make such qualification necessary, except where the failure to be so qualified does not materially affect the Client's business operations. The Client has been appointed the class B manager of the Lender. The Client has all requisite corporate power and authority to own and operate its properties, carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement.

(b)    The Client's execution and delivery of, performance under, and compliance with this Agreement have been duly authorized by all necessary corporate action on the part of the Client and will not violate the Client's governing documents, the Management Agreement, the Loan Documents, or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Client is a party or by which it or its properties may be bound or affected.

(c)    This Agreement constitutes the valid, legal and binding obligation of the Client, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

## ARTICLE V

## TERMINATION; TRANSFER OF SERVICING

-8-

LENDERS_0125505

Section 5.1   Termination Events.   Any of the following acts or occurrences shall constitute a termination event under this Agreement (each, a "**Termination Event**") and shall entitle the non-defaulting party to terminate this Agreement for cause pursuant to the terms and conditions hereof:

(a)      if a Party has breached any monetary provision of this Agreement and has not cured such breach within seven (7) days after receiving Notice describing such breach, or if a Party has breached any non-monetary provision of this Agreement in any material respect and has not cured such breach within thirty (30) days after receiving Notice describing such breach; provided that if such non-monetary breach is not capable of being cured within thirty (30) days and the breaching Party is diligently working to cure such breach, the breaching Party shall have such additional time as is necessary to cure such breach, but in no event more than sixty (60) days after it receives Notice of such breach;

(b)      if the Servicer has been grossly negligent or engaged in unlawful acts or willful misconduct in the performance of its duties under this Agreement and has not cured such gross negligence, unlawful acts or willful misconduct within ten (10) days after receiving Notice from the Client;

(c)      if any bankruptcy proceeding or a similar regulatory action has been commenced against or by a Party or any of its direct or indirect parents and has remained undismissed or undischarged for a period of sixty (60) consecutive days;

(d)      if a Party has made a general assignment for the benefit of its creditors; or if a Party is not able, or has admitted in writing its inability, to pay its debts generally as they become due; or

(e)      if a Party has consented to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Party or all or substantially all of its assets.

Section 5.2      Termination for Cause by the Client; Removal of the Servicer.   Upon the occurrence of a Termination Event caused by the Servicer, the Client, upon five (5) Business Days' Notice to the Servicer, may terminate this Agreement and appoint a replacement servicer, which may be the Client (the "**Replacement Servicer**"), and shall notify the Servicer in writing of the name and contact information for the Replacement Servicer, whereupon the Servicer shall be removed from its duties and obligations as the Servicer under this Agreement.

Section 5.3      Effect of Termination for Cause by the Client.   Upon termination of this Agreement pursuant to Section 5.2, the Servicer shall be entitled to all accrued and unpaid Fees and Expenses due to the Servicer under this Agreement through the date of termination of this Agreement that are not the subject of a dispute between the Servicer and the Client, and the Servicer and the Client shall carry out their respective obligations pursuant to the Termination Procedures set forth in Section 5.7(a).

LENDERS_0125506

Section 5.4    Termination for Cause by the Servicer.    Upon the occurrence of a Termination Event caused by the Client, the Servicer, upon twenty (20) Business Days' Notice to the Client, may terminate this Agreement.

Section 5.5    Effect of Termination for Cause by the Servicer.  Upon termination of this Agreement by the Servicer pursuant to Section 5.4, the Servicer shall be entitled to all accrued and unpaid Fees and Expenses due to the Servicer under this Agreement through the date of termination of this Agreement, and the Servicer and the Client shall carry out their respective obligations pursuant to the Termination Procedures.

Section 5.6    Termination Without Cause.

(a)    Either Party may terminate this Agreement without cause upon ninety (90) days Notice to the other Party.  Upon such termination, the Servicer shall be entitled to all accrued and unpaid Fees and Expenses due to the Servicer under this Agreement through the date of termination of this Agreement and the Servicer and the Client shall carry out their respective obligations pursuant to the Termination Procedures.  No termination without cause by the Servicer shall become effective until a Replacement Servicer shall have assumed the Servicer's responsibilities and obligations hereunder, provided that if the Client has not selected a Replacement Servicer within ninety (90) days of Notice of such termination, then the Servicer may resign effective on the ninety first (91st) day.

(b)    Notwithstanding anything to the contrary herein, upon the sale by the Lender of the Loan in its entirety to a purchaser unaffiliated with the Lender, the Client may terminate this Agreement upon no less than five (5) Business Days Notice to the Servicer. The Servicer shall be entitled to all accrued and unpaid Fees and Expenses due to the Servicer under this Agreement with respect to the Loan prior to the date of transfer of the Loan.  The Servicer will cooperate with the Client in effecting the termination of the Servicer's servicing responsibilities under this Agreement with respect to the Loan in accordance with the Termination Procedures set forth in Section 5.7(a).

Section 5.7 Termination Procedures; Term.

(a)    Upon the termination of this Agreement, the Servicer shall (i) promptly remit all funds in the Bank Accounts to the Replacement Servicer or such other Person designated by the Client, net of accrued and unpaid Fees and Expenses due to the Servicer under this Agreement through the termination date of this Agreement; (ii) promptly deliver electronic copies of documents from the Servicing File to the Replacement Servicer as reasonably requested and necessary to service the Loan; (iii) fully cooperate with the Client and the Replacement Servicer to effectuate an orderly transition of the servicing of the Loan, provided that the Servicer shall not be required to furnish the Client or the Replacement Servicer with proprietary templates, servicing methods, models and the like (including those in electronic form), and (iv) directly and promptly remit to the Replacement Servicer any Loan proceeds received by the Servicer after removal of the Loan, net of accrued and unpaid Fees and Expenses due to the Servicer hereunder; and the Client shall remit to the Servicer within ten (10) Business Days after the Client's receipt of an itemized invoice of any Fees and Expenses which remain unpaid or unreimbursed (collectively, the "**Termination Procedures**").

-10-

(b) Unless terminated pursuant to this Article V, or unless otherwise agreed upon in writing by the Parties, this Agreement shall continue until the Loan is fully paid, liquidated, or otherwise resolved.

Section 5.8    <u>Survival</u>.  The provisions of Sections 5.3, 5.5 and 5.7(a) shall survive the termination or expiration of this Agreement.

## ARTICLE VI

## CONFIDENTIALITY

Section 6.1    <u>By the Servicer</u>.  The Servicer and its affiliates shall hold in confidence all information, documents, agreements and terms contained in the Servicing File or elsewhere about the material terms and conditions of this Agreement, the acquisition, operation and disposition of the assets, the business plans, disposition strategies and methods, schedules, reports and all other information and data coming into the Servicer's possession or otherwise coming to be known by it by virtue of its activities under this Agreement. The Servicer and its affiliates shall not use such information for any purpose other than to fulfill its obligations under this Agreement ("**Permitted Purpose**").  The Servicer and its affiliates shall not disclose such information, directly or indirectly, to Persons who are not parties to this Agreement, except (a) to the Servicer's Representatives, lenders, regulatory authorities, and rating agencies who have a need to know or have access to some of or all such information for a Permitted Purpose (in any event the Servicer shall remain responsible for any disclosures by such parties), (b) as may be approved in writing by the Client, (c) as may be compelled by law or by subpoena, order of court or other judicial process or governmental authority, in which event the Servicer shall deliver to the Client, prior to such disclosure, a Notice that such disclosure has been compelled, the basis for such disclosure being compelled and the nature of the information to be disclosed, provided that the Servicer will not oppose any action by the Client or the Lender to obtain an appropriate protective order or other reliable assurance that such information will receive confidential treatment and will reasonably cooperate with the Client and the Lender, at the Client's sole cost and expense, in seeking such protective order or other assurance or (d) such information or data may be disclosed without notice to or approval by the Client if and to the extent that such information is generally available to the public (other than as a result of a breach of this Agreement).  For purposes hereof, "**Person**" means any individual, corporation, company, bank, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or governmental authority and any fiduciary acting in such capacity on behalf of any of the foregoing; "**affiliate**" means, as to any entity, any other entity that, directly or indirectly, is in control of, is controlled by or is under common control with such entity; and "**Representatives**" means employees, officers, managers, directors, members, agents, accountants, attorneys, consultants and other advisors of a party hereto.

Section 6.2    <u>By the Client</u>.  The Client and its affiliates shall hold in confidence all information regarding the Servicer's operations, finances, compensation hereunder, competitive information, trade secrets and other proprietary information and reports relating to Servicer's business.  The Client and its affiliates shall not disclose such information, directly or indirectly,

LENDERS_0125508

to Persons who are not parties to this Agreement, except (a) to the Client's and Lender's accountants, attorneys, lenders and rating agencies, and others who have a need to know or have access to some of or all such information (but in such event the Client shall remain obligated for any disclosures by such parties), (b) as may be approved in writing by the Servicer, (c) as may be compelled by law or by subpoena, order of court or other judicial process or governmental authority, in which event the Client shall deliver to the Servicer prior to such disclosure Notice that such disclosure has been compelled, the basis for such disclosure being compelled in the nature of the information to be disclosed, provided that the Client will not oppose any action by the Servicer to obtain an appropriate protective order or other reliable assurance that such information will receive confidential treatment and will reasonably cooperate with the Servicer, at the Servicer's sole cost and expense, in seeking such protective order or other assurance, or (d) such information or data may be disclosed without Notice to or approval by the Servicer if and to the extent such information is generally available to the public (other than as a result of a breach of this Agreement).

Section 6.3    No Representation.    Notwithstanding anything to the contrary herein, neither Party makes any representation or warranty, express or implied, with respect to its confidential information.

Section 6.4    Remedies for Breach.    Each Party acknowledges that its breach of this Article VI may cause irreparable injury to the other Party, which injury will be inadequately compensable in damages.    Accordingly, each Party is entitled to the remedies of injunction, specific performance and other equitable relief in respect of any actual breach or threatened breach of the terms of this Article VI in addition to any other legal remedies which may be available, without the necessity of proving actual damages or posting of security or a bond.

Section 6.6    Survival.    The obligations under this Article VI shall survive for two (2) years following the termination or expiration of this Agreement.

## ARTICLE VII

## INDEMNIFICATION AND LIABILITY

Section 7.1 Indemnification by Servicer.    The Servicer as indemnitor (in such event, an "**Indemnitor**") shall indemnify, defend and hold harmless, at the Servicer's sole expense, the Client, its affiliates, and their respective managers, directors, officers, employees, shareholders, members, consultants and advisors (in such event, collectively, "**Indemnified Party**") from and against any claims, damages, judgments, losses, costs and expenses (including reasonable attorneys' fees) caused by, resulting from or arising out of (a) the Servicer's breach in any material respect of this Agreement (including without limitation, the failure to comply with the terms of Article VI hereof), or (b) the Servicer's gross negligence, fraud, willful misconduct or willful violation of law in the performance of its duties under this Agreement or by reason of its reckless disregard of its obligations or duties hereunder.    Notwithstanding anything to the contrary herein, the Servicer shall not be required to indemnify, defend or hold harmless the Client, its affiliates, or their respective managers, directors, officers, employees, shareholders, members, consultants and advisors, (i) for any action taken, or for refraining from the taking of

-12-

LENDERS_0125509

any action, in good faith by the Servicer pursuant to this Agreement or at the written direction of the Client, or (ii) as a result of the Client's breach in any material respect of this Agreement, gross negligence, fraud, willful misconduct or willful violation of law in the performance of its duties under this Agreement, or by reason of its reckless disregard of its obligations or duties hereunder.

Section 7.2    <u>Indemnification by Client</u>.  The Client as indemnitor (in such event, an "**Indemnitor**") shall indemnify, defend and hold harmless, at the Client's sole expense, the Servicer, its affiliates, and their respective managers, directors, officers, employees, shareholders, members, consultants and advisors (in such event, collectively, "**Indemnified Party**"), from and against any claims, damages, judgments, losses, costs and expenses (including reasonable attorneys' fees) caused by, resulting from or arising out of (a) the Client's breach in any material respect of this Agreement (including without limitation, the failure to comply with the terms of Article VI hereof), (b) the Client's gross negligence, fraud, willful misconduct or willful violation of law in the performance of its duties under this Agreement or by reason of its reckless disregard of its obligations or duties hereunder, or (c) the Servicer's good faith performance hereunder, or the Servicer taking any action, or refraining from taking any action, at the written direction of the Client.  Notwithstanding anything to the contrary herein, the Client shall not be required to indemnify, defend or hold harmless the Servicer, its affiliates, or their respective managers, directors, officers, employees, shareholders, members, consultants and advisors as a result of the Servicer's breach in any material respect of this Agreement, gross negligence, fraud, willful misconduct or willful violation of law in the performance of its duties under this Agreement, or by reason of its reckless disregard of its obligations or duties hereunder.

Section 7.3    <u>Indemnification Procedures and Restrictions</u>.

(a)    If a claim or assertion of liability is made by a third party against an Indemnified Party that, if prevailed upon by any such third party, may result in that Indemnified Party being entitled to indemnification pursuant to this Article VII (a "**Claim**"), the Indemnified Party will upon learning of the Claim give to the Indemnitor immediate Notice of the Claim and request the Indemnitor to defend the Claim at the Indemnitor's sole cost and expense with counsel selected by the Indemnitor reasonably acceptable to the Indemnified Party.  Failure to so notify the Indemnitor will not relieve the Indemnitor of any liability that the Indemnitor may have to such Indemnified Party except to the extent that such failure actually and materially prejudices the Indemnitor's legal position.  The Indemnitor shall have the obligation to defend the Indemnified Party against the Claim if such Indemnified Party is entitled to indemnification pursuant to this Article VII.  The Indemnitor shall give Notice within five (5) Business Days to the Indemnified Party of acceptance or rejection of the defense of the Claim and the name of the mutually agreeable counsel selected to defend the Claim.  If the Indemnitor refuses or fails for any reason to defend an Indemnified Party in violation of this Article VII, or places qualifications or conditions on the acceptance of the obligation to defend such Claim, the Indemnified Party (provided Indemnitor may participate in the defense of such Claim) shall have the right to defend the Claim with legal counsel it selects at the Indemnitor's expense.  Even if the defense of the Claim is unconditionally accepted, the Indemnified Party shall be entitled to participate with the Indemnitor in the defense and also will be entitled at its option (and expense) to employ separate counsel for the defense.  The Indemnitor and the Indemnified Party shall cooperate with each other in the defense of a Claim and shall make its relevant records available to the other with

-13-

respect to the defense except to the extent that any such Person shall reasonably determine (based upon advice of counsel) that making all or any portion of its relevant records available to another party would constitute a waiver and result in the loss of the attorney-client privilege or the attorney work-product privilege between such party and its legal counsel.

(b)    No Indemnified Party shall be entitled to indemnification under this Article VII if it has entered into any written settlement or compromise of any Claim without the prior consent of the Indemnitor.  If a bona fide settlement offer is made with respect to a Claim and the Indemnitor desires to accept and agree to the offer, the Indemnitor will give Notice to the Indemnified Party to that effect ("**Settlement Notice**").  If the Settlement Notice includes a full, unconditional release of the Indemnified Party, which release is enforceable in the reasonable opinion of the Indemnified Party's counsel and does not have any material adverse effect on the Indemnified Party and the Indemnified Party fails to consent to the settlement offer within ten (10) Business Days after receipt of the Settlement Notice or rejects the settlement offer, then the Indemnified Party shall thereafter be solely responsible for continuing the defense of such Claim. In that event, the maximum liability of the Indemnitor as to such Claim will not exceed the amount of such settlement offer.

(c)    The indemnification rights described in this Article VII shall be in addition to any other rights that an Indemnified Party may have under any other agreement between or among the Parties, pursuant to any law or regulation or through insurance and shall continue as to an Indemnified Party who is no longer a Party and shall inure to the benefit of its permitted successors.

Section 7.4    Liability.    The Servicer and any manager, director, officer, employee, agent, consultant or advisor thereof may rely in good faith on any document of any kind, which, prima facie, is properly executed and submitted by any person with respect to matters hereunder.  In no event shall any Party be liable for indirect, exemplary, incidental, special or consequential damages to the other party arising from this Agreement.

Section 7.5    Survival.    The obligations under this Article VII shall survive the expiration or termination of this Agreement.

# ARTICLE VIII

## MISCELLANEOUS

Section 8.1    Severability Clause.    Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the Parties waive any provision of law which prohibits or renders void or unenforceable any provision hereof.  If the

-14-

LENDERS_0125511

invalidity of any part, provision, representation or warranty of this Agreement shall deprive any Party of the economic benefit intended to be conferred by this Agreement, the Parties shall negotiate in good faith to develop a structure the economic effect of which is as nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

Section 8.2    Notices.    Any notices, consents, directions, demands, approvals or other communications given under this Agreement shall be in writing ("**Notice**") and shall be deemed to have been duly given when delivered in person, by certified mail (return receipt requested), overnight courier service, or electronic transmission, to the address(es) of the recipient(s) (which may be changed from time to time by notice to the other parties) set forth in this Section 8.2):

If to the Client:    Celona Asset Management (USA) Limited
2207-09 Tower Two, Lippo Centre
89 Queensway, Admiralty
Hong Kong
Attn: Backoffice Service Group
Email: boffice@celonacapital.com

If to the Servicer:    Cottonwood Management, LLC
55 S. Lake Ave, #600
Pasadena, CA 91101
Attn: Backoffice Team
Email: accounts@cottonwoodmgmt.com

Any such demand, Notice or communication hereunder shall be given in accordance with the terms of the Loan Documents.

Section 8.3    Counterparts.    For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.    Delivery of an executed counterpart of a signature page of this Agreement in Portable Document Format (PDF) shall be effective as delivery of a manually executed original counterpart of this Agreement and legally binding and admissible in any court or tribunal of competent jurisdiction.

Section 8.4    Governing Law; Waiver of Jury Trial.

(a)    Governing Law.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.    Any dispute arising hereunder or related to this Agreement shall be resolved in any state court of the State of California or federal court of the United States of America in each case located in Los Angeles, and the Client and the Servicer hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such federal or state court.

-15-

(b)    **WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED THEREUNDER.**

Section 8.5    Amendments.  This Agreement may be amended from time to time by a written instrument signed by the Servicer and the Client and no waiver of any of the terms hereof by any Party shall be effective unless it is in writing and signed by the other Party.

Section 8.6    Headings Descriptive. The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 8.7    Intentionally Omitted.

Section 8.8    General Definitional Provisions.

(a)    The words "hereof," "herein", "hereto", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, appendix and exhibit references are to this Agreement, unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

Section 8.9    Judicial Interpretation.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

Section 8.10    Integration.  This Agreement comprises the final and complete integration of all prior expressions by the Parties with respect to the subject matter hereof as of the date hereof and shall constitute the entire agreement between the Parties with respect to such subject matter, superseding all prior oral or written understandings.

Section 8.11    Successors and Assigns.  This Agreement is not assignable by either party hereto without the prior written consent of the other party.  This Agreement shall inure to the benefit of, and be binding upon, the successors and permitted assigns of the Parties.

Section 8.12    Parties to this Agreement. The Parties agree that this Agreement shall remain in full force and effect in the event the Lender syndicates or participates the Loan, but the Lender remains agent for the co-lenders for the Loan, and the Client agrees that it will remain responsible for the payment of all accrued and unpaid Fees and Expenses due to the Servicer hereunder, including fees and expenses related to Loan participations, and that the Servicer will

-16-

LENDERS_0125513

have no obligation to seek from Loan participants on behalf of the Lender and/or the Client reimbursement for any such fees and expenses.

Section 8.13   Survival.  The provisions of this Article VIII shall survive the expiration or termination of this Agreement.


[Remained of Page Left Intentionally Blank; Signature Page Follows]

LENDERS_0125514

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed by their authorized officers as of the day and year first above written.

**CLIENT:**
Celona Asset Management (USA) Limited

數位簽署者：Max Huang
日期：2016.08.24
13:35:07 +08'00'

By: _____
Name:  Max Huang
Title: Authorized Signatory

**SERVICER:**
Cottonwood Management, LLC

By: _____
Name: _____
Title: Manager

-18-

**EXHIBIT A**

<u>Servicer Fees and Expenses</u>

| | |
|---|---|
| Setup Fee | US$5,000 |
| Servicing Fees | US$8,000 per month |
| UCC-3 Filing Fee | US$200 per filing |

-19-

LENDERS_0125516