Matthew L. Lalli (6105)
Jeremy J. Stewart (12247)
Aline Marie H. Longstaff (16089)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1531
Telephone: (801) 257-1900
Email: mlalli@swlaw.com
      jjstewart@swlaw.com
      alongstaff@swlaw.com

*Attorneys for Defendant Summit Village Development Lender 1, LLC*

Jordan D. Beltz (*pro hac vice*)
Andrew W. Breland (*pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Email: jbeltz@kasowitz.com
      abreland@kasowitz.com

Uri A. Itkin (*pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Telephone: (212) 827-1027
Email: uitkin@akingump.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SUMMIT MOUNTAIN HOLDING GROUP, L.L.C., a Utah Limited Liability Company**,<br><br>        Plaintiff,<br><br>vs.<br><br>**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, *et. al***,<br><br>        Defendants. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:21-cv-00110-DBB-JCB<br><br>District Judge David B. Barlow<br><br>Magistrate Judge Jared C. Bennett |

Pursuant to Fed. R. Civ. P. 56 and DUCivR 56-1, Defendant Summit Village Development Lender 1, LLC ("Defendant") respectfully submits this Motion for Summary Judgment granting its counterclaim against Plaintiff Summit Mountain Holding Group, L.L.C. ("Plaintiff") on the guaranty and dismissing Plaintiff's claims against Defendant with prejudice.

## TABLE OF CONTENTS

INTRODUCTION AND RELIEF SOUGHT ................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................. 3

    A.    The Inception Of The Deal .......................................................... 3

    B.    The Loan Agreement And The Shortfall Guaranty ................................. 5

    C.    The Waiver And Release Agreement ................................................. 11

    D.    The Loan Agreement Amendments ................................................... 12

    E.    The Loan Disbursements And The Borrower's Default ........................ 13

    F.    Procedural History ..................................................................... 16

ARGUMENT ...................................................................................................... 17

    I.    Defendant Is Entitled To Summary Judgment On Its Counterclaims And Plaintiff's Contract Claims. ............................................................ 18

        A.    The Shortfall Guaranty Plainly Requires Plaintiff To Backstop The Borrower's Equity Requirement. ................................................ 19

        B.    Plaintiff's Theories To Avoid Liability Have No Basis In The Plain Language Of The Agreements. ...................................................... 20

        C.    Plaintiff's Declaratory Judgment And Good Faith And Fair Dealing Claims Fail In The Face Of The Plain Contract Language. ..................... 24

    II.    Defendant Also Is Entitled To Summary Judgment On Plaintiff's Fraud Claim. 25

        A.    Plaintiff Explicitly Released Its Fraud Claim By Agreement. ................. 25

        B.    Plaintiff's Fraud Claim Also Is Barred By Equitable Estoppel. ............... 26

        C.    Plaintiff's Fraud Claim Also Is Belied By The Language Of The Agreements. ......................................................................... 27

        D.    Plaintiff's Fraud Claim Also Is Contrary To Its Principal's Sworn Admissions. .......................................................................... 29

CONCLUSION ................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*757 3rd Ave. Assocs., LLC v. Patel*,
117 A.D.3d 451 (N.Y. App. Div. 2014) ...............................................26

*Baraliu v. Vinya Capital, L.P.*,
2009 WL 959578 (S.D.N.Y. Mar. 31, 2009) ........................................31

*BBM3, LLC v. Vosotas*,
2022 WL 36158 (N.Y. Sup. Ct. Jan. 04, 2022),
*reconsideration denied*, 2022 WL 3565305 (N.Y. Sup. Ct. 2022).........................18

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
76 A.D.3d 310 (N.Y. App. Div. 2010),
*aff'd*, 17 N.Y.3d 269 (2011).............................................26

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
720 F.3d 84 (2d Cir. 2013).............................................24

*Gold Standard, Inc. v. Getty Oil Co.*,
915 P.2d 1060 (Utah 1996).........................................28, 30

*Gutman v. Gutman*,
51 A.D.2d 535 (N.Y. App. Div. 1976) ...............................22

*Higby Crane Serv., LLC v. Nat'l Helium, LLC*,
751 F.3d 1157 (10th Cir. 2014) ...................................17

*Hindsight Sols., LLC v. Citigroup Inc.*,
53 F. Supp. 3d 747 (S.D.N.Y. 2014).................................30

*Hoffmann v. Horn*,
157 A.D.3d 871 (N.Y. App. Div. 2018) .............................26

*Hotel 71 Mezz Lender LLC v. Mitchell*,
63 A.D.3d 447 (N.Y. App. Div. 2009) .............................30

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
655 F.3d 136 (2d Cir. 2011).........................................25

*N.Y. State Mortg. Loan Enforcement & Admin. Corp. v. Coney Island Site Five Houses, Inc.*,
  109 A.D.2d 311 (N.Y. App. Div. 1985) .............................................................28, 30

*New York Univ. v. Cont'l Ins. Co.*,
  87 N.Y.2d 308 (N.Y. 1995) ...........................................................................................31

*Red Tulip, LLC v. Neiva*,
  44 A.D.3d 204 (N.Y. App. Div. 2007) ...........................................................................30

*Turnberry Residential Ltd. Partner, L.P. v. Wilmington Tr. FSB*,
  99 A.D.3d 176 (N.Y. App. Div. 2012) ...........................................................................18

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (N.Y. 2004) .............................................................................18, 19, 21

*W.&S. Life Ins. Co. v. U.S. Bank N.A.*,
  209 A.D.3d 6 (N.Y. App. Div. 2022) .............................................................................21

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ...........................................................................21

Fed. R. Civ. P. 56 ...............................................................................................................17

## INTRODUCTION AND RELIEF SOUGHT

This is a contract case concerning Plaintiff's absolute, unconditional, and irrevocable guaranty (the "Shortfall Guaranty"). Defendant and non-party Grand Canyon Development Holdings 3 LLC ("Grand Canyon Lender") loaned $42,000,000 to Plaintiff's affiliate, a special purpose entity (the "Borrower"), to develop Powder Mountain. The loan was based on the Borrower's agreement to contribute at least $87,192,584 (and potentially more, as needed) to the development project (the "Borrower's Equity Requirement"), and Plaintiff's Shortfall Guaranty was integral to that deal.

The parties agreed that the Borrower could stagger the Borrower's Equity Requirement contributions so long as Plaintiff guaranteed any shortfall in the Borrower's Equity Requirement. But Defendant had the right to request the full amount in the event of a loan default. That is what happened here. The Borrower stopped making required loan payments in early 2020 and failed to repay a cent of the loan when it matured in June 2021. The Borrower funded just $35,930,227 of the Borrower's Equity Requirement, leaving a shortfall of at least $51,262,357. Defendant asked the Borrower to fund that shortfall in September 2020, and when the Borrower failed to do so and defaulted on the loan altogether in June 2021, Defendant sent Plaintiff a demand under the Shortfall Guaranty. Plaintiff failed to fund the shortfall as required under the Shortfall Guaranty and filed this suit instead.

To date, none of the loan has been repaid. By this motion, Defendant seeks summary judgment on its counterclaim on the Shortfall Guaranty, as well as dismissal of Plaintiff's related declaratory judgment and implied covenant claims. The plain language of the Shortfall Guaranty and the undisputed facts of Plaintiff's breach require judgment for Defendant on all claims here.

The Borrower's Equity Requirement is clear.  Under the loan agreement, the Borrower had to contribute a *minimum* of $87,192,584 — while the amount could be "greater", it could not be "less":

> "Borrower's Equity Requirement" means Borrower's obligation to contribute equity to the Project of ***not less*** than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.  (emphasis added)

The Shortfall Guaranty also is clear.  In it, Plaintiff guaranteed the payment of the Borrower's Equity Requirement:

> Guarantor [*i.e.*, Plaintiff] hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of [] Borrower's Equity Requirement, as and when required under the Loan Agreement[.]

In other words, the Borrower had to fund at least $87,192,584, and Plaintiff guaranteed any shortfall in that amount in the event of default.  It is undisputed that when the loan went into default, there was a shortfall of at least $51,262,357 in the Borrower's Equity Requirement.  Defendant is therefore entitled to a judgment against Plaintiff in the amount of $51,262,357.

Defendant also seeks summary dismissal of Plaintiff's fraud claim.  The fraud claim is barred by the plain language of the waiver and release agreement that Plaintiff signed before Defendant agreed to sign the loan documents.  Plaintiff's fraud claim also fails as a matter of law based on the plain language of other agreements that Plaintiff signed, as well as the sworn testimony of Plaintiff's principal.

The Court should therefore grant this motion so Defendant and Grand Canyon Lender can finally get their money back after years of needless litigation.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

As shown below, Plaintiff's obligation to fund the shortfall in the Borrower's Equity Requirement is clear.  But it is helpful to understand the context of this deal and this case.

### A.    The Inception Of The Deal

1.      Plaintiff, led at all times by its principal, Greg Mauro ("Mauro"), dreamt of building the next Aspen on Powder Mountain.  App. Ex. 1 [Mauro Dep. Tr.] at 11:21-13:12; 21:6-22:21.  Mauro had no real estate development expertise and was looking for financing that was easier to secure than traditional debt.  App. Ex. 1 [Mauro Dep. Tr.] at 181:17-19.  So he decided to turn to the EB-5 program.  App. Ex. 1 [Mauro Dep. Tr.] at 31:25-34:8.  Under a decades-old Congressional law, this program enabled foreign citizens to obtain a green card by investing $500,000 or more in America.  App. Ex. 1 [Mauro Dep. Tr.] at 41:10-20.  The individual investments could be pooled together and used to finance real estate development projects.  *Id.*; *see also id.* at 32:14-35:2.

2.      In 2014, Plaintiff signed an exclusive deal with an EB-5 agent called American Immigration Group ("AIG").  App. Ex. 1 [Mauro Dep. Tr.] at 58:15-24; 63:20-65:1; 65:25-66:19; App. Ex. 2 [AIG Term Sheet] at SMHG000010.  The AIG deal included an exclusivity clause, as well as similar guaranty provisions to the Shortfall Guaranty.  App. Ex. 2 [AIG Term Sheet] at SMHG000010.

3.      AIG did not raise a penny for Plaintiff.  App. Ex. 1 [Mauro Dep. Tr.] at 71:19-72:4.  Unhappy with AIG, Mauro decided to look elsewhere, notwithstanding the exclusivity clause in Plaintiff's term sheet with AIG.  App. Ex. 1 [Mauro Dep. Tr.] at 70:1-10.

4.      Mauro had heard that real estate developers had successfully raised financing through EB-5, and wanted to meet someone more familiar with that financing model than AIG. App. Ex. 1 [Mauro Dep. Tr.] at 44:18-45:5.  So in August 2015, despite reaffirming Plaintiff's exclusive deal with AIG a few days earlier, Mauro secretly violated his exclusivity agreement and paid several thousand dollars to be introduced to Mr. Tang Tang at a conference.  App. Ex. 1 [Mauro Dep. Tr.] at 45:9-21; 67:23-68:22.

5.      Disregarding Plaintiff's exclusive deal with AIG, Mauro asked Mr. Tang to connect him with immigration agents in China and to help him create a structure that could be attractive to potential EB-5 investors.  App. Ex. 1 [Mauro Dep. Tr.] at 87:14-88:10.

6.      Mr. Tang agreed.  In September 2015, Plaintiff signed a term sheet ("Letter of Intent" or "LOI") with Mr. Tang and a Chinese immigration agent, describing the terms of the financing for the project at issue in this case.  App. Ex. 1 [Mauro Dep. Tr.] at 117:15-118:14; Ex. 3 [LOI] at SMHG001585-1600.

7.      The Letter of Intent also described the shortfall guaranty concept.  It projected that the development project would cost over $261 million and provided that Plaintiff, as the Sponsor, would fund over $92 million of those costs through various potential funding sources (called, "Sponsor Equity").  App. Ex. 3 [LOI] at SMHG001587.  In the event there was a shortfall in the funding of the development costs due to the availability of the Sponsor Equity, Plaintiff agreed to make up the shortfall in cash.  *Id.*

8.      Mr. Tang also helped Plaintiff prepare the marketing materials that the immigration agent sent to potential EB-5 investors.  The marketing materials contained similar shortfall guaranty language as the Letter of Intent.  App. Ex. 4 [PPM] at LENDERS_0066426.

4

9.      With Mr. Tang's help, Plaintiff incorporated Defendant as Summit Village Development Lender 1, LLC.  Plaintiff agreed that Mr. Tang, through KT Capital Group LLC and its affiliate KT Summit Development Manager LLC (together, "KT"), would manage the EB-5 regulatory compliance for Defendant.  App. Ex. 5 [Class A Management Agreement] at LENDERS_0003247.  It also agreed that an independent manager in Hong Kong, Celona Asset Management ("Celona"), would manage Defendant's day-to-day activities.  App. Ex. 3 [LOI] at SMHG001588; App. Ex. 6 [Class B Management Agreement] at LENDERS_0003296.

10.     Given the investor-dependent nature of EB-5 financing, the parties understood and agreed since the outset that the ultimate amount of the loan was uncertain.  To this end, the LOI described the loan amount as an undetermined maximum amount — on an "up to" basis — and provided that the immigration agents would seek to recruit potential investors "on a best-effort-basis."  App. Ex. 3 [LOI] at SMHG001590-1591.

11.     The parties' EB-5 marketing materials reflected the same understanding:

> [I]f the Company does not raise the full US$150.0 million in this Offering, . . . then the Company will be unable to advance the full US$150.0 million contemplated under the Loan Agreement.

App. Ex. 4 [PPM] at LENDERS_0066443.[1]

**B.      The Loan Agreement And The Shortfall Guaranty**

12.     In the Spring of 2016, Plaintiff began working on the loan documents with Defendant.  Initially, Plaintiff contemplated capitalizing the Borrower with about $4.5 million of

---

[1]      The parties initially contemplated that the maximum loan amount would be $150 million but ultimately agreed to reduce that maximum amount to $120 million.  *Compare* App. Ex. 4 [PPM] at LENDERS_0066443 *with* App. Ex. 9 [Loan Agreement] at SMHG082011.

cash to be used for the development, in addition to the land and other expected sources of equity

Plaintiff promised.  The parties exchanged various drafts of this language when they negotiated

the loan agreement ("Loan Agreement").

13.    As reflected in a redline sent by Mr. Tang to Plaintiff, Plaintiff initially

contemplated that the Borrower would fund the $4.5 million of cash proportionally to the amount

of loan proceeds funded by the lenders:

> "**Borrower's Cash Equity Requirement**" means ~~an initial cash equity contribution of $1,000,000.00 on or before the Loan Closing Date, then prior to the Advance that would cause the principal balance of the Loan to exceed $7,500,000.00, $15,000,000.00, $22,500,000.00 and $30,000,000.00, Borrower shall make additional cash equity contributions in the amounts of $1,000,000.00, $1,000,000.00, $1,000,000.00 and $500,000.00, respectively~~, with respect to each Advance, a pro rata contribution of cash to the Project (at a ratio of 10:1 Loan to equity) until Borrower's cash equity requirement of Four Million Four Hundred Ninety-Eight Thousand Six Hundred Twenty-Five and 00/100 Dollars ($4,498,625) is fully funded.

App. Ex. 7 [Redline of Loan Agreement] at SMHG013585.

14.    Ultimately, however, Plaintiff changed its mind and decided that the Borrower

would not fund the $4.5 million in cash.  As a result, the parties struck this language in its

entirety from the Loan Agreement.

> ~~"**Borrower's Cash Equity Requirement**" means, with respect to each Advance, a pro rata contribution of cash to the Project (at a ratio of 10:1 Loan to equity) until Borrower's cash equity requirement of Four Million Four Hundred Ninety-Eight Thousand Six Hundred Twenty-Five and 00/100 Dollars ($4,498,625) is fully funded.~~

> "**Borrower's Equity Requirement**" means, collectively, ~~the Borrower's Cash Equity Requirement and~~ Borrower's obligation to contribute additional equity to the Project in connection with sales of Units, receipt of public incentives available to the Project and/or other sources in order to make an aggregate contribution of equity to the Project of not less than ~~Ninety-Two~~Eighty-Seven Million One Hundred Ninety-Two  Thousand Five Hundred ~~Twenty-Four Thousand Sixty Three~~Eighty-Four Dollars ($~~92,524,063.00~~87,192,584 ).

*See* App. Ex. 8 [June 14, 2016 Redline] at LENDERS_0118369.

15.     As a result, the executed Loan Agreement states, simply, that the borrower would be responsible for funding "not less than" $87 million, and potentially more as needed:

> "Borrower's Equity Requirement" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

App. Ex. 9 [Loan Agreement] at SMHG081995.

16.     As is clear from this language, the Borrower's Equity Requirement definition that both parties agreed to is unconditional and does not contain any of the pro rata language, which the parties initially contemplated with respect to the borrower's $4.5 million in cash *but ultimately struck.*

17.     The parties removed the pro rata concept from the Borrower's Equity Requirement, but they still understood and agreed that the loan amount was uncertain and could be less than $120 million, depending on how much money was raised from EB-5 investors:

> The Loan is to be disbursed in incremental Advances (as provided in this Loan Agreement), and the aggregate amount of Advances will not exceed the principal amount of One-Hundred Twenty Million Dollars ($120,000,000.00), provided that the amount of Loan shall not be greater than (a) sixty percent (60%) of the Appraised Value, or (b) the aggregate amount of EB-5 Capital deposited in the Lender's Deposit Account ( as applicable, the "Loan Amount").  . . .  Notwith-standing any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.

App. Ex. 9 [Loan Agreement] at SMHG082010-2011.

18.     The parties included various covenants and provisions to ensure that the development would move forward regardless of how much Defendant could lend.  For example, the Loan Agreement required the Borrower to continue construction, required the Borrower's

members to capitalize the Borrower with the Borrower's Equity Requirement, and entitled the Borrower to obtain other loans.  App. Ex. 9 [Loan Agreement] at SMHG082031 (§ 5.1), SMHG082042 (§ 5.27), SMHG082026 (§ 3.2), SMHG082027 (§ 3.4).

19.    The parties also included a mechanism for Defendant to make capital calls on the Borrower to ensure the payment of the Borrower's Equity Requirement.  The mechanism, called "Deposits to Balance Loan," is in Section 5.17 of the Loan Agreement.  It is based on the Borrower's obligation to keep the loan "in balance."  The "in balance" requirement consists of several elements.

20.    Section 5.17.1 provides that Borrower was responsible for funding any cost overruns and, significantly, ensuring that there were enough funds to complete the $207 million project:

> Anything contained in this Loan Agreement to the contrary notwithstanding,  the Loan shall at all times be "in balance" on (a) an individual Budget line item basis, and (b) an aggregate Budget amount basis.
>
> [. . .]
>
> The Loan shall be deemed to be "in balance" on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project.

App. Ex. 9 [Loan Agreement] at SMHG082038.

21.    Section 5.17.2 describes the process for Defendant's determination of the potential cost overruns.  App. Ex. 9 [Loan Agreement] at SMHG082039.

22.    Section 5.17.3 describes the capital call process.  It provides that if Defendant determined the loan was out of balance, it had the right to make a capital call on the Borrower for

a "Deficiency Deposit." The Borrower could pay the Deficiency Deposit from its own funds, from funds contributed by its members, or from funds Borrower raised from other loans:

> Borrower agrees that if Lender in its reasonable good faith judgment determines that the Loan is not "in balance", then regardless of how such condition may have been brought about, Borrower shall, within ten (10) Business Days after request by Lender, either deposit from its own funds (or from funds contributed by any of Borrower's direct or indirect constituent members) or from the proceeds of a Subordinated Loan or a Senior Loan (to the extent permitted under Section 3.2 or Section 3.4 of this Loan Agreement) the amount of such deficiency (the "Deficiency Deposit") into the Borrower Deposit Account which Deficiency Deposit shall first be disbursed before any further Advance shall be made and shall, until fully disbursed, constitute additional collateral security for the Loan.

App. Ex. 9 [Loan Agreement] at SMHG082039.

23.    As reflected by the final sentence of Section 5.17.3, the Deficiency Deposit had to be deposited into the Borrower Deposit Account. *Id.* That account was controlled by Defendant. *See* App. Ex. 9 [Loan Agreement] at SMHG081995. The funds in the Borrower Deposit Account would serve as additional collateral for the loan and were to be held in trust for Defendant in the event of loan default pursuant to the Deed of Trust that the parties executed at the same time as the Loan Agreement. App. Ex. 26 [Deed of Trust] at LENDERS_0002692.

24.    Section 5.17.4, in turn, describes another component of the "in balance" requirement, which is crucial here. This Section required the Borrower and/or Plaintiff, as the Guarantor, to satisfy Defendant that they had sufficient funding to complete the entire $207 million development project (defined as the "Commitment Financing Amount"). The Section provided the accommodation described above, whereby the parties agreed that the Borrower could stagger its capital contribution of the Commitment Financing Amount. But the accommodation was effective only so long as Defendant was satisfied that the Borrower had the

entire Commitment Financing Amount available, and — significantly — so long as there was no default under the loan:

> For the purposes of ensuring that the Loan is "in balance" as required by subsection 5.17.1, Borrower and/or Guarantor (if Guarantor is unconditionally obligated in writing to contribute the same to the Project) shall provide reasonable evidence satisfactory to Lender in its sole discretion of financing, Purchaser Deposits and/or equity commitments, sources of financing including, but not limited to, available proceeds of public financing incentives such as tax increment financing, transient room tax revenues, resort tax revenues, or guarantees confirming in sufficient detail the specified amount and terns of the funds that will be available on a timely basis in order to complete the construction of the Improvements on the Mortgaged Property in accordance with the Budget, the Plans and Specifications and the Schedule ("Commitment Financing Amount"). So long as (i) the Commitment Financing Amount remains available to be drawn by Borrower as and when needed to fund costs of the Improvements, and (ii) no Event of Default has occurred and is continuing, Borrower shall not be required to make a Deficiency Deposit under Section 5.17.4 with respect to the Commitment Financing Amount.

App. Ex. 9 [Loan Agreement] at SMHG082039-2040.

25.    Notably, the other financing sources referenced in Section 5.17.4 included "guarantees." App. Ex. 9 [Loan Agreement] at SMHG082039-2040. Thus, Plaintiff's obligation under the Shortfall Guaranty was among the funding sources that allowed the Borrower to avoid funding the entire Borrower's Equity Requirement, absent a loan default. *Id*.

26.    The parties signed the Loan Agreement on June 28, 2016. Under the Loan Agreement, the loan matured and had to be repaid five years later — *i.e.*, in June 2021. App. Ex. 9 [Loan Agreement] at SMHG082001 (definition of "Initial Maturity Date"). Borrower's failure to repay the loan on the Maturity Date was an Event of Default under the Loan Agreement. *Id.* at SMHG082048.

27.     Plaintiff signed the Shortfall Guaranty on the same day the parties signed the Loan Agreement.  App. Ex. 10 [Shortfall Guaranty] at SMHG081979.  As noted above, the Guaranty unambiguously obligated Plaintiff to backstop the Borrower's Equity Requirement:

> Guarantor [*i.e.*, Plaintiff] hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of [] Borrower's Equity Requirement, as and when required under the Loan Agreement[.]

*Id*.

28.     In other words, if Defendant determined that the loan was out of balance or if the loan was in default, Defendant had the right to seek the full amount of the Borrower's Equity Requirement from the Borrower, and if the Borrower failed to provide it, Defendant had the right to seek it from Plaintiff under the Shortfall Guaranty.  App. Ex. 10 [Shortfall Guaranty] at SMHG081979.

### C.     The Waiver And Release Agreement

29.     A few days before signing the Loan Agreement, the parties also entered into another relevant agreement.  On June 20, 2016, Plaintiff and Defendant entered into a Waiver and Release Agreement.  App. Ex. 11 [Waiver and Release] at SMHG082135.  Under that agreement, Plaintiff explicitly waived any and all claims against Defendant, as well as its employees and representatives, related to the loan, the project, or other events, including AIG:

> In consideration of Lender's willingness to execute the AIG Waiver, SMHG and Development, on behalf of the SMHG Parties, hereby waive, release and forever discharge and hold harmless Lender, KT, Cottonwood, Goldstone and Henry, each of their owners, general or limited partners, directors, shareholders, employees, officers, successors, executors, assigns, affiliated parent and subsidiary companies, agents and contractors, or any other individuals or entities claiming by or through any of them (collectively, the "EB-5 Lender Released Parties"), from and against any and all manner of claims, liabilities, demands, actions, causes of action, debts, accounts, bonds, covenants, agreements, liens, judgments and/or suits, whether known or unknown, suspected or unsuspected, which the SMHG Parties had, have,

may have, may have had, or may in the future have against the EB-5 Lender Released Parties, or any of them, which arise out of, are connected with, or relate in any way to the AIG LOI, the KT LOI, the AIG Fee, the Project, the Loan and/or the Loan Agreement (but excluding any claims under this Agreement) (the "Released Claims").

*Id*. at SMHG082136.

30.     Defendants had to enter into this agreement to protect themselves because AIG threatened to sue Plaintiff for violating the exclusivity provision in AIG's term sheet.  App. Ex. 11 [Waiver and Release] at SMHG082135-2136; App. Ex. 2 [AIG Term Sheet] at SMHG000010.

### D.     The Loan Agreement Amendments

31.     The parties amended the Loan Agreement five times — in September 2016, October 2017, March 2018, May 2018, and January 2019.  App. Exs. 12 - 16 [Five Amendments].  In connection with the second amendment, the parties also amended the Shortfall Guaranty.  App. Ex. 17 [Amended Shortfall Guaranty] at SMHG002864; App. Ex. 13 [Second Amendment] at LENDERS_0001554.  In connection with the third amendment, in March 2018, the parties added non-party Grand Canyon Lender as another lender under the Loan Agreement. App. Ex. 14 [Third Amendment] at LENDERS_0015772-5723.  None of the amendments affected any of the relevant provisions discussed above.

32.     When Grand Canyon Lender was added to the deal, it entered into a Syndication and Co-Lender Agreement with Defendant (the "Syndication Agreement").  App Ex. 27 [Syndication Agreement].  Under the Syndication Agreement, Defendant serves as the sole and exclusive agent and representative of Grand Canyon in connection with both the Shortfall Guaranty and the Loan Agreement and can enforce Grand Canyon Lender's rights under the loan

documents.  App Ex. 27 [Syndication Agreement] at LENDERS_0000730.  Pursuant to its rights

under the Syndication Agreement, Defendant filed its counterclaims on behalf of both it and

Grand Canyon Lender.

33.    In the loan agreement amendments, the Borrower represented that it had no

defenses to its obligations under the Loan Agreement, and Plaintiff confirmed that it "has no

defense to the enforcement of its obligations and liabilities under . . . the Shortfall Guaranty" and

has no "claim or counterclaim against Lender."  App. Ex. 14 [Third Amendment] at

LENDERS_0015776.

34.    After the loan documents were signed in June 2016, the Borrower contributed

approximately 4.52 acres of Powder Mountain where the development was supposed to take

place.  App. Ex. 18 [Amended and Restated PPM] at LENDERS_0003578 and 0003592.  The

parties stipulated at the time that contribution satisfied $29,000,000 of the Borrower's Equity

Requirement.  App. Ex. 18 [Amended and Restated PPM] at LENDERS_0003578; App. Ex. 23

[Pre-Notice of Default] at SMHG102408.

**E.    The Loan Disbursements And The Borrower's Default**

35.    Beginning in June 2016, Defendant and Grand Canyon Lender collectively made

seventeen loan disbursements to Borrower, totaling $42,000,000.  App. Ex. 19 [Email re Loan

Draws] at LENDERS_0010996.

36.    Defendant stopped the disbursements in January 2020, when Weber County,

where the project is located, lost its designation as a Targeted Employment Area ("TEA") under

the EB-5 program.  App. Ex. 19 [Email re Loan Draws] at LENDERS_0010996; App. Ex. 20

[Emails re TEA Status] at LENDERS_0086093.  Due to the loss of the TEA designation, the

minimum EB-5 investment amount doubled.  App. Ex. 20 [Emails re TEA Status] at LENDERS_0086093.  As a result, it became virtually impossible for the project to attract additional EB-5 investors, and thus, funding for the loan.  *Id*.

37.     In the first quarter of 2020, the Borrower stopped making payments required under the Loan Agreement.  App. Ex. 21 [Letter from Mulreed to Defendant].

38.     In September 2020, after months of efforts to work out the loan default, Defendant sent Plaintiff and Borrower pre-default notices.  App. Exs. 22, 23 [Pre-Default Notices].  The notices advised that the loan was out of balance and asked the Borrower to fund a Deficiency Deposit of at least $51,262,357 of the Borrower's Equity Requirement in accordance with Section 5.17.  App. Ex. 23 [Pre-Default Notice re In Balance Requirement] at SMHG102405.

39.     As reflected in Defendant's notice, the Borrower had contributed just $35,930,227 of the Borrower's Equity Requirement: $29,000,000 attributable to the Borrower's land contribution, $3,615,003 of lot sales proceeds, and $3,315,224 of other payments.  App. Ex. 23 [Pre-Default Notice re In Balance Requirement] at SMHG102408.

40.     In November 2020, Plaintiff and Borrower entered into a Pre-Negotiation Agreement with Defendant and Grand Canyon Lender (the "PNA").  App. Ex. 24 [PNA].  In the PNA, Plaintiff and Borrower represented, among other things, that there was no default by the Lenders (Defendant and Grand Canyon) under the loan or any of the loan documents, and that Plaintiff and Borrower were unaware of any claim against Defendant or Grand Canyon Lender (or any of their affiliates or other third parties) that would be a setoff or excuse of performance under the loan or any of the loan documents (including the Shortfall Guaranty):

> No Default by Lenders. The Borrower Parties each hereby acknowledge and agree that there are no defaults by Lenders or its members, managers, or any servicer or service provider, or its predecessors-in-interest, if any (collectively, the "Lender Parties"), under or in connection with the Loan or any of the Loan Documents
>
> No Claim Against the Lender Parties. The Borrower Parties represent that after conducting a thorough investigation and diligent inquiry that they are presently unaware of any claims they might hold against the Lender Parties, including, but not limited to, setoff, estoppel, waiver, cancellation of instruments, rescission or excuse of performance under or in connection with the Loan or any of the Loan Documents, and no claims against any other party that could be asserted by any of the Borrower Parties to reduce or eliminate all or any part of Co-Borrowers' or Guarantors' obligations under the Loan Documents.

*Id.* at SMHG161870 (emphasis in original).

41.    In exchange for signing the PNA, Defendant agreed to discuss restructuring the loan without waiving any of the defaults. *Id.* at SMHG161869-70.

42.    The loan matured on June 28, 2021. App. Ex. 25 [Notice of Default] at SMHG166022. Borrower failed to repay the loan by that date or within the applicable grace period provided by the Loan Agreement. *Id.*; App. Ex. 9 [Loan Agreement] at SMHG082048 (§ 7.1). That is an Event of Default under the Loan Agreement. App. Ex. 9 [Loan Agreement] at SMHG082048 (§ 7.1).

43.    On July 6, 2021, because the Borrower and Plaintiff also failed to fund the $51,262,357 Deficiency Deposit reflecting the shortfall in the minimum Borrower's Equity Requirement, Defendant declared an Event of Default against Plaintiff under the Shortfall Guaranty. App. Ex. 25 [Notice of Default] at SMHG166021-6023.

44.    The development effectively ground to a halt. Of the approximately $207 million of development costs that the parties projected in the budget, $130,167,887 was neither funded nor spent as of the date of the default. App. Ex. 28 [Budget True Up]. Under Section 5.17 of the

Loan Agreement, the Borrower was responsible for that entire amount, and Plaintiff is obligated to backstop that obligation under the Shortfall Guaranty.  App. Ex. 9 [Loan Agreement] at SMHG082038 (requiring an equity contribution of *not less* than $87 million).  At the very least, $51,262,357 of the funding gap is attributable to the Borrower's and Plaintiff's failure to fund the minimum Borrower's Equity Requirement.  App. Ex. 25 [Notice of Default] at SMHG166025.

### F.    Procedural History

45.    Plaintiff did not make any payment under the Shortfall Guaranty, but instead filed this case in August 2021.  To avoid the Shortfall Guaranty and despite its representations in the Loan Agreement amendments and the PNA, Plaintiff asserted various claims against Defendant and Grand Canyon Lender.  *See generally* Complaint [ECF No. 2].  Defendant answered and filed its counterclaim for Plaintiff's breach of the Shortfall Guaranty in December 2021.  *See* Answer and Counterclaims [ECF No. 35].

46.    The parties completed discovery on April 14, 2023 and timely filed summary judgment motions.  ECF Nos. 123, 127.  In addition to opposing Defendant's motion, Plaintiff filed motions to (a) amend its complaint so it could voluntarily withdraw its fraud claim without prejudice and, in the alternative and (b) for additional discovery pursuant to Federal Rule of Civil Procedure 56(d), relying on the baseless assertion that it needed additional information to oppose Defendant's summary judgment motion.  ECF Nos. 125-130.

47.    While the motions were pending, the Court identified a potential subject matter jurisdiction issue with the presence of the Grand Canyon Lender in the case.  ECF Nos. 138, 188. The parties stipulated to remedy this defect by removing Grand Canyon Lender from this case as

a party because it was fully represented by Defendant under the Syndication Agreement.  ECF No. 181.  On August 15, 2023, the Court so-ordered the stipulation and retained jurisdiction over this case.  ECF No. 188.

48.     Sadly, Judge Jenkins passed away in early November 2023.  On November 30, 2023, the Court denied the summary judgment motions without prejudice pending the Court's resolution of Plaintiff's non-dispositive motions.  ECF No. 192.  Magistrate Judge Bennett denied both of those motions on December 19, 2023.  ECF No. 197.

49.     Notably, Judge Bennett found that Plaintiff made a strategic decision not to seek the discovery Plaintiff sought in those motions.  ECF No. 200-1 at 69:18-70:14.  In doing so, Judge Bennett recognized that Judge Jenkins had denied Plaintiff's earlier motion to amend its complaint for largely the same reason — that Plaintiff's failure to pursue the same discovery constituted "undue delay."  *Id*.; *see also id*. at 15:11-14; 71:15-19.  Judge Bennett denied Plaintiff's Rule 56(d) motion for that same discovery as moot because no summary judgment motion was pending at the time.  *Id.* at 18:9-14; *see also* ECF No. 197.

50.     Plaintiff did not object to that order, and Judge Bennett set a briefing schedule for summary judgment.  ECF No. 206.  This motion timely follows.

## ARGUMENT

Summary judgment is appropriate here because "there is no genuine dispute as to any material fact" requiring trial.  Fed. R. Civ. P. 56(a).  In a contract dispute such as this, summary judgment "should be granted if the contractual language is unambiguous."  *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014).

**I.    Defendant Is Entitled To Summary Judgment On Its Counterclaims And Plaintiff's Contract Claims.**

By its counterclaim, Defendant seeks relief for Plaintiff's failure to fulfill its obligations under the Shortfall Guaranty to pay $51,262,357 of the Borrower's Equity Requirement that was not funded by the Borrower.  Because the relevant terms of the Shortfall Guaranty are unambiguous, Defendant is entitled to summary judgment on its counterclaim and against Plaintiff's declaratory judgment and implied covenant claims.

The Shortfall Guaranty is governed by New York law.  App. Ex. 10 [Shortfall Guaranty] at SMHG081983 (§ 15).  In New York, contracts are enforced as written.  *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) ("When interpreting contracts, we have repeatedly applied the familiar and eminently sensible proposition of law that, when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms.  We have also emphasized this rule's special import in the context of real property transactions, where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." (cleaned up and citations and quotations omitted)).

New York courts strictly interpret real estate guarantees such as the Shortfall Guaranty and routinely grant summary judgment in lenders' favor.  *See, e.g.*, *BBM3, LLC v. Vosotas*, 2022 WL 36158, at *3 (N.Y. Sup. Ct. Jan. 04, 2022) (entering summary judgment for lender on shortfall guaranty), *reconsideration denied*, 2022 WL 3565305 (N.Y. Sup. Ct. 2022); *see also Turnberry Residential Ltd. Partner, L.P. v. Wilmington Tr. FSB*, 99 A.D.3d 176 (N.Y. App. Div. 2012) (affirming grant of summary judgment to lender of real estate construction loan).  This case is no different.

### A.    The Shortfall Guaranty Plainly Requires Plaintiff To Backstop The Borrower's Equity Requirement.

Defendant's Shortfall Guaranty counterclaim is simple.  The Borrower was required to fund at least $87,192,584 under the Borrower's Equity Requirement.  Plaintiff guaranteed the Borrower's obligations in the event of a shortfall.  It is undisputed that the Borrower paid just $35,930,227 of the required amount before it defaulted on the loan.  Accordingly, Plaintiff must pay the rest under the Shortfall Guaranty.

The relevant provisions are clear.  The Borrower's Equity Requirement definition plainly requires the Borrower to fund "not less" than $87,192,584, or even more if the development costs increased beyond the parties' budget:

> "Borrower's Equity Requirement" means Borrower's obligation to contribute equity to the Project of not less than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), or such greater amount as is required to cause the loan to be "in balance" pursuant to Section 5.17 of this Agreement.

App. Ex. 9 [Loan Agreement] at SMHG081995.  And Plaintiff plainly guaranteed any shortfall of the Borrower's Equity Requirement in the Shortfall Guaranty:

> Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the punctual payment of [] Borrower's Equity Requirement, as and when required under the Loan Agreement[.]

App. Ex. 10 [Shortfall Guaranty] at SMHG081979.

There is no dispute that the Borrower fell short of the minimum Borrower's Equity Requirement by $51,262,357.  App. Ex. 23 [Pre-Notice of Default] at SMHG102408.  There is also no dispute that an Event of Default occurred (at the latest) when the Borrower failed to repay the loan in June 2021.  And there can be no dispute that due to the Event of Default, the

Borrower could no longer avoid funding the minimum Borrower's Equity Requirement under Section 5.17.4.

As such, Plaintiff is obligated to fund the $51,262,357 shortfall in the Borrower's Equity Requirement under the Shortfall Guaranty.  Plaintiff's obligation is "irrevocable, absolute," and "unconditional."  App. Ex. 10 [Shortfall Guaranty] at SMHG081979.  These provisions must be "enforced according to their terms." *Vermont Teddy Bear Co.*, 1 N.Y.3d at 475.

Defendant is therefore entitled to judgment against Plaintiff for $51,262,357.  Plaintiff is also responsible for default interest and Defendant's fees, including management fees and attorneys' fees, as provided in the Shortfall Guaranty.  App. Ex. 9 [Loan Agreement] at SMHG081995 [definition of claim]; App. Ex. 10 [Shortfall Guaranty] at SMHG081979 (§ 1).

**B.    Plaintiff's Theories To Avoid Liability Have No Basis In The Plain Language Of The Agreements.**

In its complaint and throughout this litigation, Plaintiff has asserted a jumble of theories to argue that the Borrower's Equity Requirement *could* be less than $87,192,584.  Each and every one of these theories lacks merit.

*First*, Plaintiff has argued that the parties agreed that the Borrower's contributions were supposed to be made "in proportion" to the loan disbursements.  *See* Complaint [ECF No. 2] ¶ 44.  In other words, Plaintiff contends that the minimum Borrower's Equity Requirement is conditioned on the loan amount: Plaintiff claims that because Defendant did not fund the maximum loan amount, the Borrower — and thus, Plaintiff — did not have to fund the minimum Borrower's Equity Requirement.  This theory flies in the face of and improperly tries to add terms to the plain language of the Borrower's Equity Requirement definition.

Nothing about the minimum Borrower's Equity Requirement is "proportional."  There is simply no such language in the definition.  Rather, the definition clearly and unconditionally provides that the Borrower's Equity Requirement is at least $87,192,584: "***not less*** than Eighty-Seven Million One Hundred Ninety-Two Thousand Five Hundred Eighty-Four and 00/100 Dollars ($87,192,584.00), ***or such greater amount*** as is required to cause the loan to be 'in balance' pursuant to Section 5.17 of this Agreement."  App. Ex. 9 [Loan Agreement] at SMHG081995 (emphases added).  Stated otherwise, the Borrower's Equity Requirement could be *more* than $87,192,584, but it could not be *less*.  Plaintiff is bound by these terms.  *See Vermont Teddy Bear Co.*, 1 N.Y.3d at 475 ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.").

Nor can the concept of proportionality be implied.  As discovery confirmed, the parties *deliberately removed* the proportionality concept during their negotiations of the Loan Agreement.  As discussed above, Plaintiff initially contemplated including that concept for the $4.5 million cash contribution that the Borrower was going to make.  *See supra* at p. 7 (citing App. Ex. 8 [June 14, 2016 Redline] at LENDERS_0118369).  As reflected by a redline exchanged by the parties, that provision contemplated precisely the type of proportional treatment that Plaintiff tries to add now.  Specifically, it contemplated that the Borrower would fund the $4.5 million "pro rata" to the loan disbursements.  *Id.*; *see also* Black's Law Dictionary (11th ed. 2019) (defining "pro rata" as "Proportionately").  Ultimately, however, Plaintiff decided not to have the Borrower fund the $4.5 million in cash, and the parties *removed* the "pro rata" provision from the Loan Agreement.  App. Ex. 8 [June 14, 2016 Redline] at

LENDERS_0118369 (striking "pro rata contribution of cash to the Project"); App. Ex. 9 [Loan Agreement] at SMHG081995.

The fact that the parties knew how to provide for proportionality but deliberately removed that language from the final version of the Borrower's Equity Requirement definition is dispositive.  Having agreed to remove that term during the negotiations of the Loan Agreement, Plaintiff cannot add it back through litigation or argue that it was implicitly included all along. *See W.&S. Life Ins. Co. v. U.S. Bank N.A.*, 209 A.D.3d 6, 14 (N.Y. App. Div. 2022) ("If it is apparent that the parties intended to omit the language at issue, [courts] are precluded from implying those terms from the general language of the agreement"); *Gutman v. Gutman*, 51 A.D.2d 535, 536 (N.Y. App. Div. 1976) ("This court cannot read into the agreement a provision which the parties chose not to insert").

*Second*, Plaintiff has argued that the Borrower's Equity Requirement could still be *less* than the $87 million minimum because the loan had been "in balance" under Section 5.17 before the Borrower defaulted.  This theory is wrong as a matter of the contract and undisputed fact.

As explained above, Section 5.17.4 required the Borrower and Plaintiff to have sufficient funding to complete the entire $207 million development project — *i.e.*, the Commitment Financing Amount.  While it permitted the Borrower to defer having to fund that amount, the accommodation was effective only so long as Defendant was satisfied that the entire amount was available and there was "no Event of Default. . . ."  App. Ex. 9 [Loan Agreement] at SMHG082039-40.  This language squarely refutes Plaintiff's arguments.

Specifically, as described above, it is undisputed that the Borrower stopped making required loan payments in early 2020, contributed just $35,930,277 of the equity it promised and

ultimately failed to repay the loan at maturity in June 2021.  *See supra* at p. 14.  As a result, there

can be no dispute that (a) the Borrower did not have the Commitment Financing Amount

available and (b) there was an Event of Default.   The loan was therefore out of balance under

Section 5.17.4, and the Borrower had to make a Deficiency Deposit for the Commitment

Financing Amount.  That means that at the very least, the Borrower had to satisfy the minimum

Borrower's Equity Requirement — *i.e.*, fund the $51,262,357 shortfall.  App. Ex. 25 [Notice of

Default] at SMHG166025.  The Borrower's failure to make that Deposit triggered Plaintiff's

obligations under the Shortfall Guaranty.

Notably, the Borrower and Plaintiff have already conceded that that the loan was out of

balance and the Deficiency Deposit was due in November 2020.  As noted above, in September

2020, Defendant sent Plaintiff and the Borrower a Pre-Notice of Default where it stated that the

Loan was not "in balance" and demanded a Deficiency Deposit in the amount of $51,262,357.

*See* App. Ex. 23 [Pre-Notice of Default] at SMHG102405.  In response, on November 2, 2020,

Plaintiff and the Borrower signed a Pre-Negotiation Agreement, where they explicitly confirmed

that (a) there were "no defaults by Lenders [*i.e.*, Defendant and Grand Canyon Lender]" under

any of the loan documents and (b) after "a thorough investigation and diligent inquiry," neither

Plaintiff nor the Borrower were aware of any "setoff, estoppel, waiver … or excuse of

performance under or in connection with the Loan or any of the Loan Documents," including the

Shortfall Guaranty.  App. Ex. 24 [PNA] at SMHG161870, SMHG161873.

These admissions are clear and unambiguous.  If Plaintiff believed that Defendant had

violated Section 5.17.4 or any other part of the Loan Agreement by improperly declaring the

loan to be out of balance and demanding a $51,262,357 Deficiency Deposit, it would not have

made these admissions.  Having signed them over three years ago and before filing this case, Plaintiff cannot dispute these facts now.

### C.    Plaintiff's Declaratory Judgment And Good Faith And Fair Dealing Claims Fail In The Face Of The Plain Contract Language.

By its declaratory judgment claims, Plaintiff seeks a ruling that notwithstanding the plain language of the agreements, it does not have to cover the shortfall in the Borrower's Equity Requirement.  Complaint [ECF No. 2] ¶¶ 88-100.  Since, as shown above, the language of the Shortfall Guaranty and the Borrower's Equity Requirement are clearly to the contrary, Plaintiff's declaratory judgment claims should be dismissed.

Plaintiff's good faith and fair dealing claim also should be dismissed.  Plaintiff claims that Defendant exercised "discretion to claim a deficiency in the Borrower Equity Requirement and thereafter demand[ed] Plaintiff pay the same . . . ."  Complaint [ECF No. 2] ¶¶ 107-08.  But as shown above, there is nothing discretionary about the minimum Borrower's Equity Requirement or Section 5.17.4.  These provisions plainly require the Borrower to fund at least $87 million and make a Deficiency Deposit for the entire Commitment Financing Amount in the Event of Default.  Having agreed to these provisions, Plaintiff cannot avoid them in litigation via an implied covenant claim.  *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (stating the implied covenant of good faith and fair dealing "cannot be used . . . to imply an obligation inconsistent with other terms of a contractual relationship.").

Thus, summary judgment also should be granted on Plaintiff's declaratory judgment and good faith and fair dealing claims.[2]

---

[2]    Defendant is entitled to summary judgment on its second counterclaim for the same

## II.      Defendant Also Is Entitled To Summary Judgment On Plaintiff's Fraud Claim.

Plaintiff's fraud claim likewise should be dismissed as a matter of law.  It is explicitly

barred by the Waiver and Release Agreement that Plaintiff signed.  It is also barred by the plain

language of the parties' other agreements and Mauro's sworn testimony.

Plaintiff bases its fraud claim on alleged representations, made during "negotiations of

the Loan Agreement," that Defendant would be able to raise $120 million in EB-5 proceeds.

Complaint [ECF No. 2] ¶¶ 113-14.  Plaintiff claims that based on these representations, it

"repudiated its term sheet with AIG, and both Plaintiff and the Borrower entered into a

settlement agreement with AIG and agreed to pay certain sums to AIG."  *Id*. ¶ 117.  Plaintiff also

claims that it signed the Shortfall Guaranty based on these representations.  *Id*. ¶ 119.  These

claims are legally and factually baseless.

### A.      Plaintiff Explicitly Released Its Fraud Claim By Agreement.

The Waiver and Release Agreement explicitly bars Plaintiff's claims against Defendant.

Specifically, the Agreement releases any claims related to AIG, the loan, or the development:

> ***any and all manner of claims***, liabilities, demands, actions, causes of action, debts,
> accounts, bonds, covenants, agreements, liens, judgments and/or suits, ***whether***
> ***known or unknown, suspected or unsuspected, which the SMHG Parties had,***
> ***have, may have, may have had, or may in the future have*** against the EB-5 Lender
> Released Parties, or any of them, ***which arise out of, are connected with, or relate***
> ***in any way to the AIG LOI***, the KT LOI, ***the AIG Fee, the Project, the Loan and/or***

---

reasons.  Its second counterclaim seeks damages for Plaintiff's violation of its covenants and
representations that Plaintiff had no defenses to the Shortfall Guaranty and no claims against
Defendant.  Answer and Counterclaims [ECF No. 35] ¶¶ 94-100.  By these statements, Plaintiff
induced Defendant into continuing to provide financing (and inducing Grand Canyon Lender to
become party to the Loan Agreement).  *Id*. at 3.  By this suit, Plaintiff violated those covenants
and representations when it could no longer exploit its relationship with Defendant.  Defendant is
therefore entitled to summary judgment on its second counterclaim as well.

> ***the Loan Agreement*** (but excluding any claims under this Agreement) (the
> "Released Claims").

App. Ex. 11 [Waiver and Release] at SMHG082136 (emphasis added).  The Waiver and Release

Agreement is governed by New York law (*id*. at SMHG082137), and under New York law, this

broad release is a complete bar to Plaintiff's fraud claim.  *See Interpharm, Inc. v. Wells Fargo

Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) ("[A] valid release constitutes a complete bar

to an action on a claim which is the subject of the release.") (quoting *Centro Empresarial

Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 76 A.D.3d 310, 318 (N.Y. App. Div. 2010), *aff'd*,

17 N.Y.3d 269 (2011)).

 This is underscored by the specific scope of the release — waiving claims related to AIG,

the development project, the loan, and the Loan Agreement — which explicitly covers each of

the alleged bases for Plaintiff's fraud claim.  *See Centro Empresarial*, 76 A.D.3d at 318 ("[A]

claim for fraud within the scope of a release can be released even if it is unknown to the releasor,

and notwithstanding that the releasee did not make full disclosure of its wrongdoing before the

release was granted."); *accord Hoffmann v. Horn*, 157 A.D.3d 871, 873 (N.Y. App. Div. 2018)

("A valid general release without any limiting language will apply not only to known claims, but

also unknown claims between the parties that may have existed prior to the release.").

Accordingly, the Waiver and Release Agreement requires dismissal of Plaintiff's fraud claim.

###  B. Plaintiff's Fraud Claim Also Is Barred By Equitable Estoppel.

 Plaintiff's fraud claim should also be dismissed under equitable estoppel principles.

Plaintiff decided to claim fraud over six years after signing the Shortfall Guaranty and years *after*

receiving and exploiting Defendant's $42 million.  In the interim, Plaintiff repeatedly assured

Defendant that it had no defenses to the enforcement of its obligations under the Shortfall

Guaranty and had no claims against Defendant.  Plaintiff made these assurances in the five Loan

Agreement amendments between 2016 and 2019, including as part of Plaintiff's efforts to induce

Grand Canyon Lender to become a party to the Loan Agreement.  App. Exs. 12-16

[Amendments].  As shown above, Plaintiff also assured Defendant in the PNA that Defendant

was not in default and Plaintiff was unaware of any claims against Defendant, including any

offsets or excuses of performance so that Defendant would negotiate a potential work-out instead

of pursuing enforcement options.  App. Ex. 24 [PNA] at SMHG161870.

Equity does not permit Plaintiff to claim fraud after reassuring Defendant for years that

no fraud existed so that Plaintiff could reap the benefits of unwitting EB-5 investors' $42

million.  *See 757 3rd Ave. Assocs., LLC v. Patel*, 117 A.D.3d 451 (N.Y. App. Div. 2014) ("The

purpose of equitable estoppel is to preclude a person from asserting a right after having led

another to form the reasonable belief that the right would not be asserted, and loss or prejudice to

the other would result if the right were asserted.").

### C.    Plaintiff's Fraud Claim Also Is Belied By The Language Of The Agreements.

Plaintiff's fraud claim also fails in the face of the parties' agreements.  Given the

numerous documents that Plaintiff and its principals signed, Plaintiff cannot credibly assert that

it believed Defendant would raise the full $120 million for the loan.

*First*, the Letter of Intent that Plaintiff signed in September 2015 — months before it

signed the Shortfall Guaranty — made clear that the loan would be raised by an independent

immigration agent, *not Defendant*, and that the loan could be less than the maximum amount.

App. Ex. 3 [LOI] at SMHG001590-91 (the fundraising would be "up to" a maximum amount

and merely on a "best-efforts-basis").

*Second*, the initial and amended marketing materials that Plaintiff prepared before and after it signed the Shortfall Guaranty reflected the same understanding:

> [I]f the Company does not raise the full US$150.0 million in this Offering, . . . then the Company will be unable to advance the full US$150.0 million contemplated under the Loan Agreement.

App. Ex. 4 [PPM] at LENDERS_0066443.

*Third*, the Loan Agreement provides that the loan "will not exceed" $120 million, and that Defendant was obligated to disburse only the proceeds that were raised:

> Notwithstanding any provision to the contrary in this Loan Agreement, Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance.

App. Ex. 9 [Loan Agreement] at SMHG082011. The Loan Agreement also provided other options for Plaintiff to fund the development to the extent the loan was less than the maximum amount, including borrowing other loans that were senior or subordinate to Defendant's loan. *Id.* at SMHG082026-27.

In other words, Plaintiff repeatedly and explicitly recognized that the fundraising for the loan would be done by *third parties*, not Defendant, and that Defendant could and would only disburse proceeds that were raised, not a penny more. In the face of these written acknowledgements, Plaintiff cannot credibly claim that it was somehow misled about the fact that the loan would be raised by third parties, rather than Defendant, and could be less than $120 million. *See Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996) (plaintiff could not reasonably rely on oral promise that was contradicted by written correspondence following the meeting); *accord N.Y. State Mortg. Loan Enforcement & Admin. Corp. v. Coney Island Site Five Houses, Inc.*, 109 A.D.2d 311, 318 (N.Y. App. Div. 1985) (a party cannot claim

justifiable reliance in the face of a conflict between the alleged misrepresentations and the

written terms of the agreements).

    **D.**    **Plaintiff's Fraud Claim Also Is Contrary To Its Principal's Sworn Admissions.**

The sworn deposition testimony of Plaintiff's principal, Mauro, is the final nail in the

coffin of Plaintiff's fraud claim.  Mauro admitted that Plaintiff repudiated its deal with AIG

because he was unhappy with AIG's failure to raise any funds before Mauro met any of

Defendant's representatives.  Mauro also admitted that there were no actionable

misrepresentations made by Defendant's representatives, as the only dispute is over the meaning

of the Shortfall Guaranty.

With respect to AIG, Mauro testified that he signed an exclusive EB-5 fundraising deal

with AIG in December 2014, long before he first met Defendant.  App. Ex. 1 [Mauro Dep. Tr.] at

58:15-24.  He also testified that he reaffirmed that deal — including the exclusivity clause — on

July 29, 2015.  App. Ex. 1 [Mauro Dep. Tr.] at 64:1-67:2; 68:23-69:11.  Plaintiff's agreement

with AIG explicitly provided that Plaintiff could not approach anyone else about raising EB-5

capital.  App. Ex. 2 [AIG Term Sheet] at SMHG000010.

But Mauro admitted that on August 4, 2015, just *six* days after he reaffirmed Plaintiff's

deal with AIG, he paid several thousand dollars to meet Mr. Tang *to discuss raising EB-5

capital*.  App. Ex. 1 [Mauro Dep. Tr.] at 45:9-21.  Mauro also admitted that he violated his

agreement with AIG *before even meeting anyone associated with Defendant*.  App. Ex. 1 [Mauro

Dep. Tr.] 68:23-69:11.  And Mauro also admitted that AIG had raised "zero dollars" for Plaintiff,

and *that* was the reason why he approached Mr. Tang.  App. Ex. 1 [Mauro Dep. Tr.] 72:2-13.  In

other words, Mauro admitted in sworn deposition testimony that Plaintiff breached its agreement

with AIG because AIG was unsuccessful, not because of some representations made by Defendant or its representatives. These admissions flatly contradict Plaintiff's assertion that Defendant somehow induced Plaintiff to breach its agreement with AIG.

Mauro, who led the negotiations on behalf of Plaintiff and the Borrower, testified that the *only* purported misrepresentation made by any of Defendant's representatives concerned the meaning of the Shortfall Guaranty. App. Ex. 1 [Mauro Dep. Tr.] 256:1-260:1. But that cannot possibly serve as the basis for a fraud claim because the materials that Mauro himself signed *before* Plaintiff executed the Shortfall Guaranty conclusively refute Mauro's and Plaintiff's purported reliance on this purported misrepresentation.

To be sure, the Letter of Intent that Mauro signed on Plaintiff's behalf in September 2015 — nine months before Plaintiff signed the Shortfall Guaranty — explicitly provides that Plaintiff would be responsible for covering any shortfall in the anticipated funding sources. App. Ex. 3 [LOI] at SMHG001587, SMHG001598. The parties also included the same language in the initial and amended marketing materials. App. Ex. 4 [PPM] at LENDERS_0066426; App. Ex. 18 [Amended and Restated PPM] at LENDERS_0003636.

Accordingly, Plaintiff cannot now claim that it was somehow misled about the true meaning of the Shortfall Guaranty. *See Gold Standard*, 915 P.2d at (plaintiff cannot reasonably rely on oral promise made at a meeting that was contradicted by written correspondence following the meeting); *Coney Island Site Five House*, 109 A.D.2d at 318 (a party cannot claim justifiable reliance in the face of a conflict between the alleged misrepresentations and the written terms of the agreements).

Moreover, Plaintiff's fraud claim is also barred by New York law.  *First*, Plaintiff's reliance on misrepresentations that occurred "during negotiations of the Loan Agreement," Complaint [ECF No. 2] ¶¶ 113-14, is barred by the plain and unambiguous merger clauses in the Loan Agreement and the Shortfall Guaranty.  App. Ex. 9 [Loan Agreement] at SMHG082059 (§ 9.23); App. Ex. 10 [Shortfall Guaranty] at SMHG081982 (§ 11).  It is settled law that Plaintiff, a sophisticated party represented by sophisticated counsel, cannot rely on statements made during negotiations in the presence of such merger clauses.  *See Hindsight Sols., LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 773 (S.D.N.Y. 2014) (discussing the application of a merger clause); *Hotel 71 Mezz Lender LLC v. Mitchell*, 63 A.D.3d 447, 448 (N.Y. App. Div. 2009) (dismissing claims waived by language in loan agreement); *see also Red Tulip, LLC v. Neiva*, 44 A.D.3d 204, 209 (N.Y. App. Div. 2007) (applying "broadly worded waiver language" to "preclude the assertion of defenses to a guaranty").

And *second*, Plaintiff cannot base a fraud claim on Defendant's purported misrepresentation concerning the meaning of the Shortfall Guaranty that Plaintiff signed.  *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (N.Y. 1995) ("General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the [fraud] claim.").

Put simply, Plaintiff cannot use its purported misunderstanding of the Shortfall Guaranty as an excuse.  Insofar as Plaintiff now claims that it signed the Shortfall Guaranty believing it meant something else, Plaintiff has no one but itself to blame.  Plaintiff is a highly sophisticated party, and it was represented by sophisticated counsel.  To the extent that Plaintiff had a different understanding than reflected in the parties' agreements, it was incumbent on Plaintiff to put that

understanding in writing.  *See Baraliu v. Vinya Capital, L.P.*, 2009 WL 959578, at *8 (S.D.N.Y. Mar. 31, 2009) (in cases like this one, "involving sophisticated parties and high-stakes transactions — a party lacking information cannot reasonably rely on oral representations from a negotiator on the other side of a proposed transaction, and must be expected to demand documented confirmation or otherwise perform basic due diligence") (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997)).

Plaintiff did not do so, but instead signed the Shortfall Guaranty and repeatedly assured Defendant that it had no claims against Defendant and no offsets or excuses of performance to Plaintiff's obligations under the Shortfall Guaranty.  Plaintiff must now live with the result.

## **CONCLUSION**

For the foregoing reasons, the Court should grant judgment to Defendant on its counterclaims and dismiss Plaintiff's claims against Defendant.  Given that the loan has kept accruing default interest and Defendant has been forced to incur legal expenses, Defendant respectfully requests a hearing to determine the full amount of damages due to it.

DATED:   February 21, 2024

**SNELL & WILMER L.L.P.**

*/s/ Jeremy J. Stewart*
Matthew L. Lalli
Jeremy J. Stewart
Aline Marie H. Longstaff

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Uri A. Itkin

**KASOWITZ BENSON TORRES LLP**

Jordan D. Beltz

32

Andrew W. Breland

*Attorneys for Defendant Summit Village*
*Development Lender 1, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February, 2024, I caused a true and correct copy of the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to filed via the Court's ECF system, which effectuated service upon all counsel of record, including the following:

H. Burt Ringwood
STRONG & HANNI
9350 South 150 East, Suite 820
Sandy, Utah 84070
bringwood@strongandhanni.com

William B. Ingram
Spencer W. Young
Connor J. Keller
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, Utah 84106
wingram@strongandhanni.com
syoung@strongandhanni.com
ckeller@strongandhanni.com


*/s/  Mary Batchelor*
*Legal Administrative Assistant*
*Snell & Wilmer L.L.P.*

4865-0917-6999