# EXHIBIT 1

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

SUMMIT MOUNTAIN HOLDING ) VIDEOTAPED
GROUP, LLC, a Utah Limited )
Liability Company, ) VIDEOCONFERENCE
) DEPOSITION OF:
Plaintiff, )
) GREG MAURO
vs. )
)
) Case No.
SUMMIT VILLAGE DEVELOPMENT ) 1:21-cv-00110-BSJ
LENDER 1, LLC, a Delaware )
Limited Liability Company; ) Judge Bruce S. Jenkins
GRAND CANYON DEVELOPMENT )
HOLDINGS 3 LLC, an Arizona )
Limited Liability Company; )
and DOES 1 through 10, )
)
Defendants. )

VIDEOTAPED DEPOSITION WAS TAKEN VIA VIDEOCONFERENCING
THROUGH RED ROCK REPORTING
February 3, 2023
9:36 a.m. MT - 6:37 p.m. MT

Reporter: Tamra J. Berry, CSR, RPR

Videographer: Jason Bohn

## Page 2

1    A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3         SPENCER YOUNG
          CONNOR J. KELLER
4         STRONG & HANNI
          Attorneys at Law
5         102 South 200 East, Suite 800
          Salt Lake City, Utah  84111
6         Tel:  801.532.7080
          syoung@strongandhanni.com
7
8    FOR THE DEFENDANTS:   (APPEARING VIA ZOOM)
9         URI A. ITKIN
          AKIN GUMP STAUSS HAUER & FELD, LLP
10        Attorney at Law
          One Bryant Park
11        New York, New York 10036
          Tel:  212.827.1027
12        uitkin@akingump.com
13
          JORDAN D. BELTZ
14        ANDREW W. BRELAND
          KASOWITZ BENSON TORRES LLP
15        1633 Broadway
          New York, New York 10019
16        Tel:  212.506.1700
          jbeltz@kasowitz.com
17
18   ALSO PRESENT:
19        JASON BOHN, Videographer
20             -oOo-
21        I N D E X
22   GREG MAURO:                      PAGE
     Examination by Mr. Itkin....................6
23   Examination by Mr. Young..................293
24
25

## Page 3

1
          -oOo-
2
          E X H I B I T S
3
     NUMBER        DESCRIPTION           PAGE
4
5    Number 1   Plaintiff's Second Supp. Response......47
6    Number 2   Amended and Restated Term Sheet.......56
7    Number 3   E-mails.............................99
8    Number 4   E-mails............................117
9    Number 5   E-mails............................125
10   Number 6   E-mails............................145
11   Number 7   E-mails............................147
12   Number 8   E-mails............................153
13   Number 9   E-mails............................166
14   Number 10  E-mails............................172
15   Number 11  E-mails............................182
16   Number 12  E-mails............................186
17   Number 13  E-mails............................194
18   Number 14  E-mails............................198
19   Number 15  E-mails............................204
20   Number 16  Complaint..........................226
21   Number 17  Amended and Restated Guaranty......252
22   Number 18  E-mails............................260
23   Number 19  Amended and Restated Conf. Memo....273
24   Number 20  Expert Witness Report..............280
25

## Page 4

1         P R O C E E D I N G S
2
09:46:17  3         VIDEOGRAPHER:  We're now on the record.
09:46:39  4    The time is 9:46 a.m. Mountain Time.
09:46:42  5         This is the video-recorded deposition of
09:46:46  6    Greg Mauro in the matter of Summit Mountain Holding
09:46:51  7    Group LLC versus Summit Village Development Lender 1
09:46:57  8    LLC, et al., being held via Zoom video conference on
09:47:03  9    February 3rd, 2023.
09:47:05 10         My name is Jason Bohn, certified legal
09:47:09 11    videographer, along with certified court reporter
09:47:12 12    Tamra Berry.  We are both with the firm of Red Rock
09:47:16 13    Reporting.  Counsel will now state their appearances
09:47:19 14    for the record, and the witness will be sworn.
09:47:24 15         MR. YOUNG:  Morning.  Spencer Young on
09:47:26 16    behalf of the plaintiff.
09:47:29 17         Two objections to note for the record, one
09:47:32 18    is that the videographer was not indicated in the
09:47:35 19    notice.  The other is that a stipulation was provided
09:47:38 20    late Wednesday night, which we did not have time to
09:47:40 21    review before today's deposition.  That being said we
09:47:43 22    are in agreement with the general principles that the
09:47:48 23    stipulation embodies, as I expressed to Mr. Itkin by
09:47:51 24    e-mail yesterday, February 2nd, 2023.
09:47:57 25         MR. ITKIN:  Are there other counsel in the

1 (Pages 1 to 4)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 5

```
09:48:03   1    room?
09:48:02   2          MR. YOUNG:  Yes.  We have my colleague,
09:48:05   3    Connor Keller, as well who is assisting today.
09:48:08   4          MR. ITKIN:  Thank you.  This is Uri Itkin
09:48:12   5    of Akin Gump on behalf of defendants Summit Village
09:48:16   6    Development Lender 1 LLC and Grand Canyon Development
09:48:20   7    Holdings 3 LLC.
           8
           9          GREG MAURO,
          10    called as a witness, having been duly sworn, was
          11          examined and testified as follows:
          12
09:48:44  13          MR. BELTZ:  Just for purposes of the
09:48:45  14    stenographic record I just want to note that Jordan
          15    Beltz and Andrew Breland from Kasowitz Benson Torres
          16    are also appearing remotely on behalf --
          17          THE REPORTER:  Sorry.  Did you get all of
          18    that?
          19          Okay.  Can you just repeat that, who is
          20    appearing remotely?
          21          MR. BELTZ:  Yep, sorry.  You cut me off in
09:48:48  22    the middle of it.  Jordan Beltz and Andrew Breland
09:49:04  23    from Kasowitz Benson Torres LLP appearing remotely on
09:49:04  24    behalf of the defendant counter-claimant lenders.
09:49:13  25          MR. ITKIN:  Andrew, do you want to
```

Page 6

```
09:49:15   1    introduce yourself?
09:49:16   2          MR. BRELAND:  I believe Jordan got me.
09:49:20   3    But, yes, this is Andrew Breland from Kasowitz Benson
09:49:20   4    Torres.
09:49:20   5          EXAMINATION
09:49:20   6    BY MR. ITKIN:
09:49:25   7      Q.  Thank you.  Good morning, Mr. Mauro.
09:49:26   8      A.  Good morning.
09:49:27   9      Q.  What are you reading?
09:49:29  10      A.  I'm reading the -- I think it is either
09:49:35  11    the original or amended complaint.
09:49:37  12      Q.  Can you please put that aside.  You may
09:49:43  13    just want to move that out of the way because I'm
09:49:45  14    going to show you some exhibits.  But we're not going
09:49:48  15    to be talking about that right now.
09:49:51  16          Before we begin I do want to reflect what
09:49:55  17    Mr. Young said earlier.  We had our stipulation for
09:50:00  18    virtual depositions that we sent over to Mr. Young
09:50:03  19    and his team on Wednesday night.  So as he mentioned
09:50:08  20    he is in agreement with the spirit of it.  He
09:50:11  21    promised to send objections to the -- or edits to the
09:50:15  22    extent he had any.  He has not as of the date hereof
09:50:19  23    so we're going to proceed as if that stipulation
09:50:22  24    governs.  I'm just saying that for the record.
09:50:24  25          Mr. Mauro, have you ever been deposed
```

Page 7

```
09:50:26   1    before?
09:50:26   2      A.  Yes.
09:50:27   3      Q.  How many times?
09:50:30   4      A.  Once in -- yeah, yeah.  Once or in one --
09:50:39   5    in one lawsuit.
09:50:40   6      Q.  What was that lawsuit about?
09:50:42   7      A.  One of my start-ups was called Tachyon,
09:50:50   8    and it ultimately raised about a quarter billion.  It
09:50:55   9    was the first broadband satellite -- if you're
09:50:59  10    familiar with Starlink, it was a predecessor to
09:51:02  11    Starlink.  And I founded it with the founders of a
09:51:08  12    satellite modem company called Comstream.  We brought
09:51:13  13    in a -- former COO of Titan Corporation to run
09:51:16  14    it.  He was the former deputy director of the CIA.
09:51:20  15    And a long story short, but nine months into the
09:51:24  16    enterprise he claimed my partners couldn't
09:51:26  17    participate out of a noncompete from their prior
09:51:29  18    company.  I didn't have such a noncompete.  It was a
09:51:32  19    bogus reason to try and grab their equity right when
09:51:36  20    the $8 million, initial $8 million and 250 million
09:51:40  21    was coming in there.  So I initially sued myself, and
09:51:43  22    my colleagues joined me.  And we settled in our favor
09:51:51  23    the day before trial.
09:51:52  24      Q.  Great.  And how do you spell Tachyon?
09:51:55  25      A.  T-a-c-h-y-o-n.
```

Page 8

```
09:51:57   1      Q.  Great.  So you understand the rules of the
09:52:01   2    road for depositions then?
09:52:02   3      A.  Yes.
09:52:03   4      Q.  I'll be asking you questions; you'll be
09:52:07   5    giving me answers.  You understand that?
09:52:13   6      A.  I do.
09:52:14   7      Q.  And you're testifying and providing those
09:52:16   8    answers under oath.  Do you understand that?
09:52:18   9      A.  I do.
09:52:19  10      Q.  As if you were in a court of law?
09:52:21  11      A.  I do.
09:52:22  12      Q.  Under the penalty of perjury, right?
09:52:25  13      A.  Yes.
09:52:27  14      Q.  The only kind of rule of the road that I
09:52:31  15    want to make sure we follow is that if I ask a
09:52:35  16    question and you don't understand it, please let me
09:52:38  17    know, okay?
09:52:45  18      A.  I'll do my best.
09:52:46  19      Q.  And if you don't ask me to restate it or
09:52:50  20    clarify, the assumption is going to be that you
09:52:54  21    understand it.  Is that fair?
09:52:55  22      A.  That's fine.  I guess the only caveat
09:52:59  23    would be the last time I was deposed it was fairly
09:53:03  24    fresh after the incident, whereas this is five,
09:53:07  25    six -- six, seven years.  So I may have, you know, to
```

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 9

09:53:12  1    look at source documents to answer a question
09:53:16  2    appropriately. So with that caveat.
09:53:19  3        Q. Can you please state your full name for
09:53:22  4    the record?
09:53:23  5        A. Gregory Vincent Mauro.
09:53:25  6        Q. And can you please tell us where you live?
09:53:28  7        A. I live at 83 North Yacht Club Drive, Eden,
09:53:35  8    Utah.
09:53:35  9        Q. Is that your only address?
09:53:37 10        A. No.
09:53:38 11        Q. Where else do you live?
09:53:40 12        A. I live in Laguna Beach, California and
09:53:46 13    Austin, Texas.
09:53:48 14        Q. Where is your primary residence?
09:53:51 15        A. Utah. In the process of moving it to
09:53:54 16    Texas.
09:53:55 17        Q. How long has your primary residence been
09:53:58 18    in Utah?
09:54:00 19        A. I believe three years now.
09:54:04 20        Q. So when did -- maybe give me the year when
09:54:11 21    it became your primary residence?
09:54:12 22        A. I think it was 20 -- I think it was
09:54:19 23    2020 -- or, no, 2019 or 2020. Before that it was
09:54:23 24    Texas. Austin, Texas.
09:54:27 25        Q. And how long was your primary residence in

Page 10

09:54:31  1    Texas?
09:54:32  2        A. 2009, I believe, '08 or '09.
09:54:38  3        Q. Mr. Mauro, I understand you have lots of
09:54:43  4    business interests. Can you give me a general
09:54:48  5    summary of what it is that you do?
09:54:49  6        A. Sure. I manage a venture fund focused on
09:54:56  7    human capital development with formal and informal
09:54:58  8    education from early education to next generation
09:55:03  9    universities being the biggest component of that. We
09:55:07 10    manage about a billion in assets under management
09:55:11 11    across five main funds globally, and it's now based
09:55:18 12    out of Austin. It's been -- it's always been based
09:55:23 13    either out of Austin or the Bay area. I haven't
09:55:25 14    lived in the Bay area in 20 years.
09:55:29 15        Q. And what's the venture fund called?
09:55:31 16        A. It's called Learn Capital.
09:55:34 17        Q. And is Learn Capital the only other
09:55:39 18    venture that you have outside of Powder Mountain?
09:55:47 19        A. No. Prior to Learn Capital I ran an
09:55:50 20    affiliates -- an affiliate of the Founders Fund
09:55:53 21    called Revolution Ventures. And prior to that I
09:55:57 22    founded several venture-backed startups, some that
09:56:03 23    are no longer existing like Tachyon. But others that
09:56:09 24    are -- that are -- that still exist.
09:56:14 25        Q. And what is the Founders Fund?

Page 11

09:56:19  1        A. The Founders Fund is a 7 billion assets
09:56:24  2    under management venture fund led by Peter Thiel.
09:56:24  3        Q. And when you ran -- did you say
09:56:24  4    Revolution?
09:56:24  5        A. Yes.
09:56:38  6        Q. What was the focus of that fund?
09:56:38  7        A. General tech.
09:56:43  8        Q. All right. So let's move on to this
09:56:52  9    particular project that's at issue in this case.
09:56:57 10        A. Sure. I mean it might be helpful to
09:56:59 11    clarify, you know. So Learn Capital, Founders Fund,
09:57:03 12    prior to Founders Fund the ventures that I did that
09:57:06 13    included Founders Fund investing and Revolution in
09:57:09 14    many cases, I raised about a half a million into my
09:57:15 15    own ventures.
09:57:14 16        Q. And what is the project called -- what do
09:57:20 17    you call the project that we're -- we are litigating
09:57:24 18    over in this case?
09:57:25 19        A. We're litigating over the North Village of
09:57:31 20    Powder Mountain.
09:57:33 21        Q. And the -- I understand your
09:57:38 22    clarification; that's fair. And you started a
09:57:43 23    venture, a joint venture to develop Powder Mountain;
09:57:48 24    is that right?
09:57:48 25        A. Yeah, it was more than just to develop.

Page 12

09:57:51  1    It was to purchase it and develop it and to operate
09:57:57  2    the ski resort, to own and operate the ski resort.
09:58:01  3        Q. And what is the name of that venture in
09:58:04  4    your words?
09:58:05  5        A. Summit Mountain Holding Group is the
09:58:09  6    holding company that owns the 2,800 units of
09:58:12  7    entitlement in Weber County, approximately 600 in
09:58:15  8    Cache County, and an operating ski resort that is on
09:58:20  9    a skiable terrain basis the largest in the United
09:58:23 10    States.
09:58:27 11        Q. And Summit Mountain Holding Group also
09:58:33 12    owns Powder Mountain, right?
09:58:36 13        A. Yeah, that's the operating ski resort. So
09:58:37 14    that was started in 1972 and has expanded since then.
09:58:42 15        Q. And where did the idea for this venture
09:58:49 16    generate?
09:58:51 17        A. From me.
09:58:53 18        Q. When did you come up with this idea?
09:58:58 19        A. I was -- I had discovered Powder Mountain
09:59:03 20    just as a fan of skiing. I've skied all over the
09:59:06 21    world, and I wanted to winter in the mountains. And
09:59:10 22    so I bought a place in Eden at the base of Powder
09:59:18 23    Mountain -- Powder Mountain is technically in Eden --
09:59:19 24    in 2008 and was just a fan of the mountain. And
09:59:23 25    three years I found out that the mountain was

3  (Pages 9 to 12)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 13

09:59:28 1  quietly for sale from a local. And so I did not want
09:59:35 2  to see it fall into the hands of one of the large
09:59:38 3  corporate interests rolling up the ski industry,
09:59:41 4  which are commonly now referred to as the Epic or
09:59:46 5  Ikon pass backed by two large conglomerates. I
09:59:49 6  didn't want to see that happen because I knew that
09:59:51 7  that would mean it would get rapidly overcrowded and
09:59:57 8  overdeveloped and no longer a place I wanted to ski.
10:00:00 9  And I had hopefully found the best skiing in the planet
10:00:03 10 in my opinion. So I wanted to see if I could buy it
10:00:06 11 and develop it reasonably. And so that was the --
10:00:09 12 that was the motivation and idea at the beginning.
10:00:14 13     Q. And did you bring in a partner to this
10:00:17 14 venture?
10:00:18 15     A. Yes. So after -- that was in May of 2011.
10:00:24 16 And in August of 2011 I approached the founders of
10:00:32 17 Summit Series, which is an event-like company that's
10:00:38 18 sort of a cross between Ted and Davos to see if they
10:00:46 19 would want to partner with me specifically around the
10:00:50 20 marketing of -- in their case, of the purchase and
10:00:55 21 development of Powder Mountain. And so they visited
10:01:01 22 very quickly. I think it was within two or three --
10:01:05 23 two days, and we came to terms pretty quickly. And
10:01:12 24 then jointly -- I mean I negotiated the purchase and
10:01:16 25 transaction and managed the financing and brought on

## Page 14

10:01:22 1  a development team to do the development. And the
10:01:30 2  Summit folks focused on marketing to their -- to
10:01:34 3  their community. So that was the -- that was the
10:01:39 4  partnership.
10:01:40 5     Q. Got it. And was that partnership led on
10:01:49 6  the Summit series side by a gentleman named Elliot
10:01:54 7  Bisnow?
10:01:54 8     A. He -- Elliott was the -- yeah, he was the
10:01:58 9  lead on their side.
10:01:59 10    Q. And did you know Elliott or Mr. Bisnow
10:02:05 11 before you joined forces with him on this venture?
10:02:08 12    A. No.
10:02:08 13    Q. How did you meet?
10:02:12 14    A. I asked a woman, Nicole Patrice, to
10:02:23 15 introduce us.
10:02:24 16    Q. And why did you want an introduction to
10:02:30 17 Mr. Bisnow in Summit Series in connection with this
10:02:34 18 venture?
10:02:34 19    A. I had gone -- they had held an event in
10:02:38 20 May of 2011. So the idea occurred to me in I think
10:02:44 21 it was March. In May I attended a -- an event that
10:02:51 22 the Summit Series produced where they took over a
10:02:55 23 1200-person cruise ship and, you know, Peter Thiel
10:03:00 24 who was on there who I knew obviously, Richard
10:03:03 25 Branson, a bunch of other -- a huge variety of

## Page 15

10:03:07 1  entrepreneurs across sort of the tech media,
10:03:13 2  healthcare wellness, you name it. So it was a very
10:03:17 3  impressive event and a very impressive network of
10:03:23 4  people, and so that really impressed me. And so, you
10:03:28 5  know, as part of looking to figure out how to
10:03:31 6  purchase the mountain, I thought they could be good
10:03:34 7  partners in helping bring resources to bear.
10:03:43 8        And ultimately I recruited the former head
10:03:48 9  of marketing for Yellowstone Club to consult with us
10:03:53 10 to help structure a financing strategy to purchase
10:04:00 11 the mountain, and that was -- that emulated what
10:04:06 12 Yellowstone Club did. And so that worked well with
10:04:10 13 the Summit folks, you know, leading the marketing
10:04:15 14 effort as it related to emulating the successful
10:04:19 15 Yellowstone Club what they call founding member
10:04:22 16 program.
10:04:23 17    Q. And I was just going to touch on that. So
10:04:26 18 Summit Mountain Holding Group bought the mountain; is
10:04:30 19 that right?
10:04:30 20    A. Yeah, in April of 2013.
10:04:33 21    Q. And what kind of resources or financing
10:04:41 22 did it use to buy the mountain?
10:04:43 23    A. Yeah, so this -- we did a -- so founding
10:04:51 24 member programs are, they're more common in golf
10:04:56 25 developments than they are in ski developments. But

## Page 16

10:04:58 1  the central premise of most of them is that the
10:05:02 2  developer doesn't have the funds to build out a golf
10:05:07 3  course or buy the land underneath a golf course. So
10:05:11 4  they find friends or people in their network or like,
10:05:16 5  you know, market to a group of people to effectively
10:05:22 6  financially back the effort in a manner whereby they
10:05:26 7  are entitled to a home-site credit. So in the case
10:05:32 8  of a golf community, you can have a home on the 18th
10:05:35 9  hole. And then generally most founding member
10:05:38 10 structures have it where there's a path to that
10:05:42 11 investor or lender getting, in addition to their lot
10:05:46 12 credit, a return of capital. So basically the idea
10:05:51 13 is find people who are excited about the project
10:05:54 14 itself, wanting to be part of it in terms of, you
10:05:57 15 know, a resident or user, and use them to effectively
10:06:02 16 be the financing, the core financing element.
10:06:09 17       So in the case of Powder Mountain, we
10:06:11 18 raised approximately 58 million from a founding
10:06:14 19 member program, and then we also negotiated an
10:06:20 20 infrastructure bond or assessment bond with Weber
10:06:27 21 County as well as a 20-year, 50 percent tax increment
10:06:31 22 TIF. And on the infrastructure bond we got the
10:06:37 23 county to guarantee it so that we could get it double
10:06:43 24 A rated and raised by Citibank, which we did.
10:06:50 25    Q. What was the purchase price of the

4 (Pages 13 to 16)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

### Page 17

| | |
|---|---|
| 10:06:52 1 | mountain when Summit Mountain Holding Group bought |
| 10:06:58 2 | it? |
| 10:06:58 3 | A.   Approximately 44, forty -- yeah, around |
| 10:07:04 4 | 44. |
| 10:07:05 5 | Q.   What do you think it's worth now? |
| 10:07:10 6 | A.   So we still owe 58 billion on it. So -- |
| 10:07:15 7 | but if we were -- it depends on if you were to do |
| 10:07:19 8 | highest and best use, which basically is not |
| 10:07:21 9 | something that I would like to see because it would |
| 10:07:24 10 | involve selling to one of the big guys, then I think |
| 10:07:30 11 | they could pay, you know, well over the -- you know, |
| 10:07:34 12 | substantially over the founding member amount. But |
| 10:07:37 13 | you'd have to do a third-party evaluation to figure |
| 10:07:39 14 | that out. |
| 10:07:42 15 | But the entitlements are quite large |
| 10:07:45 16 | there, and the ski resort is obviously the largest in |
| 10:07:48 17 | the United States. So it's an hour from the airport, |
| 10:07:51 18 | so it's a -- it would be a major opportunity for the |
| 10:07:56 19 | two big conglomerates in the ski industry to get |
| 10:08:00 20 | ahold of. |
| 10:08:02 21 | Q.   Do you think it would be over 60 million? |
| 10:08:04 22 | A.   I do. |
| 10:08:05 23 | Q.   Over 100? |
| 10:08:07 24 | A.   Most likely. |
| 10:08:09 25 | Q.   Over 200? |

### Page 18

| | |
|---|---|
| 10:08:10 1 | A.   Possibly. |
| 10:08:12 2 | Q.   When you say you owe $58 million, that's |
| 10:08:17 3 | the money that was put in by the founders; is that |
| 10:08:21 4 | right, by the founding members rather? |
| 10:08:23 5 | A.   Yes.  So the founding member structure, |
| 10:08:26 6 | they basically have a -- the structure allowed us |
| 10:08:30 7 | to -- they have unsecured -- unsecured obligations |
| 10:08:39 8 | where they effectively own 90 percent of the |
| 10:08:43 9 | operating company of the ski resort.  And then at a |
| 10:08:47 10 | milestone in development, so when we've sold 250 or |
| 10:08:51 11 | 300 home sites, they -- they then can trigger -- |
| 10:08:55 12 | there's an automatic trigger or they trigger a -- I |
| 10:09:03 13 | have to go back and brush up on that.  But |
| 10:09:06 14 | effectively there's a put-call arrangement where once |
| 10:09:11 15 | we're at half done material build out and we've got, |
| 10:09:15 16 | you know, 250 and the 300 on the two different |
| 10:09:18 17 | milestones, they effectively through this put-call, |
| 10:09:21 18 | that 90/10 flips.  So they get their 58 million back. |
| 10:09:26 19 | They've already gotten home sites by and large.  And |
| 10:09:30 20 | they get their -- they get their capital back.  And |
| 10:09:37 21 | Summit Mountain Holding Group goes to 90 percent |
| 10:09:40 22 | ownership of the ski resort and maintains 100 percent |
| 10:09:44 23 | of the LANDCO with the entitlements. |
| 10:09:51 24 | Q.   So I understand when you said they own |
| 10:09:53 25 | 90 percent of the operating company, is the operating |

### Page 19

| | |
|---|---|
| 10:09:56 1 | company in that phrase Summit Mountain Holding Group |
| 10:10:01 2 | or another? |
| 10:10:01 3 | A.   It's a subsidiary.  It's the ski resort. |
| 10:10:04 4 | It's the ski operating business. |
| 10:10:06 5 | Q.   Got it. |
| 10:10:09 6 | A.   So yeah. |
| 10:10:13 7 | Q.   Then when you obtained, I'm going to call |
| 10:10:19 8 | it financing -- but if there's a better word you |
| 10:10:23 9 | could use it -- when you got financing from the |
| 10:10:25 10 | founding members, were there certain expectations |
| 10:10:29 11 | that you had communicated to them or that they had |
| 10:10:33 12 | with respect to Powder Mountain? |
| 10:10:35 13 | A.   Everything was encapsulated in the |
| 10:10:38 14 | founding member offering documents that were done by |
| 10:10:42 15 | Kirkland & Ellis.  And then we had club membership |
| 10:10:45 16 | documents done by Greenberg Traurig, who was the same |
| 10:10:52 17 | firm who did the Yellowstone Club documents.  So |
| 10:10:55 18 | those were the -- those are the documents. |
| 10:10:58 19 | Q.   So let's move on to kind of a topic more |
| 10:11:05 20 | closely related to today.  After Summit Mountain |
| 10:11:14 21 | Holding Group bought Powder Mountain, you started |
| 10:11:19 22 | trying to fundraise to develop the mountain, right? |
| 10:11:28 23 | A.   Could you clarify what you mean? |
| 10:11:29 24 | Q.   Yeah.  Were you aiming to develop the |
| 10:11:31 25 | mountain, Powder Mountain, after you bought it? |

### Page 20

| | |
|---|---|
| 10:11:35 1 | A.   So as part of purchasing Powder Mountain, |
| 10:11:41 2 | our deal with the county that I mentioned, meaning |
| 10:11:43 3 | the infrastructure bond with the guaranty and the |
| 10:11:45 4 | 20-year 50-percent TIF, we also, in order to close -- |
| 10:11:50 5 | so funds went into escrow.  And in order to close we |
| 10:11:55 6 | had to have the county approve the phase 1 of our |
| 10:12:00 7 | development.  So obviously it's a 2800-unit, you |
| 10:12:03 8 | know, development ski resort.  So the way to develop |
| 10:12:05 9 | it is in phases and then in specific vertical |
| 10:12:13 10 | projects. |
| 10:12:14 11 | So the first phase was funded out of the |
| 10:12:17 12 | founding member proceeds and the infrastructure bond. |
| 10:12:24 13 | The founding member agreements, the village portion |
| 10:12:31 14 | of the project which was to be effectively a |
| 10:12:35 15 | subsequent phase, would have infrastructure stubbed |
| 10:12:40 16 | to it.  It would be the end of the county road that |
| 10:12:44 17 | the infrastructure would fund.  It would have water, |
| 10:12:51 18 | sewer, power, everything you need brought to the |
| 10:12:56 19 | site.  But the actual development of an -- you know, |
| 10:13:01 20 | effectively a flat site too.  But it did not -- it |
| 10:13:05 21 | did not include the vertical development of a |
| 10:13:11 22 | commercial mixed-use-village village. |
| 10:13:18 23 | Q.   I appreciate that.  And my question was a |
| 10:13:20 24 | lot simpler, but I think you partially answered it. |
| 10:13:24 25 | It was more just establishing that you were aiming to |

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 21

10:13:28  1   develop Powder Mountain after you bought it; is that
10:13:34  2   right?
10:13:34  3       A.   We were aiming to do phased-based
10:13:38  4   development and project-based development of Powder
10:13:41  5   Mountain after purchasing it.
10:13:43  6       Q.   That's all I was asking.  And what did you
10:13:48  7   envision, if anything, that the mountain, Powder
10:13:52  8   Mountain, would look like after all of those phases
10:13:55  9   of development were complete?
10:13:56 10       A.   So our -- our master planning we involved
10:14:04 11   Hart Howerton, who has done, you know, more ski
10:14:08 12   resorts than anyone else and then Dr. Phil Taugh
10:14:11 13   [phonetic] at Texas A&M who did Serenbe outside of
10:14:16 14   Atlanta, which is a -- what's it called -- a
10:14:25 15   neighborhood design.  Basically sort of an updated
10:14:30 16   urban planning going back to traditional
10:14:32 17   neighborhood -- traditional neighborhood design.  So
10:14:35 18   the project he did was modeled off of a British --
10:14:41 19   English countryside.
10:14:43 20       Q.   Uh-huh.
10:14:44 21       A.   So it's these roads that sort of have --
10:14:47 22   you know, basically it's like a horseshoe, and the
10:14:49 23   idea is you do a mixed use core at the top of the
10:14:53 24   horseshoe.  And as you radiate out from the top of
10:14:56 25   the horseshoe, the lots get bigger and bigger,

## Page 22

10:14:59  1   culminating in estate lots.  And you can tie these
10:15:04  2   horseshoes together over time to create multiple
10:15:08  3   hamlets or villages.  So our design principally ended
10:15:14  4   up looking like that.  That was ultimately approved
10:15:17  5   by Weber County in their DR-1 resort zone.  The core
10:15:23  6   village is about 40 acres.  The heart of it where you
10:15:30  7   could go, you know, five stories for example, is
10:15:37  8   really closer to 14.  The northern piece that had
10:15:41  9   infrastructure served to it, the core of it was I
10:15:46 10   think four to six acres.  So the goal initially was
10:15:53 11   to develop the northern parcel of the village north
10:15:59 12   of the village ski lift that would go in.  And so the
10:16:08 13   total core there would be about, I think,
10:16:15 14   400,000 square feet built out.  But eventually, you
10:16:21 15   know, 20 years out, you would basically see the other
10:16:26 16   side of it developed as well as the, you know, the
10:16:31 17   full entitlement use.  So we had 2800 units of
10:16:38 18   entitlement.  So you'd basically have a stored
10:16:43 19   Telluride-sized town or about a -- you know, a half
10:16:47 20   of an Aspen is effectively the scale of the
10:16:50 21   opportunity.
10:16:50 22       Q.   And we're jumping ahead a little bit, but
10:16:54 23   the EB-5 piece as you said on the specific project
10:17:00 24   that at issue in this case, that was only part or
10:17:04 25   would be a part of this town, right?

## Page 23

10:17:07  1       A.   Correct.
10:17:08  2       Q.   And I understand and we'll talk about
10:17:14  3   what's going on with that small piece.  But how is
10:17:18  4   the development going on the rest of the town?
10:17:22  5       A.   Well, the EB-5 project encaps, as part of
10:17:29  6   the collateral package, encapsulated the entire
10:17:35  7   northern village commercial parcel, and the
10:17:37  8   infrastructure terminated there.  So the EB-5's
10:17:42  9   project's failure to fund has retarded the commercial
10:17:45 10   core development.  So there's been no commercial core
10:17:51 11   development because everything tied to the
10:17:52 12   infrastructure for the commercial core currently is
10:17:58 13   tied up in this litigation and has not been -- you
10:18:03 14   know, there was supposed to be a quarter, almost a
10:18:06 15   quarter million square feet developed from the full
10:18:10 16   120 million, you know, proceeds.  And as you know
10:18:15 17   that didn't -- that didn't happen.
10:18:17 18          So we've sold -- I think we're
10:18:23 19   approaching -- approaching -- I mean I'd have to get
10:18:25 20   the facts, but somewhere around 180 to maybe over 200
10:18:30 21   home sites that have been sold.  And we've also
10:18:38 22   finished the resale and finished products where
10:18:40 23   people have done a townehome or a home and resold it,
10:18:46 24   have sold for about a thousand dollars a foot.  So
10:18:50 25   basically we're trading at -- you know, those values

## Page 24

10:18:57  1   are about somewhere between, you know, 65 percent and
10:19:07  2   you know 40 percent of, you know, Park City, Deer
10:19:12  3   Valley, which are our comps.  Because there is not
10:19:16  4   a -- there's not a commercial core.  Also the
10:19:19  5   velocity of those sales, you know, has obviously been
10:19:24  6   radically slower than it would otherwise be if you
10:19:28  7   had a village.  I mean basically this project funded
10:19:31  8   the initial core village that the project had
10:19:40  9   delivered infrastructure to.
10:19:43 10       Q.   Mr. Mauro, I appreciate it, and that was a
10:19:46 11   very thorough answer.  I'm going to ask you to maybe
10:19:49 12   limit it to the specific question that I'm asking.
10:19:51 13   Because otherwise we're going to be here for a long
10:19:53 14   time.  And if that's what you want to do, that's
10:19:55 15   fine.  But I'm doing this as a courtesy to you and
10:19:59 16   everyone around, including myself.  But you should
10:20:02 17   feel free to answer however you like.
10:20:04 18          So when did the infrastructure development
10:20:11 19   stop exactly?
10:20:12 20       A.   Stop.  I mean there's always
10:20:23 21   infrastructure development, for example, where it's
10:20:24 22   always still in the process of finishing our second
10:20:28 23   well.
10:20:29 24       Q.   Uh-huh.
10:20:30 25       A.   But for the phase 1 infrastructure that

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 25

| | | |
|---|---|---|
| 10:20:34 | 1 | was tied to the county bond, it -- largely by 2016 |
| 10:20:45 | 2 | that was done. We pulled our first building permit |
| 10:20:48 | 3 | in August of 2016 after -- yeah, so largely by 2016. |
| 10:20:57 | 4 | Q. Oh, go ahead. I did not mean to interrupt |
| 10:20:59 | 5 | you. I was actually focusing my question. In your |
| 10:21:07 | 6 | answer to my prior question you said that the |
| 10:21:13 | 7 | infrastructure development tied to the EB-5 funds had |
| 10:21:20 | 8 | stopped and that had, in your words, retarded the |
| 10:21:23 | 9 | rest of the developments. |
| 10:21:25 | 10 | A. No. No. No. The EB-5. |
| 10:21:25 | 11 | Q. In that -- just let me finish. |
| 10:21:27 | 12 | A. Sure. |
| 10:21:28 | 13 | Q. And when that infrastructure development |
| 10:21:32 | 14 | stopped, that was tied to EB-5. |
| 10:21:34 | 15 | MR. YOUNG: Misstates prior testimony. |
| 10:21:36 | 16 | THE WITNESS: Yeah. So, no, the EB-5 |
| 10:21:40 | 17 | funds were to develop a vertical village, as in like |
| 10:21:44 | 18 | stories, commercial on the core, parking, plazas, you |
| 10:21:48 | 19 | know, condos that could be sold above them. That's |
| 10:21:56 | 20 | what EB-5 was intended to do, along with the new ski |
| 10:22:00 | 21 | lift that would make all that real estate |
| 10:22:00 | 22 | ski-in/ski-out. We did end up funding that, |
| 10:22:03 | 23 | although -- so we did get that done from the EB-5 |
| 10:22:07 | 24 | proceeds. Although we had to do it from sales of |
| 10:22:14 | 25 | stuff unrelated to EB-5 and then get it reimbursed |

## Page 26

| | | |
|---|---|---|
| 10:22:17 | 1 | from EB-5 instead of the other way around, which is |
| 10:22:22 | 2 | what it was intended to be. |
| 10:22:24 | 3 | So that's what I -- when I talk about the |
| 10:22:28 | 4 | stillborn aspect of the village core, it's the fact |
| 10:22:32 | 5 | that as of 2016 you had paved roads, electrical |
| 10:22:39 | 6 | stubs, and a brand new sewer facility. Approximately |
| 10:22:43 | 7 | at that time I think we've -- we did it for this |
| 10:22:47 | 8 | project because this project was able to get credit |
| 10:22:49 | 9 | for the jobs associated with much of that |
| 10:22:53 | 10 | infrastructure. So we've got that detailed in the -- |
| 10:22:58 | 11 | in documents here somewhere. So I'm happy to dig |
| 10:23:01 | 12 | that up. |
| 10:23:03 | 13 | But, you know, there was 60 million, I |
| 10:23:06 | 14 | believe, roughly spent on infrastructure last time I |
| 10:23:13 | 15 | looked. And by 2016, you know, the vast majority of |
| 10:23:18 | 16 | that had been spent. And like I said, you had a |
| 10:23:21 | 17 | pad -- effectively a pad-ready site for this EB-5 |
| 10:23:27 | 18 | project to build the hotel -- you know, the project |
| 10:23:30 | 19 | it was supposed to do. And you also had the premier |
| 10:23:33 | 20 | development firm in the ski industry there as part of |
| 10:23:38 | 21 | it, East West Partners. You had the standard hotel, |
| 10:23:44 | 22 | you know their hotel ultimately designed, partnered, |
| 10:23:47 | 23 | ready to do a standard hotel. Once it was done we |
| 10:23:50 | 24 | had an option on the other side to work with Barry |
| 10:23:53 | 25 | Sternlicht to work on one hotel where we had an LOI. |

## Page 27

| | | |
|---|---|---|
| 10:23:58 | 1 | So, you know, know, we had a village design. It just |
| 10:24:05 | 2 | didn't get built. |
| 10:24:06 | 3 | Q. So that's what I'm trying to understand. |
| 10:24:10 | 4 | So the development that was tied to EB-5 -- |
| 10:24:12 | 5 | A. Yes. |
| 10:24:12 | 6 | Q. -- when did that stop? |
| 10:24:14 | 7 | A. When did that stop? |
| 10:24:17 | 8 | Q. Yeah. |
| 10:24:18 | 9 | A. The last draw would probably represent the |
| 10:24:24 | 10 | last -- I mean it never started relative to the |
| 10:24:32 | 11 | village core. Projects that were the joint -- I |
| 10:24:35 | 12 | believe we call them maybe the joint venture projects |
| 10:24:39 | 13 | in the documents that we were leading principally |
| 10:24:43 | 14 | without EB-5 funds, but they were part of the EB-5 |
| 10:24:48 | 15 | project. In some cases they were project costs and |
| 10:24:52 | 16 | reimbursable, in some cases they weren't. They were |
| 10:24:56 | 17 | just added security collateral that never got built |
| 10:24:59 | 18 | on or was utilized. So it's a hard question to |
| 10:25:04 | 19 | answer. I guess you could just look to the last |
| 10:25:07 | 20 | draw, so... |
| 10:25:09 | 21 | Q. I believe the last draw was January of |
| 10:25:11 | 22 | 2020; is that about right? |
| 10:25:13 | 23 | A. That could be. So that, if it's |
| 10:25:19 | 24 | January 2020 then that would have been the last use |
| 10:25:22 | 25 | of the incremental proceeds that came from the EB-5 |

## Page 28

| | | |
|---|---|---|
| 10:25:28 | 1 | lender. Those proceeds never allowed the vertical |
| 10:25:34 | 2 | development. So they basically were -- they were all |
| 10:25:39 | 3 | used obviously for approved costs and all validated |
| 10:25:43 | 4 | by fulcrum and other third-parties before they could |
| 10:25:47 | 5 | be approved. But they were effectively incremental |
| 10:25:53 | 6 | infrastructure related. So what I mean by that is |
| 10:25:55 | 7 | the two ski lifts that made the area ski-in/ski-out, |
| 10:26:04 | 8 | in the Horizon project area, the horizontal |
| 10:26:11 | 9 | infrastructure that supported the Horizon area |
| 10:26:15 | 10 | collateral would -- you know, was again part of EB-5, |
| 10:26:22 | 11 | but EB-5 there only provided what I call horizontal |
| 10:26:29 | 12 | infrastructure. So the principal use of the EB-5 |
| 10:26:32 | 13 | funds was to go vertical. And then to basically |
| 10:26:40 | 14 | generate -- because you have to go vertical for -- to |
| 10:26:40 | 15 | generate the TIF, the Tax Increment Financing, for |
| 10:26:45 | 16 | example, that is -- that is part of what the project, |
| 10:26:49 | 17 | you know, relied on. |
| 10:26:52 | 18 | Q. And so just to bring us back to what we're |
| 10:26:56 | 19 | talking about -- |
| 10:26:56 | 20 | A. Sure. |
| 10:26:57 | 21 | Q. -- sometime around January 2020 is when |
| 10:27:00 | 22 | EB-5 related development stopped, right? |
| 10:27:03 | 23 | A. I wouldn't characterize it that way again |
| 10:27:05 | 24 | because it's not like there was the -- the horizontal |
| 10:27:12 | 25 | EB-5 development stopped in 2020. The vertical never |

7  (Pages 25 to 28)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 29

10:27:19  1    started.
10:27:19  2         Q.   Got it.  And then when the horizontal
10:27:23  3    EB-5-related development stopped, did that also stop
10:27:26  4    development of the rest of the town?
10:27:30  5         A.   The infrastructure-served portion of the
10:27:34  6    town was wholly encumbered by the EB-5 loan.  Part of
10:27:43  7    the arrangement in the documents was the village, the
10:27:51  8    land that was used for collateral could support, I
10:27:54  9    believe, approximately 400,000 square feet of
10:27:56 10    development.  But the EB-5 project was doing
10:27:59 11    something like just under a quarter million.  And so
10:28:06 12    the deal was that if SMHG came to Cottonwood and the
10:28:13 13    lender, you know, and said:  Hey, we've got a project
10:28:19 14    ready to go on a parcel that's not part -- that still
10:28:26 15    allows us to do our targeted size, so we still do our
10:28:33 16    240.  But basically, you know, what I'm saying is
10:28:36 17    there's opportunity to do more development than what
10:28:39 18    was planned in the EB-5, in the EB-5 area.  So we
10:28:43 19    had -- we had developed and spent about a half a
10:28:47 20    million dollars and submitted to the county and
10:28:50 21    actually got approved an 86,000 square foot hotel
10:28:56 22    that we were doing in partnership with Selina,
10:28:59 23    S-e-l-i-n-a, who has about 80 hotels globally.  And
10:29:07 24    ultimately Cottonwood did not follow through in
10:29:15 25    providing us the parcel unless we were willing to --

Page 30

10:29:20  1    well, they basically refused to give us the parcel
10:29:24  2    and brought it back into broader -- you know, they
10:29:29  3    basically tied it to what then became the dispute
10:29:34  4    that we're in now.  So they did not allow that proj--
10:29:37  5    even though that project would have enhanced
10:29:40  6    everything, the underlying land, the adjacent
10:29:45  7    development to fill in the -- you know, the 400 minus
10:29:49  8    250, so call it one 50,000 square feet plus of
10:29:54  9    development that was possible to do in the northern
10:29:59 10    village but which required their consent to release.
10:30:03 11    You know, they did not allow that to happen, which
10:30:06 12    was really unfortunate.  And so after being shot down
10:30:09 13    there, there was really no point in developing --
10:30:14 14    trying to develop anything that is in the northern
10:30:18 15    village area, which is the infrastructure served
10:30:23 16    area.
10:30:23 17         Q.   And so when did the development stop in
10:30:25 18    the northern village?
10:30:27 19         A.   So there's -- other than the ski lifts,
10:30:31 20    there's been no development in the northern village.
10:30:36 21         Q.   Got it.  All right.  So we'll come back to
10:30:38 22    that.
10:30:38 23         A.   And the development in the northern
10:30:42 24    village that exists was that which existed when
10:30:46 25    the -- when this was started.

Page 31

10:30:49  1         Q.   Okay.  So were you looking -- when you
10:30:53  2    initially bought Powder Mountain, were you looking
10:30:58  3    for funds to finance the development that you had
10:31:03  4    envisioned?
10:31:03  5         A.   I was looking to fund projects.  And -- so
10:31:07  6    for example East West made a proposal to develop a
10:31:12  7    condo hotel.  It was quite small.  And so --
10:31:18  8         Q.   Mr. Mauro, can I just interrupt you for
10:31:20  9    just a minute?
10:31:20 10         A.   Sure.
10:31:21 11         Q.   My question was a lot simpler.  You're
10:31:23 12    welcome to go into more detail if you'd like.  But
10:31:26 13    I'm just telling you --
10:31:26 14         A.   Sure.
10:31:26 15         Q.   -- if we're going do that, I don't know if
10:31:30 16    today is going to be enough, and we might have to
10:31:32 17    come back.  I just want to put that on the record.
10:31:35 18         A.   Okay.
10:31:35 19         Q.   Again you're welcome to have as long of an
10:31:39 20    answer as you like.  But if we're going to be far
10:31:42 21    afield, it's going to be a much longer time with you
10:31:46 22    than you may want.
10:31:47 23         A.   Okay.  Maybe try and get to what you're
10:31:51 24    trying to get at then on the questions.
10:31:51 25         Q.   Yeah, absolutely.  It was a very simple

Page 32

10:31:52  1    question.  Are you looking for funds to commence and
10:31:58  2    proceed with your development that you would envision
10:32:01  3    for the mountain when you first bought it?
10:32:04  4         A.   So again I wasn't -- no, I wasn't in the
10:32:07  5    market to go and raise money for the holding company.
10:32:09  6    I wasn't in the market to do my first phase of
10:32:15  7    infrastructure because I already had it.  I was
10:32:17  8    interested in finding groups or people that would
10:32:20  9    partner to do hotels, condos, and mixed use.  So
10:32:28 10    people who were interested in investing in projects
10:32:32 11    like that, yes, we were interested in doing that.
10:32:37 12    And that's what lead us to EB-5.
10:32:39 13         Q.   Got it.  Why did you turn to EB-5?
10:32:45 14         A.   Good question.  So EB-5, keeping in mind
10:32:52 15    the time frame here coming out of the 2010/2011
10:32:55 16    recession, the ski industry was particularly hard
10:33:00 17    hit.  And so at the sort of 2014 -- 2013, 2014, 2015
10:33:06 18    time frame, EB-5 had been really taking off in growth
10:33:10 19    for a principal reason, the program of EB-5 is
10:33:13 20    intended to allow people to get citizenship in the
10:33:18 21    United States for putting -- for basically financing
10:33:22 22    in a gap, financing in an area that is hard for
10:33:25 23    people to get loans that they would otherwise do.
10:33:29 24    And the key thing why it took off in the hospitality
10:33:35 25    industry was that it created a lot of jobs, and if

8  (Pages 29 to 32)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 33

10:33:38  1  you could build it you knew that you had a tax base,
10:33:42  2  a utilization, and you knew you had an asset if you
10:33:48  3  built fundamentally condos or condo hotels.  And so
10:33:53  4  EB-5 ended up taking off in the hospitality space.
10:33:58  5  But the principal reason why people would go to EB-5
10:34:02  6  is because it was not -- it was nonrecourse debt.
10:34:09  7  There was not -- it was the one thing in the
10:34:11  8  hospitality industry that wouldn't require you to
10:34:15  9  guarantee, bring up other assets or personal
10:34:19 10  guarantees.  In fact, I believe EB-5 is not --
10:34:24 11  legislation prohibits EB-5 lenders from having a
10:34:28 12  personal guarantee because the intent of the
10:34:30 13  legislation is they're putting money at risk to
10:34:33 14  create jobs in the United States that otherwise
10:34:35 15  wouldn't happen.  And so in enabling hotels to get
10:34:40 16  developed that in a recessionary environment
10:34:43 17  genuinely would have gotten done because people
10:34:46 18  either would not want to do a personal guarantee or
10:34:49 19  would not want to guarantee other assets for a
10:34:52 20  speculative project, you know, it took off.  So the
10:34:57 21  advice we got from East West partners and others was
10:35:05 22  we were a picture perfect, a postcard perfect if you
10:35:11 23  will, opportunity for EB-5 because we could do a
10:35:15 24  project that could be funded by EB-5 that we were --
10:35:17 25  that we had we were land rich and cash poor, which

## Page 34

10:35:22  1  everybody knew.  And that we could do it and it
10:35:25  2  wouldn't be cross-collateralized with the largest ski
10:35:30  3  resort in the country and 2,800 units of entitlement
10:35:35  4  in Weber County alone.  So that was the strategic
10:35:39  5  reason to go after EB-5.
10:35:41  6      Then the question was, okay, who should we
10:35:44  7  go after?  And so we began our research in the EB-5
10:35:48  8  market of who to partner with.
10:35:50  9      Q.   Can I just clarify something in your
10:35:54 10  answer?  You said that EB-5 is nonrecourse and
10:35:58 11  doesn't have personal guarantees.  You're talking
10:36:01 12  about to whom?
10:36:04 13      A.   So I'm saying when the principal attract--
10:36:09 14  the reason for -- the reason why people put up with
10:36:13 15  the hassle of pursuing EB-5 financing --
10:36:17 16      Q.   Yeah.
10:36:17 17      A.   -- given that they're -- you know, the
10:36:21 18  reason you go after it is because it's nonrecourse in
10:36:26 19  nature because it lives or dies by the project
10:36:30 20  itself.  And it has the most flexible requirements
10:36:32 21  relative to how it assembles a capital stack, how it
10:36:41 22  values the contributions within that capital stack,
10:36:48 23  meaning our documents, for example.  And capital
10:36:53 24  stack was based on an as-built appraisal.  And so the
10:37:00 25  land value, you know, was implied from the as-built

## Page 35

10:37:03  1  appraisal value, and that's part of the eligible
10:37:07  2  capital stack that we had.  So --
10:37:07  3      Q.   Now --
10:37:07  4      Oh, go ahead.
10:37:09  5      A.   So --
10:37:09  6      Q.   I'm not trying to interrupt you.
10:37:14  7      A.   Sure, go ahead.
10:37:15  8      Q.   Go ahead.
10:37:17  9      I was just curious specifically with the
10:37:20 10  use of the word nonrecourse.  Nonrecourse to whom, to
10:37:24 11  the individuals behind the project or to someone
10:37:27 12  else?
10:37:27 13      A.   On two levels.  One, and I could be wrong,
10:37:31 14  but I'm pretty sure I'm right because I had this
10:37:34 15  conversation with Tang about it, but I believe EB-5
10:37:38 16  does not allow personal guarantees.  Because again
10:37:44 17  the intent of the legislation is the reason that
10:37:46 18  you're getting a visa is you're providing financing
10:37:49 19  that is -- that would otherwise not be provided, your
10:37:57 20  an economic development stimulus, okay.
10:37:59 21      Where we developed this project, our
10:38:02 22  entire project generated $10,000 for Weber County in
10:38:06 23  taxes when we bought the mountain, our entire project
10:38:10 24  area, our development area, 2800-unit entitlement
10:38:14 25  area.  It already generates over a million based on

## Page 36

10:38:18  1  just what's been done.  If this village project had
10:38:22  2  been built, you know, it would be generating -- you
10:38:25  3  know it would probably be generating, you know,
10:38:28  4  probably 6 million or 8 million.  Ultimately after
10:38:36  5  20 years if our development had gone as it was
10:38:39  6  originally projected, a third-party firm that did the
10:38:44  7  TIF analysis thought that the county would -- could
10:38:48  8  justify their 20-year TIF deal because they would
10:38:52  9  have 14 million in annual taxes coming from our
10:38:55 10  development area.  And that information was part of
10:39:00 11  the -- you know why we -- that was part of our EB-5
10:39:04 12  narrative was that this was a phenomenal economic
10:39:09 13  development opportunity.  So, yeah, I don't -- when I
10:39:10 14  say nonrecourse, I mean on two levels.  So one is
10:39:15 15  recourse to me as an individual and the second would
10:39:18 16  be recourse to, you know, other business entities
10:39:22 17  that are not -- that are not the project itself, so
10:39:29 18  in this case Summit Mountain Holding Group.
10:39:31 19      Q.   Thank you.  And did you start looking into
10:39:35 20  EB-5 sometime around 2013?
10:39:38 21      A.   Yes, yes.
10:39:42 22      Q.   And I believe you -- sometime in that time
10:39:49 23  or in 2014 you began working with a company called
10:39:53 24  AIG?
10:39:53 25      A.   Correct.

9  (Pages 33 to 36)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 37

10:39:54 1   Q.  American International Group?
10:39:57 2   A.  Yes.
10:39:57 3   Q.  Or sorry, American Integration Group?
10:40:04 4   A.  Not to be confused with Greenberg's
10:40:08 5   insurance company, yes.
10:40:10 6   Q.  Correct, correct.  Two, I think, very
10:40:11 7   different businesses.
10:40:12 8   A.  Just a little bit.  You know, they're both
10:40:14 9   run by legends.
10:40:18 10  Q.  I'll take your word for it.  And how did
10:40:21 11  you come across AIG?
10:40:24 12  A.  So there is a project in New York City
10:40:29 13  currently called Casa Cipriani, a very successful
10:40:35 14  development town in downtown New York.  And the
10:40:43 15  developers of that, one of them worked for me and the
10:40:49 16  other was one of our founding -- was a partner with
10:40:53 17  one of our founding members.  And they referred AIG
10:40:59 18  to us because they used AIG as their -- as one of
10:41:04 19  their -- they used AIG and another firm as part of
10:41:10 20  their EB-5 projects.  And they validated that we
10:41:17 21  could do a model that -- the model that we wanted to
10:41:21 22  do where our value was contributing effectively the
10:41:24 23  land and then being able to return TIF and to sell
10:41:30 24  through condos.  And so, yeah, so they -- they
10:41:38 25  steered us into conversations with two EB-5 providers

Page 38

10:41:43 1   who could do a similar -- you know, basically the
10:41:48 2   nonrecourse model, and we ended up initially working
10:41:56 3   with AIG as you know.
10:41:59 4   Q.  Why did you decide to work with AIG
10:42:04 5   specifically?
10:42:05 6   A.  They, you know, were the best that we
10:42:12 7   could find at the time.  It's not a -- you know, it's
10:42:17 8   a very opaque industry at the time of figuring out
10:42:21 9   who are the -- who is the right group to partner
10:42:24 10  with.  You know what's the -- let's just say there's
10:42:28 11  a lot of shady characters in EB-5, and it's been an
10:42:32 12  area that has been under congressional inquiry for
10:42:38 13  some time.  And they actually let the program lapse
10:42:41 14  because of abuse by unscrupulous characters in that
10:42:46 15  space.  So it's very hard space to navigate.  So we
10:42:53 16  unfortunately selected AIG before finding a gentleman
10:42:59 17  who ran a leading industry association, conference
10:43:05 18  association named Ali Jahangiri.  And when we met
10:43:11 19  him, he -- when I -- when I expressed concerns that
10:43:16 20  they couldn't get the raise done, he said he could
10:43:20 21  make some introductions to me to people who could do
10:43:24 22  it, but he obviously wanted to be paid for that.  So
10:43:27 23  I paid him to make introductions.  And actually --
10:43:32 24  yeah, so he's the one that introduced me to Tang
10:43:35 25  Tang.

Page 39

10:43:35 1   Q.  I understand.  I think we just went a
10:43:39 2   little afield from what I asked.
10:43:41 3   A.  Apologies.
10:43:42 4   Q.  I was asking about AIG.  That's okay.
10:43:45 5   A.  Sure.
10:43:45 6   Q.  And when did you begin working with AIG?
10:43:50 7   A.  I'd have to look to refresh my memory, but
10:43:55 8   I believe it was in the, you know, late '14 or early
10:43:59 9   '15.  But I'd need to check.
10:44:02 10  Q.  And you mentioned that there were
10:44:06 11  congressional I guess inquiry or investigation
10:44:11 12  into -- or scrutiny of the EB-5 program.
10:44:15 13  A.  Correct.
10:44:16 14  Q.  And various unsavory things about the EB-5
10:44:21 15  program.  Were you aware of those things when you
10:44:23 16  were looking into EB-5 at the time?
10:44:24 17  A.  Yeah, we had to -- I had to get educated
10:44:28 18  on the concept of a TEA, a Targeted Economic Area.
10:44:35 19  And in the process learned why, you know -- how
10:44:40 20  someone could justify economic development on Park
10:44:44 21  Avenue, which is pretty outrageous.  And so I was
10:44:49 22  aware of the ongoing Congressional issues related to
10:44:57 23  that and other issues.  And you know because we are
10:45:05 24  rural, so we -- as far as the USDA is concerned,
10:45:11 25  we're rural.  But the way that EB-5 legislation was

Page 40

10:45:14 1   drafted, you can't be rural if you're in a -- if
10:45:20 2   you're in a metropolitan statistical area.  And we
10:45:28 3   are in a metropolitan statistical area.  So we
10:45:32 4   engaged lobbyists.  We met with government officials
10:45:38 5   to see if as part of the ongoing sort of controversy
10:45:45 6   and evolution of the legislation that they could get
10:45:48 7   closer to the intent and make sure that something
10:45:52 8   that the USDA would define as rural would be -- would
10:45:58 9   survive any of the -- you know, survive or thrive
10:46:03 10  in -- and/or thrive -- in any ongoing policy changes
10:46:07 11  to EB-5, which have widely been expected you know
10:46:12 12  since we got involved in the industry.
10:46:17 13  Q.  Just to be sure.  So around 2014, 2015 you
10:46:21 14  were aware of all of these potential unsavory issues
10:46:25 15  and congressional investigations into EB-5?
10:46:27 16  A.  Again I was aware that EB-5 was in the
10:46:34 17  view of many Congressmen being abused by certain
10:46:42 18  unscrupulous EB-5 operators as well as the nature and
10:46:47 19  intent of the legislation in terms of where projects
10:46:51 20  qualified.  So, for example, part of the reason we
10:46:56 21  were able to get a meeting between Cottonwood and the
10:47:01 22  governor of Utah was because the governor saw that
10:47:06 23  our project, you know, matched the intent of EB-5
10:47:11 24  legislation.  And so I think that was a -- you know,
10:47:17 25  that was helpful.

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 41

10:47:18  1      Q.  Thank you.  Now, let's just touch -- you
10:47:23  2   keep touching on subjects that I've planned to talk
10:47:23  3   on later.  But since you bring them up, let's talk
10:47:23  4   about them now.
10:47:25  5      A.  Sure.
10:47:28  6      Q.  The targeted economic area you said you
10:47:30  7   got educated on that, right?
10:47:32  8      A.  Yes.
10:47:32  9      Q.  What is that?
10:47:37 10      A.  So in EB-5 if you're a targeted -- if
10:47:42 11   you're a TEA then you qualify for the lower dollar
10:47:51 12   threshold to participate in the program.  So you
10:47:54 13   basically -- if you are, for example, Chinese looking
10:47:57 14   to get citizenship in the United States, projects
10:48:01 15   that are NTAs you can invest $500,000 for citizenship
10:48:06 16   instead of I think it was either 800 or a million,
10:48:10 17   but it was a considerable delta.  And so it was
10:48:16 18   important to have a TA designation, and we were able
10:48:20 19   to -- it took time and effort, but we were able to
10:48:26 20   validate, you know, our -- we were able to do that.
10:48:32 21      Q.  Understood.  And just so the record is
10:48:35 22   clear, TEA as used is Targeted Economic Area, right?
10:48:40 23      A.  I believe that's the correct acronym.
10:48:43 24      Q.  Okay.  Can the TEA designation be lost?
10:48:47 25      A.  I believe so over time there are -- like

Page 42

10:48:52  1   there is -- there's a grandfathering for when a
10:48:55  2   project gets in.  So there's some aspects to like
10:48:57  3   once you're started if it's a TEA and you're already
10:49:01  4   creating jobs and it changes on you.  The -- there's
10:49:05  5   some grandfathering elements, but I don't -- I don't
10:49:11  6   recall the specifics of the grandfathering and/or
10:49:17  7   changing -- you know, changing definitions and such.
10:49:22  8      Q.  So based on what you said if the TEA
10:49:25  9   designation allows someone to invest -- allows as you
10:49:32 10   said, a Chinese investor to invest a lower amount,
10:49:36 11   $500,000, it is something that makes the project more
10:49:41 12   attractive, isn't it, the TEA designation?
10:49:45 13      A.  Yes.  If you don't have a TEA says
10:49:48 14   designation, you are less attractive.
10:49:51 15      Q.  And if you lose a TEA designation you also
10:49:55 16   are less attractive, right?
10:49:58 17      A.  I don't know.  I don't know if you
10:49:58 18   actually lose one or not.  I have not heard of one --
10:50:01 19   I'm not familiar with anyone losing one.  So I don't
10:50:05 20   know if it's possible to lose one.
10:50:06 21      Q.  But if -- assuming I'm correct if it is
10:50:10 22   possible to lose a TEA designation, then that would
10:50:15 23   make the project less attractive, right?
10:50:17 24      A.  I'm not going to speculate because I don't
10:50:20 25   know if that happens in practice or not.  I've not

Page 43

10:50:24  1   heard of that happening.
10:50:25  2      Q.  Okay.  So I want to move on to something.
10:50:35  3   Are you okay?  We've been going for about an hour.
10:50:39  4   We can take a break or we can just keep going.
10:50:41  5      A.  Either way.
10:50:42  6      Q.  All right, let's keep going then.  So I
10:50:45  7   believe you said you were working with AIG sometime
10:50:49  8   in the beginning of late 2014 or early 2015, right?
10:50:53  9      A.  Again I'd have to look at my notes to
10:50:56 10   confirm or my e-mail to confirm the dates, but that
10:50:59 11   sounds right.
10:51:02 12      Q.  Okay.  And did you have something in
10:51:08 13   writing with AIG reflecting that you were working
10:51:15 14   with them?
10:51:15 15      A.  Yes.  We entered into an LOI, I believe,
10:51:22 16   or initial agreements with AIG.
10:51:25 17      Q.  Was it a term sheet?
10:51:28 18      A.  I know there was a term sheet.  There
10:51:32 19   might have been something beyond the term sheet.  I
10:51:34 20   would have to look.  It's been some time.
10:51:37 21      Q.  I understand.  We'll get to that.  I'm
10:51:39 22   just trying to get through this without showing you
10:51:42 23   anything.  But if you want to look at something, we
10:51:45 24   will.
10:51:45 25          And now -- but there was a term sheet

Page 44

10:51:48  1   sometime in late 2014 with AIG, wasn't there?
10:51:51  2      A.  I mean there was a term sheet at some
10:51:56  3   point with AIG.  I can't confirm the timing.
10:52:00  4      Q.  And do you recall what the term sheet
10:52:03  5   generally said?
10:52:05  6      A.  I mean the broad brush strokes of that
10:52:09  7   term sheet are that -- are the structure, you know,
10:52:17  8   or basically contributing land and building, you
10:52:21  9   know, mixed-use condos and hospitality as the means
10:52:29 10   of repayment alongside with other elements.
10:52:34 11      Q.  Did the term sheet discuss kind of a
10:52:39 12   project that you were going to work on with AIG and
10:52:46 13   more specifically to raise EB-5 funds with AIG?
10:52:51 14      A.  Yes.
10:52:51 15      Q.  And then at some point in 2015 you had
10:52:58 16   approached Mr. Tang at KT Capital; is that right?
10:53:01 17      A.  No.
10:53:02 18      Q.  Okay.  How did you get to meet Mr. Tang at
10:53:11 19   KT Capital?
10:53:13 20      A.  So we had asked Ali Jahangiri to introduce
10:53:16 21   us to people who could do what we were looking for,
10:53:19 22   which was a -- basically how we'd finance the
10:53:24 23   project in that we did a founding member program
10:53:27 24   financing and public infrastructure.  So we were
10:53:30 25   again land rich, cash poor, and were looking for a

11  (Pages 41 to 44)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 45

10:53:34  1   way we could leverage EB-5 to do genuine economic
10:53:38  2   development that would not cross collateralize or
10:53:41  3   draw recourse on the holding company, you know, the
10:53:46  4   2800 units of entitlement and the largest ski resort
10:53:50  5   in the country.
10:53:50  6       Q.  I understand that.  And I'm going to
10:53:53  7   strike that answer as nonresponsive because I'm just
10:53:56  8   asking you something a little bit simpler.
10:53:59  9       A.  I already told you that he made the
10:54:01  10  introduction to Tang.  So I did not -- I didn't
10:54:05  11  introduce myself to Tang.  I was introduced to Tang
10:54:08  12  from someone that I paid with the explicit
10:54:11  13  instructions that I just relayed in terms of what I
10:54:13  14  paid him to do.  And he said this is the guy and this
10:54:15  15  is the firm that can do that model.  Where, you know,
10:54:20  16  they -- you build it with debt only effectively after
10:54:24  17  contributing the land.  And, you know, possibly
10:54:28  18  through taxes or other public related or other
10:54:32  19  infrastructure aspects, financing aspects, you can
10:54:35  20  complete a full capital stack.  Obviously sometimes
10:54:39  21  pre-sales and those things too.
10:54:41  22      Q.  Mr. Mauro, I understand.  It sounds like
10:54:45  23  you're a little frustrated, but that's fine.  I don't interrupt
10:54:48  24  each other.  Let me ask my question; I'll let you
10:54:51  25  answer.  And we can go back and forth.  Is that okay?

## Page 46

10:54:53  1       A.  Sure.  Maybe, you know, if you don't mind
10:54:56  2   can I use the restroom actually?
10:54:58  3           MR. ITKIN:  Yeah.  Why don't we take a
10:55:01  4   break.
10:55:01  5       A.  Okay.
10:55:02  6           MR. ITKIN:  We'll come back in five
10:55:04  7   minutes.
10:55:04  8           THE WITNESS:  Okay.
10:55:04  9           MR. ITKIN:  Oh, you've got to hold on
10:55:05  10  until we go off the record, okay?
10:55:07  11          THE WITNESS:  Okay.
10:55:07  12          VIDEOGRAPHER:  We're going off the record.
10:55:09  13  The time is 10:55 a.m.
11:05:54  14          (Break taken from 10:55 to 11:06 a.m.)
11:06:47  15          VIDEOGRAPHER:  We're going back on the
11:06:54  16  record.  The time is 11:06 a.m.  Counsel.
11:06:58  17      Q.  (BY MR. ITKIN)  Thank you.  Welcome back,
11:07:00  18  Mr. Mauro.  So we were talking about or starting to
11:07:07  19  talk about your first meeting with Mr. Tang with KT
11:07:14  20  Capital.  Do you recall that?
11:07:15  21      A.  Yes.
11:07:17  22      Q.  Okay.  Let's take a look at something that
11:07:21  23  maybe will help you or help us discuss it.  Can we
11:07:27  24  please mark tab 54 as Exhibit 1, and can we get that
11:07:31  25  up on the screen, please?

## Page 47

11:07:37  1           MR. YOUNG:  Uri, do you have a Bates
11:07:40  2   number?
11:07:40  3           MR. ITKIN:  Once you see it I don't think
11:07:42  4   you'll need it.
11:07:43  5           MR. YOUNG:  Okay.
11:07:44  6       Q.  (BY MR. ITKIN)  Exhibit 1 is Plaintiff's
11:07:45  7   Second Supplemental Responses to Defendant's First
11:07:49  8   Set of Discovery Requests.  Do you see that, Mr.
11:07:52  9   Mauro?
11:07:55  10      A.  I see half of the page here, yeah.
11:07:58  11          MR. ITKIN:  Jason, do you want to maybe
11:08:00  12  zoom out a little bit so -- and maybe just scroll
11:08:04  13  down if Mr. Mauro would like so he could see the
11:08:07  14  document?
11:08:09  15      Q.  (BY MR. ITKIN)  Do you see that now, Mr.
11:08:10  16  Mauro?
11:08:11  17      A.  Yeah.  I mean I can't read the paragraph
11:08:14  18  below, but...
11:08:15  19      Q.  That's okay.  When we need you to read
11:08:19  20  something, we'll zoom in or out as you need.
11:08:25  21          (EXHIBIT NUMBER 1 WAS MARKED.)
11:08:25  22      Q.  (BY MR. ITKIN)  Have you seen this general
11:08:28  23  document before, Mr. Mauro?
11:08:30  24      A.  If it's the supplemental responses, yes.
11:08:37  25      Q.  And these are responses that plaintiff

## Page 48

11:08:39  1   provided to defendant's discovery requests, right?
11:08:41  2       A.  That's my understanding.
11:08:44  3       Q.  And these were certified as true and
11:08:48  4   correct; is that right?
11:08:50  5       A.  Yes.
11:08:50  6       Q.  And if we could go on page 23 of the
11:08:59  7   document, there's a verification there.  Do you see
11:09:08  8   that, Mr. Mauro?
11:09:09  9       A.  Yes.
11:09:10  10      Q.  And that verification was signed
11:09:14  11  electronically with your permission with your name,
11:09:17  12  right?
11:09:17  13      A.  Correct.
11:09:17  14      Q.  And so that means you certified that
11:09:24  15  plaintiff's responses in these -- in this document
11:09:28  16  were true and correct?
11:09:30  17      A.  To the best of my recollection, yes.
11:09:32  18          MR. YOUNG:  Calls for a legal conclusion.
11:09:34  19      Q.  (BY MR. ITKIN)  And sitting here right now
11:09:37  20  do you have any reason to believe that anything in
11:09:44  21  plaintiff's responses in this document is not true or
11:09:47  22  correct?
11:09:49  23      A.  Not off the top of my head.  I mean it
11:09:54  24  could be a -- I guess something could be incomplete
11:09:57  25  as I recall more things.  So, you know, it's tough to

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 49

11:10:04  1    give a -- you know, a full response sometimes when
11:10:09  2    you're dealing with something that's, you know, five
11:10:10  3    or seven years old.
11:10:11  4         Q.   But to the best of your recollection
11:10:14  5    sitting here today these responses are true,
11:10:17  6    accurate, and complete; is that right?
11:10:18  7         A.   Yes.
11:10:21  8         MR. ITKIN:  Okay.  So can we please go to
11:10:28  9    page 5, Jason.  I'd like to go to Plaintiff's Answer
11:10:37 10    to Interrogatory Number 1.  If you could just --
11:10:42 11    exactly, focus in on that first bullet point.
11:10:46 12         Q.   (BY MR. ITKIN)  Do you see the plaintiff's
11:10:47 13    answer to interrogatory number 1, Mr. Mauro?
11:10:51 14         A.   Yeah, let me -- can I read it?  Can you
11:11:00 15    expand it a little bit more?
11:11:02 16         Q.   Yeah.  And please feel free to tell our
11:11:10 17    videographer, who is presenting the exhibit, to zoom
11:11:16 18    in, zoom out, scroll as you need.
11:11:23 19         A.   Okay.  You can go to the next part of it.
11:11:30 20         And keep going.
11:11:49 21         Q.   I'm just going to ask you about that first
11:11:50 22    bullet point.  But you're welcome to --
11:11:53 23         A.   Oh, okay.  Sure.
11:11:55 24         Q.   And did you have a chance to read the
11:11:56 25    first bullet point --

## Page 50

11:11:57  1         A.   Yep.
11:11:57  2         Q.   -- to Plaintiff's Answer to Interrogatory
11:11:59  3    number 1?
11:12:00  4         A.   Yes.
11:12:00  5         Q.   And is that narrative true and correct
11:12:08  6    from your recollection?
11:12:10  7         A.   Yes.
11:12:11  8         Q.   Okay.  So I just want to ask you a couple
11:12:15  9    of questions about it.
11:12:16 10         A.   Sure.
11:12:17 11         Q.   So you met Mr. Tang at a conference on
11:12:26 12    August 3rd, 2015; is that right?
11:12:27 13         A.   On or abouts, I believe, yes.
11:12:30 14         Q.   And you were introduced to Mr. Tang by Mr.
11:12:38 15    Ali Jahangiri?  I won't pronounce his name correctly.
11:12:40 16         A.   Yes.
11:12:41 17         Q.   Okay.  And at the time you had a binding
11:12:43 18    term sheet with AIG, right?
11:12:46 19         A.   Yes.  And again it could have been an LOI,
11:12:49 20    but it had the terms associated with it.  So I
11:12:53 21    don't -- I can't recall if the title of it was called
11:12:55 22    term sheet.  But it had -- you know, I am not
11:12:59 23    using -- I don't think I'm using term sheet
11:13:01 24    capitalized here.  So terms of their deal and, yes,
11:13:05 25    it was -- at that time it was binding that we --

## Page 51

11:13:09  1    there was binding obligations in it.
11:13:12  2         Q.   And that term sheet, according to this
11:13:18  3    bullet in Exhibit 1 that we're looking at, that term
11:13:21  4    sheet according to you did not have any payment
11:13:25  5    guarantees, right?
11:13:26  6         A.   Again any payment guarantees associated
11:13:28  7    with that would have been, you know, similar to the
11:13:33  8    ones that we negotiated here that are phase-based,
11:13:39  9    you know, so are proportional.
11:13:49 10         Q.   So there were guarantees in the term sheet
11:13:51 11    with AIG?
11:13:52 12         A.   I can't recall the exact nature of the
11:13:55 13    guarantees.  But if you're asking if Summit Mountain
11:14:02 14    Holding Group had a guaranty of the nature that
11:14:06 15    you're alleging in this litigation, correct, there
11:14:11 16    was no guaranty of a -- a loan guaranty is a loan
11:14:16 17    guaranty, and there was no loan guaranty.  Whether it
11:14:21 18    had the language of a proportional draw-down based
11:14:27 19    guaranty of keeping the contributed equity in line
11:14:33 20    and in relation to the corresponding debt, I don't
11:14:39 21    recall if it had those specifics or not.  But did it
11:14:44 22    cross collateralize the holding company?  Were we
11:14:49 23    even in the market for -- you know, would we have
11:14:53 24    spent time in EB-5 if we had to cross collateralize
11:14:57 25    the ski resort and the development?  No.

## Page 52

11:15:00  1         MR. YOUNG:  And I'll just lodge a belated
11:15:03  2    objection that the document speaks for itself.
11:15:08  3         MR. ITKIN:  Which document, Mr. Young?
11:15:09  4         MR. YOUNG:  The binding term sheet with
11:15:12  5    AIG.
11:15:12  6         Q.   (BY MR. ITKIN)  Okay.  So let's just go
11:15:14  7    back to this bullet that we're looking at, Mr. Mauro.
11:15:21  8         A.   Sure.
11:15:22  9         Q.   So you met with -- you met Mr. Tang
11:15:30 10    because you were -- you had concerns that AIG could
11:15:33 11    not perform on the EB-5 raise, right?  Is that what
11:15:38 12    you're saying here?
11:15:38 13         A.   Correct.
11:15:39 14         Q.   And you met with Mr. Tang in search of
11:15:45 15    potential EB-5 funding?
11:15:48 16         A.   Correct.
11:15:49 17         Q.   And you met with Mr. Tang in search of
11:15:53 18    EB-5 financing on August 3rd, 2015, right?
11:15:55 19         A.   Again I believe that date is correct.  I
11:15:59 20    would need to look at my -- I need to look at my
11:16:05 21    files to confirm the exact date of when the
11:16:07 22    conference was.
11:16:07 23         Q.   Well, that's what these responses say,
11:16:10 24    right, August 3rd, 2015?
11:16:12 25         A.   Yeah.  I think if you read the paragraph

13  (Pages 49 to 52)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 53

11:16:15 1 above it, it says -- it says there's still refreshing
11:16:24 2 my recollection relative to the dates and the times.
11:16:26 3 But I believe that's correct. I can't tell you
11:16:28 4 exactly August 3rd or, you know, whether it was late
11:16:34 5 July or mid August, you know. But when I -- and when
11:16:40 6 I responded to this I might have -- I might have
11:16:43 7 pulled it up on my e-mail. I don't recall. So to
11:16:46 8 confirm the date. You're asking me right now, and
11:16:48 9 you're not allowing me to look at other concurrent
11:16:51 10 documents. So I can't -- I can tell you when I
11:16:55 11 answered this I thought that sounded right or about
11:16:57 12 right.
11:16:59 13     Q.  Okay. Well, I'm just going by the
11:17:02 14 documents that you've verified, and we're going to
11:17:03 15 keep going by the document.
11:17:05 16        So the next bullet says that you met with
11:17:08 17 Mr. Tang and Mr. Shing again on August 10th, 2015.
11:17:15 18 Do you see that?
11:17:15 19     A.  Yes.
11:17:20 20     Q.  And that was also with respect to
11:17:24 21 potential EB-5 financing, right?
11:17:26 22     A.  Yes.
11:17:29 23     Q.  The next bullet says on August 23rd, 2015
11:17:33 24 you again spoke to Mr. Tang by telephone, right?
11:17:36 25     A.  Yes.

## Page 54

11:17:36 1     Q.  And that again was in search of EB-5
11:17:41 2 financing, correct?
11:17:43 3     A.  Well, that was the topic of them, you
11:17:45 4 know, potentially coming in and raising on a much
11:17:47 5 quicker and confident time frame than AIG.
11:17:51 6     Q.  And then the next bullet later on
11:17:55 7 September 2nd, 2015, you again spoke to Mr. Tang
11:18:00 8 about potentially coming in to provide EB-5
11:18:09 9 financing; is that right?
11:18:09 10        MR. YOUNG:  Uri, I believe these are
11:18:11 11 supplemental answers. And I believe the answers
11:18:13 12 we're scrolling through are the original answers.
11:18:15 13 There may be slight differences in the
11:18:18 14 supplementation. So it may be --
11:18:21 15        MR. ITKIN:  That's a good point. Why
11:18:23 16 don't we go to -- why don't we go down to the
11:18:27 17 supplemental on it, sure.
11:18:29 18        MR. YOUNG:  I don't know if there are
11:18:31 19 differences. I'm just saying there may be. So it
11:18:33 20 may be worth looking at the supplemental.
11:18:36 21        MR. ITKIN:  You're right. I think we
11:18:37 22 should go down, Jason, to page 8. And thank you for
11:18:44 23 that correction, Spencer.
11:18:46 24     Q.  (BY MR. ITKIN)  So we talked about
11:18:47 25 August 10th. On August 12th you again had a

## Page 55

11:18:50 1 telephone call with Mr. Tang about EB-5 financing,
11:18:53 2 right?
11:18:54 3     A.  Hum...
11:19:00 4     Q.  This is the bullet --
11:19:01 5     A.  Yes.
11:19:03 6     Q.  -- that --
11:19:03 7     A.  The second bullet, yes.
11:19:05 8     Q.  Yes. And then the next bullet on top of
11:19:07 9 page 9 you again spoke to Mr. Tang on August 23rd,
11:19:11 10 2015, right, about EB-5 financing?
11:19:14 11     A.  You're talking about the August 23rd, the
11:19:21 12 23rd?
11:19:21 13     Q.  Yes.
11:19:22 14     A.  Yes, that looks correct.
11:19:25 15     Q.  Then on September 2nd, 2015 you again
11:19:27 16 spoke to Mr. Tang about raising EB-5 financing,
11:19:32 17 right?
11:19:32 18     A.  Yes.
11:19:35 19     Q.  And then if you go to the top of page 10
11:19:40 20 on September 7th, 2015 you again had a call with Mr.
11:19:45 21 Tang about raising EB-5 financing, right?
11:19:48 22     A.  Yeah. Again this was where, you know,
11:19:52 23 initially he talked about raising alongside AIG, and
11:19:57 24 they discussed term. He and the AIG lead discussed
11:20:01 25 terms of sort of a raising together where AIG makes a

## Page 56

11:20:06 1 best efforts alongside, you know, with Tang's firm
11:20:12 2 taking the lead. But then ultimately Tang said that
11:20:18 3 he didn't -- he didn't need them to make any effort
11:20:21 4 and that they would do it -- they would be able to do
11:20:24 5 it themselves.
11:20:25 6     Q.  We'll get to that, Mr. Mauro.
11:20:27 7     A.  Sure.
11:20:27 8     Q.  And Tang -- and Mr. Tang does not work for
11:20:32 9 AIG, right, or did not at that point?
11:20:33 10     A.  Mr. Tang? Yeah. Of course he was with
11:20:36 11 Cottonwood.
11:20:37 12     Q.  So just that was a bad question. Let me
11:20:42 13 restate it. Mr. Tang did not work for AIG in this
11:20:46 14 August/September time period or after that when you
11:20:49 15 were talking to him about EB-5 financing, right?
11:20:51 16     A.  I don't believe Mr. Tang has ever worked
11:20:55 17 for AIG.
11:20:56 18        MR. ITKIN:  Okay, all right. I just want
11:21:02 19 to turn to -- we can close this, Jason. Can we pull
11:21:05 20 up tab number 58? If we can mark that as Exhibit 2.
11:21:10 21        (EXHIBIT NUMBER 2 WAS MARKED.)
11:21:15 22        MR. ITKIN:  And I will give you the Bates
11:21:17 23 number for this one, Mr. Young. Exhibit 2 will be
11:21:21 24 SMHG00007 to SMHG000025.
11:21:34 25        MR. YOUNG:  Thank you.

14  (Pages 53 to 56)

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 57

11:21:39  1          MR. ITKIN:  Jason, can you zoom out a
11:21:43  2   little bit so Mr. Mauro has a chance to take a look
11:21:45  3   at this document.
11:21:46  4        Q.   (BY MR. ITKIN)  Mr. Mauro, do you
11:21:47  5   recognize what we've marked as Exhibit 2?
11:21:49  6        A.   I mean I don't recognize it.  It's been
11:21:51  7   seven years.  But I can see what it is from the
11:21:54  8   title.
11:21:54  9        Q.   What is it?
11:21:56 10        A.   A term sheet for the $150 million loan for
11:22:01 11   the phase 1 Powder Mountain development.
11:22:04 12        Q.   And is this a term sheet with AIG?
11:22:08 13        A.   It appears to be.
11:22:09 14        Q.   And is this a term sheet that you executed
11:22:13 15   with AIG?
11:22:14 16        A.   I would have to see if it's an executed
11:22:18 17   version.
11:22:19 18        Q.   I totally understand.  Why don't we go to
11:22:26 19   page 7 of the document.  Do you see your signature
11:22:34 20   there, Mr. Mauro?
11:22:35 21        A.   Yes.
11:22:38 22        Q.   And do you see the date of this term
11:22:43 23   sheet?
11:22:43 24        A.   Is it July 29th?  Yeah.
11:22:52 25        Q.   July 29th.  So the day of this term sheet

Page 58

11:22:56  1   was July 29, 2015, right?
11:22:58  2        A.   Yes.
11:22:58  3        Q.   And this is a term sheet that you had
11:23:01  4   signed with AIG on August 29, 2015 with respect to
11:23:06  5   EB-5 fundraising for Powder Mountain, right?
11:23:11  6        A.   Correct.
11:23:12  7        Q.   Okay.  Let's go through it a little bit.
11:23:18  8   Can we go to page 1, please.  So this is a -- you can
11:23:27  9   zoom in a little bit, Jason.  The top
11:23:30 10   paragraph is fine for now.
11:23:35 11          And this is -- based on the first
11:23:37 12   introductory paragraph, Mr. Mauro, this was a
11:23:42 13   restated -- amended restated term sheet, right?
11:23:45 14        A.   Yeah, it says that.
11:23:46 15        Q.   There was an earlier term sheet that you
11:23:48 16   signed with AIG back in December 3rd, 2014, right?
11:23:52 17        A.   I don't recall if it was -- if the prior
11:23:55 18   one was executed or -- but I assume if this is
11:23:59 19   amended, then the other one was executed.
11:24:01 20        Q.   Does that refresh your recollection when
11:24:04 21   you approximately started working with AIG?
11:24:06 22        A.   Yes.
11:24:07 23        Q.   And when was that?
11:24:09 24        A.   Yeah, late '14.
11:24:16 25        Q.   And from -- well, let's keep talking.  And

Page 59

11:24:24  1   so this term sheet, if we go to the second page,
11:24:35  2   Jason, at the top of the second page, paragraph 1,
11:24:37  3   please.  Just stay right there.
11:24:40  4          This term sheet detailed a principal
11:24:42  5   amount of the EB-5 financing by AIG.  Do you see that
11:24:47  6   Mr. Mauro?
11:24:48  7        A.   Uh-huh.
11:24:48  8        Q.   And that was up to $150 million, right?
11:24:53  9        A.   Uh-huh.
11:24:54 10        Q.   And what does "up to" mean in that
11:24:58 11   context?
11:24:59 12        A.   What does "up to"?  Meaning it's not final
11:25:04 13   what the capital stack would be for this term sheet.
11:25:09 14        Q.   Well, for the loan, what does it mean with
11:25:12 15   respect to the loan amount?
11:25:14 16          MR. YOUNG:  Calls for a legal conclusion.
11:25:19 17          THE WITNESS:  I don't understand the
11:25:20 18   question.
11:25:21 19        Q.   (BY MR. ITKIN)  Do you understand -- well,
11:25:24 20   you signed this term sheet, right?
11:25:25 21        A.   Yeah.
11:25:25 22        Q.   And this term sheet says "up to
11:25:30 23   $150 million."  Do you see that?
11:25:31 24        A.   Yes.
11:25:31 25        Q.   So what does that phrase "up to" mean in

Page 60

11:25:36  1   this context?
11:25:37  2        A.   Yeah, I mean it means it couldn't --
11:25:39  3   there's a scenario where it's not $150 million, which
11:25:43  4   is why you do phase-based financing and phase-based
11:25:48  5   debt-to-equity ratios.
11:25:50  6        Q.   In other words the $150 million was the
11:25:54  7   maximum that could be raised under this EB-5 risk
11:26:02  8   contemplated by this term sheet, right?
11:26:03  9        A.   Well, I mean it's not necessarily the
11:26:05 10   maximum, it's -- what's contemplated here is it would
11:26:08 11   go up to 150.
11:26:09 12        Q.   Okay.  And then if we go to -- if you
11:26:17 13   scroll down, please, Jason, to paragraph 6.
11:26:23 14          And do you see that paragraph 6, Mr.
11:26:26 15   Mauro, titled "developer's equity"?
11:26:28 16        A.   Yep.
11:26:29 17        Q.   And this paragraph feel free to review it.
11:26:33 18   But it looks like you were committing to put in not
11:26:38 19   less than $80 million in equity for the project; is
11:26:40 20   that right?
11:26:42 21        A.   Yeah.  Can you go up to 4, please?  So --
11:26:52 22   and go up to 3.  Now go to 2.  Okay.  So if you look
11:27:03 23   at the bottom of 2, you see that the last sentence
11:27:08 24   where it basically says "lender will release mortgage
11:27:13 25   lien to a portion of the property so that certain

15  (Pages 57 to 60)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 61

11:27:15 1 buildings can be completed with building loan
11:27:17 2 proceeds" --
11:27:17 3    Q.  Mr. Mauro -- Mr. Mauro, hold on.
11:27:17 4    A.  Yeah.
11:27:18 5    Q.  You've got to slow down.  Because the
11:27:20 6 court reporter --
11:27:20 7    A.  Sure.
11:27:21 8    Q.  -- is not going to be able to take down
11:27:24 9 what you're saying so fast.
11:27:25 10    A.  Okay.  So you can see here that they're
11:27:33 11 contemplating that there's -- there would be separate
11:27:37 12 entities for specific buildings and phases and
11:27:40 13 projects within this.  So that is the point, right,
11:27:45 14 that I'm trying to make is that there's -- the
11:27:50 15 project consists of projects.  150 million would
11:27:55 16 correspond with 80 million on our side because the
11:27:59 17 two going together, if they did everything together,
11:28:03 18 if they raised the full 150, then the amount of land
11:28:06 19 we would contribute, the amount of sales proceeds we
11:28:09 20 would have, the amount of TIF we would have access
11:28:13 21 to, and the amount of both resales and recycled sales
11:28:16 22 would amount to 80 million.  So that's what the 80
11:28:19 23 million means there.  And there's plenty of
11:28:22 24 documentation to go into that ad nauseam if you'd
11:28:26 25 like to.  So that's the 80 million, and it's meant to

Page 62

11:28:30 1 basically correspond with the up to 150.
11:28:32 2    Q.  I understand.  Can we go back down to
11:28:36 3 paragraph 6, please.
11:28:37 4    I'm just asking a very simple question,
11:28:39 5 Mr. Mauro.
11:28:39 6    A.  Yes.
11:28:40 7    Q.  And you can elaborate on that when your
11:28:43 8 lawyer asks you questions or any other time.  But I'm
11:28:47 9 just asking you a very simple question.
11:28:49 10    Under this term sheet you had committed to
11:28:53 11 put in not less than $80 million of developer's
11:28:57 12 equity, right?
11:28:57 13    MR. YOUNG:  The document speaks for
11:28:59 14 itself.  You can answer.
11:29:01 15    THE WITNESS:  Yeah, I did not commit to
11:29:04 16 put in $80 million in cash equity.  So what I
11:29:08 17 committed to put in in phases alongside the 150
11:29:12 18 million is what's called for here.  So sales
11:29:14 19 deposits, government grant, you know, land equity.
11:29:18 20 So sales deposits, I mean --
11:29:23 21    Q.  Why don't we do --
11:29:25 22    Oh, I'm sorry.
11:29:25 23    A.  Like it's right there in the
11:29:29 24 parenthetical.  It says sales deposits.  So how am
11:29:32 25 I -- how can I commit to have sales -- cash equity

Page 63

11:29:37 1 that comes from a sale deposit of something that
11:29:40 2 hasn't been built?  So it's...
11:29:45 3    Q.  Why don't we do --
11:29:46 4    A.  Are you intimating that -- are you
11:29:47 5 intimating that I told AIG that I have 80 million,
11:29:52 6 access to 80 million in some magical bank account?
11:29:58 7    Q.  Mr. Mauro, why don't you do me a favor and
11:30:00 8 why don't you read the first sentence of paragraph 6
11:30:04 9 into the record.
11:30:05 10    A.  "Developer acknowledges that it shall be a
11:30:10 11 condition precedent of closing that developers
11:30:13 12 substantiate that it has not less than $80 million of
11:30:17 13 actual equity in the property, (which may be consist
11:30:21 14 of cash, land equity and may also be a combination of
11:30:27 15 third-party investor equity, government grant, or
11:30:30 16 usable sales deposits.)"
11:30:36 17    Q.  And -- thank you.  And was that a true
11:30:38 18 representation at the time?
11:30:39 19    A.  Yes.
11:30:40 20    Q.  Okay.  Now, can we go down to part C on --
11:30:53 21 actually on page 4, can we go down to paragraph 3 of
11:30:58 22 part C?  If you could just move up a little bit.
11:31:05 23    Mr. Mauro, do you see paragraph 3 entitled
11:31:15 24 "Exclusivity Non Circumvention"?
11:31:15 25    A.  Yes.

Page 64

11:31:16 1    Q.  Can you please read into the record the
11:31:19 2 sentence starting with "In consideration of AIG's
11:31:22 3 efforts" -- and that paragraph.
11:31:27 4    A.  Sorry, is that -- where is that in there?
11:31:32 5 Okay.
11:31:35 6    Yeah, can you please show him, Jason.
11:31:38 7    A.  Okay.  "In consideration of AIG's efforts
11:31:41 8 with respect to the potential loan including without
11:31:44 9 limitation AIG's expenditure of time and expense in
11:31:47 10 analyzing the project and making of the loan,
11:31:49 11 developer agrees that it in connection with this
11:31:51 12 project it will not solicit, make, accept, negotiate,
11:31:53 13 or provide information for or otherwise pursue any
11:31:56 14 offer for another financing for the project pursuant
11:32:01 15 to the EB-5 investor program in the form of equity or
11:32:05 16 debt will not attempt to deal directly or indirectly
11:32:07 17 with any other regional center other than the AIG
11:32:11 18 affiliated regional center without the prior written
11:32:14 19 consent of AIG, which may be withheld in its sole
11:32:18 20 discretion."
11:32:21 21    Q.  Thank you.  And do you understand what
11:32:22 22 that sentence means, Mr. Mauro?
11:32:25 23    A.  I just read it.  Yeah, I do having read
11:32:27 24 it.
11:32:28 25    Q.  What does it mean?

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 65

11:32:30  1    A.  It's a non circumvention and exclusivity
11:32:35  2  clause.
11:32:35  3    Q.  And you signed this on July 29th, 2015,
11:32:40  4  right?
11:32:40  5    A.  That's right.
11:32:41  6    Q.  So is it July 29, 2015 you agreed with AIG
11:32:45  7  you would not solicit, make, accept, negotiate,
11:32:50  8  provide information or otherwise pursue any other
11:32:52  9  efforts for other financing for the project pursuant
11:32:55 10  to the EB-5 program, right?
11:32:58 11    MR. YOUNG:  The document speaks for
11:32:59 12  itself.  You can answer.
11:33:01 13    THE WITNESS:  I just read it.  So I see
11:33:02 14  what it -- yeah, what it says.
11:33:04 15    Q.  (BY MR. ITKIN)  Was my characterization
11:33:08 16  correct?
11:33:08 17    A.  I can read it again if you'd like.
11:33:12 18    Q.  No.  I just want -- I'm trying to
11:33:14 19  shorthand it.
11:33:16 20    A.  Yeah.  It's an exclusivity and non
11:33:22 21  circumvention clause.  So --
11:33:22 22    Q.  And what it says is you weren't supposed
11:33:25 23  to be talking to anyone else about EB-5 financing,
11:33:27 24  right?
11:33:28 25    A.  No, it says what it says.  You know, I

Page 66

11:33:30  1  mean it is definitely more restrictive than I recall.
11:33:35  2  But, you know, I understood from the get-go vis-a-vis
11:33:39  3  Tang that anything that we would do vis-a-vis Tang
11:33:42  4  and AIG would have to be consensual with AIG.  That
11:33:45  5  the idea was to bring another resource to the table.
11:33:47  6  So if you're implying that I shouldn't have had that
11:33:50  7  conversation in the first part, you can make that
11:33:52  8  assertion.  I had this meeting teed up prior to
11:33:57  9  signing this.  But, you know, depending on how you
11:34:00 10  interpret this that still doesn't excuse that I did
11:34:03 11  such without -- but you know come to think of it, I
11:34:08 12  think I mentioned, you know, AIG to Hentry, you know.
11:34:17 13  I think it was actually prior to this because he was
11:34:20 14  flailing, and I was suggesting that we consider, you
11:34:24 15  know, augmenting with other people.  And that was the
11:34:27 16  idea here.  So I'd have to -- yeah, so I mean that's
11:34:34 17  ultimately what transpired was introducing the two of
11:34:37 18  them to each other to see if they could work
11:34:39 19  together, so...
11:34:43 20    Q.  And can we go to the next page, Jason,
11:34:46 21  please, to paragraph 6.  And you understand that the
11:34:52 22  paragraph that we just read, the paragraph 3
11:34:54 23  exclusivity non circumvention is in subsection C of
11:35:00 24  this term sheet, Mr. Mauro, right?
11:35:03 25    A.  Yes, I do.  And again, I had no intention

Page 67

11:35:06  1  of circumventing AIG.  Anything I would do vis-a-vis
11:35:11  2  AIG would be with their consent.
11:35:13  3    Q.  And paragraph 6 says that, "Subsection C
11:35:20  4  of the term sheet is a binding and enforceable
11:35:22  5  contract between the parties hereto."
11:35:24  6    Do you see that?
11:35:25  7    A.  I do.
11:35:26  8    Q.  And you were one of the parties hereto,
11:35:29  9  right?
11:35:31 10    MR. YOUNG:  Calls for a legal conclusion.
11:35:34 11  You can answer.
11:35:35 12    THE WITNESS:  Yes, I signed it.
11:35:35 13    Q.  (BY MR. ITKIN)  And AIG was the other
11:35:37 14  party, right?
11:35:38 15    A.  Yes.
11:35:38 16    Q.  And so this subsection C and all the terms
11:35:43 17  in it was a binding and enforceable contract on you,
11:35:48 18  right, Mr. Mauro?
11:35:49 19    MR. YOUNG:  Calls for a legal conclusion.
11:35:50 20  You can answer.
11:35:50 21    THE WITNESS:  It says binding and
11:35:52 22  enforceable, and I have a signature affixed to it.
11:35:56 23    Q.  (BY MR. ITKIN)  So you signed this term
11:35:59 24  sheet on July 29, 2015, right?
11:36:02 25    A.  Yes.

Page 68

11:36:02  1    Q.  And then just four days later on
11:36:06  2  August 3rd, 2015 you met with Mr. Tang at KT Capital
11:36:12  3  to explore EB-5 financing, right?
11:36:15  4    A.  To explore him augmenting and assisting
11:36:19  5  AIG with their financing.
11:36:22  6    Q.  And that was four days after you agreed to
11:36:25  7  exclusively deal with AIG, right?
11:36:26  8    A.  Yes.  And as I said, I believe I gave a
11:36:30  9  heads-up to AIG that I was -- that I was meeting with
11:36:35 10  him and that I had also introduced him and mentioned
11:36:38 11  that I was going into a conference and that I had a
11:36:42 12  relationship with Ali Jahangiri, who had other
11:36:46 13  relationships that could potentially augment what was
11:36:49 14  appearing to be a task that was too big for them.
11:36:52 15    Q.  Did you get written consent from AIG to do
11:36:55 16  that?
11:36:55 17    A.  I don't believe I got written consent.  I
11:36:59 18  believe it was a phone call.
11:37:00 19    Q.  So the specific provision you read, that
11:37:11 20  sentence, said that you needed a written consent,
11:37:15 21  right?
11:37:15 22    A.  The one I just read?  That's correct.
11:37:16 23    Q.  So you violated the exclusivity provision
11:37:20 24  in the AIG term sheet just four days after you signed
11:37:22 25  it, right?

17  (Pages 65 to 68)

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

### Page 69

```
11:37:22   1            MR. YOUNG:  Calls for a legal conclusion.
11:37:25   2    Go ahead and answer.
11:37:25   3            THE WITNESS:  Again I verbally discussed
11:37:28   4    bringing in Ali Jahangiri and people that he was
11:37:31   5    introducing me to augment Hentry's raise.  It's not
11:37:36   6    Hentry's raise but augmenting the AIG raise given
11:37:40   7    their lack of success.  So the fact that I should
11:37:47   8    have gotten that in writing, if in fact I did not,
11:37:52   9    was called for here.  You've pointed out and I agree
11:37:56  10    with you that that would have been the proper course
11:37:59  11    of action.
11:38:00  12       Q.  (BY MR. ITKIN)  And then as we talked
11:38:02  13    about before you also spoke to Mr. Tang on
11:38:06  14    August 10th, 2015, right, about EB-5 financing?
11:38:11  15       A.  Yes.
11:38:11  16       Q.  And then on August 12th about EB-5
11:38:15  17    financing?
11:38:15  18       A.  Yes.
11:38:16  19       Q.  And on August 23rd about EB-5 financing,
11:38:19  20    right?
11:38:20  21       A.  I can't recall if by August 23rd I had
11:38:24  22    already had Tang and AIG speak with each other about
11:38:28  23    the opportunity for mutual collaboration, which was
11:38:32  24    the intent of reaching out.  I did not reach out to
11:38:37  25    circumvent AIG.
```

### Page 70

```
11:38:40   1       Q.  But you did speak to Mr. Tang on
11:38:43   2    August 3rd, 2015 about EB-5 financing, right?
11:38:45   3       A.  I spoke to him about augmenting the AIG
11:38:48   4    financing underway, that I had concerns that AIG had
11:38:53   5    tied me up relative to this term sheet for 150
11:38:57   6    million -- not this term sheet, even the prior one --
11:39:01   7    and likely bit off more than they could chew.  And
11:39:07   8    that I had wanted to bring additional resources to
11:39:10   9    bear that obviously would have to be at AIG's
11:39:13  10    election to work with.
11:39:14  11       Q.  And then you spoke to Mr. Tang again on
11:39:19  12    September 2nd, 2015 about EB-5 financing, right?
11:39:21  13       A.  Again I can't recall if by that date there
11:39:25  14    was already multiple conversations between AIG and
11:39:28  15    Tang.  But, yes, I talked to Tang multiple times in
11:39:33  16    September.
11:39:34  17       Q.  And then September 7th again, right, was
11:39:36  18    another one of those times?
11:39:37  19       A.  Yes.
11:39:38  20       Q.  And you talked to him about raising EB-5
11:39:41  21    financing right?
11:39:42  22       A.  Again I've talked to him multiple times in
11:39:45  23    September.
11:39:45  24       Q.  So by my count that's at least six times
11:39:48  25    that you swore to talking to Mr. Tang in August and
```

### Page 71

```
11:39:53   1    September about raising EB-5 financing, right?
11:39:55   2            MR. YOUNG:  Asked and answered.
11:39:58   3            THE WITNESS:  Yeah.  I talked to Tang many
11:40:01   4    times about his -- you know, getting his
11:40:04   5    understanding to see if this would be something that
11:40:06   6    would interest him and then subsequently made the
11:40:09   7    introduction to AIG.
11:40:11   8       Q.  (BY MR. ITKIN)  And so in just the month
11:40:14   9    and a half you managed to violate the exclusivity
11:40:19  10    provision in the July 29, 2015 AIG term sheet at
11:40:23  11    least six times, right?
11:40:24  12            MR. YOUNG:  Calls for a legal conclusion.
11:40:26  13    Argumentative.  You can answer.
11:40:28  14            THE WITNESS:  I would not phrase it that
11:40:30  15    way.  So to restate the question:  Did I meet with
11:40:34  16    Tang in order to augment the AIG fundraise that was
11:40:39  17    not going well in my opinion?  Yes.  Multiple times
11:40:43  18    in August and September.
11:40:44  19       Q.  (BY MR. ITKIN)  Now, let's talk about that
11:40:51  20    AIG fundraising that was not going well.  So between
11:40:57  21    December 2014 when you signed the first term sheet
11:40:59  22    for AIG and July 29, 2015 when you signed the amended
11:41:06  23    and restated term sheet with AIG, how much EB-5
11:41:11  24    financing or funding was AIG able to raise?
11:41:17  25       A.  To my recollection -- I mean I don't
```

### Page 72

```
11:41:20   1    recall them raising any.
11:41:24   2       Q.  So they raised zero dollars in that time
11:41:26   3    frame?
11:41:27   4       A.  Correct.
11:41:28   5       Q.  And is that why you had approached Mr.
11:41:32   6    Tang in August?
11:41:34   7       A.  It was one of the reasons.  I had concern
11:41:39   8    that they were overestimating the amount that they
11:41:42   9    could raise and were just trying to tie me up so they
11:41:48  10    could, you know, get -- you know, get a feed at the
11:41:54  11    trough.  And that if I hadn't introduced them to Tang
11:41:58  12    they probably would have brought in other people for
11:42:01  13    us to work with as well.
11:42:02  14       Q.  Okay.  Now, let's go back to something you
11:42:04  15    were talking about earlier.  So you mentioned that --
11:42:08  16    we talked a little bit about -- strike that.
11:42:13  17            We talked a little bit about guarantees in
11:42:17  18    the AIG term sheet.  Do you recall that?
11:42:21  19       A.  I recall what we discussed in a section
11:42:24  20    relating to the proportional guarantee, phase-based
11:42:31  21    guarantee where they could provide up to 150 million
11:42:35  22    in capital alongside us contributing, land,
11:42:39  23    pre-sales, TIF proceeds all laid out in subsequent
11:42:43  24    documents, yes.
11:42:46  25       Q.  I'm sorry, I think I may have confused
```

18  (Pages 69 to 72)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 73

11:42:51 1   you. I'm talking about guarantees, not the equity
11:42:55 2   contribution.
11:42:58 3       A.   Sorry, okay. The guarantees in the AIG
11:43:02 4   term sheet?
11:43:03 5       Q.   Yeah.
11:43:04 6       A.   I don't -- I mean we can go back to the
11:43:10 7   term sheet and the guarantee section if you want
11:43:12 8   to review it again.
11:43:13 9       Q.   Yep. No, we should.
11:43:15 10      A.   Yeah.
11:43:15 11      Q.   But I just want to go back to your sworn
11:43:18 12  interrogatory answer that said that plaintiff had a
11:43:23 13  biding term sheet with AIG which should not require
11:43:26 14  cross collateralization or any payment guarantees.
11:43:30 15      Do you recall that?
11:43:30 16      A.   I recall something to that nature, yes. I
11:43:34 17  don't think those are my exact words, but let's go
11:43:36 18  back to it. I mean if this is --
11:43:38 19      Q.   Yeah, why don't we go back to Exhibit 1,
11:43:42 20  if that's okay, Jason. We're going to go back to
11:43:45 21  Exhibit 2 in a second. And if we go to page 8 of
11:43:51 22  Exhibit 1. Can you go to page 8, please? Perfect.
11:44:08 23      And you see right in the middle of that
11:44:10 24  bullet point, Mr. Mauro, there's a sentence starting
11:44:13 25  "At the time..."

## Page 74

11:44:16 1       Do you see that?
11:44:16 2       A.   Yeah. "At the time plaintiff had a
11:44:18 3   binding term sheet with AIG, which did not require
11:44:21 4   cross collateralization or any payment guarantees."
11:44:26 5       Q.   And that's something that you verify as
11:44:29 6   true and correct, right?
11:44:30 7       A.   Yes.
11:44:31 8       Q.   Okay. So why don't we take a look at --
11:44:38 9   why don't we go back to Exhibit 2 and go to page 8 of
11:44:55 10  the document, A1 at the bottom. Yeah, you can just
11:45:02 11  maybe zoom out a little bit, Jason, please. Thank
11:45:06 12  you. Just go up a little bit to the top.
11:45:09 13      Okay. And so you see, does this
11:45:13 14  refresh your recollection that you added some terms
11:45:17 15  in the amended and restated AIG term sheet, Mr.
11:45:23 16  Mauro?
11:45:23 17      A.   I don't know what terms were added. I'd
11:45:25 18  have to compare the document.
11:45:27 19      Q.   I'm sorry, was -- if you'd go up a little
11:45:30 20  bit, it's a loan summary of terms as Exhibit A. Do
11:45:33 21  you see that?
11:45:34 22      MR. YOUNG: May I help --
11:45:38 23      MR. ITKIN: Jason, if you'll scroll up just
11:45:40 24  a little bit.
11:45:41 25      Q.   (BY MR. ITKIN) There you go. That's all

## Page 75

11:45:42 1   I'm asking about. I'm not trying to hide the ball.
11:45:47 2       A.   Okay. So what are you asking?
11:45:49 3       Q.   I want to go over a couple of terms here.
11:45:51 4   So do you see there's a definition of guarantor?
11:45:54 5       A.   Yes.
11:45:56 6       Q.   And what's that first entity under the
11:46:01 7   guarantor definition?
11:46:02 8       A.   Summit Mountain Holding Group LLC and SMHG
11:46:07 9   Village Development LLC.
11:46:07 10      Q.   And the Summit Mountain Holding Group LLC
11:46:09 11  is the same guarantor as the guarantor in the -- the
11:46:13 12  guaranty at issue in this case, right, right?
11:46:17 13      MR. YOUNG: Calls for a legal conclusion.
11:46:18 14  You can answer.
11:46:20 15      THE WITNESS: That's guarantor as a
11:46:22 16  high-clause level, like bad boy guaranties, like in a
11:46:26 17  phase -- in a phase of the project if something is
11:46:29 18  incomplete. I'm not saying Summit Mountain Holding
11:46:32 19  Group doesn't have obligations. But relative to a
11:46:35 20  guaranty, a repayment guaranty of the loan, that is
11:46:41 21  a -- you know that is an SMHG Village development
11:46:47 22  requirement as is detailed in subsequent, you know,
11:46:50 23  laudry-form documents beyond the term sheet as well
11:46:53 24  as in the term sheet itself.
11:46:55 25      Q.   And so there were certain obligations that

## Page 76

11:47:01 1   Summit Mountain Holding Group as the parent had under
11:47:05 2   these terms that you had in the AIG term sheet marked
11:47:11 3   as Exhibit 2, right?
11:47:12 4       MR. YOUNG: The document speaks for
11:47:14 5   itself. You can answer.
11:47:16 6       THE WITNESS: Yes. As I've alluded to
11:47:19 7   multiple times, it's a -- you know, when drawing down
11:47:21 8   the loan, the loans need to be in balance. That
11:47:24 9   concept is sort of an established practice in EB-5
11:47:31 10  for phase-based development in case that -- if it
11:47:35 11  doesn't go forward beyond that, the loan's in balance
11:47:37 12  and the lenders have the equity that's there at the
11:47:42 13  time of the last disbursement of the loan, and that's
11:47:46 14  their collateral. So if basically -- you know, so
11:47:55 15  the SMHG obligations are in relation to that aspect
11:48:01 16  of the phase-based development.
11:48:03 17      There's no contemplation in any document,
11:48:07 18  e-mail or anything that we were showing up to 80
11:48:10 19  million in cash that would have -- why would I
11:48:20 20  have -- if I had 80 million in cash, why wouldn't I
11:48:15 21  just have developed stuff on my own? Why would I
11:48:18 22  have gone through the torture of developing the EB-5,
11:48:22 23  you know, opportunity as it were?
11:48:23 24      Q.   (BY MR. ITKIN) SMHG is the parent
11:48:28 25  company, right?

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 77

11:48:28 1    A. It's the holding group that owns the ski
11:48:31 2  resort and the 2800 units across 18 phases.
11:48:36 3    Q. And it's the parent company of SMHG
11:48:42 4  Village Developer, right?
11:48:43 5    A. It's -- I mean SMHG village developer is a
11:48:47 6  wholly owned subsidiary, so I guess that technically
11:48:50 7  makes it a parent company. I'm not sure what the
11:48:52 8  legal definition of parent company is, but...
11:48:54 9    Q. Mr. Mauro, if I want a legal definition I
11:48:58 10  will either tell you or I will ask your counsel. I
11:49:00 11  just want your testimony, okay?
11:49:02 12    A. Yeah.
11:49:03 13    Q. So let's go down to the loan document
11:49:08 14  section. Right in the middle there, do you see
11:49:12 15  something called a completion guaranty?
11:49:13 16    A. In the middle? Yes. Sorry, in the --
11:49:22 17  which -- which --
11:49:22 18    Q. Under the loan document section.
11:49:24 19    A. Okay.
11:49:25 20    Q. About three paragraphs -- or, sorry, two
11:49:27 21  paragraphs down from the guarantor section. Right
11:49:31 22  above security for the loan section.
11:49:36 23    A. Yeah.
11:49:36 24    Q. You can ask Jason to zoom in. I don't
11:49:39 25  want you to strain yourself.

## Page 78

11:49:40 1    A. Yeah, if you could zoom in on that one.
11:49:51 2    Q. Do you see the words "completion
11:49:53 3  guaranty," Mr. Mauro?
11:49:55 4    A. You're asking me to read the loan document
11:50:01 5  paragraph, right?
11:50:04 6    Q. Yes.
11:50:06 7    A. Okay. Can I read it, please?
11:50:07 8    Q. Sure.
11:50:22 9    A. Yes, I see it.
11:50:25 10    Q. Do you understand what a completion
11:50:28 11  guaranty means?
11:50:29 12    A. A completion guaranty? Yeah, I know what
11:50:32 13  a completion guaranty means. It means you complete
11:50:35 14  the -- what you drew the capital for. So if you draw
11:50:40 15  down a loan to do something, you do it. And if you
11:50:44 16  don't do it, you know, you've guaranteed that you're
11:50:47 17  going to do it. So that's why you draw down in
11:50:51 18  phases. That's why you have to have your debt and
11:50:54 19  equity in balance when do you it, so...
11:51:00 20    Q. You don't understand what a completion
11:51:01 21  guaranty means in the context of construction,
11:51:05 22  commercial construction?
11:51:06 23    A. Yeah, in the context of building a village
11:51:10 24  that's phased, it means as you go up on a specific
11:51:12 25  building you have to -- you have to finish that

## Page 79

11:51:16 1  building, for example. So if you draw to do, you
11:51:21 2  know, a 10,000-square-foot-building of a
11:51:25 3  240,000-square-foot project and you draw that down,
11:51:29 4  you know, you need to finish that specific building.
11:51:34 5    Q. So let's go down to page 13 of the
11:51:44 6  document, please, Jason.
11:51:47 7    A. I want to clarify one more. The idea when
11:51:50 8  you pull something down is you submit a draw request.
11:51:52 9  It's reviewed by a third-party that says: We've
11:51:55 10  reviewed the costs and associated things to get
11:51:59 11  this -- this draw request done. If it then turns out
11:52:04 12  that you don't do what you said you're going to do in
11:52:06 13  that draw request or there's some unforeseen cost
11:52:09 14  overruns in that given draw request, you know, you
11:52:12 15  have a completion guaranty relative to that draw
11:52:15 16  request. Now, you'll pull down the
11:52:18 17  draw request unless your debt to equity -- your loan
11:52:22 18  is in balance, and that's protecting the EB-5
11:52:25 19  investor so they don't get ahead of their skis
11:52:28 20  relative to the loan-to-value ratio on their
11:52:32 21  underlying collateral which is the security in the
11:52:34 22  loan which is the underlying land.
11:52:38 23    Q. Okay. Are you finished, Mr. Mauro?
11:52:41 24    A. Sure.
11:52:42 25    Q. So we're now on a different page of the

## Page 80

11:52:46 1  AIG term sheet that discusses a completion guaranty.
11:52:55 2  Do you see it?
11:52:56 3    A. Uh-huh.
11:52:57 4    Q. There's a first paragraph starting with
11:52:59 5  the words "Upon the occurrence of an event of
11:53:05 6  default."
11:53:06 7    Do you see that?
11:53:07 8    A. Yep.
11:53:10 9    Q. And do you understand that to be the terms
11:53:15 10  of the completion guaranty that you had agreed to
11:53:18 11  with AIG back in July 29, 2015?
11:53:22 12    A. Yeah. I think the first sentence is
11:53:25 13  really key here, right, that "The failure to complete
11:53:30 14  construction of any building" -- as in vertical
11:53:33 15  construction -- "the physical construction of which
11:53:34 16  has been commenced by borrower," in parenthetical.
11:53:40 17    So once you've commenced construction of
11:53:43 18  something, you better finish it. And the holding
11:53:45 19  company is standing behind that. So I don't dispute
11:53:50 20  that.
11:53:50 21    Like if we draw down from the loan to go
11:53:54 22  vertical on a building and we commence construction
11:54:00 23  for that building, we have to complete that building.
11:54:03 24  And if we pull -- so, yes, I see it. I get it. And,
11:54:09 25  yes, this is -- this is -- you can't have unfinished

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 81

11:54:14  1    improvements as it relates to what they're describing
11:54:18  2    here.
11:54:18  3        Q.    And after that it also -- I'm sorry.
11:54:23  4    After the language you just read there's also
11:54:26  5    additional language that says "And any directly
11:54:27  6    related infrastructure."
11:54:30  7        Do you see that?
11:54:34  8        A.    Yeah.  So meaning that building, if that
11:54:38  9    building to get built needs water, sewer, or power or
11:54:43  10   a paved road and that's part of the draw is to
11:54:48  11   complete that and you didn't complete that part of
11:54:50  12   the draw, then I could see how, yeah, that -- you
11:54:54  13   would be -- your guaranty presumably would come into
11:54:59  14   play relative to the draw on that specific piece of
11:55:02  15   infrastructure supporting that specific building.
11:55:06  16       In our case that's moot because as I
11:55:10  17   pointed out to you the roads were paved, the water,
11:55:14  18   the sewer, the power was all there.
11:55:19  19       Q.    I understand, Mr. Mauro.  Let's just go
11:55:18  20   through this language.  And then by you, you mean the
11:55:22  21   holding company.  The guarantor was on the hook for
11:55:24  22   this completion guaranty, right?
11:55:27  23       A.    For specific unfinished improvements of
11:55:31  24   buildings, yes, and associated infrastructure of a
11:55:37  25   given building.

Page 82

11:55:38  1        Q.    Okay.  And the guarantor is the Summit
11:55:43  2    Mountain Holding Group, right?
11:55:44  3        A.    Right.  The guarantor in this unfinished
11:55:49  4    improvement of a specific building or infrastructure
11:55:52  5    specific to that building or I think bad boy
11:55:54  6    carve-outs as well, which is probably somewhere in
11:55:57  7    here.
11:55:58  8        Q.    Yep.  I'm just going through this term
11:56:00  9    sheet and trying to understand it if you had signed
11:56:02  10   it.
11:56:02  11       A.    Sure.
11:56:03  12       Q.    And Summit Mountain Holding Group as the
11:56:06  13   guarantor in -- oh, scratch that.
11:56:09  14       Let's go to the last bullet of the
11:56:14  15   completion guaranty section.  Okay.  Can you read
11:56:20  16   that last bullet, please, that starts with "The
11:56:23  17   completion guaranty will include..."  You can read
11:56:25  18   that into the record, so we're -- we all know what --
11:56:25  19       A.    "The completion guaranty will include a
11:56:28  20   liquidated damages provision" --
11:56:28  21       Q.    Slow down please, I'm sorry.
11:56:28  22       A.    Sure.
11:56:28  23       Q.    I'm not trying to be rude.
11:56:28  24       A.    Yep, no problem.
11:56:28  25       Q.    I know the plight of the court reporter.

Page 83

11:56:29  1    We have to respect her.
11:56:29  2        A.    "The completion guaranty will include a
11:56:33  3    liquidated damages provision providing that guarantor
11:56:48  4    is not required to actually complete such
11:56:51  5    construction, subject to guarantor paying liquidated
11:56:55  6    damages to lender equal to all hard costs and soft
11:56:59  7    costs required to complete construction of the
11:57:03  8    unfinished improvements less the un disbursed portion
11:57:06  9    of the loan."
11:57:08  10       Q.    What do you understand that language to
11:57:10  11   mean, Mr. Mauro?
11:57:11  12       A.    I'd be speculating.  Because it's the --
11:57:16  13   "the less the un disbursed portion of the loan."  I
11:57:22  14   read it to be that if you don't -- if -- if you pull
11:57:28  15   down a draw for a specific -- you know, for the draw
11:57:39  16   request, which the draw requests are to complete
11:57:41  17   something.  So to complete a building and you don't
11:57:46  18   complete it, that there is a liquidated damages
11:57:50  19   provision to -- you know, relative to the lend -- the
11:57:59  20   borrower or the guarantor so that the hard costs and
11:58:05  21   soft costs associated with that unfinished
11:58:09  22   improvement could be retrieved.  So basically if --
11:58:13  23   if I don't use holding company funds to finish an
11:58:20  24   improvement because it comes -- like the example I
11:58:28  25   gave earlier where it becomes out of balance while

Page 84

11:58:31  1    doing it, for example, the construction cost comes in
11:58:34  2    higher, unforeseen construction costs so it's higher
11:58:37  3    than you thought it would be, the -- where the
11:58:44  4    guarantor is signing up to liquidated damages for
11:58:49  5    that unfinished improvement relative to that portion
11:58:54  6    of the loan drawn for that what is supposed to be a
11:58:59  7    finished improvement.  So if you're pulling down for
11:59:01  8    a finished improvement and it's unfinished, you have
11:59:06  9    that liquidated damages clause.
11:59:12  10       Q.    And this clause, this liquidated damages
11:59:16  11   clause basically requires the guarantors to pay a sum
11:59:21  12   of money, right?
11:59:23  13       MR. YOUNG:  Calls for a legal conclusion.
11:59:24  14   You can answer.  And the document speaks for itself.
11:59:34  15       THE WITNESS:  Yes.  Again the way I read
11:59:47  16   it is if -- if the -- if the borrower doesn't finish
11:59:56  17   the unfinished improvements relative to a portion of
11:59:59  18   the loan or a disbursement, then the guarantor could
12:00:05  19   be called upon to provide the hard and soft costs
12:00:11  20   remaining, you know the gap relative to that planned
12:00:17  21   improvement, planned finished improvement.
12:00:21  22       Q.    (BY MR. ITKIN) And these are terms that
12:00:23  23   you agreed to back in July 29, 2015 with respect to
12:00:28  24   this project --
12:00:28  25       A.    I signed the term sheet.

21  (Pages 81 to 84)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 85

12:00:30 1      Q.  -- with definition in AIG term sheet,
12:00:32 2  right?
12:00:32 3      A.  I signed the term sheet, yeah, on
12:00:36 4  July 29th of 2015.
12:00:38 5      Q.  Okay.  We can put this aside.
12:00:54 6      Now, if we could go to Exhibit 1, please.
12:01:04 7  I just want to go back to the responses to our
12:01:08 8  interrogatories, Mr. Mauro.  And if you'd go -- if
12:01:22 9  you go down to -- what did I say?  Page 9, please.
12:01:27 10  Okay.  Just scroll down just a little bit.  Yep.
12:01:30 11      And, Mr. Mauro, I want to focus on the
12:01:34 12  first sub bullet under the "On September 2nd, 2015
12:01:42 13  bullet.  Do you see that?  It starts with "Mr. Tang
12:01:44 14  and his team..."
12:01:45 15      A.  Yep.
12:01:46 16      Q.  And I want to ask you a couple questions
12:01:48 17  about this.
12:01:50 18      So do you see that the language about Mr.
12:01:57 19  Tang made representations to you to the effect
12:02:00 20  that --
12:02:02 21      MR. YOUNG:  Can we zoom in?  Sorry, Uri,
12:02:05 22  can we zoom in for my benefit?
12:02:10 23      MR. ITKIN:  Sure.
12:02:11 24      MR. YOUNG:  Thanks, Jason.
12:02:13 25      MR. ITKIN:  Can you go up a little bit?

Page 86

12:02:15 1  We're focusing on that first bullet.  Up.  Not down.
12:02:18 2  Yes, thank you.
12:02:20 3      Q.  (BY MR. ITKIN)  So what this September
12:02:25 4  2nd, 2015 bullet says, and I'm going to summarize and
12:02:28 5  you can take issue with my summary, but I'm going to
12:02:32 6  try to do it shorthand this.  What it basically
12:02:36 7  says is that Mr. Tang made representations to you to
12:02:38 8  the effect that plaintiff, which is Summit Mountain
12:02:45 9  Holding Group, should effectively be paying AIG to do
12:02:48 10  anything.  Do you see that?
12:02:49 11      A.  Yes.  And that's eventually what happened.
12:02:52 12      Q.  And is that your testimony under oath here
12:02:54 13  today?  That's what Mr. Tang told you on
12:02:58 14  September 2nd, 2015?
12:02:59 15      A.  That he didn't want to -- that his
12:03:01 16  preference was to not share the raise with AIG, that
12:03:05 17  they could do it all themselves and he would prefer
12:03:08 18  to let AIG be paid to do nothing.  That's what he
12:03:14 19  advocated to do, and that's what we ultimately ended
12:03:18 20  up doing.
12:03:19 21      Q.  And sorry it's a yes-or-no question.  I
12:03:22 22  just want to make sure.  That's your sworn testimony
12:03:25 23  today is that's what happened?
12:03:26 24      A.  Let me reread it.  Yes.
12:03:42 25      Q.  And he also made representations to you to

Page 87

12:03:49 1  the effect of that you should let Pathwood [phonetic]
12:03:53 2  and Hentry Global raise all of the EB-5 financing
12:03:56 3  needs on their own.  Do you see that?
12:03:58 4      A.  Yes.  I read the whole -- when I responded
12:04:01 5  yes, I read the entire paragraph.
12:04:03 6      Q.  Okay.  The entire bullet.  Perfect.  That
12:04:07 7  entire bullet is true, accurate, and complete --
12:04:10 8      A.  Well, I can go -- as you probably
12:04:12 9  gathered, it's a -- as to the completion, the
12:04:16 10  completeness of it I can go on a lot longer if you'd
12:04:19 11  like to.  However long you want to stay on this, I
12:04:21 12  can go and whatever.  We can keep pealing the onion
12:04:25 13  as much as you would like.
12:04:26 14      Q.  I appreciate that, Mr. Mauro.
12:04:29 15      Who is Hentry Global?
12:04:32 16      A.  As it was pitched to me and why we went
12:04:38 17  with them.  Hentry Global was allegedly the second
12:04:44 18  biggest EB-5 financier in China.  And their exclusive
12:04:50 19  partner, as it was represented and Hentry had direct
12:04:54 20  or indirect interest in, was Cottonwood.  So he was
12:04:59 21  the -- so Cottonwood was his vehicle for securing
12:05:07 22  projects in the United States.  And at the time both
12:05:13 23  Cottonwood and Hentry Global represented themselves
12:05:16 24  as being, you know, debt providers in the EB-5
12:05:25 25  industry and in that category, the number 2.  I later

Page 88

12:05:27 1  found out that they actually desired to partner
12:05:32 2  together to get into effectively my business of
12:05:36 3  development and go into developing their own
12:05:40 4  projects, as opposed to providing debt to projects.
12:05:44 5      So -- but that's how Hentry was
12:05:49 6  represented to me.  But I can't -- you know, it's
12:05:54 7  hard -- it's very -- you know, I can't verify whether
12:05:56 8  he was number two or number three or number four on
12:05:59 9  the lead tables in China at the time that we met.
12:06:01 10  But he was represented as number two.
12:06:04 11      Q.  Is Hentry a Global or a person or a
12:06:07 12  company or something else?
12:06:08 13      A.  So it's a company led by a gentleman named
12:06:12 14  Hentry.
12:06:13 15      Q.  Do you know what his last name is?
12:06:15 16      A.  I have it somewhere.  I'm spacing on it.
12:06:20 17      Q.  Well, it's not Hentry Global, is it?
12:06:22 18      A.  No.  Global is because it's Hentry's
12:06:26 19  company, and they provide capital globally
12:06:33 20  presumably.  But -- but --
12:06:35 21      Q.  And is your test-- or sorry, go ahead.
12:06:38 22      A.  Yeah, so that's the name of the company.
12:06:40 23  His last name is not Global.  I'm --
12:06:44 24      Q.  You keep calling him a he.  You keep
12:06:47 25  calling the company a he; that's what's confusing me.

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

---

**Page 89**

12:06:50  1     A.  Got it.  Well, Hentry is the only --
12:06:53  2   Hentry is the principal owner and the person we
12:06:57  3   liaisoned with and the business partner of Tang and
12:07:04  4   Alex.
12:07:05  5     Q.  Okay.  Have you ever met this gentleman
12:07:08  6   named Hentry?
12:07:09  7     A.  Yes.
12:07:10  8     Q.  When did you meet him?
12:07:13  9     A.  I met him in a restaurant once; I think
12:07:21 10   that was in the U.S.  And then I met him with Kobe
12:07:25 11   Bryant.  And I might --
12:07:28 12     Q.  And when was that?
12:07:28 13     A.  I'd have to look at my e-mails to confirm
12:07:32 14   the dates.
12:07:33 15     Q.  Was it sometime in 2015?
12:07:35 16     A.  Let's see, August.  I believe I met him in
12:07:47 17   2015 at some point, but it could have been -- yeah.
12:07:50 18   Yeah.
12:07:53 19     Q.  Did you --
12:07:54 20     A.  I definitely -- I definitely met him in
12:07:57 21   2016.  But I believe I met him in person in 2015 as
12:08:02 22   well.
12:08:02 23     Q.  And when in 2016?  I'm sorry, I did not
12:08:04 24   mean to interrupt you.  When in 2016 did you meet
12:08:08 25   this Hentry gentleman who heads Hentry Global?

**Page 90**

12:08:13  1     A.  I met him when -- at the Kobe Bryant
12:08:19  2   event.
12:08:20  3     Q.  When was that event?
12:08:22  4     A.  In 2016.  I can't remember the month
12:08:25  5   exactly.  It might have been -- I think it was
12:08:29  6   summertime, maybe spring.  I can't remember.
12:08:33  7     Q.  Okay.
12:08:33  8     A.  I'd just have to, you know, look at the
12:08:36  9   doc.
12:08:36 10     Q.  Did you do any diligence on the company
12:08:39 11   Hentry Global or this individual that is named Hentry
12:08:44 12   after Mr. Tang made these representations to you --
12:08:47 13     A.  Yes.
12:08:50 14     Q.  -- or made these representations, sorry?
12:08:55 15     A.  Yes.  With Ali Jahangiri and with counsel
12:09:07 16   and with other people that I had met in the kind of
12:09:10 17   industry.
12:09:11 18     Q.  And then they confirmed or undermined his
12:09:18 19   reputation or the company's reputation?
12:09:20 20     A.  They confirmed that he could -- that he
12:09:22 21   had the ability to raise a lot of money.
12:09:24 22     Q.  Now, is it your testimony sitting here
12:09:30 23   today, and I want to clarify this, that you believe
12:09:33 24   that Cottonwood and Hentry Global are affiliated?
12:09:37 25     A.  I believe they enter into business

**Page 91**

12:09:45  1   dealings together that -- where proceeds or profits
12:09:51  2   are shared, yes.  I believe they're very careful
12:09:54  3   about how they structure their entities.  But if you
12:09:58  4   were to -- let's put it this way, if you were to use
12:10:04  5   the RICO statute capabilities to look at their
12:10:07  6   interoperability or, you know, the way they
12:10:10  7   collaborate, then they certainly would get ensnared
12:10:15  8   in a RICO test.  But I can't speak to the actual
12:10:20  9   entities.
12:10:22 10         But for example Boston Seaport Project
12:10:27 11   has -- Alex has a definitive interest in there, and
12:10:33 12   Harry has -- Hentry has some level of interest above
12:10:39 13   and beyond, to my knowledge, from what I was told,
12:10:43 14   above and beyond procuring, you know, funds for it.
12:10:47 15     Q.  Sorry, who is Alex?
12:11:04 16     A.  Alex is Tang's partner.
12:11:06 17     Q.  Does he have a last name?
12:11:10 18     A.  Shing.
12:11:11 19     Q.  Okay.  And I just want to go back to
12:11:15 20   something you said.  You were alluding to the RICO
12:11:19 21   statute.  Are you a RICO expert, Mr. Mauro?
12:11:23 22     A.  I'm not a RICO expert.
12:11:24 23     Q.  Are you a lawyer?
12:11:26 24     A.  I'm not a lawyer.
12:11:28 25     Q.  Do you know anything about the RICO

**Page 92**

12:11:30  1   statute and how it's enforced and the laws around it?
12:11:32  2     A.  Yes.  I studied under James Q. Wilson at
12:11:35  3   UCLA who was the -- who was a Harvard criminologist,
12:11:41  4   and I took four graduate-level courses under him and
12:11:46  5   study under him.  He's the author of The Broken
12:11:50  6   Window Theory, which is the basis of Giuliani crime
12:11:53  7   reforms.  So I have some familiarity with RICO.
12:11:56  8     Q.  So you have sufficient sophistication in
12:11:59  9   the legal space to understand and opine about the
12:12:05 10   RICO statute?
12:12:06 11     A.  Yeah, I understand the RICO statute.
12:12:09 12   Yeah, I understand when you don't quote/unquote own
12:12:13 13   something but you benefit from its -- what that
12:12:18 14   entity does, so you're not -- you don't show up as a
12:12:22 15   beneficial owner or in control but effectively you
12:12:28 16   either are or are in partial control, you know, those
12:12:31 17   are some of the things that the mafia would do to
12:12:35 18   manage their business empire.
12:12:39 19         MR. ITKIN:  Okay.  Thank you for that.  We
12:12:44 20   are again I think about an hour and 20 minutes in.
12:12:49 21   We could keep going, but I'm going to switch to a new
12:12:52 22   topic.  Do you want to take a five-minute break, or
12:12:55 23   do you want to keep going?
12:12:58 24         THE WITNESS:  Yeah, we can take a break.
12:12:59 25         MR. YOUNG:  We're getting to lunch time

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 93

```
12:13:02  1   out here, Uri.  Do you want to break for 45 minutes
12:13:04  2   for lunch or do you want to --
12:13:05  3          MR. ITKIN:  I'm fine to break for lunch.
12:13:06  4          Can we go off the record, please?
12:13:08  5          VIDEOGRAPHER:  We're going off the record.
12:13:09  6   The time is 12:13 p.m.
12:52:12  7          (Break taken from 12:13 to 12:52 p.m.)
12:52:14  8          VIDEOGRAPHER:  We're going back on the
12:52:29  9   record.  The time is 12:52 p.m.  Counsel.
12:52:34 10     Q.  (BY MR. ITKIN)  Thanks, Jason.  Welcome
12:52:36 11   back, Mr. Mauro.
12:52:37 12     A.  Thank you.
12:52:38 13     Q.  I'd like to go back to Exhibit 1 that we
12:52:42 14   discussed on page 9, which is Plaintiff's Responses
12:52:46 15   to Defendant's Interrogatories.
12:52:48 16     A.  Okay.
12:52:48 17     Q.  And in that document can we zero in on the
12:52:59 18   bullet starting with "If plaintiff and the
12:53:06 19   borrower..."
12:53:08 20          That's perfect, and that works for me.  Go
12:53:11 21   down just a little bit.  Yep.  Nope, up a little bit.
12:53:14 22   Up a little bit more.  Yep, perfect.
12:53:17 23          So that's what I need.  But, Mr. Mauro, as
12:53:19 24   I said before, feel free to scroll or zoom.  So in
12:53:22 25   that second bullet under the September 22nd, 2015
```

## Page 94

```
12:53:26  1   category, you stated in sum total that Mr. Tang made
12:53:35  2   representations to you back in September of 2015 that
12:53:39  3   if plaintiff and the borrower could secure the
12:53:43  4   attendance of the late Kobe Bryant at a fundraising
12:53:47  5   event, Mr. Tang and his team could raise the full 150
12:53:53  6   million in EB-5 financing within six months.
12:53:55  7          Do you see that?
12:53:55  8     A.  Yes.
12:53:57  9     Q.  And is that a true statement?
12:54:02 10     A.  Yes.  I could elaborate or I could just
12:54:06 11   say yes.
12:54:07 12     Q.  In other words sitting here today under
12:54:10 13   oath your testimony is that's what Mr. Tang
12:54:12 14   represented to you back in September 2nd of 2015?
12:54:16 15     A.  Yes, there's something you need to
12:54:19 16   understand to -- I mean I could see how on the
12:54:21 17   surface that comment to you might seem outlandish.
12:54:26 18   However, you have to keep in mind that the
12:54:30 19   fundraising time frame that they initially had was
12:54:33 20   18 months.  And they thought they could collapse it
12:54:37 21   to six months or even less if Kobe Bryant could
12:54:41 22   appear.  And the reason why is if you recall Kobe
12:54:43 23   Bryant had a sex scandal, you know, years back.  And
12:54:50 24   what people don't realize, Americans don't realize is
12:54:52 25   Nike, his main sponsor, quietly sent him out to China
```

## Page 95

```
12:54:56  1   to ride out that whole period.  So he spent an
12:55:01  2   enormous amount of time in China, almost approaching
12:55:05  3   18 months to two years, you know, this big NBA star
12:55:12  4   is hanging out in China.  And I rapidly went up to
12:55:15  5   the lead tables in China.  And at the time that this
12:55:18  6   conversation happened with Tang, Kobe Bryant was the
12:55:21  7   most popular person in the country of China.  So he
12:55:26  8   surpassed the Chinese, the super tall Chinese guy.  I
12:55:32  9   can't remember that guy's name.  Can you guys
12:55:33 10   remember?  But he --
12:55:36 11     Q.  Yao Ming.
12:55:37 12     A.  Yao Ming, thank you.  He surpassed Yao
12:55:41 13   Ming.  He surpassed every-- he was the -- he ruled
12:55:43 14   China massively.  And so, you know, we didn't -- that
12:55:49 15   was not an easy task to go and convince Mr. Bryant to
12:55:53 16   come and work with this team and cut the business
12:55:57 17   deal that ultimately I cut with them.  And I had to
12:56:00 18   meet with them multiple times in their Newport Beach
12:56:03 19   offices, meet with Kobe and then lay out how the
12:56:07 20   whole thing would go down in China and get him to
12:56:10 21   come and the context of it and how it would be done.
12:56:13 22   So it was a very big deal.  And the idea was that if
12:56:18 23   Kobe is at this event, you know, the number of
12:56:21 24   Chinese that would want to come to the event would be
12:56:24 25   gigantic, and they could then basically prioritize
```

## Page 96

```
12:56:28  1   those who had those -- those looking to get U.S.
12:56:31  2   citizenship.
12:56:34  3          And again the thing to keep in mind on
12:56:36  4   U.S. citizenship is it's not so much that these
12:56:39  5   people wanted to leave China.  They wanted to have a
12:56:41  6   backup to leave China in case things go like they
12:56:44  7   have in China, but it was principally so their kids
12:56:48  8   could go to college in the United States.  So that
12:56:50  9   was the motivation for the majority of Chinese going
12:56:54 10   for EB-5 so that their kids could get a United States
12:56:58 11   college education.  And so those kids were obviously
12:57:01 12   high school age, very familiar with Kobe Bryant, and
12:57:04 13   pursuing opportunities that would allow them to get a
12:57:09 14   Visa to study in the United States.  Which once you
12:57:09 15   get the acceptance into the program, you got the
12:57:11 16   green card or provisional that allowed the family to
12:57:14 17   do that.
12:57:14 18          So that was the premise was that we could
12:57:18 19   blow out the attendance of the inaugural marketing
12:57:24 20   event, and they could do a big lead up to that.
12:57:26 21   Which it's not like it would happen immediately, but
12:57:29 22   the point would be they could market that he's going
12:57:31 23   to be doing this event, you know, weeks if not months
12:57:36 24   in advance to drive it up.  So, yeah, it was a very
12:57:39 25   big deal.  No, there was no -- for an EB-5 project to
```

24  (Pages 93 to 96)

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 97

```
12:57:45  1   have celebrity wattage like that is unheard of as
12:57:48  2   well.  So it was a big deal.
12:57:51  3        Q.   And so was bringing -- strike that.  Was
12:57:56  4   having Kobe Bryant at a fundraising event your idea
12:58:01  5   or Mr. Tang's idea?
12:58:03  6        A.   I think -- I can't recall exactly.  I
12:58:10  7   think it was my suggestion that it was a potential
12:58:14  8   possibility that he then leapt on, as did Alex.  And
12:58:18  9   we were like, oh, my God, yeah, if you could do that,
12:58:21 10   our fundraising would just -- you know, would be
12:58:24 11   done.  We would be able to do it in a radically
12:58:29 12   compressed time frame.
12:58:30 13        Q.   And was this an important idea to you at
12:58:35 14   the time that you really wanted to pursue?
12:58:37 15        A.   I mean I spent a quarter of a million
12:58:41 16   dollars securing it or offering him a half a million
12:58:48 17   dollar credit towards a home site.  So, yeah, it was.
12:58:51 18   It complimented also the fact that the project had
12:58:56 19   secured other notable people including Richard
12:58:59 20   Branson, the founder of Net-- you know, I think it's
12:59:05 21   Netflix.  Yeah, the founder of Netflix, you know the
12:59:09 22   former secretary of agriculture, the former chief
12:59:13 23   operating officer of General Electric.  You know a
12:59:16 24   host of interesting people were already there.  But
12:59:19 25   Kobe was a -- he was a big deal and a really big deal
```

Page 98

```
12:59:23  1   for China at the time.  So it was a huge coup that
12:59:31  2   ultimately, yeah.  So any ways, yeah, it was a big
12:59:34  3   deal.
12:59:34  4        Q.   And just from that point did you guys
12:59:41  5   write down anywhere this notion that if you brought
12:59:47  6   Kobe Bryant to a fund-raising event then they would
12:59:52  7   be the full $150 million would be raised within five
12:59:57  8   or six months?
12:59:57  9        A.   No.  I didn't -- I didn't ask to change
13:00:00 10   the loan docs based on getting Kobe.  You know, I
13:00:04 11   asked -- you know I did discuss the fact that it was
13:00:09 12   going to cost $250,000 or the home site.  So Tang was
13:00:13 13   well familiar with the costs incurred to be able to
13:00:16 14   do it.
13:00:19 15        Q.   We can put this exhibit aside.  So
13:00:23 16   sometime in August 2015 you began to negotiate a
13:00:29 17   letter of intent with Mr. Tang, right?
13:00:32 18        A.   I mean we negotiated off -- we negotiated
13:00:39 19   them augmenting AIG initially.  And then I
13:00:44 20   facilitated an introduction between him and AIG
13:00:49 21   pursuant to the prior conversation where I asked AIG
13:00:53 22   if I could introduce people -- get -- you know, get
13:00:58 23   people that were -- people that I didn't go with or
13:01:00 24   that I was recommended to go with to chat with them
13:01:03 25   about augmenting.  So that was the initial.  I can't
```

Page 99

```
13:01:07  1   remember if there was a -- I don't think there was an
13:01:09  2   LOI at that phase.  So I don't think there was an LOI
13:01:14  3   or term sheet until after he had determined whether
13:01:19  4   AIG would be willing to work with him.  Otherwise it
13:01:22  5   was a moot point because we had signed an exclusivity
13:01:25  6   with AIG.
13:01:26  7        Q.   And do you recall if you used AIG
13:01:36  8   documents as kind of a baseline to draft the letter
13:01:39  9   of intent with KT Capital?
13:01:43 10        A.   I don't recall the specifics.  I'd have to
13:01:50 11   refresh off looking at materials.
13:01:53 12        Q.   Okay.  Can we mark tab 1?  That's going to
13:01:59 13   be Exhibit 3, please.
13:02:01 14             (EXHIBIT NUMBER 3 WAS MARKED.)
13:02:04 15             MR. ITKIN:  I'm going to give you Bates,
13:02:06 16   Spencer.
13:02:07 17             MR. YOUNG:  Thank you.
13:02:09 18             MR. ITKIN:  The Bates of Exhibit 3 are
13:02:10 19   SMHG165262 to SMHG165314.
13:02:28 20             THE WITNESS:  Can you zoom in on this,
13:02:30 21   please?
13:02:30 22        Q.   (BY MR. ITKIN)  Do you recall this
13:02:35 23   correspondence, Mr. Mauro, that's marked as
13:02:40 24   Exhibit 3?
13:02:42 25        A.   Okay.  September 3rd.  Keep going down.
```

Page 100

```
13:03:23  1   Okay.
13:03:24  2        Q.   And there's a letter of intent attached to
13:03:28  3   this correspondence.
13:03:29  4        A.   Yes.  Can I see it?
13:03:30  5        Q.   Yeah, absolutely.  But I think you just
13:03:33  6   have to instruct the videographer on what you want to
13:03:36  7   see.
13:03:50  8        A.   Yeah, the attached thing from Tang.
13:03:57  9             VIDEOGRAPHER:  So, Uri, which document
13:03:59 10   would be the attachment?
13:04:00 11             THE WITNESS:  If you'd scroll down to page
13:04:02 12   5 of the document.
13:04:02 13             VIDEOGRAPHER:  Okay.  Thank you.
13:04:04 14             MR. ITKIN:  And you can zoom out a little
13:04:05 15   bit.  At least for me it's very -- very close.  But
13:04:10 16   Mr. Mauro can instruct you more.
13:04:16 17             MR. YOUNG:  And when it's convenient, can
13:04:17 18   I get the Bates number of the attachment?
13:04:20 19             MR. ITKIN:  It's all one document.  So the
13:04:22 20   Bates number I gave you is the e-mail and the
13:04:24 21   attachment.
13:04:25 22             MR. YOUNG:  Okay.
13:04:38 23             THE WITNESS:  Okay.  Can you scroll down?
13:04:59 24   Okay, keep going down.  Okay, keep going down.
13:05:26 25        Q.   (BY MR. ITKIN)  Mr. Mauro, you can keep
```

25 (Pages 97 to 100)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 101

```
13:05:29  1   reading as much as you want.  I want to ask you a
13:05:32  2   couple of questions.
13:05:32  3        A.  Okay, go ahead.
13:05:33  4        Q.  I'm going to represent to you that this is
13:05:35  5   one of the iterations of the letter of intent that
13:05:42  6   you had exchanged with KT Capital.
13:05:45  7        A.  Okay.
13:05:45  8        Q.  Now, I want to start on the first page.
13:05:48  9        A.  Uh-huh.
13:05:49 10        Q.  On the second paragraph, starting with --
13:05:54 11   sorry, the first page of the attachment, Jason.  So
13:05:56 12   just go back to page 5.  We're going to focus on this
13:06:00 13   attachment.  Scroll down the page.  You don't need to
13:06:04 14   zoom in.  I want to talk about the second paragraph
13:06:07 15   for a second.
13:06:09 16             And there is -- as you can see in that
13:06:13 17   second paragraph, first sentence, it talks about an
13:06:17 18   exclusivity period --
13:06:18 19        A.  Uh-huh.
13:06:19 20        Q.  With KT Capital?
13:06:21 21        A.  Uh-huh.
13:06:21 22        Q.  Do you see that?
13:06:22 23        A.  Yeah.  With the exception of the existing
13:06:26 24   ongoing relationship with AIG.
13:06:29 25        Q.  Yeah.  And so do you understand what that
```

Page 102

```
13:06:31  1   means?
13:06:32  2        A.  Yes.
13:06:32  3        Q.  What does that mean?
13:06:34  4        A.  It means that we would -- with the
13:06:42  5   exception of AIG we would have exclusive negotiations
13:06:49  6   with KT Capital to attempt to long form what's here
13:07:00  7   and to determine how we would partner with AIG if AIG
13:07:04  8   is willing to partner.
13:07:06  9        Q.  In other words you could be working --
13:07:10 10   under this language you could be working with KT
13:07:13 11   Capital and AIG at the same time, right?
13:07:15 12        A.  Yes.
13:07:15 13        Q.  Okay.  Now, let's go to page 7 of the
13:07:26 14   document.  There we go.  So there's a red lined
13:07:32 15   paragraph there.  Do you see that's actually black
13:07:35 16   lined.  It's not in color.  It starts with "In the
13:07:41 17   event..."
13:07:43 18             Do you see that language?
13:07:45 19        A.  Yeah, I do.
13:07:51 20        Q.  Can you please read that language into the
13:07:53 21   record again just so we're all on the same page about
13:07:56 22   what we're talking about.  Slowly please.
13:07:59 23        A.  "In the event there is any shortfall in
13:08:02 24   the funding of the development costs due to the
13:08:05 25   timing or availability of sponsor equity, the sponsor
```

Page 103

```
13:08:09  1   will contribute or cause to contribute the equivalent
13:08:12  2   amount in cash contribution to make up for such
13:08:15  3   shortfall."
13:08:16  4        Q.  And is that language in your recollection,
13:08:20  5   Mr. Mauro, something that Mr. Tang added to this LOI?
13:08:26  6        A.  I don't recall.
13:08:31  7        Q.  Well, the black line on this document,
13:08:34  8   since there was a version signed by Mr. Tang, does
13:08:38  9   that refresh your recollection whether this was
13:08:40 10   something that he added?
13:08:41 11        A.  Again I don't -- it's not refreshing my
13:08:44 12   memory.  I'm familiar with this phrase.  It's
13:08:48 13   obviously the phrase of focus for us historically,
13:08:52 14   you know, in making sure that as -- that the -- as
13:09:00 15   you break down that phrase that it's very clear that
13:09:04 16   it's -- this is draw based, this is balance based,
13:09:07 17   and phase based.
13:09:09 18        Q.  Okay.  So let's unpack that a little bit.
13:09:13 19   What does this phrase mean?
13:09:19 20        A.  So in the event that there's a shortfall
13:09:23 21   in funding the development cost due to the timing or
13:09:28 22   availability of sponsor," so to me that means as you
13:09:35 23   have -- you have development costs that are
13:09:36 24   associated with a draw that has an equity and debt
13:09:41 25   component that has to be in balance.  And if the ---
```

Page 104

```
13:09:46  1   if the equity side becomes out of balance because
13:09:51  2   there is a shortfall relative to the sponsor equity,
13:10:01  3   then there is a requirement for the sponsor to cause
13:10:08  4   to contribute or to contribute the amount to complete
13:10:12  5   that shortfall.  So it is definitively not that these
13:10:18  6   guys can fund $10 million and say:  Look, I've given
13:10:22  7   you $10 million.  Go put 80 million in now because of
13:10:26  8   this paragraph.  That is ludicrous and preposterous.
13:10:31  9   So I'm not sure if you're alluding to that, but happy
13:10:34 10   to go there if that's what you're getting at.
13:10:36 11             So it's a short fall based on the way that
13:10:39 12   the loan is constructed to be executed and drawn down
13:10:44 13   and practiced and utilized.
13:10:46 14        Q.  And the sponsor in this instance is Summit
13:10:55 15   Mountain Holding Group?
13:10:56 16        A.  I haven't seen where it's defined things.
13:10:58 17   It's either the village or it's within the -- I'm not
13:11:02 18   disputing that SMHG again has bad boy carve-outs and
13:11:07 19   short-fall guarantees relative to keeping the loan in
13:11:09 20   balance and completions of individual specific
13:11:13 21   improvements.  That's not one -- but that might have
13:11:20 22   been achieved through a separate document.  So you'd
13:11:22 23   have to go to the defined term here.
13:11:25 24        Q.  Okay.  So let's just go up a page.  So on
13:11:28 25   page 6 of the PDF, the prior page, let's just take it
```

26  (Pages 101 to 104)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

### Page 105

13:11:34  1  step by step.
13:11:35  2       If you just go up, Jason, to the prior
13:11:38  3  page. Just go up. Oh, sorry, go down, go down a
13:11:44  4  little bit.
13:11:44  5       Do you see the word sponsor --
13:11:46  6  A. Yes.
13:11:46  7  Q. -- Mr. Mauro?
13:11:47  8  A. Yes.
13:11:48  9  Q. Who is the sponsor here?
13:11:50 10  A. Summit Mountain Holding Group.
13:11:53 11  Q. Okay. Under this LOI, Exhibit 3, that's
13:11:58 12  Summit Mountain Holding Group?
13:11:59 13  A. Yeah.
13:11:59 14  Q. And then let's go down just a little bit,
13:12:02 15  Jason, so there's an overlap between two and three so
13:12:05 16  we can see the development cost paragraph. And then
13:12:08 17  Exhibit 3 also has a development costs on it, right,
13:12:13 18  Mr. Mauro?
13:12:14 19  A. Yes.
13:12:15 20  Q. And what -- how are the development costs
13:12:19 21  defined here?
13:12:20 22  A. Hard costs of 553 million, soft costs 50
13:12:29 23  million, financing costs of 27 million, and
13:12:32 24  contributed property of 29 million.
13:12:35 25  Q. And what's the total development costs

### Page 106

13:12:37  1  defined in Exhibit 3?
13:12:38  2  A. 261 million.
13:12:41  3  Q. Okay. So then let's go to the paragraph
13:12:44  4  we were just looking at before. And equipped with
13:12:48  5  those -- I'm sorry, there's one more definition that
13:12:55  6  we need to look at. If you'd just go down a little
13:13:08  7  bit. So then it talks about sponsor equity. Do you
13:13:11  8  see that, Mr. Mauro?
13:13:16  9  A. Correct, yeah.
13:13:17 10  Q. And what does sponsor equity mean or how
13:13:24 11  is it defined in Exhibit 3?
13:13:26 12  A. Can you expand, please? Go up a tiny bit
13:13:36 13  too. The other way. Okay. So you want me to take
13:13:54 14  you through the sponsor equity?
13:13:56 15  Q. Let me just ask you a question. What's
13:13:58 16  the total sponsor equity set forth in Exhibit 3?
13:14:01 17  A. 92 million the land value contributed.
13:14:10 18  The TIF --
13:14:11 19  Q. Why don't we take that apart?
13:14:11 20  A. Okay.
13:14:14 21  Q. I was going to ask -- I'm sorry. I'm not
13:14:16 22  trying to interrupt you. You answered my question,
13:14:19 23  but go ahead.
13:14:20 24  A. Yeah, so I mean it's what we approach the
13:14:23 25  market with. Which is, hey, all we've got is land.

### Page 107

13:14:28  1  We've got TIF tax proceeds built in from the county.
13:14:32  2  So once it's built we're going to have taxes that get
13:14:36  3  generated from the built product. And once we build
13:14:39  4  product, we can -- as we actually even -- before we
13:14:43  5  even go into construction but obviously as we sell
13:14:46  6  through we'll have nonrefundable deposits based on
13:14:50  7  how law works in Utah plus obviously eventual
13:14:54  8  purchases. So you can see the whopping cash equity
13:14:58  9  here is 4.4 million.
13:15:00 10       So, yeah, so you see the nature of our
13:15:06 11  project, which is reflecting the fact that we did --
13:15:13 12  you know, that we are as I described a founding
13:15:16 13  member based, i.e. member based financed project with
13:15:23 14  county bond. So with sales proceeds being our
13:15:27 15  primary basis of contribution of cash equity.
13:15:31 16  Q. And so just to go back because I wanted to
13:15:34 17  ask my question. So the total sponsor equity
13:15:37 18  described in Exhibit 3 is $92 and a half million,
13:15:42 19  right?
13:15:43 20  A. Correct. Yes. $92 and a half million.
13:15:46 21  So, yeah, 16.679 in tax increment financing, which
13:15:51 22  references back to the approved tax increment
13:15:54 23  financing agreement that we executed with the Weber
13:15:57 24  County, which is obviously based on assessing taxes
13:16:00 25  on built product that has a tax base once you

### Page 108

13:16:05  1  actually build it and have a certificate of
13:16:08  2  occupancy. That 16.67 is I think we estimated 72
13:16:15  3  million in total taxing financing as we built out the
13:16:20  4  project. And so this project, I think we reduced
13:16:23  5  this number down to 14, if I recall later, as we
13:16:29  6  refined this. Also as we brought in other collateral
13:16:33  7  and expanded the project from just -- this was
13:16:38  8  originally when we were just going to do the village,
13:16:41  9  and that was going to be the only collateral. We
13:16:43 10  actually brought in a lot more collateral to the
13:16:45 11  table as we -- from here to, you know, what we went
13:16:52 12  to market with.
13:16:55 13  Q. Understood. And the total $92 and a half
13:17:01 14  million sponsor equity consisted of number of sources
13:17:05 15  defined in this paragraph that you were alluding to
13:17:08 16  in Exhibit 30, right?
13:17:09 17  A. I'm sorry, say that again.
13:17:12 18  Q. And just to go back to my question,
13:17:15 19  because I don't want to keep -- on the questions that
13:17:18 20  I was asking. I don't want to go off on tangents at
13:17:22 21  the moment. The total amount of sponsor equity of 92
13:17:25 22  and a half million dollars would come or comprise
13:17:30 23  sources described in the paragraph you were just
13:17:35 24  alluding to in Exhibit 3, right?
13:17:37 25  A. The sources of -- I'm sorry, one more

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

---

Page 109

13:17:44  1    time.
13:17:44  2        Q.    The paragraph that you were just alluding
13:17:49  3    to with the TIF and the cash and the land all of that
13:17:52  4    stuff, those are all sources that would comprise the
13:17:56  5    sponsor equity of 92 and a half million, right?
13:17:59  6        A.    Correct.  Tang understood intimately that
13:18:03  7    the only sources of equity we had were land, TIF, and
13:18:11  8    pre-sales essentially.  And that is the nature of the
13:18:14  9    beast.  We just bought the mountain for 40 million
13:18:17 10    and spent most of the money we raised on buying the
13:18:20 11    mountain and on the infrastructure to get to this
13:18:25 12    land so it could have the value, the as-built value
13:18:29 13    that we described.  So, correct, you know, to -- so
13:18:39 14    it certainly --
13:18:39 15        Q.    And Mr. Mauro --
13:18:40 16        A.    Yeah.
13:18:41 17        Q.    -- you asked me off the record how long I
13:18:43 18    expect to go on this deposition.  If you answer my
13:18:45 19    questions --
13:18:45 20        A.    Yeah.
13:18:46 21        Q.    I think we're going to go much shorter.
13:18:47 22    But if you go off on explanations, which you're
13:18:50 23    welcome to do, we're going to go for longer and
13:18:54 24    potentially need to run over.  That's what I'm trying
13:18:57 25    to tell you.

---

Page 110

13:18:57  1        A.    That's fine.
13:18:58  2        Q.    Okay.  So then if we go back to the
13:19:02  3    paragraph that we were talking about, which is the
13:19:05  4    paragraph starting with "In the event there's any
13:19:08  5    shortfall..."  Since we just looked all defined
13:19:18  6    terms, development costs is $261 million, right, in
13:19:18  7    that paragraph?
13:19:21  8        A.    Correct.
13:19:23  9        Q.    And sponsor equity is $92 and a half
13:19:26 10    million, right?
13:19:27 11        A.    Correct.  Over 2X what we purchased the
13:19:31 12    mountain for, correct.
13:19:31 13        Q.    And so if there's any shortfall on the
13:19:34 14    funding of $261 million of development costs due to
13:19:38 15    the timing or availability of $92 and a half million
13:19:41 16    of sponsor equity, the sponsor will contribute or
13:19:45 17    cause to contribute the equivalent amount in cash
13:19:48 18    contribution to make up for the shortfall, right?
13:19:51 19        A.    Again, it's a village.  A village is
13:19:55 20    buildings.  As you go through and do a building and
13:19:59 21    pull down the loan for the building, you better --
13:20:03 22    you have an obligation as the sponsor guaranty to
13:20:06 23    make sure that building gets finished and that the --
13:20:10 24    as you draw down that the loan is in balance, okay.
13:20:13 25    This is specifically in relation to, you know, as

---

Page 111

13:20:19  1    you -- as you allocate development costs to the
13:20:22  2    phase-based development of the individual projects,
13:20:25  3    if you have a -- if you have a timing availability
13:20:30  4    shortfall then the sponsor needs to -- needs to
13:20:33  5    address that issue, okay?  We're not disputing that.
13:20:38  6    You're trying to say that in this paragraph I said I
13:20:42  7    can come up with 92 million or, you know, you put in
13:20:47  8    ten and, oh, Greg, we're not going to get you more
13:20:51  9    money.  Send in the 82, please, because we've done a
13:20:54 10    lot of diligence to determine that you have the
13:20:56 11    ability to get 82 million in equity.  Like where
13:20:59 12    would -- where does this 92 million come from in
13:21:05 13    cash?  How would that be possible on this or any
13:21:08 14    other planet, You know?  It's not because it was
13:21:11 15    never contemplated.
13:21:13 16        Q.    So was my characterization of that
13:21:15 17    language correct?
13:21:16 18        A.    Why you -- characterize it again if you
13:21:22 19    don't mind.
13:21:23 20        MR. ITKIN:  Tammy, do you mind reading my
13:21:24 21    question back, please?
13:19:32 22        THE REPORTER:  "And so if there's any
13:19:33 23    shortfall on the funding of $261 million of
13:19:36 24    development costs due to the timing or availability
13:19:39 25    of $92 and a half million of sponsor equity, the

---

Page 112

13:19:43  1    sponsor will contribute or cause to contribute the
13:19:46  2    equivalent amount in cash contribution to make up for
13:19:49  3    the shortfall, right?"
13:22:05  4        THE WITNESS:  Again I still don't
13:22:07  5    understand the question.  She just read it, but what
13:22:09  6    are you asking about that paragraph?
13:22:12  7        Q.    (BY MR. ITKIN)  I'm just -- well, you
13:22:13  8    asked me to look at the defined terms, and I'm just
13:22:16  9    including the defined terms as we're reading that
13:22:20 10    language.  I think I established the development
13:22:22 11    costs are defined as a total of $261 million, and
13:22:26 12    then --
13:22:32 13        A.    The development costs are anticipated to
13:22:38 14    be funded as follows.  So notice costs and funded.
13:22:38 15    You know, there's not one funding.  This is not a one
13:22:43 16    slug, hey, here's -- I'm 92?  Oh, I need to do more?
13:22:48 17    Oh, okay.  I'll cover the 18.  I mean basically if
13:22:52 18    you're reading the way you're reading it that it's a
13:22:54 19    one-time transaction for the totality of it, and you
13:22:59 20    could remove loan size or eliminate the special
13:23:05 21    bonds.  But we have to come up with not just
13:23:08 22    presumably the 92 but even more.  Because you're
13:23:11 23    tying this to the 261.  So you're saying I have to
13:23:15 24    potentially go even above the 92 in that construct if
13:23:20 25    you're tying it to the 261.  Like the point is it's
13:23:24 25    in -- these are in balance, and they have to stay in

---

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

### Page 113

```
13:23:29  1   balance as it's drawn down.  That's how I understand
13:23:31  2   that paragraph.  That's why it's development costs.
13:23:36  3       Q.  I understand.  I think earlier you agreed
13:23:38  4   with me that the total amount of development costs on
13:23:42  5   Exhibit 3 is $261 million, right?
13:23:44  6       A.  That's the anticipated total cost to be
13:23:46  7   funded, yes.
13:23:47  8       Q.  Yep.  All right.  And the total amount of
13:23:51  9   sponsor equity was $92 million, right, 92 and a half?
13:23:56 10       A.  Yes.  But again it consisted of multiple
13:23:59 11   elements, including TIF that we had I think three
13:24:03 12   years from completion of construction of the vertical
13:24:06 13   buildings.
13:24:07 14       Q.  Mr. Mauro --
13:24:08 15       A.  -- to --
13:24:09 16       Q.  -- you're going off on a tangent again.  I
13:24:12 17   asked you a yes-or-no question.  You're welcome to do
13:24:12 18   it, but I'm just trying to get through this.  You're
13:24:15 19   welcome to complete your answer if you'd like.  I'm
13:24:16 20   just asking a very simple question.  I'm inputting
13:24:20 21   the defined terms into this language so there's
13:24:22 22   context, as you asked me to do.  So what I'm saying
13:24:26 23   is do you agree with my reading of the language with
13:24:29 24   the defined terms to say:  "In the event there's any
13:24:32 25   shortfall in the funding of $260 million,
```

### Page 114

```
13:24:37  1   $261 million of development costs due to the timing
13:24:41  2   or availability of $92 and a half million of sponsor
13:24:46  3   equity, the sponsor will contribute or cause to
13:24:50  4   contribute the equivalent amount in cash contribution
13:24:54  5   to make up for such shortfall"?
13:24:57  6       A.  No, I do not.
13:24:58  7       Q.  Okay.
13:24:59  8       A.  There's no obligation of the lender to put
13:25:01  9   in the full 150 million.  It's a phase-based
13:25:05 10   development, okay.  So the reason it doesn't
13:25:08 11   specifically call out those numbers in that paragraph
13:25:10 12   is because it's entirely contemplated that they don't
13:25:13 13   fund the entire amount.  But what they do fund needs
13:25:16 14   to be funded in balance, debt and equity.  And if the
13:25:20 15   improvement that capital is -- that debt is drawn
13:25:24 16   down to do isn't done and there's a shortfall
13:25:28 17   relative to that unimproved project, okay, that has
13:25:33 18   to be completed by the guaranty.  That's what this
13:25:36 19   means.  That's how I read it, okay?  It's not meant
13:25:39 20   to be read as a $92 million guaranty upon signing of
13:25:46 21   the loan or upon taking down $1 million that you have
13:25:50 22   to show up with 92 or -- or they could foreclose on
13:25:54 23   the land or worse than that, you know, call -- call
13:25:58 24   on the, you know, broader collateral guaranty.  So it
13:26:07 25   just -- I'm sorry, but you're asking me to read
```

### Page 115

```
13:26:09  1   something that I don't see.  You're inserting the
13:26:11  2   numbers in that paragraph, and I don't see it.  These
13:26:14  3   are anticipated development costs, which ended up
13:26:17  4   changing dramatically.
13:26:19  5       You know, they're always envisioned to
13:26:23  6   change as we develop through because it's multiple
13:26:25  7   buildings in this project.
13:26:26  8       MR. YOUNG:  I'm just going to lodge a
13:26:28  9   belated objection to the line of questioning that it
13:26:31 10   calls for a legal conclusion, the document speaks for
13:26:33 11   itself.
13:26:34 12       MR. ITKIN:  Well, we already established
13:26:35 13   that this witness is legally sophisticated to
13:26:38 14   evaluate RICO claims.  So I don't think asking him to
13:26:42 15   sign a -- or explain a letter of intent that he was
13:26:47 16   directly negotiating is too much of a stretch.
13:26:48 17       THE WITNESS:  Yeah, look, I mailed the
13:26:50 18   attorney general about my RICO claims here in Utah.
13:26:54 19   Because you can imagine that Weber County is not
13:26:55 20   excited about the lack of taxes they have from this
13:26:57 21   project.  So I'm very sophisticated on RICO and happy
13:27:01 22   to talk about it more.
13:27:02 23       Q.  (BY MR. ITKIN)  And, Mr. Mauro, this
13:27:06 24   language stayed in in the later verse versions of the
13:27:10 25   letter of intent, you agreed to it?
```

### Page 116

```
13:27:12  1       A.  You'll to show me the later versions.
13:27:14  2       Q.  Okay.
13:27:15  3       A.  I'm pretty sure this is the boilerplate,
13:27:19  4   that language, that when we particularly pressed Tang
13:27:23  5   on it, okay, and said:  Why does it need to be
13:27:26  6   described this way?  It's intentionally vague.  And
13:27:28  7   it's intentionally vague because they like this
13:27:32  8   language to be the way that they have it here.  And
13:27:35  9   the way it is in our eventual documents, it's
13:27:39 10   intentionally vague at their -- with their desire.
13:27:44 11   All along I have utilized legal counsel to make sure
13:27:48 12   that the long form documents that actually get to the
13:27:54 13   specifics of how this is determined reflect the fact
13:27:58 14   that it is based on the loan remaining in balance and
13:28:06 15   it's disbursement based and in balance.  So, you
13:28:10 16   know, I -- you can speculate.  Anyone can speculate
13:28:13 17   as to why did Tang need language that could be
13:28:18 18   intentionally vague.  I suspect it had to do with
13:28:20 19   marketability in China and that that, you know,
13:28:25 20   sounds better than the areas where it's more
13:28:29 21   accurate, you know, including his own e-mails going
13:28:32 22   into more detail of how it actually works.  But
13:28:36 23   that's a question probably for Tang.
13:28:39 24       Q.  (BY MR. ITKIN)  Correct.  And I'm going to
13:28:41 25   move to strike that answer as nonresponsive.  So
```

29  (Pages 113 to 116)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 117

13:28:44  1    let's move on.

13:28:45  2         So I think you just testified it was

13:28:48  3    accepted that the maximum amount of the EB-5 raise,

13:28:55  4    there was a possibility that it may not get raised,

13:28:59  5    right?

13:28:59  6         A.   I understood that there was a -- that

13:29:04  7    there was a possibility that they would not raise it

13:29:08  8    all.  They were not legally obligated to raise it

13:29:11  9    all.  But when they determined they couldn't raise

13:29:13 10    it, they would have to notify me so I could put them

13:29:16 11    in a second position and bring in -- and bring in the

13:29:22 12    capital needed to complete -- you know, to build out

13:29:24 13    the rest of are the remaining -- you know, of the

13:29:29 14    unpopulated pads in my village.

13:29:32 15         Q.   Now, let's put this aside.  Let's go to

13:29:42 16    tab 2, please, and mark that as Exhibit 4.

13:29:51 17              (EXHIBIT NUMBER 4 WAS MARKED.)

13:29:52 18         MR. ITKIN:  I'm going to tell you the

13:29:53 19    Bates numbers of that Exhibit 4 is SMHG001583 to

13:30:03 20    SMHG001601.

13:30:10 21         Q.   (BY MR. ITKIN)  Mr. Mauro, I'd like you to

13:30:12 22    take a look at Exhibit 4.  This appears to be the LOI

13:30:19 23    that you had signed and sent to KT Capital.  Do you

13:30:26 24    see that?

13:30:46 25         A.   Yeah, I see the -- I've read the full

## Page 118

13:30:51  1    e-mail, and it appears -- yeah, I haven't seen the

13:30:55  2    attached LOI, but I'm assuming that that's the signed

13:30:58  3    LOI.

13:30:59  4         Q.   I think that's fair.  Let me, just to

13:31:04  5    assuage any concerns, why don't we go to page 16 of

13:31:07  6    the PDF, Jason.

13:31:12  7              Mr. Mauro, do you see your signature

13:31:14  8    there?

13:31:14  9         A.   Yes.

13:31:14 10         Q.   Okay.  And you signed it on behalf of

13:31:24 11    Summit Mountain Holding Group as its chairman?

13:31:24 12         A.   Yes.

13:31:25 13         Q.   Do you see that?

13:31:25 14         A.   Yes.

13:31:25 15         Q.   Okay.  Let's go to page 3 of the PDF.  And

13:31:27 16    I just want to go to the second paragraph with the

13:31:34 17    exclusivity provision.

13:31:36 18              Do you see that second paragraph in, Mr.

13:31:38 19    Mauro, Exhibit 4?

13:31:39 20         A.   Yes.

13:31:39 21         Q.   And do you see the exclusivity provision

13:31:41 22    is the same as it was in the draft, the Exhibit 3

13:31:44 23    that we looked at just a few moments ago?

13:31:46 24         A.   Yes.

13:31:47 25         Q.   In other words there was an exclusivity

## Page 119

13:31:52  1    with KT Capital to negotiate the EB-5 financing rates

13:32:01  2    but you could still be -- it included AIG, right?

13:32:02  3         A.   I wouldn't characterize it that way.

13:32:06  4    This -- this -- it carves out AIG because the

13:32:10  5    intention was for -- for Tang and KT Capital to

13:32:15  6    explore augmentation, co-lead of the -- of the -- you

13:32:20  7    know of the raise that we were at that time current

13:32:26  8    exclusively with AIG.  So it was meant to and

13:32:29  9    ultimately was, you know, a collaboration.  Where

13:32:33 10    again per the thing you showed me earlier, you know,

13:32:36 11    they ultimately elected to, you know, just get paid

13:32:40 12    for doing nothing.

13:32:41 13         Q.   I think we're saying the same thing, but

13:32:46 14    you may have misunderstood the question.  Are you

13:32:48 15    looking to tell me -- Mr. Mauro, I feel like I don't

13:32:52 16    have your full attention.

13:32:53 17         A.   No, you do.

13:32:54 18         Q.   Okay.  What I was saying is the

13:32:57 19    exclusivity provision excludes AIG, meaning that --

13:33:01 20    or carves out AIG meaning that you could be

13:33:03 21    negotiating both with AIG and KT Capital at the same

13:33:07 22    time, right?

13:33:07 23         A.   No.  That's not.  That's not accurate.

13:33:12 24    Like I said, the intent here was to acknowledge that

13:33:15 25    I have an existing agreement with AIG that I intend

## Page 120

13:33:18  1    to honor, okay, that I was offering up people that I

13:33:21  2    felt could augment their efforts.  And so this is

13:33:25  3    providing that I work with KT Capital exclusively in

13:33:31  4    that augmentation role to attempt to long form an

13:33:36  5    agreement where they could work alongside AIG.  I

13:33:42  6    don't know if the timing of this was after he had

13:33:45  7    already gotten AIG to agree to do nothing.  I don't

13:33:52  8    think so.  I think it took a little bit longer.  I

13:33:55  9    think initially they were talking about -- if my

13:33:58 10    recollection serves, there were several weeks if not

13:34:00 11    over a month where AIG, you know, wanted to raise

13:34:04 12    alongside Tang, and so -- but I'd have to look at the

13:34:14 13    documents on that.

13:34:14 14         Q.   So this exclusiv--

13:34:15 15         A.   So --

13:34:17 16         Q.   I'm sorry, go ahead.

13:34:18 17         A.   Oh, just that -- yeah.  So I didn't have

13:34:22 18    nothing more to add.

13:34:23 19         Q.   So this exclusivity provision, just maybe

13:34:27 20    to put a bookend on this one, is the exact same one

13:34:30 21    we looked at on Exhibit 3, right?

13:34:32 22         A.   No.  Because this one contemplates KT

13:34:36 23    Capital augmenting AIG.

13:34:38 24         Q.   But the language is the same, isn't it?

13:34:40 25         A.   With the exception of acknowledging that

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

---

Page 121

13:34:49  1   there's an existing agreement with AIG and that the
13:34:53  2   specific context here is to augment AIG.  Otherwise
13:34:58  3   the language of the exclusivity is fairly standard
13:35:04  4   LOI exclusivity language.  I don't know if it's taken
13:35:09  5   from a AIG document or germane to KT --
13:35:14  6       Q.  Mr. Mauro, I think you're
13:35:17  7   misunderstanding.  Exhibit 3 is the draft LOI that we
13:35:20  8   just looked at a few moments ago with KT Capital, not
13:35:23  9   AIG.  I'm not comparing this with the AIG term sheet.
13:35:26 10   I'm comparing this with the draft LOI that we just
13:35:31 11   looked at literally, you know, three minutes ago.  So
13:35:35 12   I'm saying this exclusivity provision and the KT
13:35:40 13   Capital LOI did not change from the draft that we
13:35:41 14   looked at in Exhibit 3 to the one you signed here in
13:35:45 15   Exhibit 4.
13:35:48 16       A.  If you're asking -- you're asking just
13:35:50 17   about the first part of paragraph 2 --
13:35:52 18       Q.  Yeah.
13:35:52 19       A.  -- or the entire thing?
13:35:54 20       Q.  Yeah.
13:35:55 21       A.  Yeah.  No, the first part of paragraph 2
13:35:57 22   appears to have the carve-out for AIG to -- you know,
13:36:02 23   acknowledging that they are the -- you have the
13:36:06 24   existing exclusivity.
13:36:08 25       Q.  Yeah.  Which means that you had the

Page 122

13:36:09  1   opportunity to work both with AIG and KT Capital
13:36:14  2   together, right?  This LOI did not exclude your
13:36:20  3   ability to work with AIG, right?
13:36:25  4       MR. YOUNG:  The document speaks for
13:36:27  5   itself.  Go ahead and answer.
13:36:28  6       THE WITNESS:  Yeah, I don't know what
13:36:28  7   you're getting at, and what -- I think the one point
13:36:32  8   you're maybe misconstruing is that this document
13:36:37  9   would allow KT Capital to work with AIG if AIG
13:36:42 10   allowed -- allowed so, right?  And the carve-out here
13:36:47 11   acknowledges the fact that AIG is the -- ultimately
13:36:51 12   has the ability to call the shots.  Because if you
13:36:53 13   look at the AIG agreement itself, it has exclusivity
13:36:57 14   that they would need to waive or consent to in
13:37:00 15   writing relative to an ultimate collaboration with
13:37:05 16   KT, which is what ultimately took place.
13:37:08 17       Q.  Well, I understand that.  But this is --
13:37:09 18   what you're describing is a three-party relationship.
13:37:13 19   It's you on one hand, KT Capital on the other, and
13:37:16 20   AIG as well.  Right?  So all three of you could work
13:37:19 21   together under this LOI, correct?
13:37:21 22       A.  No.  I couldn't work under this LOI.  I
13:37:26 23   couldn't long form this LOI and work with KT Capital
13:37:31 24   without the final underlying consent of AIG, and they
13:37:36 25   knew that and I knew that.

Page 123

13:37:36  1       Q.  Okay.
13:37:39  2       A.  Or KT knew that, and I knew that.  So if
13:37:41  3   that's what you're saying, then yes.  If you're
13:37:44  4   saying I could have worked with KT, you know,
13:37:48  5   alongside AIG as two independent streams and play
13:37:52  6   them off each other and go with KT and not AIG, no, I
13:37:57  7   didn't have that luxury.  I already signed up with
13:37:59  8   AIG.  That's why I brought KT to AIG to collaborate,
13:38:08  9   if that helps.
13:38:09 10       Q.  Okay.  Let's go to page 5 of the PDF.  And
13:38:20 11   so do you see right in the middle of that page
13:38:24 12   there's "In the event there's any shortfall"
13:38:26 13   language?  Do you see that?
13:38:37 14       A.  Yeah, I'm sorry, which --
13:38:29 15       Q.  That we discussed before.  And that's in
13:38:31 16   the -- it's in Exhibit 4, which is an LOI that you
13:38:36 17   signed, right?
13:38:37 18       A.  So this is the -- why was it underlined in
13:38:41 19   the last one and in this one it's not?
13:38:44 20       Q.  Because this is the final, Mr. Mauro.  We
13:38:47 21   looked at a draft, and now we're looking at the
13:38:49 22   final.  So I'm just confirming that the same language
13:38:51 23   that was added in the draft was accepted in the
13:38:53 24   final.
13:38:54 25       A.  Yes.

Page 124

13:38:54  1       Q.  Okay.  Now, there's one other thing I
13:39:07  2   wanted to ask you.  Can we just go back to page 3?
13:39:13  3       Do you understand, Mr. Mauro, that this
13:39:17  4   was a nonbinding letter of intent?
13:39:28  5       MR. YOUNG:  Calls for a legal conclusion.
13:39:32  6       THE WITNESS:  Yeah.  It's in the second
13:39:36  7   sentence -- the second sentence there, nonbinding.
13:39:39  8   Yeah.
13:39:39  9       Q.  (BY MR. ITKIN)  And do you understand what
13:39:41 10   that means?
13:39:42 11       A.  Yeah.
13:39:43 12       Q.  What does that mean?
13:39:44 13       A.  It means it's not -- it's the parties'
13:39:47 14   intent, but it's not binding the parties at this
13:39:50 15   point.
13:39:50 16       Q.  Like if you decided to walk away and you
13:39:53 17   didn't like what terms that KT Capital was giving
13:39:58 18   you, you could have walked away, right?
13:40:00 19       A.  That's how I read it, yes.  I don't know
13:40:20 20   if there's some paragraph later that has binding, you
13:40:07 21   know, carve-outs.  Sometimes you have a nonbinding
13:40:11 22   agreement with binding provisions on confidentiality
13:40:14 23   and sometimes on more.  But I don't think that's the
13:40:21 24   case here.
13:40:21 25       Q.  Okay.  We can put that exhibit aside.  So

31 (Pages 121 to 124)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 125

13:40:23  1    after the letter of intent you negotiated the private
13:40:38  2    placement memorandum or PPM for the EB-5 raise with
13:40:39  3    KT Capital, right?
13:40:39  4         A.   We developed one, yes.
13:40:41  5         Q.   And that was something that you used, your
13:40:47  6    prior PPM with AIG for, right?
13:40:55  7         A.   I mean there were elements of the AIG PPM,
13:41:00  8    yes.  But as I mentioned before the AIG PPM was
13:41:05  9    specifically for the four-acre village project.  And
13:41:08 10    what we ultimately did here was incorporate the
13:41:14 11    horizon project and its collateral, the townhomes and
13:41:20 12    its collateral, the end of Spring Park and its
13:41:21 13    collateral.  So we added a broader set of collateral
13:41:25 14    pieces that also helped generate more jobs and such.
13:41:32 15         Q.   Okay.  So let's take a look at tab number
13:41:37 16    5, which we're going to mark as Exhibit 5.  That's a
13:41:41 17    happy coincidence that's going to help us keep track
13:41:45 18    of the different exhibits.  And the Bates number for
13:41:49 19    Exhibit 5 is SMHG004488 to -- a long document --
13:41:58 20    SMHG004658, okay.
13:41:47 21         (EXHIBIT NUMBER 5 WAS MARKED.)
13:41:48 22         Q.   (BY MR. ITKIN)  And if you look at the top
13:42:08 23    of the first page, Mr. Mauro, that you see on the
13:42:11 24    screen, that's an e-mail from KT Capital to you with
13:42:16 25    a version of a PPM that appears to be redlined from

Page 126

13:42:22  1    the version KT Capital got from AIG, right?
13:42:27  2         A.   Yeah.  I think this is before we did
13:42:31  3    the -- the separation, you know, where we augmented
13:42:35  4    the village with other collateral.  But -- if we're
13:42:42  5    still talking in September.  But I think but I'm not
13:42:46  6    positive.
13:42:46  7         Q.   That's okay.  We can make that
13:42:49  8    clarification if you need.  But I don't think it's
13:42:51  9    necessary for my questions.
13:42:52 10         A.   Yeah.
13:42:53 11         Q.   What was the purpose of the PPM that you
13:42:57 12    were working on?
13:42:58 13         A.   If it's the PPM, I believe that's the
13:43:03 14    marketing piece for underlying EB-5 investors in
13:43:08 15    China.  So you can see we're collaborating obviously
13:43:12 16    with AIG.  AIG sent this directly to Tang, who
13:43:16 17    provided the redlines.
13:43:17 18         Q.   And just so I understand, this PPM was
13:43:23 19    going to be used to solicit potential EB-5 investors
13:43:30 20    in China, right?
13:43:31 21         A.   Yeah.  The final version, yes.
13:43:34 22         Q.   Correct, now I'm not saying this draft.
13:43:37 23    But this was working towards the PPM that would be
13:43:39 24    used to solicit Chinese investors for EB-5 purposes,
13:43:45 25    right?

Page 127

13:43:45  1         A.   That's my understanding.  I believe that's
13:43:46  2    what that document was called.
13:43:48  3         Q.   Okay.  And based on this redline that KT
13:43:53  4    Capital sent you, you saw the differences that KT
13:44:02  5    Capital -- or you saw the edits that KT Capital made
13:44:05  6    to this document over what AIG had in it, right?
13:44:09  7         A.   I may have.  You know, I would imagine.  I
13:44:16  8    don't recall for sure because I -- you know, I did
13:44:19  9    have assistance on the PPM as well.
13:44:22 10         Q.   Okay.  Just one thing I want to ask you
13:44:30 11    before we go down this document.  I think you said
13:44:34 12    you accept the fact that the EB-5 you were going to
13:44:39 13    use may not be in the amount of -- or any particular
13:44:44 14    amount, it's possible that it was going to be much
13:44:46 15    less than $150 million, right?
13:44:49 16         A.   Well, yeah.  It was possible that they
13:44:54 17    could fail, notify me of failure, and then I can move
13:44:57 18    them into a second position and bring in a first.
13:45:02 19         Q.   And when you're talking about bringing in
13:45:04 20    a first, you're talking about you would find
13:45:07 21    alternate sources of funding for the project you're
13:45:10 22    contemplating, right?
13:45:12 23         A.   Yeah.  And I could -- and specifically I
13:45:13 24    can move them from a first position on the collateral
13:45:16 25    to -- on the security interest to a second position.

Page 128

13:45:21  1         Q.   You could subordinate them?
13:45:23  2         A.   Yes.
13:45:23  3         Q.   So you would get more senior debt or
13:45:26  4    equity to the EB-5 financing?
13:45:29  5         A.   Yeah, more senior debt in this case since
13:45:33  6    it was purely debt.
13:45:34  7         Q.   You would get alternate sources of debt or
13:45:38  8    equity to provide for any shortfall if you needed to
13:45:42  9    complete construction and there wasn't enough EB-5
13:45:45 10    financing, right?
13:45:46 11         A.   No.  The -- well, there was -- there's a
13:45:51 12    broad based project here that anticipates using 150
13:45:55 13    million.  So if -- if I were notified that it wasn't
13:46:01 14    going to happen and there's two sources of raising,
13:46:03 15    right.  There's raising EB-55 funds.  And then
13:46:07 16    particularly as we got into 2018, 2019, 2020, there
13:46:12 17    was the opportunity to basically take prior raised
13:46:15 18    funds where the visas had yet to be issued and those
13:46:20 19    people needed to roll their loans.  They needed to
13:46:23 20    stay outstanding because they had yet to be fully
13:46:27 21    processed through the immigration department because
13:46:29 22    so many people went into the program out of China
13:46:33 23    that the wait times to actually process it extended
13:46:35 24    so far that people weren't getting their final visas
13:46:40 25    and they needed to keep their capital quote/unquote

32  (Pages 125 to 128)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 129

13:46:43   1    at risk in an EB-5 project.  And so the second area
13:46:46   2    there was, you know, that EB-5 lenders often had the
13:46:51   3    ability to move a prior loan that they'd done from
13:46:54   4    either a completed project or a busted project and
13:46:58   5    move it to a different project.  And that's -- that's
13:47:01   6    how we received almost half of the capital that we
13:47:05   7    ended up receiving was for one of those.  But we were
13:47:08   8    told often there were others in the works, but they
13:47:12   9    -- they never came to fruition.
13:47:17  10        So those are the two sources.  If -- if --
13:47:20  11    if we had known that neither of those were going to
13:47:24  12    come, then we would have taken other EB-5 capital or
13:47:29  13    non EB-5 capital to take a first position, move the
13:47:33  14    EB-5 loan into a second position, rate it, you know
13:47:38  15    move it specific -- either in second position on over
13:47:42  16    all or partition it relative to the specific projects
13:47:46  17    that it had funded.  In this case it had only really
13:47:49  18    funded horizontal.  So it makes sense to just be a
13:47:54  19    second position, but that's what we understood was
13:47:57  20    our ability with the loan if we were -- you know, if
13:48:05  21    we were given the -- you know to use a fighter pilot
13:48:11  22    term -- no joy.  That they're not going to pull it
13:48:14  23    off and fund the intended amount.
13:48:18  24        Q.   Right.  And so I just want to encapsulate
13:48:21  25    that all.  So if KT Capital couldn't raise or failed

## Page 130

13:48:27   1    to raise the EB-5 financing, you could turn to other
13:48:31   2    sources of funding to complete the project, and you
13:48:38   3    could subordinate the EB-5 financing, right?
13:48:41   4        A.   After notification from them that they
13:48:43   5    were not going to be able to do it, yes.
13:48:48   6        Q.   Okay.  Let's go to page 51 of this
13:48:55   7    document, of Exhibit 5.  It's actually page 80 of the
13:49:29   8    PDF.  Page 51 of the actual document itself.
13:49:41   9        Yeah, go to page 80, please.  Yep, there
13:49:44  10    we go.
13:49:46  11        Okay.  So if you look at -- do you see a
13:49:50  12    paragraph called "Developer Equity," Mr. Mauro?
13:49:52  13        A.   Is it the first paragraph?
13:49:53  14        Q.   Yeah.
13:49:56  15        A.   Yeah.  Can you expand it?
13:50:16  16        Q.   Do you see that, Mr. Mauro?
13:50:18  17        A.   Yep.
13:50:19  18        Q.   And that paragraph, since this is a
13:50:21  19    redline from the AIG version, you could see that
13:50:26  20    there's a sentence added at the end of that
13:50:30  21    paragraph.  Do you see that?
13:50:30  22        A.   Yes.
13:50:33  23        Q.   And that sentence starts with "In the
13:50:37  24    event there's any shortfall."  Do you see that?
13:50:39  25        A.   Yes.

## Page 131

13:50:40   1        Q.   And that sentence is the same language
13:50:44   2    that we reviewed earlier in the letter of intent that
13:50:48   3    you signed, right?
13:50:51   4        A.   It -- it appears to be the same language,
13:50:57   5    yes.
13:50:57   6        Q.   Now, Mr. Mauro, is this the language that
13:51:04   7    gave rise to the agreement that -- the guaranty
13:51:11   8    agreement that SMG signed with the defendants in this
13:51:17   9    case?
13:51:17  10        MR. YOUNG:  Vague.
13:51:18  11        THE WITNESS:  Sorry, I don't know what
13:51:19  12    you're asking.
13:51:20  13        Q.   (BY MR. ITKIN)  Do you know the guaranty
13:51:22  14    that's at issue in this case?
13:51:25  15        A.   The shortfall guaranty, is that --
13:51:32  16        Q.   Yes.
13:51:32  17        A.   I mean I'm aware of the basis of why we're
13:51:34  18    in a lawsuit.
13:51:35  19        Q.   But is this language that we're looking at
13:51:42  20    and that was added to the developer equity paragraph
13:51:44  21    in Exhibit 5, is that language the basis for the
13:51:49  22    shortfall guaranty, kind of the idea of that
13:51:53  23    language?
13:51:54  24        A.   No.  It was already -- it was already in
13:51:56  25    there.

## Page 132

13:52:00   1        Q.   I think my question, sorry, is a little
13:52:03   2    bit different.  You just alluded to the shortfall
13:52:06   3    guaranty that is the basis of this lawsuit, right?
13:52:08   4        A.   Yeah.  The -- the context that we would
13:52:13   5    have to do what is being called for here was already
13:52:19   6    called for in the AIG document, okay.  This just
13:52:23   7    reiterates it in one sentence that it is
13:52:29   8    intentionally vague and that the -- that the
13:52:35   9    Cottonwood guys, you know, wanted this intentional
13:52:39  10    vagueness, this.  So that's -- that's what you have
13:52:44  11    there.  You know let me ask you:  Do you think that
13:52:47  12    after buying a mountain for 40 million in reading
13:52:51  13    this I'm saying I can come up with $92 million, you
13:53:02  14    know, as opposed to draw down loans, contribute land,
13:53:08  15    build something, get tax proceeds from it, get
13:53:12  16    pre-sales and sell through.  And if I can't
13:53:13  17    finish a specific building then I have a shortfall.
13:53:18  18    So you're -- you're reading a single transaction
13:53:21  19    totality that doesn't -- that doesn't -- a commitment
13:53:26  20    that doesn't exist because it's meant to be what it's
13:53:30  21    described in the document when you look at the
13:53:31  22    document relative to how the actual loan is
13:53:34  23    structured and functions.
13:53:37  24        Q.   So I just want to be clear, the --
13:53:41  25        A.   I believe there's full paragraphs on the

33  (Pages 129 to 132)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 133

```
13:53:44   1    shortfall guaranty, so...
13:53:47   2          Q.   I just -- I understand.  I just want to
13:53:51   3    ask a question on this.  So the language that we're
13:53:55   4    talking about on the last sentence that was added to
13:53:57   5    the developer equity paragraph --
13:53:59   6          A.   Yes.
13:53:59   7          Q.   -- in Exhibit 5.  Do you see that?
13:54:01   8          A.   I see it.  And it captures the exact
13:54:05   9    concept that was in the AIG term sheet previously
13:54:08  10    before signing this one with Cottonwood.
13:54:11  11          Q.   Which is what, the completion guaranty?
13:54:14  12          A.   Which is, if you -- let's move back to the
13:54:18  13    AIG document, and I'll take you specifically through
13:54:20  14    it.
13:54:20  15          Q.   Well, what -- I don't want to go back to
13:54:22  16    that right now.  You just said the exact concept.  So
13:54:25  17    I want to understand what concept are you referring
13:54:28  18    to?
13:54:28  19          A.   Yeah, I forget the phrase.  But it had to
13:54:31  20    do with if -- if the improvement wasn't complete or a
13:54:36  21    partial.
13:54:37  22          Q.   The liquidated damages provision?
13:54:41  23          A.   Yeah, liquidated damages was followed up
13:54:43  24    on a concept that was addressed earlier on, which is
13:54:46  25    the fact that we're not without guarantees here but
```

Page 134

```
13:54:49   1    the guarantees are specific to the individual draws
13:54:57   2    and uses of those proceeds.  So if I draw to complete
13:55:01   3    a building and it -- and I appear to be in balance at
13:55:06   4    that point and then suddenly that building has cost
13:55:10   5    overruns and I don't have readily available equity
13:55:14   6    proceeds in the village LLC entity, in the borrowing
13:55:21   7    entity, then the holding company needs to address
13:55:23   8    that shortfall.  But that shortfall is for what the
13:55:27   9    capital has specifically been drawn down to improve.
13:55:31  10    So if the improvement is incomplete, then that's
13:55:36  11    where this comes into effect.  So that was how it was
13:55:42  12    described to me ad nauseam by Tang as well when I had
13:55:46  13    questions on this.  He would take me to the specific
13:55:49  14    language, you know, in other -- this and other -- not
13:55:53  15    this, but in other documents.  So I can assure you
13:55:56  16    this is also why we hired SheppardMullin to have
13:56:00  17    a great law firm representing us as we went to long
13:56:04  18    form documents like this.
13:56:07  19          MR. ITKIN:  So can we pull up Exhibit 2,
13:56:10  20    please?  Is there any way to put them side by side,
13:56:19  21    Jason, or is that too much to ask?
13:56:22  22          VIDEOGRAPHER:  No.  One second please.
13:56:34  23          MR. ITKIN:  It's okay if you can't.  I
13:56:37  24    just wanted to make it easier for Mr. Mauro.
13:56:41  25          VIDEOGRAPHER:  What is the other document
```

Page 135

```
13:56:44   1    you wanted put side by side?
13:56:44   2          MR. ITKIN:  Exhibit 2.
13:56:44   3          (Off-the-record discussion.)
13:56:57   4          MR. ITKIN:  Let's just go to Exhibit 2.
13:56:59   5          VIDEOGRAPHER:  One second please.
13:57:15   6          Q.   (BY MR. ITKIN)  Mr. Mauro, are you on your
13:57:18   7    cell phone right now?
13:57:19   8          A.   Well I'm looking at -- otherwise I'm
13:57:22   9    looking at myself.
13:57:23  10          Q.   How long have you been on your cell phone?
13:57:25  11          A.   Five seconds.
13:57:27  12          Q.   Okay.  Can you please not look at your
13:57:31  13    cell phone while you're testifying under oath in this
13:57:37  14    deposition?
13:57:37  15          A.   Sure.  You were not asking a question, and
13:57:39  16    there was no document in front of me to look at.
13:57:42  17          Q.   Sir, while you're on the record you're not
13:57:44  18    allowed to communicate with anyone on your cell
13:57:47  19    phone.  That's actually in the stipulation that we
13:57:49  20    sent over to your counsel.
13:57:51  21          MR. YOUNG:  Objections have been noted to
13:57:53  22    that, but point taken, Uri.
13:57:57  23          MR. ITKIN:  And, Mr. Young, I take umbrage
13:58:01  24    to the fact you did not tell your witness or me that
13:58:04  25    he was sitting and typing and reading his cell phone
```

Page 136

```
13:58:07   1    while he was testifying under oath.
13:58:10   2          THE WITNESS:  I was not typing.  I was
13:58:13   3    reading something while there was a pause here and
13:58:13   4    the screen was showing myself.
13:58:14   5          MR. ITKIN:  And it's the first time in
13:58:15   6    this entire deposition.
13:58:19   7          MR. ITKIN:  How long had the witness been
13:58:20   8    on his cell phone, Mr. Young?
13:58:23   9          MR. YOUNG:  Approximately five to ten
13:58:25  10    seconds.
13:58:25  11          MR. ITKIN:  Just this time or throughout
13:58:27  12    the day?
13:58:28  13          MR. YOUNG:  Literally just this time.
13:58:32  14          MR. ITKIN:  Okay, thank you.  Let's nix
13:58:34  15    that going forward, okay, Mr. Mauro?
13:58:37  16          THE WITNESS:  Okay.
13:58:38  17          Q.   (BY MR. YOUNG)  Can we please go to page
13:58:38  18    13 of this document?
13:58:43  19          A.   Do you mind if I use the bathroom real
13:58:47  20    quick?
13:58:47  21          Q.   Can we just finish this?  And once we
13:58:50  22    finish this we can go in a minute or two minutes,
13:58:51  23    okay?
13:58:51  24          A.   Yeah, sure.
13:58:53  25          MR. ITKIN:  Can you just move down a
```

34  (Pages 133 to 136)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 137

13:58:54  1    little bit?

13:58:56  2        Q.  (BY MR. ITKIN) So this the concept that

13:58:58  3    you were alluding to.  And this is -- strike that.

13:59:01  4        What I'm showing you is Exhibit 2, which

13:59:03  5    is AIG's amended and restated charge sheet that we

13:59:06  6    looked at before.  Do you recall it?

13:59:07  7        A.  Yes.

13:59:08  8        Q.  And this completion guaranty and

13:59:12  9    liquidated damages provision is the concept that you

13:59:16 10    were alluding to just now when you were comparing it

13:59:19 11    to in the event there's a shortfall language that was

13:59:23 12    added in the last sentence or as the last sentence of

13:59:29 13    the developer equity paragraph we were looking at in

13:59:32 14    Exhibit 5, correct?

13:59:33 15        A.  This is an element of that in that this is

13:59:37 16    how it works in practice is you've got an improvement

13:59:42 17    that you're looking to do, as we talked about a

13:59:45 18    building.  And if you pull a draw down, which you

13:59:49 19    can't do unless you're in balance, and then you go to

13:59:52 20    build it and it -- an unforeseen thing happens and

13:59:58 21    there's a cost overrun and the borrowing entity

14:00:01 22    doesn't have the cash proceeds to finish that, then

14:00:06 23    SMHG is obligated to fund that gap on that specific

14:00:12 24    improvement.  So that's -- that's how they're

14:00:17 25    related.  This is how it works in practice for a --

Page 138

14:00:22  1    you know, for a village.

14:00:24  2        We're not -- like we're not building a

14:00:27  3    hotel here, a single building structure hotel.  We're

14:00:30  4    building a village over four acres that consists of I

14:00:35  5    think -- you know, I mean probably a dozen buildings.

14:00:41  6        Q.  I understand.  So just we bookend this and

14:00:45  7    then you can go to the bathroom.  But in your mind

14:00:48  8    the shortfall language in Exhibit 5 is similar to the

14:00:54  9    liquidated damages provision in this Exhibit 2 that

14:00:58 10    we're looking at, right?

14:00:59 11        A.  No, that's not what I'm trying to say.

14:01:03 12    I'm trying to say that the completion guaranty

14:01:07 13    language here is -- it shows in practice how the

14:01:13 14    shortfall guaranty would work relative to an

14:01:18 15    unfinished improvement.  And if go back to earlier in

14:01:22 16    the document it talked about the specific building

14:01:24 17    that, you know, the building is specifically what

14:01:30 18    it's referring to.  And so this is how it works in

14:01:33 19    practice, right, is -- is what it's intended to deal

14:01:40 20    with is unfinished improvements in a phased-based,

14:01:45 21    individual-draw-down environment.

14:01:51 22        Q.  Okay.  But are there two -- the shortfall

14:01:57 23    language in Exhibit 5 and this liquidated damages

14:02:03 24    provision, Exhibit 2, you said earlier you thought

14:02:06 25    they were similar concepts.  Are they similar

Page 139

14:02:09  1    concepts or are they not similar concepts?  That's

14:02:11  2    what I'm trying to understand.

14:02:11  3        A.  Look, when I had Tang explain to me

14:02:15  4    what -- what he was intending by this, the literal

14:02:20  5    example he gave me was that the one thing they have

14:02:22  6    to avoid is like a partially constructed building.

14:02:26  7    So that's why when you pull down, the loan has to be

14:02:31  8    in balance.  And if something happens while you're

14:02:33  9    doing an individual building -- you know what they

14:02:36 10    can't have is like concrete sticking out of a

14:02:40 11    building.  And so the -- that is how it was described

14:02:45 12    that this shortfall guaranty would work in practice.

14:02:50 13    So it was -- that was the example.  And when we

14:02:54 14    looked at that based on the individual buildings, you

14:02:57 15    know, the cost overrun risk on any individual

14:03:00 16    building to us, you know, given that we'd also worked

14:03:04 17    to get completion guaranties from any general

14:03:07 18    contractor working on those individual buildings, it

14:03:10 19    was that -- you know, we viewed that as a manageable

14:03:16 20    risk.

14:03:16 21        Q.  And you started saying it, and I think you

14:03:18 22    may have run off an a tangent.  So the liquidated

14:03:21 23    damages provision we're looking at right now in

14:03:23 24    Exhibit 2, is that a similar concept or a non similar

14:03:26 25    concept to the shortfall guaranty language in

Page 140

14:03:30  1    Exhibit 5?

14:03:30  2        A.  So again I can't speak to the liquidated

14:03:33  3    damages because I don't understand exactly that

14:03:36  4    paragraph because I'm not a lawyer.  But the

14:03:39  5    unfinished improvement concept that ties to the fact

14:03:43  6    that we're doing buildings and so if -- if I could --

14:03:49  7    if they had funded 150 million right away and I built

14:03:54  8    everything right away, then the obligation would be

14:03:58  9    this development total you're talking about, right?

14:04:02 10    And that would have been fine because we would have

14:04:05 11    had a completion guaranty from our general contractor

14:04:08 12    on the entire thing, and we would have built 250,000

14:04:12 13    square feet at once.  And the Kobe Bryant deal was a

14:04:17 14    prospect of potentially having all of that capital

14:04:19 15    quickly to use.

14:04:21 16        You know, now in practicality even the use

14:04:23 17    of that construction you would pull it down as the

14:04:25 18    construction loan calls for it.  But, you know, you

14:04:30 19    would -- we would -- we would make the sales along --

14:04:38 20    the pre-sales along that.  We'd have TIF proceeds

14:04:42 21    from the completion of that that would allow us to do

14:04:45 22    the full estimated TIF that we're estimating here.

14:04:48 23    But that's not -- it was not anticipated to be done

14:04:50 24    that way.  The way it was anticipated to be done was

14:04:57 25    drawing in balance and having to fund the gap for an

35  (Pages 137 to 140)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 141

14:05:03  1    unfinished improvement on an individual specific
14:05:07  2    draw, you know, related draw, a building. That was
14:05:10  3    the example Tang gave.
14:05:12  4         Q.   Got it. And so the liquidated damages
14:05:15  5    provision, as we talked about before, it just means
14:05:18  6    the guarantor just had to make a cash payment instead
14:05:22  7    of actually completing the construction; you
14:05:25  8    understand that, right?
14:05:26  9         A.   Well, you're not required to. I mean you
14:05:40  10   can. You can just complete what was in the draw.
14:05:45  11        Q.   Right.
14:05:45  12        A.   You're not required. If you don't do it,
14:05:50  13   you're not required to complete it, but you then
14:05:53  14   would otherwise have to pay for the hard and soft
14:05:56  15   costs for a lender to complete the construction of
14:05:57  16   the unfinished improvement. Again we're getting to
14:06:02  17   the fact that no one wants a partially constructed
14:06:05  18   building. That's what this is about; it's a
14:06:07  19   partially constructed building. All guaranty
14:06:10  20   language was related to two things, the voidance of a
14:06:16  21   partially constructed building and bad boy
14:06:20  22   carve-outs, right? So...
14:06:20  23        Q.   And the avoidance of a partially
14:06:24  24   constructed building is exactly the point of that
14:06:26  25   shortfall guaranty language in Exhibit 5, right?

## Page 142

14:06:29  1         A.   When you take it together with the rest of
14:06:30  2    the documents and intent, you know, yes. Because
14:06:34  3    it's meant to encapsulate -- like it's an
14:06:39  4    encapsulation of the fact that as we go through and
14:06:43  5    draw, by draw and be in balance and by building, you
14:06:48  6    know, once we start on a building, right, we've got
14:06:52  7    to be able to complete that one, you know. And, you
14:06:55  8    know, it's not just up to us about guess of whether
14:06:59  9    we are doing that correctly. There's a third-party
14:07:02  10   involved in this case called fulcrum that we're
14:07:07  11   required to work with that validates what we're about
14:07:10  12   to spend money on or what we have spent money on did
14:07:14  13   what it's intended to do or will do what it's
14:07:16  14   intended to do. So we're not even given the
14:07:20  15   discretion to screw up. You know, it literally is
14:07:23  16   meant for unforeseen screw-ups, I guess you would
14:07:27  17   say, unforeseen costs that not just slip by us but
14:07:34  18   slip by fulcrum.
14:07:34  19        Q.   Because construction has to go on, right?
14:07:36  20        A.   For the specific draw, construction has to
14:07:39  21   go relative to what the draw was intended to do. And
14:07:42  22   if the draw -- so I would apply the same thing to a
14:07:45  23   ski lift. So we did use EB-5 proceeds to make the
14:07:49  24   entire resort ski-in/ski-out. So if we had run out
14:07:55  25   of cash in the lender co to fund the ski lift, okay,

## Page 143

14:08:00  1    and we had the lifts up -- I mean the poles were
14:08:04  2    up but the chairs weren't, we would have been
14:08:06  3    obligated to finish that ski lift once -- because we
14:08:10  4    had already drawn capital on the ski lift, right?
14:08:14  5         So -- and, you know, the example I'm
14:08:18  6    giving is assuming the ski lift came in much -- in
14:08:21  7    practicality it turned out to be much more expensive
14:08:25  8    than we thought or Fulcrum thought. So in that
14:08:32  9    instance SMHG would have to plug the gap and finish
14:08:36  10   it itself or pay the lender to presumably pay someone
14:08:37  11   to do it.
14:08:38  12        MR. ITKIN: I understand. Thank you so
14:08:39  13   much for that. I didn't mean to keep you from going
14:08:42  14   to the bathroom. So why don't we go off the record
14:08:44  15   and take a five-minute break.
14:08:48  16        THE WITNESS: Thank you.
14:08:49  17        MR. SPENCER: Hang on.
14:08:49  18        VIDEOGRAPHER: We're going off record.
14:08:51  19   The time is 2:08 p.m.
14:19:37  20        (Break taken from 2:08 to 2:19 p.m.)
14:19:37  21        VIDEOGRAPHER: We're going back on the
14:19:39  22   record. The time is 2:19 p.m. Counsel.
14:19:44  23        Q.   (BY MR. ITKIN) Welcome back, Mr. Mauro.
14:19:45  24   Okay. So I want to talk about the shortfall guaranty
14:19:51  25   language. I want to pick up on that. This is

## Page 144

14:19:57  1    something that you and Mr. Tang had discussed as you
14:20:02  2    were negotiating the PPM, right?
14:20:05  3         A.   Yeah. We discussed, you know, from the
14:20:08  4    beginning, you know, again the terminology that, you
14:20:14  5    know, I mean it's -- it's terminology that our own
14:20:17  6    lawyer, you know, felt was vague. And Tang explained
14:20:23  7    that it's intentionally -- you know, it's
14:20:24  8    intentionally vague. And, you know, our lawyer
14:20:29  9    preferred -- you know, preferred more clarifying
14:20:32  10   language and ultimately got comfortable with the
14:20:40  11   totality of, you know, those guys basically following
14:20:45  12   through on what they verbally said this represents in
14:20:50  13   the long form documents with, you know, versus how --
14:20:56  14   versus just the ambiguity of it as drafted. So it
14:21:03  15   wasn't something we necessarily dealt with at the
14:21:09  16   term sheet thing because I took Tang at his -- you
14:21:13  17   know, it's a nonbinding term sheet. So I took Tang
14:21:17  18   at his word that it would be resolved satisfactorily
14:21:20  19   as we went to long form documents and clarified what
14:21:23  20   they meant by it, which I have obviously described
14:21:26  21   multiple times in terms of the -- you know, the draws
14:21:29  22   and being in balance and if there's a -- if there's
14:21:34  23   issues in the completion of a -- given an individual
14:21:40  24   draw, so. But, yeah, go ahead.
14:21:46  25        Q.   And I just want to clarify for purposes of

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 145

```
14:21:49  1   what we're talking about.
14:21:52  2          You know, Jason, can we mark tab 6; it's
14:21:59  3   going to be Exhibit 6. And I'm just going to say the
14:22:02  4   Bates numbers. SMHG003873 to SMHG004114.
14:22:06  5          (EXHIBIT NUMBER 6 WAS MARKED.)
14:22:16  6      Q.  (BY MR. ITKIN)  Mr. Mauro, if you take a look at
14:22:18  7   this document you should see it reflects an e-mail
14:22:23  8   sent September 14th from your lawyers at
14:22:30  9   SheppardMullin to KT Capital and others, attaching
14:22:32 10   your lawyer's comments to the PPM.  Do you see that?
14:22:39 11      A.  Can you expand?
14:22:41 12          Yeah.
14:22:46 13      Q.  And I just want to go back.  And if we go
14:22:48 14   to page -- let me just get there -- 58 of the PDF.
14:23:02 15   What we're looking at is the comments that your
14:23:04 16   lawyer sent.  Do you see that?  And if you look at
14:23:07 17   the top of the page it says "SMRH initial comments,
14:23:12 18   9/13/2015."
14:23:14 19          Do you see that?
14:23:14 20      A.  Yeah.
14:23:14 21      Q.  And this reflects the comments that your
14:23:18 22   lawyers had to the PPM that KT Capital sent you, and
14:23:25 23   you guys were negotiating, right?
14:23:27 24      A.  Uh-huh.
14:23:28 25      Q.  You've got to say yes or no.
```

Page 146

```
14:23:30  1      A.  Yes.
14:23:31  2      Q.  I didn't know if you --
14:23:32  3      A.  Yeah.
14:23:33  4      Q.  Okay, thank you.
14:23:34  5          And so the shortfall guaranty language
14:23:38  6   that we're talking about is the last sentence of the
14:23:45  7   very first paragraph at the top of the page we're
14:23:49  8   looking at, page 42, right?
14:23:53  9      A.  So you're asking me to read the first
14:23:55 10   paragraph -- the first sentence in the first
14:23:57 11   paragraph?
14:23:57 12      Q.  Sorry, the last sentence.
14:23:59 13      A.  Okay.
14:24:00 14      Q.  "In the event..."
14:24:03 15          Do you want to read that into the record
14:24:05 16   so again we just know what we're talking about.
14:24:09 17   Sorry, this is part of the process.
14:24:10 18      A.  "In the event there was any shortfall in
14:24:12 19   the funding of the development costs due to the
14:24:16 20   timing or availability of any portion of developer
14:24:21 21   equity, the owner will contribute or cause to be
14:24:24 22   contributed the equivalent amount of cash
14:24:27 23   contribution to make up for such shortfall."
14:24:30 24      Q.  And is the shortfall guaranty language
14:24:33 25   that we've been talking about, right?
```

Page 147

```
14:24:35  1      A.  Yes.
14:24:35  2      Q.  That your lawyers ultimately got
14:24:41  3   comfortable with, right?
14:24:42  4      A.  Well, I think they -- with the totality of
14:24:45  5   other documents, I mean they -- you know, yeah, they
14:24:52  6   basically said they'd, you know, prefer things
14:24:55  7   clearer but they could live with the way it was
14:24:59  8   described based on the -- you know, everything else.
14:25:04  9      Q.  They could live with the shortfall
14:25:06 10   guaranty language in the PPM, right?
14:25:10 11      A.  No.  In the loan -- well, in the PPM, in
14:25:13 12   the loan documents, in the deed of trust, all of the
14:25:17 13   related documents as it related to pulling down -- to
14:25:22 14   pulling down loan proceeds, so -- let alone the PPM.
14:25:27 15      Q.  And you ultimately got comfortable with
14:25:30 16   the shortfall guaranty language in the PPM too,
14:25:33 17   right?
14:25:33 18      A.  I mean if it went out in the PPM, I --
14:25:36 19   then, yes, it was reviewed by SheppardMullin,
14:25:43 20   which -- so yes.
14:25:44 21      Q.  Okay.  And that was -- I believe this was
14:25:48 22   in September of 2015, right, this document that we're
14:25:52 23   looking at?
14:25:53 24      A.  Yes, September 13th.
14:25:57 25          MR. ITKIN:  Okay.  So let's mark tab 10,
```

Page 148

```
14:26:00  1   Jason, as Exhibit 7.
14:26:08  2          (EXHIBIT NUMBER 7 WAS MARKED.)
14:26:12  3      Q.  (BY MR. ITKIN)  And while you're doing
14:26:17  4   that I'm going to say Bates numbers of Exhibit 7 are
14:26:20  5   SMHG008262 to SMHG008263.
14:26:30  6          Okay.  Are you fidgeting with your phone
14:26:34  7   right now or your license?
14:26:35  8      A.  My license.
14:26:37  9      Q.  Okay.  I'm going to hold you to that.
14:26:43 10          Okay.  So can you please take a look at
14:26:46 11   Exhibit 7, please, Mr. Mauro, and tell me if you
14:26:50 12   recognize it.
14:26:50 13      A.  Can you expand it?  Okay.
14:26:54 14      Q.  Do you recall the context of this e-mail?
14:27:16 15      A.  Yeah, I think this is before Tang got
14:27:26 16   smart on TIF, and ultimately in our loan docs and
14:27:32 17   everything we provided for the fact that TIF -- well,
14:27:35 18   first off assessment bonds were pulled out entirely
14:27:40 19   because counsel suggested that we can't attribute
14:27:43 20   public funds to the overall capital stack and job --
14:27:47 21   I mean I think there were some -- I think we got
14:27:54 22   indirect job growth from them but not direct job
14:27:58 23   growth from them.  So assessment bonds were pulled
14:28:02 24   out entirely from everything.
14:28:05 25          Then TIF, it was clarified that TIF
```

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 149

14:28:09  1    came into existence from completed buildings, and we
14:28:13  2    would have three years for the tax base on those
14:28:15  3    completed buildings to build up before floating a TIF
14:28:18  4    bond and then pulling the proceeds from the TIF bond
14:28:23  5    into the -- you know, to use in the capital stack.
14:28:31  6    So that all got long formed in part of it.  Obviously
14:28:39  7    no TIF if you actually don't actually build
14:28:42  8    anything vertical.
14:28:48  9        Q.  Understood.  Was this e-mail in connection
14:28:53 10    with -- do you see the subject line "Questions"?
14:28:55 11        A.  Yes.
14:28:56 12        Q.  Was that potential investor questions that
14:28:59 13    you might face from Chinese -- potential Chinese
14:29:04 14    investors?
14:29:05 15        A.  I think when he's referring to people;
14:29:07 16    that's what he's referring to, the marketability.
14:29:09 17        Q.  Yeah.  So he's saying these are -- this
14:29:14 18    e-mail was in the context of guys talking about
14:29:17 19    potential questions that you may get from potential
14:29:21 20    Chinese EB-5 investors, right?
14:29:25 21        A.  Correct.  Yeah, so again --
14:29:28 22        Q.  And --
14:29:29 23            Oh, go ahead.
14:29:31 24        A.  Right.  So the questions from the Chinese
14:29:33 25    investors, you know, are in the context of the

## Page 150

14:29:39  1    totality of it.  So we get 120 million in
14:29:44  2    construction finance, we build.  What happens?  It is
14:29:46  3    the risk that you build and taxes aren't paid.  Well,
14:29:51  4    the two truths and life or death and taxes.  So no,
14:29:54  5    taxes will happen once you build it.  So if -- you
14:29:59  6    know, if KT does their job and raises the money and
14:30:02  7    we have the ability to go vertical, it will get
14:30:06  8    taxed.  So it was something we were able to address.
14:30:10  9            But as I said the assessment bond was
14:30:12 10    something it we pulled out for other reasons.  Well,
14:30:15 11    I mean it just made sense not to pull it out from the
14:30:20 12    capital stack.  We didn't need it particularly once
14:30:23 13    we had augmented with additional neighborhood level
14:30:29 14    equity, neighborhoods outside of the core village.
14:30:32 15        Q.  I understand.  And then if you look at the
14:30:36 16    second paragraph of the e-mail we were looking at,
14:30:41 17    starting with "people may"?
14:30:42 18        A.  Yeah, that's where I was focused on.
14:30:46 19        Yeah.
14:30:46 20        Q.  Me too.  So in that -- I'm focusing on
14:30:49 21    that sentence too.  And it seems like what Mr. Tang
14:30:53 22    is saying is people are going to ask what happens if
14:30:56 23    the TIF or assessment bonds aren't available, right?
14:31:00 24        A.  Yeah, I see it.
14:31:04 25        Q.  He's anticipating that question, right?

## Page 151

14:31:06  1        A.  Yes.
14:31:07  2        Q.  And the answer that he's anticipating is
14:31:09  3    that you already addressed this in the PPM because
14:31:13  4    the owner will provide equity for any gaps, right?
14:31:15  5        A.  I mean it's a message from his mobile
14:31:19  6    device.  So, yes, he's -- he's -- he's referring to
14:31:27  7    gap -- to you know gap equity, you know relative to
14:31:31  8    the PPM.
14:31:32  9        Q.  And isn't he referring to the shortfall
14:31:36 10    language that we've been talking about?
14:31:37 11        MR. YOUNG:  Foundation.
14:31:39 12        THE WITNESS:  Yeah, I can't define totally
14:31:44 13    what he's referring to here.  You know, I mean
14:31:47 14    specifically here he's talking about the TIF and
14:31:51 15    assessment bonds.  And you know again the gap -- the
14:31:56 16    gaps here are relative to the magnitude of the
14:32:01 17    eventual project.  And so if it turned out that a --
14:32:07 18    the TIF bonds were less than we thought they would
14:32:11 19    be, than as described by Tang to me, there's
14:32:13 20    rebalancing we can do in terms of scoping the size
14:32:17 21    and scale of the project.  So that was the -- that
14:32:22 22    was some of the other options you have as well as you
14:32:25 23    go along.
14:32:26 24        Q.  So you don't think what he's referring to
14:32:29 25    by saying that the owner will provide equity for any

## Page 152

14:32:32  1    gaps, you don't think that's in reference to the
14:32:35  2    shortfall guaranty language that we were talking
14:32:38  3    about in the PPM just a few moments ago?
14:32:41  4        A.  No.  I think he's referring to the owners'
14:32:43  5    obligations relative to shortfall here in some
14:32:49  6    regard.  So I mean I think that, yeah, that's what
14:32:55  7    he's -- I think that is the -- I think if you take it
14:33:07  8    with the first paragraph that it's really the timing
14:33:11  9    of whether these things exist or not, right.  So that
14:33:16 10    people get an understanding of the risks of the -- of
14:33:19 11    these.  I don't think he's saying that if there's no
14:33:24 12    EB-5 that the owner would provide all EB-5.  Like we
14:33:29 13    didn't have an ability to provide $14 million, right?
14:33:32 14    So the gaps in that context would be if -- to scale
14:33:38 15    down -- if we didn't think EB-5 was happening, to
14:33:43 16    redo the capital stack.  Because we know TIF exists.
14:33:48 17    You're going to get taxed if you build.  But if it
14:33:49 18    turns out, say, we're going to build less because we
14:33:51 19    get half the loan proceeds and they tell us we're
14:33:53 20    only going to get half of the loan proceeds and it
14:33:57 21    comes in on the timely basis then we can resize the
14:34:01 22    project, do it smaller, and the TIF is smaller, and the
14:34:04 23    gap can be sized there.  And if there's a gap it can
14:34:08 24    be -- it can be a modest gap.
14:34:11 25        Q.  Sorry, that was a long answer.  But my

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 153

14:34:14  1    question was just a little bit simpler. And I think
14:34:17  2    you answered it, but I just want to clarify. So is
14:34:23  3    what Mr. Tang referring to in this e-mail that we're
14:34:27  4    looking at as Exhibit 6 -- I'm sorry, Exhibit 7.
14:34:35  5    When you're saying "The owner will provide equity for
14:34:37  6    any gaps," is he referring to the shortfall guaranty
14:34:41  7    language in the PPM that we were talking about?
14:34:43  8          MR. YOUNG: Foundation. Calls for
14:34:45  9    speculation.
14:34:46 10          THE WITNESS: I don't know for sure.
14:34:47 11    Because I think he's talking about gaps specific to
14:34:51 12    TIF and the assessment bond. And there's no
14:34:55 13    assessment bond in our capital stack, as you know.
14:34:58 14    So I think this was -- and there was no PPM being
14:35:02 15    marketed at this point, right? So PPM was still
14:35:06 16    being developed I believe at this point. So I don't
14:35:09 17    believe we were in market for a while longer. I
14:35:13 18    think even like many months later. So, you know, I
14:35:18 19    think he's -- so I don't -- I can't speculate what he
14:35:25 20    is specifically referring to there, so...
14:35:30 21       Q.   Okay. I appreciate that. Can we move on
14:35:36 22    to, Jason, tab 11. Can we mark that as Exhibit 8?
14:35:41 23    And while you're doing that I'm going to say the
14:35:44 24    Bates SMHG007271 - SMHG007277.
14:35:44 25          (EXHIBIT NUMBER 8 WAS MARKED.)

Page 154

14:35:56  1       Q.   (BY MR. ITKIN) So this is also from
14:35:58  2    January 2016, Mr. Mauro. Can you see that?
14:36:08  3       A.   Yep.
14:36:09  4       Q.   And this is an e-mail that you sent to KT
14:36:18  5    Capital and someone named Ryan Kelly. Do you see
14:36:21  6    that?
14:36:21  7       A.   Yep.
14:36:21  8       Q.   Who is Ryan Kelly?
14:36:23  9       A.   A consultant.
14:36:24 10       Q.   For what sort of thing?
14:36:26 11       A.   For -- he did the -- he was the junior guy
14:36:35 12    on the St. Regis in Deer Valley.
14:36:37 13       Q.   Sorry, so what was he consulting you on?
14:36:40 14       A.   Development.
14:36:40 15       Q.   And what was specifically his role?
14:36:43 16       A.   He's more of a modeling finance guy.
14:36:48 17       Q.   Okay. And so in Exhibit 8 that you have
14:36:53 18    before you, you're sending him an attachment called
14:37:00 19    Apex Project Questions. Do you see that?
14:37:02 20       A.   Yes.
14:37:02 21       Q.   And is this related to the investor
14:37:07 22    questions that we were just discussing a few minutes
14:37:09 23    ago?
14:37:10 24       A.   No idea. I don't recall what Apex Project
14:37:13 25    Questions is.

Page 155

14:37:13  1       Q.   All right. Well, that's okay.
14:37:15  2          Can you maybe scroll down, Jason, to the
14:37:20  3    second page of the PDF?
14:37:22  4          Do you want to take a look at this, Mr.
14:37:27  5    Mauro? Does this refresh your recollection?
14:37:48  6       A.   I mean I don't recall this, but -- so no,
14:37:52  7    it doesn't -- I don't know who Apex is. I mean I
14:37:56  8    don't recall who Apex is. But you can keep going
14:37:59  9    down, maybe I can --
14:38:00 10       Q.   Isn't Apex the name of the project that
14:38:02 11    you were working on with KT Capital?
14:38:04 12       A.   Oh, that was like the code name or
14:38:06 13    something?
14:38:07 14       Q.   Yeah.
14:38:08 15       A.   Oh, possibly.
14:38:09 16       Q.   You don't recall?
14:38:10 17       A.   I don't recall. Can you go down to three?
14:38:34 18    Okay.
14:38:36 19       Q.   And does looking at this document refresh
14:38:40 20    your recollection that these are questions related to
14:38:42 21    the project you were working on with KT Capital, to
14:38:49 22    this project rather?
14:38:50 23       A.   Yeah. I mean if you'd keep going down, I
14:38:55 24    would appreciate it. Okay, keep going. Okay, keep
14:39:11 25    going. Wait, go up one a little bit. Okay, there

Page 156

14:39:24  1    you go. Okay. I mean, okay.
14:39:47  2       Q.   Does this refresh your recollection of --
14:39:49  3       A.   Yeah, I think this was a Q and A maybe
14:39:53  4    with Hentry's team in China. I think maybe they're
14:39:57  5    asking questions. I think that's what this was.
14:39:58  6       Q.   Right. And you were providing answers,
14:40:00  7    right?
14:40:00  8       A.   Yeah, trying to -- either Tang was filling
14:40:04  9    in. I don't know who populated this, so...
14:40:08 10       Q.   Well, this came from your e-mail address,
14:40:11 11    right?
14:40:11 12       A.   You mean I populated the answers or the
14:40:17 13    questions?
14:40:20 14       Q.   You sent this document, right?
14:40:22 15       A.   Well, I mean I sent it. But someone might
14:40:25 16    have sent it to me first. It looks like these are
14:40:28 17    questions potentially from the team in China.
14:40:31 18       Q.   Uh-huh. And I'm saying you provided the
14:40:34 19    answers, right?
14:40:34 20       A.   I don't know. You know, let's keep going,
14:40:39 21    and I can potentially tell you.
14:40:57 22          TIF and builder equity. Keep going down.
14:41:03 23    Stop, stop. Now go up, go back up. Stop, stop here.
14:41:35 24    Okay, keep going down. Okay, keep going. Okay, keep
14:41:59 25    going. Okay, stop there.

39 (Pages 153 to 156)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 157

14:42:14  1    Q.  So all I'm asking, Mr. Mauro, are these
14:42:17  2  answers that you provided to I guess Hentry
14:42:23  3  Global's questions or maybe they were provided by
14:42:26  4  your team?
14:42:34  5    A.  Sorry, one second.  I'm -- it helps with
14:42:38  6  the recollection to just actually read the document.
14:42:41  7  So just give me one second.
14:42:42  8    Q.  Uh-huh.  Should we go off the record so
14:42:58  9  you can just read it for a little while?  That's fine
14:43:01 10  too.
14:43:05 11    A.  All right.  I think if you'd go down a
14:43:07 12  little bit more, I think we're almost done.  Okay,
14:43:11 13  here's -- yeah.
14:43:14 14    Yeah, okay.  I remember this.  So -- and I
14:43:19 15  think it clarifies a lot of questions we've been
14:43:21 16  going back and forth on.  If you look at 16, the EB-5
14:43:25 17  collateral is just the village.  If you look at the
14:43:28 18  answer on the guaranty earlier, it doesn't answer
14:43:30 19  that question.  They asked it.  We're silent on it.
14:43:33 20  We let Tang describe it how he wants to describe it,
14:43:36 21  you know.
14:43:38 22    Q.  I've got it.  And so these are just --
14:43:40 23  you said you remembered it.  What is this?
14:43:42 24    A.  These were questions that I believe came
14:43:46 25  from -- from China.  The -- okay.  Can you keep going

Page 158

14:44:13  1  down to 18?  Okay, keep going.
14:44:34  2    Q.  Mr. Mauro, I'm going to give you another
14:44:36  3  ten seconds.  You just told me you remember this.
14:44:39  4  Otherwise we are going to go off the record and you
14:44:43  5  can read this as long as you want.
14:44:43  6    A.  Okay.  We can go off the record.  That's
14:44:45  7  fine.
14:44:47  8    VIDEOGRAPHER:  Going off the record, the
14:44:49  9  time is 2:44 p.m.
14:44:52 10    (Break taken from 2:44 to 2:47 p.m._
14:44:57 11    VIDEOGRAPHER:  We're back on the record.
14:47:26 12  The time is 2:47 p.m.
14:47:32 13    Q.  (BY MR. ITKIN)  So let me ask the
14:47:34 14  question, and then you can answer it.
14:47:35 15    A.  Sounds good.
14:47:36 16    Q.  Right now we're looking at Exhibit 8.
14:47:37 17    A.  Yes.
14:47:38 18    Q.  And I asked you, if you recall, what
14:47:40 19  Exhibit 8 is.
14:47:43 20    A.  So now having reviewed Exhibit 8, I can
14:47:48 21  tell you what Exhibit 8 is, which was questions that
14:47:50 22  I believe came from Hentry Global.  And they were
14:47:54 23  either directly from Hentry Global people or they
14:47:58 24  maybe got transcribed as it were by KT Capital.  And
14:48:04 25  you know, the questions are the questions.  I think

Page 159

14:48:09  1  the answers all came from our team.  So I think the
14:48:14  2  answers are instructive as to where we were at the
14:48:19  3  time in which this was provided, and it -- you know,
14:48:24  4  hopefully it shows to you that my testimony here has
14:48:29  5  been -- has been accurate.
14:48:32  6    So I'm happy to take you through the
14:48:34  7  pieces where it is, such as the guaranty will be, you
14:48:39  8  know, determined in the long form documents, that the
14:48:42  9  equity is meant to be provided over a phase-based
14:48:46 10  time frame, and that it's -- we're not doing a bunch
14:48:49 11  of speculative.  It's not going to become
14:48:53 12  overleveraged because it's going to be in balance
14:48:56 13  while we fund it.  So all of the steps are in this
14:49:00 14  document if you care to go through it.
14:49:02 15    Q.  Okay, great.  Can we go to number 17,
14:49:05 16  please.  It's on page 5, Jason.  Perfect.  Thank you.
14:49:16 17    So question number 17 concerns the owners'
14:49:19 18  equity, is that right, Mr. Mauro?
14:49:22 19    A.  There's multiple references to capital
14:49:26 20  stack, you know, guarantees, TIF, and owners equity
14:49:32 21  here.  But, yes, this is one of them.
14:49:34 22    Q.  And one of the elements of the owners'
14:49:36 23  equity, and this is consistent with what we discussed
14:49:39 24  before is this $60.7 million in TIF financing, right?
14:49:45 25    A.  Right.

Page 160

14:49:46  1    Q.  And there's a -- the questions are in dark
14:49:55  2  font, and the answers are in a lighter font.  Do you
14:49:58  3  see that?
14:49:58  4    A.  Yes.
14:49:59  5    Q.  The answer starts with the "Appraisal and
14:50:01  6  assumptions..."
14:50:01  7    Do you see that?
14:50:05  8    A.  Yeah, I see the answer in the lighter
14:50:07  9  font, yeah.
14:50:08 10    Q.  And then if you look at the third sentence
14:50:10 11  that says the estimated date.  Do you see that?
14:50:15 12    A.  Yeah.  "The estimated date for the TIF is
14:50:18 13  projected to fund in mid 2017."
14:50:20 14    Q.  And can you please read the next sentence?
14:50:22 15    A.  "If rejected" -- meaning if the TIF is
14:50:24 16  rejected because I don't -- "the shortfall will come
14:50:30 17  through additional sponsor equity."
14:50:33 18    Q.  And what does that mean to you?
14:50:37 19    A.  Well, I think before going to market we
14:50:40 20  were going to finalize the TIF.
14:50:42 21    Q.  Uh-huh.
14:50:43 22    A.  And so if TIF, similar to the -- similar
14:50:47 23  to the county bonds, initially the county bonds if
14:50:50 24  you looked at the capital stack in the AIG documents,
14:50:55 25  it included the county bonds.  We ultimately decided

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 161

14:50:59 1    not to include them, and they went out of the capital
14:51:03 2    stack and adjusted the sponsor equity.  And so that
14:51:06 3    might have been one of the reasons why we ultimately
14:51:09 4    included neighborhoods as an equity contribution or
14:51:12 5    as a security guaranty that generated, you know,
14:51:15 6    potential proceeds to go into the project, which it
14:51:19 7    obviously did to allow us to stay in balance through
14:51:22 8    the draw downs.  So here the additional sponsor
14:51:26 9    equity is not that we would, you know, produce cash
14:51:30 10   for it.  It's that -- it's that we would adjust the
14:51:34 11   capital stack and scale the project, similar to
14:51:42 12   the -- the other cash component it refers to here in
14:51:44 13   this paragraph is the fact that in Los Angeles they
14:51:48 14   did the big Greenland project, but in California you
14:51:51 15   can't use deposits as equity.  But in Utah you can
14:51:54 16   because the majority of the Utah legislator is
14:51:56 17   realtors, so very favorable real estate law.
14:52:00 18            But I think also important to this capital
14:52:04 19   stack of the village and how it is also adjustable is
14:52:08 20   if you -- there's two other paragraphs here, one that
14:52:11 21   speaks to the fact that the project won't get in
14:52:16 22   front of its skis and have a huge speculative
14:52:21 23   component that would draw the -- that would take the
14:52:24 24   project out of debt and equity balance.  And that
14:52:29 25   speaks to the fact that we were going to be

Page 162

14:52:31 1    developing it, you know, building by building, phase
14:52:34 2    by phase within the village development.  And we
14:52:39 3    would only build as pre-sales came along so that we
14:52:44 4    knew the ratio of pre-sales and like -- and sales
14:52:49 5    pace of buildings and their absorption before
14:52:54 6    lighting up another building.  And so if it turned
14:52:56 7    out that our buildings weren't at the desired price
14:52:59 8    or the desired velocity we would adjust the overall
14:53:03 9    size and scope of this project.  And so that was an
14:53:06 10   important component in here as well, and that's why
14:53:11 11   it talks about the developer equity coming in over a
14:53:15 12   five-year period.  Because even just the TIF before,
14:53:19 13   we had two things we needed to validate with TIF before
14:53:22 14   going to market.  One was that we would definitively
14:53:26 15   have it, which we sort of long -- we got the approval
14:53:29 16   that this would be -- you know, we signed off that
14:53:31 17   this was an acceptable and approved use of TIF as
14:53:38 18   part of this process, and then the second was what
14:53:40 19   was the timing cushion that we'd want to give to
14:53:43 20   raise the TIF bond based on the TIF-related
14:53:48 21   construction completion.
14:53:49 22            So those all went into the context of the
14:53:54 23   equity contribution and any adjustments to the sort
14:54:01 24   of sponsor equity that would need to take place.
14:54:03 25        Q.   Sir, I'm going to move to strike that

Page 163

14:54:05 1    answer as nonresponsive.  You went on a long tangent.
14:54:09 2    And at this point this is almost considered
14:54:11 3    filibustering.  I'm asking very simple questions.  I
14:54:15 4    would appreciate a simple answer.  If you need to
14:54:17 5    elaborate, you can do that.  But please do that on
14:54:20 6    your own lawyer's time.
14:54:22 7            Let me go back to my question.  Do you see
14:54:24 8    the sentence that says "If rejected the shortfall
14:54:27 9    will come through additional sponsor equity"?  Do you
14:54:30 10   see that, sir?
14:54:30 11        A.   I do.
14:54:32 12        Q.   And that answer came from you or your
14:54:35 13   team, correct?
14:54:35 14        A.   Correct.
14:54:35 15        Q.   And so in January 2016 when you sent these
14:54:40 16   answers to KT Capital, you understood that if the TIF
14:54:45 17   was rejected, the shortfall would come through
14:54:50 18   additional sponsor equity, correct?
14:54:52 19        A.   Yes.  Sponsor equity, meaning equity --
14:54:55 20   meaning equity balance and contributing various forms
14:54:59 21   of equity to be in balance.  That sponsor equity
14:55:03 22   contributions if it turned out that capital stream
14:55:06 23   wasn't one we could take advantage of.  We had the
14:55:10 24   same issue with the county bond.
14:55:12 25            We adjusted sponsor equity when the county

Page 164

14:55:15 1    bond was dinged.  If TIF had to be dinged, we would
14:55:20 2    need to adjust sponsor equity.
14:55:25 3        Q.   Sir, I'm going to warn you once again.
14:55:27 4    You keep giving a lot of narrative answers that go
14:55:29 5    well beyond my questions.  Although you are fully
14:55:31 6    within your right to do that.  I will bring you back
14:55:33 7    for another day if we run out of time today.  Do you
14:55:36 8    understand that?
14:55:36 9        A.   I'd like you to acknowledge that there's a
14:55:40 10   difference between sponsor equity and some of the
14:55:42 11   other terms we've been discussing today like a cash
14:55:50 12   thing or a building that isn't fully complete.  These
14:55:55 13   are different things.  So I'm trying to describe that
14:55:57 14   they're different things.
14:55:59 15        Q.   Is the sponsor equity related to SMHG
14:56:03 16   equity?
14:56:06 17        A.   It's related to SMHG equity but not to
14:56:10 18   SMHG shortfall guaranty.
14:56:15 19        Q.   But isn't the SMHG shortfall guaranty
14:56:19 20   guaranteeing exactly what the sentence says?  It
14:56:21 21   guarantees that if there's a shortfall of the TIF
14:56:24 22   that a shortfall will come through additional SMHG
14:56:28 23   equity?
14:56:28 24        A.   No.
14:56:29 25            MR. YOUNG:  The document speaks for

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 165

14:56:30  1    itself.
14:56:30  2          THE WITNESS:  No, it's not.  What this is
14:56:32  3    saying is it will adjust the capital stack if TIF is
14:56:35  4    rejected.
14:56:37  5      Q.   (BY MR. ITKIN)  That's not what it's
14:56:40  6    saying, sir, with all due respect.  What it's saying
14:56:43  7    is the shortfall will come through additional sponsor
14:56:46  8    equity, isn't it?
14:56:48  9          MR. YOUNG:  Argumentative.
14:56:49  10         THE WITNESS:  Look at the paragraph above
14:56:49  11   in the components of sponsor equity.
14:56:52  12     Q.   (BY MR. ITKIN)  No, no.  I'm looking at
14:56:53  13   the sentence you or your team wrote, sir.  I'm
14:56:55  14   looking at the --
14:56:55  15     A.   I --
14:56:56  16     Q.   -- sentence that you wrote.  Let me finish
14:56:58  17   my question.  It says, "If rejected" -- referring to
14:57:00  18   the TIF -- "the shortfall will come through
14:57:03  19   additional sponsor equity."  That's what I'm looking
14:57:07  20   at here, sir, I'm only talking about that sentence.
14:57:09  21     A.   And I agree that -- I agree that if
14:57:13  22   rejected the shortfall will come through additional
14:57:15  23   sponsor equity, which can consist of land, pre-sales,
14:57:21  24   other public related or partnerships like a bond with
14:57:27  25   the sewer district or -- there's various forms of

Page 166

14:57:29  1    sponsor equity other than just cash -- a cash
14:57:33  2    shortfall commitment, right?  So that's all I'm
14:57:38  3    pointing out is the sponsor equity is not the same
14:57:42  4    term as the shortfall guaranty.
14:57:50  5      Q.   Okay.  So then in -- in the spring of 2016
14:57:59  6    you started working on the loan documents for this
14:58:06  7    project, right?
14:58:07  8      A.   It appears so.
14:58:09  9      Q.   And if we could mark tab 13 as Exhibit 9.
14:58:22  10         (EXHIBIT NUMBER 9 WAS MARKED.)
14:58:23  11     Q.   (BY MR. ITKIN)  And the Bates are
14:58:29  12   SMHG016 -- sorry.  SMHG017614 to SMHG017696.
14:58:46  13         Mr. Mauro, do you recognize Exhibit 9?
14:58:49  14     A.   Okay, yeah.
14:59:06  15     Q.   What is it?
14:59:08  16     A.   It's the first -- it appears to be the
14:59:10  17   first draft of the loan agreement coming from Tang.
14:59:14  18     Q.   Okay.  So let's look at page 10 of the
14:59:22  19   PDF, please, Jason.  And if you can make it spill
14:59:27  20   over to page 11 so we can look at the bottom of page
14:59:29  21   10 and the top of page 11.
14:59:39  22         Slide down just a little bit more.  And
14:59:41  23   make it zoom in on the definition of borrower's cash
14:59:44  24   equity requirement and as well as the borrower's
14:59:49  25   equity requirement, please.  And if you could scroll

Page 167

14:59:51  1    down a little bit, please.  Perfect.
14:59:53  2          Okay.  So in this draft of the loan
15:00:00  3    agreement, there's already baked in definitions of
15:00:04  4    the borrower's equity requirement, right?
15:00:08  5      A.   Well, now this is cash equity requirement.
15:00:12  6    So it's obviously different than -- and below that is
15:00:15  7    borrower equity requirement.  So which one are you
15:00:18  8    referring to?
15:00:18  9      Q.   Right.  I'm saying the general concept of
15:00:22  10   borrower's equity requirement.  And I'm glad you
15:00:24  11   pointed out the difference.  So do you see the
15:00:30  12   borrower's cash equity requirement definition?
15:00:34  13     A.   Yeah.  The proposed definition there
15:00:44  14   for -- in version 1.  Do you want me to read it or --
15:00:49  15     Q.   You can review it to yourself if you'd
15:00:51  16   like.
15:00:53  17     A.   Okay.  Can you expand it a little bit?
15:01:22  18         Yeah, I've read it.
15:01:26  19     Q.   And do you understand what it means?
15:01:34  20         Strike that.  I'm just going to ask you
15:01:36  21   some questions about it.  The borrower's cash equity
15:01:39  22   requirement in Exhibit 9 refers to the borrower's
15:01:43  23   obligation at the time or the contemplated obligation
15:01:47  24   to put in about $4 and a half million, right?
15:01:50  25     A.   Right.  Yeah, this so --

Page 168

15:01:55  1      Q.   Just answer my question.  Again you can
15:01:57  2    elaborate, but --
15:01:58  3      A.   Sure.  I mean this is the -- this is
15:02:01  4    the -- this is the amount of cash that Tang knows we
15:02:04  5    were -- we had at our disposal to bring to the
15:02:07  6    project over time.
15:02:08  7      Q.   Sir, I'm not interesting nor am I asking
15:02:10  8    what Tang knows or doesn't know.  I can ask Tang
15:02:14  9    about that.  I need to understand your understanding
15:02:17  10   of this these documents.  Are we clear?
15:02:19  11     A.   Sure.
15:02:20  12     Q.   Okay.  So let me go back and pose a very
15:02:25  13   simple question.  The borrower's cash equity refers
15:02:29  14   to the borrower's obligation that was contemplated at
15:02:32  15   the time to inject $4 and a half million of cash
15:02:35  16   equity into this project, right?
15:02:37  17     A.   I mean it calls for what it calls for
15:02:42  18   here, so.
15:02:42  19     Q.   But I need to understand what you think it
15:02:44  20   calls for, because --
15:02:45  21     A.   I just explained --
15:02:45  22     Q.   I --
15:02:47  23     A.   -- what I thought it called for, and you
15:02:50  24   got upset with me.
15:02:51  25     Q.   Sir, let me finish my question, then you

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 169

15:02:55  1  can answer it. We shouldn't talk over each other.
15:02:58  2       I need to understand what you think it
15:03:00  3  means because that's what is at issue in this
15:03:04  4  lawsuit.
15:03:05  5       A.  Yeah.
15:03:05  6       Q.  So that's why I'm asking you what this
15:03:08  7  means. You have filed a lawsuit against my clients,
15:03:13  8  and you're alleging the meaning of certain documents.
15:03:16  9  I want to know what you understand the negotiations
15:03:20 10  of the documents to be. So I'm asking you --
15:03:24 11       A.  Yeah.
15:03:25 12       Q.  -- if you understand that the borrower's
15:03:28 13  cash equity requirement was at the time contemplated
15:03:31 14  to encapsulate the borrower's obligation to
15:03:34 15  contribute $4 and a half million in cash to the
15:03:37 16  project. A simple question, it's a yes-or-no
15:03:40 17  question.
15:03:42 18       A.  Again I can't answer it yes or no based on
15:03:47 19  how you're asking it, so you know.
15:03:50 20       Q.  Why not?
15:03:52 21       A.  So this is in here because we wanted the
15:03:57 22  cash component to be specifically called out and also
15:04:03 23  the fact that it would be contributed at different
15:04:06 24  time frames relative to the loan disbursement based
15:04:11 25  on our ability to come up with said cash. Because

## Page 170

15:04:16  1  Tang knew that at the time of draw the most cash we
15:04:19  2  could actually come up with was a million dollars.
15:04:22  3  That's why there's a million dollars here to start
15:04:23  4  with.
15:04:24  5       Q.  I understand. And that's why this
15:04:25  6  language has specific terms setting out when the cash
15:04:33  7  would be contributed, right?
15:04:37  8       MR. YOUNG: Foundation. Calls for
15:04:38  9  speculation. The draft came from Tang, but...
15:04:42 10       THE WITNESS: Yeah. And my understanding
15:04:47 11  of what the borrower's cash equity requirement was
15:04:49 12  was it was a means to lay out when and how much cash
15:04:55 13  would be required from us relative to how much of the
15:05:00 14  loan we took down. So -- so it adds up to 4.5.
15:05:08 15  It's -- and you can see it at the different
15:05:10 16  increments. And it started with 1 million at the
15:05:13 17  loan closing date. I don't know -- I mean that's
15:05:18 18  what I know and understand around this paragraph.
15:05:22 19       Q.  (BY MR. ITKIN) I think that's helpful.
15:05:25 20  Now, can we go to the next definition, please, Jason,
15:05:29 21  the borrower's equity requirement. Perfect.
15:05:32 22       Then there's a separate concept of the
15:05:36 23  borrower's equity requirement, right?
15:05:38 24       A.  And borrower's obligation to contribute
15:05:41 25  additional equity, yes.

## Page 171

15:05:41  1       Q.  And that encapsulates the borrower's cash
15:05:46  2  equity requirement and the borrower's obligation to
15:05:48  3  contribute other sources of equity, right?
15:05:51  4       A.  Correct.
15:05:51  5       Q.  And now in the borrower's equity
15:05:54  6  requirement there's no language saying when it's
15:05:56  7  going to be contributed, unlike the language in the
15:05:59  8  borrower's cash equity requirement definition, right?
15:06:04  9       A.  Yes. I mean it doesn't do it at the -- it
15:06:09 10  doesn't have draw-based milestones. So we didn't --
15:06:16 11  we didn't negotiate that part because the assumption
15:06:21 12  was we're going to work through the capital stack and
15:06:24 13  adjust the non cash equity as needed to be in balance
15:06:29 14  to make draw downs and so that the loan remained in
15:06:35 15  balance. What they wanted to avoid was what they
15:06:38 16  had -- problems they'd had on other projects where
15:06:40 17  per the prior document where they billed and there's
15:06:44 18  a lot of speculative product that doesn't sell, and
15:06:47 19  the loan is out of balance. They did not want to be
15:06:50 20  to be out of balance on the loan at any given time if
15:06:53 21  they could avoid it. So that -- that is why this
15:06:58 22  isn't tied to how much to maximum -- it's not
15:07:04 23  partitioned at the various funding milestones.
15:07:10 24  It's -- that's why it's captured, the borrower's
15:07:14 25  equity requirement is captured in the underlying

## Page 172

15:07:16  1  language relative to, you know, the draw procedure
15:07:19  2  and being in balance as you draw.
15:07:24  3       Q.  Can we mark tab 14 as Exhibit 10, please.
15:07:29  4       (EXHIBIT NUMBER 10 WAS MARKED.)
15:07:36  5       MR. ITKIN: You can put this one aside.
15:07:37  6  Exhibit 10 is SMHG014077 through SMHG014081.
15:07:47  7       Q.  (BY MR. ITKIN) Mr. Mauro, Exhibit 10 is
15:07:51  8  an e-mail between you and Elliott Bisnow. Do you see
15:07:56  9  it?
15:08:01 10       A.  Yes.
15:08:01 11       Q.  And it's dated in April 2016?
15:08:07 12       A.  Yes.
15:08:11 13       Q.  And if you want you can scroll around.
15:08:15 14  But let's go to the bottom of this e-mail, please,
15:08:18 15  Jason.
15:08:22 16       Keep going. Keep going. All the way to
15:08:25 17  page 3 of the PDF. Oh, there we go. So at the very
15:08:32 18  bottom there's an e-mail from Ryan Kelly to you. Do
15:08:38 19  you see that?
15:08:38 20       A.  Yes.
15:08:38 21       Q.  And it's referring to a capital call. Do
15:08:43 22  you see that?
15:08:43 23       A.  Yes.
15:08:44 24       Q.  Who is Ryan Kelly?
15:08:48 25       MR. YOUNG: Asked and answered. You can

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 173

15:08:49 1  answer again.
15:08:50 2       THE WITNESS: Yeah. He's finance, outside
15:08:52 3  finance consultant. So at times they're acting --
15:08:57 4  there's periods where he oversaw the bookkeeper.
15:09:00 5       Q. (BY MR. ITKIN) Okay. So now he has a
15:09:02 6  different e-mail address from what we looked at
15:09:04 7  before?
15:09:04 8       A. Yeah.
15:09:04 9       Q. Okay. And do you recall the context of
15:09:12 10 this e-mail?
15:09:12 11      A. Yeah, just that we needed to do a capital
15:09:18 12 call.
15:09:18 13      Q. Why did you need to do a capital call?
15:09:21 14      A. So to fund the -- you know, as I've
15:09:26 15 explained to you previously, we financed this project
15:09:32 16 through a founding member program that brought in $58
15:09:34 17 million, had a county bond, and the other cash was
15:09:37 18 provided by Elliott and myself.
15:09:39 19      Prior to acquiring Powder Mountain I think
15:09:41 20 we had lent in the aggregate 3 to 4 million, I think,
15:09:47 21 you know, it could even be less. And then that got
15:09:53 22 paid down, and then it would go up and down. And so
15:09:59 23 it's always -- you know, there's been a -- Elliott
15:10:04 24 and I as the -- you know I'm the now 55 percent
15:10:11 25 shareholder. He's the other biggest shareholder.

Page 174

15:10:14 1  We're the ones, principal ones funding any capital
15:10:17 2  call needs for the company. So that's us doing those
15:10:21 3  capital calls. So we -- I think we, you know, my
15:10:26 4  total loans, you know, are obviously represented
15:10:30 5  above what I just described, but I'm happy to answer
15:10:34 6  questions in that regard. But this is a capital
15:10:37 7  call. This is also during, you know, 20 --
15:10:40 8  August 2016 was actually when we finally received our
15:10:43 9  first building permit and through our water
15:10:49 10 challenges, which was a challenge we faced as a
15:10:52 11 project at Powder Mountain that lasted --
15:10:55 12      Q. And were you doing this capital call
15:10:59 13 because the venture had no money?
15:11:04 14      A. The holding company -- this is a capital
15:11:06 15 call --
15:11:06 16      Q. Yeah.
15:11:07 17      A. -- for the holding company. Yeah.
15:11:08 18      Q. Yeah.
15:11:08 19      A. Not the -- not the -- not the village LLC
15:11:14 20 entity.
15:11:14 21      Q. Oh, the company?
15:11:16 22      A. Yeah. Or not the ski resort but
15:11:20 23 specifically the broader real estate holding company.
15:11:24 24      And the water -- the water payments are
15:11:27 25 for our 1,400 acre feet of water payments that we

Page 175

15:11:31 1  retained.
15:11:32 2       Q. So in April of 2016 you needed to do a
15:11:36 3  capital call because the holding company was
15:11:39 4  basically out of cash?
15:11:39 5       A. Well, we always funded it as needed, so --
15:11:42 6       Q. Okay.
15:11:43 7       A. So we'd been doing that.
15:11:45 8       Q. How much money have you personally funded
15:11:49 9  to the holding company?
15:11:50 10      A. To the holding company, over from say 2011
15:11:55 11 to 2021 or 2022, would be -- like specifically the
15:12:06 12 holding company, probably -- well, it's gone up and
15:12:12 13 down. So I'd say over 10. But like at any given
15:12:15 14 time I think my max exposure was maybe five -- four
15:12:18 15 or five.
15:12:19 16      Q. From millions of dollars?
15:12:24 17      A. And Elliott's was half of that.
15:12:26 18      Q. You're talking about millions of dollars?
15:12:28 19      A. Yeah, 4 to 5.
15:12:29 20      Q. Okay. And what about you said just to the
15:12:35 21 holding company. What about to all the affiliated
15:12:38 22 companies?
15:12:39 23      A. I mean we'd usually lend through the
15:12:42 24 holding company, you know. But so I just meant that
15:12:48 25 the ski resort -- you know, the real estate

Page 176

15:12:51 1  development obviously we bought it in 2013. We
15:12:54 2  couldn't sell -- I mean we couldn't actually build
15:12:58 3  until 2016. We went through water permitting. You
15:13:03 4  know to bring our well that we built with the Weber
15:13:06 5  County bond operational, we had to get through a
15:13:08 6  water protest which are common in Utah. So that tied
15:13:11 7  us -- that sort of delayed the project there by about
15:13:17 8  two years or 18 months at least. And so this -- so,
15:13:25 9  yeah. So it was fairly common for us to, you know,
15:13:32 10 lend at different times.
15:13:33 11      Q. I understand. And the reason you were
15:13:37 12 lending is because you weren't getting cash -- the
15:13:40 13 reason you were lending to the holding company is
15:13:42 14 because cash wasn't coming in from anywhere else?
15:13:45 15      A. Well, no. Cash was coming into the ski
15:13:48 16 operating resort. And that's what I meant that we
15:13:50 17 didn't have to necessarily fund the ski operating
15:13:53 18 resort. Because the ski resort historically was cash
15:13:56 19 flow positive. On any --
15:13:59 20      Q. What about the holding company?
15:14:02 21      A. The holding, it would depend. You know
15:14:05 22 based on how -- I mean in 2016 we were still
15:14:08 23 finishing out the founding member program. So the 58
15:14:12 24 million that I mentioned, that was not raised prior
15:14:15 25 to buying it. That was raised through -- you know,

44 (Pages 173 to 176)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 177

15:14:18  1    through 2016. You know, I think that wrapped in like
15:14:23  2    either late '15 or '16 at some point because that's
15:14:25  3    when we finished the 58 million in founding member
15:14:29  4    proceeds.
15:14:29  5          Q.   Well, let's just go up, Jason, to the
15:14:32  6    first page, please. So if you look at the middle of
15:14:39  7    that page, there's an e-mail from you to I believe
15:14:43  8    Elliott Bisnow now at 2:51 p.m. Do you see that?
15:14:46  9          A.   Yeah. So this is me getting upset with
15:15:06 10    Elliott because he hadn't funded his -- this is me
15:15:20 11    e-mailing out -- so Dean was our -- we had a big
15:15:23 12    first lien loan because we had a $20 million loan for
15:15:26 13    the holding company that we were waiting to close.
15:15:29 14    And that was -- that was getting held up by the water
15:15:35 15    thing that resolved on August 16th. And then so
15:15:40 16    basically it was -- this is us having a cash -- you
15:15:48 17    know, a cash flow, you know, argument. Where I'm --
15:15:51 18    I was asking him to make his capital call. And so
15:15:56 19    his excuse was I want a plan of attack, you know.
15:16:01 20    This wasn't uncommon from Elliott.
15:16:04 21          Q.   And you were asking him for cash because
15:16:07 22    the holding company didn't have enough money to make
15:16:10 23    payroll, right?
15:16:11 24          A.   Yeah. We're the owners of the company.
15:16:14 25    We have to make capital calls. We have to make --

## Page 178

15:16:17  1    where loans actually call for real guarantees like a
15:16:20  2    first lien, you know, you also have to sign up for
15:16:23  3    the guarantees. But in addition to chasing Elliott
15:16:26  4    for -- I mean Elliott and his partners were 16 years
15:16:30  5    younger than me. These guys were 26 when we bought
15:16:33  6    the mountain. So I can't say I was super surprised
15:16:36  7    that I would have to occasionally chase him down to
15:16:39  8    make capital calls. I ended up, you know, doing
15:16:41  9    almost three-to-one on capital calls to him and --
15:16:46 10    and guarantees.
15:16:47 11          And David Black, who is on this e-mail,
15:16:51 12    who I think it was mentioned in here, you know, I had
15:16:51 13    to chase him down to sign a loan guaranty that had my
15:16:55 14    signature and his to be filled out. And ultimately
15:16:57 15    he never signed. So one of the bigger holding
15:17:01 16    company loans we had for years was ultimately paid
15:17:04 17    off, but the entire time I was the only guarantor on
15:17:08 18    it. So, you know, that's a...
15:17:11 19          Q.   I think my question is a little bit
15:17:14 20    simpler, and I want to bookend it with that. You're
15:17:22 21    requiring capital call because in April of 2016 you
15:17:24 22    didn't have money coming into the holding company
15:17:26 23    from anywhere else. So you needed capital call from
15:17:28 24    both of you to make payroll to pay for water and make
15:17:31 25    the lift payment, right?

## Page 179

15:17:34  1          A.   Not exactly. Because again we have a
15:17:38  2    growing concern ski business of about -- I think at
15:17:40  3    the time in 2016 it was about a $10 million business.
15:17:44  4    So we did have a ski business. But in addition to
15:17:47  5    the ski business, we required a capital call because
15:17:51  6    we're the owners of the business, of the holding
15:17:53  7    company.
15:17:54  8          Q.   But here you needed to make payroll. You
15:17:57  9    were asking him for a capital call to make payroll,
15:18:01 10    right?
15:18:02 11          A.   Yes. Among other things, yes.
15:18:04 12          Q.   So whatever was coming in from the ski
15:18:06 13    business into the holding company was not enough to
15:18:08 14    make payroll, right?
15:18:09 15          A.   Correct. In 2016, yeah.
15:18:11 16          Q.   Yeah. And it was not enough to pay for
15:18:14 17    the water rights, right?
15:18:16 18          A.   Correct.
15:18:18 19          Q.   And it was not enough to make the lift
15:18:21 20    payment, right?
15:18:22 21          A.   No. Reed Hastings closed and made -- and
15:18:29 22    we did -- no, we did have enough to make the lift
15:18:33 23    payment, and Reed Hastings closed.
15:18:35 24          Q.   So you're telling him that you want to
15:18:37 25    miss a lift payment in order to convince him to make

## Page 180

15:18:40  1    the capital call in your e-mail, right?
15:18:43  2          A.   Yeah. Look, we have a holding company.
15:18:46  3    He's the second largest shareholder. He's required
15:18:49  4    to make capital calls when he can make capital calls.
15:18:53  5    We lent money to acquire the mountain. We got it all
15:18:56  6    paid back. And then we lent money again and then
15:19:00  7    we'd get some of it paid back. And then we would
15:19:00  8    have to lend it again.
15:19:00  9          That's the nature of a real estate holding
15:19:03 10    company doing a multi-phased development. So that is
15:19:09 11    what -- that's what you're seeing here.
15:19:12 12          Q.   Okay. We can put this to the side. Just
15:19:16 13    a question.
15:19:16 14          A.   Sure.
15:19:17 15          Q.   Have you done real estate development
15:19:19 16    projects before this one?
15:19:19 17          A.   I had been a lender for -- I had been in
15:19:22 18    the charter school movement for about eight years,
15:19:26 19    and I financed a charter school in Northern San Diego
15:19:32 20    to help the expansion of High-Tec High. Although
15:19:36 21    that was effectively altruistic, the loan rate was
15:19:40 22    what they called a Mother Teresa loan. And it was
15:19:42 23    through a U.S. Treasury Department new market tax
15:19:47 24    credit fund that we raised and managed.
15:19:48 25          Q.   What was the rate?

45 (Pages 177 to 180)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 181

15:19:49  1      A.  I mean ultimately the principal was
15:19:52  2  forgiven on the loan and, yeah, the rate was quite
15:19:58  3  low.  Yeah.  Like 4, I think.
15:20:01  4      Q.  Four percent?
15:20:02  5      A.  Yeah.  4 percent or lower I think.  I mean
15:20:08  6  if you're interested I can pull up the documents on
15:20:11  7  it.  It's since wound down --
15:20:15  8      Q.  No need, sir.
15:20:15  9      A.  Yeah.
15:20:17 10      Q.  No need, sir.
15:20:17 11      A.  No.  But my only experience building a
15:20:21 12  campus in Northern San Diego.
15:20:23 13      Q.  Well, financing the campus, right?
15:20:25 14      A.  Yeah, financing the campus that is
15:20:28 15  about -- that is a high school, middle school, and
15:20:31 16  elementary school today.
15:20:31 17      Q.  So this was your first development
15:20:34 18  project, right?
15:20:35 19      A.  Yes.  I mean keep in mind I'm not leading
15:20:39 20  development here.  We had Jeff Werbelow I think at
15:20:43 21  this time, and before that we had Russ Watts who
15:20:46 22  developed three communities on the golf course below
15:20:50 23  the ski resort.  So he oversaw the horizontal
15:20:54 24  development phase.  And then Jeff Werbelow came in
15:20:56 25  for the vertical phase which obviously got delayed

Page 182

15:20:59  1  with EB-5.
15:21:04  2      Q.  All right.  Let's take a look at tab 15
15:21:07  3  and mark that as Exhibit 11, please.  Tab 15, the
15:21:11  4  Bates numbers for that SMHG017379 to SMHG017548.
15:21:23  5          Mr. Mauro, do you recognize Exhibit 11?
15:21:29  6          (EXHIBIT NUMBER 11 WAS MARKED.)
15:21:31  7          THE WITNESS:  Yeah, if you could scroll
15:21:44  8  down maybe.
15:21:53  9          MR. ITKIN:  Keep scrolling, Jason.  I
15:21:55 10  think that's going to help.  Keep scrolling.
15:22:06 11      Q.  (BY MR. ITKIN)  Do you recall that this is
15:22:08 12  comments that your team sent back to KT Capital to
15:22:11 13  their first draft of the loan agreement?
15:22:14 14      A.  Comments in the e-mail or is there an
15:22:16 15  attachment?
15:22:16 16      Q.  There's an attachment.
15:22:18 17      A.  Yeah, if you could show me the attachment.
15:22:20 18      Q.  Yep.  We're going look at the attachment.
15:22:24 19  Who is Tom Jolly by the way?
15:22:26 20      A.  He's another legal consultant.  So he's
15:22:28 21  the --
15:22:28 22      Q.  He was a legal consultant, or did he work
15:22:31 23  for --
15:22:31 24      A.  Well, he's a former -- he's the former
15:22:35 25  general counsel and chief operating officer of

Page 183

15:22:37  1  Sundance.  And then he came in to help -- help me
15:22:42  2  with the county bond and purchase of Powder Mountain.
15:22:49  3  And then he came in again to help with the launch
15:23:00  4  EB-5.
15:23:00  5      Q.  And was his role an employee for the
15:23:04  6  holding company?
15:23:05  7      A.  Yeah.  He was either salaried or 1099 or a
15:23:09  8  combo.  Like at one time it was one or the other.
15:23:12  9      Q.  And was his role legal or business?
15:23:15 10      A.  Both.
15:23:15 11      Q.  So he was -- he was providing legal advice
15:23:21 12  to the holding company?
15:23:22 13      A.  Yeah.  I mean he's the former general
15:23:26 14  counsel of Sundance.  Yeah, he's -- I think he's back
15:23:31 15  practicing law now.  So he's --
15:23:31 16      Q.  Okay.
15:23:34 17      A.  -- you know, capable to do both the legal
15:23:38 18  and development work.
15:23:40 19      Q.  Yep.  Can we please go to page 13 of the
15:23:46 20  PDF, Jason?  Can we focus on the top half of that
15:23:53 21  page.  Okay, thank you.
15:23:54 22          So we're looking at page -- it's really
15:23:59 23  page 4 in the redline that's attached to Exhibit 11.
15:24:02 24  Do you see that, Mr. Mauro?
15:24:05 25      A.  Borrower's cash equity requirement

Page 184

15:24:05  1  means -- do you want me to read that one, the
15:24:15  2  borrower's cash equity requirement?
15:24:15  3      Q.  I haven't asked you to read it.  But you
15:24:17  4  can take a look at it, sure.
15:24:19  5          Do you see that your team had made changes
15:24:22  6  to the borrower's cash equity requirement?
15:24:28  7      A.  Yep, I see that.
15:24:36  8      Q.  And among the changes that your team made
15:24:41  9  they deleted the milestones, the loan milestones,
15:24:45 10  when the borrower's cash equity requirement was
15:24:49 11  supposed to be contributed and instead put in the
15:24:52 12  words "pro rata."  Do you see that?
15:24:53 13      A.  Yeah.
15:24:55 14      Q.  What does pro rata mean?
15:24:58 15      A.  It just means as the loan is drawn down.
15:25:00 16      Q.  Proportional, the same thing?
15:25:02 17      A.  I mean I'm not -- I'm not a lawyer.  So I
15:25:09 18  don't want to venture to say it would be.  But I mean
15:25:11 19  it appears to me that it's sort of the same way.
15:25:14 20  It's a similar way of saying the same thing.  But so,
15:25:18 21  you know, assuming that the pro rata of the 4.4898
15:25:30 22  is -- it sort of -- you know if it scales relative to
15:25:32 23  the 715, 22, and 30 milestones in a relative pro rata
15:25:37 24  fortune, they probably just did it for simplicity.
15:25:41 25  But...

46  (Pages 181 to 184)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

---

Page 185

15:25:41 1     Q.  I appreciate that.  By the way again I'm
15:25:43 2  not asking for a legal opinion.  I know where to go
15:25:46 3  for that.  I'm asking for your opinion.
15:25:48 4     A.  Yeah.  This looks like six half dozen and
15:25:55 5  one other, I can't tell you the material between the
15:25:59 6  two on that one.
15:26:00 7     Q.  Between pro rata and proportional?
15:26:03 8     A.  Correct.
15:26:04 9     Q.  What this change seems to do is just
15:26:08 10  saying that the borrower's cash equity requirement is
15:26:13 11  supposed to be contributed over time pro rata with
15:26:16 12  the funding of the loan, right?
15:26:17 13     A.  Again the prior language says the same
15:26:19 14  thing.  So to me I don't understand why it needed to
15:26:25 15  be struck and replaced, but -- they both say the same
15:26:33 16  thing to me, so --
15:26:34 17     Q.  Okay.  And --
15:26:34 18     A.  Especially if --
15:26:35 19     Q.  What I'm trying to say is the language
15:26:39 20  that was struck in the borrower's cash equity
15:26:44 21  requirement definition Exhibit 11 in your mind is the
15:26:48 22  same as the new language that was added, right?
15:26:50 23     A.  Again I'm not a lawyer.  But from what I
15:26:53 24  can tell these -- you know, I'm sure there's some
15:26:58 25  variation there.  But it would appear that they're

---

Page 186

15:27:01 1  just trying to simplify what's going on.  That it
15:27:06 2  is -- that this, like everything, is happening in
15:27:09 3  disbursements where the loan has to be in balance and
15:27:14 4  in going back to the cash -- the actual cash piece,
15:27:18 5  you know, on what basis and time frame would that go
15:27:23 6  given that they were well aware that we were land
15:27:28 7  rich and cash poor.
15:27:30 8     Q.  Got it.  And then the borrower's equity
15:27:35 9  requirement, the next definition in Exhibit 11, that
15:27:38 10  doesn't have the same language, right?
15:27:40 11     A.  Yeah, I -- they didn't -- I don't see edit
15:28:00 12  changes to that.
15:28:01 13     Q.  Okay.  You can put that aside.  I'm trying
15:28:17 14  to move this along, Mr. Mauro.  Okay.  So let's mark
15:28:25 15  tab 16 as Exhibit 12.
15:28:27 16        (EXHIBIT NUMBER 12 WAS MARKED.)
15:28:31 17     MR. ITKIN:  And tab 16 is SMHG013573 to
15:28:39 18  SMHG013747.
15:28:50 19     Q.  (BY MR. ITKIN)  Do you recognize this
15:28:51 20  document, Mr. Mauro?
15:28:53 21     A.  It's just another iteration on the loan
15:29:01 22  document.
15:29:01 23     Q.  Yep, exactly.  And I'll represent to you
15:29:04 24  that the e-mail from Mr. Jolly was dated May 10th,
15:29:11 25  2016, and this one is dated May 20th, 2016.  Do you

---

Page 187

15:29:15 1  see that?
15:29:15 2     A.  Uh-huh.
15:29:16 3     Q.  So you're going back and forth with KT
15:29:19 4  Capital and their lawyers on the loan document,
15:29:20 5  right?
15:29:21 6     A.  Yes.
15:29:21 7     Q.  Okay.  So then let's go to the same
15:29:26 8  language talking about borrower's equity on page --
15:29:35 9  it's 13 of the PDF, Jason.  The top of the page.
15:29:44 10  Okay, perfect, you're there.
15:29:45 11        So now there's some more changes to the
15:29:50 12  borrower's cash equity requirement definition, right?
15:29:59 13  Do you see that?
15:30:00 14     A.  Yeah, I do.  Okay, yeah, I see that.  I
15:30:15 15  see the budget also looks like they left in the words
15:30:35 16  "from time to time" and the fact that the improvement
15:30:37 17  costs would be adjusted from time to time.  So it's
15:30:40 18  just putting in the flexibility to -- you know
15:30:43 19  putting in the intent of a phase-based project that
15:30:50 20  budget -- within which budget could alter as you
15:30:55 21  adjust to market conditions and what's selling or not
15:30:57 22  selling.
15:30:57 23     Q.  Let's stay focused, Mr. Mauro.
15:30:59 24     A.  Sure.
15:31:00 25     Q.  Let's keep talking about the borrower's

---

Page 188

15:31:02 1  equity requirement.  If you want to talk about
15:31:04 2  budget, we'll talk about that later.
15:31:04 3     A.  Sure.
15:31:06 4     Q.  So the new language in borrower's cash
15:31:09 5  equity requirement in Exhibit 12, there's -- it
15:31:14 6  added -- it kept in the pro rata language, right, but
15:31:18 7  it added some other language as well, right?
15:31:20 8     A.  Yeah.  It added the -- it tied it to each
15:31:25 9  advance.  So I mean I guess you had a prior to each
15:31:28 10  advance before in that this one is more specifically
15:31:32 11  with respect to each advance.  That there is this
15:31:38 12  cash contribution.  Now, what I don't totally get is
15:31:43 13  the 10 to 1 loan to equity, if they mean loan to cash
15:31:50 14  equity or loan equity of the loan being in -- you
15:31:50 15  know, in the proper -- in balance.  So I don't
15:32:00 16  know the --
15:32:01 17     Q.  I'm sorry.
15:32:02 18     A.  I just don't -- I don't know what that
15:32:05 19  necessarily means off the top of my head.  Because
15:32:08 20  it --
15:32:08 21     Q.  I'm not asking you that, sir.
15:32:10 22     A.  Okay.
15:32:11 23     Q.  I just want to ask you a couple of simple
15:32:13 24  questions about this.
15:32:14 25     A.  Okay.

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 189

15:32:15 1    Q.  So there's language in the borrower's cash
15:32:19 2  equity requirement definition in Exhibit 12 that
15:32:22 3  specifically refers to a pro rata contribution of
15:32:26 4  cash to the project by the borrower, right?
15:32:29 5    A.  On each advance, correct.  Yeah.  On an
15:32:33 6  advance-by-advance basis.
15:32:36 7    Q.  And then it talks about with respect to
15:32:38 8  each advance the -- the matter of contribution is
15:32:45 9  supposed to be at a ratio of 10 to 1, loan to equity,
15:32:49 10  right?
15:32:49 11    A.  Correct.  I mean that's what it says
15:32:51 12  there.  And again I don't know what that means, if
15:32:54 13  that's loan to cash equity or if that's loan to --
15:32:59 14  the, you know, borrower's equity.  I don't -- it's
15:33:05 15  not capitalized, so I don't know if it's borrower's
15:33:09 16  equity.  But it doesn't say cash in front of equity,
15:33:12 17  so I don't know -- I don't know what it means.  It
15:33:13 18  seems like these guys are going back and forth with
15:33:15 19  each other to refine this paragraph more and more.
15:33:19 20  But --
15:33:19 21    Q.  Were you involved in these negotiations,
15:33:21 22  Mr. Mauro?
15:33:23 23    A.  I mean they would come back to me on just
15:33:25 24  the big ones like, you know, like okay.  I mean cash
15:33:29 25  never really changed from what we first got into it.

## Page 190

15:33:34 1  I think we -- you know, it was, you know, we made
15:33:37 2  clear we needed to do the cash, you know, over -- you
15:33:41 3  know, over the period of the project.  So I think
15:33:44 4  this is just about, you know, the fact that you,
15:33:48 5  know, cash is a -- was a sensitive thing, and Tang
15:33:52 6  knew that and was, you know, flexible in drawing it
15:33:55 7  out over -- over the period of the draw down as --
15:34:02 8  you know, as it relates to doing a phase-based
15:34:06 9  project.
15:34:07 10    Q.  But the borrower's cash equity requirement
15:34:10 11  definition in Exhibit 12 specifically refers to the
15:34:13 12  concepts of pro rata contribution, right, as well as
15:34:17 13  the concept of loan-to-equity ratio, right?
15:34:21 14    A.  And the fact that each advance, as I was
15:34:25 15  speaking to the fact that this is an advanced based
15:34:29 16  lending vehicle that we're contemplating here.
15:34:32 17    Q.  And you started to answer with "and," but
15:34:36 18  you agreed with me, right?  You agreed with my
15:34:39 19  question that those concepts are in this definition?
15:34:43 20    A.  Maybe restate it.  I'm not -- I guess I'm
15:34:45 21  not sure what you're getting at.  That --
15:34:47 22    Q.  It's very simple.  It's very simple.  I'm
15:34:50 23  glad that you modified it and explained it the way
15:34:52 24  you did.  But you just need to tell me either yes or
15:34:56 25  no, and that way I can move on.

## Page 191

15:34:58 1    So the borrower's cash equity requirement
15:35:02 2  definition in Exhibit 12 specifically refers to the
15:35:05 3  concept of per rata contribution by the borrower as
15:35:09 4  well as the concept of a loan-to-equity ratio that
15:35:12 5  would modify that contribution, right?
15:35:14 6    A.  Again I can't answer that because I don't
15:35:16 7  know what they mean by equity here because they
15:35:19 8  didn't -- you know, they didn't use a defined term on
15:35:22 9  it, and it's not tied to other elements in the
15:35:28 10  borrowing documents.  Because I mean there's a very
15:35:30 11  clear concept of pulling down advances while having
15:35:33 12  to be in balance.  So if you want to go to that
15:35:36 13  section we can see if it matches, and I can maybe
15:35:40 14  answer more helpfully.
15:35:42 15    Q.  Well, go to that section.  But my question
15:35:44 16  is very simple.  I'm not asking you what those words
15:35:48 17  mean right now.  I'm just saying that the borrower's
15:35:51 18  cash equity requirement definition in Exhibit 12
15:35:54 19  specifically refers to and has language that's very
15:35:58 20  specifically saying or describing a pro rata
15:36:02 21  contribution of cash by the borrower, right?
15:36:05 22    MR. YOUNG:  The document speaks for
15:36:08 23  itself.  Foundation.  Calls for speculation.
15:36:10 24    THE WITNESS:  Yeah, it's --
15:36:10 25    MR. ITKIN:  How is that an objection, Mr.

## Page 192

15:36:13 1  Young?  We're having a contract case where I need to
15:36:15 2  understand the witness's understanding of the
15:36:17 3  document.
15:36:17 4    MR. YOUNG:  Subjective intent is
15:36:19 5  irrelevant for purposes of contract interpretation.
15:36:21 6  The law is pretty well settled on that.
15:36:24 7    Q.  (BY MR. ITKIN)  Mr. Mauro, let's go back
15:36:27 8  to my question.
15:36:28 9    A.  Okay.
15:36:28 10    Q.  Borrower's cash equity requirement
15:36:31 11  definition in Exhibit 12, does it refer to pro rata
15:36:34 12  contribution of cash by the borrower?
15:36:38 13    A.  I mean it changed from, you know,
15:36:47 14  contribution to pro rata contribution or
15:36:50 15  contributions based on funny milestones to a pro
15:36:56 16  rata.  So I see the word pro rata; it's there.  I
15:37:02 17  mean, again I just don't know what it means in this
15:37:05 18  context with the loan-to-equity because I just don't
15:37:09 19  know what they -- what that -- if it's referring to
15:37:15 20  borrower equity or cash equity.
15:37:18 21    Q.  And do you see the words ratio of 10 to 1
15:37:22 22  loan-to-equity in the borrower's cash equity
15:37:25 23  requirement definition in Exhibit 12?
15:37:27 24    A.  In the parenthetical?
15:37:30 25    Q.  Yes.

48  (Pages 189 to 192)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 193

15:37:31 1    A.  Yes.  I see the -- I see the parenthetical
15:37:36 2  and the little "e" equity, but I don't know what the
15:37:40 3  little "e" equity means.
15:37:41 4    Q.  Okay.  Do you see any words -- scratch
15:37:47 5  that.  Do you see those words, those same words of
15:37:50 6  ratio 10 to 1 loan to equity in the definition of
15:37:52 7  borrower's equity requirement just below that?
15:37:55 8    A.  Do I see a 10 to 1 ratio?  No, there's no
15:38:09 9  10 to 1 ratio in the borrow equity requirement
15:38:13 10  defined term versus the little "e" equity in the
15:38:22 11  parenthetical of the project loan to equity in the
15:38:25 12  cash equity paragraph.
15:38:28 13    Q.  And there's no word -- there's no word or
15:38:32 14  rather there's no phrase loan to equity in the
15:38:35 15  borrower's equity requirement definition just below,
15:38:39 16  right?
15:38:46 17    A.  Sorry there's no phrase what?
15:38:48 18    Q.  Loan to equity.
15:38:53 19    A.  Nope.  The reference here is to aggregate
15:38:56 20  contributions.
15:38:57 21    Q.  And there's no phrase pro rata or pro rata
15:39:02 22  contribution in the borrower's equity requirement
15:39:06 23  definition in Exhibit 12, right?
15:39:07 24    A.  It wouldn't make sense because of the
15:39:09 25  nature of the equity contributions, they're

Page 194

15:39:11 1  aggregated off of multiple stream -- multiple types
15:39:16 2  of capital stack components.
15:39:18 3    Q.  Okay.
15:39:19 4    A.  The reason you can use the word pro rata
15:39:21 5  with cash because it's cash, right?  You know, you
15:39:25 6  wouldn't use that word when you're talking about
15:39:28 7  borrower's equity requirement because borrower's
15:39:30 8  equity is these various elements of equity capital
15:39:34 9  stack.  And you can adjust things like contributed
15:39:38 10  land or you can -- for example, if something like
15:39:41 11  TIF, like TIF I'm pretty sure went from 17 to 14 in
15:39:43 12  our -- over the course of this.  And we just adjusted
15:39:53 13  other elements in the borrower's equity.
15:39:58 14    Q.  You can put this aside, Jason.  Can we
15:40:01 15  please mark tab 20 as an exhibit, and that's going to
15:40:05 16  be marked as Exhibit 13.
15:40:07 17      (EXHIBIT NUMBER 13 WAS MARKED.)
15:40:09 18    MR. ITKIN:  And the Bates numbers
15:40:12 19  SMHG028526 to SMHG028716.
15:40:20 20    Q.  (BY MR. ITKIN)  Okay.  And do you see, Mr.
15:40:24 21  Mauro, that this was another draft of the loan
15:40:28 22  agreement sent back by your team in June -- or on
15:40:33 23  June 15, 2016?
15:40:34 24    A.  Yes.
15:40:35 25    Q.  Okay.  Let's look at the attachment.

Page 195

15:40:48 1  Unfortunately, the redline here is after the clean
15:40:52 2  version.  So we're going to go to that first.
15:40:55 3    Can you please go to page 94, the top of
15:40:58 4  page 94 of Exhibit 13, please, Jason.
15:41:02 5    Okay.  Mr. Mauro, let's take a look at
15:41:09 6  this.  So in this redline that we've marked as
15:41:16 7  Exhibit 13 or that's an attachment to Exhibit 13,
15:41:20 8  your team struck the entire concept of the borrower's
15:41:24 9  cash equity requirement all together.  Do you see
15:41:26 10  that?
15:41:26 11    A.  Yeah, I mean they struck it -- yeah, I see
15:41:37 12  that it's struck here.  Yeah.
15:41:38 13    Q.  And so the borrower's cash equity
15:41:44 14  requirement concept just came out of the loan
15:41:46 15  agreement.  Do you see that?
15:41:47 16    A.  Yeah, I'm not sure if they inserted it
15:41:50 17  somewhere else.  I can't tell unless I look at the
15:41:53 18  whole document.
15:41:53 19    Q.  I understand.  And if you look at the
15:41:56 20  borrower's equity requirement, the amount of the
15:42:01 21  aggregate equity requirement went down from 92 and a
15:42:05 22  half million to 87.1 million.  Do you see that?
15:42:08 23    A.  I see that there was an adjustment down.
15:42:11 24    Q.  Do you know why that adjustment was made?
15:42:16 25    A.  Like I said things like TIF or county

Page 196

15:42:22 1  bonds or, you know, an appraisal on the addition of
15:42:27 2  neighborhoods.  I mean there were moving things in
15:42:29 3  the capital stack, so -- as was sort of anticipated.
15:42:32 4  So I don't recall the exact reason for that specific
15:42:34 5  delta.
15:42:35 6    Q.  No problem.
15:42:37 7    Can we please go to the top of page 110,
15:42:45 8  Jason.
15:42:45 9    And this is section 2.1 of the loan
15:42:48 10  agreement.  Do you recognize it, Mr. Mauro?
15:42:51 11    A.  By the way are we looking at Tang's edits
15:42:55 12  or our edits?
15:42:57 13    Q.  Your team's edits.
15:42:58 14    A.  Okay.  All right.  Go ahead.
15:42:59 15    Q.  And do you see your team had struck 150
15:43:01 16  million and made it 120 million?
15:43:05 17    A.  Got it, yes.
15:43:06 18    Q.  And that was the maximum amount of the
15:43:10 19  loan of the loan rate?
15:43:13 20    A.  Yes, this is because we added the
15:43:16 21  neighborhoods.  Yeah.
15:43:16 22    Q.  Sorry, what do you mean?
15:43:18 23    A.  In addition to the four acres in the
15:43:23 24  village core, we added security enhancement for the
15:43:28 25  loan and a product definition expansion to make sure

49 (Pages 193 to 196)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 197

15:43:35 1  we got the jobs from a variety of neighborhoods. So,
15:43:39 2  for example, we had a partnership of townhomes, and
15:43:42 3  so -- with a DC-based developer. And so adjacent to
15:43:48 4  those we took the land where you could do more
15:43:51 5  townhomes and made that part of the EB-5 collateral
15:43:54 6  package or the end of the first street in the village
15:43:58 7  that we sold all the lots on for the founding member
15:44:00 8  program or, you know, allocated those to the founding
15:44:04 9  member program, there's a development parcel for a
15:44:07 10 boutique hotel. And we -- we added that to the, you
15:44:12 11 know, neighborhood development project as we did
15:44:15 12 Horizon development, which was 30 -- 30 home sites
15:44:21 13 where cabins were to be built of which about half
15:44:24 14 have been done.
15:44:27 15      Q.  So you basically jointly agreed to reduce
15:44:31 16 the size of the loan from 150 to -- the maximum size
15:44:34 17 of the loan from 150 to 120, right?
15:44:37 18      A.  Correct. And increased the -- we modified
15:44:40 19 the capital table accordingly and added a bunch of
15:44:44 20 additional security. Yeah.
15:44:46 21      Q.  Okay. And so if you go -- Jason, if you
15:44:50 22 go to the very first page of this e-mail.
15:44:52 23          The date that this was sent by your team
15:44:55 24 was June 15, 2016, right, Mr. Mauro?
15:44:59 25      A.  Yeah.

Page 198

15:45:00 1       Q.  Let's look at tab 24. We'll go a little
15:45:04 2  faster now. And that's going to be Exhibit --
15:45:09 3       A.  And again this is the version back from
15:45:12 4  Tang, or this our version?
15:45:14 5       Q.  So that's your version.
15:45:16 6       A.  Okay.
15:45:16 7       Q.  And I'm going to show you something that
15:45:19 8  Tang sent you, Exhibit 24 -- sorry, tab 24
15:45:24 9  Exhibit 14. And I have to do two things at once, so
15:45:28 10 I can write and answer your question. And Exhibit 14
15:45:32 11 is Bates stamped SMHG095612 to SMHG095788. Do you
15:45:41 12 see that?
15:45:41 13      A.  Yes.
15:45:41 14          (EXHIBIT NUMBER 14 WAS MARKED.)
15:45:42 15      Q.  I'm sorry?
15:45:45 16      A.  Yes.
15:45:46 17      Q.  You don't need to look at the Bates
15:45:49 18 numbers.
15:45:49 19          Anyway so Tang sent you and your team a
15:45:53 20 redline that shows all of the things that you had
15:45:58 21 discussed over the last couple of days. Do you see
15:46:01 22 that?
15:46:01 23      A.  Yes.
15:46:01 24      Q.  So it's a cumulative redline, right?
15:46:04 25      A.  Yes.

Page 199

15:46:05 1       Q.  So Exhibit 14 is a cumulative redline.
15:46:10 2  We're in agreement on that, right?
15:46:10 3       A.  Well, I assume it is. I shouldn't have
15:46:13 4  said that actually. I don't know whether it's a
15:46:16 5  cumulative redline or what -- I don't know if you can
15:46:18 6  see in the red lines that this is just the latest
15:46:21 7  version. I'm assuming it is based on what you just
15:46:24 8  showed me and what you're about to show me, but...
15:46:26 9       Q.  Okay, that's fine.
15:46:28 10          Okay. Can we please go to the middle of
15:46:31 11 page 13, Jason.
15:46:40 12          And so now this redline is showing what is
15:46:43 13 the latest iteration of the borrower's equity
15:46:45 14 requirement, right? Do you see that?
15:46:48 15      A.  Yeah.
15:46:51 16      Q.  And the -- what it's showing is that --
15:46:55 17 and by this redline, on Exhibit 14, the red line
15:46:58 18 attached to Exhibit 14 is showing that the borrower's
15:47:02 19 cash equity requirement concept was removed, right?
15:47:05 20      A.  Correct.
15:47:08 21      Q.  And the only thing remaining is the
15:47:11 22 borrower's equity requirement concept, right?
15:47:14 23      A.  Correct.
15:47:19 24      Q.  And the language has been simplified
15:47:26 25 pretty significantly, right?

Page 200

15:47:28 1       A.  Yeah. I basically linked the balance
15:47:32 2  thing specifically, which was I think something we
15:47:34 3  had been pushing for a long time. So it was good to
15:47:37 4  see them pull that in and tie that to the -- and then
15:47:41 5  did they just add the cash to the other -- I can't --
15:47:46 6  can't -- yeah. I'm still not clear why the 92 went
15:47:49 7  into 87. But I'm not sure if that's -- yeah, if they
15:47:57 8  netted out the cash amount from that or something
15:48:00 9  like that. But in the simplicity they tied it to
15:48:08 10 the -- to keep the loan in balance.
15:48:16 11      Q.  Pursuant to section 517 of this agreement,
15:48:20 12 right?
15:48:20 13      A.  Yes.
15:48:20 14      Q.  So basically all the pro rata cash
15:48:23 15 contribution language, that came out, right?
15:48:25 16      A.  It appears so.
15:48:26 17      Q.  And the ratio -- sorry. The
15:48:28 18 loan-to-equity ratio came out, right?
15:48:31 19      A.  It appears so.
15:48:32 20      Q.  And all that is left is that a simple
15:48:36 21 borrower's equity requirement to contribute -- sorry.
15:48:42 22 All that's left in the borrower's equity requirement
15:48:44 23 is the borrower's obligation to contribute equity to
15:48:47 24 the project of not less than $87,192,584 and zero out
15:48:58 25 of $100, right?

50 (Pages 197 to 200)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 201

15:49:00 1    A.  Or such greater amount as is required to
15:49:03 2  cause the loan to be in balance.
15:49:05 3    Q.  And that's the complete reading.  You just
15:49:09 4  completed my reading, right?
15:49:10 5    A.  Yes.
15:49:10 6    Q.  Okay.  Now, let me ask you your
15:49:16 7  understanding of some of these words.  What does it
15:49:18 8  mean when it says "not less than 87 million"?
15:49:22 9    A.  What does it mean?
15:49:29 10   Q.  Like what does the phrase "not less than"
15:49:32 11 mean to you?
15:49:32 12   A.  Well, to do the full project is the full
15:49:36 13 village.  To do the whole village we need to provide
15:49:40 14 not less than 87 million.  If we're going to do a
15:49:43 15 subset of it, obviously it's less.  So our teams went
15:49:47 16 along with that presumably because this concept of in
15:49:51 17 balance was brought from not just in 517 but
15:49:58 18 specifically into this paragraph.  So that was --
15:49:59 19   Q.  I understand that -- oh, I'm sorry.
15:49:59 20   A.  So that was probably negotiated by
15:50:03 21 Tishler, I would imagine.  But -- so yeah.  The
15:50:09 22 project is a large village, 240,000 square feet,
15:50:14 23 building after building after building.  And to do
15:50:18 24 that project we need to come up with not less than 87
15:50:22 25 million.  That said, our borrower is not obligated to

Page 202

15:50:27 1  do more than -- to even do necessarily the 120,
15:50:31 2  although they're supposed to tell us we can't do it
15:50:34 3  so we can do it with someone else.  But equally we
15:50:37 4  are only required to keep the loan in balance.
15:50:39 5    Q.  You mean your lender is not obligated to
15:50:41 6  do 120, right?
15:50:42 7    A.  Our lender is not obligated to do 120,
15:50:46 8  correct.
15:50:46 9    Q.  120 million?
15:50:48 10   A.  Yeah, they're not -- they're not obligated
15:50:50 11 to do 120 provided they tell us that they can't
15:50:55 12 complete the 120 so we can move their first lien to a
15:51:00 13 second and bring in another lender to finish the rest
15:51:03 14 of the village.
15:51:06 15   Q.  So let's just go back to this, my language
15:51:10 16 -- oh, my language.  My question was a little bit
15:51:10 17 simpler.  I wasn't asking you what not less than
15:51:11 18 means in the context of this project or even just the
15:51:14 19 broader transaction.  I'm just talking about the
15:51:17 20 phrase "not less than" as you view here, what does it
15:51:20 21 mean in plain language?
15:51:24 22   A.  It means equity to the project of not less
15:51:26 23 than 87 million.  We're saying we're going to -- to
15:51:32 24 do this project we're going to deliver not less than
15:51:36 25 87 million.  That's how I read it.

Page 203

15:51:40 1    Q.  So not --
15:51:41 2    A.  Let's go back -- we can go to the defined
15:51:44 3  term of project if you'd like.
15:51:45 4    Q.  No, no.
15:51:45 5    A.  But that's how I read it.  That it's tied
15:51:48 6  explicitly to the project because the project -- and
15:51:52 7  a cap table that's delineated out including a time
15:52:00 8  frame of when things come like TIF sums up to the
15:52:03 9  borrower's equity being 87 million.  So this is
15:52:06 10 reconfirming that we're in a position to provide not
15:52:08 11 less than 87 million to complete the totality of the
15:52:10 12 project if the totality of the borrowings come
15:52:16 13 through.
15:52:16 14   Q.  I'm just "not less than," does that mean
15:52:20 15 minimum?
15:52:22 16   A.  I don't know if not less and minimum are a
15:52:25 17 synonym.  I think the not less is making a point that
15:52:28 18 you have to fund an entire -- to do the capital stack
15:52:34 19 envisioned in the documents, you have to do not less
15:52:38 20 than 87 million to do the project.
15:52:40 21   Q.  So at least 87 million, right?
15:52:43 22   A.  To do the project, meaning a village, yes.
15:52:49 23 You need 87 is million to do the full project, which
15:52:52 24 is a village meant to be built over multiple years
15:52:57 25 and adjusted based on pre-sales and other things that

Page 204

15:53:01 1  per Tang's own language we don't get over our skis,
15:53:04 2  or what have you, on our ratio of speculative product
15:53:10 3  to actual market performance.  So the budgets were
15:53:15 4  meant to adjust; the scope was meant to adjust.
15:53:20 5    Q.  And the 87 million could even be more,
15:53:23 6  right, because it says "such greater amount as is
15:53:25 7  required," right?
15:53:26 8    A.  Yeah, if we decided to scale it to -- to
15:53:33 9  increase the scale or to, you know -- which we could.
15:53:37 10 As you -- if you recall, there's over 400 I think
15:53:43 11 even 450,000 in available square feet of finished
15:53:48 12 product available on the underlying land contribution
15:53:53 13 in this deal.  And yet our program or project, the
15:53:56 14 capital P project there defined term to the not less
15:54:01 15 than was only 240 I want to say.
15:54:03 16      So, you know, that other 160 was supposed
15:54:06 17 to -- you know, could be done by other people or
15:54:10 18 presumably could be done by an expansion of this
15:54:13 19 project.  I think if this project had funded on time
15:54:15 20 there would have been ample opportunity, and it was
15:54:17 21 envisioned we would do more -- bring in more 85 and
15:54:23 22 do more.
15:54:23 23   Q.  All right.  Let's put that aside, Jason.
15:54:26 24 I'd like to mark tab 33, and that's going to be
15:54:32 25 Exhibit 15.  Tab 33 is Bates stamped SMHG081901 to

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 205

15:54:38  1    SMHG082141.
15:54:38  2        (EXHIBIT NUMBER 15 WAS MARKED.)
15:54:48  3    Q.  (BY MR. ITKIN) Mr. Mauro, Exhibit 15 is
15:54:49  4  an e-mail sent by KT Capital's counsel at Dentons to
15:54:56  5  you and your team attaching fully executed loan
15:55:02  6  documents. Do you see that?
15:55:03  7    A.  Yep. Yes.
15:55:07  8    Q.  On June 29, 2016. Do you see that?
15:55:11  9    A.  Yes.
15:55:11 10    Q.  So let's take a look at page 94 of the --
15:55:24 11  why don't we take a look at page 160, Jason. I just
15:55:28 12  want to -- rather 161 too. Thank you.
15:55:39 13        Do you see that it's signed by the
15:55:44 14  borrower, Mr. Mauro, or Jeff Werbelow as the
15:55:56 15  borrower?
15:55:56 16    A.  Yeah, our CEO.
15:55:58 17        Can you go back one page? I don't know
15:56:01 18  who. I never spoke to Max.
15:56:04 19    Q.  But it was signed on behalf of the lender,
15:56:07 20  right, by someone?
15:56:08 21    A.  Well, again it's signed by Celona Asset
15:56:11 22  Management. To this day I don't know technically
15:56:14 23  what is KT, what's Cottonwood, what's Celona where it
15:56:19 24  begins and who controls who, so...
15:56:23 25    Q.  Okay. And that's what I wanted to ask

Page 206

15:56:27  1  you. I just said this is signed on behalf of the
15:56:30  2  lender, right?
15:56:31  3    A.  Yeah.
15:56:31  4    Q.  Okay. So let's just go to page 94 --
15:56:39  5  sorry, it's page 95. I'm sorry. It's the next page.
15:56:43  6        Okay. So this is the final version of the
15:56:47  7  loan agreement, right, Mr. Mauro?
15:56:49  8    A.  It appears so, yes.
15:56:51  9    Q.  Okay. And have you ever read the loan
15:56:56 10  agreement closely?
15:56:56 11    A.  I mean I read it before we executed it,
15:57:01 12  so...
15:57:03 13    Q.  Okay.
15:57:03 14    A.  But closely? I'm not a lawyer. So I'm
15:57:09 15  generally utilizing advice from counsel.
15:57:11 16    Q.  And let's look at the borrower's equity
15:57:16 17  requirement definition in Exhibit 15. Do you see it
15:57:19 18  at the top of the page there?
15:57:22 19    A.  I do.
15:57:23 20    Q.  Reflecting the redline that we just looked
15:57:27 21  at, the borrower's cash equity requirement concept is
15:57:31 22  not -- is no longer here, right?
15:57:33 23    A.  Right.
15:57:33 24    Q.  And the pro rata contribution concept is
15:57:38 25  no longer here, right?

Page 207

15:57:39  1    A.  I don't see the word "pro rata," and,
15:57:41  2  yeah, the cash thing was pulled out.
15:57:43  3    Q.  And the loan to ratio concept is no longer
15:57:49  4  in the borrower's equity requirement, is it?
15:57:52  5    A.  Well, it is. That's what in balance is.
15:57:55  6    Q.  I'm saying the words to loan-to-equity
15:58:00  7  ratio are no longer in that definition, right?
15:58:01  8    A.  Well, inherently the word balance is a --
15:58:04  9  you know, to be in balance is to be in loan equity
15:58:07 10  balance. So it's a substitute for the concept that
15:58:12 11  the loan has to remain in balance, so...
15:58:17 12    Q.  I'm sorry. I'm not trying to interrupt
15:58:22 13  you. I'm not trying to play games with you. I'm
15:58:22 14  saying the words "loan to ratio equity" are not in
15:58:26 15  this document, correct?
15:58:27 16        MR. YOUNG: Document speaks for itself.
15:58:29 17  Calls for a legal conclusion.
15:58:30 18        THE WITNESS: Right. They've been
15:58:32 19  replaced by the term "loan to be in balance."
15:58:37 20    Q.  (BY MR. ITKIN) Do you know that for a
15:58:39 21  fact that's what they were replaced by, or are you
15:58:42 22  just speculating?
15:58:43 23    A.  No, I know that -- well, I mean that's --
15:58:46 24  the balance is in relation to a loan to equity. Like
15:58:49 25  it's not in balance of like entitlements used whether

Page 208

15:58:56  1  to entitlements remaining. It's the loan being in
15:58:59  2  balance and the term balance relative to loan is debt
15:59:03  3  to equity.
15:59:04  4    Q.  I understand. But just to look at my
15:59:08  5  question, the words "loan-to-equity ratio," that
15:59:13  6  phrase no longer appears anywhere in the borrower's
15:59:16  7  equity requirement definition, right?
15:59:17  8        MR. YOUNG: Same objections.
15:59:19  9        THE WITNESS: Again it's been replaced by
15:59:21 10  the last clause after as-is required.
15:59:25 11    Q.  (BY MR. ITKIN) But by the fact that it
15:59:28 12  was replaced that means it's no longer there,
15:59:30 13  correct?
15:59:30 14        MR. YOUNG: Same objections.
15:59:32 15        THE WITNESS: The concept is there. The
15:59:34 16  language has been changed.
15:59:35 17    Q.  (BY MR. ITKIN) The language has been
15:59:37 18  removed, correct?
15:59:39 19        MR. YOUNG: Same objections.
15:59:41 20        THE WITNESS: Removed and replaced. The
15:59:43 21  language referring to in balance didn't exist in the
15:59:46 22  prior versions we reviewed until the one just before
15:59:49 23  this.
15:59:51 24    Q.  (BY MR. ITKIN) I understand that, Mr.
15:59:53 25  Mauro. I'm asking you something very simple. In the

52 (Pages 205 to 208)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 209

15:59:56 1 borrower's equity requirement definition that we're
15:59:58 2 looking at in Exhibit 15, which is the executed loan
16:00:03 3 agreement, do you see any words saying loan-to-equity
16:00:09 4 ratio?
16:00:09 5         MR. YOUNG: You're asking him for the
16:00:12 6 exact phrase?
16:00:13 7         THE WITNESS: I see the concept
16:00:17 8 loan-to-equity ratio. So if you're asking me like
16:00:19 9 the actual letters, l-o-a-n and r-a-t-i-o, I would
16:00:28 10 agree with you. I don't see the word loan ratio.
16:00:32 11 It's been replaced by the words in balance.
16:00:34 12         Q.  (BY MR. ITKIN)  And it's not just the
16:00:35 13 concept of in balance.  It's in balance pursuant to a
16:00:38 14 specific section of the loan agreement, right?
16:00:40 15         A.  Correct, yeah.
16:00:42 16         Q.  And that's section -- it has to be in
16:00:46 17 balance pursuant to section 517 of the agreement,
16:00:51 18 right?
16:00:51 19         A.  Correct.
16:00:51 20         Q.  So the borrower's equity requirement is
16:00:53 21 directly related to the in balance concept set forth
16:00:57 22 in section 517 of the loan agreement, right?
16:01:00 23         A.  Again I'm not a lawyer, but that's
16:01:02 24 certainly the way I read it.
16:01:03 25         Q.  And let's just go to page 111.  And the

## Page 210

16:01:12 1 final loan agreement in section 2.1 says that the
16:01:17 2 maximum amount of the EB-5 raise was going to be 120
16:01:23 3 million, right?
16:01:24 4         A.  So you don't want to go to clause 517.
16:01:26 5 You're going to a different clause?
16:01:28 6         Q.  Mr. Mauro, we're going to make it all the
16:01:29 7 way there.  I promise you.
16:01:31 8         A.  No, I just wanted to make sure that's what
16:01:32 9 I'm looking at now.  Because I thought for a sec we
16:01:34 10 were going to go to 517 next.
16:01:36 11         Q.  We'll go there in a little bit.  I
16:01:38 12 just want to -- before we get there, there's a couple
16:01:39 13 of provisions I want to talk about.
16:01:41 14         In section 2.1 it's clear that the maximum
16:01:45 15 amount of the EB-5 raise was going to be $120
16:01:50 16 million, right?  Do you see the number 120 million?
16:01:54 17         A.  Not exceed, Yeah.  I see not exceed and
16:01:57 18 120, yeah.
16:01:58 19         Q.  And as you said before under the final
16:02:04 20 loan agreement, the lender was not required to lend
16:02:07 21 the entire $120 million, correct?
16:02:11 22         A.  No.  The lender was required to notify us
16:02:14 23 if they weren't going to give us $120 million through
16:02:18 24 either the fundraising or the redirection of other
16:02:23 25 project capital.  But, yes, they -- presuming they

## Page 211

16:02:27 1 notify me they're not going to be able to raise so I
16:02:31 2 can bring in -- move them to a second and get a
16:02:34 3 first, yeah, they're not -- they're not obligated to
16:02:37 4 get to that full number.
16:02:39 5         Q.  Let's just unpack that.  Because that was
16:02:42 6 a very convoluted and complicated answer.
16:02:46 7         A.  Sorry.
16:02:47 8         Q.  The first part they didn't have to -- the
16:02:48 9 lender didn't have to lend the full 120 million,
16:02:52 10 right?
16:02:52 11         A.  The lender could notify us of its
16:03:00 12 inability to raise the full 120 and as a consequence
16:03:04 13 would not be required to do so.
16:03:10 14         Q.  And are you basing that on some provision
16:03:14 15 in the agreement or somewhere else?
16:03:16 16         A.  Yeah.  There's a notification, you know,
16:03:20 17 they have to notify us if they can't raise.  If this
16:03:25 18 is going to be a failure they --
16:03:27 19         Q.  That is a separate provision, right?
16:03:27 20         A.  -- have to notify.
16:03:27 21         Q.  Sorry, we're talking over each other.
16:03:28 22 Why don't you finish your answer.
16:03:29 23         A.  Yes.  That that is a separate provision
16:03:33 24 somewhere, but they go hand in hand.
16:03:37 25         Q.  I'm just talking about this provision.

## Page 212

16:03:39 1 This provision says they don't have to raise 120
16:03:42 2 million, right?
16:03:43 3         A.  Where does it say that?  Right.
16:03:45 4         MR. YOUNG: The document speaks for
16:03:45 5 itself.
16:03:48 6         Q.  (BY MR. ITKIN)  It said no greater than.
16:03:49 7 You pointed to it yourself just a few minutes ago.
16:03:51 8         A.  No, to not exceed.
16:03:52 9         Q.  Not exceed, correct.
16:03:54 10         A.  Yeah.  I don't -- I don't -- I think
16:03:57 11 that's silent to being less than.
16:03:59 12         Q.  Well, shall not be greater than, right?
16:04:03 13 That means it doesn't have to be more than 120,
16:04:06 14 right?
16:04:06 15         A.  I don't -- like I said, I don't know if --
16:04:09 16 I know that -- I believe that that concept is in
16:04:11 17 here, but I don't think it's in this specific
16:04:15 18 paragraph.  I think they have more clear language
16:04:18 19 that they can call "no-joy" and say they can't get it
16:04:26 20 done and we have to live with whatever they have
16:04:28 21 advanced at that point, which is again why you
16:04:31 22 advance under the loan being in balance.
16:04:35 23         Q.  Okay.  Now, can we go to page 127, please,
16:04:45 24 Jason?  Yep, perfect.
16:04:48 25         Do you see this section 3.4 Mr. Mauro?

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 213

16:04:51   1    A.   Yeah.
16:04:51   2    Q.   You may want to remove your hand from your
16:04:54   3  mouth because the reporter again may not be able to
16:04:56   4  hear what you're saying.
16:04:57   5       Do you see this section 3.4?
16:04:59   6    A.   Yes.
16:04:59   7    Q.   Is that what you're referring to in this
16:05:04   8  kind of notice obligation that you're talking about?
16:05:09   9    A.   This -- it looks like this is at least one
16:05:16  10  of the paragraphs that pertains to that.  So lender
16:05:22  11  being -- being Celona "notifies borrower of (jumbled
16:05:22  12  words) --
16:05:22  13       THE REPORTER:  Either slow down or read to
16:05:22  14  yourself.
16:05:35  15       THE WITNESS:  Yeah.  The portion where it
16:05:37  16  says if lender notifies borrower in writing that the
16:05:42  17  aggregate amount of the advance is reasonably
16:05:46  18  expected by lender to be less than 120 million
16:05:52  19  provided it doesn't already exceed 120 million.
16:06:00  20       So, yeah, this speaks to that concept.  I
16:06:05  21  don't know if it's the only paragraph that does, but
16:06:07  22  this paragraph does.
16:06:09  23    Q.   (BY MR. ITKIN)  Sorry, which concept?
16:06:12  24    A.   The concept that we can bring in a senior
16:06:19  25  loan and make this one junior if we're notified in

Page 214

16:06:23   1  writing that they're not going to be able to get to
16:06:27   2  120 million.
16:06:28   3    Q.   Does this language in section 3.4 or do
16:06:33   4  you see -- strike that.
16:06:34   5       Do you see any language in this section
16:06:36   6  3.4 requiring the lender to give you notice so that
16:06:43   7  it does not have to raise $120 million?
16:06:46   8       MR. YOUNG:  The document speaks for
16:06:48   9  itself.  Calls for a legal conclusion.
16:06:56  10       THE WITNESS:  Yeah.  To me that's the
16:06:57  11  intent of that paragraph is that they're going to
16:07:00  12  raise 120 or tell me they can't.  And if they can't,
16:07:03  13  then I have a right to bring in someone else.
16:07:05  14    Q.   (BY MR. ITKIN)  But do you see any
16:07:07  15  obligation here requiring them to either raise 120 or
16:07:12  16  give you notice that they can't?
16:07:16  17       MR. YOUNG:  Same objections.
16:07:22  18       THE WITNESS:  I think it's implied.
16:07:45  19    Q.   (BY MR. ITKIN)  But it's not explicit, is
16:07:48  20  it, Mr. Mauro?
16:07:49  21    A.   Just as explicit as the -- you know some
16:07:54  22  of the borrower equity stuff you're talking about.
16:07:55  23  It's a capital stack with 120 million that provides
16:07:58  24  for all the construction.  So I -- you know, it is
16:08:03  25  the -- it is the essence of the existence of the

Page 215

16:08:08   1  project.  So, you know, it is hard to believe that if
16:08:14   2  you're not going to be able to do it that you, you
16:08:19   3  know, you don't follow the protocol here which
16:08:22   4  is, you know, to notify in writing so we can secure a
16:08:26   5  senior loan.
16:08:26   6    Q.   Okay.  Can you show me any language in
16:08:30   7  section 3.4, any explicit language in words that
16:08:35   8  impose any sort of obligation on the lender to give
16:08:38   9  you notice?
16:08:41  10       MR. YOUNG:  Same objections.
16:08:44  11       THE WITNESS:  Again, we have the right to
16:08:45  12  obtain debt financing, you know, secured by the
16:08:49  13  property that he has a senior loan on but only if
16:08:54  14  they notify me in writing.  It doesn't say request.
16:08:57  15  It doesn't say like I have to request and then they
16:09:00  16  say:  Oh, that's a good idea.  That's not the
16:09:03  17  language.  You know, they have to notify -- it's this
16:09:08  18  is a moot point.  Meaning me pursuing a senior loan
16:09:11  19  is not something that's in my -- that I'm responsible
16:09:15  20  for doing here and I shouldn't do.  I might be in
16:09:19  21  violation of the loan agreement if I'm doing such
16:09:21  22  until they notify me that they're not going to be
16:09:24  23  able to get the 120.  So, you know, that action
16:09:27  24  generates their reaction, which is the senior loan.
16:09:32  25    Q.   In other words you don't see any words,

Page 216

16:09:35   1  specific words, imposing any obligation on the lender
16:09:39   2  to give you any notice in section 3.4 of section 15?
16:09:43   3    A.   I do.  "The right to obtain debt financing
16:09:46   4  is conditioned upon the borrower notifying in writing
16:09:49   5  that they -- that the aggregate amount of the advance
16:09:53   6  is reasonably expected by the lender to be less than
16:09:56   7  120 million."
16:09:57   8       MR. YOUNG:  Same objections.
16:09:59   9    Q.   (BY MR. ITKIN)  So doesn't that language
16:10:01  10  give you the right to get a senior loan if the lender
16:10:04  11  tells you they're not going to be able to raise 120?
16:10:07  12    A.   I believe that's correct as well.  As is
16:10:14  13  the fact that why -- why would we pursue a senior
16:10:19  14  loan unless the lender told us that he wasn't going
16:10:21  15  to be able to raise.  Keep in mind, Tang was telling
16:10:25  16  us he was going to do more Arizona style projects.
16:10:28  17  Arizona is where he had a bulk, you know, loan of 20
16:10:31  18  plus million dollars that he moved from one project
16:10:34  19  to our project.  So it wasn't dependent on successful
16:10:37  20  marketing in China.  It was projects that had been
16:10:42  21  completed, of which there was tons of them around the
16:10:45  22  country including their own, that they could get
16:10:48  23  involved with and redirect.
16:10:50  24    Q.   Let's move down to section 1 -- oh, sorry,
16:10:55  25  page 131, section 5.1.

54  (Pages 213 to 216)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 217

16:11:00  1          Mr. Mauro, are you familiar with section
16:11:03  2    5.1 of the loan agreement that you have before you?
16:11:06  3          A.   I mean I reviewed it at one point.  So
16:11:13  4    it's the construction section.
16:11:17  5          Q.   Do you know that -- or do you know what it
16:11:23  6    requires -- scratch that.
16:11:25  7          Do you know what obligation section 5.1
16:11:28  8    imposes on the borrower?
16:11:30  9          A.   Yeah.  I mean that if you request a draw
16:11:44 10    and funds are available, that you then follow the
16:11:52 11    construction that the draw is intended to fund per
16:11:58 12    the specified, you know, time frame and, you know,
16:12:08 13    specifications.  Of which those -- and there's
16:12:13 14    another section in here that they have to be reviewed
16:12:16 15    by fulcrum.  So...
16:12:19 16          Q.   Where do you see the words if you request
16:12:21 17    the draw?
16:12:27 18          MR. YOUNG:  The document speaks for
16:12:29 19    itself.
16:12:33 20          MR. ITKIN:  That doesn't even make sense,
16:12:34 21    Mr. Young.
16:12:35 22          THE WITNESS:  This is in relation to
16:12:37 23    construction, vertical construction, right?
16:12:41 24          Q.   (BY MR. ITKIN)  Yeah.  Well, it's in
16:12:43 25    relation to construction, right, Mr. Mauro?

Page 218

16:12:46  1          A.   Yeah.
16:12:47  2          Q.   And doesn't it require the borrower to
16:12:51  3    cause all construction to be commenced, continued,
16:12:54  4    and prosecuted in a good and workman-like manner and
16:12:57  5    should cause the project to achieve substantial
16:13:00  6    completion, substantial in accordance with the
16:13:04  7    schedule and all the other specifications, plans,
16:13:10  8    budgets" --
16:13:10  9          A.   Yeah, you can see the financing delays in
16:13:14 10    section 5.1.  So I think it's pretty clear that we
16:13:14 11    faced financing delays based on the inability of
16:13:20 12    capital.  And then we have e-mails to the effect
16:13:21 13    of the lack of funds not being there to draw down and
16:13:24 14    do.
16:13:26 15          Q.   I'm not talking about financing delays.  I
16:13:28 16    asked you a very simple question.  Doesn't section
16:13:31 17    5.1 require the borrower "to cause all construction
16:13:36 18    of the improvements to be commenced, continued, and
16:13:38 19    prosecuted in a good and workman-like manner and
16:13:42 20    shall cause the project to achieve substantial
16:13:45 21    completion substantially in accordance with the
16:13:47 22    schedule, plans and specifications, budgets..." and
16:13:52 23    so on.
16:13:53 24          A.   And keep going on the "and so on."
16:13:54 25    Because you forgot "And each construction contract on

Page 219

16:13:56  1    or before the substantial completion date as such
16:13:59  2    date may be extended by the aggregate number of days
16:14:02  3    all forced majeure extensions and financing delays
16:14:06  4    defined term permitted by section 7.5."
16:14:10  5          So I don't think there's any doubt we
16:14:14  6    faced financing delays.  So I think we have to go to
16:14:17  7    section 7.5 if you would like to dig deeper into my
16:14:23  8    comments or opinions on this clause.  But, no, I
16:14:25  9    disagree on what you're construing from this.
16:14:32 10          Q.   You don't think section 5.1 imposes an
16:14:36 11    obligation on the borrower to continue construction
16:14:39 12    except in the event of forced majeure financing
16:14:45 13    delays?
16:14:45 14          MR. YOUNG:  Legal conclusion.
16:14:52 15          THE WITNESS:  I think in relation to each
16:14:58 16    construction contract that we enter into, you know, I
16:15:02 17    think there's a -- so the constituent components of
16:15:07 18    construction that we commit to do, I think there are.
16:15:11 19    But relative to the broader financing delays that can
16:15:17 20    put off an entire section, you know, when our lender
16:15:21 21    is telling us he's going to have more funds for us,
16:15:24 22    he just needs more time to move -- move a project
16:15:28 23    from A to Z or, you know, do what he did in the
16:15:32 24    Arizona project.  So, you know, we were waiting for
16:15:37 25    the capital to arrive.

Page 220

16:15:42  1          Q.   Well, you still had an obligation as the
16:15:44  2    borrower to continue construction according to the
16:15:47  3    schedule except for financing delays and forced
16:15:53  4    majeure events, right?
16:15:53  5          A.   Right.  Are you arguing we didn't have a
16:15:56  6    financing delay?
16:15:59  7          Q.   Thank you.  Let's go down to page 148,
16:16:04  8    section 7.1.
16:16:08  9          Mr. Mauro, are you familiar that there are
16:16:11 10    events of default under the loan agreement?
16:16:14 11          A.   Yes.
16:16:18 12          Q.   Are you familiar with those events of
16:16:20 13    default?
16:16:21 14          A.   It's been some time.
16:16:24 15          Q.   In section 7.1 -- scratch that.  Section
16:16:30 16    7.1 deals with a payment default.  Do you see that?
16:16:32 17          A.   Yes.
16:16:33 18          Q.   And is that a default in borrower's
16:16:38 19    requirement to pay obligations under the loan?
16:16:40 20          A.   It appears so, yes.
16:16:43 21          Q.   So if the borrower does not repay the loan
16:16:49 22    to maturity is that under the event of default?
16:16:52 23          MR. YOUNG:  Calls for a legal conclusion,
16:16:54 24    you can answer.
16:16:54 25          THE WITNESS:  That would be my assumption.

55 (Pages 217 to 220)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 221

16:16:55   1     Q.  (BY MR. ITKIN)  Do you know what the
16:16:56   2   maturity of this loan was --
16:16:58   3     A.  The original?
16:16:59   4     Q.  -- Mr. Mauro?
16:17:00   5     A.  The original --
16:17:01   6     Q.  Yes.
16:17:01   7     A.  -- loan proceeds were to be provided over
16:17:05   8   two to three years and the repayment was five -- year
16:17:11   9   five with an extension to I think seven or eight.
16:17:13  10   So...
16:17:17  11     Q.  So the initial maturity date was
16:17:20  12   June 28th, 2021, right, five years from 2016?
16:17:24  13     A.  That could be right.  I'd have to look.
16:17:28  14     Q.  And the loan was not repaid on June 28th,
16:17:32  15   2021, right?
16:17:33  16     A.  Correct.
16:17:34  17     Q.  So the loan was under the event of default
16:17:41  18   as of June 28, 2021, right?
16:17:46  19        MR. YOUNG:  Calls for a legal conclusion.
16:17:48  20        THE WITNESS:  There was payment.  We were
16:17:50  21   in discussions with Tang and Alex about -- we spent
16:17:56  22   an enormous amount of time looking to see if we could
16:18:00  23   free the underlying village property from their lien
16:18:05  24   and provide home sites for the individual lenders
16:18:10  25   given that we had very strong individual home site

Page 222

16:18:15   1   values.  So the idea was to get them all home site
16:18:19   2   values that were well above the 500K investment that
16:18:23   3   they made.  So we were spending an enormous amount of
16:18:27   4   time in planning that and providing subsequent
16:18:31   5   documentation related to that.
16:18:33   6        And then the attorney that you replaced,
16:18:36   7   who was a nightmare, was the one -- was the one who
16:18:41   8   moved to -- to intervene and reject what we'd been
16:18:48   9   working on with them for, you know, seven months I
16:18:52  10   think, relative to moving -- at Alex's request to
16:18:55  11   moving the individual lenders into this.  So, yeah, I
16:19:02  12   mean there was a payment default, so...
16:19:08  13     Q.  Just to understand what you just said,
16:19:10  14   there was a lot there.  You agree with me as of
16:19:13  15   June 28th, 2021 the loan was not repaid and it was
16:19:18  16   event of default, right?
16:19:21  17     A.  I can't comment if it was event of default
16:19:24  18   because I'm not a lawyer.  But to my knowledge the
16:19:27  19   loan was not repaid as of the date you mentioned.
16:19:29  20     Q.  And the loan had to be repaid as of that
16:19:34  21   date, right?
16:19:34  22     A.  Again I'm not a lawyer, so I don't know
16:19:36  23   what the extensions were or the fact that we had not
16:19:39  24   gotten notification from them to have adequate time
16:19:43  25   to put a -- to move this loan into a second into a

Page 223

16:19:46   1   first.  So I don't know if that automatically got us
16:19:50   2   time frame.  You know, we were promised funds right
16:19:51   3   up to the very end when Alex suggested:  Oh, instead
16:19:56   4   of that, why don't we -- you know, why don't you move
16:20:00   5   all of our people into individual home sites.
16:20:02   6     Q.  Are you aware of any extensions being
16:20:09   7   granted under the loan, Mr. Mauro?
16:20:11   8     A.  I don't know.  Again I'm not a lawyer.  So
16:20:14   9   there was something -- there was some extensions of
16:20:17  10   some kind during our negotiation periods.
16:20:20  11     Q.  Are you aware that in your complaint you
16:20:24  12   admit that the initial maturity date was June 28th,
16:20:28  13   2021 and the loan was not made by that date?
16:20:31  14     A.  Again I don't have the loan maturity date
16:20:36  15   in front of me.  So I'm not disputing that that's the
16:20:39  16   loan maturity date.  And I am telling you that I'm
16:20:43  17   not disputing the fact that we haven't repaid the
16:20:45  18   loan.
16:20:45  19     Q.  Okay.  Now, let's go to section 7.5
16:21:00  20   because you wanted to go to that.  And that's at the
16:21:02  21   bottom of the page.  Do you see that section, Mr.
16:21:06  22   Mauro?
16:21:07  23     A.  Yes.
16:21:22  24     Q.  And do you see that it says that -- well,
16:21:32  25   section 7.5 is one of the events of default

Page 224

16:21:36   1   provisions in this loan agreement, right?
16:21:39   2     A.  I believe.  I'm not a lawyer.  But, you
16:21:46   3   know, that sounds right to me.
16:21:49   4     Q.  So -- and if you read it in conjunction
16:21:51   5   with the intro to the entire event of default section
16:21:57   6   at the top of the page, basically what it says is the
16:22:00   7   occurrence of any of the following is an event of
16:22:03   8   default under the loan agreement.  Do you see that?
16:22:07   9        It's a little higher, Jason, on the -- on
16:22:12  10   page 57.  Keep going up.  Keep going up.  Right
16:22:16  11   there.
16:22:16  12        Do you see that?
16:22:16  13     A.  Yeah, I see that.
16:22:18  14     Q.  Okay.  And so the occurrence -- and
16:22:21  15   basically if you read in conjunction with that,
16:22:24  16   basically "If constructions of improvements is
16:22:27  17   discontinued for a period of more than 30 days, 30
16:22:30  18   consecutive days."
16:22:30  19        Do you see that?
16:22:31  20     A.  Yes.
16:22:31  21     Q.  That's an event of default.
16:22:35  22     A.  Yeah.  And so that ties back to the
16:22:39  23   example we keep going back to, which is if we pull
16:22:42  24   down a draw to do a building and fulcrum looks at the
16:22:49  25   budget, reviews the bids and says, "Makes sense to

56 (Pages 221 to 224)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 225

16:22:51  1   me, guys; they can do this building, this 10,000- or
16:22:54  2   this 20,000-square-foot building." And we start it
16:22:58  3   and there's some unforeseen event in that it costs a
16:23:01  4   lot more and we discontinue construction and we don't
16:23:05  5   notify for that and we trip this provision, we would
16:23:07  6   be in default.
16:23:09  7         And we would, you know, also have our --
16:23:12  8   some of our guarantees have to step in to remedy that
16:23:17  9   situation. That in my -- that is what I believe this
16:23:24 10   is in reference to. If -- if it -- if you believe
16:23:30 11   it's in reference to meeting the milestones of the
16:23:33 12   broader project, then notice was given, you know,
16:23:37 13   within, you know, six months of receiving the loan
16:23:41 14   because the fund -- the loan proceeds did not ever
16:23:46 15   come on the volume or time frame that was originally
16:23:49 16   outlined in the schedule provided to and agreed to by
16:23:53 17   the lender. So we have multiple e-mails informing
16:23:57 18   them that -- not that construction started and
16:24:01 19   stopped -- but just we've done all the infrastructure
16:24:05 20   work we can do; we're waiting to go vertical. Where
16:24:08 21   is the money to go vertical? You know, we've got a
16:24:13 22   team; they're here.
16:24:18 23         You know, that's -- they were informed all
16:24:22 24   along the way. We inquired and inquired and inquired
16:24:25 25   relative to the availability of funds all the way

Page 226

16:24:27  1   through to the last draw, and none of those draws
16:24:29  2   were significant enough to allow us to do, you know,
16:24:37  3   an initial building or buildings that would be
16:24:42  4   subject to an -- the, you know, completion guaranties
16:24:48  5   or halting of construction. It didn't commence. The
16:24:55  6   stuff that commenced completed, and that was the
16:24:57  7   horizontal work and the ski --
16:24:57  8      Q.   Go to exhibit --
16:24:59  9      A.   And the ski lifts by the way, too.
16:25:01 10      Q.   Let's look at exhibit -- sorry. Tab 55,
16:25:07 11   please, we're going to mark that as Exhibit 16.
16:25:13 12         (EXHIBIT NUMBER 16 WAS MARKED.)
16:25:15 13      Q.   (BY MR. ITKIN) That is the plaintiff's
16:25:17 14   complaint in this matter, so we don't need to say the
16:25:19 15   Bates numbers.
16:25:20 16         Mr. Mauro, have you reviewed your
16:25:23 17   complaint in this matter?
16:25:24 18      A.   I have on different occasions, yeah.
16:25:30 19      Q.   Did you review it before it was filed in
16:25:33 20   court?
16:25:34 21      A.   Yes.
16:25:34 22      Q.   And you agreed with everything it said?
16:25:40 23      A.   The best of my knowledge at the time, yes.
16:25:43 24      Q.   Did you disagree with anything it said?
16:25:51 25      A.   No, not --

Page 227

16:25:52  1      Q.   Okay.
16:25:53  2      A.   -- at the time.
16:25:55  3      Q.   All right. So let's go to -- can we go to
16:25:56  4   paragraph 44 on page 9, please, Jason?
16:26:02  5         Mr. Mauro, do you see paragraph 44 in your
16:26:06  6   complaint?
16:26:07  7      A.   Yes.
16:26:08  8      Q.   And do you see the part of the paragraph
16:26:16  9   starting with "Specifically," right after that hyphen
16:26:20 10   there or the dash rather? It starts with
16:26:27 11   "Specifically that for every dollar loaned..."
16:26:29 12      A.   Yes.
16:26:30 13      Q.   Do you see that?
16:26:30 14      A.   Yes.
16:26:31 15      Q.   It says "Specifically that for every
16:26:34 16   dollar loaned is an advance under the loan agreement,
16:26:38 17   the borrower was obligated to contribute $.7266 to
16:26:43 18   the costs of Summit Village."
16:26:49 19         Do you see that?
16:26:50 20      A.   Yes. That's the -- that's the -- that's
16:26:55 21   the in balance aspect of the paragraph you just
16:27:01 22   tortured me on.
16:27:03 23      Q.   What is that -- what is that -- I'll move
16:27:06 24   to strike the word "torture." I'm just asking you
16:27:09 25   questions, sorry.

Page 228

16:27:10  1      A.   Sorry. It's getting late.
16:27:11  2      Q.   I think you're torturing me with your long
16:27:14  3   answers.
16:27:15  4      A.   I apologize.
16:27:18  5      Q.   That's okay. I apologize too. I'm not
16:27:21  6   trying to torture you.
16:27:22  7         But you did sue my clients, so this is
16:27:24  8   part of the process, my friend.
16:27:25  9      A.   Fair enough.
16:27:26 10      Q.   Okay. So what does it mean that "The
16:27:28 11   borrower is obligated to contribute $.7266 to the
16:27:33 12   cost of Summit Village for every dollar loaned as an
16:27:36 13   advance under the loan agreement"?
16:27:38 14      A.   Yeah. It's the concept of in balance.
16:27:42 15   It's just mathematically spelling out the balance
16:27:49 16   ratio that was agreed to in the underwriting.
16:27:54 17      Q.   Okay. So what we're talking about is it's
16:27:55 18   like 7.266 percent because that's the ratio between
16:27:58 19   $87 million of equity divided by $120 million of
16:28:03 20   aspirational debt, right?
16:28:06 21      A.   Well, I think you should say aspirational
16:28:09 22   equity based on aspirational debt. Like we together
16:28:12 23   would like to build a village. Like Hillary Clinton,
16:28:17 24   "It takes a village."
16:28:18 25         And -- but if it turns out we build a

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 229

16:28:20 1    quarter of a village, we build a quarter of a
16:28:24 2    village. As long as we pull down and do the quarter
16:28:27 3    of a village, the loan is in balance.
16:28:29 4        Q.   Okay. And was this the material term of
16:28:33 5    this deal, this ratio?
16:28:34 6        A.   The in balance is a very material term
16:28:38 7    obviously. And so, yes, the concept of our
16:28:44 8    debt-to-equity ratio being in balance at all times
16:28:48 9    is -- is the underlying bases of this loan and how
16:28:54 10   you confidently go into a multi-year draw down where
16:28:59 11   you admittedly are going to change budgets, react to
16:29:04 12   the market, change the configuration and quantity of
16:29:09 13   condominiums. And are the two bedrooms selling or
16:29:12 14   are the four bedrooms selling? Do people appreciate
16:29:16 15   the amenities we did in the first building, or should
16:29:19 16   we cut them back or expand them in the second
16:29:23 17   building? All of that stuff, you know. And the
16:29:25 18   market response, how are pre-sales going? How long
16:29:28 19   is the sell through? How much can we realistically
16:29:32 20   absorb of the 120 million responsibly based on the
16:29:37 21   market reaction given that market sales are -- the
16:29:42 22   market reaction part is critical to its actual, you
16:29:46 23   know, completion and payback. So that, you know, is
16:29:53 24   the -- and what we were -- you know, what we as the
16:30:00 25   borrower was doing was putting our premium real

## Page 230

16:30:05 1    estate in this core village at risk that if we failed
16:30:10 2    with this lender to build, sell through, and pay
16:30:15 3    back, that we would go from 100 percent equity
16:30:19 4    ownership of the project to zero equity ownership of
16:30:23 5    the project, and someone would come in and presumably
16:30:27 6    make the lender as whole as they could and finish off
16:30:31 7    the rest of the land which included more land than
16:30:34 8    was even envisioned to be built in this project.
16:30:37 9    Again the 400-and-something thousand versus the
16:30:40 10   240,000.
16:30:41 11       So, yes, that phrase that is in the final
16:30:45 12   documents relating to balance is the -- you know, as
16:30:53 13   they say for Christmas: Jesus is the reason for the
16:30:58 14   season. It is the reason for the loan, right? It is
16:31:00 15   the crux of the loan.
16:31:01 16       Q.   That's not what I asked you though. I
16:31:03 17   agree with you that the in balance requirement is in
16:31:05 18   the loan agreement. I'm talking about this .7266
16:31:11 19   loan-to-equity or equity-to-loan ratio. Do you see
16:31:16 20   that?
16:31:16 21       A.   Yes. That is simply --
16:31:18 22       Q.   Was that --
16:31:20 23       A.   That is simply --
16:31:21 24       Q.   Was that a material --
16:31:22 25           I'm sorry, can I just ask my question?

## Page 231

16:31:24 1        A.   Sure, sorry.
16:31:25 2        Q.   Because remember the whole point of this
16:31:26 3    is I ask you questions and you answer them. If you
16:31:29 4    don't do that, we're going to go to the judge. He's
16:31:32 5    going to get upset, and we're going to do this again.
16:31:35 6    And I'm trying to avoid that, okay?
16:31:37 7        A.   Sounds good.
16:31:37 8        Q.   Okay. So this equity-to-loan ratio of
16:31:43 9    .7266, was that a material term of your deal?
16:31:49 10       A.   The equity ratio of .7266 is a reflection
16:31:54 11   of the word balance which is core to our deal. So
16:31:58 12   yes.
16:31:59 13       Q.   Okay. But those -- that specific number
16:32:05 14   and in fact the concept of this number is nowhere to
16:32:11 15   be found in the loan agreement, is it?
16:32:13 16       A.   It is.
16:32:14 17           MR. YOUNG: The document speaks for
16:32:16 18   itself. Calls for a legal conclusion.
16:32:18 19           THE WITNESS: If you divide whatever it is
16:32:21 20   equity and debt or debt and equity, you get the
16:32:24 21   number. That is a --
16:32:24 22       Q.   (BY MR. ITKIN) Okay. Can you go --
16:32:24 23       A.   It's a mathematical representation of
16:32:27 24   balance.
16:32:27 25       Q.   All right. Do you know what, I think

## Page 232

16:32:29 1    we've been going for a while. I think we need to
16:32:31 2    take a little break because I don't want you to get
16:32:33 3    too loopy on me.
16:32:35 4        We'll take a five-minute break, and we'll
16:32:37 5    come back.
16:32:38 6        A.   That is the perfect time. I've got to use
16:32:40 7    the restroom too.
16:32:42 8        MR. ITKIN: Perfect. Hold on. Hold on.
16:32:44 9    You've got to wait for it.
16:32:45 10       VIDEOGRAPHER: Thank you. We're off the
16:32:47 11   record. The time is 4:32 p.m.
16:32:49 12       (Break taken from 4:32 to 4:48 p.m.)
16:50:11 13       VIDEOGRAPHER: Going back on the record.
16:50:11 14   The time is 4:50 p.m. Counsel.
16:50:15 15       Q.   (BY MR. ITKIN) Mr. Mauro, welcome back.
16:50:18 16   All right. Before the break we were talking about
16:50:22 17   this .7266 loan-to-equity ratio concept, right?
16:50:28 18       A.   Correct.
16:50:29 19       Q.   And you told me that it is encapsulated in
16:50:34 20   the in balance provisions in the loan agreement,
16:50:37 21   right?
16:50:37 22       A.   Correct. Because it is -- it's the
16:50:39 23   mathematical definition of balance. It's loan
16:50:43 24   divided -- it's debt divided by equity or equity
16:50:47 25   divided in. Yeah.

58 (Pages 229 to 232)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 233

16:50:47  1       Q.   But you would agree with me it's not found
16:50:50  2   anywhere, those numbers are not actually found
16:50:52  3   anywhere in the loan agreement?
16:50:54  4       A.   Well, the numbers -- the numerator and
16:51:02  5   denominator are.
16:51:03  6       Q.   In different places.  But the actual --
16:51:05  7       A.   No, on the actual -- in the paragraph that
16:51:09  8   discusses the project or defines the village and the
16:51:12  9   capital stack, it is the -- you know, it is the debt
16:51:17 10   and the equity component that together are the total
16:51:22 11   village project, and it's just dividing one into the
16:51:24 12   other to get to the ratio.  And it's somewhere in the
16:51:29 13   loan docs is the band of the acceptable ratio of loan
16:51:32 14   to value.  Because it's not like we had to be
16:51:35 15   necessarily to that exact mathematic number.  It's
16:51:40 16   the point that you're in -- I mean maybe it was,
16:51:44 17   maybe it was like, whatever, 65 at all times or
16:51:47 18   whatever.  Whatever it was, it's in there somewhere.
16:51:51 19   But I thought we had like slightly more, like a 5
16:51:54 20   percent swing or something like that.  But maybe we
16:51:56 21   didn't.  Maybe it was -- maybe it was purely, you
16:52:01 22   know, binary, it had to be at a number or above as
16:52:05 23   opposed to in a window.
16:52:08 24       Q.   So let's -- why don't we look at this in
16:52:12 25   balance section that you've been talking about for a

Page 234

16:52:14  1   while.  Section 517 of the agreement, right?
16:52:17  2       A.   Right.
16:52:17  3       Q.   And that's -- Jason, that's Exhibit 15.
16:52:22  4   Will you pull that up, please.  On page 138.  Okay,
16:52:30  5   great.
16:52:30  6       And is this the section that you're
16:52:32  7   talking about, Mr. Mauro?
16:52:34  8       A.   I mean I don't know if this is the only
16:52:41  9   section because there probably is a section on draws
16:52:45 10   and other -- you know, other aspects.  But this does
16:52:50 11   speak to -- you know, this first sentence does speak
16:52:56 12   to the loan at all times must be in balance.
16:52:59 13       Q.   And by this you just have to be a little
16:53:02 14   bit more clear of what we're talking about.  You're
16:53:05 15   looking at section 517 that's referenced in the
16:53:09 16   borrower's equity requirement, right?
16:53:10 17       A.   Right.  So it says "Anything contained in
16:53:12 18   this loan agreement to the contrary notwithstanding,
16:53:15 19   the loan should at all times be quote/unquote in
16:53:19 20   balance on an individual budget line item basis and
16:53:24 21   an aggregate budget amount basis."
16:53:27 22       So -- so obviously it delineates it even
16:53:33 23   more.  And we've talked about the budget line items
16:53:35 24   and if a budget line item is building something and
16:53:38 25   it doesn't -- and it gets approved by fulcrum but

Page 235

16:53:46  1   then the costs go off, like that's an issue that will
16:53:49  2   have to be dealt with to get that individual thing,
16:53:50  3   you know, in line.
16:53:51  4       And then the aggregate loan.  I think B is
16:53:54  5   the big one.  It is that the aggregate loan as we
16:53:57  6   draw it down has to be matched up with the equity,
16:54:03  7   which includes the contributed land among other
16:54:08  8   things.  So the -- you know, this is an incredibly
16:54:15  9   strategic piece of property.  The core real estate
16:54:19 10   here is the entire northern village that was pad
16:54:24 11   ready and infrastructure served and ready for a
16:54:26 12   standard hotel and one hotel.
16:54:32 13       Q.   And can you point me -- so there was a
16:54:35 14   couple of sections I was going to represent to you in
16:54:38 15   517.
16:54:38 16       A.   Sure.
16:54:39 17       Q.   There's fifty-seven -- yeah, 517.  There's
16:54:42 18   517.1, 517.2, 517.3, and 517.4.
16:54:48 19       A.   Okay.
16:54:48 20       Q.   Let's go through each of them.
16:54:50 21       A.   Sure.
16:54:51 22       Q.   We're looking at 517.1.  And if you could
16:54:54 23   scroll down a little bit, Jason.  We should see the
16:54:57 24   whole section 517.1 if possible.  Perfect.
16:55:00 25       So is there anything in this section in

Page 236

16:55:04  1   your view that reflects the loan-to-value ratio
16:55:08  2   concept that you're -- that we looked at in the
16:55:10  3   complaint?
16:55:11  4       A.   Sorry, could you ask the question one more
16:55:19  5   time?
16:55:19  6       Q.   Yeah.  Is there anything in this section
16:55:22  7   517.1 that we're looking at in the loan agreement
16:55:25  8   that reflects the loan-to-value ratio concept that we
16:55:30  9   looked at in the complaint, the .7266 number?
16:55:34 10       A.   Yeah.  I mean line -- you know, the line 1
16:55:38 11   in quotes, in the balance.  So the general concept of
16:55:43 12   the loan having to remain in balance both on a line
16:55:47 13   item basis and an aggregate budget base.
16:55:50 14       Q.   Doesn't this section though refer to the
16:55:53 15   fact that the expenses can't get out of hand?
16:55:58 16       A.   No.
16:56:00 17       Q.   Like the loan balance of the expenses --
16:56:02 18       A.   No, it's the --
16:56:03 19       Q.   -- won't go beyond the budget?
16:56:05 20       A.   No, no.  It's the budget of the project.
16:56:07 21   You know, it's the -- at any given time whatever,
16:56:12 22   like if we wanted to do something to improve the
16:56:16 23   project, right, and build -- you know, build equity
16:56:20 24   value.  So you have raw line.  You can improve it
16:56:24 25   horizontally, you know, and enhance the value of it,

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

### Page 237

16:56:26  1   and then eventually you can improve it vertically,
16:56:30  2   right?  Those are the -- broadly speaking are the two
16:56:34  3   types of improvements.  You could also amenitize
16:56:38  4   around it like a ski lift for example.  But on any of
16:56:41  5   those efforts that we wanted to do, each budget item
16:56:46  6   and in the aggregate of what we've drawn down needed
16:56:51  7   to be in balance so that the project wouldn't go
16:56:53  8   upside down and the lenders, the EB-5 lenders, would
16:56:58  9   not find themselves having -- not having -- the goal
16:57:02 10   was to make sure at all times they had sufficient
16:57:06 11   collateral relative to the amount of loans that had
16:57:11 12   been utilized.
16:57:15 13       Q.   Let's just go back to section 517.1.
16:57:18 14       A.   Sure.
16:57:18 15       Q.   Because I want to actually ground
16:57:20 16   everything you're saying in the actual language of
16:57:22 17   the agreement.
16:57:23 18       A.   Okay.
16:57:25 19       Q.   So is there anything in 517.1, either
16:57:28 20   words or something else, that reflects the
16:57:31 21   loan-to-value ratio that you're talking about?
16:57:33 22       A.   Yes.
16:57:33 23       Q.   Sorry, loan-to-equity ratio.
16:57:36 24       A.   Yes.
16:57:36 25       Q.   What is that?

### Page 238

16:57:38  1       A.   It's the -- it's the words "in balance,"
16:57:39  2   in quotes.  And the fact that it's further delineated
16:57:43  3   into an A and B reflecting individual budget items,
16:57:47  4   meaning we couldn't make an individual draw request
16:57:49  5   unless that draw was in balance for the individual
16:57:52  6   item.  And then in addition they then had to look at
16:57:56  7   the aggregate draws made, the loan in full, and say:
16:58:01  8   Is the loan in full to this date in balance?  And so
16:58:05  9   on both levels, the individual draw, the aggregate
16:58:09 10   draws, is this project in a good place relative to
16:58:14 11   the debt-to-equity ratio?  I mean that's what it's
16:58:20 12   referring to right there.
16:58:22 13       Q.   So you don't think section 517.1 deals
16:58:27 14   with or ensures that the expenses don't go out of
16:58:37 15   budget?
16:58:38 16       A.   I think it's what it says here, and it's
16:58:44 17   what I described it to be.  So I don't think -- I
16:58:47 18   think this is central and not, you know, -- contrary to
16:58:52 19   that.  This is the essence of the loan.
16:58:59 20       Q.   Okay.
16:58:59 21       A.   Because it's meant to be done over years,
16:59:02 22   over a vast project with multiple building phases
16:59:06 23   that will -- that acknowledged in the get-go would be
16:59:11 24   modified over time and could be -- could be smaller,
16:59:16 25   you know, could very well be smaller as well.

### Page 239

16:59:21  1       Q.   Okay.  So it is your testimony, sworn
16:59:25  2   testimony here today, that the loan-to-value ratio
16:59:28  3   concept is encapsulated in 517.1; is that correct?
16:59:33  4       A.   It could be encapsulated in other places
16:59:37  5   too, but I believe the in balance concept here is the
16:59:40  6   central element and nature of this loan.
16:59:43  7       Q.   Okay.  Could it be encapsulated in 517.2?
16:59:51  8            Can we go down one, Jason?  Perfect, thank
16:59:56  9   you.
17:00:21 10       A.   Yeah.  So this -- we talked about this
17:00:23 11   earlier in that this relates to the fact that they're
17:00:27 12   not going to take our word for it that the individual
17:00:31 13   draw or the aggregate draws are in balance.  They're
17:00:36 14   going to use fulcrum to evaluate the draw, determine
17:00:41 15   that the stuff is actually, you know, going to get
17:00:45 16   done well or was done, you know, properly.  And that
17:00:49 17   the underlying, you know, proposed ratio is legit and
17:00:58 18   updates the corresponding total balance, you know,
17:01:01 19   accordingly.  So this is -- this was acted upon
17:01:09 20   through the fact that every draw had to be approved
17:01:13 21   by fulcrum.
17:01:15 22       Q.   But just going back to what we're talking
17:01:17 23   about, this doesn't have anything to do with the
17:01:22 24   loan-to-value ratio per se, right?
17:01:24 25       A.   No, it does.

### Page 240

17:01:25  1       Q.   But this 517.2 --
17:01:27  2       A.   Sorry.  It does in that it ensures the
17:01:32  3   accuracy of the loan-to-value ratio.  Because I'm
17:01:36  4   sure what they had in the past was lending to people
17:01:38  5   who would say they're doing XYZ or contracting with
17:01:43  6   their cousin or, you know, saying they did something
17:01:45  7   that they didn't do or syphoning off costs,
17:01:50  8   construction costs to -- you know, I've got, you
17:01:53  9   know, 400 schools in Africa at one point.  And one of
17:02:00 10   the scams we would deal with were basically
17:02:03 11   contractor kickback schemes through the construction
17:02:07 12   value chain.
17:02:08 13            So this just assures that the lender, that
17:02:11 14   this third-party that is all they do, is inspecting
17:02:16 15   the balance through the verification of any and all
17:02:22 16   construction.
17:02:23 17       Q.   Okay.  And just so I understand, I think I
17:02:30 18   finally understand your testimony.  You're saying it
17:02:33 19   is your testimony that the loan-to-value ratio
17:02:36 20   concept is embodied in the in balance concept in this
17:02:40 21   loan agreement; is that right?
17:02:41 22       A.   Among other places, yes.  And I'm saying
17:02:44 23   that the in balance concept is the vehicle under
17:02:48 24   which this loan -- is the concept under which this
17:02:51 25   loan is managed given that the time -- that's the

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 241

17:02:56  1  nature of the loan is making sure that we've
17:02:58  2  contributed enough equity relative to the capital
17:03:02  3  that we've drawn down, and that the capital we've
17:03:06  4  drawn down completes what it's supposed to complete.
17:03:09  5     Q.  Uh-huh.  But I'm really focused on this
17:03:14  6  loan-to-value ratio, that concept specifically.  I
17:03:18  7  just want to make sure it is your belief that the
17:03:21  8  loan-to-value ratio concept is embodied in the in
17:03:25  9  balance provisions of this loan agreement.
17:03:36 10     A.  To the first two sentences and more of
17:03:44 11  5.1.7.1 reflect the -- are further extrapolations of
17:03:51 12  the ratio, the loan-to-value ratio, whatever you want
17:03:58 13  to call it.  It's the --
17:03:59 14     Q.  Sorry, we kind of got off track, not loan
17:04:03 15  to value.  We're talking about loan to equity.  I'm
17:04:05 16  sorry.
17:04:05 17     A.  Loan to equity, I'm sorry.
17:04:07 18     Q.  So it is your testimony, and I just want
17:04:10 19  to get this right so we can move on.
17:04:10 20     A.  Yeah.
17:04:12 21     Q.  It is your testimony that the first
17:04:16 22  sentence of section 517.1 embodies the loan-to-equity
17:04:22 23  ratio concept, the .7266 loan-to-equity ratio concept
17:04:28 24  that is discussed in your complaint?  Is that right?
17:04:32 25     A.  This is one of the areas addressing that

Page 242

17:04:35  1  concept, yes.
17:04:36  2     Q.  Where is the other -- thank you.
17:04:39  3         Where is the other area?
17:04:40  4     A.  I would have to review the full loan
17:04:43  5  documents.
17:04:44  6     Q.  Okay.  So let's go -- so what happens if
17:04:47  7  the loan is not in balance?  Do you know?
17:04:50  8     A.  If the loan is not in balance, you
17:04:52  9  cannot -- in the aggregate, is that what you're
17:04:55 10  asking?
17:04:55 11     Q.  If the loan is not in balance period.  If
17:04:59 12  the loan is not in balance, what happens?
17:05:00 13     A.  I presume you mean in the aggregate.  If
17:05:04 14  the loan is not in balance in the aggregate then we
17:05:06 15  is -- it would have to make further draws.  So the next
17:05:11 16  draw we would do would have to result in the -- in
17:05:18 17  the project being in balance.  So we'd have to adjust
17:05:22 18  the sponsor equity, for example, and figure out a way
17:05:28 19  to add -- you know, contribute another piece of land
17:05:34 20  that can be part of the defined project, which we had
17:05:38 21  land adjacent to this and have offered that up as a
17:05:42 22  way to ameliorate the lenders.  And so that's one
17:05:46 23  way.  Or if we, you know, accelerated the TIF
17:05:54 24  financing, which, you know, was something that could
17:05:58 25  have been done.  If you did it in year two instead of

Page 243

17:06:00  1  in year three, that could have been a way to pull in
17:06:04  2  funds sooner that are more heavily weighted on equity
17:06:08  3  versus debt that would then fix the overall balance.
17:06:15  4         You could wait to draw, to submit another
17:06:20  5  draw until you'd built up some pre-sales or actual
17:06:24  6  sales, and that -- those proceeds from both could go
17:06:29  7  back into the next draw down request you have so that
17:06:33  8  you could build the next -- let's say you built
17:06:37  9  building 1 but you want to build building 2.  You
17:06:39 10  could now do building 2 if you waited to have more
17:06:43 11  sales or pre-sales.
17:06:45 12         So all of those things are ways in which
17:06:47 13  you can modify the sponsor equity and get the -- and
17:06:53 14  do a specific draw that would have a higher ratio
17:06:56 15  that would then bring the aggregated ratio back in
17:07:00 16  balance.
17:07:02 17     Q.  Could the lender do a capital call if the
17:07:05 18  loan was not in balance?
17:07:06 19     A.  That would be a last resort if the loan
17:07:10 20  was not in balance and there was some -- like if you
17:07:15 21  had a white elephant, like if you had -- if you had a
17:07:21 22  partial constructed thing, you would pull down money
17:07:23 23  to do something that you didn't complete.  If you
17:07:28 24  had, you know, a ski lift that was partially
17:07:30 25  constructed, yes.  If you had a building that was

Page 244

17:07:36  1  done except for the roof, yes.
17:07:39  2         So if you had these and there was no other
17:07:43  3  way to -- if you couldn't -- like if those other
17:07:46  4  means, contributing more land, you know, accelerating
17:07:51  5  TIF, pre-sales, actual sales, if none of those were
17:07:56  6  available -- which is hard to imagine by the way in a
17:07:59  7  project where we're building a town the size of
17:08:03  8  Telluride and this is four acres of our Telluride --
17:08:08  9  you know, that was a possibility.  It's just we
17:08:14 10  viewed it as reasonably remote given the other
17:08:16 11  sponsor equity options we had to remain in balance.
17:08:20 12     Q.  Is the capital call referred to as a
17:08:23 13  deficiency deposit in this agreement?
17:08:25 14     A.  I don't know.  I'd have to look.
17:08:26 15     Q.  Can you scroll down a little bit, Jason?
17:08:59 16     A.  Yeah, I think that's right.  And to my
17:09:02 17  knowledge I don't think we ever received a -- a
17:09:07 18  deficiency deposit notice, but I could be wrong.
17:09:12 19     Q.  In other words you never -- it's your
17:09:15 20  testimony that you're not aware of receiving a
17:09:20 21  capital call from the lender?
17:09:22 22     A.  Well, look at the -- at the very end when
17:09:26 23  they hired their insane attorney and our negotiations
17:09:30 24  to solve this amicably blew up, you know we got all
17:09:36 25  sorts of notices.  So I don't know what we got from

61 (Pages 241 to 244)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 245

17:09:39  1    the crazy individual.
17:09:41  2         But prior to that we -- to my knowledge we
17:09:46  3    did not have it where we had started on something and
17:09:49  4    didn't complete it and got one of these notices where
17:09:52  5    we had to, you know, fund within ten days something,
17:09:56  6    you know, of this nature. I don't recall that at
17:09:59  7    all.
17:09:59  8         Q.   And I assume by the insane individual,
17:10:04  9    you're not referring to me?
17:10:05 10         A.   I'm not referring to you. I'm referring
17:10:07 11    to, you know, prior counsel that got interjected
17:10:14 12    about halfway through our, you know, negotiations
17:10:21 13    with Cottonwood and Celona to provide 80 home sites
17:10:29 14    to the individual 80 lenders.
17:10:32 15         Q.   Let me just follow up on that -- not on
17:10:35 16    that but what you said before. So if the lender --
17:10:40 17    if the loan is not in balance and the lender makes a
17:10:43 18    capital call by requesting a deficiency deposit, the
17:10:49 19    borrower has to make that deficiency deposit, right?
17:10:55 20         A.   Yeah, again if you're out of balance. I
17:10:58 21    mean the whole idea here is because you have to be in
17:11:02 22    balance from draw to draw, like there's only so much
17:11:05 23    you can screw up from one draw to the next because
17:11:08 24    you've got to be in balance each draw. You've got
17:11:12 25    fulcrum, you know, giving you the full proctology

Page 246

17:11:15  1    exam each time. And so the amount that you can --
17:11:19  2    you know, I mean presumably if this thing had
17:11:22  3    actually funded like it was supposed to and we had
17:11:25  4    like a 20 million draw to build, you know, a four- or
17:11:29  5    five-story building and that had an overage that was
17:11:34  6    beyond the contingency and we couldn't solve that
17:11:39  7    with other -- with another overage draw, you know,
17:11:44  8    based on equity we already had in or additional
17:11:49  9    sponsor equity, then we could have had a deficiency
17:11:52 10    notice, and we would have to solve that problem.
17:11:54 11         Q.   And if the borrower is unable to make the
17:11:58 12    deficiency deposit upon receiving the capital call
17:12:02 13    from the lender so the loan is out of balance, then
17:12:08 14    Holdings -- talking about the Holdings Group -- has
17:12:10 15    to step in and make that deficiency deposit on behalf
17:12:14 16    of the borrower, right?
17:12:16 17         A.   If the aggregate loan is out of balance
17:12:22 18    and the lender -- sorry, borrower cannot modify that
17:12:32 19    through -- through the various forms of equity and it
17:12:37 20    doesn't have the cash equity to bring it back into
17:12:43 21    balance in the aggregate of the cumulative draws,
17:12:47 22    then yes the holding company -- as I understand it,
17:12:50 23    that's where the holding company would need to bring
17:12:53 24    the loan back into balance.
17:12:55 25         Q.   By making the deficiency deposit on behalf

Page 247

17:13:01  1    of the borrower, right?
17:13:03  2         A.   Correct.
17:13:03  3         Q.   And that's the concept that's embodied in
17:13:06  4    the shortfall guaranty; is that right?
17:13:07  5         A.   I don't know if that's -- I don't know if
17:13:10  6    that -- I mean I think that's probably better left to
17:13:13  7    a lawyer to answer. But you know my understanding is
17:13:15  8    that is an aspect of the shortfall that again it goes
17:13:21  9    to the unfinished building analogy that we talked
17:13:24 10    about that if -- if -- if, so that...
17:13:32 11         Q.   That's an aspect of the shortfall
17:13:35 12    guaranty, right?
17:13:36 13         A.   The -- the deficiency deposit, my
17:13:41 14    understanding is that it's related to that concept.
17:13:45 15    But again I'm not a lawyer, and I don't know for
17:13:48 16    sure. But I would imagine that the two are
17:13:52 17    interrelated.
17:13:54 18         Q.   And I'm just saying the concept of the
17:13:56 19    shortfall guaranty and Holdings having to step in and
17:13:59 20    making a deficiency deposit on behalf of the
17:14:05 21    borrower, those are interrelated, right?
17:14:07 22         A.   Yeah. I mean again this is about the loan
17:14:10 23    being in balance. And if it's not in balance and the
17:14:13 24    lender -- the borrower can't remedy that situation
17:14:16 25    with the various forms of sponsor equity, then the

Page 248

17:14:21  1    holding company would have to -- would have to assist
17:14:25  2    is my understanding.
17:14:26  3         Q.   And that's -- that concept that you're
17:14:30  4    talking about, that understanding, that's embodied in
17:14:33  5    the next section, 517.4, right?
17:14:39  6         Jason, can you just scroll down so we can
17:14:40  7    see that entire paragraph? Perfect, thank you.
17:14:58  8         Can we go off the record while Mr. Mauro
17:15:40  9    reviews this? Because I don't want to waste our
17:15:43 10    time.
17:15:43 11         A.   I've read it. Go ahead.
17:15:45 12         Q.   So I was just saying 517.4, section 517.4
17:15:50 13    that you're looking at in the loan agreement
17:15:54 14    addresses the concept that if the borrower cannot
17:15:57 15    and the holdings cannot provide evidence of other
17:16:04 16    equity available, then they have to make a deficiency
17:16:09 17    deposit, right, in order to keep the loan in balance?
17:16:12 18         A.   I mean this paragraph, you know, is a
17:16:18 19    further explanation of the in balance concept of
17:16:27 20    15.7 -- 5.17.1. And real-- yeah, so this is also
17:16:35 21    related to that.
17:16:38 22         Q.   So basically as I understand it, 517.4
17:16:48 23    basically requires the borrower or the guarantor to
17:16:52 24    provide reasonable evidence satisfactorily to the
17:16:54 25    lender in the lender's sole discretion of various

62  (Pages 245 to 248)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 249

```
17:16:58   1   sources of equity available, right?
17:16:59   2       A.   Yeah.  This goes to my earlier answers
17:17:06   3   where if -- if the loan that -- as part of remaining
17:17:12   4   in balance, you know, we have to be able to, if
17:17:16   5   requested, show the lender that something that we've
17:17:23   6   cited in the draw, cumulative draws to date is in
17:17:31   7   fact -- is in fact, you know, in balance, so...
17:17:38   8       Q.   Right.  There's -- there's basically
17:17:42   9   enough commitment financing amount, right, there's
17:17:46  10   enough of various sources of funding available to
17:17:52  11   meet --
17:17:54  12       A.   Well, again --
17:17:55  13       Q.   -- the budget, right?
17:17:56  14       A.   Well, the source -- yes, the sources of
17:17:59  15   funding are debt and equity, right?  So the project
17:18:05  16   is a combination of debt and equity.  And so the
17:18:08  17   combination, you know, of the two drawn down
17:18:14  18   improvement by improvement and draw by draw is --
17:18:20  19   gives you the aggregate balance.
17:18:24  20       And, for example, costs went up beyond
17:18:29  21   contingency in the middle of something or even after
17:18:35  22   something, so in between building 1 and building 2
17:18:38  23   costs went up more than expected, more than
17:18:43  24   contingency, then to draw down to do building 2 we
17:18:46  25   would have to -- you know, we would go through this
```

Page 250

```
17:18:50   1   exercise with the lender to show them that the
17:18:54   2   ability to draw down building 2 and complete it and
17:18:59   3   then to stay in balance relative to all draw downs to
17:19:05   4   date are -- would be required.
17:19:08   5       And so -- so if building 2 is going to
17:19:14   6   have deposits, purchaser deposits as part of its
17:19:18   7   equity stack that you had or modify, you've got to be
17:19:22   8   able to evidence that.
17:19:23   9       Q.   And based on the last sentence "So long
17:19:29  10   as..." that line starting with "So long as..." based
17:19:34  11   on that sentence if there was sufficient funding
17:19:38  12   sources available both from the borrower and the
17:19:42  13   guarantor, the borrower didn't have to make a
17:19:45  14   deficiency deposit, a capital call, right?
17:19:49  15       A.   I believe this is just saying that -- I
17:20:23  16   believe this is saying that as long as you're
17:20:26  17   continuing to, you know, build -- draw down on the
17:20:32  18   committed financing amount, that we wouldn't be --
17:20:46  19   and no default has occurred, you know, on -- so
17:20:50  20   that's just kind of, you know, not necessarily
17:20:55  21   germane -- that "The borrower should not be required
17:21:00  22   to make a deficiency deposit under section 517 with
17:21:07  23   respect to the commitment financing amount."
17:21:09  24       So I think this is saying that if the
17:21:13  25   committed financing amount doesn't show up, we -- you
```

Page 251

```
17:21:19   1   know, we can't be asked to -- we can't have a
17:21:29   2   deficiency deposit if -- let's say we're in the
17:21:32   3   process of -- let's say we do a building in two
17:21:35   4   draws.  So it's a $20 million building, but we decide
17:21:40   5   we're going to do the foundation and other stuff, and
17:21:42   6   then we're going to finish it off with a second draw.
17:21:45   7   And for some reason the lender doesn't come forward
17:21:52   8   with the loan amount in the second draw.  They then
17:21:57   9   can't turn around and use their inability to fund
17:22:01  10   that loan amount in the second draw for building
17:22:05  11   number 2, which would complete it, as a basis for
17:22:09  12   giving us a deficiency deposit notice.  That's how I
17:22:14  13   read it.
17:22:15  14       Q.   Let's move on to the guaranty real quick.
17:22:25  15   It's on page 79, Jason, of this same document.
17:22:30  16       Have you read the shortfall guaranty, Mr.
17:22:34  17   Mauro?
17:22:34  18       A.   I have in the past, yeah.
17:22:36  19       Q.   Do you recognize what we're looking at as
17:22:40  20   the shortfall guaranty?
17:22:41  21       A.   Yeah.  I mean it's been some time, so
17:22:47  22   yeah.
17:22:47  23       Q.   And you can see that this is the final
17:22:52  24   signed version.
17:22:53  25       If you'd go to page 84, Jason.
```

Page 252

```
17:22:57   1       Do you see that --
17:22:58   2       A.   Yeah.
17:22:58   3       Q.   -- signed?  All right.
17:23:00   4       MR. YOUNG:  Just for the record, I think
17:23:02   5   we're fighting about the amended and restated one.
17:23:05   6   I'm not sure what the differences are.  But I don't
17:23:07   7   think the language that you may ask him about has
17:23:09   8   changed, but I'll just make that note for the record.
17:23:12   9       Q.   (BY MR. ITKIN)  Yeah.  Do you know if
17:23:15  10   the -- if this shortfall guaranty was ever amended or
17:23:19  11   restated, Mr. Mauro?
17:23:22  12       A.   I don't recall.
17:23:23  13       Q.   And do you know if the language -- well,
17:23:28  14   scratch that.
17:23:28  15       Let's -- well, do you know what, why don't
17:23:31  16   we take off the amended and restated guaranty so
17:23:34  17   we're just talking about the right document.
17:23:38  18       Jason, can you please mark exhibit -- or
17:23:43  19   tab 59, it will be Exhibit 17.  And the Bates are
17:23:49  20   SMHG002864 to SMHG002871.
17:23:49  21       (EXHIBIT NUMBER 17 WAS MARKED.)
17:24:03  22       Q.   (BY MR. ITKIN)  Mr. Mauro, have you seen
17:24:04  23   this Amended and Restated Shortfall Guaranty before
17:24:07  24   that's marked as Exhibit 17?
17:24:10  25       A.   I believe so because this is the final
```

63 (Pages 249 to 252)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 253

```
17:24:18  1    amended one.
17:24:19  2       Q.   Yeah.  Do you know why the guaranty was
17:24:22  3    amended?
17:24:23  4       A.   I don't.  I don't recall off the top of my
17:24:28  5    head.
17:24:28  6       Q.   Okay.  So let's take a look at section 1.
17:24:33  7    If you'd scroll down, please, Jason.
17:24:39  8          So I think the main provision that we're
17:24:41  9    talking about is the guarantee of the section 1(1)(a).
17:24:44 10    It says the guarantee of the borrower's equity
17:24:47 11    requirement, right?
17:24:48 12       A.   Okay.
17:24:51 13       Q.   Is that a yes or a no?
17:24:55 14       A.   Yeah, can I read section 1?
17:24:57 15       Q.   Yeah, absolutely.  And I will ask you some
17:25:01 16    more questions.  I'm not going to let you not read
17:25:05 17    it, but I have some basic questions that I want to
17:25:08 18    get out of the way.
17:25:08 19       A.   Okay.
17:25:09 20       Q.   And the guarantor under this agreement is
17:25:16 21    Summit Mountain Holding Group --
17:25:16 22       A.   Right.
17:25:17 23       Q.   -- right?
17:25:17 24       A.   Right.
17:25:17 25       Q.   Which we've been referring to as Holdings?
```

Page 254

```
17:25:18  1       A.   Uh-huh, right.
17:25:19  2       Q.   And so the section that's at issue in this
17:25:22  3    case I think is the borrower's -- sorry, the
17:25:23  4    borrower's equity requirement language in section
17:25:27  5    (1)(a).
17:25:28  6          Do you see that?
17:25:29  7       A.   Yeah.
17:25:29  8       Q.   And do you have an understanding of what
17:25:33  9    this is, the guarantee in Section 1(1)(a) is of?
17:25:38 10       A.   Yeah.  It's the borrower equity
17:25:42 11    requirement as per the loan agreement.
17:25:44 12       Q.   And so what does that mean in practice?
17:25:47 13       A.   It goes --
17:25:49 14       Q.   What is it for?
17:25:52 15       A.   It's for keeping the loan in balance and
17:25:55 16    for -- and then specifically these -- the shortfall,
17:26:02 17    the nature of shortfalls.  The examples that Tang
17:26:05 18    gave me, which was the incompleted building due --
17:26:10 19    you know, the incompleting building example that he
17:26:14 20    gave.  So --
17:26:15 21       Q.   So --
17:26:17 22       A.   -- yeah.
17:26:18 23       Q.   So is it related to the holding's
17:26:25 24    obligation to pay capital calls if the borrower can't
17:26:30 25    make them and the loan is out of balance?
```

Page 255

```
17:26:36  1       A.   Yeah, if -- I believe, but you know again
17:26:39  2    I'm not a lawyer.  I believe that there is a holding
17:26:44  3    company obligation if the aggregate loan is out of
17:26:49  4    balance, you know, I believe.  But I'm fairly certain
17:26:53  5    that the main construct here was when a specific
17:27:01  6    improvement was out of balance.  So I think it covers
17:27:08  7    both in the aggregate as well as individually.  But
17:27:12  8    the main example that Tang would refer to would be
17:27:16  9    individually, you know meaning building A out of A,
17:27:20 10    B, C, D, E, F, G or building B, if building B had
17:27:26 11    unforeseen challenges completing building B and/or
17:27:34 12    the most recent -- basically completing the purpose
17:27:37 13    of the most recent draw.
17:27:39 14       Q.   And just to finish that thought, Holdings
17:27:44 15    under this shortfall guaranty -- again I'm doing this
17:27:49 16    for the record -- under the shortfall guaranty marked
17:27:51 17    as Exhibit 17, Holdings had an obligation to step in
17:27:57 18    and fund the capital call if the borrower could not,
17:28:02 19    right, in the scenario you're referring to?
17:28:04 20          MR. YOUNG:  Vague.
17:28:05 21          THE WITNESS:  Yeah.  I'm sorry, can ask
17:28:07 22    you that again?
17:28:08 23       Q.   (BY MR. ITKIN)  Yeah.  I'm just finishing
17:28:10 24    your thought.  Anyway I think you answered my
17:28:15 25    question.
```

Page 256

```
17:28:16  1          Now, I have to ask you because you are the
17:28:21  2    one that both signed plaintiff's responses to our
17:28:28  3    interrogatories and they dealt with representations
17:28:31  4    being made to you.  I didn't see anything in those
17:28:35  5    responses dealing with the shortfall guaranty itself.
17:28:43  6    So my question to you is:  Are there any
17:28:47  7    representations or misrepresentations that you
17:28:52  8    believe Tang made to you in connection with the
17:28:53  9    shortfall guaranty?
17:28:55 10       A.   Oh --
17:28:57 11          MR. YOUNG:  Assumes facts, but you can
17:28:59 12    answer.
17:29:00 13          THE WITNESS:  Representations that he made
17:29:02 14    that -- that didn't make it into the, like, the
17:29:07 15    interrogatory or whatever?  Is that you're asking?
17:29:09 16       Q.   (BY MR. ITKIN)  No, let me put it another
17:29:12 17    way.  Did Tang lie to you about anything related to
17:29:16 18    the shortfall guaranty?
17:29:17 19       A.   Well, only in relation to that Jess's
17:29:25 20    attempt to mischaracterize it as a commitment to fund
17:29:31 21    $80 million in cash if necessary for an entire
17:29:35 22    capital stack under which they had no corresponding
17:29:39 23    obligation to loan in balance to that equity
17:29:43 24    requirement.  Which is absolutely preposterous and,
17:29:53 25    you know, reminiscent of, you know, the French
```

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 257

```
17:29:54   1   policeman in Casablanca being surprised on gambling
17:29:59   2   going on only to receive his winnings. It's just --
17:30:02   3   it's absolutely crazy, right? You know, it's
17:30:04   4   inconceivable to me that that position would be taken
17:30:08   5   given the -- that's the whole basis of the project
17:30:16   6   was this, you know, drawn-based, balance-based
17:30:21   7   project that we knew we had to sell to succeed. If
17:30:29   8   we weren't selling we wouldn't go forward, right?
17:30:33   9   You know, and so it just doesn't make any -- it
17:30:37  10   doesn't make any sense that -- you know, that a
17:30:43  11   project like ours -- like if that made sense, you
17:30:46  12   know, was there any diligence done on our ability to
17:30:50  13   come up with $80 million or $40 million or even
17:30:55  14   $20 million in just -- in cash shortfall?
17:30:59  15          There wasn't because there wasn't any need
17:31:01  16   to because this loan was draw-by-draw based, you
17:31:08  17   know, balance requirements individually and in the
17:31:13  18   aggregate. And we over -- we over collateralized
17:31:17  19   because we had the land to do so relative to the loan
17:31:21  20   amounts we utilized. That was the responsible thing
17:31:24  21   to do, and that's what we did.
17:31:27  22          Q.   And --
17:31:28  23          A.   So to take --
17:31:32  24          Go ahead.
17:31:32  25          Q.   I don't want to interrupt you, but I think
```

Page 258

```
17:31:35   1   you got far afield again. And I want to bring you
17:31:38   2   back to what we're talking about. So Jess is the
17:31:41   3   lender's lawyer, right?
17:31:43   4          A.   Yes.
17:31:43   5          Q.   Who you engaged with sometime in '21?
17:31:47   6          A.   Yes.
17:31:48   7          Q.   So other than that you're saying there's
17:31:50   8   nothing that Tang told you that you believe is not
17:31:55   9   true about the shortfall guaranty?
17:31:56  10          A.   Well, Tang represented the shortfall
17:32:07  11   guaranty as I understand the shortfall guaranty and
17:32:11  12   as my lawyers told me they understand the shortfall
17:32:16  13   guaranty, which is it is in relation to the loan in
17:32:20  14   the aggregate draws being in balance and any
17:32:26  15   individual draw being in balance and avoiding any
17:32:31  16   immediate construction that could be incomplete.
17:32:39  17   Vertical construction, for example, that could be
17:32:41  18   incomplete.
17:32:42  19          Q.   Okay. And that didn't really answer my
17:32:45  20   question. So I understand what you're saying Mr.
17:32:50  21   Tang represented to you. But I'm saying other than
17:32:53  22   the statements made by the lender's lawyer in 2021,
17:32:56  23   is there anything that your -- that you believe was
17:33:02  24   misrepresented to you about the shortfall guaranty by
17:33:08  25   KT Capital or any -- or any of the lenders or any of
```

Page 259

```
17:33:12   1   their representatives?
17:33:13   2          A.   Well, you know, I -- to me, you know, I
17:33:22   3   mean if you -- if you take Tang's comments made prior
17:33:29   4   to -- I mean prior to Jess getting involved, they --
17:33:34   5   they -- you know, there was a -- the balance issue
17:33:39   6   came up prior to Jess getting involved. And they --
17:33:43   7   that's when they first raised the issue that they
17:33:46   8   could take, you know, in something. And I wasn't --
17:33:51   9   I wasn't involved with it directly. And that's when
17:33:55  10   we developed a memo on the loan being in balance that
17:34:03  11   we -- I don't know if we eventually sent or not as
17:34:06  12   part of -- you know, we didn't want to -- because we
17:34:10  13   were negotiations, we didn't think it made sense to
17:34:14  14   get into -- to get into that disagreement versus
17:34:21  15   just, you know, we wanted to free up the village so
17:34:24  16   we could develop it. And we wanted to move the EB-5
17:34:30  17   collateral into a form that it could be utilized by
17:34:33  18   the individual EB-5 participants, meaning that the --
17:34:37  19          Q.   Mr. Mauro, I've got to stop you here
17:34:41  20   because we've got limited time. And I just --
17:34:43  21          A.   I can't say pre-Jess. I mean basically in
17:34:48  22   2016 and 2017 and 2018 there was a -- you know, at a
17:34:56  23   minimum maybe even 2019 everything Tang told me about
17:35:01  24   the guaranty language is how I understand and am
17:35:10  25   representing it today.
```

Page 260

```
17:35:11   1          Q.   Thank you. Let's mark exhibit -- or tab
17:35:16   2   45.
17:35:22   3          And just so you know, just to go back to
17:35:26   4   that answer. Mr. Tang was the only person you were
17:35:31   5   dealing with, so there's no one else, right?
17:35:34   6          A.   Well, there's Tang and Alex.
17:35:35   7          Q.   Well, did Alex say anything different to
17:35:38   8   you in '16, '17 and '18?
17:35:40   9          A.   No.
17:35:41  10          Q.   Okay. Anyone else on behalf of the
17:35:42  11   lenders?
17:35:42  12          A.   No. I mean, you know, again, we were
17:35:46  13   under in the impression effectively that Tang and
17:35:48  14   Alex were the lenders. And so it's still a mystery
17:35:56  15   to me the difference between the different entities,
17:35:59  16   as I mentioned. And so you know --
17:36:00  17          Q.   I will be happy to explain that to you off
17:36:04  18   the record.
17:36:05  19          All right. Let's move on to tab 45 that
17:36:09  20   we're going to mark as Exhibit 18.
17:36:12  21          And the Bates numbers are SMHG137715 -
17:36:18  22   SMHG137717, okay.
17:36:18  23          (EXHIBIT NUMBER 18 WAS MARKED.)
17:36:21  24          Q.   (BY MR. ITKIN) Okay. This is an e-mail,
17:36:22  25   Mr. Mauro, dated sometime in -- well, January 27,
```

65 (Pages 257 to 260)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 261

17:36:28  1  2020.  Do you see that?
17:36:29  2      A.  Yes.
17:36:29  3      Q.  And the subject matter is Summit TEA.  Do
17:36:35  4  you see that?
17:36:35  5      A.  Yes.
17:36:36  6      Q.  Do you recall what this -- the context of
17:36:39  7  this e-mail?
17:36:41  8      A.  Just the TEA and staying -- the TEA was an
17:36:53  9  issued you'd have to revisit from time to time.
17:36:55 10      Q.  And in the first sentence do you --
17:36:58 11  scratch that.
17:36:59 12          Who is Shaun Mulreed in this e-mail?
17:37:04 13      A.  Shaun was our general counsel and COO.
17:37:12 14      Q.  And in the first sentence of this e-mail
17:37:14 15  right at the very top he says, "Tang, we spent some
17:37:17 16  time looking into this, and we're coming up about
17:37:22 17  .6 percent short of the rate required to qualify as a
17:37:25 18  targeted unemployment area."
17:37:27 19          Do you see that?
17:37:28 20      A.  Uh-huh.
17:37:28 21      Q.  And does that mean that this project lost
17:37:37 22  the targeted unemployment area designation?
17:37:40 23      A.  I don't know if we lost it.  So I don't
17:37:42 24  know if they came up with a solution or not, so.  And
17:37:48 25  I don't know what the results of the now accounting

Page 262

17:37:50  1  data were definitively.  I mean I know this was an
17:37:53  2  issue, but I believe that at this point in 2020 it
17:37:59  3  wasn't an issue.  The reason we -- the reason Tang
17:38:04  4  had not told us he wasn't going to raise the 120
17:38:08  5  wasn't because the success or failure of marketing in
17:38:11  6  China.  Because that he'd already -- you know, his
17:38:16  7  focus was on their ability to get projects that had
17:38:23  8  already been funded that, you know, people were
17:38:25  9  supposed to pay back.  But because I think the term
17:38:28 10  was called retrogression.  Because it was taking so
17:38:31 11  long with the immigration department, they would have
17:38:39 12  the ability -- the those people had to say in 85.
17:38:39 13  And so those were the projects he was looking to roll
17:38:42 14  into ours.  And because ours had already started, you
17:38:48 15  know, we -- you know, we qualified.  The immigration
17:38:53 16  department understands you can't do a large scale,
17:38:57 17  you know, project and have it where your TEA is just
17:39:01 18  suddenly, boom, and then midstream you can't continue
17:39:05 19  to get capital.
17:39:06 20          So there are provisions in the law -- I'd
17:39:09 21  have to revisit and look at them -- that allow you to
17:39:14 22  effectively be -- you know, your timestamp is when
17:39:17 23  your project got sort of submitted and materially
17:39:19 24  underway.  And if you can show the job creation,
17:39:22 25  which thankfully we had a lot of job creation, you

Page 263

17:39:25  1  know.  They don't -- it wasn't like you -- it
17:39:30  2  doesn't -- like it limits our ability to do new EB-5
17:39:34  3  projects if we can't stay TEA or the evolving
17:39:38  4  definition of TEA.  But I believe the Legacy stuff
17:39:42  5  has kind of grandfathering elements, so -- but I'm
17:39:45  6  not totally familiar with the magnitude of them.
17:39:49  7      Q.  So you don't know one way or another
17:39:51  8  whether you lost the TEA designation?
17:39:56  9      A.  What I -- I know we didn't lose it
17:39:58 10  relative to our -- all of our investors are compliant
17:40:03 11  currently.  So our project is still one that is in
17:40:11 12  good standing and is a TEA project.
17:40:16 13          What I don't know is whether if we were to
17:40:19 14  do an EB-5 project today, whether we'd qualify as a
17:40:25 15  TEA.  I don't know the resolution of this specific
17:40:28 16  e-mail.
17:40:28 17      Q.  Do you know whether you would qualify as a
17:40:31 18  TEA in January of 2020?
17:40:33 19      A.  I don't.
17:40:34 20      Q.  But by this e-mail it looks like you
17:40:37 21  weren't, right?
17:40:38 22      A.  Again it was a -- you know, we had these
17:40:42 23  issues before and managed to figure out ways where we
17:40:46 24  could solve it.  And also I don't know what the new
17:40:48 25  data was here.  So, you know, again this is more

Page 264

17:40:52  1  about how attractive we are in the future, you know,
17:40:56  2  with new projects as opposed to our -- you know, our
17:41:00  3  existing project.
17:41:01  4      Q.  Do you have an opinion on whether the fact
17:41:07  5  that you may not have had your TEA designation in
17:41:10  6  January of 2020 had an effect on the lender's ability
17:41:15  7  to raise EB-5 capital in China?
17:41:19  8      A.  Well, again, you weren't raising money in
17:41:25  9  China in 2020 by and large.  He was -- Tang's primary
17:41:30 10  focus by 2020 was working with projects that had been
17:41:37 11  funded in the United States and getting those
17:41:40 12  projects sponsors to work with -- to work -- to work
17:41:45 13  with Tang and channel that money into our project or
17:41:52 14  in their case some other projects that maybe had
17:41:57 15  a vested interest in doing over ours.
17:41:59 16          So they did manage to channel more than
17:42:02 17  just the Arizona loan that they channeled our way.
17:42:06 18  And so that's principally what people were focused on
17:42:13 19  was re -- you know, effectively loan terms got
17:42:17 20  doubled because EB-5 people didn't want the money
17:42:22 21  back and to stay compliant with the government.  So
17:42:25 22  they hadn't --
17:42:27 23      Q.  Sorry, what was your understanding of why
17:42:31 24  folks were not raising money EB-5 financing in China
17:42:37 25  in 2020 anymore?

66  (Pages 261 to 264)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 265

17:42:37 1    A.   Because the duration to get a new -- to
17:42:42 2  get through the system was so long.  So it -- you
17:42:50 3  know, I think it originally took "X" number of years,
17:42:53 4  and that length doubled and then potentially even
17:42:56 5  tripled in length for people to get through the
17:42:58 6  immigration process.  So that's why the focus of
17:43:01 7  people like Tang moved from new people in the process
17:43:05 8  to people that were stuck in the process.  Because
17:43:09 9  most EB-5 loans were for construction.  Once somebody
17:43:12 10  built it, they wanted to repay that loan.  But the
17:43:15 11  EB-5 guys couldn't take that money back or they would
17:43:19 12  be out of -- they would be noncompliant with the
17:43:22 13  government because they had to keep it at risk.  So
17:43:25 14  it had to get re --
17:43:26 15    Q.   It sounds like --
17:43:27 16          Oh, I'm sorry.
17:43:27 17    A.   It had to get redeployed.  So redeployment
17:43:31 18  was a bigger focus in 2020 than de novo.
17:43:38 19    Q.   And is that because -- it sounds like the
17:43:43 20  way you're describing it, it was an industry-wide
17:43:49 21  phenomenon?
17:43:50 22    A.   Yes.  The -- it was industry wide that the
17:43:54 23  market for redeployment became a bigger and more
17:43:59 24  promising market than de novo in China specifically.
17:44:04 25          In India and elsewhere it was a different

Page 266

17:44:08 1  story.  So that only applied to China.  And you know
17:44:12 2  Hentry and others raised in other markets.  Tang
17:44:16 3  developed relationships in Korea and India and
17:44:18 4  elsewhere.
17:44:19 5    Q.   But your initial -- your agreement with
17:44:26 6  Mr. Tang and KT Capital was just limited to China for
17:44:26 7  purposes of --
17:44:28 8    A.   No.
17:44:27 9    Q.   -- what we're talking about here?
17:44:28 10    A.   No, it was not.
17:44:29 11    Q.   It was not limited to China?
17:44:31 12    A.   No.
17:44:31 13    Q.   Are you saying that the letter of intent
17:44:34 14  and the PPM and everything else was not limited to
17:44:37 15  China?
17:44:38 16    A.   Not to my knowledge, no.  No.
17:44:40 17    Q.   So you thought it was global?
17:44:42 18    A.   Yeah, they were just -- I mean China --
17:44:44 19    Q.   It was global --
17:44:45 20    A.   -- China was the easiest place to market
17:44:49 21  at the time, and that's where Hentry Global's track
17:44:53 22  record was.  But, no, Tang is -- Tang consistently --
17:44:55 23  when China went down, Tang was traveling to all of
17:44:57 24  these places and telling me that we could get money.
17:45:00 25  And we might have even got money out of Korea; I'm

Page 267

17:45:03 1  not sure.  But Korea was a big market.  Again you've
17:45:10 2  got to keep in mind it's not people like dissatisfied
17:45:12 3  with living in Korea.  It was people in Korea trying
17:45:15 4  to get their kids into US universities.  And so they
17:45:15 5  needed the immigration status to do so.  And then
17:45:15 6  India became a bigger market.  Vietnam.
17:45:20 7          So I'm sure when we depose Tang we can get
17:45:23 8  the full list of countries he visited and teed up and
17:45:27 9  tapped for us and other projects.
17:45:32 10    Q.   Understood.
17:45:34 11          Okay.  I just have a couple of other
17:45:38 12  questions.  Now, is it true that you were -- you were
17:45:45 13  communicating with Kobe Bryant following the
17:45:52 14  fundraising event in China?
17:45:54 15    A.   Yes.
17:45:54 16    Q.   And were you communicating with him solely
17:45:58 17  with respect to this project, or were you also
17:46:01 18  communicating with him about your own ventures?
17:46:04 19    A.   Yeah, I know he -- he got involved with
17:46:10 20  one of our vent-- so we have 160 companies in Learn
17:46:20 21  Capital.  And one of our companies is a super high
17:46:23 22  profile company in China.  It was the fastest
17:46:24 23  education company, reached a billion in revenues.
17:46:27 24  And it was slated to go out public at 5 billion about
17:46:31 25  18 months ago when the Chinese changed their

Page 268

17:46:33 1  regulation, so.
17:46:34 2          And, yeah.  So Kobe, I mentioned that when
17:46:39 3  I gave my -- Kobe is really interested in education.
17:46:42 4  And he had us look at a building that he had bought
17:46:46 5  in Newport Beach to see if he could turn it into a
17:46:49 6  school.  And so we introduced him to our Montessori
17:46:53 7  platform because we have the largest -- we
17:46:56 8  actually -- I actually started a Montessori business
17:46:58 9  so my daughter could go to school in Powder Mountain
17:47:02 10  and in California seamlessly.  And they had a
17:47:05 11  micro-school at Powder Mountain, but we've never
17:47:07 12  built the full school.  But that now has 100
17:47:09 13  locations around the country and in Europe.  It's now
17:47:12 14  the biggest Montessori platform in the world.
17:47:15 15          So we had discussions with Kobe about
17:47:17 16  that.  He was really interested.  Ultimately the
17:47:20 17  Newport Beach location just didn't make sense for
17:47:23 18  them.  So Kobe went a different direction with that.
17:47:30 19          And then -- but on the -- you know, he was
17:47:31 20  interested in meeting the folks at our -- at VIP kid.
17:47:39 21  And so we introduced him to that and ultimately
17:47:42 22  structured an investment where he was the GP, and my
17:47:49 23  partner and I were the LPs in an investment in
17:47:53 24  that -- in that company.
17:47:54 25    Q.   And that's all having to do with Learn

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 269

17:47:58  1   Capital, right, not Summit Mountain?
17:48:00  2      A.   Correct.
17:48:01  3      Q.   And was Joe Tsai involved in that little
17:48:06  4   capital venture with Kobe as well?
17:48:09  5      A.   No.
17:48:09  6      Q.   Did you try to get him involved in that
17:48:11  7   venture with Kobe?
17:48:12  8      A.   Not the one with Kobe.  To my knowledge
17:48:15  9   we did talk to Joe Tsai about the Montessori one.
17:48:21 10   And the Montessori, you know, Tang -- Tang was going
17:48:27 11   to do EB-5 for the Montessori one.  And I think
17:48:33 12   they ended -- they might have done a loan in advance
17:48:35 13   of doing some EB-5, a small loan of like a million or
17:48:40 14   two.  But ultimately it didn't go anywhere, and that
17:48:43 15   loan was, you know, was repaid.  And so that
17:48:50 16   company is -- is still going.  That's the one with
17:48:55 17   the 100 location.  One hundred -- I think probably
17:48:57 18   110 now.
17:48:58 19      Q.   So you tried to get Joe Tsai involved
17:49:04 20   Learn Capital ventures as well?
17:49:04 21      A.   No.  Alex thought that -- so Joe was --
17:49:13 22   Joe was positioned to us as someone who could
17:49:18 23   potentially invest at Powder Mountain.  But relative
17:49:22 24   to my other interests he was -- you know, he
17:49:27 25   definitely was interested in -- it was kind of told

## Page 270

17:49:36  1   to me he was interested in Powder Mountain but also
17:49:38  2   education-related stuff.  And so it facilitated an
17:49:41  3   introduction between him and Kobe Bryant.  So -- and
17:49:47  4   that -- I think ultimately that was used, you know,
17:49:52  5   really to cement Alex's relationship with Joe because
17:49:55  6   he ended up becoming an anchor investor in one of
17:50:01  7   their future businesses.
17:50:02  8      Q.   And just so I understand, was Joe Tsai
17:50:05  9   interested in investing in Powder Mountain as an EB-5
17:50:10 10   investor?
17:50:11 11      A.   No.  As a -- as potentially coming in in
17:50:17 12   some other structure like he was -- he was mentioned
17:50:22 13   by Alex as a way that they could, you know,
17:50:27 14   potentially accelerate development given the lack or
17:50:33 15   the slow pace that they were having with EB-5.
17:50:37 16      Q.   So did Alex Shing introduce you to Joe
17:50:45 17   Tsai?
17:50:45 18      A.   I can't remember if it was -- yeah.  I
17:50:48 19   mean we did have an exchange.  I can't remember if
17:50:51 20   there was a Zoom or a phone call as well.  But we did
17:50:54 21   provide some -- I mean it was mainly just setting up
17:51:00 22   Kobe.  But Alex, I know he -- I believe he also -- I
17:51:12 23   believe it's through -- I believe through Alex he
17:51:16 24   looked at either that Montessori platform or Learn
17:51:21 25   Capital as well.

## Page 271

17:51:21  1      Q.   Now, I want to talk to you about Kobe.  I
17:51:29  2   believe earlier you testified that you had promised
17:51:33  3   Kobe a $500,000 home site in connection with the
17:51:39  4   fundraising event in China?
17:51:40  5      A.   I think it was either 2 or 3K in cash if
17:51:43  6   he wanted to go cash or a home site was the deal that
17:51:46  7   we ultimately did.
17:51:48  8      Q.   And what did he end up choosing?
17:51:51  9      A.   Yeah, his -- because they were having so
17:51:54 10   many young children, his wife just didn't think they
17:51:57 11   would use the ski house.  So he ultimately elected
17:52:01 12   cash.
17:52:01 13      Q.   And did you pay him the cash?
17:52:02 14      A.   We did.  It took some time, but we did.
17:52:05 15      Q.   But for a long time you didn't pay him,
17:52:09 16   right?
17:52:09 17      A.   Yeah.  Well, it was, you know, partly
17:52:14 18   because this project went as slow as it did.  You
17:52:17 19   know, it was something that -- you know, we really --
17:52:20 20   we thought he was taking the lot.  So when he
17:52:25 21   switched to cash, we structured the payment over
17:52:28 22   time.  And also I think -- I can't remember if I
17:52:34 23   got -- there was somebody else; I can't recall.  But
17:52:36 24   there was some other discussions going on with them
17:52:38 25   relative to other things that he was potentially

## Page 272

17:52:43  1   interested in.  But he was interested in a lot for
17:52:48  2   some time, so he didn't -- and then when they changed
17:52:51  3   their mind then it switched to cash.
17:52:54  4      Q.   So you did ultimately pay him though?
17:52:58  5      A.   Yeah, so yeah.  I know we had a
17:53:01  6   payment plan, so I believe it was all paid down.  But
17:53:05  7   I wasn't -- you know, I was chairman of the company.
17:53:10  8   I mean I -- you know, I've never been the COO or the
17:53:15  9   person running day to day Powder Mountain.  And so --
17:53:20 10   and in 2016 the -- 2016 on, you know, I stepped back
17:53:29 11   even further to focus more on Learn Capital.
17:53:39 12           MR. ITKIN:  Okay.  I have -- let's go take
17:53:42 13   a short break.  Please can we go off the record?
17:53:45 14           VIDEOGRAPHER:  We're going to go off the
17:53:48 15   record.  The time is 5:53 p.m.
18:03:56 16           (Break taken from 5:53 to 6:03 p.m.)
18:05:02 17           VIDEOGRAPHER:  We're back on the record.
18:05:08 18   The time is 6:05 p.m.  Counsel.
18:05:12 19      Q.   (BY MR. ITKIN)  Welcome back, Mr. Mauro.
18:05:15 20   Hopefully I'll only have a few questions.
18:05:17 21      A.   Thank you.
18:05:17 22      Q.   I want to take you back to the discussion
18:05:20 23   of the TEA discussion.
18:05:22 24      A.   Okay.
18:05:23 25      Q.   Can we please mark tab 57 as Exhibit 19.

68  (Pages 269 to 272)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 273

18:05:28   1    And I'll give you the Bates as you're marking this.
18:05:31   2        (EXHIBIT NUMBER 19 WAS MARKED.)
18:05:32   3        MR. ITKIN:  Bates are Lenders0003577 to
18:05:39   4    Lenders0003797.
18:05:44   5        Q.   (BY MR. ITKIN)  Do you recognize this
18:05:44   6    document, Mr. Mauro?
18:05:46   7        A.   This is the PPM, yeah.
18:05:51   8        Q.   And this is the Amended and Restated PPM,
18:05:56   9    right?
18:05:56  10        A.   You mean as of August 24th, 2016.
18:05:59  11        Q.   Yep, yep.
18:06:01  12        A.   Yeah.
18:06:02  13        Q.   And do you recall working on an amended
18:06:09  14    restated PPM?
18:06:15  15        A.   Not particularly, but it probably
18:06:17  16    happened.
18:06:17  17        Q.   Well, this is -- sorry.  I'm not trying to
18:06:17  18    talk over you.  But this is the PPM that again your
18:06:22  19    team worked with the lenders in order to send to
18:06:26  20    Chinese investors who were interested in EB-5 loans,
18:06:31  21    right?
18:06:31  22        A.   Yeah, I mean again it might have gone
18:06:35  23    beyond Chinese, but yes understood.  And certainly in
18:06:38  24    2016, you know, I was told it would be mopped up by
18:06:42  25    just Chinese, so yeah.

Page 274

18:06:43   1        Q.   Okay.  Can we go to page 88, please.  Just
18:06:56   2    scroll down a little bit, Jason.
18:06:59   3        Do you see there's a section talking about
18:07:01   4    designated target employment area, Mr. Mauro?
18:07:05   5        A.   Yeah.
18:07:11   6        Q.   And do you see the section that reflects
18:07:14   7    what you were saying earlier that without a targeted
18:07:18   8    employment area designation the minimum investment
18:07:21   9    threshold under the EB-5 program would be a million
18:07:25  10    dollars?
18:07:26  11        A.   Right, yeah.  And it's reevaluated every
18:07:29  12    two years.
18:07:29  13        Q.   It was estimated to be $500,000, right?
18:07:35  14        A.   Yeah.
18:07:35  15        Q.   Do you see in the last sentence that if at
18:07:40  16    the end of the two-year period for which the target
18:07:44  17    employment area designation is valid, the end of the
18:07:48  18    period, the geographic area in which the property is
18:07:50  19    located no longer qualifies as a target employment
18:07:56  20    area, the stated designation will be expired and will
18:08:00  21    not be renewed.
18:08:01  22        Do you see that?
18:08:05  23        A.   Yeah.
18:08:05  24        Q.   And in that event the company has to close
18:08:07  25    the offering and return funds to any subscriber who

Page 275

18:08:11   1    has not yet filed his 1526 petition.  Do you see
18:08:15   2    that?
18:08:15   3        A.   Yeah.
18:08:16   4        Q.   And so do you see that in the PPM that you
18:08:21   5    and the lenders prepared, you specifically informed
18:08:25   6    potential investors that if the area in which the
18:08:31   7    project is located lost its targeted employment area
18:08:36   8    designation, the offering would be no more?
18:08:40   9        A.   Again that's for taking on new people.  So
18:08:43  10    it's every two years.  So obviously we focused on
18:08:46  11    2014, 2016, 2018.  The e-mail you saw was a
18:08:50  12    discussion in 2020.  I don't recall what the result
18:08:54  13    of that was and whether we lost it or not.  At that
18:08:57  14    point, you know, we had been waiting for, you know,
18:09:01  15    over a year or more for Tang to divert another
18:09:05  16    project, and he hadn't.  And so I think that was --
18:09:08  17    the date of that was, you know, pretty close to when
18:09:13  18    we started restructuring negotiations is my
18:09:21  19    understanding.
18:09:22  20        And so the -- so it was sort of a moot
18:09:25  21    point in that we weren't taking on new investors at
18:09:28  22    that point anyways, and we hadn't for some time.  So,
18:09:36  23    you know, by the time that I think that that thing
18:09:38  24    was definitive, you know, if there is follow-up
18:09:42  25    correspondence that it was definitive or done, I'm

Page 276

18:09:47   1    pretty sure that overlaps with the restructuring
18:09:50   2    conversations.  I don't know how the loss of TEA
18:10:00   3    would affect the ability of Tang to redirect funds
18:10:04   4    from other projects.
18:10:06   5        I suspect he redirected his funds to
18:10:10   6    Boston Seaport and other projects that he prioritized
18:10:14   7    over ours, particularly Boston Seaport.  So the time
18:10:21   8    to do that was obviously '16 to '18 and particularly
18:10:23   9    '18 to '20.  So by 2020 it was -- you know, it was
18:10:29  10    pretty clear that we were -- you know, that they --
18:10:37  11    by then we were discussing -- you know, as we got
18:10:41  12    into 2020 we were discussing ways in which we could
18:10:43  13    move forward on our village without them and
18:10:46  14    potentially, you know, move their investors to those
18:10:49  15    80 lots as I discussed.
18:10:52  16        Q.   So is your main beef with Mr. Tang that he
18:10:55  17    did not redeploy money from other projects into this
18:10:59  18    project?
18:10:59  19        A.   I mean I have many beefs with Mr. Tang.
18:11:03  20    You know, one is the relationship, the -- shall I say
18:11:21  21    the RICO-esk relationship between the various
18:11:16  22    entities there and how they managed them.  I mean I
18:11:21  23    guess the -- you know, when you want a loan for your
18:11:24  24    house, do you talk to Wells Fargo or do you negotiate
18:11:27  25    to the person who shows up at your house and walks

69 (Pages 273 to 276)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

## Page 277

18:11:31  1  you through the loan documents?  Because technically
18:11:33  2  I think Tang is the loan doc signing guy.  You know,
18:11:37  3  that's his whole official role here is I'm the guy
18:11:40  4  who processes the loan as it were.  As you can see, I
18:11:45  5  never met Celona, right.  I never had a phone call
18:11:48  6  with Celona, never met Celona.  But I'm told they're
18:11:53  7  completely independent of Tang and Hentry are
18:11:57  8  completely independent.  So, you know, I'd love to
18:12:01  9  see it.  I'd love to see the details on it.  I'd love
18:12:03 10  to see our -- you know, we had investors who would
18:12:04 11  show up in escrow in China and in Hong Kong, and then
18:12:10 12  they would disappear and not make it to our U.S.
18:12:13 13  escrow accounts.  I would really love to see how many
18:12:16 14  of those investors ended up in the Newport project --
18:12:19 15  or, I'm sorry, in the Boston Seaport project or other
18:12:22 16  priorities of theirs.
18:12:24 17           So, you know, I'm upset with Tang that he
18:12:29 18  strung us along.  I'm upset that he would let us be
18:12:32 19  treated the way we were treated by Jess when he knows
18:12:34 20  exactly what he negotiated with us.
18:12:36 21           You know, it's really disturbing because
18:12:37 22  we were friends.  We went to football games.  And I
18:12:41 23  knew him, you know, and his fiancee before he got
18:12:45 24  married.  So it was just really, really unfortunate
18:12:48 25  that he would, you know, turn out that way, so...

## Page 278

18:12:58  1       Q.  Do you --
18:13:00  2           Oh, I'm sorry, go ahead.
18:13:01  3       A.  Yeah, I mean the -- you know, the fraud
18:13:09  4  here is, you know, is pretty staggering.  But
18:13:13  5  obviously, you know, I'm going to need to be able to
18:13:17  6  assemble the data to be able to prove it
18:13:23  7  definitively, so we'll see.
18:13:26  8           But, you know, these guys were so
18:13:28  9  impressive, you know.  But they were also -- the
18:13:32 10  braggadocio was very high.  They were number two
18:13:35 11  allegedly.  They raised over $2 billion.  It was
18:13:39 12  never conceivable that they wouldn't raise this
18:13:41 13  money, right?  That they would get this done.  And
18:13:42 14  Tang went on over and over how they were in the EB-5
18:13:46 15  industry.  They were in the center of the universe;
18:13:49 16  they were in Rome, you know.  And AIGs in the world
18:13:53 17  are in the outer province picking lice off each
18:13:58 18  other.  The bravado all the way through on being able
18:14:02 19  to get it done was pretty extraordinary, only to milk
18:14:07 20  our relationships and then, you know, to basically
18:14:14 21  enter into our business and be on the equity side
18:14:18 22  and, you know, focus on prioritizing their own
18:14:23 23  projects among other things.
18:14:24 24           So I mean that's -- in the United States
18:14:27 25  we call that a conflict of interest that should

## Page 279

18:14:30  1  generally be, you know, disclosed.  And, you know, if
18:14:35  2  they had told me:  Oh, by the way, we're planning to
18:14:38  3  hopefully buy and develop a $800 million project in
18:14:44  4  the Boston Seaport with $5 million condos because we
18:14:48  5  promised Hentry we're going to get him, you know,
18:14:50  6  into bigger and better things over time and he can
18:14:53  7  make more money than just lining up money for EB-5
18:14:57  8  lending projects.  So anyways.  So those are my --
18:15:03  9  some of my issues with Tang.
18:15:05 10       Q.  So on the fraud piece, it sounds like
18:15:08 11  there's a lot of speculation and suspicion on your
18:15:11 12  end, but you don't have any actual proof of anything?
18:15:13 13       A.  Well, I have proof of what I experienced
18:15:16 14  and know.  But you know I could understand that to
18:15:18 15  make that convincing in court, I'd have to have
18:15:24 16  effective supporting documents to -- you know,
18:15:28 17  ancillary documents as it were.
18:15:31 18       Q.  Which you don't have?
18:15:33 19       A.  I don't have all that I need.
18:15:35 20       Q.  So do you have any position on whether the
18:15:42 21  loss of a TEA designation would preclude anyone from
18:15:50 22  redeploying another EB-5 project into this one?
18:15:53 23       A.  I don't.  I don't.  So if we did -- if we
18:15:58 24  did lose it in 2020, that might have caused problems
18:16:00 25  for redeployment.  But it certainly didn't cause

## Page 280

18:16:04  1  redeployment problems in '19 and -- in '19 and '18
18:16:07  2  and '17.
18:16:10  3       Q.  Okay.  I have one more document I want to
18:16:13  4  ask you about, and then I think we should be done.
18:16:23  5  Can we please mark exhibit -- sorry, tab 53 as
18:16:26  6  Exhibit 20.
18:16:26  7           (EXHIBIT NUMBER 20 WAS MARKED.)
18:16:32  8       MR. ITKIN:  Can we pull that up?
18:16:35  9       THE WITNESS:  I can add to the Tang thing,
18:16:35 10  if you'd like, in terms of motivation and what I was
18:16:37 11  disappointed on.  But ultimately it was pretty clear
18:16:39 12  that they really wanted to milk fees here as long as
18:16:41 13  they could milk fees.  And, you know, I'd love to be
18:16:45 14  able to communicate directly with their investor base
18:16:48 15  as to the logic and merit of them turning down an
18:16:52 16  offer to get 80, you know, ski-in/ski-out home sites
18:16:58 17  at Powder Mountain in exchange for the litigation
18:17:00 18  they're now in.  But it served to, you know, allow
18:17:06 19  them to milk fees until -- you know, until the very
18:17:09 20  end.  Go ahead.
18:17:12 21       Q.  (BY MR. ITKIN)  Do you know if you -- did
18:17:13 22  you have any kind of exclusivity agreement with
18:17:17 23  Hentry Global in that either Hentry Global or Mr.
18:17:23 24  Tang or KT Capital had to raise --
18:17:28 25       A.  I mean Tang would --

70  (Pages 277 to 280)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 281

| | | |
|---|---|---|
| 18:17:29 | 1 | Q. -- for your project and no other project? |
| 18:17:32 | 2 | A. No. But Tang told me on many different |
| 18:17:38 | 3 | occasions we were the only project or the main |
| 18:17:41 | 4 | project at any given time. So which is, in |
| 18:17:45 | 5 | retrospect, inconceivable. |
| 18:17:48 | 6 | Q. Okay. So let's -- I'm sorry you're upset, |
| 18:17:52 | 7 | Mr. Mauro. But let's maybe finish this up. |
| 18:17:55 | 8 | Okay. So do you recognize what I've |
| 18:18:02 | 9 | marked as Exhibit 20? |
| 18:18:03 | 10 | A. I don't. |
| 18:18:05 | 11 | Q. What I've -- |
| 18:18:10 | 12 | Jason, can you please zoom out a little |
| 18:18:13 | 13 | bit? |
| 18:18:14 | 14 | This is the expert report that was |
| 18:18:19 | 15 | submitted by you in this case. |
| 18:18:24 | 16 | MR. YOUNG: By "you," you mean the |
| 18:18:25 | 17 | plaintiff? |
| 18:18:27 | 18 | Q. (BY MR. ITKIN) I'm sorry. By the |
| 18:18:29 | 19 | plaintiff, Mr. Mauro. |
| 18:18:31 | 20 | A. Okay. |
| 18:18:31 | 21 | Q. Have you seen it before? |
| 18:18:33 | 22 | A. It's not ringing a bell. So it's possible |
| 18:18:38 | 23 | it was sent to me, but I don't... |
| 18:18:40 | 24 | Q. That's okay. |
| 18:18:41 | 25 | A. Yeah. |

Page 282

| | | |
|---|---|---|
| 18:18:42 | 1 | Q. Now, did you speak to Mr. Connors in |
| 18:18:47 | 2 | connection with his report? |
| 18:18:48 | 3 | A. I don't recall. I may have. I don't |
| 18:18:52 | 4 | recall. |
| 18:18:53 | 5 | Q. Well, let's turn to page 6 of this PDF. |
| 18:19:02 | 6 | And can you zoom into the middle paragraph, please, |
| 18:19:07 | 7 | Jason. |
| 18:19:09 | 8 | Do you see in the middle of the -- kind of |
| 18:19:13 | 9 | the middle paragraph, Mr. Mauro, there's a sentence |
| 18:19:16 | 10 | that starts with "I am informed by..." |
| 18:19:18 | 11 | A. Is this the appraisal person? Is this |
| 18:19:21 | 12 | like the -- I mean -- |
| 18:19:23 | 13 | Q. No, this I believe is some kind of an |
| 18:19:26 | 14 | accountant. |
| 18:19:26 | 15 | A. Oh, right. I mean there was like the -- I |
| 18:19:29 | 16 | mean we've had conversations on like potential |
| 18:19:32 | 17 | damages and other things like that. Is this in |
| 18:19:36 | 18 | relation to that? |
| 18:19:40 | 19 | Q. This is a report of an accountant. He |
| 18:19:43 | 20 | doesn't set forth any damages that I'm aware of in |
| 18:19:46 | 21 | this report. |
| 18:19:46 | 22 | A. Okay. |
| 18:19:47 | 23 | Q. Maybe I didn't read it closely. |
| 18:19:48 | 24 | A. Yeah. |
| 18:19:49 | 25 | Q. But do you recall speaking to Mr. Connors, |

Page 283

| | | |
|---|---|---|
| 18:19:54 | 1 | Mr. Mauro? |
| 18:19:55 | 2 | A. I mean I recall speaking to one or two |
| 18:19:58 | 3 | gentlemen on a call about -- I thought one of them |
| 18:20:02 | 4 | was maybe an appraiser. So maybe the other person |
| 18:20:05 | 5 | was this person. But, yeah, I recall talking to two |
| 18:20:10 | 6 | gentlemen about some specifics around that -- around, |
| 18:20:20 | 7 | you know, how the loans -- you know, the nature of |
| 18:20:24 | 8 | the loans and you know how they took place, so... |
| 18:20:27 | 9 | Q. Okay. And this gentleman, I believe Mr. |
| 18:20:36 | 10 | Connors, tried to explain how -- when rather the |
| 18:20:44 | 11 | borrower equity was supposed to be contributed to the |
| 18:20:48 | 12 | project over the life of the loan. Does that refresh |
| 18:20:52 | 13 | your recollection? |
| 18:20:52 | 14 | A. Sorry, say that again. |
| 18:20:56 | 15 | Q. It doesn't matter. Let's strike that. |
| 18:21:00 | 16 | Let's just go to page 14. |
| 18:21:08 | 17 | A. Okay. |
| 18:21:09 | 18 | Q. Can we scroll down please, Jason, to the |
| 18:21:12 | 19 | Other Guarantor Sources of Capital. Yeah, thank you. |
| 18:21:16 | 20 | So do you see the paragraph under the |
| 18:21:24 | 21 | heading "Other Guarantor Sources and Capital," |
| 18:21:28 | 22 | Mr. Mauro? |
| 18:21:31 | 23 | A. Sorry. |
| 18:21:33 | 24 | Q. It starts with "We also discussed with |
| 18:21:42 | 25 | SMHG the possibility" -- |

Page 284

| | | |
|---|---|---|
| 18:21:42 | 1 | A. Yes, I do. Yeah. |
| 18:21:43 | 2 | Q. -- "of needing to raise additional |
| 18:21:43 | 3 | capital." |
| 18:21:43 | 4 | A. Yes. |
| 18:21:43 | 5 | Q. Did you discuss with Mr. Connors the |
| 18:21:46 | 6 | possibility of needing to raise additional capital? |
| 18:21:49 | 7 | A. Yeah, yeah. |
| 18:21:51 | 8 | Q. And based on that discussion it appears he |
| 18:21:57 | 9 | said that "The management of SMHG believes that a |
| 18:22:03 | 10 | variety of options were available to meet the |
| 18:22:06 | 11 | borrower's equity requirement had the Summit Village |
| 18:22:09 | 12 | units or JV neighborhood developments not provided |
| 18:22:13 | 13 | the expected capital." |
| 18:22:15 | 14 | Do you see that? |
| 18:22:18 | 15 | A. So is that in the same paragraph there? |
| 18:22:16 | 16 | Q. Yeah. |
| 18:22:20 | 17 | Jason, I'm sorry, can you please highlight |
| 18:22:25 | 18 | the part of the paragraph starting with "Management |
| 18:22:27 | 19 | of SMHG." Thank you. |
| 18:22:37 | 20 | Do you see that? |
| 18:22:38 | 21 | A. Yeah. |
| 18:22:39 | 22 | Q. Do you want to just read that into the |
| 18:22:41 | 23 | record, Mr. Mauro, so we're on the same page with |
| 18:22:43 | 24 | what we're talking about. |
| 18:22:44 | 25 | A. Okay. |

71 (Pages 281 to 284)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

---

Page 285

18:22:49  1    Q.  Do you want to read that aloud but slowly?
18:22:52  2    A.  Okay.  "Management of SMHG believes that a
18:22:55  3  variety of options were available to meet the
18:22:58  4  borrower's equity requirement had the Summit Village
18:23:03  5  units or JV Neighborhood Developments not provided
18:23:05  6  the expected capital, including a potential capital
18:23:09  7  call on SMHG owners bringing in an addition equity
18:23:14  8  investors to SMHG, selling land to a third-party for
18:23:18  9  a boutique hotel pad and petitioning for additional
18:23:24 10  TIF bond proceeds."
18:23:26 11    Q.  And is that a true statement, Mr. Mauro?
18:23:29 12    A.  Yeah.  I mean we've got -- like if we --
18:23:31 13  if the village wasn't encumbered by this loan, we
18:23:36 14  would have been able to work with a variety of
18:23:39 15  people.  You know we had a -- that's part of what
18:23:40 16  we -- in our negotiations with Tang and crew we sort
18:23:44 17  of showed:  Look, we can bring together people and
18:23:47 18  develop this through so we can replace our, you know,
18:23:51 19  development/equity lead with others.
18:23:54 20    So, for example, Gary Raymond who run
18:23:58 21  Interwest and, you know, his done multiple projects
18:24:01 22  in Park City, for example, gave us a term sheet, did
18:24:05 23  the architecture on developing a 50- or a 60-key
18:24:11 24  condo hotel on the actual land that is in the
18:24:19 25  collateral here.  And because we had an expectation

---

Page 286

18:24:22  1  that the nice Tang would be like:  Great, let's --
18:24:27  2  let's work and, you know, we'll get the proceeds out
18:24:30  3  of that, you know we'll get that up.  That will help
18:24:33  4  increase values, increase velocity.  Proceeds of that
18:24:36  5  will come to pay down the loan as well.  We had the
18:24:39  6  hotel that I described that was the Selina.  So you
18:24:42  7  had -- so you had the Gary Raymond hotel project.
18:24:48  8  You had the Selina project.  Both had independent
18:24:53  9  financing capability.  We've -- I mean we've got --
18:24:59 10  we've got, you know -- I can go ad nauseam on those.
18:25:06 11  You know, we're --
18:25:06 12    Q.  Well, before you go ad nauseam on those, I
18:25:09 13  just want to focus the question -- or focus your
18:25:12 14  answer on my actual question.
18:25:12 15    A.  Okay.
18:25:14 16    Q.  So in this report, Mr. Connors -- in this
18:25:17 17  part of his report, Mr. Connors appears to say these
18:25:21 18  were sources of equity that were available to SMHG to
18:25:26 19  meet a capital call during the course of the loan,
18:25:30 20  not if the property was not encumbered.
18:25:34 21    A.  Well, again not necessarily not
18:25:37 22  encumbered.  So meaning -- so, look, on a capital
18:25:42 23  call perspective I own 50 percent of a billion dollar
18:25:45 24  venture fund.  I now own 50 percent of 18,000 acres
18:25:50 25  adjacent to Powder Mountain; two ranches that I've

---

Page 287

18:25:53  1  assembled with partners.
18:25:54  2    So I have the -- you know, even though --
18:25:58  3  and by the way, my partner who in 2016 was screaming
18:26:03  4  for -- was complaining about capital calls, you know,
18:26:07  5  has made I think 40 million since then between
18:26:10  6  selling the business that he founded and a well-timed
18:26:16  7  investment in exiting coin base.  So you know both
18:26:20  8  the two owners have the ability to do capital calls.
18:26:24  9    But I think what he's also getting at is
18:26:26 10  that, you know, we have 100 percent of the equity
18:26:33 11  staff to play with to solve the equity shortfall,
18:26:36 12  right?  Meaning we just have to bring in the joint
18:26:39 13  venture equity partners on the equity interest, and
18:26:43 14  we can basically develop the vertical construction
18:26:45 15  needed to then arrive at the land proceeds that would
18:26:52 16  pay down the loan that were envisioned.  So that's
18:26:56 17  it.  You know, those -- those were available across
18:27:00 18  the board.
18:27:02 19    Q.  And those were available from the
18:27:06 20  beginning of the loan, right?
18:27:09 21    A.  I mean I certainly was there at the very
18:27:13 22  beginning of the loan.  And Elliott's payout was
18:27:17 23  later in 2016.  So -- so -- or even it could have
18:27:26 24  even have -- well, just around that time that he was
18:27:29 25  complaining about the capital call is when he made,

---

Page 288

18:27:35  1  you know, I think his first 16 -- 16 million-ish.
18:27:40  2    Q.  So it sounds like, just so I understand
18:27:43  3  it, since the beginning of the loan you're confident
18:27:48  4  that SMHG had the financial wherewithal to meet any
18:27:52  5  capital call filed in connection with this loan if it
18:27:55  6  had to?
18:27:55  7    MR. YOUNG:  Vague.  You can answer.
18:27:57  8    THE WITNESS:  Again any capital call
18:27:59  9  relative to this loan would be where we've made a
18:28:03 10  draw and weren't able to complete the project that we
18:28:05 11  did a draw for or where the aggregate draws were out
18:28:08 12  of balance and needed to be put back in balance and
18:28:10 13  all the other avenues for project capital were not
18:28:14 14  available.  So in that hypothetical, yes, we could
18:28:17 15  have.  And our loans to the holding company during
18:28:22 16  this time frame allowed things like lifts to get
18:28:26 17  funded off of our capital and then to turn around and
18:28:29 18  get reimbursed because they were qualified project
18:28:33 19  expenses from EB-5 when the money actually showed up
18:28:36 20  from EB-5.  So just to be clear, a lot of the stuff
18:28:38 21  we did was actually funded by ourselves and then
18:28:41 22  reimbursed out of the EB-5 proceeds because we had to
18:28:46 23  wait on the timing of those draws.  And often working
18:28:49 24  through fulcrum, to validate that the draw was good
18:28:52 25  and that we could take the draw, would take so long

---

72  (Pages 285 to 288)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

---

Page 289

18:28:55  1    that we would fund the project, that specific thing,
18:28:59  2    we would advance the funds and then -- and then
18:29:04  3    effectively because those are approved project costs
18:29:07  4    get that reimbursed out of the subsequent draw.
18:29:13  5        Q.   Draw from this EB-5 loan?
18:29:17  6        A.   Yes.  So, for example, if you -- you know,
18:29:21  7    to actually get a lift built in the winter -- you
18:29:25  8    know in the summertime because there's a timing and
18:29:29  9    either the availability of proceeds from Tang or the
18:29:34  10   associated timing of getting through the fulcrum
18:29:41  11   approval, all the draw approvals in pulling down a
18:29:44  12   draw, if that -- if that time frame shifted to pre --
18:29:49  13   pre-construction of an approved project item to post
18:29:54  14   or some portion thereof, you know, Elliott and I,
18:29:59  15   you know, and/or sales proceeds outside of this of Powder
18:30:04  16   Mountain because we've sold -- you know, between our
18:30:07  17   founding member program and other sales, I think
18:30:10  18   we're approaching 180, 190 million of cumulative
18:30:15  19   sales.  So either out of those sales or ourselves we
18:30:19  20   had the ability to fund these gaps, so -- and we did
18:30:25  21   regularly.
18:30:27  22       Q.   And just so I understand, so how much
18:30:30  23   money did you reimburse yourselves in total with the
18:30:38  24   proceeds of the EB-5 loan?
18:30:42  25       A.   I don't recall how much in total we

---

Page 290

18:30:44  1    advanced in front of the EB-5 loan, you know, where
18:30:51  2    we were waiting on draw disbursements.  But I imagine
18:30:56  3    it's pretty material.
18:30:57  4        Q.   Like is it like 10 million?
18:30:59  5        A.   I think it's probably north of ten.
18:31:06  6        Q.   So like 15?
18:31:07  7        A.   I'm guessing at this point, but you know,
18:31:12  8    I would say that's probably accurate.
18:31:15  9        Q.   So it sounds like you and Elliott, your
18:31:21  10   partner, put in about 15 million bucks into the
18:31:23  11   project and then got that back with the EB-5 loan?
18:31:28  12       A.   Again this project isn't the entirety of
18:31:31  13   our project.  This is the village and the joint
18:31:35  14   venture neighborhoods.  Our entire phase 1 was
18:31:38  15   155 units, which we were selling through.  We're now
18:31:41  16   selling through our phase 2, and -- which is just
18:31:45  17   above the village.  They're selling slower and for
18:31:49  18   less money than we would like because there's no
18:31:51  19   village below it, but they're selling.  And so we
18:31:53  20   have I think it's actually -- I think we broke the
18:31:56  21   200 million milestone, somewhere between 180 and 200
18:32:01  22   million in land-related sales for lots.  Whether
18:32:05  23   that's -- including the 58 in founding members, we've
18:32:10  24   sold another, you know -- another amount there that I
18:32:17  25   believe is over 180 at this point.

---

Page 291

18:32:20  1        MR. YOUNG:  Uri, you're --
18:32:24  2        Q.   (BY MR. ITKIN)  No, I understand.  I'm
18:32:24  3    just trying to get back to the 15 million that you
18:32:27  4    just talked about.
18:32:28  5        And, Spencer, this is the last thing I'm
18:32:29  6    going to ask about, and then I'm done.
18:32:32  7        MR. YOUNG:  Okay.
18:32:32  8        Q.   (BY MR. ITKIN)  I just want to -- because
18:32:32  9    you were talking about it, and then you went off to
18:32:34  10   the other stuff you're selling.  But just to bookend
18:32:38  11   what you were saying, so you were saying that you and
18:32:43  12   Elliott were putting in or put in about $15 million
18:32:46  13   worth of funds into the development, and that got
18:32:52  14   reimbursed through the EB-5 loan, right?
18:32:55  15       A.   No.  I'm saying that sales proceeds
18:32:57  16   outside of the JB neighborhood and the -- or
18:33:03  17   actually, I think including the JB neighborhood
18:33:05  18   because we did get some of those back to us, but I
18:33:09  19   would have to check.  But definitively outside of the
18:33:13  20   JB neighborhood, other neighborhoods where we had
18:33:16  21   sales, those sales proceeds went to the holding
18:33:18  22   company.  When we needed to fund something because
18:33:23  23   fulcrum was slow, relative to the EB-5 project like
18:33:28  24   the ski lifts, for example, we would utilize SMHG
18:33:35  25   funds, either myself and Elliott potentially in

---

Page 292

18:33:39  1    combination with sales unrelated to EB-5.
18:33:44  2        Q.   Got it.  So that's what I wasn't sure
18:33:46  3    about, the "we."  So funds of Holdings, whether they
18:33:49  4    were yours or sale proceeds or whatever, went into
18:33:53  5    the development.  You basically advance those funds
18:33:57  6    to the development, and then you got those funds
18:33:59  7    reimbursed by the EB-5 proceeds, right?
18:34:02  8        A.   If they were -- yeah, where they were
18:34:05  9    approved expenses and validated by fulcrum, yes.
18:34:09  10       Q.   Okay.  And that's about -- just my last
18:34:12  11   question.  And that's about, in your estimate, about
18:34:15  12   15 million bucks?
18:34:16  13       A.   I'm pretty sure we had to front run at
18:34:18  14   least that, yeah, relative to --
18:34:21  15       Q.   It could be more?
18:34:21  16       A.   Yeah, could be more.
18:34:23  17       Q.   Okay.  Look, I really appreciate your
18:34:26  18   time, Mr. Mauro.
18:34:27  19       Spencer, I also appreciate your
18:34:30  20   indulgence.  I think we're right around the mark with
18:34:34  21   the seven hours, but we'll find out when we go off
18:34:36  22   the record.
18:34:37  23       But I have no more questions?
18:34:38  24       MR. YOUNG:  I've got just a few
18:34:41  25   follow-ups.  They should be quick.

---

73 (Pages 289 to 292)

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 293

18:34:41  1
18:34:41  2          EXAMINATION
18:34:41  3  BY MR. YOUNG:
18:34:46  4       Q.  Can we go to Exhibit 4.  I believe it was
18:34:48  5  page 5.  Okay.  Mr. Mauro, you were asked some
18:35:05  6  questions about this language beginning "In the event
18:35:08  7  there is..."
18:35:10  8          Do you remember that questioning?
18:35:11  9       A.  "In the event there is..."  Okay, yeah.
18:35:14 10       Q.  Does this language say anything about the
18:35:17 11  funding of development costs not being available due
18:35:20 12  to a shortfall in the EB-5 proceeds?
18:35:22 13       A.  No.
18:35:23 14       Q.  Did your understanding of this language
18:35:27 15  assume the full EB-5 proceeds would be raised?
18:35:30 16       A.  Absolutely.
18:35:31 17       Q.  Can we go please to Exhibit 8, page 5.
18:35:31 18  Thank you.
18:36:03 19          Mr. Mauro, do you remember being asked
18:36:08 20  questions about these answers that the plaintiff's
18:36:15 21  team provided?
18:36:15 22       A.  Yes.
18:36:16 23       Q.  Okay.  Do you remember being asked
18:36:17 24  questions about the sentence under numbered paragraph
18:36:21 25  17 here --

Page 294

18:36:22  1       A.  Yes.
18:36:22  2       Q.  -- that begins "if rejected"?
18:36:25  3       A.  Yes.
18:36:25  4       Q.  Who did you assume would be rejecting the
18:36:27  5  TIF bond?
18:36:28  6       A.  The county.
18:36:30  7       Q.  And does that presume the project was
18:36:33  8  eligible for a TIF bond?
18:36:35  9       A.  So we -- we executed a long form,
18:36:41 10  you know 20 or 50 percent TIF with the county that
18:36:46 11  projected 74 million in proceeds over the term.
18:36:51 12  However, obviously it's only of value if -- if the
18:36:56 13  underlying buildings are built.
18:36:58 14          MR. YOUNG:  Nothing further.
18:37:04 15          Uri, any follow-up?
18:37:07 16          MR. ITKIN:  Nope.
18:37:08 17          MR. YOUNG:  I think we're done.  We'll
18:37:10 18  read and sign.
18:37:10 19          THE WITNESS:  Thanks, Uri.
18:37:10 20          (Off-the-record discussion.)
18:37:18 21          VIDEOGRAPHER:  We're going off the record.
18:37:20 22  This concludes the deposition.  The time is 6:37 p.m.
18:37:20 23          THE REPORTER:  I need to get your orders
18:37:33 24  on my stenographic record.
18:37:33 25          MR. ITKIN:  Electronic only.  We don't

Page 295

18:37:55  1  need printed copies.
18:37:56  2          MR. YOUNG:  Electronic for me.
          3          (Concluded at 6:37 p.m.)
          4
          5
          6
          7
          8
          9
         10
         11
         12
         13
         14
         15
         16
         17
         18
         19
         20
         21
         22
         23
         24
         25

Page 296

 1          REPORTER'S CERTIFICATE
 2
   STATE OF UTAH        )
 3                      ) ss.
   COUNTY OF SALT LAKE   )
 4
 5       I, Tamra J. Berry, Registered Professional
   Reporter in and for the State of Utah, do hereby
 6  certify:
 7       That prior to being examined, the witness,
   GREG MAURO, was by me duly sworn to tell the truth,
 8  the whole truth, and nothing but the truth;
 9       That said deposition was taken down by me
   in stenotype on February 3, 2023, at the place
10  therein named, and was thereafter transcribed and
   that a true and correct transcription of said
11  testimony is set forth in the preceding pages;
12       I further certify that, in accordance with
   Rule 30(e), a request having been made to review the
13  transcript, a reading copy was sent to Mr. Young for
   the witness to read and sign and then return to me
14  for filing with Mr. Itkin.
15       I further certify that I am not kin or
   otherwise associated with any of the parties to said
16  cause of action and that I am not interested in the
   outcome thereof.
17
         WITNESS MY HAND AND OFFICIAL SEAL this
18  10th day of February, 2023.
19
20
21
22
23          _____
            Tamra J. Berry, RPR, CSR
24
25

RED ROCK REPORTING
385.707.7254

SUMMIT MOUNTAIN HOLDING GROUP vs SUMMIT VILLAGE DEVELOPMENT, et al.
GREG MAURO - 02/03/2023

Page 297

1    Case:  Summit Mountain Holding Group, LLC v. Summit
     Village Development Lender 1, LLC, et al.
2    Case No.:  Case No. 1:21-cv-00110-BSJ
     Reporter:  Tamra J. Berry
3    Date taken:  February 3, 2023
4              WITNESS CERTIFICATE
5         I, GREG MAURO, HEREBY DECLARE:
          That I am the witness in the foregoing
6    transcript; that I have read the transcript and know
     the contents thereof; that with these corrections I
7    have noted this transcript truly and accurately
     reflects my testimony.
8
9    PAGE-LINE     CHANGE/CORRECTION        REASON
     _____  _____  _____
10   _____  _____  _____
     _____  _____  _____
11   _____  _____  _____
     _____  _____  _____
12   _____  _____  _____
     _____  _____  _____
13   _____  _____  _____
     _____  _____  _____
14   _____  _____  _____
     _____  _____  _____
15   _____  _____  _____
16   _____    No corrections were made.
17        I, GREG MAURO, HEREBY DECLARE THAT THE
     FOREGOING IS TRUE AND CORRECT.
18        _____
              GREG MAURO
19
20        SUBSCRIBED and SWORN to this _____ day
     of _____, 2023, at _____
21
22
23
24
25

75 (Page 297)

RED ROCK REPORTING
385.707.7254