# EXHIBIT 2

## AMENDED AND RESTATED TERM SHEET

## $150 MILLION EB-5 SENIOR LOAN

## POWDER MOUNTAIN PLANNED DEVELOPMENT PHASE I

The following sets forth an outline of the terms and conditions of (1) a potential senior loan transaction by Powder Mountain Fund, LLC ("**Lender**") arranged and managed jointly by American Immigration Group, LLC and/or its affiliates, headquartered at 230 Park Avenue, 10th Floor, New York, NY 10169 (collectively, "**AIG**"), for the benefit of Summit Mountain Holding Group, L.L.C., a Utah limited liability company and/or a affiliates, headquartered at 3632 N. Wolf Creek Drive, Eden, Utah 84310 ("**Developer**") and (2) a binding contract providing for Developer's retention of AIG to arrange and manage the raising of capital under the EB-5 Program as defined below. This Amended and Restated Term Sheet (this "**Term Sheet**") amends and restates in its entirety that certain Term Sheet, dated as of December 3, 2014 (the "**Original Term Sheet**"), which will be replaced in its entirety upon the full execution of this Term Sheet.

A.  **BACKGROUND**

AIG intends to organize and manage Lender for the purpose of making a secured commercial real estate senior construction loan (the "**Loan**") to the Developer to in part finance Developer's development project known as Powder Mountain (the "**Project**") primarily located in Eden, Utah, the site on which the Project will be built (the "**Property**"). The Project will consist of the initial development of a village consisting of up to approximately 415, 000 square feet. The initial funding of the Loan will close (the "**Initial Closing**") in accordance with and subject to the simultaneous execution and delivery by Developer of a construction loan agreement, promissory note, mortgage or deed of trust, pledge and security agreement, collateral assignments of construction related agreements, completion guaranty (subject to the terms set forth herein), plans and specifications, non-recourse carveout guaranty, environmental indemnity agreement and additional legal instruments requested by and satisfactory to Lender (collectively, the "**Definitive Agreements**").

In addition, Developer is retaining AIG to assist Developer in connection with the structuring of the Project's ownership and operation in order to enable AIG on Lender's behalf to raise capital from non-U.S. citizens ("**Foreign Investors**") and through which the Foreign Investors may apply to the United States Citizenship and Immigration Services ("**USCIS**") to obtain EB-5 visas to reside in the United States, based on applicable law and the nature and quality of jobs created in applicable USCIS-designated development zones (each, a "**Territory**") in which qualifying capital investment projects are located (the "**EB-5 Program**"). Developer acknowledges and understands that the capital raised by AIG from the Foreign Investors would be pursuant to a separate securities offering sponsored by AIG (the "**Offering**"). The entity formed for the purpose of holding the Foreign Investors' funds and funding the Loan with the proceeds so raised is hereinafter referred to as the "Company". Although it would be a condition of funding the Loan that the Offering be successful, Developer would have no direct rights or obligations in connection with that Offering other than as set forth below and as reflected on Exhibits A, B and C attached hereto.

B.  **PROPOSED LOAN**

The proposed terms under which Lender may make the Loan are more fully described on **Exhibit "A"** attached hereto and made a part hereof (in the event of any inconsistency between the terms of this Term Sheet and the terms of **Exhibit "A"**, the terms of **Exhibit "A"** shall apply). In addition, the Loan shall be on the following terms and conditions:

{01034647;2}                              1

Exhibit 2
RED ROCK REPORTING

CONFIDENTIAL INFORMATION                                                                SMHG000007

1. **Principal Amount**: Up to One Hundred Fifty Million Dollars ($150,000,000.00), based on Lender's final underwriting and the results of an econometric study and report (the **"Economic Report"**) issued by an economist retained by AIG (the **"Principal Amount"**). The Economic Report shall be subject to AIG's reasonable review and approval, provided, it concludes that a minimum of 3,600 jobs shall be created as a result of the Project. Lender confirms receipt of an Economic Report supporting the creation of 4,884 jobs. Borrower may elect to finance portions of the Project with separate constructing financing, in which case the Principal Amount of the Loan would be reduced accordingly (provided, however, Borrower shall be required to accept all Loan proceeds attributable to funds from Foreign Investors held in escrow as described herein).

2. **Borrower/Security:** Security for the Senior Construction Loan will include a first priority mortgage construction loan. Following the Maturity Date, the Borrower will retain and hold any repayment proceeds allocable to Foreign Investors whose I-829 petitions have not yet been adjudicated by the USCIS. Such proceeds will be held in a managed investment account opened for that purpose in the name of the Borrower with instructions to invest such amounts in investment grade nongovernmental securities. The Borrower will repay such unpaid amounts in increments of $500,000 or multiples thereof, together with any returns thereon, upon the Lender's written demand following receipt of evidence of USCIS adjudication of one Foreign Investor's I-829 Petition for each $500,000 increment. Lender will simultaneously release all other liens and security interests in and to the Project and the Loan will not thereafter bear any further interest. In the event Developer elects to obtain construction loan financing from a construction lender, Lender will release its mortgage lien to a portion of the Property so that certain buildings can be completed with construction loan proceeds, subject to customary terms and conditions as lender may require (i.e., that such portions of the Property be transferred to a separate entity, the portion of the Project separately financed is a separate tax parcel, and any necessary easements between the Property and such separately financed parcel are in place, etc.).

3. **Advances:** Loan Advances shall be made in accordance with the terms and conditions of **Exhibit "A"** attached hereto. Foreign Investors' investments will be held in escrow and released in accordance with the terms and conditions of **Schedule "I"** attached hereto.

4. **Use of Proceeds:** The proceeds of the Loan shall be used exclusively for the Project on the Property (hard and soft costs including land acquisition and entitlement costs) and/or in repayment of any temporary bridge financing in accordance with the plan (**"Business Plan"**) and Economic Report, which will be filed with USCIS as part of each of the Foreign Investor's I-526 petitions.

5. **Event of Default:** The Definitive Documents shall include industry-standard and Project-specific terms describing the events of default (each, an **"Event of Default"**) and the consequences and remedies in connection therewith thereof, including but not limited to increasing the otherwise-applicable Interest Rate by an additional four percent (4%) per year (the **"Default Rate"**). All fees, expenses and other payments then earned, due and owing to AIG under Subsection C below shall be current and/or paid at Closing. Neither party shall have any obligation to Close if AIG has issued Developer a notice of default under the provisions of Subsection C below.

6. **Developer's Equity:** Developer acknowledges that it shall be a condition precedent of Closing that Developer substantiate that it has not less than Eighty Million Dollars ($80,000,000.00) of actual equity in the Property (which may consist of cash, land equity and may also be a combination of third-party investor equity, Government grant or usable sales deposits). Developer shall be permitted to source additional equity that is subordinate to the Loan.

CONFIDENTIAL INFORMATION                                                                                          SMHG000008

7. **Non-Recourse:** The senior Loan shall be non-recourse to the principals of the Developer; provided however, Guarantors shall deliver the guarantees set forth on **Exhibit "A"** attached hereto.

8. **Legal Fees**: Developer shall pay at Closing the Lender's reasonable legal fees and costs, which are expected to be approximately $60,000 but shall in no event exceed $75,000 (this is in addition to EB-5 related fees and costs addressed in Subsection C below and the reasonable costs and expenses of Utah local counsel) (the "**Capped Amount**"); provided, however, to the extent that material circumstances beyond the control of Lender's legal counsel cause the scope of legal service to exceed that which was anticipated as described herein, then the Capped Amount shall be reasonably increased to reflect such circumstances. Disbursements (e.g., duplicating, postage, telephone, telefax, and other similar expenses) are billed separately and not subject to the Capped Amount. In the event that Developer fails to close the Loan for any reason, Developer shall immediately pay Lender's outstanding reasonable legal fees and costs (provided, however, that Lender's counsel shall not commence the preparation of loan documents until Lender has received confirmation that sufficient funds are in escrow and a closing is anticipated). In addition, Developer shall pay the reasonable ongoing fees, costs and expenses of Lender's construction consultant who shall monitor construction and disbursement of Loan advances. This Section B.8 of the Term Sheet is binding and enforceable between the parties hereto.

This Subsection B of the Term Sheet is for discussion purposes only, does not constitute a commitment to lend or an agreement to issue a commitment, does not constitute an offer to sell or an offer to purchase securities, and is subject to Lender's completion of customary due diligence and satisfaction of all conditions precedent to its sole and absolute satisfaction, including, without limitation, the following, all in the Lender's and AIG's reasonable discretion: (i) satisfactory completion of due diligence on the Project, the Developer, the owner of the Property, and the Developer's members and affiliates; (ii) satisfactory completion and review of acceptable Definitive Agreements; (iii) no material adverse change in the market regarding the Property, the Project or the Developer; (iv) no other fact, event, circumstance or disclosure in connection with the Loan, including, without limitation, any material adverse change in financial, banking, or capital market conditions that could cause the Loan to become delinquent or adversely affect the value or marketability of the Loan or the Property or otherwise impair the Loan in any material way; (v) the Loan being compliant with the EB-5 Immigrant Investor Program requirements; and (vi) there being no change in the EB-5 Program that would adversely affect the Loan or the ability for the Project to qualify as an approved EB-5 project;

This Subsection B of the Term Sheet shall terminate upon the earliest of the following to occur: (a) Lender notifies Developer that it has elected not to make the Loan; (b) the execution by Lender, AIG and Developer of the Loan documentation (including, without limitation, the Definitive Agreements); (c) it is determined that the Developer or the Project does not qualify for EB-5 financing or the $500,000 minimum investment area; or (d) if there is any change in applicable law (e.g. the EB-5 Program is terminated or substantially modified) which results in the Developer or Project no longer qualifying for the Loan or the Project no longer qualifying for the $500,000 minimum investment area.

C. **EB-5 IMMIGRANT INVESTOR PROGRAM**

Developer hereby retains AIG under the following terms and conditions:

1. **Regional Center:** Subject to AIG's approval of the Business Plan for the Project, which shall take place not more than 30 days after the Project Summary and Budget has been delivered to AIG by the Developer, AIG and its affiliated USCIS-approved Regional Center, Mountain States Center for Foreign Investment shall: (i) seek to qualify the Project for approval by USCIS and for funding under the EB-5 Program, as a qualifying capital investment project; (ii) effectuate the preparation and filing

CONFIDENTIAL INFORMATION                                                                                     SMHG000009

of Offering documents and a I-526 Exemplar with USCIS as sponsored by the Regional Center and the Lender and determined by AIG to qualify for EB-5 Program funding; (iii) effectuate the preparation of the documents necessary for an affiliate of AIG to market the Offering exempt from registration under the Securities Act of 1933, as amended, to the Foreign Investors outside the United States under the EB-5 Program; and (iv) administer all filings with USCIS and undertake in a commercially reasonable manner all additional, necessary and appropriate actions in connection with the Project and the EB-5 Program.

2. **Project Documentation:** Developer shall deliver to AIG such information and documentation as AIG shall reasonably request in order to comply with USCIS requirements under the EB-5 Program. A preliminary list of documents is attached hereto as Exhibit "B". Lender confirms receipt of the preliminary list of documents attached as Exhibit "B".

3. **Exclusivity and Non-Circumvention:** AIG on behalf of Lender agrees to use its commercially reasonable efforts to perform in a timely manner the services and other duties set forth in this Term Sheet, provided, however, that no guaranty is given that capital can be raised from Foreign Investors for the Project. In consideration of AIG's efforts with respect to the potential Loan, including, without limitation, AIG's expenditure of time and expense in analyzing the Project and the making of the Loan, Developer agrees that, in connection with this Project, it will not solicit, make, accept, negotiate, provide information for or otherwise pursue any offers for another financing for the Project pursuant to the EB-5Immigrant Investor Program, in the form of equity or debt, and will not attempt to deal directly or indirectly with any other Regional Center other than the AIG affiliated Regional Center, without the prior written consent of AIG (which may be withheld in its sole discretion). Notwithstanding the foregoing, Developer may engage with and seek to lease or acquire a Regional Center that shall be the Regional Center for the loan. AIG shall provide weekly reports to Developer commencing a week after the initial marketing seminars that will begin on a date to be determined, detailing progress in fund-raising efforts and listing subscription agreements executed by Foreign Investors and the status of immigration applications submitted by such Foreign Investors.

4. **Confidentiality:** Each party hereto agrees to execute and abide by the terms of a customary Nondisclosure Agreement to be negotiated by the parties hereto ("**Nondisclosure Agreement**"), it being understood and agreed that this Term Sheet shall not be used other than in connection with evaluating the transaction described herein, that this Term Sheet is being delivered with the understanding that its terms and substance will not be disclosed by Developer except to its and their officers directors, consultants, principals, members, partners, potential partners and co- investors, brokers, legal counsel, accountants and other retained business advisors, contractors, architects, hotel operators, hotel franchisors, and financing and equity sources, or as may otherwise be required by law, as advised by counsel.

5. **Indemnification:** Developer shall indemnify and hold harmless Lender and AIG and each of their respective officers, directors, employees, partners, members, investors, legal counsel and affiliates (each such indemnified person or entity, including Lender and AIG, an "**EB-5 Indemnified Party**") against any and all actual losses, claims, damages and liabilities, joint or several, and expenses (including all legal or other expenses reasonably incurred by the EB-5 Indemnified Party) caused by or arising out of (i) any material misrepresentation or omission made by Developer, (ii) Developer's bad faith, gross negligence or willful misconduct in performing undertakings set forth in this Term Sheet, including all exhibits hereto, or (iii) any claims or actions involving Steve Benjamin and/or Harlan Berger arising from or in any way related to the Project, the Property, the Term Sheet, or the transactions contemplated hereby.

AIG and Lender shall, jointly and severally, indemnify and hold harmless Developer and its affiliates

and each of its and their officers, directors, employees, partners, members, co-investors, and legal counsel (each such indemnified person or entity, including the Developer, a "**Developer Indemnified Party**") against any and all actual losses, claims, damages and liabilities, joint or several, and expenses (including all legal or other expenses reasonably incurred by the Developer Indemnified Party) caused by or arising out of (i) any material misrepresentation or omission made by AIG and/or Lender, or (ii) the bad faith, gross negligence or willful misconduct of AIG and/or Lender, or (iii) any breach by AIG or Lender of any U.S. or foreign law in performing the services or other undertakings set forth in this Term Sheet, including all exhibits hereto.

6. This Subsection C of the Term Sheet is binding and enforceable contract between the parties hereto.

7. **EB-5 Program Fees and Costs:** Attached hereto as **Exhibit "C"** is a list of the agreed fees, costs and expenses that Developer will pay to or on behalf of this Subsection C of the Term Sheet (hereinafter the "**EB-5 Program Fees and Costs**").

a) Developer paid a $65,000 EB-5 Application Fee and also deposited $60,000 with AIG (the "**Associated Costs Advance**") upon execution of the Original Term Sheet. AIG acknowledges that these fees have been paid in full.

b) No money, other than the EB-5 Fee and Associated Costs Advance shall be due to AIG and/or any of their representatives, consultants, attorneys and other affiliates, unless and until Developer authorizes AIG to begin specific professional work, or as provided in subsection (c) below.

c) The balance of the $224,000 EB-5 Program Fees and Costs as outlined in Exhibit C will be due and payable to AIG upon the completion of all offering documents and marketing material.

D. **MISCELLANEOUS AND COMMON PROVISIONS**

The following terms and conditions apply to all portions of this Term Sheet:

1. **Governing Law and Jurisdiction**: CONSTRUCTION AND INTERPRETATION OF THIS TERM SHEET AND THE DEFINITIVE AGREEMENTS SHALL AT ALL TIMES AND IN ALL RESPECTS BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD FOR ITS CHOICE OF LAW PROVISIONS; PROVIDED, HOWEVER, MATTERS OF CREATION, PERFECTION, AND ENFORCEMENT OF THE DEED OF TRUST SHALL BE GOVERNED BY UTAH LAW. THE PARTIES ACKNOWLEDGE AND AGREE THAT EXCLUSIVE VENUE SHALL BE IN THE STATE OR FEDERAL COURTS SEATED IN UTAH. LENDER AND DEVELOPER EACH CONSENT TO THE JURISDICTION OF THE COURTS OF THE STATE OF UTAH. EACH PARTY HEREBY WAIVES THE RIGHT TO TRIAL BY JURY.

2. **Counterparts**: This Term Sheet may be signed by the parties in counterparts and delivered by each party by electronic mail, facsimile or deposited in U.S. mail.

3. THIS TERM SHEET IS INTENDED AS AN OUTLINE ONLY AND IS EXPRESSLY MADE SUBJECT TO THE PREPARATION AND EXECUTION OF DEFINITIVE DOCUMENTATION SATISFACTORY IN FORM AND SUBSTANCE TO LENDER, WHICH DOCUMENTATION IS LIKELY TO INCLUDE PROVISIONS IN ADDITION TO, OR DIFFERENT THAN, THOSE SET FORTH ABOVE. THIS TERM SHEET DOES NOT REPRESENT AN OFFER OR COMMITMENT OR AGREEMENT BY LENDER TO CLOSE OR FUND THE LOAN.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CONFIDENTIAL INFORMATION                                                                                                          SMHG000011

CONFIDENTIAL INFORMATION   SMHG000012

**AMERICAN IMMIGRATION GROUP, LLC,**
a Florida limited liability company

By: DLF 500, LLC

By: _____
Name: David Finkelstein
Its: Managing Member

Developer on behalf of itself and its affiliates hereby accepts this Term Sheet on this 29TH day of July, 2015 in accordance with the terms and conditions set forth herein and agrees to be bound hereby.

**SUMMIT MOUNTAIN HOLDING GROUP, L.L.C.,**
a Utah limited liability company

By: _____
Name: Gregory V. Mauro
Title: Chairman

{01034647;2}            Signature Page to Amended and Restated Term Sheet

CONFIDENTIAL INFORMATION                                        SMHG000013

# EXHIBIT "A"

## Loan Summary of Terms

| | |
|---|---|
| **Principal Amount:** | Up to US$150,000,000 Loan |
| **Guarantor:** | Summit Mountain Holding Group, LLC and SMHG Village Developer LLC |
| **Project:** | The development and construction of a 415,482 square foot mixed-use resort development at Summit Powder Mountain. |
| **Loan Documents:** | A construction loan agreement, promissory note, Deed of Trust (as defined below), assignment of leases and rents, pledge and security agreement, completion guaranty (subject to the terms set forth below), non-recourse carve-out guaranty, environmental indemnity, collateral assignments construction related agreements, plans and specifications, general contractor's consent, architect's consent. |

### Security for the Loan

- Loan Documents will reflect that the Lender will hold a first priority deed of trust on the Property (the "**Deed of Trust**"), and a pledge of membership interests in the Borrower.
- Loan Documents will reflect the Lender's first priority security interest in the Borrower's cash, property and other assets, subordinate only to construction liens and other encumbrances specifically permitted by the Loan Documents.
- Following an event of default, interest will accrue at an additional 4% above the applicable rate (the "**Default Rate**"), and the Lender will have the right to foreclose the Deed of Trust and a contractual right to exercise its rights under the pledge and security agreement.

### Term of the Loan; Extension Options

- Term of the Loan will be five (5) years, such time period measured from the first to occur of the following: (i) the date on which 40% of the maximum number of subscribers in the Offering have been admitted to the Company as Series A Members and (ii) the date on which the Company closes the Offering (the "**Maturity Date**").
- Borrower will have the right to extend the Maturity Date for a single two (2) year period, subject to certain conditions including payment of a 0.50% extension fee on the outstanding principal balance being extended and repayment of all Accrued Interest.
- In addition, to comply with EB-5 Program requirements, Loan principal representing the $500,000 investment of a EB-5 investor whose I-829 Petition has not been adjudicated by USCIS on the Maturity Date shall become due and payable only when USCIS adjudicates that investor's I-829 Petition.

### Interest Rate: Origination Fees

- Borrower must make all interest payments from funds that are not proceeds of the Loan.

{01034647;2}   A-1

CONFIDENTIAL INFORMATION                                                                                                                                             SMHG000014

- Annual Interest Rates charged on the outstanding principal balance of each Loan Advance is 4.75% if paid currently (the "**Current Pay Interest Rate**").
- The amount of accrued interest (the "**Accrued Interest Amount**") shall itself accrue interest, if not paid currently when due, at a rate equal to 5.75% for a period ending on the earlier to occur of 36 months following the date of the related Loan Advance closing, and the date that Developer has received sufficient net proceeds from unit sales to permit the interest accrual to be paid (the "**Accrued Interest Due Date**"); provided, however, if the Accrued Interest Amount is not paid in full (including any accrued interest thereon) on or before the Accrued Interest Due Date, the interest rate on the Accrued Interest Amount shall increase to 10.00% calculated from the initial date of the accrual through the date that such amount is paid in full.
- Following the Accrued Interest Due Date, the Current Pay Interest Rate on the Loan shall be 5.75% and shall be due and payable on a current basis.
- Following the occurrence of an event of default (whether or not Lender accepts a cure thereof and subject to Lender's right to accrue interest at the Default Rate), the Current Pay Interest Rate shall be 5.75% and shall be due and payable on a current basis (in addition to interest at the Default Rate which shall be charged on all outstanding amounts).
- Borrower must pay a one percent (1%) origination fee on each principal advance for the Project.

- Progress Updates. AIG shall provide periodic reports to Developer detailing progress in fund raising efforts.

**Payments of Interest**

- Computed on the basis of a 365-day year and for the actual number of days outstanding.
- At the initial closing of the Loan, and at the time of each subsequent advance, an amount equal to one (1) year of interest payments on the Principal Amount of the Loan advanced at Closing shall be deposited by Borrower into an account pledged to and controlled by Lender.
- Interest is due and payable as follows:
    o An amount equal to one year of interest will be deemed earned and payable on the date of such applicable advance;
    o All accrued interest will be due and payable on the third anniversary of the Trigger Date;

**Repayment of the Loan**
- Except as otherwise provided in the Loan Documents, the Borrower may not prepay the Loan except after final adjudication of all I-829 petitions.
    o Loan Documents will provide for a right to prepay in increments of at least $5.0 million in outstanding principal, for each group of ten (10) I-829 petitions that have been approved by USCIS.
    o The Loan Documents will permit a Prepayment during an extension term and will provide a release mechanism for housing units as they are sold.
    o The Loan Documents will provide a release mechanism for housing units as they are sold during the initial 5-year Term (and during the extension term even if a final adjudication has not occurred with respect to the equity interests underlying the outstanding principal) under the Loan.

**Construction Provisions**
- Closings/Loan Advances. Subject to the terms and conditions of the Definitive Agreements during the Commitment Period (which shall mean the period commencing on the initial Closing Date and ending on the March 20, 2016 in the form of periodic advances to Borrower

(each, a "**Loan Advance**") in an aggregate principal amount not to exceed the Principal Amount. With respect to the initial Loan Advance, such initial Loan Advance shall be (i) in a principal amount equal to at least Ten Million and No/100 Dollars ($10,000,000.00) and (ii) require confirmation from Lender that a minimum of twenty (20) Foreign Investors shall have filed an I-526 with the USCIS. Notwithstanding anything to the contrary set forth herein, Lender shall have no obligation to make any Loan Advance that, in the aggregate with all Loan Advances previously made, exceeds the amount of funds raised from Foreign Investors who have filed I-526 applications with the USCIS.

- Borrowing Requests. With respect to subsequent Loan Advances, each such subsequent Loan Advance shall occur (i) only in increments of no less than Four Hundred Thousand and No/100 Dollars ($400,000.00) thereof, provided that the principal amount of such Loan Advance does not exceed the available Principal Amount, and (ii) with confirmation of a corresponding number of Foreign Investors shall have filed an I-526 with the USCIS. The Principal Amount shall be reduced by an amount equal to the Loan Advances previously made. This is not a revolving facility and, as such, the Loan, or any portion thereof, once repaid in accordance with the terms hereof, whether such repayment is voluntary or required, may not be re-borrowed. Borrower shall be permitted to make a borrowing request at any time during the Commitment Period; provided, however, Borrower shall not make Borrowing Requests more than once per thirty (30)-day period (each a "**Borrowing Request**"). Subject to the terms and conditions set forth in the Definitive Agreements, Lender shall make each Loan Advance to Borrower upon satisfaction of the conditions therein, as determined by Lender.

- Processing of Loan Requests. Each Loan Advance shall be made to Borrower promptly upon request, and in any event, within seven (7) Business Days after receipt by Lender of a Borrowing Request, together with evidence of Qualifying Expenditures made or a plan for Qualifying Expenditures to be made or reimbursed with the proceeds thereof, in each case in form and substance reasonably acceptable to Lender. Concurrently with the closing on the Loan, Lender has agreed to make a Loan Advance in accordance with the first Borrowing Request (subject to satisfaction of customary conditions and availability of capital from Foreign Investors who have filed I-526 applications with the USCIS). "Qualifying Expenditures" shall mean any expenditure for the Project consistent with the project budget approved by Lender, including reimbursement for project costs already spent by Borrower from and after term sheet date that have been approved by Lender.

- The Loan will be disbursed to the Borrower pursuant to written advance requests, and subject to satisfaction of customary construction advance conditions, including without limitation the following:
    o No default or event of default shall have occurred and be continuing;
    o Lender shall have received and approved the project budget, all construction related documents, necessary permits and agreements (including, without limitation, the construction contract, architect agreement, trade contracts, plans and specs, construction schedule, and contractor consents;
    o an updated budget, construction, and draw schedules;
    o a notice of borrowing, requisition letter, and borrowing certificate in forms to be attached to the loan documents (which shall include a line-by-line project funding summary (hard & soft costs) on AIA form);
    o current requisitions for payment from trade contractors and/or any of their subcontractors;

CONFIDENTIAL INFORMATION                                                                                                    SMHG000016

- o with respect to a draw request for advances for the payment of hard costs: (i) a completed Application and Certificate for Payment (AIA Document G702) executed by the general contractor, architect, which shall be certified as true and complete by Borrower and shall be verified by construction consultant; (ii) an absolute, unconditional waiver of lien with respect to the then last preceding advance from the general contractor and applicable trade contractors, all subcontractors and all other persons who were paid from the proceeds of such advance, in form and substance reasonably acceptable to Lender, covering all work done and all sums received through the date of the then last preceding advance and noting that the only amounts then due and owing (other than any retainage) are the amounts to be paid to such persons out of the advance being requested, each of which shall be certified as true and complete by Borrower and the general contractor and shall be verified by construction consultant; (iii) a conditional lien waiver with respect to the current advance from the general contractor and each applicable trade contractor and material supplier; (iv) a list of all trade contracts executed since the date of the then last preceding advance; (v) a list of all change orders that have not yet been submitted to Lender, together with a statement by Borrower that copies of the same have been submitted to construction consultant; (vi) such other information and documents as may be reasonably requested or required by Lender or construction consultant;
- o with respect to any draw request for payment for soft costs, the following: (i) reasonable evidence that such soft costs have been incurred and are due and payable and are within budgeted amounts; (ii) invoices, statements or such other information and documentation as Lender shall reasonably request or require with respect to such soft costs covered by such draw request;
- o all payments for construction shall be paid directly to the applicable contractor or subcontractor; evidence of current insurance policies including construction liability insurance, workers compensation, and general liability covering personal injury naming Lender as an additional insured;
- o Borrower shall have obtained all construction permits;
- o Lender shall have received a title continuation dated the date of the requested advance;
- o Lender shall have received an updated budget for the Project, in form and substance (including, without limitation, as with specificity as to line items and other levels of detail as Lender may require) reasonably approved by Lender, in each case which indicates the costs anticipated to complete the construction of the Project; and
- o no line item in the budget shall be eligible for funding from the proceeds of an advance until 100% of such line item has been bought out.

- Contingency. Subject to the prior approval of Lender, and provided no event of default has occurred and is continuing, Borrower may revise the Budget from time to time to move amounts available under any line item that are designated as 'Contingency' to other line items. Subject to the foregoing, prior to completion of the Project, Borrower may use Contingency funds from the Loan to pay for items in other Line Items for which such Contingency is available without the prior approval of Lender as long as the percentage of the total amount of such Contingency being applied to other line items, when added to amounts previously applied from such Contingency, does not exceed the percentage of completion of the Project at the time of such application. For example, if the percentage of completion of the Project is forty percent (40%) complete, then forty percent (40%) of each Contingency may be applied.

- Cost Savings. If there is a cost saving in a particular line item of the budget, as determined in accordance with the provisions of the Loan Documents, and if such cost saving is

{01034647;2}   A-4

CONFIDENTIAL INFORMATION                                                                                                                              SMHG000017

substantiated by evidence reasonably satisfactory to Lender then Borrower shall have the right, upon prior approval of Lender, to reallocate such cost saving to another line item with respect to which additional costs have been or may be incurred or to the line item designated as 'Contingency'.

- Change Orders. Borrower shall not request, initiate, agree to, accept, cause or suffer directly or indirectly any change order that will cause the projected aggregate costs to exceed the aggregate costs set forth in the budget, including any Contingency allocable to such line item. Borrower shall submit to Lender and Lender's construction consultant copies of each proposed change order prior to entering into it, together with documentation reasonably satisfactory to Lender and construction consultant, setting forth all additions and subtractions theretofore made to or from the scope of the Project. Borrower will reimburse Lender for all reasonable fees and costs associated with the construction consultant.

- Construction Budget. Lender will not be required to make an advance pursuant to the provisions of the Loan Documents if such advance, when added to other advances for a line item and, the Developer's Equity for such line item, exceeds the amount of such line item in the budget, unless cost savings from other line items have previously been reallocated in accordance with Loan Documents or all or a portion of the line item designated as 'Contingency' has been reallocated to such line item in accordance with the Loan Documents.

- Completion. The Project shall not be deemed completed unless and until certain conditions are satisfied, which shall include, without limitation:

    o Lender shall have received from Borrower final unconditional lien waivers and release/payment receipts from the general contractor and all trade contractors and subcontractors, or final conditional lien waivers in a form approved by Lender;
    o Lender shall have received a copy of the certificate of occupancy and all other operating permits in order to occupy and operate the Property;
    o Lender shall have received a (i) final "as-built" plans and specifications with respect to the Project; and (ii) a certificate of completion for the Project certified by the architect and confirmed by Lender's construction consultant which confirms that completion has occurred substantially in accordance with the plans and specifications.

- Retainage. The parties will mutually negotiate and discuss language for the definitive Loan Documents to address Developer's retainage arrangements with its contractors.

**Guaranties and Indemnity**
- Recourse Guaranty. Customary recourse for items, including, without limitation the following:
    o losses for fraud, intentional and material misrepresentation, willful misconduct, intentional and physical waste, misappropriation of funds, removal or disposal of property after an event of default, security deposits not delivered to Lender upon a foreclosure, and breach of the covenants requiring the Borrower to maintain its status as a single purpose, bankruptcy remote entity(i.e., the Borrower shall not own any other properties or be involved in any other businesses, shall not own any subsidiaries, shall not comingle funds with any other entity, and other industry standard provisions).; and
    o full amount of the debt for voluntary bankruptcy, collusive involuntary bankruptcy, consenting to, or joining in an application for the appointment of a custodian, receiver,

CONFIDENTIAL INFORMATION   SMHG000018

trustee, or examiner, seeking substantive consolidation in connection with a bankruptcy action, any unauthorized secondary financing, violations of the due on sale/encumbrance covenants set forth in the loan documents including, without limitation, transfer of title or direct or indirect ownership of borrower, litigation brought in bad faith to delay the exercise of remedies by Lender and breach of SPE covenants/provisions which are cited as a factor in a substantive consolidation.

- <u>Environmental Indemnity</u>.  Market standard environmental indemnity.

- <u>Completion Guaranty</u>.  Upon the occurrence of an event of default under the Loan Documents for Borrower's failure to complete construction of any building (the physical construction of which has been commenced by Borrower) and any directly related infrastructure required by the applicable governing body in order to obtain a certificate of occupancy for such building (collectively, the "**Unfinished Improvements**"), and the passage of any applicable notice and cure periods, and subject to Lender funding advances under the Loan, Guarantor will:

    o  timely complete, without lien or defect, construction of any Unfinished Improvements (completion of such construction shall commence and be completed as soon as reasonably practicable using continuous and diligent efforts on the part of Guarantor).
    o  In connection with the foregoing construction obligations, Guarantor will:
        - not be subject to any changes in scope of the project by Lender, but will be responsible for all cost overruns;
        - pay (with the Loan proceeds advanced by Lender) all architects, engineers, surveyors, and other contractors;
        - pay (with the Loan proceeds advanced by Lender) all expenses, charges, costs and fees of or relating to the foregoing construction obligations, including all permitting fees, licensing fees, amounts payable under construction contracts and subcontracts;
        - pay (with the Loan proceeds advanced by Lender) for completion of all punch list items;
        - obtain and deliver final lien waivers from all architects, contractors, engineers and surveyors; and
        - pay (with the Loan proceeds advanced by Lender) all carrying costs (all costs of taxes, utilities, insurance premiums, sales (including brokerage commissions, expenses of sales office, closing costs, transfer taxes), and all other operating expenses (including costs of owning, operating, leasing, maintaining, and repairing the Property)) through the earliest of repayment of the Loan in full, the transfer of title to Lender or tis designee through foreclosure, or the acceptance of a deed-in-lieu of foreclosure by Lender.
    o  The Completion Guaranty will include a liquidated damages provision providing that Guarantor is not required to actually complete such construction, subject to Guarantor paying liquidated damages to Lender equal to all hard costs and soft costs required to complete construction of the Unfinished Improvements less the undisbursed portion of the Loan.

**Senior Financing**
- Further to Section 9 of the Executed Term Sheet between Borrower and Lender, in the event that Borrower elects to obtain a senior mortgage loan ("**Senior Loan**"), then:
    o  Lender will limit all future fund raising activities to an amount equal to the difference between $150,000,000 and the sum of (i) the aggregate amount raised by Lender prior to Borrower's election to obtain the Senior Loan, and (ii) the principal amount of the

{01034647;2}  A-6

Senior Loan.  By way of example only, if Lender has already raised $75,000,000 and Borrower elects to obtain a Senior Loan in the amount of $50,000,000 then Lender will limit all future fund raising activities to $25,000,000.
- o The Loan shall become subordinated to the Senior Loan and thereafter the Loan will be secured by either a second mortgage on the Property or a first position security interest in the membership interests in the Borrower, in the discretion of the Senior Lender.
- o Lender will cooperate with Borrower's efforts to obtain such Senior Loan and in connection with the Senior Loan, Lender will execute, acknowledge and deliver such documents as may be required by the Senior Loan lender in connection with the Senior Loan, including, but not limited to, intercreditor, subordination and lien release agreements.

CONFIDENTIAL INFORMATION   SMHG000020

# EXHIBIT "B"

## EB-5 Document List Required of Developer

The following is an initial and non-exhaustive list of documents and information that the Developer shall deliver to AIG as a condition to Closing the senior Loan, all of must be satisfactory to Lender. " Lender confirms receipt of the preliminary list of documents listed below.

a.  **Formation Documents for Developer:**

- Certificate of Formation for Developer
- Certificate of Authority for Developer

**Developer/Entity Names:**

- Senior individuals of Developer's Project Team including independent Bios
- Sponsor Development team with individual Bios
- Builder- if outside company need the details of their past projects and individual Bios

b.  Details and terms of the current debt on the property and whether you are planning to pay it off with either EB5 funds or from the Senior Acquisition and Construction loan;

c.  Entity structure and Organizational Chart;

d.  Detailed Proforma and Construction Budget;

e.  Detailed Construction Timeline from the Construction Company depicting a minimum of 24 months for the Construction period;

f.  Letter from Developer or Construction Company explaining basis for Construction Timeline and Budget together with description of experience and qualifications;

g.  Sample construction Plans, Renderings and Drawings;

h.  Zoning Opinion from Attorney and Massing Studies from Architect;

i.  Broker Opinion of Value and Marketing Study for Project supporting the projected success of the Project, including comparable leasing data on the rental of the retail space and other revenue projected in Developers proforma projections;

j.  Appraisal of Property from an authorized independent appraisal firm; and

k.  Architect of Record and Bios.

CONFIDENTIAL INFORMATION                                         SMHG000021

**EXHIBIT "C"**
(Application Fee)

1. **EB-5 Application Fee:** AIG's Fee for EB-5 services shall be Sixty Five Thousand Dollars ($65,000.00), payable upfront and fully earned when paid. This EB-5 Fee is non-refundable, regardless for any reason or the Loan fails to close for any reason. Lender acknowledges receipt of this fee on December __, 2014.

(Costs and Expense Reimbursements)

2. **EB5-Project Documents:** Developer shall pay in advance and/or reimburse all of AIG's reasonable out of pocket and third party costs and expenses for the preparation and submission of the EB5 program for USCIS approval and for the Offering, estimated as follows:

   | | | |
   |---|---|---|
   | 1. | Immigration Attorney | $20,000 |
   | 2. | Economic Report | $15,000 |
   | 3. | SEC Attorney | $35,000 |
   | 4. | Appraisal/Feasibility Report | Provided by Developer |
   | 5. | Design and reproduction of Collateral Materials | $15,000 |
   | 6. | Translation Services | $11,500 |
   | 7. | Video Production | Provided by Developer |
   | 8. | Web Site design | $5,000 |
   | 9. | Printing | $7,500 |
   | 10. | Business Plan Preparation and Review | $5,000 |
   | | **ESTIMATED COSTS AND EXPENSES** | $114,000 |

3. **Travel:** In addition to the EB-5 Fee and the Costs and Expenses above, Developer shall advance to AIG the sum of $45,000.00 for AIG's travel costs (airfare, hotel, meals, conferences, etc.) for marketing the Project to Foreign Investors and their agents. It is anticipated that AIG will travel predominantly to China and/or other Asia-Pacific countries.

CONFIDENTIAL INFORMATION   SMHG000022

SCHEDULE "I"

<u>Escrow Provisions</u>

| | |
|---|---|
| **Conditions of Foreign Investors Subscription Amounts:** | Each Foreign Investor's $500,000 investment (a "**Subscription**") will be held in a non-interest bearing escrow account (the "**Escrow Account**") with Signature Bank ("**Escrow Agent**"). |
| **Submission of I-526 Petition:** | After the Company accepts a Subscription and the Foreign Investor has delivered funds representing his or her $500,000 Subscription (a "**Subscription Amount**") to the Escrow Account, the Foreign Investor will prepare and submit an I-526 Petition to USCIS to seek conditional permanent residence in the United States. |
| **Escrow Tranches:** | Subscription Amounts will be allocated to the following Escrow Account tranches (each, a "**Tranche**") in the order received into the Escrow Account:<br><br>(1) Tranche 1: up to $35.0 million;<br><br>(2) Tranche 2: over $35.0 million up to $75.0 million;<br><br>(3) Tranche 3: over $75.0 million up to $115.0 million; and<br><br>(4) Tranche 4: over $115.0 million up to $150.0 million. |
| **Conditions Precedent to Release of Tranche 1 Subscription Amounts:** | Subscription Amounts allocated to Tranche 1 will become eligible for release when:<br><br>(1) the Developer has executed a completion guarantee as described on Exhibit "A" to the Term Sheet covering Project construction work to be funded from the release of Tranche 1; and<br><br>(2) at least 20 Foreign Investors whose Subscription Amounts have been allocated to Tranche 1 have submitted I-526 Petitions to USCIS. |
| **Conditions Precedent to Release of Additional Subscription Amounts:** | Subscription Amounts allocated to each subsequent Tranche will become eligible for release when:<br><br>(1) all Subscription Amounts allocated to the immediately preceding Tranche have either been released or allocated to the Tranche Holdback Account;<br><br>(2) the Developer has executed a completion guarantee as described on Exhibit "A" to the Term Sheet covering Project construction work to be funded from the release of the Tranche; and<br><br>(3) at least 20 Foreign Investors whose Subscription Amounts have been allocated to the Tranche have submitted I-526 Petitions to USCIS. |
| **Release of** | Prior to the first USCIS approval of any Foreign Investor's I-526 Petition and |

{01034647;2}

Schedule I-1

| | |
|---|---|
| **Subscription Amounts from Escrow Prior to First I-526 Petition Approval:** | upon satisfaction of all conditions precedent to release of Subscription Amounts, the Escrow Agent will release $400,000 of a Foreign Investor's $500,000 Subscription Amount to the Company upon receipt of notification that the Foreign Investor's I-526 Petition has been filed with USCIS. The Company will then issue a Series A Unit to the Foreign Investor and admit the Foreign Investor to the Company as a Series A Member. The Escrow Agent will retain the Foreign Investor's remaining $100,000 (the "**Holdback Amount**") in subaccounts within the Escrow Account corresponding to each Tranche (each, a "**Tranche Holdback Account**") to facilitate the return of the Subscription Amount of the Foreign Investor or another Foreign Investor whose I-526 Petition is denied or withdrawn. Once the balance of a Tranche Holdback Account reaches $3.0 million and subject to maintenance of a $3.0 million minimum balance, the Escrow Agent will release to the Company the Holdback Amount of one Foreign Investor, determined in the order in which his or her I-526 Petition was filed, as each subsequent Holdback Amount is credited to the Tranche Holdback Account. |
| **Tranche Holdback Account Minimum Balance:** | The minimum Tranche Holdback Account balance is $3.0 million prior to the first USCIS approval of any Foreign Investor's I–526 Petition and $500,000 thereafter until there are five allocated to that Tranche whose I–526 Petitions remain to be adjudicated. Upon the first USCIS approval of any Foreign Investor's I–526 Petition, the Escrow Agent will release to the Company all amounts in excess of $500,000 held in each Tranche Holdback Account. The Company will maintain a balance in each Tranche Holdback Account of $500,000 until there are five Foreign Investors allocated to that Tranche whose I–526 Petitions remain to be adjudicated, at which point Holdback Amounts will be disbursed from that Tranche Holdback Account in $100,000 increments as each remaining I–526 Petition is adjudicated. |
| **Release of Subscription Amounts from Escrow Following First I-526 Petition Approval:** | Upon receipt of notification that a Foreign Investor's I-526 Petition has been filed with USCIS, the Escrow Agent will release $400,000 of the Foreign Investor's $500,000 Subscription Amount and the Company will then issue a Series A Unit to the Foreign Investor and admit the Foreign Investor to the Company as a Series A Member. At the same time, subject to maintenance of the applicable minimum balance in each Tranche Holdback Account, the Escrow Agent will release to the Company the Holdback Amount of one Foreign Investor, determined in the order in which his or her I-526 Petition was filed, as each subsequent Holdback Amount is credited to the Tranche Holdback Account. |
| **Return of Subscription Amount:** | Upon notification that (i) USCIS has denied a Series A Member's I-526 Petition and all administrative rights of appeal have been exhausted or waived, or (ii) the Series A Member has voluntarily withdrawn his or her I-526 Petition prior to USCIS adjudication, the Company will take the following steps in the following order to facilitate a return of the Series A Member's $500,000 Subscription Amount:<br><br>(1)    subject to the availability of funds, cause the Escrow Agent to release amounts from the applicable Tranche Holdback Account to the Company; |

CONFIDENTIAL INFORMATION    SMHG000024

  (2)  use commercially reasonable efforts to replace the Series A Member with a substitute Foreign Investor; and

  (3)  following completion of Summit Village, require the Developer to make commercially reasonable efforts to prepay the Loan to the extent required to enable the Company to return of the Series A Member's $500,000 Subscription Amount.

In any event, there is no assurance that the Series A Member's $500,000 Subscription Amount will be returned prior to repayment of the Loan. EB-5 Program rules prohibit the Company from using any portion of a Foreign Investor's $500,000 Subscription Amount to return another Foreign Investor's $500,000 Subscription Amount.

CONFIDENTIAL INFORMATION  SMHG000025