# EXHIBIT 3

KT Capital Group, LLC

September 2, 2015

Gregory V. Mauro
Summit Mountain Holding Group, L.L.C
3923 N Wolf Creek Drive, Eden, UT 84310

**Letter of Intent – EB-5 financing for the development of Summit Village at Summit Powder Mountain Resort**

Gentlemen:

Further to our prior discussions with you on the captioned matter, KT Capital Group, LLC ("**we**" or the "**Company,**") would like to set forth in this non-binding Letter of Intent (this "**LOI**") our understanding of the Project (as defined below) and the proposed terms of cooperation with Summit Mountain Holding Group, L.L.C. ("**you**" or the "**Sponsor**"), as well as the major work steps ahead, for consummating the financing for the Project (the "**EB-5 Loan**") pursuant to the EB-5 immigrant investor visa program under the Immigration and Nationality Act (the "**EB-5 Program**"). The proposed terms and conditions set forth in this LOI are provided as a summary to facilitate further discussion between we and you (the "**parties**"). The actual terms and conditions are subject to satisfactory completion of due diligence, documentation and other such terms and conditions as are agreed upon between the parties. Nevertheless, the Exclusivity Undertaking (as defined below), Confidentiality Obligations (as defined below) and the section "Lender's Attorney/Advisor Fees" under Part IV below will be binding on and enforceable against both parties in accordance with their terms and notwithstanding the termination or expiry of this LOI. Subject to such binding obligations, either party may terminate this LOI at any time by written notice to the other.

You hereby agree that during the Exclusivity Period defined below, you will not directly or indirectly, with the exception of your existing and on-going business relationship with American Immigration Group, LLC ("**AIG**"): (a) enter into, re-start, solicit, initiate or otherwise participate in any negotiations with any third party in respect of the financing, fund raising or funding of the Project pursuant to the EB-5 Program ("**Third Party Negotiations**"); (b) seek, encourage or substantively respond to any approach that would lead to Third Party Negotiations; (c) enter into any letter of intent, agreement, arrangement or understanding (whether or not legally binding) pursuant to any Third Party Negotiations; or (d) supply or otherwise disclose any information about the Project to a party that proposes to enter into Third Party Negotiations (unless the information is publicly available).  The "**Exclusivity Period**" is the period beginning the date of this LOI and ending on the earliest of (w) the date which 90 days after the date of this LOI (or such later date as both parties may mutually agree in writing), (x) the date we inform you in writing that we will not move forward with the financing contemplated by this LOI or the date that the Distributor informs you or us in writing that it will not move forward to raise the full Offering contemplated by this LOI; or (y) the date we or the Lender (defined below) informs you that the terms of the EB-5 Loan will be materially less favorable to you or Borrower (defined below) than the indicative terms set

1

STRICTLY PRIVATE & CONFIDENTIAL                                           CONFIDENTIAL

forth in Part IV of this LOI. For the purpose of this LOI, your exclusivity undertaking contained in this paragraph will be referred to as the "**Exclusivity Undertaking**".

Both parties hereby agree that, for a period of two (2) years after the date hereof, each party will keep the contents of this LOI and any resulting negotiations and documents confidential, and neither party shall disclose any such information to any third party (except as otherwise agreed upon by both parties herein or from time to time) without the prior written consent of the other party, except that the parties may disclose any information contained herein and any resulting negotiations and documents (i) to their respective employees, agents, advisors, counsel and consultants on a need-to-know basis (provided each party agrees to take reasonable steps to ensure that such persons keep such information confidential), (ii) as required by applicable law or by a relevant competent authority, provided that the party proposing to make a disclosure will promptly inform the other party and allow the other party to seek a protective order or other appropriate remedy (at the other party's sole expense) accordingly, and (iii) as otherwise required to give effect to the transaction contemplated under this LOI. For the purpose of this LOI, the confidentiality obligations of both parties as set forth in this paragraph will be referred to as the "**Confidentiality Obligations**".

In order to evidence your agreement to the foregoing, please sign a copy of this LOI where indicated below and return it to us.

**Part I: Project Information**

| | |
|---|---|
| Project: | Summit Village being part of the Summit Powder Mountain Resort is expected to include a 130-unit and 365-key hotel condominium townhome complex, approximately 70,964 ft$^2$ (6,593 m$^2$) of commercial space, approximately 62,290 ft$^2$ (5,787 m$^2$) of common areas and parking, approximately 20,000 ft$^2$ (1,858 m$^2$) of conference space and approximately 16,000 ft$^2$ (1,486 m$^2$) of activity annex (the "**Project**") to be developed on approximately 4.04 acres of land located in the gently sloping saddle near the summit of Powder Mountain, more particularly described on Exhibit A (the "**Property**"). Construction of Summit Village is expected to begin in the third quarter of 2015 and the hotel condominium is expected to receive its first guests in the fourth quarter of 2017. |
| Sponsor: | Summit Mountain Holding Group, L.L.C. |
| Project Company / Borrower: | SMHG Village Development, LLC |
| Development Costs: | The total development costs for the Project (the "**Development Costs**") are estimated as follows: |

| | |
|---|---|
| Hard Costs | $153,968,073 |

2

CONFIDENTIAL INFORMATION                                                                 SMHG001586

|  |  |
|---|---|
| Soft Costs | $50,287,243 |
| Financing Costs | $27,868,747 |
| Property Acquisition | $29,000,000 |
| Total | $261,124,063 |

Capital Stack: The Development Costs are anticipated to be funded as follows:

|  |  |
|---|---|
| EB-5 Senior Secured Mortgage Loan | $150,000,000 |
| Weber County Special Assessment Bonds | $18,600,000 |
| Sponsor Equity | $92,524,063 |
| Total | $261,124,063 |

Sponsor Equity comprises the following: (i) in-kind contribution of the Property at an independently appraised value of $29.0 million; (ii) an estimated cash contribution by the Sponsor of $16,679,300 in tax increment financing ("TIF") proceeds; (iii) an estimated cash contribution by the Sponsor of $4,498,625; and (iv) allocation of an estimated $42,346,138 constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units.

In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of Sponsor Equity, the Sponsor will contribute or cause to contribute the equivalent amount in cash contribution to makeup for such shortfall.

The EB-5 Loan is proposed to be funded by proceeds of the Offering. A portion of the Development Costs may be paid through bridge capital arrangements prior to the First Disbursement, subject to terms reasonably acceptable to the Lender and provided that the Lender's collateral position is not impaired by such bridge capital, and the EB-5 Loan may be used to repay such bridge capital.

Estimated Job Creation: The Project is estimated to create 4,884 new jobs based on the Economic Report (as defined below).

TEA: Pursuant to the letter dated March 20, 2015 from State of Utah, Department of Workforce Services, the Project is located within a "targeted employment area" for the purpose of the EB-5 Program.

**Part II: Key Terms of EB-5 Offerings**

Offering: An offering of Class B membership units ("**Class B Units**") of the Issuer up to an aggregate maximum offering amount of US$150,000,000 to appropriately qualified foreign investors

3

STRICTLY PRIVATE & CONFIDENTIAL                                                                CONFIDENTIAL

|  |  |
|---|---|
| Issuer / Lender: | A newly formed, special-purpose, bankruptcy-remote entity to be incorporated by the Sponsor for the purpose of making the Offering. |
| Initial Member and Manager: | The Sponsor will be the initial member and manager of the Issuer. Upon the amended and restated operating agreement of the Issuer ("**A&R OA**") coming into effect, such membership interest will be transferred to the Company, its affiliate, or designee and will be converted into a Class A membership unit in the Issuer, and the initial manager of the Issuer will also resign from its position. |
| Regional Center: | Mountain States Center for Foreign Investment, LLC. Subject to the Issuer's due diligence, all costs of the Regional Center will be borne by the Issuer. |
| Class A and Class B Managers: | Upon A&R OA coming into effect, the Company, its affiliate, or designee will act as Class A manager of the Issuer, Celona Asset Management (USA) Limited will act as Class B manager of the Issuer. |
| Escrow Agent: | The Bank of China Limited, Macau Branch, and/or any other escrow agent to be designated by the Issuer, will act as escrow agent to hold the Subscription Price and the Administration Fee (as defined below) pending satisfaction of the Subscription Closing Conditions. |
| Subscription Price: | US$500,000, or such other minimum investment amount as may be required under the EB-5 Program at any time, per Class B Unit. In addition, an administration fee of US$55,000 per Class B Unit (subject to reduction by up to US$5,000 or such other amount that is disclosed in the Offering Documents, on a case-by-case basis in the sole discretion of the Issuer, the "**Administration Fee**") will also be paid by each Investor and released directly to the Issuer. |
| Subscription Closing Conditions: | The escrow agent will release the Subscription Price and the Administration Fee to the Issuer and a Class B Unit will be issued to an Investor upon the earliest of: (1) the approval of such Investor's I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") by USCIS, (2) the filing of such Investor's I-526 Petition with USCIS, provided that (A) not less than three (3) I-526 Petitions of Investors for the Offering have been approved by USCIS (regardless of whether such Investor's I-526 Petition has been approved), or (B) an I-924 application submitted by the Regional Center in connection with the Project ("**I-924 Application**") has been approved by USCIS, or (3) the satisfaction of early release conditions acceptable to Issuer, including an acceptable |

(continued from prior page) participating in the EB-5 Program (the "**Investors**", each an "**Investor**").

4

STRICTLY PRIVATE & CONFIDENTIAL                                                         CONFIDENTIAL

|  |  |
|---|---|
|  | guarantee by the Sponsor of repayment of such amount in the event of such Investor's I-526 Denial. |
| Use of Proceeds: | The entire proceeds from the Offering will be loaned to the Project Company as the EB-5 Loan and be used to fund the approved Development Costs of the Project to the extent permitted under the EB-5 Program. |
| Offering Period: | Target Commencement Date: Prior to September 30, 2015. |
|  | Expiry Date: September 30, 2016 with the Issuer having an option to extend until March 31, 2017. |
|  | The actual commencement date of the Offering period will be subject to negotiations and dependent on the progress of the activities as outlined in Part V below. |
| Project Company Indemnifications: | The Project Company agrees to indemnify and keep indemnified the Issuer, the Company, the Class A Manager, the Class B Manager, and their respective shareholders, members, managers, directors, employees, agents, representatives, advisors and their affiliates (together, the "**Indemnified Parties**") and to hold each of the Indemnified Parties harmless from and against any and all claims directly or indirectly arising out of or resulting from the disclosure of any facts, risk disclosures or information relating to the Project, the Sponsor and/or the Project Company approved by the Project Company or the Sponsor in writing for the purpose of the Offering, including without limitation disclosures and information in the Offering Documents, the business plan, the economic report, except for any claims directly relating to the gross negligence or willful misconduct of any of the Indemnified Parties. |
| I-526 Template: | To expedite fundraising and the processing of the I-526 Petitions, the Sponsor and/or the Project Company will provide certain information for the preparation of an I-526 template in compliance with USCIS guidelines and regulations at the direction of the Issuer's immigration counsel. |
| Securities Counsel: | Arnstein & Lehr, LLP will be engaged by the Issuer to prepare the Offering Documents for the review and approval of the Issuer.. |
| Immigration Counsel: | David Hirson & Partners, LLP will be engaged by the Issuer. |
|  | Each Investor will engage an immigration lawyer of his/her choice, subject to approval rights of the Issuer, to process his/her I-526 Petition. |

5

STRICTLY PRIVATE & CONFIDENTIAL                                                              CONFIDENTIAL

| | |
|---|---|
| Economist: | Dr. Evans has been engaged by the Project Company and/or the Sponsor at its own cost to draft, review, update and finalize the Project's economic report (the "**Economic Report**"). |
| Business Plan Writer: | The Project Company or the Sponsor will engage a business plan writer at its own cost to draft, review, update and finalize the Project's business plan as part of the Offering Documents. |

**Part III: Distribution of Class B Units**

| | |
|---|---|
| Distribution of Class B Units: | The Issuer will procure to engage Pan-America Business Consulting Limited (the "**Distributor**") to recruit up to 300 Investors, on a best-effort-basis, for the subscription of Class B Units pursuant to the Offering. |
| Services Territory: | All Offering activities are to be conducted solely within East Asia including the People's Republic of China. |
| Marketing Events: | The Issuer and the Project Company agree that marketing events within the Services Territory should be coordinated or organized by the Distributor for promoting and marketing the Project, and that the Issuer will procure the Distributor to bear the cost and expense for such events. Travel expenses incurred by any party to the event locations will be borne by such party. |
| Translation: | The Issuer will procure the Distributor to translate the Offering Documents into the applicable language(s) of the Services Territory provided that the English version of the Offering Documents will always prevail. |
| Exclusivity: | The Issuer and Project Company agree that (i) they will undertake to provide the Distributor with the right to exclusively market and recruit Investors for the Offering for an initial period ending 180 days after the issuance of the private placement memorandum for the Offering, subject to negotiated exceptions analogous to those applicable to the Exclusivity Undertaking; and (ii) the initial exclusivity period may be extendable subject to certain fund raising milestones to be negotiated by the Distributor and the Issuer in consultation with the Project Company. |

**Part IV: Indicative Terms for the EB-5 Loans**

| | |
|---|---|
| EB-5 Loan: | Provided that the Distributor has successfully raised the maximum offering amount of US$150 million pursuant to the Offering and subject to the budgetary needs of the Project, the Lender and the Borrower |

CONFIDENTIAL INFORMATION                                                                SMHG001590

|  |  |
|---|---|
|  | anticipate that the Lender will advance to the Borrower the EB-5 Loan in the maximum principal amount of up to US$150 million. If Distributor is unable to raise all or any part of the Offering noted above, Borrower may seek alternate sources of debt or equity to provide the shortfall of capital needed to complete the construction and development of the Project or, to the extent consistent with successful adjudication of the Members' I-526 Petitions, reduce the scope of the Project. Interest only payments shall be due and payable throughout the term of the EB-5 Loan with all principal being due and payable on the maturity date. |
| Loan Amount: | Up to US$150 million, subject to a loan to value ratio (based on the latest available appraisal report for the Project as reasonably acceptable to the Lender) not exceeding 60%, and a cushion in the number of jobs to be created by the Project as estimated in the Economic Report of not less than 25% (the "**Job Cushion**") of the number of jobs required to be created under the EB-5 Program for the maximum number of Investors subscribing to the Offering. |
| Term: | 5 years from First Disbursement Date (the "**Initial Maturity Date**"), and as long as there is no event of default, extendable at the option by the Borrower for one (1) year (the "**Extension Period**"). Subject to the approval of the Distributor at its sole discretion, the Extension Period may be increased to be for a period of two (2) years in aggregate provided that the portion of the cost of the EB-5 Loan payable to the Investors during the Extension Period will be no less than 3.75% per annum of the outstanding balance of the EB-5 Loan. |
| Use of Proceeds: | Proceeds from the EB-5 Loan are to be applied towards the approved Development Costs of the Project to the extent permitted under the EB-5 Program. |
| Costs of Loan: | The Borrower will pay the following amounts to the parties set forth below (including their respective designees) which amounts will accrue on a non-compounding basis and be calculated on the basis of the actual number of days elapsed and a 360-day year: |

  1. 2.75% per annum of the outstanding balance of the EB-5 Loan, to be paid to the Distributor quarterly in arrears from the first disbursement of the EB-5 Loan (the "**First Disbursement Date**") until the final repayment in full of the EB-5 Loan (the "**Final Repayment Date**");

  2. 1.00% per annum of the outstanding balance of the EB-5 Loan, to be paid to AIG quarterly in arrears from the First Disbursement Date until the Final Repayment Date;

STRICTLY PRIVATE & CONFIDENTIAL                                                      CONFIDENTIAL

|   |   |   |
|---|---|---|
| | 3. | 0.25% per annum of the outstanding balance of the EB-5 Loan, to be accrued for the period from the First Disbursement Date until the Initial Maturity Date and be payable to the Investors upon the Initial Maturity Date; and if applicable, 3.75% per annum of the outstanding balance of the EB-5 Loan, to be accrued for the period from the Initial Maturity Date until the Final Repayment Date and be payable to the Investors upon such Final Repayment Date; |
| | 4. | 1% per annum of the maximum principal amount (instead of the outstanding balance) of the EB-5 Loan, to be accrued from the First Disbursement Date until the Final Repayment Date and be payable to the Class B Manager as follows: |
| | | (i) US$300,000 as an accelerated non-refundable payment payable upon the filing of a total of ten (10) Investors' I-526 Petitions; |
| | | (ii) payable quarterly in arrears from the First Disbursement Date, provided that each of the eight (8) initial quarterly payments (not including the first quarterly payment covering an incomplete calendar quarter) will be reduced by an amount equal to one-eighth of the accelerated payment in (i) above; and |
| | 5. | 1.5% per annum of the outstanding balance of the EB-5 Loan, to be accrued from the First Disbursement Date until the Final Repayment Date and be payable to the Distributor upon the Final Repayment Date. |

None of the proceeds from the EB-5 Loan may be used to pay any of the above amounts.

Origination Fee: One-time fee in the amount of 1.0% of the actual amount of the EB-5 Loan disbursed, which will be payable to the Distributor or its designees upon each disbursement of loan proceeds to the Borrower.

Late Payment: Any late payment of any amount payable under the EB-5 Loan will be subject to an interest charge of 5.5% per annum which will accrue on a daily basis on the amount that is unpaid and be calculated from the due date of the relevant amount until the date such outstanding amount is paid in full.

I-829 Fees: The Project Company will pay the reasonable out-of-pocket legal fees and other expenses incurred by the Lender in connection with:

8

|              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
|--------------|---|
|              | 1. Preparing a template response to any I-829 RFEs for use by the Investors who have been admitted as members of the Issuer (each, a "**Member**"), which fees shall be capped at US$50,000, provided that the Project Company will not need to bear such fees relating to RFEs on a Member's individual situation outside the control of the Project Company; |
|              | 2. Declaratory judgment lawsuits against USCIS before the federal courts due to the Project's failure to create the requisite amount of jobs, which fee shall be capped at US$300,000; *provided*, *however*, this fee cap does not include the defense of Members placed into removal proceedings before the Executive Office for Immigration Review should the Project create an insufficient number of jobs. |
| Mandatory Prepayment: | In the event that a Member's membership interests are liquidated as a result of the denial of such Member's I-526 Petition, the Borrower will prepay to the Lender an amount equal to the amount of such Member's Subscription Price that has been disbursed to the Borrower, provided that such amount prepaid will be available for draw down again under the EB-5 Loan, subject to the availability of funds in the Lender. |
| Optional Prepayment: | Prepayment, without penalty or premium, is allowed in respect of that part of the EB-5 Loan that was funded by the capital contributions of those Members who have received notice from USCIS regarding the final adjudication of their I-829 Petitions or for Members who have permanently withdrawn from the EB-5 Program. Normally this is after the fourth (4th) anniversary of the First Disbursement Date. Prepayment will also be permitted to the extent such prepayment, in the opinion of the Lender's immigration counsel, would not impair the adjudication of any pending I-829 Petitions. Prepayment may be made at any time and from time to time by or on behalf of the Borrower with 30 days' prior written notice. Subject to the applicable terms to be set forth in the EB-5 Loan documents, the Borrower may also defease the EB-5 Loans. |
| Collateral:  | The Collateral shall include: |
|              | 1. a senior lien deed of trust over the Property and additional collateral as reasonably acceptable to the Lender; |
|              | 2. collateral assignment of rights, attachments, fixtures and equipment of and on the Property, any contracts relating to the development and construction of the Project (including the general contractor agreement), and any sale contracts and assignment of |

STRICTLY PRIVATE & CONFIDENTIAL                                    CONFIDENTIAL

|  |  |
|---|---|
|  | rent and management contract pertaining to the Project (including the hotel management contract), in all instances, subject to the rights of the counterparties to any such agreements; |
|  | In addition, the Sponsor, or such other guarantor acceptable to the Lender, shall provide the following recourse guaranties: |
|  | 1. "Bad boy" guaranty on commercially reasonable terms; and |
|  | 2. Repayment guaranty in respect of the portion of the Loan being funded by the aggregate Subscription Price contributed by those Investors whose I-526 Petitions are not yet approved. |
| Guaranteed Maximum Price Contract: | The Borrower is expected to enter into a construction contract with a duly licensed general contractor, which will provide a maximum price guaranty on construction costs.  No bonding will be required provided the selected general contractor has sufficient financial strength, as determined by Lender. |
| Events of Default: | Customary for loan transactions of this size and nature. |
| Other Conditions to Disbursement of Loan Proceeds: | No proceeds under the EB-5 Loan will be disbursed until the following conditions are met: |
|  | 1. All EB-5 Loan Documents have been duly entered into and the Lender's security interest in the Collateral has been perfected. |
|  | 2. The Lender's receipt of an acceptable appraisal(s) and/or audit report determining the value and cost of the Collateral. |
|  | 3. The Class B Manager has been appointed. |
|  | 4. Other customary conditions precedent negotiated by the Lender and the Borrower after the Lender's and Lender's Counsel's due diligence review. |

CONFIDENTIAL INFORMATION                                          SMHG001594

| | |
|---|---|
| Definitive EB-5 Loan Documents: | The definitive EB-5 Loan documents may include the following:<br><br>1.  Loan Agreement;<br>2.  Promissory Note;<br>3.  Deed of Trust or Mortgage;<br>4.  Collateral Assignment;<br>5.  Limited Recourse (Bad Boy) Guaranty(ies);<br>6.  Security Instrument(s);<br>7.  Environmental Indemnity; and<br>8.  any other agreements and documents as deemed to be reasonably necessary by Lender's Counsel. |
| Lender's Counsel: | Mayer Brown LLP |
| Lender's Attorney/Advisor Fees: | The Borrower and the Sponsor will pay all reasonable out-of-pocket advisory or attorney fees incurred by the Lender, and/or Issuer, as the case may be, (for the benefit of or under the instruction of the Lender, or the Issuer as the case may be) for due diligence, preparation and review of Offering Documents and documentation for the EB-5 Loan, subject to any fee caps as may be contained in the engagement letters with the advisors, which aggregate fee caps shall not exceed US$350,000. The Sponsor's obligation to pay such fees is subject to the Sponsor's or the Borrower's advance written approval of the scope of work, fee cap and the provider's commencement of work, which approval will not be unreasonably withheld or delayed. The Borrower and the Sponsor will promptly settle such fees from time to time and prior to the First Disbursement Date and from time to time thereafter or upon termination of the proposed transaction contemplated hereunder, whichever first occurred. In addition, the Project Company/Borrower and/or the Sponsor will pay such retainer payment as may be required by the relevant advisors or attorneys from time to time following the Sponsor's or the Borrower's advance written approval as contemplated above. |

**Part V: Path to Closing**

To move forward the fund raising for the Project in the most efficient and expeditious manner, described below is a four-pronged approach: (1) preparation of Offering Documents, (2) immigration petition preparation and review, (3) due diligence review, and (4) preparation of the EB-5 Loan documents, each of which can proceed concurrently.

| | |
|---|---|
| Offering Documents: | Offering Documents, including a private placement memorandum and exhibits thereto, will be prepared by Securities Counsel based upon the documents previously drafted for the contemplated offering, which include project-specific information furnished by the Project Company and the Sponsor. The Offering Documents will subsequently be |

11

STRICTLY PRIVATE & CONFIDENTIAL                                        CONFIDENTIAL

|  |  |
|---|---|
|  | reviewed, negotiated, finalized and approved by the Securities Counsel, the Immigration Counsel, the Project Company, and the Issuer before being delivered to prospective Investors. |
|  | The Project Company will promptly retain the Economist to act as the Project's economist, to facilitate certification that the Project is within a TEA, to estimate the number of new jobs that the Project will create that qualify under the EB-5 Program, and to prepare the Project's economic report. The Project Company will promptly retain the Business Plan Writer to draft, review, update and finalize the Project's business plan to the satisfaction of the Securities Counsel, the Immigration Counsel and KT Capital Group, LLC for submission to USCIS for the purpose of the EB-5 Program. |
|  | The Project Company agrees that the completion of the Offering Documents to the satisfaction of KT Capital Group, LLC and/or the Distributor will be the first step in determining the marketing viability of the Project and the Offering. |
| Immigration Petition Preparation and Review: | To expedite the fund-raising and the I-526 Petition approval process, the Immigration Counsel will need to review certain documents to ensure compliance with USCIS guidelines and regulations and as part of this process the Immigration Counsel will request the Sponsor and/or the Project Company to provide certain information for the preparation of an I-924 Application for the Project and an I-526 template. In addition, an immigration law firm will be retained by the Issuer to review and to advise on the compliance with USCIS guidelines and regulations. |
|  | Given the EB-5 Program will sunset on September 30, 2015 absent reauthorization legislation, the Sponsor and the Borrower agree that they will make available all information on an expedited and urgent basis to for all the required and supporting documents for the I-924 Application (which will include the Offering Documents and the Business Plan) to be prepared and filed by the Immigration Counsel on or before September 30, 2015. |
| Due Diligence Review: | The Project Company will receive an initial due diligence information request list from the Lender. The process will consist of legal, business and financial due diligence review covering the Project, the Project Company, the Sponsor and any other entities related to the ownership or management of the Project. The initial due diligence process will be undertaken after the finalization of the Offering Documents which will take approximately 4 weeks but its duration will ultimately depend on the level of complexity, availability of information and cooperation of the entities involved in this transaction. |

12

CONFIDENTIAL INFORMATION                                              SMHG001596

|  |  |
|---|---|
|  | Throughout the due diligence process, it is expected that site visits and interviews with the Project representatives will accompany the iterative document review process. In addition, it is expected that access will be provided to the necessary resources and all requested documents will be furnished within a reasonable timeframe throughout the due diligence process. |
|  | Prior to the First Disbursement Date and as a condition precedent to disbursement, a formal due diligence process will need to be completed with a formal due diligence report being issued by the Lender's Counsel to the satisfaction of the Lender. |
| Preparation of EB-5 Loans Documentation: | The EB-5 Loan documents will be prepared by the Lender's Counsel. The terms and form of such documentation will then be reviewed, negotiated, agreed and finalized by the Borrower and the Lender through their respective attorneys. |

This LOI will be governed by and construed in accordance with the laws of the State of Delaware.

This LOI shall not be assignable by either party without the prior written consent of the other party, and accordingly this LOI is for the exclusive benefit of the parties and Borrower and Lender. This LOI supersedes other prior discussions by or among the parties, Borrower, Lender or any of their affiliates in connection with the EB-5 Loan or any other financing discussed by them or their respective advisors. The terms of this LOI may not be waived, modified or in any way changed by implication, correspondence or otherwise unless such waiver, modification or change is made in the form of a written amendment to this LOI and agreed to by all parties, except as directly agreed to by the parties in the final, executed Loan Documentation.

*[Remainder of page intentionally left blank]*

Yours Truly,

For and on behalf of:

**KT Capital Group, LLC**
a Washington limited liability company



By: _____
Name:
Title:



Agreed and Accepted by:

**SMHG Village Development, LLC,**
a Utah limited liability company



By: _____/s/ Greg Mauro_____
Name: Greg Mauro
Title: Chairman

**Summit Mountain Holding Group, L.L.C.**,
a Utah limited liability company



By: _____/s/ Greg Mauro_____
Name: Greg Mauro
Title: Chairman

14

STRICTLY PRIVATE & CONFIDENTIAL                                     CONFIDENTIAL

Regarding terms set forth herein related to the Distributor, Agreed and Accepted by:

**Pan-America Business Consulting Limited**,
a company incorporated under the laws of the Hong Kong
Special Administrative Region of the People's Republic of China


By: _____
Name:
Title:

15

STRICTLY PRIVATE & CONFIDENTIAL                                                          CONFIDENTIAL

# EXHIBIT A

## DESCRIPTION OF THE PROPERTY

[Describe property in more detail.  Need not be a legal description.]

16

CONFIDENTIAL INFORMATION                                                                  SMHG001600

# PHASE 1 - VILLAGE MAIN STREET

HOTEL 130 ROOMS
COMMERCIAL 30,000 SF



SCALE: 1"= 50'

CONFIDENTIAL INFORMATION

SMHG001601