# EXHIBIT 4

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**
(a Delaware limited liability company)

Up to **US$150,000,000**

**September 18, 2015**

| | |
|---|---|
| Maximum Number of Class B Units Offered: | 300 |
| Subscription Amount Per Class B Unit: | US$500,000 |
| Administration Fee Per Class B Unit: | US$55,000 |

Summit Village Development Lender 1, LLC, a Delaware limited liability company (the "**Company**" or the "**Lender**"), is offering a maximum of 300 Class B units of membership interest in the Company ("**Class B Units**" or "**Membership Interest**") at the Subscription Amount of US$500,000 per unit, or such other minimum investment amount as may be required under the EB-5 Program (as defined below) at any time ("**Subscription Amount**") and for an administration fee of US$55,000 per unit (such fee, which the Company may in its sole and absolute discretion and on a case-by-case basis reduce by up to US$5,000 per Class B Unit, and may also be increased in proportion to any increase in the Subscription Amount to an amount beyond US$500,000 per unit, the "**Administration Fee**") (the "**Offering**"). This Confidential Private Placement Memorandum (this "**Memorandum**") describes the basis on which the Offering will be made and provides information relevant to making a decision to invest in the Class B Units. All capitalized terms not defined in this Memorandum have the meanings ascribed to them in the operating agreement of the Company that will be amended and restated in connection with the Offering and the form of which is attached hereto as Exhibit B.

The Company was formed to make investments through the United States EB-5 immigrant investor program (the "**EB-5 Program**") of the United States Immigration and Nationality Act (the "**Act**"), which establishes terms and conditions under which foreign nationals may become eligible to obtain lawful permanent residence in the United States. See U.S.C. §§ 1153(b)(5)(a)(i)-(iii) and (c). Under the Act, all investments made by the Company through the EB-5 Program must be in one or more qualifying capital investment projects anticipated to create the required number of jobs in a Targeted Employment Area as part of a regional center (each, a "**Qualifying Investment**"). See "EB-5 Program" section of this Memorandum.

In April 2013, Summit Mountain Holding Group, L.L.C. (collectively along with its affiliates as applicable and as the case may be, the "**Owner**") acquired Powder Mountain, an approximately 9,200-acre (3,723-hectare) ski resort located in the Wasatch Mountains east of Eden, Utah (the "**Master Property**"). Powder Mountain has been in operation since 1972. In 2013, with regulatory and financial support from the local government of Weber County, the Owner began construction of "**Summit Powder Mountain Resort**", including new roads and lodges located within an approximately 6,240-acre (2,525-hectare) multi-phase master planned mixed-use development interlinked by walking, biking and Nordic trails and comprising (i) approximately 500 ski-accessible single-family mountain homesites, condominiums and townhomes and (ii) a thriving village core with associated amenities. The Owner

FINAL

i

intends to utilize modern mountain design and natural preservation as core values to develop Summit Powder Mountain Resort into one of the most exciting and unique destination resorts in the United States.

The Project (as defined below) is the initial phase of the redevelopment of the Summit Powder Mountain Resort and will consist of:

- the Infrastructure Component (as defined below) being the roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for Summit Powder Mountain Resort;
- the Residential Component (as defined below) being the vertical development of an anticipated 70 single family homes and 115 cabins across 293 planned homesites,; and
- Summit Village (as defined below) being the development, construction and operation of a 415,482 ft$^2$ (38,600 m$^2$) mixed-use resort development which includes:
  - the Hotel Component (as defined below) being a 130-unit, 365-key hotel condominium townhome complex;
  - the Commercial Component (as defined below) being approximately 70,964 ft$^2$ (6,593 m$^2$) of commercial space;
  - the Parking Component (as defined below) being approximately 62,290 ft$^2$ (5,787 m$^2$) of common areas and parking;
  - the Conference Component (as defined below) being approximately 20,000 ft$^2$ (1,858 m$^2$) of conference space; and
- the Activity Center Component (as defined below) being an approximately 16,000 ft$^2$ (1,486 m$^2$) of activity annex.

Overall Project costs total approximately US$409 million (the "**Development Costs**"), of which US$261.1 million are for Summit Village.

The Company intends to use the proceeds of the Offering to make a first-position secured loan (the "**Loan**") to SMHG Village Development LLC (the "**Developer**"), a newly-formed subsidiary of the Owner, as permitted under the Loan Agreement (as defined below) and other agreements to be entered into in connection with the Loan Agreement (collectively with the Loan Agreement, the "**Loan Documents**"). The Developer was established to develop, construct, own and operate Summit Village. The Developer intends to use the Loan proceeds to fund a portion of the costs associated with the construction and operation of Summit Village.

The total cost of Summit Village is estimated to be approximately US$261.1 million (the "**Summit Village Costs**"). The Developer intends to use the proceeds of the Loan to fund up to US$150.0 million of the Summit Village Costs. The remaining US$111.1 million of Summit Village Costs are expected to be funded by (i) in-kind contribution of the Property at an independently appraised value of US$29.0 million; (ii) estimated cash contributions by the Owner of (a) approximately US$4.5 million and (b) approximately US$16.7 million in tax increment financing proceeds; and (iii) allocation of an estimated US$42.3 million constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units, and (iv) net proceeds of local government assessment bonds totaling approximately US$18.6 million.

The Developer will be obligated to borrow all funds raised in the Offering; *provided*, *however* that if the Company is unable to raise all or any part of the Offering, the Developer may seek alternate sources of debt or equity to provide the shortfall of capital needed to complete the construction and development of the Summit Village. See "Loan Terms and Conditions" section of this Memorandum.

The Project and the Developer are under the ultimate control of Gregory Mauro and Elliott Bisnow (the "**Principals**"). Mr. Mauro is a managing partner of Learn Capital, a   venture capital firm focused on education, and also chairman of Owner and one of two principal equity holders in the Owner. Mr. Bisnow is the other controlling equity holder in the Owner and a founder and chief executive officer of Summit

Series, an organization that hosts conferences and events for entrepreneurs, artists and activists. See "Project Participants" section of this Memorandum.

In order to invest in the EB-5 Program through the Company, a potential subscriber must meet investor criteria set forth in this Memorandum (see "Potential Subscribers" section of this Memorandum), follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section of this Memorandum), and complete the required immigration procedures (see "Immigration Procedures" section of this Memorandum). Class B Units will be offered and sold only outside the United States and only to persons who are not "U.S. Persons" within the meaning of Regulation S promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"). In addition, Class B Units will be offered and sold only to persons who are "accredited investors" as defined in this Memorandum, unless the Company waives this requirement in the exercise of its sole discretion.

In August 2010, the United States Citizenship and Immigration Services (the "**USCIS**") designated Mountain States Center for Foreign Investment, LLC, (the "**Regional Center**") as a regional center under the EB-5 Program (the "**RC Designation**"). The Regional Center is the holder of rights to sponsor and administer qualified capital investment projects under the EB-5 Program, including the Project. By extending the benefits of the RC Designation to the Project, the Regional Center enables subscribers to include both direct and indirect job creation resulting from the Project in order to meet the minimum job creation requirements of the EB-5 Program.

The approved geographic area of the Regional Center covers the state of Utah, where the Property is located. The Regional Center is under the ultimate control of third parties unaffiliated with the Company or the Developer. The Regional Center and its affiliates are not participants in the Offering.

The RC Designation imposes certain conditions on the Regional Center. If for any reason the Regional Center fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the RC Designation, which could have an adverse impact on the Offering. See "EB-5 Program" section of this Memorandum.

Potential subscribers should make their own investigation of the investment described herein. That includes the merits and risks involved and the legality and tax consequences of such an investment. Each potential subscriber should make his or her own inquiries and consult his or her advisers regarding the Company, this Offering and legal, tax and related matters concerning an investment in the Class B Units.

Potential subscribers receiving this Memorandum have completed an initial Investor Suitability Questionnaire and delivered it to the Company together with other preliminary information. The Company will give potential subscribers the opportunity to ask questions of and receive answers and additional information from it and its representatives concerning the Offering and other relevant matters. The Company and the Owner make no representation or warranty to potential subscribers regarding the legality of an investment in the Company or about the income and other tax consequences of such an investment. For answers to those questions, potential subscribers should consult their personal legal counsel and tax advisers.

The Offering shall be completed only with a limited number of persons who (a) have executed and delivered by the Offering Termination Date (as defined below) the following: (i) a subscription agreement in the form as attached hereto as Exhibit A-1 (the "**Subscription Agreement**"), (ii) a joinder agreement and spousal consent (if applicable) to the Amended and Restated Operating Agreement of the Company in the form as attached hereto as Exhibit B (the "**Operating Agreement**"), (iii) a Confidential Prospective Investor Questionnaire attached hereto as Exhibit A-2 (a "**Confidential Prospective Investor Questionnaire**"), (iv) an escrow agreement substantially in the form attached hereto as Exhibit D or an alternative form of escrow agreement with substantially similar terms (any such agreement, the "**Escrow Agreement**"), and (v) other associated documents required from a subscriber of one or more Class B Units (a person who has completed all the Subscription Documents and submitted same to the Company, a "**Subscriber**", and once such subscription has been completed, a "**Class B Member**") as stated in the

Subscription Agreement (the Subscription Agreement, the Operating Agreement, the Confidential Prospective Investor Questionnaire, the Escrow Agreement and any other associated documents required as stated in the Subscription Agreement collectively, the "**Subscription Documents**"); and (b) have paid the Subscription Amount, Administration Fee and the escrow fees, if any, set forth in the Escrow Agreement (the "**Escrow Fee**") applicable to their subscription to an escrow account to be designated by the Company as further described in the Subscription Documents and such Subscription Amount and Administration Fee have been released or are irrevocably committed to be released to the Company. See "Escrow Procedures" section of this Memorandum.

If a Class B Member requests liquidation of his or her Class B Unit(s), the Class B Unit(s) may in certain circumstances be liquidated if the Company, in the sole and absolute discretion of the Class B Manager, so agrees or, in other circumstances, may be subject to liquidation if certain conditions are met (see "Liquidation of Class B Units" section of this Memorandum).

A Class B Member must file a Form I-829 Petition by Entrepreneur to Remove Conditions ("**I-829 Petition**") with USCIS within 90 days prior to the second anniversary of obtaining his or her conditional permanent resident status.

The Company, subject to the Operating Agreement, will utilize proceeds from the Offering (excluding the Administration Fee) to fund disbursements under the Loan in accordance with the terms of a loan agreement (the "**Loan Agreement**") to be entered into between the Company and the Developer.

All principal and accrued interest under the Loan will be due and payable on the fifth (5th) anniversary of the first disbursement date ("**Initial Maturity Date**"), subject to a one (1) year extension at the request of the Developer ("**Extension Period**") as long as there is no default under the Loan Documents.

There is no firm commitment by any person to purchase or sell any Class B Units, and there is no assurance that any of the Class B Units will be sold.

The Offering will terminate on the earliest of: (a) the date upon which the subscription for all 300 Class B Units by Subscribers have been closed, (b) September 30, 2016, as such date may be extended from time to time by the Company, to a date not later than March 31, 2017, or (c) the date the Company, at its sole and absolute discretion, elects to terminate the Offering (the "**Offering Termination Date**").  The Company reserves the right to accept a new Subscriber at any time after the Offering Termination Date, but prior to the completion of Summit Village in order to replace a Subscriber whose subscription has been cancelled, terminated or revoked or a Class B Member whose Class B Unit has been liquidated, including in such cases where the withdrawal of the Subscriber or Class B Member, as applicable, is due to the failure of USCIS to approve such Subscriber's or Class B Member's I-526 Petition.  In the event that subscriptions are received for more than the Maximum Offering Amount (as defined below), priority will be given to qualifying Subscribers by the Company at its sole and absolute discretion.

THE CLASS B UNITS OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY:

    (1)    SECURITIES REGULATORY AUTHORITY OF ANY STATE;

    (2)    BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION; OR

    (3)    BY ANY SECURITIES REGULATORY AUTHORITY IN ANY OTHER JURISDICTION,

NOR HAS ANY SUCH AUTHORITY OR COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE CLASS B UNITS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OR ANY U.S. STATE SECURITIES LAWS OR THE LAWS OF ANY OTHER

JURISDICTION. THE CLASS B UNITS ARE BEING OFFERED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY REGULATION S (PURSUANT TO WHICH THE SECURITIES MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS, AS DESCRIBED BELOW) AND/OR SECTION 4(A)(2) OF THE SECURITIES ACT OR REGULATION D, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SUCH LAWS. HEDGING TRANSACTIONS MAY NOT BE CONDUCTED, UNLESS IN COMPLIANCE WITH THE SECURITIES ACT AND THE DOCUMENTS GOVERNING THE COMPANY.

THE COMPANY WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940 (THE "**INVESTMENT COMPANY ACT**") IN RELIANCE ON ONE OR MORE EXEMPTIONS THEREUNDER. CONSEQUENTLY, SUBSCRIBERS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE CLASS B UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING:

(1)    THEY MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "**EXCHANGE ACT**"), THE APPLICABLE STATE SECURITIES LAWS AND THE APPLICABLE LAWS OF ANY OTHER, RELEVANT JURISDICTION PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM;

(2)    SUCH CLASS B UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, HEDGED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN THE OPERATING AGREEMENT; AND

(3)    THERE IS NO OBLIGATION BY ANY PERSON TO REGISTER THE CLASS B UNITS UNDER THE SECURITIES ACT, THE EXCHANGE ACT, ANY STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION.

ACCORDINGLY, POTENTIAL SUBSCRIBERS SHOULD BE AWARE THAT:

(1)    THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE CLASS B UNITS FOR AN INDEFINITE PERIOD OF TIME;

(2)    THERE WILL BE NO PUBLIC MARKET FOR THE CLASS B UNITS; AND

(3)    INVESTMENT IN THE CLASS B UNITS INVOLVES SIGNIFICANT INVESTMENT RISKS, INCLUDING RISKS OF LOSS OF CAPITAL OR THE ENTIRE INVESTMENT.

THE CLASS B UNITS ARE OFFERED SUBJECT TO PRIOR SALE, AND SUBJECT TO THE RIGHT OF THE COMPANY TO REJECT ANY SUBSCRIPTION. IN CONSIDERING THE PRIOR PERFORMANCE INFORMATION CONTAINED HEREIN, POTENTIAL SUBSCRIBERS SHOULD REMEMBER THAT PAST PERFORMANCE DOES NOT PROVE OR EVEN SUGGEST THAT FUTURE RESULTS WILL BE SIMILAR.

IN ADDITION, THERE CAN BE NO ASSURANCE THAT UNREALIZED INVESTMENTS WILL BE REALIZED AT THE VALUATIONS PROVIDED AS FORWARD-LOOKING STATEMENTS. ACTUAL REALIZED RETURNS WILL DEPEND ON, AMONG OTHER FACTORS:

(1)    FUTURE OPERATING RESULTS;

(2)    THE VALUE OF THE ASSETS;

(3)    MARKET CONDITIONS AT THE TIME OF DISPOSITION;

(4)    ANY RELATED TRANSACTION COSTS; AND

(5)    THE TIMING AND MANNER OF SALE.

ALL OF THOSE EVENTS MAY DIFFER FROM THE ASSUMPTIONS ON WHICH THE VALUATIONS CONTAINED HEREIN ARE BASED.

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO:

(1)    SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A-1;

(2)    OPERATING AGREEMENT, ATTACHED HERETO AS EXHIBIT B; AND

(3)    ESCROW AGREEMENT, ATTACHED HERETO AS EXHIBIT D

THIS MEMORANDUM, INCLUDING ITS EXHIBITS, CONSTITUTES THE ONLY DOCUMENT BY WHICH OFFERS AND SALES OF CLASS B UNITS MAY BE MADE, AND POTENTIAL INVESTORS MUST NOT RELY ON INFORMATION ABOUT THE OFFERING FROM ANY OTHER SOURCE. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THIS MEMORANDUM SUPERSEDES AND REPLACES ANY AND ALL PRIOR OFFERING MATERIALS AND PRIOR CORRESPONDENCE RELATED TO THE OFFERING. THE COMPANY RESERVES THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE CLASS B UNITS DESCRIBED HEREIN. THE COMPANY FURTHER RESERVES THE RIGHT TO SUPPLEMENT, AMEND OR REPLACE THIS MEMORANDUM AT ANY TIME, BUT HAS NO OBLIGATION TO PROVIDE THE RECIPIENT WITH ANY SUPPLEMENTAL, AMENDED, REPLACEMENT OR ADDITIONAL INFORMATION.

THIS OFFERING WILL COMPRISE OFFERS OF THE CLASS B UNITS TO NON-U.S. PERSONS OUTSIDE THE UNITED STATES PURSUANT TO REGULATION S PROMULGATED UNDER THE SECURITIES ACT AND TO "ACCREDITED INVESTORS" AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT AND PURSUANT TO REGULATION D OF THE SECURITIES ACT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE CLASS B UNITS OFFERED HEREBY. IT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES BY ANYONE:

(1)    IN THE UNITED STATES OR ANY OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED; OR

(2)    IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, INCLUDING, WITHOUT LIMITATION, ANY FOREIGN JURISDICTION.

CERTAIN INFORMATION CONTAINED HEREIN CONCERNING ECONOMIC TRENDS AND PERFORMANCE IS BASED ON OR DERIVED FROM INFORMATION PROVIDED BY INDEPENDENT THIRD-PARTY SOURCES. THE COMPANY BELIEVES THAT SUCH INFORMATION IS ACCURATE AND THAT THE SOURCES FROM WHICH IT HAS BEEN OBTAINED ARE RELIABLE. THE COMPANY CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION. THEREFORE, SUBSCRIBERS MUST ASSUME SUCH INFORMATION HAS NOT INDEPENDENTLY BEEN VERIFIED. THE SAME IS TRUE FOR THE ASSUMPTIONS ON WHICH SUCH INFORMATION IS BASED.

FINAL

THE COMPANY DOES NOT PROVIDE ANY TAX ADVICE. ANY TAX STATEMENT HEREIN REGARDING ANY US FEDERAL TAX IS NOT INTENDED OR WRITTEN TO BE RELIED ON BY A TAXPAYER NOR TO BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER. ALL CURRENCIES WITHIN THE MEMORANDUM ARE IN US DOLLARS UNLESS OTHERWISE NOTED.

THERE ARE RISK FACTORS REGARDING INVESTING IN THE COMPANY SET FORTH AT THE BACK OF THIS MEMORANDUM. ALL POTENTIAL SUBSCRIBERS ARE URGED TO CAREFULLY REVIEW THESE RISK FACTORS, WHICH DESCRIBE RISKS REGARDING, AMONG OTHER THINGS:

    (1)    GENERAL ECONOMIC CONDITIONS AND LOCAL ECONOMIC CONDITIONS IN THE TARGETED EMPLOYMENT AREA;

    (2)    PARTICULAR RISKS RELATED TO THE COMPANY AND THE PROJECT;

    (3)    THE LEVEL OF INVESTMENT RETURNS, WHICH MAY BE BELOW MARKET FOR SIMILAR INVESTMENTS;

    (4)    THE RISK THAT SOME OR ALL OF THE SUBSCRIBER'S CAPITAL MAY NOT BE RETURNED; AND

    (5)    THE FACT THAT THE CLASS B UNITS REPRESENT AN ILLIQUID INVESTMENT THAT CANNOT BE TRANSFERRED.

POTENTIAL SUBSCRIBERS ARE URGED TO CONSIDER THE RISKS SET FORTH UNDER THE HEADING "RISK FACTORS."

IN ADDITION, THERE CAN BE NO ASSURANCE THAT SUBSCRIBERS WILL OBTAIN FINAL IMMIGRATION STATUS UNDER THE ACT OR THAT THE JOBS REQUIRED TO BE CREATED AND MAINTAINED UNDER THE EB-5 PROGRAM WILL BE ACHIEVED.

A POTENTIAL SUBSCRIBER'S INVESTMENT IN THE CLASS B UNITS MUST BE DERIVED WHOLLY FROM HIS OR HER PERSONAL ASSETS AND ARE ENTIRELY AT RISK. THE POTENTIAL SUBSCRIBER MUST ESTABLISH THE SOURCE OF THE MONIES INVESTED SO THAT THE USCIS MAY DETERMINE THAT ALL MONIES PAID IN WERE BOTH LAWFULLY OBTAINED AND INVESTED. FOR FURTHER CERTAINTY, THERE IS NO DIRECT OR INDIRECT LOAN OR OTHER DEBT ARRANGEMENT CONTEMPLATED OR AVAILABLE BETWEEN THE COMPANY AND ANY POTENTIAL SUBSCRIBER.

THE OFFERING IS NOT UNDERWRITTEN. THE CLASS B UNITS ARE OFFERED ON A "BEST EFFORTS" BASIS BY THE COMPANY. THERE CAN BE NO ASSURANCE THAT ANY OF THE CLASS B UNITS WILL BE SOLD.

## NOTICES TO INVESTORS

**THE COMPANY WILL HAVE A CLASS B MANAGER APPOINTED FOLLOWING THE DATE OF THIS MEMORANDUM. THE CLASS B MANAGER WILL ONLY BE RESPONSIBLE FOR MANAGING THE COMPANY AS PROVIDED FOR IN THE ATTACHED OPERATING AGREEMENT AFTER BEING APPOINTED. THE CLASS B MANAGER DID NOT PREPARE, AND IS NOT RESPONSIBLE FOR THE CONTENTS OF THIS MEMORANDUM. SIMILARLY, THE CLASS B MANAGER IS NOT RESPONSIBLE FOR ANY OF THE COMPANY'S DECISIONS OR ACTIONS UNDERTAKEN PRIOR TO THE CLASS B MANAGER'S APPOINTMENT. THE CLASS B MANAGER IS NOT MAKING ANY**

REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER, TRANSACTION OR FACT REFERRED TO IN THIS MEMORANDUM.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SECURITIES TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL OR IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

THE CLASS B UNITS ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER. SEE "RISKS RELATED TO THE OFFERING" SECTION OF THIS MEMORANDUM AND SUMMARY OF OPERATING AGREEMENT – TRANSFER AND ASSIGNMENT OF MEMBERSHIP INTEREST BY CLASS B MEMBERS" SECTION OF THIS MEMORANDUM. THE CLASS B UNITS MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR THE SECURITIES LAWS OF EACH APPLICABLE U.S. STATE AND OTHER COUNTRY.

PROSPECTIVE SUBSCRIBERS MUST RELY ON THEIR OWN ANALYSIS OF THE INVESTMENT AND ASSESSMENT OF THE RISKS INVOLVED. PROSPECTIVE SUBSCRIBERS SHOULD CAREFULLY REVIEW THE INFORMATION SET FORTH IN THIS MEMORANDUM CONCERNING THE RISK OF INVESTING IN THE CLASS B UNITS INCLUDING, WITHOUT LIMITATION, THE SECTIONS ENTITLED "XIII. RISK FACTORS" AND "XIV. CONFLICTS OF INTEREST", BEFORE MAKING ANY SUCH INVESTMENT. ONLY THOSE PROSPECTIVE SUBSCRIBERS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THE CLASS B UNITS.

EACH SUBSCRIBER MUST ACQUIRE THE CLASS B UNITS FOR SUCH PERSON'S OWN ACCOUNT FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION OF DISTRIBUTING OR RESELLING THE CLASS B UNITS.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAVE BEEN NO CHANGES IN THE PROJECT, OR THE AFFAIRS OF THE COMPANY OR THE DEVELOPER SINCE THE DATE HEREOF OR THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL, TAX, IMMIGRATION OR INVESTMENT ADVICE. PROSPECTIVE SUBSCRIBERS ARE URGED TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS AS TO LEGAL, TAX, IMMIGRATION AND INVESTMENT AND ALL OTHER ADVICE AND MATTERS CONCERNING THE INVESTMENT IN THE CLASS B UNITS.

THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR THE INFORMATION OF THE PERSON TO WHOM IT HAS BEEN DELIVERED BY OR ON BEHALF OF THE COMPANY OR SUCH PERSON'S ADVISOR(S). DISTRIBUTION OF THIS MEMORANDUM TO ANY OTHER PERSON IS UNAUTHORIZED.

THIS MEMORANDUM SUMMARIZES CERTAIN DOCUMENTS. EACH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS OF THE DOCUMENT. FOR THE FULL TERMS OF SUCH DOCUMENTS, REFERENCES SHOULD BE MADE TO THE EXHIBITS TO THIS MEMORANDUM, OR A COPY OF THE DOCUMENT SHOULD BE REQUESTED FROM THE COMPANY.

FINAL

THE COMPANY, UPON WRITTEN REQUEST, WILL MAKE AVAILABLE TO A PROSPECTIVE SUBSCRIBER AND/OR HIS/HER ADVISORS ALL DOCUMENTS RELEVANT TO THE OFFERING AND ANY ADDITIONAL NON-CONFIDENTIAL INFORMATION REGARDING THE COMPANY, THE OFFERING AND/OR THE PROJECT, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. IN MAKING REQUESTS FOR SUCH DOCUMENTS OR INFORMATION, IT IS RECOMMENDED, FOR THOSE PROSPECTIVE SUBSCRIBERS WORKING THROUGH IMMIGRATION CONSULTANTS, THAT SUCH PROSPECTIVE SUBSCRIBERS IN THE FIRST INSTANCE CONTACT AND CHANNEL SUCH REQUESTS THROUGH THEIR IMMIGRATION CONSULTANTS.

IT IS THE RESPONSIBILITY OF ANY PERSONS WISHING TO SUBSCRIBE FOR THE PURCHASE OF CLASS B UNITS OFFERED HEREBY TO INFORM THEMSELVES OF AND TO OBSERVE ALL APPLICABLE LAWS AND REGULATIONS OF ANY RELEVANT JURISDICTIONS. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE CLASS B UNITS OFFERED HEREBY, AND ANY FOREIGN EXCHANGE OR OTHER NON-U.S. RESTRICTIONS THAT MAY BE RELEVANT THERETO.

IF THE INVESTOR IS (I) A PURCHASER IN A SALE THAT OCCURS OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (II) A "DISTRIBUTOR," "DEALER" OR PERSON "RECEIVING A SELLING CONCESSION, FEE OR OTHER REMUNERATION" IN RESPECT TO SECURITIES SOLD, PRIOR TO THE EXPIRATION OF THE APPLICABLE "DISTRIBUTION COMPLIANCE PERIOD" (AS DEFINED BELOW), IT ACKNOWLEDGES THAT (A) UNTIL THE EXPIRATION OF SUCH "DISTRIBUTION COMPLIANCE PERIOD" ANY OFFER OR SALE OF THE SECURITIES SHALL NOT BE MADE BY IT TO A U.S. PERSON OR FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON WITHIN THE MEANING OF RULE 902(K) OF THE SECURITIES ACT AND (B) UNTIL THE EXPIRATION OF THE "DISTRIBUTION COMPLIANCE PERIOD," IT MAY NOT, DIRECTLY OR INDIRECTLY, REFER, RESELL, PLEDGE OR OTHERWISE TRANSFER A SECURITY OR ANY INTEREST THEREIN EXCEPT TO A PERSON WHO CERTIFIES IN WRITING TO THE COMPANY THAT SUCH TRANSFER SATISFIES, AS APPLICABLE, THE REQUIREMENTS OF THE LEGENDS DESCRIBED HEREIN AND THAT THE SECURITIES WILL NOT BE ACCEPTED FOR REGISTRATION OF ANY TRANSFER PRIOR TO THE END OF THE APPLICABLE "DISTRIBUTION COMPLIANCE PERIOD" UNLESS THE TRANSFEREE HAS FIRST COMPLIED WITH THESE CERTIFICATION REQUIREMENTS. THE "DISTRIBUTION COMPLIANCE PERIOD" MEANS THE ONE-YEAR PERIOD FOLLOWING THE ISSUE DATE FOR THE CLASS B UNITS.

THE COMPANY, IN PREPARATION OF THIS MEMORANDUM, HAS RELIED UPON INFORMATION SUPPLIED BY OR FOR THE DEVELOPER RELATED TO THE DEVELOPER, THE PROPERTY, THE OWNER, AND THE PROJECT.

## FORWARD-LOOKING STATEMENTS

SOME OF THE STATEMENTS CONTAINED IN THIS MEMORANDUM DISCUSS FUTURE EXPECTATIONS, OR STATE OTHER "FORWARD-LOOKING" INFORMATION. THESE FORWARD-LOOKING STATEMENTS INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT THE COMPANY'S OR THE DEVELOPER'S PLANS, OBJECTIVES, EXPECTATIONS,

FINAL

INTENTIONS AND ASSUMPTIONS, BUDGETS AND OTHER STATEMENTS THAT ARE NOT HISTORICAL FACTS. WHEN USED IN THIS MEMORANDUM, THE WORDS "PROPOSE", "EXPECT", "ANTICIPATE", "INTEND", "PLAN", "BELIEVE", "SEEK", "ESTIMATE", AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THOSE STATEMENTS ARE SUBJECT TO KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS, SEVERAL OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY OR THE DEVELOPER, WHICH COULD CAUSE THE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY THE STATEMENTS. THE FORWARD-LOOKING INFORMATION IS BASED ON VARIOUS FACTORS AND WAS DERIVED USING NUMEROUS ASSUMPTIONS. IN LIGHT OF THE RISKS, ASSUMPTIONS, AND UNCERTAINTIES INVOLVED, THERE CAN BE NO ASSURANCE THAT ANY FORWARD LOOKING INFORMATION CONTAINED IN THIS MEMORANDUM WILL IN FACT TRANSPIRE OR PROVE TO BE ACCURATE AND NO REPRESENTATIONS ARE MADE WITH RESPECT TO THE SAME.

IMPORTANT FACTORS THAT MAY CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED HEREIN MAY INCLUDE, BUT ARE NOT LIMITED TO RISKS DESCRIBED UNDER "XIII. RISK FACTORS". THE COMPANY UNDERTAKES NO OBLIGATION TO UPDATE THE FORWARD LOOKING INFORMATION TO REFLECT ACTUAL RESULTS OR CHANGES IN ASSUMPTIONS OR OTHER FACTORS THAT COULD AFFECT THOSE STATEMENTS.

## CONFIDENTIALITY AND UNDERTAKINGS

The information contained in this Memorandum is confidential and proprietary to the Company and the Developer. By accepting delivery of this Memorandum, each recipient of this Memorandum is deemed to have acknowledged and agreed to the following:

- The information contained in this Memorandum and any related materials will be used by the recipient solely for evaluation of a potential investment in the Company (the "**Permitted Purpose**"), and this Memorandum and any related materials may not be used for any other purpose, reproduced, distributed or divulged in any manner;

- This Memorandum and information derived from this Memorandum will be kept in strict confidence by the recipient and will not, whether in whole or in part, be released or used by the recipient for any purpose other than the Permitted Purpose, nor will the recipient make any reproductions of such information; and

- If the recipient is not purchasing the Class B Units or the prospective Subscriber's subscription is not accepted or if the Offering is terminated, this Memorandum, and any other documents or information furnished to the recipient in connection with the Offering and any and all reproductions thereof and notes relating thereto will be promptly returned to the Company.

## NOTICE REGARDING NATIVE LANGUAGE TRANSLATION

Subscriber hereby agrees that it is the sole responsibility of Subscriber to ensure proper translation of this Memorandum into Subscriber's native language if necessary for Subscriber's understanding of the rights and obligations contained herein. Any language translation of this Memorandum provided by any of the parties hereto is not a binding legal document and is provided solely for the Subscriber's convenience. None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect. In the event of any inconsistencies between this Memorandum as set forth in English and any language translation, this Memorandum as set

forth in English shall govern. The Subscriber assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Memorandum.

**I.  SUMMARY OF OFFERING TERMS**   **1**

SUMMARY STRUCTURE CHART   **9**

**II.  REQUIREMENTS FOR SUBSCRIBERS**   **10**

**III.  THE EB-5 PROGRAM**   **11**

**IV.  IMMIGRATION PROCEDURES**   **14**

**V.  USE OF PROCEEDS**   **17**

**VI.  PROJECT PARTICIPANTS**   **17**

LEGAL ENTITIES   **17**
INDIVIDUALS   **18**

**VII.  STRATEGIC PARTICIPANTS**   **18**

SUMMIT VILLAGE ARCHITECT   **18**
SUMMIT VILLAGE DEVELOPMENT MANAGER   **19**

**VIII.  THE PROJECT**   **20**

AREA PROFILE: UTAH AND THE WASATCH RANGE   **23**
AREA PROFILE: OGDEN, UTAH   **24**
AREA PROFILE: POWDER MOUNTAIN   **24**
SUMMIT SERIES   **25**
WEBER COUNTY ENTITLEMENTS AND FINANCING   **26**
SUMMIT POWDER MOUNTAIN RESORT DEVELOPMENT   **27**
THE PROPERTY   **28**
SUMMIT VILLAGE   **29**
SUMMIT VILLAGE MARKETING AND SALES PROGRAM   **32**
HOTEL OPERATOR   **33**
COMMERCIAL SPACE LEASING AND OCCUPANCY   **33**
PROJECTED CASH FLOW   **33**
DEVELOPMENT TIMETABLE   **35**
SUMMIT VILLAGE BUDGET   **35**
MARKET ANALYSIS – CONDOMINIUM   **36**
DEMAND OUTLOOK: WESTERN MOUNTAIN RESORT ALLIANCE   **37**
COMPARABLE PROFILE   **38**
COMPARATIVE SUMMARY OF POWDER MOUNTAIN OPPORTUNITY   **41**

**IX.  PROJECT FUNDING**   **42**

SUMMARY OF PROJECTED SOURCES AND USES OF FUNDS   **42**
INFRASTRUCTURE COMPONENT FUNDING   **43**
RESIDENTIAL COMPONENT FUNDING   **43**
SUMMIT VILLAGE FUNDING   **43**
BRIDGE FINANCING   **45**

FINAL

THE COMPANY'S LOAN                                                                45

**X.   LOAN TERMS AND CONDITIONS**                                               **45**

**XI.   THE COMPANY**                                                            **48**

MANAGEMENT OF THE COMPANY                                                         48
MARKETING AND ADMINISTRATION OF THE OFFERING                                      49
SUBSCRIPTION PROCEDURES                                                           49
ESCROW PROCEDURES                                                                 50
QUALIFYING INVESTMENT                                                             51

**XII.   SUMMARY OF OPERATING AGREEMENT**                                        **51**

PURPOSE                                                                           52
TERM                                                                             52
CAPITAL CONTRIBUTIONS                                                             52
EXPENSES OF THE COMPANY                                                           52
TAX CLASSIFICATIONS                                                               53
DISTRIBUTIONS AND ALLOCATIONS                                                     53
MANAGEMENT, MANAGERS AND OFFICERS                                                 53
VOTING AND APPROVAL RIGHTS OF MEMBERS                                             53
LIABILITIES OF MEMBERS AND MANAGERS                                               54
TRANSFER AND ASSIGNMENT OF MEMBERSHIP INTEREST BY CLASS B MEMBERS                 55
LIQUIDATION OF CLASS B UNITS                                                      55
REMUNERATION TO MEMBERS, MANAGERS AND OFFICERS                                    56
COMPETING ACTIVITIES                                                             57
ACCOUNTING AND REPORTING                                                          57
JOB ALLOCATION                                                                    57
DISSOLUTION AND TERMINATION                                                       57

**XIII.   RISK FACTORS**                                                         **58**

RISKS RELATING TO REAL ESTATE AND FINANCING OF REAL ESTATE                        58
RISKS RELATED TO THE OFFERING AND THE CLASS B UNITS                               65
RISKS RELATED TO THE REGIONAL CENTER DESIGNATION, THE EB-5 PROGRAM AND THE IMMIGRANT VISA PROCESS    71
RISKS RELATED TO PROJECT PERFORMANCE AND MANAGEMENT                               76
LEGAL, TAX AND REGULATORY RISKS                                                   80

**XIV.   CONFLICTS OF INTEREST**                                                 **82**

**XV.   CERTAIN INCOME TAX CONSIDERATIONS**                                      **84**

**XVI.   TAX AND LEGAL ASPECTS**                                                 **92**

**XVII.   RESTRICTIONS ON TRANSFERABILITY**                                      **92**

FINAL

## I. SUMMARY OF OFFERING TERMS

The following is a summary of certain information contained in this Memorandum, and is qualified in its entirety by reference to the more detailed discussions contained elsewhere in this Memorandum, as well as to the Exhibits hereto (all of which are incorporated fully herein by this reference). In the case of any conflict between the summary, below, and the more detailed discussions within the Memorandum, the more detailed discussions shall control. Similarly, this Memorandum, its exhibits, and certain other documents related thereto have been initially written in the English language; in the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

| | |
|---|---|
| **Company** | Summit Village Development Lender 1, LLC is a Delaware limited liability company established on September 3, 2015, with its principal place of business located at 800 5th Avenue, Suite 4120, Seattle, WA 98104. The Company is presently managed by KT Summit Development Manager, LLC ("**KT Summit Manager**"). The Company was established to make the Loan to fund certain approved costs incurred in connection with the development, construction, ownership and operation of the Summit Village portion of the Project, as permitted under the Loan Documents and the EB-5 Program. |
| **Offering** | The Offering is the offer and sale of up to an aggregate maximum amount of US$150,000,000 under the terms and conditions described in this Memorandum (the "**Maximum Offering Amount**"). |
| **Managing Member** | KT Summit Manager, a Washington limited liability company established on September 15, 2015 with its principal place of business at 800 5th Ave Suite 4120, Seattle, WA 98104, is the current managing member of the Company (the "**Managing Member**"). |
| **Class A Manager** | KT Summit Development Manager, LLC, a Washington limited liability company ("**KT Summit Manager**") will be the Class A manager (the "**Class A Manager**") upon the Operating Agreement becoming effective.  The Class A Manager is not affiliated with the Developer (other than in connection with the sponsorship of the Project for the purposes of the EB-5 Program), the Class B Manager, or any Class B Member.  The Class A Manager's responsibilities will generally be limited to (1) liaising on behalf of the Company with the Regional Center and with certain "finders" unaffiliated with the Company that identify Subscribers, and (2) performing services as further provided in the Operating Agreement.  The Class A Manager shall not have general management rights in the Company, which will be vested in the Class B Manager. |
| **Class B Manager** | Celona Asset Management (USA) Limited ("**Celona**" or "**Class B Manager**") will be the Class B Manager upon the Operating Agreement becoming effective.  The Class B Manager will not be affiliated with the Developer, the Class A Manager, or any Class B |

|  | Member. Except for those matters reserved exclusively for or requiring the approval of the Class A Manager, the Class B Manager will have general responsibility for management of all aspects of the Company, including administering day-to-day aspects of business, exercising and enforcing the Company's rights under the Loan and other agreements, entering into contracts in the name of the Company and distributing funds to the Class B Members. Celona will participate with legal counsel for the Company in memorializing the terms of the EB-5 Loan based upon those terms agreed between the Company and the Developer prior to its appointment as Class B manager; however, Celona has not advised and will not advise the Company, either as the Class B Manager or in any other capacity, to enter into the Loan or any other transactions or agreements with the Developer that predate the appointment of the Class B Manager. The Class B Manager is not obligated to, and does not expect to, provide any services that are investment management or investment advisory services. The Class B Manager will not be registered as an investment manager or an investment adviser with the U.S. Securities and Exchange Commission. Celona is incorporated under the laws of Hong Kong with experience of the EB-5 Program, including management of entities qualifying under the EB-5 Program. |
|---|---|
| **Class B Members** | The Class B Members of the Company comprise all of the Subscribers who have purchased Class B Units in this Offering. |
| **Management of the Company** | Prior to the Operating Agreement becoming effective, the Company will have one manager: the Managing Member, and upon the Operating Agreement becoming effective, the Company will have two managers performing separate functions: the Class A Manager and the Class B Manager (each, a "**Manager**" and collectively, the "**Managers**"). Other than their roles as Managers, the Managing Member, the Class A Manager and the Class B Manager will be independent and unaffiliated with the Company, except that KT Summit Manager became the Managing Member prior to the date of this Memorandum. The Operating Agreement describes the roles and responsibilities of the Class A Manager and the Class B Manager, and limits the liability of such Managers in significant respects and eliminates the fiduciary duties of such Managers to the maximum extent permitted by law. |
| **Regional Center** | Mountain States Center for Foreign Investment, LLC, a Utah limited liability company was established on October 3, 2006. In August 2010, USCIS designated a geographic area comprising the state of Utah as a regional center under the EB-5 Program. The Regional Center is under the ultimate control of third parties unaffiliated with the Company or the Developer. The Regional Center and its affiliates are not participants in the Offering. |
| **Principals** | The Principals are Gregory Mauro and Elliott Bisnow. The Principals control the Owner, which includes the Owner and the Developer. |

| | |
|---|---|
| **Property** | The land on which the Summit Village will be built comprises of approximately 4.04 acres (1.635 hectares) of vacant land located in a gently sloping saddle near the summit of Powder Mountain at approximately 8,700 feet (2,652 meters) above sea level (the "**Property**"). Exhibit F hereto describes the physical boundaries of the Property.  In April 2013, the Owner acquired the Master Property for approximately US$33.0 million, of which US$16.5 million was paid in cash and the balance from the proceeds of a secured loan from the seller of the Master Property.  In 2014, the balance was refinanced with a US$8 million first lien with an institutional lender. As a condition to advances under the Loan Agreement, the Property will be transferred in full to the Developer free and clear of any liens or other encumbrances. |
| **Summit Powder Mountain Resort** | Summit Powder Mountain Resort is an approximately 6,860-acre (2,766-hectare) multi-phase master planned mixed-use development comprising ski-accessible homesites connected to a village core and interlinked by walking, biking and Nordic trails. The Owner intends to develop the initial phases of Summit Powder Mountain Resort under the terms of a master plan unanimously approved by the Weber County Commission which may include single-family mountain homes, townhomes, condominiums, hotel condominiums, corporate retreats and commercial development which may total 2,800 units of density. |
| **The Project** | The Project will include: |

- the Infrastructure Component, being the roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for Summit Powder Mountain Resort;
- the  Residential Component being the vertical development of an anticipated 70 single family homes and 115 cabins across 293 planned homesites,; and,
- the development, construction and operation of a 415,482 ft$^2$ (38,600 m$^2$) mixed-use resort development on the Property ("**Summit Village**") which includes:
  - the Hotel Component, being a 130-unit, 365-key hotel condominium townhome complex;
  - the Commercial Component, being approximately 70,964 ft$^2$ (6,593 m$^2$) of commercial space;
  - the Parking Component, being approximately 62,290 ft$^2$ (5,787 m$^2$) of common areas and parking;
  - the Conference Component (as defined below), approximately 20,000 ft$^2$ (1,858 m$^2$) of conference space; and
- the Activity Center Component, being an approximately 16,000 ft$^2$ (1,486 m$^2$) of activity annex.

| | |
|---|---|
| **Development Costs and** | The total Development Costs for the Project are estimated to be approximately US$409 million, including the development costs for |

| | |
|---|---|
| **Sources of Funding** | Summit Village portion of the Project which are approximately US$261.1 million being the Summit Village Costs. |
| | The $27.6 million Infrastructure Component is being funded by $17.6 million in Weber County Special Assessment Bonds and $10.0 million of Owner equity. |
| | The Owner intends to fund the $120 million Residential Component through a combination of building partner capital and construction loans. |
| | The Summit Village Costs will be funded by: |

   (1) the Loan from the Company; and

   (2) Owner equity, which includes: (i) US$29.0 million of an in-kind contribution of the Property, (ii) US$16,679,300 of anticipated TIF financing, (iii) US$4,498,625 of equity and cash contribution and (iv) US$42,346,138 from non-refundable deposits from the purchase of townhome and condominium units in Summit Village.

| | |
|---|---|
| **Developer** | The Developer is SMHG Village Development LLC, a Delaware limited liability company established on May 22, 2015 with its principal place of business located at 3923 N. Wolf Creek Drive, Eden, Utah 84310. The Developer is a subsidiary of the Owner. The Developer was established to carry out the development and operation of Summit Village. The Developer is under the ultimate control of the Principals. |
| **Subscription Amount** | The Subscription Amount for one Class B Unit is US$500,000, or such other minimum investment amount as may be required under the EB-5 Program at any time. |
| **Administration Fee** | The Administration Fee is US$55,000 per Class B Unit (subject to reduction by up to US$5,000 on a case-by-case basis in the sole discretion of the Company), to be used to pay fees and expenses of the Class A Manager, Regional Center and/or finders. At any time if the Subscription Amount is increased beyond US$500,000 per Class B Unit, the amount of the Administration Fee shall be increased in proportion to such increase in the Subscription Amount. The Administration Fee will be used to pay certain costs and fees including marketing fees to finders, brokers, the Regional Center, and/or consultants. |
| **Use of Proceeds** | The proceeds from the Offering will be used to fund the Loan to the Developer for certain approved costs incurred in connection with the development, construction, ownership and operation of the Summit Village portion of the Project, as permitted under the Loan Documents and the EB-5 Program. |
| **Bridge Financing** | To the extent the Company is unable to fund the initial disbursement of the Loan to the Developer on or before April 1, 2016, the |

Developer reserves the right to acquire additional debt or equity funding, subject to terms reasonably acceptable to the Company, from one or more third parties as bridge financing to pay a portion of Development Costs (the "**Bridge Financing**"). In such event, initial disbursement(s) of the Loan to the Developer would be used to pay back the Bridge Financing subject to certain conditions and terms under the Loan Documents.

|  |  |
|---|---|
| **Loan Amount** | Up to US$150,000,000, provided that the ratio of the Loan to the total value of the Collateral (as defined below), as determined by a certified third party appraiser reasonably acceptable to the Company (the "**LTV Ratio**"), does not exceed 60% and a cushion in the number of jobs to be created by the Project as estimated in the Economic Report of not less than 25% of the number of jobs required to be created under the EB-5 Program for the maximum number of Subscribers (the "**Job Cushion**"). |
| **Loan Maturity** | The Loan will mature on the fifth (5th) anniversary of the date of the first disbursement of proceeds under the Loan, subject to a one (1) year extension at the request of the Developer as long as there is no default under the Loan Documents. |
| **Security** | The Loan (i) will be secured by (A) a senior lien deed of trust and collateral assignment of rights, attachments, fixtures and equipment of and on the Property (including the general contractor agreement and other construction contracts) and (B) a collateral assignment of any sale contracts and assignment of rent and management contract pertaining to the Project (including the hotel management contract and (ii) may be secured by one or more additional land parcel(s) located adjacent to the Property, as the same may be reasonably identified and acceptable to the Lender and the Developer (together, "**Collateral**"). Subject to certain additional terms to be set forth in the Loan Documents and, as applicable, compliance with securities and other applicable laws, the Developer may substitute Collateral, in whole or in part, with collateral in a form and substance acceptable to the Company in its sole discretion and provided that at all times the LTV Ratio, as determined by a certified third party appraiser reasonably acceptable to the Company, does not exceed 60%. |
| **Loan Guarantees** | Summit Mountain Holding Group, L.L.C., or such other guarantor acceptable to the Company, at its sole discretion, (the "**Guarantor**"), is expected to provide the following recourse guaranties: (1) "Bad boy" guaranty on terms acceptable to the Lender, including without limitation losses incurred by the Company as a result of fraud or intentional misrepresentation by the Developer, intentional misappropriation of funds by the Developer, a transfer by the Developer of the Property or other collateral for the Loan in violation of the terms of the Loan Documents, intentional waste of the Property by the Developer, and prohibited transfer of ownership interest in the Developer (the "**Bad Boy Guaranty**"); and (2) repayment guaranty in respect of the portion of the Loan funded to |

the Developer from Subscription Amount(s) contributed by those Subscribers whose I-526 Petitions are not yet approved, which guaranty shall (with respect to a Subscriber whose I-526 Petition has not yet been approved) be provided only from the time at which such Subscriber releases its respective Subscription Amount until the approval of such Subscriber's I-526 Petition (the "**Early Release Guaranty**").

**Costs of Loan**

The Loan will bear interest on the outstanding amount of the Loan at the rate of a quarter percent (0.25%) per annum up to the Initial Maturity Date, and thereafter at the rate of three and three-quarter percent (3.75%) per annum until the final repayment of the Loan.

**Loan Prepayment**

The Developer may prepay any portion of the Loan as long as the total prepayment amount does not exceed the aggregate Subscription Amount of those Class B Members who have received notice from USCIS regarding the final adjudication of his/her I-829 Petition and those who have permanently withdrawn from the EB-5 Program. Developer may also prepay any portion of the Loan to the extent such prepayment, in the opinion of the Company's immigration counsel, would not impair the adjudication of any pending I-829 Petitions. Subject to the applicable terms set forth in the Loan Documents, the Developer may also defease the Loan if doing so does not result in material adverse consequences under applicable securities laws or material immigration consequences to any Class B Member and the Loan has been fully advanced. Developer will be required to prepay any portion of the Loan attributable to each Class B Member who has received a final disapproval by USCIS of his/her I-526 Petition, provided that such amount prepaid will be available for draw down again under the Loan, subject to the Company's availability of funds.

**Escrow of Subscription Amount and Administration Fee**

The Subscriber must deposit the Administration Fee, the Subscription Amount, and the Escrow Fee applicable to his or her subscription for one or more Class B Units into the escrow account (such account, the "**Escrow Account**") maintained by an escrow agent (such agent, the "**Escrow Agent**"). See "Escrow Procedures" section of this Memorandum.

**Submission of I-526 Petition**

After the Company accepts a subscription and the Subscriber has delivered his or her US$500,000 Subscription Amount and US$55,000 Administration Fee to the Escrow Account, the Subscriber will prepare and submit an I-526 Petition to USCIS to seek conditional permanent residence in the United States.

**Liquidation**

If a Class B Member requests for the liquidation of a Class B Unit, the Company may in the discretion of the Class B Manager agree (but shall not be required) to liquidate the Class B Unit, subject to certain conditions. In other limited circumstances, including where the Company has disposed of all of its assets, the Company may liquidate such Class B Units. (see "Liquidation of Class B Units"

section of this Memorandum").

**Investor Qualification**

The Offering is available only to persons who (i) are not a "U.S. Person" within the meaning of Regulation S of the Securities Act ("**Regulation S**") and who are located outside of the United States at the time the Subscription Agreement for the subscription of any Class B Units is executed; or (ii) are "accredited investors," as defined in Rule 501 under the Securities Act and pursuant to Regulation D of the Securities Act ("**Accredited Investors**"). (See also "Requirements for Subscribers – Non-U.S. Person and Accredited Investor Status" section of this Memorandum below). A person is generally considered a U.S. Person if they are resident in the United States.

**Transfer Restrictions**

Except as expressly provided for in the Operating Agreement, no Class B Member will be permitted to withdraw from the Company or to withdraw any portion of his or her capital account. Other than when a person becomes entitled to a Class B Unit by operation of law, a Class B Unit issued to a Class B Member is non-transferable.

**Preservation of Eligibility for Removal of CLPR Status:**

If the Developer were to sell or refinance the Project before the end of conditional residence of some or all Class B Members, such Class B Members might be found by USCIS to have failed to maintain their investment at risk in the Project and might not be able to obtain removal of conditions. Therefore, if, at any time during the conditional legal permanent resident ("**CLPR**") status period for any Class B Member, any Loan amount is prepaid, the Company shall have the option to reinvest proceeds of the Loan that have been repaid in alternate investments that qualify under the EB-5 Program for the purpose of preserving the Class B Members' "at risk" investment and eligibility for removal of CLPR status. USCIS has not set clear policy on the extent to which reinvestment might be considered to constitute a "maintenance of investment" making possible the approval of Class B Members' petitions to remove conditions.

**Allocation of Profits and Losses**

Profits and losses of the Company shall be allocated to the Class B Members as provided in the Operating Agreement, except as otherwise required by the Internal Revenue Code.

**Fees**

In addition to the interest payments set forth above, the Developer shall reimburse the Company for certain marketing and other fees not covered by the Administration Fee that the Company may pay to finders, brokers, and/or other consultants equal to an aggregate amount of approximately 1.0% of the Loan amount plus 5.25% per annum of the outstanding Loan amount. The Loan Agreement will contain a covenant requiring these payments to be made by the Developer.

NO PORTION OF THESE FEES OR ANY OTHER OFFERING COSTS, SALES COMMISSIONS, MARKETING FEES, FINDERS' FEES OR IMMIGRATION EXPENSES WILL BE PAID FROM

ANY CLASS B MEMBER'S CAPITAL CONTRIBUTION.

**Criteria for Subscribers**   In order to invest in the Company, a potential subscriber must:

(1)   meet criteria set forth in this Memorandum (see "Requirements for Subscribers" section of this Memorandum);

(2)   follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section of this Memorandum); and

(3)   complete the required immigration procedures (see "Immigration Procedures" section of this Memorandum).

**Summary Structure Chart**



## II.   REQUIREMENTS FOR SUBSCRIBERS

Prospective Subscribers of the Class B Units offered by this Memorandum should give careful consideration to certain risk factors described under "XIII. Risk Factors" below and especially to the speculative nature of this investment and the limitations described under that caption with respect to the lack of a readily available market for the Class B Units and the resulting long-term nature of any investment in the Company.  The Offering is available only to persons who (i) are not a "U.S. Person" (within the meaning of Regulation S) and who are located outside of the United States at the time the Subscription Agreement for the subscription of any Class B Units is executed; or (ii) are Accredited Investors. (See also "Requirements for Subscribers – Non-U.S. Person and Accredited Investor Status" section of this Memorandum below). A person is generally considered a U.S. Person if they are resident in the United States.

**General Requirements**

Each prospective Subscriber (or his or her duly authorized representative) must return a completed Subscription Agreement, including, representations, among other things, that:

(1)    the prospective Subscriber has adequate means of providing for his or her current financial needs and contingencies and has no need for liquidity of the investment of the Class B Units;

(2)    the prospective Subscriber is subscribing the Class B Units for personal investment purposes only and not with a view toward resale or distribution;

(3)    the prospective Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to his or her net worth and the investment in the Class B Units will not cause such overall commitment to become excessive;

(4)    the prospective Subscriber is not a "U.S. Person" within the meaning of Regulation S or that he or she meets one or more of the criteria for Accredited Investors (See also "Requirements for Subscribers – Non-U.S. Person and Accredited Investor Status" section of this Memorandum below); and

(5)    the prospective Subscriber is eligible to be admitted to the United States in accordance with Section 212 of the INA

**Non-U.S. Person and Accredited Investor Status**

Each prospective Subscriber must not be a "U.S. Person" (within the meaning of Regulation S) and must be located outside of the United States at the time of the Offering and at the time the buy order for any Class B Units is executed, unless the Company is relying upon the exemptions under Section 4(a)(2) of the Securities Act or Regulation D, in which case the prospective Subscriber meets one or more of the criteria for Accredited Investors. Persons are generally considered a U.S. Person if they are a resident of the United States. An Accredited Investor is defined in Rule 501 under the Securities Act as being: (a) any natural person whose individual net worth, or joint net worth with that person's spouse (excluding primary residence)[1], exceeds US$1,000,000; or (b) any natural person whose individual income exceeded US$200,000, or whose joint income with that person's spouse exceeded US$300,000, in each of the two most recent years and who has a reasonable expectation of reaching that income level in the current year (except for certain limited exceptions permitted under a Regulation D offering).

## III. THE EB-5 PROGRAM

The EB-5 Program and the Act provide for an EB-5 employment-based preference immigrant visa category for immigrants seeking to enter the United States to engage or invest in a commercial enterprise that will benefit the U.S. economy and create at least ten full-time jobs for each immigrant investor. Pursuant to the Act, up to 10,000 EB-5 immigrant visas are allocated each year for qualified immigrant investors, who ordinarily must invest at least US$1.0 million in a qualifying business.

However, investors may qualify under the EB-5 Program through an investment of a reduced threshold amount of US$500,000 in a capital investment opportunity located in a qualifying rural area or in a state-designated high unemployment urban area as defined by the Act (a "**Targeted Employment Area**").

In August 2010, USCIS issued the RC Designation, designating the Regional Center as a qualifying participant in the EB-5 Program. As such, the Regional Center is authorized to review and evaluate potential capital investment opportunities located within a designated geographic area comprising the state of Utah and determine their suitability for participation in the EB-5 Program.

The Regional Center is not responsible for the contents of this Memorandum. The Regional Center has not made an independent inquiry relating to the accuracy or adequacy of this Memorandum, nor has it made any finding or determination relating to the fairness of the investment opportunity described in this Memorandum.

The RC Designation provides that the Regional Center will focus investments under the EB-5 Program in the following industry categories:

(1)    Hospitality

(2)    Resort

(3)    Service

An advantage of the RC Designation is that fulfillment of the required job creation criteria under the EB-5 Program may be direct or indirect. The Regional Center has entered into an Affiliate Agreement dated March 18, 2015 (the "**Regional Center Agreement**") with the Owner under which the Regional Center

---

[1] For purposes of calculating "net worth" of a person: (A) The person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

has agreed to extend the benefits of the RC Designation to the Owner entitling the Company and the Developer to carry out the Project under the Regional Center's supervision as part of the EB-5 Program. By extending the benefits of the RC Designation to the Project, the Regional Center enables subscribers to include both direct and indirect job creation resulting from the Project in order to meet the minimum job creation requirements of the EB-5 Program.

Among other things, the Regional Center Agreement requires the Owner to comply with all applicable laws and regulations in the conduct of its business, to provide periodic financial statements to the Regional Center, and to comply with the Regional Center's methods and standards of operation. In return, the Regional Center agrees to provide general oversight of the Offering and the Project to ensure compliance with USCIS requirements and take all necessary steps to qualify the Project under the EB-5 Program.

In consideration of the Regional Center's services with respect to the Offering and the Project, the Company will pay the Regional Center a fee calculated by reference to the number of Subscribers in the Offering who submit I-526 Petitions. The portion of this fee applicable to a particular Subscriber is refundable if the Subscriber becomes entitled to a refund of his or her US$500,000 Subscription Amount within six months following submission of his or her I-526 Petition.

The Regional Center Agreement provides the Owner with an option to purchase the Regional Center for an agreed purchase price. This option is exercisable by the Owner during the 30-day period after receipt by the Regional Center of fee payments applicable to ten Subscribers. After any purchase, the current owners of the Regional Center would retain rights to utilize the Regional Center's services free of charge.

The Regional Center Agreement also provides the Regional Center with consent rights in the event that the Owner desires to pledge, mortgage or transfer to a third party (i) any interest in the Regional Center Agreement or the assets relating thereto or (ii) a majority of the Owner's assets or equity interests. The Owner is required immediately to report any transfer of ownership to the Regional Center. The Regional Center is under the ultimate control of third parties unaffiliated with the Company or the Developer. The Regional Center and its affiliates are not participants in the Offering.

Michael K. Evans, PhD, of Evans, Carroll & Associates, Inc. was engaged to measure the economic impact of the Project, including its potential to create the number of direct and indirect jobs required under the EB-5 Program. Using the "Regional Input-Output Modeling System" ("**RIMS II**"), a model recognized and accepted by USCIS, Dr. Evans determined that an estimated increase of 4,884 new jobs will be created within the Utah counties of Weber, Cache, Davis, Martin and Salt Lake, an area that includes the Property.

In calculating the number of new jobs to be created, Dr. Evans determined that the following Development Costs and additional costs are eligible for inclusion under the RIMS II methodology:

| RIMS II Eligible Hard and Soft Costs | |
|---|---|
| **Activity** | **Cost** |
| Construction of Summit Village | US$115,746,190 |
| Additional horizontal construction for Summit Village | US$24,237,376 |
| Infrastructure expenditures | US$28,000,000 |
| Additional homesites | US$120,000,000 |
| Total eligible costs | US$287,983,566 |
| Architectural and engineering | US$11,511,479 |

Dr. Evans calculated the number of jobs to be created as follows:

12

| Summary of Employment and Revenue Estimates | | | | |
|---|---|---|---|---|
| Activity | Expend/Rev (millions of 2010 US$) | RIMS II Multiplier | Total Jobs | Direct Jobs |
| Hard construction costs | 254.178 | 18.4948 | 4,701.0 | 2,035.0 |
| Architect & Engineering Services | 10.688 | 17.1769 | 183.6 | 67.9 |
| Total Jobs | | | 4,884.6 | |
| All figures based on unrounded numbers | | | | |

Source: *Evans, Carroll & Associates*

| Maximum Offering Amount | Total Investors | Capital Contribution Per Investor | Minimum New Jobs Required (10 per Investor) | Total Estimated Jobs Created | Excess Number of Jobs |
|---|---|---|---|---|---|
| US$150,000,000 | 300 | US$500,000 | 3,000 | 4,884 | 1,884 (62.8%) |

Source: *Evans, Carroll & Associates*

Although the Owner and Developer anticipates the Project will ultimately create and sustain the minimum number of jobs required for each Subscriber in the Offering, there can be no assurance in this regard.

In March 2015, the Utah Department of Workforce Services designated an area comprising census tract 210100, Block 1, in Weber County, an area containing the Property, as a Targeted Employment Area with an 11.3% unemployment rate, more than 150% of the 2013 national average unemployment rate.

Based upon this designation, Dr. Evans's RIMS II job creation assessment and the RC Designation, the Company believes the purchase of a Class B Unit by a qualified investor will constitute a Qualifying Investment under the EB-5 Program. Therefore, as described in this Memorandum, the threshold investment for potential subscribers required would be US$500,000 under the Act, plus the US$55,000 Administration Fee. See "Immigration Procedures" section of this Memorandum for a summary of immigration procedures in connection with the EB-5 Program.

The Developer will provide information to the Company from time to time to enable the Company to calculate the number of direct and indirect jobs arising from the fulfillment of the Project business plan, avoiding double counting any job. To the extent the Project creates an insufficient number of jobs to enable each Class B Member to obtain a favorable adjudication of his or her I-829 Petition, the Class B Manager will allocate jobs to Class B Members in the order that each Class B Member received conditional permanent residence.

Under the EB-5 Program, an investor is required to be an "active participant" in the management of the commercial enterprise. However, participation in connection with the activities of a limited liability company is subject to limitations set out in the Operating Agreement and relevant legislation. Notwithstanding such limitations, limited liability companies are recognized as appropriate investment vehicles under the EB-5 Program. See "Class B Member Decisions" section of this Memorandum.

The RC Designation imposes certain conditions on the Regional Center intended to ensure that the Regional Center continues to meet the statutory requirements of the EB-5 Program. In particular, the Regional Center is required to maintain records, data and information and to prepare and deliver a written report to USCIS on or before December 29 of each calendar year regarding, among other things:

- investment activities under the Regional Center's sponsorship;

- activities of the Company in carrying out the Offering and activities of the Developer carrying out the development, construction and operation of the Project;

13

- compliance with subscription and immigration procedures by individual subscribers; and

- direct and indirect job creation statistics.

If USCIS determines that the Regional Center no longer serves the purpose of promoting economic growth, improved regional productivity, job creation and increased domestic capital investment, USCIS retains the right to modify or terminate the RC Designation, which would have an adverse impact on the Offering and on the status of a Class B Member's ability to complete the required immigration procedures and maintain his or her visa status. If for any reason the Regional Center is unable to fulfill the role described in this Memorandum, the Company would attempt to engage another USCIS-approved regional center to act in place of the Regional Center.

The approved geographic area of the Regional Center comprises the entire state of Utah. The Property is located in Weber County, Utah, which is within the boundaries of the Regional Center's approved geographic area.

The Regional Center also is required to notify USCIS and to obtain an amendment to the RC Designation if there is a material change to the information upon which the RC Designation was based. The Company believes that USCIS will not require an amendment to the RC Designation unless there has been a material change to the information previously provided. However, it is unclear what types of changes USCIS would consider material for this purpose. The Project could be delayed if the Regional Center were to request an amendment to the RC Designation. In addition, there can be no assurance USCIS would approve any requested amendment. Failure to obtain a needed amendment could have a material adverse impact on the Project, the Offering and the status of a Class B Member's ability to complete the required immigration procedures or to maintain his or her visa status.

## IV.  IMMIGRATION PROCEDURES

A diagram summarizing the immigration procedures is attached to this Memorandum as Exhibit C. To qualify for conditional permanent residency, a potential subscriber must file an I-526 Petition at the designated USCIS center. Substantial documentation evidencing that a potential subscriber's funds intended for investment in the Company were derived from lawful sources must be included with the I-526 Petition. Such evidence may include information concerning real estate transactions, business income, proceeds from the sale of a business, employment income, investments, bank accounts and dealings, licenses or similar evidence. If investment funds are derived from a loan, gift or inheritance, an appropriate affidavit and/or other evidence will be required to be filed.

Each Subscriber in the Offering is responsible for retaining his or her own immigration legal counsel and for paying legal fees and expenses pursuant to the immigration process. The Company is under no obligation to accept the subscription of any potential subscriber, including a potential subscriber represented by an immigration attorney who the Company determines, in the exercise of its sole discretion, may not adequately represent the potential subscriber before USCIS.

Following completion of the Subscription Procedures (see "Subscription Procedures" section of this Memorandum), the Company will send documentation regarding the Company and the Project to potential subscribers for their immigration attorneys to use in connection with preparation of the I-526 Petition. The Company and Owner are not responsible for any errors or omissions in any I-526 Petition, the contents of which are each potential subscriber's sole responsibility.

A potential subscriber will be issued a Class B Unit and admitted to the Company as a Class B Member when all of the following have occurred:

(1)    the potential subscriber has filed his or her I-526 Petition with USCIS, and

(2)    the Escrow Agent has released to the Company the potential subscriber's US$500,000 Subscription Amount.

Following approval of a Class B Member's I-526 Petition by USCIS, the Class B Member must apply for conditional lawful permanent resident status. Lawful permanent resident status may be applied for by the Class B Member (who must be over the age of 18), together with his or her spouse and unmarried children who are under the age of 21, upon approval of the I-526 Petition, assuming there is no quota backlog and the family promptly pursues the process.

If the Class B Member (or derivative beneficiary family member) will be outside of the United States, he or she must file Form DS-260 Application for Immigrant Visa and Alien Registration ("**DS-260**") and an interview request at the appropriate U.S. Consulate (or, if in Taiwan, at the American Institute in Taiwan). If the Class B Member (or derivative beneficiary family member) will be inside of the United States, he or she must file Form I-485, Application to Register Permanent Residence or Adjust Status ("**I-485 Application**") at the appropriate USCIS office.

The consular interview process, or the USCIS adjustment of status process, as applicable (collectively, the "**Immigrant Visa Process**"), is designed to enable the U.S. Government to determine whether a person is entitled to lawful permanent residency in the United States. As part of the Immigrant Visa Process, the Class B Member (or derivative beneficiary family member) is subjected to medical, police, security and immigration history checks. Upon approval of the I-485 Application or upon first entry into the United States under the immigrant visa issued following successful completion of the consular interview process, the Class B Member (or derivative beneficiary family member) is granted conditional permanent resident status.

Persons outside the United States applying for permanent residency, or inside the United States applying for adjustment of status, must demonstrate that they are admissible to the United States according to Section 212 of the Act. Section 212 sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa or entering the United States. Foreign persons precluded from entering the United States include:

(1)     persons who are determined to have a communicable disease of public health significance;

(2)     persons who are found to have, or have had, a physical or mental disorder, and behavior associated with the disorder which poses, or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

(3)     persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(4)     persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed or admits committing acts which constitute the essential elements of same;

(5)     persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude, persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

(6)     persons engaged in prostitution or commercialized vice;

(7)     persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

(8)     persons excludable on grounds related to national security, related grounds, or terrorist activities;

(9)     persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

(10)    persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(11)    persons who are likely to become a public charge at any time after entry;

(12)    persons who were previously deported or excluded and deported from the United States;

(13)    persons who by fraud or willfully misrepresenting a material fact seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the Act;

(14)    persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

(15)    certain aliens who have departed the United States to avoid or evade U.S. military service or training;

(16)    persons who are practicing polygamists; and

(17)    persons who were unlawfully present in the United States for periods in excess of 180 days.

Each potential subscriber should review the substantive inadmissibility and eligibility grounds (set forth in part above) with his or her immigration counsel to determine whether there may be a basis for denying lawful permanent resident status to the potential subscriber (or derivative beneficiary family member) notwithstanding eligibility for immigration based on an investment in the Company.

As of May 1, 2015, the U.S. Department of State announced that, of the 10,000 immigrant visas available under the EB-5 Program, the maximum number available to residents of the People's Republic of China had been reached for the U.S. government's 2015 fiscal year. In addition, the priority date for applicants from China was September 1, 2013. This development, known as "visa retrogression," means that applicants from China who filed their I-526 Petitions on or after September 1, 2013 (and their derivative beneficiary family members) will be unable to complete the Immigrant Visa Process until additional immigrant visas become available.

Although retrogression will not affect filing and adjudication of new I-526 Petitions, the maximum number of immigrant visas available to residents of the People's Republic of China under the EB-5 Program is likely to remain insufficient for the foreseeable future. It is anticipated that an investor who receives his or her I-526 Petition approval on the date of this Memorandum will require between two and three years to complete the Immigrant Visa Process.

In addition, USCIS authority to receive, process and adjudicate investor petitions in connection with capital investment opportunities such as the Project that are affiliated with regional centers and rely on indirect job creation will expire on September 30, 2015 unless the United States Congress passes legislation to extend the regional center program that is then subsequently signed into law by the President. There are no assurances that Congress will pass such legislation or, if so, what changes the legislation might make to the EB-5 Program. Similarly, there are no assurances that the President would sign such legislation into law. Unless the regional center program is extended, after September 30, 2015 it

is likely USCIS will no longer receive, process or adjudicate regional center proposals, I-526 Petitions, I-829 Petitions or I-485 Applications affiliated with regional centers relying on indirect job creation analyses which would adversely affect the ability of Class B Members to obtain conditional permanent residence through participation in the Offering.

An immigrant visa granting permanent resident status under the Act is conditioned upon the subscriber demonstrating his or her compliance with the requirements of the EB-5 Program. Subscribers who have been granted conditional permanent resident status must file an I-829 Petition within 90 days prior to the second anniversary of conditional permanent resident status being granted. The primary purpose of the I-829 Petition is to ensure that subscribers submit evidence establishing that they have successfully met the requirements of the EB-5 Program, including the creation and maintenance of at least ten direct and indirect jobs during the period of conditional residence. Except in rare cases, subscribers who fail to file this petition in a timely manner will automatically lose their permanent resident status.

The Company will send documentation regarding the Company and the Project to subscribers for their immigration attorneys to use in connection with preparation of the I-829 Petition.

There can be no assurance that an I-526 Petition will be approved, that a subscriber will successfully complete the Immigrant Visa Process, or that upon the approval thereof that the conditions attaching thereto will be removed through an I-829 Petition. Each subscriber bears the risk that USCIS will not approve the subscriber's I-526 Petition or that the subscriber or a qualifying family member will not obtain an immigrant visa.

The foregoing description of the immigration procedures in connection with the EB-5 Program is a summary description and each potential subscriber must seek advice from his or her immigration attorney to understand these procedures fully.

## V.  USE OF PROCEEDS

The Loan will be used by the Developer to fund certain approved costs incurred in connection with the Summit Village portion of the Project as permitted under the Loan Documents and as permitted under the EB-5 Program. All uses of the Loan proceeds are to be set forth in a budget to be reviewed and approved by the Company.

## VI.  PROJECT PARTICIPANTS

### Legal Entities

The following legal entities are participants in the Project:

***Summit Village Development Lender 1, LLC (the "Company").*** The Company is a newly formed Delaware limited liability company and the issuer of the Class B Units. Using proceeds from the sale of Class B Units in the Offering, the Company will extend the Loan to the Developer to fund a portion of the Development Costs. The rights and obligations of the members in the Company are set out in the Operating Agreement. See "Summary of Operating Agreement" section of this Memorandum.

***SMHG Village Development LLC (the "Developer").*** The Developer is a newly formed Delaware limited liability company established to construct, own and operate the Summit Village. The Offering of Class B units is made solely by the Company and the Company is solely responsible for the contents of this Memorandum.

***Summit Mountain Holding Group, L.L.C.*** The Owner is a Utah limited liability company established, among other things, to acquire and operate Powder Mountain, a ski resort, and to develop, construct, own and operate the Summit Powder Mountain Resort master planned mixed-use development. The Developer is a subsidiary of the Owner and is under the ultimate control of the Principals.

**Individuals**

***Gregory Mauro.*** Mr. Mauro is chairman and one of two principal equity holders in the Owner and chairman of the Summit Institute. Mr. Mauro is also a founder and managing partner of Learn Capital, a venture capital firm, and he currently manages Revolution Community Ventures, a New Market Tax Credit fund that has financed education facilities in California and New Jersey. Mr. Mauro also manages an affiliate of The Founders Fund and has co-founded four venture backed startups in the education, wireless and media sectors. Prior to these ventures, Mr. Mauro was founding vice president of corporate development with Entropic Communications, Inc. (Nasdaq: ENTR), a developer of residential semiconductor devices. Mr. Mauro began his career as a strategy consultant for Monitor Group. He is a graduate of UCLA's College of Honors and seasonally resides in Eden, Utah.

***Elliott Bisnow.*** Mr. Bisnow is the other principal equity holder in the Owner and a founder and chief executive officer of Summit Series, an organization that hosts conferences and events for young entrepreneurs, artists and activists. Mr. Bisnow also oversees the Summit Action Fund, an organization that invests in start-up ventures including Zaarly, Warby Parker, EcoMom, Scribd and Uber. With his father, Washington, DC businessman Mark Bisnow, he is a co-founder of Bisnow Media Corporation, a publisher of targeted online content and business conference producer. Mr. Bisnow lives in Eden, Utah.

## VII. STRATEGIC PARTICIPANTS

### Summit Village Architect

The Owner retained Jarmund/Vigsnæs AS ("**JVA**"), an Oslo, Norway architectural firm with additional offices in Salt Lake City, Utah, to provide initial architectural work for Summit Village. Work performed to date includes volumetric, architectonic and typographical studies, as well as Summit Village diagrams, drawings and renderings.

JVA has advised Owner that its architectural services focus on projects with potential for outstanding and meaningful architecture, most often closely related to nature and preferably in strong natural settings with harsh climate. The firm's practice explores modern possibilities with sensual and tactile means, seeking the right character for the place and purpose. The majority of JVA's finished work involves public buildings and housing projects.

| Jarmund/Vigsnæs AS Selected Projects | |
|---|---|
| 2012 | Log House, Oppdal, Norway |
| 2012 | Hotel condo apartment Myrkdalen, Voss, Norway |
| 2010 | Dune House, Thorpeness, Suffolk, England |
| 2008 | Farm house, Toten, Norway |
| 2008 | Oslo International School, Bærum Norway |
| 2006 | White House, Bærum, Norway |
| 2006 | Norwegian Ministry of Defense, Akershus Fortress, Oslo |
| 2005 | Svalbard Science Center, Longyearbyen, Spitsbergen |
| 2002 | Red House, Oslo, Norway |
| 2002 | Turtagrø Hotel condo apartment, Jotunheimen, Norway |
| 2001 | Oslo School of Architecture, Norway |

| 1999 | Kvitsøy Coastal Control, Norway |
| 1998 | Administration building for the governor of Svalbard, Longyearbyen |

JVA is led by Einar Jarmund, Håkon Vigsnæs and Alessandra Kosberg, all of whom are graduates of the Oslo School of Architecture. Mr. Vigsnæs spent one year at the Architectural Association in London and Mr. Jarmund obtained a Master's degree from University of Washington in Seattle. Mr. Vigsnæs worked with Sverre Fehn, while Mr. Jarmund taught and worked in Seattle. Both have been teaching in Oslo and Bergen, and were visiting Professors at Washington University in St. Louis in 2004, at University of Arizona, Tucson in 2005 and at Rhode Island School of design, Providence in 2009. Mr. Jarmund and Mr. Vigsnæs share a professorship at TH Lund, Sweden. Since 2013, Mr. Vigsnæs has also been a professor at the Oslo School of Architecture. JVA projects have won or been nominated for numerous international honors and awards.

The Owner expects to retain JVA to provide a comprehensive set of architectural and design services in connection with the development of Summit Village. However, no agreement or understanding exists between JVA and Owner relating to these matters, and Owner reserves the right to engage a different firm to provide these services for Summit Village.

**Summit Village Development Manager**

The Owner has retained East West Partners ("**EWP**") to act as key development adviser in connection with Summit Village. EWP is an association of independent companies providing consulting services to developers in connection with the construction, sale and management of large-scale real estate development projects.

EWP has extensive experience providing construction management and advisory services to developers of projects of size and scope similar to Summit Village. These projects include the following:

- The Custom Homes on Village Walk, Beaver Creek Village, Vail, CO

- Market Square, Beaver Creek Village, Vail, CO

- Arrowleaf, Deer Valley, UT

- Hyatt Main Street Station, Summit County, CO





*The Custom Homes on Village Walk*
*Vail, Colorado*

*Horizon Pass Lodge, Bachelor Gulch, Colorado*





*Hyatt Main Street Station*

*Summit County, Colorado*                                    *Market Square, Beaver Creek Village*
                                                             *Vail, Colorado*

As a key development adviser, EWP has participated in important design meetings in Eden, Vail, Colorado and New York City and has assisted Owner with conceptual and schematic development work resulting in a schematic-level design package for Summit Village. In addition, EWP reviewed and provided advice regarding cost estimates and the financial budget for Summit Village. The Owner is currently negotiating with, and expects to retain, EWP to provide comprehensive project management services in connection with Summit Village under the terms of a development management agreement. Under the proposed development management agreement, EWP would provide day-to-day project management services in connection with Summit Village, including (i) management of design and engineering, (ii) construction management, (iii) permitting, (iv) sales and marketing coordination, (v) customer relations, (vi) warranty administration and (vii) pro forma maintenance, financial accounting, draw requests and coordination of tax return preparation. However, the proposed development management agreement has not been finalized between EWP and Owner, and Owner reserves the right to engage a different firm to provide these services for Summit Village.

## VIII.  THE PROJECT

The Project is a portion of the initial phases of the Summit Powder Mountain Resort master planned mixed-use development. The Project has been principally financed to date through the sale of securities to investors (described below) and public financing, and comprises the following:

1. roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for Summit Powder Mountain Resort (the "**Infrastructure Component**");
2. the vertical development of residential units, including an anticipated 70 single family homes and 115 cabins, across 293 planned homesites over a period of 4 to 5 years (the "**Residential Component**"); and,
3. the development of Summit Village, a 415,482 ft$^2$ (38,600 m$^2$) mixed-use resort residential development to be constructed on the Property.

Founding Investors

To partially finance Summit Powder Mountain Resort, the Owner has offered and sold securities to investors (each, "**Founding Investors**") in three separate private placements. Each security consists of (i) a loan to the Owner convertible into a credit towards the purchase of a homesite following completion of development and regulatory procedures required to enable the Owner to convey the homesite, (ii) an equity interest in an indirect controlled subsidiary of the Owner established to own and operate the Powder Mountain ski resort, and (iii) a non-equity membership in an indirect wholly-owned subsidiary of the Owner established to operate Summit Eden, a recreational membership organization. As of the date of this Memorandum, Founding Investors have reserved approximately 88 homesites, and the Owner has conveyed fee simple ownership to approximately 30 of those homesites.

 Infrastructure Component

Using public and private funding, the Owner and Weber County have started construction of roads, sewers and other infrastructure improvements on the Master Property which is required to facilitate and allow for additional development work of the entire Summit Powder Mountain Resort. The Infrastructure Component also includes a 5,500 ft$^2$ semi-private lodge and event space located on the top of the mountain adjacent to the Hidden Lake Lift. Owner directly funded approximately 36% of the development cost of Infrastructure Component.  The Infrastructure Component is expected to be complete by the fourth quarter of 2015, with the exception of one road which is expected to be complete in the

fourth quarter of 2016. The Infrastructure Component is anticipated to cost approximately US$27.5 million upon completion of which US$9.95 million is Owner-Funded Infrastructure Improvements.

Using the proceeds of these private placements and other resources, the Owner has undertaken the improvements to Summit Powder Mountain Resort identified below. These improvements were either completed prior to the date of this Memorandum or will be largely completed by the end of the fall of 2015 and are part of the Infrastructure Component. These improvements are in addition to the road and infrastructure improvements identified above which were financed with the proceeds of Weber County's 2013 bond issue.

To further promote the development of Summit Powder Mountain Resort, in 2013 Weber County borrowed a total of US$17.6 million in the form of special assessment bonds to finance the construction of public roads, sewers and utilities to Summit Powder Mountain Resort homesites and to the Property. Construction started in the summer of 2013 and these improvements are expected to be complete by the fourth quarter of 2015, with the exception of one road which will be complete by the fourth quarter of 2016. The bonds are special limited obligations of Weber County and are payable primarily from a special assessment levy on Summit Powder Mountain Resort homesites and other properties benefitting from the improvements, including the Property. The assessments vary depending on land use type. The assessment for a single-family residence is approximately US$22,000, or US$2,200 annually if the owner decides to pay over a 20-year period.

The successful bond issue required close cooperation between the Owner and Weber County and extensive technical and financial support from the Owner. In addition to a bond-funded reserve, the Owner was required to fund two additional reserves as security for payment of the bond obligations.

As of the date of this Memorandum, progress on certain parts of the Infrastructure Component includes the following:

- Public Road Infrastructure Project (Financed by Weber County)
  - Sewer line is approximately 100% complete throughout the public road area.
  - Water line installation, along with valves and laterals, is approximately 100% complete throughout the public road area.
  - Excavation and grading is approximately 85% complete.
  - One skier bridge is approximately 100% complete; a second skier bridge is approximately 100% complete.
  - Approximately 75% of the public road has been paved (i.e., up to the Hidden Lake access point).
  - Balance of the public road is expected to be completed by the fourth quarter of 2015.
- Private Road Project (Financed by the Owner)
  - Private road 1A is approximately 80% complete with installation of sewer, sewer lift station, water system, power conduits, grading, silk fencing, and road base ready and completed.
  - Private road 1B is approximately 90% complete, including all utilities with communication lines left to be installed as well as asphalt.
  - Private road 1C is approximately 85% complete, with sewer and water partially completed.
  - Ridge Nest P.U.D. is approximately 50% complete, with communication conduit, remaining water line hook-ups and power still to be installed and completed.
- Well and Tank (Financed by Weber County)

21

- Well and pump house are approximately 90% complete.
- A 3 million gallon aquifer test was completed on December 10, 2014 and the data has been submitted to the State of Utah for its review and approval.

Owner is working with Weber County authorities to facilitate additional borrowing of US$18.6 million in the form of a second series of special assessment bonds. It is anticipated that the net proceeds of the second bond issue will be disbursed to the Owner and used to fund construction of additional public roads and infrastructure, a portion of which is anticipated to be located on and adjacent to the Property. Terms and conditions of a second bond issue are anticipated to be similar to Weber County's 2013 bond issue and payable from a special assessment, the terms of which are being negotiated. Approval of a second bond issue and the offer and sale of the bonds will be subject to fulfillment of certain conditions. Weber County has not yet approved a second series of special assessment bonds. Although Owner believes Weber County will approve a second bond issue, there is no assurance that it will do so or, if it does, that the subsequent bond issue will be successful. See "Project Funding" section of this Memorandum.

Residential Component

The Project includes the vertical construction of residential units principally consisting of single family and multi-family units, including townhomes. The Residential Component is anticipated to be completed within "Phase I" and "Phase IIA" homesite areas located on the Master Property (see Exhibit F for the location of the Residential Component). Phase I (154 homesites) and Phase IIA (139 homesites) are currently anticipated to offer approximately 293 homesites combined exclusive of the Summit Village. Approximately 88 Phase I homesites have been reserved by Founding Investors of which 40 Phase I lots are currently in the construction planning or design stage. Of 139 planned Phase IIA homesites, 7 have been reserved by Founding Investors. It will take approximately 4 to 5 years to complete all of the vertical development contemplated on the residential homesites, which is anticipated to include 70 single family homes and 115 cabins across the combined 293 Phase I and Phase IIA planned homesites. The construction cost related to the Residential Component is anticipated to be approximately US$120 million upon completion of these units.

The sale and future development of the Residential Component is contemplated to create product variety, additional critical mass, and marketing momentum to enhance the overall development of the Project. The Owner currently plans for the Residential Component to support the Summit Village portion of the Project. The Owner and builder partners will determine the mix of residential homesite and built product types over time based on market conditions. The Owner intends for the Residential Component to be differentiated from the Hotel Component of Summit Village based on average unit size, price point per square foot, and other factors. The Owner does not expect the sales of the residential homesites or finished units in the Residential Component to compete materially with the Hotel Component of the Summit Village. Notwithstanding the Owners' current intentions and expectations, it is possible that the Residential Component of the Project will adversely affect the financial performance of the Hotel Component of Summit Village.

Summit Village

Summit Village will act as the main core town for the Summit Powder Mountain Resort and will consist of:

1. a 130-unit, 365-key hotel condominium townhome complex (the "**Hotel Component**");
2. approximately 70,964 ft$^2$ (6,593 m$^2$) of commercial space (the "**Commercial Component**");

3. approximately 62,290 ft$^2$ (5,787 m$^2$) of common areas and parking; (the "**Parking Component**");
4. approximately 20,000 ft2 (1,858 m$^2$) of conference space (the "**Conference Component**"); and
5. an approximately 16,000 ft2 (1,486 m2) activity annex (the **"Activity Center Component"**).



### Area Profile: Utah and the Wasatch Range

Utah is a state in the western United States. In a September 2014 article, *Forbes* magazine identified Utah as the best state in which to do business due to its relatively low tax rates, pro-business regulatory environment, low unemployment rate and growing status as a technology hub. Salt Lake City International Airport offers direct flights to and from more than 90 cities including Nork City, San Francisco, London, Paris, and Amsterdam. Utah is the host of the Sundance Film Festival, the largest independent cinema festival in the United States. The festival highlights new films created by American and international independent filmmakers. In 2014, the festival attracted an estimated 45,000 attendees, who spent an estimated aggregate US$64.0 million.

The Wasatch Range is a mountain range that stretches approximately 160 miles (260 km) from the Utah-Idaho border, south through central Utah in the western United States. It is the western edge of the greater Rocky Mountains, and the eastern edge of the Great Basin region. Today, 85% of Utah's population lives within 15 miles (24 km) of the Wasatch Range, mainly in the valleys just to the west. This concentration is known as the Wasatch Front and has a population of just over 2,000,000 residents. Salt Lake City lies between the Wasatch Range and the Great Salt Lake.

Wasatch peaks are sculpted by glaciers, yielding notably rugged, sweeping upland scenery comparing well with other prominent ranges of western North America. They also receive heavy falls of snow, in some places over 500 inches (1,300 cm) per year. The Wasatch Range is home to a high concentration of ski areas, with eleven stretching from Sundance in northern Utah County to Powder Mountain northeast of Ogden. Due to the low relative humidity in wintertime, along with the added lake-effect from the Great Salt Lake, the snow has a dry, powdery texture that is marketed by local ski resorts and the state of Utah as "the Greatest Snow on Earth." The high concentration of ski resorts located close to a major urban

area, as well as the famed light, powdery snow that's often considered good for skiing, were prime reasons for Salt Lake City's hosting of the 2002 Winter Olympics.

**The Wasatch Range**



Source: "Wasatchfront" by Featuresaltlakecity at en.wikipedia

## Area Profile: Ogden, Utah

Ogden Valley is part of the greater Weber and Cache County economic base. Located in the foothills of the Wasatch Range, the area is easily accessible from Salt Lake City, which lies approximately 40 miles to the south. With a metropolitan area population of approximately 576,000, Ogden is the regional economic hub for northern Utah. Forbes magazine currently ranks Ogden as the 11 th best city in the United States in which to do business, citing the nearby mountains and r ivers as a major attraction. The Internal Revenue Service has a large presence in Ogden and is the city's largest employer. In addition, outdoor recreational companies, such as Solomon, Rossignol, and Scott USA, maintain prominent offices in Ogden Valley. Ogden also offers educational opportunities, including Weber State University, Ogden-Weber Applied Technology College, Davis Applied Technology College and Stevens-Henager College.

Although Ogden Valley is known for its world-renowned winter activities, it has also become a popular destination for summer tourists. Ogden and the surrounding Weber County offers over 210 miles of trails for hiking and mountain biking, as well as 13,000 acres of lakes, which are connected by rivers for paddle-sports and fishing. Furthermore, the Ogden River has been recognized as one of the only urban Blue Ribbon Fisheries.

## Area Profile: Powder Mountain

Powder Mountain is considered the largest ski area in the United States in terms of geographic area, with an estimated 7,000 acres (2,833 hectares) of skiable terrain. Powder Mountain is an approximately one-hour drive from Salt Lake City International Airport, overlooking the Ogden Valley, an area dotted with farms and ranches and surrounded on all sides by mountains. Powder Mountain is located opposite Snow Basin ski resort, site of the 2002 Olympic downhill competition. The Owner believes the combination of world-class skiing, championship golf and a 3,00-acre (1,214 hectare) lake in a picturesque mountain valley combine to make an attractive year-round resort environment and educational retreat.

Powder Mountain had its beginnings as the winter range for Frederick James Cobabe's sheep herd. Between 1902 and 1948, Cobabe accumulated land around Eden, Utah. Cobabe's son, Dr. Alvin F. Cobabe, bought the livestock company in 1948. It is reported that, while horseback riding with friends along Lightning Ridge in the 1950s, someone casually mentioned that the terrain would make a great ski resort. Dr. Cobabe soon began to acquire adjacent property adding to the thousands of acres he had received from his father.

The Powder Mountain ski resort opened in February 1972 with 14,000 acres (5,666 hectares) and one ski lift. Today Powder Mountain has a reputation for some of the best skiing in the United States. A December 2013 article in *Forbes Travel Guide* referred to skiing in the Ogden Valley as "a hidden gem." A March 2009 article in *The Denver Post* characterized Powder Mountain as "the largest – and perhaps

least known – ski area in the nation." In addition, the most recent annual survey of *Skiing* magazine readers ranks Powder Mountain ninth in the United States in terms of overall satisfaction.

Despite this reputation, Powder Mountain has remained a relatively little known and under-developed ski area compared to other Wasatch Range ski resorts such as Canyons Resort in Park City located closer to Salt Lake City. In 2006, Dr. Cobabe sold Powder Mountain for approximately US$50.0 million to Western America Holdings, a Utah-based investment group. Due to the financial crisis and subsequent recession, Western America Holdings sold Powder Mountain to the Owner in April 2013.



**Powder Mountain**



Source: HVS Report

**Summit Series**

Summit Series is an organization that hosts conferences and events for entrepreneurs, artists and activists.

In April 2011, the organization hosted the Summit at Sea conference, where 1,000 young entrepreneurs took a chartered cruise ship from Miami to the Bahamas for a three-day conference featuring Richard Branson, Peter Thiel, General Electric chief marketing officer Beth Comstock and musical group The Roots.

Also attending Summit at Sea was Gregory Mauro, one of the Principals. Mauro was then a 41-year-old entrepreneur based in Austin, Texas. Five years earlier, a friend had introduced Mauro to Powder Mountain. An avid skier, Mauro had fallen in love with the area and had purchased a home in Eden, Utah. Later that year, after learning that Powder Mountain was once again for sale, Mauro persuaded Bisnow that Powder Mountain would be an ideal permanent home for Summit Series. In addition, Mauro suggested thatPowder Mountain could be developed, responsibly and profitably, into a community where Summit Series participants could acquire homes in order to live and network together. This initial vision soon developed into the Summit Powder Mountain Resort master planned mixed-use development, of which the Project is a key component.

Mauro shared the history of Aspen with the Summit Series founders and specifically the role of Walter Paepcke and the Aspen Institute, positing that the Summit community could have a similar impact on Powder Mountain.    Walter Paepcke was a Chicago industrialist who in 1949 visited Aspen, Colorado, then a depressed mining town with 800 residents. Attracted by the areas natural beauty, Paepcke organized an event there to commemorate the 200th birthday of Johann Wolfgang von Goethe that attracted over 2,000 participants. That event led the following year to the creation of the Aspen Institute, which brought wealthy and culturally minded individuals to Aspen and fostered decades of rapid an economic growth in the area.

The Principals established the Owner in October 2011. In June 2012 the Owner acquired approximately 1,480 acres (599 hectares) of land located in Upper Ogden Valley or "Eden Valley" at the foot of Powder Mountain. This land comprises (i) approximately 80 acres (32 hectares) intended to be used for a "park & ride" lot and bus stop and open space for special events, and (ii) approximately 1,400 acres (567 hectares) of open space, including approximately 870 acres (352 hectares) under conservation easement with the Utah Department of Wildlife Resources. The land is suitable for hiking and bicycle trails and a potential equestrian and/or ranch facility.

In April 2013, the Owner acquired the 9,200-acre (3,723-hectare) Powder Mountain, which includes the Property and the land on which the Project is constructed, for approximately US$33.0 million, of which US$12.5 million was paid in cash and the balance from the proceeds of a secured loan from an institutional lender (which loan is to be refinanced without a lien on the Property as a condition to advances under the Loan Agreement). In July 2013, Summit Series hosted Summit Outside, its first event at Powder Mountain. The event attracted over 1,000 participants.

**Summit Outside, July 2013**

 

Source: Summit Series

### Weber County Entitlements and Financing

The Owner worked in close cooperation with local residents and public officials to develop an updated master plan for Summit Powder Mountain Resort. The master plan process included comprehensive development of slope maps, existing vegetation mapping, geotechnical investigation, avalanche zones, wind and solar aspect studies, access feasibility, ski terrain and resort connectivity, wildlife corridors, existing trails, viewsheds and open space preservation.

The resulting updated master plan establishes the foundation for the Summit Powder Mountain Resort to create an authentic mountain destination with varied vibrant neighborhoods clustered throughout the 6,240 acres (2,525 hectares) of the overall development and with Summit Village as the center of the larger community. In December 2014, the Weber County Commission unanimously approved the Owner's application for a new destination resort zoning classification, as well as Ordinance No. 2014-21 approving the rezoning. In January 2015, a Zoning Development Agreement between the Owner and Weber County was also approved.

Under the approved master plan, the Owner is entitled to construct up to 2,800 units of density, calculated as follows:

| DDR-1 DENSITY AND DESCRIPTION | |
|---|---|
| **Type of Use** | **Density Equivalent** |

| Single-Family Dwelling | 1 unit |
|---|---|
| Multi-family Dwelling | 1 unit per dwelling unit |
| Hotel Room | 0.33 units |
| Commercial Square Footage | N/A. Does not count toward unit density. |
| Corporate Retreats | First 36 corporate retreat rooms do not count toward unit density. Each room after 36 counts as 0.33 units. |
| **TOTAL PROJECT DENSITY PERMITTED: 2,800 units** Workforce housing units shall not be counted toward density of the Project regardless of where they are located, as provided by the DRR-1 Zone. | |

## Summit Powder Mountain Resort Development

The Project is a key component of the Summit Powder Mountain Resort master planned mixed-use development. The Principals intend to develop Summit Powder Mountain Resort over multiple phases to include (i) approximately 500 ski-accessible single-family mountain homesites, as well as condominiums and townhomes and (ii) a thriving village core of similar scale with associated amenities and educational facilities. Summit Village is intended to comprise the initial village core development. There is no assurance that any such future phases will occur.

In terms of its sheer physical environment, Owner believes Powder Mountain compares favorably to the Swiss Alps, the Italian Dolomites and the Argentine Andes. Owner believes Powder Mountain's location provides a number of other distinct advantages, including the following:

- Rare Topography: Powder Mountain takes advantage of a unique "flat-top," inverted topography. This enables fewer lifts to service more than the typical amount of terrain, as well as providing large amounts of ski accessible homesites with panoramic views. The topography also provides cycling, hiking, Nordic, and horseback trails along ridge tops and elevated meadows, with consistent trail vistas that Owner believes comparable to those found in the European Alps. The view atop Hidden Lake and Sunrise spans four states—Utah, Wyoming, Nevada, and Idaho.

- Mount Ogden and Great Salt Lake Views: Nearly all Summit Powder Mountain Resort homesites view Mount Ogden, peak elevation 9,570 feet (2,917 meters), which features several jagged peaks. Mount Ogden is the home of Snowbasin Resort, where the 2002 Olympic Downhill events were held. In addition, many homesites will have a view of the Great Salt Lake and one or more of its islands, providing beautiful winter sunsets.

- Protected Vistas and Nature Reserves: The Summit Powder Mountain Resort master plan incorporates large areas of open space, including elevated meadows. In addition, the property is mostly bordered by or near to nature reserves managed by the Department of Wildlife Management. The reserves include the Elk Reserve plateau, which features prominently toward Mount Ogden, as well as additional reserves bordering the foothills of the Five Fingers, Mary's Bowl, Gertsen Canyon, and Wolf Creek.

- Open Valley Below: Powder Mountain overlooks Ogden Valley, which is a beautiful area largely composed of farms and ranches surrounded on all sides by mountains. The combination of world

27

class skiing, championship golf, and a 3,000-acre (1,214-hectare) lake in a picturesque mountain valley with large expanses of open space within 55 miles of an international airport is rare. In fact, Eden Valley is so sparsely populated, with fewer than 2,500 residents, that there is not a single stop light in the entire valley.

- <u>Proximity to Major City</u>: Less than 20 minutes from Ogden Valley is the City of Ogden. With a population of over 80,000, Ogden is the regional economic hub for northern Utah. In 2012, Ogden was ranked by Forbes as the sixth-best city in the U.S. to do business, citing the city's unique and diverse outdoor recreation scene as a major economic driver. There are numerous outdoor recreation companies based in Ogden - including Solomon and Rossignol. Ogden is also home to a burgeoning community of higher education, with Weber State University, Ogden-Weber Applied Technology College, Davis Applied Technology College and Stevens-Henager College. In addition to Costco, Walmart, Home Depot and other traditional retail, Ogden has acclaimed healthcare facilities across multiple hospitals and clinics.

- <u>Uncrowded Skiing and Snowboarding</u>: On its busiest days, Powder Mountain sells just over 1,000 daily lift tickets, compared to over 15,000-20,000 daily lift tickets at Vail and Breckenridge resorts. Given that Powder Mountain has 6,860 acres (2,776 hectares) of lift-accessible terrain, it retains the most acreage per day skier of any major resort, at 6.86 acres (2.78 hectares) per day skier. By comparison, each of Deer Valley, Park City, Mammoth, Vail, and Breckenridge have considerably less than a half-acre (0.2 hectare) per day skier.

- <u>Size</u>: Powder Mountain has 15,380 acres (6,224 hectares) of skiable area, consisting of 6,860 lift-accessed acres (2,776 hectares) surrounded by 8,520 acres (3,448 hectares) of adventure skiing. Even excluding adventure skiing acreage (which includes terrain that is skied pursuant to access agreements with neighboring ranches), Powder Mountain offers the largest skiable terrain in the U.S.

- <u>Snowfall</u>: Powder Mountain has been consistently ranked in the top three for snow by *Ski* magazine in their annual reader poll. In 2014, Powder Mountain was ranked #2 out of 400 resorts polled in the snow category. Powder Mountain benefits from the same Great Salt Lake "lake effect" as Snowbird and Alta, and like those resorts regularly records over 500 inches (1,270 cm) of snowfall per year, compared to approximately 350 inches (889 cm) in Park City and 300 inches (762 cm) in Aspen.

- <u>Year Round Activities</u>: According to the City of Ogden, downtown Ogden is the only place in the U.S. within 37 minutes of all of the following activities: skiing, golfing, kayaking, ice climbing, water skiing, fly fishing, horseback riding, mountain climbing, trail running, bird watching in a national bird refuge, hunting (deer, elk, duck, pheasant, buffalo, or mountain lion), sky diving, snowmobiling, mountain biking, and access to an international airport.

- <u>Proximity to Major Air Hub</u>: In typical traffic, Powder Mountain is located just over 55 minutes north of Salt Lake City, with daily direct flights into Salt Lake City International Airport from major cities including Los Angeles, New York City, San Francisco, London, Amsterdam, and Paris.

- <u>Proximity to Local Air Hub</u>: Ogden-Hinckley (OGD) airport, 23 miles (37 km) from Powder Mountain, recently became TSA-certified and began supporting discount carriers in addition to private air traffic, beginning with Allegiant Air flights to and from Mesa, Arizona. Given that Los Angeles and Oakland are only 10-20 minutes further from Ogden by commercial air than Mesa, Owner believes there is significant potential for growth of direct, discounted air service into Ogden from California and elsewhere.

**The Property**

The Property comprises approximately 4.04 acres (1.635 hectares) of vacant land located in a gently sloping saddle near the summit of Powder Mountain at approximately 8,700 feet (2,652 meters) above sea level. <u>Exhibit F</u> hereto describes the physical boundaries of the Property. The Owner has previously

contributed a portion of the Property to the Developer. The remainder of the Property is currently owned by a subsidiary of the Owner and will be contributed to the Developer upon completion of regulatory procedures required to enable transfer of ownership.

The Owner commissioned the Fort Collins, Colorado office of HVS Consulting and Valuation Services, a national hotel appraisal and consulting firm ("**HVS**"), to prepare an independent appraisal of the "as is" market value of the fee simple interest in the Property. HVS delivered its appraisal in a written report dated March 27, 2015.

In assessing the market value of the Property, HVS did not utilize a sales comparison approach to market value due to an absence of comparable sales. Instead, HVS relied primarily on an income capitalization approach that analyzed the Property's ability to generate financial returns as an investment. According to HVS, the income capitalization approach is often selected as the preferred valuation method for operating properties, because it most closely reflects the investment rationale of knowledgeable buyers.

To arrive at an appraised value for the Property, HVS estimated the Property's forecast operating cash flow during the 12-month period ending September 30, 2022, when Summit Village is anticipated to be complete and stabilized. HVS then utilized the result in a direct capitalization technique and a discounted-cash-flow analysis to arrive at a market value as of October 1, 2015, the anticipated date of the Company's initial Loan disbursement to the Developer. Based on this analysis, HVS was of the opinion that the market value of the residual land value of the Property as of October 1, 2015 is US$29.0 million.

**Summit Village**

Summit Village is a 415,482 ft$^2$ (38,600 m$^2$) mixed-use resort residential development to be constructed on the Property and partially funded with proceeds of the Loan. Summit Village is expected to include the Hotel Component, the Commercial Component, the Parking Component, the Conference Component, and the Activity Center Component.

Summit Village is anticipated to form the energetic hub of Summit Powder Mountain Resort, an intimate neighborhood where people can congregate, share ideas, enjoy meals together and attend inspirational performances and talks. Designed in collaboration with renowned Norwegian modern architectural firm Jarmund/Vigsnæs AS ("**JVA**"), Summit Village is expected to offer meeting spaces where people may participate in a wide variety of cultural events. See "Summit Village Architect" section of this Memorandum. The condominiums and townhomes of Summit Village are expected to offer dramatic views and ski accessibility within walking distance of a wide range of retail and commercial opportunities.

**Summit Village and Adjacent Property**



The following is a preliminary breakdown of the Hotel Component. All Project features are subject to change.

| Building | Units | Keys | Gross ft² | Gross m² |
|---|---|---|---|---|
| 2A (Commercial) | 1 | 1 | 17,785 | 1,652 |
| 2B/2C (Condominium) | 8 | 20 | 31,409 | 2,918 |
| 3A (Hotel Condominium) | 32 | 97 | 69,446 | 6,452 |
| 3B (Condominium) | 12 | 26 | 22,004 | 2,044 |
| 3C (Condominium) | 124 | 31 | 19,592 | 1,820 |
| 1 (Conference Center) | | | 20,000 | 1,858 |
| 3D (Condominium) | 15 | 40 | 25,840 | 2,401 |
| 3E (Townhome) | 4 | 28 | 19,592 | 1,820 |
| 4 (Activity Center) | | | 16,000 | 1,486 |
| 5A (Hotel Condominium) | 24 | 58 | 74,146 | 6,888 |
| 5C (Hotel Condominium) | 20 | 64 | 40,378 | 3,751 |

| | | | | |
|---|---|---|---|---|
| Parking Structure (160 stalls) | | | 62,290 | 5,787 |
| | | | | |
| **Total** | **130** | **365** | **415,482** | **38,600** |

Site Improvements and Resort Structure

Summit Village is expected to blend in with its mountain surroundings. As currently designed, Summit Village will comprise multiple buildings, each constructed of wood framing on a poured concrete slab. Exteriors will include wood finishes and stone accents. Elevators and stairways will provide internal vertical transportation within the structures as needed. Building roofs will be made of wood trusses covered with a market-appropriate finish. Double-paned windows will reduce noise transmission into the rooms from surrounding establishments.

Residents and guests will reach Summit Village using a portion of the public roadway financed through Weber County's 2013 special assessment bond issue. Parking is anticipated to be available for public and guest use in a subterranean parking garage located below the Hotel Component. The complex will offer self-parking and valet options to guests for a fee. Due to the anticipated exclusive location of the proposed Hotel Component, limited signage is expected; however, all signage will adequately identify the complex. Landscaping is expected to allow for a positive guest impression and competitive exterior appearance, and site improvements are anticipated to complement the existing natural features. Sidewalks and accented brick pedestrian walkways should be present along the front entrance and around the perimeter of the complex. Other site improvements are expected to include a heated outdoor pool and outdoor whirlpools with sundecks. Overall, the site improvements for the complex should provide an upscale mountain resort lodging experience.

Food and Beverage Facilities

The Summit Village Hotel Component is expected to include a casual-dining restaurant serving three meals daily, a fine-dining restaurant serving dinner only, a lounge, room service, and banquet operations. The full-service restaurants should be relatively upscale due to the expected service level and first-class nature of Summit Village and the amenities planned for the larger Summit Powder Mountain Resort. The casual dining venue is intended as a gathering place in the community, offering impressive views of resort facilities and amenities and the surrounding mountain landscape. The casual dining venue is also expected to include a private dining room that may be rented to groups. The lounge is expected to offer ample seating and a simplified food menu to provide an alternative to dining in the restaurants. The bar is intended as the focal point of the room, and the space should be equipped with at least one large flat-panel television. Furnishings are anticipated to be of a similar style and finish as lobby and guestroom furnishings.

Meeting and Banquet Space

Current development plans include construction and operation of separate building housing a 20,000 ft$^2$ (1,858 m$^2$) conference center, being the Conference Component, with technologically advanced meeting space. If feasible, the Developer may instead include the Conference Component with the same structure as the Hotel Component.  The Conference Component is expected to be managed by the operator of the Hotel Component. The Conference Component is expected to include a dividable grand ballroom and primary meeting space, as well as a number of smaller breakout rooms, secondary meeting rooms and boardroom-type spaces. Public restrooms and pre-function space should be conveniently located near the meeting rooms. Summit Village is also expected to offer outdoor function space to accommodate weddings and social gatherings.

Recreational Amenities

The Hotel Component is expected to offer recreational facilities including heated outdoor pool, outdoor whirlpools, fitness center and spa. In addition, the complex is anticipated to offer outdoor recreational services, including a ski and bike concierge and a self-service locker facility. The spa should include multiple treatment rooms and services typical of an upper-upscale mountain resort. Restrooms and locker rooms are expected to adjoin the pool area.

Additional Amenities

Other Hotel Component amenities are expected to include a gift shop, a full-service business center with various workstations and wireless Internet in public areas. The Owner anticipates utilizing Summit Village conference space and the activities annex for a variety of educational events and programs, including future Summit Series programs. The Owner has held nonbinding discussions with several event and program sponsors, including the following:

- Singularity University, a provider of educational programs and partnerships, as well as a start-up accelerator, to individuals, businesses, institutions, investors, non-governmental organizations and governments;

- General Assembly, an educational institution established in 2011 to provide entrepreneurs and start-up companies with education and opportunities in technology, business and design; and

- 2U, an educational technology company that partners with nonprofit colleges and universities to offer online degree programs.

Guestrooms, Condominiums and Townhomes

The Hotel Component is anticipated to feature standard and suite-style guestroom configurations, as well as two- and three-bedroom condominium and townhome units. Guestrooms are expected to be present on each level of the complex. Condominium and townhome units are expected to offer additional living space, bedrooms and full kitchens.

In addition to standard furnishings, each guestroom is expected to feature superior linens, a large flat-panel television, wireless Internet access, an iron and ironing board, a coffeemaker, a safe and a refrigerator stocked with products for purchase. Select guestrooms are anticipated to feature a patio or balcony. Each guest bathroom will have a separate shower, a large tub, a commode and double sink with vanity area featuring a granite countertop. Bathroom floors should be finished with tile, and walls should be finished with an upscale material. Each bathroom is expected to include a hairdryer, a robe, a make-up mirror, and an upscale line of complimentary toiletries.

Back of the House

The Hotel Component is expected to be served by all necessary back-of-the-house space, including administrative offices, an in-house laundry facility and comprehensive kitchen facilities, such as a full-service kitchen and banquet preparation areas to service the adjacent Conference Component. These planned facilities are necessary to serve the needs of multiple food and beverage outlets. These spaces are anticipated to be adequate for a resort of this type to allow for the efficient operation of the complex.

**Summit Village Marketing and Sales Program**

The Developer intends to market Summit Village townhomes, condominium and hotel condominium units experientially, by creating a curated environment for people to discover the Project (and Powder Mountain) while connecting with new or existing friends through Summit Series branded events and hosted weekends. Currently, the Summit Series hosts 16 three-day events each year, and it anticipates

increasing that number to approximately 26 events each year by 2017, including events by the Summit Institute and third-party collaborations. The Owner anticipates leveraging the existing Summit Series community, together with its ability to expand that community to include new members and potential purchasers in the Project. To date, Summit Series has hosted over 8,000 guests in Eden, Utah. Summit Series hosted its signature event, "Summit Outside" July 19-22, 2013, which it intends to repeat as additional facilities are completed. Additionally, Owner augments hosted weekends by enabling private events for companies and entities such as Nike, Patagonia and The White House. Hosted weekends require a nominal fee to attend and, when coupled with the signature Summit Series flagship events, the Owner expects that the costs of experiential marketing for Summit Village will continue to be more than offset by event revenue. Due to the curated, experiential and referral-based marketing efforts of the Summit Series community, Developer has not utilized traditional real estate marketing and sales efforts, such as large print campaigns in national and international publications.

In addition, the Developer intends to market Summit Village through traditional brokerage community sources. The Owner expects to engage IMI Resort Sales, LLC ("**IMI**") under the terms of a sales and marketing agreement currently being negotiated. Owner believes that IMI is a leader in the luxury resort real estate industry with access to real property brokers throughout the world. IMI has advised the Owner that it works closely with premier real estate developers and strategic alliances to create some of the most recognized and successful resort real estate communities in North America and the Caribbean. IMI has further advised the Owner that it has been involved with many high-end projects throughout North America over the past 25 years, including the following ski resort projects: Glenwild, The Franz Klammer Lodge, Chateau Mont Tremblant, One Ski Hill, Hyatt Beaver Creek, Ritz Vail, Main Street Station, Old Greenwood, Lahontan, Village at Northstar, The Summit at Big Springs, and Martis Camp. The Owner believes that IMI's work in core feeder markets such as those for Desert Mountain, Carlton Woods, Ginn Properties, Cliffs Communities, Baja Mar and Kukuiula create additional relations with potential buyers. The Owner anticipates that IMI's experience in the luxury resort real estate industry and access to large numbers of potential buyers would provide a significant advantage to Summit Village townhome, condominium and hotel condominium unit marketing efforts. The proposed sales and marketing agreement with IMI has not been finalized and Owner reserves the right to engage a different firm to provide sales and marketing services for the Project and Summit Village.

Depending on market conditions, the Developer may determine to develop or convert some of the residential salable units to traditional rental units that would remain owned by the Developer and operated by the Developer or a third party professional management firm under a hotel model. The projections provided below under "Projected Cash Flow" do not reflect this potential usage case for the Hotel Component.

## Hotel Operator

The Owner anticipates that it will either internally manage the Summit Village hotel condominium and associated pool of privately-owned rental units or else retain the services of a third party professional hotel management company. No decision has yet been made in this regard and no agreement or understanding exists with any existing or potential employee or with any third party hotel operator.

## Commercial Space Leasing and Occupancy

The Owner anticipates that it will retain the services of a third party professional service provider to develop a strategic mix and leasing plan for the Commercial Component. No agreement or understanding yet exists with any third party service provider.

## Projected Cash Flow

The Owner analyzed anticipated revenues and expenses relating to Summit Village and prepared the following Projected Cash Flow. These projections are based on estimates and assumptions that are subject

to change, and by their nature are not and cannot be guarantees of future results. Assumptions include that the Hotel Component will be marketed for unit sales and not as traditional vacation rental units that would remain owned by Developer and operated by Developer or a third-party hotel manager under a hotel model. The projections provided below under "Projected Cash Flow" do not reflect this potential usage case for the Hotel Component.

The estimates and assumptions underlying these projections involve judgments with respect to, among other things, future economic and competitive conditions and future business decisions, which may not be realized or which may be incorrect. These financial projections are forward-looking statements. See "FORWARD-LOOKING STATEMENTS" above.

| | Inception | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Annual Development Costs*** | | | | | | | | | | | | |
| Hard Costs | 0 | 9,651,938 | 64,346,256 | 86,867,445 | | | Potential add'l development based on prevailing market | | | | | 160,865,639 |
| Soft Costs & Contingency | 11,125,000 | 14,002,420 | 7,677,346 | 10,584,912 | | | Potential add'l development based on prevailing market | | | | | 43,389,678 |
| Land | 29,000,000 | 0 | 0 | 0 | | | Potential add'l development based on prevailing market | | | | | 29,000,000 |
| Interest Expense | 0 | 940,986 | 2,993,201 | 6,684,559 | 8,625,000 | 8,625,000 | Potential add'l development based on prevailing market | | | | | 27,868,747 |
| Total | 40,125,000 | 24,595,344 | 75,016,803 | 104,136,916 | 8,625,000 | 8,625,000 | | | | | | 261,124,063 |
| **Development Funding** | | | | | | | | | | | | |
| Profits from Homesite Construction | | | | 3,927,925 | 0 | 570,700 | Potential add'l development based on prevailing market | | | | | 4,498,625 |
| Land Contribution | 29,000,000 | 0 | 0 | 0 | | | Potential add'l development based on prevailing market | | | | | 29,000,000 |
| EB-5 Facility | 11,125,000 | 10,479,965 | 60,901,424 | 67,493,611 | | | Potential add'l development based on prevailing market | | | | | 150,000,000 |
| Assessment Bonds | 0 | 0 | 0 | 18,600,000 | | | Potential add'l development based on prevailing market | | | | | 18,600,000 |
| Total Net Sales Deposits | 0 | 14,115,379 | 14,115,379 | 14,115,379 | | | Potential add'l development based on prevailing market | | | | | 42,346,138 |
| TIF | 0 | 0 | 0 | 0 | 8,625,000 | 8,054,300 | Potential add'l development based on prevailing market | | | | | 16,679,300 |
| Total | 40,125,000 | 24,595,344 | 75,016,803 | 104,136,916 | 8,625,000 | 8,625,000 | | | | | | 261,124,063 |
| **Post-Construction Uses of Cash** | | | | | | | | | | | | |
| Debt Retirement | | | | | | | | | | | | |
| EB5 Repayment | 0 | 0 | 0 | 0 | 0 | 150,000,000 | 0 | 0 | 0 | 0 | 0 | 150,000,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 150,000,000 | 0 | 0 | 0 | 0 | 0 | 150,000,000 |
| **Revenues** | | | | | | | | | | | | |
| Remaining Sales and Recurring Revenues | | | | | | | | | | | | |
| Net Sales Proceeds at Close of Constr. | 0 | 0 | 0 | 169,384,553 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 169,384,553 |
| Remaining Profits from Homesite Constr. | | | | | | 13,501,375 | | | | | | 13,501,375 |
| Commercial NOI | 0 | 0 | 0 | 0 | 418,788 | 1,116,275 | 1,213,659 | 1,279,147 | 1,319,698 | 0 | 0 | 5,347,566 |
| Resid. Rental NOI | 0 | 0 | 0 | 0 | 1,880,871 | 2,927,120 | 3,365,346 | 2,835,474 | 3,008,141 | 0 | 0 | 14,016,951 |
| Total | 0 | 0 | 0 | 169,384,553 | 2,299,658 | 17,544,770 | 4,579,005 | 4,114,621 | 4,327,838 | 0 | 0 | 202,250,445 |
| Future Sale of Operating Assets | | | | | | | | | | | | |
| Commercial Exit Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,196,978 | 0 | 0 | 13,196,978 |
| Resid. Rental Exit Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30,081,406 | 0 | 0 | 30,081,406 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43,278,384 | 0 | 0 | 43,278,384 |
| Total Revenues | 0 | 0 | 0 | 169,384,553 | 2,299,658 | 17,544,770 | 4,579,005 | 4,114,621 | 47,606,222 | 0 | 0 | 245,528,828 |
| **Additional Homesites** | | | | | | | | | | | | |
| Building Partner Capital & Construction Loans | 0 | 24,000,000 | 24,000,000 | 24,000,000 | 24,000,000 | 24,000,000 | 0 | 0 | 0 | 0 | 0 | 120,000,000 |
| Construction of Additional Homesites | 0 | 24,000,000 | 24,000,000 | 24,000,000 | 24,000,000 | 24,000,000 | 0 | 0 | 0 | 0 | 0 | 120,000,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Public Infrastructure** | | | | | | | | | | | | |
| Weber County Special Assessment Bonds | 17,600,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17,600,000 |
| Public Infrastructure | 17,600,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17,600,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Private Infrastructure & Construction** | | | | | | | | | | | | |
| Developer Equity | 9,952,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,952,000 |
| Private Infrastructure and Construction | 9,952,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,952,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Cash Flow** | **0** | **0** | **0** | **169,384,553** | **2,299,658** | **(132,455,230)** | **4,579,005** | **4,114,621** | **47,606,222** | **0** | **0** | **95,528,828** |

**Development Timetable**

The Owner anticipates Summit Village construction will commence in the second quarter of 2016. Construction is expected to last approximately 36 months, with substantial completion anticipated in the second quarter of 2019. The Owner has commenced marketing activities and expects to close unit sales beginning in the second quarter of 2016. The following timetable illustrates the construction timetable. The actual time required to construct the Project will depend on a number of factors, including number of Class B Units ultimately sold in the Offering and the time required to do so. It is therefore subject to change.

## Summit Village Overall Schedule



**Summit Village Budget**

The following is the Developer's preliminary budget for the construction of Summit Village. Budgeted amounts are subject to change as a result of factors arising during the Project.

| Acquisition Costs | | Total |
|---|---|---|
| **Land Cost** | | **29,000,000** |
| | | |
| **Hard Costs** | | |
| *Site Work* | | *7,809,933* |
| *Concrete* | | *15,947,961* |
| *Masonry* | | *3,375,624* |
| *Metals* | | *1,592,034* |
| *Woods* | | *19,249,686* |
| *Thermal & Moisture Protection* | | *5,462,387* |
| *Doors & Windows* | | *4,681,411* |
| *Finishes* | | *9,574,009* |
| *Specialties* | | *1,894,319* |
| *Equipment* | | *545,801* |
| *Furnishings* | | *104,928* |
| *Special Construction* | | *3,079,114* |
| *Conveying Systems* | | *2,614,573* |

| Acquisition Costs | | Total |
|---|---|---|
| Mechanical | | 12,029,043 |
| Electrical | | 7,701,061 |
| Permits & Insurance | | 1,017,691 |
| Management Fees & Overhead | | 7,799,373 |
| General Conditions | | 11,267,241 |
| Developer's Fee | | 6,481,807 |
| Ski Lifts | | 8,000,000 |
| Under Ground Parking | | 5,600,000 |
| Roads | | 6,200,000 |
| Water | | 1,900,000 |
| Bridges & Meridian Road | | 1,500,000 |
| Hard Cost Contingency | | 8,540,077 |
| **Total Hard Costs** | | **153,968,073** |
| | | |
| **Soft Costs** | | |
| Permit Fees & Assessments | | 3,703,890 |
| Legal | | 2,777,917 |
| Sewer & Bond Financing Fees | | 3,400,000 |
| Marketing | | 2,963,112 |
| Insurance | | 2,592,723 |
| Soft Cost Contingency | | 5,997,752 |
| Architect & Engineering | | 11,112,652 |
| Closing, Brokerage & Pre-Opening Cost | | 17,739,197 |
| **Total Soft Costs** | | **50,287,243** |
| | | |
| **Interest Expense** | | **27,868,747** |
| | | |
| **Total Development Costs** | | **261,124,063** |

**Market Analysis – Condominium**

The Owner commissioned HVS to investigate and analyze the Hotel Component. Upon conclusion of its investigation and analysis, HVS delivered a report dated March 17, 2015 (the "**HVS Report**"). The HVS Report provides the following market area summary and outlook for the area around Powder Mountain in general and the Project in particular:

- Demand for resort residential sales competitive set includes real estate offerings in ski areas throughout the western United States, and in particular in Deer Valley and the Empire Pass neighborhood. The real estate markets were impacted by the recent economic crisis, but have shown signs of price appreciation and market absorption in the past year. The market timing for the sales of the residential units is favorable.

- The area around Powder Mountain has changed substantially over the last decade, and there has been a substantial increase in the number of seasonal units built in Weber County, as it transitions to a full-scale resort destination.

- Demand for this mountain resort competitive set, which is heightened during the winter ski and summer vacation seasons, comprises primarily free independent travelers, as well as corporate and

social destination-driven groups. Supply increased significantly from 2009 through 2011 with the opening of seven hotels within the competitive set: Madeline Hotel Telluride, Viceroy Snowmass, St. Regis Deer Valley, Waldorf Astoria Park City, Four Seasons Resort Vail, and Montage Deer Valley.

- Additional fluctuations in available room nights over the historical period shown are attributed to the conversion of guestrooms to residential uses, as well as the seasonal operation of hotels. The Great Recession, coupled with an increase in supply, resulted in occupancy declines in 2008 and 2009. Despite the significant increase in supply in late 2009 and in 2010, demand levels significantly strengthened in 2010 as discretionary income for vacations to resort destinations increased; as a result, occupancy rose in 2010 and continued to increase through 2013.

- Data for 2014 show a slight rise in occupancy to nearly 53%, as hoteliers focused on revenue per available room ("**RevPAR**") gains through increased average rates given the stabilized occupancy. The positive trend since 2010 reflects that the market is recovering from the effects of the economic downturn and the entrance of new supply.

The HVS Report concludes that the proposed hotel condominium townhome development has an opportunity to serve an unrepresented northern Utah niche in the mountain resort market and that the area near the Powder Mountain remains underserved by high-end residential and lodging facilities. Based on its market analysis, HVS believes there is sufficient market support for this component of Summit Village and that the assumptions made by the Owner are valid and reasonable. HVS is of the opinion that the Property is favorably located on Powder Mountain to provide guests with ski-in/out accessibility; furthermore, the proposed array of facilities and amenities should allow the development to perform well w i t h free independent travelers, as well as corporate and social destination-driven groups.

**Demand Outlook: Western Mountain Resort Alliance**

Western Mountain Resort Alliance ("**WMRA**") tracks real estate information in British Columbia, California, Colorado, Idaho, Montana, Utah, and Wyoming. The following table shows statistics for the most recent quarter available to HVS on sales of homes, condos and land in the ski markets tracked by WMRA. This data is not comprehensive as not all the brokers in each area report their data.

| | | Whistler | Park City | Steamboat | Sun Valley | Vail | Big Sky | Tahoe | Teton |
|---|---|---|---|---|---|---|---|---|---|
| | # of Agents | 130 | 879 | 303 | 282 | 667 | 91 | 714 | 481 |
| **# of Active Listings** | Homes | 126 | 754 | 373 | 538 | 358 | 134 | 775 | 198 |
| | Condos | 243 | 424 | 374 | 305 | 498 | 230 | 227 | 81 |
| | Land | 62 | 797 | 613 | 439 | 318 | 230 | 511 | 200 |
| | Other | 47 | 61 | 195 | 177 | 461 | 34 | 151 | 42 |
| | Total | 478 | 2,036 | 1,555 | 1,459 | 1,635 | 628 | 1,664 | 521 |
| **# of Units Sold** | Homes | 99 | 630 | 222 | 156 | 266 | 70 | 747 | 137 |
| | Condos | 378 | 552 | 306 | 148 | 555 | 113 | 230 | 125 |
| | Land | 15 | 366 | 94 | 55 | 88 | 36 | 228 | 62 |
| | Other | 46 | 48 | 77 | 25 | 109 | 7 | 81 | 24 |
| | Total | 538 | 1,596 | 699 | 384 | 1,018 | 226 | 1,286 | 348 |
| **Total Volume Sold** | Homes | $162,817,735 | $620,398,830 | $167,902,807 | $152,738,923 | $373,920,316 | $79,090,095 | $670,200,002 | $237,057,613 |
| | Condos | $204,218,069 | $362,676,640 | $130,966,021 | $63,565,905 | $531,841,525 | $59,073,824 | $122,917,254 | $73,204,102 |
| | Land | $15,250,000 | $150,187,272 | $27,198,109 | $21,975,875 | $34,673,400 | $13,907,800 | $44,606,510 | $73,981,350 |
| | Other | $4,374,350 | $28,564,675 | $43,129,938 | $19,753,500 | $24,435,167 | $2,725,000 | $7,448,850 | $58,561,150 |
| | Total | $386,660,154 | $1,161,827,417 | $369,196,875 | $258,034,203 | $964,870,408 | $154,796,719 | $845,172,616 | $442,804,215 |
| **Average Sales Price** | Homes | $1,644,624 | $984,760 | $756,319 | $979,096 | $1,405,715 | $1,129,859 | $897,189 | $1,730,348 |
| | Condos | $540,259 | $657,023 | $427,994 | $429,499 | $958,273 | $522,777 | $534,423 | $585,633 |
| | Land | $1,016,667 | $410,348 | $289,342 | $399,561 | $394,016 | $386,328 | $195,643 | $1,193,248 |
| | Other | $95,095 | $595,097 | $560,129 | $790,140 | $224,176 | $389,286 | $91,961 | $2,440,048 |
| | Total | $718,699 | $727,962 | $528,179 | $671,964 | $947,810 | $684,941 | $657,210 | $1,272,426 |
| **Median Sales Price** | Homes | $1,300,000 | $611,500 | $530,000 | $502,500 | $567,500 | $670,000 | $585,000 | $1,017,500 |
| | Condos | $448,500 | $411,482 | $315,500 | $250,000 | $545,000 | $290,000 | $362,500 | $450,000 |
| | Land | $850,000 | $213,000 | $197,500 | $185,000 | $111,500 | $239,000 | $125,000 | $482,500 |
| | Other | $84,500 | $150,000 | $110,000 | $395,000 | $486,750 | $290,000 | $57,500 | $915,000 |
| | Total | $670,750 | $428,250 | $331,250 | $367,900 | $459,950 | $420,000 | $243,750 | $675,000 |

Source: HVS Report

The following charts reflect the number of active listings and units sold in the ski markets tracked by WMRA:



Source: HVS Report

The following chart reflects the average sales price of units sold in the ski markets tracked by WMRA:



Source: HVS Report

**Comparable Profile**

The Owner believes there are several markets and developments within the United States consisting of resort real estate with spectacular views and access to expanded skiing and snowboarding experiences, all within respective premium markets. These comparative markets include Upper Deer Valley, Yellowstone Club, Martis Camp, Vail Valley and Aspen. All current information is as of March 2015.  The following market statistics have been provided by third parties and/or published by real estate sales professionals associated with these markets, and their accuracy has not been verified by the Owner.

Upper Deer Valley

Deer Valley is an alpine ski resort in the Wasatch Range, located 36 miles east of Salt Lake City, in Park City, Utah. The resort, known for its upscale amenities, is consistently ranked among the top ski resorts in North America. Deer Valley was a venue site during the 2002 Winter Olympics, hosting the freestyle moguls, aerial, and alpine slalom events. With a number of other large ski resorts nearby, Deer Valley competes by catering to a more upscale audience than its neighbors, offering amenities such as free ski valets, free parking shuttles, fine dining and boutique shopping in the main lodge. The resort's mid-mountain lodge, the Stein Eriksen Lodge, offers luxury accommodations and spa facilities. Stein Eriksen,

38

its gold medalist namesake, is host of the lodge and director of skiing at the resort. Deer Valley uses more grooming equipment than other Wasatch ski areas, and limits access to 7,500 ticket sales per day to avoid overcrowding. SKI Magazine's reader resort survey ranked Deer Valley first overall for five consecutive years between 2007 and 2011. In the 2014 survey, the resort received first place ratings in the categories of grooming, service, on-mountain food, lodging and dining. Deer Valley is one of three remaining American ski resorts that prohibit snowboarders, along with Utah's Alta Ski Resort and Vermont's Mad River Glen.

Deer Valley has benefited from the growth of the Park City area, which in part can be credited to the success of - and exposure generated by - the Sundance Film Festival and the 2002 Winter Olympics. This area of Utah was also the first to receive significant migration from California and other states, and was the first to liberalize its liquor laws, which as of 2010 have been standardized across Utah.

Neighborhoods with commanding views and ski accessibility are most prevalent in Empire Pass Deer Valley. These include Red Cloud, which is part of the Talisker Club, The Montage, and St. Regis, which offers condominiums from US$1.25 million to US$17.99 million. Red Cloud has three active single-family listings for prices ranging from US$11.30 to US$15.95 million with an average price per square foot of US$1,386. The Montage closed on 13 condominiums in 2014 with an average sales price of US$3.88 million per unit (US$1,382 per square foot). There are currently 22 active listings with an average list price of US$4.09 million per unit (US$1,431 per square foot). There are currently three pending sales with an average list price of US$3.71 million per unit (US$1,411 per square foot). The St. Regis has closed 5 condominiums in the past year with an average sales price of US$1.90 million per unit and a price per square foot of US$1,074. There are currently 21 actively marketed condos with an average list price of US$3.86 million per unit (US$1,499 per square foot). One sale is pending with a list price of US$3.1 million (US$1,256 per square foot).

Over the past year, Empire Pass - Upper Deer Valley vacant land sales had an average sales price of approximately US$4.0 million, or US$3.2 million per acre. Current inventory of vacant land in Empire Pass has an average list price of approximately US$4.1 million or US$3.4 million per acre. Also over the past year, single family homes in Empire Pass sold for an average price of US$4.9 million, with an average price per square foot of US$975. Active listings of single-family homes at Empire Pass reflect an average list price of US$7.5 million or US$1,083 per square foot. Finally, condominiums at Empire Pass over the past year had an average sales price of US$3.0 million with 32 units sold, with an average price per square foot of US$1,107.

Yellowstone Club

The Yellowstone Club provides members with 2,200 acres of private, skiable terrain and 15 lifts, making it larger than the destination resorts at Deer Valley and Beaver Creek. This substantial acreage includes extensive beginners' areas, more than five dozen trails, a large section for open-bowl skiing, a true double black-diamond ridge of steep chutes, and 400 acres of glade powder skiing. The club added off-piste snowcat skiing during the 2009-10 winter season. On Yellowstone Club's busiest days, only about 1,000 skiers take to the slopes.

Even before the opening of Warren Miller Lodge, which serves as the Yellowstone Ski Resort's clubhouse, and before many of the other amenities were completed, the Club's sales staff reportedly converted up to 65 percent of the prospective members who skied there. Much of this early marketing success was viral: members invited friends who, in turn, became members and invited friends of their own. In 2005, Yellowstone Club sold over US$200 million of property, and the former founder and owner reportedly owned Yellowstone Club nearly debt free after completing the repayment of a successful founding member program. During peak season, almost 600 people are employed at Yellowstone Club.

Because the ski resort is not open to the public, one-time membership dues are in excess of US$300,000 and annual homeowner association and Club membership dues range from US$40,000 to US$55,000 annually. The village condominiums sold strongly in 2014, with 53 condominiums trading. Single-family homes also sold well in 2014 with 14 homes. Vacant land sales exceeded previous years with 26 homesites sold. Overall in 2014 Yellowstone Club sales volume was US$450 million in single-family homes and vacant land, and US$150 million in townhome and condominium sales.

Martis Camp

Martis Camp is a private golf and ski club community located in Truckee, California with unique access to Northstar Ski Resort in North Lake Tahoe, a resort of approximately 3,170 skiable acres. Martis Camp itself is approximately 2,177 acres, and is a complete year round resort offering a full array of club amenities to its members. Members access Martis Camp primarily through three airports: Reno, Nevada (36 miles), with limited direct flights; Sacramento, California (110 miles), with direct flights from most western states; and San Francisco, California (189 miles), with daily domestic and international flights. Because of its valley floor topography, Martis Camp offers only a few ski-in/ski-out home-sites and provides a shuttle service to an exclusive ski lodge adjacent to a bowl at Northstar. The Martis Camp Express, the Club's high-speed quad lift, gives members direct access into Northstar, as well as an hour of "first tracks" every morning, and is held as the community's most significant selling feature. In contrast, the general public must deal with traffic delays at the main Northstar parking lot, lift lines, and a trek of two lifts to get to the Martis Camp bowl.

Martis Camp has reportedly sold over 100 homes and homesites a year for the last four years and is widely considered the most successful mountain resort project in the US. Out of the 681 home-sites in the Martis Camp development, there are reportedly less than 40 home-sites remaining and these have an average listing price of approximately US$1.0 million.

Vail Valley

Historically, the Vail Village has boasted some of the highest price per square foot sales of the high-end western U.S. ski markets. Vail is a well-established resort and ski community, rich in culture and ski history. Each year from 1996 through 2009, total annual real estate transactions in Vail/Eagle County exceeded US$1.0 billion, peaking at nearly US$3.0 billion in 2007. Bachelor Gulch and Vail Village/Lionshead are the premium areas with expansive views and ski accessibility.

Bachelor Gulch is an exclusive, gated community in the Vail Valley. Properties tend to be larger, ski-in/ski-out with a very high level of finish. The area is designed to cater to the needs of both the homeowner and visitors. Single-family homes, condos and fractional ownership make up the bulk of the real estate in Bachelor Gulch. During 2014 there were seven single-family/duplex sales with a volume of over US$48.4 million, an average sale price of US$6.9 million and an average price per square foot of US$901. There were 24 condominium sales with a total volume of over US$58 million, and an average price per square foot of US$876.

Vail Village and Lionshead form the core of the town of Vail. They include numerous condominiums, shops, restaurants and a few single-family and duplex residences. Lionshead is approximately one mile west of Vail Village and has excellent access to the ski mountain via a gondola and high-speed quad lift. The high-end market saw thirteen single-family/duplex sales with a sales volume of over US$130 million and an average price per square foot of US$1,833. Condominium sales reflected a total volume of US$237 million over 86 sales, and an average price per square foot of US$1,371.

Aspen

Since the early 1950's, Aspen has been one of the most successful mountain real estate markets in the world and has some of the most expensive residential real estate in the United States. Aspen was a mining town that reached a peak population of 5,108 in 1890. However, after the financial panic of 1893 and

resulting collapse of the price of silver the population fell precipitously. The founder of modern Aspen, the Chicago industrialist and supporter of the arts Walter Paepcke, quietly purchased one-third of Aspen before convening like-minded individuals who had never heard of the location. Paepcke, who helped lead the mid-century Great Books movement, enticed people to come to Aspen by putting on a celebration of the bicentennial of the birth of philosopher Johanne Goethe and, more importantly, by securing Albert Schweitzer, the 1952 Nobel Prize Winner, to leave the Congo and give the key note address at the gathering.  The event was a success and the Aspen Institute was born out of it the very next year with Walter Gropious of the Bahaus movement (whom Paepcke had helped relocate from Germany to the Chicago Art Institute) serving as its first president. Originally, design, music, and the humanities were all under one roof at the Aspen Institute. The events grew so successful over the years, underpinning Aspen's cultural ascent, that they each spun off as their own entities. Paepcke's role in creating modern Aspen, retold in *The Romance of Commerce and Culture:  The Humanist Movement and the Making of Aspen*, is arguably unmatched in any other mountain environment to date.

Primarily built since the 1980s, the premier residential vistas in Aspen are found on Red Mountain, offering views of the Maroon Bells and the town below.  Red Mountain now features some of the most expensive real estate in the country.  The overall Aspen market has rebounded strongly from 2008 lows. 2014 single-family home sales where at an eight year high with volume of over US$650 million and inventory levels at their lowest levels since 2007. The average price per square foot for luxury single-family homes has risen steadily over the last three years to over US$1,266 per square foot.

Aspen condominium sales have also been on a similar upward track with sales volumes of over US$259 million, which is the highest since 2005. The price per square foot for downtown Aspen condominiums has risen to over US$2,000. Active condominium listings are at their lowest level since 2006, with the number of sales at the highest rate since 2007. In 2014, vacant land sales in Aspen increased in volume and dollars over 2013 numbers, while listings continue to drop and are at approximately 2005 levels.

## Comparative Summary of Powder Mountain Opportunity

Owner believes that Summit Powder Mountain Resort and the Project are uniquely positioned to benefit from a number of elements that have led to success at competitive properties profiled above.

- Powder Mountain and the adjacent Eden Valley, are significantly undeveloped and in Owner's view are similar to the pristine conditions that Walter Paepcke discovered in Aspen in 1949.

- Similar to Paepcke, Owner has shown that it can convene interesting people, including its Founding Investors, for curated gatherings. Owner believes gathering exceptional people for curated conversation, events and recreation at Summit Powder Mountain Resort has the potential to have significant ramifications on the underlying real estate values over time.

- Owner believes views at Powder Mountain are unique among similar communities in the U.S. and compare favorably to any other resort, including Red Mountain in Aspen, Red Cloud in Deer Valley, and any development within Yellowstone Club.

- Ski accessibility and expanded access to uncrowded terrain offers a value proposition for skiing that compares favorably to Yellowstone Club, which has substantially smaller lift-accessible terrain and adventure terrain, both of which are expensive to maintain given the fully private nature of the club.

- Summit Powder Mountain Resort's leadership in overall skiable terrain provides an advantage that other resorts with less terrain have marketed successfully.

- Summit Powder Mountain Resort's community facilities, such as the on-mountain SkyLodge, and the expanded access to thousands of acres represented by inbound snowcat, shuttle, and adventure skiing compares favorably with Martis Camp, where early access to one lift and a private ski lodge are the most popular features for buyers.

- Summit Powder Mountain Resort's easy accessibility to the San Francisco Bay Area, which represents a significant concentration of the Summit community, provides the development with an opportunity for buyer referral patterns similar to Martis Camp.

## IX. PROJECT FUNDING

The Company expects the Developer will fund the development, construction and initial operating costs of the Project from the sources described below. However, there can be no assurance that funds from these sources will be available in the amounts and at the times anticipated by the Company, if at all. In that event, the Developer will be required to seek alternative sources of funding, reduce Development Costs, postpone or cancel construction of some or all of the Project, or a combination of the foregoing.

### Summary of Projected Sources and Uses of Funds

The following is a summary of projected sources and uses of funds for the Project assuming the Company sells 300 Class B Units in the Offering for a total of US$150.0 million in subscription proceeds.

**Development Sources & Uses**

**Summit Village**

| Sources of Cash | Amt | Uses of Cash | Amt |
|---|---|---|---|
| Disbursements under the Company's Loan [1] | 150,000,000 | Property Acquisition [4] | 29,000,000 |
| Weber County Special Assessment Bonds [2] | 18,600,000 | Hard Costs | 153,968,073 |
| Developer Equity [3] | 92,524,063 | Soft Costs | 50,287,243 |
| | | Financing Costs | 27,868,747 |
| **Sub-Total** | **261,124,063** | **Sub-Total** | **261,124,063** |

**Infrastructure Component & Residential Component**

| Sources of Cash | Amt | Uses of Cash | Amt |
|---|---|---|---|
| Weber County Special Assessment Bonds [2] | 17,600,000 | Public Infrastructure | 17,600,000 |
| Developer Equity | 9,952,000 | Private Infrastructure & Construction | 9,952,000 |
| Building Partner Capital & Construction Loans | 120,000,000 | Construction of Additional Homesites | 120,000,000 |
| **Sub-Total** | **147,552,000** | **Sub-Total** | **147,552,000** |
| **Grand Total** | **408,676,063** | | **408,676,063** |

Notes:

1. The Company anticipates that it will use the proceeds of the Offering to make the Loan to the Developer. The actual amount of the Company's Loan depends on the number of Class B Units sold in the Offering. Loan proceeds may be used to repay bridge financing previously advanced to fund Development Costs solely in contemplation of the receipt of Loan proceeds.

2. Owner is working with Weber County authorities to facilitate additional borrowing of US$18.6 million in the form of a second series of special assessment bonds. Although Owner believes Weber County will approve a second bond issue during 2015, there is no assurance that it will do so or, if it does, that the subsequent bond issue will be successful.

3. Developer Equity comprises the following: (i) in-kind contribution of the Property at an independently appraised value of US$29.0 million; (ii) an estimated cash contribution by the Owner of approximately US$16.7 million in TIF financing proceeds; (iii) an estimated cash contribution by the Owner of approximately US$4.5 million and (iv) allocation of an estimated

US$42.3 million constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units.

4.  The Property is currently owned by affiliates of the Developer and is encumbered by a first lien deed of trust securing a loan used by the Owner to pay a portion of the acquisition price of Powder Mountain, which loan is to be refinanced without a lien on the Property as a condition to advances under the Loan Agreement. The "as is" market value of the Property has been established by HVS representing the net present value of forecast operating cash flow during the 12-month period ending September 30, 2022, when Summit Village is anticipated to be complete and stabilized.

**Infrastructure Component Funding**

The Infrastructure Component costs totaling  approximately $27.6M is funded by approximately $17.6 million in Weber County Special Assessment Bonds and approximately $9.9 million of Owner equity.

**Residential Component Funding**

The Owner intends to fund the $120 million Residential Component through a combination of single family construction loans, building partner capital, and Owner developed product. As of the date of this Memorandum, Founding Investors have reserved approximately 88 homesites in Phase I, of which 40 are currently in the construction planning or design stage.  In Phase IIA, 7 homesites have been reserved by Founding Investors. Construction loans are generally available for home construction on Phase I homesites, although there is no assurance that such financing will be available in the future.   The Owner is in negotiations with several building partners to create built product, including townhomes and multi-family, and is in discussions with financial partners to build such product as Owner developed.  However, presently the Owner has no such financing commitments for either building partner product or Owner developed product and there is no assurance that such financing will be available.

**Summit Village Funding**

<u>Developer Equity</u>

To fund a portion of the Summit Village Cost, the Owner intends to contribute or allocate cash and property to the Developer in an aggregate amount of approximately US$92.5 million (the "**Developer Equity**"). The Developer Equity of approximately US$92.5 million is anticipated to comprise the following: (i) in-kind contribution of the Property at an independently appraised value of US$29.0 million; (ii) estimated cash contributions by the Owner of (a) approximately US$4.5 million and (b) approximately US$16.7 million in tax increment financing ("**TIF**") proceeds; and (iii) allocation of an estimated US$42.3 million constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units. The Developer's rights in the Developer Equity will rank junior to the Loan in all respects including with respect to repayment from cash flow from Summit Village available to the Developer; provided, however, the TIF proceeds or other proceeds available from any governmental authority may have priority in repayment over the Loan upon terms acceptable to the Lender.  The Developer Equity will be available at different times during the Project, provided that the Developer may be required to contribute a portion of its US$4.5 million cash equity contributions prior to disbursements of the Loan being available to the Developer.  In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of any portion of Developer Equity, the Owner will contribute or cause to contribute the equivalent amount in cash contribution to make up for such shortfall.

Property Contribution – US$29.0 million

A portion of the Property is currently owned by an affiliate of the Developer. The Owner intends to complete the contribution of the Property to the Developer prior to the initial disbursement of the Loan. The US$29.0 million "as is" market value of the Property has been established by an independent appraisal representing the net present value of forecast operating cash flow during the 12-month period ending September 30, 2022, when Summit Village is anticipated to be complete and stabilized. See "The Property" section of this Memorandum.

Cash Contributions – approximately US$21.2 million

The Owner expects to make cash capital contributions to the Developer in the aggregate amount of approximately US$4.5 million on or before the second quarter of 2018.

In addition, the Owner is currently working with Weber County authorities to finalize tax increment financing to fund a portion of Developer Equity.

Tax increment financing uses future gains in tax revenues to finance development projects that result in those future gains. When a public project such as a road or school is carried out, the surrounding property may increase in value, generating increased tax revenues known as the "tax increment." TIF dedicates tax increments within a certain defined governmental district to finance a portion of the cost of the improvement project.

In June 2013, the Weber County Redevelopment Agency of (the "**Agency**") adopted a resolution authorizing the Agency to take steps to establish (i) a Summit-Eden Powder Mountain Community Development Project Area (the "**TIF Development Area**") and (ii) a draft community development project area plan to provide for the expansion and development of Powder Mountain. In October 2013, the Agency and Weber County established the TIF Development Area and authorized TIF to fund qualified project expenditures such as infrastructure, ski lifts, conferencing space, parking structures and retreat facilities, all in connection with the development of Summit Powder Mountain Resort as provided in the project area plan (the "**TIF Project Area Plan**"). The Property is located within the TIF Development Area.

In July 2014, the Agency adopted resolutions authorizing it to enter into agreements with Weber County and Weber School District under which these two governmental bodies agree that a portion of TIF generated within the TIF Development Area and otherwise payable to them over the next 20 years will instead be made available to fund the development of Summit Powder Mountain Resort.

The Owner and the Agency are currently negotiating a development agreement to provide for development activities in accordance with the TIF Project Area Plan. Based on the projected TIF available in year five of the Loan, the Owner anticipates that it will be able to borrow approximately US$16.7 million utilizing projected TIF funds as collateral, which it then intends to contribute to the Developer to fund Development Costs.

Although Owner believes there will be sufficient TIF revenues to enable it to borrow approximately US$16.7 million on commercially reasonable terms, there is no assurance that TIF will be available at any time or in any particular amount. Similarly, there is no assurance, if TIF becomes available, that the Owner will be able to borrow against its proceeds on commercially reasonable terms or at all.

Allocation of Sales Deposits – approximately US$42.3 million

The Owner expects to begin marketing Summit Village townhome, condominium and hotel condominium units for sale in January 2016. It is anticipated that each purchaser of a unit will enter into a binding purchase and sale contract that will, among other things, require the purchaser to deliver to the Developer a nonrefundable deposit equal to 20% of the purchase price of the unit. The Owner estimates that approximately US$42.3 million of nonrefundable unit sales proceeds (the "**Sales Deposits**") will be

available to fund Development Costs prior to the initial maturity date of the Loan. Prior to the completion of the Summit Village, all Sales Deposits will be reinvested into the development and construction of the Summit Village.

**Bridge Financing**

To the extent the Company is unable to fund the initial disbursement of the Loan to the Developer on or before April 1, 2016, the Developer reserves the right to acquire Bridge Financing, subject to terms reasonably acceptable to the Company, from one or more third parties as bridge financing to pay a portion of Development Costs. In such event, initial disbursement(s) of the Loan to the Developer would be used to pay back the Bridge Financing as allowed for under the EB-5 Program. Loan proceeds would not be used to pay interest or return on equity, as applicable, in respect of any Bridge Financing. The Company's immigration counsel has advised the Company that USCIS guidelines permit Loan proceeds to replace prior bridge financing disbursements, provided that the Loan proceeds were contemplated to be used in Summit Village and the Loan proceeds are replacing bridge financing disbursements as soon as practicable. The identity of the provider of any bridge financing is unknown, as are the terms, if any, under which the bridge financing may be extended to the Developer but in any case will be subject to the reasonable approval of the Company.

**The Company's Loan**

The Company anticipates that it will use the proceeds of the Offering to make the Loan to the Developer in the amount of up to US$150.0 million, representing the gross proceeds from the sale of 300 Class B Units.

## X.  LOAN TERMS AND CONDITIONS

**The Company anticipates that the Loan Agreement will be entered into with the Developer prior to the initial disbursement of Loan proceeds. The following is an outline of the major terms and conditions of the Loan, which will be subject to detailed terms, covenants, representations and warranties as will be set forth in the Loan Agreement.**

| | | |
|---|---|---|
| 1. | **BORROWER**: | The Developer |
| 2. | **LENDER**: | The Company |
| 3. | **LOAN**: | The Loan is for a maximum aggregate principal amount of up to the Maximum Offering Amount, subject to the LTV Ratio not exceeding 60%, and Job Cushion of not less than 25%. |
| 4. | **TERM AND MATURITY DATE**: | The Loan shall mature on the fifth (5th) anniversary of the date of the first disbursement of the Loan proceeds to the Borrower, being the Initial Maturity Date, subject to a one (1) year extension at the option of the Borrower provided that there is no default under the Loan.  The Loan principal must be repaid on the Initial Maturity Date, unless extended. |
| 5. | **PREPAYMENT**: | The Borrower (i) may at any time, without penalty or premium, prepay any portion of the Loan, as long as the cumulative prepayment amount is less than or equal to the aggregate Subscription Price of those Class B Members each of whom has |

45

received notice from USCIS regarding the final adjudication of his/her I-829 Petition; and (ii) will be required to prepay any portion of the Loan principal attributable to each Class B Member who has received a final denial by USCIS of his/her I-526 Petition. Subject to the applicable terms set forth in the Loan Documents, the Developer may also defease the Loan if doing so does not result in material adverse consequences under applicable securities laws or material immigration consequences to any Class B Member and the Loan has been fully advanced. Defeasing the Loan means that the Developer would substitute all or part of the Collateral for collateral consisting of liquid securities, such as U.S. government bonds, of an amount and type that will generate cash flow sufficient to pay all remaining principal and interest due on the Loan through maturity. With the Loan now fully secured by liquid securities, the Company would release the encumbrances on part or all of the Property and any substitute collateral granted previously in accordance with the Loan Agreement, and the Loan obligation would remain intact through maturity.

The Borrower may not otherwise prepay the Loan principal prior to the Initial Maturity Date.

**6. USE OF PROCEEDS:** The Loan will be used by the Borrower to fund certain approved costs incurred in connection with the Summit Village portion of the Project, as permitted under the Loan Agreement and the EB-5 Program. All uses of the Loan proceeds are to be set forth in a budget to be reviewed and approved by the Lender.

**7. INTEREST RATE; INTEREST:** The Loan will bear interest on the outstanding amount of the Loan at the rate of a quarter percent (0.25%) per annum up to the Initial Maturity Date, and thereafter at the rate of three and three-quarter percent (3.75%) per annum until the final repayment of the Loan. Any late payments under the Loan will be subject to an interest charge of 5.50% per annum which will accrue until such delinquent payment is made.

**8. COLLATERAL:** The Loan (i) will be secured by (A) a senior lien deed of trust and collateral assignment of rights, attachments, fixtures and equipment of and on the Property (including the general contractor agreement and other construction contracts) and (B) a collateral assignment of any sale contracts and assignment of rent and management contract pertaining to the Project (including the hotel management contract) and (ii) may be secured by one or more additional land parcel(s) located adjacent to the Property, as the same may be reasonably identified and acceptable to the Lender and the Developer.

Subject to certain additional terms to be set forth in the Loan Documents and, as applicable, compliance with securities and other applicable laws and provided that at all times the LTV Ratio, as determined by a certified third party appraiser reasonably acceptable to the Lender, does not exceed 60%:

- the Borrower may substitute Collateral, in whole or in part, with collateral in a form and substance acceptable to the Lender in its sole discretion;
- upon a request from the Borrower, the Lender may agree to release certain lien portions of the Collateral from the lien  held by the Lender provided the remaining Collateral is sufficient to satisfy the conditions and covenants set forth in the Loan Documents; and
- upon the sale of individual homes or condominium units, the Lender will release its security interest in any such portion of the Collateral so purchased by any party.

<table>
<tr><td>9.</td><td><strong>DEPOSIT AND NET SALES PROCEEDS:</strong></td><td>Prior to the completion of Summit Village, to satisfy the equity requirement set forth herein, Sales Deposits and/or net sales proceeds will be reinvested by the Borrower into the development and construction of Summit Village.  From and after completion of Summit Village, Sales Deposits and net sales proceeds may be used to pay interest due and payable on the Loan and prepay or repay principal on the Loan as permitted under the Loan Documents.</td></tr>
</table>

| 9. | **DEPOSIT AND NET SALES PROCEEDS:** | Prior to the completion of Summit Village, to satisfy the equity requirement set forth herein, Sales Deposits and/or net sales proceeds will be reinvested by the Borrower into the development and construction of Summit Village.  From and after completion of Summit Village, Sales Deposits and net sales proceeds may be used to pay interest due and payable on the Loan and prepay or repay principal on the Loan as permitted under the Loan Documents. |
| 10. | **ADDITIONAL DEBT:** | Subject to the terms of the Loan Agreement and an inter-creditor agreement reasonably acceptable to the Lender, the Borrower shall have the right to obtain debt financing or obtain equity contributions which may be senior to the Loan with respect to repayment and/or collateral held by such lender or equity participants to the extent that the Loan amount is below US$150,000,000. The terms of the intercreditor agreement are presently unknown.  Such terms will likely materially restrict the ability of the Company to exercise its remedies in the event of a default under the loan and the uncertainty of the terms of this agreement create special risks for investors.  See "Risk Factors" below. |
| 11. | **RECOURSE:** | The Lender will have certain recourse to the Guarantor being such creditworthy entity or entities acceptable to the Lender under the Bad Boy Guaranty and the Early Release Guaranty. |
| 12. | **EQUITY:** | The Developer may be required to contribute a portion of its US$4.5 million cash equity contributions prior to disbursements of the Loan being available to the Developer. |
| | | In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of any portion of Developer Equity, the Owner will contribute or cause to contribute the equivalent amount in cash contribution to make up for such shortfall. |
| 13. | **REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS:** | The Loan Documents will include customary terms for transactions of this type and nature including without limitation customary representations, warranties, covenants, defaults (including notice |

47

and cure rights available to the Developer) and negative undertakings.

| 14. | **FEES REIMBURSEMENT:** | The Borrower and the Lender will enter into an agreement pursuant to which the Borrower will reimburse the Lender for certain fees paid by the Lender to the Class B Manager, third party immigration agents, finders, brokers, and/or consultants all on terms and conditions reasonably satisfactory to the Borrower and the Lender provided that no portion of these fees will be paid from the proceeds of the Offering and/or the Loan. |

## XI.  THE COMPANY

### Management of the Company

The Company will have two (2) managers, being the Class A Manager and the Class B Manager.  KT Summit Manager is the Class A Manager and Celona will be the Class B Manager.

In general, the Company will be managed exclusively by the Class B Manager, subject to voting or approval rights of the Class A Member and the Class B Members for certain matters.  The Class B Manager will have power and authority over management of the Company to the exclusion of the Class A Manager and will be responsible for general management and operation of the Company, except as to any matters expressly reserved exclusively to the Class A Manager pursuant to the Operating Agreement.  The Members will have no power to participate in the management of the Company except as expressly authorized by the Operating Agreement or the Delaware Limited Liability Company Act.  Without in any way limiting the powers of the Class B Manager, the Class B Members may engage in general policy formulation with respect to the management of the Company by means of participation in an advisory committee of the Company; provided, however, that under no circumstances shall the Class B Manager be bound by or otherwise be required to comply with any policies established thereby. The Class B Manager may appoint one or more officers of the Company at the Class B Manager's discretion.  The officers of the Company, if appointed by the Class B Manager, will have the duties and powers determined by the Class B Manager and shall be subject to the supervisory powers and directions of the Class B Manager.

The Managers and officers are not obligated to devote full time to the affairs of the Company, but will devote such time and skill as they deem appropriate for the reasonably proper, adequate and responsible operation of the Company.

The Class A Manager is generally not permitted to resign or otherwise terminate the Class A Management Agreement.  The Class B Manager may resign in such manner as permitted under the Class B Management Agreement.  The resignation of the Class B Manager shall take effect upon (i) the expiration of the notice period applicable to that notice or upon such later date as shall be specified in the notice, and, unless otherwise specified in the Class B Management Agreement, the acceptance of the resignation shall not be necessary to make it effective, and (ii) the approval by the Members of the appointment of a successor Class B Manager in accordance with the procedures set forth in the Operating Agreement and the execution by such successor Class B Manager of a Class B Management Agreement on terms approved by the Members in accordance with the Operating Agreement.

The Class A Manager may be removed at any time with or without cause by the Class B Manager in such manner as provided under the Class A Management Agreement.  On the other hand, the Class B Manager may be removed and a successor Class B Manager appointed upon the approval of the Class B Members holding more than sixty-seven percent (67%) of all of the voting percentage interest held by the Class B

Members. The Class B Management Agreement, provides that the Class B Manager may not be removed without cause before the first anniversary of the date of first disbursement of the Loan that occurs subsequent to an I-526 Petition approval and thereafter the Class B Manager may be terminated at any time without cause upon not less than six (6) months' prior written notice. The removal of either Manager is subject to any rights under any employment or services agreement.

### Marketing and Administration of the Offering

The Company anticipates that all potential investors will (1) not be a "U.S. Person" (within the meaning of Regulations S) and who are located outside of the United States at the time the Subscription Agreement for the subscription of any Class B Units is executed or (2) be an Accredited Investor. The Company has entered and will enter into contractual relationships with one or more firms located and conducting business entirely outside the United States to act as the Marketing Representatives to provide advice and assistance in connection with efforts to identify non-U.S. Persons interested to acquire Class B Units in the Offering. In general, the Company will pay a fee to each Marketing Representative for each non-U.S. Person identified by that Marketing Representative who ultimately purchases a Class B Unit in the Offering, provided that the Marketing Representative fulfills certain conditions. It is anticipated that the aggregate Administration Fee paid by subscribers, together with a portion of interest payments under the Loan, will be utilized to pay these fees. The Company has been advised that the fees payable to Marketing Representatives will be within the range of fees paid to marketing representatives for similar services by third parties in connection with other capital investment opportunities under the EB-5 Program. However, there is no reliable public information regarding these fees; therefore, the Company can provide no assurances in this regard.

Each Marketing Representative retained by or on behalf of the Company will be required to represent and warrant that it will carry out its activities in compliance with the requirements of Regulation S and/or Section 4(a)(2) of the Securities Act or Regulation D, and in compliance with the requirements of all applicable non-U.S. laws and regulations. No offering of Class B Units shall include any "directed selling efforts" in the United States and the Class B Units shall be purchased in an "offshore transaction" (all within the meaning of Regulation S), unless the Subscriber is an Accredited Investor, and no offer shall be made by any advertisement, article or other communication published in a newspaper, magazine, internet or similar media or broadcast over television or radio or at a seminar or meeting attended by persons who have been invited by a general solicitation or general advertising.

Marketing Representatives are free to provide similar advice and assistance to third parties in connection with other capital investment opportunities under the EB-5 Program, including advice and assistance to potential subscribers and to promoters of investment opportunities that compete with the Offering for potential subscribers. A potential subscriber who retains the services of a Marketing Representative should conduct his or her own investigation to determine whether or not a conflict of interest may exist.

### Subscription Procedures

ANY INVESTOR WHO WISHES TO SUBSCRIBE FOR THE CLASS B UNIT(S) MUST DELIVER BY CERTIFIED U.S. MAIL OR OTHER NATIONALLY RECOGNIZED TRACKING DELIVERY SERVICES (E.G., FEDEX, UPS) THE FOLLOWING ITEMS TO:

Summit Village Development Lender 1, LLC

c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Centre
89 Queensway
Admiralty, Hong Kong

(i)      a signed Subscription Agreement (original, photocopy or electronic copy);

(ii)     a signed joinder agreement and spousal consent (if applicable) accompanying the Operating Agreement (original, photocopy or electronic copy);

(iii)    four (4) signed originals of the Escrow Agreement;

(iv)    Form W-8BEN or W-9 in the form attached as Exhibit E;

(v)     a copy of the passport photograph page;

(vi)    a copy of an address proof issued within the past three (3) months;

(vii)   a signed and completed Confidential Prospective Investor Questionnaire; and

(viii)  a certified or cashier's check and/or wire transfer payable to the Escrow Agent in the total amount of the sum of the Subscription Amount, Administration Fee and Escrow Fee for the Class B Unit(s) subscribed for as required under the Subscription Agreement.

**Acceptance and Revocation of Subscription**

The Company will review the Subscription Documents for completeness, due execution, and investor suitability.  The Company has the sole and absolute right to reject or terminate, prior to the Offering Termination Date, any subscription that is tendered but has not closed or to waive any requirements in any of the Subscription Documents.  If the Company rejects a subscription, the Subscription Documents, the Subscription Amount and the Administration Fee (both actually paid to the Company) will be returned without interest.  Once the Company has accepted a subscription, the Subscriber may not cancel, terminate or revoke the subscription unless prior to the filing of his or her I-526 Petition with USCIS, such Subscriber decides not to proceed with his or her immigration procedures under the EB-5 Program, whereupon the Subscription Amount (actually paid to the Company) and such portion of the Administration Fee as determined by the Company will be returned without interest.  Subscribers may not withdraw subscriptions that are accepted by the Company except as provided herein.

**Escrow Procedures**

Commencing on the date of this Memorandum, all funds received by the Escrow Agent in connection with the Offering, consisting of payments of the Subscription Price, Administration Fee and Escrow Fee will be deposited into an escrow account.  The Company will establish such escrow account with the Escrow Agent, the terms and conditions of which are more fully described in the Escrow Agreement and the Subscription Agreement. Upon the satisfaction of the conditions described in the Escrow Agreement, the Subscription Price and the Administration Fee shall be paid to the Company in such manner as provided in the Escrow Agreement. The Company shall have the right to deliver the Sch 3 Instruction, as provided under the form of the Escrow Agreement appearing as Exhibit D to the Memorandum (or any equivalent instruction under an alternative form of Escrow Agreement, the "**Release Instruction**"), instructing the Escrow Agent to release and disburse the Investment Amount and the Administration Fee as provided for in the Release Instruction upon:

1. the approval of the undersigned's I-526 Petition with the USCIS;

2. the filing of the undersigned's I-526 Petition with the USCIS, provided that (i) not less than three (3) I-526 Petitions of Subscribers have been approved by the USCIS (regardless of whether the undersigned's I-526 Petition has been approved) or (ii) an I-924 application submitted by the Regional Center in connection with the Project has been approved by the USCIS (in the case of (1) or (2), the "**Automatic Escrow Release Conditions**"); or

3. the undersigned otherwise waiving the Automatic Escrow Release Conditions and allowing for the release and disbursement of the Investment Amount and the Administration Fee prior to receiving an approval of the undersigned's I-526 Petition by the USCIS (collectively with the Automatic Escrow Release Conditions, the "**Escrow Release Conditions**").

The Subscriber will deliver to the Company the executed Release Instruction together with other Subscription Documents such that the Company shall countersign and deliver to the Escrow Agent the Release Instruction upon the satisfaction of the Escrow Release Conditions.

**Qualifying Investment**

The Company believes utilizing subscription proceeds from the sale of Class B Units to make disbursements under the Loan to fund a portion of the development, construction, ownership and operating costs of the Project will be a Qualifying Investment under the EB-5 Program for the following reasons:

(1) The Loan disbursements will be made to the Developer to fund the Development Costs associated with the Summit Village portion of the Project, on the status of the Project as a capital investment opportunity within a Targeted Employment Area sponsored by the Regional Center, thus potentially meeting the minimum job creation requirements of the EB-5 Program and entitling immigrant investors to make use of the US$500,000 Subscription Amount threshold;

(2) The Loan disbursements will be funded from the proceeds of the sale of Class B Units, by which each immigrant investor will meet the US$500,000 Subscription Amount threshold; and

(3) The maximum total Loan amount resulting from the sale of Class B Units will depend on the number of Class B Units sold and the number of jobs anticipated to be created from the Project.

The term "Qualifying Investment" refers solely to the type of at-risk investments that will be made by investors through the Company. A potential investor's capital contribution must be derived wholly from his or her personal assets and be entirely at risk.

## XII.  SUMMARY OF OPERATING AGREEMENT

In connection with the subscription of the Class B Units, Subscribers are required to sign and deliver to the Company a joinder agreement and spousal consent (if applicable) to the Operating Agreement in the form attached hereto as <u>Exhibit B</u>. Upon the satisfaction of the subscription closing conditions specified in the Subscription Agreement, a Subscriber will become a Class B Member. The Operating Agreement and applicable law will govern the rights and obligations of the Class A Member and Class B Members, as well as the rights and obligations of the Managers and officers of the Company. The following

summary of certain provisions of the Operating Agreement is intended only to be an executive summary and is not complete. The Operating Agreement describes in detail numerous aspects of the Offering and the rights and obligations of the Members, which are material to the Members and include those summarized below, and the Operating Agreement should be read in its entirety by prospective Subscribers. Should there be any discrepancy between the Operating Agreement and anything provided in this Memorandum, the Operating Agreement shall prevail.

**Purpose**

The Company is a newly created enterprise, which has been formed to engage in any lawful activity. The Company intends to make the Loan to the Developer and engage in such other activities related to or incidental to the Loan, or as may be necessary, advisable or appropriate, in the good faith and reasonable opinion of the Class B Manager to further such purpose, subject to certain limitations set forth in the Operating Agreement

**Term**

The term of the Company shall continue until dissolved in accordance with the provisions of the Operating Agreement, or until December 31, 2025 or such later date as may be determined by the Class B Manager. Upon the Company's dissolution, the Company's assets (including the proceeds from the Developer's repayment of the Loan and interest thereon) will be distributed to the Members.

**Capital Contributions**

The Company expects to receive up to the Maximum Offering Amount in capital contributions through the sale of the Class B Units pursuant to the Offering. Upon the release of the aggregate Subscription Amount and the Administration Fees attributable to a Subscriber from the designated escrow account to the Company pursuant to the terms and conditions of the Escrow Agreement, such Subscriber will have contributed to the capital of the Company and become a Class B Member and will have a capital account balance equal to the amount that such Class B Member paid to the Company to purchase the Class B Unit(s) (excluding the Administration Fee and other fees and expenses). No Member will be entitled to any interest on any capital contribution.

No Class B Member shall be required to make any capital contribution in addition to the Subscription Amount. The Members may be permitted (but shall not be required) from time to time to make additional capital contributions if the minimum investment amount as required under the EB-5 Program has been increased before the approval of the Class B Member's Form I-526 Petition, provided that any Member making such additional Capital Contributions shall also pay to the Company an additional amount of the Administration Fee as described in this Memorandum as if such Member was making the subscription at the increased Subscription Amount and all monies received from such Member shall first be applied by the Company towards payment of such additional amount of the Administration Fee. Members may also be permitted (but shall not be required) from time to time to make additional capital contributions if the Class B Manager determines that such additional capital contributions are necessary or appropriate for the conduct of the Company's business and affairs. The Class B Manager shall determine all the terms and conditions of any such additional capital contributions, as set forth in the Operating Agreement

**Expenses of the Company**

The Company may in its discretion require the Developer to provide an operating capital loan to the Company from independent funds in an aggregate amount of up to US$130,000 per year during the term of the Loan, on commercially reasonable terms, for the purpose of paying general and administrative expenses incurred and to be incurred by the Company. NO PORTION OF SUCH OPERATING

CAPITAL LOAN PROCEEDS PROVIDED BY THE DEVELOPER SHALL BE MADE USING ANY AMOUNTS RECEIVED BY THE DEVELOPER UNDER THE LOAN.

**Tax Classifications**

The Company is intended to be classified as a partnership for U.S. federal income tax purposes. See "Legal, Tax and Regulatory Risks" section of this Memorandum.

**Distributions and Allocations**

So long as there are Class B Units in issue, and other than distributions related to liquidation of the Class B Units, no distributions to any Member shall be made. Following the liquidation of all the Class B Units, and subject to applicable law and any limitations contained in the Operating Agreement, the Class B Manager shall from time to time make distributions of available cash to the Members in proportion to their respective capital contributions.

In general, subject to certain special allocation rules set forth in the Operating Agreement, net profits are allocated to the Members in the following priority: (i) to offset any cumulative net losses of the Class B Members; and thereafter (ii) amongst the Class B Members in accordance with their respective capital contributions. Net losses are generally allocated to all the Class B Members based on their respective capital contributions.

The Operating Agreement contains certain allocation provisions (required by the regulations, including temporary regulations, promulgated by the U.S. Department of Treasury under the Code (the "Treasury Regulations")), pursuant to which (i) net losses will not be allocated to a Member if such allocation will create an adjusted capital account deficit for that Member, and special allocation rules apply in such an event, and (ii) non-recourse deductions, minimum gain chargebacks, etc. will be subject to special allocations rules.

**Management, Managers and Officers**

See "Management of the Company" section of this Memorandum.

In general, no Member is entitled to remuneration for acting in his or her capacity as a Member.

Each Manager is entitled to remuneration for services provided to the Company and other benefits in accordance with the terms of the applicable Management Agreement. As remuneration for the provision of services pursuant to the Class B Management Agreement and the Operating Agreement, the Class B Manager shall receive certain fees as described in the Class B Management Agreement (such fees averaged over the term of the appointment to be approximately 1% per annum of the maximum amount of the Loan). Any remuneration paid by the Company to the Managers pursuant to the Management Agreements shall be reimbursed to the Company by the Developer pursuant to terms to be mutually agreed upon, provided that none of such reimbursements shall be paid out of the capital contributions of any of the Class B Members. In addition, the officers of the Company shall be entitled to remuneration and other benefits for their services to the Company, all as determined by the Class B Manager.

There is no agreement with the Company or any third party whereby any Member or Manager has obtained the rights to purchase any unit of membership interest in the Company at a future date.

**Voting and Approval Rights of Members**

The Operating Agreement provides that the Members will have the right to vote in order to approve or disapprove: (i) the dissolution and winding up of the Company, (ii) the merger, consolidation, or other business combination of the Company with any entity or other entities, (iii) the sale, exchange, lease, mortgage, pledge or other transfer of all or substantial part of the assets of the Company other than as

53

contemplated in the Loan Agreement or in the ordinary course of its business, (iv) the incurrence of any obligation or indebtedness exceeding ten percent (10%) of the value of the Company's assets, (v) a change in the fundamental nature of the business of the Company or a change in the fundamental purpose of the Company, from making a Loan secured by the Project, (vi) investing more than ten percent (10%) of the Company's total assets in any entity or project other than the promissory note evidencing the Loan, the Developer and the Project, (vii) amending the terms of the Class B Management Agreement for or on behalf of the Company, (viii) subject to the appointment of the initial Class B Manager, appointment, reappointment and removal of the Class B Manager and any material amendment of the Class B Management Agreement, (ix) a change in the Certificate of Formation whereby the management of the Company is vested in the Members, and (x) to the extent not made as a result of an increase in the minimum investment amount as required under the EB-5 Program or by all of the existing Members on a pro rata basis, any additional Capital Contributions to be made by the Members and corresponding changes in the Membership Interests.  Each Member is entitled to one (1) vote for each percent of voting percentage interest held, which voting percentage interest is calculated by dividing the amount of such Member's capital contribution by the aggregate amount of Capital Contributions of all Members.  Where vote, consent or approval of the Members is required or permitted, vote, consent or approval of more than sixty-seven percent (67%) of all of the voting percentage interest held by the Members shall be required.

The Operating Agreement further provides that to the extent that the relevant matter is one expressly requiring the Class A Manager's approval pursuant to the Operating Agreement (if any), vote, consent, or approval of more than fifty percent (50%) of all of the voting percentage interest held by the Class A Members may be in lieu of such Class A Manager's approval.

**Liabilities of Members and Managers**

Except as required under applicable law or as expressly set forth in the Operating Agreement, no Member shall be personally liable for any debt, obligation or liability of the Company. A Member may have personal liability, among other things, for breach of the Operating Agreement by such Member or to the extent that such Member has received unauthorized distribution from the Company in certain cases.  The limitation on a Member's personal liability will not apply to a Member's acts or omissions in another capacity, if any, such as a Manager or an officer of the Company.  A Member's capital contribution is subject to risks of the Company's business.

Pursuant to the Operating Agreement and to the maximum extent permitted by law, the Members, the Class A Manager, the Class B Manager and the Company's officers (including their respective directors, partners, owners, managers, officers, employees or agents) generally will not have any liability to the Company or to any Member except to the extent the liability is attributable to the person's gross negligence or intentional misconduct.  Accordingly, the Class A Manager and its officers, and the Class B Manager and its officers generally will not be liable for errors in judgment or any other acts or omissions (e.g., simple negligence) not amounting to gross negligence or intentional misconduct, and the Company and the Members, therefore, have a much more limited right to claim or bring an action against them than they may have had absent such limitations of liability.

Pursuant to the Operating Agreement (and subject to certain limitations contained therein), the Company is obligated to indemnify, hold harmless and defend each Manager (including its affiliates and associated persons) and each officer, employee or agent of the Company from and against any loss or liability related to any act or omission by such person in connection with the business of the Company or service to, for or at the request of the Company undertaken in good faith on behalf of or for the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company, subject to certain limitations, including that indemnification is not available for matters involving the gross negligence or intentional misconduct of the person seeking indemnification. Pursuant to the Management Agreements,

54

the Company's indemnification of the Managers (and their affiliates and associated persons) specifically extends to losses and liability arising in connection with any actual or potential conflict of interest of the Manager, including acting in a similar capacity for other entities. To the maximum extent permitted by law, the fiduciary duties of the Managers owed to the Company or the Members that may otherwise have been applicable have been severely modified and curtailed. All such fiduciary duties are eliminated except to the extent that the applicable Manager is shown to have acted with or through gross negligence or intentional misconduct.

**Transfer and Assignment of Membership Interest by Class B Members**

The Operating Agreement contains substantial restrictions on the right of a Member to transfer, encumber or otherwise dispose of any part of such Member's Membership Interest. In general, a Class B Member may not sell, transfer, encumber, or otherwise dispose of his or her Class B Units until the conditions to permanent resident status have been removed by the USCIS pursuant to the EB-5 Program, subject to the exceptions described in this paragraph and below in "Liquidation of Class B Units". Additionally, no Member may transfer, encumber or otherwise dispose of any part of such Member's Membership Interest except with the approval by the Class B Manager, which approval may be withheld, conditioned or delayed, as the Class B Manager may determine in its reasonable opinion. With respect to any transfer by a Class B Member of a Membership Interest in the event of death of the Class B Member to certain family members of such Member, any trust for the benefit of that Member or certain family members of that Member, or any affiliate of that Member, the consent of the Class B Manager is not required.

In addition to the foregoing restrictions and the other restrictions set forth in the Operating Agreement, a Member cannot transfer, encumber or otherwise dispose of any part of his, her or its Membership Interest which will result in the violation by that Member or by the Company of U.S. federal, state or foreign securities laws and all other applicable laws. The Company will not register or otherwise permit any resale or transfer of any Membership Interest that is not made in accordance with an exemption from registration requirements, under the Securities Act and the securities laws of any applicable U.S. state and other country. Further, a Member cannot transfer, encumber or otherwise dispose of any part of his, her or its Membership Interest which may cause the Company to lose any exclusion under the 1940 Act on which it relies, or otherwise create material additional compliance obligations and burdens on the Company or the Managers. The Company may also refuse to register any transfer not made in accordance with Regulation S under the Securities Act and/or Section 4(a)(2) of the Securities Act or Regulation D, pursuant to registration under the Securities Act or pursuant to an exemption from such registration.

**Liquidation of Class B Units**

In the event that a Class B Member requests liquidation of the Member's Class B Unit(s), the Company may, in the sole and absolute discretion of the Class B Manager (but shall not be under any obligation), (a) agree to liquidate such Class B Unit(s) if the Class B Member (i) has made a request to USCIS for the withdrawal of the Class B Member's I-526 Petition and USCIS has issued a letter of acknowledgement of withdrawal agreeing to terminate all action in respect of such Class B Member's I-526 Petition, a copy of which has been provided to the Company; (ii) is required to invest more than the minimum investment amount prescribed under the EB-5 Program due to the Project no longer being able to qualify to be located in a targeted employment area under the EB-5 Program and such requirement remains for a period of sixty (60) days and such Class B Member does not file a I-526 Petition during the sixty (60)-day period and also delivers written notice of a request for liquidation to the Company within five (5) days of the end of the sixty (60)-day period; (iii) has received a USCIS decision denying his or her I-526 Petition due to (A) the petitioner's fraud or misrepresentation, or (B) any other reason, and the USCIS does not reverse its denial within forty-five (45) days of the date indicated on the USCIS I-290B Notice, which such Class B Member shall have filed in response within thirty (30) days of the petition denial, provided that the

Class B Member shall also provide evidence to the Company that he or she has withdrawn his or her I-290B Notice prior to the liquidation request; or (iv) is denied approval of his or her Adjustment of Status or consular application for an EB-5 Visa or fails to obtain conditional lawful permanent resident status under the EB-5 Program prior to the expiration of such Class B Member's EB-5 Visa, or (b) agree to liquidate such Class B Unit(s) if the Class B Member delivers to the Company a written request for the liquidation of such Class B Unit(s) within three (3) months from the latest of (i) the Company having received the full and final repayment of the Loan, (ii) such Class B Member's receipt of unconditional permanent resident status in the United States under the EB-5 Program, and (iii) the fifth (5th) anniversary of the date on which a Class B Member's I-526 Petition is approved by the USCIS.  In the event that the Company liquidates a Class B Unit for any reason referred to in (a)(ii) or (a)(iii)(B) of this paragraph, the price at which the Company liquidates such Class B Unit shall be the sum of the capital contribution of the Class B Member and the Administration Fee, both amounts without interest. In the event that the Company liquidates a Class B Unit for any reason referred to in (a)(i), (a)(iii)(A) or (a)(iv) of this paragraph, then the price at which the Company liquidates such Class B Unit shall be the sum of the aggregate capital contribution of the Class B Member and such portion, if any, of the Administration Fee as determined by the Class B Manager at its sole discretion, both amounts without interest.  In the event that the Company liquidates a Class B Unit pursuant to (b) of this paragraph, it shall be at a price equal to the balance of such Class B Member's Capital Account. Except as otherwise provided in the Operating Agreement, liquidation amounts referred to in this paragraph will be paid within ninety (90) days of the Company's acceptance of the request for liquidation, subject to the broad rights of the Company to suspend liquidation for and until such time as the Company shall determine.

In addition to the liquidation matters described above, the Class B Units will be liquidated in connection with the events described below in "Dissolution and Termination".

Under certain circumstances, the Company may suspend the liquidation of the Class B Units  if the Class B Manager determines, in its sole and absolute discretion, after consulting with the Class A Manager, that the liquidation of the Class B Units could have an adverse effect on the ability of the Company to make advances under the Loan Agreement or the immigration objectives or the ability of the other Class B Members to obtain unconditional lawful permanent resident status in the U.S. pursuant to the EB-5 Program, or the Company is restricted from liquidating any Class B Units under applicable law, or the Company does not have the available cash to effect such liquidation, the Company may suspend the liquidation of the Class B Units until such time as the Class B Manager determines, if at all and  in its sole and absolute discretion, that the liquidation of the Class B Units would not cause such consequence.

### Remuneration to Members, Managers and Officers

In general, no Member is entitled to remuneration for acting in his or her capacity as a Member.

Each Manager is entitled to remuneration for services provided to the Company and other benefits in accordance with the terms of the applicable Management Agreement.  As remuneration for the provision of services pursuant to the Class B Management Agreement and the Operating Agreement, the Class B Manager shall receive certain fees as described in the Class B Management Agreement (such fees averaged over the term of the appointment to be approximately 1% per annum of the maximum amount of the Loan).  Any remuneration paid by the Company to the Managers pursuant to the Management Agreements shall be reimbursed to the Company by the Developer pursuant to terms to be mutually agreed upon, provided that none of such reimbursements shall be paid out of the capital contributions of any of the Class B Members.  In addition, the officers of the Company shall be entitled to remuneration and other benefits for their services to the Company, all as determined by the Class B Manager.

There is no agreement with the Company or any third party whereby any Member or Manager has obtained the rights to purchase any unit of membership interest in the Company at a future date.

56

**Competing Activities**

Any Member, Manager, officer or affiliate of a Member or a Manager or officer of the Company may
engage in or invest in any business activity, even if the business activity is the same as or similar to the
Company's business and is in direct or indirect competition with the Company. Such persons are not
obligated to present any business or investment opportunity to the Company, and have the right to engage
in such opportunity for their own account or for the account of anyone other than the Company. The
Operating Agreement provides that actions by any such persons in compliance with or in accordance with
the Operating Agreement shall not be a breach of such person's fiduciary duties to the Company or any
Member.

**Accounting and Reporting**

The Company is required to keep books and records to record its financial position and the results of its
operation in accordance with the accounting methods followed by the Company for U.S. federal income
tax purposes.

The Company is required to send to each Member on or before the one hundred eightieth (180th) day
following the end of each fiscal year (or as soon as practicable thereafter) an audited financial report
containing a balance sheet as of the end of that fiscal year, a statement of profit and loss and a cash flow
statement for that fiscal year. The Company is also required to send to each Member, within ninety (90)
days after the end of each fiscal year (or as soon as practicable thereafter), such information as is
necessary for the preparation of the U.S. federal and state income tax returns of such Member, and a copy
of the Company's U.S. federal, state, and local income tax or information returns for that year.

Upon reasonable written request by a Member, the Company shall provide certain additional financial and
other information, and permit the inspection and copying of certain documents by such Member or
Members, or by their respective agents or attorneys.

**Job Allocation**

The Company has been formed for the benefit of up to 300 immigrant investors seeking status as
immigrant investors under §203(b)(5) of the INA Act. The Class B Members will be required to enter
into an EB-5 Job Allocation Addendum contained in the Schedule to the Operating Agreement attached
as <u>Exhibit B</u> hereto.

**Dissolution and Termination**

The Company will be dissolved and wound up upon the first to occur of the following:

    (i)      the entry of a decree of judicial dissolution pursuant to the Delaware Limited Liability
Company Act;

    (ii)    the approval of the Members and the Managers as set forth in the Operating Agreement;

    (iii)   the sale or other disposition of all or substantially all of the Company's non-cash assets
including the Loan and subsequent to the final adjudication of all I-829 Petitions;
provided that the Members shall not have otherwise voted to defer dissolution of the
Company in accordance with the Operating Agreement; or

    (iv)   December 31, 2025 or such later date as may be determined by the Class B Manager.

57

In connection with Company's dissolution and winding up, the Company will, after determining that all known debts and liabilities of the Company have been paid or sufficiently provided for, distribute the remaining assets to the Members in accordance with the procedures as set forth in the Operating Agreement and in the following order of priority:

> (i)    to the Class A Member to the extent of its capital contribution; and

> (ii)   the balance, if any, pro rata to the Class B Members.

The above liquidating distributions shall be made by the end of the Company's fiscal year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

## XIII.  RISK FACTORS

AN INVESTMENT IN THE COMPANY HAS ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN THE COMPANY SUITABLE ONLY FOR INVESTORS (I) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (II) WHO CAN AFFORD TO BEAR THOSE RISKS, (III) WHO HAVE PREVIOUSLY MADE INVESTMENTS OF THE NATURE AND RISK LEVEL OF AN INVESTMENT IN THE COMPANY, AND (IV) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX, AND FINANCIAL ADVISERS WITH RESPECT THERETO.  INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, MUST NOT INVEST IN THE COMPANY.

THE ORDER IN WHICH THE FOLLOWING RISKS ARE PRESENTED DOES NOT NECESSARILY CORRELATE TO THE MAGNITUDE OF THE RISKS DESCRIBED.   THE FOLLOWING RISK FACTORS ARE NOT NECESSARILY REFLECTIVE OF ALL THE RISKS ASSOCIATED WITH THIS INVESTMENT THAT MAY BE MATERIAL TO THE SUBSCRIBERS.

ANY OF THE RISKS ENUMERATED BELOW COULD HAVE MATERIAL AND ADVERSE EFFECTS ON THE DEVELOPER'S CASH FLOW OR FINANCIAL CONDITION, THE DEVELOPER'S ABILITY TO PAY THE COSTS OF THE PROJECT AND/OR THE DEVELOPER'S ABILITY TO REPAY ALL OR A PORTION OF THE LOAN.  IF THE DEVELOPER IS UNABLE TO REPAY THE LOAN MADE BY THE COMPANY, IN WHOLE OR IN PART, CLASS B MEMBERS COULD SEE A SUBSTANTIAL, IF NOT TOTAL, LOSS OF THEIR INVESTMENT.

### Risks Relating to Real Estate and Financing of Real Estate

*Investment in the Company is subject to general real estate risks.*

The Company will be subject to risks generally incident to the financing and development of real estate, including the following:

> (1)    changes in general economic or local conditions;

> (2)    changes in supply of or demand for similar or competing properties in an area;

> (3)    bankruptcies, financial difficulties or defaults by vendors, contractors and others;

> (4)    changes in tax, real estate, environmental and zoning laws;

> (5)    periods of high interest rates and tight money supply; and

(6)      general overbuilding or excess supply in the market area.

For these and other reasons, no assurance can be given that the Company will be profitable or that it will produce the targeted financial returns.

### *The Company will rely on third parties to complete and operate the Project.*

The Company will make the Loan to provide a portion of the funding required to enable the Developer to develop, construct and operate the Project. The Developer, in turn, will rely on various other third-party contractors, subcontractors, and suppliers for the completion of the Project. The Developer and the Owner have yet to enter into binding agreements with these and other critical third party vendors, including the architect, the development manager, a general contractor (except for limited infrastructure work) and subcontractors. The selection, performance and compensation of these vendors will have a material effect on the performance of the Summit Village development and the Developer's ability to repay the Loan. Potential investors will not be able to evaluate the qualifications of any of these vendors, and the Company will have no consent rights to these vendors with the exception of the general contractor. The ability of these parties to complete their work will be subject to typical construction and development risks, as well as acts of war, work stoppages, interruptions in transportation systems, and other force majeure events. Adverse changes in the operations and financial condition of these parties, which may have a material adverse effect on the Project, are beyond the control of the Company or the Developer. Further, no assurances can be given that the completed Project or the Summit Village subcomponent will generate revenues in accordance with the Owner's projections.

### *The Loan Agreement and related documents have not been drafted or executed, and their terms may differ materially from those described in this Memorandum.*

The Company anticipates that the Loan Agreement to be entered into with the Developer prior to the initial advance of Loan proceeds will include the terms described in this Memorandum. The Company also anticipates that the security to be granted by the Developer to secure the Developer's obligations under the Loan will include the terms described in this Memorandum. However, the actual terms of the Loan Agreement and related documentation are subject to negotiation among the parties and may differ materially from those described in this Memorandum. Any such differences could delay or prevent the return of the Class B Members' investment in the Company. In particular, the Developer is under no obligation to enter into the Loan Agreement. Until it does, neither the Developer nor any of its affiliates is under any obligation to borrow the Loan or to comply with any of the obligations anticipated to be contained in the Loan Agreement. If the Developer refuses to enter into the Loan Agreement for any reason, the Company expects to terminate the Offering and cause the Escrow Agent to return all funds to subscribers.

### *If the Developer maintains or obtains a senior loan or is otherwise required by a governmental authority to make a repayment in priority to the Loan, the Company's rights as mortgagee may become worthless following a default.*

The Company's anticipated security will constitute a first ranking deed of trust and security interest over the Property and Summit Village, which are anticipated to be the only material assets of the Developer. However, the Developer will have the right under certain circumstances to require the Company to subordinate its rights to another lender that would then hold a first priority deed of trust and security interest in the Property and the Summit Village. In that event, if such lender were to foreclose on its deed of trust and security interest following a default under its loan, the Company's security may become worthless. Accordingly, as a result, upon any default under the Loan, the Company may be prohibited from pursuing remedies for such default. Any senior loans will have priority payment rights to the Loan, which may result in inadequate funds being available, after payment of such senior obligations, to pay the principal and interest due on the Loan. Further, even though the Developer Equity will rank junior to the Loan in all respects including with respect to repayment from cash flow from Summit Village available to

the Developer, the TIF proceeds or other proceeds available from any governmental authority may have priority in repayment over the Loan upon terms acceptable to the Lender. This could result in a complete loss of each Class B Members' investment in the Company.

***Developer might not obtain all capital projected to be used for Summit Village.***

The Developer estimates that approximately US$261.1 million in new capital will be required to complete Summit Village, including US$150.0 million from the Loan. Developer equity includes: (i) US$29.0 million of an in-kind contribution of the Property, (ii) approximately US$16.7 million of anticipated TIF financing, (iii) approximately US$4.6 million of equity and cash contribution and (iv) approximately US$42.3 million from non-refundable deposits from the purchase of townhome and condominium units in Summit Village. The Developer Equity will be available at different times during the Project, to be more fully described in the Loan Agreement. If some or all of such capital is not available to Developer despite the commitments or projections related to each source of capital, it is possible that no advances will be made under the Loan Agreement.

Additionally, if the Company does not raise the full US$150.0 million in this Offering, or if Subscription Amounts must be returned to Class B Members upon a denial of the Project or any individual Class B Member from participation in the EB-5 Program and such amounts are not replaced, then the Company will be unable to advance the full US$150.0 million contemplated under the Loan Agreement. In such case, Developer will have the right to borrow amounts that will be senior in collateral and payment priority to the Loan, which would adversely affect the Class B Members. If the Developer is not able to raise additional equity or borrow additional funds, the Developer may have to curtail the scope of Summit Village, which may not be contractually or practically possible. Any failure of Developer to complete Summit Village would have a material adverse effect on the likelihood of repayment of the Loan to the Company and therefore the ability of the Company to produce a return on the Class B Members' investments, and may also lead to denials of the Class B Members' I-829 Petitions.

Similar risks apply in the event of cost overruns for Summit Village that are not the responsibility of the general contractor under the construction contract. Because no construction contract has been signed, it is difficult for the Company to evaluate the effect of cost overruns. If the Company is not satisfied with the construction contract, it may decline to make advances under the Loan Agreement, which would in turn lead to the risks described in the first paragraph above.

Finally, commercial and residential real estate properties often require a continuing high level of capital expenditures after completion. Additional capital may not be available to the Developer on acceptable terms or at all.

***If the Developer lacks sufficient funds to complete and operate Summit Village, the position of the
Class B Members in the Company will be adversely affected.***

Unforeseen circumstances may make it necessary for the Developer to finance the operation of the Project
through additional borrowing, which may rank senior in terms of payment and priority to the Company's
Loan and otherwise adversely affect the Company's position as a secured lender. In addition, to the extent
cash flow from the Project is not sufficient to fund these additional debt obligations, the Developer may
be required to obtain cash from other sources. Unless the Developer generates such cash, the Developer
might be required to raise additional equity investment or to borrow additional funds, and there can be no
assurance that additional funds will be available on favorable terms, if at all. In that event, the Developer
may be required to sell the Project on disadvantageous terms, or security agreements or guarantees
securing any of the Developer's debt may be foreclosed and the Project sold by priority lenders to repay
the debts owing them. This would have a materially adverse effect on the Company and its investors.

***The Developer and Company may be subject to environmental liability.***

Investing in businesses operated on real property involves risks relating to hazardous and toxic
contamination of such property or adjacent property, including subsurface and underground water
contamination. Such contamination could have a detrimental effect on the Company, and can result from
the actions of tenants, contractors, patrons, visitors, and other parties, including adjacent property owners,
over whom the Company could exercise little or no control. The Developer could be required to
participate financially in the clean up or other abatement of such contamination, which could cause the
Company to suffer a loss of some or all of the capital invested in the Project as well as the loss of any
potential profits from the Project. Under certain circumstances, courts have held that a Lender is
responsible for the environmental cleanup obligations of its borrower imposed by applicable federal
statutes. In the event such circumstances arise, a court might find that the Company is liable for such
obligations.

***The Developer may face delays in obtaining, or be unable to obtain, required permits.***

The Developer has not obtained all required approvals to begin construction of the Project. Prior to
securing final certificates of occupancy the Project, certain building and safety, handicapped, and other
permits may need to be obtained or extended. Additionally, existing public health, fire and safety and
other licenses may also need to be obtained or extended. While the Company believes that the Developer
should face no impediments to obtaining any necessary permits and licenses or obtaining any consents or
approvals, no assurance can be made that they will be obtained or extended.

***The successful completion and operation of the Project depends heavily on economic, political,
environmental and other factors over which the Company has no control.***

The Developer's ability to successfully complete and operate the Project depends in large part on its
ability to obtain and utilize equipment, materiel and services in a timely and efficient manner. In
particular, the Project is susceptible to natural and man-made disasters, including war, terrorism,
hurricanes, earthquakes, fires, floods, environmental disasters, power loss, political or economic
instability, disruptions to the financial markets, vandalism and other similar disruptive problems, any of
which could adversely affect the Project and jeopardize repayment of Company's investment. The
Developer's insurance policies may not adequately compensate it for any losses that may occur due to any
resulting damages or interruptions. Among other things, such problems could result in reduced investor
confidence, substantial volatility in securities markets and a decline in real estate and related hotel
occupancy rates, leasing and financing. In addition, general economic conditions may affect the
Company's activities. Interest rates, general levels of economic activity, the price of securities and
participation by other investors in the financial markets may affect the value of investments made by the
Company or considered for prospective investment.

***The actual market value of Summit Village and any substitute collateral upon maturity of the Loan may be significantly less than the assumed market value contained in projections prepared by the Owner.***

The Owner has performed an analysis of the marketability and the financial viability of the Summit Village development through Loan maturity and the likelihood that the Collateral can be sold or refinanced to repay the Loan upon maturity. If assumptions upon which the Owner's analysis are based turn out to have been overly optimistic, the Developer may not be able to make payments of principal and interest required under the Loan. In that event, the Company may be unable to return the full amount of each Class B Member's capital contribution.

***Under the Americans with Disabilities Act of 1990 (the "ADA"), all public accommodations are required to meet certain federal requirements related to access and use by disabled persons.***

Laws similar to the ADA may also now or in the future exist on a State or municipal level. If the Developer were required to make modifications to comply with the ADA or any state law, the Developer's ability to make expected loan payments to the Company, and the Developer's ability to satisfy its obligations under the Loan could be adversely affected.

***Employees of the Project may be union members, and non-union employee staffs in various areas may be subject to union organization activities.***

Hotel worker unions, in particular, are prominent throughout the United States. The Owner does not intend for the Project to be operated under a collective bargaining agreement. However, there can be no assurance that the unions will not organize the employees of the Project and/or require the Owner to enter into a collective bargaining agreement. In such case, the costs of operating the Project would increase materially from the Developer's current projections. Moreover, if a collective bargaining agreement is executed for any portion of the Project, there can be no assurance that the unions will abide by the terms of any collective bargaining agreement if any union deems certain aspects of such agreement unfair, and furthermore, certain employees may not be covered by such agreement. The Project could suffer work stoppages or "slow-downs" as a result. In such event, it is likely that the employee costs of the Project will be higher than presently projected for the continuation of the Project, since union workers would have compensation and benefits that are generally higher than non-union workers in the same hotel and convention industry jobs. Neither the Developer nor the Company will have control over whether one or more unions determine to target the Project's operations for union organization activities.

***The operations of the Project are and will be subject to various federal, state, and local laws and regulations, as well as court decisions, affecting Project operations, the Developer's business and the value of the Project.***

Difficulties or failures in obtaining required licenses or other regulatory approvals could delay securing the pending permanent Certificate of Occupancy or otherwise hamper completion of the Project, including opening and operating the Project. The suspension of, or inability to renew, a license could interrupt operations at the Project. The Owner is subject to federal, state, and local laws establishing minimum wages, unemployment taxes, and sales taxes, and regulating overtime, other working conditions, and similar matters over which the Company will have no control. The Project's operations will be subject to federal, state, and local regulations, including regulatory provisions relating to sanitation, health, safety and liquor licensing. All of these laws, regulations, and court decisions could have both a positive or negative impact on the Project's operations and financial results from those operations and on the Project's ability to compete. Suspension of the Owner's ability to operate or by any regulatory agency would have a material adverse effect on the profitability of the Project and the Developer's ability to repay the Loan. Increased regulation of various aspects of the Project's operations,

or of the Developer or the Company itself, should this occur, could also have an adverse effect on the Developer's and the Company's financial position. Additionally, the Company will be under substantial scrutiny by USCIS.

***Prior to securing final Certificates of Occupancy for the Project, certain building and safety, handicapped, and other permits may need to be obtained or extended.***

Additionally, public health, fire and safety, liquor and other licenses may also need to be obtained. While the Developer believes that there should be no impediments to obtaining any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will be obtained.

***The Developer has not obtained final bids for construction of Summit Village, a general contractor has not been selected and no construction contract has been entered into for Summit Village.***

The terms of the construction contract that the Developer will enter into have not been negotiated, except as to initial water, sewer, and road infrastructure and site preparation work. Such to-be-determined terms will have a material effect on the outcome of the Summit Village project, and in turn, the repayment of the Loan. There no assurance that a qualified general contractor acceptable to the Developer and the Company will be identified. And there is no assurance that the actual cost of construction of Summit Village, once bid, will approximate the Developer's budget. Any deviation would require a reassessment of the pro forma and debt and equity requirements.

***The successful development of Summit Village will also depend on the efforts of the Developer, the construction contractor, its subcontractors, and the architects involved in the design and construction of the Project.***

The Company's success will be largely dependent on the ability of the Developer and its affiliates to satisfy the development and other objectives of Summit Village and other components of the Project. Any failure by any such parties to fulfill their obligations in connections with the development of the Summit Village and other components of the Project could have a material and adverse effect on the Company's ability to realize a return of the investment made by the Class B Members.

### Success of Summit Village will, in part, depend on the successful completion of the Project.

The success of Summit Village will depend on the completion and economic success of the multi-phase master planned mixed-use development envisaged in the Project. The developer for the Infrastructure Component and the Residential Component may not be able to raise sufficient funds for the development costs of those phases of the Project. If the phases of the Project (other than Summit Village) are not completed or are not economically successful, the success and therefore the value of Summit Village could be materially and adversely affected, which may reduce the likelihood that the Collateral can be sold or refinanced to repay the Loan upon maturity or the ability of the Developer to make payments of principal and interest required under the Loan. In that event, the Company may be unable to return the full amount of each Class B Member's capital contribution

***Sources of debt or equity to refinance or pay off the Loan at maturity may not be available.***

Summit Village's financial condition, the lending market, and the national and local economic climate at the time the Loan is due may be such that refinancing the Loan is not possible. The Developer may be able to refinance the Loan. In the event the Loan cannot be refinanced, the Developer will not have the funds available to repay the Loan at maturity absent a sale of the Developer or the Property, which the

Developer is not obligated to do and which may not be possible given market conditions. After any available loan extensions are exhausted, the Loan would then either fall into default or require renegotiation of its maturity date and perhaps others terms. If the Loan falls into default, there is no assurance that the Company would be able to recover from foreclosing on the collateral it will hold.

***There is no guarantee that the Developer will repay all or any part of the Loan, either at maturity or ever.***

The ability of the Developer or any guarantor to perform under the Loan Agreement depends upon a number of factors related to its business and financial position, which cannot be ascertained or relied upon with any degree of certainty. In light of these factors, the benefit to the Company of the obligations of the Developer and any guarantor is effectively limited to the legal obligations of, and financial ability, of such parties to perform under the loan documents. The Developer is incentivized to repay the Loan by the threat of foreclosure of the Collateral if the Developer does not perform under the Loan. The manner in which the Developer is providing the significant majority of the equity for Summit Village construction limits the financial exposure to the Developer associated with a foreclosure, and may have the effect of reducing the financial impact to the Owner should the Loan not be repaid. In the event of a payment default by the Developer, the Company's rights to recover from the Developer and any guarantor are generally superior to the rights of the equity investors in said entities, however, there is no assurance that the Company's right to recover under the Loan Agreement will be superior to any liens upon the assets of, or other obligations of, any such parties. There can be no assurances, and further recognizing the uncertainty of future events, that any guaranty will in fact provide an alternative payment source upon any such payment default. The present or future capital structure, debt structure and performance of the business operations of the Developer and any guarantor may not result in any ability for the Company to recover under the Loan.

***The projected investment made by the Company will involve real property which will be improved by the construction of new improvements comprising Summit Village which contains inherent and typical risks associated with real property development.***

Construction and/or remodeling of improvements to real property will entail risks which are beyond the control of the owner of the property and the Company, such as changes in governmental rules and policies (such as zoning), the performance by contractors, costs of materials, labor difficulties (such as strikes), energy shortages, shortages of material for construction, inflation, adverse weather, and adverse subsurface conditions, including the discovery of existing earthquake fault lines and other factors, which could cause costs to exceed current estimates. If Summit Village development costs exceed the budgeted amounts, including budgeted contingencies and any contingent equity committed by the Owner, such a gap in funding may make it difficult or impossible for the Developer to meet its obligations to the Company under the Loan Agreement. These abovementioned risks may increase the costs of construction and/or remodeling and may cause, among other things, delays in construction and/or remodeling which affect the ability of the investment made by the Company to generate cash flow to repay the Company's investment and which, in turn, could cause the Company to suffer a loss of some or all of its investment as well as the loss of any potential profits from such investment.

***There may be unexpected delays or developments in completing Summit Village, which could cause the construction costs of Summit Village to exceed current estimates.***

Summit Village may suffer significant construction delays or construction-cost increases as a result of a variety of factors, including but not limited to the following:

- failure to complete infrastructure and development projects supporting Summit Village;
- failure to secure and maintain environmental and other permits or regulatory approvals;
- appeals of environmental and other permits or approvals;
- failure to obtain capital;

- failure to obtain or maintain all necessary rights to land access and use;
- failure to receive critical components and equipment that meet design specifications;
- delays in scheduled deliveries of critical components and equipment;
- failure to receive quality and timely performance from key contractors and vendors;
- increases in supplier costs, including those due to unexpected increases in inflation or commodity prices;
- work stoppages or shortages of skilled labor;
- inclement weather conditions;
- delays in satisfaction of the conditions for funding the Loan;
- adverse environmental and geological conditions including the discovery of earthquake fault lines; and
- force majeure or other events out of the control of the Developer.

Any of the aforementioned factors could give rise to construction delays and construction costs in excess of current projections. Any of the above factors could prevent the Developer from completing construction or may cause significant delays, resulting in defaults under financing agreements, including but not limited to the Loan Agreement, causing Summit Village to be unprofitable for the Developer or otherwise impairing the Developer's business, financial condition and results of operations, and the ability to perform under the Loan Agreement.

***The Project depends upon government spending and support that might not be available.***

The Project contemplates that certain local and State governmental spending and/or financing will be available for the Project. The TIF financing proceeds are intended to be made to support the equity needed to complete Summit Village and risks associated with the availability of such funding and the requirements of repayment of such funding are not fully known. In addition, government spending on certain infrastructure projects intended to support the Project is contemplated by the Owner. If such financing or funding is not available by such governmental agencies or instrumentalities, the Developer's model related to the returns to be generated by the Project will be adversely impacted. Any change in policy that could potentially negatively affect any of these awards to the Project could have negative consequences for the construction and/or operation of the Project.

***The Company may enter into subordination agreements and an intercreditor agreement with other lenders holding security interests (including senior security interests) in the Property.***

As of the date of this Memorandum, such agreements have not been prepared, negotiated or signed by the Company, the Developer and such other parties. There is no assurance that the Company will reach satisfactory subordination agreements or intercreditor agreements. Accordingly, there is no assurance that the Company will ever make the intended investment in the Project. The terms of the subordination agreements and intercreditor agreement may be more adverse to the Company than the Company currently anticipates, which could have a material effect on the terms of the Loan, the likelihood of repayment of the Loan to the Company and therefore the ability of the Company to produce a return on the Class B Members' investments.

**Risks Related to the Offering and the Class B Units**

**LEGAL COUNSEL TO THE COMPANY AND THE MANAGERS WILL NOT BE ENGAGED TO PROTECT THE INTERESTS OF PROSPECTIVE SUBSCRIBERS OR CLASS B MEMBERS AND SHOULD NEVER BE VIEWED AS REPRESENTING ANY PROSPECTIVE SUBSCRIBER OR CLASS B MEMBER. CLASS B MEMBERS AND PROSPECTIVE SUBSCRIBERS SHOULD CONSULT WITH AND RELY UPON THEIR OWN COUNSEL CONCERNING INVESTMENT IN THE COMPANY, INCLUDING, WITHOUT LIMITATION, TAX AND CURRENCY**

**EXCHANGE CONSEQUENCES TO THEM AND OTHER ISSUES RELATING TO ANY INVESTMENT IN THE COMPANY.**

*The Subscription Amount and other terms of the Class B Units have been arbitrarily determined.*

The Subscription Amount for the Class B Units, the possible return on investment proposed to be paid to the Class B Members and other terms of the Class B Units may not bear any correlation to assets acquired, or to be acquired, or the value of the Project, or any other established criteria or quantifiable indicia for valuing a business.  No representation is being made by anyone that the Class B Units have or will have a market value equal to the Subscription Amount or could be resold (if at all) at the Subscription Amount

*An investment in the Company requires a long-term commitment with no certainty of return.*

The Project will not generate income sufficient to repay the Loan for a number of years, if at all. The Company will not provide investors in Class B Units with any return of capital until such time as some or all of the Loan has been repaid. The Company generally will not be able to sell its rights under the Loan. There are no assurances, obligations or guarantees that the Company will ever have positive cash flows, make any cash distributions or realize any return on investments in Class B Units. The Class B Members of the Company should be aware that if the Developer is not successful in its business, their entire investment in the Company may become worthless.

*The availability and timing of cash distributions is uncertain.*

The Company does not expect to make any significant distributions to each Class B Member until after his or her I-829 Petition has been adjudicated or the maturity date of the Loan. These events are expected to occur only after the Summit Village is fully constructed, which may be severely delayed or never occur.

*Completion of Subscription prior to approval of I-526 Petition.*

The completion of the Subscription of Class B Units and the release from escrow of the Subscription Amount and the Administration Fee may take place upon the Subscriber's immigration counsel sending the Subscriber's I-526 Petition to USCIS for filing. The Operating Agreement will provide that upon the denial by USCIS of a Class B Member's I-526 Petition, he or she may liquidate his or her Class B Unit (see "Liquidation of Class B Units" section of this Memorandum). In such situation, despite the Early Release Guaranty, particularly when the I-526 Petition of a large number of Class B Members have been denied by USCIS and depending on the extent to which the Offering proceeds have been disbursed to the Developer under the Loan, the Guarantor, Developer and/or Company may not have sufficient assets to repay such Class B Member's Capital Contribution.

*There will be no public market or liquidity for the Class B Units and the Class B Units are subject to significant restrictions on transferability.*

There is no public market for the Class B Units and no such market is expected to develop in the future. The offer and sale of the Class B Units is intended to be exempt from registration under the Securities Act and applicable state securities laws.  As a result, the Class B Units are considered "restricted securities", and the transferability of the Class B Units offered hereby is severely restricted.  Accordingly, an investment in the Class B Units will be highly illiquid.  The Class B Units cannot be resold or otherwise transferred unless they are registered under the Securities Act or the securities laws of each applicable U.S. state and other country or are transferred in a transaction exempt from such registration requirements.  Consequently, a holder of the Class B Units may not be able to liquidate his or her investment and each Class B Member's ability to control the timing of the liquidation of his or her

investment in the Company will be restricted. Class B Members should be prepared to hold their Class B Units indefinitely.

### There are no firm commitments to purchase Class B Units.

No commitment has been extended by anyone to purchase all, or any portion, of the Class B Units being offered. The Company can give no assurance that the maximum number of Class B Units will be sold, or that any number of Class B Units will be sold. As a result, there can be no assurance that the Company will raise sufficient funds in the Offering to carry out its business plan as currently proposed, or that the net proceeds from the initial subscriptions for Class B Units will be in an amount sufficient to enable the Company or the Developer to continue operations in any meaningful manner. In the event insufficient subscriptions are received and accepted by the Company, the Developer may not be able to carry out the Project. In that event, the Developer may be forced seek additional funding which, if available, may have superior payment and priority rights to the Company's Loan. If additional funding is not available on reasonable terms or at all, the Developer may be forced to curtail or cease their activities, which would likely result in the loss to subscribers of all or a substantial portion of their investments.

### The Operating Agreement limits transferability of Class B Units.

Pursuant to the Operating Agreement, the Class B Units are not readily transferable and no transfer of Class B Units may be made unless, among other things, such transfer has been approved by the Class B Manager.

### The Company will hold only a single asset.

Once the Loan is advanced to the Developer, the Company will hold a single asset being the promissory note from the Developer evidencing its payment obligations under the Loan that will be secured by the Collateral. This lack of asset diversification increases the risk of adverse results, including total loss of the investment.

### Fiduciary duties limitation.

To the fullest extent permitted by law, to the extent that, at law or in equity, any fiduciary duty owed by the Managers to the Company is eliminated pursuant to Section 18-1101(c) of the Delaware Limited Liability Company Act, it being the express intent of the Managers that no Manager shall owe any fiduciary duties of any nature whatsoever to the Company; provided, however, that, notwithstanding any provision hereof, such Managers shall be subject to the implied contractual covenant of good faith and fair dealing.

### Prevention of money laundering.

The USA Patriot Act requires that financial institutions establish and maintain compliance programs to guard against money laundering activities. It has been announced that a U.S. Treasury agency is likely to enact regulations which would subject certain pooled investment vehicles to enact anti-money laundering policies, which regulations, if and when enacted, might require the Company, acting through the Class B Manager, to share information with U.S. government authorities with respect to its members. The Company has reserved the right in the Subscription Agreement to obtain information from its members as necessary to comply with the USA Patriot Act, the U.S. Bank Secrecy Act and other similar laws, as well as the regulations that might be promulgated thereunder.

### The Class B Units will not be registered under the Securities Act.

The Company does not intend to register the Class B Units with the Securities and Exchange Commission. The Company will rely upon an exemption from registration under Section 4(a)(2) of the Securities Act and Regulation S promulgated under the Securities Act. In order for the Company to be entitled to rely on these exemptions from the registration requirements of the Securities Act, the Offering must comply with certain requirements, including the requirement that offers and sales be made

exclusively outside the United States to non-U.S. Persons and that no directed selling efforts take place in connection with the Offering. In order to benefit from the safe harbor provided by Rule 903 of Regulation S, offers and sales made prior to a one-year distribution compliance period must not be made to or for the benefit of a U.S. Person and in accordance with the following conditions:

(1)     the purchaser must certify he or she is either a non-U.S. Person and is not acquiring Class B Units for the account of benefit of any U.S. Person or that he or she is a U.S. Person acquiring Class B Units in an exempt transaction;

(2)     the purchaser must agree (a) that any resale will either be in accordance with Regulation S, after registration, or under a registration exemption, and (b) that the purchaser will not engage in any hedging transaction in respect of Class B Units, except in compliance with the Securities Act; and

(3)     the Class B Units will contain an appropriate restrictive legend.

Under the terms of the Operating Agreement, the Company is required to refuse to recognize or register any transfer of Class B Units issued under the exemption provided by Regulation S that is not made in accordance with Regulation S, after registration or under a registration exemption. If the Offering does not comply with all of the applicable requirements for an exemption from the registration requirements of the Securities Act, regardless of whether or not the Company was aware of any such failure to comply, then the Offering will not be entitled to the applicable exemption. In that event, among other things, the Company would have the obligation to either register the Class B Units or terminate the Offering, which would have a material adverse effect on the Company and the Project and could subject the Principals to potential civil or criminal liability.

### *Intermediaries involved in the Offering will not be registered as brokers or dealers under the Exchange Act.*

The Company will utilize finders, agents, and brokers to seek potential subscribers for the Offering. Depending on the locations of and activities conducted by such persons or entities, certain laws may require that they be registered with the U.S. Securities and Exchange Commission, state authorities, or foreign authorities. The Company intends only to utilize registered finders, agents, and brokers, or work with persons and entities it believes (or has been informed) do not need to be registered. If the Company uses finders, agents, or brokers that should be registered but are not, the Company may be liable for the return of investment monies and for other fines and penalties. In addition, the securities exemptions that the Company is relying upon for the Offering may be made unavailable. In either case, a requirement to return subscriptions could cause the investors to lose all or a portion of their investment.

### *The Class B Units will not be registered or qualified under the securities laws of any other jurisdiction.*

The Class B Units have not been registered or qualified for public distribution under the securities laws of any jurisdiction. The Class B Units will be offered without registration and without the filing of a prospectus in reliance upon exemptions available under applicable law. Each potential subscriber resident outside the United States must be, and will be required to represent that he or she is entitled to acquire Class B Units in reliance upon an exemption from the registration or prospectus requirements of applicable securities laws of the potential subscriber's jurisdiction of residence. Failure to register or qualify Class B Units in any jurisdiction where registration or qualification is required could have a material adverse effect on the Company and the Project and could subject the Principals to potential civil or criminal liability in that jurisdiction.

***The Company will not be registered as an "investment company," and subscribers in the Class B Units will not receive the protections afforded by the Investment Company Act of 1940.***

The Company is not registered, and intends to avoid becoming required to register, as an investment company under the Investment Company Act of 1940, as amended (the "**1940 Act**").  The 1940 Act imposes significant substantive requirements on the organization and operation of registered investment companies ("registered funds") and on registered fund insiders, such as sponsors, promoters and underwriters.  These requirements were designed to protect the registered funds and their shareholders from the interests of fund insiders.  *As the Company is not registered (or required to register) under the 1940 Act, these protections will <u>not</u> apply to the Company or its investors.*

The 1940 Act generally defines an "investment company" to include an issuer of securities that "holds itself out as being engaged primarily, or purposes to engage primarily, in the business of investing, reinvesting or trading in securities."  (Section 3(a)(1)(A) of the 1940 Act).

In addition, under Section 3(a)(1)(C) of the 1940 Act, an "investment company" also includes any issuer which:

> "...is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."

However, Section 3(c) of the 1940 Act provides for the following relevant exceptions:

> "Notwithstanding subsection (a), none of the following persons is an investment company within the meaning of this title:
>
> > (1)     Any issuer whose outstanding securities (other than short- term paper) are beneficially owned ***by not more than one hundred persons*** [emphasis added] and which is not making and does not presently propose to make a public offering of its securities.  Such issuer shall be deemed to be an investment company for purposes of the limitations set forth in subparagraphs (A)(i) and (B)(i) of section 12(d)(1) governing the purchase or other acquisition by such issuer of any security issued by any registered investment company and the sale of any security issued by any registered open-end investment company to any such issuer.   For purposes of this paragraph:
> >
> > > (A)     Beneficial ownership by a company shall be deemed to be beneficial ownership by one person, except that, if the company owns 10 per centum or more of the outstanding voting securities of the issuer, and is or, but for the exception provided for in this paragraph or paragraph (7), would be an investment company, the beneficial ownership shall be deemed to be that of the holders of such company's outstanding securities (other than short-term paper).
> > >
> > > (B)  Beneficial ownership by any person who acquires securities or interests in securities of an issuer described in the first sentence of this paragraph shall be deemed to be beneficial ownership by the person from whom such

transfer was made, pursuant to such rules and regulations as the Commission shall prescribe as necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this title, where the transfer was caused by legal separation, divorce, death, or other involuntary event.

…

(5)    Any person who is not engaged in the business of issuing redeemable securities, face-amount certificates of the installment type or periodic payment plan certificates, and who is primarily engaged in one or more of the following businesses: (A) Purchasing or otherwise acquiring notes, drafts, acceptances, open accounts receivable, and other obligations representing part or all of the sales price of merchandise, insurance, and services; (B) making loans to manufacturers, wholesalers, and retailers of, and to prospective purchasers of, specified merchandise, insurance, and services; and (C) ***purchasing or otherwise acquiring mortgages and other liens on and interests in real estate*** [emphasis added]."

Based upon the above, the Company has been advised that the Company falls within an exception to the definition of an "investment company" under the 1940 Act based upon either the 3(c)(1) exception if the maximum offering is 100 persons or less or under the 3(c)(5) exception if the maximum offering exceeds 100 investors; however, there are no assurances that this will ultimately be the case.

Although the Company intends to avoid becoming required to register under the 1940 Act, the Company cannot assure prospective Subscribers that, under certain conditions, changing circumstances or changes in the law, the Company will not become subject to registration under the 1940 Act in the future as a result of a determination that the Company is an "investment company" within the meaning of the 1940 Act and has no exceptions from that definition available to it. For example, there can be no assurance that a defeasance of the Loan by the Developer would not adversely affect the availability to the Company of an exemption from registration that depends, in part, on whether a company is considered to be primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interest in real estate. Becoming registered and otherwise subject to the 1940 Act could have a material adverse effect on the Company. Additionally, the Company could be terminated and liquidated due to registration under the 1940 Act.

***Participants in the Offering will not be registered as "investment advisers" under the Investment Advisers Act of 1940.***

The Class B Manager and the Principals will not be registered as "investment advisers" under the Investment Advisers Act of 1940. Accordingly, Class B Members will not receive the protections afforded by the Investment Advisers Act of 1940. Although these individuals and entities intend to conduct their respective businesses so as not to be deemed an investment adviser, there can be no assurance that one or more of them will not be held to be in violation of the Investment Advisers Act of 1940 and required to either register as investment advisers or terminate the Offering, which would have a material adverse effect on the Company and the Project.

*Foreign governmental action.*

The government of the home countries of the Subscribers (each, a "**Sovereign**") may restrict or suspend entirely participation by its nationals in the EB-5 Program as being in violation of (a) the Sovereign's securities laws, (b) the Sovereign's foreign exchange controls, and/or (c) the current prohibition on such Sovereign's nationals investing overseas in an individual capacity, rather than through enterprises. Moreover, a Sovereign may promulgate new laws or regulations in the future that restrict or prohibit participation in the EB-5 Program. Finally, no Sovereign has declined to approve the Offering; although in the past it has been assumed that a lack of action on particular offerings by a Sovereign is tantamount to its tacit approval, in the future, a Sovereign could restrict or prohibit foreign private placements in general, or the Offering in particular.

*The Operating Agreement has not been negotiated at arm's length.*

KT Summit Manager has generally established the terms of the Operating Agreement, which were not negotiated on an arm's length basis. In addition, legal counsel for the Company and KT Summit Manager have not acted as counsel for or represented the interests of the prospective Subscribers. Prospective Subscribers should consult with their own legal counsel with respect to an investment in the Company.

*Subscriptions are irrevocable except under certain circumstances.*

The execution and delivery of the Subscription Documents by a Subscriber constitutes a binding offer to purchase Membership Interests. Once the Company has received a subscription, the Subscriber may not cancel, terminate or revoke the subscription except under certain circumstances (see "Acceptance and Revocation of Subscription" section of this Memorandum). If the Offering is not closed pursuant to the terms hereof, or if a Subscriber's subscription is rejected, the Class B Manager will cause the Subscription Agreement and all of the subscription monies to be promptly returned to Subscribers without interest and without any offset or deduction, and thereafter the Subscribers and the Company will have no further obligation thereunder. In those specified circumstances where subscriptions are revocable, the Company may not have sufficient assets to repay any Class B Member's Capital Contribution (see "Risks related to the Project Performance and Management" section of this Memorandum. See also "Completion of Subscription Prior to Approval of I-526 Petition" section of this Memorandum.

*Subscriptions may be rejected.*

The Company reserves the right to refuse or reject a subscription for Class B Units at its sole discretion for any reason, including concern that the prospective Subscriber may not meet the requirements for Subscribers or the Units are otherwise an unsuitable investment for the prospective Subscriber.

**Risks Related to the Regional Center Designation, the EB-5 Program and the Immigrant Visa Process**

**A PROSPECTIVE SUBSCRIBER SHOULD CONSULT WITH LEGAL COUNSEL FAMILIAR WITH UNITED STATES IMMIGRATION LAWS AND PRACTICE. PURCHASE OF A CLASS B UNIT DOES NOT GUARANTEE LAWFUL PERMANENT RESIDENCE IN THE UNITED STATES. THE CLASS B UNITS DESCRIBED IN THIS MEMORANDUM INVOLVE A SIGNIFICANT DEGREE OF RISK RELATING TO IMMIGRATION MATTERS. AMONG THE IMMIGRATION RISK FACTORS THAT A PROSPECTIVE SUBSCRIBER SHOULD CONSIDER CAREFULLY ARE THE FOLLOWING; HOWEVER, THIS LIST IS NOT EXHAUSTIVE AND DOES NOT PURPORT TO SUMMARIZE ALL RISKS ASSOCIATED WITH THE PURCHASE OF A CLASS B UNIT. SEE "XIII. RISK FACTORS" FOR CERTAIN ADDITIONAL RISKS ASSOCIATED WITH A PURCHASE OF A CLASS B UNIT.**

*General.*

While best efforts have been made to structure this Offering so that Class B Members may meet EB-5 Program immigrant visa requirements under 8 U.S.C. § 1153 (B)(5)(A) - (D); INA Act § 203 (B)(5)(A) - (D) and qualify as "alien entrepreneurs", which is a preliminary step to becoming eligible for the admission to the United States of the Class B Member, his or her spouse and qualifying children as lawful permanent residents, no representations can be made and no guarantees can be given with respect to the ability of this investment to guarantee or otherwise assure that the application will be approved as an "alien entrepreneur" and will be granted conditional or unconditional lawful permanent resident status by USCIS.

*The Regional Center must meet certain conditions in order to maintain RC Designation of the regional center designation and to maintain the Loan and the Project as a Qualifying Investment under the EB-5 Program.*

The RC Designation requires the Regional Center to monitor the development of the Project, to meet USCIS recordkeeping and reporting requirements and to notify USCIS in the event of certain changes within the regional center or the Project. The Regional Center is not affiliated with the Owner, who accordingly have no ability to ensure that the Regional Center complies with these requirements. In addition, USCIS may reconsider the Regional Center's designation on its own initiative at any time. If for any reason the Regional Center fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the RC Designation, which would have an adverse impact on the Offering and a Class B Member's ability to complete the required immigration procedures or to maintain his or her visa status.

*If the information upon which the RC Designation was based changes, the Regional Center may be required to obtain an amendment to the RC Designation.*

The Regional Center is required to notify USCIS and to obtain an amendment to the RC Designation if there is a change to the information upon which the RC Designation was based. The Company believes that USCIS will not require an amendment to the RC Designation unless there has been a material change to the information previously provided. However, it is unclear what types of changes USCIS would consider material for this purpose. In the event of a material change to the business plan provided to USCIS for the Project between the time the I-526 Petition is filed and the time the investor applies for removal of conditions, the investor may be required by USCIS to file a new I-526 Petition incorporating changes in the Project. In some cases, this will necessitate a new two-year period of conditional permanent residence after which the investor will be expected to file a new I-829 Petition to remove conditions. Failure to obtain a needed amendment could have an adverse impact on the Project, the Offering and a Class B Member's ability to complete the required immigration procedures or to maintain his or her visa status.

*In order to benefit from the US$500,000 minimum Subscription Amount, the Property must be located within a designated Targeted Employment Area, and this designation may expire prior to completion of the Offering.*

The minimum investment threshold under the EB–5 Program is US$1.0 million. However, investors may qualify through investments of a reduced threshold amount of US$500,000 in a capital investment opportunity located in a qualifying rural area or in a state-designated high unemployment urban area known as a Targeted Employment Area. Although the state of Utah has determined that the Property is located within a Targeted Employment Area, this designation is valid only for one year. If, at the end of this period, the geographic area in which the Property is located no longer qualifies as a Targeted Employment Area, the state's designation will expire and will not be renewed. In that event, the Company intends to close the Offering and cause the Escrow Agent to return funds to any subscriber who has not yet filed his or her I-526 Petition.

***The Project may not sustain the number of direct or indirect jobs required to enable each subscriber to obtain and maintain lawful permanent residency in the United States.***

There can be no assurance that the Project will create and sustain of the number of direct or indirect jobs the Company has estimated over the period of time required under the EB-5 Program. To the extent the Project results in an insufficient number of jobs to enable each subscriber to obtain a favorable adjudication of his or her I-829 Petition, the Company will allocate jobs to subscribers in the order that each was admitted to the Company as a Class B Member. In that event, Class B Members admitted to the Company last would lose their right to lawful permanent residence in the United States.

*Active participation in the Company's business.*

The EB-5 Program requires that an applicant be actively involved in the business affairs of the company in which the applicant invests. The failure of a Class B Member to be actively involved in the business affairs of the Company may jeopardize the I-526 Petition approval or result in the denial of lawful permanent residence status for the Class B Member, his or her spouse and their qualifying children. The Operating Agreement, reflecting the regulations governing what level of participation is acceptable to meet the EB-5 Program criteria, mandates that each Class B Member shall participate in the management of the Company to the extent reflected therein. The right to approve certain decisions of the Company, as set forth in the Operating Agreement, is expected to be sufficient to meet the requirements of the EB-5 Program, but in the event that such rights are not sufficient, the Class B Manager are expected to cause the Operating Agreement to be amended to conform with such requirements.

***There is no guarantee that a Class B Member's I-526 Petition will be approved, that a Class B Member or any derivative beneficiary family member will successfully complete the Immigrant Visa Process or that a Class B Member's I-829 Petition will be approved.***

Investors in the Offering who have subscribed for Class B Units with the intention of seeking lawful permanent residence in the United States under the EB-5 Program should be aware of certain risk factors involving the EB-5 Program and its administration. There can be no assurance that USCIS will approve a Class B Member's I-526 Petition, that the Class B Member or any of the Class B Member's derivative beneficiary family members will successfully complete the Immigrant Visa Process or that USCIS will approve the Class B Member's subsequent I-829 Petition to remove the conditions attached to the Class B Member's lawful permanent residence. In addition, because a substantial portion of the Loan proceeds may be used to repay outstanding bridge financing and not to fund Development Costs directly, there can be no assurance that USCIS will take the position that this use of a subscriber's Subscription Amount constitutes a Qualifying Investment under the EB-5 Program.

***There are a limited number of EB-5 immigrant visas available under the EB-5 Program, and delays relating to unavailable visas could jeopardize an investor's ability to remove his or her conditions to permanent resident status.***

There are 10,000 EB-5 immigrant visas authorized in each U.S. government fiscal year of October 1 through September 30, and there can be no assurance that one of these visas will be available to an investor or an investor's qualifying family member in any particular fiscal year or at all. An investor whose immigrant visa is delayed may become ineligible to have the conditions of his or her permanent resident status removed if any of the following events occur: (i) USCIS does not articulate a policy regarding the sale or refinancing of projects prior to adjudication of I-829 Petitions, (ii) the Developer sells the Project prior to adjudication of each subscriber's I-829 Petition, (iii) the sale or refinancing proceeds are not distributed to the Class B Members, and (iv) USCIS subsequently determines that each subscriber's investment in the Project has not been sustained for the period of time required under the EB-5 Program.

***Due to high demand, subscribers who are residents of the People's Republic of China may face additional delays completing the Immigrant Visa Process.***

As of May 1, 2015, the U.S. Department of State announced that, of the 10,000 immigrant visas available under the EB-5 Program, the maximum number available to residents of the People's Republic of China had been reached for the U.S. government's 2015 fiscal year. In addition, the priority date for applicants from China is September 1, 2013. For the foreseeable future the maximum number of immigrant visas available to residents of the People's Republic of China is likely to remain insufficient, which will further delay completion of the Immigrant Visa Process for potential investors from the People's Republic of China. In particular, as a result of these delays, a derivative beneficial family member who is currently unmarried and under 21 years of age may become ineligible for conditional permanent residence in the United States if he or she reaches 21 years of age prior to completion of his or her consular interview.

***If the authority granted to USCIS to operate the regional center portion of the EB-5 Program expires prior to completion of the Offering, investors may be unable to obtain permanent residence in the United States.***

USCIS is currently authorized to receive, process and adjudicate investor petitions in connection with capital investment opportunities such as the Project that are affiliated with regional centers and rely on indirect job creation. This authority will expire on September 30, 2015 unless the United States Congress passes legislation to extend the regional center program that is then subsequently signed into law by the President. There are no assurances that Congress will pass such legislation or, if so, what changes the legislation might make to the EB-5 Program. Similarly, there are no assurances that the President would sign such legislation into law. Unless the regional center program is extended, after September 30, 2015 it is likely USCIS will no longer receive, process or adjudicate regional center proposals, I-526 Petitions, I-829 Petitions or I-485 Applications affiliated with regional centers relying on indirect job creation analyses.

***Issues with conditional removal.***

Condition removal may be denied by USCIS when the business assumptions utilized in the Economist's report are not realized. An I-526 Petition may be approved based upon an economist's report using a reasonable methodology to predict the number of indirect and induced jobs that will be created based upon a specific dollar investment in a specific project in a specific geographical area in a specific industry in a specific timeframe and other specific foundation facts. Although USCIS should not "second guess" the Economic Study during review of the Class B Member's I-829 Petition, USCIS will want proof that the assumptions relied upon in the report have been shown to be accurate. If they have not been shown to be accurate because of economic conditions, a change of plans, construction delays, or other changed circumstances, the Class B Member is at risk that the condition removal petition will not be approved.

***USCIS discretion.***

The EB-5 Program imposes many requirements that must be met to the satisfaction of USCIS. The failure to meet any of these requirements to the satisfaction of USCIS may result in a denial of the I-526 Petition.

***Grounds for exclusion.***

Persons applying for lawful permanent residence must overcome the statutory presumption of inadmissibility. Applicants must demonstrate, affirmatively, that they are admissible to the United States. There are many grounds of inadmissibility that the government may cite as a basis to deny admission for lawful permanent residence. Various statutes, including for example Sections 212, 237 & 241 of the INA Act, the Antiterrorism & Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 (IIRAIRA) set forth grounds of inadmissibility, which

may prevent an otherwise eligible applicant from receiving an immigrant visa, entering the United States or adjusting to lawful permanent residence.

Examples of aliens precluded from entering the United States include:

(a)    persons who are determined to have a communicable disease of public health significance;

(b)    persons who are found to have, or have had, a physical or mental disorder and behavior associated with the disorder which poses or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

(c)    persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(d)    persons who have been convicted of violating any law or regulation relating to a controlled substance or have admitted to having committed or admits committing acts which constitute the essential elements of same;

(e)    persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude;

(f)    persons who are known, or for whom there is reason to believe, are or have been, traffickers in controlled substances;

(g)    persons engaged in prostitution or commercialized vice;

(h)    persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

(i)    persons excludable on grounds related to national security, related grounds, or terrorist activities;

(j)    persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

(k)    persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(l)    persons who are likely to become a public charge at any time after entry;

(m)    persons who were previously deported or excluded and deported from the United States;

(n)    persons who by fraud or willfully misrepresenting a material fact, seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the Immigration Act);

(o)    persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

(p)     certain aliens who have departed the United States to avoid or evade U.S. Military service or training;

(q)     persons who are practicing polygamists; and

(r)     persons who were unlawfully present in the United States for continuous or cumulative periods in excess of 180 days.

**Change in laws.**

U.S. IMMIGRATION LAWS, REGULATIONS, POLICIES AND USCIS INTERPRETATIONS OF THE LAW MAY BE MODIFIED AT ANY TIME BY LEGISLATIVE, JUDICIAL OR ADMINISTRATIVE ACTION. ANY SUCH CHANGES MAY HAVE RETROACTIVE EFFECT WITH RESPECT TO PENDING OR APPROVED PETITIONS, AND MAY MODIFY THE STATEMENTS MADE IN THIS MEMORANDUM. PROPOSED LEGISLATION (SENATE BILL 1501), IF ENACTED, WOULD HAVE A NUMBER OF EFFECTS, INCLUDING BUT NOT LIMITED TO: INCREASING THE MINIMUM REQUIRED INVESTMENT AMOUNT; PROHIBITING GIFTS AS THE SOURCE OF FUNDS UNLESS RECEIVED FROM A SPOUSE, PARENT, CHILD, SIBLING, OR GRANDPARENT; PROHIBITING LOANS AS THE SOURCE OF INVESTMENT FUNDS UNLESS OBTAINED FROM A REPUTABLE BANKING OR LENDING INSTITUTION THAT IS PROPERLY CHARTERED OR LICENSED; AND SIGNIFICANTLY RESTRICTING THE AMOUNT OF INDIRECT JOB CREATION FOR WHICH EB-5 INVESTORS MAY TAKE CREDIT.

## Risks Related to Project Performance and Management

**_The Company is a newly formed legal entity, which makes it difficult to evaluate their business and prospects._**

The Company is a newly formed entity with no history of operations. As a consequence of being newly formed, the Company has no revenues or financial results upon which a potential investor can assess the financial feasibility of an investment in Class B Units or the Project. The Company's activities to date have been limited to the Offering. The interest payments under the Loan along with the repayment of principal under the Loan will be its sole source of revenue.

**_The Company's only business activity will be to extend the Loan to fund a portion of the costs of the Project._**

The Company expects to participate in one business activity, the Loan to fund a portion of the Development Costs. As a consequence, the aggregate return of the Company will be entirely dependent on the performance of the Project.

**_The success of the Project is dependent on key personnel._**

The success of the Project and therefore the repayment of each subscriber's investment in the Company depend in substantial part upon the skill and expertise of the key personnel of the Owner and the other individuals employed to assist them. There can be no assurance that these key personnel or such other individuals will continue to be associated with the Project. The loss of the services of one or more of these key personnel or such other individuals could have a material adverse effect on the Project.

**_The Owner includes related entities under the ultimate control of the Principals, and the Principals may engage in similar or competing business activities._**

The Owner is under the ultimate control of the Principals, who are not required to devote their full time to the Project and are free to engage in other business activities, including activities that compete with or are opposed to the best interests of the business of the Developer. Any fees, compensation or other amounts payable to the Principals and their affiliates from such business activities will inure solely to the benefit of

such persons. In addition, the Principals have limited real estate development and resort management experience, and their lack of experience may adversely affect the viability of the Project and the larger Summit Powder Mountain Resort.  The other activities of the Principals and the Owner create various conflicts of interest that may lead the Developer to make decisions for the benefit of another of the Development Group rather than for the benefit of the Developer, and ultimately the Company.  For example, the development of Summit Village benefits the entire Project and other aspects of the full development of Powder Mountain, and the Developer may do less to protect itself from foreclosure by the Company given the benefits derived to the Owner's other interests.  Any such foreclosure by the Company on collateral worth less than the Loan amount will result in losses to the Class B Members.

***The Owner has yet to decide whether to retain a third party professional management firm to operate the Summit Village hotel condominiums.  The Developer may change the business model for the hotel condominiums.***

The centerpiece of Summit Village is expected to be the Hotel Component. The success of this complex, together with an associated rental pool program by which purchasers of residential units will make their units available for rental to resort visitors, will depend in part on retaining experienced management for the complex. As of the date of this Memorandum, the Owner has not decided whether to operate the complex using its own resources or to retain a third party professional management firm to operate the complex. Failure to hire experienced and capable managers or to retain an experienced third party hotel operator could have an adverse impact on the Project.

Depending on market conditions, the Developer may determine to develop or convert some of the residential salable units to traditional   rental units that would remain owned by the Developer and operated by the Developer or a third party professional management firm under a hotel model.  The projections provided above under "Projected Cash Flow" do not reflect this potential usage case for the Hotel Component and there is no assurance that such a change in business model would not adversely affect the ability of the Developer to pay interest and principal due on the Loan.

***The Company and the Developer will operate in an uncertain and highly competitive marketplace.***

The Company will compete with a significant number of similar investment opportunities under the EB-5 Program, and the Developer will compete with a significant number of high-quality development projects for funding and prospective business. As a result, there can be no assurance that the Company will attract the desired number of subscribers or that it will acquire sufficient funds to make the anticipated Loan. In addition, there can be no assurance that the Developer will be able to attract the additional funding required to successfully construct the Project or, if it does, that the Project will be commercially successful.

***The success of the Summit Powder Mountain Resort destination resort depends on favorable weather conditions that are beyond the control of the Company or the Owner.***

The Owner's ability to attract existing and prospective residents and visitors to Summit Powder Mountain Resort is influenced by weather conditions, including the amount of snowfall during the ski season. Powder Mountain does not possess the equipment required to generate artificial snow. Prolonged periods of adverse weather conditions, or the occurrence of such conditions during peak visitation periods, could have a material adverse effect on Owner's operating results, as well as on price levels and sales velocity. In addition, due to severe weather conditions and cold temperatures, there is a very limited window each year (potentially as short as four months) for residential construction and most infrastructure projects, which tends to increase the time and costs for these activities and the risks that markets may have changed by the time the product or project is completed.

***The Company's Loan to the Developer will be subject to the risks generally incident to the operation of hotel, conference and activity facilities and associated common areas (including parking areas) (the "Project Activities").***

The risks associated with the operation of the Project Activities, include, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; new hotel openings resulting in an over-supply; relative appeal of particular types of facilities to patrons, customers and vendors; reduction in the cost of operating competing businesses; decreases in employment, reducing the demand for hospitality in the area; the possible need for unanticipated renovations; adverse changes in interest rates, cap rates and availability of funds; changes in operating expenses; changes in governmental rules and fiscal policies; acts of God, including earthquakes, which may cause uninsured losses; the financial condition of patrons and customers of the Project; environmental risks; loss to or condemnation of the Property; and other factors which are beyond the control of the Developer or the Company. Because hotel rooms are rented for relatively short periods of time compared to most commercial properties, hotels are impacted much more quickly by adverse economic conditions and competition than other commercial properties that are rented for longer periods of time. Decreases in actual Project income from anticipated amounts, or increases in operating expenses, among other factors, could result in the Developer's inability to meet all its cash obligations. Any decrease in Project income received by the Developer may reduce, and possibly eliminate, the amount of cash available to pay the Loan, since operating expenses, such as taxes, utility costs, maintenance, and insurance are unlikely to decrease significantly, and other expenses such as food, labor, advertising, and promotion may increase. If the income from operation of the Project is not sufficient to meet operating expenses, the Developer may have to dispose of the Project on disadvantageous terms in order to raise needed funds, which could leave little or no proceeds available to repay the Loan. Additional risks associated with hospitality and recreational development and ownership include the following: (a) a decrease in travel, both for business and pleasure, resulting from a variety of factors, including without limitation general economic conditions, travel patterns, the regional economy and reduced consumer spending; (b) competition within the hospitality and recreation industry itself for guests and patrons, which competition is intense and highly competitive, with some competitors possessing substantially greater marketing and financial resources that are used to increase marketing as well as to improve their facilities or reduce price; (c) the risk of seasonality of the Project's attraction to guests and visitors to the property; and (d) regulatory issues unique to the hospitality and recreation industry, including environmental compliance, and which would be outside the control of either the Developer and the Company.

***When completed, the Project is expected to produce a separate revenue stream from the proposed sale of condominium units to persons who may then be entitled to enjoy exclusive use of portions of the completed Project.***

The sale of condominium units presents a unique set of risk, including the following:

- no assurances can be made that the Owner will be able to sell the number of condominium units forecast in the business plan for the Project or that any condominium that are sold can be sold for the amount(s) forecast in the business plan for the Project;

- no assurances can be made that for any condominium units that are sold, the condominium owners will remain owners of their units for any extended period of time or that they will continue to pay the annual condominium dues or assessments forecast in the business plan for the Project;

- the number of condominium units sold, the initial price of each units, and the annual dues, assessments and fees charged, can all be reduced over time, resulting from a variety of factors, including without limitation general economic conditions, travel patterns, the regional economy and reduced consumer spending;

- competition for condominium units in the Project is unpredictable;

- other competitors in the condominium business that are proximate to the Project could begin to adopt business plans or models for their existing or new properties that create a competitive set that could become intense and highly competitive, and in such case some competitors would possess substantially greater marketing and financial resources that will be available to the Project; and

- the successful implementation of the condominium revenue model will be dependent upon the perceived value of the Project's name, brand and image, which in turn will be dependent upon the abilities of the Owner to develop a highly coveted and desirable exclusivity for those persons desiring to become condominium owners and use the Project.

If, for any of the above reasons or others, the sale of condominium units or the payment of assessments and dues associated with such units, or the price of the units is reduced below the amounts forecast in the business plan for the Project, the business and operations of the Project would be adversely affected and the ability of the Developer to repay the Loan may be impaired.

***The legal documents for the Loan may contain limited covenants regarding the Developer's activities.***

The Loan Documents are expected to provide only certain limited restrictions on the activities of the Developer, and, therefore, the Company may have only limited control over the activities of the Developer and over the Project, including payments that could be made by the Developer to its affiliates and other parties (e.g., payments to the Developer's affiliates for services rendered and distributions to the Developer's affiliates), which could reduce the amount of financial assets retained by the Developer or applied to the Project or the Loan and could affect the financial ability of the Developer to repay the Loan.

***The Company's creditors will have recourse only to Company assets.***

The Company's assets, including any investments made by the Company and any capital held by the Company, are available to satisfy all liabilities and other obligations of the Company. If the Company itself becomes subject to a liability, parties seeking to have the liability satisfied may have recourse to the Company's assets generally and not be limited to any particular asset, such as the asset giving rise to the liability.

***Uninsured losses may adversely affect the Company.***

Certain risks in connection with the Project are either uninsurable or not fully insurable at commercially reasonable rates. The occurrence of one or more of these risks could have a detrimental effect on the Company. Examples of uninsurable or partially uninsurable losses are those arising from hurricane, flood, earthquake, environmental disaster, war and act of nature, among others. Should such an uninsurable loss occur, the Company could suffer a loss of some or all of its capital.

***The Class B Members may lose their investment in the event of the bankruptcy of the Developer.***

The Developer may become the subject of voluntary or involuntary bankruptcy proceedings under applicable bankruptcy laws. Certain risks faced in bankruptcy cases that must be factored into the investment decision include, for example, the potential total loss of the Company's Loan and,

consequently, the potential total loss of the Class B Members' investment in the Company. Upon confirmation of a plan of reorganization under applicable bankruptcy laws, or as a result of a liquidation proceeding, the Company could suffer a loss of all or a part of the value of the Loan. A bankruptcy filing may adversely and permanently affect the Project. The bankrupt entity could lose market position and key employees, and the liquidation value of the bankrupt entity may not equal the liquidation value that was believed to exist prior to the making of the initial investment.

***The repayment of the Loan is not a personal obligation of the Developer and the Company must rely solely on the value of the Collateral, which may be insufficient.***

The repayment of the Loan is not a personal obligation of the Developer. The Company will have to rely solely on the value of the Collateral, or other permitted substitute collateral, or such portion thereof, or other security interest for any other permitted collateral if not real property (i.e., collateral) from time to time, and on the guaranties to be given by the Guarantor. The risk of lending against real estate assets increases as the ratio of the amount of the loan to the fair market value of the collateral securing the loan increases. There can be no assurance, in the event of a default under the Loan that the Company will be able to realize an amount equal to the estimated or appraised value of the Property or the Collateral on which the Loan was made or from the enforcement of any guaranties given to the Company. Further, while the Developer may be required to provide an additional parcel of land adjacent to the Property as collateral for the Loan, no assurances can be made as to the ultimate value, size, or location of such additional parcel of land. If the value of the Collateral, or other permitted substitute collateral, is insufficient to cover the repayment of the outstanding balance of the Loan, which will result in a loss of all or a portion of the investment of the Class B Members.

***Remedies for non-performing loans do not assure repayment as expected and the foreclosure process may be timely and expensive.***

The Loan may become "non-performing" (i.e., the Developer is not complying with its obligations) for a variety of reasons. If the Loan were to become non-performing, substantial workout negotiations or restructuring may be required, which may result in, among other things, a reduction in the interest rate and/or a write-down of the principal of the Loan. However, even if a restructuring were done, a risk exists that, upon maturity of the Loan, replacement "takeout" financing will not be available. It is also possible that the Company may, in certain circumstances, need to foreclose on the Collateral securing the Loan. While the collateral secures the Loan, the foreclosure process itself can be lengthy and expensive. Borrowers often resist foreclosure actions by asserting numerous claims, counterclaims and defenses against the lender including lender liability claims and defenses, even when such assertions may have no basis in fact, in an effort to prolong the foreclosure action. In some states, foreclosure actions can take several years or more to conclude. At any time during the foreclosure proceedings, the Developer may file for bankruptcy, staying the foreclosure action and further delaying the foreclosure process. Foreclosure litigation tends to create a negative public image of the collateral property and may result in disrupting ongoing leasing and management of the property. These risks mean that the security and other protections against Loan non-performance of the Loan may not work as well as is intended.

**Legal, Tax and Regulatory Risks**

**PROSPECTIVE SUBSCRIBERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES (INCLUDING U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES AND NON-U.S. TAX CONSEQUENCES) OF AN INVESTMENT IN THE COMPANY. CLASS B UNITS IN THE COMPANY ARE ONLY BEING SOLD TO ACCREDITED INVESTORS (UNLESS OTHERWISE DETERMINED BY THE CLASS B MANAGER IN THEIR SOLE AND ABSOLUTE DISCRETION) WHO HAVE REPRESENTED THAT THEY ARE RELYING SOLELY UPON THE ADVICE OF THEIR**

**OWN ADVISORS WITH RESPECT TO LEGAL, IMMIGRATION, TAX, BUSINESS, FINANCIAL AND OTHER ASPECTS OF AN INVESTMENT IN THE COMPANY.**

**There are various U.S. federal income tax risks associated with an investment in the Class B Units. Some, but not all, of the various risks associated with the U.S. federal income tax aspects of the Offering of which prospective Subscribers should be aware are set forth below. The effect of certain tax consequences on a Class B Member will depend, in part, on other items in the Class B Member's tax return. No attempt is made herein to discuss or evaluate the U.S. state or local or foreign tax effects on any Class B Member. Each Class B Member is urged to consult the Class B Member's own tax advisor concerning the effects of U.S. federal, state or local or foreign tax laws on an investment in the Class B Units and on the Class B Member's individual tax situation. Neither any Manager, any affiliates of a Manager or counsel for the Company has provided or is providing any tax (or other legal) advice to any holder of units or prospective Subscriber. This summary does not discuss the impact of various proposals to amend the Internal Revenue Code of 1986, as amended (the "Code"), which could change certain of the tax consequences of an investment in the Company.**

### *The Company's tax status for federal income tax purposes could change.*

The Company has been organized as a limited liability company under the laws of the State of Delaware. The Company will not apply for a ruling from the Internal Revenue Service (the "**IRS**") to be treated as a partnership for U.S. federal income tax purposes, but the Company intends to file its tax returns as a partnership for U.S. federal and state income tax purposes. Class B Members should recognize that many of the advantages and economic benefits of an investment in the Class B Units depend upon the classification of the Company as a partnership (rather than as an association taxable as a corporation) for U.S. federal and state income tax purposes. A change in this classification would require the Company to pay a corporate level tax on its income which would reduce cash available to fund distributions to Class B Members, prevent the flow-through of tax benefits, if any, for use on the Class B Members' personal tax returns, and require that distributions generally be treated as dividends to the extent of the Company's current and accumulated earnings and profits (as determined for U.S. federal income tax purposes), which together could materially reduce the yield from an investment in the Company. This Memorandum assumes that the Company will at all times be treated as a partnership for federal tax purposes. The continued treatment of the Company as a partnership is dependent on present law and regulations, which are subject to change, and there can be no assurance that the IRS will not successfully challenge the classification of the Company as a partnership.

### *Class B Member may become a United States person for federal income tax purposes.*

If USCIS accepts a Class B Member's I-526 Petition and admits the Class B Member to the United States as a conditional lawful permanent resident, it is anticipated that such Class B Member will automatically become a U.S. Person (as defined in "XV. CERTAIN INCOME TAX CONSIDERATIONS") and not be subject to the tax treatment afforded non-U.S. Persons unless such Class B Member's tax status changes in the future. The U.S. generally imposes income and estate tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions may eliminate some but not all of the risk of double taxation. Each state in the U.S. has its own separate income tax system. Class B Members should consider the tax effects of becoming a U.S. resident before investing. Prior to making an investment in the Company, a Class B Member should consult with his or her tax advisors with regard to the consequences of becoming a conditional lawful permanent resident of the U.S.

### *Class B Members may have taxable income without distributions.*

Income, gains, losses, deductions and credits from the Company will be allocated among the Class B Members for U.S. federal income tax purposes in accordance with the Operating Agreement, and Class B Members will be required to report such income, gains, losses, deductions and credits on their own

income tax returns whether or not they receive distributions of cash from the Company. It is possible that in a given year a Class B Member will be allocated income or gain that will be subject to tax in an amount in excess of the amount of cash (if any) distributed by the Company to the Class B Member, thus requiring the Class B Member to use funds from other sources to pay any tax liability arising from such allocation. If the Company incurs losses, Class B Members will not be able to deduct such losses if they exceed such Class B Members' tax basis in their Class B Units. In addition, the Internal Revenue Code imposes various limitations on the ability of certain persons to use losses and deductions arising from investments in entities such as the Company, including limitations relating to "passive losses," amounts "at risk" and "investment interest."

***Changes in federal and state income tax laws and policies may adversely affect Class B Members.***

There can be no assurance that U.S. federal and state income tax laws and Internal Revenue Service ("IRS") administrative policies respecting the income tax consequences described in this Memorandum will not be changed in a manner which adversely affects the interests of Class B Members.

***Certain risks are associated with forward-looking statements.***

This Memorandum or the other materials furnished to potential subscribers by the Company relating to the Project or an investment in the Class B Units (the "**Materials**") may contain certain forward-looking statements regarding the plans and objectives of the Company, including plans and objectives relating to the Project. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. Assumptions relating to the statements involve judgments with respect to, among other things, future political, economic, competitive and market conditions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company or the Managers, or any of their respective affiliates. The assumptions underlying the forward-looking statements may in retrospect turn out to have been unreasonable and inaccurate. Therefore, there can be no assurance that any forward-looking statements included in the Materials will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements included in the Materials, the inclusion of such information should not be regarded as a representation by the Company or any other person or entity that the objectives and plans of the Company will be achieved.

***Changes in applicable law may occur during the course of an investment in the Company.***

The Company must comply with various legal requirements, including requirements imposed by United States and foreign immigration laws, anti-money laundering laws, securities laws, commodities laws, tax laws and pension laws. Should any of those laws change over the life of the Company, the legal requirements to which the Company and the Class B Members may be subject could differ materially from current requirements.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Company. Potential subscribers should read the entire Memorandum and consult their own counsel and advisers before deciding to invest in the Company**.

## XIV.   CONFLICTS OF INTEREST

As a result of overlapping, or in some cases divergent, financial interests, transactions between the Company and (a) a Manager, (b) the Developer, to which the Company (under the control of any Manager) shall extend the Loan or (c) any affiliates or associated persons of the Manager or the Developer, may be entered into without the benefit of "arm's length" negotiations, and may involve actual or potential conflicts of interest, including, without limitation, the overlapping or divergent interests of one or more parties in connection with the Loan. In connection with such potential conflicts of interests, the Class B Members should note that the fiduciary duties, if any, of the Managers that may otherwise have been expected to apply under Delaware law have been modified by the Operating

Agreement and, in general, will not apply unless the Manager(s) actions involved gross negligence or intentional misconduct. The following constitutes a summary of the important areas in which the interests of the Managers or their members, managers, or officers may conflict with those of the Company, as well as certain conflicts of interest between the Class B Members and the Regional Center.

### Lack of Independent Representation.

The Class B Members have not been represented by independent counsel.  The attorneys that provide services relating to the Company perform their services on behalf of the Company and at the direction of the Class B Manager after its appointment as described herein.

### Control of the Company.

Subject to very limited rights of the Class B Members, the Class B Manager will be responsible for managing the operations of the Company, including administering the Loan pursuant to the Loan Agreement.  The Class B Manager's management of the Company's affairs may otherwise be affected as described further in the Operating Agreement.

### Company Opportunities.

The Managers and their members, managers, and officers have previously had presented to it and/or to them opportunities to serve in similar capacities, and have served or do serve in similar capacities, for other investment funds or vehicles, including ones that may be in competition with the Company, for the pursuit of other investment or funding opportunities, both under the EB-5 Program, and otherwise. Additionally, by reason of the Managers' management of the Company, including in particular the successful administration of the Loan pursuant to the Loan Agreement, the Managers and their respective members, managers, and officers may have presented to it or to them in the future opportunities to serve in similar capacities for other investment funds or vehicles, and to participate in other similar projects, both under the EB-5 Program, and otherwise, which might not otherwise have been made available to it or to them.  Each Class B Member should recognize that the Managers (or another legal entity formed by the Managers and/or their members directly) intend to investigate such opportunities, and may, in consequence, undertake to manage, participate in, develop, own, or acquire other future business opportunities, as well as continue those same activities with regard to existing businesses, all whether or not similar to the Project, and conceivably competitive therewith, for their own account, or for the account of others.  Any businesses so managed, developed, owned, or acquired by or participated in by the Managers or their affiliates (or continuing to be managed, developed, owned, or acquired by or participated in by any of them) will not constitute any part of the assets, properties, or rights of the Company, and neither the Managers, nor their members, managers, or officers, will have any obligation to offer such opportunities to the Company or its Class B Members.  Such persons also do not have any duty to account to the Company for profits derived from activities other than Company activities, and are under no duty (other than, to the extent applicable, any fiduciary duties of the Managers and officers of the Company to the extent not modified or eliminated under the Operating Agreement), to engage in such activities in a manner that does not affect the Company's investments.  In addition, the Managers are required to devote to the Company's affairs only as much time as the Managers deem necessary.  As such, it is possible that the Managers may have potential conflicts of interests with the Company.  In particular, Celona, which will serve as Class B Manager, also serves other clients and customers that are, and may in the future be, engaged in a project, business or other activity that competes with or is similar to the business of the Company.  Celona's clients include various companies that engage in businesses and activities that are similar to those of the Company.

### Diverse Membership.

The Class B Members of the Company may include persons in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the Company that may be more beneficial for the Company than for the Class B Members. In making decisions appropriate for the Company the

Managers will consider the business objectives of the Company as a whole, not the objectives of any Class B Member individually.

The Class B Members recognize that the Company was formed in connection with enabling the Class B Members to apply for visas under the EB-5 program. The Class B Members also recognize that the primary objective of the Company in furtherance of those EB-5 objectives is to make, manage and protect the Company's (and in turn the Class B Members') investment in the Loan. Initially, the Class B Members' immigration-related interests on the one hand (i.e., visa application and prospects) and their financial interests on the other hand (i.e., repayment of the Loan) are separate and do not present any immediate tension or conflict. However, the potential for conflict exists to the extent going forward the Class B Manager may face decisions where, for example, something that could benefit the Company's interests under the Loan may not similarly advance (or may even be detrimental to) the ability of the Class B Members to meet their visa conditions and requirements. The Class B Members acknowledge that the Class B Manager may take actions that will not equally benefit the immigration and economic interests of the Class B Members and that in some cases a decision in favor of one could come at a cost to the others.

### *Owner Conflicts of Interest*

Investors should be aware that the Owner is currently involved in other real estate projects both within the Powder Mountain area and outside such area, and plan to initiate further projects. These other activities of the Owner may detract from the financial and management resources that can be devoted to the activities of the Developer, which could in turn jeopardize the Developer's ability to repay the Loan. These other activities of the Owner may be directly competitive with the operations of Summit Village and any substitute collateral for the Loan and could impair the value of such collateral, which could in turn jeopardize the Developer's ability to repay the Loan.

The Owner, the Developer and the Principals are all affiliates of each other. These affiliates create various conflicts of interest that may lead one or more of these persons or entities to make decisions for the benefit of one of these other entities rather than for the benefit of the Developer. For example, the development of Summit Village benefits the entire Project and other aspects of the full development of Powder Mountain, and the Developer may do less to protect itself from foreclosure by the Company given the benefits derived from the Owner's other interests. Any such foreclosure by the Company on collateral worth less than the Loan amount will result in losses to the Class B Members.

The Developer is incentivized to repay the Loan by the threat of foreclosure of the Collateral if the Developer does not perform under the Loan. The manner in which the Developer is providing the significant majority of the equity for Summit Village construction limits the financial exposure to Developer associated with a foreclosure and may have the effect of reducing the financial impact to the Owner should the Loan not be repaid.

## XV.  CERTAIN INCOME TAX CONSIDERATIONS

An investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his or her investment in the Class B Units, and no tax advice will be provided hereunder or at any time in the future. The following is intended to be only a general discussion of certain aspects of the U.S. federal income taxation of the Company and Class B Members that should be considered by a prospective Subscriber. **PROSPECTIVE SUBSCRIBERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES (INCLUDING U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES AND NON-U.S. TAX CONSEQUENCES) OF AN INVESTMENT IN THE COMPANY.**

This discussion does not address all potential U.S. federal income tax consequences of an investment in the Company and does not discuss all of the tax consequences that may be relevant to a particular Subscriber or to certain Subscribers subject to special treatment under the federal income tax laws, including financial institutions, insurance companies, tax-exempt investors or, unless otherwise specifically addressed, Class B Members that are not U.S. persons for U.S. federal income tax purposes. Moreover, this summary does not address any U.S. federal tax consequences (such as the U.S. federal estate and gift tax or alternative minimum tax consequences), other than certain U.S. federal income tax consequences, or any state, local or non-U.S. tax consequences, of the acquisition, ownership, disposition or withdrawal of an investment in the Company.

If a partnership or other flow-through entity invests in the Company, the U.S. federal income tax treatment of a partner in the partnership or an owner of an equity interest in the flow-through entity generally will depend on the status of the partner or the owner and the activities of the partnership or flow-through entity. If a prospective subscriber is treated as a partner (or other owner) in a partnership (or other flow-through entity) for U.S. federal income tax purposes, such subscriber should consult with his or her tax advisor.

This summary is based upon provisions of the Code, applicable regulations, administrative rulings and judicial decisions in effect as of the date of this Memorandum, any of which may subsequently be changed, possibly retroactively, or interpreted differently by the IRS or the courts so as to result in U.S. federal income tax consequences different from those discussed below. No ruling will be requested from the IRS or any other taxing authority with respect to any of the tax consequences related to the Company's activities or a Class B Member's ownership of a Class B Unit. The IRS or a court might reach a contrary conclusion with respect to the issues addressed herein if the matter were contested. EACH PROSPECTIVE SUBSCRIBER IS URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR AND/OR COUNSEL WITH RESPECT TO ALL TAX ASPECTS OF THE ACQUISITION AND OWNERSHIP OF A CLASS B UNIT.

### *U.S. Tax Status*

The Company is expected to be treated for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation under currently applicable tax laws, and the following discussion assumes that such treatment will be respected. This treatment, however, is not binding on the IRS or the courts, and no ruling has been, or will be, requested from the IRS. No assurance can be given that the IRS will concur with such treatment or the tax consequences set forth below.

If the Company were for any reason classified as an association taxable as a corporation, the Company would be required to pay U.S. federal income tax at the corporate tax rate on its taxable income. In such case, the amount of cash available for distribution to the Class B Members would be less than if the Company were classified as a partnership. Moreover, any distributions by the Company to a Class B Member generally would be taxable to that member as a dividend to the extent of current and accumulated earnings and profits (as determined for U.S. federal income tax purposes) and profits or losses realized by the Company would not flow through to the Class B Members.

An entity that is otherwise classified as a partnership for U.S. federal income tax purposes may be treated as a corporation if it is a publicly traded partnership (a "**PTP**"). A PTP is a partnership the interests in which are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof. Treasury Regulations issued under Code Section 7704 provide safe harbors under which the interests in a partnership will not be considered readily tradable on a secondary market (or its substantial equivalent). In addition, Code Section 7704(c) contains an exception pursuant to which a PTP will not be treated as a corporation for federal tax purposes if at least 90% of its gross

income is from permitted passive sources and it is not required to register as an investment company under the Investment Company Act of 1940. Permitted passive sources include interest income (other than interest derived in the conduct of a financial or insurance business or dependent on the income or profits of the borrower) and dividend income, and gains from the sale of stocks and securities. The Company expects to qualify for one or more exemptions from treatment as a corporation under the PTP rules.

### Treatment of the Loan

The Company and the Developer intend to treat the Loan made by the Company to the Developer as indebtedness for U.S. federal income tax purposes. However, no assurances can be given that the IRS will not treat the Loan as an equity investment in the Developer or otherwise recharacterize the transaction in a manner that alters the expected tax consequences. Class B Members are urged to consult their own tax advisors regarding the consequences of the Loan being characterized as equity in the Developer for U.S. federal income tax purposes or whether other characterizations of the transaction may be applicable. The remainder of this discussion assumes that the Loan is properly treated as debt for U.S. federal income tax purposes.

This discussion does not address any tax consequences in the event the Developer defaults on the Loan and the Company forecloses on its interest in the Loan. Class B Members are urged to consult their own tax advisors regarding the tax consequences of the Company foreclosing on its interest in the Loan.

### Taxable Year

The Company's taxable year will be the calendar year or such other year as required by the Code. Tax information will be distributed to each Class B Member as soon as reasonably practicable after the end of the year.

### Certain Considerations for U.S. Class B Members

The following discussion summarizes certain significant U.S. federal income tax consequences to a Class B Member who directly owns an interest as a Class B Member; and is a citizen or resident individual of the United States, a corporation (or other entity taxable as a corporation) created or organized in or under the laws of the United States or any political subdivisions thereof, an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or a trust (i) for which a court in the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions, as such terms are defined for U.S. federal income tax purposes, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person (any such individual, corporation, estate or trust, is a "**U.S. Person**" or "**U.S. Class B Member**"). A "Non-U.S. Class B Member" is any Class B Member that is an individual, corporation, estate or trust and is not a U.S. Class B Member.

### Taxation of Company Income, Gain, Loss, Deductions and Credits

The Company will not pay U.S. federal income taxes, but each Class B Member will be required to report his or her allocable share (whether or not distributed) of the income, gains, losses, deductions and credits of the Company. It is possible that the Class B Members could incur income tax liabilities without receiving from the Company sufficient cash distributions to pay such tax liabilities. Each Class B Member is required to take into account in computing his or her federal income tax liability, and to report separately on his or her own federal income tax return, his or her distributive share of the Company's

income, gain, loss, deduction and credit for any taxable year of the Company ending within or with the taxable year of such Class B Member.

Pursuant to the Operating Agreement, items of the Company's taxable income, gain, loss, deduction and credit are allocated so as to take into account the varying interests of the Class B Members. There can be no assurance that the allocations of income, deduction, loss and gain for tax purposes made pursuant to the Operating Agreement will be respected by the IRS. It is possible that the IRS could challenge the Company's allocations as not being in compliance with Code Section 704(b) and the Treasury Regulations thereunder. Any resulting reallocation of tax items may have adverse tax and financial consequences to a Class B Member.

### *Distributions*

Distributions (other than liquidating distributions, which are discussed in the following paragraph) of cash and certain "marketable securities" (as that term is defined in the Code) to a U.S. Class B Member from the Company (including its share in any reduction in the Company's liabilities) will reduce the tax basis of such Member's Class B Units (but not below zero). If the tax basis of a U.S. Class B Member's Class B Units is reduced to zero, its share of any subsequent distributions of cash and the fair market value of certain marketable securities for any year (including its share in any reduction in the Company's liabilities in excess of its share of the Company's taxable income) generally will be taxable to such Member as though it were gain recognized on the sale or exchange of Class B Units.

Subject to certain exceptions under the Code, no gain will be recognized by a U.S. Class B Member with respect to distributions made to it in liquidation of its Class B Units unless the amount of cash and the fair market value of certain marketable securities distributed exceeds such Member's adjusted tax basis in its units immediately before the distribution. No loss may be recognized by a U.S. Class B Member with respect to liquidating distributions unless the property distributed consists solely of cash and certain marketable securities and then only to the extent that the amount of such distributed items is less than such member's adjusted tax basis in its units. The tax basis of any property received by a U.S. Class B Member in liquidation of its Class B Units generally will be equal to the adjusted tax basis of its interest, less the amount of any cash and certain marketable securities received in the liquidating distribution.

### *Interest and OID*

The Company will recognize interest income from the Loan that will be includible in the taxable income of U.S. Class B Members in each year that the Company owns the Loan.

Whether the Loan is issued with Original Issue Discount (as defined below) largely depends on the treatment and amount of certain fees paid to the Company. The Company and the Developer expect to treat the Loan as issued without any Original Issue Discount. If the Loan is issued with Original Issue Discount, each U.S. Class B Member will be required to include in his or her income the portion of the Original Issue Discount that accrues during any tax year as ordinary interest income, regardless of whether or not any cash is received by the U.S. Class B Member from the Company. "**Original Issue Discount**" is the excess of the Loan's stated redemption price at maturity (in general, the stated principal amount of the Loan and any other payments made under the Loan that do not constitute "qualified stated interest" (as defined in the Code) over the issue price (in general, the amount invested) of the Loan where that excess is equal to or more than a de minimus amount. A de minimus amount for this purpose is equal to one quarter percent (0.25%) of the Loan's stated redemption price at maturity multiplied by the number of complete years from the issue date of the Loan to the expected maturity date of the Loan.

### *Investment Interest and Passive Activity Limitations*

There are limits on the deduction of investment interest (i.e., interest on indebtedness properly allocable to property held for investment) of individuals, trusts and estates. In general, investment interest will be deductible only to the extent of the taxpayer's net investment income. For this purpose, net investment income will generally include net income from the Company and other income from property held for investment (other than income treated as passive business income). However, long-term capital gain is excluded from the definition of net investment income unless the taxpayer makes a special election to treat such gain as ordinary income rather than long-term capital gain. Interest which is not deductible in the year incurred because of the investment interest limitation may be carried forward and deducted in a future year in which the taxpayer has sufficient investment income. The Company will report separately to each U.S. Class B Member his or her distributive share of the investment interest expense of the Company, and each U.S. Class B Member must determine separately the extent to which such expense is deductible on the U.S. Class B Member's tax return.

Non-corporate investors (and certain closely held, personal service and S corporations) are subject to limitations on using losses from passive business activities to offset active business income, compensation income, and portfolio income (e.g., interest, dividends, capital gains from portfolio investment, royalties, etc.). The Company's distributive share of income or losses generally may be treated as passive activity income or losses. Accordingly, a U.S. Class B Member may be subject to the passive activity loss limitations on the use of any allowable Company losses and allocable Company expenses.

### *Deductibility of Company Investment Expenditures and Certain Other Expenditures*

Investment expenses of an individual, trust or estate are deductible only to the extent they exceed two percent (2%) of the taxpayer's adjusted gross income for the particular taxable year. In addition, the Code further restricts the ability of individuals with an adjusted gross income in excess of a specified amount to deduct such investment expenses. Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a non-corporate taxpayer in calculating such taxpayer's alternative minimum tax liability.

These limitations on deductibility may apply to a U.S. Class B Member's share of the trade or business expenses of the Company. The Company may make an allocation of its expenses among its various activities. There can be no assurance that any of its expenses will be considered trade or business expenses nor can there be any assurance that the IRS will agree with any allocation made by the Company.

A U.S. Class B Member will not be allowed to deduct syndication expenses attributable to the acquisition of Class B Units paid by such U.S. Class B Member or the Company. Any such amounts will be included in the U.S. Class B Member's adjusted tax basis for his or her Class B Units.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, U.S. Class B Members should consult their own tax advisors with respect to the application of these limitations and on the deductibility of their share of items of loss and expense of the Company.

### *Application of Basis and "At Risk" Limitations on Deductions*

The amount of any loss of the Company that a U.S. Class B Member is entitled to deduct on such U.S. Class B Member's income tax return is limited to such U.S. Class B Member's adjusted tax basis in his or her Class B Units as of the end of the Company's taxable year in which such loss is incurred. Generally, a U.S. Class B Member's adjusted tax basis for such U.S. Class B Member's Class B Units is

equal to the amount paid for such Class B Units, increased by the sum of: (i) such U.S. Class B Member's share of the Company's liabilities, as determined for U.S. federal income tax purposes, and (ii) such U.S. Class B Member's distributive share of the Company's realized income and gains, and decreased (but not below zero) by the sum of: (a) distributions (including decreases in such U.S. Class B Member's share of Company liabilities) made by the Company to such U.S. Class B Member and (b) such U.S. Class B Member's distributive share of the Company's losses and expenses.

A U.S. Class B Member that is subject to the "at risk" limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Company to the extent that they exceed the amount such U.S. Class B Member has "at risk" with respect to such U.S. Class B Member's Class B Units at the end of the year. The amount that a U.S. Class B Member has "at risk" will generally be the same as such U.S. Class B Member's adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Company (other than certain loans secured by real property) or any amount borrowed by the U.S. Class B Member on a non-recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

### Disposition of the Class B Units

Generally, a U.S. Class B Member will recognize capital gain or loss on the sale, redemption, exchange or other taxable disposition of a Class B Unit equal to the difference between (i) the proceeds of such disposition plus its share of liabilities of the Company and (ii) its tax basis. However, that portion of a selling U.S. Class B Member's gain allocable to "unrealized receivables" or "inventory items", each as defined in Code Section 751, will be treated as ordinary income. The deductibility of capital losses may be subject to limitation. The consequences of the limitations will vary depending on the tax situation of each taxpayer. Accordingly, each U.S. Class B Member should consult his or her own tax advisors with respect to these limitations.

### Medicare Tax

Non-corporate U.S. Class B Members will generally be subject to a 3.8% tax on the lesser of (i) the U.S. Class B Member's "net investment income" for the relevant taxable year and (ii) the excess of the U.S. Class B Member's modified adjusted gross income for the taxable year over a certain threshold. A U.S. Class B Member's net investment income will generally include any income or gain recognized by such U.S. Class B Member with respect to the Company, unless such income or gain is derived in the ordinary course of the conduct of such U.S. Class B Member's trade or business (other than a trade or business that consists of certain passive or trading activities).

### Tax Shelter Regulations

Taxpayers engaging in certain transactions, including certain loss transactions above a threshold, may be required to include a detailed disclosure with their annual U.S. federal income tax return in accordance with Treasury Regulations governing tax shelters and other potentially tax-motivated transactions. It is possible that the Company may engage in transactions that subject the Company and potentially its Members to such disclosure. A Member disposing of an interest at a taxable loss may also be subject to such disclosure. Transactions that are not currently subject to disclosure may become subject to disclosure by notice from the IRS. Potential Subscribers should consult their own tax advisors concerning any potential disclosure obligation under Treasury Regulations governing tax shelters and other potentially tax-motivated transactions and the possibility that significant penalties can be imposed

with respect to such transactions.

### *Certain U.S. Income Tax Considerations for Non-U.S. Class B Members*

The U.S. federal income tax treatment of a Non-U.S. Class B Member's investment in the Company is complex and will vary depending on the circumstances and activities of such Class B Member and the Company.  Each Non-U.S. Class B Member is urged to consult with his or her own tax advisor regarding the U.S. federal, state, local and foreign income, estate and other tax consequences of an investment in the Company.  The following discussion assumes that a Non-U.S. Class B Member is not subject to U.S. federal income taxes as a result of the Non-U.S. Class B Member's presence or activities in the U.S. other than as a Class B Member in the Company.

It is anticipated that upon the acceptance of a Non-U.S. Class B Member's I-526 Petition and the issuance of a temporary resident visa, such Non-U.S. Class B Member will automatically become a U.S. person for U.S. federal income tax purposes and not be subject to the tax treatment afforded Non-U.S. Class B Members unless such Class B Member's tax status changes in the future.  The U.S. generally imposes income and estate tax on all U.S. citizens and permanent residents based on worldwide income.  Treaties and various exemptions may eliminate some but not all of the risk of double taxation.  Each state in the U.S. has its own separate income tax system.  Non-U.S. Class B Members should consider the tax effects of becoming a U.S. resident before investing.   Prior to making an investment in the Company, a Non-U.S. Class B Member should consult with his or her tax advisors with regard to the consequences of becoming a lawful permanent resident of the U.S.

The tax consequences applicable to prospective Non-U.S. Class B Members generally will depend on whether the Company is deemed to be engaged in a U.S. trade or business.  If the Company is deemed to be engaged in a U.S. trade or business, then, a Non-U.S. Class B Member's share of Company income and gains will be deemed "effectively connected" with such a U.S. trade or business of the Company (including operating income from the Company) and will be subject to tax at normal graduated U.S. federal income tax rates.  A Non-U.S. Class B Member generally will be required to file a U.S. federal income tax return with respect to the Non-U.S. Class B Member's share of effectively connected income.  If the Company is deemed to be engaged in a U.S. trade or business, then the Company will be required to withhold U.S. federal income tax with respect to the Non-U.S. Class B Member's share of Company income that is effectively connected income.

In addition, a Non-U.S. Class B Member will generally be subject to U.S. federal withholding taxes at the rate of thirty percent (30%) on his or her share of any fixed, determinable, annual or periodic income realized by the Company (such as income from dividends, interest (including imputed interest) and Original Issue Discount that is not effectively connected with a U.S. trade or business of the Company.  Such withholding tax may be reduced or eliminated with respect to certain types of such income under an applicable income tax treaty.  In addition, interest income received by the Company may be exempt from such withholding with respect to Non-U.S. Class B Members under the "portfolio interest" rules contained in Section 871 or 881 of the Code, provided that the Non-U.S. Class B Member is eligible for such exemption and provides proper certification attesting to its eligibility.

### *FATCA*

In general, under the newly enacted Foreign Account Tax Compliance Act ("**FATCA**"), a thirty percent (30%) withholding tax will be imposed on payments of certain U.S. source income (including interest and dividends), and gross proceeds from the sale or other disposal of property that can produce U.S.-sourced interest or dividends, made to certain non-U.S. entities unless such non-U.S. entities comply with certain diligence and reporting requirements regarding certain of its U.S. (or U.S.-owned foreign entity) account

holders and/or direct and indirect U.S. owners. Such withholding could apply to payments made by the Company to Non-U.S. Class B Members that are entities. Accordingly, Non-U.S. Class B Members may have to provide certain information, representations and waivers of non-U.S. law as may be required by the Class B Manager to comply with such new rules in order to avoid such withholding tax, including, for example, in the case of indirect U.S. owners that are entities information relating to a Non-U.S. Class B Member and its "substantial United States owners" (within the meaning of Code Section 1473(2)), if any, or persons holding a "financial account" (within the meaning of Code Section 1471(d)(2)) with such Non-U.S. Class B Member. As a result, potential Subscribers are encouraged to consult with their tax advisors regarding the possible implications of this legislation on an investment in the Company.

### Possible IRS Challenges; Tax Audits

Class B Members should be aware that the IRS may challenge the Company's treatment of items of income, gain loss, deduction and credit, or its characterization of the Company's transactions, and that any such challenge, if successful, could result in the imposition of additional taxes, penalties and interest charges. The Class B Manager decides how to report the items on the Company's tax returns. In the event the income tax returns of the Company are audited by the IRS, the tax treatment of the Company's income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Class B Members. If the IRS audits the Company's tax returns, however, an audit of the Class B Member's own tax returns may result. The Class B Manager, designated as the "**Tax Matters Member**", has considerable authority to make decisions affecting the tax treatment and procedural rights of all Class B Members. In addition, the Tax Matters Member has the authority to bind certain Class B Members to settlement agreements and the right on behalf of all Class B Members to extend the statute of limitations relating to the Class B Members' tax liabilities with respect to Company items. The legal and accounting costs incurred in connection with any audit of the Company's tax returns will be paid off by the Company, but each Class B Member will bear the cost of audits of his or her own tax return.

### Possible Legislative or Other Action Affecting Tax Aspects

The foregoing discussion is only a summary and is based upon existing U.S. federal income tax law. Class B Members should recognize that the U.S. federal income tax treatment of an investment in Class B Units may be modified at any time by legislative, judicial or administrative action. Any such changes may have retroactive effect with respect to existing transactions and investments and may modify the statements made above. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the Treasury Department, resulting in revisions of the Treasury Regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Company. There can be no assurance that legislation will not be enacted that has an unfavorable effect on a Class B Member's investment in the Company.

This Memorandum does not address all of the U.S. federal income tax consequences to the Class B Member of an investment in the Company, and does not address any of the state or local tax consequences of such an investment to any Class B Member, or all of the U.S. or foreign tax consequences of such an investment to any Class B Member that is not a U.S. person for U.S. federal income tax purposes. Each Class B Member is advised to consult his or her own tax counsel as to the U.S. federal income tax consequences of an investment in the Company and as to applicable state, local and foreign taxes.

## XVI.    TAX AND LEGAL ASPECTS

Potential subscribers of the Class B Units should not construe the contents of this Memorandum or any prior or subsequent communications from the Regional Center, the Company, the Managers or any of their respective agents or representatives, as legal, tax, and/or investment advice. No representations are made as to the federal, state, or local income tax consequences resulting from an investment in the Class B Units. No assurances are given that any deductions or other income tax advantages that may be contemplated will be available. Each potential subscriber should consult his or her own legal counsel, accountant, and/or other professional adviser as to legal, tax, investment, accounting, securities and/or related matters concerning an investment in the Company, and each potential subscriber is responsible for all fees or charges of any such adviser.

## XVII.    RESTRICTIONS ON TRANSFERABILITY

The Class B Units being offered hereby have not been registered under the Securities Act or the securities laws of any jurisdiction, including any foreign jurisdictions, and are being offered in reliance upon an exemption from registration under Regulation S and/or Section 4(a)(2) of the Securities Act or Regulation D.  The right of subscribers to sell, transfer, hedge, pledge or otherwise dispose of the Class B Units will be limited by U.S. federal and state securities laws. The Operating Agreement also restricts the ability of the Class B Members to transfer their Class B Units. See "Transferability of Interests and Resignation" section of this Memorandum.  If the Subscriber is a resident or citizen of a country other than the United States, the transfer of Class B Units also may be subject to the securities laws of such country(ies).  The Company makes no representation with respect to compliance with the securities or other laws of any foreign jurisdiction.  See also "XIII. Risk Factors – Risks Related to the Offering and the Class B Units – Foreign Governmental Action."

**NOTICE TO RESIDENTS OF HONG KONG**

No person may offer or sell in Hong Kong, by means of any document, any Class B Units other than (a) to "professional investors" as defined in the Securities and Futures ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that ordinance.

No person may issue, or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Class B Units, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Class B Units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong.

The contents of this Memorandum have not been reviewed by any regulatory authority in Hong Kong. The recipient of this Memorandum is advised to exercise caution in relation to the offer. If the recipient of this Memorandum is in any doubt about any of the contents of this Memorandum, such recipient should obtain independent professional advice.

This Memorandum is delivered only to the recipient solely for the purpose of evaluating a possible investment in the Company and may not be used, copied, reproduced or distributed in whole or in part, to any other person (other than professional advisers of the potential investor receiving this document who are subject to confidentiality obligations). Subscriptions will not be accepted from any person other than the person to whom this Memorandum has been delivered.

This Memorandum may not be used, copied, reproduced or distributed in whole or in part by the recipient to any other person.

**NOTICE TO RESIDENTS OF JAPAN**

The Class B Units have not been and will not be registered under the Securities and Exchange Law of Japan ("**SEL**"), and the Class B Units may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (including Japanese corporations) or to others for re-offering or resale, directly or indirectly, in Japan or to any resident of Japan, except in compliance with the private placement directed solely to Qualified Institutional Investors (as defined under SEL) or otherwise except in compliance with the SEL and other applicable laws and regulations of Japan. In particular, Investors in Japan may transfer the Class B Units only to other Qualified Institutional Investors (a "**Transferee**") and should notify any Transferee in writing upon or prior to any transfer that (i) such Class B Units may only be transferred to Qualified Institutional Investors and (ii) any Qualified Institutional Investors to whom the Class B Units are subsequently transferred are subject to such condition. In this paragraph, "a resident/residents of Japan" shall have the meaning as defined under the Foreign Exchange and Foreign Trade Law of Japan.

This Memorandum is confidential and is intended solely for the use of its recipient. Any duplication or redistribution of this Memorandum is prohibited. The recipient of this Memorandum, by accepting delivery thereof, agrees to return it and all related documents to the Company if the recipient elects not to purchase any of the Class B Units offered hereby or if requested earlier by either Manager. Neither return of the principal amount nor distribution of profit is guaranteed. This investment in the Class B Units involves certain risks of deficit caused by fluctuation of interest rates, currency and other market factors, or the credit risk of the counter-parties or relevant parties thereof. Please read the terms of the investment carefully, in particular, those relating to limitations on the period in which rights relating to such investment can be exercised.

**NOTICE TO RESIDENTS OF PEOPLE'S REPUBLIC OF CHINA**

No invitation to offer, offer or sale will be made to the public in the People's Republic of China (which, for such purposes, does not include the Hong Kong or Macau special administrative regions or Taiwan) or by any means that would be deemed public under the laws of the People's Republic of China. The information relating to the securities contained in this Memorandum has not been submitted to or approved by the China Securities Regulatory Commission or other relevant governmental authorities in the People's Republic of China. The securities may only be offered or sold to Chinese investors authorized to buy and sell securities denominated in foreign exchange. Potential investors resident in the People's Republic of China are responsible for obtaining all relevant approvals from the Chinese government authorities, including but not limited to the State Administration of Foreign Exchange, before purchasing the securities.

### LIST OF EXHIBITS

A-1    FORM OF SUBSCRIPTION AGREEMENT

A-2    CONFIDENTIAL PROSPECTIVE INVESTOR QUESTIONNAIRE

B      OPERATING AGREEMENT

C      CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES

D      ESCROW AGREEMENT

E      FORM W-8BEN or W-9

F      PROJECT MAPS AND RENDERINGS

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

## EXHIBIT A-1

## FORM OF SUBSCRIPTION AGREEMENT

[See Attached]

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**<u>EXHIBIT A-2</u>**

**<u>CONFIDENTIAL PROSPECTIVE INVESTOR QUESTIONNAIRE</u>**

[See Attached]

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**<u>EXHIBIT B</u>**

**<u>OPERATING AGREEMENT</u>**

[See Attached]

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**<u>EXHIBIT C</u>**

**<u>CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES</u>**

[See Attached]

**Immigration Procedures**

This overview is for general informational purposes only and shall not be construed as legal advice. Prospective investors must consult a qualified immigration attorney prior to commencing the procedures set forth below.



**Investment Procedures**

**PHASE 1: SUBSCRIPTION**

If you are a foreign citizen residing outside the United States and are interested in evaluating this investment opportunity, you will be asked to complete and sign an Investor Suitability Questionnaire and provide legible copies of certain identification documents.

If the Company confirms that you may proceed, you will be issued a set of confidential offering documents to evaluate the investment opportunity with your legal and financial advisers.

If you decide to proceed with the investment and if the Company confirms your eligibility to proceed, you will complete and sign the Subscription Agreement, the Operating Agreement, tax forms and the Joinder to Master Escrow Agreement.

You will deliver all completed and signed documents to the Managing Member. You will deliver the $500,000 Subscription Amount, together with the $55,000 Administrative Fee to the Escrow Agent.

When you have completed the above steps, you will proceed to Phase 2 below.

**PHASE 2: I-526 PETITION**

You will provide contact information for your immigration attorney to the Company. The Company will provide your immigration attorney with documentation to support your I-526 Petition.

You and your immigration attorney should prepare and file your I-526 Petition with USCIS within 30 days of receiving this documentation. Unless you have retained the Hirson Immigration Law Firm as your immigration attorney, you may proceed with submission of your I-526 Petition only after the Company confirms in writing that you may do so.

Upon approval of your I-526 Petition, your immigration attorney will forward to the Company and the Escrow Agent a copy of your Form I-797 Approval Notice.

You will proceed with the process of obtaining lawful permanent residence in the United States via consular processing or an adjustment of status application. You will proceed to Phase 3 below at the appropriate time.

**PHASE 3: I-829 PETITION**

Within 90 days prior to the end of the second anniversary of the date your conditional permanent residence status was obtained, the Company will provide you and your immigration attorney with impact study results containing actual job creation numbers.

You and your immigration attorney must prepare and file your I-829 Petition with USCIS prior to the second anniversary of the date your conditional permanent residence status was obtained. Unless you have retained the Hirson Immigration Law Firm as your immigration attorney, you may proceed with submission of your I-829 Petition only after the Company confirms in writing that you may do so.

Upon approval of your I-829 Petition, USCIS removes the conditions of your lawful permanent residence in the United States. You continue to be a Series A Member and will receive distributions from your investment in the Company in accordance with the Operating Agreement.

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**<u>EXHIBIT D</u>**

**<u>ESCROW AGREEMENT</u>**

[See Attached]

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**<u>EXHIBIT E</u>**

**<u>FORM W-8BEN or W-9</u>**

[See Attached]

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**<u>EXHIBIT F</u>**

**<u>PROJECT MAPS AND RENDERINGS</u>**

[See attached]



**Summit Village**

| | |
|---|---|
| HOTEL | 130 ROOMS |
| COMMERCIAL | 30,000 SF |