# EXHIBIT 5

FINAL

DATED as of SEPTEMBER 20, 2015

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**

**KT SUMMIT DEVELOPMENT MANAGER, LLC**

---

**CLASS A MANAGEMENT AGREEMENT**

---

CONFIDENTIAL INFORMATION

THIS CLASS A MANAGEMENT AGREEMENT (this "**Agreement**") is made as of **SEPTEMBER 20, 2015** (the "**Effective Date**"),

AMONG

(1) **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**, a Delaware limited liability company having its office at c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Centre, 89 Queensway, Admiralty, Hong Kong (the "**Company**"); and

(2) **KT SUMMIT DEVELOPMENT MANAGER, LLC**, a Washington limited liability company having its office at 800 5th Avenue, Suite 4120, Seattle, WA 98104 ("**KT SUMMIT MANAGER**" or the "**Class A Manager**").

WHEREAS, the Company has issued that certain Confidential Private Placement Memorandum dated September 18, 2015 ("**PPM**"), as may be amended from time to time, for the making of a private offering of the Class B Units of membership interest in the Company to certain investors (the "**Offering**");

WHEREAS, SMHG Village Development LLC, a Delaware limited liability company (the "**Project Company**"), is planning to develop a mixed use retail, residential and hotel project on approximately 4.04 acres of land located in a gently sloping saddle near the summit of Powder Mountain located in Utah (the "**Development**");

WHEREAS, the Project Company will enter into one or more loan agreements, pursuant to which the Company will agree to loan up to US$150,000,000 in the aggregate to the Project Company with the capital to be contributed by the Class B Members (the "**Development Loan**");

WHEREAS, the Company has appointed KT SUMMIT MANAGER as the initial Class A Manager of the Company and KT SUMMIT MANAGER has accepted such appointment, subject to the provisions of that certain Amended and Restated Operating Agreement of the Company of even date herewith (as amended from time to time, the "**Operating Agreement**"); and

WHEREAS, KT SUMMIT MANAGER wishes to enter into this Agreement with the Company to further provide for the terms and conditions regarding the powers and duties of the Class A Manager and certain other matters.

NOW THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

IT IS AGREED

1. **INTERPRETATION**

    1.1 In this Agreement unless the context otherwise requires,

    "**Affiliate**"     means, with respect to a person, any other person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or under

Page 2

717617266.6

common control with, such initial person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights in such controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity;

| | |
|---|---|
| **"Business Day"** | means a day (except Saturday or Sunday) on which banks in Los Angeles, California, U.S.A. and Hong Kong are open for normal banking business; |
| **"Effective Date"** | means the date above first written; |
| **"person"** | means any natural person, corporation, partnership, trust, voluntary association, limited liability company, joint venture, unincorporated organisation, government (or any agency, instrumentality or political subdivision thereof) or other association or entity of any kind; |
| **"PPM"** | has the meaning set forth in the Recitals; |
| **"Subscriber"** | means a subscriber of one or more Class B Units (or, once such subscription has been accepted, a **"Class B Member"**) as provided for in the Subscription Agreement; |
| **"Transfer"** | means any sale, transfer, assignment, delegation, hypothecation, encumbrance or other disposition, whether voluntary or involuntary or by operation of law, and whether by gift, bequest or otherwise. In the case of a hypothecation, the Transfer shall be deemed to occur both at the time of the initial pledge and at any pledgee's sale or a sale by any secured creditor. For purposes hereof, "Transfer" shall include without limitation any material change of control or ownership of a party; and |
| **"USCIS"** | means the U.S. Citizenship and Immigration Services. |

1.2   Unless defined herein, capitalized terms in this Agreement shall have the meanings ascribed to them in the Operating Agreement.

1.3   Headings are included herein for convenience only and shall not be deemed part of or used in construing this Agreement; references using the singular shall include the plural (and vice versa); all pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the context

Page 3

717617266.6

CONFIDENTIAL INFORMATION

LENDERS_0003246

may require; and references to exhibits, attachments, annexures and numbered sections, clauses or paragraphs shall be to such addenda and provisions herein, and all such addenda are hereby incorporated herein by reference.

1.4  References to legislation or legislative provisions include any amendment, consolidation, extension or re-enactment from time to time, and any orders, regulations, instruments or other subordinate legislation made under that legislation or legislative provision.

2. **POWERS AND DUTIES**

    2.1  Subject at all times to the terms of the Operating Agreement, the other terms of this Agreement commencing from the Effective Date and the fiduciary duty of the Class A Manager under applicable law, the responsibilities of the Class A Manager as a manager of the Company shall be to (A) liaise on behalf of the Company with the Regional Center and with certain "finders" unaffiliated with the Company that identify Subscribers, and (B) perform services as further provided in the Operating Agreement. The Class A Manager shall provide all services and shall conduct its activities for the Company in accordance with the Operating Agreement and shall comply with all matters as referred to in Sections 5.1.1 and 5.2.4 of the Operating Agreement, all in the best interests of the Company. Notwithstanding the foregoing, the parties hereto agree and acknowledge that the Class A Manager shall (i) not be considered an offeror or an issuer of the securities contemplated by the Offering; and (ii) have no responsibilities with respect to the Company's compliance with foreign, federal, state and/or local taxation laws.

    2.2  The Company hereby covenants to the Class A Manager that it shall not permit or allow the adoption of any written amendment or variation to the Operating Agreement that would directly or indirectly adversely affect or impact the rights, powers and authority of the Class A Manager under the Operating Agreement as of the date hereof in any material respect without the prior written consent of the Class A Manager, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that such consent shall not be necessary where the amendment or variation is required for or is a condition to the approval of any petition filed by a prospective or existing Class B Member with the USCIS pursuant to the EB-5 Program or is required for compliance with the EB-5 Program by the Class A Manager or the Company.

3. **OBSERVANCE OF INSTRUCTIONS AND EXERCISE OF POWERS**

    3.1  The Class A Manager shall observe and comply with the Operating Agreement and the Act. The Class A Manager also shall observe and comply with all valid resolutions of the Members of which it has notice.

    3.2  The Company shall promptly provide written notice to, and inform the Class A Manager of, any amendment made to the Operating Agreement.

Page 4

717617266.6

CONFIDENTIAL INFORMATION                                    LENDERS_0003247

4. **REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company hereby represents and warrants to the Class A Manager that:

4.1    The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2    The Company has the authority to execute this Agreement and the execution of this Agreement and performance of its obligations hereunder do not conflict with or violate any legal or contractual obligations of the Company or require the consent of any third party. This Agreement is a valid and legally binding agreement and obligation enforceable in accordance with its terms.

4.3    As of the Effective Date, the Company has not entered into any agreement relating to any investment or loan or any agreement that is material to the business of the Company, other than the Operating Agreement, the Management Agreement in respect of the Company's Class B Manager, and any agreements that have been provided to KT SUMMIT MANAGER prior to the Effective Date.

4.5    Prior to the Effective Date, the Company has not incurred any debt or liability whatsoever (contingent or otherwise) that exceeds US$50,000 in the aggregate, other than fees and charges payable to professional advisers.

5. **REPRESENTATIONS AND WARRANTIES OF THE CLASS A MANAGER**

The Class A Manager hereby represents and warrants to the Company that:

5.1    The Class A Manager is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Washington.

5.2    The Class A Manager has the authority to execute this Agreement and the execution of this Agreement and performance of its obligations hereunder do not and will not conflict with or violate any legal or contractual obligations of the Class A Manager or require the consent of any third party. This Agreement is a valid and legally binding agreement and obligation enforceable in accordance with its terms.

5.3    The Company does not owe or have any liabilities due to the Class A Manager or any of its Affiliates.

6. **COMPENSATION AND EXPENSES**

6.1    The compensation for the services rendered by the Class A Manager shall from time to time be mutually agreed upon by the Company and the Class A Manager, subject to any approval rights of the Members pursuant to Sections 4.8 and 5.10 of the Operating Agreement. The Class A Manager hereby acknowledges that no portion of any compensation shall be paid from the capital contribution of any of the Class B Members.

6.2    Subject to Section 5.12 of the Operating Agreement, the Class A Manager shall be entitled to receive from the Company an amount equal to the

Page 5

reasonable third party out-of-pocket expenses incurred on behalf of the Company (whether as advance payment or as subsequent reimbursements, as the case may be) in carrying out its duties hereunder and under the Operating Agreement. The Class A Manager shall submit a written request to the Company no earlier than the tenth (10th) day of each month for any such advance payment of or reimbursement for third party out-of-pocket expenses incurred in the preceding month or earlier, which request shall be accompanied by copies of invoices and such other reasonable evidence of the amount and nature of such expenses.

7. **NO OTHER COMPENSATION**

   7.1   Except as provided in Section 6 and as may be provided under the Operating Agreement, the Class A Manager shall not be entitled to any other compensation or payments in connection with serving as Class A Manager.

8. **[RESERVED]**

9. **INDEMNITY**

   9.1   Without limiting and in addition to the indemnification and exculpation provisions set forth in the Operating Agreement, the Company hereby agrees to hold harmless and fully indemnify and defend (collectively "**indemnification**" or "**indemnify**" or any variation thereof) the Class A Manager against any and all claims, actions, suits, demands, damages, liabilities, obligations, losses, settlements, judgments, penalties, fines, costs and expenses (collectively "**Claims**") which may be brought against, suffered or incurred by the Class A Manager to the extent related to any actual or alleged act or omission of the Class A Manager in connection with the business of the Company or service to, for or at the request of the Company in good faith on behalf of or for the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company (including, but not limited to, any Claims relating to any actual or potential conflict of interest due to the Class A Manager acting in such manner as provided for in Section 10.1 in respect of the Company and/or other entities, or the Developer's failure to repay the Development Loan). Such indemnification shall include, but not be limited to, all reasonable legal fees and costs (on a full indemnity basis) and any other expenses reasonably incurred, but shall exclude Claims in any way arising out of, relating to or resulting from the gross negligence or intentional misconduct of the Class A Manager or, in the case of criminal proceedings, where the Class A Manager's conduct was unlawful.

   9.2   For the avoidance of doubt, the following shall not relieve the Company of its indemnification obligations: any failure of the Class A Manager to act, do or omit to do anything to the extent caused by or attributable to (a) any withholding of, or delay in giving approval by, the Class B Manager (if any) where approval by the Class B Manager is expressly required, and the Class A Manager has exercised reasonable efforts to obtain such approval by the Class B Manager (if any), or (b) any breach of the Operating Agreement by the Class B Manager.

Page 6

9.3 **[RESERVED]**

9.4 If, and to the extent that, Class A Manager should fail to perform any part or all of its obligations hereunder, then the Company shall have the right (but not the obligation) to perform and fulfil the Class A Manager's obligations with respect thereto and (i) Class A Manager shall reimburse the Company for any reasonable and documented out-of-pocket legal or other expenses incurred in connection therewith; (ii) the Company may offset any such expenses against any payments the Company is otherwise obligated to make to Class A Manager; and (iii) the Company shall have the right to commence legal proceedings to seek monetary damages against Class A Manager for the Company's fulfilment of such obligations on Class A Manager's behalf.

9.5 In order to confer the maximum benefit to the Class A Manager, references to the Class A Manager in this Section 9 are deemed to include without limitation each and all of the respective directors, officers, managers, stockholders, members, owners, employees and agents of the Class A Manager or its Affiliates (including but not limited to any professional advisers).

9.6 The indemnification provisions of this Section 9 shall be enforceable to the fullest extent not prohibited by applicable law, and notwithstanding any failure of the essential purpose of any remedy of any kind.

**10  CONFLICT OF INTEREST**

10.1 Section 5.9 of the Operating Agreement regarding Competing Activities shall apply to the Class A Manager, its Affiliates and their respective directors, officers, representatives, servants, agents, managers, members, permitted assigns and their respective associates.

**11.  TERM AND TERMINATION**

11.1 <u>Term</u>. This Agreement shall become effective on the Effective Date. Subject to Section 11.4, the Class A Manager shall not have the right to terminate this Agreement, or be permitted to resign and/or cease to act as the Class A Manager of the Company without the prior written consent of the Class B Manager.

11.2 <u>Without Cause.</u>  This Agreement may be terminated and the Class A Manager may be removed by the Class B Manager with not less than six (6) months' prior written notice served on the Class A Manager.

11.3 <u>Removal of Class A Manager for Cause.</u>  This Agreement may be terminated and the Class A Manager may be removed by the Class B Manager with written notice with immediate effect served on the Class A Manager in any of the following events:

(a) the Class A Manager goes into liquidation (except voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the other party), or if a

Page 7

717617266.6

CONFIDENTIAL INFORMATION                                                    LENDERS_0003250

        receiver or administrative receiver is appointed with respect to all or substantially all of the assets of the Class A Manager or an administrator is appointed to that party or if the Class A Manager convenes a meeting of creditors or makes or proposes to make any arrangements or compositions with or assignments for the benefit of its creditors or ceases or threatens to cease to carry on its business;

(b)     in the case of gross negligence or intentional misconduct of the Class A Manager, through no fault of the Class B Manager, the Company or the Project Company, without a right to cure;

(c)     the Class A Manager commits a material breach of this Agreement or the Operating Agreement, which breach is not capable of remedy, or if such breach is capable of remedy, the Class A Manager fails to fully cure such breach within thirty (30) calendar days of receipt of written notice of the breach from the Class B Manager; except where such breach is caused by the failure of the Class B Manager or the Project Company to provide the necessary information or documentation for the Class A Manager to properly discharge its obligations under this Agreement or the Operating Agreement, as applicable; or

(d)     the USCIS determines that the terms of this Agreement violate the rules and regulations of the EB-5 Program or would cause any petition filed by a Subscriber or Class B Member with the USCIS under the EB-5 Program to be denied approval.

11.4     <u>Termination by the Class A Manager for Cause</u>. The Class A Manager may immediately terminate this Agreement and its service as the Class A Manager by giving written notice to the Company in any of the following events:

(a)     the Class B Manager or the Company goes into liquidation (except voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the other party), or if a receiver or administrative receiver is appointed with respect to all or substantially all of the assets of the Class B Manager or the Company or an administrator is appointed to that party or if the Class B Manager or the Company convenes a meeting of creditors or makes or proposes to make any arrangements or compositions with or assignments for the benefit of its creditors or ceases or threatens to cease to carry on its business;

(b)     in the case of gross negligence or intentional misconduct by the Class B Manager or the Company, without a right to cure; or

(c)     the Class B Manager or the Company commits a material breach of this Agreement or the Operating Agreement, which breach is not capable of remedy, or if such breach is capable of remedy, the Class B Manager fails to fully cure such breach within thirty (30) calendar days of receipt of written notice of the breach from the Class A Manager; except where such breach is caused by the failure of any third party, including the Project Company, to provide the necessary information

Page 8

or funding for the Company to properly discharge its obligations under this Agreement or the Operating Agreement, as applicable.

11.5 Upon termination of this Agreement and resignation or removal of the Class A Manager under this Section 11 for any reason, the Class A Manager shall be entitled to receive all outstanding fees and other moneys (accrued up to the date of such termination) owing by the Company to the Class A Manager, subject to any claims by the Company or the Members (including, but not limited to, any Claims that are subject to indemnification hereunder), and the Class B Manager shall have the right to deduct or offset the amount of any such Claims against such fees or other moneys owing to the Class A Manager, except in the event of any dispute concerning the amount of any fee, in which case any payment thereof shall be subject to the final resolution of any dispute between the parties as generally provided hereunder. Without limiting the generality of the foregoing, upon termination of this Agreement under Section 11.3 (other than Section 11.3(d)), the Class A Manager shall reimburse the Company for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the appointment of a successor Class A Manager.

11.6 Upon any termination of this Agreement and resignation or removal of the Class A Manager, the Class A Manager shall promptly deliver to the Company, or as it shall direct, all books of account, records, registers, correspondence, documents and assets relating to the affairs of or belonging to the Company in the possession of, or under the control of, the Class A Manager.

11.7 Termination of this Agreement and resignation or removal of the Class A Manager will not affect any right vested in or accrued to any party pursuant to this Agreement as at or prior to the date of termination. Without limiting the generality of the foregoing, Section 9 (Indemnity), Section 10 (Conflict of Interest), this Section 11 (Termination), Section 12 (Confidentiality), Section 13 (Notices), Section 15 (General) and Section 16 (Governing Law and Jurisdiction) shall survive the termination of this Agreement and shall continue in full force and effect.

12. **CONFIDENTIALITY**

12.1 None of the parties hereto shall disclose to any third party (except with the prior written consent of the other party or unless ordered or required to do so by a court or arbitrator of competent jurisdiction, the USCIS, the U.S. Securities and Exchange Commission, or any other relevant competent authority to which such person is subject) during the term of this Agreement and for two (2) years after its termination, any information relating to the business, investments (including any potential or actual investment of the Company), finances or other matters of a confidential nature of the other parties of which it may in the course of its duties hereunder become possessed and each party shall use all reasonable endeavours to prevent any such disclosure. Notwithstanding the foregoing, the Company and the Class A Manager may disclose any such information to those of its employees, managers, agents, and Affiliates that have a need to know such information,

Page 9

and subject to any other confidentiality obligations applicable to such information, either party may disclose any such information to any, current or prospective Subscriber(s), current or prospective Class B Member(s) of the Company, lender or financier to the Company or the Project Company.  The obligation of confidentiality shall not apply to any information that (i) is or becomes generally available to the public other than as a result of a disclosure in violation of this Section 12, (ii) is or becomes available to a party on a non-confidential basis by a third party, or (iii) is known to a party prior to its disclosure to such party by another party.

12.2   The Class A Manager and any of its Affiliates shall be permitted to refer to the appointment hereunder in its corporate literature.

**13.   NOTICES**

13.1   All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be in the English language and delivered by hand delivery, facsimile, e-mail, reputable commercial carrier, or first-class mail, registered or certified, return receipt requested, postage prepaid, which, if properly addressed, shall be deemed to have been duly given (a) on the date of delivery if delivered personally, (b) on the date of the confirmation of transmission report generated by the facsimile machine if sent by facsimile, (c) on the third Business Day after deposit with a commercial carrier, (d) at the time the e-mail enters the receiving party's information processing system if sent by e-mail, or (e) on the tenth Business Day after deposit for delivery by first-class mail, if delivered to the party to whom notice is to be given, to the party as follows:

The Company:

| | |
|---|---|
| Address: | Summit Village Development Lender 1, LLC |
| | c/o Celona Asset Management (USA) Limited |
| | 2207-09, Tower Two, Lippo Centre |
| | 89 Queensway |
| | Admiralty, Hong Kong |
| Attn: | Backoffice Group |
| Facsimile: | (852) 2530-8100 |
| Email: | boffice@celonacapital.com |

The Class A Manager:

| | |
|---|---|
| Address: | 800 5th Avenue, Suite 4120 |
| | Seattle, WA 98104 |
| Attn: | KT Summit Development Manager, LLC |
| E-mail: | kevin@ktcapitalgroup.com |

CONFIDENTIAL INFORMATION                                                                                                                           LENDERS_0003253

14. **ASSIGNMENT**

    14.1    No party shall have any right or power to Transfer nor shall any party Transfer or otherwise cause or permit a Transfer (whether voluntarily or by operation of law or otherwise) of this Agreement or any of the rights or obligations of such party hereunder or any other interest in this Agreement, without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld or delayed.

15. **GENERAL**

    15.1    This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter hereof; provided, however, that for the avoidance of doubt, this Agreement is not intended to supersede or affect the Operating Agreement, or the other agreements or documents set forth in Section 10.2 of the Operating Agreement (Complete Agreement), all of which shall remain in full force and effect. In the event of any direct conflict between any provision of this Agreement and the Operating Agreement, the provision in the Operating Agreement shall be controlling to the extent necessary to resolve such conflict.

    15.2    If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid or unlawful or unenforceable, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid or unlawful or unenforceable shall not be affected thereby.

    15.3    An amendment of this Agreement is valid only if it is in writing and signed by or on behalf of the Company and the Class A Manager.

    15.4    The failure to exercise or delay in exercising a right or remedy provided by this Agreement or by law does not constitute a waiver of the right or remedy or a waiver of other rights or remedies. No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy.

    15.5    The rights and remedies contained in this Agreement are cumulative and not exclusive of rights and remedies provided by law.

    15.6    This Agreement may be executed in more than one counterpart, each of which shall, when taken together, constitute one agreement.

    15.7    Nothing in this Agreement shall be deemed to create any relationship of partnership or joint venture between any of the parties to this Agreement.

    15.8    Subject to the provisions of this Agreement relating to Transfer, this Agreement shall be binding upon and inure to the benefit of each of the parties and their respective successors and permitted assigns.

    15.9    Each of the parties is competent in the English language and understands all of

the provisions of this Agreement. The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

16. **GOVERNING LAW AND JURISDICTION**

16.1    This Agreement and all matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Delaware to the rights and duties of the parties; provided, however, that any right to arbitration hereunder shall be interpreted and governed solely by the Federal Arbitration Act, 9 U.S.C. §1 et seq. (as amended or superseded).

16.2    Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement shall be submitted to JAMS (hereafter, the "**Arbitration Service**") and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section 16.2. This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature. Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service. In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern. To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties. The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel. Unless mutually agreed by the parties otherwise, any arbitration shall take place in Los Angeles, California.

In the event of a dispute subject to this Section 16.2, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitration panel, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings. The remedial authority of the arbitration panel shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitration panel shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party. The arbitration panel shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing

Page 12

the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation. The parties and the arbitration panel shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitration panel shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section 16.2, the arbitration panel shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service. If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service. The initial fees and costs of the arbitration panel shall be borne equally by the parties. The prevailing party in such arbitration, as determined by the arbitration panel, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitration panel's compensation), expenses, and attorneys' fees.

The arbitration panel shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitration panel may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section 16.2 are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section 16.2, and this Section 16.2 shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Section 16.2 are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

(Signature page to follow.)

717617266.6

CONFIDENTIAL INFORMATION                                                              LENDERS_0003256

**IN WITNESS WHEREOF,** this Class A Management Agreement has been entered into by the parties hereto on the day and the year first before written

**COMPANY:**

SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC

By: CELONA ASSET MANAGEMENT (USA) LIMITED,
    its Class B Manager

By: _____
Name: Max Huang
Title: Duly Authorized Representative

**CLASS A MANAGER:**

KT SUMMIT DEVELOPMENT MANAGER, LLC

By: _____
Name:
Title:

Page 14

717617266.6

CONFIDENTIAL INFORMATION    LENDERS_0003257

**IN WITNESS WHEREOF,** this Class A Management Agreement has been entered into by the parties hereto on the day and the year first before written

**COMPANY:**

SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC

By:    CELONA ASSET MANAGEMENT (USA) LIMITED,
        its Class B Manager


By: _____
Name: Max Huang
Title:   Duly Authorized Representative


**CLASS A MANAGER:**

KT SUMMIT DEVELOPMENT MANAGER, LLC

By: _/s/ Kevin Stamper_____
Name:  Kevin Stamper
Title:   Authorized Representative

Page 14

CONFIDENTIAL INFORMATION    LENDERS_0003258