# EXHIBIT 6

FINAL

DATED effective as of SEPTEMBER 20, 2015

SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC

CELONA ASSET MANAGEMENT (USA) LIMITED

---

CLASS B MANAGEMENT AGREEMENT

---

CONFIDENTIAL INFORMATION                    LENDERS_0003293

FINAL

THIS CLASS B MANAGEMENT AGREEMENT (this "**Agreement**") is made effective as of **SEPTEMBER 20, 2015** (the "**Effective Date**"),

BETWEEN

(1) **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**, a Delaware limited liability company having its office at 800 5th Ave Suite 4120, Seattle, WA 98104 (the "**Company**"); and

(2) **CELONA ASSET MANAGEMENT (USA) LIMITED**, a company incorporated under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, having its registered office at 2207-09, Tower Two, Lippo Centre, 89 Queensway, Admiralty, Hong Kong ("**Celona**", or the "**Class B Manager**").

WHEREAS, SMHG Village Development, LLC, a Delaware limited liability company (the "**Project Company**"), is planning to develop a mixed use retail, residential and hotel project on approximately 4.04 acres of land located in a gently sloping saddle near the summit of Powder Mountain located in Utah (the "**Development**");

WHEREAS, the Project Company will enter into one or more loan agreements, pursuant to which the Company will agree to loan up to US$150,000,000 (being the "**Maximum Loan Amount**") in the aggregate to the Project Company with the capital to be contributed by the Class B Members (the "**Development Loan**");

WHEREAS, the Company has appointed Celona as the initial Class B Manager of the Company and Celona has accepted such appointment, subject to the provisions of the Operating Agreement; and

WHEREAS, Celona wishes to enter into this Agreement with the Company to further provide for the terms and conditions regarding the powers and duties of the Class B Manager and certain other matters.

NOW THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

IT IS AGREED

1.   **INTERPRETATION**

     1.1   In this Agreement unless the context otherwise requires,

Page 2

CONFIDENTIAL INFORMATION                                                                                              LENDERS_0003294

FINAL

| | |
|---|---|
| "**Affiliate**" | means, with respect to a person, any other person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such initial person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights in such controlled corporation or limited liability company and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity; |
| "**Business Day**" | means a day (except Saturday or Sunday) on which banks in New York, New York, U.S.A. and Hong Kong are open for normal banking business; |
| "**Class B Member**" | means any member of record holding and to the extent it holds Class B Units; |
| "**Initial Disbursement Date**" | means the date of the first disbursement to the Project Company under the Development Loan agreement; |
| "**Operating Agreement**" | means the Amended and Restated Operating Agreement of the Company of even date herewith, as amended from time to time; |
| "**person**" | means any natural person, corporation, partnership, trust, voluntary association, limited liability company, joint venture, unincorporated organisation, government (or any agency, instrumentality or political subdivision thereof) or other association or entity of any kind; |
| "**Subscriber**" | means a subscriber of one or more Class B Units as provided for in the Subscription Agreement; |
| "**Transfer**" | means any sale, transfer, assignment, delegation, hypothecation, encumbrance or other disposition, whether voluntary or involuntary or by operation of law, and whether by gift, bequest or otherwise. In the case of a hypothecation, the Transfer shall be deemed to occur both at the time of the initial pledge and at any pledgee's sale or a sale by any secured creditor. For purposes hereof, "Transfer" shall include without limitation any material change of control or ownership of a party; and |
| "**USCIS**" | means the U.S. Citizenship and Immigration Services. |

CONFIDENTIAL INFORMATION

LENDERS_0003295

FINAL

1.2   Unless defined herein, capitalized terms in this Agreement shall have the meanings ascribed to them in the Operating Agreement.

1.3   Headings are included herein for convenience only and shall not be deemed part of or used in construing this Agreement; references using the singular shall include the plural (and vice versa); all pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the context may require; and references to exhibits, attachments, annexures and numbered sections, clauses or paragraphs shall be to such addenda and provisions herein; all such addenda are hereby incorporated herein by reference.

1.4   References to legislation or legislative provisions include any amendment, consolidation, extension or re-enactment from time to time, and any orders, regulations, instruments or other subordinate legislation made under that legislation or legislative provision.

2.   **POWERS AND DUTIES**

2.1   The Company acknowledges and agrees that (i) none of the services provided by the Class B Manager shall constitute or be construed as legal, tax, investment or divestment advice in relation to any asset or property; and (ii) the Class B Manager's acceptance of its appointment as an independent manager of the Company shall not constitute or be construed as an endorsement by the Class B Manager of the business prospects of the Project Company, the Development, the Development Loan, or the investment merit or recoverability of the Development Loan.

2.2   The Company agrees that the Company shall not allow the amendment of any provision of the Operating Agreement that would directly or indirectly adversely affect or impact any of the rights, powers and authority of the Class B Manager under the Operating Agreement without the prior written consent of the Class B Manager, which consent shall not be unreasonably withheld, delayed or conditioned.

3.   **OBSERVANCE OF INSTRUCTIONS AND EXERCISE OF POWERS**

3.1   The Class B Manager shall perform its obligations under the Operating Agreement in accordance with applicable law. The Class B Manager shall comply with and give due effect to all valid Member actions of which it has due notice and to which the Class B Manager's actions or the Company are subject.

3.2   The Company shall promptly provide written notice to, and inform the Class B Manager of, any amendment made to the Operating Agreement that has not been authorized by the Class B Manager; provided, however, that the foregoing is not intended to limit Class B Manager's rights to consent to amendments under Section 2.2 of this Agreement and under the Operating Agreement.

CONFIDENTIAL INFORMATION                                                                                                  LENDERS_0003296

4.  **REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

    The Company hereby represents and warrants to Celona that:

    4.1   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

    4.2   The Company has the authority to execute this Agreement and the execution of this Agreement and performance of its obligations hereunder do not conflict with or violate any legal or contractual obligations of the Company or require the consent of any third party. This Agreement is a valid and legally binding agreement and obligation enforceable in accordance with its terms.

    4.3   As of the Effective Date, the Company has not entered into any agreement relating to any investment or loan or any agreement that is material to the business of the Company, other than the Operating Agreement, the Management Agreement in respect of the Company's Class A Manager, the reimbursement agreement with the Project Company, the statement of representations, warranties and indemnity given by the Project Company and any agreement in connection with the identification of potential investors in the Company prior to the date hereof.

    4.4   Prior to the Effective Date, the Company has not entered into any agreement with the Project Company, other than the reimbursement agreement with the Project Company and the statement of representations, warranties and indemnity given by the Project Company.

    4.5   Prior to the Effective Date, the Company has not incurred any debt or liability whatsoever (contingent or otherwise), other than fees and charges payable to professional advisers.

5.  **REPRESENTATIONS AND WARRANTIES OF THE CLASS B MANAGER**

    Celona hereby represents and warrants to the Company that:

    5.1   Celona is a limited liability company duly organized, validly existing and in good standing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.

    5.2   Celona has the authority to execute this Agreement and the execution of this Agreement and performance of its obligations hereunder do not and will not conflict with or violate any legal or contractual obligations of the Class B Manager or require the consent of any third party. This Agreement is a valid and legally binding agreement and obligation enforceable in accordance with its terms.

6.  **COMPENSATION AND EXPENSES**

    6.1   The Company shall pay to the Class B Manager the following fees:

CONFIDENTIAL INFORMATION                                                                 LENDERS_0003297

    a) upon the filing of a total of ten (10) Class B Members' or Subscribers' Form I-526 Petitions, a retainer payment of US$300,000, payable on or before ten (10) days following the end of the next full calendar month (the "**Retainer Payment**"); and

    b) The Company shall pay to the Class B Manager a quarterly fee ("**Quarterly Fee**") equal to 1% per annum of the maximum principal amount that may be disbursed to the Project Company under the Loan agreement (the "**Actual Loan Amount**"), which shall accrue daily and be payable quarterly in arrears by equal quarterly payments within five (5) Business Days of the commencement of each calendar quarter commencing on the date of first disbursement of the Loan from the Company to the Project Company (the "**First Release Date**"), provided that each of the eight (8) initial quarterly payments (not including the first quarterly payment covering an incomplete calendar quarter on a pro rata basis) will be reduced by an amount equal to one-eighth of the Retainer Payment, and until the later of (i) the date on which all Class B Members shall have received final, non-appealable decisions from the USCIS regarding their Form I-829 Petitions or shall be no longer participating in the EB-5 Program in accordance with the terms of the Operating Agreement, or (ii) the full repayment of all outstanding amounts under the Development Loan agreement. For the avoidance of doubt, if the Actual Loan Amount is less than the Maximum Loan Amount, the remaining Quarterly Fees shall be reduced proportionately so that the sum of all Quarterly Fees and the Retainer Payment payable under this Section 6.1 will equal 1.0% per annum of the Actual Loan Amount.

All Quarterly Fees shall be (i) calculated on an "actual/360" and non-compounding basis, and (ii) prorated for any partial quarterly period. The Capital Contributions of the Class B Members shall not be utilized to pay the fees set forth herein to the Class B Manager.

6.2    Subject to Section 5.12 of the Operating Agreement, the Class B Manager shall be entitled to receive from the Company an amount equal to all out-of-pocket expenses incurred by the Class B Manager, including via any person performing Delegated Services (as defined below), on behalf of the Company (whether as advance payment or as subsequent reimbursements, as the case may be) in connection with serving as Class B Manager. The Class B Manager shall submit a written request to the Company no earlier than the tenth (10th) day of each month for any such advance payment of or reimbursement for expenses incurred in the preceding month or earlier, which request shall be accompanied by copies of invoices, receipts, and other reasonable evidence of the amount and nature of such expenses.

6.3    The Company shall on demand pay to the Class B Manager interest on any payment under this Section 6, including the Quarterly Fee, that was due but not yet paid which interest shall accrue at a rate of five and one-half percent (5.5%) per

CONFIDENTIAL INFORMATION                                                                                                           LENDERS_0003298

annum calculated on a daily basis from the due date until the date the outstanding payment is paid in full, provided that such delay in payment is caused by the failure of the Project Company to provide the necessary funding for the Company to make such payments under this Section 6.

**7.    NO OTHER COMPENSATION**

7.1    Except as provided in Section 6 and as may be provided under the Operating Agreement, the Class B Manager shall not be entitled to any other compensation or payments in connection with serving as Class B Manager.

**8.    POWER OF DELEGATION**

8.1    The Class B Manager in the performance of its duties and in the exercise of any of the functions, powers, duties and discretions as Manager under the Operating Agreement may, as it considers desirable or necessary in its reasonable judgment, at the expense of the Company (so long as such expense is reasonable), engage any broker, lawyer, accountant, valuation expert, surveyor, auctioneer, advisor or other professional, experts or third parties for purposes of obtaining expert or professional opinions and advice, and may fully act or rely upon such opinions, advice or information in good faith, and the Class B Manager shall not be under any duty to independently verify such opinion, advice or information. The Class B Manager shall have no liability for relying or acting upon such opinions, advice or information in the absence of gross negligence or intentional misconduct of the Class B Manager.

8.2    The Class B Manager may delegate any of its authority, functions or powers under this Agreement or the Operating Agreement to any other person, including, without limitation, any of its Affiliates or any officer, employee, adviser or consultant of the Company and any such delegation may be on such terms and conditions as the Class B Manager determines ("**Delegated Services**"); provided, however that, (i) unless provided to the contrary under the Operating Agreement, the Company shall not be obligated to pay any additional fees, compensation or expenses with respect to any Delegated Services, all of which shall be borne solely by the Class B Manager; (ii) the Class B Manager shall remain responsible, to the extent Class B Manager liability is not eliminated, for the acts or omissions of all persons to whom it delegates any of the Delegated Services, and such acts or omissions shall be deemed to be the acts or omissions of the Class B Manager for all purposes; and (iii) the services that may be obtained under Section 8.1 shall not be deemed to be Delegated Services. The Class B Manager shall be entitled to assign a portion of its compensation under Section 6.1 to any person performing the Delegated Services, and upon receipt of written notice of such assignment, the Company shall pay such amounts directly to such person. Notwithstanding the above, the Class B Manager is authorized, at the expense of the Company, to appoint such officers, employees, advisers or consultants of the Company as permitted under and pursuant to the Operating Agreement, who perform services for the benefit of the Company.

CONFIDENTIAL INFORMATION                                    LENDERS_0003299

FINAL

9. **INDEMNITY**

    9.1    Without limiting and in addition to the indemnification and exculpation provisions set forth in the Operating Agreement, the Company hereby agrees to hold harmless and fully indemnify and defend (collectively "**indemnification**" or "**indemnify**" or any variation thereof) the Class B Manager against any and all claims, actions, suits, demands, damages, liabilities, obligations, losses, settlements, judgments, penalties, fines, costs and expenses (collectively "**Claims**") which may be brought against, suffered or incurred by the Class B Manager to the extent related to any actual or alleged act or omission of the Class B Manager in connection with the business of the Company or service to, for or at the request of the Company in good faith on behalf of or for the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company (including, but not limited to, any Claims relating to any actual or potential conflict of interest due to the Class B Manager acting in such manner as provided for in Section 10.1 in respect of the Company and/or other entities, or the Project Company's failure to repay the Development Loan). Such indemnification shall include, but not be limited to, all reasonable legal fees and costs (on a full indemnity basis) and any other expenses reasonably incurred, but shall exclude Claims resulting from the gross negligence or intentional misconduct of the Class B Manager or, in the case of criminal proceedings, where the Class B Manager's conduct was unlawful.

    9.2    For the avoidance of doubt, the following shall not relieve the Company of its indemnification obligations: any failure of the Class B Manager to act, do or omit to do anything to the extent caused by or attributable to (a) any withholding of, or delay in giving approval by, the Class A Manager (if any) where approval by both Managers is required, and the Class B Manager has exercised reasonable efforts to obtain such approval by the Class A Manager (if any), or (b) any breach of the Operating Agreement by the Class A Manager.

    9.3    In order to confer the maximum benefit to the Class B Manager, references to the Class B Manager in this Section 9 are deemed to include without limitation each and all of the respective directors, officers, managers, stockholders, members, owners, employees and agents of the Class B Manager or its Affiliates and their permitted assigns (including but not limited to any professional advisers), and any person who performs the Delegated Services and its Affiliates, as the case may be, subject to Section 8.2.

    9.4    The indemnification provisions of this Section 9 shall be enforceable to the fullest extent not prohibited by applicable law, and notwithstanding any failure of the essential purpose of any remedy of any kind.

10    **CONFLICT OF INTEREST**

    10.1    Section 5.9 of the Operating Agreement regarding Competing Activities shall apply to the Class B Manager, its Affiliates and their respective directors, officers,

Page 8

representatives, servants, agents, managers, members, permitted assigns, any provider of Delegated Services and their respective associates.

## 11. TERMINATION

11.1 <u>Term</u>.  This Agreement shall become effective on the Effective Date and shall continue in effect, and Celona shall continue to act as the Class B Manager of the Company, until this Agreement is terminated in accordance with this Section 11, provided always that this Agreement shall not be terminated and the Class B Manager shall not be removed at any time prior to the first anniversary of the date of the first disbursement of the Development Loan subsequent to the approval of a Subscriber's or Class B Member's Form I-526 Petition by the USCIS (the "**First Anniversary**"), unless earlier terminated pursuant to Section 11.4.

11.2 <u>Without Cause</u>.  Subject to Section 11.4, after the First Anniversary, this Agreement may be terminated and the Class B Manager may be removed with not less than six (6) months' prior written notice served on the Class B Manager.

11.3 <u>Resignation</u>.  The Class B Manager may resign at any time following the First Anniversary with not less than six (6) months' prior written notice thereof served on the Class B Members. The resignation of the Class B Manager shall take effect upon (i) the expiration of the notice period or upon such later date as shall be specified in the notice and the acceptance of the resignation shall not be necessary to make it effective, and (ii) the approval by the Members of the appointment of a successor Class B Manager in accordance with the procedures set forth in Section 5.2.1 of the Operating Agreement and the execution by such successor Class B Manager of a Class B Management Agreement on terms approved by the Members in accordance with Section 4.5 and Section 4.8.8 of the Operating Agreement.

11.4 <u>Removal of Class B Manager</u>.  The Class B Manager may be removed for or without cause only by the Class B Members, in such manner and on such conditions as set forth herein and subject to Section 5.2.3 of the Operating Agreement.  The Class B Manager may be removed for cause in any of the following events:

(a) the Class B Manager goes into liquidation (except voluntary liquidation for the purposes of restructuring or amalgamation), or if a receiver or administrative receiver is appointed with respect to all or substantially all of the assets of the Class B Manager or an administrator is appointed for the Class B Manager or if the Class B Manager convenes a meeting of creditors or makes or proposes to make any arrangements or compositions with or assignments for the benefit of its creditors or ceases or threatens to cease to carry on its business;

(b) in the case of demonstrated gross negligence or intentional misconduct by the Class B Manager without a right to cure;

CONFIDENTIAL INFORMATION                                                                                LENDERS_0003301

FINAL

    (c)    the Class B Manager commits a material breach of this Agreement or the Operating Agreement, which breach is not capable of remedy, or if such breach is capable of remedy, the Class B Manager fails to fully cure such breach within thirty (30) calendar days of receipt of written notice of the breach from the Class A Manager; except where such breach is caused by the failure of the Class A Manager or the Project Company to provide the necessary information or documentation for the Class B Manager to properly discharge its obligations under this Agreement or the Operating Agreement, as applicable; or

    (d)    subject to Section 5.13.2 of the Operating Agreement, the USCIS determines that the terms of this Agreement violate the rules and regulations of the EB-5 Program or would cause any petition filed by a Subscriber or Class B Member with the USCIS under the EB-5 Program to be denied approval, and the foregoing cannot be remedied by reasonable amendments to this Agreement by mutual agreement of the parties hereto.

11.5    <u>Termination by Class B Manager for Cause</u>.  The Class B Manager may immediately terminate this Agreement and its service as a Class B Manager by giving written notice to the Company in any of the following events:

    (a)    if a failure to so terminate would, for any reason, cause the Class B Manager or the Company to violate any law;

    (b)    the Company goes into liquidation (except voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the Class B Manager), or if a receiver or administrative receiver is appointed with respect to all or substantially all of the assets of the Company or an administrator is appointed for the Company or if the Company convenes a meeting of creditors or makes or proposes to make any arrangements or compositions with or assignments for the benefit of its creditors or ceases or threatens to cease to carry on its business;

    (c)    in the case of the gross negligence or intentional misconduct by the Class A Manager (if any) or the Company, without a right to cure; or

    (d)    the Class A Manager (if any) or the Company commits a material breach of this Agreement or the Operating Agreement and (if such breach is capable of remedy) fails to fully cure such breach within thirty (30) calendar days of receipt of written notice of the breach from the Class B Manager; except where such breach is caused by the failure of any third party, including the Project Company, to provide the necessary information or funding for the Company to properly discharge its obligations under this Agreement or the Operating Agreement, as applicable.

Page 10

CONFIDENTIAL INFORMATION    LENDERS_0003302

11.6  Upon termination of this Agreement under this Section 11 for any reason, the Class B Manager shall be entitled to receive and deduct from the funds of the Company and/or the funds to be returned or otherwise distributed to the Members, all outstanding fees and other amounts (accrued up to the date of such termination) owing by the Company to the Class B Manager; provided, however, that (a) no event described in Section 11.4(a) has occurred that gives rise to the Company's right to terminate this Agreement, (b) the Class B Manager has not received written notice of any matter or circumstance described under Section 11.4 (other than Section 11.4(a)), whether alleged or pending, (c) the Class B Manager shall account in writing to the Company for all such amounts at least fourteen (14) days prior to deducting or receiving any funds, and (d) in the event of any dispute concerning the amount of any fee or payment, the Class B Manager shall be entitled to deduct the undisputed portion of such fee or payment but the remaining amount shall be subject to final resolution of any dispute between the parties in accordance with Section 16.2.

11.7  Upon any termination of this Agreement, the Class B Manager shall promptly deliver to the Company, or as it shall direct, all books of account, records, registers, correspondence, documents and assets relating to the affairs of or belonging to the Company in the possession of, or under the control of, the Class B Manager.

11.8  Termination of this Agreement will not affect any right vested in or accrued to any party pursuant to this Agreement as at or prior to the date of termination. Without limiting the generality of the foregoing, Section 9 (Indemnity), Section 10 (Conflict of Interest), Section 11 (Termination), Section 12 (Confidentiality), Section 13 (Notices), Section 15 (General) and Section 16 (Governing Law and Jurisdiction) shall survive the termination of this Agreement and shall continue in full force and effect.

12.  **CONFIDENTIALITY**

12.1  None of the parties hereto shall disclose to any third party (except with the prior written consent of the other parties or unless required to do so by a court or arbitrator of competent jurisdiction, the USCIS, the U.S. Securities and Exchange Commission, or any other relevant competent authority to which such person is subject) during the term of this Agreement and for two (2) years after its termination, any information relating to the business, investments, finances or other matters of a confidential nature of the other parties of which it may in the course of its duties hereunder become possessed and each party shall use all reasonable endeavours to prevent any such disclosure. Notwithstanding the foregoing, the Company and the Class B Manager may disclose any such information to those of its employees, managers, agents, and Affiliates that have a need to know such information, and subject to any other confidentiality obligations applicable to such information, either party may disclose any such information to any, current or prospective Subscriber(s), Class B Member(s), lender or financier to the Company or the Project Company. The obligation of confidentiality shall not apply to any information that (i) is or becomes generally

Page 11

available to the public other than as a result of a disclosure in violation of this Section 12, (ii) is or becomes available to a party on a non-confidential basis by a third party, or (iii) is known to a party prior to its disclosure to such party by another party.

12.2  The Class B Manager, its permitted assigns, and any of its Affiliates shall be permitted to refer to its role and capacity in the Company in its or their corporate literature and promotional materials.

## 13. NOTICES

13.1  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be in the English language and delivered by hand delivery, facsimile, e-mail, reputable commercial carrier, or first-class mail, registered or certified, return receipt requested, postage prepaid, which, if properly addressed, shall be deemed to have been duly given (a) on the date of delivery if delivered personally, (b) on the date of the confirmation of transmission report generated by the facsimile machine if sent by facsimile, (c) on the third Business Day after deposit with a commercial carrier, (d) at the time the e-mail enters the receiving party's information processing system if sent by e-mail, or (e) on the tenth Business Day after deposit for delivery by first-class mail, if delivered to the party to whom notice is to be given, to the party as follows:

The Company:

| | |
|---|---|
| Address: | SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC |
| | 800 5TH Ave, Suite 4120 |
| | Seattle, WA 98104 |
| | |
| Attn: | KT Summit Development Manager, LLC |
| Email: | kevin@ktcapitalgroup.com |

The Class B Manager:

| | |
|---|---|
| Address: | Celona Asset Management (USA) Limited |
| | 2207-09, Tower Two, Lippo Centre |
| | 89 Queensway |
| | Admiralty, Hong Kong |
| | |
| Attn: | Backoffice Service Group |
| Facsimile: | (852) 2530-8100 |
| Email: | boffice@celonacapital.com |

## 14. ASSIGNMENT

14.1  Except as specifically permitted under this Agreement, no party shall have any right or power to Transfer nor shall any party Transfer or otherwise cause or

Page 12

permit a Transfer (whether voluntarily or by operation of law or otherwise) of this Agreement or any of the rights or obligations of such party hereunder or any other interest in this Agreement, without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld or delayed.

14.2 The Class B Manager, without the consent of the Company or any other party, shall have the right to assign this Agreement to any of its Affiliates, or to any entity which may become an Affiliate of the Class B Manager upon or around such assignment. Upon execution of any assignment as aforementioned, notice thereof shall be delivered to the Company forthwith, and thereupon, the Class B Manager shall be released of all of its covenants and liabilities hereunder; provided, however, that such release shall be contingent upon the concurrent delivery to the Company of an appropriate instrument whereby the assignee shall assume the obligations of the Class B Manager hereunder.

15. **GENERAL**

15.1 This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter hereof; provided, however, that for the avoidance of doubt, this Agreement is not intended to supersede or affect the Operating Agreement or the other agreements or documents set forth in Section 10.2 of the Operating Agreement, all of which shall remain in full force and effect. In the event of any direct conflict between any provision of this Agreement and the Operating Agreement, the provision in the Operating Agreement shall be controlling to the extent necessary to resolve such conflict.

15.2 If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid or unlawful or unenforceable, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid or unlawful or unenforceable shall not be affected thereby.

15.3 An amendment of this Agreement is valid only if it is in writing and signed by or on behalf of the Company and the Class B Manager, subject further to the approval of Members to the extent required under the Operating Agreement.

15.4 The failure to exercise or delay in exercising a right or remedy provided by this Agreement or by law does not constitute a waiver of the right or remedy or a waiver of other rights or remedies. No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy.

15.5 The rights and remedies contained in this Agreement are cumulative and not exclusive of rights and remedies provided by law.

Page 13

FINAL

15.6   This Agreement may be executed in more than one counterpart, each of which shall, when taken together, constitute one agreement.

15.7   Nothing in this Agreement shall be deemed to create any relationship of partnership, joint venture between any of the parties to this Agreement.

15.8   Subject to the provisions of this Agreement relating to Transfer, this Agreement shall be binding upon and inure to the benefit of each of the parties and their respective successors and permitted assigns.

15.9   Each of the parties is competent in the English language and understands all of the provisions of this Agreement.  The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

16.  **GOVERNING LAW AND JURISDICTION**

16.1   This Agreement and all matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Delaware to the rights and duties of the parties; provided, however, that any right to arbitration hereunder shall be interpreted and governed solely by the Federal Arbitration Act, 9 U.S.C. §1 et seq. (as amended or superseded).

16.2   Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement shall be submitted to JAMS (hereafter, the "**Arbitration Service**") and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section 16.2.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature. Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service. In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern.  To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties. The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in Los Angeles, California.

Page 14

FINAL

In the event of a dispute subject to this Section 16.2, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitration panel, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings. The remedial authority of the arbitration panel shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitration panel shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party. The arbitration panel shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation. The parties and the arbitration panel shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitration panel shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section 16.2, the arbitration panel shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service. If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service. The initial fees and costs of the arbitration panel shall be borne equally by the parties. The prevailing party in such arbitration, as determined by the arbitration panel, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitration panel's compensation), expenses, and attorneys' fees.

The arbitration panel shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitration panel may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section 16.2 are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section 16.2, and this Section 16.2 shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Section 16.2 are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action,

CONFIDENTIAL INFORMATION                                                                                   LENDERS_0003307

**FINAL**

given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

(Signature page to follow.)

CONFIDENTIAL INFORMATION                                                                    LENDERS_0003308

**FINAL**

      **IN WITNESS WHEREOF** this Agreement has been entered into by the parties below on the day and the year first before written.

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**

By:

By: _/s/ Kevin Stamper_
Name:   Kevin Stamper
Title:    Authorized Representative


**CELONA ASSET MANAGEMENT (USA) LIMITED**


By:_____
Name:  Max Huang
Title:  Authorized Representative

Page 17

CONFIDENTIAL INFORMATION      LENDERS_0003309

**IN WITNESS WHEREOF** this Agreement has been entered into by the parties below on the day and the year first before written.

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**

By:

By: _____
Name:
Title:

**CELONA ASSET MANAGEMENT (USA) LIMITED**

By: _*[signature]*_____
Name: Max Huang
Title: Authorized Representative

Page 17