# EXHIBIT 18

## AMENDED AND RESTATED CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

### SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC
(a Delaware limited liability company)

Up to **US$120,000,000**
August 24, 2016

| | |
|---|---|
| Maximum Number of Class B Units Offered: | 240 |
| Subscription Amount Per Class B Unit: | US$500,000 |
| Administration Fee Per Class B Unit: | US$55,000 |

Summit Village Development Lender 1, LLC, a Delaware limited liability company (the "**Company**" or the "**Lender**"), is offering a maximum of 240 Class B units of membership interest in the Company ("**Class B Units**" or "**Membership Interest**") at the Subscription Amount of US$500,000 per unit, or such other minimum investment amount as may be required under the EB-5 Program (as defined below) at any time ("**Subscription Amount**") and for an administration fee of US$55,000 per unit (such fee, which the Company may in its sole and absolute discretion and on a case-by-case basis reduce by up to US$5,000 per Class B Unit, and may also be increased in proportion to any increase in the Subscription Amount to an amount beyond US$500,000 per unit, the "**Administration Fee**") (the "**Offering**"). This Amended and Restated Confidential Private Placement Memorandum (this "**Memorandum**") describes the basis on which the Offering will be made and provides information relevant to making a decision to invest in the Class B Units. All capitalized terms not defined in this Memorandum have the meanings ascribed to them in the operating agreement of the Company that will be amended and restated in connection with the Offering and the form of which is attached hereto as <u>Exhibit B</u>.

The Company was formed to make investments through the United States EB-5 immigrant investor program (the "**EB-5 Program**") of the United States Immigration and Nationality Act (the "**Act**"), which establishes terms and conditions under which foreign nationals may become eligible to obtain lawful permanent residence in the United States. See U.S.C. §§ 1153(b)(5)(a)(i)-(iii) and (c). Under the Act, all investments made by the Company through the EB-5 Program must be in one or more qualifying capital investment projects anticipated to create the required number of jobs in a Targeted Employment Area as part of a regional center (each, a "**Qualifying Investment**"). See "EB-5 Program" section of this Memorandum.

In April 2013, Summit Mountain Holding Group, L.L.C. (collectively along with its affiliates as applicable and as the case may be, the "**Owner**") acquired Powder Mountain, an approximately 9,200-acre ski resort located in the Wasatch Mountains east of Eden, Utah (the "**Master Property**"). Powder Mountain has been in operation since 1972. In 2013, with regulatory and financial support from the local government of Weber County, the Owner began construction of "**Summit Powder Mountain Resort**", including new roads and lodges located within a multi-phase master planned mixed-use development interlinked by walking, biking and Nordic trails and comprising (i) approximately 500 ski-accessible single-family mountain homesites, condominiums and townhomes and (ii) a thriving village core with associated amenities. The Owner intends to utilize modern mountain design and natural preservation as core values to develop Summit Powder Mountain Resort into one of the most exciting and unique destination resorts in the United States.

The "Project" is the initial phase of the redevelopment of the Summit Powder Mountain Resort and is

1

comprised primarily of the following:

- the development, construction and operation of roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for Summit Powder Mountain (the "**Infrastructure Component**"), which is more fully described in the section of this Memorandum titled "Infrastructure Component";
- the development, construction and operation of a 224,399 ft$^2$ mixed-use resort development which includes (a) an 80-unit, 214-key hotel condominium townhome complex (the "**Hotel Component**") and (b) 52,167 ft$^2$ of commercial space (the "**Commercial Component**", and together with the Hotel Component, "**Summit Village**") located on 4.52 acres of land located in a gently sloping saddle near the summit of Powder Mountain, each of which are more fully described in the section of this Memorandum titled "Summit Village";
- the development, construction and operation of (a) an 11,000 ft$^2$ next generation event facility in the Horizon Neighborhood, (b) a 15,675 ft$^2$ next generation event facility in Spring Park, (c) the 6,500 ft$^2$ Sky Lodge, which is capable of being relocated throughout Summit Powder Mountain, and (d) several remote next generation event facilities, which are capable of being relocated throughout the Summit Powder Mountain (the "**Event Spaces**"); and
- the development, construction and operation of a four distinct neighborhoods, which in aggregate represent over 11 acres of land and 59 residential units (collectively, the "**JV Neighborhood Developments**").   The individual components of the JV Neighborhood Developments are as follows:
  - a 6.25 acre subdivision site to be known as Horizon Neighborhood consisting, of 26 residential units;
  - a 4.05 acre subdivision site to be known as Spring Park, consisting of 12 residential units;
  - a .72 acre subdivision site to be known as Village Nest West, consisting of 10 residential units; and
  - a .42 acre subdivision site to be known as Copper Crest West, consisting of 11 residential units.
- the development and construction of approximately 80 residential units principally consisting of single family and multi-family units, including townhomes (the "**Residential Component**").

The Company intends to use the proceeds of the Offering to make a first-position secured loan of up to $120 million (the "**Loan**") to SMHG Village Development LLC (the "**Developer**"), a newly-formed subsidiary of the Owner, as permitted under the Loan Agreement (as defined below) and other agreements entered into in connection with the Loan Agreement (collectively with the Loan Agreement, the "**Loan Documents**"). The Developer was established to develop, construct, own and/or operate Summit Village, the JV Neighborhood Developments, and the Event Spaces. The Developer intends to use the Loan proceeds to fund a portion of the costs associated with the construction and operation of the Infrastructure Component, Summit Village, the Event Spaces, and the JV Neighborhood Developments. Costs associated with vertical construction of the Residential Component will not be directly funded by the Loan.

The total cost to develop the Project is estimated to be approximately US$307 million ("**Total Development Cost**"), and is comprised of the Summit Village Costs and the Residential Component Cost (both terms defined below).  The cost to develop Summit Village, the Event Spaces, the JV Neighborhood Developments and the Infrastructure Component is estimated to be approximately US$207 million ("**Summit Village Costs**").  The Developer intends to use the proceeds of the Loan to fund up to US$120 million of the Summit Village Costs.  The remaining $87 million of Summit Village Costs are expected to be funded by (i) an in-kind contribution of the Summit Village Property (as defined below), which is reflected in the capital stack at a value of $29.0 million but which has been independently appraised at an

2

"as complete" value of US$46.8 million[1], (ii) US$16.7 million in tax increment financing proceeds, (iii) approximately US$28.8 million of proceeds from the sale of underlying homesites in the JV Development Neighborhoods, (iv) an estimated US$12.6 million constituting non-refundable deposits by purchasers of townhome, condominium and hotel condominium units. The cost to develop the Residential Component is estimated to be approximately US$100 million ("**Residential Component Cost**"). The Residential Component Cost is expected to be funded through a combination of, but not limited to, single family construction loans, and building partner capital.

The Developer will be obligated to borrow all funds raised in the Offering; *provided, however,* that if the Company is unable to raise all or any part of the Offering, the Developer may seek alternate sources of debt or equity to provide the shortfall of capital needed to complete the construction and development of the Summit Village. See "Loan Terms and Conditions" section of this Memorandum.

The Project and the Developer are under the ultimate control of Gregory Mauro and Elliott Bisnow (the "**Principals**"). Mr. Mauro is a managing partner of Learn Capital, a venture capital firm focused on education, and also chairman of the Owner and one of two principal equity holders in the Owner. Mr. Bisnow is the other controlling equity holder in the Owner and a founder and chief executive officer of Summit Series, an organization that hosts conferences and events for entrepreneurs, artists and activists. See "Project Participants" section of this Memorandum.

In order to invest in the EB-5 Program through the Company, a potential subscriber must meet investor criteria set forth in this Memorandum (see "Potential Subscribers" section of this Memorandum), follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section of this Memorandum), and complete the required immigration procedures (see "Immigration Procedures" section of this Memorandum). Class B Units will be offered and sold only outside the United States and only to persons who are not "U.S. Persons" within the meaning of Regulation S promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"). In addition, Class B Units will be offered and sold only to persons who are "accredited investors" as defined in this Memorandum, unless the Company waives this requirement in the exercise of its sole discretion.

In August 2010, the United States Citizenship and Immigration Services (the "**USCIS**") designated Mountain States Center for Foreign Investment, LLC, (the "**Regional Center**") as a regional center under the EB-5 Program (the "**RC Designation**"). The Regional Center is the holder of rights to sponsor and administer qualified capital investment projects under the EB-5 Program, including the Project. By extending the benefits of the RC Designation to the Project, the Regional Center enables subscribers to include both direct and indirect job creation resulting from the Project in order to meet the minimum job creation requirements of the EB-5 Program.

The approved geographic area of the Regional Center covers the state of Utah, where the Master Property is located. The Regional Center is under the ultimate control of third parties unaffiliated with the Company or the Developer. The Regional Center and its affiliates are not participants in the Offering.

The RC Designation imposes certain conditions on the Regional Center. If for any reason the Regional Center fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the RC Designation, which could have an adverse impact on the Offering. See "EB-5 Program" section of this Memorandum.

Potential subscribers should make their own investigation of the investment described herein. That includes the merits and risks involved and the legality and tax consequences of such an investment. Each potential subscriber should make his or her own inquiries and consult his or her advisers regarding the Company, this Offering and legal, tax and related matters concerning an investment in the Class B Units.

---

[1] Appraisal available upon request.

CONFIDENTIAL INFORMATION

LENDERS_0003579

Potential subscribers receiving this Memorandum have completed an initial Investor Suitability Questionnaire and delivered it to the Company together with other preliminary information. The Company will give potential subscribers the opportunity to ask questions of and receive answers and additional information from it and its representatives concerning the Offering and other relevant matters. The Company and the Owner make no representation or warranty to potential subscribers regarding the legality of an investment in the Company or about the income and other tax consequences of such an investment. For answers to those questions, potential subscribers should consult their personal legal counsel and tax advisers.

The Offering shall be completed only with a limited number of persons who (a) have executed and delivered by the Offering Termination Date (as defined below) the following: (i) a subscription agreement in the form as attached hereto as Exhibit A-1 (the "**Subscription Agreement**"), (ii) a joinder agreement and spousal consent (if applicable) to the Amended and Restated Operating Agreement of the Company in the form as attached hereto as Exhibit B and which became effective on September 20, 2015 (the "**Operating Agreement**"), (iii) a Confidential Prospective Investor Questionnaire attached hereto as Exhibit A-2 (a "**Confidential Prospective Investor Questionnaire**"), (iv) an escrow agreement substantially in the form attached hereto as Exhibit D or an alternative form of escrow agreement with substantially similar terms (any such agreement, the "**Escrow Agreement**"), and (v) other associated documents required from a subscriber of one or more Class B Units (a person who has completed all the Subscription Documents and submitted same to the Company, a "**Subscriber**", and once such subscription has been completed, a "**Class B Member**") as stated in the Subscription Agreement (the Subscription Agreement, the Operating Agreement, the Confidential Prospective Investor Questionnaire, the Escrow Agreement and any other associated documents required as stated in the Subscription Agreement collectively, the "**Subscription Documents**"); and (b) have paid the Subscription Amount, Administration Fee and the escrow fees, if any, set forth in the Escrow Agreement (the "**Escrow Fee**") applicable to their subscription to an escrow account to be designated by the Company as further described in the Subscription Documents and such Subscription Amount and Administration Fee have been released or are irrevocably committed to be released to the Company. See "Escrow Procedures" section of this Memorandum.

If a Class B Member requests liquidation of his or her Class B Unit(s), the Class B Unit(s) may in certain circumstances be liquidated if the Company, in the sole and absolute discretion of the Class B Manager, so agrees or, in other circumstances, may be subject to liquidation if certain conditions are met (see "Liquidation of Class B Units" section of this Memorandum).

A Class B Member must file a Form I-829 Petition by Entrepreneur to Remove Conditions ("**I-829 Petition**") with USCIS within 90 days prior to the second anniversary of obtaining his or her conditional permanent resident status.

The Company, subject to the Operating Agreement, will utilize proceeds from the Offering (excluding the Administration Fee) to fund disbursements under the Loan in accordance with the terms of that certain loan agreement dated June 28, 2016 (the "**Loan Agreement**") entered into between the Company and the Developer.

All principal and accrued interest under the Loan will be due and payable on the fifth (5th) anniversary of the first disbursement date ("**Initial Maturity Date**"), subject to a one (1) year extension at the request of the Developer ("**Extension Period**") as long as there is no default under the Loan Documents.

There is no firm commitment by any person to purchase or sell any Class B Units, and there is no assurance that all of the Class B Units will be sold.

The Offering will terminate on the earliest of: (a) the date upon which the subscription for all 240 Class B Units by Subscribers have been closed, (b) December 31, 2016, as such date may be extended from time to time by the Company, to a date not later than June 30, 2017, or (c) the date the Company, at its sole

CONFIDENTIAL INFORMATION

LENDERS_0003580

and absolute discretion, elects to terminate the Offering (the "**Offering Termination Date**"). The Company reserves the right to accept a new Subscriber at any time after the Offering Termination Date, but prior to the completion of Summit Village and the JV Neighborhood Developments in order to replace a Subscriber whose subscription has been cancelled, terminated or revoked or a Class B Member whose Class B Unit has been liquidated, including in such cases where the withdrawal of the Subscriber or Class B Member, as applicable, is due to the failure of USCIS to approve such Subscriber's or Class B Member's I-526 Petition. In the event that subscriptions are received for more than the Maximum Offering Amount (as defined below), priority will be given to qualifying Subscribers by the Company at its sole and absolute discretion.

THE CLASS B UNITS OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY:

    (1)    THE SECURITIES REGULATORY AUTHORITY OF ANY STATE;

    (2)    THE THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION; OR

    (3)    ANY SECURITIES REGULATORY AUTHORITY IN ANY OTHER JURISDICTION,

NOR HAS ANY SUCH AUTHORITY OR COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE CLASS B UNITS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OR ANY U.S. STATE SECURITIES LAWS OR THE LAWS OF ANY OTHER JURISDICTION. THE CLASS B UNITS ARE BEING OFFERED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY REGULATION S (PURSUANT TO WHICH THE SECURITIES MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS, AS DESCRIBED BELOW) AND/OR SECTION 4(A)(2) OF THE SECURITIES ACT OR REGULATION D, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SUCH LAWS. HEDGING TRANSACTIONS MAY NOT BE CONDUCTED, UNLESS IN COMPLIANCE WITH THE SECURITIES ACT AND THE DOCUMENTS GOVERNING THE COMPANY.

THE COMPANY WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940 (THE "**INVESTMENT COMPANY ACT**") IN RELIANCE ON ONE OR MORE EXEMPTIONS THEREUNDER. CONSEQUENTLY, SUBSCRIBERS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE CLASS B UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING:

    (1)    THEY MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "**EXCHANGE ACT**"), THE APPLICABLE STATE SECURITIES LAWS AND THE APPLICABLE LAWS OF ANY OTHER, RELEVANT JURISDICTION PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM;

    (2)    SUCH CLASS B UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, HEDGED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN THE OPERATING AGREEMENT; AND

    (3)    THERE IS NO OBLIGATION BY ANY PERSON TO REGISTER THE CLASS B UNITS UNDER THE SECURITIES ACT, THE EXCHANGE ACT, ANY STATE

5

SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION.

ACCORDINGLY, POTENTIAL SUBSCRIBERS SHOULD BE AWARE THAT:

(1)  THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE CLASS B UNITS FOR AN INDEFINITE PERIOD OF TIME;

(2)  THERE WILL BE NO PUBLIC MARKET FOR THE CLASS B UNITS; AND

(3)  INVESTMENT IN THE CLASS B UNITS INVOLVES SIGNIFICANT INVESTMENT RISKS, INCLUDING RISKS OF LOSS OF CAPITAL OR THE ENTIRE INVESTMENT.

THE CLASS B UNITS ARE OFFERED SUBJECT TO PRIOR SALE, AND SUBJECT TO THE RIGHT OF THE COMPANY TO REJECT ANY SUBSCRIPTION. IN CONSIDERING THE PRIOR PERFORMANCE INFORMATION CONTAINED HEREIN, POTENTIAL SUBSCRIBERS SHOULD REMEMBER THAT PAST PERFORMANCE DOES NOT PROVE OR EVEN SUGGEST THAT FUTURE RESULTS WILL BE SIMILAR.

IN ADDITION, THERE CAN BE NO ASSURANCE THAT UNREALIZED INVESTMENTS WILL BE REALIZED AT THE VALUATIONS PROVIDED AS FORWARD-LOOKING STATEMENTS. ACTUAL REALIZED RETURNS WILL DEPEND ON, AMONG OTHER FACTORS:

(1)  FUTURE OPERATING RESULTS;

(2)  THE VALUE OF THE ASSETS;

(3)  MARKET CONDITIONS AT THE TIME OF DISPOSITION;

(4)  ANY RELATED TRANSACTION COSTS; AND

(5)  THE TIMING AND MANNER OF SALE.

ALL OF THOSE EVENTS MAY DIFFER FROM THE ASSUMPTIONS ON WHICH THE VALUATIONS CONTAINED HEREIN ARE BASED.

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO:

(1)  SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A-1;

(2)  OPERATING AGREEMENT, ATTACHED HERETO AS EXHIBIT B; AND

(3)  ESCROW AGREEMENT, ATTACHED HERETO AS EXHIBIT D

THIS MEMORANDUM, INCLUDING ITS EXHIBITS, CONSTITUTES THE ONLY DOCUMENT BY WHICH OFFERS AND SALES OF CLASS B UNITS MAY BE MADE, AND POTENTIAL INVESTORS MUST NOT RELY ON INFORMATION ABOUT THE OFFERING FROM ANY OTHER SOURCE. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THIS MEMORANDUM SUPERSEDES AND REPLACES ANY AND ALL PRIOR OFFERING MATERIALS AND PRIOR CORRESPONDENCE RELATED TO THE OFFERING. THE COMPANY RESERVES THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE CLASS B UNITS DESCRIBED HEREIN. THE COMPANY FURTHER RESERVES THE RIGHT TO SUPPLEMENT, AMEND OR REPLACE THIS MEMORANDUM AT ANY TIME, BUT HAS NO

CONFIDENTIAL INFORMATION

LENDERS_0003582

OBLIGATION TO PROVIDE THE RECIPIENT WITH ANY SUPPLEMENTAL, AMENDED, REPLACEMENT OR ADDITIONAL INFORMATION.

THIS OFFERING WILL COMPRISE OFFERS OF THE CLASS B UNITS TO NON-U.S. PERSONS OUTSIDE THE UNITED STATES PURSUANT TO REGULATION S PROMULGATED UNDER THE SECURITIES ACT AND TO "ACCREDITED INVESTORS" AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT AND PURSUANT TO REGULATION D OF THE SECURITIES ACT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE CLASS B UNITS OFFERED HEREBY. IT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES BY ANYONE:

    (1)    IN THE UNITED STATES OR ANY OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED; OR

    (2)    IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, INCLUDING, WITHOUT LIMITATION, ANY FOREIGN JURISDICTION.

CERTAIN INFORMATION CONTAINED HEREIN CONCERNING ECONOMIC TRENDS AND PERFORMANCE IS BASED ON OR DERIVED FROM INFORMATION PROVIDED BY INDEPENDENT THIRD-PARTY SOURCES. THE COMPANY BELIEVES THAT SUCH INFORMATION IS ACCURATE AND THAT THE SOURCES FROM WHICH IT HAS BEEN OBTAINED ARE RELIABLE. THE COMPANY CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION. THEREFORE, SUBSCRIBERS MUST ASSUME SUCH INFORMATION HAS NOT INDEPENDENTLY BEEN VERIFIED. THE SAME IS TRUE FOR THE ASSUMPTIONS ON WHICH SUCH INFORMATION IS BASED.

THE COMPANY DOES NOT PROVIDE ANY TAX ADVICE. ANY TAX STATEMENT HEREIN REGARDING ANY US FEDERAL TAX IS NOT INTENDED OR WRITTEN TO BE RELIED ON BY A TAXPAYER NOR TO BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER. ALL CURRENCIES WITHIN THE MEMORANDUM ARE IN US DOLLARS UNLESS OTHERWISE NOTED.

THERE ARE RISK FACTORS REGARDING INVESTING IN THE COMPANY SET FORTH AT THE BACK OF THIS MEMORANDUM. ALL POTENTIAL SUBSCRIBERS ARE URGED TO CAREFULLY REVIEW THESE RISK FACTORS, WHICH DESCRIBE RISKS REGARDING, AMONG OTHER THINGS:

    (1)    GENERAL ECONOMIC CONDITIONS AND LOCAL ECONOMIC CONDITIONS IN THE TARGETED EMPLOYMENT AREA;

    (2)    PARTICULAR RISKS RELATED TO THE COMPANY AND THE PROJECT;

    (3)    THE LEVEL OF INVESTMENT RETURNS, WHICH MAY BE BELOW MARKET FOR SIMILAR INVESTMENTS;

    (4)    THE RISK THAT SOME OR ALL OF THE SUBSCRIBER'S CAPITAL MAY NOT BE RETURNED; AND

    (5)    THE FACT THAT THE CLASS B UNITS REPRESENT AN ILLIQUID INVESTMENT THAT CANNOT BE TRANSFERRED.

POTENTIAL SUBSCRIBERS ARE URGED TO CONSIDER THE RISKS SET FORTH UNDER THE HEADING "RISK FACTORS."

CONFIDENTIAL INFORMATION

LENDERS_0003583

IN ADDITION, THERE CAN BE NO ASSURANCE THAT SUBSCRIBERS WILL OBTAIN FINAL IMMIGRATION STATUS UNDER THE ACT OR THAT THE JOBS REQUIRED TO BE CREATED AND MAINTAINED UNDER THE EB-5 PROGRAM WILL BE ACHIEVED.

A POTENTIAL SUBSCRIBER'S INVESTMENT IN THE CLASS B UNITS MUST BE DERIVED WHOLLY FROM HIS OR HER PERSONAL ASSETS AND ARE ENTIRELY AT RISK. THE POTENTIAL SUBSCRIBER MUST ESTABLISH THE SOURCE OF THE MONIES INVESTED SO THAT THE USCIS MAY DETERMINE THAT ALL MONIES PAID IN WERE BOTH LAWFULLY OBTAINED AND INVESTED. FOR FURTHER CERTAINTY, THERE IS NO DIRECT OR INDIRECT LOAN OR OTHER DEBT ARRANGEMENT CONTEMPLATED OR AVAILABLE BETWEEN THE COMPANY AND ANY POTENTIAL SUBSCRIBER.

THE OFFERING IS NOT UNDERWRITTEN. THE CLASS B UNITS ARE OFFERED ON A "BEST EFFORTS" BASIS BY THE COMPANY. THERE CAN BE NO ASSURANCE THAT ANY OF THE CLASS B UNITS WILL BE SOLD.

## NOTICES TO INVESTORS

**THE CLASS B MANAGER IS ONLY RESPONSIBLE FOR MANAGING THE COMPANY AS PROVIDED FOR IN THE ATTACHED OPERATING AGREEMENT. THE CLASS B MANAGER DID NOT PREPARE, AND IS NOT RESPONSIBLE FOR THE CONTENTS OF THIS MEMORANDUM. SIMILARLY, THE CLASS B MANAGER IS NOT RESPONSIBLE FOR ANY OF THE COMPANY'S DECISIONS OR ACTIONS UNDERTAKEN PRIOR TO THE CLASS B MANAGER'S APPOINTMENT. THE CLASS B MANAGER IS NOT MAKING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER, TRANSACTION OR FACT REFERRED TO IN THIS MEMORANDUM.**

**THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SECURITIES TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL OR IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.**

THE CLASS B UNITS ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER.  SEE "RISKS RELATED TO THE OFFERING" SECTION OF THIS MEMORANDUM AND SUMMARY OF OPERATING AGREEMENT – TRANSFER AND ASSIGNMENT OF MEMBERSHIP INTEREST BY CLASS B MEMBERS" SECTION OF THIS MEMORANDUM. THE CLASS B UNITS MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR THE SECURITIES LAWS OF EACH APPLICABLE U.S. STATE AND OTHER COUNTRY.

PROSPECTIVE SUBSCRIBERS MUST RELY ON THEIR OWN ANALYSIS OF THE INVESTMENT AND ASSESSMENT OF THE RISKS INVOLVED. PROSPECTIVE SUBSCRIBERS SHOULD CAREFULLY REVIEW THE INFORMATION SET FORTH IN THIS MEMORANDUM CONCERNING THE RISK OF INVESTING IN THE CLASS B UNITS INCLUDING, WITHOUT LIMITATION, THE SECTIONS ENTITLED "XIII. RISK FACTORS" AND "XIV. CONFLICTS OF INTEREST", BEFORE MAKING ANY SUCH INVESTMENT. ONLY THOSE PROSPECTIVE SUBSCRIBERS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THE CLASS B UNITS.

EACH SUBSCRIBER MUST ACQUIRE THE CLASS B UNITS FOR SUCH PERSON'S OWN ACCOUNT FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION OF

8

DISTRIBUTING OR RESELLING THE CLASS B UNITS.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAVE BEEN NO CHANGES IN THE PROJECT, OR THE AFFAIRS OF THE COMPANY OR THE DEVELOPER SINCE THE DATE HEREOF OR THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL, TAX, IMMIGRATION OR INVESTMENT ADVICE. PROSPECTIVE SUBSCRIBERS ARE URGED TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS AS TO LEGAL, TAX, IMMIGRATION AND INVESTMENT AND ALL OTHER ADVICE AND MATTERS CONCERNING THE INVESTMENT IN THE CLASS B UNITS.

THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR THE INFORMATION OF THE PERSON TO WHOM IT HAS BEEN DELIVERED BY OR ON BEHALF OF THE COMPANY OR SUCH PERSON'S ADVISOR(S). DISTRIBUTION OF THIS MEMORANDUM TO ANY OTHER PERSON IS UNAUTHORIZED.

THIS MEMORANDUM SUMMARIZES CERTAIN DOCUMENTS. EACH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS OF THE DOCUMENT. FOR THE FULL TERMS OF SUCH DOCUMENTS, REFERENCES SHOULD BE MADE TO THE EXHIBITS TO THIS MEMORANDUM, OR A COPY OF THE DOCUMENT SHOULD BE REQUESTED FROM THE COMPANY.

THE COMPANY, UPON WRITTEN REQUEST, WILL MAKE AVAILABLE TO A PROSPECTIVE SUBSCRIBER AND/OR HIS/HER ADVISORS ALL DOCUMENTS RELEVANT TO THE OFFERING AND ANY ADDITIONAL NON-CONFIDENTIAL INFORMATION REGARDING THE COMPANY, THE OFFERING AND/OR THE PROJECT, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. IN MAKING REQUESTS FOR SUCH DOCUMENTS OR INFORMATION, IT IS RECOMMENDED, FOR THOSE PROSPECTIVE SUBSCRIBERS WORKING THROUGH IMMIGRATION CONSULTANTS, THAT SUCH PROSPECTIVE SUBSCRIBERS IN THE FIRST INSTANCE CONTACT AND CHANNEL SUCH REQUESTS THROUGH THEIR IMMIGRATION CONSULTANTS.

IT IS THE RESPONSIBILITY OF ANY PERSONS WISHING TO SUBSCRIBE FOR THE PURCHASE OF CLASS B UNITS OFFERED HEREBY TO INFORM THEMSELVES OF AND TO OBSERVE ALL APPLICABLE LAWS AND REGULATIONS OF ANY RELEVANT JURISDICTIONS. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE CLASS B UNITS OFFERED HEREBY, AND ANY FOREIGN EXCHANGE OR OTHER NON-U.S. RESTRICTIONS THAT MAY BE RELEVANT THERETO.

IF THE INVESTOR IS (I) A PURCHASER IN A SALE THAT OCCURS OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (II) A "DISTRIBUTOR," "DEALER" OR PERSON "RECEIVING A SELLING CONCESSION, FEE OR OTHER REMUNERATION" IN RESPECT TO SECURITIES SOLD, PRIOR TO THE EXPIRATION OF THE APPLICABLE "DISTRIBUTION COMPLIANCE PERIOD" (AS DEFINED BELOW), IT ACKNOWLEDGES THAT (A) UNTIL THE EXPIRATION OF SUCH "DISTRIBUTION

CONFIDENTIAL INFORMATION                                                       LENDERS_0003585

COMPLIANCE PERIOD" ANY OFFER OR SALE OF THE SECURITIES SHALL NOT BE MADE BY IT TO A U.S. PERSON OR FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON WITHIN THE MEANING OF RULE 902(K) OF THE SECURITIES ACT AND (B) UNTIL THE EXPIRATION OF THE "DISTRIBUTION COMPLIANCE PERIOD," IT MAY NOT, DIRECTLY OR INDIRECTLY, REFER, RESELL, PLEDGE OR OTHERWISE TRANSFER A SECURITY OR ANY INTEREST THEREIN EXCEPT TO A PERSON WHO CERTIFIES IN WRITING TO THE COMPANY THAT SUCH TRANSFER SATISFIES, AS APPLICABLE, THE REQUIREMENTS OF THE LEGENDS DESCRIBED HEREIN AND THAT THE SECURITIES WILL NOT BE ACCEPTED FOR REGISTRATION OF ANY TRANSFER PRIOR TO THE END OF THE APPLICABLE "DISTRIBUTION COMPLIANCE PERIOD" UNLESS THE TRANSFEREE HAS FIRST COMPLIED WITH THESE CERTIFICATION REQUIREMENTS. THE "DISTRIBUTION COMPLIANCE PERIOD" MEANS THE ONE-YEAR PERIOD FOLLOWING THE ISSUE DATE FOR THE CLASS B UNITS.

THE COMPANY, IN PREPARATION OF THIS MEMORANDUM, HAS RELIED UPON INFORMATION SUPPLIED BY OR FOR THE DEVELOPER RELATED TO THE DEVELOPER, THE MASTER PROPERTY, THE OWNER, AND THE PROJECT.

## FORWARD-LOOKING STATEMENTS

SOME OF THE STATEMENTS CONTAINED IN THIS MEMORANDUM DISCUSS FUTURE EXPECTATIONS, OR STATE OTHER "FORWARD-LOOKING" INFORMATION. THESE FORWARD-LOOKING STATEMENTS INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT THE COMPANY'S OR THE DEVELOPER'S PLANS, OBJECTIVES, EXPECTATIONS, INTENTIONS AND ASSUMPTIONS, BUDGETS AND OTHER STATEMENTS THAT ARE NOT HISTORICAL FACTS. WHEN USED IN THIS MEMORANDUM, THE WORDS "PROPOSE", "EXPECT", "ANTICIPATE", "INTEND", "PLAN", "BELIEVE", "SEEK", "ESTIMATE", AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THOSE STATEMENTS ARE SUBJECT TO KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS, SEVERAL OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY OR THE DEVELOPER, WHICH COULD CAUSE THE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY THE STATEMENTS. THE FORWARD-LOOKING INFORMATION IS BASED ON VARIOUS FACTORS AND WAS DERIVED USING NUMEROUS ASSUMPTIONS. IN LIGHT OF THE RISKS, ASSUMPTIONS, AND UNCERTAINTIES INVOLVED, THERE CAN BE NO ASSURANCE THAT ANY FORWARD LOOKING INFORMATION CONTAINED IN THIS MEMORANDUM WILL IN FACT TRANSPIRE OR PROVE TO BE ACCURATE AND NO REPRESENTATIONS ARE MADE WITH RESPECT TO THE SAME.

IMPORTANT FACTORS THAT MAY CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED HEREIN MAY INCLUDE, BUT ARE NOT LIMITED TO RISKS DESCRIBED UNDER "XIII. RISK FACTORS". THE COMPANY UNDERTAKES NO OBLIGATION TO UPDATE THE FORWARD LOOKING INFORMATION TO REFLECT ACTUAL RESULTS OR CHANGES IN ASSUMPTIONS OR OTHER FACTORS THAT COULD AFFECT THOSE STATEMENTS.

## CONFIDENTIALITY AND UNDERTAKINGS

The information contained in this Memorandum is confidential and proprietary to the Company and the Developer. By accepting delivery of this Memorandum, each recipient of this Memorandum is deemed to have acknowledged and agreed to the following:

10

- The information contained in this Memorandum and any related materials will be used by the recipient solely for evaluation of a potential investment in the Company (the "**Permitted Purpose**"), and this Memorandum and any related materials may not be used for any other purpose, reproduced, distributed or divulged in any manner;

- This Memorandum and information derived from this Memorandum will be kept in strict confidence by the recipient and will not, whether in whole or in part, be released or used by the recipient for any purpose other than the Permitted Purpose, nor will the recipient make any reproductions of such information; and

- If the recipient is not purchasing the Class B Units or the prospective Subscriber's subscription is not accepted or if the Offering is terminated, this Memorandum, and any other documents or information furnished to the recipient in connection with the Offering and any and all reproductions thereof and notes relating thereto will be promptly returned to the Company.

**NOTICE REGARDING NATIVE LANGUAGE**
**TRANSLATION**

Subscriber hereby agrees that it is the sole responsibility of Subscriber to ensure proper translation of this Memorandum into Subscriber's native language if necessary for Subscriber's understanding of the rights and obligations contained herein. Any language translation of this Memorandum provided by any of the parties hereto is not a binding legal document and is provided solely for the Subscriber's convenience. None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect. In the event of any inconsistencies between this Memorandum as set forth in English and any language translation, this Memorandum as set forth in English shall govern. The Subscriber assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Memorandum.

CONFIDENTIAL INFORMATION
LENDERS_0003587

**I.   SUMMARY OF OFFERING TERMS** _____ **1**

  SUMMARY STRUCTURE CHART                                                   **11**

**II.   REQUIREMENTS FOR SUBSCRIBERS** _____ **12**

**III.   THE EB-5 PROGRAM**                                                **13**

**IV.   IMMIGRATION PROCEDURES** _____ **16**

**V.   USE OF PROCEEDS**                                                   **19**

**VI.   PROJECT PARTICIPANTS** _____ **19**

  _Legal Entities_                                                          _19_
  _Individuals_                                                             _19_

**VII.   STRATEGIC PARTICIPANTS**                                          **20**

  _Summit Village Architect_                                                _20_
  **SUMMIT VILLAGE DEVELOPMENT MANAGER**                                    **20**

**VIII.   THE PROJECT** _____ **21**

  _Area Profile: Utah and the Wasatch Range_                                _24_
  _Area Profile: Ogden, Utah_                                               _25_
  _Area Profile: Powder Mountain_                                           _25_
  _Summit Series_                                                           _26_
  **WEBER COUNTY ENTITLEMENTS AND FINANCING**                              **27**
  **SUMMIT POWDER MOUNTAIN RESORT DEVELOPMENT**                            **28**
  _The Property_                                                            _29_
  _Summit Village and the JV Development Neighborhoods_                     _32_
  **SUMMIT VILLAGE MARKETING AND SALES PROGRAM**                           **37**
  _Hotel Operator_                                                          _37_
  **COMMERCIAL SPACE LEASING AND OCCUPANCY**                               **37**
  _Projected Cash Flow_                                                     _37_
  _Development Timetable_                                                   _38_
  _Summit Village Budget_                                                   _39_
  _Market Analysis – Condominium_                                           _40_
  _Demand Outlook: Western Mountain Resort Alliance_                        _40_
  _Comparable Profile_                                                      _42_
  **COMPARATIVE SUMMARY OF POWDER MOUNTAIN OPPORTUNITY**                   **45**

**IX.   PROJECT FUNDING**                                                  **45**

  **SUMMARY OF PROJECTED SOURCES AND USES OF FUNDS**                       **45**
  **RESIDENTIAL COMPONENT FUNDING**                                        **46**
  _Summit Village and JV Development Neighborhood Funding_                  _46_
  _Bridge Financing_                                                        _48_
  _The Loan_                                                                _48_

**X.   LOAN TERMS AND CONDITIONS**                                         **48**

<u>XI.</u>   **THE COMPANY**                                                                          **51**

**MANAGEMENT OF THE COMPANY**                                                        **51**
**MARKETING AND ADMINISTRATION OF THE OFFERING**                          **52**
**SUBSCRIPTION PROCEDURES**                                                         **53**
*ESCROW PROCEDURES*                                                                     *54*
*QUALIFYING INVESTMENT*                                                                 *54*

<u>XII.</u>   **SUMMARY OF OPERATING AGREEMENT**                                      **55**

*PURPOSE*                                                                                          *55*
*TERM*                                                                                              *55*
*CAPITAL CONTRIBUTIONS*                                                                   *55*
**EXPENSES OF THE COMPANY**                                                         **56**
*TAX CLASSIFICATIONS*                                                                       *56*
**DISTRIBUTIONS AND ALLOCATIONS**                                                 **56**
*MANAGEMENT, MANAGERS AND OFFICERS*                                         *56*
**VOTING AND APPROVAL RIGHTS OF MEMBERS**                                **57**
**LIABILITIES OF MEMBERS AND MANAGERS**                                      **57**
**TRANSFER AND ASSIGNMENT OF MEMBERSHIP INTEREST BY CLASS B MEMBERS**   **58**
*LIQUIDATION OF CLASS B UNITS*                                                        *58*
**REMUNERATION TO MEMBERS, MANAGERS AND OFFICERS**               **59**
*COMPETING ACTIVITIES*                                                                    *60*
**ACCOUNTING AND REPORTING**                                                      **60**
*JOB ALLOCATION*                                                                            *60*
**DISSOLUTION AND TERMINATION**                                                  **60**

<u>XIII.</u>   **RISK FACTORS**                                                                        **61**

**RISKS RELATING TO REAL ESTATE AND FINANCING OF REAL ESTATE**     **61**
**RISKS RELATED TO THE OFFERING AND THE CLASS B UNITS**                **68**
**RISKS RELATED TO THE REGIONAL CENTER DESIGNATION, THE EB-5 PROGRAM AND THE
IMMIGRANT VISA PROCESS**                                                            **74**
**RISKS RELATED TO PROJECT PERFORMANCE AND MANAGEMENT**       **81**
*LEGAL, TAX AND REGULATORY RISKS*                                                 *85*

<u>XIV.</u>   **CONFLICTS OF INTEREST**                                                          **87**

<u>XV.</u>   **CERTAIN INCOME TAX CONSIDERATIONS**                                  **89**

<u>XVI.</u>   **TAX AND LEGAL ASPECTS**                                                        **97**

<u>XVII.</u>   **RESTRICTIONS ON TRANSFERABILITY**                                      **97**

## I. SUMMARY OF OFFERING TERMS

The following is a summary of certain information contained in this Memorandum, and is qualified in its entirety by reference to the more detailed discussions contained elsewhere in this Memorandum, as well as to the Exhibits hereto (all of which are incorporated fully herein by this reference). In the case of any conflict between the summary, below, and the more detailed discussions within the Memorandum, the more detailed discussions shall control. Similarly, this Memorandum, its exhibits, and certain other documents related thereto have been initially written in the English language; in the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

| | |
|---|---|
| **Company** | Summit Village Development Lender 1, LLC is a Delaware limited liability company established on September 3, 2015, with its principal place of business located at 800 5th Avenue, Suite 4120, Seattle, WA 98104. The Company was established to make the Loan to fund certain approved costs incurred in connection with the development, construction, ownership and operation of the Summit Village portion of the Project, as permitted under the Loan Documents and the EB-5 Program. |
| **Offering** | The Offering is the offer and sale of up to an aggregate maximum amount of US$120,000,000 under the terms and conditions described in this Memorandum (the "**Maximum Offering Amount**"). |
| **Class A Member** | KT Summit Development Manager, LLC, a Washington limited liability company ("**KT Summit Manager**") and established on September 15, 2015, with its principal place of business at 800 5th Ave Suite 4120, Seattle, WA 98104, is the current Class A member of the Company (the "**Class A Member**"). |
| **Class A Manager** | KT Summit Manager is also the Class A manager (the "**Class A Manager**"). The Class A Manager is not affiliated with the Developer (other than in connection with the sponsorship of the Project for the purposes of the EB-5 Program), the Class B Manager, any Class B Member, or the Regional Center. The Class A Manager's responsibilities are generally limited to (1) liaising on behalf of the Company with the Regional Center and with certain "finders" unaffiliated with the Company that identify Subscribers, and (2) performing services as further provided in the Operating Agreement. The Class A Manager is not obligated to, and does not expect to, provide any services that are investment management or investment advisory services. The Class A Manager shall not have general management rights in the Company, which will be vested in the Class B Manager. |

CONFIDENTIAL INFORMATION

**Class B Manager**                Celona Asset Management (USA) Limited ("**Celona**" or "**Class B Manager**") is the Class B Manager. The Class B Manager is not affiliated with the Developer, the Class A Manager, or any Class B Member. Except for those matters reserved exclusively for or requiring the approval of the Class A Manager, the Class B Manager has general responsibility for management of all aspects of the Company, including administering day-to-day aspects of business, exercising and enforcing the Company's rights under the Loan and other agreements, entering into contracts in the name of the Company and distributing funds to the Class B Members. Celona participated with legal counsel for the Company in memorializing the terms of the EB-5 Loan based upon those terms agreed between the Company and the Developer prior to its appointment as Class B Manager; however, Celona has not advised and will not advise the Company, either as the Class B Manager or in any other capacity, to enter into the Loan or any other transactions or agreements with the Developer that predate the appointment of the Class B Manager. The Class B Manager is not obligated to, and does not expect to, provide any services that are investment management or investment advisory services. The Class B Manager will not be registered as an investment manager or an investment adviser with the U.S. Securities and Exchange Commission. Celona is incorporated under the laws of Hong Kong with experience managing entities qualifying under the EB-5 Program.

**Class B Members**                The Class B Members of the Company comprise all of the Subscribers who have purchased Class B Units in this Offering.

**Operating Agreement**            Pursuant to the Operating Agreement, the Company has two managers performing separate functions: the Class A Manager and the Class B Manager (each, a "**Manager**" and collectively, the "**Managers**"). Other than their roles as Managers, the Class A Manager and the Class B Manager are independent and unaffiliated with the Company, except that KT Summit Manager was the original sole managing member of the Company prior to the Operating Agreement becoming effective. The Operating Agreement describes the roles and responsibilities of the Class A Manager and the Class B Manager, and limits the liability of such Managers in significant respects and eliminates the fiduciary duties of such Managers to the maximum extent permitted by law.

| | |
|---|---|
| **Regional Center** | Mountain States Center for Foreign Investment, LLC, a Utah limited liability company, was established on October 3, 2006. In August 2010, USCIS designated a geographic area comprising the state of Utah as a regional center under the EB-5 Program. The Regional Center is under the ultimate control of third parties unaffiliated with the Company or the Developer. The Regional Center and its affiliates are not participants in the Offering. |
| **Principals** | The Principals are Gregory Mauro and Elliott Bisnow. The Principals control the Owner, which includes the Owner and the Developer. |
| **Property** | The Summit Village will be built on 4.52 acres of vacant land located in a gently sloping saddle near the summit of Powder Mountain at approximately 8,700 feet above sea level (the "**Summit Village Property**").  The JV Neighborhood Developments are located in four of the most desirable locations within the Master Property in close proximity to Summit Village (the "**JV Neighborhood Property**", and together with the Summit Village Property, the "**Property**").  Exhibit F hereto describes the physical boundaries of the Summit Village Property and each component of the JV Neighborhood Property. In April 2013, the Owner acquired the Master Property for approximately US$33.0 million, of which US$16.5 million was paid in cash and the balance from the proceeds of a secured loan from the seller of the Master Property. In 2014, the balance was refinanced with a US$8 million first lien loan with an institutional lender. As a condition to the initial advance under the Loan Agreement, the Summit Village Property was transferred in full to the Developer free and clear of any liens or other encumbrances. |
| **Summit Powder Mountain Resort** | Summit Powder Mountain Resort is an approximately 6,860-acre multi-phase master planned mixed-use development comprising ski-accessible homesites connected to a village core and interlinked by walking, biking and Nordic trails. The Owner intends to develop the initial phases of Summit Powder Mountain Resort under the terms of a master plan unanimously approved by the  Weber County Commission which may include single-family mountain homes, townhomes, condominiums, hotel condominiums, corporate retreats and commercial development which may total 2,800 units of density. |

**The Project**

The "Project" is the initial phase of the redevelopment of the Summit Powder Mountain Resort and will consist primarily of:

- The Infrastructure Component consisting of the development, construction and operation of roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for Summit Powder Mountain Resort;

- The Summit Village consisting of the development, construction and operation of a 224,399 ft$^2$ mixed-use resort development which includes (a) an 80-unit, 214-key hotel condominium townhome complex and (b) 52,167 ft$^2$ of commercial space located on 4.52 acres of land located in a gently sloping saddle near the summit of Powder Mountain, each of which are more fully described in the section of this Memorandum titled "Summit Village";

- The Events Spaces consisting of the development, construction and operation of (a) an 11,000 ft$^2$ next generation event facility in the Horizon Neighborhood, (b) a 15,675 ft$^2$ next generation event facility in Spring Park, (c) the 6,500 ft$^2$ Sky Lodge, which is capable of being relocated throughout the Summit Powder Mountain, and (d) several remote next generation event facilities, which are capable of being relocated throughout the Summit Powder Mountain;

- The JV Neighborhood Developments consisting of the development, construction and operation of four distinct neighborhoods, which in aggregate represent over 11 acres of land and 59 residential units. The individual components of the JV Neighborhood Developments are as follows:
  - a 6.25 acre subdivision site to be known as Horizon Neighborhood, consisting of 26 residential units;
  - a 4.05 acre subdivision site to be known as Spring Park consisting of 12 residential units;
  - a .72 acre subdivision site to be known as Village Nest West, consisting of 10 residential units; and
  - a .42 acre subdivision site to be known as Copper Crest West, consisting of 11 residential units; and

- The Residential Component consisting of the development and construction of approximately 80 residential units principally consisting of single family and multi-family units, including townhomes.

CONFIDENTIAL INFORMATION

| | |
|---|---|
| **Development Costs and Sources of Funding** | The Total Development Cost is estimated to be approximately US$307 million, which is comprised of the Summit Village Costs and the Residential Component Cost (both terms defined below). The cost to develop Summit Village, the Event Spaces, the JV Neighborhood Developments and the Infrastructure Component is estimated to be approximately US$207 million ("**Summit Village Costs**"). The Developer intends to use the proceeds of the Loan to fund up to US$120 million of the Summit Village Costs. The remaining $87 million of the Summit Village Costs are expected to be funded by (i) an in-kind contribution of the Summit Village Property, which is reflected in the capital stack at value of $29.0 million but which has been independently appraised at an "as complete" a value of US$46.8 million, (ii) US$16.7 million in tax increment financing proceeds, (iii) approximately US$28.8 million of proceeds from the sale of underlying homesites in the JV Development Neighborhoods, (iv) an estimated US$12.6 million constituting non-refundable deposits by purchasers of townhome, condominium and hotel condominium units. The cost to develop the Residential Component is estimated to be approximately US$100 million (the "**Residential Component Cost**"). The Residential Component Cost is expected to be funded through a combination of, but not limited to, single family construction loans and building partner capital. |
| **Developer** | The Developer is SMHG Village Development LLC, a Delaware limited liability company established on May 22, 2015, with its principal place of business located at 3923 N. Wolf Creek Drive, Eden, Utah 84310. The Developer is a subsidiary of the Owner. The Developer was established to carry out the development and operation of the Project in conjunction with certain other affiliates (all of which are wholly owned subsidiaries of the Owner). The Developer is under the ultimate control of the Principals. |
| **Subscription Amount** | The Subscription Amount for one Class B Unit is US$500,000, or such other minimum investment amount as may be required under the EB-5 Program at any time. |
| **Administration Fee** | The Administration Fee is US$55,000 per Class B Unit (subject to reduction by up to US$5,000 on a case-by-case basis in the sole discretion of the Company), to be used to pay fees and expenses of the Class A Manager, Regional Center and/or finders. At any time if the Subscription Amount is increased beyond US$500,000 per Class B Unit, the amount of the Administration Fee shall be increased in proportion to such increase in the Subscription Amount. The Administration Fee will be used to pay certain costs and fees including marketing fees to finders, brokers, the Regional Center, and/or consultants. |

**Use of Proceeds**

The proceeds from the Offering will be used to fund the Loan to the Developer for certain approved costs incurred in connection with the development, construction, ownership and operation of the Project, including reimbursing the Owner for the Bridge Financing (as defined below) as permitted under the Loan Documents and the EB-5 Program.

**Bridge Financing**

The Developer has received, and until sufficient disbursements are extended under the Loan, expects to continue to receive, bridge financing from the Owner and other third parties to pay a portion of the Summit Village Costs, including certain debt servicing costs associated with other financings, until such costs can be repaid through disbursements under the Loan ("**Bridge Financing**"). Developer intends to use disbursements of the Loan to pay back the Bridge Financing subject to certain conditions and terms under the Loan Documents. The Owner expects Bridge Financing with respect to costs incurred prior to the initial advance under the Loan to represent between 10% and 15% of total Summit Village Costs.

**Loan Amount**

Up to US$120,000,000, provided that the ratio of the Loan to the total value of the Collateral (as defined below), as determined by a certified third party appraiser reasonably acceptable to the Company (the "**LTV Ratio**"), does not exceed 60%, and a cushion in the number of jobs to be created by the Project as estimated in the Economic Report of not less than 25% of the total number of jobs required to be created under the EB-5 Program for the maximum number of Subscribers (the "**Job Cushion**").

**Loan Maturity**

The Loan will mature on the fifth (5th) anniversary of the date of the first disbursement of proceeds under the Loan, subject to a one (1) year extension at the request of the Developer as long as there is no default under the Loan Documents.

**Security**

The Loan will be secured by (A) a senior lien deed of trust and collateral assignment of rights, attachments, fixtures and equipment of and on the portion of the Property that is Included Property (as defined below) at any given time (including the general contractor agreement and other construction contracts) and (B) a collateral assignment of any sale contracts and assignment of rent and management contract pertaining to the Hotel Component (including the hotel management contract) ("**Collateral**"). "**Included Property**" means the portion of the Property that is security for the Loan at any given time. Prior to the initial advance under the Loan Agreement, Summit Village was designated Included Property, and as such, is Collateral. Prior to aggregated advances of the Loan exceeding $15 million, Horizon Neighborhood will be added to and become part of the Included Property, and as such, will become Collateral at such time. Thereafter, prior to any advance of the Loan that causes aggregate advances of the Loan to exceed $25 million, $35 million, and $45 million, respectively, one of the subdivision sites associated with the other three JV Neighborhood Developments will be added to and become part of the Included Property, and as such will become Collateral at such time.

Subject to certain additional terms to be set forth in the Loan Documents and, as applicable, compliance with securities and other applicable laws, the Developer may substitute Collateral, in whole or in part, with collateral in a form and substance acceptable to the Company in its sole discretion and provided that at all times the LTV Ratio, as determined by a certified third party appraiser reasonably acceptable to the Company, does not exceed 60%.

| | |
|---|---|
| **Loan Guarantees** | Summit Mountain Holding Group, L.L.C., or such other guarantor acceptable to the Company from time to time, at its sole discretion, (the "**Guarantor**"), is providing the following recourse guaranties: (1) "Bad boy" guaranty on terms acceptable to the Lender, including without limitation losses incurred by the Company as a result of fraud or misrepresentation by the Developer, misappropriation of funds by the Developer, a transfer by the Developer of the Property or other collateral for the Loan in violation of the terms of the Loan Documents, damage or destruction to the Project caused by the acts or omissions of the Developer, and prohibited transfer of ownership interest in the Developer (the "**Bad Boy Guaranty**"); (2) repayment guaranty in respect of the portion of the Loan funded to the Developer from Subscription Amount(s) contributed  by those Subscribers whose I-526 Petitions are not yet approved, which guaranty shall (with respect to a Subscriber whose I-526 Petition has not yet been approved) be provided only from the time at which such Subscriber releases his/her respective Subscription Amount until the approval of such Subscriber's I-526 Petition (the "**Early Release Guaranty**"); and (3) a shortfall guaranty in respect of (i) the punctual payment of the Developer's equity requirements and contributions under the Loan Agreement, (ii) certain operating expenses and debt service shortfalls of the Project, and (iii) certain brokerage commissions charged by parties not engaged by the Company (the "**Equity Shortfall Guaranty**"). |
| **Costs of Loan** | The Loan will bear interest on the outstanding amount of the Loan at the rate of a quarter percent (0.25%) per annum up to the Initial Maturity Date, and thereafter at the rate of three and three-quarter percent (3.75%) per annum until the final repayment of the Loan. |
| **Loan Prepayment** | The Developer may prepay any portion of the Loan as long as the total prepayment amount does not exceed the aggregate Subscription Amount of those Class B Members who have received notice from USCIS regarding the final adjudication of his/her I-829 Petition and those who have permanently withdrawn from the EB-5 Program. Developer may also prepay any portion of the Loan to the extent such prepayment, in the opinion of the Company's immigration counsel, would not impair the adjudication of any pending I-829 Petitions. Subject to the applicable terms set forth in the Loan Documents, the Developer may also defease the Loan if doing so does not result in material adverse consequences under applicable securities laws or material immigration consequences to any Class B Member and the Loan has been fully advanced. Developer will be required to prepay any portion of the Loan attributable to each Class B Member who has received a final disapproval by USCIS of his/her I-526 Petition, provided that such amount prepaid will be available for draw down again under the Loan, subject to the Company's availability of funds. |

| | |
|---|---|
| **Escrow of Subscription Amount and Administration Fee** | The Subscriber must deposit the Administration Fee, the Subscription Amount, and the Escrow Fee applicable to his or her subscription for one or more Class B Units into the escrow account (such account, the "**Escrow Account**") maintained by an escrow agent (such agent, the "**Escrow Agent**"). See "Escrow Procedures" section of this Memorandum. |
| **Submission of I-526 Petition** | After the Company accepts a subscription and the Subscriber has delivered his or her US$500,000 Subscription Amount and US$55,000 Administration Fee to the Escrow Account, the Subscriber will prepare and submit an I-526 Petition to USCIS to seek conditional permanent residence in the United States. |
| **Liquidation** | If a Class B Member requests liquidation of a Class B Unit, the Company may in the discretion of the Class B Manager agree (but shall not be required) to liquidate the Class B Unit, subject to certain conditions. In other limited circumstances, including where the Company has disposed of all of its assets, the Company may liquidate such Class B Units. (see "Liquidation of Class B Units" section of this Memorandum"). |
| **Investor Qualification** | The Offering is available only to persons who (i) are not a "U.S. Person" within the meaning of Regulation S of the Securities Act ("**Regulation S**") and who are located outside of the United States at the time the Subscription Agreement for the subscription of any Class B Units is executed; or (ii) are "accredited investors," as defined in Rule 501 under the Securities Act and pursuant to Regulation D of the Securities Act ("**Accredited Investors**"). (See also "Requirements for Subscribers – Non-U.S. Person and Accredited Investor Status" section of this Memorandum below). A person is generally considered a U.S. Person if they are resident in the United States. |
| **Transfer Restrictions** | Except as expressly provided for in the Operating Agreement, no Class B Member will be permitted to withdraw from the Company or to withdraw any portion of his or her capital account. Other than when a person becomes entitled to a Class B Unit by operation of law, a Class B Unit issued to a Class B Member is non-transferable. |

LENDERS_0003598

| | |
|---|---|
| **Preservation of Eligibility for Removal of CLPR Status** | If the Developer were to sell or refinance the Project before the end of conditional residence of some or all Class B Members, such Class B Members might be found by USCIS to have failed to maintain their investment at risk in the Project and might not be able to obtain removal of conditions. Therefore, if, at any time during the conditional legal permanent resident ("**CLPR**") status period for any Class B Member, any Loan amount is prepaid, the Company shall have the option to reinvest proceeds of the Loan that have been repaid in alternate investments that qualify under the EB-5 Program for the purpose of preserving the Class B Members' "at risk" investment and eligibility for removal of CLPR status. USCIS has not set clear policy on the extent to which reinvestment might be considered to constitute a "maintenance of investment" making possible the approval of Class B Members' petitions to remove conditions. |
| **Allocation of Profits and Losses** | Profits and losses of the Company shall be allocated to the Class B Members as provided in the Operating Agreement, except as otherwise required by the Internal Revenue Code. |
| **Fees** | In addition to the interest payments set forth above, the Developer agrees to reimburse the Company or pay directly for certain marketing and other fees not covered by the Administration Fee that may be payable to finders, brokers, and/or other consultants equal to an aggregate amount of approximately 1.0% of the Loan amount plus 5.25% per annum of the outstanding Loan amount. Failure by the Developer to pay these fees within ten (10) business days will trigger an event of default under the Loan Agreement. |
| | NO PORTION OF THESE FEES OR ANY OTHER OFFERING COSTS, SALES COMMISSIONS, MARKETING FEES, FINDERS' FEES OR IMMIGRATION EXPENSES WILL BE PAID FROM ANY CLASS B MEMBER'S CAPITAL CONTRIBUTION. |
| **Criteria for Subscribers** | In order to invest in the Company, a potential subscriber must: |

(1)     meet criteria set forth in this Memorandum (see "Requirements for Subscribers" section of this Memorandum);

(2)     follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section of this Memorandum); and

(3)     complete the required immigration procedures (see "Immigration Procedures" section of this Memorandum).

**Summary Structure Chart**



## II.  REQUIREMENTS FOR SUBSCRIBERS

Prospective Subscribers of the Class B Units offered by this Memorandum should give careful consideration to certain risk factors described under "XIII. Risk Factors" below and especially to the speculative nature of this investment and the limitations described under that caption with respect to the lack of a readily available market for the Class B Units and the resulting long-term nature of any investment in the Company. The Offering is available only to persons who (i) are not a "U.S. Person" (within the meaning of Regulation S) and who are located outside of the United States at the time the Subscription Agreement for the subscription of any Class B Units is executed; or (ii) are Accredited Investors. (See also "Requirements for Subscribers – Non-U.S. Person and Accredited Investor Status" section of this Memorandum below). A person is generally considered a U.S. Person if they are resident in the United States.

### General Requirements

Each prospective Subscriber (or his or her duly authorized representative) must return a completed Subscription Agreement, including, representations, among other things, that:

(1)     the prospective Subscriber has adequate means of providing for his or her current financial needs and contingencies and has no need for liquidity of the investment of the Class B Units;

(2)     the prospective Subscriber is subscribing the Class B Units for personal investment purposes only and not with a view toward resale or distribution;

(3)     the prospective Subscriber's overall commitment to investments which are not readily marketable is not disproportionate to his or her net worth and the investment in the Class B Units will not cause such overall commitment to become excessive;

(4)     the prospective Subscriber is not a "U.S. Person" within the meaning of Regulation S or that he or she meets one or more of the criteria for Accredited Investors (See also "Requirements for Subscribers – Non-U.S. Person and Accredited Investor Status" section of this Memorandum below); and

(5)     the prospective Subscriber is eligible to be admitted to the United States in accordance with Section 212 of the INA Act.

### Non-U.S. Person and Accredited Investor Status

Each prospective Subscriber must not be a "U.S. Person" (within the meaning of Regulation S) and must be located outside of the United States at the time of the Offering and at the time the buy order for any Class B Units is executed, unless the Company is relying upon the exemptions under Section 4(a)(2) of the Securities Act or Regulation D, in which case the prospective Subscriber meets one or more of the criteria for Accredited Investors. Persons are generally considered a U.S. Person if they are a resident of the United States. An Accredited Investor is defined in Rule 501 under the Securities Act as being: (a) any natural person whose individual net worth, or joint net worth with that person's spouse (excluding primary residence)[2], exceeds US$1,000,000; or (b) any natural person whose individual income

---

[2]  For purposes of calculating "net worth" of a person: (A) The person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall

exceeded US$200,000, or whose joint income with that person's spouse exceeded US$300,000, in each of the two most recent years and who has a reasonable expectation of reaching that income level in the current year (except for certain limited exceptions permitted under a Regulation D offering).

## III. THE EB-5 PROGRAM

The EB-5 Program and the Act provide for an EB-5 employment-based preference immigrant visa category for immigrants seeking to enter the United States to engage or invest in a commercial enterprise that will benefit the U.S. economy and create at least ten full-time jobs for each immigrant investor. Pursuant to the Act, up to 10,000 EB-5 immigrant visas are allocated each year for qualified immigrant investors, who ordinarily must invest at least US$1.0 million in a qualifying business.

However, investors may qualify under the EB-5 Program through an investment of a reduced threshold amount of US$500,000 in a capital investment opportunity located in a qualifying rural area or high unemployment area as defined by the Act (a "**Targeted Employment Area**").

In August 2010, USCIS issued the RC Designation, designating the Regional Center as a qualifying participant in the EB-5 Program. As such, the Regional Center is authorized to review and evaluate potential capital investment opportunities located within a designated geographic area comprising the state of Utah and determine their suitability for participation in the EB-5 Program.

The Regional Center is not responsible for the contents of this Memorandum. The Regional Center has not made an independent inquiry relating to the accuracy or adequacy of this Memorandum, nor has it made any finding or determination relating to the fairness of the investment opportunity described in this Memorandum.

The RC Designation provides that the Regional Center will focus investments under the EB-5 Program in the following industry categories:

    (1)    Hospitality

    (2)    Resort

    (3)    Service

An advantage of the RC Designation is that fulfillment of the required job creation criteria under the EB-5 Program may be direct or indirect. The Regional Center has entered into an Affiliate Agreement dated March 18, 2015 (the "**Regional Center Agreement**") with the Owner under which the Regional Center has agreed to extend the benefits of the RC Designation to the Owner entitling the Company and the Developer to carry out the Project under the Regional Center's supervision as part of the EB-5 Program. By extending the benefits of the RC Designation to the Project, the Regional Center enables subscribers to include both direct and indirect job creation resulting from the Project in order to meet the minimum job creation requirements of the EB-5 Program.

Among other things, the Regional Center Agreement requires the Owner to comply with all applicable laws and regulations in the conduct of its business, to provide periodic financial statements to the Regional Center, and to comply with the Regional Center's methods and standards of operation. In return, the Regional Center agrees to provide general oversight of the Offering and the Project to ensure compliance with USCIS requirements and take all necessary steps to qualify the Project under the EB-5 Program.

In consideration of the Regional Center's services with respect to the Offering and the Project, the

be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability

Company will pay the Regional Center a fee calculated by reference to the number of Subscribers in the Offering who submit I-526 Petitions. The portion of this fee applicable to a particular Subscriber is refundable if the Subscriber becomes entitled to a refund of his or her US$500,000 Subscription Amount within six months following submission of his or her I-526 Petition.

The Regional Center Agreement provides the Owner with an option to purchase the Regional Center for an agreed purchase price. This option is exercisable by the Owner during the 30-day period after receipt by the Regional Center of fee payments applicable to ten Subscribers. After any purchase, the current owners of the Regional Center would retain rights to utilize the Regional Center's services free of charge.

The Regional Center Agreement also provides the Regional Center with consent rights in the event that the Owner desires to pledge, mortgage or transfer to a third party (i) any interest in the Regional Center Agreement or the assets relating thereto or (ii) a majority of the Owner's assets or equity interests. The Owner is required immediately to report any transfer of ownership to the Regional Center. The Regional Center is under the ultimate control of third parties unaffiliated with the Company or the Developer. The Regional Center and its affiliates are not participants in the Offering.

Michael K. Evans, PhD, of Evans, Carroll & Associates, Inc. was engaged to measure the economic impact of the Project, including its potential to create the number of direct and indirect jobs required under the EB-5 Program. Using the "Regional Input-Output Modeling System" ("RIMS II"), a model recognized and accepted by USCIS, Dr. Evans determined that an estimated increase of 4,114 new jobs will be created within the Utah counties of Weber, Cache, Davis, Martin and Salt Lake, an area that includes the Property as updated and amended on August 10, 2016.

In calculating the number of new jobs to be created, Dr. Evans determined that the following Development Costs and additional costs are eligible for inclusion under the RIMS II methodology:

| RIMS II Eligible Hard and Soft Costs | |
|---|---|
| Activity | Cost |
| Construction of Villages | $94,060,046 |
| Additional Horizontal Construction for Villages | $26,959,606 |
| Construction of Additional Homes | $100,000,000 |
| Infrastructure Expenditures | $28,000,000 |
| Architect and Engineering | $9,515,162 |

Dr. Evans calculated the number of jobs to be created as follows:

| Summary of Employment and Revenue Estimates | | | | | |
|---|---|---|---|---|---|
| Activity | Expend/Rev (millions of current US$) | Expend/Rev (millions of 2010 US$) | RIMS II Multiplier | Total Jobs | Direct Jobs |
| Hard construction costs | 249.020 | 214.367 | 18.4948 | 3,964.7 | 1,716.3 |
| Architect & Engineering Services | 9.515 | 8.705 | 17.1769 | 149.5 | 55.3 |
| Total Jobs | | | | 4,114.2 | |

CONFIDENTIAL INFORMATION

The Project creates a surplus of 1,714 jobs (or 71.4%), which is shown below:

| Minimum Required Job Creation | **2,400** |
|---|---|
| Jobs Created | **4,114** |
| Surplus | **1,714 (71.4%)** |

Although the Owner and Developer anticipates the Project will ultimately create and sustain the minimum number of jobs required for each Subscriber in the Offering, there can be no assurance in this regard.

In March 2015, the Utah Department of Workforce Services designated an area comprising census tract 210100, Block 1, in Weber County, an area containing the Property, as a Targeted Employment Area with an 11.3% unemployment rate, more than 150% of the 2013 national average unemployment rate.

Based upon this designation, Dr. Evans's RIMS II job creation assessment and the RC Designation, the Company believes the purchase of a Class B Unit by a qualified investor will constitute a Qualifying Investment under the EB-5 Program. Therefore, as described in this Memorandum, the threshold investment for potential subscribers required would be US$500,000 under the Act, plus the US$55,000 Administration Fee. See "Immigration Procedures" section of this Memorandum for a summary of immigration procedures in connection with the EB-5 Program.

The Developer will provide information to the Company from time to time to enable the Company to calculate the number of direct and indirect jobs arising from the fulfillment of the Project business plan, avoiding double counting any job. To the extent the Project creates an insufficient number of jobs to enable each Class B Member to obtain a favorable adjudication of his or her I-829 Petition, the Class B Manager will allocate jobs to Class B Members pursuant to the Job Allocation Addendum attached to the Operating Agreement.

Under the EB-5 Program, an investor is required to be an "active participant" in the management of the commercial enterprise. However, participation in connection with the activities of a limited liability company is subject to limitations set out in the Operating Agreement and relevant legislation. Notwithstanding such limitations, limited liability companies are recognized as appropriate investment vehicles under the EB-5 Program. See "Class B Member Decisions" section of this Memorandum.

The RC Designation imposes certain conditions on the Regional Center intended to ensure that the Regional Center continues to meet the statutory requirements of the EB-5 Program. In particular, the Regional Center is required to maintain records, data and information and to prepare and deliver a written report to USCIS on or before December 29 of each calendar year regarding, among other things:

- investment activities under the Regional Center's sponsorship;
- activities of the Company in carrying out the Offering and activities of the Developer carrying out the development, construction and operation of the Project;
- compliance with subscription and immigration procedures by individual subscribers; and
- direct and indirect job creation statistics.

If USCIS determines that the Regional Center no longer serves the purpose of promoting economic

LENDERS_0003604

growth, improved regional productivity, job creation and increased domestic capital investment, USCIS retains the right to modify or terminate the RC Designation, which would have an adverse impact on the Offering and on the status of a Class B Member's ability to complete the required immigration procedures and maintain his or her visa status. If for any reason the Regional Center is unable to fulfill the role described in this Memorandum, the Company would attempt to engage another USCIS-approved regional center to act in place of the Regional Center.

The approved geographic area of the Regional Center comprises the entire state of Utah. The Property is located in Weber County, Utah, which is within the boundaries of the Regional Center's approved geographic area.

The Regional Center also is required to notify USCIS and to obtain an amendment to the RC Designation if there is a material change to the information upon which the RC Designation was based. The Company believes that USCIS will not require an amendment to the RC Designation unless there has been a material change to the information previously provided. However, it is unclear what types of changes USCIS would consider material for this purpose. The Project could be delayed if the Regional Center were to request an amendment to the RC Designation. In addition, there can be no assurance USCIS would approve any requested amendment. Failure to obtain a needed amendment could have a material adverse impact on the Project, the Offering and the status of a Class B Member's ability to complete the required immigration procedures or to maintain his or her visa status.

## IV.  IMMIGRATION PROCEDURES

A diagram summarizing the immigration procedures is attached to this Memorandum as Exhibit C. To qualify for conditional permanent residency, a potential subscriber must file an I-526 Petition with USCIS. Substantial documentation evidencing that a potential subscriber's funds intended for investment in the Company were derived from lawful sources must be included with the I-526 Petition. Such evidence may include information concerning real estate transactions, business income, proceeds from the sale of a business, employment income, investments, bank accounts and dealings, licenses or similar evidence. If investment funds are derived from a loan, gift or inheritance, an appropriate affidavit and/or other evidence will be required to be filed.

Each Subscriber in the Offering is responsible for retaining his or her own immigration legal counsel and for paying legal fees and expenses pursuant to the immigration process. The Company is under no obligation to accept the subscription of any potential subscriber, including a potential subscriber represented by an immigration attorney who the Company determines, in the exercise of its sole discretion, may not adequately represent the potential subscriber before USCIS.

Following completion of the Subscription Procedures (see "Subscription Procedures" section of this Memorandum), the Company will send documentation regarding the Company and the Project to potential subscribers for their immigration attorneys to use in connection with preparation of the I-526 Petition. The Company and the Owner are not responsible for any errors or omissions in any I-526 Petition, the contents of which are each potential subscriber's sole responsibility.

A potential subscriber will be issued a Class B Unit and admitted to the Company as a Class B Member when all of the following have occurred:

> (1)    the potential subscriber has filed his or her I-526 Petition with USCIS, and

> (2)    the Escrow Agent has released to the Company the potential subscriber's Subscription Amount.

Following approval of a Class B Member's I-526 Petition by USCIS, the Class B Member must apply for conditional lawful permanent resident status. Lawful permanent resident status may be applied for by the Class B Member (who must be over the age of 18), together with his or her spouse and unmarried children who are under the age of 21, upon approval of the I-526 Petition, assuming there is no quota

backlog and the family promptly pursues the process.

If the Class B Member (or derivative beneficiary family member) will be outside of the United States, he or she must file Form DS-260 Application for Immigrant Visa and Alien Registration ("**DS-260**") and an interview will be scheduled at the appropriate U.S. Consulate (or, if in Taiwan, at the American Institute in Taiwan). If the Class B Member (or derivative beneficiary family member) will be inside of the United States, he or she must file Form I-485, Application to Register Permanent Residence or Adjust Status ("**I-485 Application**") at the appropriate USCIS office.

The consular interview process, or the USCIS adjustment of status process, as applicable (collectively, the "**Immigrant Visa Process**"), is designed to enable the U.S. Government to determine whether a person is entitled to lawful permanent residency in the United States. As part of the Immigrant Visa/Adjustment of Status Process, the Class B Member (or derivative beneficiary family member) is subjected to medical, police, security and immigration history checks. Upon approval of the I-485 Application or upon first entry into the United States under the immigrant visa issued following successful completion of the consular interview process, the Class B Member (or derivative beneficiary family member) is granted conditional permanent resident status.

Persons outside the United States applying for permanent residency, or inside the United States applying for adjustment of status, must demonstrate that they are admissible to the United States according to Section 212 of the Act. Section 212 sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa or entering the United States. Foreign persons precluded from entering the United States include:

(1)     persons who are determined to have a communicable disease of public health significance;

(2)     persons who are found to have, or have had, a physical or mental disorder, and behavior associated with the disorder which poses, or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

(3)     persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(4)     persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed or admits committing acts which constitute the essential elements of same;

(5)     persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude, persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

(6)     persons engaged in prostitution or commercialized vice;

(7)     persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

(8)     persons excludable on grounds related to national security, related grounds, or terrorist activities;

LENDERS_0003606

(9)     persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

(10)    persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(11)    persons who are likely to become a public charge at any time after entry;

(12)    persons who were previously deported or excluded and deported from the United States;

(13)    persons who by fraud or willfully misrepresenting a material fact seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the Act;

(14)    persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

(15)    certain aliens who have departed the United States to avoid or evade U.S. military service or training;

(16)    persons who are practicing polygamists; and

(17)    persons who were unlawfully present in the United States for periods in excess of 180 days.

Each potential subscriber should review the substantive inadmissibility and eligibility grounds (set forth in part above) with his or her immigration counsel to determine whether there may be a basis for denying lawful permanent resident status to the potential subscriber (or derivative beneficiary family member) notwithstanding eligibility for immigration based on an investment in the Company.

As of May 1, 2015, the U.S. Department of State announced that, of the 10,000 immigrant visas available under the EB-5 Program, the maximum number available to applicants who were born in the People's Republic of China had been reached for the U.S. government's 2015 fiscal year. In addition, the cut-off priority date for applicants from China was set at September 1, 2013 for the month of May 1, 2015. This development, known as "visa retrogression," means that applicants born in China who filed their I-526 Petitions on or after September 1, 2013 (and their derivative beneficiary family members) will be unable to complete the Immigrant Visa Process until additional immigrant visas become available.

Although retrogression will not affect filing and adjudication of new I-526 Petitions, the maximum number of immigrant visas available to applicants born in the People's Republic of China under the EB-5 Program is likely to remain insufficient for the foreseeable future. It is anticipated that an investor who receives his or her I-526 Petition approval on the date of this Memorandum will require between two and three years to complete the Immigrant Visa Process.

In addition, USCIS authority to receive, process and adjudicate investor petitions in connection with capital investment opportunities such as the Project that are affiliated with regional centers and rely on indirect job creation will expire on September 30, 2016 unless the United States Congress passes legislation to extend the regional center program that is then subsequently signed into law by the President. There are no assurances that Congress will pass such legislation or, if so, what changes the legislation might make to the EB-5 Program. Similarly, there are no assurances that the President would sign such legislation into law. Unless the regional center program is extended, after September 30, 2016 it is likely USCIS will no longer receive, process or adjudicate regional center proposals, I-526 Petitions, I-829 Petitions or I-485 Applications affiliated with regional centers relying on indirect job creation analyses which would adversely affect the ability of Class B Members to obtain conditional permanent residence through participation in the Offering.

An immigrant visa granting permanent resident status under the Act is conditioned upon the subscriber

demonstrating his or her compliance with the requirements of the EB-5 Program. Subscribers who have been granted conditional permanent resident status must file an I-829 Petition within 90 days prior to the second anniversary of conditional permanent resident status being granted. The primary purpose of the I-829 Petition is to ensure that subscribers submit evidence establishing that they have successfully met the requirements of the EB-5 Program, including the creation and maintenance of at least ten direct and indirect jobs during the period of conditional residence. Except in rare cases, subscribers who fail to file this petition in a timely manner will automatically lose their permanent resident status.

The Company will send documentation regarding the Company and the Project to subscribers for their immigration attorneys to use in connection with preparation of the I-829 Petition.

There can be no assurance that an I-526 Petition will be approved, that a subscriber will successfully complete the Immigrant Visa Process, or that upon the approval thereof that the conditions attaching thereto will be removed through an I-829 Petition. Each subscriber bears the risk that USCIS will not approve the subscriber's I-526 Petition or that the subscriber or a qualifying family member will not obtain an immigrant visa.

The foregoing description of the immigration procedures in connection with the EB-5 Program is a summary description and each potential subscriber must seek advice from his or her immigration attorney to understand these procedures fully.

## V. USE OF PROCEEDS

The proceeds from the Offering will be used to fund the Loan to the Developer for certain approved costs incurred in connection with the development, construction, ownership and operation of the Project, including reimbursing the Owner for the Bridge Financing as permitted under the Loan Documents and the EB-5 Program.

## VI. PROJECT PARTICIPANTS

### Legal Entities

The following legal entities are participants in the Project:

*Summit Village Development Lender 1, LLC (the "Company").* The Company is a newly formed Delaware limited liability company and the issuer of the Class B Units. Using proceeds from the sale of Class B Units in the Offering, the Company will extend the Loan to the Developer to fund a portion of the Development Costs. The rights and obligations of the members in the Company are set out in the Operating Agreement. See "Summary of Operating Agreement" section of this Memorandum.

*SMHG Village Development LLC (the "Developer").* The Developer is a newly formed Delaware limited liability company established to construct, own and operate the Master Property. The Offering of Class B units is made solely by the Company and the Company is solely responsible for the contents of this Memorandum.

*Summit Mountain Holding Group, L.L.C. (the "Owner").* The Owner is a Utah limited liability company established, among other things, to acquire and operate Powder Mountain, a ski resort, and to develop, construct, own and operate the Summit Powder Mountain Resort master planned mixed-use development. The Developer is a subsidiary of the Owner and is under the ultimate control of the Principals. As used in this Memorandum, the term "*Owner*" includes Summit Mountain Holding Group, L.L.C. along with its affiliates as applicable and as the case may be.

### Individuals

*Gregory Mauro.* Mr. Mauro is chairman and one of two principal equity holders in the Owner and

chairman of the Summit Institute. Mr. Mauro is also a founder and managing partner of Learn Capital, a venture capital firm, and he currently manages Revolution Community Ventures, a New Market Tax Credit fund that has financed education facilities in California and New Jersey. Mr. Mauro also manages an affiliate of The Founders Fund and has co-founded four venture backed startups in the education, wireless and media sectors. Prior to these ventures, Mr. Mauro was founding vice president of corporate development with Entropic Communications, Inc. (Nasdaq: ENTR), a developer of residential semiconductor solutions. Mr. Mauro began his career as a strategy consultant for Monitor Group. He is a graduate of UCLA's College of Honors and seasonally resides in Eden, Utah.

*Elliott Bisnow.* Mr. Bisnow is the other principal equity holder in the Owner and a founder and chief executive officer of Summit Series, an organization that hosts conferences and events for young entrepreneurs, artists and activists. Mr. Bisnow also oversees the Summit Action Fund, an organization that invests in start-up ventures including Zaarly, Warby Parker, EcoMom, Scribd and Uber. With his father, Washington, DC businessman Mark Bisnow, he is a co-founder of Bisnow Media Corporation, a publisher of targeted online content and business conference producer. Mr. Bisnow lives in Eden, Utah.

## VII.  STRATEGIC PARTICIPANTS

### Architects

The Owner is currently working with two cutting-edge architecture firms, Studio Ma and Robert & Anderson Design ("**R&A**"). Studio Ma is engaged to serve as the master planning architect for land use, density and development.  R&A is engaged as design architect for core features of Summit Village.

Studio Ma is an award-winning architecture and environmental design firm delivering innovative, sustainable and unique designs to forward thinking institutions and individuals. Founded in Phoenix, Arizona in 2003, Studio Ma's three partners, Christiana Moss, Christopher Alt and Dan Hoffman foster a creative and growing practice centered in the essence of the desert southwest.  Studio Ma's work is inspired by the stark profiles of the surrounding mountains, their jagged outlines and the play of light and shadow serving as an ever changing backdrop to the city.  They strive to create forms and surfaces that resonate with the surrounding context, both large and small.

R&A is an architectural design firm focused on creative solutions for projects of multiple scales and types. Founded by two award-winning principals, Christian Robert and Benjamin Anderson, R&A leverages a broad portfolio of experience in multiple typologies garnered from over 25 years of collective professional work from all over the world.  Focusing on more local, community-scaled projects, R&A believes that every project is an opportunity for transformation and impact. They value how curiosity feeds creativity, and how creative approaches yield innovative answers. R&A is intensely active in, and embrace related research. It is, after all, what benefits our core focus-to deliver fresh, new thinking at every point of their process.

### Summit Village Development Manager

The Owner has retained East West Partners ("**EWP**") to act as key development adviser in connection with Summit Village. EWP is an association of independent companies providing consulting services to developers in connection with the construction, sale and management of large-scale real estate development projects.

EWP has extensive experience providing construction management and advisory services to developers of projects of size and scope similar to Summit Village. These projects include the following:

- The Custom Homes on Village Walk, Beaver Creek Village, Vail, CO

- Market Square, Beaver Creek Village, Vail, CO

- Arrowleaf, Deer Valley, UT
- Hyatt Main Street Station, Summit County, CO



*Hyatt Main Street Station, Summit County, CO*          *The Custom Homes on Village Walk, Vail, CO*




*Horizon Pass Lodge, Bachelor Gulch, CO*          *Market Square, Beaver Creek Village, Vail, CO*

As a key development adviser, EWP has participated in important design meetings in Eden, Vail, Colorado and New York City and has assisted Owner with conceptual and schematic development work resulting in a schematic-level design package for Summit Village. In addition, EWP reviewed and provided advice regarding cost estimates and the financial budget for Summit Village. The Owner is currently negotiating with, and expects to retain, EWP to provide comprehensive project management services in connection with Summit Village under the terms of a development management agreement. Under the proposed development management agreement, EWP would provide day-to-day project management services in connection with Summit Village, including (i) management of design and engineering, (ii) construction management, (iii) permitting, (iv) sales and marketing coordination, (v) customer relations, (vi) warranty administration and (vii) pro forma maintenance, financial accounting, draw requests and coordination of tax return preparation. However, the proposed development management agreement has not been finalized between EWP and Owner, and Owner reserves the right to engage a different firm to provide these services for Summit Village.

## VIII.   THE PROJECT

The Project is a portion of the initial phases of the Summit Powder Mountain Resort master planned mixed-use development. The Project has been principally financed to date through the Bridge Financing, the sale of securities to investors (described below) and public financing, and is comprised primarily of the following:

- The Infrastructure Component consisting of the development, construction and operation of roads, sewers, and other horizontal infrastructure improvements required to facilitate additional development work for Summit Powder Mountain Resort, which is more fully described in the section of this Memorandum titled "Infrastructure Component";
- The Commercial Component consisting of the development, construction and operation of a

224,399 ft$^2$ mixed-use resort development which includes (a) an 80-unit, 214-key hotel condominium townhome complex and (b) 52,167 ft$^2$ of commercial space located on 4.52 acres of land located in a gently sloping saddle near the summit of Powder Mountain, each of which are more fully described in the section of this Memorandum titled "Summit Village";

- The Event Spaces consisting of the development, construction and operation of (a) an 11,000 ft$^2$ lodge and event space in the Horizon Neighborhood, (b) a 15,675 ft$^2$ lodge and event space in Spring Park, (c) the 6,500 ft$^2$ Sky Lodge, which is capable of being relocated throughout the Summit Powder Mountain, and (d) several remote event spaces, which are capable of being relocated throughout the Summit Powder Mountain; and

- The JV Neighborhood Developments consisting of the development, construction and operation of four distinct neighborhoods, which in aggregate represent approximately 11 acres of land and 59 residential units. The individual components of the JV Neighborhood Developments are as follows:
    o a 6.25 acre subdivision site to be known as Horizon Neighborhood, consisting of 26 residential units;
    o a 4.05 acre subdivision site to be known as Spring Park, consisting of 12 residential units;
    o a .72 acre subdivision site to be known as Village Nest West, consisting of 10 residential units; and
    o a .42 acre subdivision site to be known as Copper Crest West, consisting of 11 residential units.

- The Residential Component consisting of the development and construction of approximately 80 residential units principally consisting of single family and multi-family units, including townhomes.

Founding Investors, Pioneer Investors and Charter Investors

To partially finance Summit Powder Mountain Resort, the Owner has offered and sold securities to investors (each, "**Founding Investors**") in three separate private placements. Each security consists of (i) a loan to the Owner convertible into a credit towards the purchase of a homesite following completion of development and regulatory procedures required to enable the Owner to convey the homesite, (ii) an equity interest in an indirect controlled subsidiary of the Owner established to own and operate the Powder Mountain ski resort, and (iii) a non-equity membership in an indirect wholly-owned subsidiary of the Owner established to operate Summit Eden, a recreational membership organization. As of the date of this Memorandum, Founding Investors have reserved approximately 116 homesites, and the Owner has conveyed fee simple ownership to approximately 39 of those homesites.

Infrastructure Component

Using public and private funding, the Owner and Weber County have constructed roads, sewers and other infrastructure improvements on the Master Property which is required to facilitate and allow for additional development work of the entire Summit Powder Mountain Resort. The Infrastructure Component is complete with the exception of one road which is expected to be complete in the fourth quarter of 2016.

Using the proceeds of these private placements and other resources, the Owner has undertaken the improvements to Summit Powder Mountain Resort identified below. These improvements were either completed prior to the date of this Memorandum or will be largely completed by the end of the fall of 2016 and are part of the Infrastructure Component. These improvements are in addition to the road and infrastructure improvements identified above which were financed with the proceeds of Weber County's 2013 bond issue.

To further promote the development of Summit Powder Mountain Resort, in 2013 Weber County

borrowed a total of US$17.7 million in the form of special assessment bonds to finance the construction of public roads, sewers and utilities to Summit Powder Mountain Resort homesites and to the Property. However, construction started in the summer of 2013 and these improvements are complete. The bonds are special limited obligations of Weber County and are payable primarily from a special assessment levy on Summit Powder Mountain Resort homesites and other properties benefitting from the improvements, including the Property. The assessments vary depending on land use type. The assessment for a single-family residence is approximately US$22,000, or US$2,200 annually if the owner decides to pay over a 20-year period. The assessment bond will not be repaid from disbursements under the Loan. However, Developer may apply proceeds from the underlying homesites in the JV Development Neighborhoods to pay down the special assessment bond so long as the Developer is in compliance with certain requirements under the Loan Agreement.

The successful bond issue required close cooperation between the Owner and Weber County and extensive technical and financial support from the Owner. In addition to a bond-funded reserve, the Owner was required to fund two additional reserves as security for payment of the bond obligations.

<u>Residential Component</u>

The Project includes the vertical construction of residential units principally consisting of single family and multi-family units, including townhomes (the "Residential Component"). The Residential Component is anticipated to be completed within the select homesite areas located on the Master Property (see <u>Exhibit F</u> for the location of the Residential Component). The Residential Component is currently anticipated to include approximately 80 homesites combined, which number is exclusive of the 80 condo hotel units located in Summit Village. Approximately 116 homesites have been reserved by Founding Investors of which approximately 66 lots are currently in the construction planning or design stage. It will take approximately 4 to 5 years to complete all of the vertical development contemplated on the residential homesites. The construction cost related to the Residential Component is anticipated to be approximately US$100 million upon completion of these units.

The sale and future development of the Residential Component is contemplated to create product variety, additional critical mass, and marketing momentum to enhance the overall development of the Project. The Owner currently plans for the Residential Component to support the Summit Village portion of the Project. The Owner and builder partners will determine the mix of residential homesite and built product types over time based on market conditions. The Owner intends for the Residential Component to be differentiated from the Hotel Component of Summit Village based on average unit size, price point per square foot, and other factors. The Owner does not expect the sales of the residential homesites or finished units in the Residential Component to compete materially with the Hotel Component of the Summit Village. Notwithstanding the Owners' current intentions and expectations, it is possible that the Residential Component of the Project will adversely affect the financial performance of the Hotel Component of Summit Village.

<u>Summit Village</u>

Summit Village will act as the main core town for the Summit Powder Mountain Resort and will consist of mixed-use resort development which includes (a) an 80-unit, 214-key hotel condominium townhome complex, (b) 52,167 ft$^2$ of commercial space located on 4.52 acres of land located in a gently sloping saddle near the summit of Powder Mountain.

LENDERS_0003612

**Area Profile: Utah and the Wasatch Range**



Utah is a state in the western United States. In a September 2014 article, *Forbes* magazine identified Utah as the best state in which to do business due to its relatively low tax rates, pro-business regulatory environment, low unemployment rate and growing status as a technology hub. Salt Lake City International Airport offers direct flights to and from more than 90 cities including New York City, San Francisco, London, Paris, and Amsterdam. Utah is the host of the Sundance Film Festival, the largest independent cinema festival in the United States. The festival highlights new films created by American and international independent filmmakers. In 2014, the festival attracted an estimated 45,000 attendees, who spent an estimated aggregate US$64.0 million.

The Wasatch Range is a mountain range that stretches approximately 160 miles from the Utah- Idaho border, south through central Utah in the western United States. It is the western edge of the greater Rocky Mountains, and the eastern edge of the Great Basin region. Today, 85% of Utah's population lives within 15 miles of the Wasatch Range, mainly in the valleys just to the west. This concentration is known as the Wasatch Front and has a population of just over 2,000,000 residents. Salt Lake City lies between the Wasatch Range and the Great Salt Lake.

Wasatch peaks are sculpted by glaciers, yielding notably rugged, sweeping upland scenery comparing well with other prominent ranges of western North America. They also receive heavy falls of snow, in some places over 500 inches per year. The Wasatch Range is home to a high concentration of ski areas, with eleven stretching from Sundance in northern Utah County to Powder Mountain northeast of Ogden. Due to the low relative humidity in wintertime, along with the added lake-effect from the Great Salt Lake, the snow has a dry, powdery texture that is marketed by local ski resorts and the state of Utah as "the Greatest Snow on Earth." The high concentration of ski resorts located close to a major urban area, as well as the famed light, powdery snow that's often considered good for skiing, were prime reasons for Salt Lake City's hosting of the 2002 Winter Olympics.

**The Wasatch Range**





Source: "Wasatchfront" by Feature Salt Lake City at en.wikipedia

CONFIDENTIAL INFORMATION

**Area Profile: Ogden, Utah**

Ogden Valley is part of the greater Weber and Cache County economic base. Located in the foothills of the Wasatch Range, the area is easily accessible from Salt Lake City, which lies approximately 40 miles to the south. With a metropolitan area population of approximately 576,000, Ogden is the regional economic hub for northern Utah. Forbes magazine currently ranks Ogden as the 18th best city in the United States in which to do business, citing the nearby mountains and rivers as a major attraction. The Internal Revenue Service has a large presence in Ogden and is the city's largest employer. In addition, outdoor recreational companies, such as Solomon, Rossignol, and Scott USA, maintain prominent offices in Ogden Valley. Ogden also offers educational opportunities, including Weber State University, Ogden-Weber Applied Technology College, Davis Applied Technology College and Stevens- Henager College.

Although Ogden Valley is known for its world-renowned winter activities, it has also become a popular destination for summer tourists. Ogden and the surrounding Weber County offers over 210 miles of trails for hiking and mountain biking, as well as 13,000 acres of lakes, which are connected by rivers for paddle-sports and fishing. Furthermore, the Ogden River has been recognized as one of the only urban Blue Ribbon Fisheries.

**Area Profile: Powder Mountain**

Powder Mountain is considered the largest ski area in the United States in terms of geographic area, with approximately 7,500 acres of lift accessible terrain. Powder Mountain is an approximately one- hour drive from Salt Lake City International Airport, overlooking the Ogden Valley, an area dotted with farms and ranches and surrounded on all sides by mountains. Powder Mountain is located opposite Snow Basin ski resort, site of the 2002 Olympic downhill competition. The Developer believes the combination of world-class skiing, championship golf and a 3,00-acre lake in a picturesque mountain valley combine to make an attractive year-round resort environment and educational retreat.

Powder Mountain had its beginnings as the winter range for Frederick James Cobabe's sheep herd. Between 1902 and 1948, Cobabe accumulated land around Eden, Utah. Cobabe's son, Dr. Alvin F. Cobabe, bought the livestock company in 1948. It is reported that, while horseback riding with friends along Lightning Ridge in the 1950s, someone casually mentioned that the terrain would make a great ski resort. Dr. Cobabe soon began to acquire adjacent property adding to the thousands of acres he had received from his father.

The Powder Mountain ski resort opened in February 1972 with 14,000 acres and one ski lift. Today Powder Mountain has a reputation for some of the best skiing in the United States. A December 2013 article in *Forbes Travel Guide* referred to skiing in the Ogden Valley as "a hidden gem." A March 2009 article in *The Denver Post* characterized Powder Mountain as "the largest – and perhaps least known – ski area in the nation." In addition, the most recent annual survey of *Skiing* magazine readers ranks Powder Mountain ninth in the United States in terms of overall satisfaction.

Despite this reputation, Powder Mountain has remained a relatively little known and under-developed ski area compared to other Wasatch Range ski resorts such as Canyons Resort in Park City located closer to Salt Lake City. In 2006, Dr. Cobabe sold Powder Mountain for approximately US$50.0 million to Western America Holdings, a Utah-based investment group. Due to the financial crisis and subsequent recession, Western America Holdings sold Powder Mountain to the Owner in April 2013.

**Powder Mountain**

LENDERS_0003614



Source: HVS Report

**Summit Series**

Summit Series is an organization that hosts conferences and events for entrepreneurs, artists and activists.

In April 2011, the organization hosted the Summit at Sea conference, where 1,000 young entrepreneurs took a chartered cruise ship from Miami to the Bahamas for a three-day conference featuring Richard Branson, Peter Thiel, General Electric chief marketing officer Beth Comstock and musical group The Roots.

Also attending Summit at Sea was Gregory Mauro, one of the Principals. Mauro was then a 41-year-old entrepreneur based in Austin, Texas. Five years earlier, a friend had introduced Mauro to Powder Mountain. An avid skier, Mauro had fallen in love with the area and had purchased a home in Eden, Utah. Later that year, after learning that Powder Mountain was once again for sale, Mauro persuaded Bisnow that Powder Mountain would be an ideal permanent home for Summit Series. In addition, Mauro suggested that Powder Mountain could be developed, responsibly and profitably, into a community where Summit Series participants could acquire homes in order to live and network together. This initial vision soon developed into the Summit Powder Mountain Resort master planned mixed-use development, of which the Project is a key component.

Mauro shared the history of Aspen with the Summit Series founders and specifically the role of Walter Paepcke and the Aspen Institute, positing that the Summit community could have a similar impact on Powder Mountain. Walter Paepcke was a Chicago industrialist who in 1949 visited Aspen, Colorado, then a depressed mining town with 800 residents. Attracted by the areas natural beauty, Paepcke organized an event there to commemorate the 200th birthday of Johann Wolfgang von Goethe that attracted over 2,000 participants. That event led the following year to the creation of the Aspen Institute, which brought wealthy and culturally minded individuals to Aspen and fostered decades of rapid an economic growth in the area.

The Principals established the Owner in October 2011. In June 2012 the Owner acquired approximately 1,480 acres of land located in Upper Ogden Valley or "Eden Valley" at the foot of Powder Mountain. This land comprises (i) approximately 80 acres intended to be used for a "park & ride" lot and bus stop and open space for special events, and (ii) approximately 1,400 acres of open space, including approximately 870 acres under conservation easement with the Utah Department of Wildlife Resources. The land is suitable for hiking and bicycle trails and a potential equestrian and/or ranch facility.

In April 2013, the Owner acquired the 9,200-acre Powder Mountain, which includes the Property and the land on which the Project is constructed, for approximately US$33.0 million, of which US$12.5 million was paid in cash and the balance from the proceeds of a secured loan from an institutional lender (which loan was previously refinanced without a lien on the Property). In July 2013, Summit Series hosted

Summit Outside, its first event at Powder Mountain. The event attracted over 1,000 participants.

**Summit Outside, July 2013**

 

Source: Summit Series

## Weber County Entitlements and Financing

The Owner worked in close cooperation with local residents and public officials to develop an updated master plan for Summit Powder Mountain Resort. The master plan process included comprehensive development of slope maps, existing vegetation mapping, geotechnical investigation, avalanche zones, wind and solar aspect studies, access feasibility, ski terrain and resort connectivity, wildlife corridors, existing trails, viewsheds and open space preservation.

The resulting updated master plan establishes the foundation for the Summit Powder Mountain Resort to create an authentic mountain destination with varied vibrant neighborhoods clustered throughout the overall development and with Summit Village as the center of the larger community. In December 2014, the Weber County Commission unanimously approved the Owner's application for a new destination resort zoning classification, as well as Ordinance No. 2014-21 approving the rezoning. In January 2015, a Zoning Development Agreement between the Owner and Weber County was also approved.

Under the approved master plan, the Owner is entitled to construct up to 2,800 units of density, calculated as follows:

| DDR-1 DENSITY AND DESCRIPTION | |
|---|---|
| **Type of Use** | **Density Equivalent** |
| Single-Family Dwelling | 1 unit |
| Multi-family Dwelling | 1 unit per dwelling unit |
| Hotel Room | 0.33 units |
| Commercial Square Footage | N/A. Does not count toward unit density. |
| Corporate Retreats | First 36 corporate retreat rooms do not count toward unit density. Each room after 36 counts as 0.33 units. |

CONFIDENTIAL INFORMATION

> **TOTAL PROJECT DENSITY PERMITTED: 2,800 units**
>
> Workforce housing units shall not be counted toward density of the Project regardless of where they are located, as provided by the DRR-1 Zone.

**Summit Powder Mountain Resort Development**

The Project is a key component of the Summit Powder Mountain Resort master planned mixed-use development. The Principals intend to develop Summit Powder Mountain Resort over multiple phases to include (i) approximately 500 ski-accessible single-family mountain homesites, as well as condominiums and townhomes and (ii) a thriving village core of similar scale with associated amenities and educational facilities. Summit Village is intended to comprise the initial village core development. There is no assurance that any such future phases will occur.

 In terms of its sheer physical environment, the Developer believes Powder Mountain compares favorably to the Swiss Alps, the Italian Dolomites and the Argentine Andes. The Developer believes Powder Mountain's location provides a number of other distinct advantages, including the following:

- Rare Topography: Powder Mountain takes advantage of a unique "flat-top," inverted topography. This enables fewer lifts to service more than the typical amount of terrain, as well as providing large amounts of ski accessible homesites with panoramic views. The topography also provides cycling, hiking, Nordic, and horseback trails along ridge tops and elevated meadows, with consistent trail vistas that the Developer believes comparable to those found in the European Alps. The view atop Hidden Lake and Sunrise spans four states—Utah, Wyoming, Nevada, and Idaho.

- Mount Ogden and Great Salt Lake Views: Nearly all Summit Powder Mountain Resort homesites view Mount Ogden, peak elevation 9,570 feet, which features several jagged peaks. Mount Ogden is the home of Snowbasin Resort, where the 2002 Olympic Downhill events were held. In addition, many homesites will have a view of the Great Salt Lake and one or more of its islands, providing beautiful winter sunsets.

- Protected Vistas and Nature Reserves: The Summit Powder Mountain Resort master plan incorporates large areas of open space, including elevated meadows. In addition, the property is mostly bordered by or near to nature reserves managed by the Department of Wildlife Management. The reserves include the Elk Reserve plateau, which features prominently toward Mount Ogden, as well as additional reserves bordering the foothills of the Five Fingers, Mary's Bowl, Gertsen Canyon, and Wolf Creek.

- Open Valley Below: Powder Mountain overlooks Ogden Valley, which is a beautiful area largely composed of farms and ranches surrounded on all sides by mountains. The combination of world class skiing, championship golf, and a 3,000-acre lake in a picturesque mountain valley with large expanses of open space within 55 miles of an international airport is rare. In fact, Eden Valley is so sparsely populated, with fewer than 2,500 residents, that there is not a single stop light in the entire valley.

- Proximity to Major City: Less than 20 minutes from Ogden Valley is the City of Ogden. With a population of over 80,000, Ogden is the regional economic hub for northern Utah.  There are numerous outdoor recreation companies based in Ogden - including Solomon and Rossignol. Ogden is also home to a burgeoning community of higher education, with Weber State University, Ogden-Weber Applied Technology College, Davis Applied Technology College and Stevens-Henager College. In addition to Costco, Walmart, Home Depot and other traditional retail, Ogden has acclaimed healthcare facilities across multiple hospitals and clinics.

- Uncrowded Skiing and Snowboarding: On its busiest days, Powder Mountain sells just over 1,000

daily lift tickets, compared to over 15,000-20,000 daily lift tickets at Vail and Breckenridge resorts. Given that Powder Mountain has approximately 7,500 acres of lift-accessible terrain, it retains the most acreage per day skier of any major resort, at 7.5 acres per day skier. By comparison, each of Deer Valley, Park City, Mammoth, Vail, and Breckenridge have considerably less than a half-acre per day skier.

- Size: Powder Mountain has approximately 7,500 acres of lift-accessible terrain surrounded by thousands of additional acres of adventure skiing. Even excluding adventure skiing acreage (which includes terrain that is skied pursuant to access agreements with neighboring ranches), Powder Mountain offers the largest skiable terrain in the U.S.

- Snowfall: Powder Mountain has been consistently ranked in the top three for snow by *Ski* magazine in their annual reader poll. In 2015, Powder Mountain was ranked #3 out of 400 resorts polled in the snow category. Powder Mountain benefits from the same Great Salt Lake "lake effect" as Snowbird and Alta, and like those resorts regularly records over 500 inches of snowfall per year, compared to approximately 350 inches in Park City and 300 inches in Aspen.

- Year Round Activities: According to the City of Ogden, downtown Ogden is the only place in the U.S. within 37 minutes of all of the following activities: skiing, golfing, kayaking, ice climbing, water skiing, fly fishing, horseback riding, mountain climbing, trail running, bird watching in a national bird refuge, hunting (deer, elk, duck, pheasant, buffalo, or mountain lion), sky diving, snowmobiling, mountain biking, and access to an international airport.

- Proximity to Major Air Hub: In typical traffic, Powder Mountain is located just over 55 minutes north of Salt Lake City, with daily direct flights into Salt Lake City International Airport from major cities including Los Angeles, New York City, San Francisco, London, Amsterdam, and Paris.

- Proximity to Local Air Hub: Ogden-Hinckley (OGD) airport, 23 miles from Powder Mountain, recently became TSA-certified and began supporting discount carriers in addition to private air traffic, beginning with Allegiant Air flights to and from Mesa, Arizona. Given that Los Angeles and Oakland are only 10-20 minutes further from Ogden by commercial air than Mesa, the Developer believes there is significant potential for growth of direct, discounted air service into Ogden from California and elsewhere.

**The Property**

Summit Village will be built on 4.52 acres of vacant land located in a gently sloping saddle near the summit of Powder Mountain at approximately 8,700 feet above sea level. The JV Neighborhood Developments are located in four of the most desirable locations within the Master Property in close proximity to Summit Village. Exhibit F hereto describes the physical boundaries of the Property.

The Owner commissioned the Fort Collins, Colorado office of HVS Consulting and Valuation Services, a national hotel appraisal and consulting firm ("HVS"), to prepare an independent appraisal of the "as complete" market value of the fee simple interest in the Property. HVS delivered its appraisal in a written report dated June 27, 2016, a copy of which is available upon request.

In assessing the market value of the Property, HVS did not utilize a sales comparison approach to market value due to an absence of comparable sales. Instead, HVS relied primarily on an income capitalization approach that analyzed the Property's ability to generate financial returns as an investment. According to HVS, the income capitalization approach is often selected as the preferred valuation method for operating properties, because it most closely reflects the investment rationale of knowledgeable buyers.

To arrive at an appraised value for the land at the Summit Village and surrounding properties, HVS estimated the net sales proceeds, from the development and sellout of the residential units, and

performed a subdivision and discounted cash flow analysis to arrive at an indication of the residual land value at the time that the construction of each of the properties was completed. To arrive at an estimate of the "As Complete" market value of the property, HVS estimated the value based upon a discount of the gross residential sales prices, as well as the value of the operating entity for the hotel. The hospitality and amenities component of value was based upon a forecast operating cash flow during a 12-month period, when the phase 1 village is completed, and separately when the phase 2 village is completed. HVS then utilized the result in a direct capitalization technique and a discounted-cash-flow analysis to arrive at an "as complete" market value as the date of completion for each of the hotel properties. Based on this analysis, HVS was of the opinion that the values for the property are as set forth below.

|  | Units | Completion Date | As Complete Value ($ 000s) |
|---|---|---|---|
| Village Phase I | 80 | January 2018 | $59,800 |
| Village Phase II | 70 | January 2021 | $52,600 |
| Spring Park | 12 | January 2016 | $14,700 |
| Village Nest West | 10 | January 2018 | $10,800 |
| Copper Crest West | 11 | January 2018 | $14,600 |
| Horizon | 26 | Spring 2017 | $33,859 |
| Hotel and Amenities Phase I | | | $24,600 |
| Hotel and Amenities Phase I | | | $4,900 |
| **Total** | **209** | | **$215,859** |

## Summit Village and the JV Development Neighborhoods

Summit Village is a 224,399 ft$^2$ mixed-use resort residential development to be constructed on the Summit Village Property, which is expected to include the Hotel Component and the Commercial Component. The JV Neighborhood Developments are located in four of the most desirable locations within the Master Property in close proximity to Summit Village and in aggregate represent over 11 acres of land and 59 residential units. As detailed below, the JV Neighborhood Developments are generally located adjacent, or in close proximity to, neighborhoods that are sold out or nearly sold out. The JV Neighborhood Developments are expected to each offer unique characteristics and amenities, while remaining consistent with the overall aesthetic of Summit Village and Summit Powder Mountain as a whole. The following schematic illustrates the location of Summit Village the JV Neighborhood Developments:



*Summit Village and JV Development Neighborhoods*

Summit Village is anticipated to form the energetic hub of Summit Powder Mountain Resort, an intimate neighborhood where people can congregate, share ideas, enjoy meals together and attend inspirational performances and talks. Designed in collaboration with renowned architecture firms R&A and Studio Ma, Summit Village is expected to offer meeting spaces where people may participate in a wide variety of cultural events. See "Summit Village Architect" section of this Memorandum. The condominiums and townhomes of Summit Village are expected to offer dramatic views and ski accessibility within walking distance of a wide range of retail and commercial opportunities.

The following is a preliminary breakdown of the Hotel Component. All Project features are subject to change.

| Building | Units | Keys | Gross ft² | Gross m² |
|----------|-------|------|-----------|----------|
| 2A | 9 | 26 | 24,625 | 2,288 |
| 2B/2C | 22 | 64 | 52,874 | 4,912 |
| 3B/3C | 23 | 73 | 63,400 | 5,890 |
| 5A | 26 | 51 | 83,500 | 7,757 |
| **Total** | **80** | **214** | **224,399** | **20,847** |

The Developer will develop the JV Neighborhood Developments in partnership with one or more joint venture partners with appropriate expertise, experience and vision in line with the Developer's vision for Summit Powder Mountain.

Horizon Neighborhood

Horizon Neighborhood is located between the sold out Ridge Nests and Summit Pass Estates and Horizon Estates, each of which include only one available unit, and the sold out Heartwood.

CONFIDENTIAL INFORMATION



The following are renderings of the exterior and interior of the units to be located in Horizon Neighborhood. The actual units may not look identical to these artist renderings.









<u>Village Nest West</u>

Village Nest West is located adjacent to Village Nest East, a highly sought after neighborhood where all but one unit has been sold to date.



The following are renderings of the exterior and interior of the units to be located in Village Nest West. The actual units may not look identical to these artist renderings.



Copper Crest West

Copper Crest West is located adjacent to Crest East, which like Village Nest East, is a highly sought after neighborhood where all but one unit has been sold to date.

LENDERS_0003622



The following are renderings of the exterior and interior of the units to be located in Copper Crest West. The actual units may not look identical to these artist renderings.



## Spring Park

Spring Park is located directly adjacent to both the sold out Summit Pass Estates and 84 acres of open space.

CONFIDENTIAL INFORMATION



In addition, Spring Park enjoys unparalleled Western facing views.



Site Improvements and Resort Structure

Summit Village is expected to blend in with its mountain surroundings. As currently designed, Summit Village will comprise multiple buildings, each constructed of wood framing on a poured concrete slab. Exteriors will include wood finishes and stone accents. Elevators and stairways will provide internal vertical transportation within the structures as needed. Building roofs will be made of wood trusses covered with a market-appropriate finish. Double-paned windows will reduce noise transmission into the rooms from surrounding establishments.

Residents and guests will reach Summit Village using a portion of the public roadway, which has been completed through Bridge Financing. Parking is anticipated to be available for public and guest use in a subterranean parking garage located below the Hotel Component. The complex will offer self-parking

CONFIDENTIAL INFORMATION
LENDERS_0003624

and valet options to guests for a fee. Due to the anticipated exclusive location of the proposed Hotel Component, limited signage is expected; however, all signage will adequately identify the complex. Landscaping is expected to allow for a positive guest impression and competitive exterior appearance, and site improvements are anticipated to complement the existing natural features. Sidewalks and accented brick pedestrian walkways should be present along the front entrance and around the perimeter of the complex. Other site improvements are expected to include a heated outdoor pool and outdoor whirlpools with sundecks. Overall, the site improvements for the complex should provide an upscale mountain resort lodging experience.

Food and Beverage Facilities

The Summit Village Hotel Component is expected to include a casual-dining restaurant serving three meals daily, a fine-dining restaurant serving dinner only, a lounge, room service, and banquet operations. The full-service restaurants should be relatively upscale due to the expected service level and first-class nature of Summit Village and the amenities planned for the larger Summit Powder Mountain Resort. The casual dining venue is intended as a gathering place in the community, offering impressive views of resort facilities and amenities and the surrounding mountain landscape. The casual dining venue is also expected to include a private dining room that may be rented to groups. The lounge is expected to offer ample seating and a simplified food menu to provide an alternative to dining in the restaurants. The bar is intended as the focal point of the room, and the space should be equipped with at least one large flat-panel television. Furnishings are anticipated to be of a similar style and finish as lobby and guestroom furnishings.

Recreational Amenities

The Hotel Component is expected to offer recreational facilities including heated outdoor pool, outdoor whirlpools, fitness center and spa. In addition, the complex is anticipated to offer outdoor recreational services, including a ski and bike concierge and a self-service locker facility. The spa is anticipated to include multiple treatment rooms and services typical of an upper-upscale mountain resort. Restrooms and locker rooms are expected to adjoin the pool area.

Additional Amenities

Other Hotel Component amenities are expected to include a gift shop, a full-service business center with various workstations and wireless Internet in public areas. The Owner anticipates utilizing Summit Village conference space and the activities annex for a variety of educational events and programs, including future Summit Series programs. The Owner has held nonbinding discussions with several event and program sponsors, including the following:

- Singularity University, a provider of educational programs and partnerships, as well as a start-up accelerator, to individuals, businesses, institutions, investors, non-governmental organizations and governments;

- General Assembly, an educational institution established in 2011 to provide entrepreneurs and start-up companies with education and opportunities in technology, business and design; and

- 2U, an educational technology company that partners with nonprofit colleges and universities to offer online degree programs.

Guestrooms, Condominiums and Townhomes

The Hotel Component is anticipated to feature standard and suite-style guestroom configurations, as well as two- and three-bedroom condominium and townhome units. Guestrooms are expected to be present on each level of the complex. Condominium and townhome units are expected to offer additional living

CONFIDENTIAL INFORMATION

space, bedrooms and full kitchens.

In addition to standard furnishings, each guestroom is expected to feature superior linens, a large flat-panel television, wireless Internet access, an iron and ironing board, a coffeemaker, a safe and a refrigerator stocked with products for purchase. Select guestrooms are anticipated to feature a patio or balcony. Each guest bathroom will have a separate shower, a large tub, a commode and double sink with vanity area featuring a granite countertop. Bathroom floors should be finished with tile, and walls should be finished with an upscale material. Each bathroom is expected to include a hairdryer, a robe, a make-up mirror, and an upscale line of complimentary toiletries.

<u>Back of the House</u>

The Hotel Component is expected to be served by all necessary back-of-the-house space, including administrative offices, an in-house laundry facility and comprehensive kitchen facilities, such as a full-service kitchen and banquet preparation areas to service the adjacent Conference Component. These planned facilities are necessary to serve the needs of multiple food and beverage outlets. These spaces are anticipated to be adequate for a resort of this type to allow for the efficient operation of the complex.

**Summit Village and JV Development Neighborhood Marketing and Sales Program**

The Developer intends to market the condominium and hotel condominium units located in Summit Village and JV Neighborhood Developments, experientially, by creating a curated environment for people to discover Summit Powder Mountain Resort while connecting with new or existing friends through Summit Series branded events and hosted weekends. Currently, the Summit Series hosts 16 three-day events each year, and it anticipates increasing that number to approximately 26 events each year by 2017, including events by the Summit Institute and third-party collaborations. The Owner anticipates leveraging the existing Summit Series community, together with its ability to expand that community to include new members and potential purchasers in the Project. To date, Summit Series has hosted over 8,000 guests in Eden, Utah. Summit Series hosted its signature event, "Summit Outside" July 19-22, 2013, which it intends to repeat as additional facilities are completed. Additionally, Owner augments hosted weekends by enabling private events for companies and entities such as Nike, Patagonia and The White House. Hosted weekends require a nominal fee to attend and, when coupled with the signature Summit Series flagship events, the Owner expects that the costs of experiential marketing for Summit Village will continue to be more than offset by event revenue. Due to the curated, experiential and referral-based marketing efforts of the Summit Series community, Developer has not utilized traditional real estate marketing and sales efforts, such as large print campaigns in national and international publications.

**Hotel Operator**

The Developer anticipates that it will either internally manage the Summit Village hotel condominium and associated pool of privately-owned rental units or else retain the services of a third party professional hotel management company. No decision has yet been made in this regard and no agreement or understanding exists with any existing or potential employee or with any third party hotel operator.

**Commercial Space Leasing and Occupancy**

The Developer anticipates that it will retain the services of a third party professional service provider to develop a strategic mix and leasing plan for the Commercial Component. No agreement or understanding yet exists with any third party service provider.

**Projected Cash Flow**

The Developer analyzed anticipated revenues and expenses relating to Summit Village and the JV Neighborhood Developments and prepared the following Projected Cash Flow. These projections are based on estimates and assumptions that are subject to change, and by their nature are not and cannot be guarantees of future results. Assumptions include that the Hotel Component will be marketed for unit sales and not as traditional vacation rental units that would remain owned by Developer and operated by Developer or a third-party hotel manager under a hotel model. The projections provided below under "Projected Cash Flow" do not reflect this potential usage case for the Hotel Component.

The estimates and assumptions underlying these projections involve judgments with respect to, among other things, future economic and competitive conditions and future business decisions, which may not be realized or which may be incorrect. These financial projections are forward-looking statements. See "CERTAIN RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS".

| Cash Flow Projections | Inception | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|---|
| **Development Sources** | | | | | | | |
| Land Contribution | 29,000,000 | 0 | 0 | 0 | 0 | 0 | 29,000,000 |
| Sales Deposits | 0 | 3,798,102 | 8,862,238 | 0 | 0 | 0 | 12,660,340 |
| JV Development Proceeds | 0 | 14,416,122 | 14,416,122 | 0 | 0 | 0 | 28,832,244 |
| TIF Bond | 0 | 0 | 0 | 16,700,000 | 0 | 0 | 16,700,000 |
| EB-5 Facility | 7,465,576 | 41,429,806 | 37,281,342 | 33,823,276 | 0 | 0 | 120,000,000 |
| Total | 36,465,576 | 59,644,030 | 60,559,702 | 50,523,276 | 0 | 0 | 207,192,584 |
| | | | | | | | |
| **Development Uses** | | | | | | | |
| Land | 29,000,000 | 0 | 0 | 0 | 0 | 0 | 29,000,000 |
| Vertical Hard Cost | 0 | 10,292,795 | 25,053,251 | 24,585,495 | 0 | 0 | 59,931,542 |
| Site Cost | 0 | 5,185,233 | 2,792,049 | 0 | 0 | 0 | 7,977,282 |
| Ski Lifts | 2,123,081 | 5,162,000 | 1,614,919 | 0 | 0 | 0 | 8,900,000 |
| Roads/Water/Sewer | 0 | 13,414,406 | 4,645,199 | 0 | 0 | 0 | 18,059,606 |
| Lodges & Event Space (Direct Cost) | 3,228,307 | 4,833,109 | 5,747,467 | 0 | 0 | 0 | 13,808,884 |
| Hard Cost Contingency | 0 | 0 | 1,829,862 | 4,269,678 | 0 | 0 | 6,099,540 |
| Management Fee and Overhead | 0 | 2,070,000 | 2,070,000 | 2,070,000 | 0 | 0 | 6,210,000 |
| Permits, Fees, and Assessments | 0 | 581,505 | 581,505 | 0 | 0 | 0 | 1,163,010 |
| Legal | 0 | 2,100,000 | 600,000 | 300,000 | 0 | 0 | 3,000,000 |
| Marketing | 0 | 3,780,000 | 1,575,000 | 945,000 | 0 | 0 | 6,300,000 |
| Insurance | 0 | 713,665 | 356,833 | 356,833 | 0 | 0 | 1,427,331 |
| Developer Fee | 0 | 1,549,923 | 1,549,923 | 1,549,923 | 0 | 0 | 4,649,769 |
| Soft Cost Contingency | 0 | 0 | 1,524,885 | 4,574,655 | 0 | 0 | 6,099,540 |
| Architect and Engineering | 2,114,188 | 4,281,823 | 2,378,790 | 740,361 | 0 | 0 | 9,515,162 |
| Pre-Opening Expenses & Cmrcl. FF&E | 0 | 55,000 | 385,000 | 660,000 | 0 | 0 | 1,100,000 |
| Interest | 0 | 5,624,570 | 7,855,018 | 10,471,332 | 0 | 0 | 23,950,920 |
| Total | 36,465,576 | 59,644,030 | 60,559,702 | 50,523,276 | 0 | 0 | 207,192,584 |
| | | | | | | | |
| **Post-Construction Sources of Cash** | | | | | | | |
| Additional Sales Proceeds | 0 | 0 | 0 | 113,943,063 | 0 | 0 | 113,943,063 |
| NOI | 0 | 0 | 0 | 0 | 4,059,813 | 5,413,531 | 9,473,344 |
| Sale of Operating Assets | 0 | 0 | 0 | 0 | 0 | 77,336,156 | 77,336,156 |
| Total | 0 | 0 | 0 | 113,943,063 | 4,059,813 | 82,749,687 | 200,752,563 |
| | | | | | | | |
| **Post-Construction Uses of Cash** | | | | | | | |
| EB-5 Repayment | 0 | 0 | 0 | 0 | 0 | 120,000,000 | 120,000,000 |
| **Public Infrastructure** | | | | | | | |
| Building Partner Capital and Construction Loans | 17,600,000 | 0 | 0 | 0 | 0 | 0 | 17,600,000 |
| Construction of Additional Homesites | 17,600,000 | 0 | 0 | 0 | 0 | 0 | 17,600,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **Private Infrastructure and Construction** | | | | | | | |
| Building Partner Capital and Construction Loans | 9,952,000 | 0 | 0 | 0 | 0 | 0 | 9,952,000 |
| Construction of Additional Homesites | 9,952,000 | 0 | 0 | 0 | 0 | 0 | 9,952,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **Additional Homesites** | | | | | | | |
| Building Partner Capital and Construction Loans | 0 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 100,000,000 |
| Construction of Additional Homesites | 0 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 100,000,000 |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| Net Cash Flow | 0 | 0 | 0 | 113,943,063 | 4,059,813 | (37,250,313) | 80,752,563 |

## Development Timetable

The Developer anticipates Summit Village construction will commence in the second quarter of 2017. Construction is expected to last approximately 24 months, with substantial completion anticipated in the

second quarter of 2019. The following timetable illustrates the construction timetable for Summit Village. The actual time required to construct the Project will depend on a number of factors, including number of Class B Units ultimately sold in the Offering and the time required to do so. It is therefore subject to change.



## Summit Village Costs and Total Development Costs

The following is the Developer's preliminary budget for the construction of the Project. Budgeted amounts are subject to change as a result of factors arising during the Project. The total set forth below represents total Summit Village Cost and Total Development Costs.

| | | |
|---|---|---|
| Property Contribution | | 29,000,000 |
| | | |
| **Hard Costs** | | |
| General Conditions | | 4,715,920 |
| Concrete | | 4,271,220 |
| Masonry | | 1,238,316 |
| Metals | | 4,304,483 |
| Woods | | 4,482,919 |
| Thermal & Moisture Protection | | 4,819,113 |
| Doors & Windows | | 3,414,572 |
| Finishes | | 8,270,800 |
| Specialties | | 758,789 |
| Equipment | | 948,486 |
| Furnishings | | 284,546 |
| Conveying Systems | | 821,400 |
| Mechanical | | 8 441 188 |
| Electrical | | 4,746,878 |
| Permits, Insurances, Contingency, Fee | | 8,412,912 |
| Site Work | | 7,977,282 |
| Ski Lifts | | 8,900,000 |
| Roads/Water/Sewer | | 18,059,606 |
| Lodges & Event Space (Direct Cost) | | 13,808,884 |
| Hard Cost Contingency | | 6,099,540 |
| Total Hard Costs | | 114,776,853 |
| | | |
| **Soft Costs** | | |
| Management Fee and Overhead | | 6,210,000 |
| Permits, Fees, and Assessments | | 1,163,010 |
| Legal | | 3,000,000 |
| Marketing | | 6,300,000 |
| Insurance | | 1,427,331 |
| Developer Fee | | 4,649,769 |
| Soft Cost Contingency | | 6,099,540 |
| Architect and Engineering | | 9,515,162 |
| Closing Costs | | 0 |
| Pre-Opening Expenses & Cmrcl. FF&E | | 1,100,000 |
| Total Soft Costs | | 39,464,811 |
| | | |
| Interest | | 23,950,920 |
| | | |
| **Summit Village Total** | | 207,192,584 |
| | | |
| **Residential Component** | | 100,000,000 |
| | | |
| **Total** | | 307,192,584 |

**Market Analysis – Condominium**

The Owner commissioned HVS to investigate and analyze the Hotel Component. Upon conclusion of its investigation and analysis, HVS delivered a report dated June 27, 2016 (the "**HVS Report**"). The HVS Report provides the following market area summary and outlook for the area around Powder Mountain in general and the Project in particular:

- Demand for resort residential sales competitive set includes real estate offerings in ski areas throughout the western United States, and in particular in Deer Valley and the Empire Pass neighborhood. The real estate markets were impacted by the recent economic crisis, but have shown signs of price appreciation and market absorption in the past year. The market timing for the sales of the residential units is favorable.

- The area around Powder Mountain has changed substantially over the last decade, and there has been a substantial increase in the number of seasonal units built in Weber County, as it transitions to a full- scale resort destination.

- Demand for this mountain resort competitive set, which is heightened during the winter ski and summer vacation seasons, comprises primarily free independent travelers, as well as corporate and social destination-driven groups. Supply increased significantly from 2009 through 2011 with the opening of seven hotels within the competitive set: Madeline Hotel Telluride, Viceroy Snowmass, St. Regis Deer Valley, Waldorf Astoria Park City, Four Seasons Resort Vail, and Montage Deer Valley.

- Additional fluctuations in available room nights over the historical period shown are attributed to the conversion of guestrooms to residential uses, as well as the seasonal operation of hotels. The Great Recession, coupled with an increase in supply, resulted in occupancy declines in 2008 and 2009. Despite the significant increase in supply in late 2009 and in 2010, demand levels significantly strengthened in 2010 as discretionary income for vacations to resort destinations increased; as a result, occupancy rose in 2010 and continued to increase through 2013.

- Data for 2014 show a slight rise in occupancy to nearly 53%, as hoteliers focused on revenue per available room ("**RevPAR**") gains through increased average rates given the stabilized occupancy. The positive trend since 2010 reflects that the market is recovering from the effects of the economic downturn and the entrance of new supply.

The HVS Report concludes that the proposed hotel condominium townhome development has an opportunity to serve an unrepresented northern Utah niche in the mountain resort market and that the area near the Powder Mountain remains underserved by high-end residential and lodging facilities. Based on its market analysis, HVS believes there is sufficient market support for this component of Summit Village and that the assumptions made by the Owner are valid and reasonable. HVS is of the opinion that the Property is favorably located on Powder Mountain to provide guests with ski-in/out accessibility; furthermore, the proposed array of facilities and amenities should allow the development to perform well with free independent travelers, as well as corporate and social destination-driven groups.

**Demand Outlook: Western Mountain Resort Alliance**

Western Mountain Resort Alliance ("**WMRA**") tracks real estate information in British Columbia, California, Colorado, Idaho, Montana, Utah, and Wyoming. The following table shows statistics for the most recent quarter available to HVS on sales of homes, condos and land in the ski markets tracked by WMRA. This data is not comprehensive as not all the brokers in each area report their data.

| | | Whistler | Park City (**) | Steamboat | Sun Valley (**) | Big Sky | Tahoe | Teton |
|---|---|---|---|---|---|---|---|---|
| # of Active Listings | Homes | 80 | 569 | 319 | 295 | 158 | 456 | 143 |
| | Condos | 181 | 404 | 222 | 244 | 298 | 227 | 63 |
| | Land | 38 | 668 | 517 | 300 | 290 | 454 | 138 |
| | Total | 328 | 1,719 | 1,323 | 909 | 792 | 1,249 | 369 |
| | % Chng Prev Yr | -20% | -1% | 2% | -1% | 2% | 1% | -6% |
| # of Units Sold | Homes | 175 | 924 | 334 | 257 | 71 | 1,139 | 212 |
| | Condos | 555 | 856 | 291 | 232 | 132 | 282 | 169 |
| | Land | 41 | 628 | 150 | 53 | 88 | 262 | 91 |
| | Total | 841 | 2,345 | 879 | 573 | 310 | 1,770 | 498 |
| | % Chng Prev Yr | 18% | 4% | -8% | 10% | -5% | 0% | 5% |
| Total Volume Sold | Homes | $ 281,815,378 | $ 1,028,285,748 | $ 237,144,425 | $ 221,507,563 | $ 88,853,917 | $ 937,628,625 | $ 456,809,379 |
| | Condos | $ 328,581,470 | $ 543,811,897 | $ 133,477,149 | $ 109,357,622 | $ 68,976,034 | $ 140,236,508 | $ 138,402,210 |
| | Land | $ 61,241,700 | $ 201,607,238 | $ 42,497,949 | $ 21,989,700 | $ 34,869,880 | $ 67,920,651 | $ 163,896,500 |
| | Total | $678,049,995 | $1,769,082,283 | $457,454,882 | $373,932,485 | $200,836,331 | $ 1,155,024,684 | $ 803,777,339 |
| | % Chng Prev Yr | 30% | 10% | -5% | 10% | -18% | -4% | 31% |
| Average Sales Price | Homes | $ 1,610,374 | $ 1,112,663 | $ 710,013 | $ 861,897 | $ 1,252,872 | $ 823,203 | $ 2,154,761 |
| | Condos | $ 592,003 | $ 635,294 | $ 458,684 | $ 471,369 | $ 522,561 | $ 497,293 | $ 818,948 |
| | Land | $ 1,493,700 | $ 381,832 | $ 283,320 | $ 414,900 | $ 396,249 | $ 259,239 | $ 1,801,060 |
| | Total | $ 806,243 | $ 762,935 | $ 520,426 | $ 652,587 | $ 647,859 | $ 652,556 | $ 1,614,011 |

Source: HVS Report

The following charts reflect the number of active listings and units sold in the ski markets tracked by WMRA:



Source: HVS Report

The following chart reflects the average sales price of units sold in the ski markets tracked by WMRA:

CONFIDENTIAL INFORMATION



Source: HVS Report

## Comparable Profile

The Developer believes there are several markets and developments within the United States consisting of resort real estate with spectacular views and access to expanded skiing and snowboarding experiences, all within respective premium markets. These comparative markets include Upper Deer Valley, Yellowstone Club, Martis Camp, Vail Valley and Aspen. *Except as otherwise indicated, all market and pricing information below was as of March 2015.* The following market statistics have been provided by third parties and/or published by real estate sales professionals associated with these markets, and their accuracy has not been verified by the Developer.

Upper Deer Valley

Deer Valley is an alpine ski resort in the Wasatch Range, located 36 miles east of Salt Lake City, in Park City, Utah. The resort, known for its upscale amenities, is consistently ranked among the top ski resorts in North America. Deer Valley was a venue site during the 2002 Winter Olympics, hosting the freestyle moguls, aerial, and alpine slalom events. With a number of other large ski resorts nearby, Deer Valley competes by catering to a more upscale audience than its neighbors, offering amenities such as free ski valets, free parking shuttles, fine dining and boutique shopping in the main lodge. The resort's mid-mountain lodge, the Stein Eriksen Lodge, offers luxury accommodations and spa facilities. Stein Eriksen, its gold medalist namesake, is host of the lodge and director of skiing at the resort. Deer Valley uses more grooming equipment than other Wasatch ski areas, and limits access to 7,500 ticket sales per day to avoid overcrowding. SKI Magazine's reader resort survey ranked Deer Valley first overall for five consecutive years between 2007 and 2011. In the 2014 survey, the resort received first place ratings in the categories of grooming, service, on-mountain food, lodging and dining. Deer Valley is one of three remaining American ski resorts that prohibit snowboarders, along with Utah's Alta Ski Resort and Vermont's Mad River Glen.

Deer Valley has benefited from the growth of the Park City area, which in part can be credited to the success of - and exposure generated by - the Sundance Film Festival and the 2002 Winter Olympics. This area of Utah was also the first to receive significant migration from California and other states, and was the first to liberalize its liquor laws, which as of 2010 have been standardized across Utah.

Neighborhoods with commanding views and ski accessibility are most prevalent in Empire Pass Deer Valley. These include Red Cloud, which is part of the Talisker Club, The Montage, and St. Regis, which offers condominiums from US$1.25 million to US$17.99 million *(this information, as well as all other market and pricing information listed below, was as of March 2015)*. Red Cloud had three active single-

family listings for prices ranging from US$11.30 to US$15.95 million with an average price per square foot of US$1,386. The Montage closed on 13 condominiums in 2014 with an average sales price of US$3.88 million per unit (US$1,382 per square foot). There were 22 active listings with an average list price of US$4.09 million per unit (US$1,431 per square foot). There were three pending sales with an average list price of US$3.71 million per unit (US$1,411 per square foot). The St. Regis closed 5 condominiums in the year prior to March 2015 with an average sales price of US$1.90 million per unit and a price per square foot of US$1,074. There were 21 actively marketed condos with an average list price of US$3.86 million per unit (US$1,499 per square foot). One sale was pending with a list price of US$3.1 million (US$1,256 per square foot).

Over the year prior to March 2015, Empire Pass - Upper Deer Valley vacant land sales had an average sales price of approximately US$4.0 million, or US$3.2 million per acre. Inventory of vacant land in Empire Pass had an average list price of approximately US$4.1 million or US$3.4 million per acre. Also over the year prior to March 2015, single family homes in Empire Pass sold for an average price of US$4.9 million, with an average price per square foot of US$975. Active listings of single-family homes at Empire Pass reflected an average list price of US$7.5 million or US$1,083 per square foot. Finally, condominiums at Empire Pass over the year prior to March 2015 had an average sales price of US$3.0 million with 32 units sold, with an average price per square foot of US$1,107.

Yellowstone Club

The Yellowstone Club provides members with 2,200 acres of private, skiable terrain and 15 lifts, making it larger than the destination resorts at Deer Valley and Beaver Creek. This substantial acreage includes extensive beginners' areas, more than five dozen trails, a large section for open-bowl skiing, a true double black-diamond ridge of steep chutes, and 400 acres of glade powder skiing. The club added off-piste snowcat skiing during the 2009-10 winter season. On Yellowstone Club's busiest days, only about 1,000 skiers take to the slopes.

Even before the opening of Warren Miller Lodge, which serves as the Yellowstone Ski Resort's clubhouse, and before many of the other amenities were completed, the Club's sales staff reportedly converted up to 65 percent of the prospective members who skied there. Much of this early marketing success was viral: members invited friends who, in turn, became members and invited friends of their own. In 2005, Yellowstone Club sold over US$200 million of property, and the former founder and owner reportedly owned Yellowstone Club nearly debt free after completing the repayment of a successful founding member program. During peak season, almost 600 people are employed at Yellowstone Club.

Because the ski resort is not open to the public, one-time membership dues are in excess of US$300,000 and annual homeowner association and Club membership dues range from US$40,000 to US$55,000 annually. The village condominiums sold strongly in 2014, with 53 condominiums trading. Single-family homes also sold well in 2014 with 14 homes. Vacant land sales exceeded previous years with 26 homesites sold. Overall in 2014 Yellowstone Club sales volume was US$450 million in single-family homes and vacant land, and US$150 million in townhome and condominium sales.

Martis Camp

Martis Camp is a private golf and ski club community located in Truckee, California with unique access to Northstar Ski Resort in North Lake Tahoe, a resort of approximately 3,170 skiable acres. Martis Camp itself is approximately 2,177 acres, and is a complete year round resort offering a full array of club amenities to its members. Members access Martis Camp primarily through three airports: Reno, Nevada (36 miles), with limited direct flights; Sacramento, California (110 miles), with direct flights from most western states; and San Francisco, California (189 miles), with daily domestic and international flights. Because of its valley floor topography, Martis Camp offers only a few ski-in/ski-out home-sites and provides a shuttle service to an exclusive ski lodge adjacent to a bowl at Northstar. The Martis Camp Express, the Club's high-speed quad lift, gives members direct access into Northstar, as well as an hour of

LENDERS_0003632

"first tracks" every morning, and is held as the community's most significant selling feature. In contrast, the general public must deal with traffic delays at the main Northstar parking lot, lift lines, and a trek of two lifts to get to the Martis Camp bowl.

Martis Camp has reportedly sold over 100 homes and homesites a year for the years 2011-2015 and is widely considered the most successful mountain resort project in the US. Out of the 681 home-sites in the Martis Camp development, there were reportedly less than 40 home-sites remaining as of March 2015 and these have an average listing price of approximately US$1.0 million.

Vail Valley

Historically, the Vail Village has boasted some of the highest price per square foot sales of the high-end western U.S. ski markets. Vail is a well-established resort and ski community, rich in culture and ski history. Each year from 1996 through 2009, total annual real estate transactions in Vail/Eagle County exceeded US$1.0 billion, peaking at nearly US$3.0 billion in 2007. Bachelor Gulch and Vail Village/Lionshead are the premium areas with expansive views and ski accessibility.

Bachelor Gulch is an exclusive, gated community in the Vail Valley. Properties tend to be larger, ski-in/ski-out with a very high level of finish. The area is designed to cater to the needs of both the homeowner and visitors. Single-family homes, condos and fractional ownership make up the bulk of the real estate in Bachelor Gulch. During 2014 there were seven single-family/duplex sales with a volume of over US$48.4 million, an average sale price of US$6.9 million and an average price per square foot of US$901. There were 24 condominium sales with a total volume of over US$58 million, and an average price per square foot of US$876.

Vail Village and Lionshead form the core of the town of Vail. They include numerous condominiums, shops, restaurants and a few single-family and duplex residences. Lionshead is approximately one mile west of Vail Village and has excellent access to the ski mountain via a gondola and high-speed quad lift. The high-end market saw thirteen single-family/duplex sales with a sales volume of over US$130 million and an average price per square foot of US$1,833. Condominium sales reflected a total volume of US$237 million over 86 sales, and an average price per square foot of US$1,371.

Aspen

Since the early 1950's, Aspen has been one of the most successful mountain real estate markets in the world and has some of the most expensive residential real estate in the United States. Aspen was a mining town that reached a peak population of 5,108 in 1890. However, after the financial panic of 1893 and resulting collapse of the price of silver the population fell precipitously. The founder of modern Aspen, the Chicago industrialist and supporter of the arts Walter Paepcke, quietly purchased one-third of Aspen before convening like-minded individuals who had never heard of the location. Paepcke, who helped lead the mid-century Great Books movement, enticed people to come to Aspen by putting on a celebration of the bicentennial of the birth of philosopher Johanne Goethe and, more importantly, by securing Albert Schweitzer, the 1952 Nobel Prize Winner, to leave the Congo and give the key note address at the gathering. The event was a success and the Aspen Institute was born out of it the very next year with Walter Gropious of the Bahaus movement (whom Paepcke had helped relocate from Germany to the Chicago Art Institute) serving as its first president. Originally, design, music, and the humanities were all under one roof at the Aspen Institute. The events grew so successful over the years, underpinning Aspen's cultural ascent, that they each spun off as their own entities. Paepcke's role in creating modern Aspen, retold in *The Romance of Commerce and Culture: The Humanist Movement and the Making of Aspen*, is arguably unmatched in any other mountain environment to date.

Primarily built since the 1980s, the premier residential vistas in Aspen are found on Red Mountain, offering views of the Maroon Bells and the town below. Red Mountain now features some of the most expensive real estate in the country. The overall Aspen market has rebounded strongly from 2008 lows. As of June 2016, Median sales prices for single-family home sales are were a nine year high with a

CONFIDENTIAL INFORMATION

median price of $7.8 million.

Aspen condominium sales have also been on a similar upward track a median sales price of $1.2 million as of June 2016.

**Comparative Summary of Powder Mountain Opportunity**

The Developer believes that Summit Powder Mountain Resort and the Project are uniquely positioned to benefit from a number of elements that have led to success at competitive properties profiled above.

- Powder Mountain and the adjacent Eden Valley, are significantly undeveloped and in the Developer's view are similar to the pristine conditions that Walter Paepcke discovered in Aspen in 1949.

- Similar to Paepcke, the Owner has shown that it can convene interesting people, including its Founding Investors, for curated gatherings. The Developer believes gathering exceptional people for curated conversation, events and recreation at Summit Powder Mountain Resort has the potential to have significant ramifications on the underlying real estate values over time.

- The Developer believes views at Powder Mountain are unique among similar communities in the U.S. and compare favorably to any other resort, including Red Mountain in Aspen, Red Cloud in Deer Valley, and any development within Yellowstone Club.

- Ski accessibility and expanded access to uncrowded terrain offers a value proposition for skiing that compares favorably to Yellowstone Club, which has substantially smaller lift-accessible terrain and adventure terrain, both of which are expensive to maintain given the fully private nature of the club.

- Summit Powder Mountain Resort's leadership in overall skiable terrain provides an advantage that other resorts with less terrain have marketed successfully.

- Summit Powder Mountain Resort's community facilities, such as the on-mountain SkyLodge, and the expanded access to thousands of acres represented by inbound snowcat, shuttle, and adventure skiing compares favorably with Martis Camp, where early access to one lift and a private ski lodge are the most popular features for buyers.

- Summit Powder Mountain Resort's easy accessibility to the San Francisco Bay Area, which represents a significant concentration of the Summit community, provides the development with an opportunity for buyer referral patterns similar to Martis Camp.

## IX. PROJECT FUNDING

The Company expects the Developer will fund the development, construction and initial operating costs of the Project from the sources described below. However, there can be no assurance that funds from these sources will be available in the amounts and at the times anticipated by the Company, if at all. In that event, the Developer will be required to seek alternative sources of funding, reduce Development Costs, postpone or cancel construction of some or all of the Project, or a combination of the foregoing.

**Summary of Projected Sources and Uses of Funds**

The following is a summary of projected sources and uses of funds for the Project assuming the Company sells 240 Class B Units in the Offering for a total of US$120 million in subscription proceeds.

| Summit Village Costs | | | | | | |
|---|---|---|---|---|---|---|
| Sources of Cash | | | | | | |
| Disbursement Under the Company's Loan | | 120,000,000 | | Property Acquisition | | 29,000,000 |
| Developer Equity | | 87,192,584 | | Hard Costs | | 114,776,853 |
| | | 207,192,584 | | Soft Costs | | 39,464,811 |
| | | | | Financing Costs | | 23,950,920 |
| | | | | | | 207,192,584 |
| Residential Component Costs | | | | | | |
| Sources of Cash | | | | Uses of Cash | | |
| Building Partner Capital and Construction Loans | | 100,000,000 | | Construction of Additional Homes | | 100,000,000 |
| | | 100,000,000 | | | | 100,000,000 |
| Total | | 307,192,584 | | | | 307,192,584 |

Notes:

1. The Company anticipates that it will use the proceeds of the Offering to make the Loan to the Developer. The actual amount of the Company's Loan depends on the number of Class B Units sold in the Offering. Loan proceeds may be used to repay Bridge Financing previously advanced to fund Development Costs incurred in contemplation of the receipt of Loan proceeds.

2. Developer Equity comprises the following: (i) an in-kind contribution of the Summit Village Property, which is reflected in the capital stack at value of $29.0 million but which has been independently appraised at an "as complete" value of US$46.8 million; (ii) estimated cash contributions of approximately US$16.7 million in tax increment financing proceeds; (iii) allocation of an estimated US$12.6 million constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units; and (iv) approximately US$28.8 million of proceeds from homesites in the JV Development Neighborhoods.

3. The "as complete" market value of the Property has been established by HVS representing the net present value of forecast operating cash flow during the 12-month period ending September 30, 2022, when Summit Village is anticipated to be complete and stabilized.

## Residential Component Funding

The $100 million Residential Component is expected to be funded through a combination of single family construction loans, and building partner capital. As of the date of this Memorandum, investors have acquired or reserved approximately 116 homesites, of which approximately 66 are currently in the construction planning or design stage. Construction loans are generally available for home construction on homesites, although there is no assurance that such financing will be available in the future. The Owner is in negotiations with several building partners to create built product, including townhomes and multi- family, and is in discussions with financial partners to build product. However, presently the Owner has no such financing commitments for either building partner product or Owner developed product and there is no assurance that such financing will be available.

## Summit Village and JV Neighborhood Development Funding

### Developer Equity

To fund a portion of the Summit Village Costs, the Owner intends to contribute or allocate cash and property to the Developer in an aggregate amount of approximately US$87 million (the "**Developer Equity**"). The Developer Equity of approximately US$87 million is anticipated to comprise the following: (i) in-kind contribution of the Summit Village Property, which is reflected in the capital stack at value of $29.0 million and has been independently appraised at an "as complete" value of US$46.8 million; (ii) estimated cash contributions by the Owner of approximately US$16.7 million in tax

increment financing ("**TIF**") proceeds; (iii) allocation of an estimated US$12.6 million constituting non-refundable deposits by purchasers of Summit Village townhome, condominium and hotel condominium units; and (iv) approximately US$28.8 million of proceeds from homesites in the JV Development Neighborhoods. The Developer's rights in the Developer Equity will rank junior to the Loan in all respects including with respect to repayment from cash flow from Summit Village available to the Developer; provided, however, the TIF proceeds or other proceeds available from any governmental authority may have priority in repayment over the Loan upon terms acceptable to the Lender. The Developer Equity will be available at different times during the Project. In the event there is any shortfall in the funding of the Development Costs due to the timing or availability of any portion of Developer Equity, the Owner will contribute or cause to contribute the equivalent amount in cash contribution to make up for such shortfall.

Property Acquisition –US$29.0 million

A portion of the Property is currently owned by an affiliate of the Developer. The Summit Village Property was contributed to the Developer prior to the initial disbursement of the Loan. For all purposes of calculating Developer Equity, the contribution of the Summit Village Property is valued of $29.0 million even though the Summit Village Property has been independently appraised at an "as complete" market value of $46.8 million. The $46.8 million "as complete" market value of the Summit Village Property has been established by an independent appraisal representing the net present value of forecast operating cash flow during the 12-month period ending September 30, 2022, when Summit Village is anticipated to be complete and stabilized.

Cash Contributions – approximately US$16.7 million

The Owner and Weber County authorities finalized tax increment financing to fund a portion of Developer Equity in August 2015. Tax increment financing uses future gains in tax revenues to finance development projects that result in those future gains. When a public project such as a road or school is carried out, the surrounding property may increase in value, generating increased tax revenues known as the "tax increment." TIF dedicates tax increments within a certain defined governmental district to finance a portion of the cost of the improvement project.

In June 2013, the Weber County Redevelopment Agency of (the "**Agency**") adopted a resolution authorizing the Agency to take steps to establish (i) a Summit-Eden Powder Mountain Community Development Project Area (the "**TIF Development Area**") and (ii) a draft community development project area plan to provide for the expansion and development of Powder Mountain. In October 2013, the Agency and Weber County established the TIF Development Area and authorized TIF to fund qualified project expenditures such as infrastructure, ski lifts, conferencing space, parking structures and retreat facilities, all in connection with the development of Summit Powder Mountain Resort as provided in the project area plan (the "**TIF Project Area Plan**"). The Property is located within the TIF Development Area.

In July 2014, the Agency adopted resolutions authorizing it to enter into agreements with Weber County and Weber School District under which these two governmental bodies agree that a portion of TIF generated within the TIF Development Area and otherwise payable to them over the next 20 years will instead be made available to fund the development of Summit Powder Mountain Resort.

The Owner and the Agency finalized the development agreement to provide for development activities in accordance with the TIF Project Area Plan in August 2015. Based on the projected TIF available in year five of the Loan, the Owner anticipates that it will be able to borrow approximately US$16.7 million utilizing projected TIF funds as collateral, which it then intends to contribute to the Developer to fund Development Costs.

Although the Owner believes there will be sufficient TIF revenues to enable it to borrow approximately

LENDERS_0003636

US$16.7 million on commercially reasonable terms, there is no assurance that TIF will be available at any time or in any particular amount. Similarly, there is no assurance, if TIF becomes available, that the Owner will be able to borrow against its proceeds on commercially reasonable terms or at all.

<u>Allocation of Sales Deposits – approximately US$12.6 million</u>

The Owner began marketing Summit Village townhome, condominium and hotel condominium units for sale in January 2016. It is anticipated that each purchaser of a unit will enter into a binding purchase and sale contract that will, among other things, require the purchaser to deliver to the Developer a nonrefundable deposit equal to 10% of the purchase price of the unit. The Developer estimates that approximately US$12.6 million of nonrefundable unit sales proceeds (the "**Sales Deposits**") will be available to fund Development Costs prior to the initial maturity date of the Loan. Prior to the completion of the Summit Village, all Sales Deposits will be reinvested into the development and construction of the Summit Village.

**Bridge Financing**

The Developer has received, and until sufficient disbursements are extended under the Loan expects to continue to receive, Bridge Financing from the Owner and other third parties to pay a portion of the Summit Village Costs, including certain debt servicing costs associated with other financings, until such costs can be repaid through disbursements of the Loan. Developer intends to use disbursements of the Loan to pay back the Bridge Financing subject to certain conditions and terms under the Loan Documents. The Developer expects Bridge Financing with respect to costs incurred prior to the initial advance of the Loan to represent between 10% and 15% of total Summit Village Costs.

**The Loan**

The Company anticipates that it will use the proceeds of the Offering to make the Loan to the Developer in the amount of up to US$120 million, representing the proceeds from the sale of 240 Class B Units.

## X.   LOAN TERMS AND CONDITIONS

**The Company entered into the Loan Agreement on June 28, 2016. The following is an outline of the major terms and conditions of the Loan, the terms, covenants, representations and warranties of which are set forth in the Loan Agreement.**

| | | |
|---|---|---|
| 1. | **BORROWER:** | The Developer |
| 2. | **LENDER**: | The Company |
| 3. | **LOAN:** | The Loan is for a maximum aggregate principal amount of up to the Maximum Offering Amount, subject to the LTV Ratio not exceeding 60%, and a Job Cushion of not less than 25%. |
| 4. | **TERM AND MATURITY DATE:** | The Loan shall mature on the fifth (5th) anniversary of the date of the Loan Agreement, being the Initial Maturity Date, subject to a one (1) year extension at the option of the Borrower provided that there is no default under the Loan. The Loan principal must be repaid on the Initial Maturity Date, unless extended. |

5. **PREPAYMENT:**    The Borrower (i) may at any time, without penalty or premium, prepay any portion of the Loan, as long as the cumulative prepayment amount is less than or equal to the aggregate Subscription Price of those Class B Members each of whom has received notice from USCIS regarding the final adjudication of his/her I-829 Petition; and (ii) will be required to prepay any portion of the Loan principal attributable to each Class B Member who has received a final denial by USCIS of his/her I-526 Petition. Subject to the applicable terms set forth in the Loan Documents, the Developer may also defease the Loan if doing so does not result in material adverse consequences under applicable securities laws or material immigration consequences to any Class B Member and the Loan has been fully advanced.

6. **USE OF PROCEEDS:**    The Loan will be used by the Borrower to fund certain approved costs incurred in connection with the Summit Village Costs, as permitted under the Loan Agreement and the EB-5 Program. All uses of the Loan proceeds are set forth in a budget reviewed and approved by the Lender.

7. **INTEREST RATE: INTEREST:**    The Loan bears interest on the outstanding amount of the Loan at the rate of a quarter percent (0.25%) per annum up to the Initial Maturity Date, and thereafter at the rate of three and three-quarter percent (3.75%) per annum until the final repayment of the Loan. Any late payments under the Loan will be subject to an interest charge of six and three-quarter percent (6.75%) per annum which will accrue until such delinquent payment is made.

LENDERS_0003638

| | | |
|---|---|---|
| 8. | **COLLATERAL**: | The Loan will be secured by (A) a senior lien deed of trust and collateral assignment of rights, attachments, fixtures and equipment of and on the portion of the Property that is Included Property (as defined below) at any given time (including the general contractor agreement and other construction contracts) and (B) a collateral assignment of any sale contracts and assignment of rent and management contract pertaining to the Hotel Component (including the hotel management contract) ("**Collateral**"). "**Included Property**" means the portion of the Property that is security for the Loan at any given time.  Prior to the initial advance under the Loan Agreement, Summit Village was designated Included Property, and as such, is Collateral.  Prior to aggregated advances of the Loan exceeding $15 million, Horizon Neighborhood will be added to and become part of the Included Property, and as such, will become Collateral at such time.   Thereafter, prior to any advance of the Loan that causes aggregate advances of the Loan to exceed $25 million, $35 million, and $45 million, respectively, one of the subdivision sites associated with the other three JV Neighborhood Developments will be added to and become part of the Included Property, and as such will become Collateral at such time. |

Subject to certain additional terms set forth in the Loan Documents and, as applicable, compliance with securities and other applicable laws and provided that at all times the LTV Ratio, as determined by a certified third party appraiser reasonably acceptable to the Lender, does not exceed 60%:

- the Borrower may substitute Collateral, in whole or in part, with collateral in a form and substance acceptable to the Lender in its sole discretion;
- upon a request from the Borrower, the Lender may agree to release certain portions of the Collateral from the lien held by the Lender provided the remaining Collateral is sufficient to satisfy the conditions and covenants set forth in the Loan Documents; and
- upon the sale of individual homes or condominium units, the Lender will release its security interest in any such portion of the Collateral so purchased by any party.

| | | |
|---|---|---|
| 9. | **DEPOSIT AND NET SALES PROCEEDS:** | Sales Deposits and net sales proceeds may be used (a) first, to pay costs reflected on a budget approved by the Company, and (b) next, for any other purposes that are expressly permitted under the Loan Documents or otherwise approved by the Company in writing. |

| | | |
|---|---|---|
| 10. | **ADDITIONAL DEBT:** | Subject to the terms of the Loan Agreement and an inter-creditor agreement reasonably acceptable to the Lender, the Borrower shall have the right to obtain debt financing or obtain equity contributions which may be senior to the Loan with respect to repayment and/or collateral held by such lender or equity participants to the extent that the Loan amount is below US$120,000,000. The terms of the intercreditor agreement are presently unknown. Such terms will likely materially restrict the ability of the Company to exercise its remedies in the event of a default under the loan and the uncertainty of the terms of this agreement create special risks for investors. See "Risk Factors" below. |
| 11. | **RECOURSE:** | The Lender will have certain recourse to the Guarantor being such creditworthy entity or entities acceptable to the Lender under the Bad Boy Guaranty, the Early Release Guaranty, and the Equity Shortfall Guaranty. |
| 12. | **REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS:** | The Loan Documents include customary terms for transactions of this type and nature including without limitation customary representations, warranties, covenants, defaults (including notice and cure rights available to the Developer) and negative undertakings. |
| 13. | **FEES REIMBURSEMENT:** | The Borrower and the Lender have entered into an agreement pursuant to which the Lender will reimburse the Lender for certain fees paid by the Lender to the Class B Manager, third-party immigration agents, finders, brokers, and/or consultants. No portion of these fees will be paid from the proceeds of the Offering and/or the Loan. |

## XI.   THE COMPANY

**Management of the Company**

The Company has two (2) managers, being the Class A Manager and the Class B Manager. KT Summit Manager is the Class A Manager and Celona is the Class B Manager.

In general, the Company is managed exclusively by the Class B Manager, subject to voting or approval rights of the Class A Member and the Class B Members for certain matters. The Class B Manager has power and authority over management of the Company to the exclusion of the Class A Manager and will be responsible for general management and operation of the Company, except as to any matters expressly reserved exclusively to the Class A Manager pursuant to the Operating Agreement. The Members will have no power to participate in the management of the Company except as expressly authorized by the Operating Agreement or the Delaware Limited Liability Company Act. Without in any way limiting the powers of the Class B Manager, the Class B Members may engage in general policy formulation with respect to the management of the Company by means of participation in an advisory committee of the Company; provided, however, that under no circumstances shall the Class B Manager be bound by or otherwise be required to comply with any policies established thereby. The Class B Manager may appoint one or more officers of the Company at the Class B Manager's discretion. The officers of the Company, if

appointed by the Class B Manager, will have the duties and powers determined by the Class B Manager and shall be subject to the supervisory powers and directions of the Class B Manager.

The Managers and officers are not obligated to devote full time to the affairs of the Company, but will devote such time and skill as they deem appropriate for the reasonably proper, adequate and responsible operation of the Company.

The Class A Manager is generally not permitted to resign or otherwise terminate the Class A Management Agreement. The Class B Manager may resign in such manner as permitted under the Class B Management Agreement. The resignation of the Class B Manager shall take effect upon (i) the expiration of the notice period applicable to that notice or upon such later date as shall be specified in the notice, and, unless otherwise specified in the Class B Management Agreement, the acceptance of the resignation shall not be necessary to make it effective, and (ii) the approval by the Members of the appointment of a successor Class B Manager in accordance with the procedures set forth in the Operating Agreement and the execution by such successor Class B Manager of a Class B Management Agreement on terms approved by the Members in accordance with the Operating Agreement.

The Class A Manager may be removed at any time with or without cause by the Class B Manager in such manner as provided under the Class A Management Agreement. On the other hand, the Class B Manager may be removed and a successor Class B Manager appointed upon the approval of the Class B Members holding more than sixty-seven percent (67%) of all of the voting percentage interest held by the Class B Members. The Class B Management Agreement, provides that the Class B Manager may not be removed without cause before the first anniversary of the date of first disbursement of the Loan that occurs subsequent to an I-526 Petition approval You have and thereafter the Class B Manager may be terminated at any time without cause upon not less than six (6) months' prior written notice. The removal of either Manager is subject to any rights under any employment or services agreement.

**Marketing and Administration of the Offering**

The Company anticipates that all potential investors will (1) not be a "U.S. Person" (within the meaning of Regulations S) and who are located outside of the United States at the time the Subscription Agreement for the subscription of any Class B Units is executed or (2) be an Accredited Investor. The Company has entered and will enter into contractual relationships with one or more firms located and conducting business entirely outside the United States to act as the Marketing Representatives to provide advice and assistance in connection with efforts to identify non-U.S. Persons interested to acquire Class B Units in the Offering. In general, the Company will pay a fee to each Marketing Representative for each non-U.S. Person identified by that Marketing Representative who ultimately purchases a Class B Unit in the Offering, provided that the Marketing Representative fulfills certain conditions. It is anticipated that the aggregate Administration Fee paid by subscribers, together with a portion of interest payments under the Loan, will be utilized to pay these fees. The Company has been advised that the fees payable to Marketing Representatives will be within the range of fees paid to marketing representatives for similar services by third parties in connection with other capital investment opportunities under the EB-5 Program. However, there is no reliable public information regarding these fees; therefore, the Company can provide no assurances in this regard.

Each Marketing Representative retained by or on behalf of the Company will be required to represent and warrant that it will carry out its activities in compliance with the requirements of Regulation S and/or Section 4(a)(2) of the Securities Act or Regulation D, and in compliance with the requirements of all applicable non-U.S. laws and regulations. No offering of Class B Units shall include any "directed selling efforts" in the United States and the Class B Units shall be purchased in an "offshore transaction" (all within the meaning of Regulation S), unless the Subscriber is an Accredited Investor, and no offer shall be made by any advertisement, article or other communication published in a newspaper, magazine,

internet or similar media or broadcast over television or radio or at a seminar or meeting attended by persons who have been invited by a general solicitation or general advertising.

Marketing Representatives are free to provide similar advice and assistance to third parties in connection with other capital investment opportunities under the EB-5 Program, including advice and assistance to potential subscribers and to promoters of investment opportunities that compete with the Offering for potential subscribers. A potential subscriber who retains the services of a Marketing Representative should conduct his or her own investigation to determine whether or not a conflict of interest may exist.

**Subscription Procedures**

ANY INVESTOR WHO WISHES TO SUBSCRIBE FOR THE CLASS B UNIT(S) MUST DELIVER BY CERTIFIED U.S. MAIL OR OTHER NATIONALLY RECOGNIZED TRACKING DELIVERY SERVICES (E.G., FEDEX, UPS) THE FOLLOWING ITEMS TO:

> Summit Village Development Lender 1, LLC
>
> c/o Celona Asset Management (USA) Limited 2207-09, Tower Two, Lippo Centre
> 89 Queensway Admiralty, Hong Kong

| | |
|---|---|
| (i) | a signed Subscription Agreement (original, photocopy or electronic copy); |
| (ii) | a signed joinder agreement and spousal consent (if applicable) accompanying the Operating Agreement (original, photocopy or electronic copy); |
| (iii) | four (4) signed originals of the Escrow Agreement; |
| (iv) | Form W-8BEN or W-9 in the form attached as Exhibit E; |
| (v) | a copy of the passport photograph page; |
| (vi) | a copy of an address proof issued within the past three (3) months; |
| (vii) | a signed and completed Confidential Prospective Investor Questionnaire; and |
| (viii) | a certified or cashier's check and/or wire transfer payable to the Escrow Agent in the total amount of the sum of the Subscription Amount, Administration Fee and Escrow Fee for the Class B Unit(s) subscribed for as required under the Subscription Agreement. |

**Acceptance and Revocation of Subscription**

The Company will review the Subscription Documents for completeness, due execution, and investor suitability. The Company has the sole and absolute right to reject or terminate, prior to the Offering Termination Date, any subscription that is tendered but has not closed or to waive any requirements in any of the Subscription Documents. If the Company rejects a subscription, the Subscription Documents, the Subscription Amount and the Administration Fee (both actually paid to the Company) will be returned without interest. Once the Company has accepted a subscription, the Subscriber may not cancel, terminate or revoke the subscription unless prior to the filing of his or her I-526 Petition with USCIS, such Subscriber decides not to proceed with his or her immigration procedures under the EB-5 Program, whereupon the Subscription Amount (actually paid to the Company) and such portion of the Administration Fee as determined by the Company will be returned without interest. Subscribers may not withdraw subscriptions that are accepted by the Company except as provided herein.

**Escrow Procedures**

All funds received by the Escrow Agent in connection with the Offering, consisting of payments of the Subscription Price, Administration Fee and Escrow Fee will be deposited into an escrow account. The Company's escrow account with the Escrow Agent has been established on terms and conditions that are more fully described in the Escrow Agreement and the Subscription Agreement. Upon the satisfaction of the conditions described in the Escrow Agreement, the Subscription Price and the Administration Fee shall be paid to the Company in such manner as provided in the Escrow Agreement. The Company shall have the right to deliver the Sch 3 Instruction, as provided under the form of the Escrow Agreement appearing as Exhibit D to the Memorandum (or any equivalent instruction under an alternative form of Escrow Agreement, the "**Release Instruction**"), instructing the Escrow Agent to release and disburse the Investment Amount and the Administration Fee as provided for in the Release Instruction upon:

1.   the approval of the Member's I-526 Petition with the USCIS;

2.   the filing of the Member's I-526 Petition with the USCIS, provided that (i) not less than three (3) I-526 Petitions of Subscribers have been approved by the USCIS (regardless of whether the Member's I-526 Petition has been approved) or (ii) an I-924 application submitted by the Regional Center in connection with the Project has been approved by the USCIS (in the case of (1) or (2), the "**Automatic Escrow Release Conditions**"); or

3.   the Member otherwise waiving the Automatic Escrow Release Conditions and allowing for the release and disbursement of the Investment Amount and the Administration Fee prior to receiving an approval of the Member's I-526 Petition by the USCIS (collectively with the Automatic Escrow Release Conditions, the "**Escrow Release Conditions**").

The Subscriber will deliver to the Company the executed Release Instruction together with other Subscription Documents such that the Company shall countersign and deliver to the Escrow Agent the Release Instruction upon the satisfaction of the Escrow Release Conditions.

**Qualifying Investment**

The Company believes utilizing subscription proceeds from the sale of Class B Units to make disbursements under the Loan to fund a portion of the development, construction, ownership and operating costs of the Project will be a Qualifying Investment under the EB-5 Program for the following reasons:

(1)   The Loan disbursements will be made to the Developer to fund the Development Costs associated with the Summit Village portion of the Project, on the status of the Project as a capital investment opportunity within a Targeted Employment Area sponsored by the Regional Center, thus potentially meeting the minimum job creation requirements of the EB-5 Program and entitling immigrant investors to make use of the US$500,000 Subscription Amount threshold;

(2)   The Loan disbursements will be funded from the proceeds of the sale of Class B Units, by which each immigrant investor will meet the US$500,000 Subscription Amount threshold; and

(3)   The maximum total Loan amount resulting from the sale of Class B Units will depend on the number of Class B Units sold and the number of jobs anticipated to be created from the Project.

LENDERS_0003643

The term "Qualifying Investment" refers solely to the type of at-risk investments that will be made by investors through the Company. A potential investor's capital contribution must be derived wholly from his or her personal assets and be entirely at risk.

## XII.   SUMMARY OF OPERATING AGREEMENT

In connection with the subscription of the Class B Units, Subscribers are required to sign and deliver to the Company a joinder agreement and spousal consent (if applicable) to the Operating Agreement in the form attached hereto as <u>Exhibit B</u>. Upon the satisfaction of the subscription closing conditions specified in the Subscription Agreement, a Subscriber will become a Class B Member. The Operating Agreement and applicable law will govern the rights and obligations of the Class A Member and Class B Members, as well as the rights and obligations of the Managers and officers of the Company.  The following summary of certain provisions of the Operating Agreement is intended only to be an executive summary and is not complete. The Operating Agreement describes in detail numerous aspects of the Offering and the rights and obligations of the Members, which are material to the Members and include those summarized below, and the Operating Agreement should be read in its entirety by prospective Subscribers. Should there be any discrepancy between the Operating Agreement and anything provided in this Memorandum, the Operating Agreement shall prevail.

### Purpose

The Company is a newly created enterprise, which has been formed to engage in any lawful activity. The Company intends to make the Loan to the Developer and engage in such other activities related to or incidental to the Loan, or as may be necessary, advisable or appropriate, in the good faith and reasonable opinion of the Class B Manager to further such purpose, subject to certain limitations set forth in the Operating Agreement.

### Term

The term of the Company shall continue until dissolved in accordance with the provisions of the Operating Agreement, or until December 31, 2025 or such later date as may be determined by the Class B Manager. Upon the Company's dissolution, the Company's assets (including the proceeds from the Developer's repayment of the Loan and interest thereon) will be distributed to the Members.

### Capital Contributions

The Company expects to receive up to the Maximum Offering Amount in capital contributions through the sale of the Class B Units pursuant to the Offering. Upon the release of the aggregate Subscription Amount and the Administration Fees attributable to a Subscriber from the designated escrow account to the Company pursuant to the terms and conditions of the Escrow Agreement, such Subscriber will have contributed to the capital of the Company and become a Class B Member and will have a capital account balance equal to the amount that such Class B Member paid to the Company to purchase the Class B Unit(s) (excluding the Administration Fee and other fees and expenses). No Member will be entitled to any interest on any capital contribution.

No Class B Member shall be required to make any capital contribution in addition to the Subscription Amount. The Members may be permitted (but shall not be required) from time to time to make additional capital contributions if the minimum investment amount as required under the EB-5 Program has been increased before the approval of the Class B Member's Form I-526 Petition, provided that any Member making such additional capital contributions shall also pay to the Company an additional amount of the Administration Fee as described in this Memorandum as if such Member was making the subscription at the increased Subscription Amount and all monies received from such Member shall first be applied by the Company towards payment of such additional amount of the Administration Fee. Members may also

be permitted (but shall not be required) from time to time to make additional capital contributions if the Class B Manager determines that such additional capital contributions are necessary or appropriate for the conduct of the Company's business and affairs. The Class B Manager shall determine all the terms and conditions of any such additional capital contributions, as set forth in the Operating Agreement.

## Expenses of the Company

The Company may in its discretion require the Developer to provide an operating capital loan to the Company from independent funds in an aggregate amount of up to US$130,000 per year during the term of the Loan, on commercially reasonable terms, for the purpose of paying general and administrative expenses incurred and to be incurred by the Company. NO PORTION OF SUCH OPERATING CAPITAL LOAN PROCEEDS PROVIDED BY THE DEVELOPER SHALL BE MADE USING ANY AMOUNTS RECEIVED BY THE DEVELOPER UNDER THE LOAN.

## Tax Classifications

The Company is intended to be classified as a partnership for U.S. federal income tax purposes. See "Legal, Tax and Regulatory Risks" section of this Memorandum.

## Distributions and Allocations

So long as there are Class B Units in issue, and other than distributions related to liquidation of the Class B Units, no distributions to any Member shall be made. Following the liquidation of all the Class B Units, and subject to applicable law and any limitations contained in the Operating Agreement, the Class B Manager shall from time to time make distributions of available cash to the Members in proportion to their respective capital contributions.

In general, subject to certain special allocation rules set forth in the Operating Agreement, net profits are allocated to the Members in the following priority: (i) to offset any cumulative net losses of the Class B Members; and thereafter (ii) amongst the Class B Members in accordance with their respective capital contributions. Net losses are generally allocated to all the Class B Members based on their respective capital contributions.

The Operating Agreement contains certain allocation provisions (required by the regulations, including temporary regulations, promulgated by the U.S. Department of Treasury under the Code (the "Treasury Regulations")), pursuant to which (i) net losses will not be allocated to a Member if such allocation will create an adjusted capital account deficit for that Member, and special allocation rules apply in such an event, and (ii) non-recourse deductions, minimum gain chargebacks, etc. will be subject to special allocations rules.

## Management, Managers and Officers

See "Management of the Company" section of this Memorandum.

In general, no Member is entitled to remuneration for acting in his or her capacity as a Member.

Each Manager is entitled to remuneration for services provided to the Company and other benefits in accordance with the terms of the applicable Management Agreement. As remuneration for the provision of services pursuant to the Class B Management Agreement and the Operating Agreement, the Class B Manager shall receive certain fees as described in the Class B Management Agreement (such fees averaged over the term of the appointment to be approximately 1% per annum of the maximum amount of the Loan). Any remuneration paid by the Company to the Managers pursuant to the Management Agreements shall be reimbursed to the Company by the Developer pursuant to terms to be mutually agreed upon, provided that none of such reimbursements shall be paid out of the capital contributions of any of the Class B Members. In addition, the officers of the Company shall be entitled to remuneration

and other benefits for their services to the Company, all as determined by the Class B Manager.

There is no agreement with the Company or any third party whereby any Member or Manager has obtained the rights to purchase any unit of membership interest in the Company at a future date.

## Voting and Approval Rights of Members

The Operating Agreement provides that the Members will have the right to vote in order to approve or disapprove: (i) the dissolution and winding up of the Company, (ii) the merger, consolidation, or other business combination of the Company with any entity or other entities, (iii) the sale, exchange, lease, mortgage, pledge or other transfer of all or substantial part of the assets of the Company other than as contemplated in the Loan Agreement or in the ordinary course of its business, (iv) the incurrence of any obligation or indebtedness exceeding ten percent (10%) of the value of the Company's assets, (v) a change in the fundamental nature of the business of the Company or a change in the fundamental purpose of the Company, from making a Loan secured by the Project, (vi) investing more than ten percent (10%) of the Company's total assets in any entity or project other than the promissory note evidencing the Loan, the Developer and the Project, (vii) amending the terms of the Class B Management Agreement for or on behalf of the Company, (viii) subject to the appointment of the initial Class B Manager, appointment, reappointment and removal of the Class B Manager and any material amendment of the Class B Management Agreement, (ix) a change in the Certificate of Formation whereby the management of the Company is vested in the Members, and (x) to the extent not made as a result of an increase in the minimum investment amount as required under the EB-5 Program or by all of the existing Members on a pro rata basis, any additional capital contributions to be made by the Members and corresponding changes in the Membership Interests. Each Member is entitled to one (1) vote for each percent of voting percentage interest held, which voting percentage interest is calculated by dividing the amount of such Member's capital contribution by the aggregate amount of capital contributions of all Members. Where vote, consent or approval of the Members is required or permitted, vote, consent or approval of more than sixty-seven percent (67%) of all of the voting percentage interest held by the Members shall be required.

The Operating Agreement further provides that to the extent that the relevant matter is one expressly requiring the Class A Manager's approval pursuant to the Operating Agreement (if any), vote, consent, or approval of more than fifty percent (50%) of all of the voting percentage interest held by the Class A Members may be in lieu of such Class A Manager's approval.

## Liabilities of Members and Managers

Except as required under applicable law or as expressly set forth in the Operating Agreement, no Member shall be personally liable for any debt, obligation or liability of the Company. A Member may have personal liability, among other things, for breach of the Operating Agreement by such Member or to the extent that such Member has received unauthorized distribution from the Company in certain cases. The limitation on a Member's personal liability will not apply to a Member's acts or omissions in another capacity, if any, such as a Manager or an officer of the Company. A Member's capital contribution is subject to risks of the Company's business.

Pursuant to the Operating Agreement and to the maximum extent permitted by law, the Members, the Class A Manager, the Class B Manager and the Company's officers (including their respective directors, partners, owners, managers, officers, employees or agents) generally will not have any liability to the Company or to any Member except to the extent the liability is attributable to the person's gross negligence or intentional misconduct. Accordingly, the Class A Manager and its officers, and the Class B Manager and its officers generally will not be liable for errors in judgment or any other acts or omissions (e.g., simple negligence) not amounting to gross negligence or intentional misconduct, and the Company and the Members, therefore, have a much more limited right to claim or bring an action against them than

they may have had absent such limitations of liability.

Pursuant to the Operating Agreement (and subject to certain limitations contained therein), the Company is obligated to indemnify, hold harmless and defend each Manager (including its affiliates and associated persons) and each officer, employee or agent of the Company from and against any loss or liability related to any act or omission by such person in connection with the business of the Company or service to, for or at the request of the Company undertaken in good faith on behalf of or for the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company, subject to certain limitations, including that indemnification is not available for matters involving the gross negligence or intentional misconduct of the person seeking indemnification. Pursuant to the Management Agreementsthe Company's indemnification of the Managers (and their affiliates and associated persons) specifically extends to losses and liability arising in connection with any actual or potential conflict of interest of the Manager, including acting in a similar capacity for other entities. To the maximum extent permitted by law, the fiduciary duties of the Managers owed to the Company or the Members that may otherwise have been applicable have been severely modified and curtailed. All such fiduciary duties are eliminated except to the extent that the applicable Manager is shown to have acted with or through gross negligence or intentional misconduct.

**Transfer and Assignment of Membership Interest by Class B Members**

The Operating Agreement contains substantial restrictions on the right of a Member to transfer, encumber or otherwise dispose of any part of such Member's Membership Interest. In general, a Class B Member may not sell, transfer, encumber, or otherwise dispose of his or her Class B Units until the conditions to permanent resident status have been removed by the USCIS pursuant to the EB-5 Program, subject to the exceptions described in this paragraph and below in "Liquidation of Class B Units". Additionally, no Member may transfer, encumber or otherwise dispose of any part of such Member's Membership Interest except with the approval by the Class B Manager, which approval may be withheld, conditioned or delayed, as the Class B Manager may determine in its reasonable opinion. With respect to any transfer by a Class B Member of a Membership Interest in the event of death of the Class B Member to certain family members of such Member, any trust for the benefit of that Member or certain family members of that Member, or any affiliate of that Member, the consent of the Class B Manager is not required.

In addition to the foregoing restrictions and the other restrictions set forth in the Operating Agreement, a Member cannot transfer, encumber or otherwise dispose of any part of his, her or its Membership Interest which will result in the violation by that Member or by the Company of U.S. federal, state or foreign securities laws and all other applicable laws. The Company will not register or otherwise permit any resale or transfer of any Membership Interest that is not made in accordance with an exemption from registration requirements, under the Securities Act and the securities laws of any applicable U.S. state and other country. Further, a Member cannot transfer, encumber or otherwise dispose of any part of his, her or its Membership Interest which may cause the Company to lose any exclusion under the 1940 Act on which it relies, or otherwise create material additional compliance obligations and burdens on the Company or the Managers. The Company may also refuse to register any transfer not made in accordance with Regulation S under the Securities Act and/or Section 4(a)(2) of the Securities Act or Regulation D, pursuant to registration under the Securities Act or pursuant to an exemption from such registration.

**Liquidation of Class B Units**

In the event that a Class B Member requests liquidation of the Member's Class B Unit(s), the Company may, in the sole and absolute discretion of the Class B Manager (but shall not be under any obligation), (a) agree to liquidate such Class B Unit(s) if the Class B Member (i) has made a request to USCIS for the withdrawal of the Class B Member's I-526 Petition and USCIS has issued a letter of acknowledgement of

LENDERS_0003647

withdrawal agreeing to terminate all action in respect of such Class B Member's I-526 Petition, a copy of which has been provided to the Company; (ii) is required to invest more than the minimum investment amount prescribed under the EB-5 Program due to the Project no longer being able to qualify to be located in a targeted employment area under the EB-5 Program and such requirement remains for a period of sixty (60) days and such Class B Member does not file a I-526 Petition during the sixty (60)-day period and also delivers written notice of a request for liquidation to the Company within five (5) days of the end of the sixty (60)-day period; (iii) has received a USCIS decision denying his or her I-526 Petition due to (A) the petitioner's fraud or misrepresentation, or (B) any other reason, and the USCIS does not reverse its denial within forty-five (45) days of the date indicated on the USCIS I-290B Notice, which such Class B Member shall have filed in response within thirty (30) days of the petition denial, provided that the Class B Member shall also provide evidence to the Company that he or she has withdrawn his or her I-290B Notice prior to the liquidation request; or (iv) is denied approval of his or her Adjustment of Status or consular application for an EB-5 Visa or fails to obtain conditional lawful permanent resident status under the EB-5 Program prior to the expiration of such Class B Member's EB-5 Visa, or (b) agree to liquidate such Class B Unit(s) if the Class B Member delivers to the Company a written request for the liquidation of such Class B Unit(s) within three (3) months from the latest of (i) the Company having received the full and final repayment of the Loan, (ii) such Class B Member's receipt of unconditional permanent resident status in the United States under the EB-5 Program, and (iii) the fifth (5th) anniversary of the date on which a Class B Member's I-526 Petition is approved by the USCIS. In the event that the Company liquidates a Class B Unit for any reason referred to in (a)(ii) or (a)(iii)(B) of this paragraph, the price at which the Company liquidates such Class B Unit shall be the sum of the capital contribution of the Class B Member and the Administration Fee, both amounts without interest. In the event that the Company liquidates a Class B Unit for any reason referred to in (a)(i), (a)(iii)(A) or (a)(iv) of this paragraph, then the price at which the Company liquidates such Class B Unit shall be the sum of the aggregate capital contribution of the Class B Member and such portion, if any, of the Administration Fee as determined by the Class B Manager at its sole discretion, both amounts without interest. In the event that the Company liquidates a Class B Unit pursuant to (b) of this paragraph, it shall be at a price equal to the balance of such Class B Member's Capital Account. Except as otherwise provided in the Operating Agreement, liquidation amounts referred to in this paragraph will be paid within ninety (90) days of the Company's acceptance of the request for liquidation, subject to the broad rights of the Company to suspend liquidation for and until such time as the Company shall determine.

In addition to the liquidation matters described above, the Class B Units will be liquidated in connection with the events described below in "Dissolution and Termination".

Under certain circumstances, the Company may suspend the liquidation of the Class B Units if the Class B Manager determines, in its sole and absolute discretion, after consulting with the Class A Manager, that the liquidation of the Class B Units could have an adverse effect on the ability of the Company to make advances under the Loan Agreement or the immigration objectives or the ability of the other Class B Members to obtain unconditional lawful permanent resident status in the U.S. pursuant to the EB-5 Program, or the Company is restricted from liquidating any Class B Units under applicable law, or the Company does not have the available cash to effect such liquidation, the Company may suspend the liquidation of the Class B Units until such time as the Class B Manager determines, if at all and in its sole and absolute discretion, that the liquidation of the Class B Units would not cause such consequence.

## Remuneration to Members, Managers and Officers

In general, no Member is entitled to remuneration for acting in his or her capacity as a Member.

Each Manager is entitled to remuneration for services provided to the Company and other benefits in accordance with the terms of the applicable Management Agreement. As remuneration for the provision

of services pursuant to the Class B Management Agreement and the Operating Agreement, the Class B Manager shall receive certain fees as described in the Class B Management Agreement (such fees averaged over the term of the appointment to be approximately 1% per annum of the maximum amount of the Loan). Any remuneration paid by the Company to the Managers pursuant to the Management Agreements shall be reimbursed to the Company by the Developer, provided that none of such reimbursements shall be paid out of the capital contributions of any of the Class B Members. In addition, the officers of the Company shall be entitled to remuneration and other benefits for their services to the Company, all as determined by the Class B Manager.

There is no agreement with the Company or any third party whereby any Member or Manager has obtained the rights to purchase any unit of membership interest in the Company at a future date.

**Competing Activities**

Any Member, Manager, officer or affiliate of a Member or a Manager or officer of the Company may engage in or invest in any business activity, even if the business activity is the same as or similar to the Company's business and is in direct or indirect competition with the Company. Such persons are not obligated to present any business or investment opportunity to the Company, and have the right to engage in such opportunity for their own account or for the account of anyone other than the Company. The Operating Agreement provides that actions by any such persons in compliance with or in accordance with the Operating Agreement shall not be a breach of such person's fiduciary duties to the Company or any Member.

**Accounting and Reporting**

The Company is required to keep books and records to record its financial position and the results of its operation in accordance with the accounting methods followed by the Company for U.S. federal income tax purposes.

The Company is required to send to each Member on or before the one hundred eightieth (180th) day following the end of each fiscal year (or as soon as practicable thereafter) an audited financial report containing a balance sheet as of the end of that fiscal year, a statement of profit and loss and a cash flow statement for that fiscal year. The Company is also required to send to each Member, within ninety (90) days after the end of each fiscal year (or as soon as practicable thereafter), such information as is necessary for the preparation of the U.S. federal and state income tax returns of such Member, and a copy of the Company's U.S. federal, state, and local income tax or information returns for that year.

Upon reasonable written request by a Member, the Company shall provide certain additional financial and other information, and permit the inspection and copying of certain documents by such Member or Members, or by their respective agents or attorneys.

**Job Allocation**

The Company has been formed for the benefit of up to 240 immigrant investors seeking status as immigrant investors under §203(b)(5) of the INA Act. The Class B Members will be required to enter into an EB-5 Job Allocation Addendum contained in the Schedule to the Operating Agreement attached as Exhibit B hereto.

**Dissolution and Termination**

The Company will be dissolved and wound up upon the first to occur of the following:

(i)      the entry of a decree of judicial dissolution pursuant to the Delaware Limited Liability Company Act;

LENDERS_0003649

(ii)     the approval of the Members and the Managers as set forth in the Operating Agreement;

(iii)    the sale or other disposition of all or substantially all of the Company's non-cash assets including the Loan and subsequent to the final adjudication of all I-829 Petitions; provided that the Members shall not have otherwise voted to defer dissolution of the Company in accordance with the Operating Agreement; or

(iv)    December 31, 2025 or such later date as may be determined by the Class B Manager.

In connection with Company's dissolution and winding up, the Company will, after determining that all known debts and liabilities of the Company have been paid or sufficiently provided for, distribute the remaining assets to the Members in accordance with the procedures as set forth in the Operating Agreement and in the following order of priority:

(i)     to the Class A Member to the extent of its capital contribution; and

(ii)    the balance, if any, pro rata to the Class B Members.

The above liquidating distributions shall be made by the end of the Company's fiscal year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

## XIII.   RISK FACTORS

AN INVESTMENT IN THE COMPANY HAS ELEMENTS OF RISK DIFFERENT FROM AND/OR GREATER THAN THOSE ASSOCIATED WITH OTHER INVESTMENTS. THE HIGHER DEGREE OF RISK MAKES AN INVESTMENT IN THE COMPANY SUITABLE ONLY FOR INVESTORS (I) WHO HAVE A CONTINUING LEVEL OF ANNUAL INCOME AND A SUBSTANTIAL NET WORTH, (II) WHO CAN AFFORD TO BEAR THOSE RISKS, (III) WHO HAVE PREVIOUSLY MADE INVESTMENTS OF THE NATURE AND RISK LEVEL OF AN INVESTMENT IN THE COMPANY, AND (IV) WHO HAVE NO NEED FOR LIQUIDITY FROM THESE INVESTMENTS. EACH INVESTOR SHOULD CONSIDER CAREFULLY THE RISK FACTORS ASSOCIATED WITH THIS INVESTMENT, INCLUDING, WITHOUT LIMITATION, THE FOLLOWING, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX, AND FINANCIAL ADVISERS WITH RESPECT THERETO. INVESTORS UNABLE OR UNWILLING TO ASSUME THE FOLLOWING RISKS, AMONG OTHERS, SHOULD NOT INVEST IN THE COMPANY.

THE ORDER IN WHICH THE FOLLOWING RISKS ARE PRESENTED DOES NOT NECESSARILY CORRELATE TO THE MAGNITUDE OF THE RISKS DESCRIBED. THE FOLLOWING RISK FACTORS ARE NOT NECESSARILY REFLECTIVE OF ALL THE RISKS ASSOCIATED WITH THIS INVESTMENT THAT MAY BE MATERIAL TO THE SUBSCRIBERS.

ANY OF THE RISKS ENUMERATED BELOW COULD HAVE MATERIAL AND ADVERSE EFFECTS ON THE DEVELOPER'S CASH FLOW OR FINANCIAL CONDITION, THE DEVELOPER'S ABILITY TO PAY THE COSTS OF THE PROJECT AND/OR THE DEVELOPER'S ABILITY TO REPAY ALL OR A PORTION OF THE LOAN. IF THE DEVELOPER IS UNABLE TO REPAY THE LOAN MADE BY THE COMPANY, IN WHOLE OR IN PART, CLASS B MEMBERS COULD SEE A SUBSTANTIAL, IF NOT TOTAL, LOSS OF THEIR INVESTMENT.

**Risks Relating to Real Estate and Financing of Real Estate**

*Investment in the Company is subject to general real estate risks.*

The Company will be subject to risks generally incident to the financing and development of real estate,

including the following:

(1)    changes in general economic or local conditions;

(2)    changes in supply of or demand for similar or competing properties in an area;

(3)    bankruptcies, financial difficulties or defaults by vendors, contractors and others;

(4)    changes in tax, real estate, environmental and zoning laws;

(5)    periods of high interest rates and tight money supply; and

(6)    general overbuilding or excess supply in the market area.

For these and other reasons, no assurance can be given that the Company will be profitable or that it will produce the targeted financial returns.

### The Company will rely on third parties to complete and operate the Project.

The Company will make the Loan to provide a portion of the funding required to enable the Developer to develop, construct and operate the Project. The Developer, in turn, will rely on various other third-party contractors, subcontractors, and suppliers for the completion of the Project. The Developer has yet to enter into binding agreements with these and other critical third party vendors, including the architect, the development manager, a general contractor (except for limited infrastructure work) and subcontractors. The selection, performance and compensation of these vendors will have a material effect on the performance of the Summit Village development and the Developer's ability to repay the Loan. Potential investors will not be able to evaluate the qualifications of any of these vendors, and the Company will have no consent rights to these vendors with the exception of the general contractor. The ability of these parties to complete their work will be subject to typical construction and development risks, as well as acts of war, work stoppages, interruptions in transportation systems, and other force majeure events. Adverse changes in the operations and financial condition of these parties, which may have a material adverse effect on the Project, are beyond the control of the Company or the Developer. Further, no assurances can be given that the completed Project or the Summit Village subcomponent will generate revenues in accordance with the Owner's projections.

### If the Developer maintains or obtains a senior loan or is otherwise required by a governmental authority to make a repayment in priority to the Loan, the Company's rights as mortgagee may become worthless following a default.

The Company's security will constitute a first ranking deed of trust and security interest over the Included Property (which phases in over time – see "Loan Terms and Conditions – Collateral" above), which are anticipated to be the only material assets of the Developer. However, the Developer will have the right under certain circumstances to require the Company to subordinate its rights to another lender that would then hold a first priority deed of trust and security interest in the Property and the Summit Village. In that event, if such lender were to foreclose on its deed of trust and security interest following a default under its loan, the Company's security may become worthless. Accordingly, as a result, upon any default under the Loan, the Company may be prohibited from pursuing remedies for such default. Any senior loans will have priority payment rights to the Loan, which may result in inadequate funds being available, after payment of such senior obligations, to pay the principal and interest due on the Loan. Further, even though the Developer Equity will rank junior to the Loan in all respects including with respect to repayment from cash flow from Summit Village available to the Developer, the TIF proceeds or other proceeds available from any governmental authority may have priority in repayment over the Loan upon terms acceptable to the Lender. This could result in a complete loss of each Class B Members' investment in the Company.

### Developer might not obtain all capital projected to be used for Summit Village.

LENDERS_0003651

The Developer estimates that approximately US$120 million in new capital will be required to complete Summit Village, including the use of some of the proceeds from the Loan. Developer equity includes: (i) an in-kind contribution of the Summit Village Property, which is reflected in the capital stack at value of $29.0 million and has been independently appraised at an "as complete" value of US$46.8 million, (ii) approximately US$16.7 million of anticipated TIF financing, and (iii) approximately US$12.6 million from non-refundable deposits from the purchase of townhome and condominium units in Summit Village. The Developer Equity will be available at different times during the Project, to be more fully described in the Loan Agreement. If some or all of such capital is not available to Developer despite the commitments or projections related to each source of capital, it is possible that no further advances will be made under the Loan Agreement.

Additionally, if the Company does not raise the full US$120 million in this Offering, or if Subscription Amounts must be returned to Class B Members upon a denial of the Project or any individual Class B Member from participation in the EB-5 Program and such amounts are not replaced, then the Company will be unable to advance the full US$120 million contemplated under the Loan Agreement. In such case, Developer will have the right to borrow amounts that will be senior in collateral and payment priority to the Loan, which would adversely affect the Class B Members. If the Developer is not able to raise additional equity or borrow additional funds, the Developer may have to curtail the scope of Summit Village, which may not be contractually or practically possible. Any failure of Developer to complete Summit Village would have a material adverse effect on the likelihood of repayment of the Loan to the Company and therefore the ability of the Company to produce a return on the Class B Members' investments, and may also lead to denials of the Class B Members' I-829 Petitions.

Similar risks apply in the event of cost overruns for Summit Village that are not the responsibility of the general contractor under the construction contract. Because no construction contract has been signed, it is difficult for the Company to evaluate the effect of cost overruns. If the Company is not satisfied with the construction contract, it may decline to make further advances under the Loan Agreement, which would in turn lead to the risks described in the first paragraph above.

Finally, commercial and residential real estate properties often require a continuing high level of capital expenditures after completion. Additional capital may not be available to the Developer on acceptable terms or at all.

***If the Developer lacks sufficient funds to complete and operate Summit Village, the position of the Class B Members in the Company will be adversely affected.***

Unforeseen circumstances may make it necessary for the Developer to finance the operation of the Project through additional borrowing, which may rank senior in terms of payment and priority to the Company's Loan and otherwise adversely affect the Company's position as a secured lender. In addition, to the extent cash flow from the Project is not sufficient to fund these additional debt obligations, the Developer may be required to obtain cash from other sources. Unless the Developer generates such cash, the Developer might be required to raise additional equity investment or to borrow additional funds, and there can be no assurance that additional funds will be available on favorable terms, if at all. In that event, the Developer may be required to sell the Project on disadvantageous terms, or security agreements or guarantees securing any of the Developer's debt may be foreclosed and the Project sold by priority lenders to repay the debts owing them. This would have a materially adverse effect on the Company and its investors.

***The Developer and Company may be subject to environmental liability.***

Investing in businesses operated on real property involves risks relating to hazardous and toxic contamination of such property or adjacent property, including subsurface and underground water contamination. Such contamination could have a detrimental effect on the Company, and can result from

the actions of tenants, contractors, patrons, visitors, and other parties, including adjacent property owners, over whom the Company could exercise little or no control. The Developer could be required to participate financially in the clean up or other abatement of such contamination, which could cause the Company to suffer a loss of some or all of the capital invested in the Project as well as the loss of any potential profits from the Project. Under certain circumstances, courts have held that a Lender is responsible for the environmental cleanup obligations of its borrower imposed by applicable federal statutes. In the event such circumstances arise, a court might find that the Company is liable for such obligations.

**The Developer may face delays in obtaining, or be unable to obtain, required permits.**

The Developer has not obtained all required approvals to begin construction of the Project. Prior to securing final certificates of occupancy the Project, certain building and safety, handicapped, and other permits may need to be obtained or extended. Additionally, existing public health, fire and safety and other licenses may also need to be obtained or extended. While the Company believes that the Developer should face no impediments to obtaining any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will be obtained or extended.

**The successful completion and operation of the Project depends heavily on economic, political, environmental and other factors over which the Company has no control.**

The Developer's ability to successfully complete and operate the Project depends in large part on its ability to obtain and utilize equipment, materiel and services in a timely and efficient manner. In particular, the Project is susceptible to natural and man-made disasters, including war, terrorism, hurricanes, earthquakes, fires, floods, environmental disasters, power loss, political or economic instability, disruptions to the financial markets, vandalism and other similar disruptive problems, any of which could adversely affect the Project and jeopardize repayment of Company's investment. The Developer's insurance policies may not adequately compensate it for any losses that may occur due to any resulting damages or interruptions. Among other things, such problems could result in reduced investor confidence, substantial volatility in securities markets and a decline in real estate and related hotel occupancy rates, leasing and financing. In addition, general economic conditions may affect the Company's activities. Interest rates, general levels of economic activity, the price of securities and participation by other investors in the financial markets may affect the value of investments made by the Company or considered for prospective investment.

**The actual market value of Summit Village and any substitute collateral upon maturity of the Loan may be significantly less than the assumed market value contained in projections prepared by the Owner.**

The Owner has performed an analysis of the marketability and the financial viability of the Summit Village development through Loan maturity and the likelihood that the Collateral can be sold or refinanced to repay the Loan upon maturity. If assumptions upon which the Owner's analysis are based turn out to have been overly optimistic, the Developer may not be able to make payments of principal and interest required under the Loan. In that event, the Company may be unable to return the full amount of each Class B Member's capital contribution.

**Under the Americans with Disabilities Act of 1990 (the "ADA"), all public accommodations are required to meet certain federal requirements related to access and use by disabled persons.**

Laws similar to the ADA may also now or in the future exist on a State or municipal level. If the Developer were required to make modifications to comply with the ADA or any state law, the Developer's ability to make expected loan payments to the Company, and the Developer's ability to satisfy its obligations under the Loan could be adversely affected.

**Employees of the Project may be union members, and non-union employee staffs in various areas may**

*be subject to union organization activities.*

Hotel worker unions, in particular, are prominent throughout the United States. The Owner does not intend for the Project to be operated under a collective bargaining agreement. However, there can be no assurance that the unions will not organize the employees of the Project and/or require the Owner to enter into a collective bargaining agreement. In such case, the costs of operating the Project would increase materially from the Developer's current projections. Moreover, if a collective bargaining agreement is executed for any portion of the Project, there can be no assurance that the unions will abide by the terms of any collective bargaining agreement if any union deems certain aspects of such agreement unfair, and furthermore, certain employees may not be covered by such agreement. The Project could suffer work stoppages or "slow-downs" as a result. In such event, it is likely that the employee costs of the Project will be higher than presently projected for the continuation of the Project, since union workers would have compensation and benefits that are generally higher than non-union workers in the same hotel and convention industry jobs. Neither the Developer nor the Company will have control over whether one or more unions determine to target the Project's operations for union organization activities.

***The operations of the Project are and will be subject to various federal, state, and local laws and regulations, as well as court decisions, affecting Project operations, the Developer's business and the value of the Project.***

Difficulties or failures in obtaining required licenses or other regulatory approvals could delay securing the pending permanent Certificate of Occupancy or otherwise hamper completion of the Project, including opening and operating the Project. The suspension of, or inability to renew, a license could interrupt operations at the Project. The Owner is subject to federal, state, and local laws establishing minimum wages, unemployment taxes, and sales taxes, and regulating overtime, other working conditions, and similar matters over which the Company will have no control. The Project's operations will be subject to federal, state, and local regulations, including regulatory provisions relating to sanitation, health, safety and liquor licensing. All of these laws, regulations, and court decisions could have both a positive or negative impact on the Project's operations and financial results from those operations and on the Project's ability to compete. Suspension of the Owner's ability to operate or by any regulatory agency would have a material adverse effect on the profitability of the Project and the Developer's ability to repay the Loan. Increased regulation of various aspects of the Project's operations, or of the Developer or the Company itself, should this occur, could also have an adverse effect on the Developer's and the Company's financial position. Additionally, the Company will be under substantial scrutiny by USCIS.

***Prior to securing final Certificates of Occupancy for the Project, certain building and safety, handicapped, and other permits may need to be obtained or extended.***

Additionally, public health, fire and safety, liquor and other licenses may also need to be obtained. While the Developer believes that there should be no impediments to obtaining any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will be obtained.

***The Developer has not obtained final bids for construction of Summit Village, a general contractor has not been selected and no construction contract has been entered into for Summit Village.***

The terms of the construction contract that the Developer will enter into have not been negotiated, except as to initial water, sewer, and road infrastructure and site preparation work. Such to-be-determined terms will have a material effect on the outcome of the Summit Village project, and in turn, the repayment of the Loan. There no assurance that a qualified general contractor acceptable to the Developer and the Company will be identified. And there is no assurance that the actual cost of construction of Summit

Village, once bid, will approximate the Developer's budget. Any deviation would require a reassessment of the pro forma and debt and equity requirements.

***The successful development of Summit Village will also depend on the efforts of the Developer, the construction contractor, its subcontractors, and the architects involved in the design and construction of the Project.***

The Company's success will be largely dependent on the ability of the Developer and its affiliates to satisfy the development and other objectives of Summit Village and other components of the Project. Any failure by any such parties to fulfill their obligations in connections with the development of the Summit Village and other components of the Project could have a material and adverse effect on the Company's ability to realize a return of the investment made by the Class B Members.

## *Success of Summit Village will, in part, depend on the successful completion of the Project.*

The success of Summit Village will depend on the completion and economic success of the multi-phase master planned mixed-use development envisaged in the Project. The developer for the Infrastructure Component and the Residential Component may not be able to raise sufficient funds for the development costs of those phases of the Project. If the phases of the Project (other than Summit Village) are not completed or are not economically successful, the success and therefore the value of Summit Village could be materially and adversely affected, which may reduce the likelihood that the Collateral can be sold or refinanced to repay the Loan upon maturity or the ability of the Developer to make payments of principal and interest required under the Loan. In that event, the Company may be unable to return the full amount of each Class B Member's capital contribution

***Sources of debt or equity to refinance or pay off the Loan at maturity may not be available.***

Summit Village's financial condition, the lending market, and the national and local economic climate at the time the Loan is due may be such that refinancing the Loan is not possible. The Developer may be able to refinance the Loan. In the event the Loan cannot be refinanced, the Developer will not have the funds available to repay the Loan at maturity absent a sale of the Developer or the Property, which the Developer is not obligated to do and which may not be possible given market conditions. After any available loan extensions are exhausted, the Loan would then either fall into default or require renegotiation of its maturity date and perhaps others terms. If the Loan falls into default, there is no assurance that the Company would be able to recover from foreclosing on the collateral it will hold.

***There is no guarantee that the Developer will repay all or any part of the Loan, either at maturity or ever.***

The ability of the Developer or any guarantor to perform under the Loan Agreement depends upon a number of factors related to its business and financial position, which cannot be ascertained or relied upon with any degree of certainty. In light of these factors, the benefit to the Company of the obligations of the Developer and any guarantor is effectively limited to the legal obligations of, and financial ability, of such parties to perform under the loan documents. The Developer is incentivized to repay the Loan by the threat of foreclosure of the Collateral if the Developer does not perform under the Loan. The manner in which the Developer is providing the significant majority of the equity for Summit Village construction limits the financial exposure to the Developer associated with a foreclosure, and may have the effect of reducing the financial impact to the Owner should the Loan not be repaid. In the event of a payment default by the Developer, the Company's rights to recover from the Developer and any guarantor are generally superior to the rights of the equity investors in said entities, however, there is no assurance that the Company's right to recover under the Loan Agreement will be superior to any liens upon the assets of, or other obligations of, any such parties. There can be no assurances, and further recognizing the

uncertainty of future events, that any guaranty will in fact provide an alternative payment source upon any such payment default. The present or future capital structure, debt structure and performance of the business operations of the Developer and any guarantor may not result in any ability for the Company to recover under the Loan.

***The projected investment made by the Company will involve real property which will be improved by the construction of new improvements comprising Summit Village which contains inherent and typical risks associated with real property development.***

Construction and/or remodeling of improvements to real property will entail risks which are beyond the control of the owner of the property and the Company, such as changes in governmental rules and policies (such as zoning), the performance by contractors, costs of materials, labor difficulties (such as strikes), energy shortages, shortages of material for construction, inflation, adverse weather, and adverse subsurface conditions, including the discovery of existing earthquake fault lines and other factors, which could cause costs to exceed current estimates. If Summit Village development costs exceed the budgeted amounts, including budgeted contingencies and any contingent equity committed by the Owner, such a gap in funding may make it difficult or impossible for the Developer to meet its obligations to the Company under the Loan Agreement. These abovementioned risks may increase the costs of construction and/or remodeling and may cause, among other things, delays in construction and/or remodeling which affect the ability of the investment made by the Company to generate cash flow to repay the Company's investment and which, in turn, could cause the Company to suffer a loss of some or all of its investment as well as the loss of any potential profits from such investment.

***There may be unexpected delays or developments in completing Summit Village, which could cause the construction costs of Summit Village to exceed current estimates.***

Summit Village may suffer significant construction delays or construction-cost increases as a result of a variety of factors, including but not limited to the following:

- failure to complete infrastructure and development projects supporting Summit Village;
- failure to secure and maintain environmental and other permits or regulatory approvals;
- appeals of environmental and other permits or approvals;
- failure to obtain capital;
- failure to obtain or maintain all necessary rights to land access and use;
- failure to receive critical components and equipment that meet design specifications;
- delays in scheduled deliveries of critical components and equipment;
- failure to receive quality and timely performance from key contractors and vendors;
- increases in supplier costs, including those due to unexpected increases in inflation or commodity prices;
- work stoppages or shortages of skilled labor;
- inclement weather conditions;
- delays in satisfaction of the conditions for funding the Loan;
- adverse environmental and geological conditions including the discovery of earthquake fault lines; and
- force majeure or other events out of the control of the Developer.

Any of the aforementioned factors could give rise to construction delays and construction costs in excess of current projections. Any of the above factors could prevent the Developer from completing construction or may cause significant delays, resulting in defaults under financing agreements, including but not limited to the Loan Agreement, causing Summit Village to be unprofitable for the Developer or otherwise impairing the Developer's business, financial condition and results of operations, and the ability to perform under the Loan Agreement.

*The Project depends upon government spending and support that might not be available.*

The Project contemplates that certain local and State governmental spending and/or financing will be available for the Project. The TIF financing proceeds are intended to be made to support the equity needed to complete Summit Village and risks associated with the availability of such funding and the requirements of repayment of such funding are not fully known. In addition, government spending on certain infrastructure projects intended to support the Project is contemplated by the Owner. If such financing or funding is not available by such governmental agencies or instrumentalities, the Developer's model related to the returns to be generated by the Project will be adversely impacted. Any change in policy that could potentially negatively affect any of these awards to the Project could have negative consequences for the construction and/or operation of the Project.

*The Company may enter into subordination agreements and an intercreditor agreement with other lenders holding security interests (including senior security interests) in the Property.*

As of the date of this Memorandum, such agreements have not been prepared, negotiated or signed by the Company, the Developer and such other parties. There is no assurance that the Company will reach satisfactory subordination agreements or intercreditor agreements. Accordingly, there is no assurance that the Company will ever make the intended investment in the Project. The terms of the subordination agreements and intercreditor agreement may be more adverse to the Company than the Company currently anticipates, which could have a material effect on the terms of the Loan, the likelihood of repayment of the Loan to the Company and therefore the ability of the Company to produce a return on the Class B Members' investments.

### Risks Related to the Offering and the Class B Units

**LEGAL COUNSEL TO THE COMPANY AND THE MANAGERS WILL NOT BE ENGAGED TO PROTECT THE INTERESTS OF PROSPECTIVE SUBSCRIBERS OR CLASS B MEMBERS AND SHOULD NEVER BE VIEWED AS REPRESENTING ANY PROSPECTIVE SUBSCRIBER OR CLASS B MEMBER. CLASS B MEMBERS AND PROSPECTIVE SUBSCRIBERS SHOULD CONSULT WITH AND RELY UPON THEIR OWN COUNSEL CONCERNING INVESTMENT IN THE COMPANY, INCLUDING, WITHOUT LIMITATION, TAX AND CURRENCY EXCHANGE CONSEQUENCES TO THEM AND OTHER ISSUES RELATING TO ANY INVESTMENT IN THE COMPANY.**

*The Subscription Amount and other terms of the Class B Units have been arbitrarily determined.*

The Subscription Amount for the Class B Units, the possible return on investment proposed to be paid to the Class B Members and other terms of the Class B Units may not bear any correlation to assets acquired, or to be acquired, or the value of the Project, or any other established criteria or quantifiable indicia for valuing a business. No representation is being made by anyone that the Class B Units have or will have a market value equal to the Subscription Amount or could be resold (if at all) at the Subscription Amount

*An investment in the Company requires a long-term commitment with no certainty of return.*

The Project will not generate income sufficient to repay the Loan for a number of years, if at all. The Company will not provide investors in Class B Units with any return of capital until such time as some or all of the Loan has been repaid. The Company generally will not be able to sell its rights under the Loan. There are no assurances, obligations or guarantees that the Company will ever have positive cash flows, make any cash distributions or realize any return on investments in Class B Units. The Class B Members of the Company should be aware that if the Developer is not successful in its business, their entire investment in the Company may become worthless.

***The availability and timing of cash distributions is uncertain.***

The Company does not expect to make any significant distributions to each Class B Member until after his or her I-829 Petition has been adjudicated or the maturity date of the Loan. These events are expected to occur only after the Summit Village is fully constructed, which may be severely delayed or never occur.

***Completion of Subscription prior to approval of I-526 Petition.***

The completion of the Subscription of Class B Units and the release from escrow of the Subscription Amount and the Administration Fee may take place upon the Subscriber's immigration counsel sending the Subscriber's I-526 Petition to USCIS for filing. The Operating Agreement will provide that upon the denial by USCIS of a Class B Member's I-526 Petition, he or she may liquidate his or her Class B Unit (see "Liquidation of Class B Units" section of this Memorandum). In such situation, despite the Early Release Guaranty, particularly when the I-526 Petition of a large number of Class B Members have been denied by USCIS and depending on the extent to which the Offering proceeds have been disbursed to the Developer under the Loan, the Guarantor, Developer and/or Company may not have sufficient assets to repay such Class B Member's capital contribution.

***There will be no public market or liquidity for the Class B Units and the Class B Units are subject to significant restrictions on transferability.***

There is no public market for the Class B Units and no such market is expected to develop in the future. The offer and sale of the Class B Units is intended to be exempt from registration under the Securities Act and applicable state securities laws. As a result, the Class B Units are considered "restricted securities", and the transferability of the Class B Units offered hereby is severely restricted. Accordingly, an investment in the Class B Units will be highly illiquid. The Class B Units cannot be resold or otherwise transferred unless they are registered under the Securities Act or the securities laws of each applicable

U.S. state and other country or are transferred in a transaction exempt from such registration requirements. Consequently, a holder of the Class B Units may not be able to liquidate his or her investment and each Class B Member's ability to control the timing of the liquidation of his or her investment in the Company will be restricted. Class B Members should be prepared to hold their Class B Units indefinitely.

***There are no firm commitments to purchase Class B Units.***

No commitment has been extended by anyone to purchase all, or any portion, of the Class B Units being offered. The Company can give no assurance that the maximum number of Class B Units will be sold, or that any number of Class B Units will be sold. As a result, there can be no assurance that the Company will raise sufficient funds in the Offering to carry out its business plan as currently proposed, or that the net proceeds from the initial subscriptions for Class B Units will be in an amount sufficient to enable the Company or the Developer to continue operations in any meaningful manner. In the event insufficient subscriptions are received and accepted by the Company, the Developer may not be able to carry out the Project. In that event, the Developer may be forced seek additional funding which, if available, may have superior payment and priority rights to the Company's Loan. If additional funding is not available on reasonable terms or at all, the Developer may be forced to curtail or cease their activities, which would likely result in the loss to subscribers of all or a substantial portion of their investments.

***The Operating Agreement limits transferability of Class B Units.***

Pursuant to the Operating Agreement, the Class B Units are not readily transferable and no transfer of Class B Units may be made unless, among other things, such transfer has been approved by the Class B Manager.

***The Company will hold only a single asset.***

Once the Loan is advanced to the Developer, the Company will hold a single asset being the promissory note from the Developer evidencing its payment obligations under the Loan that will be secured by the Collateral. This lack of asset diversification increases the risk of adverse results, including total loss of the investment.

*Fiduciary duties limitation.*

To the fullest extent permitted by law, to the extent that, at law or in equity, any fiduciary duty owed by the Managers to the Company is eliminated pursuant to Section 18-1101(c) of the Delaware Limited Liability Company Act, it being the express intent of the Managers that no Manager shall owe any fiduciary duties of any nature whatsoever to the Company; provided, however, that, notwithstanding any provision hereof, such Managers shall be subject to the implied contractual covenant of good faith and fair dealing.

*Prevention of money laundering.*

The USA Patriot Act requires that financial institutions establish and maintain compliance programs to guard against money laundering activities. It has been announced that a U.S. Treasury agency is likely to enact regulations which would subject certain pooled investment vehicles to enact anti-money laundering policies, which regulations, if and when enacted, might require the Company, acting through the Class B Manager, to share information with U.S. government authorities with respect to its members. The Company has reserved the right in the Subscription Agreement to obtain information from its members as necessary to comply with the USA Patriot Act, the U.S. Bank Secrecy Act and other similar laws, as well as the regulations that might be promulgated thereunder.

*The Class B Units will not be registered under the Securities Act.*

The Company does not intend to register the Class B Units with the Securities and Exchange Commission. The Company will rely upon an exemption from registration under Section 4(a)(2) of the Securities Act and Regulation S promulgated under the Securities Act. In order for the Company to be entitled to rely on these exemptions from the registration requirements of the Securities Act, the Offering must comply with certain requirements, including the requirement that offers and sales be made exclusively outside the United States to non-U.S. Persons and that no directed selling efforts take place in connection with the Offering. In order to benefit from the safe harbor provided by Rule 903 of Regulation S, offers and sales made prior to a one-year distribution compliance period must not be made to or for the benefit of a U.S. Person and in accordance with the following conditions:

(1)    the purchaser must certify he or she is either a non-U.S. Person and is not acquiring Class B Units for the account of benefit of any U.S. Person or that he or she is a U.S. Person acquiring Class B Units in an exempt transaction;

(2)    the purchaser must agree (a) that any resale will either be in accordance with Regulation S, after registration, or under a registration exemption, and (b) that the purchaser will not engage in any hedging transaction in respect of Class B Units, except in compliance with the Securities Act; and

(3)    the Class B Units will contain an appropriate restrictive legend.

Under the terms of the Operating Agreement, the Company is required to refuse to recognize or register any transfer of Class B Units issued under the exemption provided by Regulation S that is not made in accordance with Regulation S, after registration or under a registration exemption. If the Offering does not comply with all of the applicable requirements for an exemption from the registration requirements of the Securities Act, regardless of whether or not the Company was aware of any such failure to comply, then the Offering will not be entitled to the applicable exemption. In that event, among other things, the Company would have the obligation to either register the Class B Units or terminate the Offering, which would have a material adverse effect on the Company and the Project and could subject the Principals to potential civil or criminal liability.

LENDERS_0003659

***Intermediaries involved in the Offering will not be registered as brokers or dealers under the Exchange Act.***

The Company will utilize finders, agents, and brokers to seek potential subscribers for the Offering. Depending on the locations of and activities conducted by such persons or entities, certain laws may require that they be registered with the U.S. Securities and Exchange Commission, state authorities, or foreign authorities. The Company intends only to utilize registered finders, agents, and brokers, or work with persons and entities it believes (or has been informed) do not need to be registered. If the Company uses finders, agents, or brokers that should be registered but are not, the Company may be liable for the return of investment monies and for other fines and penalties. In addition, the securities exemptions that the Company is relying upon for the Offering may be made unavailable. In either case, a requirement to return subscriptions could cause the investors to lose all or a portion of their investment.

***The Class B Units will not be registered or qualified under the securities laws of any other jurisdiction.***

The Class B Units have not been registered or qualified for public distribution under the securities laws of any jurisdiction. The Class B Units will be offered without registration and without the filing of a prospectus in reliance upon exemptions available under applicable law. Each potential subscriber resident outside the United States must be, and will be required to represent that he or she is entitled to acquire Class B Units in reliance upon an exemption from the registration or prospectus requirements of applicable securities laws of the potential subscriber's jurisdiction of residence. Failure to register or qualify Class B Units in any jurisdiction where registration or qualification is required could have a material adverse effect on the Company and the Project and could subject the Principals to potential civil or criminal liability in that jurisdiction.

***The Company will not be registered as an "investment company," and subscribers in the Class B Units will not receive the protections afforded by the Investment Company Act of 1940.***

The Company is not registered, and intends to avoid becoming required to register, as an investment company under the Investment Company Act of 1940, as amended (the "**1940 Act**"). The 1940 Act imposes significant substantive requirements on the organization and operation of registered investment companies ("registered funds") and on registered fund insiders, such as sponsors, promoters and underwriters. These requirements were designed to protect the registered funds and their shareholders from the interests of fund insiders. *As the Company is not registered (or required to register) under the 1940 Act, these protections will* not *apply to the Company or its investors.*

The 1940 Act generally defines an "investment company" to include an issuer of securities that "holds itself out as being engaged primarily, or purposes to engage primarily, in the business of investing, reinvesting or trading in securities." (Section 3(a)(1)(A) of the 1940 Act).

In addition, under Section 3(a)(1)(C) of the 1940 Act, an "investment company" also includes any issuer which:

> "...is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."

However, Section 3(c) of the 1940 Act provides for the following relevant exceptions:

> "Notwithstanding subsection (a), none of the following persons is an investment company within the meaning of this title:
>
> > (1)      Any issuer whose outstanding securities (other than short-

LENDERS_0003660

term paper) are beneficially owned *by not more than one hundred persons* [emphasis added] and which is not making and does not presently propose to make a public offering of its securities. Such issuer shall be deemed to be an investment company for purposes of the limitations set forth in subparagraphs (A)(i) and (B)(i) of section 12(d)(1) governing the purchase or other acquisition by such issuer of any security issued by any registered investment company and the sale of any security issued by any registered open-end investment company to any such issuer. For purposes of this paragraph:

> (A)    Beneficial ownership by a company shall be deemed to be beneficial ownership by one person, except that, if the company owns 10 per centum or more of the outstanding voting securities of the issuer, and is or, but for the exception provided for in this paragraph or paragraph (7), would be an investment company, the beneficial ownership shall be deemed to be that of the holders of such company's outstanding securities (other than short-term paper).

> (B)   Beneficial ownership by any person who acquires securities or interests in securities of an issuer described in the first sentence of this paragraph shall be deemed to be beneficial ownership by the person from whom such transfer was made, pursuant to such rules and regulations as the Commission shall prescribe as necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this title, where the transfer was caused by legal separation, divorce, death, or other involuntary event.

…

(5) Any person who is not engaged in the business of  issuing redeemable securities, face-amount certificates of the installment type or periodic payment plan certificates, and who is primarily engaged in one or more of the following businesses: (A) Purchasing or otherwise acquiring notes, drafts, acceptances, open accounts receivable, and other obligations representing part or all of the sales price of merchandise, insurance, and services; (B) making loans to manufacturers, wholesalers, and retailers of, and to prospective purchasers of, specified merchandise, insurance, and services; and (C) *purchasing or otherwise acquiring mortgages and other liens on and interests in real estate* [emphasis added]."

Based upon the above, the Company has been advised that the Company falls within an exception to the definition of an "investment company" under the 1940 Act based upon either the 3(c)(1) exception if the maximum offering is 100 persons or less or under the 3(c)(5) exception if the maximum offering exceeds 100 investors; however, there are no assurances that this will ultimately be the case.

Although the Company intends to avoid becoming required to register under the 1940 Act, the Company cannot assure prospective Subscribers that, under certain conditions, changing circumstances or changes in the law, the Company will not become subject to registration under the 1940 Act in the future as a result of a determination that the Company is an "investment company" within the meaning of the 1940 Act and has no exceptions from that definition available to it. For example, there can be no assurance that a defeasance of the Loan by the Developer would not adversely affect the availability to the Company of an exemption from registration that depends, in part, on whether a company is considered to be primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interest in real estate. Becoming registered and otherwise subject to the 1940 Act could have a material adverse effect on the Company. Additionally, the Company could be terminated and liquidated due to registration under the 1940 Act.

***Participants in the Offering will not be registered as "investment advisers" under the Investment Advisers Act of 1940.***

The Class B Manager and the Principals will not be registered as "investment advisers" under the Investment Advisers Act of 1940. Accordingly, Class B Members will not receive the protections afforded by the Investment Advisers Act of 1940. Although these individuals and entities intend to conduct their respective businesses so as not to be deemed an investment adviser, there can be no assurance that one or more of them will not be held to be in violation of the Investment Advisers Act of 1940 and required to either register as investment advisers or terminate the Offering, which would have a material adverse effect on the Company and the Project.

***Foreign governmental action.***

The government of the home countries of the Subscribers (each, a "**Sovereign**") may restrict or suspend entirely participation by its nationals in the EB-5 Program as being in violation of (a) the Sovereign's securities laws, (b) the Sovereign's foreign exchange controls, and/or (c) the current prohibition on such Sovereign's nationals investing overseas in an individual capacity, rather than through enterprises. Moreover, a Sovereign may promulgate new laws or regulations in the future that restrict or prohibit participation in the EB-5 Program. Finally, no Sovereign has declined to approve the Offering; although in the past it has been assumed that a lack of action on particular offerings by a Sovereign is tantamount to its tacit approval, in the future, a Sovereign could restrict or prohibit foreign private placements in general, or the Offering in particular.

***The Operating Agreement has not been negotiated at arm's length.***

KT Summit Manager has generally established the terms of the Operating Agreement, which were not negotiated on an arm's length basis. In addition, legal counsel for the Company and KT Summit Manager have not acted as counsel for or represented the interests of the prospective Subscribers. Prospective Subscribers should consult with their own legal counsel with respect to an investment in the Company.

***Subscriptions are irrevocable except under certain circumstances.***

The execution and delivery of the Subscription Documents by a Subscriber constitutes a binding offer to purchase Membership Interests. Once the Company has received a subscription, the Subscriber may not cancel, terminate or revoke the subscription except under certain circumstances (see "Acceptance and Revocation of Subscription" section of this Memorandum). If the Offering is not closed pursuant to the terms hereof, or if a Subscriber's subscription is rejected, the Class B Manager will cause the Subscription Agreement and all of the subscription monies to be promptly returned to Subscribers without interest and without any offset or deduction, and thereafter the Subscribers and the Company will have no further obligation thereunder. In those specified circumstances where subscriptions are revocable, the Company may not have sufficient assets to repay any Class B Member's capital contribution (see "Risks related to the Project Performance and Management" section of this Memorandum. See also "Completion of Subscription Prior to Approval of I-526 Petition" section of this Memorandum.

LENDERS_0003662

*Subscriptions may be rejected.*

The Company reserves the right to refuse or reject a subscription for Class B Units at its sole discretion for any reason, including concern that the prospective Subscriber may not meet the requirements for Subscribers or the Units are otherwise an unsuitable investment for the prospective Subscriber.

**Risks Related to the Regional Center Designation, the EB-5 Program and the Immigrant Visa Process**

**A PROSPECTIVE SUBSCRIBER SHOULD CONSULT WITH LEGAL COUNSEL FAMILIAR WITH UNITED STATES IMMIGRATION LAWS AND PRACTICE. PURCHASE OF A CLASS B UNIT DOES NOT GUARANTEE LAWFUL PERMANENT RESIDENCE IN THE UNITED STATES. THE CLASS B UNITS DESCRIBED IN THIS MEMORANDUM INVOLVE A SIGNIFICANT DEGREE OF RISK RELATING TO IMMIGRATION MATTERS. AMONG THE IMMIGRATION RISK FACTORS THAT A PROSPECTIVE SUBSCRIBER SHOULD CONSIDER CAREFULLY ARE THE FOLLOWING; HOWEVER, THIS LIST IS NOT EXHAUSTIVE AND DOES NOT PURPORT TO SUMMARIZE ALL RISKS ASSOCIATED WITH THE PURCHASE OF A CLASS B UNIT. SEE "XIII. RISK FACTORS" FOR CERTAIN ADDITIONAL RISKS ASSOCIATED WITH A PURCHASE OF A CLASS B UNIT.**

*General.*

While best efforts have been made to structure this Offering so that Class B Members may meet EB-5 Program immigrant visa requirements under 8 U.S.C. § 1153 (B)(5)(A) - (D); INA Act § 203 (B)(5)(A) - (D) and qualify as "alien entrepreneurs", which is a preliminary step to becoming eligible for the admission to the United States of the Class B Member, his or her spouse and qualifying children as lawful permanent residents, no representations can be made and no guarantees can be given with respect to the ability of this investment to guarantee or otherwise assure that the application will be approved as an "alien entrepreneur" and will be granted conditional or unconditional lawful permanent resident status by USCIS.

Investors who obtain conditional or permanent resident status must intend to make the United States their primary residence.  Permanent residents who continue to live abroad risk revocation of their conditional or permanent resident status by the U.S. government.

The process of obtaining conditional and permanent resident status involves numerous factors and circumstances that are not within the control of the Company.  These include an EB-5 investor's personal background and immigration history, as well as quotas established by the U.S. government limiting the number of immigrant visas available to qualified individuals seeking conditional permanent resident status under the EB-5 Program.

***The Regional Center must meet certain conditions in order to maintain RC Designation of the regional center designation and to maintain the Loan and the Project as a Qualifying Investment under the EB-5 Program.***

The RC Designation requires the Regional Center to monitor the development of the Project, to meet USCIS recordkeeping and reporting requirements and to notify USCIS in the event of certain changes within the regional center or the Project. The Regional Center is not affiliated with the Owner, who accordingly have no ability to ensure that the Regional Center complies with these requirements. In addition, USCIS may reconsider the Regional Center's designation on its own initiative at any time. If for any reason the Regional Center fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the RC Designation, which would have an adverse impact on the Offering and a Class B Member's ability to complete the required

immigration procedures or to maintain his or her visa status.

***If the information upon which the RC Designation was based changes, the Regional Center may be required to obtain an amendment to the RC Designation.***

The Regional Center is required to notify USCIS and to obtain an amendment to the RC Designation if there is a change to the information upon which the RC Designation was based. The Company believes that USCIS will not require an amendment to the RC Designation unless there has been a material change to the information previously provided. However, it is unclear what types of changes USCIS would consider material for this purpose. In the event of a material change to the business plan provided to USCIS for the Project between the time the I-526 Petition is filed and the time the investor receives conditional residency, the investor may be required by USCIS to file a new I-526 Petition incorporating changes in the Project. In some cases, this will necessitate a new two-year period of conditional permanent residence after which the investor will be expected to file a new I-829 Petition to remove conditions. Failure to obtain a needed amendment could have an adverse impact on the Project, the Offering and a Class B Member's ability to complete the required immigration procedures or to maintain his or her visa status.

***In order to benefit from the US$500,000 minimum Subscription Amount, the Property must be located within a designated Targeted Employment Area, and this designation may expire prior to completion of the Offering.***

The minimum investment threshold under the EB–5 Program is US$1.0 million. However, investors may qualify through investments of a reduced threshold amount of US$500,000 in a capital investment opportunity located in a qualifying rural area or in a high unemployment area known as a Targeted Employment Area. Although the state of Utah has determined that the Property is located within a Targeted Employment Area, this designation is valid only for two years. If, at the end of this period, the geographic area in which the Property is located no longer qualifies as a Targeted Employment Area, the state's designation will expire and will not be renewed. In that event, the Company intends to close the Offering and cause the Escrow Agent to return funds to any subscriber who has not yet filed his or her I-526 Petition.

***The Project may not sustain the number of direct or indirect jobs required to enable each subscriber to obtain and maintain lawful permanent residency in the United States.***

There can be no assurance that the Project will create and sustain the number of direct or indirect jobs the Company has estimated over the period of time required under the EB-5 Program. To the extent the Project results in an insufficient number of jobs to enable each subscriber to obtain a favorable adjudication of his or her I-829 Petition, the Company will allocate jobs to subscribers pursuant to the Job Allocation Addendum attached to the Operating Agreement. In that event, Class B Members admitted to the Company last would lose their right to lawful permanent residence in the United States.

***Active participation in the Company's business.***

The EB-5 Program requires that an applicant be actively involved in the business affairs of the company in which the applicant invests. The failure of a Class B Member to be actively involved in the business affairs of the Company may jeopardize the I-526 Petition approval or result in the denial of lawful permanent residence status for the Class B Member, his or her spouse and their qualifying children. The Operating Agreement, reflecting the regulations governing what level of participation is acceptable to meet the EB-5 Program criteria, mandates that each Class B Member shall participate in the management of the Company to the extent reflected therein. The right to approve certain decisions of the Company, as set forth in the Operating Agreement, is expected to be sufficient to meet the requirements of the EB-5 Program, but in the event that such rights are not sufficient, the Class B Manager are expected to cause the Operating Agreement to be amended to conform with such requirements.

LENDERS_0003664

***There is no guarantee that a Class B Member's I-526 Petition will be approved, that a Class B Member or any derivative beneficiary family member will successfully complete the Immigrant Visa Process or that a Class B Member's I-829 Petition will be approved.***

Investors in the Offering who have subscribed for Class B Units with the intention of seeking lawful permanent residence in the United States under the EB-5 Program should be aware of certain risk factors involving the EB-5 Program and its administration. There can be no assurance that USCIS will approve a Class B Member's I-526 Petition, that the Class B Member or any of the Class B Member's derivative beneficiary family members will successfully complete the Immigrant Visa Process or that USCIS will approve the Class B Member's subsequent I-829 Petition to remove the conditions attached to the Class B Member's lawful permanent residence. In addition, because a substantial portion of the Loan proceeds may be used to repay outstanding bridge financing and not to fund Development Costs directly, there can be no assurance that USCIS will take the position that this use of a subscriber's Subscription Amount constitutes a Qualifying Investment under the EB-5 Program.

The INA Act defines a "child" in part as an individual who is under 21 years of age. Once a "child" turns 21 (or marries), he or she is no longer eligible to immigrate as the dependent of his/her parent. Stepchildren of the EB-5 investor must have been under 18 years of age at the time the EB-5 investor and the child's parent were married. An EB-5 investor's child seeking to immigrate with the EB-5 investor must be unmarried and under the age of 21, calculated in accordance with the Child Status Protection Act ("CSPA"). The CSPA, which took effect on August 6, 2002, amended the INA and changed the definition of "child," such that certain dependents retain eligibility as a "child," even though they may have turned 21 years of age. According to the CSPA, a child who was under 21 at the time the petition was filed and received by USCIS (as evidenced by an official USCIS Receipt Notice) may remain eligible to immigrate after reaching age 21 as long as (1) the child seeks to acquire permanent residence within one year of visa availability, and (2) the child remains under 21 after subtracting the USCIS adjudication time from his/her age at the time the visa becomes available. The longer the wait is for visa to become available, the more likely the child may age out even with the protection of CSPA.

To summarize the CSPA for EB-5 investors, the key consideration is whether or not visas are available at the time the I-526 petition is approved. If they are, the child still qualifies as a dependent and there is no "age-out," so long as the child had not yet turned 21 at the time the I-526 petition was received by USCIS and the child seeks to acquire status as a lawful permanent resident within one year of the I-526 petition approval. According to the State Department, the child can satisfy this latter requirement by paying immigrant visa fee, filing Form DS-260 with the State Department, or Form I-485 or I-824 with USCIS. If visas are unavailable at the time of the I-526 petition approval, then the child must wait until visas become available. At the time visas become available, the amount of time the I-526 petition was pending with USCIS may be subtracted from the child's biological age at the time an immigrant visa becomes available, resulting in the "CSPA age", as long as the child seeks to acquire status as a lawful permanent resident within one year of the visa becoming available. If the CSPA age is 21 or more, the child has "aged-out," and may not be eligible to immigrate with the family as a qualifying dependent.

Even if the requisite action is taken within one year, thereby preserving the CSPA benefit for the child, consulates are required to return unused visas to the Department of State headquarters at the end of each month. Therefore, EB-5 investors who do not appear at a scheduled consular interview may forfeit the immigrant visa reserved for them. This may cause delay until new immigrant visas are available for allocation. Lack of diligence may cause delay of unforeseeable length due to the temporary unavailability of visa numbers.

***There are a limited number of EB-5 immigrant visas available under the EB-5 Program, and delays relating to unavailable visas could jeopardize an investor's ability to remove his or her conditions to permanent resident status.***

There are 10,000 EB-5 immigrant visas authorized in each U.S. government fiscal year of October 1 through September 30, and there can be no assurance that one of these visas will be available to an investor or an investor's qualifying family member in any particular fiscal year or at all. An investor whose immigrant visa is delayed may become ineligible to have the conditions of his or her permanent resident status removed if any of the following events occur: (i) USCIS does not articulate a policy regarding the sale or refinancing of projects prior to adjudication of I-829 Petitions, (ii) the Developer sells the Project prior to adjudication of each subscriber's I-829 Petition, (iii) the sale or refinancing proceeds are not distributed to the Class B Members, and (iv) USCIS subsequently determines that each subscriber's investment in the Project has not been sustained for the period of time required under the EB- 5 Program.

***Due to high demand, subscribers who are residents of the People's Republic of China may face additional delays completing the Immigrant Visa Process.***

As of May 1, 2015, the U.S. Department of State announced that, of the 10,000 immigrant visas available under the EB-5 Program, the maximum number available to visa applicants born in the People's Republic of China had been reached for the U.S. government's 2015 fiscal year. During that month, the cut-off date for applicants from China was set at September 1, 2013. For the foreseeable future the maximum number of immigrant visas available to the applicants born in the People's Republic of China is likely to remain insufficient, which will further delay completion of the Immigrant Visa Process for potential investors from the People's Republic of China. In particular, as a result of these delays, a derivative beneficial family member who is currently unmarried and under 21 years of age may become ineligible for conditional permanent residence in the United States if he or she reaches 21 years of age prior to the investor's priority date becoming current.

***If the authority granted to USCIS to operate the regional center portion of the EB-5 Program expires prior to completion of the Offering, investors may be unable to obtain permanent residence in the United States.***

USCIS is currently authorized to receive, process and adjudicate investor petitions in connection with capital investment opportunities such as the Project that are affiliated with regional centers and rely on indirect job creation. This authority will expire on September 30, 2015 unless the United States Congress passes legislation to extend the regional center program that is then subsequently signed into law by the President. There are no assurances that Congress will pass such legislation or, if so, what changes the legislation might make to the EB-5 Program. Similarly, there are no assurances that the President would sign such legislation into law. Unless the regional center program is extended, after September 30, 2015 it is likely USCIS will no longer receive, process or adjudicate regional center proposals, I-526 Petitions, I- 829 Petitions or I-485 Applications affiliated with regional centers relying on indirect job creation analyses.

***Issues with conditional removal.***

Condition removal may be denied by USCIS when the business assumptions utilized in the Economist's report are not realized. An I-526 Petition may be approved based upon an economist's report using a reasonable methodology to predict the number of indirect and induced jobs that will be created based upon a specific dollar investment in a specific project in a specific geographical area in a specific industry in a specific timeframe and other specific foundation facts. Although USCIS should not "second guess" the Economic Study during review of the Class B Member's I-829 Petition, USCIS will want proof that the assumptions relied upon in the report have been shown to be accurate. If they have not been shown to be accurate because of economic conditions, a change of plans, construction delays, or other changed circumstances, the Class B Member is at risk that the condition removal petition will not be approved.

LENDERS_0003666

*At-Risk Investment.*

An EB-5 investor's capital investment must be "at risk" to qualify for the EB-5 Program. As part of the I-526 petition process, an EB-5 investor must show that he or she has placed the required amount of capital at risk for the purpose of generating a return on said investment. The Company believes that an investment in the Company will place an investor's capital investment "at risk" because, among other reasons, the investor must relinquish control over the invested capital; the invested capital is subject to complete loss; there is no assurance that the Company's future financial performance will be sufficient to pay a return on or of an EB-5 investor's investment in the Units at any time; and the EB-5 investors have no redemption rights. The Company's investments will be subject to all of the risks generally incident to the investment of "at risk" capital, as further described in this Memorandum, including, without limitation, the uncertainty of cash flow to meet fixed as well as variable obligations.

*Proving Lawful Source of Funds.*

As part of an individual I-526 petition, an EB-5 investor must present documentary evidence clearly tracing the source of his or her investment funds, and proving the funds were lawfully obtained, under the standard of preponderance of the evidence. USCIS typically requires copies of income tax returns for the previous five years as well as other documentation as it pertains to the source and path of the EB-5 investor's funds. EB-5 investors who do not have such records, may be able to substitute other records to demonstrate that the investment funds came from legal sources; however, there is no guaranty such alternative documentation will be accepted by USCIS as sufficient. USCIS may also require evidence beyond income tax returns and beyond the specific funds invested for EB-5 eligibility. All such matters regarding the EB-5 investor's I-526 petition should be discussed by the EB-5 investor with his or her immigration counsel.

*USCIS discretion.*

The EB-5 Program imposes many requirements that must be met to the satisfaction of USCIS. The failure to meet any of these requirements to the satisfaction of USCIS may result in a denial of the I-526 Petition.

*New Commercial Enterprise.*

The EB-5 Program requires EB-5 investors to make qualified investments in a new commercial enterprise. A "commercial enterprise" includes "any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned."

The Company is a private, for-profit entity organized under the laws of the State of Delaware for the purpose of raising, investing and managing investment capital in a job creating enterprise under the EB-5 Program, as further described in this Memorandum. It is believed that the Company will qualify as a new commercial enterprise but there is no guarantee that USCIS will adjudge it to be such.

*Grounds for exclusion.*

Persons applying for lawful permanent residence must overcome the statutory presumption of inadmissibility. Applicants must demonstrate, affirmatively, that they are admissible to the United States. There are many grounds of inadmissibility that the government may cite as a basis to deny admission for lawful permanent residence. Various statutes, including for example Sections 212, 237 &

241 of the INA Act, the Antiterrorism & Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 (IIRAIRA) set forth grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa, entering the United States or adjusting to lawful permanent residence.

Examples of aliens precluded from entering the United States include:

(a)    persons who are determined to have a communicable disease of public health significance;

(b)    persons who are found to have, or have had, a physical or mental disorder and behavior associated with the disorder which poses or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

(c)    persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(d)    persons who have been convicted of violating any law or regulation relating to a controlled substance or have admitted to having committed or admits committing acts which constitute the essential elements of same;

(e)    persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude;

(f)    persons who are known, or for whom there is reason to believe, are or have been, traffickers in controlled substances;

(g)    persons engaged in prostitution or commercialized vice;

(h)    persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

(i)    persons excludable on grounds related to national security, related grounds, or terrorist activities;

(j)    persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

(k)    persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(l)    persons who are likely to become a public charge at any time after entry;

(m)    persons who were previously deported or excluded and deported from the United States;

(n)    persons who by fraud or willfully misrepresenting a material fact, seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the Immigration Act);

(o)    persons who have at any time assisted or aided any other alien to enter or try to enter

                                                                 LENDERS_0003668

the United States in violation of law;

(p)    certain aliens who have departed the United States to avoid or evade U.S. Military service or training;

(q)    persons who are practicing polygamists; and

(r)    persons who were unlawfully present in the United States for continuous or cumulative periods in excess of 180 days.

### *No Refund after Visa Issuance or Adjustment.*

If an EB-5 investor is granted conditional permanent resident status based on an approved I-526 petition but is later the subject of any adverse immigration decision or process, whether through revocation of approved filings, failure to remove conditions on permanent residence, removal proceedings or any other proceedings, the Class B Manager will use commercially reasonable efforts to return to the Class B Member his or her capital contribution; provided, however that in the Class B Manager's reasonable judgment, the return of such capital contribution will not have a material adverse effect on the Company and/or the Loan. Such commercially reasonable efforts by the Class B Manager may include procuring a replacement Class B Member, whose capital contribution made to the Company will be available for use by the Class B Manager in its sole discretion to refund the funds due to the rejected Class B Member. If the Class B Manager reasonably determines that the return of such capital contribution will have a material adverse effect on the Company or the Loan, the Company or the Class B Manager may (but is not required to) obtain an alternative financing to replace such capital contribution to be returned. In no event will a Class B Member's Administration Fee be returned following approval of such Class B Member's I-526 petition.

### *Use of Immigration Attorney and Processing Time.*

The filing of an I-526 petition by an investor with USCIS should be done through a qualified U.S. immigration attorney. As of the date of this document, USCIS is issuing approvals (or denials) of I-526 petitions within approximately sixteen (16) months' time; however, it is impossible to predict USCIS' processing times. If approved, an I-526 petition will be forwarded to the U.S. State Department's National Visa Center and then to the U.S. Consulate abroad selected by the EB-5 investor for processing or, if the EB-5 investor is lawfully in the United States and otherwise eligible, the EB-5 investor may apply to adjust his or her status to that of conditional permanent resident through the adjustment of status application process with USCIS. After an I-526 petition has been approved, assuming the priority date is current it may take an EB-5 investor an additional six months or longer to obtain a conditional permanent resident visa for entry into the United States or for the EB-5 investor's status to be adjusted to that of a conditional permanent resident. Therefore, EB-5 investors outside the United States applying for a conditional permanent resident visa through a U.S. Consulate abroad should not make arrangements to physically move to the United States until their immigrant visa has been issued.

### *Change in laws.*

U.S. IMMIGRATION LAWS, REGULATIONS, POLICIES AND USCIS INTERPRETATIONS OF THE LAW MAY BE MODIFIED AT ANY TIME BY LEGISLATIVE, JUDICIAL OR ADMINISTRATIVE ACTION. ANY SUCH CHANGES MAY HAVE RETROACTIVE EFFECT WITH RESPECT TO PENDING OR APPROVED PETITIONS, AND MAY MODIFY THE STATEMENTS MADE IN THIS MEMORANDUM. PROPOSED LEGISLATION (SENATE BILL 1501), IF ENACTED, WOULD HAVE A NUMBER OF EFFECTS, INCLUDING BUT NOT LIMITED TO: INCREASING THE MINIMUM REQUIRED INVESTMENT AMOUNT; PROHIBITING GIFTS AS THE SOURCE OF FUNDS UNLESS RECEIVED FROM A SPOUSE, PARENT, CHILD, SIBLING, OR GRANDPARENT; PROHIBITING LOANS AS THE SOURCE OF

LENDERS_0003669

INVESTMENT FUNDS UNLESS OBTAINED FROM A REPUTABLE BANKING OR LENDING INSTITUTION THAT IS PROPERLY CHARTERED OR LICENSED; AND SIGNIFICANTLY RESTRICTING THE AMOUNT OF INDIRECT JOB CREATION FOR WHICH EB-5 INVESTORS MAY TAKE CREDIT.

**Risks Related to Project Performance and Management**

***The Company is a newly formed legal entity, which makes it difficult to evaluate their business and prospects.***

The Company is a newly formed entity with no history of operations. As a consequence of being newly formed, the Company has no revenues or financial results upon which a potential investor can assess the financial feasibility of an investment in Class B Units or the Project. The Company's activities to date have been limited to the Offering. The interest payments under the Loan along with the repayment of principal under the Loan will be its sole source of revenue.

***The Company's only business activity will be to extend the Loan to fund a portion of the costs of the Project.***

The Company expects to participate in one business activity, the Loan to fund a portion of the Development Costs. As a consequence, the aggregate return of the Company will be entirely dependent on the performance of the Project.

***The success of the Project is dependent on key personnel.***

The success of the Project and therefore the repayment of each subscriber's investment in the Company depend in substantial part upon the skill and expertise of the key personnel of the Owner and the other individuals employed to assist them. There can be no assurance that these key personnel or such other individuals will continue to be associated with the Project. The loss of the services of one or more of these key personnel or such other individuals could have a material adverse effect on the Project.

***The Owner includes related entities under the ultimate control of the Principals, and the Principals may engage in similar or competing business activities.***

The Owner is under the ultimate control of the Principals, who are not required to devote their full time to the Project and are free to engage in other business activities, including activities that compete with or are opposed to the best interests of the business of the Developer. Any fees, compensation or other amounts payable to the Principals and their affiliates from such business activities will inure solely to the benefit of such persons. In addition, the Principals have limited real estate development and resort management experience, and their lack of experience may adversely affect the viability of the Project and the larger Summit Powder Mountain Resort. The other activities of the Principals and the Owner create various conflicts of interest that may lead the Developer to make decisions for the benefit of another of the Development Group rather than for the benefit of the Developer, and ultimately the Company. For example, the development of Summit Village benefits the entire Project and other aspects of the full development of Powder Mountain, and the Developer may do less to protect itself from foreclosure by the Company given the benefits derived to the Owner's other interests. Any such foreclosure by the Company on collateral worth less than the Loan amount will result in losses to the Class B Members.

***The Owner has yet to decide whether to retain a third party professional management firm to operate the Summit Village hotel condominiums. The Developer may change the business model for the hotel condominiums.***

The centerpiece of Summit Village is expected to be the Hotel Component. The success of this complex, together with an associated rental pool program by which purchasers of residential units will make their

units available for rental to resort visitors, will depend in part on retaining experienced management for the complex. As of the date of this Memorandum, the Owner has not decided whether to operate the complex using its own resources or to retain a third party professional management firm to operate the complex. Failure to hire experienced and capable managers or to retain an experienced third party hotel operator could have an adverse impact on the Project.

Depending on market conditions, the Developer may determine to develop or convert some of the residential salable units to traditional rental units that would remain owned by the Developer and operated by the Developer or a third party professional management firm under a hotel model. The projections provided above under "Projected Cash Flow" do not reflect this potential usage case for the Hotel Component and there is no assurance that such a change in business model would not adversely affect the ability of the Developer to pay interest and principal due on the Loan.

***The Company and the Developer will operate in an uncertain and highly competitive marketplace.***

The Company will compete with a significant number of similar investment opportunities under the EB-5 Program, and the Developer will compete with a significant number of high-quality development projects for funding and prospective business. As a result, there can be no assurance that the Company will attract the desired number of subscribers or that it will acquire sufficient funds to make the anticipated Loan. In addition, there can be no assurance that the Developer will be able to attract the additional funding required to successfully construct the Project or, if it does, that the Project will be commercially successful.

***The success of the Summit Powder Mountain Resort destination resort depends on favorable weather conditions that are beyond the control of the Company or the Owner.***

The Owner's ability to attract existing and prospective residents and visitors to Summit Powder Mountain Resort is influenced by weather conditions, including the amount of snowfall during the ski season. Powder Mountain does not possess the equipment required to generate artificial snow. Prolonged periods of adverse weather conditions, or the occurrence of such conditions during peak visitation periods, could have a material adverse effect on Owner's operating results, as well as on price levels and sales velocity. In addition, due to severe weather conditions and cold temperatures, there is a very limited window each year (potentially as short as four months) for residential construction and most infrastructure projects, which tends to increase the time and costs for these activities and the risks that markets may have changed by the time the product or project is completed.

***The Company's Loan to the Developer will be subject to the risks generally incident to the operation of hotel, conference and activity facilities and associated common areas (including parking areas) (the "Project Activities").***

The risks associated with the operation of the Project Activities, include, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; new hotel openings resulting in an over-supply; relative appeal of particular types of facilities to patrons, customers and vendors; reduction in the cost of operating competing businesses; decreases in employment, reducing the demand for hospitality in the area; the possible need for unanticipated renovations; adverse changes in interest rates, cap rates and availability of funds; changes in operating expenses; changes in governmental rules and fiscal policies; acts of God, including earthquakes, which may cause uninsured losses; the financial condition of patrons and customers of the Project; environmental risks; loss to or condemnation of the Property; and other factors which are beyond the control of the Developer or the Company. Because hotel rooms are rented for relatively short periods of time compared to most commercial properties, hotels are impacted much more quickly by adverse economic conditions and competition than other commercial properties that are rented for longer periods of time. Decreases in actual Project income from anticipated amounts, or increases in operating expenses, among other factors, could result in the Developer's inability to meet all its cash obligations.

LENDERS_0003671

Any decrease in Project income received by the Developer may reduce, and possibly eliminate, the amount of cash available to pay the Loan, since operating expenses, such as taxes, utility costs, maintenance, and insurance are unlikely to decrease significantly, and other expenses such as food, labor, advertising, and promotion may increase. If the income from operation of the Project is not sufficient to meet operating expenses, the Developer may have to dispose of the Project on disadvantageous terms in order to raise needed funds, which could leave little or no proceeds available to repay the Loan. Additional risks associated with hospitality and recreational development and ownership include the following: (a) a decrease in travel, both for business and pleasure, resulting from a variety of factors, including without limitation general economic conditions, travel patterns, the regional economy and reduced consumer spending; (b) competition within the hospitality and recreation industry itself for guests and patrons, which competition is intense and highly competitive, with some competitors possessing substantially greater marketing and financial resources that are used to increase marketing as well as to improve their facilities or reduce price; (c) the risk of seasonality of the Project's attraction to guests and visitors to the property; and (d) regulatory issues unique to the hospitality and recreation industry, including environmental compliance, and which would be outside the control of either the Developer and the Company.

*When completed, the Project is expected to produce a separate revenue stream from the proposed sale of condominium units to persons who may then be entitled to enjoy exclusive use of portions of the completed Project.*

The sale of condominium units presents a unique set of risk, including the following:

- no assurances can be made that the Owner will be able to sell the number of condominium units forecast in the business plan for the Project or that any condominium that are sold can be sold for the amount(s) forecast in the business plan for the Project;
- no assurances can be made that for any condominium units that are sold, the condominium owners will remain owners of their units for any extended period of time or that they will continue to pay the annual condominium dues or assessments forecast in the business plan for the Project;
- the number of condominium units sold, the initial price of each units, and the annual dues, assessments and fees charged, can all be reduced over time, resulting from a variety of factors, including without limitation general economic conditions, travel patterns, the regional economy and reduced consumer spending;
- competition for condominium units in the Project is unpredictable;
- other competitors in the condominium business that are proximate to the Project could begin to adopt business plans or models for their existing or new properties that create a competitive set that could become intense and highly competitive, and in such case some competitors would possess substantially greater marketing and financial resources that will be available to the Project; and
- the successful implementation of the condominium revenue model will be dependent upon the perceived value of the Project's name, brand and image, which in turn will be dependent upon the abilities of the Owner to develop a highly coveted and desirable exclusivity for those persons desiring to become condominium owners and use the Project.

If, for any of the above reasons or others, the sale of condominium units or the payment of assessments and dues associated with such units, or the price of the units is reduced below the amounts forecast in the business plan for the Project, the business and operations of the Project would be adversely affected and the ability of the Developer to repay the Loan may be impaired.

*The legal documents for the Loan may contain limited covenants regarding the Developer's activities.*

The Loan Documents are expected to provide only certain limited restrictions on the activities of the Developer, and, therefore, the Company may have only limited control over the activities of the Developer and over the Project, including payments that could be made by the Developer to its affiliates and other parties (e.g., payments to the Developer's affiliates for services rendered and distributions to the Developer's affiliates), which could reduce the amount of financial assets retained by the Developer or applied to the Project or the Loan and could affect the financial ability of the Developer to repay the Loan.

***The Company's creditors will have recourse only to Company assets.***

The Company's assets, including any investments made by the Company and any capital held by the Company, are available to satisfy all liabilities and other obligations of the Company. If the Company itself becomes subject to a liability, parties seeking to have the liability satisfied may have recourse to the Company's assets generally and not be limited to any particular asset, such as the asset giving rise to the liability.

***Uninsured losses may adversely affect the Company.***

Certain risks in connection with the Project are either uninsurable or not fully insurable at commercially reasonable rates. The occurrence of one or more of these risks could have a detrimental effect on the Company. Examples of uninsurable or partially uninsurable losses are those arising from hurricane, flood, earthquake, environmental disaster, war and act of nature, among others. Should such an uninsurable loss occur, the Company could suffer a loss of some or all of its capital.

***The Class B Members may lose their investment in the event of the bankruptcy of the Developer.***

The Developer may become the subject of voluntary or involuntary bankruptcy proceedings under applicable bankruptcy laws. Certain risks faced in bankruptcy cases that must be factored into the investment decision include, for example, the potential total loss of the Company's Loan and, consequently, the potential total loss of the Class B Members' investment in the Company. Upon confirmation of a plan of reorganization under applicable bankruptcy laws, or as a result of a liquidation proceeding, the Company could suffer a loss of all or a part of the value of the Loan. A bankruptcy filing may adversely and permanently affect the Project. The bankrupt entity could lose market position and key employees, and the liquidation value of the bankrupt entity may not equal the liquidation value that was believed to exist prior to the making of the initial investment.

***The assets of the Developer are expected to be limited to the Collateral and the Company must therefore rely solely on the value of the Collateral, which may be insufficient.***

The Developer is not expected to have assets other than the Collateral.  The Company will therefore have to rely solely on the value of the Collateral, or other permitted substitute collateral, or such portion thereof, or other security interest for any other permitted collateral if not real property (i.e., collateral) from time to time, and on the limited guaranties to be given by the Guarantor. The risk of lending against real estate assets increases as the ratio of the amount of the loan to the fair market value of the collateral securing the loan increases. There can be no assurance, in the event of a default under the Loan that the Company will be able to realize an amount equal to the estimated or appraised value of the Property or the Collateral on which the Loan was made or from the enforcement of the guaranties given to the Company. If the value of the Collateral, or other permitted substitute collateral, is insufficient to cover the repayment of the outstanding balance of the Loan, it will result in a loss of all or a portion of the investment of the Class B Members.

***Remedies for non-performing loans do not assure repayment as expected and the foreclosure process may be timely and expensive.***

LENDERS_0003673

The Loan may become "non-performing" (i.e., the Developer is not complying with its obligations) for a variety of reasons. If the Loan were to become non-performing, substantial workout negotiations or restructuring may be required, which may result in, among other things, a reduction in the interest rate and/or a write-down of the principal of the Loan. However, even if a restructuring were done, a risk exists that, upon maturity of the Loan, replacement "takeout" financing will not be available. It is also possible that the Company may, in certain circumstances, need to foreclose on the Collateral securing the Loan. While the collateral secures the Loan, the foreclosure process itself can be lengthy and expensive. Borrowers often resist foreclosure actions by asserting numerous claims, counterclaims and defenses against the lender including lender liability claims and defenses, even when such assertions may have no basis in fact, in an effort to prolong the foreclosure action. In some states, foreclosure actions can take several years or more to conclude. At any time during the foreclosure proceedings, the Developer may file for bankruptcy, staying the foreclosure action and further delaying the foreclosure process. Foreclosure litigation tends to create a negative public image of the collateral property and may result in disrupting ongoing leasing and management of the property. These risks mean that the security and other protections against Loan non-performance of the Loan may not work as well as is intended.

**Legal, Tax and Regulatory Risks**

**PROSPECTIVE SUBSCRIBERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES (INCLUDING U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES AND NON-U.S. TAX CONSEQUENCES) OF AN INVESTMENT IN THE COMPANY. CLASS B UNITS IN THE COMPANY ARE ONLY BEING SOLD TO ACCREDITED INVESTORS (UNLESS OTHERWISE DETERMINED BY THE CLASS B MANAGER IN THEIR SOLE AND ABSOLUTE DISCRETION) WHO HAVE REPRESENTED THAT THEY ARE RELYING SOLELY UPON THE ADVICE OF THEIR OWN ADVISORS WITH RESPECT TO LEGAL, IMMIGRATION, TAX, BUSINESS, FINANCIAL AND OTHER ASPECTS OF AN INVESTMENT IN THE COMPANY.**

**There are various U.S. federal income tax risks associated with an investment in the Class B Units. Some, but not all, of the various risks associated with the U.S. federal income tax aspects of the Offering of which prospective Subscribers should be aware are set forth below. The effect of certain tax consequences on a Class B Member will depend, in part, on other items in the Class B Member's tax return. No attempt is made herein to discuss or evaluate the U.S. state or local or foreign tax effects on any Class B Member. Each Class B Member is urged to consult the Class B Member's own tax advisor concerning the effects of U.S. federal, state or local or foreign tax laws on an investment in the Class B Units and on the Class B Member's individual tax situation. Neither any Manager, any affiliates of a Manager or counsel for the Company has provided or is providing any tax (or other legal) advice to any holder of units or prospective Subscriber. This summary does not discuss the impact of various proposals to amend the Internal Revenue Code of 1986, as amended (the "Code"), which could change certain of the tax consequences of an investment in the Company.**

***The Company's tax status for federal income tax purposes could change.***

The Company has been organized as a limited liability company under the laws of the State of Delaware. The Company will not apply for a ruling from the Internal Revenue Service (the "**IRS**") to be treated as a partnership for U.S. federal income tax purposes, but the Company intends to file its tax returns as a partnership for U.S. federal and state income tax purposes. Class B Members should recognize that many of the advantages and economic benefits of an investment in the Class B Units depend upon the classification of the Company as a partnership (rather than as an association taxable as a corporation) for
U.S. federal and state income tax purposes. A change in this classification would require the Company to pay a corporate level tax on its income which would reduce cash available to fund distributions to

Class B Members, prevent the flow-through of tax benefits, if any, for use on the Class B Members' personal tax returns, and require that distributions generally be treated as dividends to the extent of the Company's current and accumulated earnings and profits (as determined for U.S. federal income tax purposes), which together could materially reduce the yield from an investment in the Company. This Memorandum assumes that the Company will at all times be treated as a partnership for federal tax purposes. The continued treatment of the Company as a partnership is dependent on present law and regulations, which are subject to change, and there can be no assurance that the IRS will not successfully challenge the classification of the Company as a partnership.

### Class B Member may become a United States person for federal income tax purposes.

If USCIS accepts a Class B Member's I-526 Petition and admits the Class B Member to the United States as a conditional lawful permanent resident, it is anticipated that such Class B Member will automatically become a U.S. Person (as defined in "XV. CERTAIN INCOME TAX CONSIDERATIONS") and not be subject to the tax treatment afforded non-U.S. Persons unless such Class B Member's tax status changes in the future. The U.S. generally imposes income and estate tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions may eliminate some but not all of the risk of double taxation. Each state in the U.S. has its own separate income tax system. Class B Members should consider the tax effects of becoming a U.S. resident before investing. Prior to making an investment in the Company, a Class B Member should consult with his or her tax advisors with regard to the consequences of becoming a conditional lawful permanent resident of the U.S.

### Class B Members may have taxable income without distributions.

Income, gains, losses, deductions and credits from the Company will be allocated among the Class B Members for U.S. federal income tax purposes in accordance with the Operating Agreement, and Class B Members will be required to report such income, gains, losses, deductions and credits on their own income tax returns whether or not they receive distributions of cash from the Company. It is possible that in a given year a Class B Member will be allocated income or gain that will be subject to tax in an amount in excess of the amount of cash (if any) distributed by the Company to the Class B Member, thus requiring the Class B Member to use funds from other sources to pay any tax liability arising from such allocation. If the Company incurs losses, Class B Members will not be able to deduct such losses if they exceed such Class B Members' tax basis in their Class B Units. In addition, the Internal Revenue Code imposes various limitations on the ability of certain persons to use losses and deductions arising from investments in entities such as the Company, including limitations relating to "passive losses," amounts "at risk" and "investment interest."

### Changes in federal and state income tax laws and policies may adversely affect Class B Members.

There can be no assurance that U.S. federal and state income tax laws and Internal Revenue Service ("IRS") administrative policies respecting the income tax consequences described in this Memorandum will not be changed in a manner which adversely affects the interests of Class B Members.

### Certain risks are associated with forward-looking statements.

This Memorandum or the other materials furnished to potential subscribers by the Company relating to the Project or an investment in the Class B Units (the "**Materials**") may contain certain forward-looking statements regarding the plans and objectives of the Company, including plans and objectives relating to the Project. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. Assumptions relating to the statements involve judgments with respect to, among other things, future political, economic, competitive and market conditions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company or the Managers, or any of their respective affiliates. The assumptions underlying the forward-looking statements may in retrospect turn out to have been unreasonable and inaccurate. Therefore, there

can be no assurance that any forward-looking statements included in the Materials will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements included in the Materials, the inclusion of such information should not be regarded as a representation by the Company or any other person or entity that the objectives and plans of the Company will be achieved.

***Changes in applicable law may occur during the course of an investment in the Company.***

The Company must comply with various legal requirements, including requirements imposed by United States and foreign immigration laws, anti-money laundering laws, securities laws, commodities laws, tax laws and pension laws. Should any of those laws change over the life of the Company, the legal requirements to which the Company and the Class B Members may be subject could differ materially from current requirements.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Company. Potential subscribers should read the entire Memorandum and consult their own counsel and advisers before deciding to invest in the Company.**

## XIV.   CONFLICTS OF INTEREST

As a result of overlapping, or in some cases divergent, financial interests, transactions between the Company and (a) any Manager, (b) the Developer, to which the Company (under the control of any Manager) shall extend the Loan or (c) any affiliates or associated persons of the Manager or the Developer, may be entered into without the benefit of "arm's length" negotiations,  and  may involve actual or potential conflicts of interest, including, without limitation, the overlapping or divergent interests of one or more parties in connection with the Loan. In connection with such potential conflicts of interests, the Class B Members should note that the fiduciary duties, if any, of the Managers that may otherwise have been expected to apply under Delaware law have been modified by the Operating Agreement and, in general, will not apply unless the Manager(s) actions involved gross negligence or intentional misconduct. The following constitutes a summary of the important areas in which the interests of the Managers or their members, managers, or officers may conflict with those of the Company, as well as certain conflicts of interest between the Class B Members and the Regional Center.

***Lack of Independent Representation.***

The Class B Members have not been represented by independent counsel. The attorneys that provide services relating to the Company perform their services on behalf of the Company and at the direction of the Class B Manager after its appointment as described herein.

***Control of the Company.***

Subject to very limited rights of the Class B Members, the Class B Manager will be responsible for managing the operations of the Company, including administering the Loan pursuant to the Loan Agreement. The Class B Manager's management of the Company's affairs may otherwise be affected as described further in the Operating Agreement.

***Company Opportunities.***

The Managers and their members, managers, and officers have previously had presented to it and/or to them opportunities to serve in similar capacities, and have served or do serve in similar capacities, for other investment funds or vehicles, including ones that may be in competition with the Company, for the pursuit of other investment or funding opportunities, both under the EB-5 Program, and otherwise. Additionally, by reason of the Managers' management of the Company, including in particular the successful administration of the Loan pursuant to the Loan Agreement, the Managers and their respective members, managers, and officers may have presented to it or to them in the future

LENDERS_0003676

opportunities to serve in similar capacities for other investment funds or vehicles, and to participate in other similar projects, both under the EB-5 Program, and otherwise, which might not otherwise have been made available to it  or to them. Each Class B Member should recognize that the Managers (or another legal entity formed by the Managers and/or their members directly) intend to investigate such opportunities and may, in consequence, undertake to manage, participate in, develop, own, or acquire other future business opportunities, as well as continue those same activities with regard to existing businesses, all whether or not similar to the Project, and conceivably competitive therewith, for their own account, or for the  account of others. Any businesses so managed, developed, owned, or acquired by or participated in by  the Managers or their affiliates (or continuing to be managed, developed, owned, or acquired by or participated in by any of them) will not constitute any part of the assets, properties, or rights of the Company, and neither the Managers, nor their members, managers, or officers, will have any obligation to offer such opportunities to the Company or its Class B Members. Such persons also do not have any duty to account to the Company for profits derived from activities other than Company activities, and are  under no duty (other than, to the extent applicable, any fiduciary duties of the Managers and officers of the Company to the extent not modified or eliminated under the Operating Agreement), to engage in such activities in a manner that does not affect the Company's investments. In addition, the Managers are required to devote to the Company's affairs only as much time as the Managers deem necessary. As such, it is possible that the Managers may have potential conflicts of interests with the Company. In particular, Celona, which will serve as Class B Manager, also serves other clients and customers that are, and may in the future be, engaged in a project, business or other activity that competes with or is similar to the business of the Company. Celona's clients include various companies that engage in businesses and activities that are similar to those of the Company.

### Diverse Membership.

The Class B Members of the Company may include persons in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the Company that may be more beneficial for the Company than for the Class B Members.  In making decisions appropriate for the Company the Managers will consider the business objectives of the Company as a whole, not the objectives of any Class B Member individually.

The Class B Members recognize that the Company was formed in connection with enabling the Class B Members to apply for visas under the EB-5 program. The Class B Members also recognize that the primary objective of the Company in furtherance of those EB-5 objectives is to make, manage and protect the Company's (and in turn the Class B Members') investment in the Loan. Initially, the Class B Members' immigration-related interests on the one hand (i.e., visa application and prospects) and their financial interests on the other hand (i.e., repayment of the Loan) are separate and do not present any immediate tension or conflict. However, the potential for conflict exists to the extent going forward the Class B Manager may face decisions where, for example, something that could benefit the Company's interests under the Loan may not similarly advance (or may even be detrimental to) the ability of the Class B Members to meet their visa conditions and requirements. The Class B Members acknowledge that the Class B Manager may take actions that will not equally benefit the immigration and economic interests of the Class B Members and that in some cases a decision in favor of one could come at a cost to the others.

### Owner Conflicts of Interest.

Investors should be aware that the Owner is currently involved in other real estate projects both within the Powder Mountain area and outside such area, and plan to initiate further projects.  These other activities  of the Owner may detract from the financial and management resources that can be devoted to the activities of the Developer, which could in turn jeopardize the Developer's ability to repay the Loan. These other activities of the Owner may be directly competitive with the operations of Summit Village and any substitute collateral for the Loan and could impair the value of such collateral, which could in

turn jeopardize the Developer's ability to repay the Loan.

The Owner, the Developer and the Principals are all affiliates of each other. These affiliates create various conflicts of interest that may lead one or more of these persons or entities to make decisions for the benefit of one of these other entities rather than for the benefit of the Developer. For example, the development of Summit Village benefits the entire Project and other aspects of the full development of Powder Mountain, and the Developer may do less to protect itself from foreclosure by the Company given the benefits derived from the Owner's other interests. Any such foreclosure by the Company on collateral worth less than the Loan amount will result in losses to the Class B Members.

The Developer is incentivized to repay the Loan by the threat of foreclosure of the Collateral if the Developer does not perform under the Loan. The manner in which the Developer is providing the significant majority of the equity for Summit Village construction limits the financial exposure to Developer associated with a foreclosure and may have the effect of reducing the financial impact to the the Owner should the Loan not be repaid.

## XV.  CERTAIN INCOME TAX CONSIDERATIONS

An investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his or her investment in the Class B Units, and no tax advice will be provided hereunder or at any time in the future. The following is intended to be only a general discussion of certain aspects of the U.S. federal income taxation of the Company and Class B Members that should be considered by a prospective Subscriber. **PROSPECTIVE SUBSCRIBERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES (INCLUDING U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES AND NON-U.S. TAX CONSEQUENCES) OF AN INVESTMENT IN THE COMPANY.**

This discussion does not address all potential U.S. federal income tax consequences of an investment in the Company and does not discuss all of the tax consequences that may be relevant to a particular Subscriber or to certain Subscribers subject to special treatment under the federal income tax laws, including financial institutions, insurance companies, tax-exempt investors or, unless otherwise specifically addressed, Class B Members that are not U.S. persons for U.S. federal income tax purposes. Moreover, this summary does not address any U.S. federal tax consequences (such as the U.S. federal estate and gift tax or alternative minimum tax consequences), other than certain U.S. federal income tax consequences, or any state, local or non-U.S. tax consequences, of the acquisition, ownership, disposition or withdrawal of an investment in the Company.

If a partnership or other flow-through entity invests in the Company, the U.S. federal income  tax treatment of a partner in the partnership or an owner of an equity interest in the flow-through entity generally will depend on the status of the partner or the owner and the activities of the partnership or flow-through entity.  If a prospective subscriber is treated as a partner (or other owner) in a partnership (or other flow-through entity) for U.S. federal income tax purposes, such subscriber should consult with his or her tax advisor.

This summary is based upon provisions of the Code, applicable regulations, administrative rulings and judicial decisions in effect as of the date of this Memorandum, any of which may subsequently be changed, possibly retroactively, or interpreted differently by the IRS or the courts so as to result in U.S. federal income tax consequences different from those discussed below. No ruling will be requested from the IRS or any other taxing authority with respect to any of the tax consequences related to the Company's activities or a Class B Member's ownership of a Class B Unit.  The IRS or a court might reach a contrary conclusion with respect to the issues addressed herein if the matter were contested. EACH PROSPECTIVE SUBSCRIBER IS URGED TO CONSULT WITH HIS OR HER OWN TAX

ADVISOR AND/OR COUNSEL WITH RESPECT TO ALL TAX ASPECTS OF THE ACQUISITION AND OWNERSHIP OF A CLASS B UNIT.

### U.S. Tax Status

The Company is expected to be treated for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation under currently applicable tax laws, and the following discussion assumes that such treatment will be respected. This treatment, however, is not binding on the IRS or the courts, and no ruling has been, or will be, requested from the IRS. No assurance can be given that the IRS will concur with such treatment or the tax consequences set forth below.

If the Company were for any reason classified as an association taxable as a corporation, the Company would be required to pay U.S. federal income tax at the corporate tax rate on its taxable income. In such case, the amount of cash available for distribution to the Class B Members would be less than if the Company were classified as a partnership. Moreover, any distributions by the Company to a Class B Member generally would be taxable to that member as a dividend to the extent of current and accumulated earnings and profits (as determined for U.S. federal income tax purposes) and profits or losses realized by the Company would not flow through to the Class B Members.

An entity that is otherwise classified as a partnership for U.S. federal income tax purposes may be treated as a corporation if it is a publicly traded partnership (a "**PTP**"). A PTP is a partnership the interests in which are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof. Treasury Regulations issued under Code Section 7704 provide safe harbors under which the interests in a partnership will not be considered readily tradable on a secondary market (or its substantial equivalent). In addition, Code Section 7704(c) contains an exception pursuant to which a PTP will not be treated as a corporation for federal tax purposes if at least 90% of its gross income is from permitted passive sources and it is not required to register as an investment company under the Investment Company Act of 1940. Permitted passive sources include interest income (other than interest derived in the conduct of a financial or insurance business or dependent on the income or profits of the borrower) and dividend income, and gains from the sale of stocks and securities. The Company expects to qualify for one or more exemptions from treatment as a corporation under the PTP rules.

### Treatment of the Loan

The Company and the Developer intend to treat the Loan made by the Company to the Developer as indebtedness for U.S. federal income tax purposes. However, no assurances can be given that the IRS will not treat the Loan as an equity investment in the Developer or otherwise recharacterize the transaction in a manner that alters the expected tax consequences. Class B Members are urged to consult their own tax advisors regarding the consequences of the Loan being characterized as equity in the Developer for U.S. federal income tax purposes or whether other characterizations of the transaction may be applicable. The remainder of this discussion assumes that the Loan is properly treated as debt for U.S. federal income tax purposes.

This discussion does not address any tax consequences in the event the Developer defaults on the Loan and the Company forecloses on its interest in the Loan. Class B Members are urged to consult their own tax advisors regarding the tax consequences of the Company foreclosing on its interest in the Loan.

### Taxable Year

The Company's taxable year will be the calendar year or such other year as required by the Code. Tax

information will be distributed to each Class B Member as soon as reasonably practicable after the end of the year.

### Certain Considerations for U.S. Class B Members

The following discussion summarizes certain significant U.S. federal income tax consequences to a Class B Member who directly owns an interest as a Class B Member; and is a citizen or resident individual (or other entity taxable as a corporation) created or organized in or under the laws of the United States or any political subdivisions thereof, an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or a trust (i) for which a court in the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions, as such terms are defined for U.S. federal income tax purposes, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person (any such individual, corporation, estate or trust, is a "**U.S. Person**" or "**U.S. Class B Member**"). A "Non-U.S. Class B Member" is any Class B Member that is an individual, corporation, estate or trust and is not a U.S. Class B Member.

### Taxation of Company Income, Gain, Loss, Deductions and Credits

The Company will not pay U.S. federal income taxes, but each Class B Member will be required to report his or her allocable share (whether or not distributed) of the income, gains, losses, deductions and credits of the Company. It is possible that the Class B Members could incur income tax liabilities without receiving from the Company sufficient cash distributions to pay such tax liabilities. Each Class B Member is required to take into account in computing his or her federal income tax liability, and to report separately on his or her own federal income tax return, his or her distributive share of the Company's income, gain, loss, deduction and credit for any taxable year of the Company ending within or with the taxable year of such Class B Member.

Pursuant to the Operating Agreement, items of the Company's taxable income, gain, loss, deduction and credit are allocated so as to take into account the varying interests of the Class B Members. There can be no assurance that the allocations of income, deduction, loss and gain for tax purposes made pursuant to the Operating Agreement will be respected by the IRS. It is possible that the IRS could challenge the Company's allocations as not being in compliance with Code Section 704(b) and the Treasury Regulations thereunder. Any resulting reallocation of tax items may have adverse tax and financial consequences to a Class B Member.

### Distributions

Distributions (other than liquidating distributions, which are discussed in the following paragraph) of cash and certain "marketable securities" (as that term is defined in the Code) to a U.S. Class B Member from the Company (including its share in any reduction in the Company's liabilities) will reduce the tax basis of such Member's Class B Units (but not below zero). If the tax basis of a U.S. Class B Member's Class B Units is reduced to zero, its share of any subsequent distributions of cash and the fair market value of certain marketable securities for any year (including its share in any reduction in the Company's liabilities in excess of its share of the Company's taxable income) generally will be taxable to such Member as though it were gain recognized on the sale or exchange of Class B Units.

Subject to certain exceptions under the Code, no gain will be recognized by a U.S. Class B Member with respect to distributions made to it in liquidation of its Class B Units unless the amount of cash and the fair market value of certain marketable securities distributed exceeds such Member's adjusted tax basis in its units immediately before the distribution. No loss may be recognized by a U.S. Class B Member

CONFIDENTIAL INFORMATION

with respect to liquidating distributions unless the property distributed consists solely of cash and certain marketable securities and then only to the extent that the amount of such distributed items is less than such member's adjusted tax basis in its units. The tax basis of any property received by a U.S. Class B Member in liquidation of its Class B Units generally will be equal to the adjusted tax basis of its interest, less the amount of any cash and certain marketable securities received in the liquidating distribution.

### Interest and OID

The Company will recognize interest income from the Loan that will be includible in the taxable income of U.S. Class B Members in each year that the Company owns the Loan.

Whether the Loan is issued with Original Issue Discount (as defined below) largely depends on the treatment and amount of certain fees paid to the Company. The Company and the Developer expect to treat the Loan as issued without any Original Issue Discount. If the Loan is issued with Original Issue Discount, each U.S. Class B Member will be required to include in his or her income the portion of the Original Issue Discount that accrues during any tax year as ordinary interest income, regardless of whether or not any cash is received by the U.S. Class B Member from the Company. "**Original Issue Discount**" is the excess of the Loan's stated redemption price at maturity (in general, the stated principal amount of the Loan and any other payments made under the Loan that do not constitute "qualified stated interest" (as defined in the Code) over the issue price (in general, the amount invested) of the Loan where that excess is equal to or more than a de minimus amount. A de minimus amount for this purpose is equal to one quarter percent (0.25%) of the Loan's stated redemption price at maturity multiplied by the number of complete years from the issue date of the Loan to the expected maturity date of the Loan.

### Investment Interest and Passive Activity Limitations

There are limits on the deduction of investment interest (i.e., interest on indebtedness properly allocable to property held for investment) of individuals, trusts and estates. In general, investment interest will be deductible only to the extent of the taxpayer's net investment income. For this purpose, net investment income will generally include net income from the Company and other income from property held for investment (other than income treated as passive business income). However, long-term capital gain is excluded from the definition of net investment income unless the taxpayer makes a special election to treat such gain as ordinary income rather than long-term capital gain. Interest which is not deductible in the year incurred because of the investment interest limitation may be carried forward and deducted in a future year in which the taxpayer has sufficient investment income. The Company will report separately to each U.S. Class B Member his or her distributive share of the investment interest expense of the Company, and each U.S. Class B Member must determine separately the extent to which such expense is deductible on the U.S. Class B Member's tax return.

Non-corporate investors (and certain closely held, personal service and S corporations) are subject to limitations on using losses from passive business activities to offset active business income, compensation income, and portfolio income (e.g., interest, dividends, capital gains from portfolio investment, royalties, etc.). The Company's distributive share of income or losses generally may be treated as passive activity income or losses. Accordingly, a U.S. Class B Member may be subject to the passive activity loss limitations on the use of any allowable Company losses and allocable Company expenses.

### Deductibility of Company Investment Expenditures and Certain Other Expenditures

Investment expenses of an individual, trust or estate are deductible only to the extent they exceed two percent (2%) of the taxpayer's adjusted gross income for the particular taxable year. In addition, the Code further restricts the ability of individuals with an adjusted gross income in excess of a specified

LENDERS_0003681

amount to deduct such investment expenses. Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a non-corporate taxpayer in calculating such taxpayer's alternative minimum tax liability.

These limitations on deductibility may apply to a U.S. Class B Member's share of the trade or business expenses of the Company. The Company may make an allocation of its expenses among its various activities. There can be no assurance that any of its expenses will be considered trade or business expenses nor can there be any assurance that the IRS will agree with any allocation made by the Company.

A U.S. Class B Member will not be allowed to deduct syndication expenses attributable to the acquisition of Class B Units paid by such U.S. Class B Member or the Company. Any such amounts will be included in the U.S. Class B Member's adjusted tax basis for his or her Class B Units.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, U.S. Class B Members should consult their own tax advisors with respect to the application of these limitations and on the deductibility of their share of items of loss and expense of the Company.

### Application of Basis and "At Risk" Limitations on Deductions

The amount of any loss of the Company that a U.S. Class B Member is entitled to deduct on such U.S. Class B Member's income tax return is limited to such U.S. Class B Member's adjusted tax basis in his or her Class B Units as of the end of the Company's taxable year in which such loss is incurred. Generally, a U.S. Class B Member's adjusted tax basis for such U.S. Class B Member's Class B Units is equal to the amount paid for such Class B Units, increased by the sum of: (i) such U.S. Class B Member's share of the Company's liabilities, as determined for U.S. federal income tax purposes, and (ii) such U.S. Class B Member's distributive share of the Company's realized income and gains, and decreased (but not below zero) by the sum of: (a) distributions (including decreases in such U.S. Class B Member's share of Company liabilities) made by the Company to such U.S. Class B Member and (b) such U.S. Class B Member's distributive share of the Company's losses and expenses.

A U.S. Class B Member that is subject to the "at risk" limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Company to the extent that they exceed the amount such U.S. Class B Member has "at risk" with respect to such U.S. Class B Member's Class B Units at the end of the year. The amount that a U.S. Class B Member has "at risk" will generally be the same as such U.S. Class B Member's adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Company (other than certain loans secured by real property) or any amount borrowed by the U.S. Class B Member on a non-recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

### Disposition of the Class B Units

Generally, a U.S. Class B Member will recognize capital gain or loss on the sale, redemption, exchange or other taxable disposition of a Class B Unit equal to the difference between (i) the proceeds of such disposition plus its share of liabilities of the Company and (ii) its tax basis. However, that portion of a selling U.S. Class B Member's gain allocable to "unrealized receivables" or "inventory items", each as defined in Code Section 751, will be treated as ordinary income. The deductibility of capital losses may

LENDERS_0003682

be subject to limitation. The consequences of the limitations will vary depending on the tax situation of each taxpayer. Accordingly, each U.S. Class B Member should consult his or her own tax advisors with respect to these limitations.

*Medicare Tax*

Non-corporate U.S. Class B Members will generally be subject to a 3.8% tax on the lesser of (i) the U.S. Class B Member's "net investment income" for the relevant taxable year and (ii) the excess of the U.S. Class B Member's modified adjusted gross income for the taxable year over a certain threshold. A U.S. Class B Member's net investment income will generally include any income or gain recognized by such U.S. Class B Member with respect to the Company, unless such income or gain is derived in the ordinary course of the conduct of such U.S. Class B Member's trade or business (other than a trade or business that consists of certain passive or trading activities).

*Tax Shelter Regulations*

Taxpayers engaging in certain transactions, including certain loss transactions above a threshold, may be required to include a detailed disclosure with their annual U.S. federal income tax return in accordance with Treasury Regulations governing tax shelters and other potentially tax-motivated transactions. It is possible that the Company may engage in transactions that subject the Company and potentially its Members to such disclosure. A Member disposing of an interest at a taxable loss may also be subject to such disclosure. Transactions that are not currently subject to disclosure may become subject to disclosure by notice from the IRS. Potential Subscribers should consult their own tax advisors concerning any potential disclosure obligation under Treasury Regulations governing tax shelters and other potentially tax-motivated transactions and the possibility that significant penalties can be imposed with respect to such transactions.

*Certain U.S. Income Tax Considerations for Non-U.S. Class B Members*

The U.S. federal income tax treatment of a Non-U.S. Class B Member's investment in the Company is complex and will vary depending on the circumstances and activities of such Class B Member and the Company. Each Non-U.S. Class B Member is urged to consult with his or her own tax advisor regarding the U.S. federal, state, local and foreign income, estate and other tax consequences of an investment in the Company. The following discussion assumes that a Non-U.S. Class B Member is not subject to U.S. federal income taxes as a result of the Non-U.S. Class B Member's presence or activities in the U.S. other than as a Class B Member in the Company.

It is anticipated that upon the acceptance of a Non-U.S. Class B Member's I-526 Petition and the issuance of a temporary resident visa, such Non-U.S. Class B Member will automatically become a U.S. person for
U.S. federal income tax purposes and not be subject to the tax treatment afforded Non-U.S. Class B Members unless such Class B Member's tax status changes in the future. The U.S. generally imposes income and estate tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions may eliminate some but not all of the risk of double taxation. Each state in the U.S. has its own separate income tax system. Non-U.S. Class B Members should consider the tax effects of becoming a U.S. resident before investing. Prior to making an investment in the Company, a Non-U.S. Class B Member should consult with his or her tax advisors with regard to the consequences of becoming a lawful permanent resident of the U.S.

The tax consequences applicable to prospective Non-U.S. Class B Members generally will depend on whether the Company is deemed to be engaged in a U.S. trade or business. If the Company is deemed to

be engaged in a U.S. trade or business, then, a Non-U.S. Class B Member's share of Company income and gains will be deemed "effectively connected" with such a U.S. trade or business of the Company (including operating income from the Company) and will be subject to tax at normal graduated U.S. federal income tax rates. A Non-U.S. Class B Member generally will be required to file a U.S. federal income tax return with respect to the Non-U.S. Class B Member's share of effectively connected income. If the Company is deemed to be engaged in a U.S. trade or business, then the Company will be required to withhold U.S. federal income tax with respect to the Non-U.S. Class B Member's share of Company income that is effectively connected income.

In addition, a Non-U.S. Class B Member will generally be subject to U.S. federal withholding taxes at the rate of thirty percent (30%) on his or her share of any fixed, determinable, annual or periodic income realized by the Company (such as income from dividends, interest (including imputed interest) and Original Issue Discount that is not effectively connected with a U.S. trade or business of the Company. Such withholding tax may be reduced or eliminated with respect to certain types of such income under an applicable income tax treaty. In addition, interest income received by the Company may be exempt from such withholding with respect to Non-U.S. Class B Members under the "portfolio interest" rules contained in Section 871 or 881 of the Code, provided that the Non-U.S. Class B Member is eligible for such exemption and provides proper certification attesting to its eligibility.

## FATCA

In general, under the newly enacted Foreign Account Tax Compliance Act ("**FATCA**"), a thirty percent (30%) withholding tax will be imposed on payments of certain U.S. source income (including interest and dividends), and gross proceeds from the sale or other disposal of property that can produce U.S.-sourced interest or dividends, made to certain non-U.S. entities unless such non-U.S. entities comply with certain diligence and reporting requirements regarding certain of its U.S. (or U.S.-owned foreign entity)  account holders and/or direct and indirect U.S. owners. Such withholding could apply to payments made by the Company to Non-U.S. Class B Members that are entities. Accordingly, Non-U.S. Class B Members may have to provide certain information, representations and waivers of non-U.S. law as may be required by the Class B Manager to comply with such new rules in order to avoid such withholding tax, including, for example, in the case of indirect U.S. owners that are entities information relating to a Non-U.S. Class B Member and its "substantial United States owners" (within the meaning of Code Section 1473(2)), if any, or persons holding a "financial account" (within the meaning of Code Section 1471(d)(2)) with such Non-
U.S. Class B Member. As a result, potential Subscribers are encouraged to consult with their tax advisors regarding the possible implications of this legislation on an investment in the Company.

## Possible IRS Challenges; Tax Audits

Class B Members should be aware that the IRS may challenge the Company's treatment of items of income, gain loss, deduction and credit, or its characterization of the Company's transactions, and that any such challenge, if successful, could result in the imposition of additional taxes, penalties and interest charges.  The Class B Manager decides how to report the items on the Company's tax returns.  In the event the income tax returns of the Company are audited by the IRS, the tax treatment of the Company's income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Class B Members. If the IRS audits the Company's tax returns, however, an audit of the Class B Member's own tax returns may result. The Class B Manager, designated as the "**Tax Matters Member**", has considerable authority to make decisions affecting the tax treatment and procedural rights of all Class B Members. In addition, the Tax Matters Member has the authority to bind certain Class B Members to settlement agreements and the right on behalf of all Class B Members to extend the statute of limitations relating to the Class B Members' tax liabilities with respect to Company

LENDERS_0003684

items. The legal and accounting costs incurred in connection with any audit of the Company's tax returns will be paid off by the Company, but each Class B Member will bear the cost of audits of his or her own tax return.

### *Possible Legislative or Other Action Affecting Tax Aspects*

The foregoing discussion is only a summary and is based upon existing U.S. federal income tax law. Class B Members should recognize that the U.S. federal income tax treatment of an investment in Class B Units may be modified at any time by legislative, judicial or administrative action. Any such changes may have retroactive effect with respect to existing transactions and investments and may modify the statements made above. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the Treasury Department, resulting in revisions of the Treasury Regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Company. There can be no assurance that legislation will not be enacted that has an unfavorable effect on a Class B Member's investment in the Company.

This Memorandum does not address all of the U.S. federal income tax consequences to the Class B Member of an investment in the Company, and does not address any of the state or local tax consequences of such an investment to any Class B Member, or all of the U.S. or foreign tax consequences of such an investment to any Class B Member that is not a U.S. person for U.S. federal income tax purposes. Each Class B Member is advised to consult his or her own tax counsel as to the U.S. federal income tax consequences of an investment in the Company and as to applicable state, local and foreign taxes.

## XVI.   TAX AND LEGAL ASPECTS

Potential subscribers of the Class B Units should not construe the contents of this Memorandum or any prior or subsequent communications from the Regional Center, the Company, the Managers or any of their respective agents or representatives, as legal, tax, and/or investment advice. No representations are made as to the federal, state, or local income tax consequences resulting from an investment in the Class B Units. No assurances are given that any deductions or other income tax advantages that may be contemplated will be available. Each potential subscriber should consult his or her own legal counsel, accountant, and/or other professional adviser as to legal, tax, investment, accounting, securities and/or related matters concerning an investment in the Company, and each potential subscriber is responsible for all fees or charges of any such adviser.

## XVII.   RESTRICTIONS ON TRANSFERABILITY

The Class B Units being offered hereby have not been registered under the Securities Act or the securities laws of any jurisdiction, including any foreign jurisdictions, and are being offered in reliance upon an exemption from registration under Regulation S and/or Section 4(a)(2) of the Securities Act or Regulation D. The right of subscribers to sell, transfer, hedge, pledge or otherwise dispose of the Class B Units will be limited by U.S. federal and state securities laws. The Operating Agreement also restricts the ability of the Class B Members to transfer their Class B Units. See "Transferability of Interests and Resignation" section of this Memorandum. If the Subscriber is a resident or citizen of a country other than the United States, the transfer of Class B Units also may be subject to the securities laws of such country(ies). The Company makes no representation with respect to compliance with the securities or other laws of any foreign jurisdiction. See also "XIII. Risk Factors – Risks Related to the Offering and the Class B Units – Foreign Governmental Action."

### NOTICE TO RESIDENTS OF HONG KONG

No person may offer or sell in Hong Kong, by means of any document, any Class B Units other than (a) to "professional investors" as defined in the Securities and Futures ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that ordinance.

No person may issue, or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Class B Units, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Class B Units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong.

The contents of this Memorandum have not been reviewed by any regulatory authority in Hong Kong. The recipient of this Memorandum is advised to exercise caution in relation to the offer. If The recipient of this Memorandum is in any doubt about any of the contents of this Memorandum, such recipient should obtain independent professional advice.

This Memorandum is delivered only to the recipient solely for the purpose of evaluating a possible investment in the Company and may not be used, copied, reproduced or distributed in whole or in part, to any other person (other than professional advisers of the potential investor receiving this document who are subject to confidentiality obligations). Subscriptions will not be accepted from any person other than the person to whom this Memorandum has been delivered.

This Memorandum may not be used, copied, reproduced or distributed in whole or in part by the recipient to any other person.

LENDERS_0003686

**NOTICE TO RESIDENTS OF JAPAN**

The Class B Units have not been and will not be registered under the Securities and Exchange Law of Japan ("**SEL**"), and the Class B Units may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (including Japanese corporations) or to others for re-offering or resale, directly or indirectly, in Japan or to any resident of Japan, except in compliance with the private placement directed solely to Qualified Institutional Investors (as defined under SEL) or otherwise except in compliance with the SEL and other applicable laws and regulations of Japan. In particular, Investors in Japan may transfer the Class B Units only to other Qualified Institutional Investors (a "**Transferee**") and should notify any Transferee in writing upon or prior to any transfer that (i) such Class B Units may only be transferred to Qualified Institutional Investors and (ii) any Qualified Institutional Investors to whom the Class B Units are subsequently transferred are subject to such condition. In this paragraph, "a resident/residents of Japan" shall have the meaning as defined under the Foreign Exchange and Foreign Trade Law of Japan.

This Memorandum is confidential and is intended solely for the use of its recipient. Any duplication or redistribution of this Memorandum is prohibited. The recipient of this Memorandum, by accepting delivery thereof, agrees to return it and all related documents to the Company if the recipient elects not to purchase any of the Class B Units offered hereby or if requested earlier by either Manager. Neither return of the principal amount nor distribution of profit is guaranteed. This investment in the Class B Units involves certain risks of deficit caused by fluctuation of interest rates, currency and other market factors, or the credit risk of the counter-parties or relevant parties thereof. Please read the terms of the investment carefully, in particular, those relating to limitations on the period in which rights relating to such investment can be exercised.

**NOTICE TO RESIDENTS OF PEOPLE'S REPUBLIC OF CHINA**

No invitation to offer or sale will be made to the public in the People's Republic of China (which, for such purposes, does not include the Hong Kong or Macau special administrative regions or Taiwan) or by any means that would be deemed public under the laws of the People's Republic of China. The information relating to the securities contained in this Memorandum has not been submitted to or approved by the China Securities Regulatory Commission or other relevant governmental authorities in the People's Republic of China. The securities may only be offered or sold to Chinese investors authorized to buy and sell securities denominated in foreign exchange. Potential investors resident in the People's Republic of China are responsible for obtaining all relevant approvals from the Chinese government authorities, including but not limited to the State Administration of Foreign Exchange, before purchasing the securities.

**LIST OF EXHIBITS**

A-1     FORM OF SUBSCRIPTION AGREEMENT

A-2     CONFIDENTIAL PROSPECTIVE INVESTOR QUESTIONNAIRE

B       OPERATING AGREEMENT

C       CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES

D       ESCROW AGREEMENT

E       FORM W-8BEN or W-9

F       PROJECT MAPS AND RENDERINGS

Exhibit to Memorandum for Summit Village Development Lender 1, LLC

## EXHIBIT A-1

## FORM OF SUBSCRIPTION AGREEMENT

[See Attached]

LENDERS_0003689

## SUBSCRIPTION AGREEMENT

### Memorandum No. ___

Summit Village Development Lender 1, LLC
c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Centre
89 Queensway
Admiralty, Hong Kong
Facsimile: (852) 2530-8100


Dear Sirs or Madams:

      The undersigned acknowledges that the undersigned has received and reviewed a copy of the Confidential Private Placement Memorandum dated August 24, 2016 (the "**Memorandum**"), relating to the private placement by Summit Village Development Lender 1, LLC, a Delaware limited liability company (the "**Company**"), of up to a maximum of 240 Class B Units of membership interest in the Company ("**Unit**" or "**Units**") at a price of US$500,000 per Unit, or such other minimum investment amount as may be required under the EB-5 Program (without any fractional interest) (the "**Offering**").  Certain terms used herein are defined in the Company's Amended and Restated Operating Agreement, the form of which is attached as Exhibit B to the Memorandum (the "**Operating Agreement**").  Subscriptions will be limited to persons who are not "U.S. Persons" as such term is defined in Rule 902(k) under the U.S. Securities Act of 1933 (the "**Securities Act**"), unless the Company is relying upon the exemptions under Section 4(a)(2) of the Securities Act or Regulation D.

      1.    Subscription.

      (a)    Subject to the terms and conditions contained herein and in the Memorandum, the undersigned hereby subscribes for and, if such subscription is accepted by the Company, shall purchase Units for the total amount set forth on Schedule A attached hereto (as adjusted for any increase in minimum investment amount as may be required under the EB-5 Program, the "**Investment Amount**").  The undersigned tenders herewith a certified check or cashier's check or tenders by wire transfer the sum of the Investment Amount plus the administration fee of US$55,000 (the "**Administration Fee**"), plus the escrow fee set forth in the Escrow Agreement (as defined herein) (the "**Escrow Fee**"), which Investment Amount, Administration Fee and Escrow Fee shall be deposited with an escrow agent designated by the Company at its sole and absolute discretion (the "**Escrow Agent**").  At any time if the Subscription Price is increased beyond US$500,000 per Unit, the amount of the Administration Fee shall be increased in proportion to such increase in the Subscription Price.

      (b)    Upon the satisfaction of the conditions described in the Escrow Agreement, a form of which is attached as Exhibit D to the Memorandum (the "**Escrow Agreement**"), the Investment

1

FINAL

Amount and the Administration Fee shall be paid to the Company in such manner as provided in the Escrow Agreement. The undersigned acknowledges and agrees that the Company shall have the right to deliver the Sch 3 Instruction, as provided under the form of the Escrow Agreement appearing as Exhibit D to the Memorandum (or any equivalent instruction under an alternative form of Escrow Agreement, the "**Release Instruction**"), instructing the Escrow Agent to release and disburse the Investment Amount and the Administration Fee as provided for in the Release Instruction upon:

(1) the approval of the undersigned's I-526 Petition with the USCIS;

(2) the filing of the undersigned's I-526 Petition with the USCIS, provided that (i) not less than three (3) I-526 Petitions of Subscribers have been approved by the USCIS (regardless of whether the undersigned's I-526 Petition has been approved) or (ii) an I-924 application submitted by the Regional Center in connection with the Project has been approved by the USCIS (in the case of (1) or (2), the "**Automatic Escrow Release Conditions**"); or

(3) the undersigned otherwise waiving the Automatic Escrow Release Conditions and allowing for the release and disbursement of the Investment Amount and the Administration Fee prior to receiving an approval of the undersigned's I-526 Petition by the USCIS (collectively with the Automatic Escrow Release Conditions, the "**Escrow Release Conditions**").

The undersigned further agrees to deliver to the Company the executed Release Instruction together with other Subscription Documents such that the Company shall countersign and deliver to the Escrow Agent the Release Instruction upon the satisfaction of the relevant Escrow Release Conditions.

(c)     The undersigned understands and agrees that any subscription may be accepted, rejected or cancelled by the Company in the sole and absolute discretion of the Company. If this subscription is rejected or cancelled, this subscription shall be rendered void and shall have no further force or effect.

2.     <u>Acceptance of Subscription</u>. The undersigned understands and agrees that this subscription is made subject to the following terms and conditions:

(a)     prior to the closing of this subscription, the Company has the right to reject this subscription for any reason or no reason at all;

(b)     the Company has the right to terminate the Offering, at its sole and absolute discretion;

(c)     the Company shall have no obligation to accept subscriptions in the order received;

(d)     acceptance of any subscription by the Company is contingent on, among other things, deposit with the Escrow Agent of the Investment Amount, the Administration Fee and the Escrow Fee in immediately available funds; and

FINAL

CONFIDENTIAL INFORMATION                                                                    LENDERS_0003691

(e)     the documents to be issued and delivered on account of this subscription will be issued only in the name of and delivered only to the undersigned.

3.      <u>Closing</u>.   The closing of this subscription and the sale of the Unit(s) by the Company to the undersigned pursuant to the Offering will occur, if at all, upon: (a) the Company's acceptance of this subscription after reviewing the Subscription Documents for completeness, due execution and investor suitability; and, (ii) the release or irrevocable commitment to release of the Investment Amount and the Administration Fee to the Company pursuant to the Escrow Agreement, unless the requirement for such release is deferred by the Company.

4.      <u>Rejection of Subscription</u>.   If this subscription shall have been rejected or the Offering (in its entirety) shall have been terminated by the Company, the Company shall return or procure the return of the Investment Amount (without interest) and the Administration Fee (without interest) that have been paid by the undersigned.

5.      <u>Revocation of Subscription</u>.   Upon the acceptance of this subscription by the Company, this subscription may not be cancelled, terminated or revoked by the undersigned, unless prior to the closing of this subscription <u>and</u> the filing of his or her I-526 Petition with USCIS, the undersigned decides not to proceed with the undersigned's immigration procedures under the EB-5 Program. If the undersigned revokes this subscription pursuant to this Section 5, the Company shall return, or procure the return of, the Investment Amount (without interest) and such portion of the Administration Fee as determined by the Company (without interest) that have been paid by the undersigned. The undersigned acknowledges that the Company reserves the right to accept a new subscription to replace this subscription to the extent it has been terminated or withdrawn.

6.      <u>Representations, Warranties, Covenants and Acknowledgments of the Undersigned</u>. The undersigned represents, warrants, covenants and acknowledges as follows:

(a)     The undersigned represents and warrants that the undersigned reads and understands English or has had this Subscription Agreement, the Memorandum, the Operating Agreement, and any other documents provided to the undersigned by the Company in connection therewith translated by a competent translator into a language understood by the undersigned.

(b)     The undersigned understands and acknowledges that (i) an investment in the Unit(s) carries a complex set of goals, including but not limited to financial and immigration goals, which may potentially conflict with one another, such that it may not be possible that all the goals are achieved to the complete satisfaction of the undersigned; (ii) USCIS has sole and absolute discretion with respect to the granting of conditional or unconditional permanent residency in the United States under the EB-5 Program and may deny a Form I-526 Petition or a Form I-829 Petition for any reason; (iii) the U.S. consulates abroad have sole and absolute discretion with respect to the granting of an immigrant visa; (iv) the Company and its affiliates, managers, officers, employees, consultants, representatives and agents, including without limitation the Managers (as defined in the Memorandum), have not made any statement, promise, or representation to the undersigned regarding the likelihood of the undersigned receiving conditional or unconditional permanent residency in the United States and no salesperson, manager, officer, employee, consultant, representative and agent of the Company and its affiliates

FINAL

3

has authority to make any representations which contradict the foregoing statements; (v) the undersigned is solely responsible for filing a Form I-526 Petition, applying for conditional permanent residency in the United States, and filing a Form I-829 Petition and the costs and expenses related thereto, including, without limitation, fees and expenses of retaining immigration counsel; and (vi) the Company has no obligation to assist or incur any cost on behalf of the undersigned in connection with any Form I-526 Petition, application for conditional permanent residency in the United States, or Form I-829 Petition other than to provide information and copies of documents that are in the Company's possession or can be obtained by the Company at a nominal expense and that is required by USCIS in connection with such petition or application.

(c)    The undersigned understands and acknowledges that the Units have not been and will not be registered under the Securities Act and is aware that the offer to subscribe for the Units is being made in a transaction which the Company intends to be exempt from the registration requirements of the Securities Act pursuant to Regulation S under the Securities Act and/or Section 4(a)(2) of the Securities Act or Regulation D.

(d)    The undersigned understands and acknowledges that the Units are "restricted securities" within the meaning of Rule 144 under the Securities Act, which rule permits only limited resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions set forth therein.

(e)    The undersigned confirms that he or she:

(i)    is not a "U.S. Person", is purchasing the Units in an "offshore transaction", in compliance with and within the meaning of Rule 902 of Regulation S under the Securities Act (*i.e.*, was located outside the United States when the Offering was made and when this Subscription Agreement was executed), is an individual whose net worth, together with that of his or her spouse, excluding the value of his or her primary residence, exceeds US$1,000,000, and the undersigned confirms that the Units have not been offered or sold to it by any form of "directed selling efforts" in the United States within the meaning of Rule 902(c) of Regulation S under the Securities Act; and/or

(ii)    is an individual (A) whose individual net worth, or joint net worth with that person's spouse (excluding primary residence)[1], exceeds US$1,000,000; or (B) whose individual income exceeded US$200,000, or whose joint income with that person's spouse exceeded US$300,000, in each of the two most recent years and who has a reasonable expectation of reaching that income level in the current year.

(f)    The undersigned understands and acknowledges that the undersigned is purchasing

---

[1] For purposes of calculating "net worth" of a person: (A) the person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

CONFIDENTIAL INFORMATION                              LENDERS_0003693

the Units without being furnished any offering literature or prospectus other than the Memorandum; that neither this transaction nor the Memorandum has been examined or approved by the U.S. Securities and Exchange Commission (the "**SEC**") or by any other governmental authority, including, without limitation, any agency, public or regulatory authority, instrumentality, department, commission, court, ministry, tribunal or board of any government, whether foreign or domestic and whether national, federal, provincial, state, regional, local or municipal ("**Governmental Authority**") and that no such Governmental Authority has made any recommendation or endorsement as to, or otherwise passed on the merits of, purchasing the Units.

(g)     The undersigned agrees that the undersigned shall not make any sale, transfer or other disposition of the Units (or any interest therein) in violation of the Securities Act or the U.S. Securities Exchange Act of 1934 (the "**Exchange Act**"), the applicable securities laws of any applicable U.S. state, any applicable non-U.S. securities laws, or the rules and regulations of the SEC or any securities authority of any U.S. state or other country in which the sale, transfer or disposition may be made, or in violation of any transfer restriction applicable to the Units pursuant to this Subscription Agreement or the Operating Agreement.  The undersigned agrees that the undersigned shall not make any sale, transfer or other disposition of all or any portion of the Units (or any interest therein) unless and until (i) (x) there is then in effect a registration statement under the Securities Act or the securities laws of the applicable jurisdiction covering such sale, transfer or disposition, and such sale, transfer or disposition is made in accordance with such registration statement, or (y) such sale, transfer or disposition is made (a)(1) to a person whom the seller reasonably believes is a "qualified institutional buyer" in a transaction meeting the requirements of Rule 144A under the Securities Act, (2) outside the United States in accordance with the resale exemption under Regulation S or (3) in accordance with the resale limitations under Rule 144 under the Securities Act and (b) in each case in accordance with any applicable securities laws of any state of the United States and applicable non-U.S. securities laws, and (ii) all transfer restrictions applicable to the Units pursuant to this Subscription Agreement or the Operating Agreement or applicable law have been satisfied or are no longer applicable with respect to such sale, transfer or disposition. Upon request by the Company, the undersigned also shall deliver to the Company an opinion of counsel, in form and substance satisfactory to the Company and its counsel, that such proposed sale, transfer or disposition is in full compliance with the requirements of this Section 6(g).

(h)     The undersigned understands, acknowledges and agrees that the Company has no obligation to register the resale of any of the Units under the Securities Act or the laws of any other jurisdiction or country and does not intend to do so, and that there can be no assurance that any registration statement will be filed with respect to the Units, or, if filed, that such registration statement will become effective. The undersigned acknowledges and agrees that, unless an exemption from the registration requirements under applicable law is available, the undersigned may not be able to resell the units and thus may be required to bear the economic risk of the undersigned's investment for an indefinite period of time.

(i)     The undersigned understands, acknowledges and agrees that, regardless of whether the offering and sale of the Units have been registered under the Securities Act or any other applicable securities laws, the Company may impose restrictions upon the sale, transfer or disposition of Units (including the placement of appropriate legends on membership certificates or the imposition of stop-transfer instructions) if, in the sole and absolute discretion of the Company,

such restrictions are necessary or desirable (i) to achieve compliance with the Securities Act, any other securities laws or any other law; or (ii) in light of the transfer and other restrictions set forth in this Subscription Agreement or the Operating Agreement.  Without limiting the generality of the foregoing provisions, the undersigned consents to the placement of the following legends (in substantially the form set forth below) on any document representing the Units being purchased by the undersigned, if applicable:

> **"THE UNIT(S) REPRESENTED HEREBY HAS/HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PURSUANT TO THE SECURITIES ACT, OR ANY OTHER SECURITIES AUTHORITIES."**

> **"THE UNIT(S) REPRESENTED HEREBY MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE TERMS OF THE WRITTEN OPERATING AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDERS OF THE UNIT(S) (OR THE PREDECESSOR IN INTEREST TO THE UNIT(S)).  SUCH OPERATING AGREEMENT GRANTS TO THE COMPANY AND ITS OTHER MEMBERS CERTAIN REPURCHASE RIGHTS AND RIGHTS OF FIRST REFUSAL TO ACQUIRE SUCH UNIT(S). THE SECRETARY OR MANAGER OF THE COMPANY WILL UPON WRITTEN REQUEST AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS FURNISH A COPY OF SUCH OPERATING AGREEMENT TO THE HOLDER HEREOF WITHOUT CHARGE."**

> **"THE UNIT(S) REPRESENTED HEREBY MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED EXCEPT: (A)(i) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, (ii) IN ACCORDANCE WITH THE RESALE LIMITATIONS UNDER RULE 144 UNDER THE SECURITIES ACT OR (iii) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH THE RESALE EXEMPTION UNDER REGULATION S AND (B) IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION.  ANY REQUEST FOR TRANSFER BY THE HOLDER SHALL, IF REQUESTED BY THE COMPANY, BE ACCOMPANIED BY AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY AND ITS COUNSEL, TO THE EFFECT THAT SUCH PROPOSED TRANSFER IS IN FULL COMPLIANCE WITH THE REQUIREMENTS SET FORTH IN THIS AND THE PRECEDING TWO PARAGRAPHS."**

    (j)    The undersigned agrees and acknowledges that the undersigned (i) is not a distributor or dealer of the Units and is not taking the Units with the intent to make a "distribution" of the Units, as such term is defined in the Securities Act; (ii) is acquiring the Units in good faith solely for the undersigned's own personal account for investment purposes and not with a view to

FINAL

6

 LENDERS_0003695

resell or for the resale by way of distribution, subdivision, fractionalization or other means; and (iii) has no understanding, agreement or arrangement, formal or informal, existing or intended, to sell or transfer to any person for consideration the Units for which he or she hereby subscribes or any part thereof.

(k)    The undersigned confirms that the undersigned (i) is able to bear the economic risk of investment in the Units, (ii) is able to hold the Units for an indefinite period of time such that the undersigned's overall commitment to non-marketable investments (including the undersigned's investment in the Units) is not excessive or disproportionate to his or her net worth, (iii) is presently able to afford a complete loss of the undersigned's investment, and (iv) has adequate means of providing for the undersigned's current needs and possible personal contingencies and has no need for liquidity in the undersigned's investment.

(l)    The undersigned understands and acknowledges that the Company was organized on September 3, 2015 as a Delaware limited liability company to engage in any lawful business activity and as its first endeavor, the Company intends to make a loan, on the terms described in the Memorandum, to SMHG Village Development LLC, a Delaware limited liability company, with all the attendant business risks of a company that has no significant operating history as well as other business risks. The undersigned agrees and acknowledges that the investment in the Company as contemplated herein is a speculative investment and involves substantial risks, including the potential loss of the undersigned's entire investment contemplated herein, and the undersigned understands, accepts and assumes all of the risk factors related to the purchase of the Units, including but not limited to those set forth in the Memorandum. The undersigned recognizes that the Memorandum does not purport to contain all the information which would be contained in a registration statement under the Securities Act or under the securities laws of any other jurisdiction.

(m)    The undersigned understands and acknowledges that the Company has made available to the undersigned all documents, records and books of the Company pertaining to the investment in the Units and the undersigned's representatives, including the undersigned's attorney, accountant and/or purchaser representative, if any, and the undersigned has received and reviewed such information as deemed necessary or appropriate concerning the Company and the Units and any other matters relevant to the decision to subscribe for the Units as deemed necessary.

(n)    The undersigned has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of an investment in the Units, which risks are substantial, and of making an informed investment decision.

(o)    The undersigned confirms that, in making a decision to purchase the Units hereby subscribed for, the undersigned has carefully reviewed the Memorandum and that the undersigned has been given the opportunity to ask questions of and to receive answers from the Company concerning the information set forth in the Memorandum, and to obtain any additional information which the Company possesses or can acquire without unreasonable effort or expense as is necessary to verify the accuracy of the information furnished in the Memorandum.

FINAL

CONFIDENTIAL INFORMATION                                                                                    LENDERS_0003696

(p)    The undersigned has consulted with and relied completely on the advice of the undersigned's own personal tax, immigration, investment, legal or other advisors regarding the tax, immigration, investment and legal matters discussed in the Memorandum, including but not limited to the risk factors described therein.

(q)    The undersigned confirms that he or she understands and has fully considered for purposes of this investment that there are substantial legal, contractual and practical restrictions on the transferability of the Units, including but not limited to the right of first refusal and repurchase rights of the Company and/or its members, and that there will be no public market for the Units, and, accordingly, it probably will not be possible for the undersigned to liquidate the undersigned's investment in the Units in case of an emergency or to use the Units as collateral for a loan.

(r)    If the Company becomes subject to reporting requirements under the Exchange Act or any other applicable securities laws, the undersigned will provide such information and deliver such documents, within five days after receipt of a request from the Company, as may reasonably be necessary to comply with any and all laws and ordinances to which the Company is subject.

(s)    The undersigned understands and acknowledges that no assurance is or has been made regarding any tax advantages which may accrue to an investor in the Units, and that existing tax laws and regulations could be modified in the future, thus denying the investor all or a portion of the tax benefits which may be currently available under existing tax laws and regulations. The undersigned understands and acknowledges that an investment in the Units, as well as conversion, sale or other disposition of the Units, may result in tax consequences under federal, state or other tax laws in the United States (including, without limitation, under the Foreign Account Tax Compliance Act (FATCA)), or under non-U.S. tax laws. Therefore, the undersigned has made such independent inquiries as the undersigned deems necessary to evaluate properly an investment in the Units, including consultation with a personal tax adviser, to determine whether such investment is appropriate. The undersigned understands and acknowledges that it is the undersigned's sole responsibility, and not the Company's, to file timely tax returns or any tax election relating to the undersigned's investment, conversion, sale or other disposition of the Units.

(t)    The undersigned confirms that he or she has not been convicted of any crime or been sanctioned by the SEC or any other Governmental Authority in connection with any violation of the securities laws.  If the undersigned has been convicted of a crime or been sanctioned by the SEC for violation of the securities laws, the undersigned must provide complete details thereof in writing and attach such writing to this Subscription Agreement.

(u)    The undersigned agrees and acknowledges that his or her purchase of the Units is not a transaction, or any element of a series of transactions, that is part of a plan or scheme to evade the registration requirements of the Securities Act or any other applicable legal requirement.  The undersigned agrees and acknowledges that the undersigned has complied with all applicable securities, currency exchange, and other laws, including but not limited to the laws of the country in which the undersigned is currently domiciled or the undersigned's country of citizenship, in connection with the undersigned's purchase of the Units, and including but not limited to obtaining

FINAL

8

any required consents from any Governmental Authority or any other consents or observing any other applicable legal formalities.

(v)     The undersigned agrees and acknowledges (i) that his or her representations, warranties, covenants, acknowledgments, agreements and understandings herein and in any of the exhibits hereto are required in connection with the laws of the United States; (ii) the Company is relying on such representations, warranties, covenants, acknowledgments, agreements and understandings in determining the suitability of the undersigned to acquire such Units, and (iii) he or she has made such representations, warranties, covenants, acknowledgments, agreements and understandings with the intent that the Company rely on them in determining his or her suitability as an investor in the Company, and the undersigned hereby agrees that such representations, warranties, covenants, acknowledgments, agreements and understandings shall survive the undersigned's purchase of the Units.

(w)     If more than one person is signing this Subscription Agreement, each representation, warranty, covenant and acknowledgment made herein by or on behalf of the undersigned shall be a joint and several representation, warranty or undertaking of each such person.

(x)     The undersigned understands that he or she is admissible to the United States in accordance with Section 212 of the Immigration and Nationality Act. Inadmissibility under Section 212 of the Immigration and Nationality Act is a legal determination that is made best in conjunction with a competent U.S. immigration attorney.  The undersigned understands that he or she is admissible to the United States or will confer with competent U.S. immigration counsel to determine whether there may be a basis for denying admission of the undersigned and his/her qualifying immediate family members.

(y)     The undersigned acknowledges and agrees that neither the Company nor any of its Managers have given, or have held out to the undersigned that any of them gives, any investment advice with respect to the purchase of the Units hereunder.

7.     <u>Covenants of the Company</u>.  The Company shall notify the undersigned in writing of the cancellation of the Offering (in its entirety) or the rejection of this subscription within a reasonable period of time after the occurrence of any such event.

FINAL

CONFIDENTIAL INFORMATION

LENDERS_0003698

8. <u>Covenants of Subscriber</u>. The undersigned shall, or shall cause the undersigned's immigration counsel to, diligently prepare and submit to USCIS a complete and accurate Form I-526 Petition, including, without limitation, any and all documents, records, and fees requested by USCIS. The undersigned shall promptly notify the Company in writing of the filing of the undersigned's Form I-526 Petition, requests for evidence and/or notice of intent to deny from USCIS, USCIS's approval or denial of the undersigned's Form I-526 Petition, the approval or denial of conditional permanent resident status, the filing of the undersigned's Form I-829 Petition, USCIS's approval or denial of the undersigned's Form I-829 Petition, the undersigned's address after the approval of conditional permanent resident status and any change thereof, which notice shall be accompanied by a copy of the Form I-526 Petition, the Form I-829 Petition, and the approval or denial letter (as the case may be) as well as any other documentation requested by the Company. The undersigned shall provide to the Company or the Managers any information that may be necessary to comply with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Patriot Act**"), the U.S. Bank Secrecy Act (the "**BSA**") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.

9. <u>Transferability</u>. The undersigned agrees not to transfer or assign this Subscription Agreement or any interest herein and further agrees that the assignment and transfer of the Units acquired pursuant hereto shall be effected only in accordance with the Operating Agreement and all applicable laws, including the U.S. securities laws. The undersigned acknowledges that, if he or she intends to petition for conditional and unconditional permanent resident status in the United States under the EB-5 Program, the restrictions on transferability of the Units will be subject to such program's requirements.

10. <u>Indemnification</u>. The undersigned hereby covenants and agrees to indemnify and hold harmless the Company and any of its successors, assigns, agents, affiliates, Managers, other Class B Members (as defined in the Memorandum), and employees, against any loss or cost (including, without limitation, attorneys' fees and required tax withholdings) incurred by any of them by reason of any misrepresentation or misstatement of material fact in connection with this Subscription Agreement or of any other document or information supplied by the undersigned to the Company in connection with the Offering.

11. <u>Admission as Class B Member</u>. The undersigned shall be admitted as a Class B Member of the Company as of the closing of the sale of the Units by the Company to the undersigned. If the Units are liquidated and the Investment Amount is returned to the undersigned pursuant to the terms of the Operating Agreement, the undersigned shall cease to be a Class B Member of the Company and the undersigned shall have no interest in the Company.

12. <u>Adoption of Operating Agreement</u>. The undersigned hereby agrees to be bound by the terms and provisions of the Operating Agreement as a Class B Member by executing a joinder as contained in the Operating Agreement.

CONFIDENTIAL INFORMATION

13.   <u>Non-U.S. Status</u>.

(a)     Unless otherwise indicated in the signature page hereto signed by the undersigned, the undersigned certifies that he or she is not a "U.S. Person" within the meaning of Section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and, as required by the Memorandum, agrees to deliver to the Company a properly completed and executed IRS Form W-8BEN (or other applicable IRS Form W-8). In the event the undersigned becomes a "U.S. Person" under the Code, the undersigned agrees to promptly notify the Company of such fact in writing and to promptly execute and deliver to the Company any documents or instruments deemed necessary by the Company to comply with applicable laws (including securities and tax laws), including on IRS Form W-9.

(b)     If the undersigned has so indicated in the signature page hereto signed by the undersigned, the undersigned hereby certifies that the undersigned is a "U.S. Person" within the meaning of the Code and, as required by the Memorandum, agrees to deliver to the Company a properly completed and executed IRS Form W-9. In the event the undersigned becomes a non-U.S. Person under the Code, the undersigned agrees to promptly notify the Company of such fact in writing and to promptly execute and deliver to the Company any documents or instruments deemed necessary by the Company to comply with applicable laws (including securities and tax laws), including an IRS Form W-8BEN (or other applicable IRS Form W-8).

(c)     The undersigned understands and agrees that the foregoing certification of the undersigned, in addition to any forms or documents received pursuant to the foregoing by the undersigned, may be disclosed to the U.S. Internal Revenue Service ("**Internal Revenue Service**") by the Company and that any false statement made could be punishable by fine, imprisonment, or both.

14.   <u>Miscellaneous</u>.

(a)     This Subscription Agreement shall be binding upon the undersigned's heirs, executors, administrators, and successors.

(b)     All notices or other communications given or made hereunder shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Subscription Agreement, by facsimile transmission to the facsimile number set forth in this Subscription Agreement, or by electronic mail to the email address set forth in this Subscription Agreement, subject to the provisions of that certain Confidential Prospective Investor Questionnaire attached hereto.  Delivery of any notice shall be deemed made on the date of actual receipt if personally delivered.  Any such notice sent by regular mail shall be deemed delivered ten (10) days after the same is mailed.  Notices delivered by a reputable overnight courier that guarantees next day delivery shall be deemed delivered two business days after delivery of the same to the courier. Notices transmitted by facsimile or electronic mail shall be deemed to have been delivered on the next business day after the notice is sent.  A party may change its address for notice by notice to each other party given in accordance with this Section.

(c)     This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws provisions thereof

CONFIDENTIAL INFORMATION                                          LENDERS_0003700

which would result in the application of the law of another state. Each of the parties hereto submits to personal jurisdiction in the federal and state courts located in the State of Delaware for the enforcement of this Subscription Agreement and waives any and all personal rights to object to such jurisdiction with respect to any action or proceeding related to this Subscription Agreement.

(d)     This Subscription Agreement and all other agreements required to be delivered by the undersigned to the Company under the Memorandum constitute the entire agreement among the parties hereto with respect to the subject matter hereof and this Subscription Agreement may be amended only by a writing executed by the parties. The representations and the indemnification obligations of the undersigned herein shall survive the acceptance of his or her subscription.  In the event of conflict between the English-language version and any other translated version of this Subscription Agreement, the Memorandum, the Operating Agreement, and any other documents provided to the undersigned by the Company, the English-language version shall control.

(e)     This Subscription Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Subscription Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Subscription Agreement.

[*The remainder of this page is intentionally left blank.*]

CONFIDENTIAL INFORMATION                                                                                    LENDERS_0003701

IN WITNESS WHEREOF, the undersigned and the Company, intending to be legally bound hereby, have executed this Subscription Agreement, effective as of the date set forth below.


_____
Signature

_____
Print or Type Name

_____
Passport/ID Number


Country of Citizenship:_____

Executed at: _____

City _____

State _____

this _____ day of _____, 20_____


Current Mailing Address:

_____

_____

Country:_____

_____
Telephone Number

_____
Facsimile Number

_____
Email Address

If known, address in United States where investor intends to reside after issuance of visa:

_____

_____

_____
Telephone Number

_____
Facsimile Number

_____
Email Address


13

FINAL

                                                              LENDERS_0003702

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**

By:    CELONA ASSET MANAGEMENT (USA) LIMITED,
       its Class B Manager


       By: _____
       Name:
       Title:


       Dated:

FINAL

CONFIDENTIAL INFORMATION                                    LENDERS_0003703

## SCHEDULE A

## SECURITY OWNERSHIP NAME

Please print here the exact name (registration) investor desires for securities.

_____

**Investment Amount**

Number of Units                                        Investment Amount

_____ Units            multiplied by US$500,000        _____

**(Subject to adjustment for any increase in the minimum investment amount
as may be required under the EB-5 Program)**

15

CONFIDENTIAL INFORMATION                                                    LENDERS_0003704

**CONFIDENTIAL PROSPECTIVE INVESTOR QUESTIONNAIRE**

<u>CONFIDENTIAL</u>

_____

_____

_____

     The information contained herein is being furnished by me, the undersigned, in order for the Company to determine whether my subscription to purchase unit(s) of membership interest (the "**Unit(s)**") in SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware limited liability company (the "**Company**"), may be accepted.  I, the undersigned, understand that (i) the Company will rely upon the information contained herein for purposes of determining the availability of exemptions from the registration requirements of the Securities Act of 1933 (the "**Securities Act**") and (ii) the issuance of the Unit(s) is not intended to be registered under the Securities Act in reliance upon the exemption from registration provided by Regulation S under the Securities Act and/or Section 4(a)(2) of the Securities Act or Regulation D.

     To satisfy banking and EB-5 immigrant investor requirements, the Company will be sharing my completed and signed Confidential Prospective Investor Questionnaire (this "**Questionnaire**") and the information contained herein with the Escrow Agent for the Offering and such other financial institutions or governmental organizations as necessary to verify the funds used to subscribe for Unit(s) were obtained by lawful means.  The Escrow Agent will also be provided with a copy of my unexpired government-issued picture identification and current residency address and national identifier number and other supporting documentation provided by me.  Using such information, the Escrow Agent may conduct background searches on me and my family members, and the Escrow Agent may share the results of such background searches with the Company.  Except in such cases, the Manager and the Company intend to keep the contents of this Questionnaire confidential.

     All information furnished is for the sole use of the Company and will be held in confidence by me and by the Company, except that this Questionnaire may be furnished to such parties as the Company's counsel deems necessary or desirable to establish compliance with the U.S. federal or state securities laws.

     Any capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed in the Operating Agreement, the Memorandum, or the Subscription Agreement.

     In accordance with the foregoing, I, the undersigned, make the following representations and warranties:

FINAL

CONFIDENTIAL INFORMATION

LENDERS_0003705

A.      PROSPECTIVE INVESTOR INFORMATION.[*]

1.      Name: _____
        (Investor's exact name, as it should appear in the records of the Company.)
        Address:      _____
                      _____
        Telephone:    _____  Fax:_____
        Passport / ID Number:_____
        E-mail address: _____

2.      Details of my Immigration Consultant:
        Name:  _____
        Company: _____
        Address:      _____
                      _____
        Telephone:    _____  Fax:_____
        E-mail address: _____

3.      Educational background:
        _____
        _____

4.      Professional licenses or registrations, including professional certifications, licenses and
        governmental registrations, if any;
        _____
        _____

5.      Prior employment, positions or occupations during the past five years (and the inclusive
        dates of each) are as follows:
        Employment or Occupation:_____
        Nature of Responsibility:_____
        From/To:_____
        _____
        _____

6.      I, the undersigned,        have   _____        have not       _____

        previously purchased securities that were sold in reliance upon the private offering
        exemption from registration under the Securities Act of 1933, as amended:

---

[*]Must not be a U.S. based mailing or email address or telephone number.

FINAL

CONFIDENTIAL INFORMATION                                                         LENDERS_0003706

7.      Type of prior investments in which I have participated and the amounts involved:

Nature of Investment                                        Amount Invested

_____          _____

_____          _____

8.      The checked item below **IS APPLICABLE** to me:

_____    (a)    I am a "Politically Exposed Person".  A Politically Exposed Persons is defined as a current or former senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned commercial enterprise; a corporation, business or other entity formed by or for the benefit of any such individual; an immediate family member of such an individual; or any individual publicly known (or actually known by the financial institution) to be a close personal or professional associate of such an individual.

_____    (b)    I am related to a Politically Exposed Person.


B.      REPRESENTATIONS AND WARRANTIES OF EACH PROSPECTIVE INVESTOR.

I, the undersigned, understand that the Company will be relying on the accuracy and completeness of the responses to the foregoing questions and represent and warrant to the Company as follows:

1.      The answers to the above questions are complete and correct and may be relied upon by the Company in determining whether I, the undersigned, meet the investor suitability requirements set forth in the Memorandum, and whether the Offering in which I propose to participate is exempt from registration under the Securities Act and the rules promulgated thereunder.

2.      I, the undersigned, will notify the Company immediately of any material change in any statement made herein occurring prior to the closing of my subscription.

3.      I, the undersigned, have adequate means of providing for my current needs and personal contingencies, have no need for liquidity in my investment in the Unit(s), and am able to bear the economic risk of an investment in the Unit(s) of the size contemplated. In making this statement I at the present time can afford a complete loss of such investment.

FINAL

18

4.    I, the undersigned,

(i)    am not a "US Person" within the meaning of Regulation S under the Securities Act (i.e., I am not a resident of the United States) and am an individual whose net worth, together with that of my spouse, excluding the value of our primary residence, exceeds US$1,000,000, and I acknowledge that at the time of the offer and sale of the Unit(s), I am not or will not be in the United States, and I confirm that the Units have not been offered or sold to me by any form of "directed selling efforts" in the United States within the meaning of Rule 902(c) of Regulation S under the Securities Act. "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia; and/or

(ii)    am an individual (A) whose individual net worth, or joint net worth with my spouse (excluding primary residence)[1], exceeds US$1,000,000; or (B) whose individual income exceeded US$200,000, or whose joint income with my spouse exceeded US$300,000, in each of the two most recent years and who has a reasonable expectation of reaching that income level in the current year.

My subscription will not cause the Company or the Manager to be in violation of any provision of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Patriot Act**"), the U.S. Bank Secrecy Act (the "**BSA**"), or any other anti-money laundering laws and regulations adopted to implement the provisions of such laws.  To the extent necessary or appropriate to satisfying the foregoing warranty, I will maintain policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA. I am not and shall not be a person: (i) who is identified on the List of Specially Designated Nationals and Blocked Persons maintained by the United States Office of Foreign Assets Control ("**OFAC**"); (ii) who is a citizen or resident of, or located in, any country that is the target of comprehensive economic sanctions administered by OFAC or by any other agency of the United States Government or in any country that is designated as a Non-Cooperative Jurisdiction by the Financial Action Task Force on money laundering ("**FATF**"), or who is a person whose funds are from or through such a jurisdiction; (iii) who is otherwise a person with whom a person subject to United States jurisdiction may not engage in transactions without authorization of the United States Government; (iv) who is a "Foreign Shell bank" within the meaning of the USA Patriot Act; or (v) residing in or organized under the laws of a jurisdiction designated by the United States Secretary of the Treasury under Sections 311 or 312 of the USA Patriot Act as warranting special measures due to money-laundering concerns.

---

[1] For purposes of calculating "net worth" of a person: (A) the person's primary residence shall not be included as an asset; (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

FINAL

CONFIDENTIAL INFORMATION

LENDERS_0003708

C.    <u>PAYMENTS</u>.

1.    The bank or other financial institution (the "**Wiring Institution**") from which my funds will be wired to pay the purchase price of the Unit(s) subscribed for is set forth below.  I, the undersigned, understand that any amounts paid to me will be paid to the same account from which my subscription funds were originally remitted unless the Manager agrees otherwise.

Name of Wiring Institution: _____
Address of Wiring Institution: _____
ABA, Chips or SWIFT Number
of Wiring Institution; _____
Account Name: _____
Account Number: _____
For Benefit of: _____
Account Representative: _____
Telephone: _____
                          (Area Code)         (Number)

I, the undersigned,    am _____    am not _____    a customer of the Wiring Institution.

2.    <u>Payments</u>.  I, the undersigned, hereby agree that all or any funds payable to me (including if my subscription is rejected or, if I am admitted as a member of the Company, any distributions of available cash of the Company when and as determined by the Manager pursuant to the terms set forth in the Operating Agreement) shall be delivered to me by wire transfer to the account specified in Section C(1) of this Questionnaire, unless otherwise agreed to in a written document signed by me and the Manager.

D.    <u>AUTHORIZATIONS; ACKNOWLEDGEMENTS; NOTICES; DECLARATION AND SIGNATURE</u>.

I, the undersigned, expressly authorize _____,
the escrow agent for the Offering, to obtain and verify information from others concerning credit standing, employment, identity verification and other information as required by the escrow agent's policy for opening deposit accounts.

I, the undersigned, understand and acknowledge that it is my obligation (i) to obtain from the Internal Revenue Service an Individual Taxpayer Identification Number ("**ITIN**") upon my admission as a member of the Company, (ii) to obtain from the U.S. Social Security Administration a Social Security Number ("**SSN**") upon my entry into the United States, and (iii) to provide the Company with my ITIN and SSN immediately upon receipt thereof, respectively.  I further understand that my failure to timely provide such ITIN and SSN to the Company may impact both the amount and timing of U.S. taxes that the Company will withhold with respect to my investment and my eligibility to apply any tax amounts previously withheld to offset my future tax liabilities.

FINAL

20

I, the undersigned, hereby authorize my Immigration Consultant named above and any of its designees to be my agent to accept any and all notices and other communications in respect of this Subscription Agreement, the subscription hereunder, the Company and/or the Units. I understand and acknowledge that service shall be deemed completed on delivery to my Immigration Consultant or its designee regardless of whether it was forwarded to and received by me.

I, the undersigned, understand and acknowledge that it is my obligation to consult with my own personal tax, investment, legal and/or other advisors as appropriate regarding the information I have provided herein.

I, the undersigned, understand and acknowledge that (i) I am solely responsible for filing a Form I-526 Petition, applying for conditional permanent residency in the United States, and filing a Form I-829 Petition and the costs and expenses related thereto, including, without limitation, fees and expenses of retaining immigration counsel, and that I and/or my immigration counsel shall be responsible for all matters related thereto, (ii) the involvement of the Company in such matters shall be limited, and (iii) the Company shall be entitled to rely exclusively on my Immigration Consultant or its designee in obtaining information related to such matters.

I, the undersigned, hereby further authorize my immigration counsel to directly communicate with and provide information to the Company and upon the Company's request, deliver to the Company any final and/or drafts versions of my Form I-526 Petition, Form I-829 Petition and any response to a request for evidence (an "**RFE**") or a notice of intent to deny (a "**NOID**") from the USCIS related to my Form I-526 Petition (including a copy of the associated RFE and/or NOID) before each is submitted to USCIS.  I understand and agree that I have retained separate legal counsel on immigration and other matters and that neither the Company nor its managers (including the Managers) and agents will be providing any financial, immigration or other professional advice to me or to my immigration counsel, including without limitation, any advice relating to my Form I-526 Petition, Form I-829 Petition, any RFE and/or NOID response or other immigration matters.

I, the undersigned, hereby represent and warrant that the foregoing information is true and correct and that all questions in this Questionnaire have been fully completed, and I understand and acknowledge that such information will be relied upon by the Company, the Manager and the escrow agent for the Offering, and I agree to notify the Company and the Manager immediately of any change in any statement made herein.

[*The remainder of this page is intentionally left blank.*]

FINAL

CONFIDENTIAL INFORMATION                                                                  LENDERS_0003710

IN WITNESS WHEREOF, I have executed this Questionnaire this _____ day of _____, 20__.

INVESTOR (INDIVIDUALS):

_____
Printed Name(s)

_____
Signature

_____
Signature (if Joint Tenants or
Tenants in Common)

FINAL

CONFIDENTIAL INFORMATION                                                    LENDERS_0003711

THE INVESTOR MUST RETURN THE FOREGOING COMPLETED AND SIGNED QUESTIONNAIRE TO:

Summit Village Development Lender 1, LLC
c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Centre
89 Queensway
Admiralty, Hong Kong
Facsimile: (852) 2530-8100

FINAL

CONFIDENTIAL INFORMATION

LENDERS_0003712

Exhibit to Memorandum for Summit Village Development Lender 1, LLC

## **EXHIBIT A-2**

## **CONFIDENTIAL PROSPECTIVE INVESTOR QUESTIONNAIRE**

Confidential Prospective Investor Questionnaire contained in Exhibit A-1 Form of Subscription Agreement

LENDERS_0003713

Exhibit to Memorandum for Summit Village Development Lender 1, LLC

## EXHIBIT B

## OPERATING AGREEMENT

[See Attached]

CONFIDENTIAL INFORMATION

FINAL

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**FOR**

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

**DATED AS OF SEPTEMBER 20, 2015**

THE MEMBERSHIP INTERESTS REPRESENTED BY OR ISSUED PURSUANT TO THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH MEMBERSHIP INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE U.S. STATE AND FEDERAL SECURITIES LAWS AND APPLICABLE NON-U.S. SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED UNDER SUCH ACT AND LAWS.  ANY TRANSFER OF THE MEMBERSHIP INTERESTS REPRESENTED BY OR ISSUED PURSUANT TO THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

**FINAL**

AMENDED AND RESTATED
OPERATING AGREEMENT
FOR
SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

This Amended and Restated Operating Agreement for **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**, a Delaware limited liability company (the "**Company**"), is entered into on and effective as of September 20, 2015 (the "**Effective Date**"), by and among the Members and the Class A Manager and the Class B Manager (each as defined below and each solely for their respective appointments as Managers of the Company under and to the extent provided in Article V of this Agreement and the respective Management Agreement, and solely in such capacities as Managers), with reference to the following facts:

A.    The Certificate of Formation of the Company was filed with the Delaware Division of Corporations on September 3, 2015.

B.    To provide for the initial governance and operation of the Company that certain Operating Agreement of the Company became effective as of September 8, 2015 (the "**Prior Agreement**").

C.    On September 16, 2015 KT Summit Manager (as defined below) acquired the entire membership interest of the Company and became its sole managing member (the "**Managing Member**").

D.    This Amended and Restated Operating Agreement (this "**Agreement**") amends and restates the Prior Agreement in its entirety, and the Managers hereby accept their respective appointments in accordance with this Agreement and subject further to the terms and conditions of the Management Agreements (as defined below).

E.    On the Effective Date, the entire Membership Interest in the Company held heretofore by KT Summit Manager under the Prior Agreement shall be designated as one Class A Unit (as defined below)

F.    Each Person, including a Class B Member upon the date of his or her admission as a new Member, upon the execution of a Joinder Agreement in the form attached hereto shall become a party to this Agreement subject to the terms and conditions hereof.

NOW, THEREFORE, the parties to this Agreement hereby agree as follows:

## ARTICLE I

## DEFINITIONS

When used in this Agreement (including the Schedule and Exhibits), unless the context otherwise requires, the following terms shall have the meanings set forth below (all terms used in

CONFIDENTIAL INFORMATION

this Agreement that are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

"**Act**" means the Delaware Limited Liability Company Act, as the same may be amended or superseded from time to time.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

 a. Credit to such Capital Account of any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5);

 b. Credit to such Capital Account of (i) the amount of the deductions and losses referable to any outstanding recourse liabilities of the Company owed to or guaranteed by such Member to the extent that no other Member bears any economic risk of loss and (ii) the amount of the deductions and losses referable to such Member's share (determined in accordance with the Member's Capital Contribution) of outstanding recourse liabilities owed by the Company to non-Members to the extent that no Member bears any economic risk of loss; and

 c. Debit to such Capital Account of the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Administration Fee**" means the amount paid by each Class B Member as one or more administration fees, including any discounts thereto, pursuant to his or her Subscription Agreement, which fee shall be held in escrow with an escrow agent pending release to the Company to be used for purposes specified under this Agreement.

"**Affiliate**" of any Person means any other Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such first Person. The term "control," as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies.

"**Affiliate Agreement**" means that certain Affiliate Agreement entered into between the Sponsor and the Regional Center on March 18, 2015, as the same may be amended, modified, supplemented and/or replaced by a new agreement from time to time pursuant to the terms thereof and hereof.

CONFIDENTIAL INFORMATION

**FINAL**

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Arbitration Service**" has the meaning set forth in Section 10.9.

"**Available Cash**" means the net cash proceeds from the Company's operations, including without limitation the proceeds from the repayment of the Loan, less the portion thereof used to pay, or establish reserves for, all the expenses (including debt payments) and contingent liabilities of the Company, all as determined by the Class B Manager.

"**BSA**" means the U.S. Bank Secrecy Act, as may be amended from time to time.

"**Capital Account**" means, with respect to any Member, the capital account that the Company establishes and maintains for such Member pursuant to Section 3.4.

"**Capital Contribution**" means, with respect to (a) the Class A Member, US$100; and (b) any Class B Member, a contribution or a series of contributions in cash made by such Class B Member (provided that the initial Capital Contribution must not be less than the minimum investment amount as required under the EB-5 Program from time to time (exclusive of the Administration Fee)).

"**Certificate of Formation**" means the Certificate of Formation of the Company filed with the Delaware Secretary of State on January 16, 2015, as amended or restated from time to time.

"**Class A Management Agreement**" means that certain Class A Management Agreement to be entered into between the Company and the Class A Manager on or about the date of this Agreement, as the same may be amended, modified, supplemented and/or replaced by a new agreement from time to time pursuant to the terms thereof and hereof.

"**Class A Manager**" has the meaning set forth in Section 5.2.1, or its successor as appointed pursuant to Section 5.2.

"**Class A Member**" means any Member of record holding, and to the extent it holds, Class A Units, which shall initially be KT Summit Manager.

"**Class A Units**" means any Unit denominated as "Class A" hereunder.

"**Class B Management Agreement**" means that certain Class B Management Agreement to be entered into between the Company and the Class B Manager on or about the date of this Agreement, as the same may be amended, modified, supplemented and/or replaced by a new agreement from time to time pursuant to the terms thereof and hereof.

"**Class B Manager**" has the meaning set forth in Section 5.2.1, or its successor as appointed pursuant to Section 5.2.

"**Class B Member**" means any Member of record holding and to the extent it holds Class B Units.

Page - - 3 - -

"**Class B Unit**" means any Unit denominated as "Class B" hereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of any succeeding law, and to the extent applicable, the Regulations.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Company Counsel**" has the meaning set forth in Section 10.1.

"**Company Minimum Gain**" has the meaning ascribed to the term "Partnership Minimum Gain" in Regulations Section 1.704-2(d).

"**Company Person**" has the meaning set forth in Section 5.9.

"**Development**" means that real estate redevelopment undertaken or to be undertaken by the Project Company, which entails the development of a mixed use retail, residential and hotel project on approximately 4.04 acres of land located in a gently sloping saddle near the summit of Powder Mountain located in Weber County, Utah.

"**EB-5 Program**" means the EB-5 immigrant investor visa program under the Immigration and Nationality Act and the related regulations and standards adopted by the USCIS, as amended or superseded from time to time.

"**Effective Date**" has the meaning set forth in the preamble to this Agreement.

"**Fiscal Year**" means the Company's fiscal year, which shall be the calendar year, or any portion of such period for which the Company is required to allocate Net Profits, Net Losses, or other items of Company income, gain, loss, or deduction pursuant to this Agreement.

"**Form I-526 Petition**" means the USCIS Form I-526 Immigrant Petition by Alien Entrepreneur, as amended or superseded from time to time.

"**Form I-829 Petition**" means the USCIS Form I-829 Petition by an Entrepreneur to Remove Conditions, as amended or superseded from time to time.

"**KT Summit Manager**" means KT Summit Development Manager, LLC, a Washington state limited liability company formed on September 15, 2015.

"**I-290B Notice**" means the USCIS I-290B Notice of Appeal or Motion.

"**Loan**" means one or more loans to be made by the Company to the Project Company pursuant to the Loan Agreement, the proceeds of which will be used by the Project Company in connection with the Development.

"**Loan Agreement**" means one or more loan agreements, each one to be entered into between the Company, as lender, and the Project Company, as borrower, pursuant to which the Company will make the Loan.

CONFIDENTIAL INFORMATION

**FINAL**

"**Loss**" has the meaning set forth in Section 5.6.2.

"**Majority in Interest**" means a vote, consent or approval of more than fifty percent (50%) of all of the Voting Percentage Interests held by the Class A Members, with each Class A Member having one (1) vote for each percent of Voting Percentage Interest held.

"**Management Agreements**" means the Class A Management Agreement and the Class B Management Agreement, collectively.

"**Manager**" means each manager of the Company as appointed from time to time pursuant to Section 5.2.1.

"**Manager Persons**" has the meaning set forth in Section 5.9.

"**Managing Member**" has the meaning set forth in the preamble to this Agreement.

"**Member**" means each Person who (a) has been admitted as a Member in accordance with the Certificate of Formation, the Prior Agreement or this Agreement, or has become a Member pursuant to a Transfer in accordance with Article VII, and (b) has not retired, resigned, withdrawn, been expelled, or been removed as a Member, or, if other than an individual, been dissolved.

"**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to each Member Nonrecourse Debt, an amount equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" means items of Company loss, deduction or Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt or to other liabilities of the Company owed to or guaranteed by a Member to the extent that no other Member bears the economic risk of loss.

"**Members Schedule**" has the meaning set forth in Section 3.1.3.

"**Membership Interest**" means a Member's limited liability company interest in the Company, which shall be held in the form of Class A Units or Class B Units, including (i) the Member's right to share in income, gains, losses, deductions, credits, or similar items of, and to receive distributions from, the Company pursuant to this Agreement and the Act, (ii) the right to vote or participate in the management of the Company to the extent herein provided or as specifically required by the Act, (iii) the right to receive information concerning the business and affairs of the Company, and (iv) any other rights and obligations of a member of a limited liability company under the general provisions of the Act except to the extent modified hereunder in accordance with the Act.

CONFIDENTIAL INFORMATION                                                                    LENDERS_0003720

"**Net Capital Account Balance**" means, with respect to any Member, the current balance of such Member's Capital Account less such Member's Capital Contributions.

"**Net Profits**" and "**Net Losses**" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

      a.      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

      b.      Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

      c.      If the book value of any Company asset is adjusted as a result of the application of Regulations Section 1.704-1(b)(2)(iv)(e) or Regulations Section 1.704-1(b)(2)(iv)(f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

      d.      Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its book value;

      e.      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation, amortization, and other cost recovery deductions for such Fiscal Year, computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); and

      f.      Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 6.3 or Section 6.4 hereof shall not be taken into account in computing Net Profits or Net Losses (the amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 6.3 or Section 6.4 hereof shall be determined by applying rules analogous to those set forth in paragraphs a through e above).

The foregoing definition of Net Profits and Net Losses is intended to comply with the provisions of Regulations Section 1.704-1(b) and shall be interpreted consistently therewith. If the Class B Manager determines that the Company is required to modify the manner in which Net Profits and Net Losses are computed in order to comply with such Regulations, the Class B Manager may make such modification, provided that any material modification shall be

CONFIDENTIAL INFORMATION

LENDERS_0003721

conditioned upon the issuance of an opinion of counsel for the Company confirming the necessity of such modification.

"**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1).

"**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

"**Offering**" means the placement by the Company of Class B Units pursuant to the Private Placement Memorandum.

"**Permitted Transferee**" has the meaning set forth in Section 7.1.3.

"**Person**" means any natural person, corporation, partnership, trust, voluntary association, limited liability company, joint venture, unincorporated organization, government (or any agency, instrumentality or political subdivision thereof) or other association or entity of any kind.

"**Prior Agreement**" has the meaning set forth in the preamble of this Agreement.

"**Private Placement Memorandum**" means the confidential private placement memorandum of the Company dated September 18, 2015, used in connection with the Offering, as may be further amended, supplemented and restated from time to time.

"**Project Company**" means SMHG Village Development LLC, a Delaware limited liability company.

"**Regional Center**" means, as of the Effective Date, Mountain States Center for Foreign Investment, LLC a Utah limited liability company, or such other regional center as may be appointed from time to time to sponsor the Development in connection with the EB-5 Program.

"**Regulations**" means the rules and regulations issued by the U.S. Department of the Treasury pursuant to its authority under the Code as such regulations are codified in the Code of Federal Regulations. If a word or phrase is defined in this Agreement by cross-referencing the Regulations, then to the extent the context of this Agreement and the Regulations require, the term "Member" shall be substituted in the Regulations for the term "partner", the term "Company" shall be substituted in the Regulations for the term "partnership", and other similar conforming changes shall be deemed to have been made in the Regulations for purposes of applying the Regulations.

"**Regulatory Allocations**" has the meaning set forth in Section 6.4.

"**Rules**" has the meaning set forth in Section 10.1.

"**Securities Act**" means the Securities Act of 1933, as may be amended from time to time.

CONFIDENTIAL INFORMATION

LENDERS_0003722

"**Sponsor**" means Summit Mountain Holding Group, L.L.C., a Utah limited liability company and the 100% owner of the Project Company.

"**Subscriber**" means a subscriber of one or more Class B Units pursuant to the applicable Subscription Agreement.

"**Subscription Agreement**" means the subscription agreement executed and delivered by each Class B Member to subscribe for Class B Units.

"**Super Majority in Interest**" means a vote, consent or approval of more than sixty-seven percent (67%) of all of the Voting Percentage Interests held by the Members, with each Member having one (1) vote for each percent of Voting Percentage Interest held.

"**Transfer**" means any sale, transfer, assignment, delegation, hypothecation, encumbrance or other disposition, whether voluntary or involuntary or by operation of law, and whether by gift, bequest or otherwise.  In the case of a hypothecation, the Transfer shall be deemed to occur both at the time of the initial pledge and at any pledgee's sale or a sale by any secured creditor.  For purposes hereof, "Transfer" shall include without limitation any direct or indirect material change of control or ownership of such Person.

"**Units**" means units evidencing a Member's Membership Interest, consisting of the Class A Units and the Class B Units.

"**USCIS**" means United States Citizenship and Immigration Services.

"**Voting Percentage Interest**" means, for each Member, a percentage of voting power calculated by dividing the amount of such Member's Capital Contribution by the aggregate amount of Capital Contributions of all Members (or in the case of voting by a particular class of Members, the aggregate amount of Capital Contributions of all Members of that class).

Headings are included herein for convenience only and shall not be deemed part of or used in construing this Agreement; references using the singular shall include the plural (and vice versa); all pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the context may require; and references to exhibits, attachments, annexures and numbered sections, clauses or paragraphs shall be to such addenda and provisions herein, and all such addenda are hereby incorporated herein by reference. References to legislation or legislative provisions include any amendment, consolidation, extension or re-enactment from time to time, and any orders, regulations, instruments or other subordinate legislation made under that legislation or legislative provision.

## ARTICLE II

## ORGANIZATIONAL MATTERS

2.1      Formation.  Pursuant to the Act, the Company was formed as a Delaware limited liability company under the laws of the State of Delaware through the filing of the Certificate of Formation with the Delaware Division of Corporations and such filing and formation is hereby

CONFIDENTIAL INFORMATION                                                            LENDERS_0003723

ratified and confirmed. The Class B Manager as an authorized person under the Act shall cause to be executed and filed any and all amendments or restatements of the Certificate of Formation approved hereunder.

       2.2   <u>Name</u>. The name of the Company shall be "Summit Village Development Lender 1, LLC". The business and affairs of the Company may be conducted under that name or any other name that the Class B Manager may deem appropriate or advisable. The Class B Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that may be appropriate or advisable.

       2.3   <u>Term</u>. The term of the Company commenced on September 3, 2015, the date of the filing of the Certificate of Formation with the Delaware Division of Corporations, and shall continue until December 31, 2025 as provided in Article IX.

       2.4   <u>Principal Office; Registered Agent</u>. The principal office of the Company is c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Centre, 89 Queensway, Admiralty, Hong Kong, or such other place or places as the Class B Manager may from time to time designate. The Company shall continuously maintain an agent for service of process and office in the State of Delaware as required by the Act. The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by the Class B Manager. The name and address of the Company's agent for service as of the date of this Agreement is The Corporation Trust Company, 1209 Orange St, Wilmington, Delaware, 19801, and such agent for service may be removed and replaced by the Class B Manager in its sole discretion.

       2.5   <u>Purpose and Powers of the Company</u>. The Company has been formed to engage in any lawful business activity. As its first business undertaking, the Company intends to make the Loan to the Project Company and engage in such other activities related or incidental to the Loan, or as may be determined in the good faith and reasonable opinion of the Class B Manager to be necessary, advisable or appropriate by the Class B Manager to further such purpose, subject to the terms and restrictions of this Agreement. While the Loan is outstanding, the Company shall not engage in any business, and it shall have no purpose, unrelated to the making and administration of the Loan and shall not acquire any real property or own assets other than those, if any, related to the collateral acquired upon foreclosure of any lien or security interest securing repayment of the Loan or otherwise in furtherance of the purpose of the Company. The Company shall have all of the powers provided for a limited liability company under the Act in order to carry out the foregoing purposes.

       2.6   <u>Ratifications</u>. The Company and the Members hereby approve, ratify and confirm all actions heretofore taken, including the following documents filed, executed or approved by or on behalf of the Company by the Managing Member, Kevin Stamper, or such other authorized Person or authorized signatory designated therein, copies of which have been reviewed by the Class B Manager:

            2.6.1     Certificate of Formation;

            2.6.2     Private Placement Memorandum;

CONFIDENTIAL INFORMATION

2.6.3      the Management Agreements; and

2.6.4      any other agreements entered into by the Company and delivered to the Class B Manager heretofore.

**ARTICLE III**

**CAPITAL CONTRIBUTIONS**

3.1      <u>Units; Initial Capital Contributions</u>.

3.1.1      As of this Agreement becoming effective, entire Membership Interest held by KT Summit Manager shall be designated as one Class A Unit and KT Summit Manager shall be the Class A Member as of the Effective Date.

3.1.2      In connection with the Offering, each Class B Member has made the initial Capital Contribution in the amount set forth in the Members Schedule and paid the Administration Fee to the Company in accordance with the Subscription Agreement. The Company has issued one or more Class B Units to each Class B Member that has satisfied all the conditions to the closing of his/her subscription under the Subscription Agreement and executed and delivered a Joinder Agreement in the form attached hereto.

3.1.3      The Class B Manager shall maintain a schedule of Members, their respective mailing addresses and their Capital Contributions (the "**Members Schedule**") and shall update the Members Schedule to reflect any changes thereto in accordance with this Agreement and applicable law. A current copy of the Members Schedule is attached hereto as Exhibit A.

3.2      <u>Additional Capital Contributions</u>. No Member shall be required to make any Capital Contributions other than the initial Capital Contributions specified in Section 3.1. However, the Members may be permitted (but shall not be required) from time to time to make additional Capital Contributions if the minimum investment amount as required under the EB-5 Program has been increased before the approval of the Class B Member's Form I-526 Petition, provided that any Member making such additional Capital Contributions shall also pay to the Company an additional amount of the Administration Fee as described in the Private Placement Memorandum as if such Member was making the subscription at the increased Subscription Price (as defined in the Private Placement Memorandum) and all monies received from such Member shall first be applied by the Company towards payment of such additional amount of the Administration Fee. Members may also be permitted (but shall not be required) from time to time to make additional Capital Contributions if the Class B Manager determines that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business and affairs. The Class B Manager shall determine all the terms and conditions of any such additional Capital Contributions, such as the amount and nature of the consideration to be contributed to the Company, the resulting increase in Membership Interests to be received by the contributing Member, the resulting dilution of interest to be incurred by the other Member(s), and the extent to which Members will participate in the allocations and distributions of the Company as a result thereof; provided, however, that if such additional Capital Contributions are

Page - - 10 - -

not to be made as a result of an increase in the minimum investment amount as required under the EB-5 Program or by all of the Members on a pro rata basis, then any such additional Capital Contributions and corresponding changes in the Membership Interests shall require the approval of the Members pursuant to Section 4.8.

3.3     Company's Expenses. For the purpose of paying general and administrative expenses incurred and to be incurred by the Company, the Company shall procure the Project Company to provide a payment to the Company, which payments would partially offset the principal repayment obligation of the Project Company under the Loan, in an aggregate amount of up to US$130,000 per year during the term of the Loan on commercially reasonable terms. No portion of such payment provided by the Project Company shall be made using any Offering proceeds or amounts received by the Project Company under the Loan. Additionally, Capital Contributions shall not be used by the Company to pay for any of its expenses, including the compensation of the Managers pursuant to the Management Agreements or hereunder.

3.4     Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv) and, in pursuance thereof, the following provisions shall apply:

3.4.1     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocated share of Net Profits and any items in the nature of income or gain that are allocated pursuant to Section 6.3 or Section 6.4, and the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member;

3.4.2     To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocated share of Net Losses and any items in the nature of expenses or losses that are allocated pursuant to Section 6.3 or Section 6.4 hereof, and the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

3.4.3     If all or a portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

3.4.4     In determining the amount of any liability for purposes of Sections 3.4.1 and 3.4.2, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such section of the Regulations. If the Class B Manager determines that the Company is required to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such section of the Regulations, the Class B Manager may make such modification, provided that any

CONFIDENTIAL INFORMATION                                                    LENDERS_0003726

material modification shall be conditioned upon the issuance of an opinion of counsel for the Company confirming the necessity of such modification.

      3.5    <u>No Interest</u>.  No Member shall be entitled to receive any interest on such Member's Capital Contributions to the Company.

      3.6    <u>No Withdrawal</u>.  No Member shall have the right to withdraw such Member's Capital Contributions or to demand and receive property of the Company or any distribution in return for such Member's Capital Contributions, except as may be specifically provided in this Agreement or required by law.

      3.7    <u>Administration Fee</u>.  The Administration Fee will be utilized to pay the fees and expenses in connection with the Company's affiliation with the Regional Center and of certain finders unaffiliated with the Company that were retained to identify potential subscribers for Class B Units in the Offering.

## ARTICLE IV

## MEMBERS

      4.1    <u>Limited Liability</u>.  Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation or liability of the Company, whether that debt, obligation or liability arises in contract, tort or otherwise.

      4.2    <u>Admission of Additional Members</u>.  Except as set forth in Article VII and subject to Section 4.8, other than the initial Class A Member, no Person shall be admitted as a Member unless and until such admission has been approved by the Class B Manager.  No Person shall become a Member until such Person has satisfied all of the requirements under the Subscription Agreement. Substitute Members may be admitted only in accordance with Article VII.  The Members acknowledge that the admission of new Members or the issuance of additional Membership Interests may dilute the economic interests of the Members.

      4.3    <u>Transactions with the Company</u>.  Subject to any limitations set forth in this Agreement, a Member may lend money to and transact other business with the Company upon such terms as may be approved by the Class B Manager.

      4.4    <u>Meetings of Members</u>.  No annual or regular meetings of the Members shall be required.  Any action that can be taken at a meeting of the Members may be taken without a meeting if a consent in writing setting forth the action so taken is delivered to the Company by Members representing not less than the minimum vote necessary under this Agreement to approve the action.

      4.5    <u>Voting by Members</u>.  The Members, acting solely in their capacities as Members, shall have the right to vote on, consent to, or otherwise approve only those matters as to which Section 4.8 of this Agreement or the Act (to the extent not modified by this Agreement) specifically requires approval of the Members. Each Member shall have units of voting power equal to the Member's Voting Percentage Interest.  For all matters as to which the vote,

CONFIDENTIAL INFORMATION

consent, or approval of the Members is specifically required pursuant to Section 4.8 of this Agreement or the Act (to the extent not modified by this Agreement), the vote, consent, or approval of a Super Majority in Interest of the Members shall be required; provided that to the extent that the relevant matter is one expressly requiring the Class A Manager's approval pursuant to this Agreement (if any), vote, consent, or approval of only a Majority in Interest of the Class A Members may be in lieu of such Class A Manager's approval. For all matters as to which the vote, consent, or approval of only the Class A Members is specifically required or permitted under Section 4.8 of this Agreement or the Act, the vote, consent, or approval of only a Super Majority in Interest of the Class A Members shall be required. For all matters as to which the vote, consent, or approval of only the Class B Members is specifically required or permitted under Section 4.8 of this Agreement or the Act, the vote, consent, or approval of only a Super Majority in Interest of the Class B Members shall be required.

4.6     Members Are Not Agents.  No Member acting solely in its capacity as a Member shall be deemed to be an agent of the Company, nor shall any Member acting solely in its capacity as a Member have any right or authority to bind the Company or execute any agreement or instrument on behalf of the Company.

4.7     No Withdrawal.  Except as provided in Articles VII and IX hereof, no Class B Member may withdraw, retire, or resign from the Company without the prior consent of the Class B Manager.  The Class A Member may withdraw, retire, or resign from the Company at such time as the initial Class A Member ceases to be the Class A Manager under this Agreement and the Class A Management Agreement.

4.8     Voting Rights of the Members.  Notwithstanding any contrary provision of this Agreement or in the Act, and notwithstanding any rights or powers otherwise expressly granted to the Class B Manager hereunder, Members have the right to approve or disapprove the following, and only the following matters:

4.8.1     the dissolution and winding up of the Company;

4.8.2     the merger, consolidation, or other business combination of the Company with any Person;

4.8.3     the sale, exchange, lease, mortgage, pledge or other transfer of all or substantial part of the assets of the Company other than as contemplated in the Loan Agreement and otherwise in the ordinary course of the Company's business;

4.8.4     the incurrence of any obligation or indebtedness exceeding 10% of the value of the Company's assets;

4.8.5     a change in the fundamental nature of the business of the Company, or a change in the fundamental purpose of the Company, from making a Loan secured by the Development;

CONFIDENTIAL INFORMATION                                                    LENDERS_0003728

4.8.6    investing more than 10% of the Company's total assets in any entity or in any asset other than the promissory note evidencing the Loan, the Project Company and the Development;

4.8.7    subject to Section 5.2, amending the terms of the Class B Management Agreement for or on behalf of the Company;

4.8.8    subject to Section 5.2, appointment, reappointment or removal of the Class B Manager, as the case may be;

4.8.9    a change in the Certificate of Formation whereby the management of the Company is vested in the Members; and

4.8.10    to the extent not made as a result of an increase in the minimum investment amount as required under the EB-5 Program or by all of the existing Members on a pro rata basis, any additional Capital Contributions to be made by the Members and corresponding changes in the Membership Interests.

4.9    Allocation of Job Creation Credit.  In connection with the EB-5 Program, the allocation to each Class B Member of job creation numbers arising from fulfillment of the Project Company's business plan will be reported to the Regional Center, and double counting of any jobs shall be avoided.  Jobs created by the Development that qualify for approval at the Form I-829 Petition stage shall be allocated to the Class B Members in accordance with the EB-5 Job Allocation Addendum attached hereto as the Schedule.

# ARTICLE V

## MANAGEMENT AND CONTROL OF THE COMPANY

5.1    Management of the Company.

5.1.1    Management by the Class B Manager.  Except as otherwise expressly set forth in this Agreement, the business, property, and affairs of the Company shall be managed, and all powers of the Company shall be exercised, by or under the direction of the Class B Manager.  Without limiting the generality of the foregoing, and in addition to any other rights and powers vested in the Class B Manager in this Agreement, the Class B Manager shall have the right, power and authority (without the Members' approval but subject to the other provisions of this Article V at all times, including Section 5.5 hereof) to do or cause to be done each of the following for or on behalf of the Company:

(a)    enter into and approve the acceptability of the Subscription Agreements;

(b)    pay, in accordance with the provisions of this Agreement, all expenses, debts and obligations of the Company to the extent that funds are available therefor;

CONFIDENTIAL INFORMATION

**FINAL**

(c)     enter into the Loan Agreement and related collateral and other documents, and to make the Loan;

(d)     consent to, approve or agree to settle any claim, litigation or threatened litigation involving the Company or confess to a judgment against the Company;

(e)     make any tax election, settle any tax controversy or make tax decisions with respect to the Company;

(f)     invest, from time to time, Company funds in time deposits of United States banks or short-term U.S. Treasury notes or other government agency securities including without limitation Fannie Mae- and Freddie Mac-backed securities;

(g)     hire employees to carry on the Company's business;

(h)     appoint and remove the Company's legal counsel, accountant, tax adviser, registered agent, agent of service, and other professional service providers;

(i)     negotiate, amend, supplement or provide approvals, consents or any other decision to be made by the Company under the terms of the Loan;

(j)     exercise any rights of the Company with respect to the Loan and any agreement made between the Company and the Project Company, including without limitation by commencing foreclosure and legal proceedings against the Project Company;

(k)     make payments to the Managers or otherwise carry out the terms of the Management Agreements;

(l)     approve the terms of appointment of any successor to the initial Regional Center and execute any necessary documentation with such successor Regional Center;

(m)     approve the terms of appointment of any successor to the initial Class A Manager and execute a Class A Management Agreement with such successor;

(n)     enter into any agreement that the Class B Manager may reasonably deem appropriate for any purpose beneficial to the Company;

(o)     establish reasonable reserve funds from income derived from the Loan, but the Company shall not establish reserves consisting of Capital Contributions of Class B Members prior to repayment of the Loan by the Project Company;

(p)     distribute funds to the Class B Members, by way of cash or otherwise, all in accordance with the provisions of this Agreement;

(q)     perform or cause to be performed all of the Company's obligations under any agreement to which the Company is a party; and

CONFIDENTIAL INFORMATION

(r)    execute, acknowledge and deliver any and all instruments necessary to effectuate any of the foregoing.

The Members acknowledge that the Class B Manager may take actions that will not equally benefit the immigration interests (i.e., those in connection with Class B Members' applications for an immigrant visa) and economic interests (i.e., those in connection with the Class B Members' indirect economic investment through the Loan) of the individual Class B Members and that in some cases a decision in favor of one set of interests could come at a cost to the other.

5.1.2    Agency Authority of Class B Manager.  The Class B Manager may endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, sign checks, drafts, and other instruments obligating the Company to pay money, and sign agreements or other documents on behalf of the Company.  Subject to the provisions of this Agreement, the Class B Manager may delegate any power to any Person, including but not limited to, any officer or employee or agent of the Company as it determines to be appropriate.

5.1.3    Advisory Committee.  Without in any way limiting the powers of the Class B Manager, the Class B Members may engage in general policy formulation with respect to the management of the Company by means of participation in an advisory committee of the Company; provided, however, that under no circumstances shall the Class B Manager be bound by or otherwise be required to comply with any policies established thereby.  All costs and expenses associated with the advisory committee shall be borne by the Company.

5.2    Managers.

5.2.1    Number, Term, and Qualifications.

(a)    As of the Effective Date, the Company shall have two managers, the "**Class A Manager**" and the "**Class B Manager**". KT Summit Manager is hereby appointed as the initial Class A Manager, and Celona Asset Management (USA) Limited, a company incorporated under the laws of the Hong Kong Special Administrative Region of the People's Republic of China ("**Celona**"), is hereby appointed as the initial Class B Manager, and subject further to the terms and conditions in the Management Agreements.

(b)    The appointments as of the Effective Date of both KT Summit Manager as the initial Class A Manager and Celona as the initial Class B Manager were authorized by KT Summit Manager as the Managing Member prior to the Effective Date, without the need for any additional or separate approvals; provided, that although Class B Member approval of such appointments is not required, each Class B Member, by becoming a signatory (including through joinder) to this Agreement, acknowledges and agrees that it has reviewed and accepted the terms and conditions of the Management Agreements.

(c)    Each Manager shall hold office for a term commencing on the date of its appointment and expiring upon the earlier of (i) the date on which such Manager is removed pursuant to the terms of this Agreement, dies or is dissolved or (ii) as otherwise provided in the relevant Management Agreement.  The Class A Management Agreement and the

Page - - 16 - -

FINAL

Class B Management Agreement shall be deemed to terminate upon any resignation, removal or dissolution of the Class A Manager or the Class B Manager, respectively, in accordance with the provisions of this Agreement and the respective Management Agreement. A Manager does not need to be a Member in order to serve as a Manager.

(d)    The Class B Members shall have the power and authority to appoint a successor Class B Manager in the event of the removal, resignation in accordance with the Class B Management Agreement, death or dissolution of the Class B Manager, and shall have the right to cause the Company to enter into a Class B Management Agreement (and the terms or any amendment thereof) in respect of any successor Class B Manager.  The Class B Manager shall have the exclusive power and authority to appoint a successor Class A Manager pursuant to Section 5.1.1(m) in the event of removal or resignation of the Class A Manager in accordance with the Class A Management Agreement.

5.2.2    Resignation.

(a)    Except as the term of the Class A Management Agreement shall expire as provided therein or otherwise permitted thereby, the Class A Manager shall not be permitted to resign or terminate the Class A Management Agreement.

(b)    The Class B Manager may resign or terminate the Class B Management Agreement only as permitted under the Class B Management Agreement.

(c)    The resignation of a Manager shall not affect the Manager's rights as a Member, if applicable, and shall not by itself constitute a withdrawal of a Member.

5.2.3    Removal.

(a)    The Class A Manager may be removed by the Class B Manager, in such manner as provided under the Class A Management Agreement.  In the event such removal shall give rise to any adverse impact on the Company's affiliation with the then Regional Center, the Company shall seek affiliation with a successor Regional Center so that (i) the Development will continue to be a qualifying investment under the EB-5 Program and will be within the scope of the successor Regional Center's regional center designation, which shall be in good standing, and (ii) indirect and induced jobs created by the Development will continue to be counted for the purposes of the EB-5 Program.

(b)    The Class B Manager may be removed only with the approval of the Class B Members, subject to the requirements of the Class B Management Agreement, provided that (i) the Class B Members shall cause the Company to issue a written notice of termination to the Class B Manager, (ii) the Members shall have approved the appointment of a successor Class B Manager in accordance with the procedures set forth in Section 5.2.1, and (iii) a Class B Management Agreement on terms approved by the Class B Members shall have been executed by such successor Class B Manager.

CONFIDENTIAL INFORMATION

(c)    Any removal of a Manager shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member, except as otherwise provided in this Agreement or any other contract with such Member.

(d)    Except as provided under Section 5.2.2, upon the permitted removal or resignation of a Manager and prior to the appointment of a replacement Manager, the remaining Manager (whether a Class A Manager or a Class B Manager) shall not be entitled to assume or seek to exercise any rights or powers of the Manager that has resigned or been removed until the applicable Members have had a reasonable opportunity to approve the appointment of a replacement Manager, or as otherwise approved by the applicable Member(s).

5.2.4    <u>Decision Making</u>.

(a)    The Class B Manager shall have power and authority over management of the Company to the exclusion of the Class A Manager, and the Class B Manager, except as expressly provided in Section 5.2.4(b), shall be responsible for general management and operation of the Company in accordance with the provisions of this Agreement.

(b)    The Class A Manager (A) shall (i) perform such services as set forth in the Class A Management Agreement, and (ii) execute on behalf of the Company the Class B Management Agreement as approved by the Members; and (B) shall have the right to (i) review the books, accounts, and records of the Company to monitor the Class B Manager's compliance with the terms of this Agreement, the Act, and any other applicable laws, (ii) restructure the appointment of the Class B Manager solely to the extent required by Section 5.13.2 hereof, (iii) give written notice to the Class B Manager on behalf of the Company of any breach of the Class B Management Agreement as required thereunder, and (iv) bring any action against the Class B Manager on behalf of the Company in respect of any breach or suspected breach of this Agreement, the Class B Management Agreement, or any other agreement between the Company and the Class B Manager (provided, in each of cases (iii) and (iv) such actions are directed by the Class B Members entitled to remove Class B Manager). The Class B Manager shall provide and make available to the Class A Manager all information and documents reasonably requested by Class A Manager to the extent necessary for the Class A Manager's exercise of its management rights and responsibilities as set forth herein and in the Class A Management Agreement.

5.3    <u>Officers</u>.

5.3.1    <u>Appointment of Officers</u>.  The Class B Manager may, at the expense of the Company, appoint officers of the Company at any time and from time to time.  The officers of the Company may include, but are not limited to, a chairman, president, vice presidents, secretary, chief financial officer and treasurer.  The officers shall act as agents of the Company and serve at the pleasure of the Class B Manager, without prejudice to the rights, if any, of an officer under any contract of employment.  Any individual may hold any number of offices. Subject to any limitations contained in this Agreement, the officers shall exercise such powers and perform such duties, and shall receive such salaries and other compensation paid by the Company, as are determined from time to time by approval of the Class B Manager or as permitted or authorized in this Agreement.  An officer need not be a Member or a Manager.

CONFIDENTIAL INFORMATION                                    LENDERS_0003733

5.3.2    Removal, Resignation, and Filling of Vacancy of Officers.  Any officer may be removed, either with or without cause, by the Class B Manager at any time.  Any officer may resign at any time by giving written notice to the Class B Manager.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation or removal is without prejudice to the rights, if any, of the parties under any contract to which the officer is a party.  A vacancy in any office because of death, resignation, removal, disqualification, or any other cause shall be filled, if at all, by the Class B Manager.

5.3.3    Signing Authority of Officers.  Subject to any restrictions imposed by the Class B Manager, any officer, acting alone, is authorized to endorse checks, drafts and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.  Subject to the terms of bank resolutions, if any, adopted by the Class B Manager with respect to each Company disbursement account, all checks, drafts or other instruments obligating the Company to pay money may be signed on behalf of the Company by any officer, acting alone.  Subject to any restrictions imposed by the Class B Manager, the president or the chief financial officer (and such other officers as the Class B Manager may designate from time to time), acting alone, shall be authorized to sign contracts and obligations on behalf of the Company.

5.4    Limitations on Authority.  Neither Manager nor any officer shall do any act in contravention of this Agreement, or possess Company property or assign rights in Company property other than for Company purposes.

5.5    Fiduciary Duties of Managers.  Subject to Section 5.9 hereof, to the extent each Manager shall have and owe to the Company and to the Members under applicable law, any fiduciary duties, a Manager shall not be liable for a breach of any such duties except to the extent that the Manager is shown to have acted in a manner where the Manager would not be entitled to indemnification, or would be required to indemnify the Company and/or its Members, pursuant to the terms of this Agreement.

5.6    Limited Liability.

5.6.1    Acknowledgement.  The Members expressly acknowledge that the Managers have been, and the officers may be, given substantial responsibilities and discretion pursuant to this Agreement.  In order to assure the Managers and the officers that they may carry out their responsibilities and exercise their discretion hereunder, the Members agree that the following provisions in this Section 5.6 governing limitation on liabilities and indemnities shall apply.

5.6.2    Limitations on Liability of Member, Manager, or Officer.  To the maximum extent permitted by law, and notwithstanding any contrary provision of this Agreement or the Management Agreements, if applicable, or the failure of the essential purpose of any remedy of any kind, no Member, Manager or officer of the Company (including their respective directors, partners, owners, managers, officers, employees or agents) shall be individually or personally liable under any judgment of a court or arbitrator, or in any other

CONFIDENTIAL INFORMATION                                                    LENDERS_0003734

manner, for any claims, actions, suits, demands, damages, debt, liabilities, obligations, losses, penalties, fines, settlements, judgments, costs and expenses (collectively "**Loss**") of the Company or any other Member, whether arising in contract, tort, or otherwise and whether or not involving a third party claim, solely by reason of its or his being or acting as a Member, Manager, officer of the Company, or their respective director, partner, owner, manager, officer, employee or agent, except to the extent any such Loss is shown to have resulted from the gross negligence or intentional misconduct of such party.

       5.6.3    <u>Class B Manager and EB-5 Program Matters</u>.  Notwithstanding anything to the contrary in this Section 5, the Class B Manager shall not be responsible or liable for (a) the Company's and/or any Member's compliance with USCIS' rules and regulations except to the extent the Class B Manager fails to comply with reasonable effort with any instructions of the Class A Manager regarding matters that may facilitate compliance by the Class A Manager (if any), the Company, or the Class B Members with the EB-5 Program; or (b) any damages or losses due to the Class B Members' investment in the Company carrying a complex set of goals, including but not limited to financial and immigration goals, which may potentially conflict with one another, such that it may not always be possible that all the stated and implicit goals are achieved to the complete satisfaction of all the Class B Members.

       5.7    <u>Indemnification</u>.

       5.7.1    <u>Indemnification of the Managing Member</u>.  The Company hereby agrees to hold harmless and fully indemnify and defend (collectively "**indemnification**" or "**indemnify**" or any variation thereof) the Managing Member and any affiliates thereof and their officers, employees or agents against any and all Losses suffered or incurred by any of them by reason of the Prior Agreement or any actual or alleged act or omission undertaken by any of them related to the Prior Agreement including, but not limited to, all reasonable legal fees and costs (on a full indemnity basis) and any other expenses properly incurred, except to the extent such Loss results from the gross negligence or intentional misconduct of the entity or person being indemnified hereunder.

       5.7.2    <u>Indemnification of Managers, Officers and Employees of the Company</u>. To the maximum extent permitted by law, and notwithstanding any contrary provision of this Agreement, the Company agrees to indemnify, hold harmless and defend each Manager (inclusive of its Affiliates, managers, directors, officers, agents, employees, members, and representatives) and officer, employee or agent of the Company (each an "**Indemnified Person**") from and against any and all Losses suffered or incurred by such Indemnified Person, to the extent related to any actual or alleged act or omission of such Indemnified Person in connection with the business of the Company or service to, for, or at the request of the Company in good faith on behalf of or for the Company and in a manner reasonably believed to be in, or not opposed to, the interests of the Company, except that such Indemnified Person shall not be entitled to be indemnified for any Loss resulting from, (i) the gross negligence or intentional misconduct of such Indemnified Person, or (ii) in the case of a criminal proceeding, where the Indemnified Person has reasonable cause to believe the conduct was unlawful; provided further however, that notwithstanding the foregoing, any indemnity under this Section 5.7.2 shall be payable solely out of and to the extent of the net assets of the Company (including without limitation any director and officer liability insurance proceeds recovered by the Company), and

CONFIDENTIAL INFORMATION

no debt or other obligation shall be incurred by the Company or Members in order to provide additional funds for any such indemnification, and no Member shall have any personal liability (or any liability to make any additional Capital Contributions) for such indemnification.

       5.7.3    <u>Indemnification Procedures</u>.  In the case of any claim, demand, action, suit or other proceeding in respect of any Loss (collectively, "**Action**"), the Company shall control the defense of such Action with counsel of its choice, and no settlement, compromise, admission of liability or consent to judgment regarding any Loss shall occur without the prior consent of the Company, which approval will not be unreasonably withheld or delayed.  Where an Action is brought against the Company by a Manager, appointment of counsel and judgment shall also be subject to consent of the other Manager.

       5.7.4    <u>Expenses</u>.  To the extent not prohibited by applicable law, and subject at all times to the control and approval rights of the Company under Section 5.7.3 hereof, all reasonable expenses (including reasonable attorney's fees) incurred by an Indemnified Person in its or his capacity as such with respect to the defense of any Action brought by any third party (and excluding for the avoidance of doubt any Action brought by the Company against such Indemnified Person) shall, from time to time, be advanced by the Company prior to the final disposition of such Action, upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall be determined that such Person is not entitled to be indemnified as provided in Section 5.7.1 or Section 5.7.2 hereof.

       5.8    <u>Devotion of Time</u>.  Except as required by any separate contract and notwithstanding any other provision of this Agreement, no Manager or officer is obligated to devote all of such Manager's or officer's time or business efforts to the affairs of the Company, but shall devote such time and skill as it or he deems appropriate for the reasonably proper, adequate and responsible operation of the Company.

       5.9    <u>Competing Activities</u>.  Except as provided by any separate contract or to the extent otherwise limited under this Agreement: (i) any Member, Manager, officer or Affiliate of a Member or a Manager or officer of the Company (each, a "**Company Person**") may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company; (ii) neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom; (iii) no Company Person shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company; (iv) any Company Person shall have the right to hold any investment opportunity or prospective economic advantage for such Company Person's own account or to recommend such opportunity to Persons other than the Company; (v) actions by any Company Person in compliance with or in accordance with the foregoing clauses (i) through (iv) shall not be a breach of such Company Person's fiduciary duties to the Company or any Member, if any.  Each Member acknowledges that the other Company Persons might own or manage other businesses, including businesses that may compete with the Company for the time of the Company Person. The Class A Manager, the Class B Manager, the Affiliates of the Class A Manager or the Class B Manager, and the respective directors, officers, representatives and agents of the Class A

CONFIDENTIAL INFORMATION

LENDERS_0003736

Manager, the Class B Manager or any of their respective Affiliates (the "**Manager Persons**") shall not be deemed to be affected with notice of, or be under any duty to disclose to the Company, any other Manager or the Members, any fact or matter which may come to the notice of the Manager Persons in the course of or in connection with the Manager Persons rendering such services to any other Person or in any manner whatsoever, other than in the course of carrying out its duties hereunder or under the respective Management Agreement, and the other Manager and the Members hereby waive any claim in respect thereof. The foregoing provisions shall not, however, affect the obligations of the Manager or any related persons in connection with any interested transactions with the Company as further provided in Section 5.11 below.

5.10    Remuneration for Management or Other Services. Each Manager shall be entitled to remuneration for services provided to the Company and other benefits in accordance with the terms of the relevant Management Agreement, provided such agreement shall have been approved in accordance with terms and provisions herein. The officers of the Company shall be entitled to remuneration and other benefits for their services to the Company, as determined by the Class B Manager.

5.11    Transactions between the Company and an Interested Manager. Neither Manager nor any Affiliate or employee or agent thereof shall directly or indirectly engage in any material transaction (including without limitation the purchase, sale, lease, or exchange of any property, or the lending or borrowing of funds, or the rendering of any service but excluding its appointment as a Manager) as an interested party with the Company unless in each case (i) such transaction is not expressly prohibited by this Agreement, (ii) the terms and conditions of such transaction on an overall basis are fair and reasonable to the Company, (iii) all material facts about such transaction have been disclosed to the other Manager, and (iv) the transaction has been approved in writing by the other Manager, which approval shall not be unreasonably withheld. For purposes of clarification, the requirements set forth in the immediately preceding sentence shall be in addition to (and shall not limit in any way) the requirements of the Act or the other provisions of this Agreement with respect to interested party transactions.

5.12    Reimbursement of Expenses.  Subject to the foregoing limitations of this Article V and except as otherwise provided in any employment or service agreement, the Company shall reimburse the Managers and officers for the actual cost reasonably paid or incurred by them for goods, materials, and services solely used by or for the Company, except that, unless authorized by the Class B Manager, no officer shall be reimbursed by the Company for any indirect or overhead expenses.

5.13    EB-5 Program.

5.13.1    Compliance with EB-5 Restrictions. The Class B Manager shall operate the Company in a manner that complies with the legal and policy requirements of the EB-5 Program, including consulting with the Regional Center with respect to and in connection with the affiliation of the Development with the Regional Center under the EB-5 Program and pursuant to the Regional Center's administrative duties. In particular, the Class B Manager shall:

(i)       cause the Company to require the Project Company, through the Loan Agreement, to deploy the initial Capital Contribution of each Class B Member solely for

Page - - 22 - -

CONFIDENTIAL INFORMATION

the Development, directly and indirectly, and to keep such funds invested in the Development in order to enable such Class B Member to receive adjudication of the removal of the conditions for permanent resident status;

(ii)    avoid agreements for redemption (including return on investment) in respect of any Class B Member's Capital Contribution after he or she has obtained the conditional permanent resident status and before adjudication of the removal of the conditions for permanent resident status;

(iii)    require the Project Company, in accordance with the terms of the Loan Agreement, to follow the business plan for the Development as approved by the USCIS, consulting with the Regional Center before implementing any changes that could be considered by the USCIS material (it being understood that ultimate decision making authority with respect to such changes, following such consultation, rests with the Class B Manager);

(iv)    track, maintain records, and share data and records with the Class A Manager and the Regional Center concerning the Loan and the Development, including data and records related to the expenditure of funds, completion of construction, and operation of facilities;

(v)    require the Project Company, to the extent provided in the Loan Agreement, (A) to perform tracking of and documentation relating to, without limitation, the expenditure of funds, employment of workers, completion of construction, operation of facilities and enterprises, and (B) to share same information with the Company and the Regional Center in order (1) to fulfill the USCIS' requirement that the Company be affiliated with the Regional Center and that the Regional Center perform certain administrative duties; and (2) to provide information to Class B Members needed for them to apply for the removal of the conditions for their permanent resident status;

(vi)    enforce, to the extent provided in the Loan Agreement, those obligations of the Project Company to follow the business plan as submitted for approval to USCIS, as the same may have been amended, modified and/or supplemented by Class B Manager on behalf of the Company;

(vii)    in the event the Company's affiliation with the Regional Center is lost or adversely affected, cause the Company to seek affiliation with a successor Regional Center so that (A) the Development will continue to be a qualifying investment under the EB-5 Program and will be within the scope of the successor Regional Center's regional center designation, which shall be in good standing, and (B) indirect and induced jobs created by the Development will continue to be counted for the purposes of the EB-5 Program; and

(viii)    Following the Initial Maturity Date (as defined in the Private Placement Memorandum) (subject to any extensions thereof), reinvest proceeds of the Loan that have been repaid in alternate investments that qualify under the EB-5 Program for the

CONFIDENTIAL INFORMATION

purpose of preserving the Class B Members' "at risk" investment and eligibility for removal of conditional lawful permanent residents status, as more fully set forth in the Private Placement Memorandum.

       5.13.2    <u>Compliance with USCIS Requirements for EB-5 Program</u>.

       (a)    In the event that USCIS determines that this Agreement and/or the Class B Management Agreement, or the appointment of the Class B Manager, violate the rules and regulations of the EB-5 Program or would cause any petition filed by a Subscriber or Class B Member with USCIS under the EB-5 Program to be denied, the Class A Manager and the Class B Manager, in consultation with the Regional Center, shall use all commercially reasonable efforts to restructure this Agreement and/or the appointment of the Class B Manager hereunder and under the Class B Management Agreement so as to achieve a substantially similar commercial result to the current appointment of the Class B Manager. Any such changes, including any amendments to the Class B Management Agreement, shall not require the Members' approval, notwithstanding anything contained in this Agreement to the contrary.

       (b)    In the event that USCIS determines that this Agreement, the appointment of the Class A Manager, and/or the manner in which the Regional Center is affiliated with the Company, violate the rules and regulations of the EB-5 Program or would cause any petition filed by a Subscriber or Class B Member with USCIS under the EB-5 Program to be denied, the Class A Manager and the Class B Manager, in consultation with the Regional Center, shall use all commercially reasonable efforts to restructure this Agreement and/or the appointment of the Class A Manager hereunder and under the Class A Management Agreement and/or the manner in which the Regional Center is affiliated with the Company so as to achieve a substantially similar commercial result to that achieved by this Agreement and/or the current appointment of the Class A Manager, as applicable. Any such changes, including any amendments to this Agreement or the Class A Management Agreement, shall not require the Members' approval notwithstanding anything contained in this Agreement to the contrary.

       5.13.3    <u>Class B Members' Obligations</u>.  Each Class B Member shall, or shall cause his or her immigration counsel to diligently prepare and submit to USCIS a complete and accurate Form I-526 Petition, including, without limitation, any and all documents and records, and to pay all fees requested by USCIS.  Each Class B Member shall promptly notify the Company in writing of the filing of his or her Form I-526 Petition, requests for evidence and/or notice of intent to deny from USCIS, USCIS's approval or denial of his or her Form I-526 Petition, the approval or denial of conditional permanent resident status, the filing of his or her Form I-829 Petition, requests for evidence and/or notice of intent to deny from USCIS, USCIS's approval or denial of his or her Form I-829 Petition, his or her address and taxpayer identification number after the approval of conditional permanent resident status and any change thereof, which notice shall be accompanied by a copy of the Form I-526 Petition, the Form I-829 Petition, and the approval or denial letter (as the case may be) as well as any other documentation requested by the Company. Each Class B Member shall provide to the Company or the Class B Manager any information that may be necessary to comply with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, the BSA and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including

Page - - 24 - -

      

policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA.

## ARTICLE VI

## ALLOCATIONS OF NET PROFITS AND NET LOSSES
## AND DISTRIBUTIONS

6.1     Allocations of Net Profits. After giving effect to the special allocations set forth in Sections 6.3 and 6.4, Net Profits for any Fiscal Year shall be allocated to the Members in the following manner and order of priority:

6.1.1     Chargeback to the Extent of Net Losses of Class B Members. First, that part of the Net Profits shall be allocated among those Class B Members with a negative Net Capital Account Balance immediately prior to such allocation, to the extent of their respective negative Net Capital Account Balance and in the same order and manner as the Net Losses were previously allocated to such Class B Members pursuant to Section 6.2.2.

6.1.2     Remaining Net Profit. Thereafter, after the chargeback provided in Section 6.1.1 (if any), the Net Profits or any balance thereof shall be allocated to among the Class B Members in proportion to their respective Capital Contributions.

6.2     Allocations of Net Losses. After giving effect to the special allocations set forth in Sections 6.3 and 6.4, Net Losses for any Fiscal Year shall be allocated to the Class B Members in the following manner and order of priority:

6.2.1     Chargeback to the Extent of Net Profits. First, except as provided in Section 6.2.3, Net Losses shall be allocated among those Class B Members with a positive Net Capital Account Balance immediately prior to such allocation, to the extent of their respective positive Net Capital Account Balance and in the same order and manner as the Net Profits were previously allocated to such Class B Members pursuant to Section 6.1.2.

6.2.2     Remaining Net Losses. Second, after the chargeback provided in Section 6.2.1 (if any) and except as provided in Section 6.2.3, the Net Losses or any balance thereof shall be allocated among the Class B Members in proportion to their respective Capital Contributions.

6.2.3     Adjusted Capital Account Deficit. An allocation of Net Losses under Sections 6.2.1 and 6.2.2 shall not be made to the extent it would create or increase an Adjusted Capital Account Deficit for a Member or Members at the end of any Fiscal Year. Any Net Losses not allocated because of the preceding sentence shall be allocated to the other Class B Member or Members in proportion to such Member's or Members' respective Capital Contributions; provided, however, that to the extent such allocation would create or increase an Adjusted Capital Account Deficit for another Member or Members at the end of any Fiscal Year, such allocation shall be made to the remaining Class B Member or Members in proportion to the respective Capital Contributions of such Member or Members.

Page - - 25 - -

6.3    Special Allocations.

      6.3.1    Member Nonrecourse Deductions.    Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt or other liability to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) and Regulations Section 1.704-1(b).

      6.3.2    Nonrecourse Deductions Referable to Liabilities Owed to Non-Members.    Any Nonrecourse Deductions for any Fiscal Year and any other deductions or losses for any Fiscal Year referable to a liability owed by the Company to a Person other than a Member to the extent that no Member bears the economic risk of loss shall be specially allocated to the Members in accordance with their Capital Contributions.

      6.3.3    Member Minimum Gain Chargeback.    Except as otherwise provided in Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Article VI, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).    Allocations pursuant to the previous sentence shall be made in proportion to the amounts required to be allocated to each Member pursuant thereto.    The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).    This Section 6.3.3 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

      6.3.4    Minimum Gain Chargeback.    Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Article VI, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2).    Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.    The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f)(6) and 1.704-2(j)(2).    This Section 6.3.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

      6.3.5    Qualified Income Offset.    If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) or any other event creates an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to each such Member in an amount and

CONFIDENTIAL INFORMATION

FINAL

manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 6.3.5 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VI have been tentatively made as if this Section 6.3.5 were not in the Agreement.

6.4    Curative Allocations.  The allocations set forth in Section 6.2.3 and Sections 6.3.1 through 6.3.5, inclusive (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 6.4.  Therefore, notwithstanding any other provision of this Article VI (other than the Regulatory Allocations), the Class B Manager shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, a Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 6.1 and Sections 6.2.1 and 6.2.2.  In exercising its discretion under this Section 6.4, the Class B Manager shall take into account any future Regulatory Allocations under Sections 6.3.3 and 6.3.4 that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 6.3.1 and 6.3.2.

6.5    Code Section 704(c) Allocations.  The allocations specified in this Agreement shall govern the allocation of items to the Members for Code Section 704(b) book purposes, and the allocation of items to the Members for tax purposes shall be in accordance with such book allocations, except that solely for tax purposes and notwithstanding any other provision of this Article VI:  (i) Code Section 704(c) shall apply to the allocation of items of income, gain, deduction, and loss related to contributed property having an adjusted federal income tax basis at the time of contribution that differs from its fair market value; and (ii) Regulations Section 1.704-1(b)(2)(iv)(f)(4) shall apply to the items of income, gain, deduction, and loss related to property the book value of which is adjusted, in the Class B Manager's sole discretion, pursuant to Regulations Section 1.704-1(b)(2)(iv)(f).  In cases where Code Section 704(c) or Regulations Section 1.704-1(b)(2)(iv)(f) applies, the Members' Capital Accounts shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

6.6    Allocations in Respect of a Transferred Membership Interest.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be allocated among the Members, as determined by the Class B Manager in accordance with any method permitted by Code Section 706(d) and the rules and regulations promulgated thereunder in order to take into account the Members' varying interests in the Company during such Fiscal Year.

6.7    Obligations of Members to Report Consistently.  The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

CONFIDENTIAL INFORMATION

6.8    <u>Distributions by the Company to Members</u>.

        6.8.1    <u>In General</u>.  So long as there are Class B Units in issue, no distributions to any Member, other than distributions related to liquidation of the Class B Units in accordance with Section 7.5 or under Article IX, shall be made.

        6.8.2    <u>Advances or Drawings</u>.  Distributions of money and property may be treated as advances or drawings of money or property against a Member's distributive share of income and as current distributions made on the last day of the Company's taxable year with respect to such Member.

        6.8.3    <u>Distributees; Liability for Distributions</u>.   All distributions made pursuant to this Section 6.8 shall be made only to the Persons who, according to the books and records of the Company, hold the Membership Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor any Member, Manager, or officer thereof shall incur any liability for making distributions in accordance with this Section 6.8.

6.9    <u>Form of Distributions</u>.  A Member, regardless of the nature of the Member's Capital Contributions, has no right to demand or receive any distribution from the Company in any form other than money.  No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.

6.10    <u>Return of Distributions</u>.  Except for distributions made in violation of the Act, this Agreement, or, with respect to Class B Members only, the rules and regulations of the EB-5 Program, or as otherwise required by law, no Member shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

6.11    <u>Limitation on Distributions</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to any Member on account of such Member's interest in the Company if such distribution would violate the Act or other applicable law or, with respect to Class B Members only, would violate the rules and regulations of the EB-5 Program.

6.12    <u>Withholding</u>.  Any tax required to be withheld with respect to any Member under Section 1446 or other provisions of the Code, or under state law, shall be treated for all purposes of this Agreement (i) as a distribution of cash to be charged against future distributions to which such Member would otherwise have been entitled, or (ii) if determined by the Class B Manager, as a demand loan to such Member.

CONFIDENTIAL INFORMATION

LENDERS_0003743

## ARTICLE VII

### TRANSFER OF INTERESTS

7.1    <u>Transfer of Interests In General</u>.

      7.1.1    <u>Conditions to Member Transfer</u>.  No Member shall be entitled to Transfer all or any part of its, his or her Membership Interest unless all of the following conditions have been met: (a) the Class B Manager shall have received written notice of the proposed Transfer, setting forth the circumstances and details thereof; (b) except as provided in Section 7.1.3, the Transfer shall have been approved by the Class B Manager, which consent may be given or withheld, conditioned or delayed (to the extent permitted by this Agreement or the Act or other applicable law) as the Class B Manager may determine; (c) the Class B Manager shall (at its option) have received a written opinion, in form and substance and from a legal counsel reasonably satisfactory to the Company that the proposed Transfer will not be in violation of any of the registration provisions of or other restrictions under the Securities Act, any applicable state securities laws, or any applicable non-U.S. securities laws, and any rules or regulations promulgated thereunder, each as may be amended or superseded; (d) the Class B Manager shall have received from the transferee (and the transferee's spouse if such spouse will receive a community property interest in the Membership Interest) a written consent to be bound by all of the terms and conditions of this Agreement; (e) the Transfer will not result in the loss of, or violate any of the terms or conditions of, any license or regulatory approval or exemption that has been obtained by, or is relied upon by, the Company and is materially useful in the conduct of its business as then being conducted or proposed to be conducted; (f) the Company is reimbursed upon request for its reasonable expenses in connection with the Transfer; (g) the Transfer complies with all other applicable requirements of this Agreement, any applicable U.S. federal, state or foreign securities laws, and all other applicable laws; and (h) the Transfer will not in the opinion of the Class B Manager cause the Company or any Manager to lose any exemption under the Investment Advisers Act or the Investment Company Act or otherwise create material additional compliance obligations and burdens on the Company or the Managers. Each Member agrees that the Company shall refuse to register any Transfer of a Class B Unit not made in accordance with Regulation S under the Securities Act and/or Section 4(a)2 of the Securities Act or Regulation D, pursuant to registration under the Securities Act or pursuant to an exemption from such registration.

      7.1.2    <u>Invalid Transfers</u>.  Transfers in violation of this Section 7.1 or in violation of any other provision of this Article VII or this Agreement shall be null and void <u>ab initio</u> and of no effect whatsoever.

      7.1.3    <u>Permitted Transfers</u>.  Notwithstanding any provision in this Agreement to the contrary, any Member may Transfer its or his or her Membership Interest in whole or in part, without compliance with Section 7.1.1, but subject to the other provisions of this Section 7.1, (i) in the case of the Class A Member, to an Affiliate of such Member, provided that the Company shall continue to be affiliated with the Regional Center following such transfer so that (A) the Development will continue to be a qualifying investment under the EB-5 Program within the scope of the Regional Center's regional center designation, which shall be in good standing, and (B) indirect and induced jobs created by the Development will continue to be

Page - - 29 - -

counted for the purposes of the EB-5 Program; or (ii) in the event of the death of a Class B Member, to any such Member's spouse or children, or the trustee of a trust for the principal benefit of such persons (each such transferee, a "**Permitted Transferee**"); provided that in the case of any such Transfer, the only Permitted Transferees of such transferee (and of any subsequent transferee of such transferred Membership Interest or any portion thereof) shall be the Permitted Transferees of the original transferor Member as of the date of the original Transfer.

       7.2   <u>Effective Date of Permitted Transfers</u>.  Any Transfer permitted under this Agreement of all or any portion of a Membership Interest shall be effective no earlier than the date following the date upon which the requirements of this Agreement with respect to such Transfer have been met.

       7.3   <u>Effect of Permitted Transfers</u>.  After the effective date of any Transfer of any part of a Membership Interest in accordance with this Agreement, the Membership Interest so transferred shall continue to be subject to the terms, provisions, and conditions of this Agreement and any further Transfers shall be required to comply with all of the terms, provisions, and conditions of this Agreement.  Any transferee of all or any portion of a Membership Interest shall take subject to the restrictions on Transfer imposed by this Agreement.

       7.4   <u>Substitution of Members</u>.  Notwithstanding anything to the contrary expressed or implied in this Agreement, a transferee of a Membership Interest shall not have the right to become a substitute Member until each of the following conditions are complied with: (a) the requirements of Section 7.1.1 are satisfied (other than the requirement of Section 7.1.1 for any Permitted Transferee); (b) such Person (and such Person's spouse if such spouse will receive a community property interest in the Membership Interest) executes an instrument satisfactory to the Members approving the transfer and to the Class B Manager accepting and adopting the terms, provisions, and conditions of this Agreement, with respect to the acquired Membership Interest; and (c) such Person pays any reasonable expenses in connection with such Person's admission as a new Member.  The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

       7.5   <u>Liquidation of Interest</u>.

       7.5.1   Subject to the remaining provisions of this Section 7.5, in the event that a Class B Member requests liquidation of his or her Class B Unit(s), the Company may, in the sole and absolute discretion of the Class B Manager (but shall not be under any obligation),  (a) agree to liquidate such Class B Unit(s) if the Class B Member (i) has made a request to USCIS for the withdrawal of the Class B Member's I-526 Petition and USCIS has issued a letter of acknowledgement of withdrawal agreeing to terminate all action in respect of such Class B Member's I-526 Petition, a copy of which has been provided to the Company; (ii) is required to invest more than the minimum investment amount prescribed under the EB-5 Program due to the Development no longer being able to qualify to be located in a targeted employment area under the EB-5 Program and such requirement remains for a period of sixty (60) days and such Class B Member does not file a I-526 Petition during the sixty (60)-day period and also delivers written notice of a request for liquidation to the Company within five (5) days of the end of the sixty

CONFIDENTIAL INFORMATION                                          LENDERS_0003745

(60)-day period; (iii) has received a USCIS decision denying his or her Form I-526 Petition due to (A) the petitioner's fraud or misrepresentation, or (B) any other reason, and the USCIS does not reverse its denial within forty-five (45) days of the date the receipt notice for the I-290B Notice, which such Class B Member shall have filed in response within thirty (30) days of the petition denial, provided that the Class B Member shall also provide evidence to the Company that he or she has withdrawn his or her I-290B Notice prior to the liquidation request; or (iv) is denied approval of his or her Adjustment of Status or consular application for an EB-5 Visa (both as defined in the Schedule hereto) or fails to obtain conditional lawful permanent resident status under the EB-5 Program prior to the expiration of such Class B Member's EB-5 Visa, or (b) agree to liquidate such Class B Unit(s) if the Class B Member delivers to the Company a written request for the liquidation of such Class B Unit(s) within three (3) months from the latest of (i) the Company having received the full and final repayment of the Loan, (ii) such Class B Member's receipt of unconditional permanent resident status in the United States under the EB-5 Program, and (iii) the fifth (5th) anniversary of the date on which a Class B Member's Form I-526 Petition is approved by the USCIS.

7.5.2      In the event that the Company liquidates the Class B Unit(s) of a Class B Member for any reason referred to in (ii) or (iii)(B) of Section 7.5.1(a) above, the price at which the Company liquidates such Class B Unit(s) shall be the sum of the aggregate Capital Contribution of the Class B Member and the Administration Fee paid by such Class B Member, both amounts without interest.  In the event that the Company liquidates the Class B Unit(s) of a Class B Member for any reason referred to in (i), (iii)(A) or (iv) of Section 7.5.1(a) above, then the price at which the Company liquidates such Class B Unit(s) shall be the sum of the aggregate Capital Contribution of the Class B Member and such portion, if any, of the Administration Fee paid by such Class B Member as determined by the Class B Manager at its sole discretion, both amounts without interest, and the Company may defer such liquidation, also at its sole discretion. In the event that the Company liquidates a Class B Unit pursuant to Section 7.5.1(b), it shall be liquidated at a price equal to the balance of such Class B Member's Capital Account.

7.5.3      For the avoidance of doubt in respect of liquidation under Section 7.5.1(a), the Company shall have the right, but not the obligation to agree to liquidate the Class B Unit(s) of the relevant Class B Member for any of the reasons set forth in Section 7.5.1(a). Without limiting the foregoing, and notwithstanding anything to the contrary in this Section 7.5, if the Class B Manager determines, in its sole and absolute discretion after consulting with the Regional Center, that (A) the liquidation of a Class B Unit pursuant to Section 7.5.1(a) could have an adverse effect on (i) the ability of the Company to make advances of the Loan under the Loan Agreement, or (ii) the immigration objectives of any other Class B Member(s) or (iii) the ability of any other Class B Member(s) to obtain unconditional permanent resident status in the United States pursuant to the EB-5 Program, or (B) the Company is restricted from liquidating the Class B Unit under the Act or other applicable law or the Company does not have sufficient Available Cash to effect such liquidation of the Class B Unit, then any requirement to liquidate the Class B Unit (and such Class B Member's rights under this Section) shall be suspended until such time as the Class B Manager determines, if at all and in its sole and absolute discretion, that the liquidation of the Class B Unit no longer presents the issues in the foregoing sub-clauses (A) and (B).  The Class B Manager may also invoke the foregoing suspension of liquidation if the Class B Manager determines in its sole and absolute discretion that a replacement Subscriber

CONFIDENTIAL INFORMATION                                              LENDERS_0003746

would be required to replace the investment associated with the liquidated Class B Unit and until such time as the Class B Manager determines that such replacement Subscriber is satisfactorily in place. The Company reserves the right to (i) determine the order of any liquidation of Class B Units under Section 7.5.1(a), and (ii) limit distributions to Class B Members in order to enable such distributions to be made on a proportionate basis to each such Class B Member in accordance with their Capital Contributions in the Company, in the its sole and absolute discretion.

7.5.4    The closing of the liquidation and sale of any Class B Units pursuant to this Section shall be held within ninety (90) days after the Company accepts a Class B Member's request for liquidation or, in the event that the purchase and sale of any Class B Units is suspended pursuant to Section 7.5.3, ninety (90) days after the date on which the Class B Manager makes the determinations provided for in Section 7.5.3. The parties to such liquidation and sale shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and liquidation in accordance with the terms and provisions of this Agreement and the closing shall take place at the then principal offices of the Company or such other place as is agreed upon by the parties thereto.

7.6    Prohibition of Redemption or Repurchase.    Except as expressly provided in Section 7.5 relating to the failure of a Class B Member to obtain conditional permanent resident status or to the extent provided under Section 7.5.1(b), the Company is not obligated to redeem or repurchase the Class B Units of any Class B Member at any time or under any circumstances.

## ARTICLE VIII

### BOOKS AND RECORDS; ACCOUNTING; TAX MATTERS

8.1    Books and Records.    The Class B Manager shall cause the books and records of the Company to be kept, and the financial position and the results of its operations to be recorded, in accordance with the accounting methods followed by the Company for U.S. federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.

8.2    Delivery to Members and Inspection.

8.2.1    Subject to such reasonable standards as may be established by the Class B Manager in accordance with the Act, upon the reasonable notice and request of any Member for purposes reasonably related to the Membership Interest of that Person as a Member, the Class B Manager shall make available to the requesting Member information required to be maintained by Section 8.1 or such other information as the Company shall be required to provide to such Member under applicable law.

8.2.2    Any request, inspection, or copying of information by a Member under this Section 8.2 may be made by that Person or that Person's agent or attorney.

8.3    Financial Statements. The Class B Manager shall cause the Company to provide to the Members, on or before the one hundred and eightieth day (180th) day or as soon as

CONFIDENTIAL INFORMATION                                    LENDERS_0003747

practicable following the end of each Fiscal Year or as soon as practicable thereafter, an audited financial report of the Company for such year, including (i) a balance sheet, (ii) a statement of profit and loss, and (iii) a cash flow statement, provided that the first audited financial report of the Company shall be prepared after the end of the first full Fiscal Year.

8.4     Tax Returns.  The Class B Manager shall cause to be prepared at least annually information necessary for the preparation of the Members' U.S. federal and state income tax and information returns.  The Class B Manager shall send or cause to be sent to each Member within ninety (90) days after the end of each Fiscal Year, or as soon as practicable thereafter, such information as is necessary to complete such Member's federal and state income tax or information returns, and a copy of the Company's U.S. federal, state, and local income tax or information returns for that year.  The Class B Manager shall cause the income tax and information returns for the Company to be timely filed with the appropriate authorities.

8.5     Other Filings.  The Class B Manager also shall cause to be prepared and timely filed, with appropriate U.S. federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate of Formation and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations.

8.6     Bank Accounts.  The Class B Manager shall open one or more separate bank accounts in the name of the Company and maintain the funds of the Company therein, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

8.7     Accounting Decisions and Reliance on Others.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Class B Manager. The Class B Manager may rely upon the advice of the Company's accountants as to whether such decisions are in accordance with accounting methods followed for U.S. federal income tax purposes.

8.8     Tax Matters.

8.8.1     Taxation as Partnership.  The Company shall be treated as a partnership for tax purposes, and the Members shall cooperate with the Company in connection therewith and hereby authorize the Class B Manager to take whatever actions and execute whatever documents are necessary or appropriate to effectuate the foregoing.

8.8.2     Elections; Tax Matters Partner.  Subject to Section 8.8.1, the "tax matters partner" (as hereinafter defined) shall from time to time cause the Company to make such tax elections as he deems to be necessary or appropriate. The Class B Manager (or another Member appointed by the Class B Manager) shall be designated as the "tax matters partner" (within the meaning of Code Section 6231(a)(7)) to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including without limitation any associated judicial and administrative proceedings, and shall expend Company funds for professional services and costs associated therewith.

Page - - 33 - -

# ARTICLE IX

## DISSOLUTION AND WINDING UP

Subject only to the requirements of the Act applicable to the dissolution and winding up of a limited liability company under Delaware law, to the extent such requirements may not be modified by this Agreement:

9.1     <u>Dissolution</u>.  The Company shall be dissolved, its assets shall be disposed of, and its affairs shall be wound up upon the first to occur of the following:

        9.1.1     The entry of a decree of judicial dissolution pursuant to the Act;

        9.1.2     the approval of the Members and of the Class A Manager and the Class B Manager;

        9.1.3     the sale or other disposition of all or substantially all of the Company's non-cash assets including the Loan and subsequent to the final adjudication of all Form I-829 Petitions; provided that the Members shall not have otherwise voted to defer dissolution of the Company in accordance with Section 4.8 hereof; or

        9.1.4     December 31, 2025, or such later date as may be determined by the Class B Manager.

9.2     <u>Winding Up</u>.  Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Class B Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the assets and liabilities of the Company, shall either cause the assets of the Company to be sold to any Person or distributed to a Member, and if sold, as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.5 herein.

9.3     <u>Distributions in Kind</u>.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the gain or loss that would have been included in the amounts allocated pursuant to Article VI if such asset were sold for such value. Such gain or loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).

9.4     <u>Determination of Fair Market Value</u>.  For purposes of Sections 9.2 and 9.3, the fair market value of each asset of the Company shall be determined in good faith by the Class B Manager with reference to standard valuation methodologies.

CONFIDENTIAL INFORMATION

LENDERS_0003749

9.5    <u>Order of Distributions Upon Liquidation</u>.  After determining that all known debts and liabilities of the Company in the process of winding up, including without limitation, any outstanding debt owed to the Project Company or any of its Affiliates as described under Section 3.3 hereof or other debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in the following order: (i) to the Class A Member to the extent of its Capital Contribution; and (ii) the balance, if any, pro rata to the Class B Members based on the number of their respective Class B Units.  Such liquidating distributions shall be made by the end of the Company's Fiscal Year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

9.6    <u>Limitations on Payments Made in Dissolution</u>.  Each Member shall be entitled to look solely to the assets of the Company for the distribution of the balance of such Member's Capital Account.  Notwithstanding that the assets of the Company remaining after payment of or due provision for all debts, liabilities, and obligations of the Company may be insufficient or insufficiently liquid to distribute the balance of such Member's Capital Account, a Member shall have no recourse against the Company, Managers, or any other Member.

9.7    <u>Certificate of Cancellation</u>.  Upon completion of the winding up of the affairs of the Company, the Class B Manager, or other Person(s) winding up the affairs of the Company, shall cause to be filed in the office of, and on a form prescribed by, the Delaware Secretary of State, a certificate of cancellation.

9.8    <u>Termination</u>.  The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Article IX, and certificate of cancellation is filed in accordance with Section 9.7.

9.9    <u>No Action for Dissolution</u>.  Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a dissolution of the Company.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Counsel to the Company</u>.  Counsel to the Company ("**Company Counsel**") may also be counsel to any Member.  The Company, if approved by the Class B Manager, may execute any other retainer letter and/or consent to the representation of the Company that counsel may request pursuant to and in compliance with the ABA Model Rules of Professional Conduct or similar rules in any other jurisdiction ("**Rules**").  In the event any dispute or controversy arises between any Member and the Company, or between a Member and another Member, then each Member agrees that, although no Person shall be obligated to use Company Counsel, Company Counsel may represent either the Company or any Member, or both, in any such dispute or controversy to the extent permitted by and subject to compliance with the Rules, and each Member hereby consents to such representation.  Each Class B Member acknowledges and agrees that the Company's special immigration counsel, as appointed by the Class B Manager from time to time, is the sole person authorized to respond on behalf of the Company or the Class B Manager in any matter before the USCIS.  Each Class B Member agrees to supply a

CONFIDENTIAL INFORMATION

LENDERS_0003750

Form G-28 appointing such special immigration counsel to facilitate such response by the Company or the Class B Manager.

10.2    Complete Agreement.    This Agreement (including any schedules or exhibits hereto), the Joinder Agreement of each Class B Member and the Management Agreements constitute the complete and exclusive statement of agreement among the parties with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the parties or any of them with respect to the subject matter hereof.  Except as expressly stated herein, no representation, statement, condition, or warranty not contained in this Agreement shall be binding on the Members or the Company or the other parties have any force or effect whatsoever.

10.3    Binding Effect.    Subject to the provisions of this Agreement relating to Transfer, this Agreement shall be binding upon and inure to the benefit of the Members, and their respective successors and permitted assigns.

10.4    Parties in Interest.    Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and the Managers and their respective successors and permitted assigns or the other named parties to this Agreement, nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

10.5    Pronouns; Statutory References.    All references using the singular shall include the plural (and vice versa); and all pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the context in which they are used may require.   Any reference to the Code, the Regulations, the Act, or other statutes or laws shall include all amendments, modifications, or replacements of the specific sections and provisions concerned.

10.6    Headings.    All headings herein are inserted only for convenience and ease of reference and shall not be considered in the construction or interpretation of any provision of this Agreement.

10.7    References to this Agreement.    Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

10.8    Governing Law.  This Agreement and all matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Delaware to the rights and duties of the parties; provided, however, that any right to arbitration hereunder shall be interpreted and governed solely by the Federal Arbitration Act, 9 U.S.C. §1 et seq. (as amended or superseded).

CONFIDENTIAL INFORMATION                                                                      LENDERS_0003751

10.9    <u>Arbitration of Disputes</u>.  Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement  shall be submitted to JAMS (hereafter, the **"Arbitration Service"**) and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section 10.9.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract or otherwise, regardless of its nature.  Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service.   In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern.  To select the three-member arbitration panel, the parties shall each name one neutral arbitrator, and those two arbitrators shall select a third neutral arbitrator from a list of potential arbitrators jointly prepared by the parties.  The arbitration proceeding shall be decided by majority vote of the three-arbitrator panel.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in Los Angeles, California.

In the event of a dispute subject to this Section 10.9, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitration panel, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings.  The remedial authority of the arbitration panel shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitration panel shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party.   The arbitration panel shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation.  The parties and the arbitration panel shall keep confidential all matters relating to any arbitration hereunder (including without limitation the existence of the dispute and the arbitration).

In interpreting this Agreement, the arbitration panel shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section 10.9, the arbitration panel shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Any filing or administrative fees shall be borne initially by the party requesting administration by the Arbitration Service.  If both parties request such administration, the fees shall be borne initially by the party incurring such fees as provided by the rules of the Arbitration Service.  The initial fees and costs of the arbitration panel shall be borne equally by the parties. The prevailing party in such arbitration, as determined by the arbitration panel, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party

CONFIDENTIAL INFORMATION

LENDERS_0003752

**FINAL**

for all of the prevailing party's costs (including but not limited to the arbitration panel's compensation), expenses, and attorneys' fees.

The arbitration panel shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitration panel may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

If any of the provisions of this Section 10.9 are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Section 10.9, and this Section 10.9 shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Section 10.9 are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10.10   Jurisdiction.  Subject in all events to the foregoing provisions on arbitration, all actions to enforce or interpret this Agreement shall be brought exclusively in the federal or state courts located in Los Angeles, California and each of the parties agrees that such courts shall have exclusive jurisdiction and venue for any such actions.  If a suit or other legal proceeding is brought by a party to this Agreement to enforce its provisions, or to seek remedy for any breach hereof, then the prevailing party shall be entitled to recover all costs and expenses reasonably incurred in connection with such suit or proceeding. Any judgment may be entered in any court having competent jurisdiction wherever located.  Process in any action or proceeding may be served on any party anywhere in the world, and service by written notice in the manner provided by Section 10.14 hereof (Notices) shall be deemed fully valid and effective service on such party for all purposes, to the fullest extent not prohibited by law.

10.11   Severability.  If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid or unlawful or unenforceable, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid or unlawful or unenforceable shall not be affected thereby.

10.12   Waiver.  Any failure to enforce or delay in enforcing any of rights or obligations for the benefit of a party shall not be treated as a waiver thereof.   Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches.

10.13   Additional Documents and Acts.  Each Member agrees to execute and deliver, from time to time, such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

10.14   Notices.  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement shall be in writing (which may include facsimile) and

Page - - 38 - -

shall be deemed to have been given and received when delivered to the address specified by the party to receive the notice. The respective address of each Member shall be as set forth on the Members Schedule, provided that pursuant to the Joinder Agreement attached each Class B Member shall have authorized his or her immigration consultant specified in the Subscription Agreement to be his/her agent to accept any and all notices and other communications in respect of this Section 10.14. Subject to the foregoing provision, any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice shall be given.

      10.15  <u>Amendments</u>. Notwithstanding anything to the contrary in this Agreement, any amendment to this Agreement shall be adopted and be effective as an amendment hereto only in the following manner: (A) the Class B Manager may, without the consent of the Members, (i) amend this Agreement for maintaining compliance with the rules and regulations of USCIS, including as required pursuant to Section 5.13.2, (ii) amend the Members Schedule at any time and from time to time to reflect the admission or withdrawal of any Member, or the change in any Member's Capital Contributions, or any changes in the Members' addresses, all to the extent permitted by this Agreement, or (iii) amend this Agreement to extend the dissolution date provided in Section 9.1.4; (B) to the extent any amendments to this Agreement not subject to Section 10.15(A), directly or indirectly, adversely affects or impacts, in any respect, the rights, powers and authority of either the Class A Manager or Class B Manager, under this Agreement or under the respective Management Agreement, such amendments shall be adopted or take effect only with the prior written consent of Class A Manager or Class B Manager as applicable; (C) to the extent any amendments to this Agreement not subject to Section 10.15(A), directly or indirectly, adversely affects or impacts, in any respect, the rights, powers and obligation of either the Class A Member or Class B Members under this Agreement, such amendments shall be adopted or take effect only with the prior consent of Class A Member or Class B Members as applicable, all in accordance with Section 4.5; and (D) any other amendments to this Agreement not subject to Sections 10.15(A), 10.15(B) or 10.15(C) shall be approved with the consent of the Members in accordance with Section 4.5.

      10.16  <u>No Interest in Company Property; Waiver of Action for Partition</u>. No Member has any interest in specific property of the Company. Without limiting the foregoing, each Member irrevocably waives during the duration of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

      10.17  <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. A signed copy of this Agreement (including any joinder hereto) delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

      10.18  <u>Remedies Cumulative</u>. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

      10.19  <u>Investment Representation</u>. As further provided in the investment representations of each Class B Member in the Subscription Agreement, which are incorporated by reference as if fully set forth herein, each Member hereby represents to, and agrees with, the other Members

CONFIDENTIAL INFORMATION

**FINAL**

and the Company that such Member has acquired the Membership Interest for investment purposes for such Member's own account only and not with a view to or for the resale or distribution of all or any part of the Membership Interest; and further that the Membership Interests are not being sold in the United States or that the Member is not, or is not acquiring the Membership Interest for the account of, a U.S. Person within the meaning of Regulation S under the Securities Act, unless the Company is relying upon the exemptions under Section 4(a)(2) of the Securities Act or Regulation D, in which case the prospective Subscriber meets one or more of the criteria for "accredited investors", as defined in Rule 501 under the Securities Act. No other Person will have any direct or indirect beneficial interest in or right to the Membership Interest. Each Member acknowledges and agrees that neither the Company nor any of its Managers have given, or held out to any Member that any of them gives, any investment advice with respect to the Units.

10.20   Spousal Consent.   Each Member who is a married individual shall, upon becoming a Member or, if later, upon becoming married, cause his spouse to execute a spousal consent in the form attached hereto as Exhibit B and shall furnish such consent to the Company.

10.21   English Language.   The English language text of this Agreement has been translated to a language in which each of the Class B Members are competent and each Class B Member understands all of the provisions of this Agreement.   The English language text and American usage thereof shall control the interpretation and construction of this Agreement and all other writings between the parties.

10.22   Representations.   Each of the parties represents and warrants that this Agreement has been duly executed and delivered personally (in the case of an individual Member) or by its duly authorized officer or representative and that this Agreement is its valid and legally binding agreement and obligation enforceable in accordance with its terms.

10.23   Effective Date.   Notwithstanding anything to the contrary in this Agreement, this Agreement shall not become effective and shall have no force and effect until the Effective Date.

*[The remainder of this page is intentionally left blank.]*

CONFIDENTIAL INFORMATION

FINAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

**CLASS A MEMBER:**

KT SUMMIT DEVELOPMENT MANAGER, LLC

By: _____
Name:
Title:

**CLASS B MEMBERS:**

See Joinder Agreements

**Acknowledged and agreed to:**          **MANAGING MEMBER:**

KT SUMMIT DEVELOPMENT MANAGER, LLC

By: _____
Name:
Title:

*(Additional signature page to follow)*

The following entity hereby accepts its appointment as Class A Manager of the Company under and to the extent provided in Article V of this Agreement and the Class A Management Agreement, and solely in such capacity as Manager hereby consents to and agree to be bound by the terms and conditions of this Agreement:

**CLASS A MANAGER:**

KT SUMMIT DEVELOPMENT MANAGER, LLC

By: _____
Name:
Title:

The following entity hereby accepts its appointment as Class B Manager of the Company under and to the extent provided in Article V of this Agreement and the Class B Management Agreement, and solely in such capacity as Class B Manager hereby consents to and agrees to be bound by the terms and conditions of this Agreement:

**CLASS B MANAGER:**

CELONA ASSET MANAGEMENT (USA) LIMITED

By: _____
Name:
Title:

LENDERS_0003757

**FINAL**

## SCHEDULE

### EB-5 JOB ALLOCATION ADDENDUM

The Company, Class A Member and each Class B Member hereby agree and acknowledge as follows:

1.       Company is a business with an investment opportunity and is affiliated with the Regional Center for the purposes of the EB-5 Program, where the Regional Center has been designated by USCIS as a regional center to participate in the EB-5 Program;

2.       the Class B Member desires to make an investment in the Company to enable the Company to lend such investment monies to the Project Company in order to create ten (10) direct, indirect and/or induced full-time permanent jobs ("**Qualifying Jobs**") in respect of his or her Capital Contribution investment funded to the Company pursuant to the EB-5 Program;

3.       the Class B Member acknowledges that he/she will only become a Member of the Company upon the satisfaction of all the subscription closing conditions specified in the Subscription Agreement;

4.       a Class B Member who receives USCIS' approval of his/her Form I-526 Petition while outside the United States obtains conditional lawful permanent resident status after: (i)  filing Form DS-260 Application for Immigrant Visa Application and Registration Part I and Part II with the United States Department of State (the immigrant visa referenced therein, the "**EB-5 Visa**"); (ii) the processing of the EB-5 Visa at a United States Consulate abroad; and (iii) such Member's admission to the United States on the EB-5 Visa as a conditional lawful permanent resident;

5.       a Class B Member of the Company who receives USCIS' approval of his/her Form I-526 Petition while in the United States in valid non-immigrant status may obtain conditional lawful permanent resident status upon USCIS' approval of such Member's Form I-485, Application to Register Permanent Residence or Adjust Status ("**Adjustment of Status**");

6.       the total number of Qualifying Jobs created shall be allocated solely (i) to each of those Class B Members who has used the establishment of the Company as the basis for his or her Form I-526 Petition;

7.       each Class B Member shall be required to demonstrate at the time of filing his/her respective Form I-829 Petition, within the ninety (90)-day period preceding the second anniversary of his/her (i) admission to the United States as a conditional lawful permanent resident or (ii) adjustment of status to that of a conditional lawful permanent resident status, that ten (10) Qualifying Jobs have been created in respect of his or her Capital Contribution in the Company lent to the Project Company; and

Page - 43 -

    LENDERS_0003758

8.      the Class B Member has entered into an Amended and Restated Operating Agreement (the "**Agreement**") with the Company incorporating this EB-5 Job Allocation Addendum, and all definitions contained therein are incorporated herein by reference shall have the meanings ascribed in the Agreement.

9.      EB-5 Equity Fund is hereby irrevocably named as an express third-party beneficiary of this EB-5 Job Allocation Addendum.

## INTRODUCTION

The Company shall take such action to meet the objective of allocating to each Class B Member a minimum number of ten (10) Qualifying Jobs created by the Project Company on the following basis:

In the event of a shortfall of jobs for all the Class B Members at the time of the Form I-526 Petition adjudication, Qualifying Jobs to be created by the Project Company shall be allocated to each Class B Member and/or EB-5 Equity Investor based on the date of filing his or her Form I-526 Petition for the purposes of determining whether sufficient jobs will be created within two and one-half (2½) years from the approval of the Class B Member's Form I-526 Petition.

At the time of the Form I-829 Petition adjudication, the assignment of Qualifying Jobs created by the Project Company shall be allocated to each Class B Member and/or EB-5 Equity Investor based on the sequential order of the date that one either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status, as applicable. If the Form I-829 Petition of any Class B Member and/or EB-5 Equity Investor is permanently denied, Qualifying Jobs allocated to such Person will be reallocated to the other Class B Members in the manner described above.

## ARTICLE I
## DUTIES OF CLASS B MEMBER

Prior to the Class B Member's entry into the United States based on the Class B Member's EB-5 Visa, the Class B Member shall notify the Company of the Class B Member's intent to enter the United States and provide the Company with the Class B Member's expected travel dates.

Within thirty (30) days after the Class B Member's entry into the United States, based on the Class B Member's EB-5 Visa, Class B Member shall provide the Company with a copy of the I-551 Stamp located in Class B Member's passport.

Within thirty (30) days after the Class B Member receives a Form I-797A Notice of Action indicating USCIS' approval of the Class B Member's Form I-485, Application for Adjustment of Status, the Class B Member shall provide the Company with a copy of such Form I-797A Notice of Action.

Within thirty (30) days after the Class B Member either (i) entered the United States on an EB-5 Visa or (ii) received USCIS' approval of his/her Adjustment of Status,

Page - 44 -

the Class B Member shall provide the Company with the Class B Member's electronic-mail address, new physical address and telephone number where the Company may contact the Class B Member. Should the Class B Member's electronic-mail address, physical address, or telephone number change at any point during the two years after the Class B Member's entry into the United States on the Class B Member's EB-5 Visa or USCIS' approval of the Class B Member's Adjustment of Status, the Class B Member shall notify the Company of such change within thirty (30) days.

Within one hundred and twenty (120) days prior to the second anniversary of the Class B Member's entry into the United States, based on the Class B Member's EB-5 Visa, or USCIS' approval of the Class B Member's Adjustment of Status, the Class B Member shall notify the Company of the name and physical address of the attorney retained by the Class B Member who shall file the Class B Member's Form I-829 Petition.

**ARTICLE II**
**DUTIES OF THE COMPANY**

The Company shall maintain a record at its principal place of business that shall state the date that each Class B Member either (i) entered the United States based on such member's EB-5 Visa, or (ii) received USCIS' approval of such Class B Member's Adjustment of Status. The Company shall further maintain at its principal place of business a record of the number of direct and/or indirect and/or induced full-time equivalent, permanent positions created by the Development.

Within one hundred and twenty (120) days after the Class B Member notifies the Company that the Class B Member (i) has entered the United States based on the Class B Member's EB-5 Visa, or (ii) received USCIS' approval of the Class B Member's Adjustment of Status, the Company shall deliver to the Class B Member a letter indicating the Class B Member's sequential order for job allocation, and the corresponding full-time equivalent positions for qualifying employees to be allocated to the Class B Member for inclusion in such Class B Member's Form I-829 Petition.

Within ninety (90) days preceding the second anniversary of the Class B Member's admission to the United States as a conditional lawful permanent resident, the Company shall provide the Class B Member and/or the Class B Member's attorney with documentation regarding the full-time job creation by the Project Company due to the Company's investment in the Project Company.

**ARTICLE III**
**NO GUARANTEES/INDEMNIFICATION**

The Class B Member hereby acknowledges, understands, and agrees that the Company has not guaranteed, nor can guarantee, that the EB-5 Program job requirements will be satisfied at the time the Class B Member files his/her Form I-829 Petition. The Class B Member further acknowledges and understands that (a) any allocation of jobs to a Class B Member shall be subject to the terms and provisions of this EB-5 Job

Page - 45 -

**FINAL**

Allocation Addendum, and (b) should the Class B Member not be able to demonstrate that the Class B Member has met the EB-5 Program job requirements at the time of filing his/her Form I-829 Petition, the Class B Member will be asked to leave the United States.

The Class B Member agrees to hold the Company and any agent, Affiliate, director, Manager, officer, or employee thereof harmless for any failure to create ten (10) direct and/or indirect and/or induced full-time equivalent, permanent positions for his or her Capital Contribution investment in the Company, so long as the Company exercised reasonable business judgment in the fulfillment of the Company's duties under this EB-5 Job Allocation Addendum.

CONFIDENTIAL INFORMATION

LENDERS_0003761

FINAL

## EXHIBIT A – LAST UPDATED [●]

### Capital Contributions

| Member's Name and Address | Capital Contribution |
|---|---|
| **KT SUMMIT DEVELOPMENT MANAGER, LLC**<br>800 5th Avenue, Suite 4120, Seattle, Washington 98104 | US$100 |

_____                    _____

CONFIDENTIAL INFORMATION

FINAL

## EXHIBIT B

## SPOUSAL CONSENT

The undersigned is the spouse of _____ and acknowledges that he/she has read the Amended and Restated Operating Agreement, including the EB-5 Job Allocation Addendum contained in the Schedule thereto, for SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC, a Delaware limited liability company, dated as of September 20, 2015 and the Joinder Agreement attached thereto (collectively the "**Operating Agreement**") and the related Subscription Agreement and Investor Suitability Questionnaire of his/her spouse (together, "**Subscription Documents**"), and that the undersigned understands the provisions of the Operating Agreement and the Subscription Documents.   All capitalized terms used herein shall have the same meaning as given to them in the Operating Agreement.   The undersigned is aware that his/her spouse has executed and entered into the Operating Agreement, and by the provisions of the Operating Agreement, his/her spouse has agreed to purchase one or more Class B Units (as defined in the Operating Agreement) and to subject such Class B Unit(s) to the Operating Agreement, including any community property interest or quasi-community property interest, in accordance with the terms and provisions of such Agreement.   The undersigned hereby expressly approves of and agrees to be bound by the provisions of the Operating Agreement in its entirety, including, but not limited to, those provisions relating to the purchase, sales and Transfers of Membership Interests and the restrictions thereon, and agrees to adhere to the provisions of the Subscription Documents as if he/she were a party thereto.   If the undersigned predeceases his/her spouse when his/her spouse owns any Membership Interest, he/she hereby agrees not to devise or bequeath or otherwise Transfer whatever community property interest or quasi-community property interest he/she may have in any Membership Interest in contravention of the Operating Agreement or the Subscription Documents.

Date: _____

_____
Signature

_____
Print Name

Page - 48 -

CONFIDENTIAL INFORMATION

FINAL

## JOINDER AGREEMENT

The undersigned is a current or a prospective member of **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**, a Delaware limited liability company (the "**Company**"). The undersigned hereby consents to and agrees to be bound, with effect from the date of admission of the undersigned as a new Member, by the terms and conditions of that certain Amended and Restated Operating Agreement, including the EB-5 Job Allocation Addendum contained in the Schedule thereto, of the Company dated as of September 20, 2015 attached hereto as Exhibit A (the "**Operating Agreement**").

The arbitration provision as contained in Section 10.9 of the Operating Agreement is hereby expressly incorporated into this Agreement.

The undersigned hereby authorizes his or her immigration consultant specified in the Subscription Agreement to be his/her agent to accept any and all notices and other communications pursuant to Section 10.14 of the Operating Agreement. The undersigned understands and acknowledges that service shall be deemed completed on delivery to his or her immigration consultant regardless of whether it is thereafter forwarded to and received by the undersigned.

The undersigned hereby further authorizes his/her immigration counsel to directly communicate with and provide information to the Company and, upon the Company's request, deliver to the Company any final and/or drafts versions of his/her Form I-526 Petition, Form I-829 Petition and any response to a request for evidence (an "**RFE**") or notice of intent to deny (a "**NOID**") from the USCIS related to a Class B Member's Form I-526 Petition (including a copy of the associated RFE and/or NOID) before each is submitted to USCIS. The undersigned understands and agrees that he/she has retained separate legal counsel on immigration and other matters and that neither the Company nor its managers or agents are or will be providing any financial, immigration or other professional advice to him/her or to his/her immigration counsel, including without limitation, any advice relating to his/her Form I-526 Petition, Form I-829 Petition, any RFE and/or NOID response or other immigration matters.

*[Signature page follows]*

717617273.8

**FINAL**

Signed as of _____, 201__

_____
Signature

_____
Print Name

**Acknowledged and accepted by**:        **SUMMIT VILLAGE DEVELOPMENT
LENDER 1, LLC** (the "**Company**")

By Celona Asset Management (USA)
Limited, as the Class B Manager of the
Company

_____
Name:
Title:
Date signed:

*[**Signature Page to Joinder Agreement**]*

717617273.8

Exhibit to Memorandum for Summit Village Development Lender 1, LLC

## EXHIBIT C

## CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES

[See Attached]

LENDERS_0003766

## Immigration Procedures

This overview is for general informational purposes only and shall not be construed as legal advice. Prospective investors must consult a qualified immigration attorney prior to commencing the procedures set forth below.

Your immigration attorney submits your I-526 Petition to USCIS

Your immigration a Upon approval of your I-526 Petition, you may apply for Lawful Permanent Residence via Consular Processing (if you are outside the United States) or Adjustment of Status (if you are in the United States with valid non-immigrant status) if a visa number is currently available. Please check the monthly visa bulletin published by the U.S. Department of State for current visa availability and consult your immigration attorney for further details on your eligibility.

**Consular Processing**
Approval of your I-526 Petition is forwarded to the National Visa Center (NVC) for processing. The NVC will contract you with information, forms and documentary requirements for completion prior to the scheduling of a visa interview at the U.S. Consulate.

**Adjustment of Status**
You must submit an I-485 application to USCIS. Your immigration attorney will assist with the required forms and documentary evidence. Separate applications must be submitted for each qualifying family member (spouse and children under 21)

Once the NVC notifies you that an interview has been scheduled, you will undergo a medical examination, the results of which must be presented at the interview. Review U.S. Consulate interview guidelines and ensure that all necessary original documents will be available at the time of the interview.

While your I-485 application is pending, you may obtain employment and travel authorization from USCIS. Subject to Few exceptions, you must receive advance permission to return to the United States if you travel outside the United States. Failure to do so will constitute abandonment of you I-485 application.

Immigrant visa is usually granted at the time of interview. Following visa approval, you and your qualifying family members must enter the United States in order to be granted conditional lawful permanent residence. You will proceed to Phase 3 below at the appropriate time.

Upon approval of your I-485 application, you will receive a Welcome Notice, and shortly thereafter, a Lawful Permanent Residence card as evidence of your status as conditional residents of the United States.

## Investment Procedures

### PHASE 1:
### SUBSCRIPTION

If you are a foreign citizen residing outside the United States and are interested in evaluating this investment opportunity, you will be asked to complete and sign an Investor Suitability Questionnaire and provide legible copies of certain identification documents.

If the Company confirms that you may proceed, you will be issued a set of confidential offering documents to evaluate the investment opportunity with your legal and financial advisers.

If you decide to proceed with the investment and if the Company confirms your eligibility to proceed, you will complete and sign the Subscription Agreement, the Operating Agreement, tax forms and the Joinder to Master Escrow Agreement.

You will deliver all completed and signed documents to the Managing Member. You will deliver the $500,000 Subscription Amount, together with the $55,000 Administrative Fee to the Escrow Agent.

When you have completed the above steps, you will proceed to Phase 2 below.

**PHASE 2: I-526 PETITION**

You will provide contact information for your immigration attorney to the Company. The Company will provide your immigration attorney with documentation to support your I-526 Petition.

You and your immigration attorney should prepare and file your I-526 Petition with USCIS within 30 days of receiving this documentation. Unless you have retained the Hirson Immigration Law Firm as your immigration attorney, you may proceed with submission of your I-526 Petition only after the Company confirms in writing that you may do so.

Upon approval of your I-526 Petition, your immigration attorney will forward to the Company and the Escrow Agent a copy of your Form I-797 Approval Notice.

You will proceed with the process of obtaining lawful permanent residence in the United States via consular processing or an adjustment of status application. You will proceed to Phase 3 below at the appropriate time.

LENDERS_0003769

**PHASE 3: I-829 PETITION**

Within 90 days prior to the end of the second anniversary of the date your conditional permanent residence status was obtained, the Company will provide you and your immigration attorney with impact study results containing actual job creation numbers.

You and your immigration attorney must prepare and file your I-829 Petition with USCIS prior to the second anniversary of the date your conditional permanent residence status was obtained. Unless you have retained the Hirson Immigration Law Firm as your immigration attorney, you may proceed with submission of your I-829 Petition only after the Company confirms in writing that you may do so.

Upon approval of your I-829 Petition, USCIS removes the conditions of your lawful permanent residence in the United States. You continue to be a Series A Member and will receive distributions from your investment in the Company in accordance with the Operating Agreement.

CONFIDENTIAL INFORMATION

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

## **EXHIBIT D**

## **ESCROW AGREEMENT**

[See Attached]

E-1

LENDERS_0003771

# U.S. EB-5 Immigrant Investor Program

# Escrow Agreement

**by and between**

**Bank of China Limited, Macau Branch**

**and**

──────────────

**and**

**Summit Village Development Lender 1, LLC**

**For investment in Summit Village Development Lender 1, LLC to be associated with Mountain States Center for Foreign Investment, LLC**

CONFIDENTIAL INFORMATION

This U.S. EB-5 Immigrant Investor Program Escrow Agreement (this "**Agreement**") is entered into on _____ (the "**Effective Date**"), by and between

**Bank of China Limited**, **Macau Branch**, Business Registration No. 2428 (SO), a company incorporated under the laws of the Macau Special Administrative Region of the People's Republic of China and having its registered office at 323 Avenida Doutor Mario Soares, Bank of China Building, Macau (the "**Escrow Agent**", represented by Lee Shiu Man Simon),

and

_____, a citizen of People's Republic of China, Identity Card number _____, whose address is _____
_____(the "**Investor**"),

and

**Summit Village Development Lender 1, LLC**, a Delaware limited liability company having its office at c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Centre, 89 Queensway Admiralty, Hong Kong (the "**Company**").

The Escrow Agent, the Investor and the Company are hereinafter collectively referred to as the "**Parties**" and individually, a "**Party**".

WHEREAS, Mountain States Center for Foreign Investment, a Utah limited liability company, having its registered office at 515 S Palisade Dr, Orem, Utah 84097 (the "**Regional Center**") is designated by the United States Citizenship and Immigration Services (the "**USCIS**") as a regional center through which foreign investors are eligible to make investments under the Immigrant Investor Program, also known as EB-5 Program (the "**Program**");

WHEREAS, the Company is making a private offering for a maximum of 240 Class B units of membership interest in the Company (each a "**Class B Unit**") at a subscription price of US$500,000 per Class B Unit or such other minimum investment amount as may be required under the EB-5 Program at any time (the "**Subscription Price**") and an administration fee of US$55,000 per Class B Unit which may also be increased in proportion to any increase in the Subscription Price to an amount more than

1

US$500,000 and may, in the Company's sole and absolute discretion and on a case-by-case basis, be reduced by up to US$5,000 (the "**Administration Fee**"), to certain investors pursuant to that certain Confidential Private Placement Memorandum as amended from time to time (the "**Offering**"); and

WHEREAS, the Investor desires to subscribe to the Offering and thereafter to file a Form I-526 Petition by Alien Entrepreneur (the "**I-526 Petition**") pursuant to the immigration requirements of the Program, and agrees to deposit or procure the deposit of an escrow fee of US$1,500 (the "**Escrow Fee**"), which may also be increased in proportion to any increase in the Subscription Price, unless the payment of the Escrow Fee is deferred or waived by the Escrow Agent, in addition to the Subscription Price and the Administration Fee (altogether, the "**Escrowed Funds**") to an escrow account pursuant to the terms of the Offering.

NOW THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, subject to any applicable laws, regulations and policies of the Macau Special Administrative Region Government, the Parties hereby agree as follows:

1.    **Appointment of the Escrow Agent**

      The Investor hereby appoints the Escrow Agent as the escrow agent for the purposes set forth herein and the Escrow Agent accepts the appointment in accordance with the terms and conditions of this Agreement and agrees to accept, hold and disburse the Escrowed Funds for the benefit of the Investor and the Company in accordance with this Agreement.

2.    **Deposit of the Escrowed Funds**

      2.1    The Escrow Agent is hereby instructed by the Investor to open and designate an interest-bearing bank account in the name of the Investor, account number: _____, to function as the escrow account for the Escrowed Funds which will be applied for the investment in the Company (the "**Escrow Account**").

      2.2    Upon opening of the Escrow Account, the Investor shall deposit or procure the deposit of the Escrowed Funds into the Escrow Account.

2.3     Upon receipt of the deposit of the Escrowed Funds, in whole or in part, into the Escrow Account, the Escrow Agent shall provide written confirmation of the receipt of such deposit to the Investor and the Company within five (5) Business Days.  For the purposes of this Agreement, "**Business Days**" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent is authorized or required by applicable law or executive order to remain closed.

**3.      Administration of the Escrowed Funds**

The Escrow Agent shall hold the Escrowed Funds in escrow and on deposit subject to the terms and conditions of this Agreement. The Escrow Agent shall hold the Escrowed Funds separate from its own monies or monies of any other party or person, and shall not deposit any other monies that are not specified in this Agreement into the Escrow Account. Notwithstanding anything to the contrary contained in this Agreement, all Escrowed Funds shall be deposited and, at all times, maintained in actual U.S. dollars (and in no other currency).

**4.      Release of the Escrowed Funds**

4.1     The Company and the Investor each irrevocably agrees not to give the Escrow Agent any instructions, including but not limited to cash withdrawal, remittance, fund transfer to either an account under the same name as Investor or third party, stop payment, account suspension, settlement of account, and interception of funds from the account, in connection with the Escrow Account, except as allowed for in this Section 4.  The Escrow Agent hereby acknowledges and agrees that any instruction given by the Company and/or the Investor in contravention of this Section 4 shall be invalid.

4.2     Unless the Escrow Agent has previously executed remittance transaction(s) pursuant to Section 4.3 whereby the Subscription Price and the Administration Fee have been released, in full, pursuant to said instructions,

4.2.1     within ten (10) Business Days of the receipt of the Investor's I-526 Petition approval notice (the "**Approval Notice**") by either the Investor or the attorney who filed the Investor's I-526 Petition, the Investor shall deliver to the

3

EXECUTION COPY

Company, or cause to be so delivered, a copy of the Approval Notice. By this Agreement, the Investor gives the Company the irrevocable power to issue and sign an *Instruction to Release upon Approval of I-526 Petition* (as set forth in Schedule 1, the "**Sch 1 Instruction**") on behalf of Investor;

4.2.2      within three (3) Business Days of its receipt of a copy of the Approval Notice, the Company shall issue an Sch 1 Instruction, accompanied by a copy of the Approval Notice, to the Escrow Agent; and

4.2.3      within three (3) Business Days of its receipt of the Sch 1 Instruction and a copy of the Approval Notice, the Escrow Agent shall carry out the remittance transactions specified in the Sch 1 Instruction.

4.3      Provided that the Subscription Price and the Administration Fee have not been released in full pursuant to previously executed remittance transaction(s) pursuant to Section 4.4, upon receipt, by either the Investor or the attorney who filed the Investor's I-526 Petition, of a denial notice from the USCIS of the Investor's I-526 Petition (the "**Denial Notice**"), the Investor shall deliver to the Company, or cause to be so delivered, a copy of the Denial Notice. Within thirty (30) days of his or her receipt of the Denial Notice, the Investor shall file a Form I-290B Notice of Appeal or Motion (the "**Appeal**") with the USCIS and shall deliver to the Company, or cause to be so delivered, a copy of the Appeal. No earlier than forty-five (45) days from the date indicated on the USCIS receipt notice for the Appeal (the "**Appeal Receipt Notice**"), the Investor may withdraw his or her Appeal, if the Appeal has not been otherwise granted by the USCIS, by delivering to the USCIS the *Appeal Withdrawal Request* (as set forth in Schedule 5, the "**Appeal Withdrawal**"). Upon delivery of the Appeal Withdrawal, the Investor shall deliver to the Escrow Agent, or cause to be so delivered (i) a copy of the Denial Notice, (ii) a copy of the Appeal, (iii) a copy of the Appeal Receipt Notice, (iv) a copy of the Appeal Withdrawal, including proof of delivery, and (v) the *Investor's Instruction to Release After Denial of I-526 Petition* (as set forth in Schedule 2, the "**Sch 2 Instruction**"), and to deliver to the Company, or cause to be so delivered, a copy of each the foregoing. Within three (3) Business Days of the receipt of items (i), (ii), (iii), (iv) and (v) above, the Escrow Agent shall carry out the remittance transactions specified in the Sch 2 Instruction.

4

4.4    Provided that the Investor's I-526 Petition has been filed with the USCIS, the Company and the Investor may from time to time agree to the release of the Escrowed Funds, in whole or in part, prior to the approval of the Investor's I-526 Petition by issuing a *Joint Instruction* (as set forth in Schedule 3, the "**Sch 3 Instruction**") to the Escrow Agent. Within three (3) Business Days of the receipt of the Sch 3 Instruction the Escrow Agent shall carry out the remittance transactions specified therein.

4.5    For the avoidance of doubt, the Escrow Agent may deduct from the Escrow Account the Escrow Fee and a reimbursement for the Expenses described in Section 5.2.1 upon carrying out a remittance instruction issued under this Section 4, provided any such deduction shall only occur after the full amount of the Subscription Price and the Administration Fee have been released pursuant to said instructions. For the further avoidance of doubt, no portion of the Escrow Fee or the Expenses shall be deducted from the monies for the Subscription Price or the Administration Fee whatsoever.

4.6    Absent any fraud, negligence or willful misconduct, the Escrow Agent shall have no liability for releasing the Escrowed Funds pursuant to Section 4. The Escrow Agent shall not be required to validate the authenticity of any notices, instructions or agreements furnished to it, provided that the Escrow Agent reasonably believes such furnished items to be genuine.

5.    **Rights, Duties, Representations and Warranties**

5.1    The Investor

5.1.1    For the purpose of setting up the Escrow Account, the Investor shall deliver to the Escrow Agent the Investor's identity card, passport, address and Tax Identification Number (if applicable) and other documentation as reasonably requested by the Escrow Agent in order for it to carry out its duties in accordance with the terms and conditions of this Agreement.

5.1.2    The Investor is entitled to receive interest on any monies deposited in the Escrow Account subject to the interest rate as determined by the Escrow Agent.

5.1.3    The Investor can request, and the Escrow Agent will agree to provide for, an e-banking inquiry service linked to the Escrow Account. Separately, the Investor

5

authorizes and instructs the Escrow Agent to provide to the Company weekly account balance reports.

5.1.4    The Investor hereby represents, warrants and undertakes (as the case may be) to the Company and the Escrow Agent on a continuing basis that the execution, delivery and performance of and the transactions to be effected under this Agreement will not violate (i) any applicable law or regulation, or (ii) any agreement by which the Investor is bound or by which any of his or her assets are affected.

5.2    The Escrow Agent

5.2.1    The Escrow Agent shall be entitled to receive the Escrow Fee in such manner as set forth in Section 4.5 for the provision of its services hereunder. The Escrow Agent may, at its discretion, choose to waive any portion of the Escrow Fee. In addition, the Investor agrees to reimburse the Escrow Agent for all reasonable expenses, fees and disbursements, including but not limited to remittance fees and postage fees (the "**Expenses**") incurred by the Escrow Agent in the performance of its duties hereunder. Subject to the limitations in Section 4.5, the Escrow Agent may deduct the Escrow Fee and the Expenses from the Escrow Account in satisfaction of the Investor's obligation to pay the Escrow Fee and reimburse the Escrow Agent for the Expenses.  The Investor will pay directly to the Escrow Agent within ten (10) Business Days of the termination of this Agreement that portion of the amounts due under this Section 5.2.1 that have not otherwise been paid.  The duties contained in the foregoing sentence shall continue and survive the termination of this Agreement.

5.2.2    The Escrow Agent must comply with and carry out its duties under this Agreement and under all applicable laws and regulations. Unless otherwise specified, the Escrow Agent shall have no duty to comply with agreements between the Parties other than this Agreement or amendments to this Agreement pursuant to Section 10.

5.2.3    The duties and obligations of the Escrow Agent shall be determined solely by the express provisions of this Agreement, and the Escrow Agent shall not

6

be liable except for the performance of such duties and obligations as specifically set out in this Agreement. The Escrow Agent shall not be required to inquire as to the performance or observation of any obligation, term or condition under any other agreement or arrangement by the Parties, except for this Agreement or amendment to this Agreement pursuant to Section 10. The Escrow Agent is not a party to, and is not bound by, any agreement or other document out of which this Agreement may arise. The Escrow Agent shall be under no liability to the Investor by reason of any failure on the part of the Investor or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document. The Escrow Agent shall not be bound by any waiver, modification, termination or rescission of this Agreement or any of the terms hereof, unless the same is evidenced in writing, duly signed by all the Parties. This Agreement shall not be deemed to create any fiduciary relationship between the Parties.

5.2.4     Absent any fraud, negligence or willful misconduct, the Escrow Agent shall not be responsible in any manner for: (i) any property after it has been delivered by the Escrow Agent in accordance with this Agreement, (ii) the value or collectability of any note, check or other instrument, if any, so delivered, (iii) pursuing the Company for the return of the Subscription Price or Administration Fee to the Investor, or (iv) any representations made or obligations assumed by the Investor or the Company. Nothing contained herein shall be deemed to obligate the Escrow Agent to deliver any cash, instruments, documents or any other property, unless the same shall have first been received by the Escrow Agent pursuant to this Agreement.

5.2.5     The Escrow Agent shall not be liable for (i) any actions taken or omitted by it in its general and/or standard practice in good faith, (ii) any changes in applicable legal and regulatory rules, or (iii) anything which it may do or refrain from doing in connection of its duties hereunder, and shall be liable only for its negligence, willful misconduct or fraud.

5.2.6     The Parties agree that should any dispute arise with respect to the payment from, ownership or right of possession of the Escrow Account, the

CONFIDENTIAL INFORMATION

Escrow Agent is authorized and directed to retain in its possession, without liability to the Investor or the Company, except for its fraud, bad faith, willful misconduct or negligence, all or any part of the Escrowed Funds until such dispute shall have been settled either by mutual agreement of the Parties or by a final order, decree or judgment of a court or other tribunal of competent jurisdiction, and a notice executed by the Parties or their authorized representatives shall have been delivered to the Escrow Agent setting forth the resolution of the dispute. The Escrow Agent shall be under no duty whatsoever to institute, defend or partake in proceedings related to the dispute.

5.2.7      The Escrow Agent hereby represents, warrants and undertakes (as the case may be) to the Company and the Investor on a continuing basis that: (i) it is duly incorporated, established or constituted (as the case may be) and validly existing under the laws of its country of incorporation, establishment or constitution (as the case may be); (ii) it is duly authorized and has taken all necessary action to allow it to enter into and perform this Agreement and the transactions contemplated under this Agreement; (iii) it has obtained all authorizations of any governmental authority or regulatory body required in relation to this Agreement and such authorizations remain in full force and effect; and (iv) the execution, delivery and performance of and the transactions to be effected under this Agreement will not violate (a) any law or regulation applicable to it,  (b) its constitutional documents, or (c) any agreement by which it is bound or by which any of its assets are affected.

## 6.      **Confidentiality**

6.1      The Parties will treat any information related to this Agreement as confidential under the principle of mutual responsibility, except that the information related to this Agreement may be released to the Company, the Regional Center and the attorney filing the I-526 Petition.  Unless consent is prohibited by law or qualified by any data policy issued by the Escrow Agent, the Investor consents to the transfer and disclosure by the Escrow Agent of any information relating to the Investor to and between the branches, subsidiaries, representative offices, affiliates and agents of the Escrow Agent and, with advance notice to but without consent from the Investor, third parties selected by the Company wherever situated, for

8

pue

confidential use (including, without limitation, in connection with the provision of any services hereunder and for data processing, statistical and risk analysis purposes) or as otherwise described in Section 7.    The Escrow Agent and any branch, subsidiary, representative office, affiliate, agent or third party may transfer and disclose any such information as required by any applicable law, court of competent jurisdiction, relevant regulator or legal process. If any Party suffers losses as a result of another Party breaching the confidentiality obligations described in this Section 6, the breaching Party shall be liable for any liabilities that may arise from such breach.

6.2     The duties contained in this Section 6 shall continue and survive the termination of this Agreement.

## 7.    Assignment and Transfer

The Investor may not assign any of his or her rights or transfer any of his or her obligations under this Agreement without the prior written consent of the Company and the Escrow Agent. The Escrow Agent may at any time assign or transfer by novation any of, or any interest in, its rights and/or obligations under this Agreement to any person, provided that such person shall agree to be fully bound by and assume the obligations of this Agreement as if it were an original party hereto; provided further that any such assignment or transfer shall be subject to the prior written approval of the Company.    Notwithstanding its obligations pursuant to Section 6, the Escrow Agent may, with advance notice to both the Company and the Investor but without consent from either of them, disclose confidential information to any person, as circumstances reasonably require, with whom it is proposing to enter, or has entered into, any kind of assignment, transfer, participation or other agreement in relation to this Agreement.    The rights created by this Agreement shall inure to the benefit of and the obligations created hereby shall be binding upon the successors and permitted assigns of the Parties.

## 8.    Resignation and Termination

8.1     If the Escrow Agent delivers notice to the Company and the Investor of its intent to resign as escrow agent, the Company shall procure to appoint a successor escrow agent within thirty (30) days of receipt of such notice (the "**Resignation Date**").    The Company shall provide notice to the Escrow Agent upon appointment of any successor escrow agent, and

9

within three (3) Business Days of its receipt of such notice, the Escrow Agent shall deliver to the successor escrow agent all monies standing in the Escrow Account.

8.2    Notwithstanding any failure of the Company to appoint a successor escrow agent, the Escrow Agent shall be under no responsibility to receive or carry out instructions pursuant to Section 4 after the Resignation Date. The Escrow Agent shall not be deprived of its Escrow Fee, unless otherwise waived in whole or in part by the Escrow Agent, and the reimbursement of Expenses pursuant to Section 5.2.1 in the event of its resignation.

8.3    This Agreement shall terminate upon any of the following events:

> 8.3.1    the Escrow Agent having delivered all monies standing in the Escrow Account to a successor escrow agent pursuant to Section 7 and Section 8.1;
>
> 8.3.2    the Escrow Agent having executed the remittance transaction(s) pursuant to Section 4.2, 4.3, or 4.4, provided that no portion of the Subscription Price or the Administration Fee remains in the Escrow Account; or
>
> 8.3.3    the Escrow Agent having received court order(s) to seize, detain or freeze the Escrow Account.

8.4    Termination of this Agreement shall be without prejudice to any liability or obligation in respect of any matters, undertakings or conditions which shall not have been observed or performed by the relevant Party prior to termination.

## 9.    **Notices**

9.1    All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally; (ii) upon confirmed transmittal, if delivered by facsimile; (iii) on the next Business Day, if sent by overnight courier; or (iv) four (4) Business Days after mailing, if mailed by prepaid registered mail, return receipt requested, in each case to the appropriate notice address set forth below or such other address as any Party may have furnished to the other Parties in writing by registered mail, return receipt requested.

9.2    All communications made to the Escrow Agent or the Company or the Investor pursuant to this Agreement will be made in accordance with the contact details shown below:

10

| If to the Escrow Agent | The Bank of China Limited, Macau Branch |
| | 11/F, Bank of China Building |
| | Avenida Doutor Mario Soares |
| | Macau |
| | Attn: Private Banking Department |
| | Fax:  (853) 8792 1178 |

| If to the Company | Summit Village Development Lender 1, LLC |
| | c/o Celona Asset Management (USA) Limited |
| | 2207-09 Tower Two, Lippo Centre |
| | 89 Queensway |
| | Admiralty, Hong Kong |
| | Attn: Backoffice Group |
| | Fax: (852) 2264 3700 |

| If to the Investor | To the address set out on page 1. |

## 10.  Amendment

The Parties reserve the right to amend this Agreement and all such amendments shall be in writing and signed by all the Parties. All amendments shall form an integral part of this Agreement and have the same legal effect.

## 11.  General Provisions

11.1    Upon this Agreement becoming effective, the Parties are encouraged to resolve any disputes arising out of and under this Agreement through arbitration.

11.2    This Agreement shall be governed by and construed in accordance with the laws of the Macau Special Administrative Region, and the courts of competent jurisdiction in the Macau Special Administrative Region shall have exclusive jurisdiction in connection with any disputes arising out of and under this Agreement.

11

LENDERS_0003783

11.3    Headings are for the purpose of convenience and shall not affect the interpretation of this Agreement.  All references contained herein to sections or subsections shall refer to the sections or subsections of this Agreement, unless specific reference is made to the sections or subsections of another document.

11.4    This Agreement constitutes the entire agreement between the Parties relating to the transactions contemplated herein and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are superseded by this Agreement.

11.5    This Agreement shall become effective upon the Effective Date.

11.6    This Agreement may be signed in one or more counterparts and each counterpart shall constitute an original document and such counterparts, taken together, shall constitute one and the same agreement with the same legal effect.  Delivery of executed signature pages by facsimile or electronic transmission will constitute effective and binding execution and delivery of this Agreement and have the same effect as the delivery of an original executed counterpart.

11.7    If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a relevant jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Parties to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

11.8    As long as any provisions of this Agreement shall continue post termination as expressly provided hereunder, Section 11.2 (Governing Law) shall also continue post termination.

[Remainder of page intentionally left blank]

12

This Agreement is accepted and agreed by:

**The Bank of China Limited, Macau Branch**

By:      _____

Name:     Lee Shiu Man Simon

Title:     Co-Director

**Investor**

By:      _____

Name:     _____

**Summit Village Development Lender 1, LLC**

By: Celona Asset Management (USA) Limited

By:      _____

Name:     _____

Title:      Authorized  Signatory

13

                    LENDERS_0003785

**EXECUTION COPY**

## Schedule 1

### Instruction to Release upon Approval of I-526 Petition

Date _____

The Bank of China Limited, Macau Branch
11/F, Bank of China Building
323 Avenida Doutor Mario Soares
Macau
Attn.: Private Banking Department
Fax:    (853) 87921178

Dear Sir/Madam,

Reference is made to that certain U.S. EB-5 Immigrant Investor Program Escrow Agreement dated _____, _____ (the "**Agreement**") among _____ (the "**Investor**"), Summit Village Development Lender 1, LLC (the "**Company**"), and the Bank of China Limited, Macau Branch (the "**Escrow Agent**").  Unless defined otherwise, terms defined in the Agreement shall have the same meaning herein.

This is to confirm that the Form I-526 Petition by Alien Entrepreneur for the Investor has been approved by the USCIS.  Please find attached a copy of such approval notice issued by the USCIS.

Pursuant to Sections 4.2 and 5.2.1 of the Agreement, the Company hereby instructs the Escrow Agent to release the Subscription Price and the Administration Fee from the Escrow Account (Account Name:_____ / Account Number: _____) to the Company by transfer to the following account:

Beneficiary Bank: _____
Beneficiary Bank SWIFT: _____
Ben Bank ABA: _____
Account Name: _____
Account Number: _____

Any amount remaining in the Escrow Account, net of deductions for the Escrow Fee and the reimbursement of Expenses as further described in Section 5.2.1 of the Agreement, shall be released to the Investor by transfer to the following account:

Beneficiary Bank: _____
Beneficiary Bank SWIFT: _____
Ben Bank ABA: _____
Account Name: _____
Account Number: _____

Yours sincerely,


_____
Company's Authorized Signature

**Schedule 2**

**Investor's Instruction to Release After Denial of I-526 Petition**

Date _____

The Bank of China Limited, Macau Branch
11/F, Bank of China Building
323 Avenida Doutor Mario Soares
Macau
Attn.: Private Banking Department
Fax:    (853) 87921178

Dear Sir/Madam,

Reference is made to that certain U.S. EB-5 Immigrant Investor Program Escrow Agreement dated _____, ____ (the "**Agreement**") among _____ (the "**Investor**"), Summit Village Development Lender 1, LLC (the "**Company**"), and the Bank of China Limited, Macau Branch (the "**Escrow Agent**").  Unless defined otherwise, terms defined in the Agreement shall have the same meaning herein.

This is to confirm that the Form I-526 Petition by Alien Entrepreneur for the Investor has been denied by the USCIS and that a Form I-290B Notice of Appeal or Motion ("**Notice of Appeal**") dated _____, _____ was subsequently filed.  Please find attached a copy of the denial notice issued by the USCIS, the Notice of Appeal, including evidence of its receipt by the USCIS, and the request to withdraw the appeal, including proof of delivery of such request.

Pursuant to Sections 4.3 and 5.2.1 of the Agreement, the Investor hereby instructs the Escrow Agent to release the Subscription Price or such portion thereof not yet released pursuant to Section 4.4 of the Agreement, the Administration Fee and any amount remaining in the Escrow Account net of deductions for the Escrow Fee and the reimbursement of Expenses as further described in Section 5.2.1 of the Agreement, from the Escrow Account (Account Name:_____ / Account Number:_____) to the Investor by transfer to the following account (the "**Designated Account**"):

Beneficiary Bank: _____
Beneficiary Bank SWIFT: _____
Ben Bank ABA: _____
Account Name: _____
Account Number: _____

Yours sincerely,

_____
Investor

EXECUTION COPY

**Schedule 3**

**Joint Instruction**

Date _____

The Bank of China Limited, Macau Branch
11/F, Bank of China Building
323 Avenida Doutor Mario Soares
Macau
Attn.: Private Banking Department
Fax:    (853) 87921178

Dear Sir/Madam,

      Reference is made to that certain U.S. EB-5 Immigrant Investor Program Escrow Agreement dated _____, ____ (the "**Agreement**") among _____ (the "**Investor**"), Summit Village Development Lender 1, LLC (the "**Company**"), and the Bank of China Limited, Macau Branch (the "**Escrow Agent**").  Unless defined otherwise, terms defined in the Agreement shall have the same meaning herein.

      Pursuant to Section 4.4 and 5.2.1 of the Agreement, the Investor and the Company hereby instruct the Escrow Agent to transfer the Subscription Price and the Administration Fee, prior to the approval of the Investor's Form I-526 Petition by Alien Entrepreneur by the USCIS, to the following account:

Beneficiary Bank: _____
Beneficiary Bank SWIFT: _____
Ben Bank ABA: _____
Account Name: _____
Account Number: _____

      Any amount remaining in the Escrow Account, net of deductions for the Escrow Fee and the reimbursement of Expenses as further described in Section 5.2.1 of the Agreement, shall be released to the Investor by transfer to the following account:

Yes_____        No_____

Beneficiary Bank: _____
Beneficiary Bank SWIFT: _____
Ben Bank ABA: _____
Account Name: _____
Account Number: _____

Yours sincerely,

_____        _____
Investor                                                        Company's Authorized Signature

EXECUTION COPY

## Schedule 4

### Authorized Signature(s) of

### Person(s) Designated by the Company to give and confirm Funds Transfer Instructions

|  | Name | Signature |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |

### Telephone Number(s) of

### Person(s) Designated by the Company to confirm Funds Transfer Instructions

|  | Name | Telephone Number / Cell Phone |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |

**Schedule 5**

**Appeal Withdrawal Request**

USCIS - The Administrative Appeals Office

_____

_____

_____

_____

**Re.: <u>Withdrawal from Appeal of the denial decision of Form I-526 Petition by Alien Entrepreneur</u>**

       Petitioner: _____

       Receipt No.: _____

Dear Sir/Madam,

This letter is submitted in connection with my decision to withdraw from the appeal of the denial notice of my Form I-526 Petition by Alien Entrepreneur**.**

On _____, I received the denial notice for my Form I-526 Petition by Alien Entrepreneur. (Receipt No.: _____). On _____, I appealed the decision by delivering Form I-290B Notice of Appeal or Motion to the Administrative Appeals Office.

Now, I, _____, hereby declare that I wish to withdraw from the appeal in accordance with 8 CFR PART 1103.3 (a)(2)(ix) with prejudice.

I understand that any fees submitted to the United States Citizenship and Immigration Services or to the Administrative Appeals Office for the adjudication in connection with my Form I-526 Petition by Alien Entrepreneur shall not be waived or refunded, and I acknowledge that I myself will be responsible for any consequences arising from the withdrawal from the appeal.

Thank you for your attentiveness in this matter.


_____

Print Name


_____

Signature


_____

Date

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

**EXHIBIT E FORM W-8BEN or W-9**

[See Attached]

E-1

Form **W-8BEN**

(Rev. February 2014)

Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)

▶ For use by individuals. Entities must use Form W-8BEN-E.
▶ Information about Form W-8BEN and its separate instructions is at *www.irs.gov/formw8ben*.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do NOT use this form if:**                                                                                                                **Instead, use Form:**

- You are NOT an individual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8BEN-E
- You are a U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . W-9
- You are a beneficial owner claiming that income is effectively connected with the conduct of trade or business within the U.S. (other than personal services) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- You are a beneficial owner who is receiving compensation for personal services performed in the United States . . . . . . . 8233 or W-4
- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

### Part I    Identification of Beneficial Owner (see instructions)

| 1 Name of individual who is the beneficial owner | 2 Country of citizenship |
|---|---|

3 Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|

4 Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|

| 5 U.S. taxpayer identification number (SSN or ITIN), if required (see instructions) | 6 Foreign tax identifying number (see instructions) |
|---|---|

| 7 Reference number(s) (see instructions) | 8 Date of birth (MM-DD-YYYY) (see instructions) |
|---|---|

### Part II    Claim of Tax Treaty Benefits (for chapter 3 purposes only) (see instructions)

9 I certify that the beneficial owner is a resident of _____ within the meaning of the income tax treaty between the United States and that country.

10 **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article _____ of the treaty identified on line 9 above to claim a _____ % rate of withholding on (specify type of income): _____ .

Explain the reasons the beneficial owner meets the terms of the treaty article: _____

### Part III    Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

- I am the individual that is the beneficial owner (or am authorized to sign for the individual that is the beneficial owner) of all the income to which this form relates or am using this form to document myself as an individual that is an owner or account holder of a foreign financial institution,
- The person named on line 1 of this form is not a U.S. person,
- The income to which this form relates is:
  (a) not effectively connected with the conduct of a trade or business in the United States,
  (b) effectively connected but is not subject to tax under an applicable income tax treaty, or
  (c) the partner's share of a partnership's effectively connected income,
- The person named on line 1 of this form is a resident of the treaty country listed on line 9 of the form (if any) within the meaning of the income tax treaty between the United States and that country, and
- For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. **I agree that I will submit a new form within 30 days if any certification made on this form becomes incorrect.**

**Sign Here** ▶

| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) |
|---|---|

| Print name of signer | Capacity in which acting (if form is not signed by beneficial owner) |
|---|---|

**For Paperwork Reduction Act Notice, see separate instructions.**          Cat. No. 25047Z          Form **W-8BEN** (Rev. 2-2014)

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

*Print or type*
*See Specific Instructions on page 2.*

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

– –

or

Employer identification number

–

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**

Signature of U.S. person ▶

Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding? *on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued), or

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

Form W-9 (Rev. 12-2014)

Page **2**

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* above.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account, list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

Form W-9 (Rev. 12-2014) | Page **3**

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box in line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box in line 3.

**Limited Liability Company (LLC).** If the name on line 1 is an LLC treated as a partnership for U.S. federal tax purposes, check the "Limited Liability Company" box and enter "P" in the space provided. If the LLC has filed Form 8832 or 2553 to be taxed as a corporation, check the "Limited Liability Company" box and in the space provided enter "C" for C corporation or "S" for S corporation. If it is a single-member LLC that is a disregarded entity, do not check the "Limited Liability Company" box; instead check the first box in line 3 "Individual/sole proprietor or single-member LLC."

## Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space in line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
| --- | --- |
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 5 [2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note.** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns.

## Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see Limited Liability Company (LLC) on this page), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at www.ssa.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

Form W-9 (Rev. 12-2014)

Page **4**

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 6. Grantor trust under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i) (A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity [4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i) (B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.
[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 2.

**\*Note.** Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or contact them at *www.ftc.gov/idtheft* or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

CONFIDENTIAL INFORMATION

Exhibit to Offering Memorandum for Summit Village Development Lender 1, LLC

## EXHIBIT F

### PROJECT MAPS AND RENDERINGS



LENDERS_0003797