# EXHIBIT 27

## SYNDICATION AND CO-LENDER AGREEMENT

This SYNDICATION AND CO-LENDER AGREEMENT (this "Agreement"), dated as of March 2, 2018 ("Effective Date"), is made by and among **SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC**, a Delaware limited liability company, with its principal office located at c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Center, 89 Queensway, Admiralty, Hong Kong (in its individual capacity as a Lender (as hereinafter defined), "Existing Lender," and in its capacity as the collateral agent for the Lenders, together with its successors and/or assigns, "Agent"), **GRAND CANYON DEVELOPMENT HOLDINGS 3 LLC**, an Arizona limited liability company, with its principal office located at c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Center, 89 Queensway, Admiralty, Hong Kong ("GCDH3"), and **THE LENDERS FROM TIME TO TIME PARTY HERETO** (each an "Additional Lender", and collectively with GCDH3, the "Additional Lenders"; Existing Lender and the Additional Lenders are collectively referred to herein as the "Lenders").

W I T N E S S E T H:

WHEREAS, Existing Lender entered into the Original Loan Agreement (as defined herein) to make a loan ("Loan") in the amount of One Hundred Twenty Million and No/100 Dollars ($120,000,000.00) to SMHG VILLAGE DEVELOPMENT LLC, a Delaware limited liability company ("Borrower"), which Loan is evidenced by that certain Promissory Note dated June 28, 2016 (as amended, supplemented, restated or replaced from time to time, the "Original Note"), and that certain Loan Agreement dated June 28, 2016, as amended by that certain First Amendment to Loan Agreement and other Loan Documents dated September 23, 2016, and as further amended by that certain Second Amendment to Loan Agreement and Other Loan Documents dated as of October 31, 2017 (collectively, as amended, supplemented, restated or replaced from time to time, the, the "Original Loan Agreement"). The Loan is secured by that certain Amended and Restated Construction Deed of Trust, Security Agreement and Fixture Filing (Securing Present and Future Advances) (Eden, Weber County, Utah) on the Property, dated as of October 31, 2017 (as amended, supplemented, restated or replaced from time to time, the "Original Security Instrument") encumbering certain parcels of real property identified therein (the "Property"), and other Loan Documents (as defined in the Loan Agreement);

WHEREAS, Agent is the present holder of the Original Note and the Loan Agreement;

WHEREAS, the Loan Agreement has been amended by that certain Third Amendment to Loan Agreement and Other Loan Documents, dated the date hereof, by and among Borrower, the Existing Lender and Agent (the "Third Amendment"; the Original Loan Agreement, as amended by the Third Amendment, as the same may be further amended, supplemented, modified, renewed, restated or replaced from time to time, is referred to herein as the "Loan Agreement"; capitalized terms not otherwise defined in this Agreement, shall have the meanings set forth in the Loan Agreement), and the Original Security Instrument has been amended and restated by that certain Second Amended and Restated Construction Deed of Trust, Security Agreement and Fixture Filing (Securing Present and Future Advances) (Eden, Weber County, Utah) on the Property, dated the date hereof, granted by Borrower in favor of Agent, for

105717378

the benefit of the Lenders (the "A&R Security Instrument;" the Original Security Instrument, as amended by the A&R Security Instrument, as the same may be further amended, supplemented, modified, renewed, restated or replaced from time to time, is referred to herein as the "Security Instrument");

WHEREAS, the Existing Lender and Agent desire to jointly syndicate the Loan to the Additional Lenders, and the Additional Lenders desire to assume from the Existing Lender, on the terms and conditions set forth in this Agreement and the Assignment and Acceptance Agreement, their respective Percentage Shares (as that term and certain other capitalized terms are defined in the Glossary attached hereto as Annex I) of the Loan; and

WHEREAS, the Existing Lender desires to affirm, and the Additional Lenders shall acknowledge, that Agent is the collateral agent on behalf of the Lenders under the Loan Agreement, and Agent has agreed to act as collateral agent on behalf of the Lenders on the terms, and subject to the conditions, set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the Parties hereto agree as follows:

1.      Syndication of the Loan.

(a)      The Loan Agreement permits the Existing Lender to, inter alia, (i) syndicate the Loan, (ii) divide the Loan into multiple loan components, and (iii) require Borrower to execute and deliver substitute notes ("Component Notes") with respect to such syndication and loan componentization. For the avoidance of doubt, the aggregate amount payable under the Component Notes shall equal the aggregate amount of the Loan.

(b)      The Existing Lender may syndicate and assign the Original Note, the Loan and the other Obligations held by the Existing Lender, in whole or in part (any such transaction, a "Syndicated Sale") to any Eligible Assignee as provided further in this Agreement. Such right to pursue Syndicated Sales is reserved exclusively to Existing Lender, although once an Additional Lender has assumed its Percentage Share of the Loan as provided herein (such Additional Lender, a "Syndication Assignee"), it may thereafter assign and participate its interests in the Loan as provided in Section 11 below.

(c)      Each Syndicated Sale shall be effected through the execution and delivery of a Component Note and an Assignment and Acceptance Agreement. Upon agreement of the Existing Lender and the prospective Syndication Assignee to consummate a Syndicated Sale, the prospective Syndication Assignee shall comply with the conditions and requirements set forth in Section 11(a)(i) and (ii) as if such assignment was an assignment as further described therein.

2.      Appointment of Agent.

(a)      Subject to Section 10 hereof, the Existing Lender and each Additional Lender hereby appoint Agent as the collateral agent of such Lender under the Loan Documents solely for the purposes of assisting the Lenders in enforcing Borrower's compliance with, and satisfaction of, the Borrower's payment obligations under the Loan Documents. Agent

2

CONFIDENTIAL INFORMATION

hereby accepts and agrees to such agency. Subject to the terms hereof, Agent agrees to receive, hold, administer and enforce, as applicable, the Collateral, and to realize upon, collect and dispose of the Collateral and to apply the proceeds therefrom, in such manner and on such terms as are set forth herein for the benefit of the Lenders as provided herein, and otherwise to perform its duties and obligations as Agent hereunder in accordance with the respective terms hereof, provided that the Agent shall have no duties or responsibilities except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with the Lenders, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Documents or otherwise exist with respect to the Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties, and no implied covenants or obligations shall be read into this Agreement or any of the Loan Documents against the Agent.

(b)    As to any matters not expressly provided for in the Loan Documents, Agent shall not be required to exercise any discretion or take any action, but shall be permitted to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) only upon the instructions of the Required Lenders, subject to Section 6(b) hereof; provided, however, that in no event shall Agent be required to take any action that exposes Agent to personal liability or that is contrary to the Loan Documents or applicable law or regulation. Subject to Section 6(b) hereof, during the period from when Agent seeks direction from the Required Lenders until the Required Lenders respond (or are deemed to have responded pursuant to Section 6 hereof), Agent may take such action as Agent believes in good faith is necessary, desirable or appropriate to preserve the Collateral supporting the Loan and to preserve the rights, interests and position of the Lenders under the Loan Documents.

(c)    Lenders holding more than fifty percent (50%) of the aggregate outstanding principal amount of the Loan (for the purposes of this subsection, such amount shall not include any amounts funded by the Agent in its capacity as Lender) (the "Non-Agent Required Lenders") may elect in writing at any time to replace Agent for any reason or for no reason; provided, however, that any such replacement shall only become effective upon the substitution of a successor collateral agent pursuant to Section 10 below.

3.    Collection and Application of Payments.

(a)    Notwithstanding anything to the contrary in the Loan Agreement or the other Loan Documents, all Advances to be made to Borrower shall be made directly by each Lender in accordance with the Loan Documents. Subject to any cash management provisions in the Loan Agreement (as Modified by Section 8 below), all payments made by the Borrower on account of the Obligations shall be made directly to the respective Lender at such Lender's Contact Office in accordance with each Lender's Component Note.  If any Lender shall directly receive any payment in respect of another Lender's Component Note or Funded Share in the Obligations (including, without limitation, payments received not in accordance with Section 3(b) below), the receiving Lender shall promptly, and in any event within two (2) Business Days,

105717378

remit such payment in the same form received to such other Lender. In the event Agent incurs any third party costs and expenses in the performance of Agent's duties and its enforcement of the rights of the Lenders under the Loan Documents, including the exercise of any rights under Article 8 of the Loan Agreement, each of the Lenders shall remit to Agent such Lender's Percentage Share of such costs and expenses. In the event of a Defaulting Lender, the other Lenders have the ability at their discretion to fund such Defaulting Lender's share and any such Lenders who fund such costs and expenses (the "Funding Lenders") shall be entitled to charge interest to Defaulting Lender at a rate of 6.75% per annum on the amount of such Defaulting Lender's share. Defaulting Lender agrees that it shall remit to Funding Lenders on a pro rata basis amounts to satisfy in full the costs and expenses and interest accrued thereupon upon receipt of any payments from the Borrower on account of the Obligations or realization of proceeds from the Collateral, within two (2) Business Days of such receipt.

(b)      The Lenders hereby acknowledge and agree that each Component Note shall be of equal priority with each other Component Note, and no portion of any Component Note shall have priority or preference over any portion of any other Component Note.  Any payment (whether principal or interest) or prepayment under the Component Notes (including reimbursement of expenses from the Borrower and proceeds from sales of collateral) shall be applied by Lenders to the Component Notes on a *pari passu* basis based on the Funded Shares of the Lenders as further provided in this Section 3.  Furthermore, from and after the date hereof, no portion of the Loan is outstanding under any promissory note or other instrument other than the Component Notes.

(c)      Following the occurrence of an Event of Default and acceleration of the Obligations, all amounts received by Agent on account of the Obligations, shall be promptly disbursed by Agent by wire transfer of like funds received within five (5) Business Days of the date of receipt, without further interest payable by Agent, as follows:

(i)      First, to the payment of any third party costs and expenses in the performance of Agents duties and its enforcement of the rights of the Lenders under the Loan Documents, including the exercise of any rights under Article 8 of the Loan Agreement and to protective advances, and reasonable fees and expenses of Agent's legal counsel;

(ii)      Then, to the Lenders, to pay accrued interest accrued under the Component Notes, allocated based on the percentage that the total accrued interest under any Component Note bears to the accrued interest on all Component Notes, until interest accrued on the Loan (including, without limitation, interest at the default rate set forth in the Loan Agreement if applicable) has been paid in full;

(iii)      Then, to the Lenders, pro rata in accordance with their respective Funded Shares, until principal under the Loan has been paid in full;

(iv)      Then, to the Lenders, pro rata in accordance with their respective Funded Shares, any prepayment fees under the Loan Agreement, to the extent actually received from Borrower; and

4

105717378

(v)     Then, to the Lenders, pro rata to each Lender based upon the amount of remaining Obligations owed to such Lender as a percentage of all remaining Obligations held by all Lenders, until all other Obligations have been paid in full.

4.     <u>Funding by GCDH3</u>.  From and after the Effective Date of that certain Assignment and Acceptance Agreement, dated as of March 2, 2018, by and between Existing Lender and GCDH3, Existing Lender and GCDH3 agree that GCDH3 shall thereafter fully fund all Advances under the Loan Documents until such time as the Component Note held by GCDH3 is fully advanced, prior to any further Advances by Existing Lender under its Component Note.

5.     <u>Set-Off Rights</u>.   If any Lender shall receive and retain any payment, whether by setoff, application of deposit balance or security, or otherwise, in respect of the Obligations in excess of such Lender's Funded Share thereof, then such Lender shall purchase from the other Lenders for cash and at face value and without recourse, such participation in the Obligations held by them as shall be necessary to cause such excess payment to be shared ratably with each other Lender as set forth in <u>Section 3</u> above; provided, that if such excess payment or part thereof is thereafter recovered from such purchasing Lender, the related purchases from the other Lenders shall be rescinded ratably and the purchase price restored as to the portion of such excess payment so recovered, but without interest.

6.     <u>Voting Rights of Lenders</u>.

(a)     <u>Required Lender Approvals</u>. Required Lenders shall jointly have the right to take all actions, including granting any consents or approvals, to be made by, or on behalf of, the "Lender" under the Loan Agreement and the other Loan Documents. Without limiting the foregoing, but subject to subsection (b) below, except under exigent circumstances that require, in the good faith judgment of Agent, immediate actions by Agent to protect or preserve the value of the Collateral or the interests of the Lenders under the Loan Documents, before taking any material remedial action in response to an Event of Default, Agent shall advise the Lenders of such proposed material remedial action and obtain the consent of the Required Lenders with respect thereto.   Agent shall be entitled to rely upon such consent or other directions given by Required Lenders with respect to such remedial actions, and all costs and expenses incurred by Agent in responding to such remedial actions shall be subject to reimbursement by Lenders in accordance with their Percentage Shares of the Loan, and Lenders shall, upon request, reimburse Agent for their Percentage Shares of any such costs and expenses incurred.  Such material remedial action shall include the payment of Liens pursuant to <u>Section 8.1</u> of the Loan Agreement, the defense against any apparent or threatened adverse title, Lien, claim of lien, encumbrance, claim or charge against the Property pursuant to <u>Section 8.1</u> of the Loan Agreement, and the other matters contemplated by <u>Section 8.1</u> of the Loan Agreement.

(b)     <u>Agent Approval</u>.   Notwithstanding anything to the contrary contained in this Agreement or the Loan Documents, no Modification of any provision of the Loan Documents that would expand the liability or obligations of Agent or Modify provisions relating to the fees or reimbursements to Agent shall be effective without the written consent of Agent.

105717378

CONFIDENTIAL INFORMATION                                                                                    LENDERS_0000734

(c)    Borrower Related Party. In the event a Lender or an Affiliate thereof becomes a Borrower Related Party or an Affiliate of a Borrower Related Party, then (A) such Lender shall not be entitled to vote on any matter as to which a vote by the Lenders is required hereunder, and the Funded Share of the Loan held by such Lender shall be disregarded and excluded, and (B) such Lender shall not have any right to receive copies of any reports or information prepared by Agent except as necessary to verify the amounts due with respect to such Lender's Component Note and the payment of such amounts.  In addition, if Agent becomes a Borrower Related Party, Agent shall promptly resign from its role as collateral agent and shall cooperate with the delivery of documentation in accordance with the terms of Section 10 hereof.

(d)    Defaulting Lender. Notwithstanding anything to the contrary herein, a Defaulting Lender shall not be entitled to vote on any matter as to which a vote by the Lenders is required hereunder, so long as such Lender is a Defaulting Lender and the Funded Share of the Loan held by a Defaulting Lender shall be disregarded and excluded.

7.    Delivery of Information; Confidentiality.

(a)    Subject to, and in accordance with, any obligation of confidentiality to which the "Lender" under the Loan Documents is subject, Agent shall make available to Lenders (either by delivering copies or by posting on IntraLinks or a similar website), promptly upon receipt by Agent (provided the Lenders have not received the same), (i) copies of all financial statements, reports, certificates and other material information (including certificates of insurance) of the Borrower received by Agent in connection with the Loan Documents, and (ii) any notices of default from the Borrower received by Agent pursuant to the Loan Agreement, provided that, to the extent of any obligation of confidentiality to which the "Lender" under the Loan Documents is subject, any such financial statements, reports, certificates, notices and other material information shall be treated by Lenders as confidential in accordance with the Loan Documents.  Additionally, Agent shall promptly make available to Lenders (either by delivering copies or by posting on IntraLinks or a similar website) copies of any express notices of default, pursuant to which Agent would reserve the right to exercise remedies on account thereof, delivered by the Agent to the Borrower.  Notwithstanding the foregoing provisions of this paragraph, no failure on Agent's part to furnish Lenders with such documents shall result in any Agent liability hereunder in the absence of bad faith, gross negligence or willful misconduct.

(b)    Each Lender agrees to act in compliance with any confidentiality provisions of the Loan Agreement and the other Loan Documents.

8.    Rights with Respect to Accounts, Collateral, and Enforcement.

(a)    Notwithstanding anything to the contrary contained in the Loan Documents, all accounts and sub-accounts maintained for the benefit of "Lender" under the Loan Documents, and any additional accounts and sub-accounts established for the benefit of Lenders with respect to the Loan and the Loan Documents (collectively, the "Accounts"), shall be held exclusively in the name of Agent (for the benefit of Lenders), and shall be under the sole dominion and control of Agent in accordance with this Agreement.  Agent shall administer all

6

CONFIDENTIAL INFORMATION

aspects of the Accounts and the sums deposited therein, including the collections of all sums to be deposited therein, the disbursement of sums to Borrower, Junior Lenders, or other Persons, and the application of sums in respect of the Obligations, all in accordance with this Agreement and the Loan Documents.

(b)    Notwithstanding anything to the contrary contained in the Loan Documents, any security or collateral for the Loan, and all Guaranties, letters of credit, interest rate protection agreements, and other credit enhancement or collateral support with respect to the Loan shall be held by Agent for the benefit of all the Lenders and shall be subject to enforcement solely by Agent (subject to the rights of the Required Lenders and other designated groups of Lenders) in accordance with this Agreement.

(c)    No Lender shall have, and shall not assert or seek to exercise, any right of legal redress against the Borrower, any Guarantor, or any other Person obligated with respect to the Loan Documents in respect of the Loan or the Loan Documents other than through Agent's exercise of rights and remedies in accordance with the terms of this Agreement.  Each Lender agrees that, subject to Section 6 above and the other terms of this Agreement, Agent may take legal action to enforce or protect the Lenders' interests in respect of the Loan and the Loan Documents.

9.    Further Rights of Agent.

(a)    Delegation of Duties.  Agent may execute any of its duties under the Loan Documents and this Agreement by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

(b)    Exculpatory Provisions.  None of Agent nor any of its respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (1) liable for any action lawfully taken or omitted to be taken in accordance with the terms of this Agreement by it or such Person under or in connection with the Loan Documents (except for, and to the extent of, its or such Person's own gross negligence or willful misconduct), or (2) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with the Loan Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Loan Documents or for any failure of the Borrower or any Guarantor to perform their obligations thereunder.  Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, the Loan Documents or to inspect the properties, books or records of the Borrower or any Guarantor.

(c)    Reliance by Agent.

(i)    Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certification, affidavit, letter,

105717378

cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower), independent accountants and other experts selected by Agent.  As to the Lenders:  (1) Agent shall be fully justified in failing or refusing to take any action under the Loan Documents unless it shall first receive such advice or concurrence of the Required Lenders (or, if a provision of this Agreement expressly provides that a lesser number of the Lenders may direct the action of Agent, such lesser number of Lenders) or it shall first be indemnified to its satisfaction by the Lenders ratably in accordance with their respective Percentage Shares against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any action (except for liabilities and expenses resulting from Agent's gross negligence or willful misconduct), and (2) Agent shall in all cases be fully protected in acting, or in refraining from acting, under the Loan Documents in accordance with a request of the Required Lenders (or, if a provision of this Agreement expressly provides that Agent shall be required to act or refrain from acting at the request of a lesser number of the Lenders, such lesser number of Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(ii)    All acts of and communications by Agent, as agent for the Lenders, shall be deemed legally conclusive and binding on the Lenders; and Borrower or any third party (including any court) shall be entitled to rely on any and all communications or acts of Agent with respect to the exercise of any rights or the granting of any consent, waiver or approval on behalf of the Lenders or the Required Lenders in all circumstances where an action by the Lenders or the Required Lenders is required or permitted pursuant to this Agreement or the provisions of any other Loan Document or by applicable Laws without the right or necessity of making any inquiry of any individual Lender as to the authority of Agent with respect to such matter.  In no event shall any of the foregoing limit the rights or obligations of any Lender with respect to any other Lender pursuant to this Agreement.  Each Lender acknowledges and agrees for the benefit of Agent and Borrower that Agent shall be, and Borrower shall be entitled to deal with Agent as, the exclusive representative of the Lenders on all matters relating to the Loan, this Agreement and each of the other Loan Documents

(d)    Notice of Default.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless (a) Agent has received written notice from a Lender or the Borrower referring to the Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default" or (b) Agent has actual knowledge of such Default or Event of Default.  In the event that Agent receives such a notice (pursuant to clause (a) above), or shall have actual knowledge (pursuant to clause (b) above), that a Default or Event of Default has occurred, Agent shall promptly give notice thereof to the Lenders.  Agent shall address such Default or Event of Default in accordance with the terms of Section 6(a) hereof.

(e)    Non-Reliance on Agent and Other Lenders.

(i)    Each Lender expressly acknowledges that, except as set forth in any Assignment and Acceptance Agreement, none of Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or

8

CONFIDENTIAL INFORMATION

warranties to it and that no act by Agent hereinafter taken, including any review of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by Agent to any Lender.  Each Lender represents to Agent that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Borrower and any Guarantor and made its own decision to make its loans under the Loan Documents and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any Guarantor.  Except as expressly provided in this Agreement, neither Agent nor any Lender shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of the Borrower or any Guarantor which may come into the possession of Agent or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates, whether coming into its possession before the making of any Loan or disbursement or at any time or times thereafter.  Except as expressly provided in the preceding sentence or elsewhere in this Agreement, neither Agent nor any Lender shall have an obligation whatsoever to the other Lenders, as the case may be, or to any other Person to assure that: (i) the Collateral exists; (ii) any Collateral is owned by Borrower or any other Person; (iii) the Collateral is cared for, protected or insured; (iv) the liens granted to Agent on behalf of Lenders under the Loan Documents or pursuant thereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority.

(ii)     Independently and without reliance upon Agent or the other Lenders, each Lender, has and shall independently determine whether it desires, or Agent or any Lender is entitled, to exercise any right or remedy under the terms of the Loan Documents,   No Lender is relying upon or shall rely upon any representation, warranty, business judgment, decision, interpretation or analysis of any other Lender or Agent in determining whether to fund or not fund any draw request by Borrower or whether to take any other action, or decision not to act, permitted pursuant to the Loan Documents. Each Lender hereby covenants to the other Lenders to: (i) timely and fully perform all covenants and obligations of a Lender under the Loan Documents to which it is a party; (ii) use its reasonable judgment in making all decisions and exercising all rights or remedies under the terms of the  Loan Documents or this Agreement; and (iii) to act at all times in good faith.  Nothing contained in this Agreement shall require any Lender to require strict compliance by Borrower with the terms of any Loan Document and each Lender hereby expressly acknowledges that a Lender may elect, in its sole and exclusive discretion, without notice to the other Lender or to Agent, to waive any requirement or condition precedent set forth in any Loan Document (either temporarily or permanently), though the actions of Agent under this Agreement shall be binding on all Lenders as between Borrower and Lenders.  Subject to the foregoing, no determination or waiver by one Lender shall be binding upon any other Lender, except as expressly set forth herein.  No Lender shall be liable to the other for any act or decision not to act taken in good faith, upon the exercise of its reasonable judgment in accordance with the terms of this Agreement and the Loan Documents; <u>provided</u>

9

CONFIDENTIAL INFORMATION

that nothing contained in this Section shall limit a Lender's liability for its Percentage Share of any liability to Borrower; provided that if such liability is imposed upon a Lender for failure to fund such Lender's Percentage Share of a disbursement and the other Lender did fund its Percentage Share of such disbursement, then the funding Lender shall not be liable for its Percentage Share of such liability imposed upon the Lenders and said liability shall be the sole liability of the non-funding Lender. Without limiting the forgoing, the advancement of a disbursement by a Lender to or for the account of Borrower shall not be deemed or construed to constitute a representation by such Lender to any other Lender or any other Person with respect to Borrower or Borrower's compliance with the Loan Documents.

   (f)  <u>Indemnification</u>.

     (i)  The Lenders agree to indemnify Agent in its capacity as collateral agent (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Percentage Shares, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including without limitation at any time following the payment of the Obligations) be imposed on, incurred by or asserted against Agent in any way relating to or arising out of the Loan Documents or any documents contemplated by or referred to herein or in the Loan Agreement or the transactions contemplated hereby or thereby or any action taken or omitted by Agent under or in connection with any of the foregoing or the Loan generally; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements (i) resulting from Agent's gross negligence or willful misconduct, or (ii) resulting solely from another Lender's gross negligence or willful misconduct. The provisions of this <u>Section 9(f)(i)</u> shall survive the payment of the Obligations and the termination of this Agreement.

     (ii)  Each Lender agrees to indemnify Agent and the other Lenders from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including without limitation at any time following the payment of the Obligations) be imposed on, incurred by or asserted against Agent or such other Lenders in any way relating to or arising out of a default by the first-mentioned Lender under this Agreement, the Loan Documents or any documents contemplated by or referred to herein or in the Loan Agreement or the transactions contemplated hereby or thereby or any action taken or omitted by first-mentioned Lender under or in connection with any of the foregoing or the Loan generally. The provisions of this Section 9(f)(ii) shall survive the payment of the Obligations and the termination of this Agreement.

   (g)  <u>Right to Act in Individual Capacity</u>. Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any of the Borrower or any of its Affiliates as though Agent were not Agent hereunder. With respect to such loans made or renewed by them and any Note issued to them, Agent and its affiliates shall have the same rights and powers under the Loan Documents as any Lender and may exercise the same as though it were not Agent, and the terms "Lender" and "Lenders" shall include Agent in its individual capacity as a Lender.

1057173378

10.     <u>Successor Agent</u>.   Agent may resign as collateral agent upon thirty (30) days' notice to the Lenders, which resignation shall be effective upon the appointment of a successor agent as provided below.  If Agent shall resign or if Non-Agent Required Lenders shall have elected to replace Agent pursuant to <u>Section 2</u> above, then the Required Lenders shall appoint a successor agent or, if the Required Lenders are unable to agree on the appointment of a successor agent within thirty (30) days after receipt of notice of such resignation from Agent, Agent shall appoint a successor agent for the Lenders.  Upon such appointment such successor agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the Parties or any of the Loan Documents or successors thereto.  After any Agent's resignation or replacement hereunder as Agent, the provisions of this Agreement and any indemnification or reimbursement provisions in the Loan Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent.  Any resigning Agent shall cooperate with its successor (at the cost and expense of its successor), including, without limitation, delivering (at the request of Required Lenders) to its successor all original Loan Documents held by Agent, all Loan files, the Register and all other books, records and other documentation regarding the Loan in its possession.

11.     <u>Assignments and Participations</u>.

(a)     Any Lender may at any time assign and delegate to one or more Eligible Assignees (each permitted assignee referred to herein, an "<u>Assignee</u>") all or any part of such Lender's unfunded portion of the Percentage Share of the Loan and the other Obligations held by such Lender in accordance with this Agreement and its respective Component Note, in a minimum amount of $10,000,000.00, which minimum amount may be an aggregated amount in the event of simultaneous assignments to or by two or more funds under common management (or if such Lender's Percentage Share of the Loan is less than $10,000,000.00, one hundred percent (100%) thereof); <u>provided</u>, <u>however</u>, that any such assignment shall not be enforceable, and Agent and the other Lenders may continue to deal solely and directly with the assigning Lender in connection with the interest purported to be assigned to such Assignee until (i) written notice of such assignment, together with payment instructions, addresses and related information with respect to the Assignee, shall have been given to Agent by such Lender and the Assignee, (ii) such Lender and its Assignee shall have executed and delivered to Agent an Assignment and Acceptance Agreement pursuant to which the Assignee shall expressly assume all obligations of such Lender to the extent that such obligations hereunder and under the Loan Documents have been assigned by it pursuant to such Assignment and Acceptance Agreement, and (iii) Borrower shall have executed and delivered to the Assignee a Component Note in substantially the form attached hereto as <u>Exhibit A</u>.

(b)     Agent shall maintain a copy of each Assignment and Acceptance delivered to it and a register (the "<u>Register</u>") for the recordation of the names and addresses of the Lenders and the principal amount of the Loan owing to each Lender from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, and each Lender and Agent shall treat each person whose name is recorded in the Register as the owner of the applicable Percentage Share of the Loan for all purposes of this Agreement.  From and after the date that Agent notifies the assigning Lender and the Borrower that it has received an executed

105717378

Assignment and Acceptance Agreement: (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder and under the Loan Documents have been assigned to it pursuant to such Assignment and Acceptance Agreement, shall have the rights and obligations of a Lender under this Agreement and the Loan Documents, (ii) the assignor Lender shall, to the extent that rights and obligations hereunder and under the Loan Documents have been assigned by it pursuant to such Assignment and Acceptance Agreement, relinquish its rights and be released from its obligations under this Agreement and the Loan Documents (but shall be entitled to indemnification as otherwise provided in the Loan Documents with respect to any events occurring prior to the assignment) and (iii) this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Percentage Shares resulting therefrom.

(c)    Any Lender may at any time sell to one or more commercial banks or other Persons not Affiliates of the Borrower (a "Participant") participating interests in the Loan and the other interests of that Lender (the "originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the originating Lender's obligations under this Agreement shall remain unchanged, (ii) the originating Lender shall remain solely responsible for the performance of such obligations, and (iii) Agent and Lenders shall continue to deal solely and directly with the originating Lender in connection with the originating Lender's rights and obligations under this Agreement and the other Loan Documents. In the case of any such participation, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under the Loan Documents and this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement and the Loan Documents, and Section 5 of this Agreement shall apply to such Participant as if it were a Lender party hereto.

(d)    Notwithstanding any other provision contained in this Agreement to the contrary, to the extent permitted under the Loan Agreement, any Lender may assign all or any portion of its Percentage Share of the Loan held by it to any Federal Reserve Lender or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Lender, provided that any payment in respect of such assigned Percentage Share of the Loan made by the Borrower to or for the account of the assigning and/or pledging Lender in accordance with the terms of this Agreement shall be deemed to satisfy any obligations hereunder in respect to such assigned Percentage Share of the Loan to the extent of such payment. No such assignment shall release the assigning Lender from its obligations hereunder.

12.    Other Business Activities of the Lenders. Each Lender acknowledges that each party hereto may make loans or otherwise extend credit to, and generally engage in any kind of business with the Affiliates of the Borrower (collectively, "Borrower Related Parties"), and receive payments on such other loans or extensions of credit to any Borrower Related Parties and otherwise act with respect thereto freely and without accountability in the same manner as if this Agreement and the transactions contemplated hereby were not in effect.

105717378

13.    Governing Law.    THIS AGREEMENT AND THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

14.    Consent to Jurisdiction.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE AGENT AND THE LENDERS CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH OF THE AGENT AND THE LENDERS IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO.  EACH OF THE AGENT AND THE LENDERS AGREES THAT SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS MAY BE MADE BY ANY MEANS PERMITTED BY NEW YORK LAW.

15.    Waiver of Jury Trial.    EACH OF THE AGENT AND THE LENDERS WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY PARTICIPANT OR ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH OF THE AGENT AND THE LENDERS AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, EACH OF SUCH PARTIES FURTHER AGREES THAT ITS RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

16.    Foreclosure.    In the event the Property is to be acquired by Agent on behalf of the Lenders, as a result of foreclosure, public or private sale, transfer or assignment in lieu of foreclosure or otherwise in accordance with Section 6(a) above, title to the Property shall be taken in the name of a newly formed special purpose entity, which shall be formed by Agent for the purpose of holding the Property and shall be owned by Agent in its capacity as agent for the Lenders, on behalf of the Lenders pursuant to organizational documents reasonably acceptable to the Required Lenders in accordance with the respective interests of the Lenders. During such time as the Property is held by Agent as set forth herein, all income and

105717378

distributions received from the ownership of the Property will be distributed in accordance with Section 3(c) of this Agreement.

17.    Severability.  The illegality or unenforceability of any provision of this Agreement or any other Loan Document or any instrument or agreement required hereunder or thereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement.

18.    No Relation.  The relationship between Agent and the Lenders, and the relationship among the Lenders, is not intended by the parties to create, and shall not create, any trust, joint venture or partnership relation between them.

19.    No Third Party Beneficiaries.  This Agreement is made and entered into for the sole protection and legal benefit of the Lenders and Agent, and their permitted successors and assigns, and no other Person (including the Borrower and any Guarantor) shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement.

20.    Modifications.  Except as expressly provided herein, this Agreement shall not be Modified, cancelled or terminated except by an instrument in writing signed by the Parties hereto.

21.    Inconsistencies with Other Documents.   To the extent there is any inconsistency between this Agreement and any other document (including, without limitation, the Loan Agreement Supplement) with respect to any term or provision governing the relationship among Agent and each Lender, the terms and provisions of this Agreement shall govern.

22.    Time.   Time is of the essence as to each term or provision of this Agreement.

23.    Counterparts; Facsimile Execution.  This Agreement may be executed in any number of counterparts and all of such counterparts shall together constitute one and the same instrument.  This Agreement may be executed by signature(s) transmitted by facsimile.

24.    Captions.  The titles and headings of the paragraphs of this Agreement have been inserted for convenience of reference only and are not intended to summarize or otherwise describe the subject matter of the paragraphs and shall not be given any consideration in the construction of this Agreement.

25.    Notices.  All notices given by any party to the others under this Agreement and the Loan Documents shall be in writing, and any such notice shall become effective (i) upon personal delivery thereof, including, but not limited to, delivery by overnight mail and courier service, (ii) four (4) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid, or (iii) in the case of notice by a telecommunications device, when properly transmitted, in each case addressed to the party at the address set forth on Exhibit C attached hereto, or in the Assignment and Acceptance Agreement. Any party may change the address to which notices are to be sent by notice of such change to

14

CONFIDENTIAL INFORMATION

each other party given as provided herein.  Such notices shall be effective on the date received or, if mailed, on the third Business Day following the date mailed.

26.  <u>Entire Agreement</u>.  This Agreement (together with the applicable Loan Documents and Assignment and Acceptance Agreements) constitutes the entire agreement among the Parties hereto with respect to the subject matter contained in this Agreement and supersedes all prior agreements, understandings and negotiations between the Parties, and there are no other agreements governing the relationship between Agent and Lenders.

**[NO FURTHER TEXT ON THIS PAGE]**

105717378

CONFIDENTIAL INFORMATION

IN WITNESS HEREOF, the Parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

AGENT:

SUMMIT VILLAGE DEVELOPMENT
LENDER 1, LLC, a Delaware limited liability
company

By:    Celona Asset Management (USA) Limited,
       its Class B Manager

By:    _____
       Name: Max Huang
       Title: Authorized Signatory

ADDITIONAL LENDERS:

SUMMIT VILLAGE DEVELOPMENT
LENDER 1, LLC, a Delaware limited liability
company

By:    Celona Asset Management (USA) Limited,
       its Class B Manager

By:    _____
       Name: Max Huang
       Title: Authorized Signatory

GRAND CANYON DEVELOPMENT
HOLDINGS 3 LLC, an Arizona limited liability
company

By:    Celona Asset Management (USA) Limited,
       its Class B Manager

By:    _____
       Name: Max Huang
       Title: Authorized Signatory

S-1

105717378

CONFIDENTIAL INFORMATION

ANNEX I
GLOSSARY

"Agreement" shall mean this Syndication and Co-Lender Agreement, all exhibits and schedules hereto and all Modifications hereto.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the US. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the US. Code of Federal Regulations), and the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the US. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies and any other requirements of any Governmental Agency (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) relating to or attempting to eliminate, terrorist acts and acts of war, money laundering or similar activities, each as hereafter supplemented, amended or modified from time to time.

"Assignment and Acceptance Agreement" means an agreement in the form of that attached to the Agreement as Exhibit B.

"Collateral" means the Property and interests in Property, tangible or intangible, now owned or hereafter acquired by the Borrower, in or upon which Lender at any time shall have a Lien pursuant to the Security Instrument or any other Loan Documents, and all proceeds and products of such Property and interests in Property.

"Contact Office" means (i) for Existing Lender and Agent, the office at c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Center, 89 Queensway, Admiralty, Hong Kong, or such other offices as Agent may notify the Borrower and the Lenders from time to time in writing, and (ii) for GCDH3, the office at c/o Celona Asset Management (USA) Limited, 2207-09, Tower Two, Lippo Center, 89 Queensway, Admiralty, Hong Kong, or such other offices as GCDH3 may notify the other Lenders from time to time in writing.

"Defaulting Lender" means any Lender which shall fail to pay any costs or expenses or disbursements as and when required hereunder or shall otherwise default hereunder or any Loan Document.

"Effective Federal Funds Rate" means, for any day, the weighted average of the rate on overnight Federal funds transactions, with members of the Federal Reserve System, only, arranged by Federal funds brokers, as published as of such day by the Federal Reserve Bank of New York.

"Eligible Assignee" means any successor or assign of any Lender, provided, however, that no Person shall be an "Eligible Assignee" if at the time of the proposed assignment to such Person, such Person is (1) a Borrower Related Party or an Affiliate of a Borrower Related Party (2) a Prohibited Person, or (3) any Person that is not a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended from time to time.

105717378

"Funded Share" means, for any Lender at any date, the percentage that the outstanding principal amount under such Lender's Component Note(s) bears to the outstanding principal amount of the Loan.

"Liquidation Event" means, following the occurrence of an Event of Default and the acceleration of the Loan, the enforcement against and/or liquidation of any of the Collateral, whether through foreclosure, deed in lieu of foreclosure, or otherwise.

"Modifications" means any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "Modify," "Modified," or related words shall have meanings correlative thereto.

"Parties" means Agent and Lenders.

"Percentage Share" means for any Lender at any date the percentage set forth next to such Lender's name in the Register maintained by Agent, as the same may be Modified from time to time, including, without limitation, to reflect the addition or withdrawal of a Lender or the assignment of all or a portion of an existing Lender's Percentage Share as permitted pursuant to Section 11 of this Agreement.

"Prohibited Person" means any Person (a) listed in any annex to, or who is otherwise subject to the provisions of, any of the Anti-Terrorism Laws; (b) that is owned or controlled by, or acting for or on behalf of, any Person that is listed in any annex to, or is otherwise subject to the provisions of, any of the Anti-Terrorism Laws; (c) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including any of the Anti-Terrorism Laws; (d) who commits, threatens or conspires to commit or supports "terrorism" as defined in any of the Anti-Terrorism Laws; (e) that is named on any "Specially Designated Nationals and Blocked Persons" list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or (f) who is an Affiliate of or otherwise affiliated with any Person listed in clauses (a) through (e).

"Required Lenders" means one or more Lenders holding, in the aggregate, Funded Shares of the Loan representing greater than fifty percent (50%) of the aggregate outstanding principal amount of the Loan.

Other Interpretive Provisions.

(1)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(2)    The words "hereof", "herein", "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section,

CONFIDENTIAL INFORMATION

subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(3)     (i)     The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced;

(ii)     The term "including" is not limiting and means "including without limitation;"

(iii)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including;"

(4)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent Modifications thereto, but only to the extent such Modifications are not prohibited by the terms of this Agreement, (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, Modifying or interpreting the statute or regulation, and (iii) references to any Person include its permitted successors and assigns.

105717378

CONFIDENTIAL INFORMATION

LENDERS_0000748

<u>EXHIBIT A</u>

FORM OF COMPONENT NOTE

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT, REQUESTS FOR INFORMATION REGARDING THE ORIGINAL ISSUE DISCOUNT ON THE NOTE MAY BE DIRECTED TO SMHG VILLAGE DEVELOPMENT, LLC C/O SUMMIT MOUNTAIN HOLDING GROUP, L.L.C, 3923 N. WOLF CREEK DRIVE, EDEN, UTAH 84310.

**REPLACEMENT PROMISSORY NOTE**

$_____                                                              _____, 20__

       1.    **Borrower's Promise to Pay**.  For value received, the undersigned, SMHG VILLAGE DEVELOPMENT LLC, a Delaware limited liability company ("**Borrower**"), promises to pay to, and at the principal office of, _____, a _____ ("**Lender**"), or its registered assigns, on or before the fifth (5th) anniversary of the Loan Closing Date (the "**Initial Maturity Date**", provided that the same may be extended as provided in Section 3(d) below), the principal sum of _____ Dollars ($_____), or so much thereof as is advanced, in lawful money of the United States of America, with interest thereon to be computed from the date of disbursement under the Loan Agreement at the Interest Rate (as defined below), and to be paid in accordance with the terms of this Replacement Promissory Note (this "**Note**") and that certain Loan Agreement dated as of June 28, 2016, between Borrower and Summit Village Development Lender 1, LLC, a Delaware limited liability company, Lender, as collateral agent, as amended by that certain First Amendment to Loan Agreement and Other Loan Documents dated as of September 23, 2016, that certain Second Amendment to Loan Agreement and Other Loan Documents dated as of October 31, 2017, and that certain Third Amendment to Loan Agreement and Other Loan Documents dated as of March 2, 2018 (collectively, as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").  Any capitalized term not defined in this Note shall have the same meaning given to such term in the Loan Agreement.

       2.    **Interest**.  Interest on the principal sum of this Note shall be non-compounding and calculated on the basis of a 360-day year, payable on the basis of the actual number of days elapsed.  Borrower shall pay interest at the rate of zero and one-quarter percent (0.25%) per annum through the Initial Maturity Date and, if the Loan is extended as provided in Section 3(d) below, thereafter at the rate of three and three-quarters percent (3.75%) per annum through the Maturity Date (as applicable, the "**Interest Rate**").

       3.    **Payment**.

105919324

(a)    Time.  Borrower shall pay the unpaid principal balance of this Note and all accrued and unpaid interest on or before the Initial Maturity Date or Maturity Date, as applicable (the "**Payment**"; and the amount of such Payment, the "**Payment Amount**").

(b)    Place.  Borrower shall make the Payment at such location as may be designated in writing by Lender.

(c)    Application of Payment.  In the absence of a specific determination by Lender to the contrary, the Payment Amount and all other payments paid by Borrower to Lender in connection with the obligations of Borrower under this Note and under the other Loan Documents shall be applied in the following order of priority: (i) firstly, to amounts, other than the principal sum and interest accruing at the Interest Rate, due to Lender pursuant to this Note or the other Loan Documents; (ii) secondly, to the portion of accrued but unpaid interest accruing at the Interest Rate on this Note; and (iii) thirdly, to the unpaid principal balance of this Note. Upon a Default or an Event of Default, Borrower irrevocably waives the right to direct the application of the Payment Amount and all other payment amounts at any time hereafter received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Borrower in such order of priority as Lender may deem advisable.

(d)    Extension Option.  At the request of Borrower made at least sixty (60), but not more than ninety (90), days, prior to Initial Maturity Date, the maturity date shall be extended to the first (1st) anniversary of the Initial Maturity Date (the "**Maturity Date**"), provided that: (i) no Default or Event of Default shall have occurred and be continuing on the Initial Maturity Date and, (ii) subject to any extensions pursuant to Section 5.1 of the Loan Agreement, Substantial Completion of the Improvements has been achieved.

(e)    Prepayment.

(i)    The terms of Section 2.7.1, 2.7.2, 2.7.3 and 2.7.4 of the Loan Agreement are hereby incorporated by reference.

(ii)    Except as provided in Section 3(e)(i) above or in Section 5.9 of the Loan Agreement, Borrower may not prepay the Loan in whole or in part prior to the Initial Maturity Date.  If the Initial Maturity Date is extended as provided in Section 3(d), then Borrower may thereafter make optional prepayments of the Loan at any time and from time to time, without penalty or premium but with payment of all then accrued and outstanding interest.

4.    **Borrower's Failure to Pay as Required.**

(a)    Default and Acceleration; Default Rate.  If the Payment or any other payment then required under this Note or any of the Loan Documents is not made on or before the Initial Maturity Date or Maturity Date, as applicable, or as otherwise required under the Loan Documents, then the Payment Amount and all other sums as provided in this Note or any of the Loan Documents shall without notice become immediately due and payable at the option of Lender and shall begin to accrue interest at the Default Rate.  The "**Default Rate**" shall equal the lesser of (i) six and three-quarters percent (6.75%) per annum or (ii) the maximum rate of

5

CONFIDENTIAL INFORMATION

interest permitted by applicable law.  This provision shall not be deemed to excuse a default under this Note or an Event of Default and shall not be deemed a waiver of any other rights Lender may have.

      (b)    <u>No Waiver by Lender</u>.

      (i)    Lender shall not be deemed to have waived any of its rights or remedies under this Note unless such waiver is expressed in writing by Lender, and no delay or omission by Lender in exercising, or failure by Lender on any one or more occasions to exercise, any of Lender's rights hereunder or under the Loan Documents, or at law or in equity, shall be construed as a novation of this Note or shall operate as a waiver or prevent the subsequent exercise of any or all such rights.

      (ii)    Acceptance by Lender of any portion or all of any sum payable hereunder, whether before, on or after the due date of such payment shall not be a waiver of Lender's right either to require prompt payment when due of all other sums payable hereunder or to exercise any of Lender's rights, powers and remedies under this Note or the other Loan Documents.  A waiver of any right in writing on one occasion shall not be construed as a waiver of Lender's rights to insist thereafter upon strict compliance with the terms hereof without previous notice of such intention being given to Borrower, and no exercise of any right by Lender shall constitute or be deemed to constitute an election of remedies by Lender precluding the subsequent exercise by Lender of any or all of the rights, powers and remedies available to it under this Note or the other Loan Documents, or at law or in equity.

      (iii)    Even if, at a time when an Event of Default has occurred, Lender does not accelerate the amounts due under this Note and the other Loan Documents and require Borrower to pay all such amounts immediately in full as described above, Lender shall still have the right to do so at a later time if such Event of Default is continuing, or upon the occurrence of another Event of Default.

      c.    <u>Payment of Lender's Costs and Expenses</u>.  Lender shall have the right to be reimbursed by Borrower for all of its reasonable costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, attorneys' fees, costs and expenses. As used in this Note, "attorneys' fees, costs and expenses" shall mean the reasonable attorneys' fees and the costs and expenses of counsel to Lender, which may include printing, duplicating, telephone, fax, air freight and other charges, and fees billed for law clerks, paralegals, expert witnesses and others not admitted to the bar but performing services under the supervision of an attorney, and all such fees, costs and expenses incurred with respect to trial, appellate proceedings, arbitrations, out-of-court negotiations, workouts and settlements, and bankruptcy or insolvency proceedings (including seeking relief from stay in bankruptcy proceedings), and whether or not any action or proceeding is brought or is concluded with respect to the matter for which such fees, costs and expenses were incurred. Lender shall also be entitled to its attorneys' fees, costs and expenses incurred in any post-judgment action or proceeding to enforce and collect the judgment. This Section 4(c) is separate and several, shall survive the discharge of this Note, and shall survive the merger of this Note into any judgment on this Note.

6

105919324

5. **Notices**. All notices required or permitted under this Note shall be given and become effective as provided in the Loan Agreement.

6. **Waivers**. Borrower and all others who may become liable for the payment of all or any amounts due under this Note, the Deed of Trust, or the other Loan Documents do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and nonpayment and all other notices of any kind, except those notices for which the Loan Documents expressly provide. No release of any security for this Note or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Deed of Trust or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any amounts due under this Note or the Deed of Trust, or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Deed of Trust or the other Loan Documents.

7. **Secured Note**. The obligations of Borrower under this Note are secured by the Deed of Trust, which contains provisions for acceleration of the entire indebtedness secured hereby upon the happening of certain events.

8. **Transfer**. Upon the transfer of this Note to an Eligible Assignee pursuant to the terms of Section 9.10 of the Loan Agreement, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Deed of Trust and the other Loan Documents, or any part thereof, to such Eligible Assignee, who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto.

9. **Severability and Usury Savings Clause**. The provisions contained in Section 9.8 of the Loan Agreement are hereby incorporated by referenced as if fully set forth herein.

10. **Offsets**. No indebtedness evidenced by this Note shall be deemed to have been offset or to be offset or compensated by all or part of any claim, cause of action, counterclaim or cross claim, whether liquidated or unliquidated, which Borrower or any successor to Borrower now or hereafter may have or may claim to have against Lender, except for any loan made by Borrower to Lender; and, in respect to the indebtedness now or hereafter secured hereby, Borrower waives, to the fullest extent permitted by law, the benefits of any law which authorizes or permits such offsets.

11. **Miscellaneous**.

(a) <u>Remedies Cumulative</u>. The remedies of Lender as provided in this Note and in any other Loan Document, or any one or more of them, or at law or in equity, shall be cumulative and concurrent to the greatest extent permitted by applicable law, and may be pursued singly, successively, or together at the sole discretion of Lender, and may be exercised as often as occasion thereof shall occur.

105919324

CONFIDENTIAL INFORMATION                                                                LENDERS_0000752

(b)     <u>Headings</u>. The headings and captions of various Sections and subsections of this Note are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

(c)     <u>Governing Law</u>. This Note shall be governed by and construed and enforced in accordance with the laws of the State of New York.

(d)     <u>Amendments</u>. This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of any party, but only by an instrument in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

(e)     <u>Interpretation</u>. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

(f)     <u>Clerical Error</u>. In the event Lender at any time discovers that this Note, the Deed of Trust or any other Loan Document contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to re-execute any documents that are necessary to correct any such error(s).  Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error(s).

(g)     <u>Lost, Stolen, Destroyed or Mutilated Note</u>. In the event of the loss, theft, destruction or mutilation of this Note upon Lender's surrender to Borrower of the mutilated Note, Borrower shall execute and deliver to Lender a note in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Note and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Note, and may be treated for all purposes as the original copy of such Note.

(h)     <u>Time is of the Essence</u>.  Time is of the essence in the performance of each provision of this Note.

(i)     <u>Effective Date of Disbursements</u>. Funds representing the proceeds of the indebtedness evidenced hereby which are disbursed by Lender by wire transfer to Borrower or otherwise for the benefit of Borrower shall, for all purposes, be deemed outstanding hereunder and to have been received by Borrower as of the date of such wire transfer.

(j)     <u>Replacement Note</u>. This Note is one of two (2) replacement promissory notes that replace and supersede the Existing Note (as defined in the Mortgage).  This Note and that certain Replacement Promissory Note dated as of _____ and issued by Borrower to _____, a _____, in the stated principal amount of $_____ (as subsequently amended, modified, renewed or replaced, the "**Additional Note[s]**")[1] collectively constitute the Note referred to in the Loan Agreement and are secured by the Mortgage and the

---

[1] Note references to be updated as necessary.

105919324

Loan Agreement.  This Note and the Additional Note shall be paid pari passu.  The indebtedness evidenced by the Existing Note is not being extinguished but instead is being evidenced by this Note and the Additional Note.  This Note and the Additional Note replace and supersede in their entirety the terms of the Existing Note, and the making of this Note and the Additional Note shall not have the effect of discharging, nor be deemed to discharge, the indebtedness evidenced by the Existing Note, all of which indebtedness remains outstanding.

(Remainder of Page Intentionally Left Blank)

105919324

CONFIDENTIAL INFORMATION

LENDERS_0000754

**IN WITNESS WHEREOF**, Borrower has duly executed this Note as of the day and year first above written.

> **BORROWER:**
>
> **SMHG VILLAGE DEVELOPMENT LLC**,
> a Delaware limited liability company
>
> By:  SMHG Investments LLC
>       a Delaware limited liability company
>
>
> By:  _____
>       Name:
>       Title:

A-1

105717378

LENDERS_0000755

<u>EXHIBIT B</u>

FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

**ASSIGNMENT AND ACCEPTANCE AGREEMENT**

THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT (the "<u>Assignment Agreement</u>") is made and dated as of _____ ___, 20___ between _____, a _____ (the "<u>Assignor</u>"), and _____ (the "<u>Assignee</u>").  The parties hereto agree as follows:

1.     The Assignor is a Lender under that certain Loan Agreement dated as of June 28, 2016, by and between SMHG Village Development LLC, a Delaware limited liability company, as borrower ("<u>Borrower</u>"), and Summit Village Development Lender 1, LLC, a Delaware limited liability company (the "<u>Original Lender</u>"), as amended by that certain First Amendment to Loan Agreement and Other Loan Documents dated as of September 23, 2016, and as further amended by that certain Second Amendment to Loan Agreement and Other Loan Documents dated as of October 31, 2017 and a certain Third Amendment to Loan Agreement and Other Loan Documents dated as of _____, 2018, by and among Borrower, the Original Lender and Assignor, as Agent for the Lenders (as Modified from time to time, the "<u>Loan Agreement</u>", capitalized terms used herein and not otherwise defined herein shall have the same meanings attributed to them in the Loan Agreement).

2.     On the date upon which all the conditions under Section 11 of the Co-Lending Agreement that are applicable to the assignment hereunder have been satisfied (the "<u>Effective Date</u>"), the Assignor hereby assigns to the Assignee, and the Assignee hereby assumes from the Assignor, such proportion of the Percentage Share (as defined in the Co-Lending Agreement (defined below)) of the Obligations held by the Assignor as more fully set forth on <u>Schedule 1</u> attached hereto (the "<u>Assigned Interests</u>") in consideration of the Assignee's undertaking to comply with the obligations under the Loan Agreement in respect of the Assigned Interests. For the avoidance of doubt, the Assigned Interests relate only to the unfunded portion of the Loan that is being assigned and assumed.

3.     By executing this Assignment Agreement in the space provided below, Assignor, as the Agent, approves the inclusion of the Assignee as (a) a Lender under the Loan Agreement, and (b) an Additional Lender under the Co-Lending Agreement, effective as of the Effective Date.

4.     On and after the Effective Date:  (a) the Assignee shall be a party to the Loan Agreement and shall have the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with respect to the rights and obligations assigned to the Assignee hereunder arising on and after such Effective Date, and (b) the Assignor shall relinquish its rights and be released from its corresponding obligations under the Loan Agreement and the other Loan Documents with respect to the rights and obligations assigned to Assignee hereunder arising prior to such Effective Date.

B-2

105717378

5.      The Assignee shall be entitled to receive from Borrower and/or Agent all payments of principal, interest and fees with respect to the interest assigned hereby accruing on and after the Effective Date pursuant to, and in accordance with, the terms and provisions of the Co-Lending Agreement.  In the event that either the Assignee or the Assignor receives any payment to which the other party hereto is entitled under this Assignment Agreement, then the party receiving such amount shall promptly remit it to the other party hereto.

6.      (a) The Assignor represents and warrants that (i) Assignor has good and marketable title to and owns a one hundred percent (100%) interest in the Assigned Interests; (ii) Assignor is duly organized, validly existing and in good standing under the laws of the its jurisdiction of formation and is qualified in each jurisdiction required in order to execute, deliver and perform this Assignment Agreement; (iii) Assignor has the full power and authority to enter into and consummate the transactions contemplated by this Assignment Agreement and assign to Assignee the Assigned Interests, is authorized to execute, deliver and perform this Assignment Agreement, and the person or persons signing this Assignment Agreement on behalf of Assignor have been duly authorized to sign this Assignment Agreement on behalf of Assignor; (iv) this Assignment Agreement constitutes a valid, legal and binding agreement of Assignor enforceable against Assignor in accordance with its terms subject to (1) applicable bankruptcy, reorganization, insolvency and moratorium laws and (2) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity; (v) all actions (including, without limitation, all third party consents and any and all internal approvals) necessary to authorize the execution, delivery, and performance of this Assignment Agreement on behalf of Assignor have been duly taken, and all such actions continue in full force and effect as of the date hereof; (vi) there are no conditions precedent to the effectiveness of this Assignment Agreement as against Assignor that have not been satisfied or waived; (vii) the notional principal amount of the Original Note is $120,000,000.00; (viii) Assignor is the legal and beneficial owner of the Assigned Interests and such Assigned Interests are free and clear of any claim, lien, option, security interest, encumbrance or other charge or adverse interest; (ix) to Assignor's actual knowledge, there is no pending action, suit or proceeding, arbitration or governmental investigation against it relating directly to the Loan, an adverse outcome of which materially would affect Assignor's performance under this Assignment Agreement; (x) except as specifically set forth in the Loan Documents, Assignor has not released in writing the Borrower or any guarantor from any of its material obligations under the Loan Documents to which it is a party; (xi) Assignor has not waived in writing any material default, breach, violation or event of acceleration under the Loan Documents; (xii) except as permitted under the Loan Documents and the Co-Lending Agreement, Assignor shall not agree to release any Collateral delivered by Borrower for the Loan; (xiii) Assignor has made available to Assignee accurate and complete copies of all material Loan Documents, all material Loan Documents are listed in <u>Schedule 3</u> attached hereto, and since origination, the Loan Documents have not been amended or modified except as reflected in the Loan Documents made available to Assignee; (xiv) to Assignor's actual knowledge, without investigation or inquiry, there exists no Event of Default and (xv) Assignor has not dealt with any broker, investment banker, agent or other Person that may be entitled to any commission or compensation in connection with the consummation of any of the transactions contemplated hereby.

        (b) Except with respect to the foregoing representations and warranties, it is understood and agreed that the assignment and assumption hereunder is made without recourse

105717378

CONFIDENTIAL INFORMATION

to the Assignor and that the Assignor makes no other representation or warranty of any kind to the Assignee. Neither the Assignor nor any of its officers, directors, employees, agents or attorneys shall be responsible for: (i) the due execution, legality, validity, enforceability, genuineness, sufficiency or collectability of any the Loan Documents or the Obligations, (ii) any representation, warranty or statement made in or in connection with any of the Loan Documents, (iii) the financial condition or creditworthiness of Borrower, (iv) except as expressly provided herein, the performance of or compliance with any of the terms or provisions of any of the Loan Documents, (v) inspecting any of the property, books or records of Borrower and Guarantor (collectively, the "Transaction Parties") or their respective subsidiaries, (vi) the validity, enforceability, perfection, priority, condition, value or sufficiency of any Collateral securing or purporting to secure the Obligations or (vii) any mistake, error of judgment, or action taken or omitted to be taken in connection with the Loan Documents.

7.      The Assignee: (a) confirms that it has received a copy of the Loan Documents listed on Schedule 3 attached hereto and made a part hereof, together with copies of any financial statements requested by the Assignee and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement, (b) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (c) appoints and authorizes the Agent to take such actions as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to such agent by the terms thereof on the terms set forth therein, including, without limitation, the terms set forth in the Co-Lending Agreement (defined below), (d) agrees that on and after the Effective Date it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender, (e) agrees that its payment instructions and notice instructions are as set forth in Schedule 2 attached hereto, and (g) represents and warrants to Assignor and Agent that it is an Eligible Assignee.

8.      As of the Effective Date, Assignee agrees to be bound by the terms and provisions of the Syndication and Co-Lender Agreement dated as of March 2, 2018 (as Modified from time to time, the "Co-Lending Agreement"), by and among the Original Lender, Assignor, as Agent for the Lenders, and the Lenders party thereto as if Assignee had been a signatory thereto.

9.      The Assignee agrees to indemnify and hold harmless the Assignor against any and all losses, costs and expenses (including, without limitation, reasonable attorneys' fees) and liabilities incurred by the Assignor in connection with or arising in any manner from the Assignee's non-performance of the obligations assumed under this Assignment Agreement. The Assignor agrees to indemnify and hold harmless the Assignee against any and all losses, costs and expenses (including, without limitation, reasonable attorneys' fees) and liabilities incurred by the Assignee in connection with or arising in any manner from the Assignor's default under any of the Loan Documents and any misrepresentation made hereunder.

10.     The Assignor and the Assignee each hereby agrees to execute and deliver such other instruments, and take such other action, as either party may reasonably request in connection with the transactions contemplated by this Agreement, including the delivery of any

105717378

notices or other documents or instruments to Transaction Parties or Agent, which may be required in connection with the assignment and assumption contemplated hereby.

11.    This Assignment Agreement embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.  Any amendment or waiver of any provision of this Agreement shall be in writing and signed by the parties hereto.  No failure or delay by either party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof and any waiver of any breach of the provisions of this Agreement shall be without prejudice to any rights with respect to any other or further breach thereof.

12.    This Assignment Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York, including Section 5-1401 of the General Obligations Law, but otherwise without regard to choice of law rules.

13.    Notices shall be given under this Assignment Agreement in the manner set forth in the Co-Lending Agreement.  For the purpose hereof and of the Loan Documents, the address of the Assignee (until notice of a change is delivered pursuant to the provisions of the Co-Lending Agreement) shall be the address set forth on <u>Schedule 2</u> attached hereto.

[SIGNATURE PAGE IMMEDIATELY FOLLOWS]

B-5

105717378

CONFIDENTIAL INFORMATION                                                                 LENDERS_0000759

    IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement by their duly authorized officers as of the date first above written.

**ASSIGNOR**

[NAME OF ASSIGNOR]

By:_____
Name:
Title:

By:_____
Name:
Title:

**ASSIGNEE**

[NAME OF ASSIGNEE]

By:_____
Name:
Title:

By:_____
Name:
Title:

105717378

CONFIDENTIAL INFORMATION

LENDERS_0000760

ACKNOWLEDGED AND AGREED TO THIS ___ DAY OF _____, 20___:

**AGENT**

**SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC,** a Delaware limited liability company

By:      Celona Asset Management (USA) Limited,
         its Class B Manager


         By:  _____
              Name:
              Title:

B-7

105717378

SCHEDULE 1
TO ASSIGNMENT AND
ACCEPTANCE AGREEMENT

**ASSIGNED INTEREST**

| Total Loan | Portion of Loan Assigned | Percentage Share |
|---|---|---|
| $120,000,000.00 | $[_____] | [_____]% |

105717378

LENDERS_0000762

SCHEDULE 2
TO ASSIGNMENT AND
ACCEPTANCE AGREEMENT

**PAYMENT AND NOTICE INSTRUCTIONS**

[To be supplied by the Assignee in format acceptable to the Agent]

B-9

105717378

CONFIDENTIAL INFORMATION

<u>SCHEDULE 3</u>
<u>TO ASSIGNMENT AND</u>
<u>ACCEPTANCE AGREEMENT</u>

### LIST OF MATERIAL LOAN DOCUMENTS

1.      $120,000,000.00 Promissory Note dated as of June 28, 2016, by SMHG Village Development LLC, a Delaware limited liability company ("<u>Borrower</u>"), as maker, in favor of Summit Village Development Lender 1, LLC, a Delaware limited liability company ("<u>Original Lender</u>"), as payee.

2.      Loan Agreement dated as of June 28, 2016, between Borrower and Original Lender.

3.      First Amendment to Loan Agreement and Other Loan Documents dated as of September 23, 2016, between Borrower and Original Lender.

4.      Second Amendment to Loan Agreement and Other Loan Documents dated as of October 31, 2017, between Borrower and Original Lender.

5.      Third Amendment to Loan Agreement and Other Loan Documents dated as of March 2, 2018, between Borrower and Original Lender.

6.      Amended and Restated Construction Deed of Trust, Security Agreement and Fixture Filing (Securing Present and Future Advances) (Eden, Weber County, Utah) dated as of October 31, 2017, by Borrower in favor of Original Lender.

7.      Second Amended and Restated Construction Deed of Trust, Security Agreement and Fixture Filing (Securing Present and Future Advances) (Eden, Weber County, Utah) dated as of March 2, 2018, by Borrower in favor of Summit Village Development Lender 1, LLC, a Delaware limited liability company, as collateral agent for the Lenders defined therein ("<u>Agent</u>").

8.      Amended and Restated Guaranty Agreement dated as of October 31, 2017, by Summit Mountain Holding Group, L.L.C., a Utah limited liability company ("<u>Guarantor</u>"), as guarantor, for the benefit of Lender.

9.      Unconditional Guaranty of Early Release dated as of September 18, 2015, by Guarantor in favor of Lender.

10.     Recourse Indemnity Agreement dated as of June 28, 2016, by Guarantor in favor of Lender.

11.     Environmental Indemnity Agreement dated as of June 28, 2016, by Borrower and Guarantor in favor of Lender.

B-10

105717378

12.    Assignment of Documents dated as of June 28, 2016, between Borrower and Lender.

13.    UCC-1 Financing Statement, filed with the Delaware Secretary of State, naming Borrower, as debtor, and Lender, as secured party.

105717378

CONFIDENTIAL INFORMATION    LENDERS_0000765

EXHIBIT C
ADDRESSES

Agent:
**Summit Village Development Lender 1, LLC**

Notice Address:

Summit Village Development Lender 1, LLC
c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Centre
89 Queensway, Admiralty, Hong Kong
Facsimile Number: (852) 2264-3700

*with a copy to:*

Dentons US LLP
One Metropolitan Square, Suite 3000
St. Louis, Missouri  63102
Attn: Jennifer A. Marler
Facsimile Number:  (314) 259-5959

GCDH3:
**Grand Canyon Development Holdings 3 LLC**

Notice Address:
Grand Canyon Development Holdings 3 LLC,
c/o Celona Asset Management (USA) Limited
2207-09, Tower Two, Lippo Center
89 Queensway, Admiralty, Hong Kong
Facsimile Number: (852) 2264-3700

C-1

105717378

CONFIDENTIAL INFORMATION