THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SUMMIT MOUNTAIN HOLDING GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SUMMIT VILLAGE DEVELOPMENT LENDER 1, LLC,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING [ECF NO. 207] PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART [ECF NO. 210] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:21-cv-00110-DBB-JCB<br><br>District Judge David Barlow |

Before the court are Summit Mountain Holding Group, LLC's[1] and Summit Village Development Lender 1, LLC's[2] motions for summary judgment. Having considered the briefing and relevant law, the court finds oral argument unnecessary.[3] For the reasons discussed below, Summit Mountain Holding Group, LLC's motion is denied in its entirety and Summit Village Development Lender 1, LLC's motion is granted in part and denied in part.

## BACKGROUND

This dispute arises from a Loan Agreement (the "Agreement")[4] between non-party SMHG Village Development, LLC ("Borrower") and Defendant Summit Village Development Lender 1, LLC ("Lender"). Plaintiff Summit Mountain Holding Group, LLC ("Guarantor")

---

[1] Plaintiff's Renewed Motion for Partial Summary Judgment, ECF No. 207, filed Feb. 21, 2024 ("Guarantor's MSJ").
[2] Defendant's Motion for Summary Judgment, ECF No. 210, filed Feb. 21, 2024 ("Lender's MSJ").
[3] *See* DUCivR 7-1(g).
[4] Loan Agreement, ECF No. 2-2, filed August 4, 2021.

1

guaranteed Borrower's equity requirements under the Agreement.[5] Guarantor brought this suit to determine obligations and assert claims against Lender after Borrower defaulted on the Loan.

In April 2013, Guarantor was formed to purchase the Powder Mountain ski resort near Eden, Utah.[6] Guarantor sought to develop a complex of townhomes, condominiums, and hotel condominiums near the summit of the Powder Mountain ski resort (the "Project").[7] In addition to hundreds of housing units, the development was to include a lodge, event spaces, and other infrastructure.[8] Borrower was formed as a wholly-owned subsidiary of Guarantor to manage the development of the Project.[9]

To support the Project, Greg Mauro ("Mr. Mauro"), Guarantor's majority owner and principal, sought an EB-5 visa fundraiser.[10] The EB-5 program allows foreign investors to obtain a green card if they invest in a U.S. business enterprise that will create jobs.[11] To be eligible for an EB-5 visa, foreign investors must invest over a million dollars in a qualifying US business.[12] However, if the investment is in a Targeted Employment Area ("TEA"), they may invest far less to qualify.[13] In 2017, foreign investors had to make a minimum investment of $500,000 for projects located in a TEA to be eligible for the EB-5 program.[14]

---

[5] Amended and Restated Guaranty Agreement ("Guaranty Agreement"), ECF No. 2-1, filed Aug. 4, 2021.
[6] Complaint 3, ECF No. 2, filed Aug. 4, 2021; Deposition Transcript of Greg Mauro 11:21–25, 12:1–14 ("Mauro Dep."), ECF No. 210-2, filed Feb. 21, 2024. Guarantor is the "grandparent" of Borrower SMHG Village Development, LLC. *See* Declaration of Gregory V. Mauro ("Mauro Dec."), ECF No. 209-57, filed Feb. 21, 2024.
[7] Loan Agreement 17, ECF No. 2-2, filed Aug. 4, 2021.
[8] *Id.*
[9] Mauro Dep. 77:3–8.
[10] Mauro Dep. 173:19–25; 25:16–24.
[11] 8 U.S.C. § 1153(b)(5)(A).
[12] 8 U.S.C. § 1153 (b)(5)(C)(i).
[13] 8 U.S.C. § 1153 (b)(5)(C)(ii).
[14] Mauro Dep. 41:6–23.

Mr. Mauro initially engaged with American Immigration Group, LLC ("AIG") to find EB-5 investors.[15] AIG did not secure any investors for the Project, so Mr. Mauro sought another partner for EB-5 fundraising.[16] In August 2015, Mr. Mauro was put in contact with Tang Tang ("Mr. Tang"), the director of economic analysis for KT Capital Group, LLC ("KT Capital"), which manages regional centers of EB-5 investment.[17] Over the next month, Mr. Tang and Mr. Mauro discussed having KT Capital and its associates solicit EB-5 investors in China to fund the Project.[18]

Lender was formed by KT Capital in September 2015 to act as the lender for the Project.[19] On September 18, 2015, Borrower and Lender executed the Master Distribution and Referral Agreements Reimbursement Agreement ("MDRA").[20] Under this contract, KT Summit Development Manager, LLC ("KT Summit") agreed to engage with migration agencies to find EB-5 investors for the project.[21] Then, on September 20, 2015, KT Summit agreed to be Lender's Class A Manager,[22] and Celona Asset Management ("Celona") agreed to be the Class B Manager.[23] Lender also engaged with Cottonwood Management, LLC ("Cottonwood") for loan servicing and Henry Global for EB-5 fundraising.[24]

---

[15] Mauro Dep. 36:22–25; Amended and Restated Term Sheet ("AIG Term Sheet"), ECF No. 210-3, filed Feb. 21, 2024.

[16] Mauro Dep. 72:19–25; 73:1–13.

[17] Deposition Transcript of Tang Tang 15:21–25; 23:19–24; 25:4–13 ("Tang Dep."), ECF No. 209-10, filed Feb. 21, 2024.

[18] Plaintiff's Responses to Lenders' First Discovery Requests 5–7, ECF No. 152-6, filed May 26, 2023.

[19] Tang Dep. 61:16–25; 62:1–18.

[20] MDRA Reimbursement Agreement, ECF No. 71-6, filed Sep. 1, 2022. The MDRA governing law provisions selects Delaware law to govern the contract.

[21] KT Summit Development Manager, LLC, is a wholly owned subsidiary of KT Capital Group. *See* Tang Dep. 16:1–6.

[22] Class A Management Agreement, ECF No. 210-6, filed Feb. 21, 2024.

[23] Class B Management Agreement, ECF No. 210-7, filed Feb. 21, 2024.

[24] Tang Dep. 74:19–25; 75:1–12; 104:1–10. This entity is sometimes referred to as "Hentry" by the parties. *See* Mauro Dep. 87:15–25. For clarity, the court refers to this entity as "Henry."

On June 20, 2016, Borrower, Guarantor, and Lender signed the Waiver and Release Agreement.[25] This agreement acknowledged that Borrower and Guarantor (together "Summit Entities") had previously agreed that AIG would arrange EB-5 financing for the Project but had since entered into discussions with Lender regarding EB-5 financing.[26] The Summit Entities agreed to waive claims against Lender, KT Capital, Cottonwood, Henry Global, and the individuals tied to these entities from any claims related to AIG and the Project.[27]

On June 28, 2016, Borrower and Lender entered into the Loan Agreement.[28] Borrower agreed it would contribute "not less than" $87,192,584 to the Project, allowing for greater contributions as required to keep the loan in balance (the "Borrower's Equity Requirement").[29] Borrower was credited $29 million for contributing the land the Project was to be built upon.[30] Lender agreed to lend to Borrower a maximum of $120,000,000, for a total Project budget of $207,192,584.[31]

The loan was to be distributed incrementally and only insofar as Lender had sufficient EB-5 capital to fund requested advances.[32] Borrower could request advances on the loan when it submitted a draw package itemizing the purpose of the advance and confirming the amounts in the request were consistent with the budget.[33] The loan had to be "in balance" after each draw package was submitted, meaning the previous disbursements had to cover payments for each line

---

[25] Waiver and Release Agreement, ECF No. 210-12, filed Feb. 21, 2024. The Waiver and Release Agreement's Governing Law provision selects New York law for enforcement of the agreement.
[26] Id. at 1.
[27] Id. at 2.
[28] Loan Agreement, ECF No. 2-2, filed August 4, 2021.
[29] Id. at 4.
[30] Loan Agreement B-1.
[31] Loan Agreement 20; B-1.
[32] Id.
[33] Loan Agreement 24–25 ("Draw Package" definition); 47–49 (Loan "In Balance" Provisions); Exhibit F (Form of Request for Advance).

item and the Project as a whole.[34] The parties agreed that if Lender reasonably determined that the loan was not in balance, Borrower must deposit the amount of the deficiency to ensure the loan remained balanced.[35] Borrower and Lender also agreed that Borrower would have the right to obtain senior loans if Lender notified it in writing that the aggregate amount of loan advances was reasonably expected by Lender to be less than the full $120 million.[36]

Borrower began submitting draw packages and receiving disbursements in July 2016.[37] Soon after, demand for EB-5 services in China decreased dramatically.[38] In September 2017, Mr. Tang stated in an email to an AIG executive that "[e]veryone is doing very little EB-5 in China these days."[39] On October 31, 2017, the parties executed the Amended and Restated Guaranty Agreement ("Guaranty Agreement"), under which Guarantor guaranteed to Lender payment of the Borrower's Equity Requirement as described in the Loan Agreement.[40] By this time, construction on the project was behind schedule because EB-5 funding had been coming in unevenly.[41]

On March 2, 2018, Borrower and Lender agreed to bring Grand Canyon Development Holdings 3, LLC ("Grand Canyon") on as an additional lender of $19,500,000 of EB-5 funds.[42]

---

[34] Loan Agreement 47–48.
[35] *Id.* at 48.
[36] The Agreement was amended five times between September 2016 and January 2019. *See* First Amendment to Loan Agreement and Other Loan Documents (Sep. 23, 2016), ECF No. 2-3, filed Aug. 4, 2021; Second Amendment to Loan Agreement and Other Loan Documents (Oct. 31, 2017), ECF No. 2-4, filed Aug. 4, 2021; Third Amendment to Loan Agreement and Other Loan Documents (Mar. 2, 2018) (the "Third Amendment"), ECF No. 2-5, filed Aug. 4, 2021; Fourth Amendment to Loan Agreement and Other Loan Documents (May 24, 2018), ECF No. 2-6, filed Aug. 4, 2021; Fifth Amendment to Loan Agreement and Other Loan Documents (Jan. 31, 2019), ECF No. 2-7, filed Aug. 4, 2021.
[37] Email indicating Total Amount of Draws, ECF No. 210-20, filed Feb. 21, 2024.
[38] John Tishler Deposition Transcript 65:7– 25, 66:1– 6, ECF No. 217-10, filed Mar, 20, 2024 (John Tishler, who represented Guarantor, testifies that around 2017 and 2018 demand for EB-5 projects in China "just fell off a cliff").
[39] Emails RE: Summit Loan, ECF No. 209-49, filed Feb. 21, 2024.
[40] Amended and Restated Guaranty Agreement ("Guaranty Agreement"), ECF No. 2-1, filed Aug. 4, 2021.
[41] Emails Re: Development Management Agreement, ECF No. 209-50, filed Feb. 2, 2021.
[42] Third Amendment 1.

However, fundraising challenges persisted. Although the Project initially had TEA status and could secure EB-5 investors at the reduced minimum contribution amount, this designation expired on January 3, 2019.[43] The parties discussed renewing the Project's TEA status as late as December 13, 2019.[44] Then, on January 6, 2020, James Yuan ("Mr. Yuan") of Cottonwood Group emailed Mr. Tang and Shaun Mulreed ("Mr. Mulreed"), Powder Mountain's Chief Financial Officer, stating that "[g]iven the loss of TEA designation, there will be no more new EB-5 funds."[45] Mr. Tang confirmed to Shaun Mulreed that "without the TEA it will be very tough" to raise additional funds.[46] Shortly thereafter, Borrower stopped making payments as required under the loan.[47]

The final draw on the loan was disbursed on January 31, 2020, and Project development based on EB-5 funds stopped soon after.[48] In all, Lender and Grand Canyon disbursed seventeen draws for a total of $42 million loaned for the project.[49] Borrower contributed $29 million in land, $3,615,003 in sales proceeds, and $3,315,224 of other payments.[50]

On June 2, 2020, Mr. Mulreed requested a fee deferral from Lender to avoid a loan default from Borrower's non-payment of fees.[51] On September 11, 2020, Lender sent Guarantor two Pre-Notice of Default letters.[52] The first letter states that the Summit Entities had not

---

[43] Email Chain re TEA Analysis, ECF No. 217-9, filed March 20, 2024; Emails RE TEA Update, ECF No. 219-1, filed Mar. 20, 2024; Tang Dep. 191:3–23.
[44] Email Chain re Summit TEA, ECF No. 217-11, filed Mar. 20, 2024.
[45] Emails re TEA Status, ECF No. 131-27, filed May 5, 2023.
[46] Id.
[47] Lender's MSJ 14; Guarantor's Opp. 58.
[48] Email indicating Total Amount of Draws, ECF No. 210-20, filed Feb. 21, 2024.
[49] Id.
[50] Pre-Default re In Balance, ECF No. 210-24, filed Feb. 21, 2024.
[51] Id.
[52] Pre-Notice of Default re Loan Agreement, ECF No. 35-4, filed Dec. 6, 2021; Pre-Notice of Default, ECF No. 35-6, filed Dec. 6, 2021.

complied with their contractual promises to keep the Loan in balance, reimburse $15,000 of Construction Consultant's fees, deliver a financial audit, or proceed with construction according to schedule.[53] The second letter states that Guarantor had not complied with its obligations to reimburse Lender under the Loan and Guaranty Agreements.[54]

On November 2, 2020, the parties signed a Pre-Negotiation Agreement, expressing an intent to discuss a potential restructuring transaction.[55] These negotiations failed, and on July 6, 2021, Lender sent Guarantor a Notice of Default. The Notice stated that the Loan's maturity date, June 28, 2021, had passed without payment despite the Pre-Notice of Default Letters.[56] The Notice states that the Loan was out of balance and the Borrower was obligated to deposit at least $51,262,357 to satisfy this imbalance.[57] The Notice further states that $6,193,061.19 in fees and $360,622.92 in accrued investor interest were due.[58]

On August 4, 2021, Guarantor filed its Complaint against Lender, Grand Canyon Development Holdings 3, LLC, and Does 1 through 10.[59] Lender filed a Motion to Dismiss for failure to state a claim.[60] The court held a hearing on the motion on November 4, 2021,[61] and

---

[53] Id.
[54] Pre-Notice of Default re Reimbursement Agreements, ECF No. 35-5, filed Dec. 6, 2021.
[55] Pre-Negotiation Agreement ("Pre-Negotiation Agreement"), ECF No. 35-6, filed Dec. 6, 2021.
[56] Mauro Dep. 244:19–25; Notice of Default Under Amended and Restated Guaranty ("Default Notice"), ECF No. 2-8, filed Aug. 4, 2021; *See also* Notice of Default, ECF No. 17-1, filed Aug. 26, 2021.
[57] Id.
[58] Id.
[59] Complaint, ECF No. 2, filed Aug. 4, 2021. Guarantor has not served any Doe Defendants as required by Fed. R. Civ. P. 4(c).
[60] Summit Village Development Lender 1 LLC's Motion to Dismiss, ECF No. 16, filed Aug. 26, 2021.
[61] Motion Hearing and Oral Ruling via Zoom before the Honorable Judge Bruce S. Jenkins ("MTD Hearing Transcript"), ECF No. 30, filed Nov. 24, 2021.

denied Lender's motion to dismiss.[62] On December 6, 2021, Lender answered the complaint and brought two counterclaims for breach of contract against Guarantor.[63]

Guarantor filed a Motion for Partial Summary Judgment on May 5, 2023, which the court dismissed without prejudice pending the resolution of other motions.[64] On July 7, 2023, the parties submitted a Stipulated Motion to Dismiss Grand Canyon Development Holdings 3, LLC, as a defendant, which the court granted.[65] The case was reassigned on November 20, 2023.[66]

On February 21, 2024, Guarantor filed its Renewed Motion for Partial Summary Judgment and Lender filed its Motion for Summary Judgment.[67] On March 20, 2024, both parties filed their oppositions.[68] In April 2024, the parties filed their replies.[69]

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[70] "The movant bears the initial burden to show the absence of a genuine issue of material fact, and, if successful, the burden then shifts to the nonmovant to 'set

---

[62] Order Granting in Part, Denying in Part, Defendants' Motions to Dismiss and Request for Judicial Notice, ECF No. 28, filed Nov. 15, 2021.

[63] Answer and Counterclaim, ECF No. 35, filed Dec. 6, 2021.

[64] Plaintiff's Motion for Partial Summary Judgment, ECF No. 125, filed May 5, 2023; Docket Text Order, ECF No. 192, entered Nov. 30, 2023. This case was assigned to Judge Barlow on Nov. 20, 2023. *See* ECF No. 189.

[65] Stipulated Motion to Dismiss Defendant Grand Canyon Development Holdings 3, LLC, ECF No. 181, filed July 7, 2023; Order Dismissing Defendant Grand Canyon Development Holdings 3, LLC, ECF No. 188, filed Aug. 15, 2023.

[66] ECF No. 189, filed Nov. 20, 2023.

[67] Plaintiff's Renewed Motion for Partial Summary Judgment ("Guarantor's MSJ"), ECF No. 207, filed Feb. 21, 2024; Defendant's Motion for Summary Judgment ("Lender's MSJ"), ECF No. 210, filed Feb. 21, 2024.

[68] Defendant's Opposition to Plaintiff's Renewed Motion for Partial Summary Judgment ("Lender's Opp."), ECF No. 216, filed Mar. 20, 2024; Memorandum in Opposition to Defendant's Renewed Motion for Summary Judgment ("Guarantor's Opp."), ECF No. 220, filed Mar. 20, 2024.

[69] Plaintiff's Reply Memorandum in Further Support of Renewed Motion for Partial Summary Judgment ("Guarantor's Reply"), ECF No. 227, filed April 3, 2024; Defendant's Reply in Further Support of Its Motion for Summary Judgment ("Lender's Reply"), ECF No. 228, filed April 3, 2024.

[70] Fed. R. Civ. P. 56(a).

forth specific facts showing that there is a genuine issue for trial.'"[71] "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[72] "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim"[73]

The court must "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party."[74] However, "a nonmovant must provide significantly probative evidence that would support a verdict in [its] favor."[75] Summary judgment on a claim is "required if the party that bears the burden of proof at trial 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"[76]

When parties file cross motions for summary judgment, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[77] "[S]o long as sufficient evidence could lead a rational trier of fact to resolve the dispute in favor of either party, granting either party's dueling motions for summary judgment would be inappropriate."[78] "Cross

---

[71] *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 107 F.4th 1121, 1131 (10th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

[72] *Lazy S Ranch Properties, LLC v. Valero Terminaling & Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[73] *Id.*

[74] *Cronick v. Pryor*, 99 F.4th 1262, 1267 (10th Cir. 2024) (quoting *Simpson v. Little*, 16 F.4th 1353, 1360 (10th Cir. 2021)).

[75] *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250 (1986)).

[76] *ClearOne, Inc. v. PathPartner Tech., Inc.*, No. 218CV00427JNPJCB, 2022 WL 1063733, at *3 (D. Utah 2022) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[77] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (*quoting James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

[78] *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1215 (10th Cir. 2009) (citing *Liberty Lobby*, 477 U.S. at 248)).

motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[79]

## DISCUSSION

Guarantor moves for summary judgment on its declaratory relief and breach of the implied covenant of good faith and fair dealing claims, as well as Lender's claim that it breached the Guaranty Agreement. Lender moves for summary judgment on both of its breach of contract counterclaims and Guarantor's breach of the implied covenant and fraud claims. The contracts central to this dispute select New York law to govern their enforcement,[80] therefore the court applies New York's substantive law.[81]

### I.      Guarantor's Claims

Guarantor moves for summary judgment on its claims for declaratory relief and breach of the implied covenant of good faith and fair dealing. Lender moves for summary judgment on Guarantor's implied covenant and fraud claims.

To support its motion for summary judgment, Guarantor repeatedly claims that the court has already held that the Loan Agreement is ambiguous. Guarantor maintains that the court found the Agreement was ambiguous when it denied Lender's motion to dismiss, asserting that:

---

[79] *Direxa Eng'g, LLC v. U.S. Citizenship & Immigr. Servs.*, 557 F. Supp. 3d 1144, 1149 (D. Colo. 2021) (citing *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).
[80] Equity Requirement Guarantee 5; Loan Agreement 66–67; Waiver and Release Agreement 3.
[81] *See Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 470, 45 N.E.3d 917, 919 (2015) ("We begin with the basic premises that courts will generally enforce choice-of-law clauses and that contracts should be interpreted so as to effectuate the parties' intent.")

- The court "found that the Equity Requirement Guaranty and Loan Agreement were ambiguous as to 'when' contribution of the Borrower's Equity Requirement is required" and denied the Lender's motion to allow discovery of parol evidence.[82]

- The record of the Motion to Dismiss "made clear that the Court found the Equity Requirement Guaranty and the Loan Agreement to be ambiguous and denied Defendant's Motion to Dismiss to allow the parties to conduct discovery of parol evidence necessary to understand when, under the Loan Agreement, the parties understood contribution of the Borrower's Equity Requirement would be required."[83]

- "[T]he Court found the Equity Requirement Guaranty was ambiguous, denied Defendant's Motion to Dismiss, and allowed the parties to conduct discovery of parol evidence to better understand the parties' intent."[84]

Despite Guarantor's repeated assertions, neither the order denying Lender's motion to dismiss nor the hearing on the motion establish that the Loan Agreement is ambiguous. At the hearing, Guarantor's counsel could not clearly identify the relationship between Guarantor and Borrower, stating that Borrower "may be a child, it may be a grandchild."[85] The presiding judge at that time, Judge Jenkins, responded that the parties needed to clarify the corporate structure of the parties involved, stating that "[w]e need to know who the players are" and that they needed "to know who's involved."[86] Although Guarantor's counsel asserted that discovery was

---

[82] Guarantor's MSJ 6–7.
[83] Guarantor's Opp. 78 (internal citations and italics removed).
[84] Guarantor's Reply 3 (internal citations omitted).
[85] MTD Hearing Transcript 58:6–8.
[86] MTD Hearing Transcript 58:14; 59:2.

necessary to interpret the allegedly ambiguous Loan Agreement, Judge Jenkins never agreed with counsel on this point or made any orders to that effect.[87]

Judge Jenkins asked Lender's counsel questions about when funds for the project were due, to which Lender's counsel answered that the "funds are due as construction progresses."[88] Judge Jenkins then asked if there were specific dates where the loan was balanced, to which Lender's counsel responded that there had been requests for balancing the loan in the last year.[89] Later in the hearing, Judge Jenkins acknowledged Lender's contention that it is not unusual to have a balancing requirement in a construction loan.[90] Before concluding the hearing, Judge Jenkins stated that

> As to the balance, it's an interesting case. It needs some cleanup features. But I think at this point I'm going to deny the motion, ask that an answer be filed. I do that in part because of what's basically a need for folks to appear in court to talk about matters of some [degree] of complexity. And I'm going to ask counsel for plaintiff to prepare and submit a fairly simple order in reference to the orders that I've made today in this matter in reference to Grand Canyon, denied in part, granted in part as indicated.[91]

The court's order reflected this statement, denying Lender's Motion to Dismiss without finding the agreement was too ambiguous to be enforced or ordering any particular discovery.[92]

---

[87] MTD Hearing Transcript 27:9–13 (Mr. Young states that "unless the Court finds my client's interpretation of the loan agreement to be manifestly unreasonable, then the most the Court can conclude today is that the documents are ambiguous, which invites discovery on the parties' parole evidence for presentation to the fact finder at trial.")
[88] *Id.* at 47:16–21.
[89] *Id.* at 49:4–14.
[90] *Id.* at 54:10–18 (Mr. Bressi: "That was the whole premise of making this construction loan, that there would be construction, that there would be a project, and the teeth to make sure that if our proceeds were not enough or otherwise there wasn't enough to complete the project was this equity requirement. And it's not unusual to have a balancing requirement in a construction loan." The Court: "Sometimes they even call it proportions." Mr. Bressi: "Perhaps, but not in this transaction.")
[91] *Id.* at 62:23–25.
[92] Order Granting in Part, Denying in Part, Defendants' Motions to Dismiss and Request for Judicial Notice 2.

Therefore, the court has not previously found the Guaranty and Loan Agreements are ambiguous, and Guarantor's arguments based on the court's prior orders fail.[93]

### a.   Breach of the Implied Covenant of Good Faith and Fair Dealing

Guarantor claims that Lender violated the implied covenant of good faith and fair dealing by failing to inform it that EB-5 fundraising had "dried up."[94] Guarantor argues the Loan Agreement obligated Lender to give notice if it would not be able to raise the full $120,000,000. Guarantor alleges that Lender knew in September 2017 that it would not be able to fundraise this amount, as shown by Mr. Tang's email stating that "[e]veryone is doing very little EB-5 in China these days."[95] Guarantor argues that Lender did not notify it about these fundraising difficulties until January 2020, when Mr. Yuan sent an email stating that "[g]iven the loss of TEA designation, there will be no more new EB-5 funds."[96]

Guarantor alleges that if Lender had informed it sooner that the EB-5 market had slowed down it would have been able to pursue other financing for the Project.[97] Guarantor also asserts that Lender's failure to notify it of fundraising difficulties was the first material breach of the

---

[93] And even if the predecessor judge had so ruled on the motion to dismiss, the ruling would not bind the court. As a general matter, the court is free to correct a non-final ruling at any time. The denial of the motion to dismiss allowed the case to proceed, nothing more.

[94] Guarantor's MSJ 32. Guarantor's motion for summary judgment argues different grounds for breach of the implied covenant than alleged in its complaint. *See* Complaint 20–22 (Alleging Lender breached the implied covenant "by exercising that purported discretion to claim a deficiency in the Borrower Equity Requirement and thereafter demanding Plaintiff to pay the same, but only after inducing Plaintiff and the Borrower to repudiate the term sheet with AIG and then to secure Kobe Bryant's attendance at an event to help Defendants secure funds for other projects"). Lender has not argued that it has been prejudiced by this change. *See* Lender's Opp. 37–38 ("Plaintiff raises this theory for the first time, as the implied covenant claim pled in its complaint concerned Defendant's 'purported discretion to claim a deficiency' deposit. In any event, Plaintiff's newly minted theory fails for a host of reasons.") Accordingly, the court evaluates Guarantor's motion based on the arguments it puts forth in the motion. *See* Fed. R. Civ. P. 15 (a)(2); *see also Van Alstyne v. Ackerley Grp., Inc.*, 8 F. App'x 147, 154 (2d Cir. 2001) ("The function of the pleadings is to give opposing parties notice of the facts on which the pleader will rely, and, in the absence of prejudice to the opposing party, the court may allow the pleadings to be amended").

[95] Emails RE: Summit Loan, ECF No. 209-49, filed Feb. 21, 2024.

[96] Emails re TEA Status, ECF No. 131-27, filed May 5, 2023.

[97] Guarantor's MSJ 33–34.

agreements, so Lender cannot enforce the Guaranty Agreement. Lender argues that Guarantor knew it was uncertain whether it would be able to secure the full amount of EB-5 funding, so it has not breached the agreements.[98] Lender also argues that the Loan and Guaranty Agreements did not require Lender to inform either Borrower or Guarantor that it was unable to fundraise the full $120 million.[99]

"Under New York law, when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party. A breach is material when it 'substantially defeats the purpose of that contract.'"[100] "[A]ll contracts imply a covenant of good faith and fair dealing in the course of performance."[101] "Broadly stated, the implied covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[102] The "party who asserts the existence of an implied-in-fact covenant bears a heavy burden to prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole."[103] "The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties

---

[98] Lender's Opp. 37–40.
[99] *Id.* at 39.
[100] *Nadeau v. Equity Residential Properties Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) (quoting *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997)); *see also Bear, Stearns Funding, Inc. v. Interface Grp-Nevada, Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (citations omitted).
[101] *Singh v. City of New York*, 40 N.Y.3d 138, 145, 217 N.E.3d 1, 5 (2023) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500 (2002)).
[102] *Id.* at 145–146 (internal quotations omitted).
[103] *Id.* at 146 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69, 385 N.E.2d 566, 569 (1978)) (cleaned up).

represented by counsel."[104] If there are triable issues of fact pertaining to the agreement between the parties, summary judgment is inappropriate.[105]

Guarantor's claim centers on Section 3.4 of the Loan Agreement (the "Senior Loans Provision"), which states that Borrower shall have the right to obtain senior loans "if Lender notifies Borrower in writing that the aggregate amount of the Advances is reasonably expected by Lender to be less than $120,000,000."[106] Guarantor argues Lender failed to give timely notice to Borrower under this provision, depriving Guarantor of the benefits of their contract.[107] This argument fails for two reasons.

First, Guarantor is not a party to the Loan Agreement. The Senior Loan Provision gives Borrower the option to seek additional senior funding upon notification from Lender. This is a benefit to Borrower, and Guarantor has not explained how it can enforce this separate entity's contractual rights. Indeed, the Loan Agreement itself seemingly precludes this, stating the "terms and provisions of this Loan Agreement are for the benefit of the parties hereto and, except as herein specifically provided, no other Person shall have any right or cause of action on account thereof."[108] Moreover, the Agreement does not explicitly require Lender to notify any Summit Entity that it does not expect to raise $120,000,000. The Senior Loan Provision gives Borrower the option to seek additional senior financing if Lender gives a notification without stating that Lender must give this notice.

---

[104] *D & L Holdings, LLC v. RCG Goldman Co., LLC*, 287 A.D.2d 65, 73, 734 N.Y.S.2d 25, 31 (2001).
[105] *See Seidler v. Knopf*, 186 A.D.3d 889, 891, 130 N.Y.S.3d 37, 39 (2020).
[106] Loan Agreement 36.
[107] Pl. MSJ 34–35.
[108] Loan Agreement 66, 9.14 Third Parties; Benefit.

Second, Guarantor has not demonstrated notice from Lender is implicitly required by the Guaranty Agreement. This agreement guarantees to Lender that Borrower's Equity Requirement will be paid as required under the Loan Agreement. The Guarantee Agreement says nothing about Lender providing any notice, and it explicitly states that it "contains the entire agreement of the parties with respect to the subject matter hereof."[109] Notice from Lender that it would not be able to raise $120,000,000 is not essential to Guarantor's performance under the agreement, and Guarantor has not shown that it has not received its expected benefits under the Guaranty Agreement without this implied notice requirement.

Guarantor argues that delayed notice deprived it of the material benefit it expected to receive as Borrower's "affiliate entity."[110] But Guarantor has not shown that it can enforce Borrower's contracts or that any benefit to this separate company was essential to it entering into the Guaranty Agreement. Guarantor claims that it should have been selling the real estate it owns in the area surrounding the Project and that it is unable to make these sales because Lender did not provide timely notice.[111] If this was the benefit Guarantor sought by entering the Guarantee Agreement, and it could not obtain this benefit without a notice requirement on Lenders, Guarantor has not explained why it did not obtain a provision to that effect in the contract itself. Accordingly, the motion for summary judgment on this claim fails.

For these reasons, Guarantor's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law. Guarantor has failed to establish that a notice requirement is implicit in the Guaranty Agreement and that it could not realize the benefits of this contract

---

[109] Amended and Restated Guaranty Agreement 4, Section 11 Entire Agreement; Amendments.
[110] Guarantor's MSJ 35.
[111] *Id.*

16

without this absent term. Accordingly, Lender is granted summary judgment on Guarantor's implied covenant claim.

>   **b.    Fraud**

In its next claim, Guarantor asserts that Lender fraudulently induced it to repudiate the term sheet with its previous EB-5 fundraiser, AIG, and misrepresented its own capability to secure EB-5 investors.[112] Lender argues it is entitled to summary judgment on the fraud claim because it is barred by the parties' agreements, barred by equitable estoppel, and contrary to Mr. Mauro's statements.[113] Guarantor did not move for summary judgment on its fraud claim.

"The elements of a fraud cause of action consist of a misrepresentation or material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."[114] The party alleging fraud must "state with particularity the circumstances constituting fraud or mistake."[115] Plaintiffs must allege facts that give rise to "a strong inference of fraudulent intent" which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[116] "A present expression of the intent to perform a future act is actionable as fraud

---

[112] Complaint 22. The Complaint alleges that Lender and Does 1 through 10 committed fraud. *Id.* at 2. Guarantor has not served any Doe Defendants and neither party refers to these unserved Doe Defendants in their briefing. Accordingly, the court addresses the fraud claim only insofar as it concerns Defendant Summit Village Development Lender 1, LLC.

[113] Lender's MSJ 25–32.

[114] *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 827, 59 N.E.3d 485, 491 (2016) (cleaned up) (citing *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 944 N.E.2d 1104, 1107 (2011)).

[115] Fed. R. Civ. P. 9(b).

[116] *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)) (also quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

only if 'actually made with a preconceived and undisclosed intention of not performing it.'"[117] "Promises of future performance, alone, are insufficient to sustain a claim of fraud and the mere fact that the expected performance was not realized is insufficient to demonstrate that the promisor falsely stated its intentions."[118]

Lender argues that Guarantor agreed to waive any possible fraud claims in the Waiver and Release Agreement.[119] "Under New York law. . . a valid release constitutes a complete bar to an action on a claim which is the subject of the release."[120] "Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release 'shifts the burden of going forward. . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release.'"[121]

The Release clause in the Waiver and Release Agreement states:

In consideration of Lender's willingness to execute the AIG Waiver, SMHG and Development, on behalf of the SMHG Parties, hereby waive, release and forever discharge and hold harmless Lender, KT, Cottonwood, Goldstone and Henry, each of their owners, general or limited partners, directors, shareholders, employees, officers, successors, executors, assigns, affiliated parent and subsidiary companies, agents and contractors, or any other individuals or entities claiming by or through any of them (collectively, the "EB-5 Lender Released Parties"), from and against any and all manner of claims, liabilities, demands, actions, causes of action, debts, accounts, bonds, covenants, agreements, liens, judgments and/or suits, whether known or unknown, suspected or unsuspected, which the SMHG Parties had, have, may have, may have had, or may in the future have against the EB-5 Lender Released Parties, or any of them, which arise out of, are connected with, or relate in any way to the AIG LOI, the KT LOI, the AIG Fee, the Project, the Loan and/or the Loan Agreement (but excluding any claims under this

---

[117] *Tanzman v. La Pietra*, 8 A.D.3d 706, 708, 778 N.Y.S.2d 199, 201 (2004) (quoting *Sabo v. Delman*, 3 N.Y.2d 155, 160, 143 N.E.2d 906, 908 (1957)).

[118] *Dowlings, Inc. v. Homestead Dairies, Inc.*, 88 A.D.3d 1226, 1229, 932 N.Y.S.2d 192, 196 (2011) (cleaned up) (quoting *Moon v. Clear Channel Commc'ns, Inc.*, 307 A.D.2d 628, 631, 763 N.Y.S.2d 157, 160 (2003)) (also quoting *Edelman v. Buchanan*, 234 A.D.2d 675, 676, 650 N.Y.S.2d 874, 876 (1996)).

[119] Waiver and Release Agreement, ECF No. 210-12, filed Feb. 21, 2024.

[120] *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 76 A.D.3d 310, 328, 901 N.Y.S.2d 618, 632 (2010) (Catterson, J., dissenting)).

[121] *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (*quoting Fleming v. Ponziani*, 24 N.Y.2d 105, 111, 247 N.E.2d 114, 118 (1969)).

Agreement) (the "Released Claims"). SMHG and Development, on behalf of themselves and each of the SMHG Parties, hereby further unconditionally and irrevocably undertake not to, and shall cause their affiliates not to, make any claim, demand, right of action or counterclaim or bring any action, legal proceedings or claim in any jurisdiction, whether now or in the future, against any of the EB-5 Lender Released Parties in respect of the Released Claims or any part thereof.[122]

This language clearly and unambiguously releases Lender from any claims related to the AIG Letter of Intent or AIG Fees. Guarantor offers three arguments in an effort to circumvent this plain language. First, Guarantor argues that Lender cannot rely on the Waiver and Release Agreement because the court previously rejected this argument in the Order on Lender's motion to dismiss.[123] However, as discussed above, denying Lender's motion to dismiss was not a conclusive rejection of these arguments. The court did not make any findings on the validity or enforceability of the Waiver and Release Agreement when it denied Lender's motion.[124] Lender has not forfeited these arguments by unsuccessfully bringing them in its motion to dismiss and may reassert them now in its motion for summary judgment.

Second, Guarantor argues that releases bar suits on causes of action arising on or prior to the date of their execution, not after, so the Waiver and Release Agreement does not apply.[125] But the language of the agreement regarding timing does not support Guarantor's argument. It covers all non-Agreement claims Guarantor "had, have, may have, may have had, or may in the future have" that "relate in any way" to the "AIG LOI, the KT LOI, the AIG Fee, the Project, [and] the Loan." Additionally, the fraudulent actions Guarantor alleges Lender took—inducing Guarantor to stop working with AIG and instead partner with it—happened prior to the execution of the

---

[122] Waiver and Release Agreement, ECF No. 210-12, filed Feb. 21, 2024.
[123] Guarantor's Opp. 51.
[124] Order Granting in Part, Denying in Part, Defendants' Motions to Dismiss and Request for Judicial Notice, ECF No. 28, filed Nov. 15, 2021.
[125] Guarantor's Opp. 51.

Waiver and Release Agreement. This agreement was effective as of June 20, 2016, months after Guarantor had agreed to work with Lender instead of AIG. Therefore, Guarantor's timing argument fails.

Finally, Guarantor argues Lender was not honest about its ability or intention to fundraise for the Project.[126] But Guarantor has not introduced any facts showing that Lender knew it would be unable to raise the full $120 million at the time the Loan Agreement was executed. Guarantor argues that it can prove Lender committed fraud because four entities related to Lender including KT Capital, Celona, Cottonwood, and Henry Global were able to raise funds for a different project at the same time the Project was seeking EB-5 investors.[127] But this does not show Lender misrepresented its intention or ability to raise funds for the Project when the Loan Agreement was executed. The other entities' engagement in other projects does not establish that Lender misrepresented its intent to raise EB-5 funds or made any false statements. Accordingly, Guarantor has failed to dispute the material facts put forth by Lender on the fraud claim, and summary judgment for Lender on Guarantor's fraud claim is granted.

### c.   Declaratory Judgment

Guarantor styles its first two causes of action as declaratory relief on its obligations under the Equity Requirement Guaranty. It argues that it is entitled to summary judgment because the parties understood the Borrower's Equity Requirement would be contributed in proportion to EB-5 loan proceeds and because Lender breached the implied covenant of good faith and fair

---

[126] Guarantor's Opp. 104.
[127] *Id.* at 4, 106.

dealing.[128] However, "the operation of the Declaratory Judgment Act is procedural only."[129] The Act "enlarged the range of remedies available in the federal courts" but did not create new causes of action.[130] The availability of declaratory relief presupposes the existence of a judicially remediable right; if the party's "substantive claims have failed, [its] request for declaratory relief in relation to those claims is not viable."[131]

Guarantor's declaratory relief causes of action assert remedies it is seeking, not independent claims. Guarantor has not demonstrated that it is entitled to summary judgment on its claims or, as discussed below, Lender's counterclaims. Therefore, the request for summary judgment in the form of declaratory relief is denied.

## II. Lender's Claims

Lender moves for summary judgment on both of its breach of contract counterclaims. Guarantor requests summary judgment on Lender's first claim for breach of the Guaranty Agreement.

---

[128] Guarantor's MSJ 24–25.

[129] *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937).

[130] *Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667, 671 (1950).

[131] *Long v. Wells Fargo Bank, N.A*., 670 F. App'x 670, 671 (10th Cir. 2016) (citations omitted). Guarantor's second cause of action seeks declaratory relief under the Utah Declaratory Judgment Act. *See* Complaint 19. However, requests for declaratory relief made in federal court are governed by the federal statute, not state procedural law. *See Farmers All. Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir. 1978) ("It is well recognized that the [Declaratory Judgment] Act involves procedural remedies and not substantive rights."); *Cohen Braffits Ests. Dev., LLC v. Shae Fin. Grp., LLC*, No. 4:23-CV-00031-RJS-PK, 2023 WL 8574898, at *16 (D. Utah 2023) ("Plaintiffs cited the Utah Declaratory Judgment Act, but requests for declaratory relief in federal court are governed by the federal Declaratory Judgment Act and accompanying caselaw."); *Young v. Hartford Cas. Ins. Co*., 503 F. Supp. 3d 1125, 1238 (D.N.M. 2020) (under *Erie* doctrine, federal courts must apply state substantive law, but assess Declaratory Judgment claim under federal Declaratory Judgment Act.).

### a. Breach of Guaranty Agreement

Lender's first counterclaim asserts that Guarantor breached the Guaranty Agreement.[132] Lender argues it is entitled to summary judgment because Guarantor failed to contribute the entirety of the Borrower's Equity Requirement, $87,192,584, as required under the Guaranty Agreement.[133] Guarantor argues it is entitled to summary judgment on this claim because the Loan Agreement is ambiguous, parol evidence supports its view that the Loan Agreement requires pro rata contributions by the Lender and Summit Entities, and that Lender did not act in good faith.[134]

"The essential elements for pleading a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach."[135] "When parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms."[136] "This rule is especially important in commercial transactions negotiated between sophisticated parties" because "commercial certainty is a paramount concern" and the contract has been negotiated at arm's length.[137]

"Clear, unambiguous contractual terms must be enforced according to their plain meaning; when the terms are clear and unambiguous, the court cannot look beyond the four

---

[132] Answer and Counterclaim 36–37.
[133] Lender's MSJ 19.
[134] Guarantor's Opp. 83.
[135] *Dee v. Rakower*, 112 A.D.3d 204, 208–209, 976 N.Y.S.2d 470, 474 (2013) (citations omitted).
[136] *Loughlin v. Meghji*, 186 A.D.3d 1633, 1639, 132 N.Y.S.3d 65, 73 (2020) (citing *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (2004)).
[137] *White Plains Plaza Realty, LLC v. Town Sports Int'l, LLC*, 79 A.D.3d 1025, 1028, 914 N.Y.S.2d 222, 225 (2010); *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548, 658 N.E.2d 715, 717 (1995) (internal citations omitted).

corners of the contract."[138] "The proper inquiry in determining whether a contract is ambiguous is 'whether the agreement on its face is reasonably susceptible of more than one interpretation.'"[139] "To be entitled to summary judgment, the moving party has the burden of establishing that its construction of the agreement 'is the only construction which can fairly be placed thereon.'"[140] If a contract is ambiguous and "the extrinsic evidence presents a question of credibility or a choice among reasonable inferences, the case should not be resolved by way of summary judgment."[141]

Eight provisions in the Loan Agreement are of particular importance in determining whether the contract is ambiguous in establishing the parties' rights and obligations:

- "Borrower's Equity Requirement" is defined as Borrower's "obligation to contribute equity to the Project of not less than [$87,192,584], or such greater amount as is required to cause the loan to be 'in balance'" as required by Section 5.17.[142]

- Section 2.1 states that Lender agrees to lend to the Borrower, disbursed in incremental advances, an amount "not to exceed the principal amount of [$120,000,000.]"[143] It further provides that "Lender shall have no obligation to make any Advance to the extent that EB-5 Capital then deposited in the Lender's Deposit Account is not sufficient to fund the requested Advance."[144]

---

[138] *B.D. v. E.D.*, 218 A.D.3d 9, 14, 194 N.Y.S.3d 8, 13 (2023) (citations omitted).
[139] *Arrow Commc'n Lab'ys, Inc. v. Pico Prod., Inc.*, 206 A.D.2d 922, 922–23, 615 N.Y.S.2d 187, 188 (1994) (quoting *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 489 N.E.2d 231, 233 (1986)).
[140] *Jellinick v. Joseph J. Naples & Assocs., Inc.*, 296 A.D.2d 75, 79, 744 N.Y.S.2d 610, 613 (2002) (quoting *Lipari v. Maines Paper & Food Serv., Inc.*, 245 A.D.2d 1085, 1085, 667 N.Y.S.2d 548, 549 (1997)).
[141] *Mohawk Valley Water Auth. v. State*, 159 A.D.3d 1548, 1550, 74 N.Y.S.3d 430, 432 (2018) (quoting *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 77, 430 N.Y.S.2d 179, 184 (1980)).
[142] Loan Agreement 4.
[143] *Id.* at 19–20.
[144] *Id.* at 20.

- Section 2.4, Advance of Loan Proceeds, states that advances on the loan will be made to the Borrower upon the submission of a Draw Package.[145]

- Section 2.4.5, Loan in Balance, states that following a requested Advance, the Loan shall be "in balance."[146]

- Section 5.17.1, Deposits to Balance Loan, states that "the Loan shall at all times be 'in balance' on (a) an individual Budget line item basis, and (b) an aggregate Budget amount basis. The Loan shall be deemed to be 'in balance' on an individual Budget line item basis only at such time (and from time to time) as the unexpended amount for each Budget line item. . . is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete such Budget line item. The Loan shall be deemed to be 'in balance' on an aggregate Budget amount basis only at such time (and from time to time) as the aggregate of the unexpended amounts for all individual Budget line items (including the contingency) is sufficient to pay all outstanding amounts for the completed work done and to pay for any work to be done to complete the Project." [147]

- Section 5.17.2 goes on to provide that the Lender shall have the right, no more than once per month, to make a reasonable estimate of the cost of construction.[148]

---

[145] *Id.* at 24–25.
[146] *Id.* at 27.
[147] *Id.* at 47–48.
[148] *Id.* at 48.

- In Section 5.17.3, Borrower agrees that if the Lender determines "in its reasonable good faith judgment" that the Loan is not "in balance" then Borrower shall, within 10 business days, deposit the amount of the deficiency to ensure the loan remains balanced.

- Section 5.17.4 states that "For the purposes of ensuring that the Loan is 'in balance' as required by subsection 5.17.1, Borrower and/or Guarantor. . . shall provide reasonable evidence satisfactory to Lender in its sole discretion of [sources of] financing. . . confirming in sufficient detail the specified amount and terms of the funds that will be available on a timely basis in order to complete the construction of the Improvements on the Mortgaged Property in accordance with the Budget, the Plans and Specifications and the Schedule ("Commitment Financing Amount"). So long as (i) the Commitment Financing Amount remains available to be drawn by Borrower as and when needed to fund costs of the Improvements, and (ii) no Event of Default has occurred and is continuing, Borrower shall not be required to make a Deficiency Deposit under Section 5.17.4 with respect to the Commitment Financing Amount."[149]

Reading these provisions together and considering the Loan Agreement as a whole, the contract appears unambiguous. Borrower and Lender agreed the Project needed to remain on budget and that they would need to have sufficient deposits to pay for expenses every time a new draw package was submitted. If Lender did not have sufficient EB-5 investments to cover these expenses, Guarantor promised that it would deposit the necessary funds to cover this shortfall. Guarantor represented that it would contribute no less than $87,192,584 to the Project, while Lender agreed to loan at most $120,000,000, both making contributions as needed to keep the

---

[149] *Id.* at 48–49.

loan in balance as construction on the Project continued. Finding no ambiguity, the court looks only to the terms agreed to in the document itself and does not consider the parol evidence offered by the parties.

Lender does not sufficiently support its proposed interpretation of the Agreement. Lender argues that because the Borrower fell short of the minimum Borrower's Equity Requirement by $51,262,357 and is now in default, Guarantor is obligated to pay this entire shortfall amount to Lender.[150] However, the Loan and Guarantee Agreements do not impose this obligation on Guarantor.

The Guarantee Agreement ensures payment of the "Borrower's Equity Requirement, as and when required under the Loan Agreement."[151] The Borrower's Equity Requirement is defined in the Loan Agreement as the obligation to contribute "not less than" $87,192,584 "or such greater amount as is required to cause the loan to be 'in balance' pursuant to Section 5.17."[152] The Loan is "in balance" when deposits are sufficient to cover individual budget line items and the project as a whole,[153] and the budget must be in balance after each draw package.[154] Lender argues that Section 5.17.4 requires Guarantor to deposit the remaining amount of the minimum Borrower's Equity Requirement upon default. But that section requires Guarantor to have deposits available to ensure the Loan remains in balance.[155] Indeed, that section, like all of the Section 5.17 sections, requires "Deposits to Balance Loan." Therefore,

---

[150] Lender's MSJ 19–20.
[151] Guaranty Agreement 1.
[152] Loan Agreement 4.
[153] *Id.* at 47.
[154] *Id.* at 27.
[155] *Id.* at 48–49.

they require the Borrower or the Guarantor to make deposits sufficient to keep the loan in balance.

And the parties dispute whether the loan is in balance. Lender's Notice of Default claims the loan is out of balance.[156] However, the record suggests Borrower has not submitted a draw request since January 2020.[157] Budget spreadsheets submitted by Lender seemingly show that the previous disbursements were sufficient to cover payments for each line item and the Project as a whole as of the date of the last draw package, which appears to put the Project's budget in balance.[158] Based on these facts, a reasonable jury could determine the loan is in balance. Therefore, there are disputed material facts on whether the loan is in balance, and summary judgment for Lender is denied on their first breach of contract claim.[159]

Guarantor has also failed to show it is entitled to summary judgment on Lender's first counterclaim. Guarantor claims it should receive summary judgment because the Guaranty Agreement is contrary to the public policy of the EB-5 program. Guarantor argues it has no obligation to the Lenders under the Equity Requirement Guaranty because EB-5 funding must be "at risk" and therefore does not need to be repaid.[160] Lender responds that this assertion is contrary to the Guaranty Agreement, which states that obligations will be paid regardless of any law or regulation.[161]

---

[156] Answer and Counterclaim 36–37; Lender's MSJ 22–23; Default Notice 2; Guarantor's MSJ 30 (stating that "the loan consistently remained in debt-to-equity balance").
[157] Email indicating Total Amount of Draws, ECF No. 210-20, filed Feb. 21, 2024.
[158] *Id.*, *see also* Exhibit 28, ECF No. 210-29, filed Feb. 21, 2024.
[159] Lender also claims Guarantor owes it default interest, management fees, and attorney fees as provided in the Guaranty Agreement. *See* Lender's MSJ 20. Like with Guarantor's declaratory judgment claims, the court will not grant summary judgment on proposed remedies.
[160] Guarantor's MSJ 31.
[161] Lender's Opp. 37, fn. 10; Guaranty Agreement 2.

Under New York law, contractual provisions are "unenforceable where the public policy in favor of freedom of contract is overridden by another weighty and countervailing public policy."[162] "Only a limited group of public policy interests has been identified as sufficiently fundamental to outweigh the public policy favoring freedom of contract."[163] The court's "usual and most important function is to enforce contracts rather than invalidate them on the pretext of public policy unless they clearly contravene public right or the public welfare."[164]

Federal regulations require that EB-5 investors place "the required amount of capital at risk for the purpose of generating a return."[165] To be at risk, the investor "must show actual commitment of capital" as opposed to evidence of "mere intent to invest, or of prospective investment arrangements entailing no present commitment."[166] Guarantor does not explain why the at risk requirement is a weighty public policy that outweighs the court's obligation to enforce the Guaranty Agreement. There is no indication that the regulation's at risk requirement is so fundamental that it cannot be waived by sophisticated parties as part of a complex financing agreement. Guarantor also fails to explain how EB-5 funding requirements would free it of its obligations to pay loan fees due to Lender. Accordingly, Guarantor is not entitled to summary judgment on the grounds that the agreements violate public policy.

---

[162] *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 360, 128 N.E.3d 128, 133 (2019) (citations omitted).
[163] *Id.*
[164] *Id.* (cleaned up) (quoting *Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 679, 358 N.E.2d 258, 261 (1976)).
[165] 8 C.F.R. § 204.6(j)(2); *In Re Izummi*, 22 I. & N. Dec. 169, 181 (BIA 1998) (Board of Immigrations Appeals decision stating that petitioner's investment "cannot be said to be at risk because it is guaranteed to be returned, regardless of the success or failure of the business.")
[166] *Tingzi Wang v. United States Citizenship & Immigr. Servs.*, 375 F. Supp. 3d 22, 27 (D.D.C. 2019) (quoting 8 C.F.R. § 204.6(j)(2)).

28

Finally, Guarantor argues it is entitled to judgment as a matter of law because Lender first breached the Loan Agreement's implied covenant of good faith and fair dealing.[167] However, as discussed above, Guarantor failed to show that there is genuine issue of material fact on this issue. Accordingly, summary judgment is denied for both parties on Lender's first counterclaim.

### b. Breach of Release Agreements

In its second breach of contract counterclaim, Lender alleges Guarantor violated the Third Amendment to the Loan Agreement ("Third Amendment"), Pre-Negotiation Agreement, and Lot 108 Release Agreements by filing this lawsuit.[168] It argues that in these agreements, Guarantor represented that the Loan Agreement and Guaranty Agreement were enforceable and that it had no offsets, claims, or defenses based on the Agreements.[169] Only Lender moves for summary judgment on this claim.

In the Third Amendment to the Loan Agreement, Borrower represented that there were "no offsets, counterclaims or defenses which may be asserted with respect to this Amendment, the Loan Agreement or any of the other Loan Documents."[170] In the Lot 108 Release Agreement, Borrower similarly represented that "there are no offsets, counterclaims or defenses which may be asserted with respect to this Agreement, the Loan Agreement or any of the other Loan Documents."[171] In the Pre-Negotiation Agreement, the "Borrower Parties," including Guarantor,

---

[167] Guarantor's MSJ 32.
[168] Answer and Counterclaim 38.
[169] *Id.*
[170] Third Amendment 5.
[171] Lot 108 Agreement, ECF No. 35-12, filed Dec. 6, 2021.

acknowledge that there were "no defaults by Lenders or its members. . . under or in connection with the Loan or any of the Loan Documents."[172]

"It is a general principle that only the parties to a contract are bound by its terms."[173] In New York, a parent corporation generally cannot be bound by the contract of its subsidiary.[174] However, a parent will be held liable as a party to its subsidiary's contract "if the parent manifests an intent to be bound by the contract" or "if the elements of piercing the corporate veil are present."[175] "Intent is inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if subsidiary is controlled by the parent for the parent's own purposes."[176]

Lender has not argued, much less identified evidence, that Guarantor manifested an intent to be bound by the Third Amendment or the Lot 108 Agreement or that elements of piercing the corporate veil are present. Although Lender argues that Guarantor induced it to continue to provide financing through these agreements, Lender does not explain how this inducement binds Guarantor to Borrower's contracts. Accordingly, only the Pre-Negotiation Agreement, to which Guarantor is a party, can be considered.

When a party "clearly and unambiguously" waives its right to bring claims based on an agreement, it may not later assert those claims.[177] "If the language of a release is clear and

---

[172] Pre-Negotiation Agreement. The Pre-Negotiation Agreement's Choice of Law term selects the law of New York to govern the agreement.
[173] *Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd*., 184 A.D.3d 116, 121, 124 N.Y.S.3d 346, 352 (2020) (citation omitted).
[174] *World Wide Packaging, LLC v. Cargo Cosms., LLC*, 193 A.D.3d 442, 144 N.Y.S.3d 41 (2021).
[175] *Id.*
[176] *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 239 A.D.2d 171, 172, 657 N.Y.S.2d 632, 633 (1997) (citations omitted).
[177] *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 363, 128 N.E.3d 128, 135 (2019) (lease provision waiving right to bring declaratory judgment action precluded plaintiff from commencing declaratory judgment suit); *see also Norman Realty & Constr. Corp. v. 151 E. 170th Lender LLC*, 162 N.Y.S.3d 925 (N.Y. Sup. Ct. 2022).

unambiguous, the signing of a release is. . . binding on the parties."[178] Release agreements in a pre-negotiation agreement are valid when "there is no ambiguity."[179]

Lender has not established that the Pre-Negotiation Agreement unambiguously prohibited Guarantor from filing the present action. In the Pre-Negotiation Agreement, Guarantor agreed that there are no defaults by Lender and that it is "presently unaware of any claims" it might hold against Lender.[180] Guarantor further agreed that it was not aware of claims that could be asserted "to reduce or eliminate all or any part of" its obligation under the Loan Documents.[181] Lender has not explained how this language unambiguously bars Guarantor's claims in this case. Guarantor stated that there were no defaults; it did not unambiguously give up its right to bring its claim for breach of the implied covenant of good faith and fair dealing. Therefore, Lender has not established the language of the Pre-Negotiation Agreement unambiguously entitles it to summary judgment on its second counterclaim.

Lender also argues that it is entitled to summary judgment because Guarantor's representations that it had no claims against Lender and no defenses to the Guaranty Agreement

---

(provision stating that plaintiff "has no defenses, counterclaims, offsets, cross-complaints or demands of any kind or nature whatsoever" barred unconscionability claims).

[178] *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276, 952 N.E.2d 995, 1000 (2011) (quoting *Booth v. 3669 Delaware, Inc.*, 92 N.Y.2d 934, 935, 703 N.E.2d 757, 758 (1998)) (internal quotation marks omitted).

[179] *Veneto Hotel & Casino, S.A. v. German Am. Cap. Corp.*, 160 A.D.3d 451, 452, 75 N.Y.S.3d 4, 5 (2018) (cause of action for breach of loan agreement barred by Pre-Negotiation Agreement, through which party unambiguously certified that it had no defense to payment or any offsets or claims under the loan agreement); *see also Orchard Hotel, LLC v. D.A.B. Grp., LLC*, 106 A.D.3d 628, 629, 966 N.Y.S.2d 395, 396 (2013) (breach of contract counterclaim barred by Estoppel Certificate in which party represented that it had no claims and no defenses to its obligations); *Wilshire Westwood Plaza LLC v. UBS Real Est. Sec., Inc.*, 94 A.D.3d 514, 515, 942 N.Y.S.2d 75, 76 (2012) (applying California law) (pre-negotiation agreement where borrower agreed to release lender "of and from all damage, loss, claims, demands, liabilities, obligations, actions and causes whatsoever that Borrower. . . may now have or claim" was enforceable).

[180] Pre-Negotiation Agreement 3.

[181] *Id.*

induced it to provide financing.[182] However, the Pre-Negotiation Agreement did not lead to Lender providing additional funding, as the Pre-Negotiation Agreement was executed after the final loan disbursement in January 2020. Lender has not established that the Pre-Negotiation Agreement unambiguously released it from Guarantor's claims, therefore, summary judgment on its second counterclaim is denied.

## ORDER

In sum, the court DENIES Guarantor's motion for summary judgment[183] and DENIES IN PART and GRANTS IN PART Lender's motion for summary judgment.[184]

- Guarantor is DENIED summary judgment on its breach of the implied covenant of good faith and fair dealing claim. Lender is GRANTED summary judgment on Guarantor's breach of the implied covenant of good faith and fair dealing claim.

- Lender is GRANTED summary judgment on Guarantor's fraud claim.

- Lender is DENIED summary judgment on its breach of the Guaranty Agreement claim. Guarantor is DENIED summary judgment on Lender's breach of the Guaranty Agreement claim.

- Lender is DENIED summary judgment on its breach of the Release Agreements claim.

---

[182] Lender's MSJ 24–25, fn. 2.
[183] ECF No. 207.
[184] ECF No. 210.

Signed November 27, 2024.


BY THE COURT

_____
David Barlow
United States District Judge